

```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
                SOUTHERN DISTRICT OF WEST VIRGINIA
 2                       AT CHARLESTON

 3

 4   * * * * * * * * * * * * * * * * * * * * * * *

 5   WILLIAM ALLEN MEANS,

 6              Plaintiff,

 7   vs.                             CIVIL ACTION
                                 NO. 2:20-cv-00561
 8   E.M. PETERSON, D. HARVEY,
     and THE CITY OF SOUTH
 9   CHARLESTON,

10              Defendants.

11   * * * * * * * * * * * * * * * * * * * * * * *

12

13

14        Deposition of David Harvey taken by the
     Plaintiff under the West Virginia Rules of Civil
15   Procedure in the above-entitled action, pursuant to
     notice, before Angela L. Curtis, a Certified Court
16   Reporter, at Pullin, Fowler, Flanagan, Brown & Poe, 901
     Quarrier Street, Charleston, West Virginia, on the 26th
17   day of April 2021.

18

19              REALTIME REPORTERS, LLC
                ANGELA L. CURTIS, CCR
20                  713 Lee Street
                 Charleston, WV  25301
21                  (304) 344-8463
                 realtimereporters.net

22

23

24
```



```
 1               APPEARANCES:

 2

 3   APPEARING FOR THE PLAINTIFF:

 4        Dante diTrapano, Esquire
          CALWELL LUCE DITRAPANO, PLLC
 5        500 Randolph Street
          Charleston, WV  25302

 6        W. Jesse Forbes, Esquire
          FORBES LAW OFFICES, PLLC
 7        1118 Kanawha Boulevard, East
          Charleston, WV  25301

 8

 9   APPEARING FOR THE DEFENDANTS:

10        Duane J. Ruggier, II, Esquire
          PULLIN, FOWLER, FLANAGAN, BROWN & POE, PLLC
11        James Mark Building
          901 Quarrier Street
12        Charleston, WV  25301

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1               EXAMINATION INDEX

 2   BY MR. FORBES . . . . . . . . . . . .  6

 3
```

```
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1                EXHIBIT INDEX

 2   Exhibit 1    Motion for Protective Order        8

 3   Exhibit 2    2015 Charleston Gazette Article   63

 4   Exhibit 3    Case Report                       67

 5   Exhibit 4    Pursuit Audio

 6   Exhibit 5    Pursuit Video, Part 1

 7   Exhibit 6    Pursuit Video, Part 2

 8   Exhibit 7    Use of Force Report              117

 9   Exhibit 8    Bystander Video

10   Exhibit 9    Crash Report                     131

11   Exhibit 10   Photograph                       132

12   Exhibit 11   Photograph                       133

13   Exhibit 12   Photograph                       136

14   Exhibit 13   Photograph                       137

15   Exhibit 14   Photograph                       138

16   Exhibit 15   Emergency Response & Vehicular
                  Pursuit Policy                   145
```

```
17
18
19
20
21
22
23
24
```

1  P R O C E E D I N G S
      VIDEO OPERATOR:  This is the videotaped
2  deposition of D. Harvey taken by the plaintiff in
3  the matter of William Allen Means versus E.M.
4  Peterson, et. al. being Civil Action Number
5  2:20-CV-00561 in the US District Court for the
6  Southern District of West Virginia at Charleston
7  held at the offices of Pullin, Fowler, Flanagan,
8  Brown & Poe in Charleston, West Virginia on this
9  26th day of April 2021.
10      My name is Chris Leigh and I'm the
11 certified legal video specialist.  The court reporter
12 is Angie Curtis.  We're now on the record.  The time is
13 approximately 9:05 a.m.  Would counsel please
14 introduce themselves and whom they represent?
15      MR. FORBES:  Jesse Forbes and Dante
16 diTrapano on behalf of Billy Means.
17      MR. RUGGIER:  Duane Ruggier on
18 behalf of the defendants.
19      VIDEO OPERATOR:  Would the court
20 reporter please swear in the witness?
21        D A V I D  H A R V E Y
22 was called as a witness by the Plaintiff, pursuant
23 to notice, and having been first duly sworn,
24 testified as follows:

1              EXAMINATION
2  BY MR. FORBES:
3      Q.   Would you state your name for the record
4  please?
5      A.   David Harvey.
6      Q.   And, Mr. Harvey, how are you employed?
7      A.   With the South Charleston Police Department.
8      Q.   I understand previously in this case just a
9  few weeks ago you filed a pleading indicating you may
10 have to take your Fifth Amendment rights.  Do you
11 understand you have the right to remain silent as we
12 sit here today?
13      A.   Correct.
14      Q.   You understand that by moving forward anything
15 you say could be used against you in any criminal
16 investigation?
17      A.   Correct.
18      Q.   Including investigations by the FBI?
19      A.   Correct.
20      Q.   Investigations by local law enforcement?
21      A.   Correct.
22      Q.   You understand there's no statute of
23 limitations in West Virginia for felony offenses?
24      A.   Correct.

1      Q.   Understanding all of that, are you wanting to
2  move forward and waive your Fifth Amendment right to
3  remain silent here today?
4      A.   Correct.
5      Q.   Are you doing that knowingly and
6  intelligently?
7      A.   Correct.
8      Q.   I'm going to hand you a document here.  We'll
9  make this Exhibit 1.
10          HARVEY DEPOSITION EXHIBIT NO. 1
11              (Motion For Protective
12              Order was marked for identification
13              purposes as Harvey Deposition Exhibit No.
14              1.)
15     Q.   You recognize that?
16     A.   Yes.
17     Q.   Okay.  What is it?
18     A.   It's defendants' emergency motion for
19 protective order and/or stay.
20     Q.   Okay.  And did you authorize your lawyer to
21 file this in this case?
22     A.   I don't know.  I mean, what do you mean
23 authorize?
24     Q.   I mean, had you seen it before it was filed?

1      A.   Not before it was filed.
2      Q.   Okay.  Did you know it was going to be filed.
3      A.   Yes.
4      Q.   Okay and you know that in this motion it
5  states that because your depositions were scheduled for
6  March 30th that "It was discovered that an FBI
7  investigation had been initiated into defendant
8  officers'," that's you; right?
9      A.   Uh-huh.
10     Q.   "conduct regarding the subject May 2nd, 2020
11 police pursuit and arrest."  Then it says "Due to the
12 FBI's investigation into the events of May 2nd, 2020,
13 defendants move the Court for a protective order or
14 stay of these depositions."
15     It goes on to say, on Page 4, Paragraph 11, that
16 "The defendants submit that they have conferred with
17 plaintiff to halt the depositions to no avail.  Without
18 a protective order and/or stay, defendants will likely
19 have to plead the Fifth at the depositions which may
20 result in an adverse inference instruction and, of
21 course, prejudice defendants."  At the time this was
22 filed on March 29th, '21, did you intend to take the
23 Fifth Amendment?
24          MR. RUGGIER:  I'm just going to object to

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.                                                    DAVID HARVEY
                                                                        04/26/2021

1  the entire line of questioning here and note -- please
2  note it on the record.  I don't think this is really a
3  discoverable part of the case.
4            This is -- I'm not sure what you're
5  looking for here, but this is not -- these are not
6  facts that are going to be presented to a jury.  I'm
7  not sure what you're looking for in questioning him on
8  this, on his decision to take the Fifth, not take the
9  Fifth.  I'll let it go for a little bit, but it's
10 just not --
11           MR. FORBES:  Well, if you want to
12 instruct him not to answer you can.  I'm concerned
13 about whether or not he understands the rights that
14 he's giving up and want to make sure it's clear on the
15 record that he does because he clearly filed a document
16 a few weeks ago saying he was going to take the Fifth
17 Amendment.
18     Q.   So why -- why did you say that?
19     A.   That would be something you'd have to ask my
20 attorney John Dascoli.
21     Q.   Is Mr. Dascoli not coming today?
22     A.   No.
23     Q.   Does Mr. Dascoli represent you criminally?
24     A.   Yes.

---

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.                                                    DAVID HARVEY
                                                                        04/26/2021

1      Q.   When did you hire him?
2      A.   Couple months ago.  I don't know exactly when.
3      Q.   Okay.  Let me ask you, before we continue with
4  that, how old are you?
5      A.   Twenty-nine.
6      Q.   How far did you go in school?
7      A.   Associate's degree.
8      Q.   From where?
9      A.   First it was Kanawha Valley Technical College,
10 now it's Bridge Valley and also another associate's
11 from  Mountwest.
12     Q.   What are your associate's degrees in?
13     A.   Criminal justice.
14     Q.   Both of them?
15     A.   I believe so.  The second one was associated
16 with the Police Academy, but it was criminal justice as
17 well.
18     Q.   Have you ever been deposed before?
19     A.   No.
20     Q.   Okay.  Let me give you just some basic rules
21 then we're going to kind of go back into what we're
22 talking about.  The court reporter is going to take
23 down everything that's said here today.  If you don't
24 understand something that I ask you, ask me to rephrase

---

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.                                                    DAVID HARVEY
                                                                        04/26/2021

1  it, ask me to -- tell me that you don't understand it
2  and I'll try to ask it in a different way, okay?
3      A.   Okay.
4      Q.   If you answer a question, I'm going to assume
5  you answered it because you do understand what the
6  question was and what the answer would be.  Is that
7  fair?
8      A.   Yes.
9      Q.   Are you under the influence of any
10 medications, drugs, alcohol or anything else that would
11 impact your ability to testify truthfully here today?
12     A.   No.
13     Q.   And we're doing a good job of it right now,
14 but I'm about the world's worst for this, for people
15 talking over one another, so let's try to let me finish
16 my question and then you answer the question, okay?
17     A.   Okay.
18     Q.   Now, back to Mr. Dascoli.  Why did you hire a
19 criminal lawyer?
20     A.   If there was an FBI investigation, that would
21 be the right thing to do.
22     Q.   When did you learn there was an FBI
23 investigation into this case?
24     A.   Just around the same time that I hired him.

---

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.                                                    DAVID HARVEY
                                                                        04/26/2021

1      Q.   Okay, so a few months ago?
2      A.   Yeah.
3      Q.   Can you give me a ballpark of what month it
4  might have been?
5      A.   February.
6      Q.   Okay.  So you knew there was an FBI
7  investigation into this case at least as early as
8  February of 2021?
9      A.   Best I can remember.
10     Q.   And I don't want to know about any specific
11 discussions with either your civil attorney here today
12 or your criminal lawyer, Mr. Dascoli, but let me ask
13 you this:  Did you pay Mr. Dascoli?
14     A.   I did not.
15     Q.   Okay.  How is it that he became your lawyer?
16 How did you retain him?
17     A.   How did I retain him?
18     Q.   Yeah, how he is being paid?
19     A.   By the Fraternal Order of Police Legal Defense
20 Fund.
21     Q.   Okay.  Is that like a fund that you're a
22 member of and it provides you a defense lawyer in
23 criminal cases?
24     A.   Yes.

1   Q.   How did you learn in February there was an FBI
2   investigation into this case?
3   A.   In February, again, this would be attorney
4   client privilege.
5   Q.   Okay.  I don't want -- I don't want to know
6   what your lawyer told you.
7        MR. RUGGIER:  If you learned of it -- if
8   you learned of something through your attorney, so your
9   attorney tells you, either your civil attorney or
10  criminal attorney, tells you that there's an
11  investigation, then I think that's probably protected,
12  attorney client privilege protected, but if you learned
13  of an FBI investigation because, you know, an FBI comes
14  to you and talks to you, that's different.
15  A.   Mr. Ruggier explained to me that, you know,
16  that the allegations would have criminal --
17       MR. RUGGIER:  Objection.  Stop.  Stop.
18  I'm sorry.
19  Q.   I want to be clear, I'm not --
20  A.   Talking about when I first hired Mr. Dascoli.
21       MR. RUGGIER:  Right, but so you can't
22  talk -- if I tell you something --
23       THE DEPONENT:  Okay
24       MR. RUGGIER:  -- and then you're going

---

1   to, you know --
2        THE DEPONENT:  The reason I hired --
3        MR. RUGGIER:  Right.  You can't talk
4   about any information or advice that I gave you.
5        THE DEPONENT:  Okay.
6        MR. RUGGIER:  Or any information or
7   advice that John Dascoli gave you.
8        THE DEPONENT:  Okay.
9        MR. RUGGIER:  So we would object.
10       MR. FORBES:  I'm not asking for what he
11  talked about with you or Mr. Dascoli.
12       MR. RUGGIER:  It somehow got to that
13  which I wasn't --
14  A.   Around February is whenever I hired
15  Mr. Dascoli just in case something happened.  Then a
16  little bit after that, a few weeks, not much longer
17  after, that's when I learned of the FBI investigation
18  because I was contacted by Lafferty.
19  Q.   Okay, so you were contacted by FBI agent
20  Lafferty?
21  A.   Uh-huh.
22  Q.   Do you know when that was?
23  A.   I could get more like in depth stuff, but I
24  would say just a few weeks after I hired Mr. Dascoli,

---

1   so just sometime in February, late February.
2   Q.   So you think it would have been late
3   February --
4   A.   Uh-huh.
5   Q.   -- that you personally were contacted by the
6   FBI agent Lafferty?
7   A.   Yes.
8   Q.   You say you could get me more information.
9   What do you mean by that?
10  A.   Like whenever, around whenever the call was or
11  whenever I wrote down his information.
12  Q.   Okay, so you received a phone call from him?
13  A.   Uh-huh.
14  Q.   Is that the first communication you had
15  directly from the FBI?
16  A.   Yes.
17  Q.   And you've got a record of that somewhere?
18  A.   Yes.
19  Q.   Okay.  Is that record in like a note that you
20  made or a message to somebody or what?
21  A.   A note.  A note on my phone.
22  Q.   A note on your phone.  Do you have your phone
23  with you today?
24  A.   No.  It's in my car.

---

1   Q.   If we took a break, is that something you
2   could get?
3   A.   Yes.
4   Q.   Okay.  All right.  We'll keep going.  When we
5   take a break here in a little bit, we'll take a break
6   probably about every hour, okay?  When we take a break,
7   I'd ask you to go out and get that, show it to your
8   counsel obviously and if you can, produce it, okay?
9   A.   Okay.
10  Q.   Now, what did you and Agent Lafferty talk
11  about when he called you?
12  A.   He just was inquiring on giving a statement.
13  Q.   A statement in what?  I mean, what did he say
14  to you as best you remember?
15  A.   Just talked about giving a statement reference
16  to this case, just come in and talk to him.
17  Q.   Did you go give a statement?
18  A.   No.
19  Q.   Why not?
20  A.   I told him that I would talk with my counsel
21  and then after that it he contacted me one more time,
22  told him who my counsel was and he never contacted me
23  again until we were cleared.
24  Q.   So you told -- Agent Lafferty called you up,

1  fellow law enforcement person; right?
2      A.   Yes, he's a member of law enforcement.
3      Q.   Yeah and he asked you to come give a statement
4  about the Billy Means case?
5      A.   Yes.
6      Q.   And you said I can't do that, I need to talk
7  to my lawyer?
8      A.   At that time I was hiring an attorney so I
9  didn't have one just yet.
10     Q.   So you told him, hey, I better get a lawyer?
11     A.   No.
12     Q.   No, okay, what did you say to him?
13     A.   I told him I would give him a call back.
14     Q.   Did you tell him anything about getting a
15 lawyer on that call?
16     A.   I don't recall.
17     Q.   So you just told Agent Lafferty you'd call him
18 back and then you thought I better get a criminal
19 lawyer?
20     A.   I think I was already in the process of
21 getting one.
22     Q.   Well, that's what I'm confused by because I
23 thought you said a minute ago that early February you
24 hired Dascoli and then late February you get the call

1  from the FBI?
2      A.   Early February is whenever I started the FOP
3  process of getting one.  I don't remember exact dates
4  or anything like that for counsel.
5      Q.   Okay, so when Lafferty called you, you already
6  at that point had planned on getting criminal counsel?
7      A.   Yes.
8      Q.   And you never went and gave a statement to the
9  FBI?
10     A.   Correct.
11     Q.   Why not?
12     A.   I was --
13         MR. RUGGIER:  Objection.  I mean --
14         MR. FORBES:  He's here giving a statement
15 today.  Why can't he tell me -- I don't understand why
16 he didn't talk to the FBI.  What's he got to hide?
17         MR. RUGGIER:  Well, I don't understand
18 how any of this is discoverable at all.  It's not.
19 It's --
20         MR. FORBES:  Number one, you filed a
21 motion saying he just learned about it -- he just
22 learned about it on the week of March 29 and his
23 testimony is he learned about it a month earlier.
24         MR. RUGGIER:  That's not discoverable.

1          MR. FORBES:  If you want to tell him not
2  to answer you go ahead.  I'm going to ask questions.
3          MR. RUGGIER:  You can -- go ahead.
4  Repeat the question.
5      Q.   So why didn't you give a statement to Agent
6  Lafferty?
7      A.   I've been cleared.  I talked to him twice and
8  then I never said I wasn't giving a statement to him
9  and then we were cleared, so there's no need to.  Why
10 would I go give a statement if I've been cleared?
11     Q.   Okay, let me ask you about that.  How do you
12 know you've been cleared?
13     A.   From -- I don't know his name right off.  You
14 could talk to Chief Rinehart, but they were contacted
15 by the FBI and said that we were cleared through them
16 and the Department of Justice.
17     Q.   Okay.  So who told you that?
18     A.   The Chief, Brad Rinehart.
19     Q.   So Chief Rinehart told you you've been cleared
20 by the Department of Justice and the FBI?
21     A.   Yes.
22     Q.   Did he tell you how he learned that?
23     A.   Again, he was contacted by a member from the
24 FBI, whoever is over their office, I'm not sure of his

1  name.
2      Q.   Okay, so Chief Rinehart told you that a member
3  of FBI contacted him and told him that the
4  investigation criminally into you with respect to Billy
5  Means had cleared you?
6      A.   Yes.
7      Q.   Okay.  When was that conversation?
8      A.   After this, so I don't know exactly when.
9      Q.   Did anyone tell you whether the Department of
10 Justice and the US Attorney's Office had made a
11 charging decision about whether to charge you or not?
12     A.   They said we were cleared and there's --
13     Q.   Did they explain --
14     A.   You'd have to ask him specifically, but I
15 think they mentioned there was no chargeable offenses.
16     Q.   Okay.  Did anyone tell you
17 that?
18     A.   No.
19     Q.   Did you receive anything in writing from the
20 FBI or the Department of Justice?
21     A.   No.
22     Q.   The conversation with Rinehart was when?
23     A.   A few weeks ago.
24     Q.   Okay.  Did anyone from South Charleston, Chief

1  Rinehart or anyone else, put anything in writing to you
2  about the FBI investigation?
3      A.   No.
4      Q.   Any text messaging?
5      A.   No.
6      Q.   The conversation with Rinehart, was that in
7  person or on the phone?
8      A.   In person I believe.
9      Q.   Who was present?
10     A.   Me and him.
11     Q.   Just the two of you?
12     A.   Uh-huh.
13     Q.   What about Officer Peterson?
14     A.   No.
15     Q.   Where did it take place, that conversation?
16     A.   I believe in his office.
17     Q.   How did you know to go into his office?
18     A.   I think he called.  I don't recall
19 specifically.
20     Q.   Called you on the phone?
21     A.   Yes.
22     Q.   Do you and Chief Rinehart talk on the phone
23 often?
24     A.   Not necessarily.

1      Q.   What about text messages, do you ever text
2  each other?
3      A.   Yeah.  Not very often.
4      Q.   Have you ever texted each other about anything
5  involving this case?
6      A.   No.
7      Q.   Okay, so FBI agent Lafferty called you and
8  asked you to give a statement somewhere in late
9  February?
10     A.   Best I can recall.  Maybe mid February, late
11 February.
12     Q.   Okay, mid to late February, and you never gave
13 a statement to him?
14     A.   Correct.
15     Q.   And then later you were told by your chief
16 that you had been cleared?
17     A.   Yes.
18     Q.   Were you ever suspended as a South Charleston
19 police officer during this investigation?
20     A.   No.
21     Q.   Have you ever been suspended as a South
22 Charleston police officer?
23     A.   No.
24     Q.   All right.  Let's back up for a minute.  Walk

1  me through -- you gave me kind of your educational
2  history.  Walk me through your employment history.
3      A.   Employment history in general?
4      Q.   Yeah, everywhere you've ever worked.
5      A.   I worked -- I don't remember like very
6  specific dates or anything, but I worked at the Yeager
7  Airport.
8      Q.   What did you do at Yeager Airport?
9      A.   Valet.  Valet driver.
10     Q.   When was that?  Was that your first job?
11     A.   I think so.  Probably 2011.
12     Q.   Okay.  Walk me through from that, from the
13 first job, as best you recall, first job to where we
14 are now.
15     A.   After that City of South Charleston as a
16 lifeguard.  After that, Capitol.  At the Capitol as a
17 telecommunicator and then after that the Dunbar Police
18 Department and then South Charleston Police Department.
19     Q.   You said you were at the Capitol as a
20 telecommunicator.  What's that?
21     A.   It's kind of like a dispatcher.  You watch
22 cameras and manage the radios, answer the phones and
23 dispatch whoever accordingly, whether it be the police
24 or, you know, like if there's an emergency, a fire.

1      Q.   So is this like the security force for the
2  Capitol?
3      A.   Yeah, they're attached with the police
4  department there.
5      Q.   Okay.  Did you receive any police training for
6  that job?
7      A.   No.
8      Q.   All right, so your first police job was at
9  Dunbar; is that right?
10     A.   Correct.
11     Q.   When was that?
12     A.   December 2013.
13     Q.   Why did you decide to become a police officer
14 in December of 2013?
15     A.   Just to help people out.  Job is always
16 different.  There's always new stuff going on.
17     Q.   Okay.  Tell me about that hiring process.  Was
18 there an application time?  Did you take the test?
19     A.   You take the physical test, take a written
20 test and then go through the background process and
21 then if all that passes then you get hired.
22     Q.   Okay.  Did Dunbar send you to the State Police
23 Academy?
24     A.   Yes.

1    Q.   When was that?

2    A.   April of 2014.

3    Q.   How long were you at the academy?

4    A.   Four months.  Graduated August 15th, 2014.

5    Q.   Did you receive any training at the State

6 Police Academy with respect to spinal injury victims?

7    A.   No.

8    Q.   None at all?

9    A.   No.

10    Q.   Did you receive any medical training with the

11 State Police Academy?

12    A.   Yes.

13    Q.   What kind?

14    A.   Like for trauma victims like gunshot wounds,

15 stuff like that, like putting tourniquets on.

16    Q.   Do you remember taking part in a first

17 responder training program at the State Police Academy?

18    A.   Yes.

19    Q.   Do you remember if there was part of that had

20 to do with spinal injuries?

21    A.   Not that I recall.

22    Q.   Okay.  Do you recall anybody ever training you

23 on what to look for, signs and symptoms of spinal

24 injuries?

1    A.   No.

2    Q.   Do you recall anyone ever training you on the

3 care for spinal injuries?

4    A.   No.

5    Q.   Okay.  So you're at the State Police Academy

6 for four months.  Were you trained in use of force

7 while you were at the Police Academy?

8    A.   Yes.

9    Q.   What did you learn?

10    A.   Like, can you be more specific?

11    Q.   Sure.  When did they tell you it was

12 appropriate to use various force methods such as pepper

13 spray, tasers, things along those lines?

14    A.   Pepper spray can be used whenever somebody is

15 non compliant and if they're possibly reaching where a

16 weapon could be, then that's something that would be

17 appropriate.

18    Q.   Any other reasons that someone could use

19 pepper spray?

20    A.   Active aggression, like active fight.

21    Q.   Are there standards that you have to use to

22 apply before you decide to use OCs or pepper spray?

23    A.   Standards?

24    Q.   Yeah.  I mean, is there an assessment you've

1 got to do of the situation?

2    A.   Yes.

3    Q.   Okay.  What is it?

4    A.   Again, just like previous stated, if they're

5 actively agress -- if they're actively being

6 aggressive, actively fighting, if they're reaching

7 where weapons are commonly concealed or hidden such as

8 a waste band or a pocket and whenever you're giving

9 them commands not do it and they do it, then that would

10 be applicable.

11    Q.   How long was the training program at the State

12 Police Academy with respect to pepper spray?

13    A.   Just specifically pepper spray or use of

14 force?

15    Q.   Yeah, let's stick with pepper spray right now.

16    A.   I'm not sure exactly.  Defensive tactics last

17 a week.

18    Q.   Okay and is the use of force within the

19 defensive tactics curriculum?

20    A.   Yes.

21    Q.   And that's a one week program?

22    A.   Yes.

23    Q.   Who taught you that program?

24    A.   He's lieutenant now, Petry, or he might be a

1 captain now.

2    Q.   Did you receive training materials for that,

3 handouts, things along those lines?

4    A.   Yes.

5    Q.   Do you still have them?

6    A.   No.

7    Q.   That would have occurred back in 2013?

8    A.   Fourteen.

9    Q.   Fourteen.  I thought you were hired by Dunbar

10 December of 2013 you said.

11    A.   Yes.

12    Q.   How long after you were hired by Dunbar did

13 you go to the Academy?

14    A.   I went to the Academy April of 2014.

15    Q.   Okay.  Other than your one week defensive

16 tactics course at the Academy, have you ever had any

17 training with respect to use of force?

18    A.   Yes.

19    Q.   Okay.  What was that?

20    A.   Defensive tactics instructor course at the

21 State Police Academy.

22    Q.   When was that?

23    A.   I don't recall specifically.  If I had to

24 guess, within two years ago.

WILLIAM ALLEN MEANS v.                                    DAVID HARVEY
E.M. PETERSON, et al.                                         04/26/2021

1     Q.   So within the last two years?
2     A.   Best I can remember.
3     Q.   Would you say, for our purposes here, would
4  that have been before this May 2nd, 2020 incident or
5  after?
6     A.   Before.
7     Q.   Okay.  How long was that defensive tactics
8  instructor course?
9     A.   A week.
10    Q.   Who taught that?
11    A.   Captain Petry and Sergeant Barker, I believe.
12    Q.   Did you receive handouts or other materials
13 with that course?
14    A.   I believe so.
15    Q.   Do you still have them?
16    A.   No.
17    Q.   What happened to them?
18    A.   I don't know.
19    Q.   Is it something you would have kept at the
20 time, you just didn't maintain or is it something they
21 took back after the course?
22    A.   I don't recall.
23    Q.   Okay.  Other than what you described so far,
24 any other training that you've received in your law

WILLIAM ALLEN MEANS v.                                    DAVID HARVEY
E.M. PETERSON, et al.                                         04/26/2021

1  enforcement career with respect to use of force?
2     A.   Not that I recall.
3     Q.   Okay.  With respect to medical issues, have
4  you received any training other than what you got at
5  the State Police Academy?
6     A.   At the expo I had a combat casualty care
7  class.
8     Q.   What's the expo?
9     A.   It's here at the Civic Center like around May
10 or so just for law enforcement, first responders.
11    Q.   Is this like a conference?
12    A.   Yeah.
13    Q.   Is it something where it's just local people
14 or we have folks from all over the State or region or
15 what?
16    A.   For the most part local, just within the
17 State.
18    Q.   And you think you had some training there.
19 Tell me about that.
20    A.   It was, again, just kind of like the Academy
21 stuff.  Mainly for like gunshot wounds and lacerations,
22 stuff like that.  Treating, like, bleeding and chest
23 wounds and stuff like that.
24    Q.   What about injuries that can't be seen on the

WILLIAM ALLEN MEANS v.                                    DAVID HARVEY
E.M. PETERSON, et al.                                         04/26/2021

1  surface?  Did you receive any training for that?
2     A.   No.
3     Q.   Have you ever received any training during
4  your time as a law enforcement officer on how to
5  immobilize someone's spine?
6     A.   Not that I recall.
7     Q.   Have you received any training on proper
8  carrying techniques for accident victims that might
9  have a spinal injury?
10    A.   Not that I recall.
11    Q.   Do you know if there are certain ways that
12 you're suppose to deal with someone who's a potential
13 spinal injury victim?
14    A.   When you say deal, what does that mean?
15    Q.   So if you're going to move them, are there
16 certain things you've got to do?
17    A.   I would imagine so, but I've never received
18 training in respect to that as far as law enforcement
19 goes.
20    Q.   Anybody from South Charleston ever give you
21 any type of training along those lines?
22    A.   No.
23    Q.   Okay.  So other than what we talked about so
24 far, including this expo, any other use of force

WILLIAM ALLEN MEANS v.                                    DAVID HARVEY
E.M. PETERSON, et al.                                         04/26/2021

1  training that you received?
2     A.   Not that I recall.
3     Q.   Okay.  All right.  So back to when you were in
4  Dunbar.  You go to the State Police Academy.  Did you
5  pass the course there?
6     A.   Yes.
7     Q.   Okay and then you return to Dunbar as an
8  officer?
9     A.   Yes.
10    Q.   What was your position in Dunbar?
11    A.   Patrolman.
12    Q.   How long were you there?
13    A.   Around approximately three and a half years.
14    Q.   Did Dunbar give you any type of training on
15 medical response and looking out for spinal victims,
16 things along those lines?
17    A.   Not that I recall.
18    Q.   Did Dunbar give you any further training on
19 use of force?
20    A.   Not that I recall.
21    Q.   The time that you were at Dunbar, did you have
22 any body cams?
23    A.   No.
24    Q.   Did anyone at Dunbar have body cams?

1    A.   No.

2    Q.   Did anyone at Dunbar have dash cam?

3    A.   Yes.

4    Q.   Okay and how did the dash cam, when you were

5  at Dunbar, work?

6    A.   Can you be more specific, like?

7    Q.   Yeah.  How does it come on?

8    A.   It comes on whenever you turn your lights on.

9  Lights, like, so when you turn your lights on 1, it's

10 just rear lights, 2 is rear and front and 3 is both and

11 siren.  Whenever you go to 2, it will automatically

12 engage, the camera will.

13   Q.   So if you put both your lights and your siren

14 on it automatically engages?

15   A.   Both lights, front and back.  You don't have

16 to do the siren.

17   Q.   Okay.

18   A.   Just if you go to 2, it will automatically

19 engage.

20   Q.   I see.  So if you put both your lights on, the

21 video recording system in the Dunbar cruisers would

22 automatically engage?

23   A.   Yes.

24   Q.   Okay.  Was that true your entire time at

1  Dunbar?

2    A.   No.  I don't really recall specifically, but I

3  think after a year or two some of the other cruisers

4  may not have had them, but I don't recall specifically.

5    Q.   Were you ever given a cruiser during your time

6  at Dunbar that didn't have dash cam?

7    A.   I believe so.

8    Q.   How long was that for?

9    A.   You never were -- you never really were given

10 a cruiser.  It would just be at the station, you would

11 share.

12   Q.   Okay, so you weren't assigned a specific

13 cruiser?

14   A.   For the most part no, but sometimes you would

15 for a few months, but it would change often.

16   Q.   The ones that weren't working when you were at

17 Dunbar, was that something that had a technical

18 malfunction, were the cameras removed?

19   A.   Best I remember they may not have been there,

20 but it's been a long time.

21   Q.   How long were you at Dunbar again?

22   A.   About three and a half years.

23   Q.   And from Dunbar, what was your next job?

24   A.   South Charleston Police Department.

1    Q.   When did you get hired on there?

2    A.   May of 2017.

3    Q.   What was your position?

4    A.   Patrolman.

5    Q.   What is your position now?

6    A.   Patrolman.

7    Q.   Have you moved up in rank or anything at your

8  time at South Charleston?

9    A.   Still the same rank.

10   Q.   Is that normal in the course of four years?

11   A.   Yes.

12   Q.   Okay.  Have you had the same rate of pay your

13 entire time at South Charleston?

14   A.   It goes up with steps.

15   Q.   What was it when you started in 2017?

16   A.   Best I can recall, 15.30.

17   Q.   It was what now?

18   A.   15.30.

19   Q.   15.30 how often?

20   A.   An hour.

21   Q.   So $15.30 an hour?

22   A.   Yes.

23   Q.   Okay and what is your pay now?

24   A.   17.16, I believe, an hour.

1    Q.   Do you get overtime?

2    A.   Yes.

3    Q.   What are you paid for overtime?

4    A.   Time and a half for that.

5    Q.   Are you single or married?

6    A.   Married.

7    Q.   Do you have any kids?

8    A.   Yes.

9    Q.   How many?

10   A.   One.

11   Q.   How old?

12   A.   Almost two.

13   Q.   Does your wife work?

14   A.   No.

15   Q.   Who hired you at South Charleston?

16   A.   The chief at the time, Brad Rinehart.

17   Q.   How did that come about where you left Dunbar

18 and went to South Charleston?

19   A.   Like why did I leave?

20   Q.   Yeah.

21   A.   More opportunity, bigger department.

22   Q.   Was that something that you took a test for

23 with South Charleston or you just talked to somebody or

24 how does that --

1       A.    Same process.  You have to go through the same
2   process whether you're certified or not.  You have to
3   take the physical, written and then score high enough
4   to get hired.
5       Q.    How often do they offer that test?
6       A.    These days every few months.
7       Q.    Because they're trying to find people?
8       A.    Yeah, I'd say six months, eight months.
9       Q.    How many, approximately, how many officers
10  were employed with Dunbar?
11      A.    They were slotted for 16, but around when I
12  left 10 or 9.
13      Q.    How many officers are employed with South
14  Charleston?
15      A.    Around 50.
16      Q.    Has that been about the number since you've
17  been there?
18      A.    Forty-five, fifty.
19      Q.    Do they have difficulty hiring people?
20      A.    I would assume.  I don't know specifically,
21  but I'd imagine so.
22      Q.    Well, I know you said around, you know, now
23  you're seeing these tests being run every few months
24  and I'm aware those tests are generally run when they

1   need to get the list updated so they can make hiring
2   decisions.
3       Is that something that's increased, the frequency
4   of the test and the hiring process, from the time
5   you've been at South Charleston?
6       A.    Yeah.
7       Q.    Tell me about the chain of command at South
8   Charleston.  Do you have a direct supervisor?  How does
9   that work?
10      A.    Me specifically or just like in general?
11      Q.    Well, let's start at the top.  Just walk me
12  through from the chief on down.
13      A.    The chief and then two captains and then you
14  have around four lieutenants or so and then you have
15  sergeants, corporals and then patrolmen.
16      Q.    Do you have a direct supervisor that you
17  report to?
18      A.    Me specifically, I report to Captain Rader
19  because I'm in a specialized unit.
20      Q.    You're in a specialized unit?
21      A.    Yes.
22      Q.    What kind of drug is that?
23      A.    The Metro Drug Unit.
24      Q.    How long have you been with the Metro Drug

1   Unit?
2       A.    A few months.
3       Q.    In your time with the Metro Drug Unit, do you
4   work sort of hand in hand with the DEA?
5       A.    We walk along side each other.  You don't
6   really see them too too much, but, yeah, we'll help
7   each other out.
8       Q.    Do a lot of your cases end up being prosecuted
9   through the US Attorney's Office?
10      A.    Mine specifically not yet just because it's
11  been a few months.
12      Q.    The Metro Drug Unit in general?
13      A.    Yeah, uh-huh.
14      Q.    Okay.  And I asked you if you'd ever given a
15  deposition earlier and you said no; right?
16      A.    Uh-huh.
17      Q.    Is that a yes?
18      A.    Correct.  Sorry.
19      Q.    She's taking things down and I'm awful about
20  that, but if we don't do the yes and nos it will be a
21  problem.  Have you testified in court proceedings
22  before?
23      A.    Yes.
24      Q.    Have you testified in magistrate court?

1       A.    Yes.
2       Q.    Have you testified in circuit court?
3       A.    No.
4       Q.    Have you ever testified in Federal Court?
5       A.    No.
6       Q.    Have you testified in City court?
7       A.    Dunbar, yes.  South Charleston, no.
8       Q.    About how many times would you say that you've
9   testified in a court proceeding?
10      A.    Thirty approximately.
11      Q.    Would majority of those be in magistrate
12  court?
13      A.    Uh-huh.
14      Q.    Yes?
15      A.    Yes.
16      Q.    Backing up to the State Police Academy, during
17  your time there, were you trained in vehicular
18  pursuits?
19      A.    Yes.
20      Q.    And how so?
21      A.    A lot of it was driving.  Like you put up
22  cones in the parking lot and do, like, driving courses.
23      Q.    At the State Police Academy itself?
24      A.    Yeah.

WILLIAM ALLEN MEANS v.                                               DAVID HARVEY
E.M. PETERSON, et al.                                                    04/26/2021

1    Q.   Is that something where an officer would ride
2  along with you and kind of give you tips or how did
3  that happen?
4    A.   Best I can recall, yeah, I think the
5  instructor will ride with you and give you tips and
6  then at the end of it you have to do the obstacle
7  course in so much time.
8    Q.   Was there a classroom portion to that?
9    A.   I believe so.
10   Q.   Do you know if there were materials that you
11 received?
12   A.   I don't recall.
13   Q.   You don't have any of those today if there
14 were, do you?
15   A.   No.
16   Q.   Okay.  Were you trained on when it was
17 appropriate to engage in a vehicular pursuit?
18   A.   At the Academy?
19   Q.   Yes.
20   A.   Not that I recall.
21   Q.   Have you ever been trained on when it's
22 appropriate to engage in a vehicular pursuit?
23   A.   Trained?  No.  I mean, you'll talk about it
24 with your supervisors.

WILLIAM ALLEN MEANS v.                                               DAVID HARVEY
E.M. PETERSON, et al.                                                    04/26/2021

1    Q.   Okay.  What will you talk about?
2    A.   Like, you know, the seriousness of what's
3  going on and then like just making sure you know what's
4  going around you and how pursuits always change, the
5  dynamic.
6    Q.   What about in terms of when to pursue
7  somebody?
8    A.   No, not that I recall.
9    Q.   Okay.  Well, to the best of your understanding
10 then, if no one's directly trained you on it, are there
11 times where you should pursue and times where you
12 should not?
13   A.   Yes.
14   Q.   And how do you make that decision?
15   A.   Just the same dynamics, the seriousness of the
16 crime, the time of day, how much traffic there is and
17 it's always changing.
18   Q.   For seriousness of the crime, how serious does
19 the crime need to be to pursue somebody, for instance,
20 above the speed limit?
21   A.   That wouldn't be the only part.  It just
22 depends when it is, what's going on around you.  The
23 crime itself is not the only thing, it's the totality
24 of the circumstances.

WILLIAM ALLEN MEANS v.                                               DAVID HARVEY
E.M. PETERSON, et al.                                                    04/26/2021

1    Q.   So regardless of the crime, you could pursue,
2  for instance, a traffic offense, regardless of the
3  level of the offense, if the circumstances to your
4  personal belief were -- seemed okay?
5    A.   Yes.
6    Q.   Tell me about the process if you engage in a
7  vehicular pursuit, what do you need to do?
8    A.   You mark out with Metro that you have a
9  pursuit going and then just start calling out where
10 you're at.
11   Q.   Who's in charge of calling out where you're
12 at?
13   A.   If it's just you by yourself obviously you,
14 but if there's two or more, a lot of times it would be
15 the second car.
16   Q.   Is there any discussion made with a
17 supervising officer during a pursuit?
18   A.   What do you mean by discussion?
19   Q.   Over the radio.  Do you talk to a supervisor
20 and tell them what you're doing?
21   A.   A lot of times they just listen to it so a lot
22 of times they won't talk back because then that would
23 tie up the radio.  If they jumped out and bailed then
24 you wouldn't be able to say where you're at and what's

WILLIAM ALLEN MEANS v.                                               DAVID HARVEY
E.M. PETERSON, et al.                                                    04/26/2021

1  going on.
2    Q.   So you don't need approval from the supervisor
3  in South Charleston in order to pursue somebody in a
4  vehicle?
5    A.   Correct.
6    Q.   How many vehicular pursuits would you say
7  you've been involved in in your law enforcement time?
8    A.   Approximately 20, 30, I don't know.
9    Q.   About how many with South Charleston?
10   A.   Approximately 10, 15, I don't know.
11   Q.   I understand you're just kind of giving me
12 your best estimate and that's what I'm asking you for,
13 okay?
14   A.   Yeah.
15   Q.   Have you ever been involved in a vehicular
16 pursuit other than the one we're going to talk about in
17 a little bit with Officer, and I don't know, maybe it's
18 Sergeant Peterson?
19   A.   Yes.
20   Q.   How many other vehicle pursuits have you been
21 involved in with him?
22   A.   Just a handful, I don't know.
23   Q.   About how many times have you used pepper
24 spray on someone?

1    A.   Five to ten.  I don't recall specifically.

2    Q.   Okay.  That's kind of a bigger range and I

3  understand this has been over a period of time, but as

4  best you can, walk me through what you remember about

5  the incidents you've used pepper spray.

6      Let's not talk about this one with Mr. Means yet,

7  we'll talk about that in a little bit.  But walk me

8  through the first time you had to use pepper spray on

9  someone.

10    A.   I couldn't go through them all, I don't know.

11    Q.   You don't remember the specifics of it?

12    A.   I can tell you the last time I did.  A male

13  ran from us and wouldn't put his hands behind his back.

14    Q.   Okay.  Tell me about that.  So he ran from

15  you.  What was the crime?

16    A.   The call was a male, like, banging on

17  somebody's back door and when we got there as soon as

18  he saw us he took off running away from us, tried to

19  take him to the ground, told him put his hands behind

20  his back and he wouldn't.  He was intoxicated.

21    Q.   Before you pepper sprayed him to get him to

22  put his hands behind his back, did you use any other

23  tactics first?

24    A.   Just tried to go hands-on, put his hands

1  behind his back and couldn't get him.

2    Q.   What do you mean by hands-on?

3    A.   Like grabbing his arms and hands and trying to

4  put his arms behind his back.

5    Q.   When you say we, who you are talking about?

6    A.   Me and another.

7    Q.   So the two of you tried to get his hands

8  behind his back and you couldn't?

9    A.   Correct.

10    Q.   Did you apply any kind of pressure to his arms

11  or other means other than the pepper spray?

12    A.   Pressure to his arms, what's that mean?

13    Q.   So did you try to use any type of physical

14  restraint of him that would cause him discomfort to

15  make him comply?

16    A.   I don't know what that means.  Like pressure

17  points?

18    Q.   Yeah, did you try pressure points, did you

19  jerk his arm around, did you try to --

20    A.   Tried to put his arm behind his back with

21  force, but couldn't.

22    Q.   Okay.  How big was this guy?

23    A.   I don't recall.

24    Q.   About when was this?

1    A.   Around a year ago.  I don't recall

2  specifically.

3    Q.   Would it have been before the incident with

4  Billy Means or after?

5    A.   Maybe before, I don't know.

6    Q.   Do you recall using pepper spray on anybody

7  since the time with Billy Means?

8    A.   Not that I recall.

9    Q.   When you use force in your time as a law

10  enforcement officer, are you required to fill out a

11  report?

12    A.   Like a use of force report?

13    Q.   Yes.

14    A.   Yes.

15    Q.   Okay.  Is that true any time you use force on

16  a suspect?

17    A.   Yes.  Well, let's -- sorry.  When you say

18  force, what do you mean exactly?  Does that mean just

19  grabbing somebody and forcing their arms behind their

20  back or do you mean taking them to the ground?

21    Q.   Well, I'm asking you about when you use a

22  chemical agent, when you use a taser, when you take

23  someone to the ground, when you are in a situation

24  where you would have to, for instance, put your knee on

1  somebody or take them down, something along those

2  lines.  You tell me.  What's the dividing line?  When

3  do you have to fill out one of these reports?

4    A.   For the most part just like you said, when you

5  take somebody down.  Like if you take them down and

6  there's any type of injuries or anything or from there

7  you use chemical agents, anything like that, then you

8  would.

9    Q.   Have you ever arrested somebody where they

10  needed medical care afterwards that you didn't fill out

11  a use of force report on?

12    A.   Not that I recall.

13    Q.   Okay.

14    A.   But there could be a time when they harm them

15  self and then I wouldn't.

16    Q.   Understood.  I assume there could be a time

17  where somebody could have a heart attack or something

18  and you wouldn't necessarily need to fill out a use of

19  force report, but if you take someone to the ground,

20  you're suppose to fill out a use of force report?

21    A.   For the most part.  I mean, if it was real

22  easy and you went to the ground and there were no

23  injuries or anything then you probably wouldn't.

24    Q.   Okay.  If there were injuries and the person

1  had to get medical care and you've taken them down to
2  the ground, are you suppose to put that in your use of
3  force report?
4      A.   Suppose to put that they had injuries?
5      Q.   Yeah.
6      A.   Yeah.
7      Q.   Are you suppose to put the type of force that
8  you used?
9      A.   Yeah.
10      Q.   I've asked you about pepper spraying.  What
11  about tasers?  Have you ever had to use a taser on
12  somebody?
13      A.   At Dunbar I attempted to use one and it was
14  ineffective.
15      Q.   How did that come about?  How was it
16  ineffective?
17      A.   I shot the taser and it didn't do anything.
18      Q.   Okay.  Is that the only time you've ever tried
19  to use a taser?
20      A.   Yes.
21      Q.   Did you receive training for taser use at the
22  State Police Academy?
23      A.   No.
24      Q.   Where did you receive training, if ever?

1      A.   Dunbar and then South Charleston.
2      Q.   Okay.  Tell me about that training at Dunbar
3  on taser use.
4      A.   You go over the taser, obviously, and then you
5  talk a little bit about when you can and can't use it
6  and then you'll shoot it at like a box or whatever,
7  just shows about the spread, how far away you can be.
8      Q.   What about at South Charleston, what was the
9  training like there?
10      A.   The same, but you got tased.
11      Q.   You got tased yourself?
12      A.   Uh-huh.
13      Q.   Okay.  When you did it who tased you?
14      A.   Messer.
15      Q.   Is that the only time you've ever been tased?
16      A.   Yes.
17      Q.   I'm going to assume you've never been arrested
18  yourself?
19      A.   No.
20      Q.   Okay.  You don't have any criminal history, do
21  you?
22      A.   No.
23      Q.   Other than this FBI investigation into you,
24  have you ever, to your knowledge, been the subject of a

1  criminal investigation?
2      A.   No.
3      Q.   If you use your taser you're required to fill
4  out a use of force report; right?
5      A.   Yeah.
6      Q.   Let's move into May of 2020.  What kind of
7  shift were you on May 2nd of 2020?
8      A.   Day shift, 6:00 a.m. to 6:00 p.m.
9      Q.   Okay.  And how long had you been on day shifts
10  at that point, if you recall?
11      A.   Do you know what day of the week it was,
12  Saturday or Sunday?
13      Q.   I do not off the top of my head.
14      A.   Well, if it was one of those we worked day
15  shift Friday, Saturday, Sunday.
16      Q.   Okay.  Explain that to me.  How do the shifts
17  work at South Charleston?
18      A.   So starting on Friday night you do four
19  nights, which it's 6:00 to 6:00 either way and so
20  6:00 p.m. to 6:00 a.m., so four nights 6:00 to 6:00.
21  Then you're off three days.  You work three day
22  shifts, so 6:00 a.m. to 6:00 p.m..  Then you're off one
23  day.
24      Q.   Okay.

1      A.   Then you work three nights.  Then you're off
2  three days.  Then you work four day shifts.  Then
3  you're off seven.
4      Q.   Then does it start over?
5      A.   Uh-huh.
6      Q.   Okay.  Has that pretty much been true your
7  whole time at South Charleston?
8      A.   Yeah.
9      Q.   So that would have been the type of shift
10  somewhere in there on a day shift?
11      A.   Yeah, those three days.
12      Q.   Okay.
13      A.   The weekend day shifts, whatever.
14      Q.   And you would have come on about 6:00 a.m. on
15  May 2nd?
16      A.   Uh-huh.
17      Q.   Tell me about that process.  How do you come
18  on?
19           MR. RUGGIER:  Say yes or no.
20      Q.   How do you come on shift?  What are you
21  suppose to do when you start out your day shift?
22      A.   Just mark on duty on the radio and then before
23  COVID you would go to station for shift change, which
24  really just they might -- night shift might say what

1   they had the night before, but past COVID you just
2   start working.  Just start taking calls for day shift
3   or for the last shift, that way they can go home.
4       Q.   Are there areas of the City you're assigned
5   to?
6       A.   Yes.
7       Q.   How does that work?
8       A.   Just rotates.  It's east, west and south.
9       Q.   Okay.
10      A.   Jefferson Road splits it and south is just
11  like, you know, Southridge area.
12      Q.   Okay.  You say Jefferson Road splits it.
13  Describe where is the east, the west and the south
14  generally?
15      A.   So Jefferson Road splitting the east and the
16  west.  The east is just like the station and all that,
17  like the Montrose, The Flats and all that and then west
18  stops at like Rock Lake and all that.
19      Q.   And then south is basically out Jefferson
20  Road?
21      A.   Yeah.  Once you start Jefferson Road, just
22  everything out that way.
23      Q.   Okay.  On May 2nd, 2020, do you know which one
24  you were assigned to?

1       A.   No.
2       Q.   Okay.  Do you remember that morning?
3       A.   Yes.
4       Q.   Do you know what time you would have -- would
5   you have gone to the station?
6       A.   I don't recall.
7       Q.   Okay.  Well, it was May of 2020 so based on
8   what you said earlier I'm going to assume COVID was
9   going on?
10      A.   Probably not.
11      Q.   Okay.  Would you have already had a cruiser at
12  your house?
13      A.   Yeah, we have take home cruisers.
14      Q.   How are those assigned?  Does everybody get to
15  take one home?
16      A.   Yes.
17      Q.   How many cruisers does South Charleston have?
18      A.   I would imagine 45, but I don't know for sure.
19      Q.   Enough for everybody to take one home; right?
20      A.   And extra, spare, whatever, so, yeah, maybe
21  50.
22      Q.   Okay.  Do any of the cruisers have dash cam at
23  South Charleston?
24      A.   No.

1       Q.   Has that been true your entire time at South
2   Charleston?
3       A.   Yes.
4       Q.   Do you know it was talked about several years
5   ago about getting dash cam and body cam in South
6   Charleston?
7       A.   No, not that I recall.
8       Q.   Has anyone ever talked to you about getting
9   those things in place in South Charleston?
10      A.   Not that I recall.  Recently, like here within
11  the past couple months, I think they are.
12      Q.   So since May 2nd, 2020 it's been talked about,
13  but not before that time?
14      A.   Best I can recall and then the only caveat to
15  that is I do have a dash cam in my car, it's a South
16  Charleston cruiser, but it's assigned to MDENT and the
17  two interdiction cars have dash -- have dash cams.
18      Q.   Because you're assigned to MDENT you now have
19  dash cam?
20      A.   Yes.
21      Q.   May 2nd, 2020, the cruiser you would have had
22  at that time did not have dash cam?
23      A.   Correct.
24      Q.   And you didn't have body cam at that time

1   either; right?
2       A.   Correct.
3       Q.   Have you ever worn a body cam in your time as
4   a law enforcement officer?
5       A.   No.
6       Q.   Other than your time now assigned to the Metro
7   Drug Unit, during your whole time at South Charleston
8   you never had a dash cam in a vehicle, have you?
9       A.   I had my own camera.
10      Q.   You do?
11      A.   I did.  I had it for -- a couple people,
12  Peterson as well, bought them ourselves and put them in
13  the cruiser and then sometime after that we received an
14  e-mail telling us not to have our own personal ones.
15      Q.   Okay.  So you and Peterson and others or just
16  the two of you?
17      A.   Definitely a few others.
18      Q.   A few others?
19      A.   Yeah.
20      Q.   All got your own cameras set up.  What kind of
21  camera?
22      A.   I think it was Anchor brand.  Just something
23  from Amazon.
24      Q.   Okay, but like a dash mounted camera?

1    A.    Yeah, like one you put on your own personal
2 vehicle.
3    Q.    Would it record and then you could download
4 that onto a phone or something?
5    A.    It had like an SD card and you could pull it
6 out and put it on the computer.
7    Q.    Okay.  About when did you get those?
8    A.    I don't recall, but if I had to give a year,
9 2018 or '19.
10    Q.    Okay, but definitely prior to May 2nd of 2020?
11    A.    Yes.
12    Q.    All right, so you guys got these.  Did
13 everyone go together and get them on Amazon, how did
14 that work?
15    A.    No, just kind of did it on your own.
16    Q.    If you went back through your Amazon history,
17 would you be able to see when you bought it?
18    A.    Yeah.
19    Q.    Okay.  Is that something you could do?
20    A.    Yeah.
21    Q.    You could provide that to your counsel to get
22 to us?
23    A.    Uh-huh.
24    Q.    Is that a yes?

1    A.    Yes.
2    Q.    That's the difference between this and
3 magistrate court is nobody's taking anything down over
4 there.  So you said you got an e-mail at some point.
5 Was that just to you or to everybody?
6    A.    The Department.
7    Q.    Who was the e-mail from?
8    A.    The chief, Brad Rinehart.
9    Q.    What did it say?
10    A.    To sum it up, just saying I know some people
11 have been using their own personal dash cams and due
12 to, like, chain of custody and evidence concerns not to
13 do that.  I mean, I don't know specifically what it
14 was, but to sum it up would be that.
15    Q.    Do you still have e-mail?
16    A.    Yeah.
17    Q.    Okay.  Is that something you could get for us
18 and provide to your counsel?
19    A.    Yeah.
20    Q.    Great.  About when did that e-mail come, do
21 you know?
22    A.    If I had to guess it would be 2019.
23    Q.    Let me ask you this:  About how long did you
24 have the camera in the cruiser?

1    A.    Approximately six months.
2    Q.    Now, it wasn't a secret during those six
3 months that you all had these things, was it?
4    A.    No.
5    Q.    Would you, if you arrested somebody, would you
6 tell them that there's video?
7    A.    No.
8    Q.    But the people in the Department knew there
9 was video?
10    A.    Yeah.
11    Q.    And that would have been everybody up to the
12 chief would have known you all were doing this; right?
13    A.    Yeah.
14    Q.    So after about six months of you personally
15 having the camera, you get an e-mail from Chief
16 Rinehart saying all the cameras for the whole
17 Department, get the dash cams out?
18    A.    The personal ones, yes.
19    Q.    Well, there's no others, are there?
20    A.    Correct.
21    Q.    Okay, so by taking the personal ones out,
22 that's all the cameras; right?
23    A.    Correct.
24    Q.    Okay.  Did you have a conversation with

1 anybody about the cameras being removed?
2    A.    No.
3    Q.    Why did you guys put cameras in to begin with?
4    A.    Just the same reason you'd have them in
5 general.  Just so you can document what's going on or
6 whatever.
7    Q.    There's no question mark; right?  There's no
8 way to fudge that.  You would know what happened in an
9 arrest or a pursuit or something along those lines if
10 you had video footage; right?
11    A.    Yes.
12    Q.    And that was something you thought was
13 important enough to spend your own money, when you were
14 making somewhere between $15.00 to $17.00 an hour, to
15 buy?
16    A.    Yes.
17    Q.    No one from South Charleston Police Department
18 provided any type of dash cam or other recording
19 camera, did they?
20    A.    No.
21    Q.    Did any of the officers that had these
22 complain when they were told to take them out?
23    A.    Not to my knowledge.
24    Q.    Do you know if it's ever been discussed at

1　City Council at South Charleston about, prior to this
2　last -- since this incident, about getting dash cam or
3　body cam?
4　　　A.　Not to my knowledge.
5　　　Q.　Have you ever attended a South Charleston City
6　Council meeting?
7　　　A.　Just when you have to be there to get sworn
8　in.　Other than that, no.
9　　　Q.　Okay.　Hey, you know what, I told you we'd
10　take a break about every hour.　We've been going about
11　an hour.　Let's take a break.
12　　　A.　Okay.
13　　　　　　VIDEO OPERATOR:　Time is 10:02 a.m.
14　We're off the record.
15　　　　　　(A brief recess was taken after which the
16　deposition continued as follows:)
17　　　　　　VIDEO OPERATOR:　Time is 10:26 a.m.
18　We're on the record.
19　BY MR. FORBES:
20　　　Q.　All right, Officer Harvey, right before we
21　took the break we were talking about those dash cams
22　that you personally -- all right, before we took the
23　break I was asking you, we were talking a little bit
24　about the dash cam that you bought yourself with your

1　own money off Amazon.　You said the e-mail you got from
2　Chief Rinehart indicated they had concerns about chain
3　of custody.
4　　　A.　Yeah, for the evidence.　Like, you know, who's
5　maintaining those records, like as far as who's
6　downloading the videos and getting it to court and all
7　that.
8　　　Q.　Did anyone form South Charleston offer to you,
9　say, hey, we'll just make a repository, bring us your
10　SD cards and we'll upload it all onto the computer
11　network?
12　　　A.　No.
13　　　Q.　Did anyone give you any options for how to
14　preserve that evidence?
15　　　A.　No.
16　　　Q.　Are you aware of any cases where the video
17　evidence was lost?
18　　　A.　No.
19　　　Q.　Any cases you had in particular, anyone ask
20　for in discovery, hey, where's that video evidence and
21　you said, well, I deleted my SD card or something like
22　that?
23　　　A.　No.
24　　　Q.　Do you still have the camera?

1　　　A.　Yeah.
2　　　Q.　Do you still have your SD cards?
3　　　A.　Maybe somewhere.　I don't know.
4　　　Q.　I'm going to hand you --
5　　　　　　MR. FORBES:　Duane, I don't have extra
6　copies of this is if you want to look at it real quick.
7　Here, she's got to mark it.　Is that Number 2?
8　　　　　　HARVEY DEPOSITION EXHIBIT NO. 2
9　　　　　　　(2015 Charleston Gazette
10　　　　　　　Article was marked for identification
11　　　　　　　purposes as Harvey Deposition Exhibit No.
12　　　　　　　2.)
13　　　Q.　Take a read on that, Officer.
14　　　　　　MR. RUGGIER:　I want to just object to
15　the questioning over issues which are not involved in
16　this lawsuit, but are more directed toward the City of
17　South Charleston who's no longer a defendant.
18　　　　　　MR. FORBES:　Well, your objection is
19　noted.
20　　　A.　Okay.
21　　　Q.　Okay.　Did you get a chance to read that?
22　　　A.　I skimmed it, yes.
23　　　Q.　All right.　Let me see it back from you.　It's
24　a 2015 article from the Charleston Gazette; right?

1　　　A.　Okay.
2　　　Q.　All right and it indicates, it's an article
3　entitled Body Cameras for Police Officers on Rise in
4　West Virginia.　It's got some quotes from Bob Houck who
5　at the time was Charleston's assistant chief of police.
6　Do you know Bob Houck?
7　　　A.　Yes.
8　　　Q.　Is he still there?
9　　　A.　Yes.
10　　　Q.　Is he still the assistant chief of police?
11　　　A.　No.
12　　　Q.　Okay.　What's his position now?
13　　　A.　Sergeant on a shift, running a shift.
14　　　Q.　He said in this article the Department, "South
15　Charleston Department would soon be getting body
16　cameras, but hasn't made a decision yet on which one."
17　He said and quoted, "The Mayor wants us to have them.
18　He's concerned with everything going on.　South
19　Charleston mayor, Frank Mullens, says he's been an
20　advocate of putting cameras on officers for a number of
21　years, but said current events show the need is clear."
22　　　"A couple of years ago there was a complaint.　Two
23　sides are always opposite.　If we'd had the camera on,
24　we would have known what was going on, Mullens said.　I

1  think what's going on around the country highlights the
2  needs for cameras.  It's good for everybody.  It's good
3  for the police and good for the citizens.  I can't see
4  a negative thing about it."
5      That's from the mayor of South Charleston in 2015.
6  Is that generally the reason you went out and got a
7  dash cam on your own is because you wanted to make sure
8  that the video showed what really happened in these
9  encounters?
10     A.   Yes.
11     Q.   And the video would be the real story; right?
12     A.   Yes.
13     Q.   There's not two sides to a video, are there?
14     A.   Correct.
15     Q.   "Houck mentioned that officers had concerns
16  when they first brought a body cam model in for
17  testing.  They were at first like big brother, y'all
18  are trying to watch everything we're doing.  Now they
19  kind of get it, Houck said.  They started liking the
20  idea.  Supervisors liked it because it keeps the
21  officers in check and could dispel any complaints we
22  might get."
23     "Officers have told people on traffic stops that
24  they are filming the interactions, Houck said.  The

1  officers have had cameras in their vehicles for years,
2  but in their latest round of police vehicle purchases
3  they didn't choose that add on, Houck said.  The
4  Department recently purchased ten new vehicles, but
5  didn't include in car cameras.  The plan is to buy 40
6  cameras for each of the Department's officers."
7      "Mullens said the mayor said he could see any
8  initial concerns the officers might have, but hopes
9  that they would see the cameras as more of a tool.  The
10  camera doesn't lie, he said.  Quite frankly, if you're
11  not doing anything wrong, you don't have anything to
12  hide."  Did you know that South Charleston used to have
13  dash cams in the cruisers?
14     A.   I think so.  Yeah, I think I've heard people
15  talk about it.
16     Q.   Do you know why they were removed?
17     A.   No.
18     Q.   And then you go out on your own, get a dash
19  cam, put it in the cruiser, chief says get them out of
20  there.
21     A.   Correct.
22     Q.   Do you agree with the mayor's comments there
23  that the video doesn't lie?
24     A.   Correct.

1      Q.   All right.  Officer Harvey, let's talk about
2  that May 2nd incident.  I want to hand you what we're
3  going to mark as Number 3.
4              HARVEY DEPOSITION EXHIBIT NO. 3
5                   (Case Report was marked
6                   for identification purposes as Harvey
7                   Deposition Exhibit No. 3.)
8              MR. RUGGIER:  Can't move it to Thursday.
9  'I've got my daughter Tuesday through Sunday.  I have
10  to get her and make arrangements.'  They can't do it on
11  Thursday.
12             MR. FORBES:  Is there another day he can
13  do it?  Go off the record a second.
14             VIDEO OPERATOR:  Time 10:35 a.m.  We're
15  off the record.
16             (An off the record discussion was held
17  after which the deposition continued as follows:)
18             VIDEO OPERATOR:  Time is 10:37 a.m.
19  We're on the record.
20  BY MR. FORBES:
21     Q.   Officer Harvey, I handed you what's marked as
22  Exhibit 3.  Do you recognize that?
23     A.   Yes.
24     Q.   What is it?

1      A.   A case report.
2      Q.   Case report from what?
3      A.   The incident on May 2nd.
4      Q.   Involving William Means?
5      A.   Yes.
6      Q.   Okay.  Flip over to Page 12.
7      A.   Okay.
8      Q.   Page 12 through 13 has a narrative report.
9  Whose narrative is that?
10     A.   Mine.
11     Q.   Okay.  Did you write this?
12     A.   Yes.
13     Q.   When did you write it?
14     A.   That day I believe.
15     Q.   Okay.  The first paragraph indicates that "On
16  May 2nd, 2020 Corporal Peterson initiated a pursuit on
17  119 at Trace Fork.  The pursuit went for a few minutes
18  and I waited for it to pass me on Rabel Mountain at
19  Split Rail Drive."  Were you already on Rabel Mountain
20  or where were you that morning?
21     A.   That morning I think when he marked out with
22  the pursuit I was on Jefferson Road, City garage.
23     Q.   Okay, so you got to the City garage out to
24  Rabel Mountain Road where you met up with the pursuit;

1  right?

2      A.   Correct.

3      Q.   Then it says "After they passed me, I backed

4  up Corporal Peterson in the pursuit and was the second

5  car and called the radio traffic."  Is that right?

6      A.   Correct.

7      Q.   "We went left on Brounland Road and then

8  ultimately on Emmons Drive which turned into Dartmouth

9  Ashford Road.  The entire duration of the pursuit the

10 driver continued to look back at us and see if we were

11 still chasing him."  That would be the driver, Billy

12 Means, was on a motorcycle; right, is that who you're

13 talking about?

14     A.   Correct.

15     Q.   "He was also going at a high rate of speed

16 around blind curves."  That's dangerous; right?

17     A.   Yes.

18     Q.   To go a high rate of speed around blind

19 curves?

20     A.   Yes.

21     Q.   That would be dangerous not just for the

22 driver of a vehicle, but dangerous for potentially for

23 other citizens that might come around in their cars;

24 right?

1      A.   Correct.

2      Q.   Could be a danger to any pedestrians or

3  children or anything like that that are out there;

4  right?

5      A.   Correct.

6      Q.   "Whenever he would make these blind turns he

7  would cross into the opposite lane of traffic.  If

8  there were any vehicles on the other side of the turn,

9  he would have struck them."  Is that a concern you had

10 during this chase that Mr. Means's motorcycle might

11 strike another vehicle?

12     A.   It's always a possibility.

13     Q.   I'm not asking about possibilities.  You wrote

14 in your report here as a definitive statement.  "If

15 there were any vehicles on the other side of the turn,

16 he would have struck them."  Was that your belief on

17 May 2nd, 2020?

18     A.   Yes, that was a concern.

19     Q.   Okay.  Let's go on through there.  On

20 Dartmouth Ashford Road, County Highway 10, right past

21 the Kanawha Boone County line near Gripple Lane, the

22 driver of the motorcycle went over the railroad tracks

23 and didn't make the left turn.  He wrecked and went in

24 standing water to the left side of the tracks.  I

1  didn't see the actual crash, but saw water splash."  So

2  you didn't see the crash of the motorcycle; is that

3  right?

4      A.   Correct.

5      Q.   Did you see the alleged loss of control of the

6  motorcycle that lead to the crash?

7      A.   No.

8      Q.   Okay, so were you far enough back then in this

9  pursuit that you couldn't see exactly what happened to

10 Mr. Means on the motorcycle that caused the crash?

11     A.   Correct.

12     Q.   Okay, so as we sit here today, you can't offer

13 any testimony about what the cause of the crash was,

14 can you, from personal knowledge?

15     A.   I could speculate that it was speed related.

16     Q.   Okay.  And that would be pure speculation;

17 correct?

18     A.   Not necessarily because on that straightaway

19 the speeds got up to about 60 and then --

20     Q.   Let me get this straight.  So the speeds --

21 you guys are following this guy in a -- was this a

22 25 mile an hour zone?

23     A.   I don't recall.

24     Q.   Do you know what the speed limit was during

1  this chase?

2      A.   Not at that specific part, just the

3  straightaway before this turn.

4      Q.   You say he was doing 60.  Do you know what the

5  speed limit was on that straightaway?

6      A.   No.

7      Q.   Do you have an estimation that it was -- well,

8  strike that.  Do you believe 60 was too fast for that

9  road?

10     A.   Yeah.

11     Q.   Okay.  Are you aware that the speed limits

12 there during this pursuit ranged from 25 to 30 miles an

13 hour on that road?

14     A.   I don't recall.

15     Q.   Well, let me ask you this:  Why did you

16 mention speed being a factor if you don't know how fast

17 the appropriate speed for the road is?

18     A.   Because he got up to about 60 miles an hour,

19 just based on my speedometer while we were chasing him,

20 and then he took that turn, a tight turn, going close

21 to that.

22     Q.   So while you're chasing him in the second car

23 back, your speedometer is showing 60 miles an hour?

24     A.   At least approaching it, yeah, 55, 60.

```
 1     Q.   Okay.  How long were you and is it Corporal or
 2  Sergeant Peterson?
 3     A.   Corporal.
 4     Q.   How long were you and Corporal Peterson
 5  pursuing him at speeds in excess of 50 miles an hour?
 6     A.   Just that portion.  Just that straightaway
 7  portion at the end.
 8     Q.   Okay.  Did you and Corporal Peterson discuss
 9  ending the pursuit at any point?
10     A.   No.
11     Q.   So back to the actual crash.  You didn't
12  witness the motorcycle lose control at the railroad
13  tracks, did you?
14     A.   No.
15     Q.   You also didn't witness Corporal Peterson
16  strike the motorcycle with his vehicle, did you?
17     A.   Correct, he did not.
18     Q.   I'm not asking whether he did or didn't.  I'm
19  asking whether you witnessed it?
20     A.   It would not be possible.
21     Q.   Okay.  Let me ask you again:  Did you witness
22  Corporal Peterson strike Billy Means's motorcycle?
23     A.   No.
24     Q.   Okay.  But you didn't see what caused the
```

```
 1  actual crash of the motorcycle?
 2     A.   No, but I was close with Corporal Peterson and
 3  he was away from Mr. Means.  He was closer to me and
 4  he's up there, so it wouldn't be possible for him to
 5  have struck him.
 6     Q.   How far from Corporal Peterson's vehicle were
 7  you at the time that you guys approached these railroad
 8  tracks where Mr. Means's motorcycle crashed?
 9     A.   If I -- I don't recall specifically, but I'd
10  estimate about 20 yards, 15 yards.
11     Q.   At 55, 60 miles an hour?
12     A.   When we were slowing.  We're slowing because
13  we're coming up for this turn, but prior to that,
14  whenever we were going those speeds on the straight,
15  I'd say 30, 35 yards, but I don't recall specifically.
16     Q.   Okay.  I want to play something for you.  And
17  we're going to make this Exhibit 4.  I've got it
18  available electronically that we'll get to the court
19  reporter.  It's the pursuit audio.
20     (Whereupon an excerpt from Exhibit 4, Pursuit
21  Audio, was played after which the deposition continued
22  as follows:)
23     Q.   Let's pause that for a second there at 1
24  minute, 21 seconds.  Let me ask you this:  Is that your
```

```
 1  understanding the initial encounter where Corporal
 2  Peterson saw Billy Means's motorcycle was around
 3  Walmart at 119?
 4     A.   Yeah.
 5     Q.   Okay.
 6          MR. RUGGIER:  I'm sorry, you said at 1:19
 7  or on 119?
 8          MR. FORBES:  Let's ask it both ways.
 9          MR. RUGGIER:  What I'm asking, because
10  the road is 119.
11          MR. FORBES:  Right.
12          MR. RUGGIER:  And the time is --
13          MR. FORBES:  Oh, I'm referring to the
14  road.
15     Q.   You were referring to --
16     A.   US 119.
17     Q.   All right.  Okay.  The time was around 8:00
18  o'clock in the morning; right?
19     A.   Best I can remember, yeah.
20     Q.   Okay.  What's your understanding of why
21  Corporal Peterson began to follow Billy Means's
22  vehicle?
23     A.   I know that the tags were improper and then
24  other than that I don't know, we haven't talked about
```

```
 1  it.
 2     Q.   Okay.  You didn't talk about it after the
 3  incident on May 2nd when you had to write your report
 4  as to why he was following this guy?
 5     A.   No.
 6     Q.   So let me ask you this:  When you're engaged
 7  in this pursuit that went on for, what, almost 20
 8  minutes?
 9     A.   It sounds right.  I'm not sure completely, but
10  yeah.
11     Q.   Did you know why you were following this
12  vehicle?
13     A.   I was assisting in a pursuit.
14     Q.   Okay.  Did you know why Corporal Peterson was
15  following this vehicle?
16     A.   No.
17     Q.   Did you know whether he suspected a traffic
18  offense?
19     A.   He said that the tags were improper and then
20  said that he was looking back at him, so.
21     Q.   Other than the tags being improper and him
22  looking back at him, are you aware of any other
23  suspected offenses that this pursuit was engaged
24  following Billy Means for?
```

```
 1    A.    I'm not aware of any.  I was just there to
 2  assist.
 3    Q.    Do you believe as a South Charleston police
 4  officer that you have a duty to factor in the type of
 5  offense when you conduct a pursuit even if you're the
 6  second vehicle?
 7    A.    Yes.
 8    Q.    How do you do that if you don't know what he's
 9  being pursued for?
10    A.    He said that the tags were improper and then
11  he was looking back at him.
12    Q.    So in your determination of why to follow this
13  vehicle and why not to stop this pursuit, the only
14  offense that you're aware of for Billy Means is the
15  improper tag; right?
16    A.    The improper tag accompanied with somebody
17  that continually looks back to you would make me
18  believe that it could be a stolen vehicle.
19    Q.    Okay.  Let me ask you this:  Is it a crime to
20  look back at somebody off of a motorcycle?
21    A.    No, but the improper tags and then not
22  stopping for police is.
23    Q.    Improper tags is the only thing --
24          MR. RUGGIER:  Sorry, guys.
```

```
 1    Q.    Improper tags is the only thing at the
 2  beginning of this encounter that you're aware of being
 3  a reason to stop a vehicle; right?
 4    A.    Correct.  Just what you heard on the radio
 5  traffic is the only thing I was aware of.
 6    Q.    All right.  Let's keep listening.
 7    (Whereupon an excerpt from Exhibit 4, Pursuit
 8  Audio, was played after which the deposition continued
 9  as follows:)
10    Q.    Okay, so that's Officer Peterson asking Metro
11  to notify Lincoln County that potentially this person
12  could flee and that they should have somebody ready
13  over in that area; right?
14    A.    Yes.
15    (Whereupon an excerpt from Exhibit 4, Pursuit
16  Audio, was played after which the deposition continued
17  as follows:)
18    Q.    All right, so that's at about 2 minutes and 50
19  seconds of the audio recording and at that point
20  Corporal Peterson is radioing that he believes
21  Mr. Means is going to flee.
22    A.    At that point?
23    Q.    Yeah.
24    A.    From what I understand I think he was already
```

```
 1  started fleeing.
 2    Q.    Fleeing at 2:50
 3    A.    I think.
 4    Q.    That's what you believe based on what you've
 5  heard here?
 6    A.    Uh-huh.
 7    (Whereupon an excerpt from Exhibit 4, Pursuit
 8  Audio, was played after which the deposition continued
 9  as follows:)
10    Q.    Do you know what the speed limit is out
11  through there on Trace Fork?
12    A.    No.
13    Q.    It's not 50 miles per hour, is it?
14    A.    I don't know.
15    (Whereupon an excerpt from Exhibit 4, Pursuit
16  Audio, was played after which the deposition continued
17  as follows:)
18    Q.    That's about 4:40 on the recording.  Can
19  you tell who that is that's telling him if he goes
20  reckless just let him go?
21    A.    Paskal.
22    Q.    Who's Paskal?
23    A.    Ben Paskal, the lieutenant.
24    Q.    Okay, so that would be the supervising
```

```
 1  officer; right?
 2    A.    Correct.
 3    Q.    So at 4:40 on this audio recording, Lieutenant
 4  Paskal is telling Corporal Peterson if he goes reckless
 5  just let him go; right?
 6    A.    Yeah.
 7    Q.    Okay.  Did you hear that during the audio?
 8  Were you listening to all this?
 9    A.    I don't recall, but I'm sure I would have
10  heard it.
11    Q.    Okay.  How do you define reckless?
12    A.    Reckless would be like if there's cars passing
13  like swerving towards him, passing cars on a double
14  line, things like that.
15    Q.    Let me ask you this:  Have you ever charged
16  anybody with reckless driving?
17    A.    Maybe.
18    Q.    Okay.  You're aware reckless driving is a
19  crime; right?
20    A.    Yeah.
21    Q.    Okay.  Is there any legal requirement that
22  you've got to be passing a vehicle to be recklessly
23  operating one?
24    A.    No.  The code for reckless driving just says
```

1  driving without due regard.
2     Q.   Back to your report and Exhibit 3, you
3  yourself wrote "He was also going at a high rate of
4  speed around blind curves.  Whenever he would make
5  these blind turns, he would cross in the opposite lane
6  of traffic.  If there were any vehicles on the other
7  side of the road -- other side of the turn, he would
8  have struck them."  Do you think somebody operating a
9  vehicle like that has a regard for safety?
10    A.   Not necessarily, no.
11    (Whereupon an excerpt from Exhibit 4, Pursuit
12 Audio, was played after which the deposition continued
13 as follows:)
14    Q.   Now, at that point you've got Corporal
15 Peterson saying we're not speeding, I'm right with him.
16 Then he says 47 miles an hour.  Do you know what the
17 speed limit was through there?
18    A.   No.
19    Q.   Do you believe, based on what Lieutenant
20 Paskal was saying, that he, Lieutenant Paskal, was
21 telling Corporal Peterson to disengage a pursuit if
22 someone starts driving in a manner that's dangerous to
23 people?
24    A.   Yeah, recklessly.

1     (Whereupon an excerpt from Exhibit 4, Pursuit
2  Audio, was played after which the deposition continued
3  as follows:)
4     Q.   Let me ask you a question.  We're 5 minutes
5  and 47 seconds into this.  If you engage in a pursuit
6  of somebody, are you suppose to have your sirens and
7  lights running?
8     A.   At first I would do my lights and sirens to
9  let them know I was behind them and then after you
10 could just go with just your lights.
11    Q.   Okay.  At any point up to now in this radio, 5
12 minutes and 47 seconds, have you heard sirens on the
13 recording?
14    A.   No.
15    (Whereupon an excerpt from Exhibit 4, Pursuit
16 Audio, was played after which the deposition continued
17 as follows:)
18    Q.   What's he talking about there, take down unit?
19 Is that what he said?
20    A.   I think I said tell those other units.
21    Q.   Tell those other units?
22    A.   I think, yeah.
23    Q.   I couldn't make it out.  When they're
24 referring to 45, that would be your car; right?

1     A.   Yes.
2     (Whereupon an excerpt from Exhibit 4, Pursuit
3  Audio, was played after which the deposition continued
4  as follows:)
5     Q.   We're a little over 10 minutes into this.
6  This is you talking now; right?
7     A.   Yeah.
8     Q.   Okay, so you've taken over the radio chatter
9  with Metro?
10    A.   Yes.
11    Q.   Are you communicating with Peterson separately
12 at this point?
13    A.   No.
14    Q.   Okay, so the only way for you and Peterson to
15 communicate is also through this radio that Metro is
16 listening to?
17    A.   Yes.
18    Q.   Is that right?  Okay.  I guess what I'm asking
19 is you guys aren't switching channels somehow or any of
20 that kind of, you know, where you can talk, just the
21 two of you?
22    A.   Correct.  Just what you hear.
23    Q.   Just what I hear.  Okay.  All right.  Let's
24 keep going.

1     (Whereupon an excerpt from Exhibit 4, Pursuit
2  Audio, was played after which the deposition continued
3  as follows:)
4     Q.   Did you see that yourself where the parts were
5  falling off the motorcycle that Peterson is describing?
6     A.   No.
7     Q.   Did you see any parts in the roadway?
8     A.   No, not that I recall.
9     (Whereupon an excerpt from Exhibit 4, Pursuit
10 Audio, was played after which the deposition continued
11 as follows:)
12    Q.   At 11:30, was that you or Peterson asking for
13 units to be stationed by Metro where the road comes
14 out?
15    A.   Just now?
16    Q.   Yeah.
17    A.   That was Peterson.
18    Q.   That was Peterson.  Okay, so at 11 minutes and
19 30 seconds into this Peterson is asking Metro again, I
20 think he said it earlier, but he's asking Metro again
21 to make sure they've got units at the end of wherever
22 this road comes out?
23    A.   Yeah.
24    Q.   That would be because if he got, he being

---

**Page 85**

1 Mr. Means, either got away in the pursuit or the
2 pursuit was terminated, there would be other officers
3 to try to locate him; right?
4     A.   Yes.
5     (Whereupon an excerpt from Exhibit 4, Pursuit
6 Audio, was played after which the deposition continued
7 as follows:)
8     Q.   All right, so we're at 11:45 and Metro is
9 advising both you and Peterson that Boone's been
10 notified and if you keep going on this road that you're
11 going to end up in Boone County; right?
12     A.   Correct.
13     Q.   And when they say Boone's been notified, they
14 mean Boone law enforcement officers; right?
15     A.   Yes.
16     (Whereupon an excerpt from Exhibit 4, Pursuit
17 Audio, was played after which the deposition continued
18 as follows:)
19     Q.   That's about 13, 14, 13 minutes 14 seconds
20 or so on the recording.  That's Metro advising you and
21 Peterson that Boone had a trooper and a deputy waiting
22 on the Boone County line on this road; right?
23     A.   Yeah.
24     Q.   Okay.  So if the wreck hadn't happened,

---

**Page 86**

1 Mr. Means would have continued and would have then been
2 pursued or come into contact with a State Trooper, a
3 West Virginia State Trooper and a Boone County
4 sheriff's deputy on out the road; right?
5     MR. RUGGIER:  Object to the form of the
6 question.  Calls for speculate.  You can answer if you
7 can.
8     A.   I can speculate they were set up there.
9     Q.   It's what you were advised by Metro
10 Communications; right?
11     A.   Yeah, that they were around there.
12     Q.   And that's done, again, so if a pursuit is
13 terminated or you lose the suspect during a pursuit
14 there's other officers that can then apprehend the
15 suspect; right?
16     A.   Yeah and also they know, excuse me, they know
17 the area so they can help you know where you're at like
18 as far as the pursuit goes.
19     Q.   They'd know the roads a lot better than you
20 all would; right?
21     A.   Yeah.
22     (Whereupon an excerpt from Exhibit 4, Pursuit
23 Audio, was played after which the deposition continued
24 as follows:)

---

**Page 87**

1     Q.   That's 13 minutes and 34 seconds.  Is that you
2 describing crossing some railroad tracks on Emmons?
3     A.   Yes.
4     (Whereupon an excerpt from Exhibit 4, Pursuit
5 Audio, was played after which the deposition continued
6 as follows:)
7     Q.   That was 14 minutes and I think about 12
8 seconds and Metro was advising that they were starting
9 to lose you.  Were they losing radio contact?
10     A.   Whoever just talked, they didn't hear, but I
11 don't know who it was.  I don't know if it was me or
12 somebody else.
13     Q.   Okay.  Were there issues on your end hearing
14 what Metro was saying?  Was it breaking up at some
15 points?
16     A.   Not that I recall.
17     Q.   Okay.
18     (Whereupon an excerpt from Exhibit 4, Pursuit
19 Audio, was played after which the deposition continued
20 as follows:)
21     Q.   All right.  That's about 14 minutes and 50
22 seconds and someone's saying he crashed at, I think
23 they said at the railroad?
24     A.   Uh-huh.

---

**Page 88**

1     Q.   Is that you?
2     A.   Peterson.
3     Q.   That was Peterson talking?  Okay.
4     (Whereupon an excerpt from Exhibit 4, Pursuit
5 Audio, was played after which the deposition continued
6 as follows:)
7     Q.   So let me ask you, at this point we're about
8 15 minutes into this pursuit and you guys have crossed
9 into Boone County from Kanawha County; right?
10     A.   Yes.
11     Q.   Okay.  Where in there, in what we just
12 listened to, the 15 minutes of it, was he described as
13 going 60 miles an hour?
14     A.   At the very end there's a straightaway before
15 that railroad crossing.
16     Q.   You don't report that to Metro though, do you,
17 that he went 60?
18     A.   No.
19     Q.   Is there a reason you didn't tell Metro how
20 fast he was going?
21     A.   Didn't have a chance.  We went that speed and
22 then you heard the next thing which was where he
23 wrecked.
24     Q.   So there's descriptions throughout that though

1    that he's going 40 some miles an hour; right?
2        A.   Correct.
3        Q.   This is a very lengthy pursuit through what's
4    barely a two lane road and some places it's a one lane
5    road, isn't it?
6        A.   I believe so.  Like maybe some slippage on the
7    road, but I don't recall specifically, but I think so.
8        Q.   The blind curves that you described in your
9    report, they're not just at the end; right?  I mean,
10   those things are all the way through this.
11       A.   Correct.
12       Q.   At any point did you radio Metro or Peterson
13   and say, hey, we should stop this pursuit?
14       A.   No.
15       Q.   Did you hear Lieutenant Paskal in the
16   beginning say that if it became reckless to let him go?
17       A.   I don't recall, but probably.
18       Q.   Have you been told that by South Charleston
19   before?
20       A.   If a pursuit gets too reckless to discontinue
21   it?
22       A.   Yes.
23       A.   Yes.
24       Q.   And how do you describe too reckless?

1        A.   Again, just the totality of circumstances, the
2    speed, how they're driving, other vehicles on the road,
3    pedestrians, are you going through a residential area
4    or, you know, interstate.  It all depends on all those
5    things put together.
6        Q.   This was a compact residential area pretty
7    much your entire pursuit, wasn't it?
8        A.   A residential area?
9        Q.   Yeah.
10       A.   No.
11       Q.   You didn't see residences?
12       A.   Whenever I consider residential area, I mean,
13   somewhere where there's, the speed limit is about 50,
14   there's houses all along and there's cross streets
15   everywhere.
16       Q.   The speed limit would be what?
17       A.   About 15.  This was a county highway road.
18       Q.   Okay.  Let me show you -- let's go to another
19   exhibit.  We'll make this Exhibit 5.  We'll provide
20   this electronically to the court reporter.
21       This is -- I'm going to have to try to get
22   technically savvy here so give me a second.  All right.
23   This is a pursuit video taken by South Charleston
24   provided to us.  I'm going to come around.

1             VIDEO OPERATOR:  Is this the video that's
2    half an hour long?
3             MR. FORBES:  Yeah, I'm not going to play
4    the whole 30 minutes.
5             VIDEO OPERATOR:  I've got about 15
6    minutes left on my disk.
7             MR. FORBES:  That's fine.  Just flag me,
8    we'll take a break about five or ten minutes, okay?
9    We're not going to play the whole thing right now.
10            (Whereupon an excerpt of Exhibit 5,
11   Pursuit Video Part 1, was played after which the
12   deposition continued as follows:)
13       Q.   Can you tell who that was that just popped
14   upped on this video, this Go Pro video?
15       A.   It looked like Corporal Peterson.
16       Q.   Let me ask you, have you ever seen this video
17   before?
18       A.   No.
19       Q.   Okay.  Where are they right now in the car?
20   This is the very beginning of the video.
21       A.   This is South Ridge Boulevard passing like
22   Buffalo Wild Wings and turning into Walmart parking lot
23   or Sam's right now.
24       Q.   Okay.  Do you know who's riding with Corporal

1    Peterson?  If that's him, it looked like he was in the
2    passenger seat.
3        A.   I don't know.
4        Q.   Wasn't you?
5        A.   No.
6        Q.   Tell you what I'm going to do, I'm going to go
7    ahead and skip forward a little bit.  I think some of
8    this may be more directed at Corporal Peterson.  So
9    we're at about a minute 25 right now.  Let's skip on
10   out here.  It may take a second with the Wi-Fi.  All
11   right.
12            (Whereupon an excerpt of Exhibit 5,
13   Pursuit Video Part 1, was played after which the
14   deposition continued as follows:)
15       Q.   We're 7 minutes and 48 seconds into the video.
16   Do you recognize that road?
17       A.   No.
18       Q.   Would that part have been before you joined
19   the chase?
20       A.   I think so.  Yeah, looks like it.
21       Q.   You tell me when you recognize the spot where
22   you come into this chase at, okay?
23       A.   Okay.
24            (Whereupon an excerpt of Exhibit 5,

1  Pursuit Video Part 1, was played after which the
2  deposition continued as follows:)
3      Q.    We're about 9 and a half minutes in right now,
4  into this video.  Those are houses that they're passing
5  at this point; right?
6      A.    Yeah.
7      Q.    Cars on both sides of the road; is that right?
8      Q.    What is it now?
9      Q.    I said there were houses and cars on both
10 sides of the road.
11     A.    Yeah.
12           (Whereupon an excerpt of Exhibit 5,
13 Pursuit Video Part 1, was played after which the
14 deposition continued as follows:)
15     Q.    We're at 10 minutes and 37 seconds.  Does that
16 look like more than a one lane road to you?
17     A.    No.  Maybe one and a half.
18     Q.    That's a stop sign at 10 minutes and 58
19 seconds.  Now you're still not at the part -- we're not
20 at a part in this video where we can see where you came
21 into this chase yet.
22     A.    Correct.
23           (Whereupon an excerpt of Exhibit 5,
24 Pursuit Video Part 1, was played after which the

1  deposition continued as follows:)
2      Q.    Okay.  This is 12 minutes into this and
3  they're going down, at least on this video, down some
4  kind of gravel road?
5      A.    Yeah, looks like it.
6      Q.    Okay.
7      A.    That's it right there.
8      Q.    Okay, so let me back that up a couple seconds.
9  Okay, so you entered the pursuit about there; is that
10 right?
11     A.    Yeah.
12     Q.    That's at 15 minutes basically, about 14.58 or
13 so on this video is where they said you started and you
14 entered.  Does that sound about right to you, at that
15 intersection there?
16     A.    Yeah.
17     Q.    I say intersection, it's basically one little
18 road coming into another little road; right?
19     A.    Yeah.
20     Q.    Okay.
21           MR. FORBES:  Do you need to change tapes?
22 Let's take just a very quick break.
23           VIDEO OPERATOR:  Time is 11:27 a.m.
24 We're off the record.

1           (A brief recess was taken after which the
2  deposition continued as follows:)
3           VIDEO OPERATOR:  Time is 11:34 a.m.
4  We're on the record.
5  BY MR. FORBES:
6      Q.    All right.  We're back on the record, Officer
7  Harvey.  We're at the point in the video where you come
8  into this pursuit so let's watch some of that.
9           (Whereupon an excerpt of Exhibit 5,
10 Pursuit Video Part 1, was played after which the
11 deposition continued as follows:)
12     Q.    Is that right by The Ridges, is that where
13 we're at?
14     A.    Yeah.
15     Q.    That's a residential area, isn't it, The
16 Ridges?
17     A.    Once you go up on the hill, yes.
18     Q.    Whole bunch of houses and townhouses and stuff
19 like that?
20     A.    Yeah, away from the road, up, uh-huh.
21     Q.    What are all these houses we're passing here,
22 16 minutes, 11 seconds, does it look like people live
23 in those?
24     A.    I would assume so.

1      Q.    We're at 16.24.  You see a whole bunch of
2  houses up that way; right, on the right-hand side of
3  the road?
4      A.    Yeah.
5      Q.    Houses on the left hand side of the road?
6      A.    Yeah.
7      Q.    Look like residences?
8      A.    Those look like residences, yes.
9      Q.    What's that 15 mile an hour with the yellow at
10 the top?
11     A.    School zone sign.
12     Q.    Do you all pursue this pursuit through a
13 school zone?
14     A.    There's no school on the weekend.
15     Q.    Okay, but it was a school zone; right, there's
16 a school there?
17     A.    Most school zones are only applicable whenever
18 a school's in session or like the bus is picking them
19 up.
20     Q.    It indicates places that children play and do
21 things; right?
22     A.    No, they indicate for a school zones.
23     Q.    Okay.  Would you believe there's a school
24 right in this area at 16 minutes and 28 seconds based

WILLIAM ALLEN MEANS v.                                      DAVID HARVEY
E.M. PETERSON, et al.                                           04/26/2021

1   on the school zone sign?
2       A.   There could be.  I don't know if there is or
3   isn't, but it was on the weekend and with the pandemic
4   they also weren't having in house school.
5       Q.   I understand there may not have been school
6   going on actively at 8:00 something in the morning that
7   day.  What I'm asking you is you pursued this through
8   an area that had a school in it; right?
9       A.   Possibly.  I don't know if there's a school
10  there or not.
11      Q.   Maybe just a sign for a school?
12      A.   Yeah, sometimes they'll put them where the
13  school bus picks kids up.
14              (Whereupon an excerpt of Exhibit 5,
15  Pursuit Video Part 1, was played after which the
16  deposition continued as follows:)
17      Q.   What's that look like to you right there?
18      A.   Looks like a school.
19      Q.   Yeah, you all drove right past that; right?
20      A.   Okay.  Yeah.  I don't know that area.  That's
21  the first and last time I been out there.
22      Q.   Okay.  It switches over to Part 2 and I'm not
23  going to make you watch all of Part 2, but we'll watch
24  a little bit of it.

---

WILLIAM ALLEN MEANS v.                                      DAVID HARVEY
E.M. PETERSON, et al.                                           04/26/2021

1       A.   Okay.
2              MR. RUGGIER:  Does this need to be a new
3   exhibit or is it going to be --
4              MR. FORBES:  Yeah, I guess let's go ahead
5   and make it, just because it will be easier since it's
6   going to come in two parts, let's go ahead and make
7   this Exhibit --
8              THE DEPONENT:  Six.
9              MR. FORBES: -- 6.  It's called Pursuit
10  Path 2.
11              (Whereupon an excerpt of Exhibit 6,
12  Pursuit Video Part 2, was played after which the
13  deposition continued as follows:)
14      Q.   I'm going to skip a ahead a little bit just to
15  save us some time, okay?
16      A.   Okay.
17      Q.   Maybe.  Now, we're at 2 minutes and 32
18  seconds.  What's that speed limit sign say right there?
19      A.   Twenty-five.
20      Q.   Okay and that's at 2 minutes and 32 seconds
21  into this Part 2 of the pursuit path.  You all were
22  definitely not going under 25 miles an hour at this
23  point; right?
24      A.   Not that I recall.  We might not have been

---

WILLIAM ALLEN MEANS v.                                      DAVID HARVEY
E.M. PETERSON, et al.                                           04/26/2021

1   going much over it, but I don't recall specifics.
2       Q.   Okay, but you do recall that you wouldn't have
3   been going under 25?
4       A.   I don't think we were.
5              (Whereupon an excerpt of Exhibit 6,
6   Pursuit Video Part 2, was played after which the
7   deposition continued as follows:)
8       Q.   We're at 3 minutes and 20 seconds.  Does that
9   look like a residence there on the left to you?
10      A.   Yeah.
11      Q.   Around that kind of curve.
12              (Whereupon an excerpt of Exhibit 6,
13  Pursuit Video Part 2, was played after which the
14  deposition continued as follows:)
15      Q.   This definitely here, 3 minutes, 35 seconds
16  doesn't look like a full two lane road, does it?  I
17  mean, what would you describe that as?
18      A.   Maybe just like a one and a half.  Like you
19  could probably get two, but somebody would have to be
20  slowed.
21      Q.   Pretty tight; right?
22      A.   Yeah.
23              (Whereupon an excerpt of Exhibit 6,
24  Pursuit Video Part 2, was played after which the

---

WILLIAM ALLEN MEANS v.                                      DAVID HARVEY
E.M. PETERSON, et al.                                           04/26/2021

1   deposition continued as follows:)
2       Q.   Seems like whoever is taking the video is
3   going a pretty good rate, aren't they?
4       A.   I don't know.
5       Q.   All right.  We're at 5 minutes, 41 seconds
6   into this.  That's another speed limit sign.  What is
7   it?
8       A.   Twenty-five.
9       Q.   Miles per hour?
10      A.   Correct.
11              (Whereupon an excerpt of Exhibit 6,
12  Pursuit Video Part 2, was played after which the
13  deposition continued as follows:)
14      Q.   Was that like a rock wall we just passed
15  there, about 7 minutes, on the left?
16      A.   Looked like it.
17      Q.   Yeah.  Here's one railroad crossing.  This is
18  at 7 minutes about 40 seconds.  You notice how they
19  stop?
20      A.   Uh-huh.
21      Q.   What did they stop for?
22      A.   I don't know, maybe looking for trains, I'm
23  not sure.
24              (Whereupon an excerpt of Exhibit 6,

1  Pursuit Video Part 2, was played after which the
2  deposition continued as follows:)
3       Q.   9:05 we've got another railroad crossing.
4  They stopped again.  Did you see that?
5       A.   Yes.
6       Q.   We got residences again.  I mean, I haven't
7  described them all the way through here, but you see
8  periodically residences on this road; right, where
9  people live?
10      A.   Yes.
11           (Whereupon an excerpt of Exhibit 6,
12  Pursuit Video Part 2, was played after which the
13  deposition continued as follows:)
14      Q.   Can you tell what this is over here with
15  picnic tables?  We're at 9 minutes and 23 seconds into
16  this.  We've got a little pull off and it looks like a
17  basketball court, picnic tables, I guess a kids' swing
18  set, play set, do you see that?
19      A.   Yeah.
20      Q.   Do you know what that is?
21      A.   Looks like a park.
22      Q.   So the pursuit at 8:00 something in the
23  morning proceeded past this park?
24      A.   Yes.

1       Q.   And of course beside the park you've got
2  residences off to the right and then you've got the
3  park with the kids' swing set and stuff off to the left;
4  right?
5       A.   Correct.
6            (Whereupon an excerpt of Exhibit 6,
7  Pursuit Video Part 2, was played after which the
8  deposition continued as follows:)
9       Q.   All right.  We're at 9 minutes and 36 seconds.
10  What's that white thing there?
11      A.   Speed limit sign for 25 miles per hour.
12      Q.   You all passed that; right?
13      A.   Correct.
14      Q.   Do you know where the straight stretch you
15  were talking about where you saw Mr. Means's motorcycle
16  going 60 miles an hour was?
17      A.   I should be able to let you know.  It's just
18  the straight stretch right before the tracks.
19      Q.   Just let me know, okay?
20      A.   I will.
21      Q.   This is all pretty curvy with a lot of
22  residences, but you tell me when you see that.
23      A.   Okay.
24           (Whereupon an excerpt of Exhibit 6,

1  Pursuit Video Part 2, was played after which the
2  deposition continued as follows:)
3       Q.   At 9:45, that was a cemetery off to the left;
4  right, 9 minutes and 45 seconds?  I'll back it up for
5  you a little bit.
6       A.   Yeah, it looked like it.  Yeah, it appears so.
7       Q.   And while we're looking for the straight
8  stretch, in your report, Officer, where you're talking
9  about him going at a high rate of speed around blind
10  curves and he'd make these blind turns and cross into
11  the opposite lane of traffic, is that a specific place
12  in here or is that just throughout?
13      A.   I would just say throughout.
14      Q.   So basically the whole time you're dealing
15  with him, from the mark where we saw you come onto this
16  pursuit through to the end with the crash, he's going
17  around all these curvy blind curves unsafely?
18      A.   I wouldn't say all of them, but he was going
19  around a lot of them at a high rate of speed.
20      Q.   Throughout the pursuit?
21      A.   Yeah.
22      Q.   It's not like it just was a couple curves and
23  it stopped.  It was pretty much the whole way through?
24      A.   Yeah.

1       Q.   Okay and those were done where you believed
2  that he was crossing into the opposite lane of traffic
3  and you believed that if there were any vehicles on the
4  other side he would have struck those vehicles;
5  correct?
6       A.   Correct.
7       Q.   Okay.  Nevertheless this pursuit continued?
8       A.   Correct.
9            (Whereupon an excerpt of Exhibit 6,
10  Pursuit Video Part 2, was played after which the
11  deposition continued as follows:)
12      Q.   What's this at 10 minutes and 51 seconds?
13  What is this almost on the road here?  What is that
14  building?
15      A.   It looks like a church.
16      Q.   Okay, so that's a church and this chase is at
17  8:00 something in the morning; right?
18      A.   Correct.
19      Q.   You all are passing on this road right beside
20  this church where we've got some kind of walkway or
21  path almost right on the road; right?
22      A.   Looks like it.
23      Q.   He didn't strike anybody at the church, did
24  he?

1    A.   Not to my knowledge.
2              (Whereupon an excerpt of Exhibit 6,
3    Pursuit Video Part 2, was played after which the
4    deposition continued as follows:)
5    Q.   Let me ask you.  Now that was about 11:48,
6    probably somewhere in that neighborhood.  The vehicle
7    stopped to let another car pass, did you see that?
8    A.   Yeah.
9    Q.   Was that because the road was so narrow the
10   safe way to do that would be to stop so the other car
11   could pass?
12   A.   Yeah, looks like it.
13             (Whereupon an excerpt of Exhibit 6,
14   Pursuit Video Part 2, was played after which the
15   deposition continued as follows:)
16   Q.   Here's another railroad track and they stopped
17   again.  Would you say watching them do it over and over
18   again it's likely to be safe, make sure there's no
19   trains and stuff coming?
20   A.   Yeah.  I think it's this straight stretch.
21   Q.   Right here?
22   A.   I think so.
23   Q.   Okay.
24   A.   It appears so.

1    Q.   So you think -- around 12:59 is what I've got
2    on here.  You think it's somewhere in that neighborhood
3    is where he's going 60 miles an hour you think?
4    A.   I don't know for sure if he was going 60, but
5    I was going 60 to try and --
6    Q.   You were going 60 to try to catch him?
7    A.   Uh-huh.
8    Q.   Through this stretch here?  Pretty beat up
9    looking road from what I can tell.
10   A.   Yeah.
11   Q.   Would you agree with me the last speed limit
12   sign we've seen on this video was for 25 miles an hour?
13   A.   Yeah, the last one I saw, correct.
14   Q.   You yourself are doing 60 in the straight
15   stretch before we get to the tracks?
16   A.   Yeah or close to it, 60 or close to it.
17             (Whereupon an excerpt of Exhibit 6,
18   Pursuit Video Part 2, was played after which the
19   deposition continued as follows:)
20   Q.   That's at 13 minutes and 10 seconds.  We're
21   now at the crash location.  So the spot where you --
22   and I assume Peterson was in front of you.  He would
23   have had to been doing 60 also.
24   A.   I assume so, I don't know.  You have to ask

1    him.
2    Q.   You didn't run into him; right?
3    A.   Correct.
4    Q.   And you're the second car back?
5    A.   Uh-huh.
6    Q.   If you're going 60 and he's going much less
7    than you you'd have run into him; right?
8    A.   Correct.  We keep distance between each other.
9    Could be possible for a little bit of leeway.  Like I
10   could be coming up on him 60, but, no, for the most
11   part he'd be going close to that.
12   Q.   About the same speed; right?  Okay, so this is
13   right before you guys are chasing Billy Means to this
14   railroad track, you're both going 60 in pursuit
15   roughly?
16   A.   Roughly.
17             (Whereupon an excerpt of Exhibit 6,
18   Pursuit Video Part 2, was played after which the
19   deposition continued as follows:)
20   Q.   All right.  Now, in this video at 13 minutes
21   and 22 seconds, is this the little bed that had the
22   water in it that you found Mr. Means in?
23   A.   Yes.
24   Q.   There's no water on it on this date where this

1    is taken or not much not that you can see on the
2    camera.
3    A.   Correct.
4    Q.   Okay.  That's all the questions I got about
5    that.
6    A.   Okay.
7    Q.   All right.  Let's go on your report there,
8    Exhibit 3 I believe, the case report, on down your
9    summary.  It says "I got out of my cruiser at the same
10   time as Corporal Peterson."  So is it your belief that
11   you and Corporal Peterson both exited your vehicles at
12   the same time?
13   A.   At least close, I mean, I wouldn't say exact,
14   but approximately at the same time, yes.
15   Q.   Well, because, I mean, your report you did
16   say, you said "I got out of my cruiser at the same
17   time."  You didn't say approximately or anything like
18   that.  You said at the same time.
19   A.   I'd say approximately.
20   Q.   "We began to approach and drew our service
21   weapon."  You both had your guns out at that point?
22   A.   Yes.
23   Q.   "Giving commands for him to show us his hands.
24   I saw the male, later identified as William Means,

1 lying on his back in the water." Now at this point you
2 don't know who this person is; right?
3    A.   Correct.
4    Q.   You don't know what his criminal history is?
5    A.   Correct.
6    Q.   You said "The water was approximately three
7 foot deep." You didn't measure the water or anything,
8 did you?
9    A.   No.
10   Q.   Where he had kicked up dirt, excuse me, "Where
11 he had kicked dirt up, you couldn't see under the water
12 at all." Did you see him kicking, with his legs, the
13 dirt?
14   A.   Kicked up dirt is an expression just where he
15 hit the water and dirt came up. Not literally kicking.
16   Q.   Okay. Then it says "Mr. Means initially
17 complied." So when you first approach him, he complies
18 and puts his hands up?
19   A.   Correct.
20   Q.   Okay. "Whenever we got closer to him he
21 immediately put both hands under the water where we
22 couldn't see." You don't know whether he did that
23 intentionally or whether he was having difficulty given
24 his injuries, do you?

1    Q.   What do you mean exactly?
2    Q.   Well, you describe it as he initially complies
3 and puts his hands up. Then he puts his hands back
4 down in the water. We all know he had a serious spinal
5 injury at the end of this, okay?
6    I guess what I'm asking is do you know whether or
7 not the hands went back down due to a medical reason or
8 whether it was some kind of intent on his part? You
9 don't know what was going through his mind is what I'm
10 asking.
11   A.   No, I don't know what was going through his
12 mind.
13   Q.   Then it says "Peterson had to get in the water
14 with him and grabbed his left hand. He still refused
15 to show us his other hand and was pulling away. I
16 administered a short burst of OC spray to Mr. Means to
17 get him to comply." What compliance measures had you
18 tried prior to spraying him with pepper spray?
19   A.   Verbal commands.
20   Q.   You hadn't grabbed his wrist at that point,
21 had you?
22   A.   No. Or, sorry, Corporal Peterson did, I
23 didn't, if that's what you're asking.
24   Q.   Your report says Corporal Peterson grabbed his

1 left hand.
2    A.   Correct.
3    Q.   And then you say he refused to show us his
4 other hand and was pulling away. You didn't see
5 Corporal Peterson try to grab his other hand, did you?
6    A.   No.
7    Q.   You say "I administered a short burst of OC
8 spray." How long did you spray the spray for?
9    A.   Under a second.
10   Q.   Okay. How long are you trained to spray for?
11   A.   Just around there. Just a short burst at
12 first to see if it gains compliance.
13   Q.   One second, two seconds, three seconds, half a
14 second, what's the --
15   A.   They don't give specifics on that. Just a
16 short burst.
17   Q.   Is there a limit?
18   A.   No.
19   Q.   So you could spray for 20 seconds if you
20 wanted to?
21   A.   If the totality of circumstances dictated
22 that, yes.
23   Q.   What circumstances would dictate a 20 second
24 straight burst of OC spray?

1    A.   You want me to speculate or?
2    Q.   I want you, based on your training and
3 experience as a police officer, you just testified that
4 you could spray for 20 seconds. I want you to tell me
5 why -- what circumstances there would be --
6    A.   Like if there was a weapon or something, they
7 continued to reach for it and wouldn't stop.
8    Q.   What's the longest you ever sprayed OC spray
9 at anybody?
10   A.   Not long, just a short burst.
11   Q.   What's a short burst?
12   A.   Under a second. Second or under.
13   Q.   Have you ever sprayed more than a second?
14   A.   No. Not to my knowledge. Approximately. I
15 wouldn't say absolutely I never went over a second, but
16 no, not to my knowledge.
17   Q.   Okay. Now, when you approached Mr. Means as
18 he lay on his back in this little ravine area, he had a
19 helmet on; right?
20   A.   Correct.
21   Q.   A motorcycle helmet. It did not have a visor,
22 did it?
23   A.   Correct.
24   Q.   Okay, so when you sprayed the OC spray, did

1  you spray that into his eyes in the helmet or where
2  exactly did you administer the OC spray?
3      Q.   The facial region.  Just the opening in the
4  helmet.
5      Q.   Okay.  After you sprayed him, did you remove
6  his helmet?
7      A.   No.
8      Q.   Did you ever remove his helmet?
9      A.   No.
10     Q.   You indicated in your report here that you
11 said that the OC spray had no effect on him.
12     A.   Correct.
13     Q.   Did you administer a second blast?
14     A.   No.
15     Q.   Why not?
16     A.   Corporal Peterson was able to get hold of his
17 left hand and then so at that point he kept saying he
18 was drowning, so that's point number one is to get him
19 out of the water and save his life.
20     Q.   So the OC spray ultimately didn't make him
21 comply to anything?
22     A.   Correct.
23     Q.   When you sprayed him with the pepper spray he
24 didn't have a weapon to your knowledge, did he?

1      A.   Not to my knowledge.
2      Q.   He wasn't threatening you verbally saying he
3  was going to hit you or stomp you or shoot you or
4  anything like that?
5      A.   No.
6      Q.   Ultimately Corporal Peterson was able to just
7  simply grab both wrists and get compliance?
8      A.   Not both, just the left.
9      Q.   I thought you said after the OC spray didn't
10 work that Corporal Peterson was able to get the other
11 hand?
12     A.   Get his left hand and I got his right, I
13 believe.  It could be vice versa, but one of us had one
14 and the other one had the other.
15     Q.   You were able to get his hand, regardless of
16 the OC spray used, once you reached and grabbed his
17 hand you were able to get compliance?
18     A.   Yeah, I had to reach under the water and find
19 his hand and then grab it.
20     Q.   You didn't try that prior to spraying him with
21 pepper spray though?
22     A.   No.
23     Q.   When you remove someone from the scene that's
24 been injured in a vehicle accident, are you provided

1  with any training as to how to do that safely to make
2  sure you don't further a spinal injury?
3      A.   No.
4      Q.   Do you know anything about how spinal cords
5  work?
6      A.   Not too much, no.
7      Q.   Okay.  Are you aware that there's the spinal
8  column and then inside of that is a very delicate
9  spinal cord, it's like the consistency of toothpaste.
10 Did you know that?
11     A.   It sounds right.
12     Q.   Okay.  Has anyone provided you with any
13 training, prior to this May 2nd 2020 incident, that you
14 need to be very careful in moving people who present
15 with spinal injuries?
16     A.   Whenever I was a lifeguard, like the first aid
17 training.
18     Q.   What did they tell you as a lifeguard?
19     A.   Just if somebody has a neck injury or spine
20 injury try and, like, stabilize them.
21     Q.   Okay.  How do you stabilize them?
22     A.   With like a backboard, like a C collar and
23 backboard.  They have them at the pool.
24     Q.   When you took the lifeguard training, did they

1  tell you it was okay to grab somebody by the arm and
2  drag them multiple yards if they present with a spinal
3  injury?
4      A.   If you knew about a spine injury, correct.
5      Q.   You knew Billy Means had been thrown from his
6  motorcycle into this ravine; right?
7      A.   I knew he was involved in a wreck and went in
8  the ravine, correct.
9      Q.   You don't have any knowledge of whether or not
10 he had feeling and sensation in his feet at the time
11 you pepper sprayed him, do you?
12     A.   Correct.
13     Q.   Correct that you don't know?
14     A.   Correct, I do not know.
15     Q.   For all you know he could have?
16     A.   Yes.
17     Q.   All right.  I'm going to hand you, make this
18 one --
19          MR. FORBES:  Are we on 7?  That's
20 convenient because this one says 7.  Do you need a use
21 of force report, Duane?
22          MR. RUGGIER:  Yeah, if you hand it to him
23 -- if you have a copy I'll take it.
24          HARVEY DEPOSITION EXHIBIT NO. 7

1       (Use of Force Report was
2    marked for identification purposes as
3    Harvey Deposition Exhibit No. 7.)
4    Q.   All right.  Officer Harvey, do you recognize
5 that document?
6    A.   Yes.
7    Q.   What is it?
8    A.   Use of force report.
9    Q.   Whose use of force report is it?
10   A.   Mine.
11   Q.   Okay.  When did you complete this?
12   A.   I would say the day, May 2nd, but I don't
13 recall specific.
14   Q.   Okay.  Look over on the last page.
15   A.   Okay.
16   Q.   It's got a spot for a date that's blank and
17 then another spot for a date that says May 5th.  Why do
18 you think it would have been approved on May 5th?
19   A.   They may not have looked at and read it until
20 then, I don't know.
21   Q.   Okay.  All right.  Why did you complete this?
22   A.   Because we administered OC spray or, sorry,
23 that I administered OC spray.
24   Q.   Okay.  Is that the only thing that you put in

1 use of force report on for?  I mean, there's no --
2 there's nothing in here that indicates that you
3 impacted or used your hands or used any other parts of
4 your body in a forceful manner on Mr. Means; right?
5    A.   Correct, just OC.
6    Q.   Are you suppose to, when you fill out a use of
7 force report, list all types of control, it says
8 control, all types of control that you administered,
9 not just if you did one?
10   A.   When you say control.
11   Q.   Well, it's your form.  In the front about
12 two-thirds of the way down, level or levels of control
13 and this has got an X under chemical.
14   A.   Uh-huh.
15   Q.   It also has some spots for open hand, closed
16 hand, impact or firearm.
17   A.   Yeah.
18   Q.   What would be impact, what would that be?
19   A.   Impact would be like an ASP baton.
20   Q.   What if someone used a knee or a foot?
21   A.   That would be like a closed hand.
22   Q.   You would list that as a closed hand?
23   A.   Yeah.
24   Q.   Okay.  You didn't list any closed hands on

1 this use of force report, did you?
2    A.   Correct.
3    Q.   You didn't list anything on here indicating
4 that you used your foot on Mr. Means's head, did you?
5    A.   Correct.
6    Q.   In fact, you don't mention that anywhere in
7 your report, do you?
8    A.   No.  If something didn't happen I wouldn't
9 list it.
10   Q.   Okay, so your testimony is you did not use
11 your foot to stomp on Mr. Means's head?
12   A.   Correct.
13   Q.   Okay.  All right.  Let's watch the video.  You
14 know what, I think I can pull this up on my phone, be
15 simpler.  Just a second here.
16        MR. RUGGIER:  Do you type the video?
17        COURT REPORTER:  No.
18        MR. RUGGIER:  What about the audio, do
19 you type that?
20        COURT REPORTER:  No.
21        MR. FORBES:  We talked about that.  We've
22 got the exhibit in the record.  I didn't want to have
23 to make her retype everything that was in it.
24   Q.   All right.  Let me come over there.

1        MR. FORBES:  All right.  We'll make this
2 Exhibit 8.  This is the --
3        MR. RUGGIER:  You just going to e-mail it
4 to her later?
5        MR. FORBES:  Yeah.  I've got a flash
6 drive for her or she said she'd rather have a Dropbox,
7 so I'll just do that.
8    Q.   All right.  Let me play this for you here.
9    (Whereupon an excerpt from Exhibit 8, bystander
10 video, was played after which the deposition continued
11 as follows:)
12   Q.   You know what, let me see if I can get it up
13 on the computer because it's not working very well that
14 way.
15   (Whereupon an excerpt from Exhibit 8, bystander
16 video, was played after which the deposition continued
17 as follows:)
18   Q.   Now, beginning of this video we're about eight
19 seconds in here.  Are you one of those people?
20   A.   Yeah.
21   Q.   I don't think that part is going to matter
22 much.  Let me go back to the beginning.
23   A.   Okay.
24   (Whereupon an excerpt from Exhibit 8, bystander

1  video, was played after which the deposition continued
2  as follows:)
3      Q.   Who just fell down there at seven seconds?
4      A.   That could be me.  It's hard to tell.  It
5  looks like me.
6      Q.   What are you doing there?
7      A.   I think trying to pull him out.  I can't tell.
8      Q.   Okay.  You don't think that's where you
9  administered the pepper spray?
10     A.   I don't know.
11     (Whereupon an excerpt from Exhibit 8, bystander
12  video, was played after which the deposition continued
13  as follows:)
14     Q.   Now, on this video they mentioned that you're
15  tasering him.  Did you administer a taser?
16     A.   No.
17     Q.   Did you have a taser with you?
18     A.   No.
19     Q.   Now, someone's got what looks like their
20  firearm drawn.  Is that you or is that Peterson?
21     A.   It looks like me on the far right.
22     Q.   I don't see Peterson anywhere on this video
23  having a firearm out.  Did he ever have his firearm
24  out?

1      A.   At the beginning, yeah.
2      Q.   Is that you with your gun over top of him?
3      A.   Yeah.
4      Q.   Okay.  Now, looks to me like you all are about
5  to drag him out of there.  Is that what you're doing?
6      A.   Yeah, uh-huh.
7      Q.   Okay.
8      (Whereupon an excerpt from Exhibit 8, bystander
9  video, was played after which the deposition continued
10  as follows:)
11     Q.   Had you seen this car that these women were in
12  during the chase?
13     A.   Yeah.
14     Q.   You did?  What do you think she was talking
15  about where she thought she was going to get hit?
16     A.   I guess they were speaking of Mr. Means.
17     Q.   Could have been speaking of you guys; right?
18     A.   I wouldn't imagine so, but anything is
19  possible.
20     (Whereupon an excerpt from Exhibit 8, bystander
21  video, was played after which the deposition continued
22  as follows:)
23     Q.   Okay.  Now, how do you guys have Mr. Means at
24  this point?  How are you lifting him in this video in

1  there?
2      A.   I think by his arms and maybe like -- and
3  maybe the back of his jacket because he had a lot of
4  water.
5      Q.   Just like pulling on his clothing kind of?
6      A.   Uh-huh.
7      Q.   What was that with your leg there?  That's
8  you; right?
9      A.   Yeah, me stepping over him.
10     Q.   1 minute 31 seconds.  That's you stepping over
11  him?
12     A.   Correct.
13     Q.   These ladies watching this on the video say
14  they saw you stomp his head.  You're saying your foot
15  didn't come in contact with his head?
16     A.   Correct.  They also saw that we tased him
17  which we didn't have tasers.  They've been wrong
18  before.
19     Q.   When the FBI called wanting a statement about
20  this why didn't you just tell them that?
21     A.   Tell them what?
22     Q.   That you didn't stomp on his head?
23     A.   I would have.  I never got a chance to give
24  them a statement.

1      Q.   They offered the chance; right, Lafferty
2  called you and said come give us a statement.  You said
3  I'll get back to you and you talked to several lawyers
4  and you decided not to give him a statement?
5      A.   No.
6      Q.   You didn't give him one, did you?
7      A.   I didn't decide not to.  Nobody ever said that
8  I wasn't going to.
9      Q.   You didn't run down there to offer to clear
10  yourself, did you?
11     A.   I needed to talk with counsel first.
12     Q.   Why do people get lawyers?
13          MR. RUGGIER:  Objection.
14     Q.   How many times have you questioned somebody --
15  I'll go back over here for a second.
16     Q.   Okay.
17     Q.   How many times have you questioned a suspect
18  who's invoked their right to get a lawyer and told them
19  that guilty people get lawyers?  You ever told them
20  that?
21     A.   No.
22     Q.   Really?
23     A.   Really.
24     Q.   You never told a suspect that you're

1   questioning that they don't need a lawyer, they should
2   just talk to you and clear this up?
3      A.   No.  If somebody mentions wanting an attorney
4   to me, I allow them to have that right.
5      Q.   I'm sure you allow them to have the right.
6   I'm not suggesting you don't allow them to have the
7   right.  What I'm asking is do you ever question them
8   about why would they want to get a lawyer?  Be easier
9   just to talk to you now and clear all this up.
10     A.   No.
11     Q.   Okay.  Give me a second here.  I want to try
12  one more thing.  All right.  Let me show it to you on
13  here.
14       (Whereupon an excerpt from Exhibit 8, bystander
15  video, was played after which the deposition continued
16  as follows:)
17     Q.   Now, we're at 1 minute and 20 seconds on the
18  video here.  Now, is that Peterson running back towards
19  the cruiser?
20     A.   Yeah.
21     Q.   Let me ask you first, as we watched this in
22  the very beginning -- let me find the SUV.  Okay.  Now,
23  is yours the SUV?
24     A.   No.

1      Q.   Okay.  You're in this --
2      A.   Charger.
3      Q.   The charger?
4      A.   Uh-huh.
5      Q.   Okay.  You all have got the road blocked at
6   this point pretty much?
7      A.   There might have been a little bit on it, but
8   I don't know.
9      Q.   All right.  I think I just messed that up
10  again.
11         MR. RUGGIER:  You getting all that down?
12     Q.   So it's your testimony that that foot that
13  went up in the air and went down was just stepping over
14  this guy?
15     A.   Correct.
16     Q.   Okay.  Was he on his back or on his front at
17  that point?
18     A.   I think front.
19     Q.   If you had put your foot on his head in a
20  stomping manner like these ladies described, you would
21  have needed to do a use a force report for that;
22  correct?
23     A.   Correct.
24     Q.   At the time you filled out this use of force

1   report somewhere between May 2nd and May 5th of 2020,
2   you didn't know the video I just showed you existed,
3   did you?
4      A.   Correct.
5      Q.   When did you find out that video existed?
6      A.   Months later.
7      Q.   Now, did you place Billy Means in handcuffs?
8      A.   Yeah.
9      Q.   Okay.  Was he cuffed behind his back
10  initially?
11     A.   Initially.
12     Q.   Okay.  Describe that to me.  How did that --
13  when you got him over there and you step over him or
14  stomp on him, depending on who you believe, was he in
15  handcuffs at that point?
16     A.   I believe so.
17     Q.   When did you put the handcuffs on him?
18     A.   Just right around that time.  Just as soon as
19  we got him there Peterson went to check on the cruiser,
20  make sure it didn't get hit by a train and then cuffs.
21     Q.   So before Peterson runs away in the video
22  you've already got him handcuffed?
23     A.   No, I'm starting to.  I cuffed him by myself.
24     Q.   Okay, but did you cuff him prior to your leg

1   going up in the air in the video?
2      A.   I think so, yeah.
3      Q.   Your report on Page 13 there says "I grabbed
4   Mr. Means's right wrist and told him to roll over.  He
5   refused."  Do you know if he refused or he was unable?
6      A.   He didn't.  He didn't comply.
7      Q.   You wrote refused though.
8      A.   He refused to comply.
9      Q.   "And attempted to grab my right wrist with his
10  left hand.  I was able to move my hand to stop him and
11  then I rolled him over and secured him in cuffs."  So
12  after you guys got him out of this area, this swampy,
13  marshy area and drug him across the railroad tracks,
14  you then rolled him over to put cuffs on him; is that
15  right?
16     A.   Yes.
17     Q.   So was he laying on his back and you rolled
18  him onto his front?
19     A.   Best I can remember, yeah.
20     Q.   Were you concerned about that damaging his
21  spinal cord?
22     A.   No.
23     Q.   Why not?
24     A.   Because we had no indication that he had a

1  spinal cord injury.
2  Q. He'd flown off a motorcycle; right, and landed
3  in a ravine; right?
4  A. Again, I had no indication to think that he
5  had a spinal cord injury.
6  Q. At the time after you guys had drug him across
7  the railroad tracks, there was no danger of a train
8  hitting him at that point, was there?
9  A. After we got him away from the tracks,
10  correct.
11  Q. At the point you rolled him over there was no
12  danger of a train?
13  A. Correct.
14  Q. Was there anything to prevent you from
15  handcuffing him in the front?
16  A. Officer safety.
17  Q. Okay. Could you have handcuffed him through a
18  belt loop, for instance, on his side?
19  A. I never seen somebody do that and if they had
20  a weapon on their side they'd still be able to access
21  it.
22  Q. Did Mr. Means have a weapon?
23  A. Not to my knowledge.
24  Q. Okay. Well, you investigated all this; right?

---

1  Did he ever have a weapon?
2  A. Whenever he was reaching under the water it's
3  possible there could have been one in the ravine, but
4  no, we never located one.
5  Q. You think you missed it?
6  A. I'm not saying we did or didn't. I'm just
7  saying we don't know what he could have been reaching
8  for under the water because he was reaching towards his
9  waist band and pockets.
10  Q. As far as you know there's nothing but mud
11  down there in that water; right?
12  A. Correct.
13  Q. You all didn't go in the water and find any
14  kind of weapon, did you?
15  A. Correct.
16  Q. Correct that did you not?
17  A. Correct we didn't go in the water.
18  Q. Correct that you never found a weapon on
19  Mr. Means?
20  A. Correct.
21  Q. All right. Let me hand you this.
22  MR. FORBES: We'll make this number --
23  what number am I at, 8?
24  COURT REPORTER: Nine.

---

1  MR. FORBES: Nine.
2  HARVEY DEPOSITION EXHIBIT NO. 9
3  (Crash Report was marked
4  for identification purposes as Harvey
5  Deposition Exhibit No. 9.)
6  Q. Can you tell me what that is, Officer?
7  A. Crash report. State of West Virginia crash
8  report.
9  Q. Go over to Page 2. Do you know who completed
10  this?
11  A. I know it was a trooper. I'm not familiar
12  with them.
13  Q. Would this have been the trooper that was
14  waiting at the end of the road in Boone County?
15  A. More than likely.
16  Q. Under the narrative it indicates that "Vehicle
17  Number 1 was traveling south on West Virginia Route 3
18  at approximately 60 miles per hour while being pursued
19  by South Charleston Police Department." Do you agree
20  with that?
21  A. Is that Route 3 just that straight stretch I
22  showed you?
23  Q. Well, I think Route 3 is the whole roadway.
24  A. Then, yeah, if Route 3 dictates that straight

---

1  stretch I told you about, yes, I would agree with it.
2  Q. It says it "crashed into an embankment and
3  Vehicle Number 1 came to a rest approximately 60 feet
4  to the south beside the railroad tracks." Now,
5  Mr. Means's body, when you found it, was close to the
6  intersection, but the motorcycle was a good ways down
7  the ravine; right?
8  A. I think so.
9  MR. FORBES: Make this Number 10.
10  HARVEY DEPOSITION EXHIBIT NO. 10
11  (Photograph was marked for
12  identification purposes as Harvey
13  Deposition Exhibit No. 10.)
14  Q. Take a look at that for me and show Duane the
15  picture you guys produced. All right. Do you see that
16  picture there?
17  A. Yes.
18  Q. Do you see where the motorcycle is in that?
19  A. Yeah.
20  Q. Would you agree with me that where you guys
21  were dealing with Mr. Means was up here by this little,
22  for lack of a better word, waterfall?
23  A. I think it was after that.
24  Q. All right. Let's go back to the --

1    A.   Because you can see it where the items are,
2 like the backpack, I think it was around there.
3    Q.   So you think it was down by -- you think he
4 was down by where that backpack is?
5    A.   Somewhere between, yeah, the motorcycle and in
6 that area prior to the motorcycle.
7    Q.   Let's do this one.
8         HARVEY DEPOSITION EXHIBIT NO. 11
9              (Photograph was marked for
10             identification purposes as Harvey
11             Deposition Exhibit No. 11.)
12    A.   But I don't recall exactly.
13    Q.   I'm going to hand you Number 11.  See where
14 that little waterfall area is?
15    A.   Yeah.
16    Q.   Okay.  Do you see where the box is, that gray
17 metal box?
18    A.   Yeah.
19    Q.   Okay.  Now, we just watched that video.  Can
20 you see that you basically, you all drug him to the
21 other side of that little metal box?
22    A.   Yeah.
23    Q.   Okay.  Does that appear to be where he would
24 have to be over towards that little waterfall as

1 opposed to on down where the records and the backpack
2 area is?
3    A.   Possibly.
4    Q.   Okay.  Let me show you the video again.
5    (Whereupon an excerpt from Exhibit 8, bystander
6 video, was played after which the deposition continued
7 as follows:)
8         MR. RUGGIER:  How much longer you going
9 to be with him, do you have any idea?
10        MR. FORBES:  Half hour or so, maybe more?
11        MR. RUGGIER:  I may not make it.
12        MR. FORBES:  What's that?
13        MR. RUGGIER:  I may have to go to the
14 restroom.
15        MR. FORBES:  Oh, that's fine.  Yeah, we
16 can take a break in a second.
17    Q.   Here, let me show you.  Let's just get past
18 this.  Would you agree with me looking at the video
19 there you guys are to the left of the box?
20    A.   Uh-huh.
21    Q.   Okay, which would put you in this area and not
22 down in that area.  Do you see what I'm saying?
23    A.   Yeah.
24    Q.   You'd agree it was closer toward the waterfall

1 area over in here?
2    A.   Looks like it.
3    Q.   You described this as being three feet deep.
4 Do you have any knowledge how you got that measurement?
5    A.   Just where it was able to cover him and his
6 hands.
7    Q.   He was laying on his back; right?
8    A.   Uh-huh.
9         MR. FORBES:  Duane, if you want to take a
10 break, let's go ahead because the next section may take
11 a minute.
12        MR. RUGGIER:  Sounds good.
13        VIDEO OPERATOR:  Time is 12:30 p.m.
14 We're off the record.
15        (A brief recess was taken after which the
16 deposition continued as follows: )
17        VIDEO OPERATOR:  Time is 12:52 p.m.
18 We're on the record.
19 BY MR. FORBES:
20    Q.   All right, Officer Harvey, the manner in which
21 you and Corporal Peterson removed Billy Means from the
22 ravine and drug him across the railroad tracks was
23 grabbing him by his wrists; right?
24    A.   Yeah.

1    Q.   Okay, so one of you had one wrist, the other
2 had the other wrist and you all just drug him by his
3 arms across the tracks?
4    A.   Yeah, best I can recall.
5    Q.   I want you to hand you another picture.  This
6 will be Exhibit 12.
7         HARVEY DEPOSITION EXHIBIT NO. 12
8              (Photograph was marked for
9              identification purposes as Harvey
10             Deposition Exhibit No. 12.)
11    Q.   I'd asked you some questions earlier about
12 where he was when you drug him out of the ravine in
13 relation to the box and the motorcycle.  Would you
14 agree with me, looking on Exhibit 12, you can kind of
15 see the distance there between that box, the gray box,
16 and how far down the motorcycle was?
17    A.   Yeah.
18    Q.   So when we're looking at 12, again, to be
19 clear, we've got some officers walking, but you guys
20 would have been up in that area toward the road where
21 Billy was; right?
22    A.   Yeah, just in around between here and there.
23 I'm not sure exactly where, but somewhere in there,
24 somewhere prior.

1    Q.   Well, you drug him, we can watch on the video
2  again if you want, but you clearly drug him this way
3  over behind that metal box; right?
4    A.   Behind it, yes, like on this side of the box.
5    Q.   Yeah, so in this Exhibit 12, it would have
6  been over in that area; right?
7    A.   That video is at an angle.  I don't know
8  exactly where in reference -- I know it was on this
9  side of the box, but now if it was here or here I don't
10 know.
11   Q.   Okay, but that's where you drug him to.  Where
12 you started was back over here towards the roadway;
13 right?
14   A.   Just somewhere in around here.  I don't recall
15 exactly.
16   Q.   All right.  Fair enough.  Now, let me hand
17 you -- we'll make this 13.
18       HARVEY DEPOSITION EXHIBIT NO. 13
19             (Photograph was marked for
20         identification purposes as Harvey
21         Deposition Exhibit No. 13.)
22   Q.   What's that a picture of?
23   A.   Mr. Means.
24   Q.   Okay.  And it looks to me like at that point

1  he's handcuffed with his arms up above his head.  Did
2  you change where his handcuffs were at some point?
3    A.   We moved his cuffs to the front.
4    Q.   Okay.  Why did you do that?
5    A.   Because he was complaining of not -- it may
6  even been for the medics, but at some point he was
7  complaining of, like, not being able to breathe or
8  something like that and we cleared him of weapons and
9  patted him down, search him and make sure he didn't
10 have any weapons.
11   Q.   Okay, so either he was complaining or the
12 medics asked you to move the handcuffs to the front?
13   A.   Yeah, one or the other.
14   Q.   Let's do -- this one would be 14.
15       HARVEY DEPOSITION EXHIBIT NO. 14
16             (Photograph was marked for
17         identification purposes as Harvey
18         Deposition Exhibit No. 14.)
19   Q.   What's that a picture of?
20   A.   Mr. Means.
21   Q.   Now, in that one it looks like he's propped up
22 somehow.  Can you tell whether his handcuffs are in the
23 front or the back in that picture?
24   A.   They look like they're in the back.  Like I

1  can see his --
2    Q.   What it looks like to me too.  Like he's got
3  his arms slumped in a way that --
4    A.   Looks like it.
5    Q.   So it's your belief, looking at 14, that would
6  have been a picture of him while his arms are
7  handcuffed behind him?
8    A.   Yeah.
9    Q.   In a propped up or looks like a sitting up
10 position?
11   A.   Yeah.  Whenever he had the Carhart jacket on
12 he was complaining like freezing, you know, like
13 hypothermia or something like that, so we removed the
14 jacket and then moved the cuffs to the front.  That's
15 why this one jacket, this one no jacket.
16   Q.   In 14 he's got the jacket on, he's complaining
17 about being cold?
18   A.   Yeah, like freezing to death or something like
19 that.
20   Q.   So 13 the picture was taken afterwards, after
21 you'd removed the jacket?
22   A.   Yeah, for a second.
23   Q.   Who took all these pictures?
24   A.   I don't know for those.

1    Q.   Did you take any of them?
2    A.   I think that I took a couple.
3    Q.   You may have taken -- I know we have a stack
4  of about 30 pictures.  You're saying you may have taken
5  some of them?
6    A.   Yeah, but not all.
7    Q.   Okay, but all the pictures I've shown you here
8  today look to be true and accurate representations of
9  what you saw at the scene; is that right?
10   A.   Correct.
11   Q.   In 14, Mr. Means has sort of some white stuff
12 around his face.  Is that something you'd expect to see
13 after somebody was pepper sprayed?
14       MR. RUGGIER:  You want to point to the
15 white stuff you're referring to?
16   Q.   I see what just looks like spit to me, but
17 right here at the bottom of his lip.
18   A.   Yeah, it looks like spit to me.
19   Q.   Looks like spit.
20   A.   OC could cause that.  I don't know, I mean.
21   Q.   Okay.  Because he was pepper sprayed inside a
22 helmet.  At this point somebody's taken the helmet off.
23 Did you all do that?
24   A.   I did not.

1    Q.   Do you know who did?
2    A.   Not right off.   I never -- I didn't see
3  whoever took the helmet off.
4    Q.   You mentioned in your report on Page 13, the
5  last line of the second to last paragraph it says --
6           MR. RUGGIER:   Object to the form of the
7  question.   You said your report.
8           MR. FORBES:   Well, it's his narrative.
9           MR. RUGGIER:   You talking about that one?
10 Okay.   Not the crash report, the entire report.
11          MR. FORBES:   No.
12   Q.   So in your narrative --
13   A.   Exhibit 3.
14   Q.   Yes.
15   A.   Okay.
16   Q.   Exhibit 3 on Page 13, second to last paragraph
17 it says Mr. Means had prior firearm offenses.
18   A.   Yes.
19   Q.   How did you get the information for that in
20 this report?
21   A.   Checking his history back at the station.
22   Q.   All right.   Let me make sure I've got it very
23 clear.   At the time that you were in this pursuit and
24 the time that you're dealing with Mr. Means in the

1  video I showed you, you were not aware of who the
2  person was or what kind of criminal history they had;
3  correct?
4    A.   Correct.
5    Q.   Okay, so you didn't know Mr. Means would have
6  had any firearm offenses at the time that you were
7  placing handcuffs on him, for instance?
8    A.   Correct.
9    Q.   Okay.   All right.   What is your understanding
10 of South Charleston's emergency response and vehicular
11 pursuit policy?
12   A.   Just as previously stated, the totality of
13 circumstance.   You got to take in account of the public
14 safety, like other cars on the road, how many cars on
15 the road, time of day, speeds and where you're at.
16   Q.   Are there any times when you have to disengage
17 a pursuit under that policy?
18   A.   I would say if it gets too, like too reckless,
19 too much danger, but it's never like black and white.
20 There's a middle ground there.
21   Q.   Okay, so is it your understanding from the
22 policy there's always some middle ground?   There's
23 nothing like a shall or you must do something?
24   A.   Correct, my understanding.

1    Q.   Okay.   Whose decision is it to terminate a
2  pursuit?
3    A.   It can come down to the officer that
4  initiated, the first one, you know, to see what's going
5  on, see how stuff is changing and then also the
6  supervisor.
7    Q.   What about the backup officer, the second car?
8    A.   He could, the backup officer could.
9    Q.   Okay.   He could recommend that the pursuit be
10 terminated; right?
11   A.   Yeah, I never heard of it happening, but it's
12 possible.
13   Q.   Okay.   At no point during this pursuit did you
14 ever recommend that the pursuit be stopped, did you?
15   A.   No.
16   Q.   You would agree with me that you thought
17 Mr. Means was driving unsafely for most of this 15
18 minute chase; right?
19   A.   Unsafely, yes.
20   Q.   By unsafe he was a danger to other potential
21 vehicles?
22   A.   If they were there, yes.   There wasn't very
23 much traffic on the road.
24   Q.   He got lucky; right, he was going around blind

1  curves.   You didn't know what was on your side of the
2  curve, did you?
3    A.   We didn't see any vehicles out.
4    Q.   I understand, but your words describe it as a
5  blind curve.
6    A.   Correct.
7    Q.   What's a blind curve to you?
8    A.   Like you can't see around the other side type
9  turn.
10   Q.   As you're going through this pursuit,
11 Mr. Means is going around blind curves in the wrong
12 lane of traffic; correct?
13   A.   Yeah, like in the middle like coming over,
14 yeah.
15   Q.   Yeah, I mean, you wrote he's in the opposing
16 lane; right?
17   A.   Yeah.   You could see how the road's small.
18   Q.   You wrote "If there were any vehicles on the
19 other side of the turn he would have struck them."   Not
20 that he might have, not that he probably --
21   A.   If they were there, yes.
22   Q.   Right and they're blind curves so you don't
23 know whether they're there or not as this pursuit's
24 going on?

1    A.    Correct.

2    Q.    Nevertheless you continued with the pursuit?

3    A.    Correct.

4    Q.    You knew there were vehicles that had been

5 called by Metro that were at the end of the road, law

6 enforcement vehicles, that could have tried to

7 apprehend Mr. Means; right?

8    A.    Typically they'll stay off the road, you know,

9 wait for us to come past them.

10    Q.    All right.  On the route somewhere there's

11 some law enforcement vehicles that could have tried to

12 apprehend Mr. Means even if you guys would have

13 disengaged; correct?

14    A.    Correct.  I would say somewhere down there

15 they were.

16    Q.    All right.  Let's make this --

17          MR. FORBES:  What number am I on, 15?

18          MR. RUGGIER:  Well, that says Exhibit 6.

19          MR. FORBES:  Well, that's how you guys

20 gave it to us.

21          HARVEY DEPOSITION EXHIBIT NO. 15

22                    (Emergency Response and

23                    Vehicular Pursuit Policy was marked for

24                    identification purposes as Exhibit

1                    Deposition Exhibit No. 15.)

2    Q.    This is Exhibit 15.  Actually let me hand

3 you --

4          MR. FORBES:  You know what, mark me

5 another one.  I got my notes on it.

6          MR. RUGGIER:  Is this the policy?

7          MR. FORBES:  Yeah.

8    Q.    Hang on.  Hang on.  Take a look over that and

9 then I've got some questions for you.

10    A.    Okay.

11    Q.    Just tell me when you've had a chance to read

12 it.

13    A.    Just the first there, that 23?

14    Q.    I'm going to ask you questions about the whole

15 thing there, so it runs from -- it's numbered Page 141

16 through 146 titled Emergency Response and Vehicular

17 Pursuit, so just read through however much you want and

18 I'm going to read you some sections and ask you

19 questions, so.

20    A.    Okay.  Okay.

21    Q.    Okay, you've had a chance to read over that?

22    A.    Yes.

23    Q.    Is that the South Charleston Police

24 Department's emergency response and vehicular pursuit

1 policy?

2    A.    It appears so.

3    Q.    Under Page 1 under 23.1 it indicates that

4 "Public safety and protections of human life are

5 paramount concerns.  The need to apprehend a law

6 violator or respond to a location or situation does not

7 normally justify creation of new or additional risks of

8 injury or death to police officers or to others."  Do

9 you agree with that?

10    A.    Yeah.

11    Q.    Okay and others there includes generally the

12 public; right?

13    A.    Yeah.

14    Q.    It includes people that you're pursuing,

15 doesn't it?

16          MR. RUGGIER:  I'm going to object to the

17 form of the question.  He's not the creator of the

18 policy, so you can ask him.

19          MR. FORBES:  I'm going to ask him because

20 he's suppose to know the policy, I assume, as a South

21 Charleston police officer.  Seems like he might not

22 have been trained very well on it, but in any event he

23 can answer it and you can make sure objection.

24          MR. RUGGIER:  No speaking objections.

1          MR. FORBES:  I thought yours was a

2 speaking objection.

3          MR. RUGGIER:  I thought yours was a

4 speaking objection.

5          MR. FORBES:  I was replying.

6          MR. RUGGIER:  Yours was an editorial

7 commentary.

8          MR. FORBES:  Good for the goose is good

9 for the -- yeah.

10          MR. RUGGIER:  Agree.

11    A.    I would assume others could be either.

12    Q.    Could be anybody.  Doesn't say it's limited to

13 just the public or children or old people.  It's

14 others, all others; right?

15    A.    Yeah, whenever somebody put that they can mean

16 either.  I don't know what their intent was.

17    Q.    "The need to apprehend a serious criminal or

18 to provide emergency services may justify driving

19 outside normally acceptable law and rules of the road."

20 What's a serious criminal to you?

21    A.    For me a serious criminal is somebody that's

22 committed a violent crime or somebody that could be

23 fleeing from us, I mean, because usually they're

24 fleeing for a reason and you don't know what that

1    reason is until the pursuit ends.

2        Q.   So if someone's fleeing from you you're

3    automatically in the category of a serious criminal, is

4    that what you're saying?

5        A.   I would say you're definitely getting there.

6    I mean, I'm not saying that it's black and white.  It

7    could change, but, yeah, I think you're getting there

8    because you're running for a reason.

9        Q.   All right.  Look to the last sentence of 23.1.

10   "Irresponsible, careless and reckless driving are

11   prohibited and will not be tolerated."  The driving

12   that went on in this 15 minute chase became dangerous

13   to potential members of the public as well as to

14   Mr. Means, didn't it?

15       A.   No.

16       Q.   It wasn't dangerous to members of the public?

17       A.   My driving and --

18       Q.   I didn't say your driving.  I said the

19   driving.

20       A.   This is talking about -- I believe this is in

21   reference to our driving.

22       Q.   Okay, so you think that this is in reference

23   to your driving?

24       A.   Yes.

1        Q.   All right.  Let's go over to 23.2, the

2    definitions.  "Vehicle pursuit.  An active attempt by

3    an officer in a police vehicle to apprehend one or more

4    occupants of a moving vehicle providing the driver of

5    such vehicle is aware of the attempt and is resisting

6    apprehension by maintaining or increasing speed or

7    ignoring the attempt of the officer to stop the

8    driver."

9        Now, on down there the bullet points it lists what

10   a serious felony is.  "A felony that involves an actual

11   or threatened attack which the officer has reasonable

12   cause to believe could or has resulted in death or

13   serious bodily injury, i.e. aggravated assault, armed

14   robbery, murder."  Can we agree that there was not a

15   serious felony under this definition that you guys were

16   concerned of with Mr. Means?

17            MR. RUGGIER:  Objection just to the

18   extent that he can't testify to what Peterson was

19   thinking or knew.

20            MR. FORBES:  Okay.  I'm just going to ask

21   him about what he knows.

22       Q.   To the extent that in your pursuit here as the

23   second car, can we agree that there was no

24   circumstances presented to you that there was a serious

1    felony in progress?

2        A.   As far as this definition goes, correct.

3        Q.   You don't disagree with your own Department's

4    definition, do you?

5        A.   There can be multiple different, you know,

6    felonies.  This just gives a few examples.

7        Q.   Of a serious felony?

8        A.   Yeah, but as far as this goes, correct.

9        Q.   All right.  Let's go over to Page 143.  23.4

10   has "The Communications are to be advised of a brief

11   description of the seriousness of the violation of the

12   vehicle being pursued and the direction of travel if

13   appropriate."  The only violation that was ever

14   reported by Corporal Peterson to Metro was the expired

15   registration or tag; correct?

16            MR. RUGGIER:  Object to the form of the

17   question.  I don't believe that's correct, but go

18   ahead.

19       A.   He said that registration was improper and

20   then that he started fleeing from him.

21       Q.   Okay, but prior to the fleeing, we're just

22   talking about the registration; right?  That's the only

23   violation that he would have had probable cause to

24   initiate a stop on; right?

1            MR. RUGGIER:  Object to the form of the

2    question.  I don't think that's correct.  Go ahead.

3    You can answer.

4        A.   I don't recall specifically what it was.

5        Q.   Okay.

6        A.   Like a specifically what was said over the

7    radio.

8        Q.   All right.  Let's go to 23.5.  "Communications

9    personnel will ensure that the shift commander is aware

10   of the activity and circumstances."  Would that shift

11   commander have been Lieutenant Paskal?

12       A.   Yeah.

13       Q.   Go to 23.8.  "Discontinuance of emergency

14   operation."  It states "Department members may not

15   continue emergency operation when conditions escalate

16   to a degree which places the safety of members or

17   others in unreasonable jeopardy.  Conditions which must

18   be evaluated continuously are:  Capabilities of the

19   member to control the situation.  Speed in relation to

20   road and environmental conditions.  Degree of

21   emergency, urgency or threat to others.  Traffic

22   congestion and proximity to schools, auditoriums,

23   churches or other areas where pedestrians congregate."

24       Now, let's run through those.  As this chase

1  ensued, you heard the radio where Peterson is talking
2  about parts are falling off of this motorcycle; right?
3      A.   Yeah.
4      Q.   Okay.  You yourself described Mr. Means's
5  motorcycle as going around blind curves in an unsafe
6  manner where he could have struck or would have, you
7  actually said would have, struck any oncoming vehicles;
8  right?
9      A.   Yeah.
10     Q.   Speed in relation to road and environmental
11 conditions.  The video we went over earlier showed 25
12 miles an hour zones; correct?
13     A.   Yeah, correct.
14     Q.   The radio that we listened to had both
15 yourself and Corporal Peterson describing Mr. Means as
16 going in excess of 40 miles an hour?
17     A.   Definitely Corporal Peterson.  I can't
18 remember if I called the speeds, but yeah.
19     Q.   All right.  I believe we listened to at least
20 one section where you did, but regardless you heard the
21 radio say, and the radio, if you're recorded on there,
22 it will be what it will be; right?
23     A.   Uh-huh.
24     Q.   Okay.  You yourself have now testified that in

1  pursuing Mr. Means, you had to go over 60 miles an hour
2  which would indicate that he was going too fast for the
3  speed zone; right?
4      A.   At the end.  Just at the end.
5      Q.   He was going too fast for the speed zone at
6  various parts throughout this, wasn't he?
7      A.   Yeah, but as far as the 60, it was just at the
8  end.  Other parts were lower than that.
9      Q.   Okay.  We passed at least one school and one
10 church that we talked about; right?
11     A.   Yeah.
12     Q.   And a park with a kids' play area; right?
13     A.   Yeah.
14     Q.   And houses all through this pursuit zone, for
15 lack of a better word; right?
16     A.   There were houses along the highway road.
17     Q.   All right, 23.9.  Vehicle pursuits.  "The
18 following procedures are intended to reduce the hazards
19 involved in vehicle pursuits while still assuring the
20 apprehension of law violators.  In this regard, all
21 Department members will remain familiar with these
22 procedures and abide by them."  You're a Department
23 member; right?
24     A.   Yes.

1      Q.   So it's your duty to abide by these rules;
2  right?
3      A.   Yes.
4      Q.   Under 23.9, Initiating the Pursuit, the end of
5  that says "The in car video and audio recording
6  equipment will be activated when available and remain
7  activated whenever a member is contemplating initiating
8  a pursuit."  Your all's vehicles on this May 2nd, 2020
9  date didn't have any in car video or audio recording;
10 right?
11     A.   Correct.
12     Q.   In fact, during your time at South Charleston,
13 the Department's never provided you with any of that,
14 have they?
15     A.   Just recently with the Metro Drug Unit
16 vehicle.
17     Q.   Okay.
18     A.   But as far as working normal road, no.
19     Q.   Prior to May 2nd, 2020 had they ever provided
20 you with in car audio or video recording equipment?
21     A.   No.
22     Q.   However, you testified earlier you went out on
23 your own and bought some which was available and
24 activated at one point; right?

1      A.   Yes.
2      Q.   And you were actually told by the chief to get
3  rid of it?
4      A.   Yes.
5      Q.   All right.  Let's go down to 23.9.4.
6  Termination of pursuit.  "The decision to pursue is not
7  irreversible."  Would you agree with that?
8      A.   Yes.
9      Q.   You have to factor things in and make a
10 decision of whether to continue a pursuit, whether it's
11 safe; right?
12     A.   Yep.
13     Q.   "Officers must continually question whether
14 the seriousness of the crime and other factors justify
15 continuing the pursuit."  Then it says "A vehicle
16 pursuit shall," and shall is underlined, "be terminated
17 under any of the following circumstances."
18     I know I asked you before when you started reading
19 this whether there was any black and white shall issues
20 and you said no.  That's incorrect, isn't it?  This
21 actually has a shall in it.
22     A.   This says shall.
23     Q.   And that's a policy that, based on what we
24 read a little bit ago, you're to abide by and be

1  informed of; right?
2      A.   Yeah.
3      Q.   So there are conditions where you, under these
4  rules, shall terminate a vehicle pursuit; correct?
5      A.   Yes, but then the shall says "If in the
6  opinion of," that's what I was talking about was the
7  black and white.  Or, sorry, where it wasn't the black
8  and white, where it's ever changing.
9      Q.   Oh, you mean the first bullet point where it
10 says "If in the opinion of?"
11     A.   Yes.
12     Q.   Okay.  What about the second bullet point, got
13 anything in there giving you an opinion?
14     A.   No.
15     Q.   How about the third one?
16          MR. RUGGIER:  Objection to the form.
17 Answer.
18     A.   It says creates the recognized risk of a
19 collision, so that's something that could be changing.
20     Q.   Okay.  Would that be something like he was
21 going at a high rate of speed around blind curves and
22 whenever he would make these blind turns he would cross
23 into the other lane of traffic?  "If there were any
24 vehicles in the other side in the turn, he would have

1  struck them;" right, that's a recognized risk of
2  collision, isn't it?
3      A.   If there's heavy traffic.
4      Q.   No, no, no.  You didn't write if there's heavy
5  traffic.  On May 2nd, 2020 you wrote "If there were any
6  vehicles on the other side of the turn, he would have
7  struck them;" right?
8      A.   Correct.
9      Q.   That's a risk of collision, isn't it?
10     A.   I mean, there's a risk of collision any time
11 somebody runs from the police, any time they break the
12 speed limit.
13     Q.   You documented in here that he was going
14 around a blind curve in the opposite lane of traffic
15 and if there had been a vehicle, he would have struck
16 it; right?
17     A.   Yes.
18     Q.   You continued the pursuit anyway?
19     A.   Yes.
20     Q.   Are you saying -- is it your testimony that
21 that is within the mean -- not within the meaning of
22 creating a risk of collision?
23     A.   Again, you'd have to speak with the initial
24 officer that has all the information because this talks

1  about the crime which is a misdemeanor.  I don't know
2  exactly what he's got going on.
3      You heard the radio traffic.  He said that the tags
4  didn't match and then the suspect kept looking back at
5  him.  So through my training and experience, that would
6  be suspicion of a stolen vehicle which would be a
7  felony.
8      Q.   Okay.
9      A.   But, again, on this --
10     Q.   The only thing that he's wanted for at this
11 point is improper registration; right?  You don't have
12 any evidence -- you didn't have any evidence on May 2nd
13 of 2020 that he stole a vehicle, did you?
14          MR. RUGGIER:  Objection in that, again,
15 he is just the assisting officer.  He's not the one
16 initiating the pursuit.
17          MR. FORBES:  I'm asking him.
18          MR. RUGGIER:  I understand, but --
19          MR. FORBES:  You can object.  Just
20 object.
21          MR. RUGGIER:  I did.
22     Q.   Okay.
23     A.   Just where I was assisting the pursuit.  I
24 don't have the specific knowledge on what the

1  initiating officer had.
2      Q.   Okay.  As the assisting officer, should you
3  have the knowledge so that you can assess this during
4  the pursuit?
5      A.   I'm just there to help the initial officer to
6  make sure everything's okay.  Like if they stopped or
7  something like that and there's some type of incident
8  that happens there and I'm there to help people know
9  where we're at.
10     Q.   Are you saying you can't make a decision to
11 stop the pursuit?
12     A.   It could be possible, but my main goal there
13 is to make sure the initial officer is okay and help
14 them out with whatever he needs.
15     Q.   But wouldn't you have a responsibility to
16 recommend to the supervisor on the line that a pursuit
17 should stop if it's unsafe?
18     A.   I could.
19     Q.   I'm not asking if you could.  I'm asking do
20 you believe you would have had a responsibility to do
21 that?
22     A.   Yeah.
23     Q.   Okay.  Look on down, couple bullet points down
24 in that same section.  Again, you have to read this

1   with the top of it.  "A vehicle pursuit shall be
2   terminated under any of the following circumstances."
3   One of them is a supervisor orders the pursuit
4   terminated.  Now, we heard that audio earlier.
5   Lieutenant Paskal said that if this became reckless to
6   call it off; right?
7        Q.   Did he say reckless or too reckless?
8        Q.   Okay.  Let me ask you a question.  If it's
9   only a little bit reckless is it okay to continue with
10  a pursuit?
11       A.   Yeah, I would say almost every pursuit is a
12  little bit wreck -- I mean, they're doing something to
13  not stop unless they just go the speed limit and never
14  change a lane or anything, but it's a subjective term
15  what reckless is.
16       Q.   Okay.  In your mind, where does a little bit
17  reckless change into too reckless for a pursuit?
18       A.   Too reckless would be if it was like a weekday
19  like around 4:00 p.m., people are getting off work,
20  there's a lot of traffic, they start passing cars on
21  the double line, swerving at other vehicles, there's
22  people out on the road walking, things like that,
23  everything together, breaking the speed limit.
24       Q.   What about animals, if somebody's got a dog

1   out there or something, would that give you pause or
2   you just go ahead and take the risk on the animal.
3        A.   I think an animal would be inherently less
4   than a human life.  Again, it would just depend on the
5   situation.  Like just passing an animal wouldn't be a
6   reason to stop a pursuit.
7        Q.   What about nearly hitting one?  What if you
8   nearly hit a dog as you came around a blind curve, is
9   that something you think you should stop a pursuit for?
10       A.   No.
11       Q.   So it's okay if you hit somebody's dog?
12       A.   Dogs run out in the road all the time.  You
13  could just be driving down the road normal and that
14  would happen.
15       Q.   Well, if you're going around blind curves
16  being chased by police, there's a better chance you're
17  going to hit somebody's dog than not; right?
18       A.   I can't speculate on that.
19       Q.   All right.  The end of the one I was just
20  reading to you, "Supervisor orders the pursuit
21  terminated or" then it states "the backup unit has a
22  responsibility to recommend to the supervisor if the
23  pursuit should be terminated."  You would be the backup
24  unit here; right?

1        A.   Yes.
2        Q.   You did not recommend at any point to the
3   supervisor to terminate this pursuit, did you?
4        A.   No.
5        Q.   Because you think the pursuit was okay?
6        A.   Yes.
7        Q.   And you think that the danger going around the
8   blind curves and at these speeds was a risk that was
9   worth taking to apprehend this guy?
10       A.   Yes.
11       Q.   Okay.  Responsibility.  "The initial pursuing
12  unit will be responsible for the conduct of the pursuit
13  unless such unit is unable to remain close enough to
14  the violator's vehicle to prevent losing contact."
15  Here that initial pursuing unit would be Corporal
16  Peterson; correct?
17       A.   Correct.
18       Q.   Number of Units under 23.9.6.  "Pursuing units
19  will be limited to two unless additional units are
20  authorized by a supervisor."  So it was just the two of
21  you guys in this pursuit; right?
22       A.   Yes.
23       Q.   23.9.10.  Ramming.  It's on Page 145.  States
24  "Ramming of fleeing vehicles or forcing them off the

1   road should be avoided.  The criteria for using deadly
2   force must be present before using ramming or forcing
3   the vehicle off the road.  These tactics should not be
4   used unless authorized by the shift commander if time
5   permits."
6        Would you agree that before a vehicle is forced off
7   of a road that you should be in a position, same
8   position you'd be to use deadly force on somebody?
9        A.   Yes.
10       Q.   All right, go over to 146, Page 146.  23.13,
11  Misdemeanor/Traffic Offenses.  "Department members
12  should seriously consider discontinuance of pursuits
13  when the persons being pursued have committed or is
14  suspected of committing misdemeanor crimes or traffic
15  offense."  Here this suspect was clearly suspected of a
16  traffic offense; right?
17       A.   From what I understand, yes, but you'd have to
18  refer that to the initial officer.
19       Q.   I'll ask the initial officer in a little bit.
20  I'm just asking for what you know.
21       A.   Okay.
22       Q.   "When making the decision to continue or
23  discontinue the pursuit, the initiating unit and
24  supervisor should consider the following:  Is there a

1 greater probability of a collision than there is of a
2 successful apprehension? Is it possible to identify
3 the suspect and make a follow up at a later time? What
4 is the seriousness or type of misdemeanor offense?
5 Generally equipment, registration or license violations
6 do not justify the hazards of pursuit."
7     Do you understand that the policy of South
8 Charleston is that equipment, registration and license
9 violations generally do not justify the hazards of a
10 pursuit?
11     A. Yes.
12     Q. 23.15 has to do with reporting and it states
13 that "Any time a member is involved in a pursuit, the
14 supervisor will write a pursuit notification report
15 before completing his or her tour of duty and forward
16 it to the chief." Have you seen a pursuit notification
17 report in this case?
18     A. No.
19     Q. Have you ever seen one?
20     A. No.
21     Q. Do you know if that's something that the
22 supervisors at South Charleston do?
23     A. Not to my knowledge.
24     Q. Do you know the report is suppose to include

1 specific details and it lists all those out? It's
2 suppose to have a written account from all officers
3 involved. Did anyone ask you to give them a written
4 account of the pursuit for purposes of a pursuit
5 notification report?
6     A. No.
7     Q. 23.16 has to do with a pursuit review. It
8 says "The chief of police will conduct an
9 administrative review of each pursuit to ensure
10 compliance with policy and existing law." Are you
11 aware of an administrative review taking place with
12 respect to this vehicular pursuit?
13     A. Not to my knowledge.
14     Q. Have you ever, in your time at South
15 Charleston, been aware of them conducting a pursuit
16 review or administrative review of any vehicular
17 pursuit that you've been involved in?
18     A. No, not that I'm aware of.
19     Q. You know what, let's take couple minutes, let
20 me look at my notes.
21     A. Okay.
22     Q. Getting close to being done.
23         VIDEO OPERATOR: Time is 1:27 p.m. We're
24 off the record.

1         (A brief recess was taken after which the
2 deposition continued as follows:)
3         VIDEO OPERATOR: Time is 1:33 p.m. We're
4 on the record.
5 BY MR. FORBES:
6     Q. Officer Peterson (sic), are you aware that the
7 fleeing charges that were pursued from this in Kanawha
8 County have been dismissed?
9     A. Peterson or Harvey?
10     Q. I'm sorry, Officer Harvey.
11     A. Am I aware that there were felony charges?
12     Q. Are you aware they've been dismissed, the
13 felony charges for fleeing?
14     A. I think so. I think I heard something. I
15 never seen anything in writing or anything.
16     Q. Speaking of writings, have you, and I don't
17 want to know about anything you talked about with
18 either your civil lawyer here or this firm or your
19 criminal lawyer, Mr. Dascoli, or his office, but other
20 than that have you e-mailed, text messaged or written
21 in any manner to anyone about this case or what
22 happened here?
23     A. No.
24     Q. Have you e-mailed, text messaged or written in

1 any manner with Officer Peterson about what happened
2 here?
3     A. No.
4     Q. What did you do to prepare for your deposition
5 today?
6     A. Read the report and then read the policy.
7     Q. Is there a written use of force policy at
8 South Charleston?
9     A. Yes.
10     Q. Is that something that you are suppose to be
11 aware of?
12     A. Yes.
13     Q. As an officer, you've got to comply with that
14 policy; right?
15     A. Yes.
16     Q. And just like, as an officer, you have to
17 comply with the vehicular pursuit policy; correct?
18     A. Yes.
19     Q. Now, we watched the video that the bystanders
20 took in this. Would you agree with me that it's good
21 that bystanders take these types of videos when
22 departments don't have their own video stuff so we can
23 really see what happened?
24     A. It's good to know what happened.

1    Q.   And in South Charleston the only way we're
2  really going to know is if someone else takes a video
3  unless they change the system?
4    A.   The only way to see stuff on video is, yeah,
5  bystander or, like, security camera from the station.
6    Q.   In this situation, on that video we watched a
7  little bit ago that the bystanders took, it is your
8  sworn testimony under oath that your foot, as you, in
9  what I view as a stomp, you're saying your foot did not
10 come in contact with Billy Means's head?
11   A.   Correct.
12   Q.   Okay.  I asked you some questions early on
13 about your understanding of being cleared by the FBI?
14   A.   Yeah.
15   Q.   Did anyone tell you if they've spoken to
16 anyone at the US Attorney's Office?  Again, not
17 counsel.  I don't want to know about conversations with
18 your attorneys, but Chief Rinehart or others, did
19 anyone, when they were telling you you were "cleared,"
20 that they had spoken to the United States Attorney's
21 Office and there had been some kind of decision about
22 whether to charge you with a crime made?
23   A.   Yes, Chief Rinehart told me that.
24   Q.   Did he say which US attorney he spoke to?

1    A.   No.
2    Q.   But he directly told you that he talked to a
3  United States, an assistant United States attorney?
4    A.   I don't know if he said did or the FBI guy
5  did.  I don't know who did.
6    Q.   He might have said that the FBI guy spoke to
7  an assistant United States attorney?
8    A.   Yes, yeah.
9    Q.   And decided not to charge you with a crime?
10   A.   Correct.
11   Q.   Did you get the name of who that US attorney
12 was?
13   A.   No.
14   Q.   You understand that the US Attorney's Office
15 and the Department of Justice, through the United
16 States Attorney's Office, would ultimately make a
17 charging decision for Federal crimes; right?
18   A.   Yes.
19   Q.   You also understand with respect to State
20 crimes, those would be brought by local prosecutors
21 potentially.  Did anyone tell you about whether they
22 spoke to either Boone County or Kanawha County
23 prosecutor's office?
24   A.   Not to my knowledge.  I wouldn't be aware of

1  anything like that.
2    Q.   Have you spoken to anyone at the United States
3  Attorney's Office about this Billy Means incident?
4    A.   No.
5    Q.   Have you spoken to anyone at the Department of
6  Justice, other than when the FBI asked you for a
7  statement and you said I have to get back to you, about
8  this incident?
9    A.   No, no other communication.
10   Q.   Have you spoken to anyone at the Kanawha
11 County prosecutor's office about this situation?
12   A.   No.
13   Q.   Have you spoken to anyone at the Boone County
14 prosecutor's office about this situation?
15   A.   No.
16   Q.   Why did you become a police officer?
17   A.   To help people.  Like I said before, you know,
18 it's something always different.  Every day is
19 different.
20   Q.   You feel bad at all that Billy Means is
21 paralyzed?
22   A.   Do I feel bad?
23   Q.   Yeah.
24   A.   It's unfortunate that he's paralyzed.

1    Q.   Have you changed any of the manners that you use
2  for pursuing vehicles now in light of this May 2nd, 2020
3  incident?
4    A.   No.  The standard is still the same.
5    Q.   Were you investigated by South Charleston for
6  this incident?
7    A.   No.
8    Q.   Has anyone at South Charleston expressed to you
9  that they were concerned you might have done something
10 wrong here?
11   A.   No.
12   Q.   You were never suspended, never removed from the
13 force in any way, were you?
14   A.   No.
15   Q.   When the bystander video became public, did
16 anyone at South Charleston suggest to you that maybe you
17 should be placed on some kind of leave pending an
18 investigation?
19   A.   No.
20   Q.   You don't think you did anything wrong here, do
21 you?
22   A.   No.
23        MR. FORBES:  I don't have any further
24 questions.
25        MR. RUGGIER:  I don't have any questions.

1   We will read.

2           VIDEO OPERATOR:  The time is 1:39 p.m. This

3   concludes the deposition.

4           (Having indicated he would like to read

5   his deposition before filing, further this deponent saith

6   not.)

---

1   STATE OF WEST VIRGINIA,
    COUNTY OF KANAWHA, to wit;

2           I, Angela L. Curtis, a Notary Public within and

3   for the County and State aforesaid, duly commissioned and
    qualified, do hereby certify that the foregoing deposition

4   of David Harvey was duly taken by me and before me at the
    time and place and for the purpose specified in the

5   caption hereof, the said witness having been by me first
    duly sworn.

6           I further certify that the attached deposition

7   transcript of David Harvey meets the requirements set
    forth within article twenty-seven, chapter forty-seven of

8   the West Virginia Code to the best of my ability.

9           I do further certify that the said deposition was

10  correctly taken by me in shorthand notes, and that the
    same were accurately written out in full and reduced to

11  typewriting and that the witness did request to read his
    transcript.

12          I further certify that I am neither attorney or

13  counsel for, nor related to or employed by, any of the
    parties to the action in which this deposition is taken,

14  and further that I am not a relative or employee of any
    attorney or counsel employed by the parties or financially
    interested in the action.

15          My commission expires August 23, 2022.  Given

16  under my hand this 28th day of April 2021.

---

1   STATE OF WEST VIRGINIA,
    COUNTY OF KANAWHA, to wit:

2

3           I, Teresa Evans, owner of Realtime

4   Reporters, LLC, do hereby certify that the attached

5   deposition transcript of David Harvey meets the

6   requirements set forth within article twenty-seven,

7   chapter forty-seven of the West Virginia Code to the best

8   of my ability.

9

10          Given under my hand this 28th day of April

11  2021.

12

13

14          /s/ Teresa Evans

15

16          ----------------------

17          Registered Professional

18          Reporter/Certified Realtime Reporter

---

1                    ERRATA SHEET

2           I, David Harvey, do hereby certify that the

3   foregoing is a true and correct transcript of my
    deposition with the exception of the following

4   corrections:

5   PAGE  LINE  CORRECTION

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17          _____
                DEPONENT'S SIGNATURE

18  STATE OF _____,

19  COUNTY OF _____,

20      Sworn to before me, _____, Notary
    Public, this ____ day of _____, 20__.

21

22          _____
                NOTARY PUBLIC

## Quadrant 1

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.
DAVID HARVEY
04/26/2021 Index: $15.00..5th

**Exhibits**

Exhibit 1 4:2 7:19, 10,13,14
Exhibit 2 4:3 6:3 8, 11,12
Exhibit 3 4:4 6:7,4, 7,22 81:2 108:8 141:13,16
Exhibit 7 4:8 116:24 117:3
Exhibit 9 4:10 131:2,5
Exhibit 10 4:11 132:10,13
Exhibit 11 4:12 133:8,11
Exhibit 12 4:13 136:6,7,10,14 137:5
Exhibit 13 4:14 137:18,21
Exhibit 14 4:15 138:15,18
Exhibit 15 4:16 145:21 146:1,2

**$**
$15.00 60:14
$15.30 35:21
$17.00 60:14

**1**
1 7:9,10,14 33:9 74:23 91:11 92:13 93:1,13,24 95:10 97:15 123:10 125:17 131:17 213:2 147:3

10 37:12 44:10 70:20 83:5 93:15, 10:4 104:12 106:20 132:9,10,13
10:02 61:13
10:26 61:17
10:35 67:14
10:37 67:18
11 8:15 84:18 95:22 133:8,11,13
119 68:17 75:3,7, 10,16
11:27 94:23
11:30 84:12
11:34 95:3
11:45 85:8
11:48 105:5
12 68:6,8 87:7 94:2 136:6,7,10,14,18 137:5
12:30 135:13
12:52 135:17
12:59 106:1
13 68:8 85:19 87:1 102:10 107:20 128:3 131:17,18,21 139:20 141:4,16
14 85:19 87:7,21 138:14,15,18 139:5,16 140:11
141 146:15
143 151:9
145 163:23
146 146:16 164:10
15 44:10 74:10 88:8,12 90:17 91:5 94:12 96:9 143:17 146:17,21 146:1,2

149:12
15.30 35:16,18,19
15th 25:4
16 37:11 95:22 96:24
16.24 96:1
17.16 35:24
19 57:9
1:19 75:6
1:27 166:23
1:33 167:3
1:39 173:2

**2**
2 33:10,11,18 63:7, 8,12 78:18 97:22, 23 98:10,12,17,20, 21 99:6,13,24 100:12 101:1,12 102:7 103:1 104:10 105:3,14 106:18 107:18 131:9
20 44:8 74:10 76:7 99:8 111:19 23 112:4 125:17
2011 23:11
2013 24:12,14 28:7,10
2014 25:2,4 28:14
2015 63:9,24 65:5
2017 35:2,15
2018 57:9
2019 58:22
2020 3:10 123:9 51:6,7 53:23 54:7 55:12,21 57:10 68:16 70:17 115:13 127:1 155:8,19 158:5 159:13 172:2

2021 5:9 12:8
21 8:22 74:24
22 107:21
23 101:15 146:13
23.1 147:3 149:9
23.13 164:10
23.15 165:12
23.16 166:7
23.2 150:1
23.4 151:9
23.8 152:3
23.9 154:17 155:4
23.9.10 163:23
23.9.4 156:5
23.9.6 163:18
23.9.9 167:18 168:2
28 96:24
29 18:22
29th 8:2,22
2:50 79:2
2nd 8:10,12 29:4 51:7 52:15 53:23 55:12,21 57:10 67:2 68:3,16 70:17 78:3 115:13 117:12 127:1 155:8,19 158:5 159:12 172:2 90:13

**3**
3 33:9 67:3,4,7,22 81:2 99:8,15 108:8 131:17,21,23,24 141:13,16
30 44:8 72:12 74:8 84:19 91:4 140:4

30th 74:6
31 123:10
32 98:17,20
34 87:1
35 74:15 99:15
36 102:9
37 93:15

**4**
4 8:15 74:17,20 78:7,15 79:7,15 81:11 82:1,15 83:2 84:1 91:9 85:5,16 86:22 87:4,18 88:4
40 66:5 89:1 100:18 153:16
41 100:5
45 54:18 82:24 103:4
47 81:16 82:5,12
48 92:15
4:00 161:19
4:40 79:8,20

**5**
5 82:4,11 90:19 72:12 92:24 93:12,23 95:9 97:14 100:5
50 37:15 54:21 73 78:18 79:13 87:21 90:13
51 104:12
55 72:24 74:11
58 113:18
5th 117:17,18 127:1

## Quadrant 2

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.
DAVID HARVEY
04/26/2021 Index: 6..attempted

**6**
6 98:9,11 99:5,12, 23 100:11,24 101:11 102:6 104:9 105:2,13 106:17 107:17 145:18
60 71:19 72:4,8,18, 23,24 74:11 88:13, 17 102:16 100:3,4, 5,6,14,16,23 107:6, 10,14 131:18 132:3 154:1,7
6:00 51:8,19,20,22 52:14

**7**
7 92:15 100:15,18 116:19,20,24 117:3

**8**
8 120:2,9,15,24 121:11 122:8,20 125:14 130:23 134:5
8:00 75:17 97:6 101:22 104:17

**9**
9 17:12 93:3 101:15 102:9 103:1 131:2,3,5
9:05 5:13 101:3
9:45 103:3

**A**
a.m. 5:13 51:8,20, 22 52:14 61:13,17 67:14,18 94:23

95:3
abide 154:22 155:1 156:24
ability 11:11
absolutely 112:15
academy 10:16 24:23 25:3,6,11,17 26:5,7,27:12 28:13, 14,16,21 30:5,20 32:4 40:16,23 41:18 49:22
acceptable 148:19
access 129:20
accident 31:8 114:24
accompanied 77:16
account 142:13 156:24
accurate 140:8
Action 5:4
activated 155:6,7, 24
active 26:20 150:2
actively 27:5,6 97:6
activity 152:10
actual 71:3 73:11 74:1 150:10
add 66:3
additional 147:7 163:19
administer 113:2, 13 121:15
administered 110:16 111:7 117:22,23 118:8

adverse 8:20
advice 14:4,7
advised 86:9 151:10
advising 85:9,20 87:8
advocate 64:20
agent 14:19 15:6 16:10,24 17:17 19:5 22:7 47:22
agents 48:7
aggravated 150:13
aggression 26:20
aggressive 27:4
agree 66:22 106:11 131:19 132:1,20 134:18,24 136:14 140:16 147:9 148:10 150:14,23 156:7 164:6 168:20
agress 27:5
ahead 19:2,3 92:7 98:4,6,14 135:10 151:18 152:1 162:7
aid 115:16
air 126:13 128:1
Airport 23:7,8
alcohol 11:10
all's 155:8
allegations 13:16
alleged 71:15
Allen 5:3
Amazon 56:23 57:13,16 62:1
Amendment 6:17 21:8 22:3 9:17
Anchor 52:14

and/or 7:19 8:18
Angie 5:12
angle 137:7
animal 162:2,3
animals 161:2,4
appears 103:6 105:24 147:2
applicable 27:10 96:17
application 24:18
apply 26:22 46:10
apprehend 84:17 145:7,12 147:5 148:17 150:3 163:9
apprehension 150:6 154:20 165:2
approach 108:20 109:17
approached 74:7 112:17
approaching 72:24
approval 44:2
approved 117:18
approximately 5:13 32:13 37:9 40:10 44:8,10 59:1 108:14,17,19 109:6 118:14,18 131:14 131:18 132:3
April 5:9 25:2 28:14
area 53:11 78:13 86:17 90:3,6,8,12 95:15 96:24 97:8, 20 112:18 128:12, 13 133:6,14 134:2, 21,22 135:1 136:20 137:6 154:12
areas 53:4 152:23

arm 46:19,20 116:1
armed 150:3,4
arms 46:3,4,10,12 47:19 123:2 136:3 138:1 139:3,6
arrangements.' 67:10
arrest 8:11 60:9
arrested 48:9 60:17 63:5
arresting 64:8,14 64:2,14
Ashford 69:9 70:20
ASP 118:19
assault 150:13
assess 160:3
assessment 26:24
assigned 34:12 53:4,24 54:14 55:16,18 56:6
assist 77:2
assistant 64:5,10 170:3,7
assisting 76:13 159:15,23 160:2
associate's 10:7, 10,12
assume 14:4
assure 37:20 48:16 50:17 54:8 95:24 106:22 154:6 155:24
assuring 154:19
attached 24:3
attack 48:17 150:11
attempt 150:2,5,7 128:9
attempted 49:13 128:9

## Quadrant 3

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.
DAVID HARVEY
04/26/2021 Index: attended..cams

attended 61:5
attorney 9:20 12:11 13:3,8,9,10, 12 17:8 125:3 169:24 170:3,7,11
Attorney's 20:10 39:9 169:16,20 170:14,16 171:3
attorneys 169:18
audio 74:19,21 78:8,16,19 79:8,16 80:3,7 81:12 82:2, 16 83:3 84:2,10 85:6,17 86:23 87:5, 19 88:5 119:18 155:5,9,20 161:4
auditoriums 152:22
August 20:4
authorize 7:20,23
authorized 163:20 164:4
automatically 33:11,14,18,22 149:3
avail 8:17
avoided 164:1
aware 37:24 62:16 72:11 76:22 77:1, 14 78:2,5 80:18 115:7 142:1 150:5 152:9 166:11,15,18 167:6,11,12 168:11 170:24
awful 39:19

**B**
back 10:21 11:18 17:13,18 22:24 28:7 29:21 32:3 33:15 43:22 45:13, 17,20,22 46:1,4,8, 17,20,22 46:1,4,8, 20 47:20 57:16

63:23 69:10 71:8 72:23 73:11 76:20, 22 77:11,17,20 81:2 94:8 95:6 103:4 107:4 109:1 110:3,7 112:18 120:22 123:3 124:3,15 125:18 126:16 127:9 128:17 132:24 135:7 137:12 138:23,24 141:21 159:4 171:7
backboard 115:22,23
backed 69:3
background 24:20
Backing 40:16
backpack 133:2,4 134:1
backup 143:7,8 162:21,23
bad 171:20,22
bailed 43:23
ballpark 12:3
band 27:8 130:9
banging 45:16
barely 89:4
Barker 29:11
based 54:7 72:19 79:4 81:19 96:24 112:2 156:23
basic 10:20
basically 53:19 54:12,17 103:14 133:20
basketball 101:17
baton 118:19
beat 106:8

bed 107:21
began 75:2,5 108:20
begin 60:3
beginning 78:2 89:16 91:20 120:22 126:12 126:16,22 128:17 132:24 135:7 138:23,24 141:21 159:4 171:7
behalf 5:16,18
belief 43:4 70:16
believed 104:1,3
believes 78:20
belt 129:18
Ben 79:23
big 46:22 65:17
bigger 36:21 45:2
Billy 5:16 17:4 20:4 47:4,7 69:11 73:22 75:2,21 76:24 77:14 107:13 116:5 127:7 135:21 136:21 160:21 169:10 171:3,20
bit 9:14 16:16,5 44:17 45:7 62:5 61:23 92:7 97:24 98:14 103:6 107:9 126:7 156:24 161:9,12,16 164:19 169:7
black 142:19 146:6 156:19 157:7
blank 117:16
blast 113:13
bleeding 30:22
blind 69:16,18 70:6 81:4,5 89:8 103:9, 10,17 143:24 144:5,7,11,22 153:5 157:21,22

163:8
blocked 145:7
Bob 64:4,6
bodily 150:13
body 32:22,24 55:5,24 66:3 61:3 64:3,15 65:16 118:4 142:5,14
Boone 70:21 85:11,14,21,22 86:3 88:9 131:14 170:22 171:13
Boone's 85:9,13
bottom 146:17
bought 56:12 57:17 61:24 155:23
Boulevard 91:21
box 50:6 133:16, 17,21 134:19 135:3,16,18 137:4, 9
Brad 19:18 36:16 58:8
brand 56:22
break 16:1,5,6 61:10,11,21,23 91:8 94:22 134:16 135:10 158:11
breaking 87:14 161:23
breathe 138:7
Bridge 10:10
bring 62:9
brother 65:17
brought 65:16 170:20
Bruenland 69:7
Brown 5:8
Buffalo 91:22

building 104:14
bullet 150:9 157:9, 12 160:23
bunch 95:18 96:1
burst 110:16 111:7,11,16,24 112:10,11
bus 96:18 97:13
buy 60:15 66:5
bystander 120:9, 15,24 121:11 122:8,20 125:14 134:5 169:5 172:15
bystanders 168:19,21 169:7

**C**
call 15:10,12 17:13, 15,17,24 45:16 161:6
called 5:2 16:11, 24 18:13 21:8,20 22:7 69:5 98:9 124:12 143:4 145:5 153:18
calling 43:9,11
calls 53:2 80:6
cam 32:4,34:6 54:22 55:5,15,19, 22,24 56:3,8 60:18 61:2,3,24 65:7,16 66:19
camera 33:12 56:9,21,24 58:24 59:15 60:19,24 62:60:1,3 64:3,16 60:65:2 66:1,5,6,9 169:5
cameras 23:2 34:18 56:20 59:16 22 60:1,3 64:3,16 20 65:2 66:1,5,6,9
cams 32:22,24

## Quadrant 4

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.
DAVID HARVEY
04/26/2021 Index: Capabilities..computer

55:17 58:11 59:17 61:21 66:13
Capabilities 152:18
Capitol 23:16,19 24:2
captain 28:1 29:11 38:18
captains 38:13
car 15:24 43:15 55:15 66:5 69:5 72:22 82:24 91:19 105:7,10 107:4 122:11 143:7 150:23 155:5,9,20
card 57:5 62:2
cards 62:10 63:2
care 26:3 30:6 48:10 49:1
career 30:1
careful 115:14
careless 149:10
Carhart 139:11
carrying 31:8
cars 55:17 69:23 80:12,13 93:7,9 142:14 161:20
case 6:8 7:21 9:3 11:23 12:7 13:2 14:15 16:16 17:4 22:5 67:5 68:1,2 108:8 165:17 167:21
cases 12:23 39:8 62:16,19
casualty 30:6
catch 106:6
category 149:1
caused 71:10 73:24

caveat 55:14
cemetery 103:3
Center 30:9
certified 5:11 37:2
chain 38:7 58:12 152:24
chance 63:21 88:21 123:23 124:1 146:11,21 162:16
change 34:15 42:4 52:23 94:21 138:2 149:7 161:14,17 169:3
changed 172:1
changing 42:17 143:5 157:8,19
channels 40:8
charge 20:11 43:11 169:22 170:9
chargeable 20:15
charged 80:15
charger 126:2,3
charges 167:7,11, 13
charging 20:11 170:17
Charleston 56:8 6:7 20:24 22:18,22 23:15,18 31:20 34:24 35:6,13 36:15,18,23 37:14 38:5,8 40:7 44:3,9 50:1,8 51:17 52:7 54:17,23 55:2,6,9 56:16,7:60:17 61:1, 4 64:15,16 65:5 66:12 77:3 89:18 90:23 131:19 146:23 147:21 155:12 165:8,22 166:15 168:9 169:1 172:5,8,16

Charleston's 64:5 142:10
chase 70:10 72:1 92:19,22 93:21 94:12,13 143:12 167:18
chased 62:16
chasing 69:11 72:19,22 107:13 143:24
chatter 83:8
check 65:21 127:19
Checking 141:21
chemical 47:22 48:7 118:13
chest 30:22
chief 19:14,18,19 20:20 21:24,22:1 22:15 36:16 38:12, 13 58:8 59:12,15 62:2 64:5,10 66:19 169:18,23
children 70:3 96:20 148:13
choose 66:3
Chris 5:10
church 146:15,16, 20,23 154:10
churches 152:23
circuit 40:2
circumstance 142:13
circumstances 42:24 43:3 90:1 111:21,23 112:5 150:24 152:10 158:11 160:16 169:5
citizens 65:3 69:23
City 23:15 6:10

comments 66:22
committed 148:22 164:13
committing 164:14
commonly 27:7
communicate 83:15
communicating 83:11
communication 15:14 171:9
Communications 86:10 151:10 152:8
compact 90:6
complain 60:2
complaining 138:5,7,11 139:12, 16
complaint 64:22
complaints 65:21
complete 117:11, 21
completed 131:9
completely 76:9
completing 165:15
compliance 110:17 111:12 114:7,17 166:10
compliant 26:15
complied 109:17 110:2
complies 109:17
comply 46:15 110:17 113:21 128:6,8 168:13,17
computer 57:6 62:10 120:13

## Panel 1

concealed 27:7
concern 70:9,18
concerned 64:18 128:20 150:16 172:9
concerns 58:12 62:2 65:15 66:8 147:5
concludes 173:3
conditions 152:15,17,20 153:11 157:3
conduct 8:10 77:5 163:12 165:8
conducting 166:15
cones 40:22
conference 30:11
conferred 8:16
confused 17:22
congestion 152:22
congregate 152:23
consistency 115:9
contact 86:2 87:9 123:15 163:14 169:10
contacted 14:18, 19 15:5 16:21,22 19:14,23 20:3
contemplating 155:7
continually 77:17 156:13
continue 10:3 152:15 156:10 161:9 164:22
continued 61:16 67:17 69:10 74:21

78:8,16 79:8,16 81:12 82:2,16 83:3 84:2,10 85:6,17 86:1,23 87:5,19 88:5 91:12 92:14 93:2,14 94:1 95:2, 11 97:16 98:13 99:7,14 100:1,13 101:2,13 102:8 103:2 104:7,11 105:4,15 106:19 107:19 112:7 120:10,16 121:1,12 122:9,21 125:15 134:6 135:16 145:2 158:18 167:2
continuing 156:15
continuously 152:18
control 71:5 73:12 118:7,8,10,12 152:19
convenient 116:20
conversation 20:7,22 21:6,15 59:24
conversations 169:17
copies 63:6
copy 116:23
cord 115:9 128:21 129:1,5
cords 115:4
Corporal 68:16 69:4 73:1,3,4,8,15, 22 74:2,6 75:1,21 76:14 78:20 80:4 81:14,21 91:15,24 92:8 108:10,11 110:22,24 111:5 113:16 114:6,10 135:21 151:14 153:15,17 163:15
corporals 38:15

correct 6:13,17,19, 21,24 7:4,7 18:10 22:14 24:10 39:18 44:5 46:9 55:23 56:2 59:20,23 65:14 66:21,24 69:2,6,14 70:1,5 71:4,11,17 73:17 78:4 80:2 83:22 85:21 89:2,11 93:22 100:10 102:5,13 104:5,6,8, 18 106:13 107:3,8 108:3 109:3,5,19 111:2 112:20,23 113:12,22 116:4,8, 12,13,14 118:5 119:2,5,12 123:12 126:10,15,22,23 127:9 129:10,13 130:12,15,16,17, 18,20 140:10 142:3,4,8,24 144:6, 12 145:1,3,13,14 151:2,8,15,17 152:21 153:11 155:11 157:4 158:8 163:16,17 168:17 169:11 170:10
Council 65:1,6
counsel 5:15,18 10:8,20,22 18:4,6 57:21 58:18 124:11 169:17
country 65:1
county 70:20,21 78:11 85:11,22 86:3 88:9 90:17 131:14 167:8 169:22
couple 10:22 151:11 56:11 64:22 94:8 122:9 160:23 166:19
court 5:5,11,19 8:13 10:22 39:21, 24 40:2,4,6,9,12

58:3 62:6 74:18 90:20 101:17 119:17,20 130:24
cover 115:5
COVID 52:23 53:1 54:8
crash 71:1,2,6,10, 13 73:11 74:1 103:16 106:21 131:3,7 141:10
crashed 74:8 87:22 132:2
creates 157:18
creating 158:22
creation 147:7
creator 147:17
crime 42:16,18,19, 23 43:1 45:15 77:19 80:19 148:22 156:14 159:1 169:12 170:17,20
crimes 164:14 170:17,20
criminal 6:15 10:13,16 111:19 112:12,23 113:10,16 17:18 18:6 50:20 51:1 109:4 142:2 148:17,20,21 149:3 167:19
criminally 9:23 20:4
criteria 164:1
cross 70:7 81:5 90:14 103:10 157:22
crossed 88:8
crossing 87:22 88:15 100:17 101:3 104:2
cruiser 34:5,10,13 54:11 55:16,21

### D

damaging 128:20
danger 70:2 129:7, 12 142:19 143:20
dangerous 69:16, 21,22 81:22 149:12,16
Dante 5:15
Dartmouth 69:8 70:1
Dascoli 9:20,21,23 11:18 12:12,13 13:20 14:7,11,15, 17,24 17:24 167:19

## Panel 2

dash 33:2,4 34:6 54:22 55:5,15,17, 19,22 56:8,24 58:11 59:17 60:18 61:2,21,24 65:7 66:13,18
date 107:24 117:16,17 155:9
dates 18:3 23:6
daughter 67:9
David 6:1
day 5:9 42:16 51:8, 9,11,14,21,23 52:2, 10,13,21 53:2 67:12 68:14 97:7 117:12 142:15 171:18
days 37:6 51:21 52:2,11
DEA 39:4
deadly 164:1,8
deal 31:12,14
dealing 103:14 132:21 141:24
death 139:18 147:8 150:12
December 24:12, 14 28:10
decided 124:4 170:9
decision 9:8 20:11 42:14 64:16 143:1 156:6,10 160:10 164:22 169:21 170:17
decisions 38:2
deep 109:7 135:3
defendant 8:7 63:17

defendants 5:18 8:13,16,18,21
defendants' 7:18
defense 12:19,21
defensive 27:16, 19 28:15,20 29:7
define 80:11
definition 150:15 151:2,4
definitions 150:2
definitive 70:14
degree 9:7 152:16,20
degrees 10:12
deleted 62:21
delicate 115:8
department 7:8 19:16,20 20:9,20 23:18 24:4 34:24 36:21 58:6 59:8,17 60:17 64:14,15 66:4 131:19 152:14 154:21,22 164:11 170:15 171:5
Department's 66:6 146:24 151:3 156:6 124:8
departments 168:22
depend 162:4
depending 127:14
depends 42:22 90:4
deponent 13:23 14:2,5,8 98:8 173:5
deposed 10:18
deposition 5:2 7:10,13 39:15 109:23

depositions 8:5, 14,17,19
depth 14:23
deputy 85:21 86:4
describe 53:13 89:24 99:17 110:2 127:12 144:4
describing 84:5 87:2 153:15
description 151:11
descriptions 88:24
details 166:1
determination 77:12
dictate 111:23
dictated 111:21
dictates 131:24
difference 133:24
difficulty 37:19 109:23
direct 38:8,16

directed 63:16 92:8
direction 151:12
directly 15:15 42:10 170:2
dirt 109:10,11,13, 14,15
disagree 151:3
discomfort 46:14
discontinuance 152:13 164:12
discontinue 89:20 164:23
discoverable 9:3 18:18,24
discovered 8:6
discovery 62:20
discuss 73:8
discussed 60:24
discussion 43:16, 18 67:16
discussions 12:11
disengage 81:21 142:16
disregarded 148:13
disk 91:6
dismissed 167:8, 12
distance 107:8 136:15
District 5:5,16
ditrapano 5:16
dividing 48:2

document 7:8 9:15 60:5 117:5
documented 158:13
dog 116:24 162:8, 11,17
door 45:17
double 80:13 161:21
download 57:3
downloading 62:6
drag 116:22 122:5
drawn 121:20
drew 108:20
drive 68:19 69:8 120:6
driver 23:9 69:10, 11,22 70:22 150:4, 8
driving 40:21,22 80:16,18,24 81:1, 22 90:2 143:17 148:18 149:10,11, 17,18,19,21,23 162:13
Dropbox 120:6
drove 97:19
drowning 113:18
drug 38:22,23,24 39:3,12 56:7 128:13 129:6 133:20 135:22 136:2,12 137:1,2, 11 155:15
drugs 11:10
Duane 5:17 63:5 116:21 132:14 135:9
due 8:11 58:11 81:1 110:7

## Panel 3

duly 5:23
Dunbar 23:17 24:9,22 28:9,12 32:4,7,10,14,18,21, 24 33:2,5,21 34:1, 6,17,21,23 36:17 37:10 40:7 49:13 50:1,2
duration 69:9
duty 52:22 77:4 155:1 165:15
dynamic 42:5
dynamics 42:15

### E

e-mail 56:14 58:4, 7,15,20 59:15 62:1 120:3
e-mailed 167:20, 24
E.M. 5:3
earlier 18:23 39:15 54:8 84:20 136:11 153:11 155:22 161:4
early 12:7 17:23 18:2 169:12
easier 98:5 135:8
east 53:8,13,15,16
easy 48:22
editorial 148:6
educational 23:1
effect 113:11
electronically 74:18 90:20
embankment 132:2
emergency 7:18 23:24 142:10 145:22 146:16,24

148:18 152:13,15, 21
Emmons 69:8 87:2
employed 6:6 37:10,13
employment 23:2, 3
encounter 75:1 78:2
encounters 65:9
end 39:8 41:6 73:7 84:21 85:11 87:13 88:14 89:9 103:16 110:15 131:14 145:5 154:4,8 155:4 162:19
ending 73:9
ends 149:1
enforcement 6:20 17:1,2 30:1,10 31:4,18 44:7 47:10 56:8 84:14 145:6, 11
engage 33:12,19, 22 41:17,22 43:6 82:5
engaged 76:6,23
engages 33:14
ensued 33:11
ensure 152:9 153:16
entered 94:9,14
entire 9:1 33:24 35:13 55:1 69:9 90:7 141:10
entitled 64:3
environmental 152:20 153:10
equipment 155:6, 20 165:5,8

escalate 152:15
estate 44:12 74:10
estimation 72:7
event 147:22
events 8:12 64:21
everything's 160:6
evidence 58:12 62:4,14,17,20 159:12
exact 18:3 108:13
EXAMINATION 6:1
examples 151:6
excerpt 74:20 78:15 79:7,15 81:11 82:1,15 83:2 84:1,9 85:5,16 86:22 87:4,18 88:4 91:10 92:12,24 93:12,23 95:9 97:14 98:11 99:5, 12,23 100:11,24 104:9 105:2,13 106:17 107:17 120:9,15,24 121:11 128:15,24 134:5
excess 73:5
excuse 86:16 170:10
exhibit 7:9,10,13 63:8,11 67:4,7,22 74:17,20 78:7,15 79:7,15 81:2,11 82:1,15 83:2 84:1,9 85:5,16 86:22 87:4, 18 88:4 91:10 92:13,24 93:12,23 95:9

97:14 98:3,7,11 99:5,12,23 100:11, 24 101:13 103:16 134:5 136:6,7,10 135:13 137:1 145:13,18,21 146:1,18,21 147:6 148:16,21,24 149:3
existed 127:2,5
existing 166:10
exited 108:11
expect 140:12
experience 112:3 159:5
expired 151:14
explain 20:13 51:16
explained 13:15
expo 30:6,8 31:24
expressed 172:8
expression 109:14
extent 150:18,22
extra 54:20 63:5
eyes 14:21

### F

face 140:12
facial 113:3
fact 119:6 155:12
factor 72:16 77:4 156:9
factors 156:14

facts 9:6
fair 11:7 137:16
falling 84:5 153:2
familiar 131:11 154:21
fast 72:8,16 88:20 154:2,5
FBI 6:18 8:6 11:21, 24 14:4 16:1,5,15, 18 48:11,19,20 49:3,7 51:4 116:21 117:1,8,9 118:1,7 119:1 126:21,24 164:2,8 168:7 172:13
FBI's 8:12
February 12:5,8 13:3,14 15:1,4 17:23,24 18:2 22:9, 10,11,12
federal 40:4 170:17
feel 171:20,22
feeling 116:10
feet 116:10 132:3 135:3
fell 121:3
fellow 17:1
felonies 151:6
felony 6:23 150:10, 15 151:1,7 159:7 167:11,13
fifty 37:18
fight 26:20
fighting 27:6
file 71:8
filed 6:9 7:24 8:1,2, 22 9:15 18:20
filing 173:5

## Panel 4

fill 47:10 48:3,10, 18,20 51:3 118:6
filled 126:24
filming 65:24
find 37:7 114:18 125:22 127:5 130:13
fine 91:7 134:15
finish 11:15
fire 23:24
firearm 118:16 121:20,23 141:17 142:6
firm 167:18
flag 91:7
Flanagan 5:7
flash 120:5
Flats 53:17
flee 78:12,21
fleeing 79:1,2 148:23,24 149:2 151:20,21 163:24 167:7,13
Flip 63:6
flown 129:2
folks 30:14
follow 75:21 77:12 165:3
foot 109:7 118:20 119:4,11 123:14 126:12,19 169:8
footage 60:10
FOP 18:2
Forbes 5:15 6:2 9:11 14:10 18:14, 20 19:1,19 63:9,5, 18 67:12,20 75:8, 11,13 91:3,7 94:21 95:5 96:4,9 116:19 119:21 120:1,5

130:22 131:1 132:9 134:10,12,15 135:19 141:8,11 145:17,19 146:4,7 147:18 148:1,5,8 150:20 159:17,19 167:7,13
force 24:1 26:6,12 27:14,18 28:17 30:1 31:24 32:19 46:21 47:9,12,15, 18 48:11,19,20 49:3,7 51:4 116:21 117:1,8,9 118:1,7 119:1 164:2,4 167:2,13
Forty-five 37:18
forward 6:14 7:2 92:7 165:15
found 107:22 130:18 132:5
Fourteen 28:8,9
Fowler 5:7
Frank 64:19
frankly 46:10
Fraternal 12:19
freezing 139:12,18
frequency 48:1
Friday 51:15,18
front 33:10,15 106:22 118:11 126:16,18 128:18

129:15 138:3,12,23 139:14
Fourth 64:16
fudge 60:8
full 99:16
fund 12:20,21

### G

gains 111:12
garage 68:22,23
gave 14:4,7 18:8 122:1 145:22 147:17 162:2
Gazette 63:9,24
general 23:3 38:10 39:12 60:5
generally 37:24 53:14 65:6 147:11
give 10:20 12:3 16:17 17:3,13 19:5, 22 23:18 32:14,22 31:14 42:1,2,5 52:9 62:2,19,22 111:15 123:23 124:2,4,6 125:11 162:1 166:3
goal 160:12
gone 11:13 65:2,3 100:3 132:6 135:12 148:8 162:24 169:22
goose 148:8
grab 111:5 114:7, 10,20,24 116:18
grabbed 110:14, 20,24 114:16 128:3
grabbing 46:3 118:15,17

Graduated 25:4
gravel 94:4
gray 133:16 136:15
Great 58:20
greater 165:1
Gripple 70:21
ground 45:19 47:20,23 48:19,22 49:2 142:20,22
guess 28:24 58:22 83:18 98:4 101:17 110:6 122:16
guilty 124:19
gun 122:2
guns 122:3
guy 46:22 71:21 76:4 126:14 163:9 170:4,6
guys 57:12 60:3 71:21 74:7 77:24 83:19 88:8 107:13 122:17,23 138:12 134:19 136:19 140:2 145:12,19 150:5 163:21

### H

half 32:13 34:22 36:4 91:2 93:3,17 99:18 111:13 134:17
halt 8:17
hand 7:9 35:4 67:2 96:5 110:14, 15 111:1,4,5 113:17 114:11,12, 15,17,19 116:17,22 119:18,19,22 123:23 128:10,12,21

133:13 136:5 137:16 146:2
handcuffed 127:22 129:17 138:1 139:7
handcuffing 129:15
handcuffs 127:7, 15,17 138:2,12,23
handed 67:21
handful 44:22
handouts 28:3 29:12
hands 45:13,19,22, 24 46:3,7 108:23 109:18,21 110:3,7 118:3,24 135:6
hands-on 45:24 46:8
Hang 146:8
happen 41:3 119:8 162:14
happening 143:11
hard 121:24
harm 48:14
Harvey 5:2 6:5,6 7:10,13 61:20 63:8, 11 67:1,4,6,21 96:7 116:17 146:2 167:18 174:3
hazards 154:18 165:6,9
head 51:13 119:4,

11 123:14,15,22 126:19 138:1 169:10
hear 80:7 83:22,23 87:10 89:15
heard 66:14 78:4 79:5 80:10 82:12 88:22 143:11 153:1,20 159:3 161:4 167:14
hearing 87:13
heart 48:17
heavy 158:3,4
held 5:7 67:16
helmet 112:19,21 113:1,4,6,8 140:22 141:3
hey 17:10 61:9 62:9,20 89:13
hidden 27:7
hide 18:16 66:12
high 37:3 69:15,18 81:3 103:9,19 157:21
highlights 65:1
highway 70:20 90:17 154:16
hill 95:17
hire 10:1 11:18
hired 11:24 13:20 14:21,14,24 17:24 24:21 28:9,12 35:1 36:15 37:4
hiring 17:8 24:17 37:19 38:1,4
history 23:2,3 50:20 57:16 109:4 141:21 142:2
hit 109:15 114:13 122:15 127:20 162:8,11,17

hitting 129:8 162:7
hold 113:16
home 53:3 54:13,15,19
hopes 66:8
Houck 64:4,6 65:15,19,24 66:3
hour 16:6 35:20,21,24 60:14 61:10,11 71:22 72:13,18,23 73:5 74:11 79:13 81:16 88:13 89:1 91:2 96:9 98:22 100:9 102:11,16 106:3,12 131:18 134:10 153:12,16 154:1
house 54:12 97:6
houses 90:14 93:4,9 95:18,21 96:2,5 154:14,16
human 147:4 162:4
hypothermia 139:13

I

i.e. 150:13
idea 65:20 134:9
identification 7:12 63:10 67:6 117:2 131:4 132:12 133:10 136:9 137:20 138:17 145:24
identified 108:24
identify 165:2
ignoring 150:7
imagine 31:17 37:21 54:18 122:18
immediately

immobilize 31:5
impact 11:11
impacted 118:3
important 60:13
improper 75:23 76:19,21 77:10,15,16,21,23 78:1 151:19 159:11
incident 29:4 47:3 61:2 67:2 68:3 76:3 163:1 160:7 171:3,8 172:3,6
incidents 45:5
includes 147:11,16
including 6:18 31:24
incorrect 156:20
increased 38:3
increasing 15:6
indicating 6:9 119:3
indication 128:24 129:4
inference 8:20
influence 1:19
information 14:4,6 15:8,11 141:19 158:24
informed 15:7
inherently 162:3
initial 66:8 75:1 158:23 160:5,13 163:11,15 164:18,

initially 109:16 110:2 127:10,11
initiate 151:24
initiated 8:7 68:16 143:4
initiating 155:4,7 159:16 160:1 164:23
injured 114:24
injuries 25:20,24 26:3 30:24 48:6,23,24 49:4 109:24 115:15
injury 25:6 31:9,13 110:5 115:2,10,20 116:3,4 129:1,5 147:8 150:13
inquiring 16:12
inside 115:8 140:22
instance 42:19 43:2 47:24 129:18 142:7
instruct 9:12
instruction 8:20
instructor 28:20 29:8 41:5
intelligently 7:6
intend 8:2
intended 154:18
intent 110:8 148:16
intentionally 109:23
interactions 65:24
interdiction 55:17
intersection 94:15,17 132:6

19
intoxicated 45:20
introduce 5:14
investigated 129:24 172:5
investigation 6:16 8:7,12 11:20,23 12:7 13:2,11,13 14:17 20:4 21:2 22:19 50:23 51:1 172:18
investigations 6:18,20
invoked 124:18
involved 44:7,15,21 63:15 116:7 154:19 165:13 166:3,17
involves 150:10
involving 22:5 68:4
Irresponsible 149:10
irreversible 156:7
issues 30:3 63:15 87:13 156:19
items 133:1

J

jacket 123:3 139:11,14,15,16,21
Jefferson 53:10,12,15,19,21 68:22
jeopardy 152:17
jerk 45:19
Jesse 5:15
job 11:23 23:10,13 24:6,8,15 34:23 26:9
John 9:20 14:7

interstate 90:4

joined 92:18
jumped 43:23
jury 9:6
justice 10:13,16 19:16,20 20:10,20 170:15 171:6
justify 147:7 148:18 156:14 165:6,9

K

Kanawha 10:9 70:21 88:9 167:7 170:22 171:10
kicked 109:10,11,14
kicking 109:12,13
kids 36:7 97:13
kids' 101:17 102:3 154:12
kill 101:23
kind 10:21 23:1,21 25:13 30:20 38:22 41:2 44:11 45:2 46:10 51:6 56:20 57:15 65:19 83:20 94:4 99:11 104:20 110:8 123:5 130:14 136:14 142:2 169:21 172:17
knew 47:24 118:20
knew 12:6 59:8 116:4,5,7 145:4
knowingly 7:5
knowledge 50:24 60:23 61:4 71:14 101:15 112:14,16 113:24 114:1 116:9 129:23 135:4 159:24 160:3 165:23 166:13 170:24

L

lacerations 30:21
lack 132:22 154:15
ladies 123:13 126:20
Lafferty 14:18,20 15:16 16:10,24 17:18 18:5 19:6 22:7 124:1
Lake 53:18
landed 129:2
Lane 70:7,21 81:5 89:4 93:16 99:16 103:11 104:2 144:12,16 157:23 158:14 161:14
late 15:2 17:24 22:8,10,12
latest 101:17 102:3 154:12
law 6:20 17:1,2 29:24 30:10 31:4,18 44:7 47:9 56:4 85:14 145:5,11 147:5 148:19 154:20 166:10
lawsuit 63:16
lawyer 7:20 11:19 12:12,15,22 13:6 17:7,10,15,19 124:18 125:1,8 167:18,19
lawyers 124:3,12,19
lay 112:18
laying 128:17 135:7
lead 71:6
learn 112:23 126:9
learned 13:7,8,12

14:17 18:21,22,23 19:22
leave 36:19 172:17
leeway 107:9
left 16:17 37:12 90:7 70:23,24 91:6 96:5 99:9 100:15 102:3 103:3 110:14 111:1 113:17 114:8,12 128:10 134:19
leg 123:7 127:24
legal 5:11 12:19 80:21
legs 109:12
Leigh 5:10
lengthy 89:3
level 43:3 118:12
levels 118:12
license 165:5,8
lie 66:10,23
lieutenant 27:24 79:23 80:3 81:19,20 89:15 152:11 154:20 166:10 161:5
lieutenants 38:14
life 113:19 147:4 162:4
lifeguard 23:16 34:8,20,21 38:24 51:9 58:23 73:1,4 112:10
lifting 122:24
lights 33:8,9,10,13,15,20 82:7,8,10
liking 65:19
limit 42:20 71:24 72:5 79:10 81:17 90:16 100:8 102:11 106:6 105:7,11

limitations 6:23
limited 148:12 163:19
limits 72:11
Lincoln 18:1
lines 26:13 28:3 31:21 32:16 48:2 60:9
lip 140:17
list 38:1 118:7,22,24 119:3,9
listen 43:21
listened 88:12 153:14,19
listening 79:8 80:8 83:16
lists 150:9 166:1
literally 109:15
live 95:22 101:9
local 6:20 30:13,16 170:20
locate 85:3
located 130:4
location 106:21 168:14
long 25:3 27:11 28:12 29:7 32:12 34:8,20,21 38:24 51:9 58:23 73:1,4 112:10
longer 14:16 63:17 134:8
longest 112:8
looked 91:15 92:1 100:16 103:6 117:19
loop 129:18

lose 73:12 86:13 87:9
losing 87:9 163:14
loss 71:5
lost 62:17
lot 39:8 40:21,22 43:14,21 86:19 91:22 102:21 103:19 123:3 130:14 169:20
lower 154:8
lucky 143:24
lying 109:1

M

made 15:20 20:10 43:16 64:16 169:22
magistrate 39:24 40:11 58:3
main 160:12
maintain 29:20
maintaining 62:5 150:6
majority 40:11
make 7:9 9:14 38:1 42:14 46:15 62:9 65:7 67:10 70:6,23 74:17 77:17 81:4 82:23 84:21 90:19 97:23 98:5,6 103:10 105:18 113:20 115:1 116:17 119:8 120:1 127:20 134:11 137:17 138:9 141:22 145:16 147:23 156:9 157:22 160:6,10,13 165:3 170:16
making 42:3 60:14

164:22
male 45:12,16 108:24
malfunction 34:18
manage 23:12
manner 81:22 118:4 126:20 135:20 153:6 167:21 168:1
manners 172:1
March 8:6,22 18:22
mark 43:8 62:2 60:7 63:7 67:3 103:15 146:4
marked 7:12 63:10 67:5,21 68:21 117:2 131:3 132:11 133:9 136:8 137:19 138:16 145:23
married 36:5,6
marshy 128:13
match 159:4
materials 28:2 29:12 41:10
matter 5:3 120:21
mayor 64:17,19 65:5 66:7
mayor's 66:2
MDENT 55:16,18
meaning 158:21
means 5:3,16 17:4 20:5 45:6 46:11,16 47:4,7 68:4 69:12 70:10 74:3 76:24 77:14 78:21 85:1 86:1 107:13,22 108:24 109:16 110:16 112:17 116:5 118:4 122:16,23 127:7 129:22 130:19 132:21 133:21

137:23 138:20 140:11 141:17,24 142:5 143:17 144:11 145:7,12 149:14 150:16 153:15 154:1 171:3,20
Means's 70:10 73:22 74:8 75:2,21 102:15 119:4,11 128:4 132:5 153:4 169:10
measure 109:7
measurement 135:4
measures 110:17
medical 25:10 30:3 32:15 48:10 49:1 110:7
medications 11:10
medics 138:6,12
meeting 61:6
member 12:22 17:2 19:23 20:2 152:19 154:23 155:7 165:13
members 149:13,16 152:14,16 154:21 164:11
mention 72:16 119:6
mentioned 20:15 65:15 121:14 141:4
mentions 125:3
message 118:3
messaged 167:20,24
messages 22:1
messaging 21:4
messed 109:23

Messer 50:14
met 68:24
metal 133:17,21 137:3
methods 26:1
Metro 38:23,24 39:3,12 43:8 56:6 78:10 83:9,15 84:13,19,20 85:8,20 86:9 87:8,14 88:16,19 89:12 145:15 154:4 155:15
mid 20:10,12
middle 142:20,22 144:13
mile 71:22 96:9
miles 72:12,18,23 73:5 74:11 79:13 81:16 88:13 89:1 98:22 100:9 102:11,16 106:3,12 131:18 153:12 154:1
mind 110:9,12 161:16
Mine 39:10 68:10 117:10
minute 54:2 68:20,21 75:18 97:6 101:23 104:17 111:18 138:12 149:12
minutes 68:7 76:8 78:18 82:4,12 83:5 84:18 85:19 87:1,7,21 88:8,12 91:4,6,8 92:15 93:5,15,18 94:2,12 95:22 96:24 98:17,20 99:8,15 100:5,15,18 101:15 102:9 104:14 112:20 166:19

misdemeanor 159:1 164:14 165:4
Misdemeanor/ traffic 164:11
missed 130:5
model 65:16
money 60:13 62:1
month 12:3 18:22
months 10:2 12:1 25:4 26:6 34:15 37:6,8,23 39:2,11 55:15 114:3,14 127:6
Montrose 53:17
morning 54:2 68:20,21 75:18 97:6 101:23 104:17
motion 7:11,18 8:4 18:21
motorcycle 69:12 70:10,22 71:2,6,10 73:12,16,22 74:1,8 75:2 77:20 84:5 102:15 112:21 116:6 129:2 132:6,18 133:5,6 136:13,16 153:2,5
moved 35:7 138:3 139:14
moving 6:14 119:10
mud 130:10
Mullens 64:19,24 66:7

multiple 116:2 151:5
murder 10:14

N

narrative 68:8,9 131:16 141:8,12
narrow 105:9
necessarily 21:24 48:18 71:18 81:10
neck 115:19
needed 48:10 124:11 126:21
negative 65:4
neighborhood 105:6 106:2
network 62:11
night 51:18 52:24 53:1
nights 51:19,20 52:1
nobody's 58:3
normal 35:10 155:18 162:13
nos 39:20
note 9:1,2 15:19,21,22
noted 63:19
notes 146:5 166:20
notice 5:23 100:18 128:10 138:12 134:10 140:8
notified 85:10,13
notify 78:11
number 5:4 18:20 37:16 63:7 64:20 67:3 113:18 130:22,23 131:17 132:3,9 133:13

145:17 163:18
numbered 146:15

O

oath 169:8
object 8:24 14:9 63:14 86:5 141:6 147:16 151:16 152:1 159:19
objection 13:17 18:13 63:18 124:13 147:23 148:2,4 150:17 157:16 159:14
objections 147:24
obstacle 41:6
OC 110:16 111:7,24 112:8,24 113:2,11,20 114:9,16 117:22,23 118:5 140:20
occupants 150:4
occurred 26:7
OCS 26:22
offense 43:2,3 76:18 77:5,14 164:15,16 165:4
offenses 62:3 20:15 76:23 141:17 142:6 164:11
offer 37:5 62:8 71:12 124:9
offered 124:1
office 19:24 20:10 21:16,17 39:9 167:19 169:16,21 170:14,16,23 171:3,11,14
officer 21:13 22:19,22 24:13 31:4 32:8 41:1 43:7 44:17 47:10

56:4 61:20 63:13 67:1,21 77:4 78:10 80:1 95:6 103:8 112:3 117:4 129:16 131:6 133:5,17 140:21 143:3,7 147:21 150:3,7,11 158:24 159:16 161:1,5,9 159:19 165:21,22 166:10,16 167:1,9 171:16
officers 37:9,13 60:21 64:3,20 65:15,21,23 66:1,6,8 85:2,14 86:14 136:19 147:8 156:13 166:2
officers' 88:15 141:5,16
offices 5:7
oncoming 153:7
one's 42:10
open 118:15
opening 13:3
operating 80:23 81:8
operation 152:14,15
OPERATOR 5:1,15,17
opinion 157:6,10,13
opportunity 36:1
opposed 134:1
opposing 144:15
opposite 64:23 70:7 81:5 103:11 104:2 158:14
options 62:13
order 7:12,19 8:13,

18 12:19 44:3
orders 161:3 162:20
overtime 36:1,3

P

p.m 51:22
p.m. 51:8,20 135:13,17 161:19 166:23 167:3 173:2 134:17 145:9
paid 12:18 36:3
pandemic 97:3
paragraph 8:15 68:15 141:5,16
paralyzed 21:7,24
paramount 147:5
park 101:21,23 102:1,3 154:12
parking 40:22 91:22
part 9:3,16,19 30:16 34:14 42:21 48:4,21 72:2 91:11 92:13,18 93:1,13,19,20,24 95:10 97:15,22,23 98:12,21 99:6,13,24 100:12 101:1,12 102:7 103:1 104:10 105:3,14 106:18 107:11,18 110:8 120:21
parts 84:4,7 98:6 118:3 153:2 154:6,8
Paskal 79:21,22,23 80:4 81:20 89:15 114:21 116:11 121:9 140:13,21
pass 32:5 68:18 105:7,11

passed 69:3 100:12 102:1 154:9
passenger 32:7
passes 24:21
passing 80:12,13,22 91:21 93:4 95:21 104:19 161:20 162:5
past 53:1 55:11 70:20 97:19 101:23 134:17 145:9
Patrolman 32:1 35:4,6
patrolmen 38:15
patted 138:9
pause 74:23 162:1
pay 12:18 35:23 22
pedestrians 70:2 90:3 152:23
pending 172:17
people 11:14 24:15 30:13 37:7,19 56:11 58:10 60:9 65:23 99:22 81:23 95:22 101:9 124:12,19 147:14 169:16 170:20
Peterson's 74:6
Petry 27:24 29:3
phone 15:12,21,22 21:7,20,22 57:4 119:14
phones 23:22
photograph 132:11 133:9 136:8 137:19 138:16
physical 24:19 37:3 46:13
picking 96:18
picks 97:13
picnic 105:15,17
picture 132:15,16

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.
DAVID HARVEY
04/26/2021 Index: pictures..pursuits

136:5 137:22 138:19,23 139:6,20
pictures 139:23 140:4,7
place 21:15 55:9 103:11 127:7 166:11
places 89:4 96:20 152:16
placing 142:7
plaintiff 5:22 8:17
plan 86:6
planned 18:6
play 74:16 91:3,9 96:20 101:18 120:8 154:12
played 74:21 78:8,16 79:8,16 81:12 82:2,16 83:3 84:2,10 85:6,17 86:23 87:5,19 88:5 91:11 92:13 93:1,13,24 95:10 97:15 98:12 99:6,13,24 100:12 101:1,12 102:7 103:1 104:10 105:3,14 106:18 107:18 120:10,16 121:1,12 122:9,21 125:15 134:6
plead 8:19
pleading 6:9
pocket 47:8
pockets 130:9
Poe 5:8
point 18:6 51:10 58:4 73:9 78:19,22 81:14 82:11 83:12 88:7 89:12 93:5 95:7 98:23 108:21 109:1 110:20 113:17,18 122:24

126:6,17 127:15 129:8,11 137:24 138:2,6 140:14,22 143:13 155:24 157:9,12 159:11 163:2
points 46:17,18 87:15 150:9 160:23
police 6:7 8:11 10:16 12:19 22:19,22 23:17,18,23 24:3,5,8,13,22 25:6,11,17 26:6,7 27:12 28:21 30:5 32:4 34:24 40:16,23 49:22 60:17 64:3,5,10 65:3 66:2 77:3,22 112:3 131:19 146:23 147:8,21 150:3 158:11 162:16 166:8 171:16
policy 142:11,17,22 145:23 146:6 147:1,18,20 156:23 165:7 166:10 168:6,7,14,17
pool 113:23
popped 91:13
portion 41:8 73:6,7
position 32:10 35:3,5 64:12 139:10 164:7,8
possibilities 70:13
possibility 70:12
possibly 26:15 97:9 134:3
potential 31:12 143:20 149:13
potentially 69:22 78:11 170:21
prejudice 8:21

prepare 168:4
present 21:9 115:14 116:2 164:2
presented 9:6 150:24
preserve 62:14
pressure 46:10,12,16
pretty 52:6 90:6 99:21 100:3 102:21 103:23 106:8 126:6
prevent 129:14 163:14
previous 27:4
previously 6:8 142:12
prior 57:10 61:1 74:13 110:18 114:20 115:13 127:24 133:6 136:24 141:17 151:21 155:19
privilege 13:4,12
Pro 91:14
probability 165:1
probable 151:23
problem 39:21
procedures 154:18,22
proceeded 101:23
proceeding 40:9
proceedings 39:21
process 17:20 18:3 24:17,20 37:1,2 38:4 43:6 52:17
produce 16:8
produced 132:15
program 25:17 27:11,21,23

progress 151:1
prohibited 149:11
proper 31:7
propped 128:21 139:9
prosecuted 39:8
prosecutor's 170:23 171:11,14
prosecutors 170:20
protected 13:11,12
protections 147:4
protective 7:11,19 8:13,18
provide 57:21 58:18 90:19 148:18
provided 60:18 90:24 114:24 115:12 155:13,19
providing 150:4
proximity 162:22
public 142:13 147:4,12 148:13 149:13,16
pull 57:5 101:16 119:14 121:7
Pullin 5:7
pulling 110:15 111:4 123:5
purchased 66:4
purchases 66:2
pure 71:16
purposes 7:13 29:3 63:11 67:6 117:2 131:4 132:12 133:10 137:20 138:17 145:24 166:4
pursuit's 144:21
pursuits 40:18 42:4,4,6,20 116:12 117:9,19 164:12

pursuant 5:22
pursue 42:6,11,19 43:1,4 44:3 96:12 156:6
pursued 77:9 86:2 97:7 131:18 151:12 164:13 167:7
pursuing 73:5 147:14 154:1 163:1,11
pursuit 8:11 41:17,22 43:7,9,17 44:16 60:9 68:16,17,22,24 69:4,9 71:9 72:12 73:9 74:19,20 76:7,13,23 77:5 81:11,21 82:1,5,15 83:2 84:1,3 85:1,2,5,16 86:12,13,18,24 87:2,4,6 88:8,14,18 89:3,13 90:9 92:1,2 117:13 133:12 134:8 137:4 152:4
pursuit's 144:21
pursuits 40:18 42:4,4,6,20 116:12 117:9,19 164:12

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.
DAVID HARVEY
04/26/2021 Index: put..respond

put 21:1 33:13,20 40:21 45:13,19,22,24 46:4,20 47:24 49:2,4,7 56:12 57:1,6 60:3 66:19 90:5 97:12 109:21 117:24 126:19 127:7 134:21 148:15
puts 109:18 110:3
putting 25:15 64:20

Q
question 11:4,6,16 16:4 46:21 88:6 125:7 141:7 147:17 151:17 152:2 156:13 161:8
questioned 124:14,17
questioning 9:1,7 63:15 125:1
questions 19:2 108:4 136:11 146:9,14,19 169:12 172:24,25
quick 63:6 94:22
quoted 64:17
quotes 64:4

R
Rabel 68:18,19,24
Rader 38:18
radio 43:19,23 52:22 69:5 78:4 82:11 83:8,15 87:9 89:12 152:7 153:1, 14,21 162:7
radioing 78:20
radios 23:22

Rail 68:19
railroad 70:22 73:12 74:7 87:2,23 88:15 100:17 101:3 105:16 107:14 128:13 129:7 132:4 135:22
ramming 163:23,24 164:2
ran 45:13,14
range 45:2
ranged 72:12
rank 35:7,9
rate 35:12 69:15,18 81:3 100:3 103:9,19 157:21
ravine 112:8 116:6,9 129:3 130:3 132:7 135:22 136:12
reach 112:7 114:16
reached 114:16
reaching 26:15 27:6 130:2,7,8
read 63:13,21 117:19 146:11,17,18,21 156:24 160:24 168:6 173:1,4
reading 156:18 162:20
ready 78:12
real 48:21 63:6 65:11
rear 33:10
reason 14:2 60:4 65:6 78:3 88:19 89:12 162:7
reasonable 150:11

reasons 26:18
recall 17:16 21:18 22:10 23:13 25:21,22 26:2 28:23 29:22 30:2 31:6,10 32:2,17,20 34:2,4 35:16 41:4,12,20 42:8 45:1 46:23 47:1,6,8 48:12 51:10 54:6 55:7,10,14 57:8 71:23 72:24 74:9,15 80:9 84:8 87:16 89:7,17 98:24 99:12
reckless 79:20 80:4,11,12,16,18,24 89:16,20,24 142:18 149:10 161:5,7,9,15,17,18
recklessly 80:22 81:24
recognize 7:15 67:22 92:16,21 117:4
recognized 157:18 158:1
recommend 143:9,14 160:16 162:22 163:2
record 9:2,15 15:17,19 57:3 61:14,18 67:13,15,16,19

94:24 95:4,6 119:22 135:14,18 166:20 167:4
recorded 153:21
recording 33:21 60:18 78:19 79:18 80:3 82:13 85:20 126:16,22
records 62:5 134:1
reduce 154:18
refer 164:18
reference 16:15 137:8 149:21,22
referring 151:14 82:24 140:15
refused 10:14 111:3 128:5,7,8
regard 8:11,9 154:20
region 30:14 113:3
registration 151:15,19,22 159:11 165:5,8
related 71:15
relation 136:13 152:19 153:10
relatively 14:16 150:2
remember 16:14 18:3 23:5 25:16,19 29:2 34:19 45:4,11 54:2 75:19 128:19 153:18
remove 113:5 114:23
removed 34:18 60:1 66:16 135:21 139:13,21 172:12
Repeat 19:4

rephrase 10:24
replying 148:5
report 38:17,18 47:11,12 48:11,19,20 49:3 51:4 67:5 68:1,2,8 70:14 76:3 81:2 88:16 89:9 103:8 108:7,8,15 110:24 113:10 116:21 117:1,8 118:1,7 119:1,7 126:21 127:1 128:3 131:3,7,8 141:4,7,10,20 165:14,17,24 166:5 168:6
reported 151:14
reporter 5:11,20 10:22 74:19 90:20 119:17,20 130:24
reporting 165:12
reports 48:3
repository 62:14
represent 5:14 9:23
representations 44:8
required 47:10 51:3
requirement 80:21
residence 99:9
residences 90:1 96:7,8 101:6,8 102:2,22
resisting 150:5
respect 20:4 25:6 27:12 28:17 30:1,3 31:18 166:12 170:19
respond 147:6

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.
DAVID HARVEY
04/26/2021 Index: responder..sitting

responder 25:17
responders 30:10
response 32:15 142:10 145:22 146:16,24
responsibility 160:15,20 162:22 163:11
responsible 163:12
rest 132:3
restraint 46:14
restroom 134:14
result 8:20
resulted 150:12
retain 12:16,17
return 32:7
retype 119:23
review 166:7,9,11,16
rid 166:3
ride 41:1,5
Ridge 91:21
Ridges 95:12,16
right-hand 96:2
rights 6:10 9:13
Rinehart 19:14,18,19 20:2,22 21:1,6 22:36:16 58:8 59:16 62:2 169:18,23
Rise 64:3
risk 52:18 158:1,9,10,22 162:2 163:8
risks 147:7
road 53:10,12,15,

20,21 68:22,24 69:7,9 70:20 72:9,13,17 75:10,14 81:7 84:13,22 85:10,22 86:4 89:4 90:2,17 92:16 95:20 96:3,5 99:16 101:8 104:13,19,21 105:9 106:9 126:5 131:14 136:20 142:14,15 143:23 145:5,8 149:19 152:20 153:10 154:16 155:18 161:22 162:12,13 164:1,3,7
road's 144:17
roads 86:19
roadway 84:7 131:23 137:12
robbery 150:14
rock 53:18 100:14
roll 128:4
rolled 128:11,14,17 129:11
rotates 53:8
roughly 107:15,16
round 66:2
route 131:17,21,23,24 145:10
Ruggier 5:17 8:24 13:7,15,17,21,24 14:3,6,9,12 18:13,17 19:5 52:19 63:14 67:8 75:6 86:5 98:2 116:22 119:16,18 120:3 124:13 126:1,19 128:11 136:8,11 132:14 140:21 141:6 151:16 152:1

157:16 159:14,18,21 172:25
rules 10:20 148:19 155:1 157:4
run 37:23,24 107:2,7 124:9 152:24 162:12
running 45:18 64:13 82:7 125:18 148:19
runs 127:21 146:15 158:11

S
safe 106:10,18 156:11
safely 115:1
safety 81:9 129:16 142:14 147:4 152:16
saith 173:5
Sam's 91:23
Saturday 51:12,15
save 98:15 113:19
savvy 90:22
scene 114:23 140:9
scheduled 8:5
school 10:6 96:11,13,14,16,17,22 154:9
school's 96:18
schools 152:22
score 37:3
SD 57:5 62:10,21
scratch 138:9
seat 92:2

seconds 74:24 78:19 82:5,12 84:19 85:19 87:1,8,22 92:15 93:15,19 94:8 95:22 96:24 98:18,20 99:8,15 100:5,18 101:15 102:9 103:4 104:12 105:9 112:16,23 123:10 125:17
secret 59:2
section 135:10 153:20 160:24
sections 146:18
secured 138:1,11
security 24:1 169:5
send 24:22
sensation 116:10
sentence 146:9
separately 83:11
Sergeant 29:11 44:18 64:13 73:2
sergeants 38:15
seriousness 42:2,15,18 151:11 156:14 165:4
service 108:20
services 148:18
session 96:18
set 58:20 86:8 101:18 102:3
share 34:11
she'd 120:6
sheriff's 86:4
shift 51:7,8,15 52:9,10,20,21,23,24 53:2,3 64:13 152:9,10 164:4

shifts 51:9,16,22 52:1,3
shoot 50:6 114:3
shooting 110:16 111:7,11,16 112:10,11
shot 49:17
show 16:7 64:21 90:18 108:23 110:15 111:3 123:10 125:7
shoveled 65:8
showing 72:5
shown 140:7
shows 50:7
sic 167:6
side 39:5 70:8,15,24 81:1 96:2,9 104:4 129:18,20 133:21 137:4,9 158:6
sign 58:18 96:11 97:1,11 98:18 100:12 106:12
signs 20:21
silent 6:11 7:3
simpler 18:15
simply 114:7
single 36:5
siren 33:11,13,16
sirens 82:6,8,12
sit 6:12 71:12
sitting 139:9

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.
DAVID HARVEY
04/26/2021 Index: situation..suggesting

situation 27:1 47:23 147:6 152:19 162:5 169:6 171:11,14
skimmed 63:22
skip 92:7,9 98:14
slippage 89:6
slotted 37:11
slowed 39:20
slowing 74:12
slumped 139:3
small 144:17
somebody's 45:17 140:22 161:24 162:11,17
someone's 31:5 87:22 121:19 149:2
sort 39:4 140:11
sound 94:14
sounds 76:9 115:11 135:12
south 6:7 20:24 22:18,21 23:15,18 31:20 34:24 35:8,13 36:15,18,23 37:13 38:5,7 40:7 44:3 50:1,8 51:17 52:7 53:8,10,13,19 54:17,23 55:1,5,9,15 56:7 60:17 61:1,5 62:8 63:17 64:14,18 65:5 66:12 77:7,9 78:6,15 85:6,12,15 86:5,22 98:19 107:6 148:7 153:18 154:9 159:4 162:23
Southern 5:5
Southridge 5:11
spare 54:20

speak 158:23
speaking 122:16,17 147:24 148:2,4 167:16
specialist 5:11
specialized 38:19,24
specific 12:10 23:6 26:10 33:6 34:12 72:2 103:11 117:13 159:24 166:1
specifically 20:14 21:19 27:13 28:23 34:2,4 37:20 38:16 39:10 45:1 47:2 58:13 74:9,15 89:7 152:4,6
speculate 75:15 86:6,8 112:1 162:18
speculation 71:16
speed 42:20 69:15,18 71:15,24 72:5,16,17,19 73:10 81:4,17 88:21 90:2,3,16 98:18 100:6 102:11 103:9,19 106:11 107:12 150:6 152:19 153:10,24 157:21 158:7,12 161:23 165:2,4 166:3 169:7,14,17,21 171:2,8,16
spraying 49:10 110:18 114:20
spread 50:7
speeding 81:6
speedometer 72:19,23
speeds 71:19,20 73:5 74:14 142:15 153:18 163:8
spend 60:13
spinal 25:6,20,23 26:3 31:9,13 32:21 161:20

110:4 115:2,4,7,9,15 116:2 128:21 167:16
spine 31:5 115:19 116:4
spit 140:16,18,19
splash 71:1
Split 68:19
splits 53:10,12
spoke 169:24
spoken 169:15,20 171:2,5,10,13
spot 92:21 106:21 117:16,17
spots 41:15
spray 26:13,14,19,22 27:12,13,15 44:24 45:5,8 46:11 47:6 110:16,18 111:8,11,19,24 112:4,8,24 113:1,2,11,20,22 115:9,14 116:3,17
sprayed 45:21 112:8,13,24 113:5,11,23 114:16
spraying 49:10 110:18 114:20
spread 50:7
stabilize 115:20,21
stack 140:3
standard 172:4
standards 26:21,23
standing 70:24 107:4 148:16
start 38:11 43:9 52:7,24 121:22,23 161:20

started 18:2 35:15 65:19 79:1 94:13 137:12 151:20 156:18
starting 51:18 87:8 127:23
starts 41:2
state 6:3 24:22 25:5,11,17 26:5 27:11 28:21 30:5,14,17 32:4 40:16,23 49:22 86:2,3 131:7 170:19
stated 27:4 142:12
statement 16:12,13,15,17 17:3 18:8,14 19:5,8,10,22 70:14 123:19,24 124:2,4 171:7
states 4:15 7:2 162:8 170:17
station 34:10 52:23 53:16 54:1 137:10 144:1
stationed 84:13
statute 6:22
stay 7:19 8:14,18 145:8
step 127:13
stepping 123:9,10 126:13
steps 35:14
stick 27:15
stole 119:13
stolen 77:18 159:6
stomp 114:3 119:11 123:14,22
stomping 126:20

stop 13:17 77:13 78:3 89:13 93:18 100:16,21 105:10 112:7 128:10 150:7 151:24 160:11,17 161:13 162:6,9
stopped 101:4 103:23 105:7,16 143:14 160:6
stopping 77:22
stops 53:18 65:23
straight 71:20 74:14 102:14,18 103:7 105:20 116:4 144:10,14 131:21,24
straightaway 71:18 72:3,5 73:6 88:14
streets 90:14
stretch 102:14,18 103:8 105:20 106:8,15 131:21 132:1
strike 70:11 72:8 73:16,22 104:23
struck 70:3,16 74:5 81:8 104:4 144:19 153:6,7 158:1,7,15
stuff 14:23 24:16 25:15 30:21,22,23 95:18 102:3 105:19 140:11,14,21 143:5 168:22 169:4
subject 8:10 50:24
subjective 161:14
submit 8:6
successful 165:2
suggest 172:16
suggesting 125:6

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.
DAVID HARVEY
04/26/2021 Index: sum..tracks

sum 58:10,14
summary 108:9
Sunday 51:12,15; 67:9
supervising 43:17 79:24
supervisor 38:8, 16 43:19 44:2 143:6 160:16 161:3 162:20,22 163:3,20 164:24 165:14
supervisors 41:24 65:20 165:22
suppose 31:12 48:20 49:2,4,7 52:21 62:6 118:6 147:20 165:24 166:2 168:10
surface 31:1
suspect 47:16 86:13,15 124:17,24 159:4 164:15 165:3
suspected 76:17, 23 164:14,15
suspended 22:18, 21 172:12
suspicion 159:6
SUV 125:22,23
swampy 128:12
swear 5:20
swerving 80:13 161:21
swing 101:17 102:3
switches 107:2
switching 83:19
sworn 5:23 61:7 169:8
symptoms 25:23
system 33:21

169:3

**T**

tables 101:15,17
tactics 27:16,19 28:16,20 29:7 45:23 164:3
tag 77:15,16 151:15
tags 75:23 76:19, 21 77:10,21,23 78:1 159:3
takes 169:2
taking 25:16 39:19 47:20 53:2 58:3 59:21 100:2 163:9 168:11
talk 13:22 14:3 16:10,16,20 17:6 18:16 19:14 21:22 41:23 42:1 43:19, 22 44:16 45:6,7 50:5 66:15 67:1 76:23 120:24 111 125:2,9
talked 14:11 16:15 19:7 31:23 36:23 55:4,8,12 75:24 87:10 119:21 124:3 154:10 167:17 170:2
talking 10:22 11:15 13:20 46:5 61:21,23 69:13 82:18 83:6 88:3 102:15 103:8 122:14 141:9 149:20 151:22 153:1 157:6
talks 13:14 158:24
tapes 94:21
tased 50:10,11,13, 15 123:16

taser 47:22 49:11, 17,19,21 50:3,4 51:3 121:15,17
tasering 121:15
tasers 26:13 49:11 123:17
technical 10:9 34:17
technically 90:22
techniques 31:8
telecommunicato r 23:17,20
telephone 19:19 80:4 81:21 169:19
tells 13:9,10
ten 45:1 66:4 91:8
term 161:14
terminate 143:1 157:4 163:3
terminated 85:2 86:13 143:10 156:16 161:2,4 162:21,23
Termination 156:6
terms 42:6
test 24:18,19,20 36:22 37:5 38:4
testified 5:24 39:21,24 40:2,4,6,9 112:3 153:24 155:22
testify 11:11 150:18
testimony 18:23 71:13 119:10 126:12 158:20 169:8
testing 65:17

tests 37:23,24
text 21:4 22:1 167:20,24
texted 22:4
thing 11:21 42:23 65:4 77:23 78:1,5 89:2 90:12 102:10 117:24 125:12 146:15 159:10
things 26:13 28:3 31:16 32:16 39:19 55:9 59:3 80:14 89:10 90:5 96:21 156:9 161:22
thinking 150:19
telling 56:14 79:19 80:4 81:21 169:19
thought 17:18,23 28:9 60:12 114:9 122:15 143:16 148:1,3
threat 152:1
threatened 150:11
threatening 114:2
thrown 116:5
Thursday 67:8,11
tie 43:23
tight 72:20 99:21
time 5:12 8:21 11:24 16:21 17:8 24:18 29:20 31:4 32:21 33:24 34:5, 20 35:8,13 36:4,16 38:4 39:3 40:17 41:7 42:16 44:7 45:3,8,12 47:7,9,15 48:16,19 49:18 50:15 52:7 54:4 55:1,13,22,24 56:3, 6,7 61:13,17 64:5 67:14,18 74:7 75:12,17 94:23 95:3 97:21 98:15 103:14 108:10,12,

14,17,18 116:10 126:24 127:18 144:24 145:4 151:5 155:12 158:10,11 162:12 164:4 165:3,13 166:14,23 167:3 173:2
times 40:8 42:11 43:14,21,22 44:23 124:14,17 142:16
tips 41:2,5
titled 146:16
today 6:12 7:3 9:21 10:23 11:11 12:11 15:23 18:5 41:13 71:12 140:8 168:15
told 13:6 16:20,22, 24 17:10,13,17 19:17,19 20:2,3 22:15 45:19 60:22 61:9 65:23 89:18 124:18,19,24 128:4 132:1 156:2 169:23 170:2
tolerated 149:11
tool 66:9
toothpaste 115:9
top 38:11 51:13 96:10 122:2 161:1
totality 42:23 90:1 111:21 142:12
tour 165:15
tourniquets 25:15
townhouses 95:18
Trace 68:17 79:11
track 105:16 107:14
tracks 70:22,24 73:13 74:8 87:22 102:18 106:15 128:13 129:7,9

---

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.
DAVID HARVEY
04/26/2021 Index: traffic..water

132:4 135:22 136:3
traffic 42:16 43:2 65:23 69:5 70:7 76:17 78:5 81:6 103:11 104:2 143:23 144:12 152:21 157:23 158:3,5,14 159:3 161:20 164:14,16
train 127:20 129:7, 12
trained 26:6 40:17 41:16,21,23 42:10 111:10 147:22
training 24:5 25:5, 10,17,22 26:22 27:11 28:2,17 29:24 30:4,18 31:1, 3,7,18,21 32:1,14, 18 49:21,24 50:2,9 112:2 115:1,13,17, 24 159:5
trains 100:22 105:19
trauma 25:14
travel 151:12
traveling 131:17
Treating 30:22
trooper 85:21 86:2,3 131:11,13
true 33:24 47:15 52:6 55:1 140:8
truthfully 11:11
Tuesday 67:9
turn 33:8,9 70:8,15, 23 72:3,20 74:13 81:7 144:9,19 157:24 158:6
turned 69:8
turning 91:22
turns 70:6 81:5 103:10 157:22

Twenty-five 98:19 100:8
Twenty-nine 10:5
two-thirds 118:12
type 31:12 32:14 46:13 48:6 49:7 52:9 60:18 77:4 119:16,19 144:8 160:7 165:4
types 118:21 168:21
Typically 145:8

**U**

uh-huh 8:9 14:21 15:4,13 21:12 39:13,16 40:13 50:12 52:5,16 57:23 79:6 87:24 95:20 100:20 106:7 107:5 118:14 122:6 123:6 126:4 134:20 135:8 153:23
ultimately 69:8 113:20 114:6 170:16
unable 128:5 163:13
underlined 55:15
understand 6:8, 11,14,22 10:24 11:1,5 18:15,17 44:11 45:3 78:24 97:5 144:4 159:24 151:12 154:17,19 164:17 165:7 170:14,19
understanding 7:1 42:9 75:1,20 142:9,21,24 169:13
understands 9:13
Understood 48:16
unfortunate 171:24

172:2
vehicular 40:17 41:17,22 43:7 44:6, 15 142:10 145:23 146:16,24 166:12, 16 168:17
Verbal 110:19
verbally 114:2
versa 114:13
versus 5:3
vice 114:13
victim 31:13
victims 25:6,14 31:8 32:15
video 5:1,11,19 33:21 59:5,9 60:10 61:13,17 62:16,20 65:8,11,13 66:23 67:14,18 90:23 91:1,5,11,14,16,20 92:13,15 93:1,4,13, 20,24 94:3,13,23 100:2,12 101:1,12 102:7 103:1 104:10 105:3,14 106:12,18 107:18,20 119:18, 16,19 120:10,16,18 121:1,12,14,22 122:9,21,24 123:13 125:15,18 127:2,5, 24 128:1 143:19 134:4,6,18 135:13, 17 137:1,7 142:1 150:1 151:6,15,20 166:23 167:3 168:19,22 169:2,4, 6 172:15 173:2
videos 62:6 168:21
view 169:9
violation 151:11, 13,23
violations 165:5,9

violator 147:6
violator's 163:14
violators 154:20
violent 148:22
Virginia 5:6,8 6:23 64:4 86:3 131:7,17
visor 112:21

**W**

waist 130:9
wait 145:9
waited 68:18
waiting 85:21 131:14
waive 7:2
walk 22:24 23:2,12 38:11 39:5 45:4,7
walking 136:19 161:22
walkway 104:20
wall 100:14
Walmart 75:3 91:22
wanted 65:7 111:20 159:10
wanting 7:1
waste 27:8
watch 23:21 65:18 95:8 97:23 119:13 137:1
watched 125:21 133:19 168:19 169:6
watching 105:17 123:13
water 70:24 71:1 107:22,24 109:1,6, 7,11,15,21 110:4,

unit 38:19,20,23 39:1,3,12 56:7 82:18 155:15 162:21,24 163:12, 13,15 164:23
United 169:20 170:3,7,15 171:2
units 82:20,21 84:13,21 163:18,19
unreasonable 162:14
unsafe 143:20 153:5 160:17
unsafely 103:17 143:17,19
updated 38:1
upload 62:10
upped 91:14
urgency 152:21

**V**

Valet 23:9
Valley 10:9,10
vehicle 44:4,20 56:8 57:2 66:2 69:22 70:11 73:16 74:6 75:22 76:12, 15 77:6,13,18 78:3 80:2 82:9 105:6 124:24 131:6 132:3 150:2,3,4,5 151:12 154:17,19 155:6,13 161:1 159:6,13 161:1 162:19 169:24 172:6

---

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.
DAVID HARVEY
04/26/2021 Index: waterfall..zones

13 113:19 114:18 123:4 130:2,8,11, 13,17
waterfall 132:22 133:14,24 134:24
ways 31:11 75:8 132:6
weapon 26:16 108:21 112:6 113:24 129:20,22 130:1,14,18
weapons 27:7 138:8,10
week 18:22 27:17, 21 28:15 29:9 51:11
weekday 161:18
weekend 52:13 96:14 97:3
weeks 6:9 9:16 14:16,24 20:23
west 5:6,8 6:23 53:8,13,16,17 64:4 86:3 131:7,17
white 102:10 140:11,15 142:19 149:6 156:19 157:7,8
Wi-fi 92:10
wife 36:13
Wild 91:22
William 5:3 68:4 108:24
Wings 91:22
witnessed 73:19
women 132:1
word 132:22 154:15
words 144:4
work 33:5 36:13 38:9 39:4 51:17,21

52:1,2 53:7 57:14 114:10 115:5 161:19
worked 23:4,5,6 51:14
working 34:16 53:2 120:13 155:18
world's 11:14
worn 56:3
worst 11:14
worth 163:9
wounds 25:14 30:21,23
wreck 85:24 116:7 161:12
wrecked 70:23 88:23
wrist 110:20 128:4, 9 136:1,2
wrists 114:7 135:23
write 68:11,13 76:3 158:4 165:14
writing 20:19 21:1 167:15
writings 167:16
written 24:19 37:3 166:2,3 167:20,24 168:7
wrong 66:11 123:17 144:11 172:10,20
wrote 15:11 70:13 81:3 128:7 144:15, 18 158:5

**Y**

y'all 65:17
yards 74:10,15 116:2

Yeager 23:6,8
year 34:3 47:1 57:8
years 28:24 29:1 32:13 34:22 35:10 55:4 64:21,22 66:1
yellow 96:9

**Z**

zone 71:22 96:11, 13,15 97:1 154:3,5, 14
zones 96:17,22 153:12