*WILLIAM ALLEN MEANS v.*

*E.M. PETERSON, et al.*

*ERIC PETERSON*

*05/04/2021*



713 LeeStreet
Charleston, WV 25301

(304) 344-8463
schedulerealtime@gmail.com

Realtimereporters.net

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

**Page 3**

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE
            SOUTHERN DISTRICT OF WEST VIRGINIA
 2                    AT CHARLESTON
 3
 4   * * * * * * * * * * * * * * * * * * * * * * *
 5   WILLIAM ALLEN MEANS,
 6           Plaintiff,
 7   vs.                        CIVIL ACTION
                          NO. 2:20-cv-00561
 8   E.M. PETERSON, D. HARVEY,
     and THE CITY OF SOUTH
 9   CHARLESTON,
10           Defendants.
11   * * * * * * * * * * * * * * * * * * * * * * *
12
13
            Continuation of the deposition of Eric
14   Peterson taken by the Plaintiff under the West Virginia
     Rules of Civil Procedure in the above-entitled action,
15   pursuant to notice, before Angela L. Curtis, a
     Certified Court Reporter, at Pullin, Fowler, Flanagan,
16   Brown & Poe, 901 Quarrier Street, Charleston, West
     Virginia, on the 4th day of May 2021.
17
18
            REALTIME REPORTERS, LLC
19          ANGELA L. CURTIS, CCR
                713 Lee Street
20          Charleston, WV 25301
               (304) 344-8463
21           realtimereporters.net
22
23
24
```

**Page 2**

```
 1   APPEARANCES:
 2
     APPEARING FOR THE PLAINTIFF:
 3
            Dante diTrapano, Esquire
 4       CALWELL LUCE DITRAPANO, PLLC
         500 Randolph Street
 5       Charleston, WV 25302
 6       W. Jesse Forbes, Esquire
         FORBES LAW OFFICES, PLLC
 7       1118 Kanawha Boulevard, East
         Charleston, WV 25301
 8
 9   APPEARING FOR THE DEFENDANTS:
10       Duane J. Ruggier, II, Esquire
         PULLIN, FOWLER, FLANAGAN, BROWN & POE, PLLC
11       James Mark Building
         901 Quarrier Street
12       Charleston, WV 25301
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3** (Examination Index)

```
 1                   EXAMINATION INDEX
 2   BY MR. FORBES . . . . . . . . . . . . 6
 3   BY MR. RUGGIER. . . . . . . . . . . 277
 4
```

**Page 4**

```
 1                    EXHIBIT INDEX
 2   Exhibit 1    Motion for Protective Order    Previously
                                                 Marked
 3
     Exhibit 2    Criminal Complaint             44
 4
     Exhibit 3    Charleston Gazette Article     96
 5
     Exhibit 4    Pursuit Path 1 Video
 6
     Exhibit 5    Pursuit Path 2 Video
 7
     Exhibit 6    Radio Communication with Metro
 8
     Exhibit 7    Bystander Video
 9
     Exhibit 8    Case Report                    208
10
     Exhibit 9    Photographs                    216
11
     Exhibit 10   Photograph of License Plate    234
12
     Exhibit 11   Emergency Response and Vehicle
13                Pursuit Policy                 235
14   Exhibit 12   Electronic Picture
15   Exhibit 13   Ambulance Report               268
16
17
18
19
20
21
22
23
24
```

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 5

1           P R O C E E D I N G
2       VIDEO OPERATOR:  This is a continuation
3   of the videotaped deposition of E.M. Peterson taken by
4   the plaintiff in the matter of William Allen Means vs.
5   E.M. Peterson, et. al. being civil action number
6   2:20-CV-00561 in the US District Court for the
7   Southern District of West Virginia at Charleston
8   held at the offices of Pullin, Fowler, Flanagan,
9   Brown and Poe in Charleston, West Virginia on this
10  4th day of May 2021.
11      My name is Chris Leigh and I am the
12  certified legal video specialist.  The court reporter
13  is Angie Curtis.  We're now on the record.  The time is
14  approximately 1:08 p.m.  Would counsel please introduce
15  themselves and whom they represent?
16      MR. FORBES:  Jesse Forbes and Dante
17  diTrapano on behalf of Billy Means.
18      MR. RUGGIER:  Duane Ruggier on behalf of
19  Officer Peterson and Officer Harvey.
20      VIDEO OPERATOR:  Would the court reporter
21  please swear in the witness?
22          E R I C   P E T E R S O N
23  was called as a witness by the Plaintiff, pursuant
24  to notice, and having been first duly sworn,
    testified as follows:

Page 6

1                EXAMINATION
2   BY MR. FORBES:
3       Q.  Would you state your name for the record
4   please, sir?
5       A.  Eric M. Peterson.
6       Q.  And how are you employed?
7       A.  City of South Charleston.
8       Q.  I know we started your deposition a little
9   over a week ago and had to take a break and some of
10  this may be repetitive, but I understand you've had
11  your deposition taken at least twice before; is that
12  right?
13      A.  Yes.
14      Q.  Okay.  Just give you some ground rules.  I'm
15  going to ask questions.  If you don't understand my
16  question, ask me to rephrase it, tell me you don't
17  understand, tell me that you're not sure what I'm
18  asking.  I'll be happy to try to rephrase it, okay?
19      A.  Yes, sir.
20      Q.  If you answer the question that I ask, I'm
21  going to assume that you understood what I was asking
22  and that you gave me an answer based on your
23  understanding of what it was I was asking you.  Is that
24  fair?

Page 7

1       A.  Yes.
2       Q.  If we start going back and forth, we're going
3   to try not to talk over one another.  I'm really bad
4   about that, but hopefully we won't do that because it
5   makes it really difficult for the court reporter to
6   take things down, okay?
7       A.  Yes.
8       Q.  Are you under the influence of any drugs,
9   alcohol or medications that would in any way impact
10  your ability to testify truthfully here today?
11      A.  No.
12      Q.  If you need a break at any time, let me know.
13  The only caveat with that would be you can't have a
14  break while there's a question pending, but once you
15  answer the question you're more than willing -- you're
16  more than able to take a break at any point, okay?
17      A.  Yes.
18      Q.  All right.  I went through this with you last
19  time, but I'll do it again.  As you know, there's been
20  a Federal investigation into the subject matter that's
21  at issue in this civil suit; right?
22      A.  Yes.
23      Q.  And you understand you have Fifth Amendment
24  protections.  I know you have counsel here.  I asked

Page 8

1   you last time, you said you didn't have criminal
2   counsel retained in this, but you understand you would
3   have certain protections and you have the ability to
4   assert the Fifth Amendment today.  Are you choosing to
5   move forward and testify anyway?
6       A.  Yes.
7       Q.  And you understand that there's no statute of
8   limitations for felonies in West Virginia and I'm not
9   representing to you in any way and don't have any
10  knowledge of what any law enforcement agency may or may
11  not be doing, but you understand that by testifying
12  here today that whatever you say would be in a public
13  record and could potentially be used against you?
14      A.  Yes.
15      Q.  All right.  Let me ask you, is it Corporal
16  Peterson, Sergeant Peterson?
17      A.  It's corporal, but I'm Officer Peterson to me.
18      Q.  Okay.  All right.  So, Officer Peterson, tell
19  me about the two prior depositions you had.  What were
20  those about?
21      A.  The prior deposition that I had here was for a
22  case, it was Robinson versus the City and myself and
23  Detective Moyer and I don't remember the male's first
24  name, but I do remember his last name.

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 9

1    Q.  What was that case about?

2    A.  It was a malicious prosecution, I believe, is

3 how it was titled.  It was, I believe, almost nine

4 years ago.

5    Q.  Okay.  The deposition was nine years ago or

6 the incident or both?

7    A.  I believe that the incident was nine years ago

8 and the deposition was taken a year after.

9    Q.  Okay.  So the deposition was probably about

10 eight years ago or so to the best of your recollection?

11    A.  To the best of my recollection.

12    Q.  Okay.  And what was the result of that case?

13    A.  That case was just settled within the last two

14 months, I believe.

15    Q.  Okay, so there was a settlement and money paid

16 out?

17    A.  I believe so.

18    Q.  Okay.  Did not go to trial?

19    A.  No, sir.

20    Q.  Do you know what court that was pending in?

21    A.  It was the -- it was the Federal courthouse

22 here in Charleston.

23    Q.  Okay.  All right.  And what was the other

24 deposition that you took part in?

Page 10

1    A.  That was a case of a person against Walmart,

2 but I don't believe I was named or my coworker at the

3 time was named and I don't remember the person's name,

4 but it was against Walmart.

5    Q.  Okay.

6    A.  Both of these incidents arose out of an

7 incident at Walmart.

8    Q.  The same incident?

9    A.  No, sir, two separate incidents.

10    Q.  Okay.  All right.  This second one against

11 Walmart, what was suppose to have happened there?

12    A.  I believe that they thought Detective Moyer

13 and I were asset protection officers and we were

14 actually police officers, so I believe that they

15 thought us detaining a person in their atrium or

16 entryway was illegal.

17    Q.  Okay, so some sort of wrongful detention and

18 they thought you guys worked for Walmart, but you were

19 plain clothes South Charleston officers at Walmart?

20    A.  That is correct.

21    Q.  Okay.  The first one, the Robinson case you

22 mentioned, that was a malicious prosecution case that

23 also arose out of Walmart.  What supposed to have

24 happened there?

Page 11

1    A.  Allegedly the defendant in the case assisted

2 two other people in taking merchandise, iPads

3 specifically, from Walmart and basically stealing them.

4    Q.  Okay and what was the allegation that they

5 claimed the prosecution to be malicious on?

6    A.  So the first two defendants, one I believe

7 pled guilty and the other two defendants, which were

8 Davis and Robinson, Detective Moyer and I refiled

9 charges on and they, to my knowledge, that's what they

10 based malicious prosecution on.

11    Q.  What was the result of that case?

12    A.  What's that, sir?

13    Q.  Did it go to trial, was it dismissed, was it

14 settled?

15    A.  It was a preliminary hearing and Mr. Davis, I

16 believe, pled to a misdemeanor and Mr. Robinson did

17 not -- did not have any charges.  They were dismissed.

18    Q.  Criminal charges were dismissed?

19    A.  Yes, sir.

20    Q.  On the civil end, was a settlement reached on

21 that case?

22    A.  That's the one I was speaking about when we

23 first started speaking.

24    Q.  Okay.

Page 12

1    A.  This firm represented me.  I have not spoke to

2 the new attorney that handled that.  Former represented

3 by Molly Poe and Moyer has spoke with that attorney and

4 Moyer relayed that to me, but I have not -- Moyer

5 relayed to me that that was settled within the last two

6 months.

7    Q.  Okay.  Got ya.  Do you know anything, any

8 details about amounts or anything like that?

9    A.  No, sir.

10    Q.  Okay.  Now, I know we stopped your deposition

11 last week because of this issue that came up during the

12 questioning where you had been interviewed by the FBI

13 in this case.

14      And we were able to get a copy of that and it was

15 provided to us by your counsel after the last -- after

16 we took the break in this deposition last week.  In

17 reviewing that, it appears to me that your FBI

18 interview was on March 11th of 2021, this year.  Is

19 that your understanding?

20    A.  That is correct.

21    Q.  Okay.  And so and in that interview you

22 mentioned a phone call that you had with one of the

23 agents prior to that March 11th date; right?

24    A.  Yes, sir.

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 13

1    Q.  Okay, so at least as early as March 11th of
2  2021 you yourself, Officer Peterson, were aware there
3  was an FBI investigation into the subject matter here;
4  correct?
5    A.  Sir, I received a phone call from that agent
6  two days, I believe it was, prior our meeting.
7    Q.  Okay.
8    A.  He asked if I could meet on the next day,
9  which would have been on a Wednesday, I believe that
10  was Tuesday, I was not available on Wednesday so my
11  next date to meet with him would have been March 11th.
12  It was Thursday, March 11th.
13    Q.  So you would have received a call from him on
14  March 9th, is that your understanding?
15    A.  I believe it was March 9th.
16    Q.  Okay.
17    A.  But it wasn't any sooner than the week of the
18  8th through whatever that -- the 8th through the 12th.
19    Q.  Okay, so it was the week of the 8th through
20  the 12th is the first time you heard directly from the
21  FBI asking to interview you?
22    A.  Yes.
23    Q.  Okay.  Had anyone at the Department told you
24  they were going to call, lieutenant, chief, anybody

Page 14

1  else say, hey, the FBI called and they're going to give
2  you a shout?
3    A.  I believe that's what we spoke about before we
4  cancelled this last week or continued this last week.
5  Lieutenant Gordon told me that the FBI had reached out
6  to the Department and wanted to speak with Harvey and
7  I.
8    Q.  Was that conversation with Lieutenant Gordon,
9  was that also the week of March 8th or was that
10  earlier?
11    A.  That would have been the same, either the
12  8th -- that would have been the same week.  That was
13  either the 8th or 9th or whatnot.
14    Q.  Of March?
15    A.  Yes, sir.
16    Q.  Got it and was that conversation with
17  Lieutenant Gordon, was that in person, over the phone,
18  through messaging?
19    A.  I believe I was in the gym in the station.
20    Q.  Okay.  All right, but was it face to face, the
21  conversation?
22    A.  Yes, sir.
23    Q.  Okay.  Have you text messaged with anyone, not
24  lawyers, not lawyers' staff, but anyone else regarding

Page 15

1  the FBI investigation or them wanting to interview you
2  or anything along those lines?
3    A.  Aside from Mr. Ruggier?
4    Q.  Yeah, I don't want to know about --
5    A.  Right, I'm just asking --.
6    Q.  Yep, yep, yep, yep, not anything with your
7  lawyer --
8       MR. RUGGIER:  Or me or your criminal
9  attorney.
10      MR. FORBES:  He doesn't have a criminal
11  attorney; right?
12    A.  I don't have a criminal attorney.
13    Q.  Do you have a criminal attorney?
14    A.  No, sir.  No, sir.
15      MR. FORBES:  He doesn't have a criminal
16  attorney; right?
17      MR. RUGGIER:  He does not, but just in
18  case he spoke to somebody in regard to that, I want to
19  be sure that he doesn't talk about that also.
20    Q.  Okay, but you testified you've not spoken to a
21  criminal lawyer?
22    A.  I have not, no, sir.
23    Q.  All right.
24    A.  And, no, sir, I have not spoke about this case

Page 16

1  with anyone except Mr. Ruggier.
2    Q.  To be clear, you've not text messaged with
3  anyone, any other officers, any officers in South
4  Charleston, any other employees of South Charleston,
5  you haven't messaged with them through text messaging
6  or e-mails about this investigation, have you?
7    A.  The only other communication that I had
8  regarding the FBI the week of March 8th through the
9  12th was with Lieutenant Gordon, Chief Rinehart,
10  Mr. Ruggier and Patrolman Harvey.  I don't recall
11  texting anyone.
12    Q.  Okay and that's what -- let me just -- let's
13  just kind of break it down, make sure I understand.
14    A.  Okay.
15    Q.  Let's start with texting, okay?
16    A.  Uh-huh.
17    Q.  Again, I don't want to know about
18  communication with Mr. Ruggier.
19    A.  Sure.
20    Q.  But other than him or his office, have you
21  texted with anyone about the FBI investigation?
22    A.  Not that I recall.
23    Q.  Okay.  And this would have been within the
24  last two months basically; right?

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 17

1   A.  Yes.

2   Q.  Okay.  Do you think there's a text that maybe

3  you're just not thinking of?

4   A.  I don't recall.  I'm not much of a text

5  messager, sir.

6   Q.  Okay and I don't know.  Some people are, some

7  people aren't.

8   A.  I just got a smart phone in 2014 or '15 I

9  believe.  I was still carrying a flip phone.  I don't

10  recall anyone about an FBI investigation, about

11  this FBI investigation.

12   Q.  Okay.  Well and let's take that one step

13  further.  What about this case at all in general?

14   A.  No, sir.  When we spoke to Mr. Ruggier, we --

15  no, sir, no, sir, not that I recall.

16   Q.  Okay.  All right.  Just to be very clear, I

17  don't want you to --

18   A.  Right.

19   Q.  I'm not asking you about communications with

20  your lawyer and please don't tell me about

21  communications with your lawyer, okay?  Best you can,

22  try to answer my question without doing that.

23     So, okay, so then how about conversations about the

24  FBI investigation, have you talked to anyone, again,

Page 18

1  other than your lawyer, have you talked to anyone else?

2  Have you talked to Harvey about the FBI investigation,

3  for instance?

4   A.  Since we all came here on a -- and then we

5  talked about this last week.  It was a Friday before

6  that motion was filed.  We sat in this room

7  specifically and talked about this case and that.  This

8  case meaning the civil case.

9   Q.  Don't tell me about the conversation, but who

10  was present at that meeting?

11   A.  Chief Brad Rinehart, Lieutenant Gordon and

12  Patrolman Harvey.

13   Q.  Okay.  And, again, without telling me the

14  substance of the conversation, Harvey, Rinehart,

15  Gordon, you and a lawyer were present having a

16  conversation?

17   A.  Yes.

18   Q.  Okay.

19     MR. FORBES:  Are you asserting that's

20  privileged conversation, Duane?

21     MR. RUGGIER:  I am.

22   Q.  Officer Peterson, to your knowledge has

23  Lieutenant Gordon been named as a defendant in this

24  lawsuit?

Page 19

1   A.  No, sir.

2   Q.  Has Chief Rinehart been named as a defendant

3  in this lawsuit?

4   A.  No, sir.  Not that I'm aware of.

5   Q.  To your knowledge, at the time you had this

6  meeting, and you say this would have been the Friday

7  before the deposition or when, I'm sorry, tell me when

8  this meeting was.

9   A.  The Friday before March 30th.

10   Q.  Oh, okay.  So it would have been the Friday

11  before March 30th?

12   A.  The original deposition, yes, sir.

13   Q.  Understood.  All right, so let me look at the

14  calendar.  That would have been, from what I can see,

15  March 26th is the Friday immediately before.  So you

16  think this was about March 26 of 2021?

17   A.  The best I can recall.

18   Q.  Okay.  Did you all ride to the meeting

19  together or separately?

20   A.  No, sir, I drove myself.  I came directly from

21  work.

22   Q.  Okay.

23   A.  I do not know how the others arrived.

24   Q.  Understood.  All right.  Other than this

Page 20

1  meeting, have you had any conversations with, let's

2  start with Lieutenant Gordon about this case or the FBI

3  investigation?

4   A.  Yes.

5   Q.  Tell me when those occurred and what the

6  substance of them were?

7   A.  Lieutenant Gordon assisted in, I guess, some

8  of the documentation needed for this case.

9   Q.  Okay.  Putting things together for discovery

10  responses in this case?

11   A.  Yes.

12   Q.  Okay and so you and he would have had had

13  conversations.  Again, I don't want to know about the

14  ones that the lawyer was part of, but just

15  conversations between you and Lieutenant Gordon I do

16  want to know about.  What was discussed in those

17  conversations?

18   A.  The -- I believe he looked at the prior cases

19  that the City had.  I believe he was involved in

20  looking up the prior cases that the City was asked

21  about.

22   Q.  Prior cases with Mr. Means?

23   A.  Yes.

24   Q.  Okay.

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 21

1    A.   And I'm not sure -- that was the direction of
2   our conversation in regards to the discovery requests.
3    Q.   Okay and what about with Patrolman Harvey,
4   what conversations have you had with him about this
5   case?
6    A.   We have not had many conversations about this
7   since this all -- like I said, we knew this case was
8   filed in August, so we haven't had many conversations
9   in regards to this at all.
10    Q.   Sure.  So the few conversations you've had,
11   what were those about?
12    A.   About this case, about he did contact me in
13   regards his contact from the FBI.  He asked if I had
14   been contacted by the FBI, I said yes.  And then --
15    Q.   Did he tell you whether or he had spoken to the
16   FBI?
17    A.   Yes.
18    Q.   What did he tell you?
19    A.   He told me that he had not spoken, he has not
20   spoke to the FBI.
21    Q.   Did he tell you why not?
22    A.   He did not.
23    Q.   Did you ask him if he was going to speak to
24   the FBI?

Page 22

1    A.   No.  He said he'd retained counsel.
2    Q.   So do you know when this conversation was?
3   Would it have been that same week?
4    A.   Yes.
5    Q.   Of March 8th?
6    A.   Yes, sir, 8th through the 12th.
7    Q.   Somewhere in that range?
8    A.   It was guaranteed that conversation happened
9   between the 8th through the 12th.
10    Q.   Was this a phone conversation or an in person
11   conversation?
12    A.   In person conversation.
13    Q.   Okay.  Would it have taken place at the
14   station?
15    A.   No, it actually took place at my office.
16    Q.   Where is your office?
17    A.   The South Charleston Middle School, 400 Third
18   Avenue.
19    Q.   Got ya.  did Harry come to you there?
20    A.   He did.
21    Q.   Did he come to you solely to talk about the
22   FBI investigation?
23    A.   No, he does stop in every once in a while, but
24   on this week specifically, yes, he did come to ask me

Page 23

1   if I was going to speak to them and what my thoughts
2   were.
3    Q.   How did he know you had been contacted by the
4   FBI?
5    A.   How did he know I had been contacted by the
6   FBI?
7    Q.   Yeah.
8    A.   I would say, I can't speak for Harvey, I would
9   say that the Chief or Lieutenant Gordon had notified
10   Patrolman Harvey of that.  I don't -- I don't know.
11    Q.   Don't know for sure --
12    A.   No, sir.
13    Q.   -- but you would assume that either the Chief
14   or Lieutenant Gordon must have told Harvey?
15        MR. RUGGIER:  I'll just object to the
16   form of the question.  That's not necessarily what his
17   testimony was, but go ahead.
18    Q.   Okay.  Tell me what your testimony is.  I
19   don't want any --
20    A.   I don't know how he learned originally of me
21   being contacted by the FBI.
22    Q.   Okay.  But somehow he came to see you to talk
23   about it?
24    A.   Yes, sir.

Page 24

1    Q.   Did he call first or message first or just
2   show up?
3    A.   I don't recall.
4    Q.   Do you all text each other?
5    A.   Not as much as we used to, but yes, sir.
6    Q.   Okay.  What's the last text you have from
7   Patrolman Harvey?
8    A.   I don't know.
9    Q.   Do you have those on your phone?
10    A.   No, sir.
11    Q.   How do you get your text messages?
12    A.   Oh, I receive text messages on my phone.
13    Q.   Yeah.
14    A.   I clear my phone daily.
15    Q.   You clear out all your messaging on your phone
16   daily?
17    A.   Yes, sir.  I always have.  I prioritize my day
18   used on my text messages.
19    Q.   Okay.  When did you start clearing out your
20   phone daily?
21    A.   When I received an Apple iPhone from the City.
22    Q.   Is your cell phone issued by the City?
23    A.   No longer, no, sir.
24    Q.   But it was until some point?

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 25

1    A.  Until 2018.
2    Q.  You told me you first got a smart phone in,
3  what, like 2014, 2015?
4    A.  Yes, sir.
5    Q.  So somewhere from whenever you got that up
6  until 2018 you cleared your phone out of all messages
7  everyday?
8    A.  At the end of the day I delete my text
9  messages, yes, sir and every so often I take my -- I
10  don't know how to operate the Apple iCloud.  I don't
11  have many apps on my phone.  I take my photos and put
12  them on a hard drive.
13    Q.  Okay.
14    A.  Or save them to a thumb drive.
15    Q.  All your photos you put on a thumb drive?
16    A.  Yes, sir.
17    Q.  Or you put them up into the cloud?
18    A.  I don't know how to operate the cloud, that's
19  what I'm saying.  I'm old fashioned in terms of that.
20  They normally go on a thumb drive or an external hard
21  drive.
22    Q.  Do you know if your text messaging that you
23  clear off your phone is also on the iCloud?
24    A.  I do not.

Page 26

1    Q.  But it could be, you just don't know?
2    A.  Yes, sir.
3    Q.  Okay.  Does Patrolman Harvey have an iPhone,
4  do you know?
5    A.  I'm not sure what brand phone he has.
6    Q.  So any texts between you and Patrolman Harvey
7  regarding this case with Billy Means, as far as your
8  phone's concerned, would be deleted?
9    A.  They're deleted off the device that I have in
10  my hand, yes, sir.
11    Q.  Okay.  Well, is that different than a phone,
12  the device you have in your hand?
13    A.  No, sir, I'm just telling you, if you're
14  saying they're stored in the cloud, I don't know --
15    Q.  I don't know whether they are or not.  I guess
16  what I'm trying to make clear is that you've got --
17  your phone is what you clear out, not like an iPad or
18  something else, we're just talking about your phone is
19  where these messages would have been during the day
20  when you had them; right?
21    A.  I have an iPhone 6, yes, an old iPhone 6, yes,
22  sir.
23    Q.  All right.  What's your number?
24    A.  What's my telephone number?

Page 27

1    Q.  Yes, on the iPhone 6?
2    A.  (304)533-0461.
3    Q.  Do you know Harvey's number?
4    A.  I do not, sir.
5    Q.  You got it stored in your phone?
6    A.  Yes, sir.
7    Q.  Has he texted you, Harvey, or you texted him,
8  either way, back and forth, since this civil case was
9  filed?
10    A.  Oh, yes, sir.
11    Q.  And you've deleted those everyday at the end
12  of the day; correct?
13    A.  Yes, sir.
14    Q.  Okay.  Let's go back to March, the March 8th
15  week.  Were you at the middle school everyday that
16  week?
17    A.  I don't recall.  I should be.  Monday through
18  Friday I'm there.
19    Q.  Your schedule, you generally would be; right?
20    A.  Yes, sir.
21    Q.  I was trying to see if we could pinpoint a day
22  when he came to see you.
23    A.  Okay.
24    Q.  Sounds like maybe you just don't know, just

Page 28

1  some time that week?
2    A.  Yes, sir.
3    Q.  Okay, so did he message you or you message him
4  that week?
5    A.  I don't recall.
6    Q.  Okay.
7    A.  I see Patrolman Harvey in passing.  He was at
8  the office that week, so I also seen him at the office
9  the week of the 8th through the 12th.
10    Q.  Okay.  So you might have bumped into him at
11  the office too, you're not sure?
12    A.  I know he was at the office the week of the
13  8th through the 12th because I believe he spoke to the
14  Chief in regards to this.
15    Q.  Were you present for that conversation?
16    A.  No, sir.
17    Q.  Did Patrolman Harvey tell you about that
18  conversation?
19    A.  No, sir.  He said he was there --
20      MR. RUGGIER:  I'm going to object -- go
21  ahead and answer.  I'm going to object along the lines
22  of this is work product.  Once the lawsuit's been
23  filed, conversations which are done are always in
24  anticipation of litigation.  I let you go on this for a

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 29

1  while, but --
2          MR. FORBES:  These are two defendants in
3  this lawsuit that are communicating back and forth and
4  deleting messages and I don't see how on earth the two
5  of them could be work product.
6      This isn't somebody from your office that's part
7  this conversation.  These are two separate defendants
8  in this case that chose to get the same law firm to
9  represent them, but I don't see how this is work
10  product.
11         MR. RUGGIER:  If they're doing something
12  in anticipation of litigation, I think that it would be
13  work product.  It's during the litigation of the case.
14  How is it not work product?
15         MR. FORBES:  Are you saying that their
16  conversations where they have these texts and then
17  deleted them were at your direction?
18         MR. RUGGIER:  No, I'm not saying that at
19  all.  No, I'm not saying that at all.
20         MR. FORBES:  I hear your objection.  I
21  think this is relevant material and that we can ask
22  about the conversations that he's had with another
23  defendant witness and officer in the case that are not
24  done with an attorney present or a member of the law

Page 30

1  firm present.
2          The two of them chose to meet and discuss
3  things and I think it's both relevant and that it's not
4  objectionable.  Are you instructing him not to answer?
5          MR. RUGGIER :  The objection is noted.
6          MR. FORBES:  Okay.
7          MR. RUGGIER:  Or I presume you note the
8  objection.
9          MR. FORBES:  I think she's going to note
10  the objection.
11         MR. RUGGIER:  Somebody better note the
12  objection.
13         MR. FORBES:  I'm confident the objection
14  is noted somewhere.
15     Q.  All right, so let's talk about these
16  conversations some more.  The March 8th week, you guys
17  are at South Charleston Middle, Harvey comes to see
18  you.  Anybody else present --
19     A.  No, sir.
20     Q.  -- when you guys had that conversation?  What
21  room were you in?
22     A.  In my office.
23     Q.  And you have a separate office just for you as
24  the -- is it resource officer or what do they call

Page 31

1  there you there at the school?
2      A.  Yes, sir, it's a resource.
3      Q.  You're in there.  Door open or shut?
4      A.  Shut.
5      Q.  And what was said?
6      A.  I don't recall the words exactly.  He just
7  came to ask me in regards to speaking to the FBI and I
8  told him I arranged a time to meet with the FBI.
9      Q.  Okay.  And did he tell you that he was not
10  going to talk to the FBI?
11     A.  He told me that he had retained counsel,
12  Mr. Dascoli.
13     Q.  Have you ever spoken to Mr. Dascoli?
14     A.  No, sir.
15     Q.  Did you all watch the video together on that
16  date, the video the bystanders took, you heard their
17  testimony, you were here for it last time, that video
18  the bystanders took, did you and Harvey watched it that
19  day?
20     A.  No, sir.
21     Q.  Have the two of you ever watched it together?
22     A.  Not -- not that I recall.
23     Q.  How many times have you watched it?
24     A.  Up until I met with the agents, probably three

Page 32

1  times.
2      Q.  Was Harvey with you on any of those three
3  times?
4      A.  Not that I recall.
5      Q.  Okay.  Do you think you're just not
6  remembering that he might have been?  It seems you
7  watched this thing three times and you're not sure who
8  was with you when you watched it.
9      A.  I don't recall anybody being with me.  When I
10  was -- when I was -- when I first saw the video, I
11  don't recall anybody being with me.  I don't recall
12  viewing the video with Patrolman Harvey.
13     Q.  Okay, so on the week of March 8th meeting with
14  Harvey, he mentions he's got a criminal lawyer,
15  Mr. Dascoli.  Did you ask him why he got a criminal
16  lawyer?
17     A.  No, sir.
18     Q.  Did he ask you if you had a criminal lawyer?
19     A.  Yes, sir.
20     Q.  What did you tell him?
21     A.  No.
22     Q.  Did you tell him why you didn't get one?
23     A.  I told him I didn't receive criminal counsel
24  because I didn't do anything illegal in this instance.

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 33

1    Q.  Was he worried that he might have done
2 something illegal?
3    A.  Not that I recall.  He's never said that he
4 did anything illegal on that date.
5    Q.  Has he said he did anything illegal on any
6 other dates?
7    A.  No, sir.
8    Q.  Okay.  Did you wonder why he got a criminal
9 lawyer if he didn't do anything wrong?
10    A.  No, sir.  I believe he's the member of like a
11 fraternal police fund or something.  You pay a certain
12 amount yearly and it entitles you to legal advice, so I
13 believe he retained Mr. Dascoli based on that FOP
14 membership.
15    Q.  Do you know when he hired Dascoli?
16    A.  I do not.
17    Q.  Did you all talk about, at that meeting the
18 week of March 8th, what the FBI might ask you about?
19    A.  No, sir.
20    Q.  What was the purpose of the meeting, near as
21 you can tell, between you and Patrolman Harvey the week
22 of March 8th?
23    A.  So I believe, I don't know another word, we
24 were flabbergasted in terms of the FBI wanting to

Page 34

1 investigate he and I in regards to this matter.
2    That was the only -- he wasn't there that long, you
3 know, but, I mean, he came over and said that he, I
4 believe that he said, I don't remember exact words, but
5 he could not believe that.
6    Q.  So he said something to the effect of he was
7 flabbergasted or couldn't believe?
8    A.  I'm saying flabbergasted in lack of a better
9 term.  We were kind of blind sided.
10    Q.  So you felt blind sided?
11    A.  Yes, sir.
12    Q.  And did Patrolman Harvey express to you that
13 he felt blind sided somehow, is that the right word?
14 I'm just trying to figure out what he was saying.
15    A.  I don't recall --
16    Q.  And I understand you may not know the
17 specifics.
18    A.  I don't recall or know his emotion, but I
19 don't believe that he -- to characterize this, I don't
20 think he saw this coming.  I don't think that he
21 understood.
22    Q.  But during the same conversation he mentions
23 that he has a criminal lawyer?
24    A.  Yes.

Page 35

1    Q.  If somebody doesn't see something coming, does
2 it make a lot of sense that they go out and hire a
3 criminal lawyer?
4    A.  Only -- the only thoughts I have on that
5 process is, and when I say retained, I guess this fund
6 provides you legal advice.  I think that he just
7 contacted Mr. Dascoli initially in regards to legal
8 advice in this situation.  So I don't know that
9 necessarily --
10    Q.  You don't know the details of that?
11    A.  No, sir.  No, I don't know anything in regards
12 to his conversations with Mr. Dascoli or why he
13 retained him or why he spoke to him regarding legal
14 advice.
15    Q.  When he shows up at the school to talk to you
16 and you say seems blind sided, he already had a
17 criminal lawyer he mentions to you during the same
18 conversation?
19    A.  Yes, but I believe he retained Mr. Dascoli
20 when he found out in regards to his -- the
21 investigation.
22    Q.  Do you know when he found out?
23    A.  I do not.
24    Q.  Do you know if it was the same week as you or

Page 36

1 it could have been earlier?
2    A.  I do not.
3    Q.  You just don't know either way?
4    A.  I do not.
5    Q.  All right, so you guys are discussing this and
6 you say you feel blind sided or flabbergasted about it.
7 What's the rest of the conversation like?
8    A.  We didn't have much of a rest of conversation.
9 We spoke about how his work was going.  He asked how I
10 liked being at the school and then he went about his
11 business and there's a certain point in the morning
12 when I get busy, so that ended -- that ended our
13 conversation.
14    Q.  This would have been in the morning?
15    A.  Yes, sir.
16    Q.  Do you know about what time?
17    A.  It would have been prior 10:30.
18    Q.  Does he have to sign in or out of the school
19 when he comes in?
20    A.  No, sir.
21    Q.  Is that normal?
22    A.  I don't believe -- I don't believe I've ever
23 signed into -- I'm a law enforcement officer in the
24 City, so I go in -- in every school system we're asked

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 37

1  to do walk throughs, so we badge in and walk through.
2     Q.  Okay, so you just show up and walk in and
3  nobody says anything?
4     A.  Yes, sir.
5     Q.  All right.  Was he wearing a uniform?
6     A.  I don't recall.  He is not in a uniformed
7  service anymore.
8     Q.  That's what I thought.  He said he's with
9  Metro Drug Unit now; right?
10    A.  Yes, sir.
11    Q.  Do you know how long he's been with them?
12    A.  I believe since December or January, December
13 of 2020 or January of this year.
14    Q.  But he would have been with them in this
15 March, this March time frame that we're talking about?
16    A.  Yes, sir.
17    Q.  Okay.  Did you all talk during this meeting
18 about the allegations that the FBI might be looking at
19 here?
20    A.  We have not spoke to the FBI, so we didn't
21 know the substance of their line of questioning.
22    Q.  You knew it was about the Billy Means case;
23 right?
24    A.  Yes, sir.

Page 38

1     Q.  And you knew the bystander video existed;
2  right?
3     A.  Yes, sir.
4     Q.  Did you all talk, during this conversation
5  March 8th, about the accusation that Patrolman Harvey
6  had stomped on Billy's head?
7     A.  No, sir.
8     Q.  That wasn't brought up at all?
9     A.  No, sir.
10    Q.  When did you all have the conversation where
11 he told you that he didn't think he stepped on his
12 head?
13    A.  Sometime after that video was released in,
14 what was it, August or September of 2020.
15    Q.  Okay.  Where did that conversation take place?
16    A.  Probably -- we were still working a shift
17 together.  Probably in the office.
18    Q.  The best you recall, how did it come up to
19 talk about that?
20    A.  Detective Cook notified us of it.  He runs our
21 Facebook page and notified us that there was a video
22 out there and then we observed the video.  We viewed
23 the video I guess is what I'm --
24    Q.  How did you view the video?  You described to

Page 39

1  me you're not exactly a tech guy so tell me how you
2  accessed it.
3     A.  I don't recall if it was on Cook's device or
4  if it was on his - what am I trying to say - PC.
5     Q.  Do you think that was in somebody's office?
6     A.  It was at the station.
7     Q.  And where in the station?
8     A.  In the patrol office.
9     Q.  Is that like -- I've been down there, but I'm
10 not sure what it all, you know, what's that patrol
11 office versus something else.  Is that a private
12 office?  Is that just an area everybody's in?  What's
13 the patrol office?
14    A.  The patrol office is shared with whoever is on
15 that shift.
16    Q.  So whoever is working that shift would share
17 the office that day or that time frame?
18    A.  Yes, sir.
19    Q.  Okay.  So you guys watched it there and you're
20 not sure, could have been Detective Cook's, like, cell
21 phone or iPad?
22    A.  He doesn't have an iPad, sir.  It was viewed
23 either -- it was viewed from Facebook.
24    Q.  Okay.

Page 40

1     A.  On either his device or pulled up on the PC.
2     Q.  Okay, so by device we're talking about a cell
3  phone?
4     A.  Yes.  Sorry.
5     Q.  Okay.  All right.  No, that's okay.  I mean,
6  use whatever words you want, I just want to make sure
7  if we read this later we understand what we're talking
8  about.  So probably viewed it on Detective Cook's
9  device or on a PC and when you say a PC, we talking
10 about a laptop or a desk top, like a bigger, thicker
11 computer?
12    A.  A desk top.
13    Q.  Okay.  Did Cook pull it up to play it for you
14 all?
15    A.  I believe so and when you say you all, I think
16 that Cook and I viewed it.
17    Q.  Okay.
18    A.  And then Harvey was notified or vice versa.  I
19 viewed the video first with Detective Cook.  I don't
20 know that Patrolman Harvey viewed the video first with
21 Detective Cook.
22    Q.  Okay.  So you and Detective Cook watched it
23 together.  Harvey was not there for that viewing.
24    A.  That's -- from the best of my recollection

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 41

1 Detective Cook and I viewed that for the first time,
2 yes.
3    Q.  Anybody else present when you all watched it?
4    A.  Not that I recall.
5    Q.  And so when you say you and Harvey had a
6 conversation at that time, was that after you both had
7 watched the video or after you had watched the video?
8    A.  That was after we had -- he had viewed the
9 video and I had viewed the video.
10   Q.  Okay, but you all didn't view it together at
11 the same time?
12   A.  Not that I recall.
13   Q.  Okay.  And how long after you watched the
14 video did you have the conversation with Harvey?
15   A.  It would have -- I believe the same day.
16   Q.  Who all was present for that conversation?
17   A.  Just he and I that I recall.
18   Q.  And how did it come up that he said he stepped
19 over or whatever?
20   A.  How did it come up, sir?
21   Q.  Yeah, I mean, I'm just trying to figure out
22 how the conversation went.
23   A.  In terms of the conversation, the first point
24 of interest was the taser comment and then it went on

Page 42

1 through the stomp comment and Patrolman Harvey made it
2 clear to me that he was stepping over Mr. Means to, I
3 believe, transition his weight or search him to
4 handcuff him.
5    Q.  Do you believe that, that he was stepping
6 over?
7    A.  In terms of a step over, it appears he stepped
8 over Mr. Means as opposed to stomp.  A stomp, I would
9 believe, in my personal opinion, would be a downward
10 motion and then your knee would come back up and then
11 reset on the ground.  A step is one complete motion.
12   Q.  Okay and we'll watch the video in a little bit
13 and get more into that.  So this conversation takes
14 place at the station.  What did Detective Cook say to
15 you when you watched the video with him?
16   A.  Detective Cook just made us aware of the
17 video.  He is like the -- I would say he's the computer
18 guy or the Facebook guy of the Department.  So he
19 brought it to my attention.
20   Q.  Do you remember about what time frame this
21 would have been?
22   A.  No, sir.
23   Q.  Do you know if it was before or after this
24 lawsuit was filed?

Page 43

1    A.  I'm trying to recall.  I don't recall the date
2 that he showed me that video and I don't recall if it
3 was prior to this lawsuit being filed or not.
4    Q.  How close in time to the incident, the May
5 2nd, 2020 incident, was Detective Cook telling you
6 about this video?
7    A.  Sorry.  Repeat the question.
8    Q.  Sure.  So the incident with Billy Means
9 happens on May 2nd, 2020; right?
10   A.  Uh-huh.
11   Q.  That's correct; right?
12   A.  Yes, sir.
13   Q.  To the best of your knowledge.  May 2nd, 2020.
14 About how long after that do you and Detective Cook
15 watch this video roughly and I understand you may not
16 know exactly.  Just give me your best estimate.
17   A.  Right.  When I spoke earlier, I believe I said
18 August or September.
19   Q.  Okay.
20   A.  I believe that's when we viewed the video.
21 Sitting here today I don't remember the actual date
22 that you all filed this lawsuit.
23   Q.  Understood.  Okay.
24   A.  I don't know if it was before or after is the

Page 44

1 issue.
2    Q.  That's fine.  But the incident itself in May,
3 it was several months later when you became aware of
4 the video.
5    A.  Yes, sir.
6    Q.  Okay and that's several months after you had
7 written your report, filed the criminal complaint,
8 things like that; correct?
9    A.  Yes, sir.
10   Q.  Okay.  Let's go ahead and take a look at --
11 we'll make this -- this would be Exhibit 2 to the
12 continued deposition.
13        PETERSON DEPOSITION EXHIBIT NO. 2
14            (Criminal Complaint was
15            marked for identification purposes as
16            Peterson Deposition Exhibit No. 2.)
17        MR. FORBES:  Duane, it's the criminal
18 complaint.  You want a copy?
19        MR. RUGGIER:  Yeah, I'll take one.
20   Q.  Take a look at that.  That's a four page
21 document I just handed you.
22   A.  Sir, did you say four?
23   Q.  I think it's four.  I know it says 3 of 5, but
24 I don't see 5.

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 45

1     A.  Number 5 is the victim witness sheet, sir.
2     Q.  Got ya.
3     A.  They redact that.
4     Q.  Okay.  There you go.
5     A.  Excuse me.
6         MR. RUGGIER:  We're always helpful.
7         MR. FORBES:  I'm noticing that.
8     Q.  You tell me when you've had a chance to
9  review.
10        MR. RUGGIER :  You got parts you want to
11  ask him about?
12        MR. FORBES:  I'm asking about a few
13  things throughout.
14    Q.  You don't need to sit there and read the whole
15  thing.  I just want to make sure you recognize what it
16  is and know it.  You're welcome to read it all if you
17  want.
18    A.  Yes, sir.
19    Q.  Did you have a chance to read over that?
20    A.  Yes, sir.
21    Q.  What is that four page document I just handed
22  you marked as Exhibit 2?
23    A.  That is the criminal complaint that I filed.
24    Q.  And you're the officer that filed this;

Page 46

1  correct?
2     A.  Yes, sir.
3     Q.  And that's your signature on Page 1 on the
4  front there for complainant's signature?
5     A.  Yes, sir.
6     Q.  And then there's a spot where the magistrate
7  found probable cause and issued an arrest warrant;
8  correct?
9     A.  Yes, sir.
10    Q.  That's because this was a sworn and affirmed
11  statement by you; right?
12    A.  Yes, sir.
13    Q.  Okay.  And so you, when you filed this, this
14  is an under oath sworn statement; correct?
15    A.  Yes, sir.
16    Q.  Okay.  And you would have filed this on May
17  2nd, 2020?
18    A.  No, sir, I filed this on, appears to be, May
19  7th.
20    Q.  Seventh?
21    A.  Yes, sir.
22    Q.  Okay.  Well, yeah, okay, I see where the
23  magistrate signs on 5-7.
24    A.  Uh-huh.

Page 47

1     Q.  Okay.  I couldn't tell if that was a 7 or a 2.
2  It's your belief it was on the 7th is when this was
3  filed, that would have been five days later?
4     A.  Yes, sir.  When we went throughout the rest of
5  the day I continued to take calls.  I believe this was
6  filed when I came back on shift.
7     Q.  Okay and that would have been then on the 7th.
8     A.  So that was a Sunday day shift.  I was off
9  Monday.  It would have been a Tuesday, Wednesday,
10  Thursday night shift, but we would have to look at a
11  calendar.
12    Q.  There's a record somewhere of the exact day.
13    A.  I understand.  I believe it was the 7th.
14    Q.  Okay.  Fair enough.  When you signed this you
15  signed it stating that everything in it, to the best of
16  your knowledge, was true because you were swearing that
17  it was all true; right?
18    A.  Yes, sir.
19    Q.  What did you charge William Means with in this
20  criminal complaint?
21    A.  Fleeing a law enforcement with reckless
22  indifference.
23    Q.  What's reckless indifference?
24    A.  It's where it places, I mean, would you like

Page 48

1  me to read via the Code?
2     Q.  Just what's your understanding of what
3  reckless indifference is?  If it's the Code, you can
4  read that.
5     A.  Well, I mean that's what I write the reports
6  and I base my investigations on is the West Virginia
7  Criminal Code.  I mean, so he didn't pull over this
8  motorcycle and he fled law enforcement at risk with
9  safety to others.
10    Q.  Okay.  And the Code section that you've cited
11  here in the complaint states that "who operates the
12  vehicle in a manner showing a reckless indifference to
13  the safety of others."  Is it your belief that at the
14  time of this pursuit on May 2nd, 2020 that the way that
15  William Means was operating the motorcycle and driving
16  was reckless?
17    A.  Not initially.
18    Q.  Okay.  Well, let me ask it this way:
19    A.  Uh-huh.
20    Q.  This pursuit goes on for about 17 minutes or
21  so.
22    A.  Sir, if I timed it correctly, there was pre --
23  I left Chick-fil-A and saw Mr. Means coming out of
24  Oakhurst Drive so there's about two to three minutes,

WILLIAM ALLEN MEANS v.                                                    ERIC PETERSON
E.M. PETERSON, et al.                                                        05/04/2021

Page 49

1  if I timed it correctly, the time I initiated to the
2  time of Mr. Means's crash is 12 minutes and 7 seconds
3  or 12 minutes and 9 seconds of us pursuing him until he
4  crashes.  So there is a portion of that which is
5  preemptive.
6      Q.  What do you mean by preemptive?
7      A.  Like I'm trying to get other people to help
8  me, I'm watching and waiting to see what he's going to
9  do.  Some people fled for me from the minute I've got
10  behind them, so I'm trying to notify other people.
11      There's, like I said, when I left Chick-fil-A I saw
12  Mr. Means traveling, he turned off Oakhurst Drive onto
13  119, but I didn't catch up with him until the South
14  Ridge Boulevard interchange and that's when I was able
15  to visually inspect the motorcycle and see the
16  registration and see Mr. Means.
17      Q.  At what point in that do you start the radio
18  back and forth over Metro?
19      A.  At what point did I?
20      Q.  Yeah.
21      A.  What point did I start a conversation with
22  Metro?
23      Q.  Correct.
24      A.  Probably when I left -- probably when I'm in

Page 50

1  the intersection between Green Road and South Ridge
2  Boulevard.
3      Q.  Okay and it's 12 minutes and how many seconds?
4      A.  The time I initiated it, which is the time he
5  turned off 119, to the time he crashes is 12 minutes
6  and 7 seconds or 12 minutes and 9 seconds.
7      Q.  I hear you.  So you're saying the 12 minutes 7
8  seconds starts when he turned off 119.
9      A.  That's when I initiated my traffic stop on
10  Mr. Means.
11      Q.  You would agree with me that during that time
12  frame, that 12 minutes and 7 seconds, there are
13  portions where the driving is reckless.
14      A.  Yes, sir.  In the end portions, yes, sir.
15      Q.  Only in the end portions?
16      A.  Like I say, so initially no.  Initially he
17  does break the speed limit.  There is one hairpin curve
18  that I can remember, but he slowed down.  He
19  would have had to cross into traffic to slow down, but
20  he went around that turn very slow placing his foot
21  down.  Then in the end there are three different
22  straightaways and out of the two, he accelerated on the
23  last two.
24      Q.  When you say the end, from a time frame

Page 51

1  perspective, how much time are we talking at the end?
2      A.  Okay, so Patrolman Harvey joins in at about
3  five to six minutes, so we're looking at the last four
4  minutes or three minutes.  The last part, once you turn
5  off of Brounland Road onto Emmons Road, that portion
6  initially again, like I say, wasn't that reckless, but
7  then it became reckless.
8      Q.  Okay.  When you say wasn't that reckless, I
9  mean, based on what you've written in your complaint
10  and what your reports are, there's periods where he's
11  going considerably fast and then there's periods where
12  the pursuit and he slow down; right?
13      A.  Straight -- from what I remember and from what
14  I've written here, the straight stretches were the only
15  portions he accelerated on.
16      Q.  Okay.
17      A.  He never really -- he didn't accelerate
18  extremely through the set of woods either.  The
19  straight stretches were the portion that he accelerated
20  on.
21      Q.  In asking you these questions, it's pretty
22  obvious to me that you've spent some time preparing for
23  this deposition; right?
24      A.  Well, sir, it's just I've been in these

Page 52

1  situations with pursuits and this initially wasn't, it
2  wasn't that reckless, like I said, at first.  That's
3  the only way I can -- I can assess it.
4      Q.  I hear ya.  Let me back up to the question
5  though because you've timed this up 12 minutes and 7
6  seconds from the time he turns off 119.  Walk me
7  through what you reviewed for your deposition here
8  today.  What have you looked over?
9      A.  Well, that was -- that was from the radio
10  traffic.  That's what I remember from the radio
11  traffic.
12      Q.  So you've listened to the radio traffic?
13      A.  Yes, sir.
14      Q.  Okay.  When did you last listen to that?
15      A.  Probably -- when was my last deposition
16  scheduled?
17      Q.  Would have been about eight days ago, I think.
18      A.  The 26th, was that correct?
19      Q.  I believe so.
20      A.  I listened to it on that morning.  And I don't
21  know that I've listened to it -- I don't believe I
22  listened to it afterwards, but I listened to it on that
23  morning, yes, sir.
24      Q.  Okay.  Did you watch the bystander video that

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 53

1  day?

2     A.  Not that I remember.  The last time I remember

3  viewing the bystander video I was with the FBI.

4     Q.  Okay.  That was March 11th?

5     A.  That is correct.

6     Q.  What else have you reviewed for your

7  deposition here today?

8     A.  The report.  Not necessarily the criminal

9  complaint because it goes on along with the narrative

10  of my report.

11     Q.  Okay.

12     A.  And the Code, excuse me, the Policy and

13  Procedure and --

14     Q.  When did you review the Policy and Procedures?

15     A.  I've looked over it.  I've looked over it, I

16  don't know, I don't know the last day.  I know I looked

17  at that time, the morning of the 22nd, because I was

18  preparing to --

19     Q.  The morning we were going to be here on the

20  26th?

21     A.  Twenty-sixth, excuse me, yeah.

22     Q.  So you would have read over the -- when you

23  say policy and procedures, what are you talking about?

24     A.  That was the South Charleston Police Policy

Page 54

1  Procedure Manual.

2     Q.  Is that something as a South Charleston police

3  officer you're suppose to be familiar with?

4     A.  Yes, sir.

5     Q.  And as part of your job duties, are you

6  suppose to be aware of what's in that manual?

7     A.  Yes, sir.

8     Q.  And you have to follow what's in that manual;

9  correct?

10     A.  Yes, sir.  It's a guidance, yes, sir.

11     Q.  There's portions of the manual that have the

12  word shall in there; right?

13     A.  Shall?

14     Q.  Yeah.

15     A.  Yes.

16     Q.  And shall wouldn't just be some kind of

17  guideline, it's a directive, isn't it?

18     A.  I believe you'd have to ask the writer of the

19  policy that.

20     Q.  Okay.  Well, you're charged with having to

21  know what the policy is.  If it says shall in the South

22  Charleston Police Policies and Procedures, you're

23  suppose to follow that; right?

24     A.  Yes, sir.

Page 55

1     Q.  Okay.  What else have you read or looked at

2  prior to your deposition here today?

3     A.  Prior to my deposition, prior to April 26th as

4  well, I've looked at a lot of stuff.  I mean, I don't

5  remember, recall everything.  I know I looked at

6  Mr. Means's hospital paperwork.  I know I looked at his

7  indictment, his plea, his sentencing.  I don't recall

8  what else I looked at.

9     Q.  Okay.  Did you read a copy of the draft

10  transcript of Patrolman Harvey's deposition?

11     A.  Yes, sir.

12     Q.  Okay.  When did you read that?

13     A.  I don't know what date I received it.

14  Whatever day I received it.  I did skim through it, but

15  I didn't read it in its entirety.  I mean, I don't have

16  the time to read it in its entirety.

17     Q.  I understand.  That's how people are going to

18  feel after your deposition too.  So we were here on

19  April 26th.  We conducted Patrolman Harvey's deposition

20  from 9:00 a.m. until I think around 2:00, so somewhere

21  in that neighborhood.

22        Then we were suppose to start your deposition,

23  which we did begin, but then we had to stop because

24  there was this FBI interview that we didn't have a copy

Page 56

1  of.  And then so we postponed the rest of your

2  deposition, you were under oath at that point and I

3  already begun to ask you questions; right?

4     A.  Yes, sir.

5     Q.  And then since that time you were able to get

6  a draft copy of Patrolman Harvey's deposition from the

7  morning of the 26th and you read over or skimmed over

8  those prior to today?

9     A.  Yes, sir.

10     Q.  Okay.  We've been going about an hour and I

11  need to hit the restroom.  Let's take a quick break,

12  okay?

13     A.  Okay.

14        VIDEO OPERATOR:  Time is 2:02 p.m.  We're

15  off the record.

16        (A brief recess was taken after which the

17  deposition continued as follows:)

18        VIDEO OPERATOR:  Time is 2:15 p.m.  We're

19  on the record.

20  BY MR. FORBES:

21     Q.  All right.  We're back here, Officer.  Let me

22  ask you this:  There came a time, we received this as

23  part of the case, where I guess you and somebody else,

24  a sergeant maybe, went back and out took some kind of

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 57

1 video of the pursuit route. Was that you that took
2 that video?
3  A. I drove and Sergeant Moyer took the video.
4  Q. Okay. Anybody else in the vehicle?
5  A. Just Sergeant Moyer and I.
6  Q. What did you guys do that for?
7  A. For this part of -- actually, I believe we did
8 it before the grand jury in the criminal case to play
9 if there was a trial to show the pursuit path.
10  Q. Okay. Did anyone ask you to do that or you
11 guys just go on your own?
12  A. Did it on our own.
13  Q. And it looked like you had some kind of GoPro
14 or something set up in the window to do that. What
15 kind of camera was that?
16  A. That's Officer Messer's GoPro.
17  Q. Let me ask you this: In your cruiser that
18 day, and you had the SUV on May 2nd, 2020; right?
19  A. Yes, sir.
20  Q. In that vehicle, did you have a dash cam?
21  A. No, sir.
22  Q. Have you ever had a dash cam?
23  A. Yes, sir.
24  Q. When was that?

Page 58

1  A. The first time, sir?
2  Q. Yeah.
3  A. First time in 2008 when I was hired.
4  Q. Okay, so there was dash cam in South
5 Charleston vehicles in 2008 or at least the one you
6 had?
7  A. 2008, I believe, until I left my patrol
8 assignment in 2011.
9  Q. Maybe we should walk through that because it
10 got a little disjointed where we started last time and
11 then started again here before we keep going down this
12 road. You've been with South Charleston, did you say,
13 13 years?
14  A. 2008 is when I began.
15  Q. Okay and so walk me through your time starting
16 with South Charleston to now, the positions you've
17 held.
18  A. In 2008 through 2011 with the patrol division.
19 2011 through 2018 I was with street crimes, which is a
20 plain clothes unit, and then 2018 to 2020 I was in
21 patrol and 2021 I've been in the school system.
22  Q. Okay. Is the street crimes unit, is there
23 still a street crimes unit in South Charleston?
24  A. Yes, sir.

Page 59

1  Q. Is there a reason you rotated off of that?
2  A. In 2018?
3  Q. If that's when it was, yeah.
4  A. Yes, sir.
5  Q. Why?
6  A. I had an off duty incident.
7  Q. What was the off duty incident?
8  A. So in October of 2017 I was at a get together
9 and after the get together on the way home my fiance
10 and I were in an argument over another officer's
11 Snapchats and messages to her and that officer is
12 married and I don't have those Snapchats because I've
13 never had a Snapchat and I don't know how to operate a
14 Snapchat.
15  Q. You struck me that way about what you said
16 earlier about the smart phone.
17  A. I don't know, I don't have the messages that
18 she received prior to Snapchat either, but they were of
19 sexual content and so instead of handling it as I
20 should, I contacted that other officer's wife in that
21 seven to ten minute drive home which lead to an
22 argument between my fiance and I.
23  At a point where I wasn't wanting to talk about
24 this situation anymore I asked to exit the vehicle. I

Page 60

1 exited the vehicle in taking what I thought was going
2 to be my keys and my cell phone because they had been
3 in her purse. She was -- she had been drinking earlier
4 in the evening too. She left. I walked to another
5 location and contacted somebody to come pick me up.
6  She contacted -- she normally has some of the
7 numbers of guys on the shift of mine, but she didn't
8 have the -- any numbers on the shift that was out, so
9 she called and stated that I wouldn't give her her
10 purse back.
11  Low and behold she didn't have her purse, but
12 regardless, it didn't matter, she came out looking for
13 me. I stayed standing in the same position that I was
14 when she pulled up because I knew there were cameras in
15 the area to record the, you know, the discussion.
16  Two patrol officers showed up and I was -- I began
17 recording the incident on the phone that I had at the
18 time. That was a City assigned phone that I was
19 speaking of to you earlier. So I was disrespectful to
20 them and I was intoxicated in public.
21  So after that, I left and stayed the night at the
22 Fairfield and she went home and I came home the next
23 day. This was more of a conduct unbecoming against the
24 two patrolmen and the other officer and his wife and I

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 61

1  was intoxicated in public.
2    **Q.  Who was the other officer?**
3    A.  Which one, sir?
4    **Q.  The one that your wife had the Snapchat**
5  **messages with?**
6    A.  Patrolman Parsons.  Actually, sir, he's not
7  Patrolman Parsons, he's got a different title, but it
8  was Officer Parsons.
9    **Q.  Officer Parsons.  And were you charged with**
10 **anything criminally that night?**
11   A.  No, sir.
12   **Q.  Have you ever been charged with a criminal**
13 **offense?**
14   A.  Yes, sir.
15   **Q.  What was that?**
16   A.  In 2003 I was at -- I don't know what it was
17 called at the time.  It was Banana Joe's.
18   **Q.  It's been a lot of things.**
19   A.  Something at the time, I believe it was Banana
20 Joe's because there was a boat inside at the time.
21   **Q.  Yeah.**
22   A.  I was with a group of people and one of my
23 friends was up on the boat dancing.  The bouncer placed
24 his hands on him to get down.  I stepped in between

Page 62

1  them.  I couldn't really calm my friend down where he
2  needed to be at the time.
3     We had been drinking.  Some other bouncers came and
4  at the time I believe the police department was having
5  a problem with that establishment and it was pretty
6  much a point and go once we got to the door.
7     When we got to the door, there was some officers
8  working that corner and we were loaded into the -- we
9  were placed under arrest for public intoxication,
10 loaded into a wagon and taken to a place called Cares
11 that no longer exists.  I think you're familiar with
12 it.
13   **Q.  Yeah, I've had clients at Cares.**
14   A.  Yes, sir.  In that instance I was charged with
15 public intox.
16   **Q.  Other than the public intox charge, have you**
17 **ever been charged criminally with anything else?**
18   A.  No, sir.
19   **Q.  Okay and that was in '03 prior to your**
20 **becoming a police officer?**
21   A.  Yes, sir.
22   **Q.  Were you with TSA at that point?**
23   A.  No, sir.
24   **Q.  Okay.  Other than TSA and South Charleston, do**

Page 63

1  **you have any other law enforcement experience?**
2    A.  No, sir.  Well, forgive me, no, sir, I don't.
3    **Q.  That's all right.  What were you thinking it**
4  **might be?**
5    A.  I was a security guard, but that's not law
6  enforcement.  I was downtown Charleston so I contacted
7  those guys a lot.
8    **Q.  Where were you a security guard at?**
9    A.  When the Heart of Town split up into the two
10 entities they are now, I don't know what it was named
11 after that, but it was a construction site and it got
12 -- I was hired there and I was a security guard and it
13 was very, very busy.
14   **Q.  Sure.  About what years were you there?**
15   A.  I don't recall.
16   **Q.  Before the TSA job or after?**
17   A.  Oh, I'm sorry, it was before.
18   **Q.  So back, this 2017 incident.**
19   A.  Yes, sir.
20   **Q.  As a result of that, were you given any formal**
21 **discipline by South Charleston?**
22   A.  Yes, sir.
23   **Q.  Okay and what was that?**
24   A.  After that incident I was suspended with pay.

Page 64

1  I went to my local PCP and asked to receive some
2  alcohol counseling or reduction counseling.  I
3  completed that and then I took a suspension.
4    **Q.  How long was the suspension?**
5    A.  I don't recall the amount of -- I don't recall
6  the hours, but it would be 20 shifts.
7    **Q.  Was that without pay or with pay?**
8    A.  Twenty shifts was without pay.
9    **Q.  Okay.  And you were, after that - I'm not sure**
10 **what the right word for it is - removed from the street**
11 **crimes unit or transferred?**
12   A.  We had a conversation after that.  I been
13 working in plain clothes for seven years.  That
14 environment was no longer conducive to -- I'm not
15 trying to say that environment.  It was better that I
16 went back to the road and started working on myself.
17   **Q.  Have you continued with those, like counseling**
18 **or anything like that, since this time?**
19   A.  So I saw a certain person for a lengthy period
20 of time, then I did a return to duty session and I do
21 still see someone, but that's for -- it's not
22 necessarily for -- it's not necessarily related to the
23 alcohol.
24   **Q.  Okay.  Is it anger management?**

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 65

1    A.  Oh, no, sir, no.  It's -- I don't know how to
2  -- I don't know what you would word it.  It's not
3  depression or anything like that.  It's more
4  relationship wise.
5    Q.  But it's some sort of formal counseling for
6  something along those lines?
7    A.  Yes.  It's more -- it's more of a trust issues
8  and communication issues with my fiance.
9    Q.  Okay.  2017 you were married?
10    A.  I'm not married, no, sir.
11    Q.  At the time in 2017 were you married?
12    A.  I was engaged.  I still am.
13    Q.  Was it your fiance having the issue with the
14  other patrolman?
15    A.  Sir, we didn't really have an issue, she and
16  I.  I had the issue with him.  I contacted his wife
17  with no proof.  That enlies (sic), I mean, that just
18  caused a storm.  So -- I don't know how to characterize
19  it.  I didn't have any evidence or proof that she had
20  ever sent anything back.  The Snapchat that he sent her
21  was unopened at 1:24 in the morning.
22    Q.  Do you know what was on it?
23    A.  No, but I do know that there was a video that
24  was sent of sexual nature and it wasn't him or it

Page 66

1  wasn't his Mrs., but it was intercourse and he said he
2  sent it to the wrong person.  That was the first
3  instance.  And then the second instance was the Snap in
4  the middle of the night.
5    Someone else had made a Snap and I believe they
6  have a wall or something where it's posted and this has
7  been described to me, when I say lack of proof, I don't
8  know.  She posted something on her wall, another
9  person --
10    Q.  Okay.
11    A.  -- which included my fiance.  It was them
12  together at the female's apartment dancing to a video,
13  making a video and just like a dancing video and he
14  commented on that and asked where she was in the night
15  time hours.
16    Q.  Okay.  Did you and your fiance break up after
17  that or are you still together?
18    A.  No, sir.
19    MR. RUGGIER:  I'm just going to object
20  and note I've let this go on for a little while.  I
21  mean, you can go so far with -- this has nothing to do
22  with the case or even, frankly, him as far as his
23  potential as being something of relevance in the
24  lawsuit.  Note my objection.  You can keep asking

Page 67

1  questions.
2    MR. FORBES:  I'll note your objection,
3  but it's a suspension without pay due to an incident
4  and I'm just asking some questions about the incident
5  and I'm trying to be tactful in asking them, but, you
6  know, I think I have to ask them.
7    Q.  So, on the evening that lead up to all this
8  the two of you had been drinking somewhere.  Where was
9  that?
10    A.  It was a Halloween party that a coworker of
11  hers and a coworker of mine had thrown.  They're
12  actually married, a couple, I work with him and she
13  works with her, so we were at a Halloween party and
14  that other person and his Mrs. was there as well.
15    Q.  You were at a Halloween party.  Was this South
16  Charleston or elsewhere?
17    A.  It was in the county.
18    Q.  Within the county?
19    A.  Yeah.
20    Q.  You leave the Halloween party.  Who was
21  driving when you left?
22    A.  She was.
23    Q.  Is it her vehicle or yours?
24    A.  Hers.

Page 68

1    Q.  At what point did you tell her you wanted to
2  get out of the car?
3    A.  When we were about a minute to two minutes
4  from being to our apartment.
5    Q.  Where was that?
6    A.  At the time Parkland Terrace apartments.  It's
7  a part of the South Charleston Housing Authority.  It's
8  over by Jones Street and Park Avenue in South
9  Charleston.
10    Q.  You said you wanted to stay somewhere where
11  there were cameras?
12    A.  Yes, sir.
13    Q.  Okay, so where was that at?
14    A.  That was at Parkland Terrace apartments.
15    Q.  So you were just right outside of the
16  apartments is where you got out of the vehicle?
17    A.  I got out on Pennsylvania.  Okay,
18  Pennsylvania, Greenway, Park, Jones and Goshorn are all
19  covered by cameras so I got out on Pennsylvania and
20  walked to Jones Street.
21    Q.  All those streets in, for lack of a better
22  word, sort of downtown South Charleston have camera
23  surveillance on them?
24    A.  No, sir.  Parkland Terrace apartments are on

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 69

1 all those streets. It's a multi duplex apartments with
2 a senior living section, a community building, an
3 office section and then two, three and four bedroom
4 units.
5    Q.   Parkland Terrace has the cameras?
6    A.   Yes, sir.
7    Q.   And you knew those would be able to see where
8 you were standing?
9    A.   Yes, sir.
10    Q.   Do you know if there was footage from the
11 incident?
12    A.   I do not know.
13    Q.   Do you know if anyone at South Charleston
14 received footage of the incident?
15    A.   I do not know.
16    Q.   You said you went to your primary care
17 physician and got some alcohol counseling classes. Do
18 you attend any type of alcohol meetings or anything at
19 this point?
20    A.   I do not, no, sir.
21    Q.   Do you drink?
22    A.   Yes, sir.
23    Q.   How do you describe your drinking?
24    A.   Far less than what I used to drink and in

Page 70

1 terms of the choice.
2    Q.   What do you mean by choice?
3    A.   I no longer drink Jagermeister, sir. I no
4 longer drink any dark liquor. I don't drink Jack
5 Daniels or Jim Beam and those were my -- those were my
6 poison.
7    Q.   Got ya. When did that stop?
8    A.   When did that stop?
9    Q.   Uh-huh.
10    A.   Then in 2017.
11    Q.   So you still drink, but you make different
12 decisions about what type of alcohol you drink now?
13    A.   Yes, sir.
14    Q.   Okay. So other than that incident, have you
15 ever been disciplined by South Charleston?
16    A.   Other than that incident?
17    Q.   Correct.
18    A.   Yes.
19    Q.   Tell me about that,
20    A.   In that instance, it was 2011 or 2012. It was
21 when I first started out in the plain clothes unit. I
22 was seeing some -- I was seeing a female. She had
23 assisted us with a case. She assisted us with
24    I just started in that unit. She assisted us with

Page 71

1 a case and she was living with another male that
2 married and we had sexual relations twice in her
3 driveway in a vehicle.
4    Q.   What kind of vehicle?
5    A.   In an unmarked, I can't say company vehicle.
6 In an unmarked vehicle that we had seized, that
7 Detective Moyer and I seized at the time.
8    Q.   Was it a vehicle that was being used for the
9 South Charleston street crimes unit?
10    A.   Yes, sir, so we can say a City assigned
11 vehicle I guess would be better.
12    Q.   Probably makes sense.
13    A.   That was one of the problems. Those two
14 instances he, I don't know -- I don't know if he
15 oversaw them, I don't know if he -- somehow he found
16 out about them.
17    Q.   The husband?
18    A.   No, he's not married to her, sir, it was --
19    Q.   Oh, okay.
20    A.   He's from a different county, but has a
21 business here and was seeing this girl that worked for
22 him and they were staying in an apartment together.
23    Q.   Okay.
24    A.   So the next instance was Detective Moyer and I

Page 72

1 took lunch breaks at some points. Detective Moyer went
2 to eat with his wife that day and I went and saw her
3 and we began to have a sexual encounter.
4    However, we got a call in that area and we had
5 started in that act in terms of clothing, but we had
6 not got in that act, so that was when I was on the
7 clock, okay, and then the second one were the two in
8 the driveway off duty.
9    Q.   Did you have to go to the call?
10    A.   I left and went to the call, yes, sir.
11    Q.   Okay. All right.
12    A.   But my suspension was -- this male had brought
13 a manilla folder to the office addressed with my name
14 on it. It wasn't given to me. It was opened by
15 someone else, passed on to someone else and then passed on
16 to the Chief's office a week later, from my
17 understanding, when he gave it. When I didn't talk to
18 him or have contact with him, he got my phone number at
19 the time and called me.
20    Q.   And this is the guy that was living with the
21 girl?
22    A.   Yes, sir.
23    Q.   Okay. Who owns the business in South
24 Charleston?

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 73

1    A.  Yes, sir, he says, hey, man --
2    Q.  What business does he own?
3    A.  I'm not sure what -- I know she worked for
4  him, but I'm not sure what she does, you know what I'm
5  saying?  I'm not sure what business they had.
6    Q.  Okay.
7    A.  You know, it was something to do with
8  computers or software.  We didn't talk --
9    Q.  Do you know the guy's name?
10    A.  I don't.  He did call me, though, and asked me
11  why I didn't get or what was the deal was, I didn't get
12  the thing or whatever and I didn't know what he was
13  talking about, but at that point I spoke to him and
14  said, hey, whatever, this is over.  So it wasn't
15  lengthy, but that did happen.  He did turn in that
16  manilla envelope in to --
17    Q.  What was in that envelope?
18    A.  It was saying, hey, you know, I know you're
19  with so and so.  Like I said, I don't know the
20  terminology of it because I didn't have it.
21    Q.  Sure.
22    A.  And, you know, I know you're a police officer
23  and this and that.  I know that you're at my house on
24  this date or whatever, but those were the three

Page 74

1  instances and --
2    Q.  What was your discipline from that?
3    A.  On that I took -- on that it was unpaid five
4  shifts off.
5    Q.  Is there -- was there some sort of write up
6  you were given from that or just was it just a meeting
7  where it's, hey, you're going to lose five shifts?
8    A.  So on both they give you a document that says
9  these are the policy violations you - I don't know what
10  I'm trying to say - that you didn't adhere to and this
11  is your punishment.  Do you wish to accept this
12  suspension of five shifts off or do you wish to have
13  hearing?
14    Q.  Okay.  So they give you something, South
15  Charleston does, the police department, that says that
16  we believe you violated these provisions of the
17  Policies and Procedures?
18    A.  Yeah.  It's the section, it's printed out and
19  says something like officer unbecoming -- unbecoming an
20  officer and disrespect towards peers and something that
21  happened on both.
22    Q.  Does it have like a recommended discipline
23  you're going get or you have a right to a hearing in
24  front of, I assume, their Civil Service Commission or

Page 75

1  whatever the equivalent is there?
2    A.  I'm not sure, sir.  I'm accountable.  I took
3  both.  I understood those policy -- policies and I did
4  not argue them I guess is what I'm trying to say.
5    Q.  Both of those, for lack of a better word,
6  writes ups, I don't know what they're called, both of
7  those disciplinary measures, write ups, would be
8  reflected in your personnel file at South Charleston at
9  this point, do you know?
10    A.  I'm not sure how they keep their records, sir.
11    Q.  That's not your job; right, to keep their
12  records?
13    A.  I've not seen my personnel file, sir.
14    Q.  You mentioned the female, do you know her
15  name?
16    A.  I don't recall her name.  I believe her first
17  name was Amber, but I don't remember her last name.
18    Q.  I thought you said that she assisted with a
19  case.
20    A.  She did.
21    Q.  What does that mean?
22    A.  She gave us information on a prior case
23  probably three to six months earlier in the year on --
24  I can't remember the girl's name that she assisted with

Page 76

1  either.
2    Q.  Was it a drug case, a theft case?
3    A.  It was a drug case.  We primarily, Detective
4  Moyer and I primarily worked drug cases.
5    Q.  I thought so.  I wanted to make sure what we
6  were talking about.  So this person who might have been
7  named Amber had given you information on a drug case
8  three to six months prior to this sexual relationship?
9    A.  Yes.
10    Q.  Okay.  How did you come into contact with this
11  Amber for her to give you information?
12    A.  We met her at the 7 Eleven at the corner of
13  Rock Lake and -- Rock Lake and Kentucky Street.  It's
14  now closed.
15    Q.  I guess maybe that was a bad question.  How
16  does it come about that she knows to give you
17  information or wants to give you information?
18    A.  She was meeting with the other female, and I
19  can't remember her name at the time, and she was, I
20  believe she was purchasing pills off of that -- off
21  that other girl.  I'm not sure.  And then again, I
22  don't remember the substances, I don't remember the
23  content of all that, but that's how we met.
24    Q.  I know it's been while, we're talking about

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 77

1 ten years ago, nine or ten years ago sounds like. But
2 how does a person, let's assume her name's Amber,
3 decide, hey, I'm going to tell two plain clothes South
4 Charleston police officers I'm going to go purchase
5 pills. Did you guys arrest her at some point? I'm
6 trying to figure out how you started with her to get to
7 this spot?
8    A. I'm sorry. I know what you're saying now.
9 Yes.
10    Q. I think it was my question frankly.
11    A. Yes, we caught her with the pills on that
12 date. The date at the 7 Eleven.
13    Q. Okay.
14    A. She had initially said they were her pills,
15 her prescription pills. I believe Detective Moyer
16 wrote her for the without valid script through the City
17 of South Charleston and then I think at sometime during
18 that week, the weeks leading up to or whatever, she
19 contacted us and said, hey, I want to provide
20 information on this girl.
21    Q. Do you know if Amber's citation was dismissed
22 as a result of that information being provided?
23    A. I don't recall.
24    Q. Okay.

Page 78

1    A. Naturally in that line of work, yes, sir, most
2 of the time that is the way those things operate.
3    Q. Some kind of quid pro quo where she's going to
4 give you information and --
5    A. For deferral.
6    Q. -- or you guys decide to defer or not convict
7 her of this citation?
8    A. Yes, but I do not recall the outcome of her
9 specific citation.
10    Q. Okay. Other than these two incidents we
11 talked about, any other discipline with South
12 Charleston?
13    A. No, sir. Both of my -- both of those
14 situations did occur from off duty activity and I've
15 not had a written formal complaint on me in my official
16 capacity at the South Charleston Police Department.
17    Q. And I haven't seen, obviously, these
18 complaints. The 2011, 2012 incident at least you agree
19 part of the substance of that was doing things in the
20 City assigned vehicle and having to respond to calls;
21 right, or a call?
22    A. Two instances. First is the sexual encounters
23 and the second is that girl provided us with
24 information previous.

Page 79

1    Q. Okay.
2    A. Those are both -- those are both the policy
3 issues.
4    Q. Understood. Do you remember what the policy
5 issues were with the 2017 incident that were listed?
6    A. Yeah. The officer unbecoming, the public
7 intoxication, the disrespect to fellow officers for me
8 recording. There is one more.
9    Q. Okay.
10    A. Something about use of position and I don't
11 recall.
12    Q. The two officers, the plain clothes guys that
13 came, did not arrest you or charge you with anything;
14 right?
15    A. They were uniformed officers, sir.
16    Q. I'm sorry.
17    A. They were patrolmen.
18    Q. I'm sorry. So two patrolman that came, they
19 didn't arrest you or charge you with anything; correct?
20    A. No, sir.
21    Q. Do you think maybe that's what the third prong
22 was related to, somehow telling these guys not to do
23 that? I'm trying to understand how it went down.
24    A. No, sir, not at all. I was somewhat

Page 80

1 belligerent in speaking and telling them I had a ride
2 and I wasn't going to speak to either of them with her
3 present, so I separated myself from the situation and
4 walked over to Thomas Hospital in the ER bay and that's
5 where I sat until another one of the officers arrived
6 and then the ride that came to pick me up. But, no,
7 sir, in regards to that, no, sir.
8    Q. You didn't go into the hospital, you just went
9 to the bay area and hung out?
10    A. Yes, sir.
11    Q. Okay. Okay. Do you know who the other
12 officer that picked you up was?
13    A. I do.
14    Q. Who was it?
15    A. Jake Dent.
16    Q. And the two officers that came that responded
17 to the call, who was that?
18    A. It was Cole and Harvey.
19    Q. Patrolman Harvey that's involved in this case?
20    A. Yes, sir. He was the second officer. Cole
21 was the first.
22    Q. In 2017 was there dash cam in the cruisers?
23    A. No, sir.
24    Q. Okay. All right. Let me -- let's back away

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 81

1 from that for a second and let's go back to in 2008
2 when you started, I think is what you said, that there
3 was dash cam in the cruisers?
4     A.   Yes, sir.
5     Q.   Okay.  When did that change?
6     A.   I don't recall.  I believe we still had them
7 in 2011, but I'm not positive.  Then I went from 2011
8 to 2018 I was in street crime so I don't know.
9         Detective Moyer and I purchased our own cameras in
10 street crimes to wear on our shirt collar or whatever.
11 They weren't the highest quality.  They were $200 total
12 I think.  But they -- a lot of our work was recorded
13 either by a device and/or a Sony Handycam, but we also
14 had, we did, for a period time have lapel, what they
15 would call a lapel cameras.
16     Q.   And those are like little tiny cameras,
17 somewhat difficult to see?
18     A.   No.
19     Q.   Okay.  All right.  That's a different lapel
20 camera than what I'm used to.
21     A.   They look like thumb drives.  In times, you
22 got to think about the time, they were -- they looked
23 like thumb drives so they'd either be pinned to our
24 collar or if we had a shirt with a pocket in it or

Page 82

1 something like that.
2     Q.   So they're sort of like an early body cam?
3     A.   They were audio and video.
4     Q.   Yeah.  Okay.
5     A.   But a lot of our work that cooperating
6 individuals did was used from other soures more of what
7 you spoke of and we also used a Sony Handycam.
8     Q.   Okay.  And you and Moyer bought those on your
9 own?
10     A.   We did.
11     Q.   Did you have those -- from the time you bought
12 them, do you know about what year you would have bought
13 them?
14     A.   I don't.  I know will the guy's name we bought
15 them from was Jack with, I believe, Advanced
16 Technology, but I don't recall his last name and he's
17 not with that company anymore because we'd see them
18 yearly at conferences and he's no longer there.
19     Q.   What kind of conferences?
20     A.   The -- the, sorry, my mic fell off.  The
21 Narcotics Officers Association conference and the
22 conference, the Southern Law Enforcement conference in
23 Gatlinburg.
24     Q.   So you bought these cameras from Jack at

Page 83

1 Advanced Technology somewhere after you joined street
2 crimes?
3     A.   Yes, sir.
4     Q.   Okay.  And did you have them up until you left
5 street crimes?
6     A.   No, they malfunctioned.
7     Q.   About when was that?
8     A.   I don't recall.
9     Q.   About how long did you have these cameras?
10     A.   Not too long.  The battery life on them was
11 horrible.  We did send them back.  The manufacturer
12 took them back and I don't know that we got anything in
13 return.
14     Q.   When you used them, how would you download the
15 footage from them?
16     A.   They have a card, an SD card.  You take the SD
17 card and plug it into a reader.
18     Q.   Is that the only camera other than the Sony
19 dash -- was it dash cam?
20     A.   No, sir, Sony Handycam.
21     Q.   Handycam, I'm sorry, Sony Handycam and these
22 lapel cameras, other than those, did you have any other
23 cameras the time you were in street crimes?
24     A.   Oh, in street crimes?

Page 84

1     Q.   Yeah.
2     A.   No.  Outside, and forgive me, outside of the
3 recording devices that we used to record our
4 transactions like the drug transactions, but they
5 weren't with -- they weren't with Detective Moyer and I
6 purchasing from someone.  They were with the informant,
7 or an individual.  See what I'm saying?  Those were
8 recording devices, but those weren't devices that
9 Detective Moyer and I used to --
10     Q.   They would be what type of recording devices
11 that you're talking about now?  Like some person that
12 is going to make a purchase uses their own phone to
13 record it?
14     A.   No, sir.
15     Q.   All right.  Tell me what you mean.
16     A.   We used a bunch of different things.  I
17 believe one of them was a Monster can with a camera
18 inside.
19     Q.   Okay.
20     A.   Pens.  There was a hat.  I think maybe we had
21 some -- there were many different devices, but the only
22 thing that Detective Moyer and I used ourselves to film
23 I guess what would be the public or the suspect is a
24 Sony Handycam and the lapel cams.

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 85

1    Q.   Okay.  The devices that would go in a Monster
2  can or hat or whatever, where did you get those?
3    A.   Those were purchased by the Department for use
4  in the street crimes division.
5    Q.   Okay.  Any other cameras during your time in
6  street crimes?
7    A.   Not during my time in street crimes.
8    Q.   Any dash cam for any of the vehicles during
9  your time in street crimes?
10   A.   No, sir.
11   Q.   Okay, so you leave regular patrol around 2011,
12  you go to street crimes, you go back into regular
13  patrol in 2018.  Are there dash cams at that point in
14  the cruisers?
15   A.   No, sir.
16   Q.   Do you know when that changed?
17   A.   Sorry, sir?
18   Q.   Well, in 2011 there's dash cams in the
19  cruisers, 2018 there's not.  I understand you're not in
20  patrol during, but you're at South Charleston, I'm just
21  wondering do you know when that -- about when that
22  changed?
23   A.   I do not know when they phased the dash cams
24  out of the cruisers.  They were all in the rear view

Page 86

1  mirror, the old rear view mirror type concept cameras,
2  but I don't know when they phased them out of the
3  cruisers.
4    Q.   Do you know why they phased them out of the
5  cruisers?
6    A.   I do not.
7    Q.   Okay, so you go back into patrol in 2018.  Did
8  there come a time when you bought your own dash cam?
9    A.   Yes, sir.
10   Q.   When was that?
11   A.   May of 2018.
12   Q.   When did you go back into patrol?
13   A.   February.
14   Q.   February 2018 you go back into patrol?
15   A.   Yes, sir.
16   Q.   May 2018 you buy your own dash cam?
17   A.   Yes, sir.
18   Q.   Okay.  Where did you buy it?
19   A.   Amazon.
20   Q.   And do you have the documentation of buying
21  that camera?
22   A.   I do.
23   Q.   I thought you might because I saw on the FBI
24  interview that you all produced it looked like you

Page 87

1  handed it to them at one point and I guess they handed
2  it back or something.  Is that something that you've
3  kept during this time, the documents, or did you go
4  back and print them off?
5    A.   Went back and printed them off.
6    Q.   Okay.  When did you buy -- that's how -- is
7  that how you know you bought it in May of 2018?
8    A.   Yes, sir.
9    Q.   How much did it cost.
10   A.   Sixty-seven dollars plus tax probably.  I'm
11  just giving you an estimate.  I don't know if that's
12  approximate.
13   Q.   Well, you bought it online in 2018, might not
14  have been tax, I don't know.  You bought it through
15  Amazon.
16   A.   Yes, sir.
17   Q.   Okay and you used your own money to do that;
18  right?
19   A.   Yes, sir.
20   Q.   How much is your rate of pay right now?
21   A.   It's 18 and some change.
22   Q.   In 2018 about how much, around the same or --
23   A.   I don't know, sir.  It would have been in the
24  17 mark I'd say, 17.35 maybe, I'm not positive.

Page 88

1    Q.   So making 17 some dollars an hour as a South
2  Charleston police officer you took it upon yourself to
3  spend your own money to purchase a dash cam for your
4  cruiser?
5    A.   Yes.
6    Q.   Did you use it in your cruiser?
7    A.   Yes.
8    Q.   Why did you do that?
9    A.   To document the events that unfolded before
10  me.
11   Q.   Having video is real handy, isn't is?
12   A.   Yes.
13   Q.   Tells people what really happened?
14   A.   Yes.
15   Q.   Do you still have dash cam in your cruiser?
16   A.   No, sir.
17   Q.   Why not?
18   A.   I had to take it out.
19   Q.   Why?
20   A.   Was given a policy memo instructing us to take
21  them out of our vehicles.
22   Q.   When was that?
23   A.   I'm sorry?
24   Q.   When?

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 89

1    A.  September of 2019.

2    Q.  Okay.  Who gave you the policy memo?

3    A.  It was an e-mail and then our lieutenant came
4    around and made sure that the -- there weren't any
5    videos in our car or video cameras in our car.

6    Q.  Which lieutenant did that?

7    A.  In 2019.  I don't remember if it was
8    Lieutenant Vineyard or if I was working for Lieutenant
9    Paskal.  The lieutenants at the time came around.  The
10   guys on my shift started this and we all placed them
11   primarily almost in the same exact location so they're
12   visible and they're placed on the windshield so if
13   you're walking around and looking during inspections,
14   you're going to know if they're in the car or not.

15   Q.  How often are inspections done?

16   A.  On Sundays once a month.

17   Q.  Is that done -- who does the inspection?

18   A.  Supervisor on duty.

19   Q.  What rank is the supervisor on duty usually?

20   A.  Lieutenant or the Sergeant.

21   Q.  Okay.  So there wouldn't have been any
22   mistake.  I mean, these cameras that you all bought
23   would have been visible from all these inspections from
24   May of 2018 until September of 2019; right?

Page 90

1    A.  Yes.

2    Q.  Okay.  How did the cameras function?  Was
3    there an SD card or something along those lines?

4    A.  Yes.

5    Q.  How many of you all bought the cameras?

6    A.  On my shift I know that Patrolman Messer and I
7    had one.  Officer Bean had one.  So out of the seven, I
8    think maybe three or four of us did.  I'm not positive
9    about the other members.

10   Q.  Sure.  When did you get the e-mail saying take
11   them out?

12   A.  September of 2019.

13   Q.  Who sent you the e-mail?

14   A.  Came from the Chief's office.

15   Q.  When you say the Chief's office, was there an
16   e-mail address associated with somebody that sent it to
17   you.

18   A.  I believe it was the Chief, sir.

19   Q.  Okay.  Do you still have that e-mail?

20   A.  I do.

21   Q.  What did it say?

22   A.  It talked about the retrieval of the footage
23   and there's no way to oversee it as it's not deleted
24   and/or misused, shared with other individuals, others

Page 91

1    outside the police department.

2    I think it possibly would have talked about policy,

3    there not being policy to cover that.  I'm not sure of

4    the exact content, but from what I remember.

5    Q.  Do you know if South Charleston has policies
6    regarding dash cams and body cams written into their
7    Policy and Procedures?

8    A.  I do not.

9    Q.  Was that e-mail the first communication you
10   had that the dash cams were going to have to come out?

11   A.  Yes.

12   Q.  Is this how -- go ahead.

13   A.  I believe it come to some supervisors.  This
14   was -- I don't believe this was in the e-mail, but I do
15   know that some supervisors were concerned about the
16   storing and retrieval and chain of these videos, like
17   where they were going, where they were being stored and
18   who was using them, who was viewing them.

19   Q.  So they were worried people that might not be
20   seeing these videos would get them somehow?

21   A.  I believe so.  I mean, I can't speak for those
22   supervisors, but I remember hearing some supervisors
23   were concerned about the chain of custody with these
24   videos.

Page 92

1    Q.  Had any of the videos to your knowledge gotten
2    out to like the media or other people they might have
3    been concerned about?

4    A.  No, sir.

5    Q.  How long after the e-mail did the lieutenants
6    come around to make sure they were out of the cars?

7    A.  I think it was -- I think it would have been
8    the next monthly inspection that they addressed that.

9    Q.  So it would have been September, October 2019,
10   somewhere in there?

11   A.  My shift, we took them down after the memo
12   came out.  The next shift we showed up for duty, we
13   took them out.

14   Q.  Because that's a directive of your superior
15   officer telling you to get them out of there; right?

16   A.  Yes.

17   Q.  And you've got to follow what the Chief says?

18   A.  Yes.

19   Q.  So they come out of your car September 2019.
20   The incident with Billy Means was May 2020; right?

21   A.  Yes.

22   Q.  Do you still have the camera, the dash camera?

23   A.  Yes.

24   Q.  You still have your SD cards with your footage

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 93

1  and stuff on them?
2      A.  I believe so.
3      Q.  Did anyone in the Department, when they sent
4  this memo around from the Chief and then the
5  Lieutenants come around, everybody says get them out of
6  the vehicles, did anyone at the Department offer you
7  guys a repository for that information?
8      A.  Sorry, meaning somewhere to store it?
9      Q.  Yeah.
10     A.  Okay, so I believe that was a problem.  I
11  believe that was addressed in the memo as a problem.
12  Me, in turn, so whatever I recorded I would download
13  and place in the case file, so that's what I did with
14  my recordings.
15     Q.  How would you download it and place it in the
16  case file?  I mean, physically tell me how you do that.
17     A.  The desk top that is in the office, I plug
18  into the card reader and save a copy on that desk top
19  and burn it to a disk and place it in the case file?
20     Q.  So if the case file got sent to the prosecutor
21  or turned over in discovery or whatever, your video of
22  what happened is going to be in there; right?
23     A.  Yes.
24     Q.  And that was your procedure that you followed?

Page 94

1      A.  Yes.
2      Q.  Did anyone, after they told you to get the
3  dash cams out of the vehicles in September 2019, did
4  anyone at the Department offer you guys an alternative
5  like, hey, we'll buy dash cams and put them in?
6      A.  You said after?  Did you say after?  I'm
7  sorry.
8      Q.  Yeah, let's go after, yeah.
9      A.  So in the beginning of the year 2020 Sergeant
10  Moyer is my sergeant which we work together in street
11  crimes.  He, Lieutenant Gordon and I believe Sergeant
12  Bean were on a committee and they started looking at
13  different brands, three specific types of brands and
14  when they looked at those three brands, they started to
15  do, I guess, studies of them to look into purchasing
16  them.
17      So then they set up -- I know they did some Zoom
18  meetings with the companies.  The they did cost
19  analysis studies.  The software storage studies, a
20  bunch of different things factored into these that I'm
21  not privy to, only he and I's conversation.
22      So, yes, they began to look at them the beginning
23  of that year, the beginning of before May 2020 up
24  through Corona time which would be March or after

Page 95

1  because they were doing Zoom meetings with the camera
2  companies and then they did finally select a company to
3  go with.  It's the same company that Charleston PD and
4  Huntington PD use.
5      Q.  Do you know when that decision was made?
6      A.  I don't.
7      Q.  Are there dash cams in the cruisers yet?
8      A.  No, sir.
9      Q.  Okay.  We're in 2021 at this point.
10     A.  Yes, sir.  I know they've been purchased, but
11  they're not in the vehicles or on our bodies.  When the
12  mayor looked at them I know he wanted the Cadillac
13  version, so I believe what was purchased was the
14  camera, the in car camera, as well as the body camera.
15         MR. RUGGIER:  You all right?  You need a
16  break or anything?
17         THE DEPONENT:  I'm okay.
18     Q.  Yeah, if you need a break at any point, you
19  just tell me.  We'll take another one here in a little
20  bit.  I'm going to hand you this.
21         MR. FORBES:  Let's mark this as Number 3.
22      PETERSON DEPOSITION EXHIBIT NO. 3
23             (Charleston Gazette
24         Article was marked for identification

Page 96

1      purposes as Peterson Deposition Exhibit
2      No. 3.)
3         THE DEPONENT:  Is there some water over
4  there by chance?  My sinuses are --
5         MR. RUGGIER:  There is not.  We'll get
6  you some water here.
7         MR. DITRAPANO:  I'll go grab one in the
8  kitchen.
9         THE DEPONENT:  Thank you.
10     Q.  I'm going to hand you what we've marked as
11  Exhibit No. 3.
12         MR. FORBES:  Duane, this is that article
13  from last time if you want to look at it.  It's the
14  same one.  I did not have an extra copy, so if you --
15  that's the exhibit.
16     Q.  I'll hand you that.  Take a look at that for
17  me, Officer Peterson, if you will.
18     A.  Excuse me.  Okay.
19     Q.  You had a chance to take a look at that?
20  That's a Charleston Gazette article, isn't it, from
21  January 2015?
22     A.  Yes, sir.
23     Q.  It interviews some people in South Charleston.
24  Interviews Bob Houck who at the time was South

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 97

1  Charleston's assistant chief of police.  Do you know
2  him?
3     A.  Yes, sir.
4     Q.  Is he still with South Charleston?
5     A.  Yes, sir.
6     Q.  He's in there saying that "The mayor wants us
7  to have them, Houck said.  He's concerned with
8  everything going on."  And this is an article entitled
9  Body Cameras For Police Officers on the Rise in West
10  Virginia in January of 2015.
11     There's actually some quotes from South Charleston
12  mayor Frank Mullens at the time saying "He's been an
13  advocate of putting cameras on officers for a number of
14  years, but said current events show the need is clear.
15  Couple of years ago there was a complaint.  Two sides
16  are always opposite.  If we'd had the camera on, we
17  would have known what was going on, Mullens said.  I
18  think what's going on around the country highlights the
19  need for cameras.  It's good for everybody.  It's good
20  for the police and good for citizens.  I can't see a
21  negative thing about it."  And then Houck, in the
22  article, said he thought it likely that nearly every
23  police department in the area was looking into devices.
24  This is in 2015.  Did you know South Charleston was

Page 98

1  looking at getting cameras back in 2015?
2     A.  I remember them talking about it, yes, sir.
3     Q.  Okay.  Go ahead.
4     A.  Go ahead.
5     Q.  No, go ahead.
6     A.  I remember them talking about the cost, not
7  necessarily of the -- and then again this is speaking
8  through Detective Moyer at the time.  He's been on
9  these committees.
10     Not the cost of the equipment, the cost of the
11  software, the cost of the software storage and the
12  licensing fees possibly is what that was.  Not
13  preventing them, but the extreme cost of what it was.
14     Q.  And actually it looks like Houck is, on over
15  on Page 4 of this, they talk about "One of the problems
16  officers have had with a number of the models on the
17  market is storage, Houck said.  Some of the devices
18  require videos to be saved into a cloud based system.
19  Forced user to subscribe to the system to access the
20  videos.  Houck doesn't care for that method.  We'd
21  rather have it stored to a hard drive here, Houck said.
22  One model the Department looked at allowed the officers
23  to look at the videos, but gave only supervisors, such
24  as himself, the ability to erase them and even then

Page 99

1  that can be a challenge with that particular device."
2  And then they talk about where to --
3     A.  Mount them.
4     Q.  -- mount them and he says "The officers had
5  concerns when the officers brought in the first model
6  for testing.  They were at first like, big brother,
7  y'all are trying to watch everything we're doing, but
8  now they kind of get it, Houck said.  They started
9  liking the idea.  Supervisors liked it because it keeps
10  the officers in check and could dispel any complaints
11  we might get."  Houck mentions that officers have told
12  people on traffic stops that they're filming the
13  interaction.  Do you know what he's talking about
14  there?
15     A.  I'm sorry, where it is it?
16     Q.  Bottom of 4.  Bottom of Page 4.  It says
17  "Officers have told people on traffic stops they're
18  filming the interaction, Houck said."
19     Next paragraph on 5 says "The officers had had
20  cameras in their vehicles for years, but in their
21  latest round of police vehicle purchases they didn't
22  choose that add on, Houck said."
23     Then they talk about the plan to buy 40 cameras for
24  each of the Department's officers.  Then he says "Houck

Page 100

1  said the cameras are about $500 a piece and there could
2  be grants. The mayor was quoted as saying  It's a shame
3  it's had to come to this point with all this going on
4  because we've needed this."
5     Then he says, the mayor's quoted at the end "Quite
6  frankly, if you're not doing anything wrong, you don't
7  have anything to hide."  Now that's 2015.  As we sit
8  here today in 2021, you're in your uniform; right?
9     A.  Yes, sir.
10     Q.  You got a body cam on there?
11     A.  No, sir.
12     Q.  Have you had a body cam at any point when
13  you've been with South Charleston?  We've talked about
14  that street crime stuff where you went and bought it
15  yourself.  Other than that, have you worn a body cam?
16     A.  No, no, sir.
17     Q.  Has the Department ever issued you a body cam?
18     A.  No, sir.  The only thing I can add to that is,
19  like I said, they've purchased them.  They've purchased
20  one for each officer in each cruiser.
21     It's not going to be a shared type of system.  Each
22  police officer will have their own body camera and each
23  cruiser will have its own body camera.
24     Q.  The cruiser will have its own dash camera?

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 101

1    A.  Dash camera, I'm sorry, not body cam.

2    Q.  Okay, so that's been purchased now, here we're
3  in May of 2021 and they're still not installed?

4    A.  Yes, sir.

5    Q.  Do you know when they were purchased?

6    A.  No, sir.

7    Q.  Does South Charleston still do trash service
8  twice a week?

9    A.  Yes, sir.

10    Q.  That been true the whole time you've been an
11  officer there?

12    A.  Yes, sir.

13    Q.  How many cruisers does South Charleston have
14  roughly?

15    A.  I don't know, sir.  We have a larger fleet
16  than we've ever had since I've been there.

17    Q.  About how many officers are in South
18  Charleston?

19    A.  We're slated for 50, but I do not know our
20  current.  I know we're down right now, but I don't know
21  our number of police officers that we have.

22    Q.  Are there 50 cruisers?

23    A.  I don't know.  There are a lot.

24    Q.  There's lot of cruisers; right?  Okay.  All

Page 102

1  right.  Tell you what, let's take a look at that video
2  you did when you went back on this route from May 2nd.
3  Do you need a break?

4    A.  No.  Thank you.

5    Q.  All right.

6    A.  I do need to stretch though.

7    Q.  That's fine.

8         VIDEO OPERATOR:  I only have about ten
9  minutes left on my disk.

10         MR. FORBES:  Okay.  Just flag me and
11  we'll pause it.

12    Q.  We'll mark this as Exhibit 4.  This is Pursuit
13  Path 1.  I'm going to bring it down here and show it to
14  you.  This video looks to be about 17 and a half
15  minutes.  I might bring it down to you if I stop
16  unplugging it.  Seventeen and a half minutes long.

17         MR. FORBES:  Duane, it's the same video
18  from last time.

19         MR. RUGGIER:  Yeah.

20         (Whereupon an excerpt of Exhibit 4,
21  Pursuit Path 1 video, was played after which the
22  deposition continued as follows:)

23    Q.  Do you recognize this video?

24    A.  I do.

Page 103

1    Q.  Okay.  Who took it?

2    A.  That's the video that Sergeant Moyer and I
3  took.

4    Q.  Okay.  We talked about it a little bit
5  earlier, but you and Sergeant Moyer actually did this
6  yourself, you took this video?

7    A.  Yes, sir.

8    Q.  Hang on.  I've -- there's always got to be a
9  technical problem, particularly when I do this stuff.
10  Let me try this again.

11         (Whereupon an excerpt of Exhibit 4,
12  Pursuit Path 1 video, was played after which the
13  deposition continued as follows:)

14    Q.  Where are we starting from here?

15    A.  This is my day.  I was in Chick-fil-A.  That's
16  Sergeant Moyer.

17    Q.  I was wondering whose head that was.  Harvey
18  thought it might have been your head.

19    A.  I am gray, but not on that side as much as he
20  is.  I'm at Chick-fil-A getting -- there's a man that
21  pumps gas at our City garage, works nights, I'm getting
22  breakfast for him and my breakfast and we're going to
23  go back to the garage and eat it.

24    Q.  Okay.  When you say this, you're talking about

Page 104

1  the May 2nd, 2020; right; that's what you're --

2    A.  Not this day.

3    Q.  This is a recreation of that; right?

4    A.  Uh-huh.

5    Q.  So May 2nd, 2020 you're at Chick-fil-A going
6  to get breakfast and take it back to the garage to eat
7  it.  At what point do you see the motorcycle that Billy
8  Means is on?

9    A.  Can we go through --

10    Q.  Oh, yeah, absolutely.

11         (Whereupon an excerpt of Exhibit 4,
12  Pursuit Path 1 video, was played after which the
13  deposition continued as follows:)

14    A.  So I've gotten breakfast for Rick and I, the
15  maintenance guy at the garage, there's a dispatcher
16  over here, Stanley, he's from Metro Communications.  I
17  pull over here, talk to him briefly.

18    Q.  Where was Stanley at?

19    A.  I'm going to show you.  Stanley is parked
20  right here in this truck.

21    Q.  I wondered why you guys went around there.

22    A.  He works 7:00 to -- 7:00 in the morning to
23  7:00 in the evening.  He had taken off an hour into his
24  shift.  He needed some help.  We spoke briefly.  He's

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 105

1  going to go get some help.  He's directly in front of
2  me in his truck, his Chevy Silverado truck.
3      **Q.  You go out this exit behind Buffalo Wild**
4  **Wings?**
5      A.  This is where I first see Mr. Means.  So
6  Stanley is in front of me.  It's now Mr. Means at the
7  red light, okay?  Mr. Means is at the red light,
8  stopped at the red light.
9      **Q.  So here we are here 1 minute, 6 seconds into**
10 **this.  You're coming off that little exit behind BW3s?**
11     A.  Uh-huh.
12     **Q.  And you said Billy's on a bike at the red**
13 **light.  Is he coming up Davis Creek going this way**
14 **or --**
15     A.  He's -- if you go ahead please.
16     **Q.  Yep.**
17         (Whereupon an excerpt of Exhibit 4,
18 Pursuit Path 1 video, was played after which the
19 deposition continued as follows:)
20     A.  Okay, now, if you want to stop it there, stop
21 it there please.  He's at this light.
22  **Q.  Okay.**
23  A.  Okay.
24  **Q.  We're at 1 minute, 10 seconds.**

Page 106

1   A.  Yes, sir.
2      **Q.  He's at the light like coming out of Davis**
3  **Creek facing toward the India Center here?**
4   A.  Yes, sir, he is.
5      **Q.  Okay and there's the red light right there and**
6  **he's in the left lane?**
7   A.  Right, but Stanley's between us.
8      **Q.  Okay, so you got a vehicle between you and --**
9   A.  Yeah.  Well, yes.
10     **Q.  I'm sorry.  You go ahead.  I won't put words**
11 **in your mouth.**
12     A.  Right now Stanley is going to go to Charleston
13 so Stanley is behind Mr. Means now and signaling to
14 to right, but we're still at the red light so I pulled
15 in behind Mr. Means at that point.
16     **Q.  Let me ask you a question because I thought**
17 **you said you had breakfast and you were going to take**
18 **it back to eat it.**
19     A.  Uh-huh.
20     **Q.  Okay.  To go back you would have turned right?**
21     A.  Yes, sir.  That motorcycle caught my
22 attention, yes, sir.
23     **Q.  What on the motorcycle caught your attention?**
24     A.  The -- it looked pieced together and also it

Page 107

1  was spray painted completely black.  And in prior
2  experience, time after time, I can tell you a couple,
3  these people altered, there was a specific female that
4  would rent cars and alter the car every time she rented
5  it and that was by painting it and this thing was jet
6  black painted and that's what caught my attention.
7      **Q.  Okay, so at that point you decided not to go**
8  **back and eat your breakfast, but instead to follow**
9  **Billy Means's bike.  You didn't know it was Billy**
10 **Means, but you decided to follow this black motorcycle?**
11     A.  I was going to get closer.  So at this point
12 this light is turning green as I'm pulling out here and
13 he's turning left to go south on 119 because I was not
14 able to catch up to Mr. Means until he gets to the
15 South Ridge light to relay the registration, take a
16 better look at this motorcycle.
17     **Q.  Okay.**
18     A.  I got a good look at it when it turned here in
19 front of me because I was directly behind it now.
20     **Q.  Enough of a look to skip breakfast, turn left**
21 **and follow it?**
22     A.  Yes.
23     **Q.  Okay.  At that point you had not run the plate**
24 **or seen the expired registration?**

Page 108

1   A.  Sir, those motorcycle tags are small.
2      **Q.  I understand.**
3   A.  What I'm saying is I got it at the next light.
4  He stopped at the next light, so I got it at the next
5  light.
6      **Q.  All right.  Let's go through that.  So we're**
7  **at 1 minute, 10 seconds.**
8          (Whereupon an excerpt of Exhibit 4,
9  Pursuit Path 1 video, was played after which the
10 deposition continued as follows:)
11     **Q.  The light sort of turns green on you when**
12 **you're following the motorcycle, but here you've got to**
13 **wait through a red light?**
14     A.  Yes.
15     **Q.  I'm going pause it here.  So this is the light**
16 **into, I mean, you say into South Ridge into like where**
17 **the Walmart and stuff is; right?**
18     A.  That is correct.
19     **Q.  We're on 119.  This is at 2 minutes and 10**
20 **seconds in the video.  Is this the light you're saying**
21 **you pulled up behind him and saw the plate?  Walk me**
22 **through what happened.  I don't want to put words in**
23 **your mouth.**
24     A.  That was where I was first able to relay the

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 109

1  communication to Metro Communications.
2      Q.   Where were you first able to see the
3  registration?
4      A.   Oh, he had a registration on the motorcycle.
5  I mean, as he rounded that turn, as we pulled onto 119,
6  I could see that there was a registration or what
7  appeared to be a registration on the vehicle, you know,
8  some people --
9      Q.   But to read it.  I'm just saying --
10     A.   I was not able to read it until this light.
11     Q.   That's what I'm getting at.  So it's this
12  light right here, the light where you would turn into
13  Walmart, 2 minute, 10 seconds, that's the light where
14  you're able now to read the registration and then relay
15  it to Metro?
16     A.   Yes and this is where he -- this is where he
17  looked back.  This is where he started to look back.
18     Q.   Okay.
19     A.   This is where I believe that he noticed me in
20  this stretch of highway for the first time.
21     Q.   You, at this point, did not have your lights
22  or sirens activated?
23     A.   No, sir.
24     Q.   All right.  I think we may need to change

Page 110

1  tapes.  Let's go off the record to do that.
2          VIDEO OPERATOR:  Time is 3:18 p.m.  We're
3  off the record.
4          (A brief recess was taken after which the
5  deposition continued as follows:)
6          VIDEO OPERATOR:  Time is 3:46 p.m.  We're
7  on the record.
8  BY MR. FORBES:
9      Q.   All right.  Officer Peterson, let's continue
10  through this video.  Part 1.
11         (Whereupon an excerpt of Exhibit 4,
12  Pursuit Path 1 video, was played after which the
13  deposition continued as follows:)
14     Q.   All right.  So now we're leaving that light by
15  the Walmart.  Tell me when you attempt to actually pull
16  him over, where does that take place?
17     A.   Okay, so we're going down through here and he
18  still continues to look back to see if I'm here.  No
19  lights, no siren.  You have to understand, this has
20  changed.  This used to be down to one lane, okay, so
21  this was coned off and there was only one lane of
22  operation.
23     Q.   So they're doing construction and there's only
24  one lane at the time?

Page 111

1      A.   Yeah, this is where they just redid that
2  paving up through here, so this is down to one lane and
3  there's traffic in front of him.
4      Q.   When you say he's looking back at you, he's
5  operating the motorcycle and he's looking backward in
6  your direction?
7      A.   Which is hard to do, yes, sir.
8      Q.   Okay.  But you're not attempting to stop him
9  at that point?
10     A.   No, sir.
11     Q.   And just to be clear, at that point it's not a
12  crime to look back at you?
13     A.   Not at all.
14     Q.   Okay.  All right and it's not a crime to drive
15  a black motorcycle; right?
16     A.   No, sir.
17     Q.   Okay.
18     A.   But previous experience, if I'm behind a
19  motorcyclist, a majority of motorcyclists aren't
20  looking back at me continuously.  Even when I'm driving
21  I continuously want to be concerned with what's in
22  front of me.
23         He had vehicles in front of him and I would want to
24  be concerned of what's in front of me, especially on a

Page 112

1  motorcycle the way people drive, potholes extensive and
2  whatnot.
3      Q.   Let me ask you this:  Do you think at that
4  point when he's looking back at you that he's driving
5  in some reckless manner and you're going to stop him
6  for that?
7      A.   He's not at all.  I think he was seeing what I
8  was doing.
9      Q.   Nothing up to this point where we are in this
10  video gave you a reason to stop his vehicle?
11     A.   Oh, yes, sir.  Yes, sir.  I ran his tag at the
12  South Ridge light and they came back that the tag was
13  expired.
14     Q.   Okay, so you had a reason at that point to
15  stop him for an expired tag; right?
16     A.   Yes.
17     Q.   Okay.  Any other reason you had to stop him at
18  that point?
19     A.   Just the suspicion of the -- well, it was
20  improperly registered, so expired and improperly
21  registered, okay?  Like I said in the audio, he's
22  looking back at me.
23         We haven't approached the 74 mile marker.  We're
24  coming up on it and we had a previous pursuit on -- in

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 113

1 April, somewhat of the same instance in this same
2 stretch of highway and so that's why I'm telling --
3 **Q. Not with Billy Means?**
4 A. No, sir.
5 **Q. Okay. All right.**
6 A. It was a pursuit and it started in the same
7 stretch of highway and that's exactly why I related to
8 those guys, Harvey and Moyer, who we left Chick-fil-A
9 with and I said, hey, because I knew they were close
10 because we all just pulled out of there.
11 **Q. So that prior pursuant doesn't have anything**
12 **to do with William Means, you're just saying there had**
13 **been a prior pursuit you had been involved in in April**
14 **in this stretch of road?**
15 A. Yes.
16 **Q. Okay.**
17 A. And I knew we were coming up on the 74 marker
18 and that was the pivotal point where I kept relaying in
19 the previous suit where this guy was, had started to
20 flee from and where he was running back to on foot
21 after he left his vehicle.
22 **Q. Okay. So where we are in this video right**
23 **now, we're approaching the 74 mile marker. We're at 2**
24 **minutes and 46 seconds into the video and at this point**

Page 114

1 you've got a reason to stop him for an expired tag and
2 an improper registration; right?
3 A. Yes, sir.
4 **Q. Okay. No other reasons that you would have**
5 **been justified in stopping him at this point?**
6 A. No, sir.
7      (Whereupon an excerpt of Exhibit 4,
8 Pursuit Path 1 video, was played after which the
9 deposition continued as follows:)
10 **Q. And just tell me, now we're playing the video**
11 **again, tell me when you attempt to, and I don't know**
12 **what you do, if you turn your lights on or what you do?**
13 A. Okay.
14 **Q. You just tell me when that occurs.**
15 A. This is the construction I was telling you
16 about, okay. Now, then again, on the audio, I'm
17 telling the other officers and the dispatcher there's
18 traffic in front of him, he darts over, okay, so once
19 he darts over into this turning lane, this left hand
20 turning lane.
21 **Q. Okay. Okay and this is -- we're at 3 minutes,**
22 **21 seconds. That narration, is that you on there?**
23 A. Uh-huh.
24 **Q. I think the words were "Initial stop location**

Page 115

1 to the left."
2 A. To the left. I'm going to show you.
3 **Q. So he turns off --**
4 A. This is where I initiate my sirens and my
5 lights.
6 **Q. Were you across 119 when you started or where**
7 **does that --**
8 A. Right here. Right as I was coming through
9 this intersection, we know this is here, I've been out
10 here previously.
11 **Q. We're at 3 minutes and 34 seconds on the**
12 **video. I'm saying this to make sure the transcript is**
13 **right because she can't see the video, so I want to**
14 **make a record where we're at here, so we're at 3**
15 **minutes, 34 seconds.**
16 A. I just don't want it to get misinterpreted
17 with the audio from the dispatch conversation.
18 **Q. Yeah and we'll listen to the audio in a**
19 **minute. When I say 3:34, I'm talking about Video 1**
20 **that we've marked as the last exhibit here we're**
21 **talking about.**
22 **We'll talk about the audio in a second. But the**
23 **record's going to read that we're on this exhibit, 3**
24 **minutes, 34 seconds, and it's about there that you**

Page 116

1 believe is where you initiate your lights?
2 A. This is where I initiated a traffic stop on
3 Mr. Means.
4 **Q. Okay. Got it. All right.**
5      (Whereupon an excerpt of Exhibit 4,
6 Pursuit Path 1 video, was played after which the
7 deposition continued as follows:)
8 **Q. All right, so what happens next?**
9 A. This is where he continues to flee. This is
10 where he starts to flee.
11 **Q. So he does not stop at this point?**
12 A. He does not stop. He does not go extremely
13 fast on this portion of highway. I'll show you the
14 first portion where he gets up to --
15 **Q. What road is this here?**
16 A. Trace Fork.
17 **Q. So we're turning onto Trace Fork at about 4:09**
18 **on the video.**
19 A. This is his initial -- this is his initial
20 acceleration.
21 **Q. About how fast was he going?**
22 A. Whatever I relayed in the -- whatever I
23 relayed in the -- well, it's probably going to be more
24 in the audio, sir.

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 117

1    Q.   Okay.  All right.  We can listen to the audio
2  in a minute.
3    A.   I gave you a variance in there, as slow as and
4  as much as.
5    Q.   Got ya.
6    A.   So this is the first --
7    Q.   Yeah because I see a line in here on Page 2 of
8  Exhibit 2, which is the criminal complaint, I see a
9  line that says, Paragraph 3, "I observed the motorcycle
10  continue to travel on Trace Fork Road with speeds
11  ranging from 15 miles an hour to a top speed of 53
12  miles per hour to the intersection with Heavenly
13  Drive."  So is it fair to say that as you followed him
14  on Trace Fork he was varying between 15 miles an hour
15  up to 53 miles an hour?
16    A.   Between Trace Fork and Heavenly Drive.  This
17  section along with the next section to Heavenly Drive,
18  those were his various speeds.
19    Q.   Okay.  All right.  As you followed him along
20  Trace Fork, his various speeds up to Heavenly Drive
21  were 15 to 53?
22    A.   Yes, sir.
23         (Whereupon an excerpt of Exhibit 4,
24  Pursuit Path 1 video, was played after which the

Page 118

1  deposition continued as follows:)
2    Q.   Okay.  Let me know when we get to Heavenly
3  Drive.  What was the speed limit on Trace Fork?
4    A.   Twenty-five I believe.
5    Q.   So if somebody's going 53, they're going more
6  than twice over the speed limit?
7    A.   Like I said, we'll have to listen to the
8  audio.  I would agree, yes, they're going double the
9  speed limit.  I'm not sure which section of highway.
10    Q.   Yeah, well, let me, I'll show you back on
11  Exhibit 2.  Looks to me like, and those are your words,
12  "I observed the motorcycle continue to travel on Trace
13  Fork Road with speeds ranging from 15 miles per hour to
14  a top speed of 53 miles per hour to the intersection
15  with Heavenly Drive where it turns onto Heavenly Drive.
16  The posted speed limit for this roadway is 25 miles an
17  hour."
18    A.   Yes.
19    Q.   Okay.
20         (Whereupon an excerpt of Exhibit 4,
21  Pursuit Path 1 video, was played after which the
22  deposition continued as follows:)
23    Q.   All right.  When did you all take this video?
24    A.   I don't know, sir.  I don't know.

Page 119

1    Q.   Okay.
2    A.   It was prior, like I said, it was going to --
3  I intended it for use for the prosecutor's office.
4    Q.   Okay.  I mean, maybe the fall of 2020 or do
5  you have any range at all?
6    A.   I don't remember.  It's still very well -- the
7  vegetation is still green, so it was before fall.
8    Q.   Right.  So probably before fall of 2020, the
9  video would have been taken somewhere in that range?
10    A.   I remember that it was shot on a Sunday and
11  not a Saturday, I do remember that.
12    Q.   The incident took place on a Saturday.
13    A.   It did.
14    Q.   And this video you went out on a Sunday around
15  the same time?
16    A.   We did and there's a church up here and I
17  stopped and spoke to some church members on the way
18  out.  That's why I remember it being on a Sunday and
19  not a Saturday.
20    Q.   Had those church --
21    A.   There's the speed limit, 35.
22    Q.   There's 35 and we're at 7 minutes and 16
23  seconds.  At some point on this roadway it goes to 35.
24    A.   And we're still on Trace Fork.

Page 120

1    Q.   When you spoke to those church members, had
2  they seen any of the pursuit?
3    A.   Sir, they didn't even have a clue why we were
4  out there.  They just waived and we stopped and there
5  it goes back to 25.
6    Q.   That's at 7 minutes and 38 seconds.  Still
7  there's another 25 and we're at 7 minutes and 44
8  seconds.  About how fast are you all going?
9    A.   I don't remember, sir.
10    Q.   Think it would be over or below the posted
11  speed?  I'm sorry, before we ask that question, what
12  road did we just turn on there?
13    A.   We're still on Trace Fork.  Actually, I don't
14  know if you can back up.  I don't know if we've turned
15  on Heavenly yet.
16    Q.   Yeah, let me back up because we turned on
17  something there.
18    A.   No, that's Parker Drive to the left.
19    Q.   Parker is down?
20    A.   So I believe we're still on Trace Fork.
21    Q.   Do you have any sense of what kind of speeds
22  you were going?
23    A.   This is the first point where he slowed down
24  really, really slow and this is where I talk about him

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 121

1  placing his foot down on the pavement.
2      Q.  Yeah and it sounds like in your report you
3  made some comments about, maybe on the audio and we'll
4  listen to it in a second, you're not sure this guy
5  knows how to drive or something along those lines.
6      A.  Sir, it was a question as to whether he could
7  operate his motorcycle or the motorcycle was failing.
8  Like the mechanical abilities of the -- limit abilities
9  of the --
10     Q.  So you were concerned the motorcycle itself
11  physically was failing or somehow falling apart?
12     A.  I'm just talking about the motor, whether the
13  motor was able to -- he slowed way down in that corner
14  and put his foot down.
15     Q.  Okay.
16     A.  Not too many riders place their foot down.
17     Q.  Sounds like -- go ahead. I'm sorry.
18     A.  Not too many riders that I've encountered
19  place their foot down on the motorcycle in movement.
20  At stop lights and whatnot, that's understandable, but
21  in movement, even at some higher speeds, he would place
22  his foot down which I didn't know if the motorcycle was
23  slowing down via mechanical problem or if he was not
24  able to balance the motorcycle.

Page 122

1      Q.  You were concerned one way or the other that
2  either he wasn't able to drive this thing properly or
3  the vehicle itself wasn't going to handle it?
4      A.  I'm not going to say properly because I'm not
5  a motorcycle rider.
6      Q.  Okay.
7      A.  I'm just going to say that I've seen
8  motorcyclists ride motorcycles and his operation or
9  ability was different than most motorcycles that I --
10     Q.  Different in some negative way? It wasn't
11  different like he's the world's greatest motorcycle
12  operator you ever saw; right?
13     A.  Yes. Yes, different.
14     Q.  All right. Let's continue this and you tell
15  me when you get to Heavenly.
16          (Whereupon an excerpt of Exhibit 4,
17  Pursuit Path 1 video, was played after which the
18  deposition continued as follows:)
19     A.  Pause it here please.
20     Q.  Okay. We're at 9 minutes and 20 seconds.
21     A.  Can you let it play like a millisecond more to
22  see if this -- .
23     Q.  Yeah.
24     A.  I believe this is Heavenly Drive. It is

Page 123

1  Heavenly Drive.
2      Q.  So this is the intersection with Heavenly
3  Drive?
4      A.  Uh-huh.
5      Q.  In your report in Exhibit 2, in the complaint,
6  Exhibit 2 here it says --
7      A.  Excuse me.
8      Q.  -- right after where I read a minute ago about
9  the intersection with Heavenly Drive, where it turned
10  on to Heavenly Drive.  The posted the speed limit for
11  this roadway is 25.  "I observed the motorcycle
12  operator, while negotiating sharp and slight turns,
13  cross into the opposite lane of travel which did not
14  travel into the path of any oncoming vehicles at high
15  and low speeds.  Also putting his foot down on the
16  pavement seeming to indicate he was unsure of his or
17  the motorcycle's abilities."  Are you talking about
18  that happening kind of throughout or on Heavenly Drive?
19     A.  That section of the roadway between Trace Fork
20  and Heavenly Drive.
21     Q.  Okay, so in your estimation, at that point in
22  this pursuit he's going into the opposite lane of
23  travel while negotiating turns?
24     A.  Well, the report's written after it based on

Page 124

1  my recollection of events.
2      Q.  Right.
3      A.  And, like I said, I hadn't redriven this until
4  we went and redid this -- this retake or what you want.
5      Q.  The video we're watching now?
6      A.  I do remember the serious sharp turn to the
7  left where -- that's where he slowed to the 15 miles an
8  hour and placed his foot down or whatnot. I guess we
9  when come up here more so he's going to place his foot
10  down as well. I'm not seeing -- I'm not seeing a lot
11  of more like S type turns is what I'm saying.
12     Q.  Yes, in the video, right.
13     A.  But I wrote that on that, you know, that date.
14     Q.  At some point during this pursuit that goes on
15  I think you said 12 minutes and 7 seconds or so?
16     A.  Oddly, yes.
17     Q.  Yeah. At some point during that time frame
18  he's going into the opposite lane of travel as he's
19  negotiating turns; right?
20     A.  In the S turn he would have been, if the
21  roadway were marked, this roadway is not marked, this
22  stretch of roadway. He was in the opposite lane of
23  traffic.
24     Q.  And if a car had been coming around the

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 125

1 opposite lane of traffic he would have struck it;
2 right?
3    A.  Possibly but there were no -- we didn't pass
4 any motor vehicles going --
5    Q.  Luckily?
6    A.  I'm sorry.
7    Q.  Luckily?
8    A.  We did pass traffic coming opposite our
9 direction, but we never passed anything going the same
10 direction, nor did he swerve or make any aggressive
11 movements until, like I said, when I said earlier
12 initially this was low to variant speed and in control.
13    Q.  Right.  Would you say he's in control when
14 he's doing the -- "I," that's you; right, you're I,
15 "observed the motorcycle operator while negotiating
16 sharp and slight turns cross over into the opposite
17 lane of travel."
18    A.  What was the question again?
19    Q.  Would you describe that as being in control?
20    A.  He's not in control.  He was in control of his
21 motorcycle, but he's only in control of his motorcycle,
22 not control of what anybody else does, but there wasn't
23 anybody else on the roadway at that time of morning.
24    Q.  As he goes around the curve, if he's in the

Page 126

1 opposite lane of travel, you wouldn't have anyway of
2 knowing that; right, I mean that's just luck?
3    A.  Well, I don't know from his vantage point what
4 he saw and what he didn't see.
5    Q.  Let's talk about your vantage point.  These
6 are your words.  I didn't write this.
7    A.  Right.
8    Q.  You wrote it and swore to it; right?
9    A.  Yes.
10    Q.  Okay.  Swore that you observed this?
11    A.  I did.
12    Q.  Tell me what you observed when you observed
13 the motorcycle operator while negotiating sharp and
14 slight turns cross into the opposite lane of travel?
15    A.  He did, around that S turn, cross into what
16 would be the opposite lane of travel if the roadway
17 were marked.
18    Q.  This says turns, with an S.  We're talking
19 about more than one turn.
20    A.  Well, we're going to go through some more
21 turns, but at the same time, this very turn, I believe
22 that this turn with his right foot down.
23    Q.  Okay.  In the wrong lane?
24    A.  No, wouldn't be the wrong lane.  That would be

Page 127

1 his lane, but first time I remember him going into the
2 opposite lane of traffic was that S turn we just saw
3 where he slowed down.  Now, at his speed, I don't know
4 if he would have been able to avoid oncoming traffic or
5 not, but he did cross into oncoming traffic.
6    Q.  We're at 9 minutes and 22 seconds right now in
7 the video.  So far you can identify that one S turn?
8    A.  Yes, sir.  This would be a turn that I
9 remember.
10    Q.  You've only described one so far where he's in
11 the wrong lane of travel; right, that you can recall?
12    A.  Yes.
13    Q.  Okay.
14        (Whereupon an excerpt of Exhibit 4,
15 Pursuit Path 1 video, was played after which the
16 deposition continued as follows:)
17    Q.  Now at some point in this you describe going
18 through a rough gravel access road with ruts and some
19 water in it.  Tell me when we get to that.
20    A.  Okay.
21    Q.  What's that little talk, is that GPS or
22 something, connection restored?
23    A.  That's -- here's another turn.  I'm not
24 positive that he was in the opposite lane of traffic,

Page 128

1 but I know that's where he placed his foot down
2 rounding the turn again.  This stop sign he violated.
3    Q.  Yeah, I noticed you put in the report he just,
4 I mean, didn't look to me like any of the stop signs
5 you mentioned -- well, let me rephrase that.  Reading
6 your complaint and your report, it sounds like he ran
7 all the stop signs that you encountered.
8    A.  I remember there, I believe there were three,
9 but I'm not positive.  This would be the first that I
10 remember.
11    Q.  Did you stop at them?
12    A.  I don't remember.
13    Q.  Did you just pursue him?
14    A.  I pursued him through that intersection.  I
15 was getting ready to say I'm not real sure -- this used
16 to be a one lane, so this is no longer a one lane.  I'm
17 not sure why the stop is here.
18    Q.  Okay, but you didn't stop at it, you just
19 pursued him?
20    A.  That is correct.  We slowed.  Then again, he's
21 not going extremely fast at this point.
22    Q.  And this is, we're at 10 minutes and 55
23 seconds in the video.
24        (Whereupon an excerpt of Exhibit 4,

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 129

1  Pursuit Path 1 video, was played after which the
2  deposition continued as follows:)
3      Q.  You said that used to be a one lane.  It's not
4  much more than that now, is it?
5      A.  I believe there was a slip repair there, sir,
6  and I believe that it stopped with alternating traffic.
7  You see here?
8      Q.  Yeah.
9      A.  Okay.  That is one lane.
10     Q.  Okay.  That's at 11:09 on the video.
11     A.  And there's the opposing stop sign.
12     Q.  So you all ran through both of those stop
13  signs?
14     A.  No, sir, that was for the opposite direction.
15     Q.  I got you.  You just ran through one stop sign
16  at that point; right?
17     A.  In that stretch of highway, that was the first
18  stop sign that was violated I believe.
19     Q.  Okay.
20         (Whereupon an excerpt of Exhibit 4,
21  Pursuit Path 1 video, was played after which the
22  deposition continued as follows:)
23     A.  Here's where he's turning.
24     Q.  Okay, so we're at 11:55 on the video.  Is this

Page 130

1  where we start this gravel road that's described in
2  your complaint?
3      A.  Yes, sir.
4      Q.  So the pursuit is now going down along this
5  gravel road with ruts and stuff?
6      A.  That is correct.  This is -- at the time that
7  I indicated with the dispatcher that he's, I believe,
8  to him, for him to be attempting to take off the
9  backpack that he was wearing.
10     Q.  What color was that backpack?
11     A.  I believe it was black.  I don't recall, I'd
12  have to look at the photos that were taken from the
13  scene.
14     Q.  He just had one back pack on; right?
15     A.  Yes.  It was dark colored, that's all I -- we
16  both stopped here, slowed to a stop.
17     Q.  Okay.  I was going to ask you about that.
18  Again, back to Exhibit 2, the complaint says that
19  "Motorcycle then turned down off Heavenly Drive onto a
20  dirt gravel access road with multiple ruts and
21  potholes.  The motorcycle operator slowed operation of
22  the motorcycle due to the rough terrain, continued to
23  look over his shoulder as he appeared to try and take
24  off the backpack without success.  I observed some

Page 131

1  parts of the motorcycle start to fall off from the
2  frame and hit the roadway due to the rough ride."  Do
3  you know what parts those were?
4      A.  I don't, sir.
5      Q.  Did you ever go back and look for them?
6      A.  No, sir.
7      Q.  Do you know if anybody else from the
8  Department did?
9      A.  No.
10     Q.  "I observed the motorcycle approaching a creek
11  bed with four foot of water flowing in it."  Is that
12  the creek bed?
13     A.  Yes, sir.  This has all been filled in with
14  new gravel.
15     Q.  Okay, so we're at 13 minutes, 31 seconds.  The
16  time you guys go back and take this pursuit or path
17  video or whatever there's gravel there that wasn't
18  there at the time of the May 2nd pursuit?
19     A.  A couple different things have happened.
20     Q.  Sure.
21     A.  The first section of highway that was coned
22  off, which is that section that you saw prior where I
23  told you that it was the initial stop location, has
24  been opened up.

Page 132

1      This entire section from the top of Heavenly Drive
2  to, this is Rabel Mountain, has been all filled with
3  this gravel.  This is, I guess, a smoother surface and
4  this is also filled in.
5      Q.  So it was a lot rougher, this road, when you
6  all --
7      A.  Not in terms of the, I guess, the roadway per
8  se.  I mean, it wasn't -- you can hear my handcuffs
9  beat up against the spotlight.  My handcuffs are
10  hanging from the spotlight.
11     Q.  On the audio you're talking about?
12     A.  On this.  On this.  That would determine the
13  roughage of the road.
14     Q.  I'm saying it would have been rougher on May
15  2nd before they filled it all in; is that right?
16     A.  It was in parts I guess.  This is still, if
17  you saw the ruts to the left of the roadway, that
18  roadway still appears the same.  This is, in terms of
19  this though, this is filled in and not as deep as it
20  once was.
21     Q.  Now, you describe in here, Exhibit 2, "I
22  observed the motorcycle approaching a creek bed with
23  four foot of water flowing in it."  Do you know if it
24  was four feet of water?

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 133

1    A.   Sir, I guesstimated based on where it came up
2  to on my cruiser.  That's not an approximate.
3    Q.   I'm just asking that because four feet is
4  pretty daggone high.  I just went through this and I'm
5  fairly familiar with what water can do to a car, so
6  it's my understanding most even SUVs have sort of a
7  limit of how many inches of water they can travel
8  through.  Do you know what your SUV would have been
9  capable of on May 2nd, 2020 traveling through?
10    A.   I don't.
11    Q.   When you're saying four feet, you're
12  estimating that, could have been three feet, could have
13  been five feet, you didn't measure?
14    A.   I didn't go back and stick a measurement
15  device in.  That's just based on what it felt like on,
16  I guess, maybe the fender and door well of my --
17    Q.   On May 2nd, 2020 when you're doing, you know,
18  these estimates of how much water is in there, that's
19  just your best guess under the circumstances?
20    A.   That is a guess.
21    Q.   Okay.  All right.  You say "I stopped my
22  vehicle at this point as I thought the operator may
23  stop and not try to cross the water."  So you stopped
24  before the water?

Page 134

1    A.   I stopped here, yes and I -- yes.  I thought
2  about getting out of my cruiser and attempting to
3  tackle the motorcyclist.  He started to accelerate and
4  go through the water.  Had we had somebody on the other
5  side, that may have even been possible because there
6  was little to no speed going through this creek.
7    Q.   So if there had been somebody on the other
8  side, they could have stopped him and you wouldn't have
9  had to continue this?
10    A.   I did request additional resources from prior
11  initiating the stop even, but, yes, had there been
12  somebody on this, I would have preferred them to try to
13  tackle this operator.
14    Q.   Okay.  It says "I observed the motorcycle
15  speed up and the operator place his feet up in the air
16  in alignment with the handlebars of the motorcycle and
17  travel through the water.  I observed the motorcycle
18  then travel up a hillside and turn left onto" -- is it
19  Rabel?
20    A.   Rabel.
21    Q.   -- "Rabel Mountain Road."  So you're saying to
22  get over this water he put his feet up on the --
23    A.   He didn't put them on the handlebars.  He
24  brought them in alignment with the handlebars.  I

Page 135

1  can't -- I mean, I'm  motioning, but he brought them up
2  in alignment with, not up on them.  He didn't place
3  them up on them, but he brought them up beside the --
4    Q.   Brought his feet up beside the handle and
5  level with the handlebar?
6    A.   Yes, sir.
7    Q.   All right.  It says then "I moved through the
8  creek and continued to follow the motorcycle on Rabel
9  Mountain Road.  As we approached the intersection with
10  Brounland Road, I observed Unit 145 Patrolman Harvey
11  off to the right of the roadway waiting to assist."
12  Can you show me where you first encountered Patrolman
13  Harvey?
14         (Whereupon an excerpt of Exhibit 4,
15  Pursuit Path 1 video, was played after which the
16  deposition continued as follows:)
17    A.   It's voice illustrated on here.
18    Q.   I thought so.  I just want to make sure we've
19  got it on here.  I've listened to it.  I want to make
20  sure there's no confusion about where you get with
21  Harvey.  That's the same Harvey we talked about with
22  your incident in 2017 that was on the scene; right?
23    A.   Yes, but we -- I wasn't working directly with
24  Patrolman Harvey at that time.

Page 136

1    Q.   I understand.  I just want to make sure --
2    A.   Yes, there's not -- there -- yeah.
3    Q.   There's not two Harveys, this is the same guy?
4    A.   Yes.
5    Q.   Okay.
6    A.   Entrance where we're coming up toward The
7  Ridges.
8    Q.   We're near The Ridges right now at 14:53?
9    A.   I believe this is where Harvey joined me, but
10  hold on for just a second.  If there's not another
11  driver, that's where -- yeah.
12    Q.   Okay and you even narrate that.  We're right
13  at 15 minutes on the video and there's even narration.
14  Is that you talking on the narration saying this is
15  where Harvey joins?
16    A.   Yes.
17    Q.   Okay.  All right.  Now, at that point after
18  Harvey joins the pursuit, he takes over radio
19  communications with Metro; is that right?  At some
20  point does he take over the radio with Metro?
21    A.   He is now the back up officer, yes, sir.
22    Q.   All right.  Okay.  Let's get out of Exhibit 4.
23  This is Exhibit 4.  I want to go ahead and show you
24  real quick the second part of that video.  We're going

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 137

1 to mark that Exhibit 5.  Just call it Pursuit Path 2.
2 It starts a little bit later.
3     A.  Okay.
4         (Whereupon an excerpt of Exhibit 5,
5 Pursuit Path 2 video, was played after which the
6 deposition continued as follows:)
7     Q.  Now, you also took this video; right?  I mean,
8 was it just that the data was so big you had to split
9 this thing into two parts?
10    A.  Yes.  This is the same day, same video.
11    Q.  Same day.  It's just a continuation of the
12 pursuit path, but it's called Pursuit Path 2 because
13 you guys just split it in two parts the way it was
14 produced; right?
15    A.  Yes.
16    Q.  Okay.  All right.  We'll come back to that.
17 We're going to mark this.  This is the radio with
18 Metro.  Maybe.
19        (Whereupon an excerpt of Exhibit 6, Radio
20 Communication with Metro, was played after which the
21 deposition continued as follows:)
22    A.  It is, sir, that's it.
23    Q.  Always some technical difficulty.  I got
24 another way to pull that up that's better.

Page 138

1         (Whereupon an excerpt of Exhibit 6, Radio
2 Communication with Metro, was played after which the
3 deposition continued as follows:)
4     Q.  Now, this is the Metro, for lack of a better
5 word, sort of chatter back and forth.  Is that you
6 talking in this?
7     A.  That's me talking and then Harvey stated he's
8 at the City garage, where you at and then the
9 dispatcher has also received some of my information.
10    Q.  This audio is 30 some minutes long.  Let's go
11 ahead and sort of continue it for now.
12        (Whereupon an excerpt of Exhibit 6, Radio
13 Communication with Metro, was played after which the
14 deposition continued as follows:)
15    Q.  All right, so at 1:51 in that and you're
16 telling Metro if he decides to flee.  He hasn't tried
17 to flee from you at this point; right?
18    A.  No, sir.
19    Q.  Okay, but you're already telling Metro, hey, I
20 need you to do some stuff in case he decides to flee?
21    A.  Yes, sir.  When you're involved in something
22 like this, and I've been here a while, it's good to get
23 everybody coming.  I probably wouldn't have thought
24 about that as a younger officer, but I've been involved

Page 139

1 in a lot of these and some with motorcycles recently
2 and --
3     Q.  Was the one in April with a motorcycle?
4     A.  Yes, sir.
5     Q.  What color was that motorcycle?
6     A.  I don't recall.  That was -- so I didn't
7 initiate the pursuit.  I was the second officer in the
8 pursuit and it crashed.  That didn't last two minutes.
9     Q.  Was the driver hurt?
10    A.  He got up and fled on foot.
11    Q.  Okay.
12    A.  I was injured.  That was one of my injuries in
13 my career.  I was injured and off for -- I had just
14 come back to work when this one happened.
15    Q.  So April of 2020 you're the second officer in
16 a two minute pursuit with a motorcycle where there's a
17 wreck.  How were you injured?
18    A.  That gentlemen took off down a ravine off of
19 214 which would be at the Childress Road intersection.
20 Then again, being a little bit older, the other officer
21 took off on foot after him, I used my vehicle and
22 positioned myself probably 50 yards in front and got
23 out and he was running to me unbeknownst.
24    I jumped over a guardrail to scale the ravine and

Page 140

1 apparently somebody comes by there everyday and throws
2 out a 12 pack of bottles.  I fell and rode that
3 embankment on a broken beer bottle and it gashed my
4 hip.  I didn't know that.
5     I got down there and did place the male under
6 arrest and then after my adrenaline beeped down, the
7 other officer got me, my pants were ripped and I was
8 bleeding in the creek bed below me.
9     Q.  Did you have to have stitches?
10    A.  I did.
11    Q.  How many?
12    A.  I don't recall.  They were the inside out
13 ones.  They're fairly new.  I don't know, 12 to 14
14 possibly.  And then the other one was -- the other one
15 was suppose to be glued.
16    This was right in the beginning of Corona time.  I
17 met with an intern and I met with a doctor and they
18 both had a difference of opinion, so they sewed one and
19 left the other one.
20    Q.  Is that all healed up at this point?
21    A.  It is.  And then that motorcycle -- that
22 motorcycle was improperly registered, but I don't
23 believe it was stolen.
24    Q.  Was the reason for the pursuit of that

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 141

1 motorcycle improper registration?
2     A.  I don't recall.  The officer that initiated it
3 initiated it around the same part, which was what we
4 said, 74, he turned -- the mile marker 74 on 119, he
5 turned the opposite direction.
6     Instead of turning out towards Trace Fork, he
7 turned back on to 214, stopped and he had a passenger.
8 He stopped and dropped the passenger off.  He moved to
9 the next intersection and went into some gravel and
10 laid the bike down.  It was a street bike as well.
11     Q.  So this is about a month after that, not even;
12 right, because you said that other one is in April and
13 this is May 2nd.
14     A.  I don't remember the exact date.  I know it
15 was in April because that's when I was --
16     Q.  So within a month of the pursuit of the
17 motorcycle that went the other way in April, you're now
18 following Billy Means and so it's kind of fresh in your
19 mind, so you're radioing them, hey, get things ready in
20 case he decides to flee?
21     A.  If you look at the last probably four years of
22 my radio traffic or three years, I don't like people
23 behind me, I like people around.  I like somebody
24 behind me calling radio traffic and helping out in case

Page 142

1 they bail on foot, but I like people positioned
2 elsewhere.
3     If it's a vehicle, I like people positioned in
4 front of me with stop sticks.  You'll hear me say that
5 a lot on audio traffic, with stop sticks.
6     Q.  How many motorcycle pursuits would you say
7 you've had in your career?
8     A.  I know that I've been involved directly or --
9 I know that I've been involved directly or like the
10 second or third car in over 50 pursuits in my career.
11     Q.  Total or just with motorcycles?
12     A.  I don't know how many of them were
13 motorcycles, sir.  I believe there were five last year
14 alone.
15     Q.  Five motorcycle pursuits last year?
16     A.  I'm saying I believe that I was involved in
17 four or five last year alone.
18     Q.  Okay.  Four or five pursuits.
19     A.  Motorcycle pursuits, sir.
20     Q.  Okay.
21     A.  I don't know about -- we pursued a tractor
22 trailer.
23     Q.  That's fine.  You don't know, you don't know.
24 That's fine.  I'm just wanting to make sure it was

Page 143

1 clear.  So last year, in the year 2020, you yourself
2 were involved in four or five pursuits with
3 motorcycles?
4     A.  Yes, sir.
5     Q.  What were the reasons for those pursuits as
6 best as you can recall?  This one's improper
7 registration and a dead sticker.
8        MR. RUGGIER:  Objection to the form of
9 that question.  That's inaccurate.
10     Q.  Okay.  This one is an improper registration
11 and dead sticker; right?
12        MR. RUGGIER:  Objection to the form of
13 the question.  It's proper form.  That's fine.
14     A.  Forgive me, are we talking about Mr. Means?
15     Q.  Mr. Means, yeah.
16     A.  Sir, the reason I stayed with Mr. Means,
17 again, is because that bike was spray painted and it,
18 through my career, I've seen people attempt to spray
19 paint motor vehicles and motorcycles to cover their
20 color and their identity, their make and model.
21     That's the reason I didn't turn and take Rick
22 breakfast that day.  That's the reason I stayed with
23 the motorcycle.  I believed it to be stolen I guess is
24 what I'm saying.

Page 144

1     Q.  I understand what you're saying, but I think
2 we went through this earlier.  I want to make sure I'm
3 clear.  At the time you initiated lights and sirens,
4 the only legal reason you had to stop that motorcycle
5 was the improper registration and the expired sticker;
6 correct?
7     A.  The only legal reason, yes.
8     Q.  All right.  The one in April had an improper
9 registration?
10     A.  We're going to have to refer to the officer
11 that initiated the pursuit.  It did have improper
12 registration that, like I said, lasted less than two
13 minutes and I was the back up officer on that.
14     Q.  Fair enough.  The other two or three, just as
15 best as you can recall, what were the reasons for the
16 stops?
17     A.  If I recall the last two, one of them was
18 stolen out of a state out west, don't remember the
19 exact state.  It crashed and it was stolen.  And the
20 other one, I'm not positive.  I don't remember if it
21 was stolen or if the offender was wanted, but that one
22 crashed as well.
23     And then the last one, the reason for -- the reason
24 for stopping the last one, it was, and I'm saying last

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 145

1  one, that I can remember, it was night time and it was
2  a speeding offense and it crashed as well.
3      Q.  Okay.  All right.  I'm going to continue with
4  this, but I tell you what, I think you can hear it from
5  down here and this way -- I'm going to be hovering all
6  over you again in a second with more videos, so I'm
7  going to move it down here and you tell me if you can't
8  hear and I'll move it back down that way.
9          (Whereupon an excerpt of Exhibit 6, Radio
10 Communication with Metro, was played after which the
11 deposition continued as follows:)
12     Q.  That's at 2 minutes and about 28 seconds on
13 the audio.  Who are you telling you'll wait if they
14 want?
15     A.  Harvey and Moyer.
16     Q.  Okay, so you're discussing with them on the
17 audio that you could wait for them to engage or try to
18 pull him over, is that -- walk me through it.
19     A.  We're on 119 and I'm thinking -- and we're in
20 construction.  I don't know if you've traveled that
21 section of roadway, but at that time, that section of
22 roadway was closed off.  The lanes were closed off.
23     From that position, probably to 73 mile marker, 72
24 mile marker, to way on the other side of Childress Road

Page 146

1  so we had a huge stretch blocked off by cones and then
2  some construction equipment sitting in those opposite
3  lanes, so he either had the grass or the roadway.  That
4  was my thinking prior to him exiting the freeway.
5      Q.  Okay.  Prior to him making that turn, you're
6  thinking you got plenty of time for backup to show up?
7      A.  (Witness indicates.)
8      Q.  When he makes the turn, at that point there's
9  no time for backup?
10     A.  It's very briefly after I said that that he
11 decides to turn off the roadway or off 119.
12         (Whereupon an excerpt of Exhibit 6, Radio
13 Communication with Metro, was played after which the
14 deposition continued as follows:)
15     Q.  Now, that's at 2:38 and you're saying
16 disregard, you're going to wait for them, he's probably
17 going to go?
18     A.  Disregard, I'm not going to wait for them.
19 Looks like he's going to go which means he's now moving
20 over to get into the left hand -- actually I don't even
21 remember if the left hand turning lane was open there
22 or not and the section coned off or if he just
23 darted --
24     Q.  Okay.

Page 147

1      A.  -- across 119 there.
2      Q.  All right.  Let's keep listening.
3          (Whereupon an excerpt of Exhibit 6, Radio
4  Communication with Metro, was played after which the
5  deposition continued as follows:)
6      Q.  At that point you're telling Metro he's going
7  flee from you.  Has he made the turn at that point?
8      A.  He's made the turn.
9          (Whereupon an excerpt of Exhibit 6, Radio
10 Communication with Metro, was played after which the
11 deposition continued as follows:)
12     Q.  That's at 3 minutes and 5 seconds and you're
13 saying he just turned on to Trace Fork and the speed is
14 about 25?
15     A.  Correct.
16         (Whereupon an excerpt of Exhibit 6, Radio
17 Communication with Metro, was played after which the
18 deposition continued as follows:)
19     Q.  We're at 3 minutes and 28 seconds.  You all
20 are on Trace Fork, I presume, at this point?
21     A.  Yes because I tell us when we get to Heavenly,
22 so yes, sir.
23     Q.  He's at, did you say 47 miles an hour?
24     A.  Forty-three or forty-seven.  If you'd like to

Page 148

1  play it back.  I don't remember what I said.
2      Q.  Let's play it back.
3      A.  I believe you're correct, I believe I said 47
4  miles an hour.
5          (Whereupon an excerpt of Exhibit 6, Radio
6  Communication with Metro, was played after which the
7  deposition continued as follows:)
8      Q.  Forty-seven; right?
9      A.  Yes, sir.
10     Q.  That's at 3 minutes and 27 seconds on the
11 audio?
12     A.  Yes, sir.
13     Q.  That's on Trace Fork that we saw earlier is
14 probably a 25 mile an hour zone; right?
15     A.  Twenty-five or thirty-five, whichever.  It did
16 indicate 25 and 35, but yes.
17         (Whereupon an excerpt of Exhibit 6, Radio
18 Communication with Metro, was played after which the
19 deposition continued as follows:)
20     Q.  We're at 3:54.  Did you just ask them to
21 notify County and State?
22     A.  Yes, sir, but I thought that I said that
23 before.
24     Q.  I think you might have.  I think I heard it

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 149

1  right there too.
2      A.  I did say that there, yes, sir, that's me, but
3  I thought I said it prior even initiating the traffic
4  stop because I thought he might flee.
5      Q.  Yeah and that's to make sure you're going to
6  have other officers on the other end of whatever route
7  he's on looking for him; right?
8      A.  Yes, sir because I kept asking for assistance
9  at Rabel Mountain because I believe that's where he was
10  going to come out, but it didn't seem like -- I don't
11  know if I was getting relayed or I don't know what the
12  thought was there.
13          (Whereupon an excerpt of Exhibit 6, Radio
14  Communication with Metro, was played after which the
15  deposition continued as follows:)
16      Q.  That's at about 4 minutes and 10 seconds. Who
17  are you talking to there?
18      A.  That's Harvey.
19      Q.  That's Harvey and he was asking whether it was
20  that other route towards Childress Road; right?
21      A.  He was confused.  He thought that we turned
22  right and went up 214.
23      Q.  Got ya.
24          (Whereupon an excerpt of Exhibit 6, Radio

Page 150

1  Communication with Metro, was played after which the
2  deposition continued as follows:)
3      Q.  Okay.  That starts at about 4:40.  Who is that
4  speaking?
5      A.  That's Lieutenant Paskel.
6      Q.  Did you understand what he said there?
7      A.  Yes, sir.
8      Q.  What do you think he said?
9      A.  He said if the speeds pick up or he starts to
10  get reckless, let him go.
11      Q.  And Lieutenant Paskel was your supervisor that
12  day; right?
13      A.  Yes, sir.
14      Q.  And you have to follow what he tells you to
15  do; correct?
16      A.  Yes, sir.
17          (Whereupon an excerpt of Exhibit 6, Radio
18  Communication with Metro, was played after which the
19  deposition continued as follows:)
20      Q.  Okay.  That's you.  I just paused it at 4
21  minutes, 56 seconds.  That's you saying copy, sir, and
22  then you say that you don't think he can ride meaning
23  you don't think the motorcyclist knows what he's doing;
24  right?

Page 151

1      A.  Like we said earlier, it's either his ability
2  to control that motorcycle or its mechanical ability.
3      Q.  Then you say we're not even speeding, but then
4  you say 47 miles an hour which is definitely speeding;
5  right?
6      A.  I agree with you.  At the time I didn't see
7  the posted speed limits on that roadway, so.
8      Q.  You saw that video a minute ago.  It didn't
9  look like the type of place 47 miles an hour is going
10  to be the speed limit, does it?  I mean, you're an
11  officer, been around a long time.
12      A.  I agree.  We're in West Virginia.  There's
13  some 45 miles an hour roadways.  What I'm saying is I
14  didn't realize it was 25 or 30 miles an hour until I
15  wrote that report.
16      Q.  Okay.  But you knew he was going 45 at that
17  point or 47 maybe at that point when you're relaying
18  back to the supervisor who's saying if speeds pick up
19  or he goes reckless let him go.
20      A.  In terms of reckless or speeds for a
21  motorcycle, I would have to say I've seen, in my
22  career, motorcyclists become very reckless at speeds
23  above, you know, 60, 65, 80, 85, 90, 100, 120 miles an
24  hour.

Page 152

1      Q.  You don't have to wait until they get to 65,
2  80, 85, 90 or 120 miles an hour to stop somebody for
3  reckless driving, do you?
4      A.  Sir, I don't even -- I don't know if I could
5  keep up with that motorcycle at that point.
6      Q.  Okay.  Have you ever charged anyone with
7  reckless driving?
8      A.  I don't know, in my career, if I have.
9      Q.  Okay.
10      A.  If I did, it probably would have been a
11  citation, but I don't recall if I've ever charged
12  anybody with it.
13      Q.  You charged Mr. Means, from this incident that
14  we're dealing with right here on May 2nd, 2020, with
15  fleeing with reckless indifference; right?
16      A.  Yes.
17      Q.  So at some point in this pursuit it got
18  reckless; right?
19      A.  As I said, sir, earlier, I'm constantly
20  reevaluating things and right now, I mean, I'm not
21  going to label it as a -- this initial part we haven't
22  come into contact with - I can't even say it - contact
23  with any vehicle or pedestrians or livestock, so at
24  this point right now, it's initially I don't have that

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 153

1  action as reckless.
2  **Q.  Okay.**
3      A.   In terms of -- in terms of Code, there's
4  fleeing and then there's fleeing with reckless.  Later
5  on, you know, as I stated earlier when we hit those
6  straight stretches, I wasn't looking down at my
7  speedometer.  I know it's premature, but when Harvey
8  took over this, the radio communication on this thing,
9  I quit.
10     If you hear in my narrative, my audio narrative, I
11  try to give the biggest picture, the best picture,
12  talking about my speeds.  I try to give the speeds.  I
13  try to give what's going on so I can paint it because I
14  don't have a video.  I try to paint it in a picture for
15  that report and for that criminal complaint so I can
16  fall back on it.  So that's why I'm saying these
17  different things.
18  **Q.  Okay.**
19          (Whereupon an excerpt of Exhibit 6, Radio
20  Communication with Metro, was played after which the
21  deposition continued as follows:)
22  **Q.   That's at 5:18 you say he's gone down to 15**
23  **miles an hour and you say he can't ride.  Doesn't sound**
24  **to me like you're describing at this point a mechanical**

Page 154

1  **problem, you're saying this guy doesn't know what he's**
2  **doing.**
3      A.   I thought it was odd for him to place his foot
4  down on the pavement of a roadway, possibility of
5  snapping your ankle or crashing the motorcycle.
6  **Q.   But you didn't get on there and say I think**
7  **this is odd.  You say this guy can't ride.**
8      A.   Based on the other motor -- again, I'm saying
9  I don't have -- I guess what I'm saying is I'm not an
10  expert in riding motorcycles.  I don't -- I haven't
11  ridden a motorcycle in a long time.  I'm basing that on
12  previous people that have fled from me or previous
13  people that I've seen operate motorcycles.
14  **Q.   At the time in the moment when you're sitting**
15  **there communicating back to your lieutenant and Metro,**
16  **your view is this guy can't ride the motorcycle?**
17     A.   When I stated that, that's what I, at the
18  time, that's what I believed.
19          (Whereupon an excerpt of Exhibit 6, Radio
20  Communication with Metro, was played after which the
21  deposition continued as follows:)
22  **Q.   Let me ask you this:  We're six minutes in**
23  **this.  I haven't heard any siren.**
24     A.   Six minutes in the tape?

Page 155

1  **Q.  Yeah.**
2      A.   Okay.
3  **Q.   We're six minutes into this audio here and**
4  **I've yet to hear any siren at all.  Did you have your**
5  **siren on?**
6      A.   I understand.  And I noticed that in your
7  filing.  So then again, this is me being, I'm alone,
8  first of all, this is me being a 13 year guy on the
9  job.  Initially when we talk about lights and sirens,
10  initially when I came around that corner to light them
11  up, I hit two horn sounds and the yelp.
12     I mean, you can even see that on some TV shows.  I
13  can't really tell you what it's like, but it's two loud
14  audible (indicates) and then (indicates).  I don't know
15  how you transcribe that.
16  **Q.   That's for her.**
17     A.   Right.  Okay, so that's to indicate that I'm
18  going to light him up and stop him.  My lights are on.
19  My lights were on and if you look back on that video, I
20  turned my lights on when I initiated that --
21  **Q.   When you say video?**
22     A.   I'm talking about the reenactment video if
23  that's what we want to call it.
24  **Q.   Okay.**

Page 156

1      A.   You can clearly see those on the signs and on
2  the houses approaching, but obviously I can't run
3  lights and sirens.  I ran I think maybe three houses
4  in.  The first reason is I like to communicate loud and
5  clear to the dispatchers and the other guys that are
6  coming with me.
7      I have a three position switch.  So the 3 position
8  is audio or, excuse me, audible and visual, it's the
9  siren and the lights.  The second position is both the
10  lights.  The third position, well, I'm saying that
11  backwards.  Number 3 is audio and visual.  Number 2 is
12  front and rear visual and Number 1 is rear only.  Like
13  if you're just coming up on something and you want to
14  hoard off traffic.
15     So I turned that switch back to 2 to communicate
16  with other officers and with the dispatcher, not to
17  be -- not to be misunderstood or mistaken, misheard.
18  The second reason is I have a hearing impairment from a
19  shotgun blast in my left ear.  I don't hear as well as
20  I used to.
21     I've been injured on this job four times, so I'm
22  breaking apart here, but hearing is one thing.  So I
23  turn that back from 3 to 2 repeatedly when I'm
24  transmitting.  In the section on -- do you want to

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

---

Page 157

1 continue to go or you want me to continue?
2     **Q. No, no, you go ahead. I want to hear.**
3     A. Only the section when we go down in the woods,
4 I turned -- when we turn down in the woods, maybe I'd
5 say about 50 yards, I thought that was a dead end. I
6 thought he was going to bail on me.
7     I believe that I turned it back to 2 during that
8 entire time to communicate with the dispatcher and
9 second of all, if he bailed out of the car and I'm on
10 my hand held, if it's getting out, number one, because
11 we're in West Virginia, I don't want that siren
12 drowning out my hand held so they can't understand or
13 hear where I'm at.
14     So in the portion of that - what am I trying to say
15 - wooded area, I don't know that it was on until we get
16 back up on Rabel Mountain Road, then it was on.
17     **Q. You're saying it was on, you're saying the**
18 **siren was on?**
19     A. Lights were always on, right, my front and
20 rear lights were always on. The siren was on when I
21 initiated the stop and when I'm not communicating with
22 the dispatcher.
23     **Q. When you say the siren was on, I thought you**
24 **said when you tried to initiate the stop you just hit**

Page 158

1 **this horn twice and the woop sound or whatever.**
2     A. Which is a siren.
3     **Q. Okay. I want to make sure. When I think of a**
4 **siren, I'm thinking, you know, the constant kind of**
5 **(indicating) whatever that --**
6         MR. FORBES: Good luck transcribing that.
7     **Q. So, you know, I'm thinking that type of deal.**
8 **When you're talking about it, I mean, are you saying**
9 **essentially there were the two horn blasts and the woop**
10 **when you first tried to pull him over and then nothing**
11 **again audible until Rabel?**
12     A. Oh, no, sir. No, sir.
13     **Q. I haven't heard any yet. I'm six minutes into**
14 **this. I'm just trying to figure out.**
15     A. I hit the two horns and the siren when I
16 initially, at my initial stop location where he's
17 turned off 119 on Trace Fork Road. Then I'm, like I
18 said, between 3 and 2 each time I'd like to transmit
19 something to the dispatcher and that's a combination of
20 different things.
21     My radio right now is up to 31, it's the loudest it
22 will go, in my car right now that's where it stays.
23 Not my car radio, my radio to the dispatcher. Second
24 of all I want to clearly communicate with the

Page 159

1 dispatcher and the other officers where I'm at, what
2 I'm doing and I'm by myself at this point.
3     So when you hear me transmit, that siren is off,
4 okay, it's back from 2 to 3. When I'm not in
5 transmission it's on, it's loud blaring, it's on. It's
6 absolutely on.
7     **Q. Okay, so you're taking the time to turn that**
8 **off in order to --**
9     A. It's not the time, sir, it's just, it's a
10 second. It's off and on.
11     **Q. Okay.**
12     A. I mean, I can't even characterize it as a
13 second I wouldn't guess, but, I mean, it's a switch.
14     **Q. Where is the switch located?**
15     A. It's right here.
16     **Q. Middle by the seat?**
17     A. Right by -- okay, so I'm having to drive.
18     **Q. Right.**
19     A. I'm having to radio. I switch that off and
20 radio back in.
21     **Q. So you're taking your hand off the radio, you**
22 **got one hand on the wheel.**
23     A. No, sir. I got my hand on the -- the radio is
24 in my hand the whole time. We don't have that dispatch

Page 160

1 like some other police officers have.
2     I don't know what you've seen, but some of them
3 operate from the -- I've got to hold it, it would be
4 like holding this -- it's holding this in my hand right
5 here at the level.
6     **Q. You're sitting there holding the little hand**
7 **held unit you brought with you here. It would be like**
8 **holding that in your hand and you're holding that down**
9 **to click the switch off.**
10     A. It's all right here together, sir. It's all
11 right here together.
12     **Q. Okay.**
13     A. It's all right here together. All I got do is
14 hold this button in -- make sure that's off. Hold this
15 button in and flip the switch and I'm driving. It's
16 mounted all right here together.
17     **Q. You're driving with one hand?**
18     A. I'm driving with one hand.
19     **Q. Throughout this whole thing pretty much;**
20 **right? At least until Harvey shows up?**
21     A. I don't recall, but, I mean, if,
22 unfortunately, if I've got my hand on my hand held
23 radio and that switch, yes.
24     **Q. You're aware there are police cars that have**

---

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 161

1 it where you can talk and keep both hands on the wheel;
2 right?
3     A.   That's why I wanted to make you aware of what
4 equipment we have.  We don't have that.  We never have
5 unfortunately.
6     Q.   Fair enough.  South Charleston's never
7 provided that to you?
8     A.   We don't have cruisers that are equipped with
9 hands free transmitting devices.
10    Q.   Okay.  All right.  Let's listen to some more.
11        (Whereupon an excerpt of Exhibit 6, Radio
12 Communication with Metro, was played after which the
13 deposition continued as follows:)
14    Q.   All right.  We're at 6:21 and you said 43
15 miles an hour.
16    A.   I believe I said 43, yes, sir.
17        (Whereupon an excerpt of Exhibit 6, Radio
18 Communication with Metro, was played after which the
19 deposition continued as follows:)
20    Q.   Now that's the first time I hear a siren.
21 We're at 6:25.  That's kind of what I think of when I
22 think of siren.
23    A.   I understand what you're --
24    Q.   Is that yours or we hearing Harvey?

Page 162

1     A.   We can go back.  I don't know.  I understand
2 what you're saying, but in terms of my hearing and in
3 terms of I'm by myself at this time and I want to
4 effectively communicate my position and what's going
5 on.
6     Q.   Okay.  We'll go back a few seconds here.
7        (Whereupon an excerpt of Exhibit 6, Radio
8 Communication with Metro, was played after which the
9 deposition continued as follows:)
10    Q.   See that's Harvey's voice; right?
11    A.   I can't -- it possibly is, sir.  I think he
12 says I'm starting out that way.  I don't know if that's
13 Patrolman Harvey or Sergeant Moyer because they were
14 together when they left.
15    Q.   That's somebody else communicating when I hear
16 those sirens?
17    A.   I believe so, yes.
18    Q.   Okay.
19        (Whereupon an excerpt of Exhibit 6, Radio
20 Communication with Metro, was played after which the
21 deposition continued as follows:)
22    Q.   What did you call them, unit?  Did you hear
23 that?
24    A.   Sorry, sir, I didn't.

Page 163

1     Q.   That's all right.  Let me back it up just a
2 touch.
3     A.   Metro position the County units, is that what
4 I asked?
5     Q.   It could be.  Here, tell me what you think.
6 We're at 8:06.
7        (Whereupon an excerpt of Exhibit 6, Radio
8 Communication with Metro, was played after which the
9 deposition continued as follows:)
10    Q.   Position the County units?
11    A.   Have they been notified.
12        (Whereupon an excerpt of Exhibit 6, Radio
13 Communication with Metro, was played after which the
14 deposition continued as follows:)
15    Q.   Okay and that's Metro telling you 10-4, the
16 County units are on their way?
17    A.   Yes, sir.
18    Q.   That would be the position on the opposite
19 side where you guys are going to come out.
20    A.   Yes, sir.  I asked, I don't know if you heard
21 it, I know you're reading, a little bit before that, my
22 Sergeant, which is 109, said I'm behind you on Heavenly
23 and then I'm wanting somebody in front of me and that
24 is where Patrolman Harvey catches up with me.

Page 164

1        (Whereupon an excerpt of Exhibit 6, Radio
2 Communication with Metro, was played after which the
3 deposition continued as follows:)
4     Q.   How is she telling you where you are?
5     A.   My computer in my car.
6     Q.   Like a GPS deal?
7     A.   It is.  It's an AVL.  I do not know what it
8 stands for, but she's following me by my AVL on my car.
9     Q.   So she can see you, Metro can see where you're
10 located?
11    A.   Yes, given that there's communication.
12    Q.   Okay.
13        (Whereupon an excerpt of Exhibit 6, Radio
14 Communication with Metro, was played after which the
15 deposition continued as follows:)
16    Q.   Was Harvey, at this point, taking over the
17 communication?
18    A.   He did just a little bit ago.  He said you're
19 going to see me and he said you want me to take it over
20 and that is him transmitting now.
21    Q.   Let me -- I paused it at 10 minutes, 12
22 seconds and it happened a little bit before that.
23        (Whereupon an excerpt of Exhibit 6, Radio
24 Communication with Metro, was played after which the

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 165

1  deposition continued as follows:)
2      Q.  That's you; right, at 10:27 saying that and
3  you're saying --
4      A.  Yes.
5      Q.  -- you know the bike's coming apart or
6  something to that effect or this poor guy doesn't know
7  how to ride?
8      A.  When I say that, again, I'm talking about the
9  mechanical limits.  I've pursued a vehicle before where
10  the engine blew up and it just coasted to the side of
11  the roadway.
12      I'm not talking about parts falling off.  I haven't
13  seen any parts fall off but in the woods.  Once we got
14  back on the pavement, I've no longer seen any parts
15  fall off, but he seems to be slowing and, like I said,
16  that's Mr. Means's interpretation.
17      I don't know what he was doing.  He was slowing and
18  I thought the bike was going to give out.  Like I
19  thought the mechanical, like the motor was going to
20  give out.
21          (Whereupon an excerpt of Exhibit 6, Radio
22  Communication with Metro, was played after which the
23  deposition continued as follows:)
24      Q.  Now that was Harvey talking, but he's saying

Page 166

1  at 10:47 on the audio the speeds are 40?
2      A.  Yes, sir.
3          (Whereupon an excerpt of Exhibit 6, Radio
4  Communication with Metro, was played after which the
5  deposition continued as follows:)
6      Q.  That was at about 11 minutes and 28 seconds or
7  so and you're asking to have units positioned wherever
8  this route comes out; right?
9      A.  Yes.
10      Q.  And I think even a little bit, few seconds
11  before that, Metro had advised that Boone was notified,
12  that Boone County was notified, did you hear that?
13      A.  Yes, sir.
14          (Whereupon an excerpt of Exhibit 6, Radio
15  Communication with Metro, was played after which the
16  deposition continued as follows:)
17      Q.  There's at 11:46 Metro is telling you to keep
18  going on Emmons Road, you're going to go into Boone
19  County and Boone County has been he notified; right?
20      A.  If we continue on.  I'm not sure what she
21  said.  I thought she said if we continue on Emmons Road
22  we're going to run into Boone County, yes.
23          (Whereupon an excerpt of Exhibit 6, Radio
24  Communication with Metro, was played after which the

Page 167

1  deposition continued as follows:)
2      Q.  That was at about 13 minutes and 10 seconds
3  and that's Metro advising you all that there's a
4  trooper and a Boone County deputy on the Boone County
5  line on Emmons Road; right?
6      A.  Yes, sir.
7      Q.  So there would be someone, if you continued
8  down Emmons, to intercept Mr. Means?
9      A.  You're asking me, I'm sorry, I didn't hear
10  you.
11      Q.  Yeah, based on that, if you continue out this
12  road there's going to be law enforcement to intercept
13  Mr. Means; right?
14      A.  Yes.
15      Q.  Take a look at Exhibit 2 there, the criminal
16  complaint.  Look at Page 3.
17      A.  Yes, sir.
18      Q.  All right.  Go down on third paragraph down,
19  about halfway through it says "I observed the
20  motorcycle" and I is you here; right?
21      A.  Where are we, sir?  Give me just a second.
22  You said the third paragraph?
23      Q.  Yeah.  Third paragraph on Page 3 of 5.
24      A.  Okay.  Yes, sir.  I've got it now.

Page 168

1      Q.  "I observed the motorcycle continue."  The I
2  there is you; right?
3      A.  Yes, sir.
4      Q.  "I observed the motorcycle continue to travel
5  on Emmons Road," which is what you all are on about
6  this point in the audio; right?
7      A.  No, I don't know.
8      Q.  You haven't gone on Emmons yet?
9      A.  No, we're on Emmons.  Where did you say we're
10  at?
11      Q.  I was just asking you're on Emmons Road at
12  this point in the audio?
13      A.  Yes, we are.
14      Q.  Okay.  Just generally.  Let me finish reading
15  this and I'll ask you a question, might help clear it
16  up.  "I observed the motorcycle continue to travel on
17  Emmons Road on a straight stretch where he accelerated,
18  almost struck a dachshund K-9 in the roadway and gained
19  distance between his position and my cruiser."  Where
20  on Emmons did he almost strike the dog?
21      A.  Okay, so there's -- are we going to go back to
22  the video?
23      Q.  We'll go back to the video in a minute, you
24  can show me.  I guess I was just trying to figure out

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 169

1 where on the audio that occurred because I don't hear
2 you on the audio say anything about a dog.
3     A.   Right.  Then again, this is based on my
4 recollection of this day, this is after the -- and it
5 was a little dog.  I mean, I'm not talking -- this is a
6 little, what I would say, a dachshund type dog, like a
7 small K-9, but, I mean, I can show you on this video
8 where I --
9     Q.   Yeah, we'll do the video in a minute and you
10 can show me.  I just wondered if you knew where about
11 on the audio that might have happened.
12     A.   It was prior, I mean, obviously prior to the
13 crash.  I believe it was just after the third railroad
14 crossing prior his crash.
15     Q.   Okay.
16     A.   There are two straight stretches there.
17         (Whereupon an excerpt of Exhibit 6, Radio
18 Communication with Metro, was played after which the
19 deposition continued as follows:)
20     Q.   That's at 13:35 and that's Harvey saying we're
21 still on Emmons wherever that crossing is.
22     A.   13:35.
23     Q.   Thirteen minutes and thirty-five seconds is
24 where that was at on this audio?

Page 170

1     A.   Like I say, I'm not narrating this, he is now,
2 so I'm not sure what crossing he's referring to.
3     Q.   Okay.
4         (Whereupon an excerpt of Exhibit 6, Radio
5 Communication with Metro, was played after which the
6 deposition continued as follows:)
7     Q.   That's at 13:50.  He says we just passed
8 Holstein Drive.
9         (Whereupon an excerpt of Exhibit 6, Radio
10 Communication with Metro, was played after which the
11 deposition continued as follows:)
12     Q.   All right, so at 14:35 she's saying that
13 you're at the last street you're going to pass before
14 you go into Boone County and Boone County is where you
15 have been advised now that there is a trooper and a
16 deputy waiting at the line; right?
17     A.   Yes, sir and you said that's where at in the
18 play?
19     Q.   Fourteen minutes and, I believe, thirty-five
20 seconds roughly.
21     A.   Yes.  So if that's where she just said we're
22 going to Boone County, that's the last road we passed
23 before it?
24     Q.   Let me just back it up, you can listen to it,

Page 171

1 okay, and I'll tell you where we're at and we'll just
2 listen to it.  This is 14 minutes and 33 seconds.
3     A.   Okay.
4         (Whereupon an excerpt of Exhibit 6, Radio
5 Communication with Metro, was played after which the
6 deposition continued as follows:)
7     Q.   She said that's the last street you're going
8 to pass before you go into Boone County.
9     A.   Okay.
10     Q.   And at that point, I mean, you're being
11 advised of that, you've been told by Metro that there's
12 a Boone County deputy and a state trooper waiting at
13 the Boone County line; right?
14     A.   Yes, sir.
15         (Whereupon an excerpt of Exhibit 6, Radio
16 Communication with Metro, was played after which the
17 deposition continued as follows:)
18     Q.   That's at 14:51 and I believe that's Harvey
19 saying Metro he crashed?
20     A.   That was me, sir.
21     Q.   That was you?  I'm sorry.  Let me back it up
22 starting at 14 minutes and 46 seconds now.
23         (Whereupon an excerpt of Exhibit 6, Radio
24 Communication with Metro, was played after which the

Page 172

1 deposition continued as follows:)
2     Q.   What did you say there?
3     A.   Metro he crashed into the railroad?
4     Q.   Okay.
5         (Whereupon an excerpt of Exhibit 6, Radio
6 Communication with Metro, was played after which the
7 deposition continued as follows:)
8     Q.   All right.  You said based on that audio you
9 listened to before you came here today you think the
10 pursuit was about 12 minutes and 7 seconds, where is
11 that from?  Where would that start?
12     A.   What I was saying earlier, when I initiated
13 the stop off of 119 at Trace Fork.
14     Q.   Okay.
15     A.   To that position and I'm -- now that you're
16 saying this though, that's odd because you said it was
17 14 minutes and 33 seconds where she said we were
18 getting ready to go into Boone County.
19     Q.   She said -- Harvey had radioed about a road
20 and she radioed back saying this is the last road
21 you'll pass before you go into Boone County.
22     A.   Right.  I agree with you.  I thought you said
23 that was 14:33.
24     Q.   Fourteen thirty roughly, yeah.

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 173

1    A.   Right, I'm just thinking in terms of that and
2  you mentioned about the police officers.  There were no
3  -- the Boone County sheriff and the West Virginia State
4  Police were not, from what I remember, anywhere near
5  that.  It took them some time to get there.  So I'm
6  wondering --
7    Q.   You heard Metro earlier say there's a deputy
8  and a trooper that will be at the Boone County line?
9    A.   Yes and I'm wondering --
10   Q.   On Emmons?
11   A.   -- what line because that's less than 20
12 seconds later.  We're in Boone County and they weren't
13 there and it was some time before they showed up on the
14 scene when you mentioned it.
15   Q.   Let's watch that video.  I want you to try to
16 tell me where the dog was.
17       (Whereupon an excerpt of Exhibit 5,
18 Pursuit Path 2, was played after which the deposition
19 continued as follows:)
20   Q.   I'm going to skip ahead there.
21   A.   Excuse me again.
22   Q.   If you get an idea about where I ought to
23 stop, let me know.
24   A.   Okay.  Hold on.

Page 174

1    Q.   Let me ask you first, do you know what this
2  park we're passing at 9 minutes, 23 seconds in the
3  Pursuit Path 2 exhibit.  There's a park with, like,
4  picnic tables, basketball court, a kids area for like a
5  jungle gym and stuff like that.  Do you know what park
6  that is?
7    A.   I don't.  I don't remember seeing that park in
8  the pursuit.  Harvey was narrating this, but I do
9  remember it when we went back and looked or, excuse me,
10 when we redid this, yes.  I don't know what that park's
11 called.
12   Q.   You all were going pretty fast through the
13 first pursuit; right?
14   A.   You're getting ready to get to the straight
15 stretches where he sped up and, like I say, this is in
16 a turn.  If you want to label it a hairpin turn, but
17 Harvey's --
18   Q.   He would have been in the opposite lane going
19 around those types of turns in this?
20   A.   On this I don't recall.  I mean, I wasn't
21 narrating on this.  When I tell you the description of
22 something, I like to give -- I know Harvey gave cross
23 streets, but I didn't hear him give much speed or --
24   Q.   I noticed that you gave a lot more speed than

Page 175

1  we noticed out of Harvey when he was narrating this.
2  Is that fair?
3    A.   In terms of speeds?  I did hear him say a
4  speed earlier.  It was in the 40 miles per hour range.
5    Q.   He did say some.
6    A.   Like I said earlier, I like to paint a picture
7  of what's going on.
8    Q.   Okay.
9    A.   And what kind of roadway we have and what's
10 going on with the operator.
11       (Whereupon an excerpt of Exhibit 5,
12 Pursuit Path 2, was played after which the deposition
13 continued as follows:)
14   Q.   We're at 9:36, what's the speed limit?
15   A.   Twenty-five.
16       (Whereupon an excerpt of Exhibit 5,
17 Pursuit Path 2, was played after which the deposition
18 continued as follows:)
19   Q.   Okay.  Tell me if you figure out where we get
20 to where the dog was.
21   A.   Well, I need to see -- well -- if this is the
22 -- it would be in this straight stretch here, sir.
23   Q.   Okay, so we're at 10 minutes and 13 seconds in
24 the straight stretch, little bit further?

Page 176

1    A.   I'm not going to mark the dog here, so if you
2  want to let it, but there are two straight stretches
3  and this one was the one -- there are two straight
4  stretches and these are both the ones he accelerate on.
5    Q.   So he's going fast through this straight
6  stretch?
7    A.   Okay.  He accelerates in both, but the one I'm
8  referring to is the next straight stretch.
9    Q.   Where the dog was?
10   A.   The dog is at the end of this straight stretch
11 where he pulls away from me a little bit of distance
12 and then you'll see.  I guess we can --
13   Q.   We can watch it.  So you're saying the way
14 this is written, the dog is in this straight stretch?
15   A.   Prior, yes, there are two straight stretches.
16   Q.   Okay.  Do your best to tell me to pause it
17 about where, and I understand this was happening very
18 fast, but I want to know about where you thing the
19 dachshund K-9 dog was.  Tell me when to pause, okay?
20   A.   Okay.
21       (Whereupon an excerpt of Exhibit 5,
22 Pursuit Path 2, was played after which the deposition
23 continued as follows:)
24   A.   It's going to be around here, but it was in

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 177

1 these row of houses. There's nothing past that third
2 set of railroad tracks. This is a, I mean, this is a
3 long straight stretch. This is one of the longest
4 straight stretches of road we drove that day.
5      Q.  With the number of houses and stuff?
6      A.  Well, if you back up, they're spread out, but
7 in terms of residential area, yes. This is spread out,
8 but this is a straighter stretch.
9      Q.  This is at 10 minutes and 43 seconds.
10     A.  Okay.
11          (Whereupon an excerpt of Exhibit 5,
12 Pursuit Path 2, was played after which the deposition
13 continued as follows:)
14     Q.  And he would have been accelerating through
15 here?
16     A.  On the two -- on the two straight stretches
17 prior to the crash he did accelerate.
18     Q.  And you all would have accelerated to keep up
19 with him?
20     A.  Yes.
21     Q.  What's this at 10:51 right here on this
22 straight stretch on the right-hand side?
23     A.  That is the church that I was telling you
24 about. When we redid this drive, like I said, it was

Page 178

1 on a Sunday, not a Saturday, there was on old fellow
2 here that stopped us and talked to us.
3      Q.  On the way back?
4      A.  Yes, sir.
5          (Whereupon an excerpt of Exhibit 5,
6 Pursuit Path 2, was played after which the deposition
7 continued as follows:)
8      Q.  Okay. Have we got to the dog yet?
9      A.  Like I said, if there -- the dog was in a
10 stretch of houses, so if that's the last set, although
11 there may be more up here.
12     Q.  You watch it. I can back it up if you want me
13 to. Tilt that however you need to. It's a little dark
14 when I don't have it plugged in.
15          (Whereupon an excerpt of Exhibit 5,
16 Pursuit Path 2, was played after which the deposition
17 continued as follows:)
18     A.  Best of my recollection that dog crossed, if
19 you want to back up a little bit, I don't know what you
20 want to do in time purposes, was prior to this -- oh,
21 sorry.
22     Q.  That's all right. Where that little pole is?
23     A.  Keep going. Around this area here is where
24 that dog crossed the roadway.

Page 179

1      Q.  We're at 11 minutes and 37 seconds in Pursuit
2 Path 2, whatever exhibit number that was, but exhibit
3 for Pursuit Path 2. Okay and that's where you saw the
4 dog kind of cross and the way you described it, he
5 nearly hits the dog?
6      A.  He swerved to miss the dog.
7      Q.  You all didn't stop the pursuit at that point,
8 did you?
9      A.  Of the dog?
10     Q.  You never pursued the dog, did you?
11     A.  No, sir.
12     Q.  You didn't stop the pursuit of Mr. Means at
13 that point, did you?
14     A.  When he swerved around the dog, sir?
15     Q.  Correct.
16     A.  No, sir.
17     Q.  Okay.
18          (Whereupon an excerpt of Exhibit 5,
19 Pursuit Path 2, was played after which the deposition
20 continued as follows:)
21     Q.  We're getting towards the end. Couple minutes
22 left before we're at the end here. Was that you? Now
23 that was at 11:50 now, but right before that you all,
24 looked like you pulled over to let a car pass. Is this

Page 180

1 road not wide enough for two cars?
2      A.  If you want to rewind it.
3      Q.  Yeah.
4      A.  We did slow stop. I don't remember the -- I
5 didn't even. That's a big Ford Expedition, yes.
6      Q.  Looks to me like you guys are pulling off the
7 roadway?
8      A.  I did yield for that vehicle.
9      Q.  About how fast do you think you're going
10 through there?
11     A.  Right now?
12     Q.  Yeah.
13     A.  Twenty-five, thirty miles an hour.
14     Q.  How about there?
15     A.  Still the same. You haven't heard my
16 transmission shift into --
17     Q.  Okay. I notice on this you guys stop at all
18 the railroad crossings. What do you do that for?
19     A.  See these railroad crossing numbers?
20     Q.  Yeah.
21     A.  I called out the railroad crossing number that
22 he crashed at and when I did this, there were
23 actually -- he crashed on the fourth.
24     Q.  I heard you say that.

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 181

1    A.   The I said we passed two railroad crossing.
2 When we went back and did this, we followed the wrecker
3 driver out so I counted these on the way back out and I
4 didn't realize there were four until we went back and
5 drove this and this is the straight stretch we were
6 speaking of.
7    Q.   Where you all were doing 60?
8    A.   I don't know the speed, sir, I didn't look at
9 my speedometer.
10   Q.   Okay.
11   A.   And then --
12   Q.   Did you read Harvey's transcript?
13   A.   I looked over Harvey's transcript, but I don't
14 recall -- like I said, I don't remember.
15   Q.   Okay.
16   A.   I don't recall what he said.  This is rough
17 and he was more to the center of here.
18   Q.   12:55?
19   A.   Yes, this is a rough set of roadway.
20   Q.   Yeah, pretty rough road.  You said he was in
21 the center?
22   A.   He's in the center.
23   Q.   Of this rough road, but still accelerating?
24   A.   I'd say, then again, that's for Mr. Means to

Page 182

1 determine, but I would believe that he's attempting to
2 avoid these potholes.  You know, I'm not sure what he
3 does.  However, go ahead.
4        (Whereupon an excerpt of Exhibit 5,
5 Pursuit Path 2, was played after which the deposition
6 continued as follows:)
7    A.   There's a Jeep that crossed right here.
8    Q.   A Jeep that crossed right here?
9    A.   Yes, sir.
10   Q.   During on May 2nd?
11   A.   Yes, sir.
12   Q.   Okay.
13   A.   Yellow Jeep Wrangler.
14   Q.   Okay.  Yellow Jeep Wrangler.  You heard the
15 ladies testify last week, you were present for their
16 testimony; right?
17   A.   I was.
18   Q.   Is that the Jeep Wrangler we're talking about,
19 the one they were in?
20   A.   I don't know, sir.
21   Q.   Could have been a different Jeep?
22   A.   I don't know.  Apparently in the time that,
23 you know what I'm saying, apparently in the time I saw
24 the yellow Jeep Wrangler parked behind Harvey's cruiser

Page 183

1 after this crash and they said they were there and they
2 took this video which, I mean, if you time it up with
3 the markings out here where I mark out here it wasn't,
4 but I'd say 60, 40 to 60 seconds after he crashed.
5    Q.   Okay.  I guess what I'm asking is we're at
6 12:59 on this video.  You said you passed a yellow Jeep
7 in this stretch.
8    A.   Uh-huh.
9    Q.   Okay.  Now, I think the ladies said they
10 passed you at the railroad tracks.
11   A.   Yes, sir, but that's not my recollection.  My
12 recollection is they passed us here, the crash happened
13 here and they turned around.  They would have turned
14 around somewhere down here.
15   Q.   Okay.
16   A.   There was, like I was explaining to you
17 earlier, there were -- we didn't pass any cars going
18 the same direction to swerve around or, you know,
19 attempt to maneuver around, but we did pass -- there
20 were three vehicles going the opposite direction, you
21 know, one on Rabel Mountain, you know, one near that
22 roadside park and then this third being the Jeep.
23   Q.   So during the course of the pursuit on May
24 2nd, 2020, after the time you turned onto Trace Fork

Page 184

1 off of 119, would you say you passed three oncoming
2 vehicles?
3    A.   After we turned off of 119, is that what you
4 said?
5    Q.   Correct.
6    A.   Yes.  And specifically one was on Rabel
7 Mountain, Rabel Mountain Road, one was before this
8 roadside park and the next was the Jeep.
9    Q.   Okay.  Okay.  What were the, best of your
10 recollection, what were the other two vehicles?
11   A.   It was a small pickup truck.  I believe a Ford
12 Ranger was the first truck we passed.  A dark colored
13 four door sedan was the second one and then this was
14 the yellow Jeep Wrangler.
15   Q.   If I back it up in a second, can you show me
16 where you passed the other two?
17   A.   On -- yes.  Yes.
18        (Whereupon an excerpt of Exhibit 5,
19 Pursuit Path 2, was played after which the deposition
20 continued as follows:)
21   Q.   This is -- is this the crash site?  We're at
22 13 minutes and 12 seconds and you're at the crash
23 location; right, that was what you just said I thought,
24 the narration?

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 185

1    A.  Sorry.  In this video, yes.  I'm still
2  thinking -- I'm going back to 14:51 I guess you have
3  written over there.
4    Q.  We have 14:50 something on the audio.  We're
5  in Part 2 of this video.  We're at 13 minutes and 12
6  seconds.  Part 1 ran for a total of 17 minutes, so
7  we've got 17 minutes and about 13 minutes, so we're at
8  30 minutes; is that right, total for that pursuit path?
9    A.  On which video, sir?
10    Q.  So I've got you're at the crash location on
11  Part 2 after running for 13 minutes and 12 seconds;
12  right?
13    A.  Yes, sir.
14    Q.  Part 1 ran for a total of 17 minutes and 35
15  seconds, so be about 30 minutes that it took you when
16  you recreated this.  From the Chick-fil-A parking lot
17  it took you about 30 minutes to run this route; right?
18    A.  Yes, sir.
19    Q.  On the audio we listened to, which your
20  communications with Metro started at the light by
21  Walmart; right?
22    A.  On the stretch between Green Road and South
23  Ridge Boulevard, yes.
24    Q.  Okay and that's at 14 minutes and 50 seconds

Page 186

1  roughly?
2    A.  Where he crashes at, I believe we agreed it
3  was 14:50 or 14:51, yes, sir.
4    Q.  So on May 2nd you ran that route in less than
5  15 minutes.  When you he recreated it, it took you 30.
6    A.  Okay.  We've got Chick-fil-A, we've got Sam's,
7  we've got the access road, we've got the lights, we've
8  stopped at every intersection, we stopped at that stop
9  sign up at Heavenly, so, yes, there's some time
10  difference.
11    Q.  Okay, so the Metro communication, at least the
12  Metro call we listened to, the audio, you're on with
13  them by the time you get to the South Ridge light;
14  right, the Walmart turn light, you're on with Metro at
15  that point; right?
16    A.  That is correct.
17    Q.  Okay.  And on the May 2nd date there's
18  actually construction in a one lane and there's time
19  for you to sit there and think, hey, two other officers
20  can come and you'll be here by the time this guy gets
21  through the construction; right?
22    A.  Prior to him turning off, yes.
23    Q.  There's some time eaten up with that is my
24  point.

Page 187

1    A.  There's only two minutes, if it's what I
2  remember.  I mean, I don't know if you want to go back
3  and do that again, but.
4    Q.  I could ask you this way:  So you timed it
5  yourself, you think it was 12 minutes and 7 seconds
6  from the time that you turned off 119 to the crash
7  time; right?  I thought you told me that at the
8  beginning of the day.
9    A.  Yes, sir.  From the time we turned off 119
10  where I initiated the stop until the crash point.
11    Q.  Let's see where you turn off of 119 on this.
12      (Whereupon an excerpt of Exhibit 4,
13  Pursuit Path 1, was played after which the deposition
14  continued as follows:)
15    Q.  We're again back on Pursuit Path 1 on that
16  video exhibit.  All right.  Would you agree with me
17  that says 3 minutes and 34 seconds?
18    A.  Yes.
19    Q.  Okay, so about 27 minutes it takes you from
20  there on this video to run the route that took you 12
21  minutes when you were chasing Mr. Means.
22      MR. RUGGIER :  Objection to the form of
23  the question.  It's a different route, but go ahead.
24      MR. FORBES:  It's a different route?

Page 188

1    Q.  Is this not the exact pursuit route that you
2  went on?  We just went through this two parts of the
3  pursuit path video, it's not the exact route?
4    A.  This is a recreation of the route.  Those are
5  the same roads.
6    Q.  Same roads; right?  I mean, you drove the same
7  roads that you would have driven that day?
8    A.  I drove the same roads that we drove that day.
9    Q.  And it took you 27 minutes; right, roughly?
10    A.  After -- well, I would say after stopping at
11  the stop signs, yielding for vehicles, stopping at the
12  railroad tracks to document the railroad track numbers
13  and whatever, I mean, we haven't watched it, we can go
14  back through it, but.
15    Q.  We can watch the whole thing if you want to
16  stay.
17    A.  I don't know where we stopped.  I can't give
18  you the time difference in this as opposed to 14 as
19  opposed to whatever else.
20    Q.  All right.  Let me help.
21      (Whereupon an excerpt of Exhibit 4,
22  Pursuit Path 1, was played after which the deposition
23  continued as follows:)
24    Q.  This is 3 minutes and 34 seconds and we're

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 189

1 turning onto the route.
2    A.  I agree.
3    Q.  Okay.  The total time of these videos from
4 beginning to end is 30 minutes and some odd seconds;
5 right?
6    A.  Yes.
7    Q.  Okay.  That would be about 27 minutes then
8 from the time you start here to the time where the
9 crash site is it takes you to get to it?
10   A.  Yes, if that's the depiction on these videos.
11   Q.  That's what the video shows, that's what the
12 video shows.  On the day of the crash, we've got 14
13 minutes and 50 seconds from the Walmart light to the
14 crash location or the time that you call and say he
15 crashed on the Metro call; right?
16   A.  Yes.
17   Q.  And you yourself said you went back through
18 and tried to sync that up and you think it's 12 minutes
19 and 7 seconds from the time he turned off 119?
20   A.  Yes.
21   Q.  Okay, so on May 2nd, 2020 you drove this route
22 from right here in this video, from the 3 minute 34
23 seconds mark, you drove that in about 12 minutes and
24 when you recreated it it took 27 minutes; right?

Page 190

1    A.  Yes.  Yes.
2    Q.  You all had to be going considerably faster;
3 right?
4    A.  Which time?  Sorry.
5    Q.  On May 2nd?
6    A.  Oh, on May 2nd, we were going whatever speeds
7 I indicated.
8    Q.  Okay.  Heck of a lot faster than when you
9 recreated this thing; right?
10   A.  I did all the -- yes.  Yes.
11   Q.  Okay.  All right.  Let me see where to find
12 the next video.  You need a break or anything?
13   A.  No thank you.  Thank you.
14   Q.  All right.  Let's watch the bystander video.
15        MR. RUGGIER :  You going to make this an
16 exhibit?
17        MR. FORBES:  Yeah, we'll make the
18 bystander video Exhibit 7?
19        MR. RUGGIER:  Seven.
20        MR. FORBES:  Exhibit 7.
21        (Whereupon an excerpt of Exhibit 7,
22 Bystander Video, was played after which the deposition
23 continued as follows:)
24   Q.  All right.  Do you know which one of these

Page 191

1 people you are in the video?
2    A.  That's me, sir.
3    Q.  You're on the left at the 7 second mark;
4 correct?
5    A.  Yes, sir.
6    Q.  Okay.  Now, did you see the crash itself occur
7 with Mr. Means?
8    A.  Okay, when you're talking about crash, we've
9 talked about this.  I saw him strike the railroad
10 tracks.  That bike spun and ejected him off through the
11 air.
12      Now, when I talk about striking the tracks, I don't
13 know if it was full body striking the track or if it
14 was his legs that struck the tracks, but I did not see
15 where he land -- did not see where he landed at the
16 time, but afterwards, obviously after getting out and
17 running up here I saw that he was in this ditch line
18 and water.  So if you want to back up.
19   Q.  Let me ask you this:  Where were you in your
20 vehicle at the time that the motorcycle -- did you say
21 the motorcycle struck the tracks or you saw Billy
22 strike the tracks?
23   A.  No, the motorcycle strikes the tracks and it
24 spins him.  On down here is where the motorcycle struck

Page 192

1 the tracks and it spins him.  I'm coming up through
2 here, as I am stopped, parked on the tracks, he was
3 airborne.
4      It looked like his, it appeared that his body or
5 some part of his body struck the tracks and went into
6 that ditch line area and then again, exiting my
7 vehicle, I didn't know, you know, what was over there
8 or where he was, but.
9    Q.  In this video it shows your vehicle, you're
10 the SUV; correct?
11   A.  That is correct.
12   Q.  The beginning of it you're up here on the
13 left, your SUV is on the railroad tracks; right?
14   A.  It is.
15   Q.  Okay.  Where was it at the time that you say
16 his bike struck the tracks?
17   A.  I don't know an approximate footage.  I was
18 able to see -- I was able to see that motorcycle spin
19 and eject him from the -- I didn't concentrate on the
20 motorcycle, I kept my eyes on him and you want to talk
21 about fast, that all happened so fast, I'm basically
22 coming to a screeching halt and so did Harvey.  I mean,
23 Harvey almost struck me.
24   Q.  At the time you guys are approaching the

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 193

1  tracks, however from Billy's bike was your cruiser?
2      A.   I don't remember.
3      Q.   More than 10 feet?
4      A.   Oh, I'm talking, I would say a car length if
5  not two car lengths if not more than that.  I don't
6  know in terms of -- I would have to look back and see
7  on this stretch of roadway where --
8      Q.   No more than two car lengths?
9      A.   Possibly more than car lengths.  Like I say,
10 I'd have to look back on this stretch of roadway and
11 see where I could possibly see him coming up there.  It
12 had to be more than two car lengths because there's two
13 car lengths there and here's a third and a fourth, so
14 three to four.
15     Q.   Okay.  Let me ask you this:  Would you have
16 been further than where the yellow Jeep is at the
17 beginning of the video?  Were you further away from him
18 at that point or closer?
19     A.   Probably in regards to where she is, if not
20 over here to the left more.  I've not driven this road
21 before.  This railroad crossing wasn't marked.  The
22 other one was marked, but this one wasn't and I wasn't
23 aware these railroad crossings were here until we came
24 to this intersection.

Page 194

1      Q.   You didn't realize you're getting to a
2  railroad crossing at this point?
3      A.   No, sir.
4      Q.   From what I can tell on your GoPro video, this
5  is right after a straight stretch where there's a lot
6  of acceleration, so you guys would have been going
7  pretty fast; right?
8      A.   Well, we slowed to come over -- the third set
9  of railroad tracks is right here near this set of
10 railroad tracks, so he had that initial straight
11 stretch where he accelerated.  He slowed to come over
12 the third -- we all slowed to come over the third set
13 of railroad tracks and then he accelerated.
14     His acceleration wasn't greater than that of the
15 first stretch.  That's a long, continuous stretch.
16 When I say accelerated, he accelerated and in terms of
17 speed, I don't know how fast he was going.
18     Q.   Would it be fair to say that Harvey would have
19 a better idea of how fast he was going at that time
20 than you would because you weren't reporting speed?
21     A.   I did not look at my speedometer, no, sir.
22     Q.   Back to my question though.  Would it be fair
23 to say Harvey would have a more accurate description of
24 how fast you guys were going through that straight

Page 195

1  stretch approaching this last railroad track?
2      A.   Yes, sir.
3      Q.   All right.  Let's watch this video.
4          (Whereupon an excerpt of Exhibit 7,
5  Bystander Video, was played after which the deposition
6  continued as follows:)
7      Q.   Is that Harvey bent over there?
8      A.   It is.
9      Q.   Okay.  We're at 18 seconds and so you're now
10 on the right-hand side of the video.  You're the person
11 in the right, Harvey is bent over top of Mr. Means;
12 correct?
13     A.   That's correct.
14     Q.   Is he pepper spraying him at that point?
15     A.   Sir, I don't know.  I'm trying to get out on
16 this radio.  That's my radio.  My radio's come loose,
17 so I'm pulling it back around to walk around back
18 behind Harvey.  I've slipped.
19     We exited our vehicles and, like I said, there's 40
20 to 60 seconds here that's not shown.  I've entered on
21 this side.  I'm on the far side of the ditch and jumped
22 back over on this side and my microphone has come --
23 and I've already slipped and fallen, I think, prior to
24 this and then you'll see me slip and fall again.

Page 196

1      Q.   Looks to me like he's bent down, got something
2  in his hand.
3      A.   I believe that's his firearm.  I don't think
4  he's pepper sprayed  him yet because --
5      Q.   We're at 21 seconds?
6      A.   Right.
7          (Whereupon an excerpt of Exhibit 7,
8  Bystander Video, was played after which the deposition
9  continued as follows:)
10     Q.   Go ahead.  Two of you look like you're kind of
11 bent over here at 31 seconds just looking at him.  I'm
12 trying to figure out what's going on.
13     A.   He's screaming.  We're telling him to make his
14 hands presentable and I believe that's the butt of his,
15 I believe that's the barrel of his firearm.
16         (Whereupon an excerpt of Exhibit 7,
17 Bystander Video, was played after which the deposition
18 continued as follows:)
19     Q.   Now we're at 50 seconds.  Is that you?
20     A.   I'm in the water, sir.
21     Q.   You're down in the water and this is Harvey on
22 the right with what appears to be probably his gun
23 drawn?
24     A.   Yes, sir.  Like I say, I don't know if

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 197

1 that's -- when he had -- whatever he had down beside
2 his right side looked like the barrel of his firearm.
3     **Q. Did you have your gun out at any point in**
4 **this?**
5     A. When I exited my vehicle, my gun was drawn and
6 so was Patrolman Harvey's gun, so in essence when I'm
7 going in he's providing me cover because I reholstered
8 and decided to go in the water.
9     **Q. At any point during the video that the**
10 **bystanders took did you see yourself with a gun drawn?**
11     A. No, sir.
12         (Whereupon an excerpt of Exhibit 7,
13 Bystander Video, was played after which the deposition
14 continued as follows:)
15     **Q. What about when Patrolman Harvey administered**
16 **pepper spray, did you have your gun drawn at that**
17 **point?**
18     A. That's a good question. I don't believe so.
19 I would have already been -- I would have already -- I
20 was in this ditch line or and/or in this water more
21 than he was.
22     I had water to here and I had to change my pants
23 and my shoes and my socks or my socks after this. He,
24 from what I remember, Harvey didn't enter the water at

Page 198

1 all. He did majority of his positioning from the side.
2     **Q. Okay. Now we're at one minute.**
3         (Whereupon an excerpt of Exhibit 7,
4 Bystander Video, was played after which the deposition
5 continued as follows:)
6     **Q. What are you all doing there?**
7     A. Pulling him across the railroad tracks, sir.
8     **Q. You have him by his wrist?**
9     A. No, sir, up underneath his arm. Up underneath
10 his armpit.
11     **Q. You've got him under his armpit?**
12     A. Yes, sir. His jacket armpit. I think he sill
13 had his jacket on.
14         (Whereupon an excerpt of Exhibit 7,
15 Bystander Video, was played after which the deposition
16 continued as follows:)
17     **Q. Which one are you, left or right? Hold on let**
18 **me back it up.**
19     A. I'm still right here, sir.
20     **Q. You're on the left in the video at 1:07?**
21     A. Uh-huh.
22     **Q. I want you to watch it again.**
23     A. Yes, sir.
24     **Q. That was your hand down there holding his**

Page 199

1 **wrist, wasn't it?**
2     A. Sir, what I remember was we pulled him from
3 the ditch line and I moved up underneath his armpit or
4 his bicep.
5     **Q. I hear what you're saying, I just don't see on**
6 **the video where you've got him under his armpit?**
7     A. I don't see his wrist.
8     **Q. Let's go back a little bit.**
9         (Whereupon an excerpt of Exhibit 7,
10 Bystander Video, was played after which the deposition
11 continued as follows:)
12     A. That's not his wrist, sir, that's his
13 clothing.
14     **Q. So you got him by his clothing?**
15     A. His jacket I would say, yes.
16     **Q. So you're pulling him by his jacket. At 1:10**
17 **you're pulling him by his jacket up out of the ravine?**
18     A. Yes, sir and whatever I did there, I
19 repositioned, so yes.
20         (Whereupon an excerpt of Exhibit 7,
21 Bystander Video, was played after which the deposition
22 continued as follows:)
23     **Q. Okay. Now we're at 1:26 and someone's coming**
24 **out behind the gray box and going back toward the**

Page 200

1 **cruiser. Is that you?**
2     A. That is me.
3     **Q. You're on the left side of the video now;**
4 **right?**
5     A. Yes, sir.
6     **Q. What are you going back to do?**
7     A. My hand held would not get out in terms of
8 radio communication, so I ran back to the cruisers and
9 used that radio to radio them that we had one detained
10 and we needed EMS.
11         (Whereupon an excerpt of Exhibit 7,
12 Bystander Video, was played after which the deposition
13 continued as follows:)
14     **Q. All right. Let me show you this again. I**
15 **want you to watch because we're coming up on -- you see**
16 **his foot motion there, 1 minute, 31 seconds?**
17     A. Yes, sir.
18     **Q. I think you said earlier that, correct me if**
19 **I'm wrong, are you saying Harvey told you that he**
20 **didn't stomp on his head, that he stepped over him?**
21     A. Yes, sir.
22     **Q. Okay. I think earlier you were trying to**
23 **explain to me how that happened; right?**
24     A. Yes, sir.

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 201

1    Q.  Okay and it looked liked you were going to
2  demonstrate something.  Can you show me what you were
3  talking about?
4          MR. RUGGIER:  Watch your --
5          THE DEPONENT:  I'm sorry?
6          MR. RUGGIER:  Watch your microphone.
7    A.  So in terms of the way I believe he
8  articulated to me is he stepped over him to reposition
9  his weight to move him onto his side.  When we brought
10  him over here, he was on his back face up, okay, so
11  now -- I don't know when Harvey handcuffed him.
12    He was not handcuffed when he was laid right here.
13  He was brought over to this side of the railroad
14  tracks.  I know from what Harvey stated that he
15  searched him, searched his person and then handcuffed
16  him.
17    Q.  Okay.
18    A.  But Harvey was telling me that he stepped over
19  him to reposition him.  I don't know if he positioned
20  him on his side or how he needed to be repositioned,
21  but that's what he stated.
22    Q.  You didn't see it with your own eyes, did you?
23    A.  I did not, no, sir.
24    Q.  So the only time you visualized this is what's

Page 202

1  shown on the video that these bystanders took; correct?
2    A.  Yes, sir.
3          (Whereupon an excerpt of Exhibit 7,
4  Bystander Video, was played after which the deposition
5  continued as follows:)
6    Q.  You say when you guys drug him over here
7  behind the box, and we're at 1:30 on the video now,
8  when you left him laying there you're saying he was
9  laying on his back?
10    A.  He was.
11    Q.  When Harvey pepper sprayed him, did he pepper
12  spray him inside the helmet or do you know how that
13  happened?
14    A.  I don't -- I know that he was pepper sprayed,
15  but I don't know if it made contact with his skin or
16  got on his helmet or what.
17    Q.  He had a helmet on when you guys approached
18  him in the ravine; correct?
19    A.  He had a full face helmet on, yes, sir.
20    Q.  Was the visor intact or no?
21    A.  I don't remember the visor.  I don't
22  remember -- I don't remember the visor.
23          VIDEO OPERATOR:  I'm sorry to interrupt,
24  but I have less than a minute left on the tape.

Page 203

1          MR. FORBES:  Let's go ahead and switch
2  tapes.
3          VIDEO OPERATOR:  Time is 5:47 p.m.  We're
4  off the record.
5          (A brief recess was taken after which the
6  deposition continued as follows:)
7          VIDEO OPERATOR:  The time is 6:10 p.m.
8  we're on the record.
9  BY MR. FORBES:
10    Q.  Officer Peterson, when we went off the record
11  I was asking you some questions about the helmet and
12  visor.  It's my understanding you don't remember
13  whether or not he had the visor in tact or not;
14  correct?
15    A.  No, sir.
16    Q.  Did -- to the best of your recollection, at
17  what point did Officer Harvey pepper spray Billy Means?
18    A.  When we couldn't get control of his hands.  Go
19  ahead.
20    Q.  So it was when you're down in the ravine?
21    A.  Yes.
22    Q.  And Mr. Means was laying on his back in the
23  water; correct?
24    A.  That's how he was when I approached him, sir.

Page 204

1  When I approached him with my gun drawn he was laying
2  on his hands, excuse me, laying on his back with his
3  hands.  When we approached him he initially kept his
4  hands there, however he started to move around when we
5  got closer to him I guess is what I'm trying to say.
6    Q.  Do you know --
7    A.  His hands went underneath the water and they
8  were not visible.
9    Q.  You don't know why they were under there;
10  correct?
11    A.  I do not.
12    Q.  Could have been trying to stabilize himself
13  and get up?
14    A.  Possibility.
15    Q.  Did you see the pepper spray being
16  administered?
17    A.  I don't -- I remember the pepper spray because
18  I remember the smell of it, but I don't remember when
19  he did it.  I mean, I remember it being administered.
20    I remember it being on the exterior of the helmet
21  when we pulled Mr. Means across.  That stuff is strong.
22  It doesn't -- it affects everybody different, but it
23  affects me bad.
24    Q.  So you're sort of hyper sensitive to pepper

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 205

1  spray?
2      A.  Anything, yeah, like even hot food, so yes.
3      Q.  So you don't know whether he sprayed it down
4  inside of his visor in his eyes, you don't know if he
5  sprayed it on the exterior of the helmet, you're not
6  sure where he sprayed the pepper spray?
7      A.  He administered it from a standing position up
8  above the water.  He was never in the water.  Officer
9  Harvey was never in the water.
10     Q.  Okay.
11     A.  So it was a distance, so I would say that he
12 didn't -- up close, no.  From a distance.  And when I
13 say a distance, six to or, excuse me, three feet.
14     Q.  Do you know how long the stream of pepper
15 spray was sprayed for?
16     A.  Couldn't have been long, no, sir.
17     Q.  I understand it couldn't have been long.  I'm
18 asking do you know how long?
19     A.  I would say it's a short burst, a second to
20 two seconds.
21     Q.  Okay.  What measures did you or Officer Harvey
22 take before the pepper spray was administered to get
23 him to comply?
24     A.  I tried to get one of Mr. Means's hands so I

Page 206

1  was on the left side, it would have been his -- I was
2  on the right side when he came out, so initially his
3  right hand because I was on the opposite side of the
4  ditch line and then I believe it was his left arm that
5  we pulled him out by when I came back and around behind
6  Harvey, vice versa.
7      Q.  Prior to the pepper spray being administered,
8  you had only gripped on one of Mr. Means's hands; is
9  that correct?
10     A.  Yes.
11     Q.  Okay.  Had Officer Harvey tried to grip the
12 other hand?
13     A.  Yes.
14     Q.  Prior to the pepper spray being administered?
15     A.  Again, sir, I don't remember the sequence
16 of -- I had my hands on Mr. Means first before
17 Patrolman Harvey and when he wouldn't comply to
18 bringing his hands, when we couldn't get hold of his
19 hands, he was administered OC.
20     Q.  We watched that video together.  You didn't
21 actually witness the alleged head stomping by Patrolman
22 Harvey; right, you didn't see that with your own eyes?
23     A.  No, sir.
24     Q.  You've watched the video now and you've heard

Page 207

1  what Patrolman Harvey's told you; correct?
2      A.  Yes, sir.
3      Q.  You've also been present for the two
4  bystanders who took the video who actually said in
5  their own words that they saw with their own eyes
6  Patrolman Harvey's foot come into contact and stomp
7  down on Billy Means's head which was in the helmet;
8  right?
9      A.  I heard them say that, yes, sir.
10     Q.  Okay.  Had Patrolman Harvey done that, that
11 would have been a use of force; correct?
12     A.  Had he stomped on Mr. Means's head?
13     Q.  Right.
14     A.  Yes, sir.
15     Q.  And it would have been improper for him to
16 have stomped on his head; right?
17     A.  Yes.
18     Q.  Would have been excessive force if he'd
19 stomped on his head; correct?
20     A.  In the manner of Mr. Means laying on his back
21 in his position, yes.
22     Q.  Okay.  So it's important that Patrolman Harvey
23 did not stomp on Mr. Means's head; right?
24     A.  Yes.

Page 208

1      Q.  I'm going to hand you what we'll mark as
2  Exhibit 8.
3          MR. FORBES:  Duane, you've got this.
4  This is the case report if you want to look at it
5  first.
6          MR. RUGGIER:  Anything in particular
7  you're going to ask him about?
8          MR. FORBES:  Just the parts, just
9  excerpts of his narrative.
10         MR. RUGGIER:  Whose narrative?
11         MR. FORBES:  Peterson's.
12         MR. RUGGIER:  Peterson's, okay.
13     PETERSON DEPOSITION EXHIBIT NO. 8
14          (Incident Report was
15          marked for identification purposes as
16          Peterson Deposition Exhibit No. 8.)
17     Q.  Do you recognize that document, sir?
18     A.  Yes, sir.
19     Q.  What is it?
20     A.  It's the incident report that I completed.
21     Q.  And it's 13 pages long?
22     A.  That I'll have to look at.
23     Q.  Bottom says Page 1 of 13.  That's how I get
24 that.

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 209

1    A.   Okay.  My portion was -- mine was 1 of -- mine
2 was 1 through 11 is the portion that I completed.
3    Q.   All right, so you did not complete Pages 12
4 and 13, that would have been Patrolman Harvey; right?
5    A.   Yes, sir.
6    Q.   Let me ask you, if you flip over to Page 6
7 there's a narrative by Corporal E.M. Peterson.  Is that
8 you?
9    A.   Yes, sir.
10    Q.   And to the best of your knowledge is what you
11 wrote in this narrative true?
12    A.   Yes, sir.
13    Q.   You wouldn't have falsified it in here
14 intentionally, would you?
15    A.   No, sir.
16    Q.   A lot of what's in here crosses over and is
17 what's in your complaint that we went through earlier;
18 correct?
19    A.   Yes, sir.
20    Q.   Kind of the same language?
21    A.   Yes, sir.
22    Q.   Let's go over to Page 8 of 13.
23    A.   Yes, sir.
24    Q.   And it's your name at the bottom as reporting

Page 210

1 officer, that's Peterson, that's you; right?
2    A.   I completed this, sir, yes, sir.
3    Q.   It says the date of May 2nd, 2020.  Is that
4 when you completed this?
5    A.   That would be my report date.  I don't know --
6 I don't know if I started it that day.  I see that the
7 sergeant approved it on the 7th, but I started or did
8 this report on the 2nd.
9    Q.   Okay, so you began the report on the 2nd
10 anyway; is that right?
11    A.   Yes, sir.
12    Q.   Okay.
13         MR. RUGGIER:  Is that my copy right
14 there?
15         MR. DITRAPANO:  Your what?
16         MR. RUGGIER:  Is that my copy?
17         MR. FORBES:  I didn't have an extra one.
18 If you need one I can give you mine and take his.
19         MR. RUGGIER:  Let me have his.
20         MR. FORBES:  You can have this one.
21         MR. RUGGIER:  Thanks.  I appreciate it.
22    Q.   All right.  We're on Page 8 of 13.  Towards
23 the bottom of the page you talk about it says "Harvey
24 deployed his OC spray and sent a burst of OC spray into

Page 211

1 the suspect's face as he failed to make his hands
2 visible."  That didn't cause him to make his hands
3 visible, did it?
4    A.   I don't know if it assisted in our -- in him
5 making his hands visible or not.  I don't recall.  I
6 don't recall if that helped or hindered.
7    Q.   Well, you've got written in here "The suspect
8 made his hands visible and was removed from the water
9 by Harvey and I sliding up under his armpits."  So
10 you've written in here you and Patrolman Harvey used
11 your hands to slide up under his armpits and moved him
12 on his back to a safe location out of the water and
13 away from possible train traffic.
14    A.   That's what I recall, yes.
15    Q.   "The suspect was placed into handcuffs once he
16 was moved, detained and cleared of weapons."  You
17 didn't assist putting him in handcuffs; right?
18    A.   No, sir.
19    Q.   Did you know Patrolman Harvey actually placed
20 the handcuffs behind him initially and cuffed him
21 behind his back?
22    A.   I don't recall.  I know he that was handcuffed
23 around behind the back, but I don't remember -- he was
24 handcuffed around the back, yes, sir.

Page 212

1    Q.   Initially; right, and then they were moved?
2    A.   Yes, sir.  I don't know at what point they
3 were moved.  I mean, in terms of --
4    Q.   You say "I immediately notified Metro of the
5 suspect being detained and requested fire and EMS
6 assistance for the assessment of the suspect and decon
7 for the OC spray."  What assessment did you want done?
8    A.   He was, well, first of all he's complaining of
9 drowning, he just had his crash and he had OC, so any
10 time we administer OC we have to have EMS.  We can't
11 decon suspects ourself.
12         EMS has to come spray them off or try to remove the
13 decontaminant and assess him afterwards to make sure
14 he's, I guess, medically clear for smashed quarters in
15 jail.
16    Q.   Are you trained in some way how to deal with
17 that when people are in vehicle crashes, motorcycle
18 crashes, things like that, is there some kind of
19 initial response training or something that you get as
20 a police officer?
21    A.   Yes, sir.
22    Q.   What is it?
23    A.   We had -- we have like a basic medical class
24 or something like that at the Academy.  I was also an

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 213

1 EMT for a certain period of time as well prior to my
2 law enforcement career.
3    Q. Were you a certified EMT?
4    A. I was.
5    Q. Who did you work for?
6    A. Goodness gracious, it's not Jan-Care, it's
7 General Ambulance. It's in Jackson County, Raleigh and
8 Fayette County if they still exist.
9    Q. How long were you an EMT?
10    A. Not long. Not very long at all. I think the
11 pay was maybe $7.10.
12    Q. Did you go to school for that?
13    A. I went to training for it.
14    Q. Where did you go to training?
15    A. RESA 2. It is in Dunbar on 22nd Street.
16    Q. How old were you when you went to that program
17 roughly?
18    A. That's a good question. I mean, it's over 15
19 years ago.
20    Q. Okay. Did they train you in what to look for
21 when you're dealing with crash victims?
22    A. No, not necessarily crash victims. I mean,
23 you have to -- one would have to have what we call a
24 chief complaint, what you're complaining of. So once

Page 214

1 you get a chief complaint, you assess what it is that
2 that person is -- what they're complaining of.
3    If your hand hurts, you assess their hand. If
4 their neck hurts, you assess their neck. If their
5 airway is obstructed, you try to unobstruct their
6 airway. If their toe hurts, you try to assess their
7 toe.
8    Q. Do you have a duty as an EMT to do an
9 assessment of a potential patient or person you're
10 dealing with and determine what needs they might have?
11    A. Repeat the question.
12    Q. Yeah. As an EMT, do you have a duty to do an
13 initial assessment of a patient or person that you're
14 dealing with and try determine what needs they might
15 have?
16    A. Yes.
17    Q. Okay. What goes into that assessment?
18    A. Airway, breathing, circulation, that's the
19 first thing. You want to make sure their airway is
20 unobstructed, they're breathing and their blood is
21 circulating and then you do a head to toe assessment.
22    Q. How do you do a head to toe assessment?
23    A. You remove clothing to see if there's any
24 injury or protrusion or intrusion to the body. Then it

Page 215

1 actually is somewhat like a skin pat down from head to
2 toe.
3    Q. Make sure they can feel and have sensory
4 perception?
5    A. It's necessary for a multiple of things.
6 That's one of them and then again to assess if there's
7 any injury or palpitate, you know, to see if a person's
8 injured where that can't be seen.
9    Q. You didn't do any assessment like that before
10 you moved Billy Means out of that ravine, did you?
11    A. Mr. Means, if I'm going to call it a chief
12 complaint at that time, was drowning. He was spitting
13 up water and he stated I'm drowning. I think he said
14 something like get me out of here or help me or
15 something like that, but he said he was drowning.
16    Q. I've seen the photos of the ravine and the
17 video. Does it make a lot of sense to you that
18 somebody would drown in a ravine looking like that?
19    A. Sir, I don't know from the time I got out of
20 my car to the time I got to Mr. Means, I don't know if
21 he ingested water or what he was -- what was going on
22 with him. I don't know. I don't know if he was
23 drowning or not. I don't know.
24    Q. You didn't know at that point what his

Page 216

1 injuries were, did you?
2    A. No, sir.
3    Q. And you all lifted and moved him anyway;
4 correct?
5    A. He was in the water, sir, he asked to be
6 removed from the -- he said I'm drowning, so we removed
7 him from the water.
8    Q. If he asked you to throw him off the bridge
9 would you have done that?
10    A. No, sir, but we can't take him up a ravine,
11 okay, so the easiest point to move him safely, train
12 traffic hadn't been notified that we were on their
13 tracks or that we were near their tracks.
14    He was brought from the other side of the roadway
15 or, excuse me, the other side of the railroad tracks to
16 maybe three to four feet away from the railroad tracks
17 if not greater, a greater distance.
18    Q. I'm going to hand you a series of photos.
19 These are the photos you all produced. Just mark it
20 collectively as Exhibit 9.
21       PETERSON DEPOSITION EXHIBIT NO. 9
22         (Series of Photographs
23         were marked for identification purposes
24         as Peterson Deposition Exhibit No. 9.)

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 217

1   Q.  Look at the second photo there.

2   A.  Yes, sir.

3   Q.  You took this on May 2nd, 2020; right?

4   A.  I did.

5   Q.  Did you take all these photos?

6   A.  I don't know.  I'll have to review what you

7   have if that's okay.

8   Q.  Yeah, you can go ahead.

9   A.  Yes, sir.

10   Q.  Okay.  Look at the second photo, the one with

11   the little red truck in it.

12   A.  Okay.

13   Q.  About where in the ravine was Billy?

14   A.  He was prior to the motorcycle.  He was after

15   the drainage ditch point, but prior to the motorcycle.

16   In my report I say 10 to 12 feet prior to this in this

17   deep ravine area here.

18   Q.  Okay, so you think he's in around there?

19   A.  Yes, sir.  This is where we pulled him across

20   the tracks here.

21   Q.  Okay.  Go ahead and mark for me on there where

22   you think Billy was.

23   A.  Possibly.  If we look at that video I may be

24   able to tell you better.

Page 218

1   Q.  Yeah because when I look at the video, I can

2   see the little waterfall thing, I guess you call that a

3   drainage ditch, I don't know, whatever it is, looked to

4   me like he was back down this way some, particularly

5   from the fact that you all drug him back behind the

6   gray box in the first video which would make sense to

7   me he's over in there somewhere.

8   Let me ask you, so back only the second picture

9   with the little red truck, all right, there was nothing

10   preventing you guys from holding him out of the water

11   down here once you had him secured and going and

12   calling for an EMT, was there?

13   A.  Sir, what are you talking about?  I'm not sure

14   what you're talking about.

15   Q.  Why couldn't you just brought him to a

16   shallower end of this muddy ditch and kept him right

17   there or not moved him at all?

18   A.  Then again, I'm going to reinstate that we

19   haven't stopped train traffic, okay, we're close to the

20   train tracks.

21   Q.  Train's not driving in the ditch, is it?

22   A.  No, but we're close to that which leads to

23   Officer Harvey, again, was standing up here.  He could

24   have been struck by it then.  We had vehicles, mine

Page 219

1   number one, being parked on the roadway and Harvey

2   almost up in my rear end.

3   Q.  Okay.  When did you move your vehicle off the

4   train track?

5   A.  It's in that video, sir.

6   Q.  You move your vehicle in the video?

7   A.  Oh, no.  No, sir.  After that video.  You hear

8   me relay in and I tell Patrolman Harvey once those

9   girls go I'm backing those cars up.

10   Q.  Okay.

11   A.  It was almost immediately after I relayed

12   to -- because Harvey asked someone to bring back -- I'm

13   not there with Harvey for a portion of the time.

14   Q.  Turning back over to Exhibit 8 for a minute.

15   On Page 9 of 13, looks to me like you wrote "Sergeant

16   Moyer and Corporal Vineyard arrived at this time to

17   assist.  Paskal alerted Metro to ask CSX to delay rail

18   traffic at our location and they were notified."  So

19   that's Lieutenant Paskal telling CSX, hey, stop trains

20   in the area and that's something you asked them to do;

21   right?

22   A.  Asked Lieutenant Paskal to do?

23   Q.  Asked Metro to have somebody to do.

24   A.  We'll have to listen to the audio.  I thought

Page 220

1   I asked to do that or Harvey asked them to do that

2   prior to Lieutenant Paskel arriving.

3   Q.  That's what I thought too.  That's what I'm

4   saying, so on the audio it sounds like you or Harvey

5   one are saying, hey, you all need to call somebody and

6   tell CSX to stop trains.

7   A.  I agree.

8   Q.  Okay.  All right.  Now, that's written here in

9   your report before we get to this next line it says

10   "Once the other units arrived, Harvey and I moved our

11   cruisers out of the roadway to make way for traffic and

12   other emergency personnel."

13   Just to be real clear, you didn't move your cruiser

14   until after other units came onto the scene, so the

15   cruiser stayed on the railroad tracks until that point;

16   correct?

17   A.  I don't recall specifically, but I do remember

18   the guys were there pretty -- I'd have to look at their

19   mark out time.  Moyer and Corporal Vineyard --

20   Q.  Can't we just look at your report because you

21   wrote this the day it happened; right, wouldn't that be

22   true or right what you wrote in there?

23   A.  I agree with you, but in terms of time, I

24   don't know about time.

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 221

1    Q.  I'm not asking about time, I'm asking about
2  sequence of events.  Your sentence there says -- let me
3  read it again.  "Once the other units arrived, Harvey
4  and I moved our cruisers out of the roadway to make way
5  for traffic and other emergency personnel."
6    I guess what I'm getting at is you didn't move your
7  cruiser until other units are arriving on the scene.
8  Why do you guys need to drag him out of the ditch
9  across the railroad track?
10    A.  Sir, I don't know how many times I'm going to
11  have to say it, he said he was drowning.  If one's
12  drowning in a pool, I'm not going to leave them in
13  water.  I'm going to remove them from --
14    Q.  How deep do you think this was?
15    A.  I don't know, sir, like I said, I don't know
16  what water he ingested when he came into contact with
17  the water.  In terms of depth, like I said, I do
18  remember going in -- I don't know if I was in the
19  entire depth, but I was up to my knees and the
20  motorcycle was, if you look at the picture, is the
21  frame and the front tire is somewhat under water.
22    Q.  Part of the engine is kind of poking out if
23  you look over there; right?
24    A.  Yes, sir, but that appears to be a shallower

Page 222

1  end, but yes, sir.
2    Q.  You can look at it on the exhibit I gave you,
3  the motorcycle picture is in there.  You took it;
4  right?
5    A.  I did take these photos, yes, sir, unless --
6  yes, sir.
7    Q.  Motorcycle would have been sitting in about as
8  deep as a part of that ditch as there was; correct?
9    A.  I believe it was deeper prior the motorcycle.
10    Q.  You think so?
11    A.  Yes, sir.
12    Q.  Okay.
13    A.  That's not going to get to my knee, right
14  there is not.
15    Q.  I didn't think so either.  All right.  So in
16  your EMT training you would agree with me you've got to
17  assess the scene, you've got to assess the individual
18  patient and determine what their needs might be; right?
19    A.  Their chief complaint, uh-huh.
20    Q.  Are there any special procedures that you're
21  suppose to follow if you're lifting and moving a
22  patient that's been in an auto accident and is at least
23  appearing unable to get up on their own?
24    A.  Yes.  Yes, sir.

Page 223

1    Q.  What?
2    A.  Stabilization of the neck, backboard, C collar
3  and then backboard immobilization - if I can get that
4  out - and then transport.
5    Q.  You would have known that to be true on May
6  2nd of 2020; correct?
7    A.  Yes, sir.
8    Q.  You all didn't use a C collar, a backboard or
9  any type of spinal immobilization, did you?
10    A.  Sir, we -- no, sir.
11    Q.  Now, in your training with the State Police
12  Academy, when did you do that?
13    A.  That was 2008.
14    Q.  Okay.  Do you know who gave you the first
15  responder training?
16    A.  No, sir.  I remember we had a class, but I do
17  not remember who instructed it.
18    Q.  When did you go to the academy, do you
19  remember if it was spring, fall, winter?
20    A.  It was September of 2008 through December of
21  2008 I believe.
22    Q.  Have you had any other law enforcement
23  training other than the State Police Academy?
24    A.  Law enforcement training?

Page 224

1    Q.  Yes, sir.
2    A.  Yes, sir.
3    Q.  Describe that for me.
4    A.  I went to Florida for the Narcotics --
5  goodness gracious, I can't remember.  It was a week
6  long course based on a narcotics investigation.  I've
7  been to Desert Snow and then we have in service classes
8  that we take yearly.
9    Q.  Is that where someone comes in and lectures
10  you in the Department?
11    A.  No, sir.  Various places.  I mean,
12  Parkersburg, Bridgeport, excuse me, the last have been
13  here in Charleston because of the Corona virus.  Just
14  various places, Florida, Tennessee, various places.
15    Q.  All right.  Do you recall being trained at the
16  State Police Academy on lifting and moving patients?
17    A.  I don't remember that training.  I remember
18  the first -- I remember the first aid portion of
19  training based on its title, First Aid, but I don't
20  remember the specific training we were given.
21    Q.  And of course you would have already had your
22  own training as an EMT; correct?
23    A.  Yes and my certificate expired in 2008 I
24  believe.

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 225

1    Q.  Do you recall a portion of the training at the
2  State Police Academy having to deal with spinal
3  injuries and identifying signs and symptoms of those?
4    A.  I don't recall it, no, sir.
5    Q.  Or care for spinal injuries?
6    A.  I don't recall that, no, sir.
7    Q.  All right.  Back to your case report that's
8  there.  On Page 8 at the bottom it states "Once across
9  the tracks, the suspect stated he could not feel his
10  legs."
11    A.  Page 8?
12    Q.  I see it on 8, at the bottom of 8.
13    A.  Okay, I'm sorry, that's Page 7 on mine, I
14  believe.  Is that right?
15          MR. RUGGIER:  On mine it's Page 8.
16          THE DEPONENT:  It's not mine.
17    Q.  Oh, there's two different page numbers.
18  There's a South Charleston PD case number.
19    A.  I'm on 7.
20    Q.  Yeah, but look, I'm looking at this over here.
21    A.  But that one is 6.  Yours is 6.
22    Q.  That's a different page.  Hold on.  Hold on, 8
23  of 13 is the second.
24    A.  Oh, I'm sorry, okay.

Page 226

1    Q.  We're good.  I was just looking -- there's two
2  pages numbers.
3    A.  We're reference the same thing?
4    Q.  Same document.  Bottom left corner of Exhibit
5  8, page 8 of 13, okay, down here, last couple
6  sentences.
7    A.  Okay.
8    Q.  "Once across the tracks the suspect stated he
9  could not feel his legs."  Now, you didn't mark that in
10  your report for prior to being across the tracks,
11  anything about him saying he couldn't feel his legs,
12  did you?
13    A.  He never stated he couldn't feel his legs
14  prior to being moved until after being moved.
15    Q.  First time that he complained to you of not
16  being able to feel his legs was after you all drug him
17  across the tracks?
18    A.  I believe he complained that to Patrolman
19  Harvey, yes, and Harvey related to me, yes.
20    Q.  Okay, so the first time he told somebody about
21  not feeling his legs was after Patrolman Harvey had
22  been told that?
23    A.  After we moved Mr. Means across the railroad
24  track, when I go back to my vehicles, when I came back

Page 227

1  over to Mr. Means and Harvey, that's when I was
2  informed of --
3    Q.  Okay and we watched the video.  That's after
4  the alleged stomping or stepping over or whatever
5  occurred, that's the first time that Patrolman Harvey
6  told you Mr. Means said, hey, I can't feel my legs?
7    A.  Yes.
8    Q.  Mr. Means never complained of that to you
9  prior to you, in the video, running back over to your
10  cruiser and then coming back over and talking to
11  Harvey; correct?
12    A.  No, sir.
13    Q.  No, sir that he never complained of that to
14  you?
15    A.  No, sir.  He never -- his chief complaint was
16  drowning.  When I came back to Mr. Means and Patrolman
17  Harvey, he was complaining of not being able to feel
18  his legs.
19    Q.  I can see that.  All right.  That line "Once
20  across the tracks, the suspect stated he could not feel
21  his legs and still felt as if he was drowning and
22  requested his helmet be removed.  I informed him that
23  the OC probably was adding to his issue and we were not
24  removing his helmet as it can help stabilize his neck

Page 228

1  and spine."
2    So at the time he's complaining to have his helmet
3  removed, you've now been informed by Harvey, hey, he's
4  saying he can't feel his legs and you're thinking we're
5  not removing your helmet because you could have a
6  spinal injury?
7    A.  Could possibly be injured further, yes, sir.
8    Q.  Understood.  The next line, "I did observe the
9  suspect to have white foam," this is the top of Page 9
10  of 13, "white foam around his lips at this time, a
11  possible sign of substance abuse."  If you look at the
12  pictures I gave you in the next exhibit, there's some
13  pictures of Billy, there's two of them.  I'm assuming
14  you took them?
15    A.  Yes, sir.
16    Q.  The first picture he's got the jacket on?
17    A.  Yes, sir.
18    Q.  You see that?
19    A.  Yes, sir.
20    Q.  And he's got what looks like spit to me around
21  his mouth.  Is that what you're talking about, the
22  white substance?
23    A.  No, sir.  No, sir.  These were taken after the
24  EMS was there and the handcuffs had been moved to the

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 229

1   front and they removed his clothing.  These two photos
2   were taken once EMS arrived.
3      Q.   I see on the second photo where he just has
4   the tee shirt on and the stuff's cut?
5      A.   I got to go back to it, I'm sorry.
6      Q.   That's all right.  The one that's got the big
7   bruise on his arm, I see that one and it looks like the
8   handcuffs have been moved to the front.
9      A.   Right.
10     Q.   The one immediately prior to that, looks
11  pretty clear to me like he's got his arms behind him.
12  You can see it on the left arm and the jacket is still
13  on?
14     A.   Yes, sir.
15     Q.   That looks to me like the picture is taken
16  when his hands are cuffed behind his back.
17     A.   So in this series what was happening here is I
18  went off to -- Corporal Vineyard, Sergeant Moyer
19  Lieutenant Paskal had come.  Corporal Vineyard and
20  Patrolman Harvey remained with Mr. Means until he was
21  loaded in the ambulance.
22     Q.   Okay.
23     A.   I went off to photograph the scene.  The
24  trooper and deputy arrived in terms of coming back and

Page 230

1   taking these photographs, that's when EMS was there and
2   they were beginning to speak with Mr. Means and move
3   these cuffs and do whatnot because Harvey did both
4   cuffing procedures and those are Harvey's cuffs.  I
5   don't have any hinged cuffs.  I notice that now.
6      Q.   What's the difference in his cuffs versus your
7   cuffs?
8      A.   I don't have any hinged cuffs.  I mean, I'm
9   older.  I still have the basic handcuffs.
10     Q.   Got ya.
11     A.   I don't have any plastic things or anything
12  like that.  They're just the regular metal cuffs.
13     Q.   Okay.  Once you came back over after going to
14  radio for everybody and then you come back over and
15  Harvey says he's saying he can't feel his legs.
16     Billy asks to remove his helmet, you realize as a
17  prior EMT and with your law enforcement training, be
18  dangerous to remove the helmet because he needs to keep
19  his spine immobilized; right?
20     A.   Uh-huh.
21     Q.   Right?
22     A.   Yes, sir.
23     Q.   Once that occurs, at that point you wouldn't
24  want to move Billy in terms of rolling him over from

Page 231

1   front to back or any of that kind of stuff until EMT
2   arrived and then can do an assessment and figure out
3   what needs to be done?
4      A.   He was not moved until the EMTs arrived.
5      Q.   I see.  So, for instance, it would be bad for
6   Billy if somebody would have rolled him over from front
7   to back for instance?
8      A.   Yes.
9      Q.   Okay.  And you would not have wanted yourself
10  or Patrolman Harvey to have done that; right?
11     A.   I'm sorry?
12     Q.   You would not have wanted yourself or
13  Patrolman Harvey to have done that; right, roll him
14  over from back to front or front to back?
15     A.   I didn't roll him over from back to front,
16  sir.
17     Q.   I understand.  I'm saying you wouldn't have
18  wanted to do that; right?
19     A.   Sir, you got to think of the situation.  He's
20  been brought from the ravine.  He's not been cleared of
21  weapons.  He's not been cleared of any substances and
22  he was -- he had to be handcuffed.
23     So in terms of that thinking, Patrolman Harvey,
24  from what I remember, what he stated to me, rolled him

Page 232

1   over on his side and cuffed one hand at a time behind
2   his back and then from that point forward he wasn't
3   moved from his back until the EMS people arrived.
4      Q.   Okay.
5      A.   I believe he was on his left side when Harvey
6   cuffed him, but I'm not positive.
7      Q.   So when you all drug him across the track he
8   was on his back?
9      A.   When we moved him across the tracks.
10     Q.   You can use whatever term you want.  After he
11  was moved across the tracks, when you go back to your
12  cruiser, did you leave him laying on his back?
13     A.   He was still on his back, sir, back facing up,
14  when I left, when I left him and Officer Harvey.
15     Q.   When you came back over, was he handcuffed at
16  that point?
17     A.   I don't recall.
18     Q.   Would you agree with me that once someone
19  complains of having trouble feeling their legs and
20  they've been cleared for weapons or secured, handcuffed
21  or whatever, at that point you should not take any
22  action or as little action as possible to move them
23  or maneuver them until the EMTs arrive?
24     A.   I agree.

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 233

1    Q.  Because it can be dangerous for a spinal cord
2  injury; correct?
3    A.  Yes.
4    Q.  All right.  Let's get back to your case
5  report.  Let's go to Page 10 of 13.  The paragraph
6  towards the bottom of the page, this is your report;
7  right?
8    A.  It is.
9    Q.  And it says "Based on the combination of
10  speed, length/duration of pursuit and road conditions
11  which created a hazard for the pursuing officers, the
12  public and Means, I obtained a warrant for Means for
13  fleeing with reckless indifference on 07 May 2020;"
14  right?
15    A.  Yes, sir.
16    Q.  Would you agree with me that you believed at
17  the time you wrote this that the combination of the
18  speed, the length and duration of the pursuit and the
19  road conditions created a hazard not only for the
20  pursuing officers, but also for the public and
21  ultimately for Billy Means?
22    A.  In the initial portion of the pursuit, no, but
23  in the end, yes.  Towards the end, yes.
24    Q.  Where in this paragraph do you make that

Page 234

1  distinction?
2    A.  I don't, sir.
3    Q.  I didn't think so.
4    A.  No, sir.
5    Q.  At the time you wrote this report, either on
6  May 2nd, 2020 or somewhere between then and May 7th,
7  2020, you did not know that a video existed that had
8  been taken by bystanders at the scene of this, did you?
9    A.  No, sir.  All right.  Let's mark this one as
10  number --
11        MR. FORBES:  What am I on?
12        COURT REPORTER:  Ten.
13    Q.  -- 10.
14        PETERSON DEPOSITION EXHIBIT NO. 10
15            (Photograph of License
16            Plate was marked for identification
17            purposes as Peterson Deposition Exhibit
18            No. 10.)
19    Q.  This is a picture of a license plate produced,
20  I believe, by you all in the discovery either in this
21  case or in the State criminal prosecution.  Is this the
22  license plate with the expired registration that was on
23  Billy Means's bike?
24    A.  Yes, sir.

Page 235

1    Q.  Okay.
2        MR. FORBES:  Let's mark this as 11.  Do
3  you need another copy of the Response and Vehicle
4  Pursuit Policy?
5        MR. RUGGIER:  No.  As long as he has it
6  it's fine.
7        PETERSON DEPOSITION EXHIBIT NO. 11
8            (Emergency Response and
9            Vehicle Pursuit Policy was marked for
10            identification purposes as Peterson
11            Deposition Exhibit No. 11.)
12    Q.  Officer Peterson, do you recognize that
13  document?
14    A.  I do yes, sir.
15    Q.  What is it?
16    A.  It's the South Charleston Police Department's
17  Emergency Response and Vehicle Pursuit Policy.
18    Q.  Are you familiar with this policy?
19    A.  Somewhat.
20    Q.  Is this a policy that, in your position as a
21  law enforcement officer with South Charleston, you're
22  suppose to be familiar with?
23    A.  Yes.
24    Q.  Is this a policy that you have to abide by?

Page 236

1    A.  Yes, sir.
2    Q.  Hey, at the end on that, the last page of it,
3  Section 24.0.
4    A.  Uh-huh.
5    Q.  What's that?
6    A.  In car audio and video recording equipment
7  policy to be effective at a later date.
8    Q.  Do you know how long that's been in the
9  Policies and Procedures?
10    A.  No, sir, I don't.
11    Q.  Okay.  The 20 -- I'm jumping around a little
12  bit on you, but I'm trying to streamline this because I
13  know it's getting late.  The 2011 and 2017 incidents we
14  talked about that you got the write ups for, were your
15  write ups for violations of other portions of the
16  Policy and Procedure Manual?
17    A.  Yes, sir.
18    Q.  So in other words, the portion I got produced
19  in discovery here, they didn't give us a full one, they
20  gave us starting with 23.0 and they gave us from Page
21  141 to 146.  We weren't provided with the rest at this
22  point.
23        Would it be fair to say, though, that the rest of
24  the Policy and Procedure Manual, there's portions of

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 237

1  that for what you agreed to the suspension time for
2  having violated?
3      A.  In my off duty conduct, yes, sir.
4      Q.  Well, the 2017 incident in your off duty
5  conduct.  The 2011 incident, are you sure that the
6  write ups are only for off duty conduct there?
7      A.  The one -- the one instance was during my work
8  hours where I went to her apartment and began to engage
9  in activity and left to a call.
10     Q.  Okay.  And she was a witness for you all in
11 criminal, at least one criminal investigation; right?
12     A.  Yes and that -- I'm not saying that we met and
13 this happened.  We met, there was time in between.
14 That case was -- I'm not talking about her case, the
15 other case was adjudicated and then we did see each
16 other.
17     Q.  I understand.
18     A.  After that person's case was adjudicated.
19     Q.  Okay.  So let me ask you with respect to that.
20 Did -- did her particular case get dismissed before or
21 after the sexual relationship began?
22     A.  I don't recall, but I would say it was before
23 because the entire case had been adjudicated.
24     Q.  The case involving whoever she was giving you

Page 238

1  information on?
2      A.  Yes, sir.
3      Q.  Did -- do you know if she ever testified in
4  any cases for you?
5      A.  She did not testify on any cases for us, no,
6  sir.
7      Q.  Did she ever provide you with any additional
8  information after the relationship that you had with
9  her?
10     A.  No, sir.  After the relationship we've had?
11 We've not spoke since -- we've not spoke since I talked
12 to that guy and we ended that, that seeing each other,
13 prior my suspension, prior me knowing that that
14 envelope was passed around.  We ended that relationship
15 when that man contacted me.
16     Q.  Okay and not even about the relationship, but
17 did she -- was she then, to your knowledge, used in any
18 investigations at South Charleston after that point?
19     A.  She was not.
20     Q.  Did she make -- I know that the guy made some
21 kind of complaint, whatever this was, did this Amber or
22 whatever her name was, did she make any type of
23 complaint that you were using your power as a police
24 officer or your color of title or anything like that in

Page 239

1  order to get her to engage in this sexual relationship?
2      A.  No, sir.
3      Q.  Did this guy who dropped the envelope off, did
4  he make any complaint along those lines?
5      A.  No, sir.
6      Q.  And, again, you don't know what was in the
7  envelope?
8      A.  I know that his complaint was that I was at
9  their residence in a City vehicle or a vehicle engaged
10 in sexual activity in his driveway and then also in
11 his -- in their apartment which she lead me to believe
12 was her apartment.
13     Q.  Do you know if there was any photographs or
14 anything in the envelope?
15     A.  No, sir.  I don't know the contents of the --
16 I don't remember the contents of the envelope.
17     Q.  That's what I was asking about.  Sounds like
18 you kind of knew what parts of it were, but not the
19 whole thing.  I was trying to make sure --
20     A.  After speaking to him, it was a letter
21 basically to me saying, you know, this is the activity
22 I know you're engaged in, you know, and this is who I
23 am, you know, whatnot and whatnot and it needs to stop.
24     Q.  All right.  Let's just take a couple minutes

Page 240

1  and let me look at my notes.  We're about done.
2          MR. RUGGIER :  Sounds good.
3          VIDEO OPERATOR:  Time is 6:53 p.m.  We're
4  off the record.
5          (A brief recess was taken after which the
6  deposition continued as follows:)
7          VIDEO OPERATOR:  Time is 7:01 p.m.  We're
8  on the record.
9  BY MR. FORBES:
10     Q.  Officer Peterson, do you live in Kanawha
11 County?
12     A.  I do.
13     Q.  You still live in South Charleston?
14     A.  I do.
15     Q.  Are you married or single?
16     A.  I'm engaged.
17     Q.  What's your fiance's name?
18     A.  Cassie Burgess.
19     Q.  Have you been married previously?
20     A.  I have.
21     Q.  Can you give me the names of your spouses?
22     A.  I've only been married once.
23     Q.  Okay.  Who was your spouse?
24     A.  That was Paige and her last name now is

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 241

1  Conklin, C-O-N-K-L-I-N.
2     Q.  Does she still live in the area?
3     A.  She does.
4     Q.  The lady you're engage to, I assume she lives
5  around here?
6     A.  We do.
7     Q.  You all live together?
8     A.  Yes, sir.
9     Q.  Part of what I'm doing here, if this case goes
10  to trial and we end up in jury selection process, it's
11  important if we figure out if anybody is related to
12  anybody.
13     A.  Yeah, you can talk to these people, but go
14  ahead.
15     Q.  How many kids do you have?
16     A.  Four.
17     Q.  Okay.  And are they with different mothers?
18     A.  They are.
19     Q.  Can you walk me through the names of the
20  mothers?
21     A.  I can.
22     Q.  I figured you probably could?
23     A.  Jaden or, goodness, my oldest son, his
24  mother's name is Lindsay Williams, but she just got

Page 242

1  married, so I'm not sure her married name.  Have to get
2  back with you on that.
3     Q.  That's fine.
4     A.  My middle son was the one I already gave you,
5  that's Paige Conklin.  The youngest son is Kristen
6  Tolley and my youngest is my daughter and that's Breah
7  Blake.
8     Q.  And your kids age range from what?
9     A.  They're all four years apart, sir.  They're
10  19, 14, 10 and 6, but they're all getting ready to move
11  to the next age.
12     Q.  Okay.  Let me ask you, because I don't know
13  that I actually got this kind of solidified and I want
14  to make sure I do.  Can you walk me through your
15  employment history from first job to now?
16     A.  From 1993 to 2001 I think I was employed or, I
17  mean, I think that was the dates, I was employed at
18  Derek's Roller Arena for a long time.  From my ninth
19  grade year through college I was Derek's Roller Arena.
20  After Derek's, gosh, this is awful to say, but I don't
21  remember the years, but I can give you my employers.
22     Q.  Just walk me through.
23     A.  Derek's was easy.  Okay, so I was employed at
24  the dog track, and I forgot to mention that, that was

Page 243

1  not law enforcement.  I was a security guard there, but
2  I wasn't there long enough to get a uniform.  I didn't
3  care for that.
4     I was employed at the at Pinkerton Security which
5  is the one we talked about on the east end here.  At
6  some points I had two jobs at the same time.  When I
7  worked at the roller rink I worked at two car
8  dealerships as well and Pinkerton and I was working at
9  the roller rink at the same time in between.
10     Gold Brickers Sports Bar and Restaurant was on
11  Capitol Street.  I managed the restaurant portion of
12  that for a period of time.  General Ambulance, Mesaba
13  Airlines which is a Northwest carrier.  I was at the
14  airport for five years total, two airlines and TSA, so
15  however you want to break that up.  I was with TSA for
16  a year and Chem Lawn for a short portion.
17     I didn't care for that line of work and one other
18  one that I remember was a telemarketing company on the
19  west side down by Washington Street and Millennium
20  Teleservices and I didn't care for that as well.
21     Q.  Okay.  Where did the EMT job fit into that?
22  Roughly?
23     A.  I'm going to say it was possibly 2003 or 2004.
24     Q.  Did you ever have any write ups or anything as

Page 244

1  an EMT?
2     A.  No, sir.
3     Q.  No employment issues?
4     A.  No, sir.
5     Q.  What job did you have immediately prior to
6  joining South Charleston?
7     A.  The TSA.
8     Q.  Okay.
9     A.  Forgive me, Verizon.
10     Q.  Verizon.  Got ya.  And did you, when you
11  joined South Charleston, how did that come about, did
12  you just apply for an open testing or, I mean, what?
13     A.  I applied at South Charleston and Charleston
14  and some other agencies and was on Charleston and South
15  Charleston's list.  South Charleston interviewed me
16  first and then when I was in the Academy, two weeks
17  into the academy, Charleston called me and offered me a
18  job and I declined as I started with South Charleston.
19     Q.  So you were already started with South
20  Charleston then at the Academy when Charleston offered
21  you a position?
22     A.  Yes.
23     Q.  When you start with South Charleston, do you
24  go out on the street first or do you go straight to the

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 245

1  academy?
2      A.  Here we started in August.  We did a bunch of,
3  I think it was August 11th is when I got hired, we did
4  a bunch of instruction stuff, the range, and then I
5  went to the Academy in September.
6      Q.  Let me jump back to the beginning.  That
7  Robinson case that you testified about?
8      A.  Yes, sir.
9      Q.  Were there allegations in the Robinson case
10  involving falsifying a document?
11      A.  No, sir.
12      Q.  Okay.  What are your -- what's your
13  understanding of the allegations of the Robinson case?
14      A.  So in the Robinson case, like I said, they
15  were codefendants and there wasn't much documentation.
16  It was a refile based on another patrolman's --
17      Q.  Would you agree with me that you refiled;
18  right, so first a patrolman filed, the case got
19  dismissed, you refiled the charge; correct?
20      A.  Sergeant Moyer and I did, yes.
21      Q.  And in the refiling there's an omitting of
22  information that was in the first filed complaint;
23  correct?
24      A.  I don't recall that at all.

Page 246

1      Q.  Okay.
2      A.  We would have to go over that.  I don't recall
3  anything being omitted.  I remember I believe we may
4  have corrected some of his grammar, but I'm not
5  positive as to what would be omitted from the criminal
6  complaint.
7      Q.  Do you remember that being an allegation in
8  the case?
9      A.  I don't recall that.  Malicious prosecution is
10  what I remember.
11      Q.  Okay.  Let me ask you this:  Would you agree
12  with me that based on South Charleston's policies for
13  vehicular pursuit, when a pursuit becomes reckless you
14  have a duty to end the pursuit?
15      A.  Based on the variations of what is going on
16  and the reconsideration of and constant review, if it
17  were to be too reckless, yes.
18      Q.  Okay.  All right.  So a little bit reckless is
19  okay?  I'm confused by this too reckless deal because I
20  don't -- it seems a strange terminology to me.  Explain
21  it.
22      A.  I guess based on my previous experience and
23  previous experiences with pursuits, initially this
24  wasn't an extremely reckless pursuit being that we

Page 247

1  didn't come into contact with any pedestrian, vehicle
2  or traffic, we weren't weaving in and out of heavy,
3  busy traffic.  There was nobody at the church.  There
4  was nobody at the park.
5      I've discontinued a pursuit before when I came into
6  heavy traffic area and the subject, even without being
7  followed, still fled and crashed a time later, so my
8  basis is relayed -- my basis relies on the previous
9  pursuits that I've had and experience that I've had in
10  terms of, I guess, justifying this pursuit.
11      Q.  Okay.  So you've discontinued a pursuit in the
12  past?
13      A.  Yes, sir.
14      Q.  Why?  Why did you discontinue that pursuit?
15      A.  We came to a heavy populated area of vehicle
16  traffic and possible pedestrian traffic.  Just a really
17  dense, populated area with pedestrian traffic and
18  vehicular traffic.
19      Q.  Are there certain number of vehicles that have
20  to be in the traffic area for it to become reckless?
21      A.  If you are -- that's based on officer's
22  discretion.  I would say based on this, we didn't meet
23  any -- we didn't force any vehicles off the roadway.
24      There was a vehicle that moved off the roadway,

Page 248

1  that was the one that you and I were talking about that
2  I was going to show you where it was.  That was the one
3  right before the park around that turn.
4      Q.  Okay, so right before the park in the video we
5  saw earlier, there's that park with the picnic tables
6  and the basketball court and the kids' play area.  I
7  can pull up the video if you want, but we both know --
8      A.  I can give you -- yes, sir.
9      Q.  Okay.  At that point a vehicle pulled off to
10  the side to allow your pursuit to go forward?
11      A.  Yes, sir.
12      Q.  Okay.  What vehicle was that?
13      A.  That was the dark sedan, the four door sedan.
14  That's the only way I remember.  I don't remember the
15  make and model.  The first vehicle I believe
16  was a Ford Ranger, an older Ford Ranger.
17      Q.  Did that vehicle have to pull off the roadway?
18      A.  That vehicle continued past us and that was on
19  Rabel Mountain Road.
20      Q.  Okay, so Rabel Mountain Road, when you passed
21  that vehicle, about where on Rabel Mountain, do you
22  know?
23      A.  When we were coming up out of the creek bed
24  and we turn left, there's a straight stretch there and

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 249

1 we passed that Ford Ex or, excuse me, Ranger then.
2    Q.  Before or after Harvey joined the pursuit?
3    A.  That was before.
4    Q.  Okay.  The vehicle at the park, it pulled off
5 to the side and you guys continue around that sort of
6 turn at the park.  Do you know about where the vehicle
7 had to pull off?
8    A.  No, sir.
9    Q.  Did you ever --
10    A.  I just -- go ahead.
11    Q.  Did you ever talk to the people in the
12 vehicle?
13    A.  Sir, we didn't see any other traffic that day
14 other than the yellow Jeep and we didn't speak to
15 anybody.  Nobody stuck around.  Nobody stayed around.
16    Q.  Was there a Monte Carlo that kept driving
17 around the scene?
18    A.  Black Monte Carlo.
19    Q.  What was the story there?
20    A.  I don't know.  That car passed the tracks and
21 kept coming back and forth.  I don't know if that was a
22 gawker or somebody knew what was going on or what, but
23 there was a black Monte Carlo that came up and back on
24 the railroad tracks.

Page 250

1    Q.  When did you first see the black Monte Carlo?
2    A.  Well, it was -- it had been there two
3 different times if not three, but I don't remember
4 specifically.  I did see it cross the tracks and then
5 come back once that I know of.  But the other officers
6 had seen it as well and then, of course, there was that
7 red truck that was in the pictures.
8    Q.  Did anyone ever talk to, to your knowledge,
9 from any police agency, talk to the people in the black
10 Monte Carlo or the red truck?
11    A.  No, sir.
12    Q.  Are there a certain number of pedestrians that
13 have to be involved when you're in a pursuit before you
14 call it off?
15    A.  No, sir.  I didn't observe any pedestrians on
16 that date.
17    Q.  What about the dog?  The dog was in danger;
18 right?
19    A.  The dog was in danger?
20    Q.  Yeah.
21    A.  Yes, sir.
22    Q.  You guys didn't stop this pursuit at the park
23 when the guy pulled off in the dark sedan, did you?
24    A.  No, sir.  We were slowing to take that turn at

Page 251

1 that time.
2    Q.  But, I mean, you guys did not discontinue the
3 pursuit, you continued that pursuit; right?
4    A.  We continued to pursue Mr. Means, yes.
5    Q.  And you continued to pursue Mr. Means after
6 you saw the dog; right?
7    A.  Sir, I don't know if you'd call that an act of
8 nature.  I mean, the vehicle obviously is more
9 observant, more forward coming.  The dog is what I'm
10 going to say was unpredictable, but no, if you're
11 asking me if we stopped after we swerved around -- I
12 had to swerve around the dog.  I believe Mr. Means went
13 to the left of the dog and I went to the right and it
14 continued to cross the road.
15    Q.  Your vehicle nearly hit the dog too?
16    A.  Well, if that dog's running in a path down the
17 road, yes, sir.
18    Q.  You didn't discontinue the pursuit at that
19 point?
20    A.  After we almost struck the dog?
21    Q.  Correct.
22    A.  No, sir.
23    Q.  And you knew that the pursuit became reckless
24 at some point; right?

Page 252

1    A.  When we came onto Emmons Road, I know we
2 didn't go through the video either, we talked about, I
3 talked about a coned off area that was on a straight
4 stretch.
5    Mr. Means, Harvey and I were able to see there was
6 no traffic coming either although he did - what am I
7 trying to say - he did not obey the traffic signal, I
8 guess, there at the time.
9    Q.  The alternating traffic or whatever?
10    A.  Yes, sir, there was no traffic, but the only
11 traffic --
12    Q.  Luckily; right?
13    A.  I'm sorry?
14    Q.  Luckily; right?
15    A.  We could see that and I believe that's when
16 Harvey's talking about he was going 40 miles an hour or
17 whatever.  That was prior to us turning on Emmons Road,
18 but, yes, after the straight stretch on Emmons, there
19 was a point on Emmons where it runs along the river
20 that we'd slowed down because it was -- it's in a
21 different elevation, so Mr. Means slowed down and we
22 slowed down.
23    Q.  My question was there's a point where this
24 pursuit became reckless; right?

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 253

1    A.   From the end, okay, let's say maybe two
2  minutes prior, three minutes before Mr. Means crashed,
3  yes, sir.
4    Q.   Okay, so two to three minutes prior to the
5  crash the pursuit was reckless?
6    A.   In those straight stretches I say Mr. Means's
7  operation of his vehicle became reckless.
8    Q.   And you wrote in your own report it became a
9  danger to the pursuing officers; right; is that right?
10   A.   Yes.
11   Q.   It became a danger to the public; correct?
12   A.   Yes.
13   Q.   And it became a danger to Billy Means; right?
14   A.   Yes.
15   Q.   And what you wrote there is true; correct?
16   A.   Yes.
17   Q.   Because this pursuit became reckless and
18 became a danger to all three of those categories that I
19 just mentioned; right?
20   A.   Yes.
21   Q.   You were instructed at the beginning of the
22 pursuit by Lieutenant Paskel that if it became reckless
23 to stop the pursuit; right?
24   A.   Yes, sir, at the beginning initially, that's

Page 254

1  correct.
2    Q.   Okay. Hey, what does serious felony mean to
3  you?
4    A.   Serious felony?
5    Q.   Yeah, I mean, do you know what, you know, you
6  can look -- in fact, if you want to look in the exhibit
7  on the emergency response and vehicular pursuit, Page
8  142, it defines serious felony.
9    A.   Oh, I understand on 142. If you look at 23.12
10 it says "If a suspect is known to commit a serious
11 felony or if a felony is being committed, the person
12 fleeing is a suspect, every reasonable effort will be
13 made to apprehend him."
14      I didn't know who he was. I believe, like I said,
15 this thing could be altered, possibly stolen. I
16 believed this motorcycle was stolen based on my
17 previous dealings with altered and painted vehicles. I
18 believed this was possibly a felony in progress.
19      Might it be a murder or something? No. Might it
20 be a violent assault or rape? No, sir. I believe this
21 could possibly be a felony.
22   Q.   Would you agree with me that under 23.2 in the
23 policies and procedures of South Charleston that a
24 serious felony states "A felony that involves an actual

Page 255

1  or threatened attack which the officer has reasonable
2  cause to believe could or has resulted in death or
3  serious bodily injury, i.e. aggravated assault, armed
4  robbery or murder."
5    A.   That's in terms of definitions, yes, sir.
6    Q.   Yeah. Okay. All right. We've been over
7  this, but I want to make sure, based on what you just
8  said, we both understand it because I understand you're
9  saying that in your mind you think this might have been
10 a stolen bike. As we sit here today, a year later --
11   A.   Yes, sir.
12   Q.   -- a couple days over a year later; right, you
13 don't have any information that that bike was actually
14 stolen, do you?
15   A.   Sir, I've never been able to locate the
16 registered owner of that vehicle because it's not
17 registered to anyone. We asked the DMV, excuse me, we
18 asked the dispatchers through communication if they can
19 figure out who this bike belongs to and they didn't and
20 they were able to use a system called Inlets, which I
21 don't know anything about, I can't speculate or
22 understand what or how they determined what this
23 motorcycle was.
24   Q.   Are you aware that the motorcycle, that Billy

Page 256

1  Means built motorcycles and the motorcycle was various
2  parts of different bikes? Are you aware of that?
3    A.   I'm not aware of that or I wasn't aware of
4  that, excuse me.
5    Q.   You didn't charge Billy Means with stealing
6  that motorcycle?
7    A.   We're unable to determine if that motorcycle
8  was stolen and we were unable to determine who the
9  registered owner of that motorcycle is.
10   Q.   So that's a no to my question? You did not
11 charge Billy Means with stealing that motorcycle?
12   A.   No because I could not prove that it was
13 stolen.
14   Q.   In fact, you don't have any information it was
15 stolen, do you?
16   A.   Or who the registered owner was, no, sir, I
17 don't.
18   Q.   At the time you initiated the pursuit, the
19 only lawful reason you had to stop Billy Means was the
20 expired registration and the dead sticker; correct?
21   A.   That was, yes. Yes, my belief was based on
22 my --
23   Q.   I understand what your gut reaction --
24      MR. RUGGIER:  Wait, let him talk. He

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 257

1   gets to answer it.
2       MR. FORBES:  I've been letting him talk.
3       A.  I know we're going around, but based on my
4   belief, people spray paint and alter vehicles so they
5   don't show the make and the model.  I've had multiple
6   vehicles that were spray painted different colors to
7   hide their make and model and/or just simply the color
8   and some people leave the registration still on them.
9       They paint them thinking that's going to change an
10  officer's mind based on that.  That's why on that date
11  I continued to follow that vehicle instead of take Rick
12  breakfast and go on about my day.
13      I'm sure that there are occasions where improper
14  registrations don't lead to a stolen motorcycle which,
15  then again, we haven't determined that on this, but
16  that's why I continued on that day.
17      **Q.  I understand.  I'm just making sure that we**
18  **both are on the same page, but you agree with me at the**
19  **time you initiated the pursuit, the only lawful reason**
20  **to stop him was the registration and the expired tag?**
21      A.  Yes.
22      **Q.  Would you also agree with me that there are a**
23  **lot of perfectly legal motorcycles out there that are**
24  **spray painted matte black?**

Page 258

1       A.  Sir, I haven't seen many people spray paint
2   over the emblems or the model like a Suzuki or a Ninja
3   or anything like that.  I have not seen many people
4   spray paint their motorcycles.
5       **Q.  Would you agree with me that in 23.94 of your**
6   **regulations under Termination of Pursuit that the**
7   **underlined part there in the first paragraph where it**
8   **says shall, that shall means shall; right?  It's not**
9   **may, you don't get a choice, it means shall.**
10      A.  I don't know the Webster's dictionary of
11  shall, but I agree that it says shall.
12      **Q.  Okay.  The next section under responsibility**
13  **23.95.**
14      A.  Yes, sir.
15      **Q.  It says "The initial pursuing unit will be**
16  **responsible for the conduct of the pursuit."  That**
17  **would be you; right?**
18      A.  Yes, sir.
19      **Q.  At the end of this at 23.15 and 23.16 there's**
20  **a part about reporting and a pursuit notification**
21  **report.**
22      A.  Okay.
23      **Q.  And then there's a part about a pursuit**
24  **review.**

Page 259

1       A.  Yes, sir.
2       **Q.  Are you aware whether a pursuit notification**
3   **report was done following this incident?**
4       A.  Sir, if there's a report notification, what
5   did you call it, a report notification?
6       **Q.  They call it in here under 23.15 it says "Any**
7   **time a member is involved in a pursuit, the supervisor**
8   **will write a pursuit notification report before**
9   **completing his or her tour of duty and forward it to**
10  **the chief."**
11      A.  Okay.
12      **Q.  Do you know whether a pursuit notification**
13  **report was done from this incident?**
14      A.  Sir, the only thing that I know is that the
15  lieutenant contacted, I believe, the assistant chief or
16  the chief and let them know about this pursuit and
17  that's been primarily what the lieutenant or the
18  sergeant does when we have pursuits.
19      In terms of the shift that I was on on that date,
20  we have a debrief afterwards and we talk about the
21  incident.  But in terms of what you're stating here,
22  I've not seen that form.
23      **Q.  Who was present at the debrief that day?**
24      A.  The officers that were involved.

Page 260

1       **Q.  Which --**
2       A.  I mean, it was the shift.
3       **Q.  The whole shift; right?**
4       A.  Yes, sir.
5       **Q.  Who was the supervisor of the shift?**
6       A.  Lieutenant Paskel.
7       **Q.  The next, part 23.15, Reporting, no, I'm**
8   **sorry, next part, 23.16, Pursuit Review.  Says "The**
9   **chief of police will conduct an administrative review**
10  **in each pursuit to ensure compliance."  Are you aware**
11  **of any administrative review that was done from this**
12  **pursuit?**
13      A.  Sir, that would have to be handled or that
14  would have to be asked of the administration.  I am
15  not.
16      **Q.  Understood.  Are you aware of ever having any**
17  **kind of written pursuit notification report done from**
18  **any of your pursuits?**
19      A.  I'm sorry.  One more time.
20      **Q.  Sure.  It says, I'm back under 23.15.  Are you**
21  **aware of a written pursuit notification report being**
22  **done from any pursuit you've been involved in?**
23      A.  I'm not aware of that report.
24      **Q.  Okay, so you don't know whether one was done**

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 261

1  here or not?
2      A.  I don't know.  I don't know that -- I don't
3  know that Paskel completed this form or whatnot.  I
4  have not seen this form that this speaks of or report.
5      Basically the accident or, excuse me, my report was
6  completed, a jurisdiction accident report was
7  completed, so that's the only reports that I know are
8  completed and Sergeant or, excuse me, Patrolman
9  Harvey's narrative.
10     Q.  And you know Patrolman Harvey did a use of
11 force report?
12     A.  Yes.  Based on the -- yes.
13     Q.  Give me just a second here.  Are you aware
14 that 23.15 states that the supervisor will write a
15 pursuit notification report.  Would you agree with me
16 that that says they have to write that?
17     A.  Yes.
18     Q.  All right.  Let me show you one more
19 electronic picture and we'll make this Exhibit Number
20 12 and we'll send this to the court reporter
21 electronically.
22         MR. FORBES:  Duane, you want to look at
23 it first?  It's a picture from the inspection.
24         MR. RUGGIER:  Yeah.

Page 262

1      Q.  All right.  Do you recognize this picture or
2  do you recognize what's in this picture I guess would
3  be a better way to describe it?
4      A.  That is a motorcycle.
5      Q.  Okay.  Are you aware this is your -- the
6  cruiser that was involved that day?
7      A.  If you tell me.  Is that my cruiser?
8         MR. RUGGIER:  You're the one being asked
9  the question.
10     A.  I don't know.  I don't see the number on it,
11 sir.
12     Q.  Are you aware an inspection was done in this
13 case where a motorcycle and your cruiser were
14 inspected?
15     A.  Yes, sir.
16     Q.  Okay.  All right.  I'm going to represent to
17 you that this was a picture taken of the motorcycle and
18 your cruiser.
19     A.  Yes, sir.
20     Q.  Are you still driving the same cruiser?
21     A.  Yes, sir.
22     Q.  Has there been any body work done to the
23 cruiser since May 2nd, 2020?
24     A.  No, sir.

Page 263

1      Q.  We got the video of the FBI interview and
2  watched it and they asked you that question and you
3  replied that there's been routine maintenance.
4      A.  Uh-huh.
5      Q.  What's routine maintenance?
6      A.  Oil changes, tire rotation, brakes and so
7  forth.
8      Q.  Okay, but to your knowledge, no paint jobs,
9  fender repairs, buffing out scratches or stuff like
10 that?
11     A.  No, sir.  We have two different departments
12 that do that.  Our City garage does all the routine
13 maintenance and another shop elsewhere does all our
14 body work.
15     Q.  Okay and to your knowledge since May 2nd, 2020
16 the SUV you were involved in has not had any body work?
17     A.  No, sir.
18     Q.  Hasn't been to that other shop that does body
19 work?
20     A.  No, sir.
21     Q.  Let me ask you:  Can you see this light
22 scratch area up here?
23     A.  I do.
24     Q.  Do you know what that's from?

Page 264

1      A.  Yes.
2      Q.  What was it?
3      A.  A vehicular accident on 11, well, I'm going
4  say 11 of '19 because I don't know the exact date.
5      Q.  Okay.  What happened with that vehicle
6  accident?
7      A.  That vehicle was -- do you know where South
8  Ridge Boulevard and the One Stop is?
9      Q.  Yes.
10     A.  Okay.  That vehicle came to pass me on an
11 upper edge, like if you have a curve or the mulchy
12 grassy area and struck it, passed me on the right and
13 struck me on the front fender.
14     Q.  What kind of vehicle was it?
15     A.  It was a motorcycle, but I don't know the make
16 and model.
17     Q.  What color was it?
18     A.  I don't remember that, sir.  I wasn't behind
19 it, it was behind me.
20     Q.  Was there a report done?
21     A.  Yes.
22     Q.  Was somebody determined at fault or pay any
23 damages for it?
24     A.  The insured was to pay for the fender.

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 265

1    Q.  Do you know if that was done?
2    A.  That was never done.
3    Q.  Okay.  If we asked for a copy of that report,
4  is that something you can get for us?
5    A.  The accident report, sir?
6    Q.  Yeah.
7    A.  Yes, sir.
8    Q.  Do you know who did the accident report?
9    A.  Sheriff's deputy and I believe his last name
10  is Gaddy, G-A-D-D-Y.
11    Q.  Okay.  See the scratches up here in the front
12  by the light?
13    A.  Yes, sir.
14    Q.  What's that from?
15    A.  That's from a construction cone in the exact
16  same stretch of highway we were talking about on 119
17  south.
18    Q.  What happened with the construction cone?
19    A.  I struck a construction cone.
20    Q.  Do you need to do a report when you damage the
21  vehicle like that?
22    A.  When it's something cosmetic like this, no.
23  If I was striking another vehicle, I have had prior
24  accidents and notified my supervisors and persons

Page 266

1  immediately, but in terms of this, this was -- I
2  informed my supervisor of this and the assistant or the
3  patrol, they call them the patrol commander now.
4    Q.  So the scratches on the front of the vehicle
5  from the cone are not reported anywhere?
6    A.  No, sir.  Well, they are on a vehicle
7  inspection form.
8    Q.  Okay.
9    A.  It's done once monthly.
10    Q.  You get a vehicle inspection form once a month
11  done.  Who does the inspection?
12    A.  We were talking about that earlier.  That's
13  the sergeant or the lieutenant.  That's done on Sunday
14  day shift once a month.
15    Q.  So when they do the inspection of the
16  vehicles, they actually produce a written report?
17    A.  Should -- they should, sir, yes.
18    Q.  Okay.
19    A.  It is a form.
20    Q.  What day of the month are those done?
21    A.  On Sundays.
22    Q.  Do you recall whether one was done the
23  immediate, like the next day after May 2nd, that
24  Sunday, or whether it would have been, you know, later

Page 267

1  in the month or do you know?
2    A.  If it was that morning they probably haven't
3  been completed yet because we don't do that until
4  10:00 a.m.
5    Q.  Well, the morning that this occurred was a
6  Saturday.
7    A.  Oh, Saturday.  On the following Sunday?  No
8  because the crash report, I don't know if Lieutenant
9  Paskel did a vehicle inspection on that Sunday, but a
10  crash report was done for this accident.
11    Q.  For the accident on the May 2nd by the State
12  Trooper?
13    A.  Yes, sir.  And what are you asking?
14    Q.  I'm asking about the vehicle inspection
15  report.
16    A.  Was it completed the next day on May 3rd?
17    Q.  Yeah, correct.
18    A.  I do not know.
19    Q.  There would be a record, assuming those are
20  done, a written report, there would be a record at
21  South Charleston of those vehicle inspection reports;
22  right?
23    A.  Yes.
24    Q.  Okay.  Hey, let me ask you too:  So this was

Page 268

1  the bike Billy was on in the picture here, --
2    A.  Yes, sir.
3    Q.  -- this exhibit we're looking at.  About how
4  wide would you say that bike is?  It's a street bike.
5  It's pretty narrow.
6    A.  I don't know the dimensions of street bikes,
7  sir.
8    Q.  Fair enough.  And, you know, we can get
9  measurements of the bike.  I was curious.  Looks like a
10  pretty narrow bike to me.
11    A.  Okay.
12    Q.  Let's take a -- just a break.
13       VIDEO OPERATOR:  Time is 7:33.  We're off
14  the record.
15       (A brief recess was taken after which the
16  deposition continued as follows:)
17       VIDEO OPERATOR:  Time is 7:35 p.m.  We're
18  back on the record.
19       PETERSON DEPOSITION EXHIBIT NO. 13
20          (Ambulance Report was
21          marked for identification purposes as
22          Peterson Deposition Exhibit No. 13.)
23  BY MR. FORBES:
24    Q.  I'm going to hand you what was marked as

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 269

1  deposition as Exhibit 13. Have you seen that before?

2      A.  If this was with his other medical paperwork,

3  yes.

4      Q.  And that report indicates in the narrative,

5  this is a Boone County Ambulance Authority Report, the

6  narrative it says "They were dispatched to the scene to

7  assist law enforcement via 911. 911 stated law

8  enforcement was in a high speed pursuit with subject

9  and subject had crashed." Would you agree this was a

10  high speed pursuit?

11      A.  Initially, no. In the end, yes.

12      Q.  Certainly at some portions throughout; right,

13  when you're doing 47 in a 25?

14      A.  On a straight stretch of highway, yes.

15  Unobstructed, yes.

16      Q.  All right. Next part it indicates that "The

17  patient was handcuffed and was short of breath so law

18  enforcement cuffed patient with hands in front and

19  rolled patient onto his back."

20      So this report indicates that, seems to indicate

21  that after the EMTs got there they asked to move the

22  handcuffs to the front. Is that your understanding?

23      A.  Like I said, sir, I don't remember being there

24  during the exchange of his handcuffs.

Page 270

1      Q.  Do you know if any other law enforcement did

2  that, not you?

3      A.  Sir, Harvey did whatever handcuffing there was

4  here. I didn't handcuff Mr. Means at all. I didn't

5  move my cuffs either. Like I said, when Corporal

6  Vineyard and specifically I can remember him, he and

7  Patrolman Harvey remained with Mr. Means during his

8  assessment and then until he was loaded into the

9  ambulance.

10      Q.  This indicates that law enforcement cuffed

11  patient with hands in front and rolled patient onto his

12  back seeming to indicate that law enforcement did that

13  rolling. Was that you or somebody else?

14      A.  Sir, like I said, I didn't have -- my hands

15  were not on Mr. Means after he was removed from the

16  water, moved across the railroad tracks. I no longer

17  assisted with any of Mr. Means's movements I guess is

18  what I'm trying to say.

19      Q.  Then it looks to me like on down there the

20  patient was given several medications including

21  Fentanyl; right, I see towards the end says --

22      A.  80 mcs of Fentanyl for pain.

23      Q.  And Zofran for nausea.

24      A.  Yes, sir.

Page 271

1      Q.  And the EMTs put him on a backboard and

2  secured that with spider straps; right? I think it

3  says that in the middle.

4      A.  Sir, then again, I wasn't present for that.

5      Q.  I understand. When you left, I was listening

6  to the Metro call towards the end, it sounded like you

7  made a call and had his Social Security number and

8  stuff like that at some point. Do you know how you got

9  that?

10      A.  That's not me, sir, that's Sergeant Moyer,

11  Sergeant Moyer --

12      Q.  You guys been working together so long you

13  sound alike.

14      A.  Patrolman Harvey and Vineyard, I mean, I hate

15  to say immediate because it wasn't immediate immediate,

16  but when those guys got there, I moved those cars and

17  started photograph -- I remember walking up and

18  shooting the scene back and started taking photographs

19  of everything.

20      Q.  How long after Moyer got there did the EMTs

21  arrive or did they come at the same time?

22      A.  Oh, no, sir. No, sir. If you look at that on

23  scene time, it says 8:34. It says at patient 8:35 and

24  I don't know if that's accurate or not, but Sergeant

Page 272

1  Moyer, Lieutenant Paskel and, well, actually Sergeant

2  Moyer and Corporal Vineyard, I believe, arrived first

3  and you can hear them mark out. It was maybe a minute

4  40 seconds or whatever and then Lieutenant Paskel gets

5  there.

6      Q.  Okay. When you took those pictures I gave

7  you, I don't remember what exhibit it is, you got all

8  the pictures over there. Tell me what exhibits those

9  are.

10      A.  Exhibit 9.

11      Q.  Would you flip through there and find the

12  picture that's got the backpacks?

13      A.  Yes, sir.

14      Q.  Let me make sure we're looking at the same

15  one. I think we are. Yeah, same one. So this picture

16  here has got, I mean, I see three bags here. I'm

17  trying to figure out what's going on.

18      A.  I'm not sure -- I'm not sure what this is.

19  That looks like clothing, but I'm not positive, but I

20  believe this bag was inside this bag and these contents

21  were inside this bag.

22      Q.  Okay, so you think, just for purposes of

23  making this record, we've got a picture here that at

24  the bottom has a couple canisters; right?

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 273

1    A.  Yes, sir.
2    Q.  Then we've got a blue bag on the right.  We've
3  got some kind of black something on the left with cords
4  out of it and we've got what looks like a black
5  backpack at the top.
6    A.  Yes, sir.
7    Q.  Do you think this black backpack was inside
8  the blue bag, is that what you're saying?
9    A.  All these contents came from one of these two
10  bags.  Excuse me, all these contents came from one of
11  these two bags, okay?  I believe that's clothing, but
12  I'm not positive.  I can't tell you what that is, but
13  these came from one of these two bags.  Whether this
14  bag was in this bag or this bag was in that bag.
15    Q.  Okay.  Is that how they were laying or did you
16  move them there?
17    A.  No, sir.  So when I brought them over across
18  from the creek, that's when I began to go through them.
19    Q.  Okay.  Was anybody else with you when you
20  opened them up or just you?
21    A.  I can't remember if it was just me or if -- I
22  don't remember.  I don't recall.
23    Q.  Did you take all these pictures?
24    A.  Yes.

Page 274

1    Q.  On the first picture on the front of the
2  exhibit here, okay, can you describe for me where the
3  bike went off the road?
4    A.  This bike traveled around in the corner and up
5  through here.  It didn't go around here.  It went up
6  through -- it was more of a straight -- straight --
7  more of a straight -- more of a straight angle of
8  travel.  Almost like he was going up the railroad
9  tracks.
10    Q.  I want you to draw that on here, okay?
11    A.  Okay.
12    Q.  Give you -- on the first page there on Exhibit
13  9 if you could draw me the direction of travel of
14  Billy's bike.
15    A.  The best of my recollection, through that way.
16    Q.  Do an arrow for me there.
17    A.  Meaning the direction of travel?
18    Q.  Yeah.  And then just write Billy's bike along
19  the line there.  Means bike, whatever you want.  Okay.
20  Your cruiser in the video ends up over here right on
21  the railroad tracks; right?
22    A.  Where is the one --
23    Q.  May be a better picture to do this from.
24    A.  There's one shooting back.

Page 275

1    Q.  Yeah, let's see if we can find it in there.
2    A.  There should be one going back.  There it is,
3  sir.
4    Q.  This the one you're talking about?  Mark about
5  where your cruiser was parked on it.
6    A.  I'd have to look at that video again to give
7  you an accurate depiction.
8    Q.  It was definitely up on the railroad tracks?
9    A.  It was, yes, sir.
10    Q.  You don't need to mark it then.  That's fine.
11    A.  And Harvey's was positioned here with the more
12  the ambulance in the middle in the bed of this truck
13  because, like I said, I heard him screeching to either
14  avoid me or I don't know.
15    Q.  And there's nothing on the Metro
16  communications at that point really, I mean, you come
17  on and say there's a crash and then it kind of goes
18  silent.  Did you all get out of your vehicles at
19  different times or the same time?
20    A.  That's when I relayed that he has crashed.  If
21  you hear me relay he's crashed.
22    Q.  Yeah.
23    A.  And when I'm getting out, Harvey is screeching
24  in.  He gets out.  I approached from the left, he

Page 276

1  approached from the right.  We approach Mr. Means
2  pretty much -- I'm a couple steps ahead of him, but I
3  guess at the same length of view he approaches from the
4  right, I approach from the left and I did immediately
5  go into the water.
6    Q.  Okay.  Billy's bike goes off the way you
7  showed me there on the thing and then, what, you just
8  slam the brakes on?
9    A.  I'm sorry?
10    Q.  Billy's bike goes off the railroad tracks and
11  you just slam the brakes on?
12    A.  My vehicle went more of a left turn, more
13  toward like a left turn.  Like if he'd gotten up to run
14  or something like that, I could have continued up on
15  the railroad tracks.  Patrolman Harvey's is more at a
16  straight angle.
17    Q.  About how far was your vehicle from Billy's
18  bike when it went off the railroad tracks?
19    A.  Like I said, in terms of car lengths, I don't
20  remember.  I don't recall.  We looked at that video
21  earlier and we said one, two, three, there was four car
22  lengths, so between three and a half and four.
23    Q.  I thought earlier you said it could have been
24  two?

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 277

1   A.  Originally --

2   Q.  You're just not sure?

3   A.  Originally when we looked at that, I thought I
4   said well, there's two cars, so two, then a space here
5   and then the Jeep, so between three and a half and
6   four.

7       It was -- both ours was immediate halt.  Mine was
8   immediate halt coming on the railroad tracks and
9   Harvey's was a very immediate halt because, like I
10  said, I believed he was going to strike me.

11  Q.  You understand that Billy Means is paralyzed
12  today; correct?

13  A.  Yeah.

14  Q.  I don't have any other questions.

15      MR. RUGGIER :  I just have a couple of
16  questions for you.

17          EXAMINATION

18  BY MR. RUGGIER:

19  Q.  Getting back to the reason why you initially
20  noticed Billy Means and his motorcycle.  When you --
21  what was your initial reason for getting behind Billy
22  Means?

23  A.  What caught my eye was the spray painted
24  motorcycle in which I couldn't tell a make or model.

Page 278

1   Q.  Did that make you think that the motorcycle
2   might be stolen?

3   A.  Yes.

4   Q.  And when you get behind Billy Means, does he
5   continually look back at you?

6   A.  Yes.

7   Q.  Does that make you think that the motorcycle
8   might be stolen?

9   A.  Yes.

10  Q.  And when the registration came back, did that
11  make you think that the vehicle, the motorcycle, might
12  be stolen?

13  A.  Yes.

14  Q.  And when you go to turn on your lights and
15  initiate a stop and Billy fled on his motorcycle, did
16  that make you think that the motorcycle might be
17  stolen?

18  A.  Yes.

19  Q.  Do you agree with me that one of the reasons
20  why you attempted to pull over Billy Means was because
21  you thought the motorcycle might be stolen?

22      MR. FORBES:  Object to the form.

23  A.  Yes.

24  Q.  I don't have any further questions.

Page 279

1       MR. FORBES:  Is he going to read or
2   waive?

3       MR. RUGGIER :  He will read.

4       VIDEO OPERATOR:  Time is 7:49 p.m. and
5   this concludes the deposition.

6       (Having indicated he would like to read
7   his deposition before filing, further this deponent
8   saith not.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 280

1   STATE OF WEST VIRGINIA,
    COUNTY OF KANAWHA, to wit;

2

3       I, Angela L. Curtis, a Notary Public within and
    for the County and State aforesaid, duly commissioned and
    qualified, do hereby certify that the foregoing deposition

4   of Eric Peterson was duly taken by me and before me at the
    time and place and for the purpose specified in the

5   caption hereof, the said witness having been by me first
    duly sworn.

6

7       I further certify that the attached deposition
    transcript of Eric Peterson meets the requirements set
    forth within article twenty-seven, chapter forty-seven of

8   the West Virginia Code to the best of my ability.

9       I do further certify that the said deposition was
    correctly taken by me in shorthand notes, and that the

10  same were accurately written out in full and reduced to
    typewriting and that the witness did request to read his

11  transcript.

12      I further certify that I am neither attorney or
    counsel for, nor related to or employed by, any of the

13  parties to the action in which this deposition is taken,
    and further that I am not a relative or employee of any

14  attorney or counsel employed by the parties or financially
    interested in the action.

15

16      My commission expires August 23, 2022.  Given
    under my hand this 7th day of May 2021.

17

18

19

20

21

22

23

24

25

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021

Page 281

```
1   STATE OF WEST VIRGINIA

    COUNTY OF KANAWHA, to wit:

2

3           I, Teresa Evans, owner of Realtime

4   Reporters, LLC, do hereby certify that the attached

5   deposition transcript of Eric Peterson meets the

6   requirements set forth within article twenty-seven,

7   chapter forty-seven of the West Virginia Code to the best

8   of my ability.

9

10          Given under my hand this 7th day of May

11  2021.

12

13

14          /s/ Teresa Evans

15

16          ----------------------

17          Registered Professional

18          Reporter/Certified Realtime Reporter

19

20

21

22

23

24

25
```

Page 282

```
1           ERRATA SHEET

2

        I, Eric Peterson, do hereby certify that the

3   foregoing is a true and correct transcript of my

    deposition with the exception of the following

4   corrections:

5   PAGE  LINE  CORRECTION

6       _____

7       _____

8       _____

9       _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____
            DEPONENT'S SIGNATURE

18
    STATE OF _____,

19  COUNTY OF _____,

20      Sworn to before me, _____, Notary

    Public, this _____ day of _____, 20___.

21

            _____

22          NOTARY PUBLIC

23

24

25
```

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: $200..304 533-0461

**Exhibits**

**Exhibit 1** 4:2

**Exhibit 2** 4:3 44:11, 13,16 45:22 117:8 118:11 123:5,6 130:18 132:21 167:15

**Exhibit 3** 4:4 95:22 96:1,2,11

**Exhibit 8** 4:9 208:2, 13,16 219:14 226:4,5

**Exhibit 9** 4:10 216:20,21,24 272:10 274:12,13

**Exhibit 10** 4:11 234:14,17,18

**Exhibit 11** 4:12 235:7,11

**Exhibit 12** 4:14 261:19,20

**Exhibit 13** 4:15 268:19,22 269:1

**$**

**$200** 81:11

**$500** 100:1

**$7.10** 213:11

**0**

**03** 62:19

**07** 233:13

**1**

**1** 46:3 102:13,21 103:12 104:12 105:9, 18,24 108:7,9 110:10, 12 114:8 115:19 116:6 117:24 118:21 122:17 127:15 129:1, 21 135:15 156:12 185:6,14 187:13,15 188:22 200:16 208:23 209:1,2

**10** 105:24 108:7,19 109:13 128:22 149:16

164:21 167:2 175:23 177:9 193:3 217:16 233:5 234:13,14,18 242:10

**10-4** 163:15

**100** 151:23

**109** 163:22

**10:00** 267:4

**10:27** 165:2

**10:30** 36:17

**10:47** 166:1

**10:51** 177:21

**11** 166:6 179:1 209:2 235:2,7,11 264:3,4

**119** 49:13 50:5,8 52:6 107:13 108:19 109:5 115:6 141:4 145:19 146:11 147:1 158:17 172:13 184:1,3 187:6, 9,11 189:19 265:16

**11:09** 129:10

**11:46** 166:17

**11:50** 179:23

**11:55** 129:24

**11th** 12:18,23 13:1, 11,12 53:4 245:3

**12** 49:2,3 50:3,5,6,7, 12 52:5 124:15 140:2, 13 164:21 172:10 184:22 185:5,11 187:5,20 189:18,23 209:3 217:16 261:20

**120** 151:23 152:2

**12:55** 181:18

**12:59** 183:6

**12th** 13:18,20 16:9 22:6,9 28:9,13

**13** 58:13 131:15 155:8 167:2 175:23 184:22 185:5,7,11 208:21,23 209:4,22 210:22 219:15 225:23 226:5 228:10 233:5 268:19, 22 269:1

**13:35** 169:20,22

**13:50** 170:7

**14** 140:13 171:2,22 172:17 185:24 188:18 189:12 242:10

**141** 236:21

**142** 254:8,9

**145** 135:10

**146** 236:21

**14:33** 172:23

**14:35** 170:12

**14:50** 185:4 186:3

**14:51** 171:18 185:2 186:3

**14:53** 136:8

**15** 17:8 117:11,14,21 118:13 124:7 136:13 153:22 186:5 213:18

**16** 119:22

**17** 48:20 87:24 88:1 102:14 185:6,7,14

**17.35** 87:24

**18** 87:21 195:9

**19** 242:10 264:4

**1993** 242:16

**1:07** 198:20

**1:08** 5:13

**1:10** 199:16

**1:24** 65:21

**1:26** 199:23

**1:30** 202:7

**1:51** 138:15

**2**

**2** 44:11,13,16 45:22 47:1 108:19 109:13 113:23 117:7,8 118:11 123:5,6 130:18 132:21 137:1, 5,12 145:12 156:11, 15,23 157:7 158:18 159:4 167:15 173:18 174:3 175:12,17 176:22 177:12 178:6,

16 179:2,3,19 182:5 184:19 185:5,11 213:15

**20** 64:6 122:20 173:11 236:11

**2001** 242:16

**2003** 61:16 243:23

**2004** 243:23

**2008** 58:3,5,7,14,18 81:1 223:13,20,21 224:23

**2011** 58:8,18,19 70:20 78:18 81:7 85:11,18 236:13 237:5

**2012** 70:20 78:18

**2014** 17:8 25:3

**2015** 25:3 96:21 97:10,24 98:1 100:7

**2017** 59:8 63:18 65:9, 11 70:10 79:5 80:22 135:22 236:13 237:4

**2018** 25:1,6 58:19,20 59:2 81:8 85:13,19 86:7,11,14,16 87:7, 13,22 89:24

**2019** 89:1,7,24 90:12 92:9,19 94:3

**2020** 37:13 38:14 43:5,9,13 46:17 48:14 57:18 58:20 92:20 94:9,23 104:1,5 119:4,8 133:9,17 139:15 143:1 152:14 183:24 189:21 210:3 217:3 223:6 233:13 234:6,7 262:23 263:15

**2021** 5:9 12:18 13:2 19:16 58:21 95:9 100:8 101:3

**21** 114:22 196:5

**214** 139:19 141:7 149:22

**22** 127:6

**22nd** 53:17 213:15

**23** 174:2

**23.0** 236:20

**23.12** 254:9

**23.15** 258:19 259:6 260:7,20 261:14

**23.16** 258:19 260:8

**23.2** 254:22

**23.94** 258:5

**23.95** 258:13

**24.0** 236:3

**25** 118:16 120:5,7 123:11 147:14 148:14,16 151:14 269:13

**26** 19:16

**26th** 19:15 52:18 53:20 55:3,19 56:7

**27** 148:10 187:19 188:9 189:7,24

**28** 145:12 147:19 166:6

**2:00** 55:20

**2:02** 56:14

**2:15** 56:18

**2:38** 146:15

**2nd** 43:5,9,13 46:17 48:14 57:18 102:2 104:1,5 131:18 132:15 133:9,17 141:13 152:14 182:10 183:24 186:4,17 189:21 190:5,6 210:3, 8,9 217:3 223:6 234:6 262:23 263:15 266:23 267:11

**3**

**3** 44:23 95:21,22 96:2, 11 114:21 115:11,14, 23 117:9 147:12,19 148:10 156:7,11,23 158:18 159:4 167:16, 23 187:17 188:24 189:22

**30** 138:10 151:14 185:8,15,17 186:5 189:4

**304 533-0461** 27:2

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: 30th..ahead

**30th** 19:9,11

**31** 131:15 158:21 196:11 200:16

**33** 171:2 172:17

**34** 115:11,15,24 187:17 188:24 189:22

**35** 119:21,22,23 148:16 185:14

**37** 179:1

**38** 120:6

**3:18** 110:2

**3:34** 115:19

**3:46** 110:6

**3:54** 148:20

**3rd** 267:16

**4**

**4** 98:15 99:16 102:12, 20 103:11 104:11 105:17 108:8 110:11 114:7 116:5 117:23 118:20 122:16 127:14 128:24 129:20 135:14 136:22,23 149:16 150:20 187:12 188:21

**40** 99:23 166:1 175:4 183:4 195:19 252:16 272:4

**400** 22:17

**43** 161:14,16 177:9

**44** 120:7

**45** 151:13,16

**46** 113:24 171:22

**47** 147:23 148:3 151:4,9,17 269:13

**4:09** 116:17

**4:40** 150:3

**5**

**5** 44:23,24 45:1 99:19 137:1,4 147:12 167:23 173:17 175:11,16 176:21 177:11 178:5,15

**179**:18 182:4 184:18

**5-7** 46:23

**50** 101:19,22 139:22 142:10 157:5 185:24 189:13 196:19

**53** 117:11,15,21 118:5,14

**55** 128:22

**56** 150:21

**5:18** 153:22

**5:47** 203:3

**6**

**6** 26:21 27:1 105:9 137:19 138:1,12 145:9 146:12 147:3,9, 16 148:5,17 149:13, 24 150:17 153:19 154:19 161:11,17 162:7,19 163:7,12 164:1,13,23 165:21 166:3,14,23 169:17 170:4,9 171:4,15,23 172:5 209:6 225:21 242:10

**60** 151:23 181:7 183:4 195:20

**65** 151:23 152:1

**6:10** 203:7

**6:21** 161:14

**6:25** 161:21

**6:53** 240:3

**7**

**7** 47:1 49:2 50:6,7,12 52:5 76:12 77:12 119:22 120:6,7 124:15 172:10 187:5 189:19 190:18,20,21 191:3 195:4 196:7,16 197:12 198:3,14 199:9,20 200:11 202:3 225:13,19

**72** 145:23

**73** 145:23

**74** 112:23 113:17,23 141:4

**7:00** 104:22,23

**7:01** 240:7

**7:33** 268:13

**7:35** 268:17

**7:49** 279:4

**7th** 46:19 47:2,7,13 210:7 234:6

**8**

**8** 208:2,13,16 209:22 210:22 219:14 225:8, 11,12,15,22 226:5

**80** 151:23 152:2 270:22

**85** 151:23 152:2

**8:06** 163:6

**8:34** 271:23

**8:35** 271:23

**8th** 13:18,19 14:9,12, 13 16:8 22:5,6,9 27:14 28:9,13 30:16 32:13 33:18,22 38:5

**9**

**9** 49:3 50:6 122:20 127:6 174:2 216:20, 21,24 219:15 228:9 272:10 274:13

**90** 151:23 152:2

**911** 269:7

**9:00** 55:20

**9:36** 175:14

**9th** 13:14,15 14:13

**A**

**a.m.** 55:20 267:4

**abide** 235:24

**abilities** 121:8 123:17

**ability** 7:10 8:3 98:24 122:9 151:1,2

**absolutely** 104:10 159:6

**abuse** 228:11

**academy** 212:24 223:12,18,23 224:16 225:2 244:16,17,20 245:1,5

**accelerate** 51:17 134:3 176:4 177:17

**accelerated** 50:22 51:15,19 168:17 177:18 194:11,13,16

**accelerates** 176:7

**accelerating** 177:14 181:23

**acceleration** 116:20 194:6,14

**accept** 74:11

**access** 98:19 127:18 130:20 186:7

**accessed** 39:2

**accident** 222:22 261:5,6 264:3,6 265:5,8 267:10,11

**accidents** 265:24

**accountable** 75:2

**accurate** 194:23 271:24 275:7

**accusation** 38:5

**act** 72:5,6 251:7

**action** 5:4 153:1 232:22

**activated** 109:22

**activity** 78:14 237:9 239:10,21

**actual** 43:21 254:24

**add** 99:22 100:18

**adding** 227:23

**additional** 134:10 238:7

**address** 90:16

**addressed** 72:13 92:8 93:11

**adhere** 74:10

**adjudicated** 237:15, 18,23

**administer** 212:10

**administered** 197:15 204:16,19 205:7,22 206:7,14,19

**administration** 260:14

**administrative** 260:9,11

**adrenaline** 140:6

**Advanced** 82:15 83:1

**advice** 33:12 35:6,8, 14

**advised** 166:11 170:15 171:11

**advising** 167:3

**advocate** 97:13

**affects** 204:22,23

**affirmed** 46:10

**age** 242:8,11

**agencies** 244:14

**agency** 8:10 250:9

**agent** 13:5

**agents** 12:23 31:24

**aggravated** 255:3

**aggressive** 125:10

**agree** 50:11 78:18 118:8 151:6,12 172:22 187:16 189:2 220:7,23 222:16 232:18,24 233:16 245:17 246:11 254:22 257:18,22 258:5,11 261:15 269:9 278:19

**agreed** 186:2 237:1

**ahead** 23:17 28:21 44:10 91:12 98:3,4,5 105:15 106:10 121:17 136:23 138:11 157:2 173:20 182:3 187:23 196:10 203:1,19 217:8,21 241:14 249:10 276:2

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: aid..backpacks

**aid** 224:18,19

**air** 134:15 191:11

**airborne** 192:3

**airlines** 243:13,14

**airport** 243:14

**airway** 214:5,6,18,19

**alcohol** 7:9 64:2,23 69:17,18 70:12

**alerted** 219:17

**alignment** 134:16,24 135:2

**alike** 271:13

**allegation** 11:4 246:7

**allegations** 37:18 245:9,13

**alleged** 206:21 227:4

**Allegedly** 11:1

**Allen** 5:3

**allowed** 98:22

**alter** 107:4 257:4

**altered** 107:3 254:15, 17

**alternating** 129:6 252:9

**alternative** 94:4

**Amazon** 86:19 87:15

**Amber** 75:17 76:7,11 77:2 238:21

**Amber's** 77:21

**ambulance** 213:7 229:21 243:12 268:20 269:5 270:9 275:12

**Amendment** 7:23 8:4

**amount** 33:12 64:5

**amounts** 12:8

**analysis** 94:19

**and/or** 81:13 90:24 197:20 257:7

**anger** 64:24

**Angie** 5:12

**angle** 274:7 276:16

**ankle** 154:5

**anticipation** 28:24 29:12

**anymore** 37:7 59:24 82:17

**apartment** 66:12 68:4 71:22 237:8 239:11,12

**apartments** 68:6,14, 16,24 69:1

**apparently** 140:1 182:22,23

**appeared** 109:7 130:23 192:4

**appearing** 222:23

**appears** 12:17 42:7 46:18 132:18 196:22 221:24

**Apple** 24:21 25:10

**applied** 244:13

**apply** 244:12

**apprehend** 254:13

**approach** 276:1,4

**approached** 112:23 135:9 202:17 203:24 204:1,3 275:24 276:1

**approaches** 276:3

**approaching** 113:23 131:10 132:22 156:2 192:24 195:1

**approved** 210:7

**approximate** 87:12 133:2 192:17

**approximately** 5:13

**apps** 25:11

**April** 55:3,19 113:1,13 139:3,15 141:12,15, 17 144:8

**area** 39:12 60:15 72:4 80:9 97:23 157:15 174:4 177:7 178:23 192:6 217:17 219:20 241:2 247:6,15,17,20 248:6 252:3 263:22 264:12

**Arena** 242:18,19

**argue** 75:4

**argument** 59:10,22

**arm** 198:9 206:4 229:7,12

**armed** 255:3

**armpit** 198:10,11,12 199:3,6

**armpits** 211:9,11

**arms** 229:11

**arose** 10:6,23

**arranged** 31:8

**arrest** 46:7 62:9 77:5 79:13,19 140:6

**arrive** 232:23 271:21

**arrived** 19:23 80:5 219:16 220:10 221:3 229:2,24 231:2,4 232:3 272:2

**arriving** 220:2 221:7

**arrow** 274:16

**article** 95:24 96:12,20 97:8,22

**articulated** 201:8

**asks** 230:16

**assault** 254:20 255:3

**assert** 8:4

**asserting** 18:19

**assess** 52:3 212:13 214:1,3,4,6 215:6 222:17

**assessment** 212:6,7 214:9,13,17,21,22 215:9 231:2 270:8

**asset** 10:13

**assigned** 60:18 71:10 78:20

**assignment** 58:8

**assist** 135:11 211:17 219:17 269:7

**assistance** 149:8 212:6

**assistant** 97:1 259:15 266:2

**assisted** 11:1 20:7 70:23,24 75:18,24 211:4 270:17

**Association** 82:21

**assume** 6:21 23:13 74:24 77:2 241:4

**assuming** 228:13 267:19

**atrium** 10:15

**attack** 255:1

**attempt** 110:15 114:11 143:18 183:19

**attempted** 278:20

**attempting** 111:8 130:8 134:2 182:1

**attend** 69:18

**attention** 42:19 106:22,23 107:6

**attorney** 12:2,3 15:9, 11,12,13,16 29:24

**audible** 155:14 156:8 158:11

**audio** 82:3 112:21 114:16 115:17,18,22 116:24 117:1 118:8 121:3 132:11 138:10 142:5 145:13,17 148:11 153:10 155:3 156:8,11 166:1 168:6, 12 169:1,2,11,24 172:8 185:4,19 186:12 219:24 220:4 236:6

**August** 21:8 38:14 43:18 245:2,3

**Authority** 68:7 269:5

**auto** 222:22

**Avenue** 22:18 68:8

**AVL** 164:7,8

**avoid** 127:4 182:2 275:14

**aware** 13:2 19:4 42:16 44:3 54:6 160:24 161:3 193:23 255:24 256:2,3 259:2

260:10,16,21,23 261:13 262:5,12

**awful** 242:20

**B**

**back** 7:2 27:8,14 29:3 42:10 47:6 49:18 52:4 56:21,24 60:10 63:18 64:16 65:20 80:24 81:1 83:11,12 85:12 86:7,12,14 87:2,4,5 98:1 102:2 103:23 104:6 106:18,20 107:8 109:17 110:18 111:4,12,20 112:4,12, 22 113:20 118:10 120:5,14,16 130:14, 18 131:5,16 133:14 136:21 137:16 138:5 139:14 141:7 144:13 145:8 148:1,2 151:18 153:16 154:15 155:19 156:15,23 157:7,16 159:4,20 162:1,6 163:1 165:14 168:21, 23 170:24 171:21 172:20 174:9 177:6 178:3,12,19 181:2,3,4 184:15 185:2 187:2, 15 188:14 189:17 191:18 193:6,10 194:22 195:17,22 198:18 199:8,24 200:6,8 201:10 202:9 203:22 204:2 206:5 207:20 211:12,21,23, 24 218:4,5,8 219:12, 14 225:7 226:24 227:9,10,16 229:5,16, 24 230:13,14 231:1,7, 14,15 232:2,3,8,11, 12,13,15 233:4 242:2 245:6 249:21,23 250:5 260:20 268:18 269:19 270:12 271:18 274:24 275:2 277:19 278:5,10

**backboard** 223:2,3,8 271:1

**backing** 219:9

**backpack** 130:9,10, 24 273:5,7

**backpacks** 272:12

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: backup..called

**backup** 146:6,9

**backward** 111:5

**backwards** 156:11

**bad** 7:3 76:15 204:23 231:5

**badge** 37:1

**bag** 272:20,21 273:2, 8,14

**bags** 272:16 273:10, 11,13

**bail** 142:1 157:6

**bailed** 157:9

**balance** 121:24

**Banana** 61:17,19

**Bar** 243:10

**barrel** 196:15 197:2

**base** 48:6

**based** 6:22 11:10 33:13 51:9 98:18 123:24 133:1,15 154:8 167:11 169:3 172:8 224:6,19 233:9 245:16 246:12,15,22 247:21,22 254:16 255:7 256:21 257:3, 10 261:12

**basic** 212:23 230:9

**basically** 11:3 16:24 192:21 239:21 261:5

**basing** 154:11

**basis** 247:8

**basketball** 174:4 248:6

**battery** 83:10

**bay** 80:4,9

**Beam** 70:5

**Bean** 90:7 94:12

**beat** 132:9

**bed** 131:11,12 132:22 140:8 248:23 275:12

**bedroom** 69:3

**beeped** 140:6

**beer** 140:3

**began** 58:14 60:16 72:3 94:22 210:9 237:8,21 273:18

**begin** 55:23

**beginning** 94:9,22,23 140:16 187:8 189:4 192:12 193:17 230:2 245:6 253:21,24

**begun** 56:3

**behalf** 5:16,17

**behold** 60:11

**belief** 47:2 48:13 256:21 257:4

**believed** 143:23 154:18 233:16 254:16,18 277:10

**belligerent** 80:1

**belongs** 255:19

**bent** 195:7,11 196:1, 11

**bicep** 199:4

**big** 99:6 137:8 180:5 229:6

**bigger** 40:10

**biggest** 153:11

**bike** 105:12 107:9 141:10 143:17 165:18 191:10 192:16 193:1 234:23 255:10,13,19 268:1,4,9,10 274:3,4, 14,18,19 276:6,10,18

**bike's** 165:5

**bikes** 256:2 268:6

**Billy** 5:16 26:7 37:22 43:8 92:20 104:7 107:9 113:3 141:18 191:21 203:17 207:7 215:10 217:13,22 228:13 230:16,24 231:6 233:21 234:23 253:13 255:24 256:5, 11,19 268:1 277:11, 20,21 278:4,15,20

**Billy's** 38:6 105:12 193:1 274:14,18 276:6,10,17

**bit** 42:12 95:20 103:4 137:2 139:20 163:21 164:18,22 166:10 175:24 176:11 178:19 199:8 236:12 246:18

**black** 107:1,6,10 111:15 130:11 249:18,23 250:1,9 257:24 273:3,4,7

**Blake** 242:7

**blaring** 159:5

**blast** 156:19

**blasts** 158:9

**bleeding** 140:8

**blew** 165:10

**blind** 34:9,10,13 35:16 36:6

**blocked** 146:1

**blood** 214:20

**blue** 273:2,8

**boat** 61:20,23

**Bob** 96:24

**bodies** 95:11

**bodily** 255:3

**body** 82:2 91:6 95:14 97:9 100:10,12,15,17, 22,23 101:1 191:13 192:4,5 214:24 262:22 263:14,16,18

**Boone** 166:11,12,18, 19,22 167:4 170:14, 22 171:8,12,13 172:18,21 173:3,8,12 269:5

**bottle** 140:3

**bottles** 140:2

**bottom** 99:16 208:23 209:24 210:23 225:8, 12 226:4 233:6 272:24

**bought** 82:8,11,12, 14,24 86:8 87:7,13,14 89:22 90:5 100:14

**Boulevard** 49:14 50:2 185:23 264:8

**bouncer** 61:23

**bouncers** 62:3

**box** 199:24 202:7 218:6

**Brad** 18:11

**brakes** 263:6 276:8, 11

**brand** 26:5

**brands** 94:13,14

**Breah** 242:6

**break** 6:9 7:12,14,16 12:16 16:13 50:17 56:11 66:16 95:16,18 102:3 190:12 243:15 268:12

**breakfast** 103:22 104:6,14 106:17 107:8,20 143:22 257:12

**breaking** 156:22

**breaks** 72:1

**breath** 269:17

**breathing** 214:18,20

**Brickers** 243:10

**bridge** 216:8

**Bridgeport** 224:12

**briefly** 104:17,24 146:10

**bring** 102:13,15 219:12

**bringing** 206:18

**broken** 140:3

**brother** 99:6

**brought** 38:8 42:19 72:12 99:5 134:24 135:1,3,4 160:7 201:9,13 216:14 218:15 231:20 273:17

**Brounland** 51:5 135:10

**Brown** 5:8

**bruise** 229:7

**Buffalo** 105:3

**buffing** 263:9

**building** 69:2

**built** 256:1

**bumped** 28:10

**bunch** 84:16 94:20 245:2,4

**Burgess** 240:18

**burn** 93:19

**burst** 205:19 210:24

**business** 36:11 71:21 72:23 73:2,5

**busy** 36:12 63:13 247:3

**butt** 196:14

**button** 160:14,15

**buy** 86:16,18 87:6 94:5 99:23

**buying** 86:20

**BW3S** 105:10

**bystander** 38:1 52:24 53:3 190:14,18,22 195:5 196:8,17 197:13 198:4,15 199:10,21 200:12 202:4

**bystanders** 31:16,18 197:10 202:1 207:4 234:8

## C

**C-O-N-K-L-I-N** 241:1

**Cadillac** 95:12

**calendar** 19:14 47:11

**call** 12:22 13:5,13,24 24:1 30:24 72:4,9,10 73:10 78:21 80:17 81:15 137:1 155:23 162:22 186:12 189:14,15 213:23 215:11 218:2 220:5 237:9 250:14 251:7 259:5,6 266:3 271:6,7

**called** 5:22 14:1 60:9 61:17 62:10 72:19 75:6 137:12 174:11

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: calling..communication

180:21 244:17 255:20

**calling** 141:24 218:12

**calls** 47:5 78:20

**calm** 62:1

**cam** 57:20,22 58:4
80:22 81:3 82:2 83:19
85:8 86:8,16 88:3,15
100:10,12,15,17
101:1

**camera** 57:15 68:22
81:20 83:18 84:17
86:21 92:22 95:1,14
97:16 100:22,23,24
101:1

**cameras** 60:14
68:11,19 69:5 81:9,
15,16 82:24 83:9,22,
23 85:5 86:1 89:5,22
90:2,5 97:9,13,19
98:1 99:20,23 100:1

**cams** 84:24 85:13,18,
23 91:6,10 94:3,5
95:7

**cancelled** 14:4

**canisters** 272:24

**capable** 133:9

**capacity** 78:16

**Capitol** 243:11

**car** 68:2 89:5,14 92:19
95:14 107:4 124:24
133:5 142:10 157:9
158:22,23 164:5,8
179:24 193:4,5,8,9,
12,13 215:20 236:6
243:7 249:20 276:19,
21

**card** 83:16,17 90:3
93:18

**cards** 92:24

**care** 69:16 98:20
225:5 243:3,17,20

**career** 139:13 142:7,
10 143:18 151:22
152:8 213:2

**Cares** 62:10,13

**Carlo** 249:16,18,23
250:1,10

**carrier** 243:13

**carrying** 17:9

**cars** 92:6 107:4
160:24 180:1 183:17
219:9 271:16 277:4

**case** 8:22 9:1,12,13
10:1,21,22 11:1,11,21
12:13 15:18,24 17:13
18:7,8 20:2,8,10 21:5,
7,12 26:7 27:8 29:8,
13,23 37:22 56:23
57:8 66:22 70:23 71:1
75:19,22 76:2,3,7
80:19 93:13,16,19,20
138:20 141:20,24
208:4 225:7,18 233:4
234:21 237:14,15,18,
20,23,24 241:9 245:7,
9,13,14,18 246:8
262:13

**cases** 20:18,20,22
76:4 238:4,5

**Cassie** 240:18

**catch** 49:13 107:14

**catches** 163:24

**categories** 253:18

**caught** 77:11 106:21,
23 107:6 277:23

**caused** 65:18

**caveat** 7:13

**cell** 24:22 39:20 40:2
60:2

**center** 106:3 181:17,
21,22

**certificate** 224:23

**certified** 5:11 213:3

**chain** 91:16,23

**challenge** 99:1

**chance** 45:8,19 96:4,
19

**change** 81:5 87:21
109:24 197:22 257:9

**changed** 85:16,22
110:20

**characterize** 34:19
65:18 159:12

**charge** 47:19 62:16
79:13,19 245:19
256:5,11

**charged** 54:20 61:9,
12 62:14,17 152:6,11,
13

**charges** 11:9,17,18

**charleston** 5:6,8 6:7
9:22 10:19 16:4 22:17
30:17 53:24 54:2,22
58:5,12,16,23 62:24
63:6,21 67:16 68:7,9,
22 69:13 70:15 71:9
72:24 74:15 75:8
77:4,17 78:12,16
85:20 88:2 91:5 95:3,
23 96:20,23 97:4,11,
24 100:13 101:7,13,
18 106:12 224:13
225:18 235:16,21
238:18 240:13 244:6,
11,13,14,15,17,18,20,
23 254:23 267:21

**Charleston's** 97:1
161:6 244:15 246:12

**chasing** 187:21

**chatter** 138:5

**check** 99:10

**Chem** 243:16

**Chevy** 105:2

**Chick-fil-a** 48:23
49:11 103:15,20
104:5 113:8 185:16
186:6

**chief** 13:24 16:9
18:11 19:2 23:9,13
28:14 90:18 92:17
93:4 97:1 213:24
214:1 215:11 222:19
227:15 259:10,15,16
260:9

**Chief's** 72:16 90:14,
15

**Childress** 139:19
145:24 149:20

**choice** 70:1,2 258:9

**choose** 99:22

**choosing** 8:4

**chose** 29:8 30:2

**Chris** 5:10

**church** 119:16,17,20
120:1 177:23 247:3

**circulating** 214:21

**circulation** 214:18

**circumstances**
133:19

**citation** 77:21 78:7,9
152:11

**cited** 48:10

**citizens** 97:20

**City** 6:7 8:22 20:19,20
24:21,22 36:24 60:18
71:10 77:16 78:20
103:21 138:8 239:9
263:12

**civil** 5:4 7:21 11:20
18:8 27:8 74:24

**claimed** 11:5

**class** 212:23 223:16

**classes** 69:17 224:7

**clear** 16:2 17:16
24:14,15 25:23 26:16,
17 42:2 97:14 111:11
143:1 144:3 156:5
168:15 212:14 220:13
229:11

**cleared** 25:6 211:16
231:20,21 232:20

**clearing** 24:19

**click** 160:9

**clients** 62:13

**clock** 72:7

**close** 43:4 113:9
205:12 218:19,22

**closed** 76:14 145:22

**closer** 107:11 193:18
204:5

**clothes** 10:19 58:20
64:13 70:21 77:3
79:12

**clothing** 72:5 199:13,
14 214:23 229:1
272:19 273:11

**cloud** 25:17,18 26:14
98:18

**clue** 120:3

**coasted** 165:10

**Code** 48:1,3,7,10
53:12 153:3

**codefendants**
245:15

**Cole** 80:18,20

**collar** 81:10,24 223:2,
8

**collectively** 216:20

**college** 242:19

**color** 130:10 139:5
143:20 238:24 257:7
264:17

**colored** 130:15
184:12

**colors** 257:6

**combination** 158:19
233:9,17

**commander** 266:3

**comment** 41:24 42:1

**commented** 66:14

**comments** 121:3

**Commission** 74:24

**commit** 254:10

**committed** 254:11

**committee** 94:12

**committees** 98:9

**communicate** 156:4,
15 157:8 158:24
162:4

**communicating**
29:3 154:15 157:21
162:15

**communication**
16:7,18 65:8 91:9
109:1 137:20 138:2,
13 145:10 146:13
147:4,10,17 148:6,18
149:14 150:1,18
153:8,20 154:20
161:12,18 162:8,20
163:8,13 164:2,11,14,

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: communications..creek

17,24 165:22 166:4,
15,24 169:18 170:5,
10 171:5,16,24 172:6
186:11 200:8 255:18

**communications**
17:19,21 104:16
109:1 136:19 185:20
275:16

**community** 69:2

**companies** 94:18
95:2

**company** 71:5 82:17
95:2,3 243:18

**complainant's** 46:4

**complained** 226:15,
18 227:8,13

**complaining** 212:8
213:24 214:2 227:17
228:2

**complains** 232:19

**complaint** 44:7,14,18
45:23 47:20 48:11
51:9 53:9 78:15 97:15
117:8 123:5 128:6
130:2,18 153:15
167:16 209:17 213:24
214:1 215:12 222:19
227:15 238:21,23
239:4,8 245:22 246:6

**complaints** 78:18
99:10

**complete** 42:11
209:3

**completed** 64:3
208:20 209:2 210:2,4
261:3,6,7,8 267:3,16

**completely** 107:1

**completing** 259:9

**compliance** 260:10

**comply** 205:23
206:17

**computer** 40:11
42:17 164:5

**computers** 73:8

**concentrate** 192:19

**concept** 86:1

**concerned** 26:8
91:15,23 92:3 97:7
111:21,24 121:10
122:1

**concerns** 99:5

**concludes** 279:5

**conditions** 233:10,
19

**conducive** 64:14

**conduct** 60:23 237:3,
5,6 258:16 260:9

**conducted** 55:19

**cone** 265:15,18,19
266:5

**coned** 110:21 131:21
146:22 252:3

**cones** 146:1

**conference** 82:21,22

**conferences** 82:18,
19

**confident** 30:13

**confused** 149:21
246:19

**confusion** 135:20

**Conklin** 241:1 242:5

**connection** 127:22

**considerably** 51:11
190:2

**constant** 158:4
246:16

**constantly** 152:19

**construction** 63:11
110:23 114:15 145:20
146:2 186:18,21
265:15,18,19

**contact** 21:12,13
72:18 76:10 152:22
202:15 207:6 221:16
247:1

**contacted** 21:14
23:3,5,21 35:7 59:20
60:5,6 63:6 65:16
77:19 238:15 259:15

**content** 59:19 76:23
91:4

**contents** 239:15,16
272:20 273:9,10

**continually** 278:5

**continuation** 5:1
137:11

**continue** 110:9
117:10 118:12 122:14
134:9 138:11 145:3
157:1 166:20,21
167:11 168:1,4,16
249:5

**continued** 14:4 44:12
47:5 56:17 64:17
102:22 103:13 104:13
105:19 108:10 110:5,
13 114:9 116:7 118:1,
22 122:18 127:16
129:2,22 130:22
135:8,16 137:6,21
138:3,14 145:11
146:14 147:5,11,18
148:7,19 149:15
150:2,19 153:21
154:21 161:13,19
162:9,21 163:9,14
164:3,15 165:1,23
166:5,16 167:1,7
169:19 170:6,11
171:6,17 172:1,7
173:19 175:13,18
176:23 177:13 178:7,
17 179:20 182:6
184:20 187:14 188:23
190:23 195:6 196:9,
18 197:14 198:5,16
199:11,22 200:13
202:5 203:6 240:6
248:18 251:3,4,5,14
257:11,16 268:16
276:14

**continues** 110:18
116:9

**continuous** 194:15

**continuously**
111:20,21

**control** 125:12,13,19,
20,21,22 151:2
203:18

**conversation** 14:8,
16,21 19:3,9,14,16,20
21:2 22:2,8,10,11,12
28:15,18 29:7 30:20
34:22 35:18 36:7,8,13

38:4,10,15 41:6,14,
16,22,23 42:13 49:21
64:12 94:21 115:17

**conversations** 17:23
20:1,13,15,17 21:4,6,
8,10 28:23 29:16,22
30:16 35:12

**convict** 78:6

**Cook** 38:20 40:13,16,
19,21,22 41:1 42:14,
16 43:5,14

**Cook's** 39:3,20 40:8

**cooperating** 82:5

**copy** 12:14 44:18
55:9,24 56:6 93:18
96:14 150:21 210:13,
16 235:3 265:3

**cord** 233:1

**cords** 273:3

**corner** 62:8 76:12
121:13 155:10 226:4
274:4

**Corona** 94:24 140:16
224:13

**corporal** 8:15,17
209:7 219:16 220:19
229:18,19 270:5
272:2

**correct** 10:20 12:20
13:4 27:12 43:11 44:8
46:1,8,14 49:23 52:18
53:5 54:9 70:17 79:19
108:18 128:20 130:6
144:6 147:15 148:3
150:15 179:15 184:5
186:16 191:4 192:10,
11 195:12,13 200:18
202:1,18 203:14,23
204:10 206:9 207:1,
11,19 209:18 216:4
220:16 222:8 223:6
224:22 227:11 233:2
245:19,23 251:21
253:11,15 254:1
256:20 267:17 277:12

**corrected** 246:4

**correctly** 48:22 49:1

**cosmetic** 265:22

**cost** 87:9 94:18 98:6,

10,11,13

**counsel** 5:13 7:24 8:2
12:15 22:1 31:11
32:23

**counseling** 64:2,17
65:5 69:17

**counted** 181:3

**country** 97:18

**county** 67:17,18
71:20 148:21 163:3,
10,16 166:12,19,22
167:4 170:14,22
171:8,12,13 172:18,
21 173:3,8,12 213:7,8
240:11 269:5

**couple** 67:12 97:15
107:2 131:19 179:21
226:5 239:24 255:12
272:24 276:2 277:15

**court** 5:5,11,19 7:5
9:20 174:4 234:12
248:6 261:20

**courthouse** 9:21

**cover** 91:3 143:19
197:7

**covered** 68:19

**coworker** 10:2 67:10,
11

**crash** 49:2 169:13,14
177:17 183:1,12
184:21,22 185:10
187:6,10 189:9,12,14
191:6,8 212:9 213:21,
22 253:5 267:8,10
275:17

**crashed** 139:8
144:19,22 145:2
171:19 172:3 180:22,
23 183:4 189:15
247:7 253:2 269:9
275:20,21

**crashes** 49:4 50:5
186:2 212:17,18

**crashing** 154:5

**created** 233:11,19

**creek** 105:13 106:3
131:10,12 132:22
134:6 135:8 140:8
248:23 273:18

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: crime..determined

**crime** 81:8 100:14 111:12,14

**crimes** 58:19,22,23 64:11 71:9 81:10 83:2,5,23,24 85:4,6,7, 9,12 94:11

**criminal** 8:1 11:18 15:8,10,12,13,15,21 32:14,15,18,23 33:8 34:23 35:3,17 44:7, 14,17 45:23 47:20 48:7 53:8 57:8 61:12 117:8 153:15 167:15 234:21 237:11 246:5

**criminally** 61:10 62:17

**cross** 50:19 123:13 125:16 126:14,15 127:5 133:23 174:22 179:4 250:4 251:14

**crossed** 178:18,24 182:7,8

**crosses** 209:16

**crossing** 169:14,21 170:2 180:19,21 181:1 193:21 194:2

**crossings** 180:18 193:23

**cruiser** 57:17 88:4,6, 15 100:20,23,24 133:2 134:2 168:19 182:24 193:1 200:1 220:13,15 221:7 227:10 232:12 262:6, 7,13,18,20,23 274:20 275:5

**cruisers** 80:22 81:3 85:14,19,24 86:3,5 95:7 101:13,22,24 161:8 200:8 220:11 221:4

**CSX** 219:17,19 220:6

**cuffed** 211:20 229:16 232:1,6 269:18 270:10

**cuffing** 230:4

**cuffs** 230:3,4,5,6,7,8, 12 270:5

**curious** 268:9

**current** 97:14 101:20

**Curtis** 5:12

**curve** 50:17 125:24 264:11

**custody** 91:23

**cut** 229:4

**D**

**dachshund** 168:18 169:6 176:19

**daggone** 133:4

**daily** 24:14,16,20

**damage** 265:20

**damages** 264:23

**dancing** 61:23 66:12, 13

**danger** 250:17,19 253:9,11,13,18

**dangerous** 230:18 233:1

**Daniels** 70:5

**Dante** 5:15

**dark** 70:4 130:15 178:13 184:12 248:13 250:23

**darted** 146:23

**darts** 114:18,19

**Dascoli** 31:12,13 32:15 33:13,15 35:7, 12,19

**dash** 57:20,22 58:4 80:22 81:3 83:19 85:8,13,18,23 86:8,16 88:3,15 91:6,10 92:22 94:3,5 95:7 100:24 101:1

**data** 137:8

**date** 12:23 13:11 31:16 33:4 43:1,21 55:13 73:24 77:12 124:13 141:14 186:17 210:3,5 236:7 250:16 257:10 259:19 264:4

**dates** 33:6 242:17

**daughter** 242:6

**Davis** 11:8,15 105:13 106:2

**day** 5:9 13:8 24:17 25:8 26:19 27:12,21 31:19 39:17 41:15 47:5,8,12 53:1,16 55:14 57:18 60:23 72:2 103:15 104:2 137:10,11 143:22 150:12 169:4 177:4 187:8 188:7,8 189:12 210:6 220:21 249:13 257:12,16 259:23 262:6 266:14,20,23 267:16

**days** 13:6 47:3 52:17 255:12

**dead** 143:7,11 157:5 256:20

**deal** 73:11 158:7 164:6 212:16 225:2 246:19

**dealerships** 243:8

**dealing** 152:14 213:21 214:10,14

**dealings** 254:17

**death** 255:2

**debrief** 259:20,23

**December** 37:12 223:20

**decide** 77:3 78:6

**decided** 107:7,10 197:8

**decides** 138:16,20 141:20 146:11

**decision** 95:5

**decisions** 70:12

**declined** 244:18

**decon** 212:6,11

**decontaminant** 212:13

**deep** 132:19 217:17 221:14 222:8

**deeper** 222:9

**defendant** 11:1 18:23

19:2 29:23

**defendants** 11:6,7 29:2,7

**defer** 78:6

**deferral** 78:5

**defines** 254:8

**definitions** 255:5

**delay** 219:17

**delete** 25:8

**deleted** 26:8,9 27:11 29:17 90:23

**deleting** 29:4

**demonstrate** 201:2

**dense** 247:17

**Dent** 80:15

**department** 13:23 14:6 42:18 62:4 74:15 78:16 85:3 91:1 93:3, 6 94:4 97:23 98:22 100:17 131:8 224:10

**Department's** 99:24 235:16

**departments** 263:11

**depiction** 189:10 275:7

**deployed** 210:24

**deponent** 95:17 96:3, 9 201:5 225:16 279:7

**deposition** 5:2 6:8, 11 8:21 9:5,8,9,24 12:10,16 19:7,12 44:12,13,16 51:23 52:7,15 53:7 55:2,3, 10,18,19,22 56:2,6,17 95:22 96:1 102:22 103:13 104:13 105:19 108:10 110:5,13 114:9 116:7 118:1,22 122:18 127:16 129:2, 22 135:16 137:6,21 138:3,14 145:11 146:14 147:5,11,18 148:7,19 149:15 150:2,19 153:21 154:21 161:13,19 162:9,21 163:9,14 164:3,15 165:1,23 166:5,16 167:1

169:19 170:6,11 171:6,17 172:1,7 173:18 175:12,17 176:22 177:12 178:6, 16 179:19 182:5 184:19 187:13 188:22 190:22 195:5 196:8, 17 197:13 198:4,15 199:10,21 200:12 202:4 203:6 208:13, 16 216:21,24 234:14, 17 235:7,11 240:6 268:16,19,22 269:1 279:5,7

**depositions** 8:19

**depression** 65:3

**depth** 221:17,19

**deputy** 167:4 170:16 171:12 173:7 229:24 265:9

**Derek's** 242:18,19, 20,23

**describe** 69:23 125:19 127:17 132:21 224:3 262:3 274:2

**describing** 153:24

**description** 174:21 194:23

**Desert** 224:7

**desk** 40:10,12 93:17, 18

**details** 12:8 35:10

**detained** 200:9 211:16 212:5

**detaining** 10:15

**Detective** 8:23 10:12 11:8 38:20 39:20 40:8,19,21,22 41:1 42:14,16 43:5,14 71:7,24 72:1 76:3 77:15 81:9 84:5,9,22 98:8

**detention** 10:17

**determine** 132:12 182:1 214:10,14 222:18 256:7,8

**determined** 255:22 257:15 264:22

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: device..ended

**device** 26:9,12 39:3 40:1,2,9 81:13 99:1 133:15

**devices** 84:3,8,10,21 85:1 97:23 98:17 161:9

**dictionary** 258:10

**difference** 140:18 186:10 188:18 230:6

**difficult** 7:5 81:17

**difficulty** 137:23

**dimensions** 268:6

**direction** 21:1 29:17 111:6 125:9,10 129:14 141:5 183:18, 20 274:13,17

**directive** 54:17 92:14

**directly** 13:20 19:20 105:1 107:19 135:23 142:8,9

**dirt** 130:20

**disciplinary** 75:7

**discipline** 63:21 74:2,22 78:11

**disciplined** 70:15

**discontinue** 247:14 251:2,18

**discontinued** 247:5, 11

**discovery** 20:9 21:2 93:21 234:20 236:19

**discretion** 247:22

**discuss** 30:2

**discussed** 20:16

**discussing** 36:5 145:16

**discussion** 60:15

**disjointed** 58:10

**disk** 93:19 102:9

**dismissed** 11:13,17, 18 77:21 237:20 245:19

**dispatch** 115:17 159:24

**dispatched** 269:6

**dispatcher** 104:15 114:17 130:7 138:9 156:16 157:8,22 158:19,23 159:1

**dispatchers** 156:5 255:18

**dispel** 99:10

**disregard** 146:16,18

**disrespect** 74:20 79:7

**disrespectful** 60:19

**distance** 168:19 176:11 205:11,12,13 216:17

**distinction** 234:1

**District** 5:5,6

**ditch** 191:17 192:6 195:21 197:20 199:3 206:4 217:15 218:3, 16,21 221:8 222:8

**ditrapano** 5:16 96:7 210:15

**division** 58:18 85:4

**DMV** 255:17

**doctor** 140:17

**document** 44:21 45:21 74:8 88:9 188:12 208:17 226:4 235:13 245:10

**documentation** 20:8 86:20 245:15

**documents** 87:3

**dog** 168:20 169:2,5,6 173:16 175:20 176:1, 9,10,14,19 178:8,9, 18,24 179:4,5,6,9,10, 14 242:24 250:17,19 251:6,9,12,13,15,20

**dog's** 251:16

**dollars** 87:10 88:1

**door** 31:3 62:6,7 133:16 184:13 248:13

**double** 118:8

**download** 83:14 93:12,15

**downtown** 63:6 68:22

**downward** 42:9

**draft** 55:9 56:6

**drag** 221:8

**drainage** 217:15 218:3

**draw** 274:10,13

**drawn** 196:23 197:5, 10,16 204:1

**drink** 69:21,24 70:3,4, 11,12

**drinking** 60:3 62:3 67:8 69:23

**drive** 25:12,14,15,20, 21 48:24 49:12 59:21 98:21 111:14 112:1 117:13,16,17,20 118:3,15 120:18 121:5 122:2,24 123:1, 3,9,10,18,20 130:19 132:1 159:17 170:8 177:24

**driven** 188:7 193:20

**driver** 136:11 139:9 181:3

**drives** 81:21,23

**driveway** 71:3 72:8 239:10

**driving** 48:15 50:13 67:21 111:20 112:4 152:3,7 160:15,17,18 218:21 249:16 262:20

**dropped** 141:8 239:3

**drove** 19:20 57:3 177:4 181:5 188:6,8 189:21,23

**drown** 215:18

**drowning** 157:12 212:9 215:12,13,15, 23 216:6 221:11,12 227:16,21

**drug** 37:9 76:2,3,4,7 84:4 202:6 218:5 226:16 232:7

**drugs** 7:8

**Duane** 5:17 18:20 44:17 96:12 102:17 208:3 261:22

**due** 67:3 130:22 131:2

**duly** 5:23

**Dunbar** 213:15

**duplex** 69:1

**duration** 233:18

**duties** 54:5

**duty** 59:6,7 64:20 72:8 78:14 89:18,19 92:12 214:8,12 237:3, 4,6 246:14 259:9

### E

**e-mail** 89:3 90:10,13, 16,19 91:9,14 92:5

**e-mails** 16:6

**E.M.** 5:2,4 209:7

**ear** 156:19

**earlier** 14:10 36:1 43:17 59:16 60:3,19 75:23 103:5 125:11 144:2 148:13 151:1 152:19 153:5 172:12 173:7 175:4,6 183:17 200:18,22 209:17 248:5 266:12 276:21, 23

**early** 13:1 82:2

**earth** 29:4

**easiest** 216:11

**east** 243:5

**easy** 242:23

**eat** 72:2 103:23 104:6 106:18 107:8

**eaten** 186:23

**edge** 264:11

**effect** 34:6 165:6

**effective** 236:7

**effectively** 162:4

**effort** 254:12

**eject** 192:19

**ejected** 191:10

**electronic** 261:19

**electronically** 261:21

**elevation** 252:21

**Eleven** 76:12 77:12

**embankment** 140:3

**emblems** 258:2

**emergency** 220:12 221:5 235:8,17 254:7

**Emmons** 51:5 166:18,21 167:5,8 168:5,8,9,11,17,20 169:21 173:10 252:1, 17,18,19

**emotion** 34:18

**employed** 6:6 242:16,17,23 243:4

**employees** 16:4

**employers** 242:21

**employment** 242:15 244:3

**EMS** 200:10 212:5,10, 12 228:24 229:2 230:1 232:3

**EMT** 213:1,3,9 214:8, 12 218:12 222:16 224:22 230:17 231:1 243:21 244:1

**EMTS** 231:4 232:23 269:21 271:1,20

**encounter** 72:3

**encountered** 121:18 128:7 135:12

**encounters** 78:22

**end** 11:20 25:8 27:11 50:14,15,21,24 51:1 100:5 149:6 157:5 176:10 179:21,22 189:4 218:16 219:2 222:1 233:23 236:2 241:10 243:5 246:14 253:1 258:19 269:11 270:21 271:6

**ended** 36:12 238:12, 14

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: ends..figure

**ends** 274:20

**enforcement** 8:10
36:23 47:21 48:8
63:1,6 82:22 167:12
213:2 223:22,24
230:17 235:21 243:1
269:7,8,18 270:1,10,
12

**engage** 145:17 237:8
239:1 241:4

**engaged** 65:12
239:9,22 240:16

**engine** 165:10 221:22

**enlies** 65:17

**ensure** 260:10

**enter** 197:24

**entered** 195:20

**entire** 132:1 157:8
221:19 237:23

**entirety** 55:15,16

**entities** 63:10

**entitled** 97:8

**entitles** 33:12

**Entrance** 136:6

**entryway** 10:16

**envelope** 73:16,17
238:14 239:3,7,14,16

**environment** 64:14,
15

**equipment** 98:10
146:2 161:4 236:6

**equipped** 161:8

**equivalent** 75:1

**ER** 80:4

**erase** 98:24

**Eric** 6:5

**essence** 197:6

**essentially** 158:9

**establishment** 62:5

**estimate** 43:16 87:11

**estimates** 133:18

**estimating** 133:12

**estimation** 123:21

**evening** 60:4 67:7
104:23

**events** 88:9 97:14
124:1 221:2

**everybody's** 39:12

**everyday** 25:7 27:11,
15 140:1

**evidence** 65:19

**exact** 34:4 47:12
89:11 91:4 141:14
144:19 188:1,3 264:4
265:15

**EXAMINATION** 6:1
277:17

**excerpt** 102:20
103:11 104:11 105:17
108:8 110:11 114:7
116:5 117:23 118:20
122:16 127:14 128:24
129:20 135:14 137:4,
19 138:1,12 145:9
146:12 147:3,9,16
148:5,17 149:13,24
150:17 153:19 154:19
161:11,17 162:7,19
163:7,12 164:1,13,23
165:21 166:3,14,23
169:17 170:4,9 171:4,
15,23 172:5 173:17
175:11,16 176:21
177:11 178:5,15
179:18 182:4 184:18
187:12 188:21 190:21
195:4 196:7,16
197:12 198:3,14
199:9,20 200:11
202:3

**excerpts** 208:9

**excessive** 207:18

**exchange** 269:24

**excuse** 45:5 53:12,21
96:18 123:7 156:8
173:21 174:9 204:2
205:13 216:15 224:12
249:1 255:17 256:4
261:5,8 273:10

**exhibit** 44:11,13,16
45:22 95:22 96:1,11,
15 102:12,20 103:11
104:11 105:17 108:8

110:11 114:7 115:20,
23 116:5 117:8,23
118:11,20 122:16
123:5,6 127:14
128:24 129:20 130:18
132:21 135:14
136:22,23 137:1,4,19
138:1,12 145:9
146:12 147:3,9,16
148:5,17 149:13,24
150:17 153:19 154:19
161:11,17 162:7,19
163:7,12 164:1,13,23
165:21 166:3,14,23
167:15 169:17 170:4,
9 171:4,15,23 172:5
173:17 174:3 175:11,
16 176:21 177:11
178:5,15 179:2,18
182:4 184:18 187:12,
16 188:21 190:16,18,
20,21 195:4 196:7,16
197:12 198:3,14
199:9,20 200:11
202:3 208:2,13,16
216:20,21,24 219:14
222:2 226:4 228:12
234:14,17 235:7,11
254:6 261:19 268:3,
19,22 269:1 272:7,10
274:2,12

**exhibits** 272:8

**exist** 213:8

**existed** 38:1 234:7

**exists** 62:11

**exit** 59:24 105:3,10

**exited** 60:1 195:19
197:5

**exiting** 146:4 192:6

**Expedition** 180:5

**experience** 63:1
107:2 111:18 246:22
247:9

**experiences** 246:23

**expert** 154:10

**expired** 107:24
112:13,15,20 114:1
144:5 224:23 234:22
256:20 257:20

**explain** 200:23
246:20

**explaining** 183:16

**express** 34:12

**extensive** 112:1

**exterior** 204:20 205:5

**external** 25:20

**extra** 96:14 210:17

**extreme** 98:13

**extremely** 51:18
116:12 128:21 246:24

**eye** 277:23

**eyes** 192:20 201:22
205:4 206:22 207:5

**F**

**face** 14:20 201:10
202:19 211:1

**Facebook** 38:21
39:23 42:18

**facing** 106:3 232:13

**fact** 218:5 254:6
256:14

**factored** 94:20

**failed** 211:1

**failing** 121:7,11

**fair** 6:24 47:14 117:13
144:14 161:6 175:2
194:18,22 236:23
268:8

**Fairfield** 60:22

**fairly** 133:5 140:13

**fall** 119:4,7,8 131:1
153:16 165:13,15
195:24 223:19

**fallen** 195:23

**falling** 121:11 165:12

**falsified** 209:13

**falsifying** 245:10

**familiar** 54:3 62:11
133:5 235:18,22

**fashioned** 25:19

**fast** 51:11 116:13,21
120:8 128:21 174:12

176:5,18 180:9
192:21 194:7,17,19,
24

**faster** 190:2,8

**fault** 264:22

**Fayette** 213:8

**FBI** 12:12,17 13:3,21
14:1,5 15:1 16:8,21
17:10,11,24 18:2 20:2
21:13,14,16,20,24
22:22 23:4,6,21 31:7,
8,10 33:18,24 37:18,
20 53:3 55:24 86:23
263:1

**February** 86:13,14

**Federal** 7:20 9:21

**feel** 36:6 55:18 215:3
225:9 226:9,11,13,16
227:6,17,20 228:4
230:15

**feeling** 226:21 232:19

**fees** 98:12

**feet** 132:24 133:3,11,
12,13 134:15,22
135:4 193:3 205:13
216:16 217:16

**fell** 82:20 140:2

**fellow** 79:7 178:1

**felonies** 8:8

**felony** 254:2,4,8,11,
18,21,24

**felt** 34:10,13 133:15
227:21

**female** 70:22 75:14
76:18 107:3

**female's** 66:12

**fender** 133:16 263:9
264:13,24

**Fentanyl** 270:21,22

**fiance** 59:9,22 65:8,
13 66:11,16

**fiance's** 240:17

**figure** 34:14 41:21
77:6 158:14 168:24
175:19 196:12 231:2
241:11 255:19 272:17

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: figured..guilty

**figured** 241:22

**file** 75:8,13 93:13,16, 19,20

**filed** 18:6 21:8 27:9 28:23 42:24 43:3,22 44:7 45:23,24 46:13, 16,18 47:3,6 245:18, 22

**filing** 155:7 279:7

**filled** 131:13 132:2,4, 15,19

**film** 84:22

**filming** 99:12,18

**finally** 95:2

**find** 190:11 272:11 275:1

**fine** 44:2 102:7 142:23,24 143:13 235:6 242:3 275:10

**finish** 168:14

**fire** 212:5

**firearm** 196:3,15 197:2

**firm** 12:1 29:8 30:1

**fit** 243:21

**flabbergasted** 33:24 34:7,8 36:6

**flag** 102:10

**Flanagan** 5:7

**fled** 48:8 49:9 139:10 154:12 247:7 278:15

**flee** 113:20 116:9,10 138:16,17,20 141:20 147:7 149:4

**fleeing** 47:21 152:15 153:4 233:13 254:12

**fleet** 101:15

**flip** 17:9 160:15 209:6 272:11

**Florida** 224:4,14

**flowing** 131:11 132:23

**foam** 228:9,10

**folder** 72:13

**follow** 54:8,23 92:17 107:8,10,21 135:8 150:14 222:21 257:11

**food** 205:2

**foot** 50:20 113:20 121:1,14,16,19,22 123:15 124:8,9 126:22 128:1 131:11 132:23 139:10,21 142:1 154:3 200:16 207:6

**footage** 69:10,14 83:15 90:22 92:24 192:17

**FOP** 33:13

**Forbes** 5:15 6:2 15:10,15 18:19 29:2, 15,20 30:6,9,13 44:17 45:7,12 56:20 67:2 95:21 96:12 102:10, 17 110:8 158:6 187:24 190:17,20 203:1,9 208:3,8,11 210:17,20 234:11 235:2 240:9 257:2 261:22 268:23 278:22 279:1

**force** 207:11,18 247:23 261:11

**Forced** 98:19

**Ford** 180:5 184:11 248:16 249:1

**forgive** 63:2 84:2 143:14 244:9

**forgot** 242:24

**Fork** 116:16,17 117:10,14,16,20 118:3,13 119:24 120:13,20 123:19 141:6 147:13,20 148:13 158:17 172:13 183:24

**form** 23:16 143:8,12, 13 187:22 259:22 261:3,4 266:7,10,19 278:22

**formal** 63:20 65:5 78:15

**forty-seven** 147:24 148:8

**Forty-three** 147:24

**forward** 8:5 232:2 248:10 251:9 259:9

**found** 35:20,22 46:7 71:15

**Fourteen** 170:19 172:24

**fourth** 180:23 193:13

**Fowler** 5:7

**frame** 37:15 39:17 42:20 50:12,24 124:17 131:2 221:21

**Frank** 97:12

**frankly** 66:22 77:10 100:6

**fraternal** 33:11

**free** 161:9

**freeway** 146:4

**fresh** 141:18

**Friday** 18:5 19:6,9,10, 15 27:18

**friend** 62:1

**friends** 61:23

**front** 46:4 74:24 105:1,6 107:19 111:3, 22,23,24 114:18 139:22 142:4 156:12 157:19 163:23 221:21 229:1,8 231:1,6,14,15 264:13 265:11 266:4 269:18,22 270:11 274:1

**full** 191:13 202:19 236:19

**function** 90:2

**fund** 33:11 35:5

**G**

**G-A-D-D-Y** 265:10

**Gaddy** 265:10

**gained** 168:18

**garage** 103:21,23 104:6,15 138:8 263:12

**gas** 103:21

**gashed** 140:3

**Gatlinburg** 82:23

**gave** 6:22 72:17 75:22 89:2 98:23 112:10 117:3 174:22,24 222:2 223:14 228:12 236:20 242:4 272:6

**gawker** 249:22

**Gazette** 95:23 96:20

**general** 17:13 213:7 243:12

**generally** 27:19 168:14

**gentlemen** 139:18

**girl** 71:21 72:21 76:21 77:20 78:23

**girl's** 75:24

**girls** 219:9

**give** 6:14 14:1 43:16 60:9 74:8,14 76:11, 16,17 78:4 153:11,12, 13 165:18,20 167:21 174:22,23 188:17 210:18 236:19 240:21 242:21 248:8 261:13 274:12 275:6

**giving** 87:11 237:24

**glued** 140:15

**Gold** 243:10

**good** 97:19,20 107:18 138:22 158:6 197:18 213:18 226:1 240:2

**goodness** 213:6 224:5 241:23

**Gopro** 57:13,16 194:4

**Gordon** 14:5,8,17 16:9 18:11,15,23 20:2,7,15 23:9,14 94:11

**gosh** 242:20

**Goshorn** 68:18

**GPS** 127:21 164:6

**grab** 96:7

**gracious** 213:6 224:5

**grade** 242:19

**grammar** 246:4

**grand** 57:8

**grants** 100:2

**grass** 146:3

**grassy** 264:12

**gravel** 127:18 130:1, 5,20 131:14,17 132:3 141:9

**gray** 103:19 199:24 218:6

**greater** 194:14 216:17

**greatest** 122:11

**green** 50:1 107:12 108:11 119:7 185:22

**Greenway** 68:18

**grip** 206:11

**gripped** 206:8

**ground** 6:14 42:11

**group** 61:22

**guaranteed** 22:8

**guard** 63:5,8,12 243:1

**guardrail** 139:24

**guess** 20:7 26:15 35:5 38:23 56:23 71:11 75:4 76:15 84:23 87:1 94:15 124:8 132:3,7,16 133:16,19,20 143:23 154:9 159:13 168:24 176:12 183:5 185:2 204:5 212:14 218:2 221:6 246:22 247:10 252:8 262:2 270:17 276:3

**guesstimated** 133:1

**guidance** 54:10

**guideline** 54:17

**guilty** 11:7

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: gun...idea

**gun** 196:22 197:3,5,6, 10,16 204:1

**gut** 256:23

**guy** 39:1 42:18 72:20 104:15 113:19 121:4 136:3 154:1,7,16 155:8 165:6 186:20 238:12,20 239:3 250:23

**guy's** 73:9 82:14

**guys** 10:18 30:16,20 36:5 39:19 57:6,11 60:7 63:7 77:5 78:6 79:12,22 89:10 93:7 94:4 104:21 113:8 131:16 137:13 156:5 163:19 180:6,17 192:24 194:6,24 202:6,17 218:10 220:18 221:8 249:5 250:22 251:2 271:12, 16

**gym** 14:19 174:5

---

**H**

**hairpin** 50:17 174:16

**half** 102:14,16 276:22 277:5

**halfway** 167:19

**Halloween** 67:10,13, 15,20

**halt** 192:22 277:7,8,9

**hand** 26:10,12 95:20 96:10,16 114:19 146:20,21 157:10,12 159:21,22,23,24 160:4,6,8,17,18,22 196:2 198:24 200:7 206:3,12 208:1 214:3 216:18 232:1 268:24

**handcuff** 42:4 270:4

**handcuffed** 201:11, 12,15 211:22,24 231:22 232:15,20 269:17

**handcuffing** 270:3

**handcuffs** 132:8,9 211:15,17,20 228:24 229:8 230:9 269:22,

24

**handed** 44:21 45:21 87:1

**handle** 122:3 135:4

**handlebar** 135:5

**handlebars** 134:16, 23,24

**handled** 12:2 260:13

**handling** 59:19

**hands** 61:24 161:1,9 196:14 203:18 204:2, 3,4,7 205:24 206:8, 16,18,19 211:1,2,5,8, 11 229:16 269:18 270:11,14

**handy** 88:11

**Handycam** 81:13 82:7 83:20,21 84:24

**Hang** 103:8

**hanging** 132:10

**happen** 73:15

**happened** 10:11,24 22:8 74:21 88:13 93:22 108:22 131:19 139:14 164:22 169:11 183:12 192:21 200:23 202:13 220:21 237:13 264:5 265:18

**happening** 123:18 176:17 229:17

**happy** 6:18

**hard** 25:12,20 98:21 111:7

**Harry** 22:19

**Harvey** 5:18 14:6 16:10 18:2,12,14 21:3 23:8,10,14 24:7 26:3, 6 27:7 28:7,17 30:17 31:18 32:2,12,14 33:21 34:12 38:5 40:18,20,23 41:5,14 42:1 51:2 80:18,19 103:17 113:8 135:10, 13,21,24 136:9,15,18 138:7 145:15 149:18, 19 153:7 160:20 161:24 162:13 163:24 164:16 165:24 169:20

171:18 172:19 174:8, 22 175:1 192:22,23 194:18,23 195:7,11, 18 196:21 197:15,24 200:19 201:11,14,18 202:11 203:17 205:9, 21 206:6,11,17,22 207:10,22 209:4 210:23 211:9,10,19 218:23 219:1,8,12,13 220:1,4,10 221:3 226:19,21 227:1,5,11, 17 228:3 229:20 230:3,15 231:10,13, 23 232:5,14 249:2 252:5 261:10 270:3,7 271:14 275:23

**Harvey's** 27:3 55:10, 19 56:6 162:10 174:17 181:12,13 182:24 197:6 207:1,6 230:4 252:16 261:9 275:11 276:15 277:9

**Harveys** 136:3

**hat** 84:20 85:2

**hate** 271:14

**hazard** 233:11,19

**head** 38:6,12 103:17, 18 200:20 206:21 207:7,12,16,19,23 214:21,22 215:1

**healed** 140:20

**hear** 29:20 50:7 52:4 132:8 142:4 145:4,8 153:10 155:4 156:19 157:2,13 159:3 161:20 162:15,22 166:12 167:9 169:1 174:23 175:3 199:5 219:7 272:3 275:21

**heard** 13:20 31:16 148:24 154:23 158:13 163:20 173:7 180:15, 24 182:14 206:24 207:9 275:13

**hearing** 11:15 74:13, 23 91:22 156:18,22 161:24 162:2

**Heart** 63:9

**Heavenly** 117:12,16, 17,20 118:2,15

120:15 122:15,24 123:1,2,9,10,18,20 130:19 132:1 147:21 163:22 186:9

**heavy** 247:2,6,15

**Heck** 190:8

**held** 5:7 58:17 157:10,12 160:7,22 200:7

**helmet** 202:12,16,17, 19 203:11 204:20 205:5 207:7 227:22, 24 228:2,5 230:16,18

**helped** 211:6

**helpful** 45:6

**helping** 141:24

**hey** 14:1 73:1,14,18 74:7 77:3,19 94:5 113:9 138:19 141:19 186:19 219:19 220:5 227:6 228:3 236:2 254:2 267:24

**hide** 100:7 257:7

**high** 123:14 133:4 269:8,10

**higher** 121:21

**highest** 81:11

**highlights** 97:18

**highway** 109:20 113:2,7 116:13 118:9 129:17 131:21 265:16 269:14

**hillside** 134:18

**hindered** 211:6

**hinged** 230:5,8

**hip** 140:4

**hire** 35:2

**hired** 33:15 58:3 63:12 245:3

**history** 242:15

**hit** 56:11 131:2 153:5 155:11 157:24 158:15 251:15

**hits** 179:5

**hoard** 156:14

**hold** 136:10 160:3,14 173:24 198:17 206:18 225:22

**holding** 160:4,6,8 198:24 218:10

**Holstein** 170:8

**home** 59:9,21 60:22

**horn** 155:11 158:1,9

**horns** 158:15

**horrible** 83:11

**hospital** 55:6 80:4,8

**hot** 205:2

**Houck** 96:24 97:7,21 98:14,17,20,21 99:8, 11,18,22,24

**hour** 56:10 88:1 104:23 117:11,12,14, 15 118:13,14,17 124:8 147:23 148:4, 14 151:4,9,13,14,24 152:2 153:23 161:15 175:4 180:13 252:16

**hours** 64:6 66:15 237:8

**house** 73:23

**houses** 156:2,3 177:1,5 178:10

**Housing** 68:7

**hovering** 145:5

**huge** 146:1

**hung** 80:9

**Huntington** 95:4

**hurt** 139:9

**hurts** 214:3,4,6

**husband** 71:17

**hyper** 204:24

---

**I**

**I's** 94:21

**i.e.** 255:3

**icloud** 25:10,23

**idea** 99:9 173:22 194:19

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: identification..kind

**identification** 44:15 95:24 208:15 216:23 234:16 235:10 268:21

**identify** 127:7

**identifying** 225:3

**identity** 143:20

**illegal** 10:16 32:24 33:2,4,5

**illustrated** 135:17

**immediately** 19:15 212:4 219:11 229:10 244:5 266:1 276:4

**immobilization** 223:3,9

**immobilized** 230:19

**impact** 7:9

**impairment** 156:18

**important** 207:22 241:11

**improper** 114:2 141:1 143:6,10 144:5, 8,11 207:15 257:13

**improperly** 112:20 140:22

**inaccurate** 143:9

**inches** 133:7

**incident** 9:6,7 10:7,8 43:4,5,8 44:2 59:6,7 60:17 63:18,24 67:3,4 69:11,14 70:14,16 78:18 79:5 92:20 119:12 135:22 152:13 208:14,20 237:4,5 259:3,13,21

**incidents** 10:6,9 78:10 236:13

**included** 66:11

**including** 270:20

**India** 106:3

**indicating** 158:5

**indictment** 55:7

**indifference** 47:22, 23 48:3,12 152:15 233:13

**individual** 84:7

222:17

**individuals** 82:6 90:24

**influence** 7:8

**informant** 84:6

**information** 75:22 76:7,11,17 77:20,22 78:4,24 93:7 138:9 238:1,8 245:22 255:13 256:14

**informed** 227:2,22 228:3 266:2

**ingested** 215:21 221:16

**initial** 114:24 116:19 131:23 152:21 158:16 194:10 212:19 214:13 233:22 258:15 277:21

**initially** 35:7 48:17 50:16 51:6 52:1 77:14 125:12 152:24 155:9, 10 158:16 204:3 206:2 211:20 212:1 246:23 253:24 269:11 277:19

**initiate** 115:4 116:1 139:7 157:24 278:15

**initiated** 49:1 50:4,9 116:2 141:2,3 144:3, 11 155:20 157:21 172:12 187:10 256:18 257:19

**initiating** 134:11 149:3

**injured** 139:12,13,17 156:21 215:8 228:7

**injuries** 139:12 216:1 225:3,5

**injury** 214:24 215:7 228:6 233:2 255:3

**Inlets** 255:20

**inside** 61:20 84:18 140:12 202:12 205:4 272:20,21 273:7

**inspect** 49:15

**inspected** 262:14

**inspection** 89:17 92:8 261:23 262:12

266:7,10,11,15 267:9, 14,21

**inspections** 89:13, 15,23

**installed** 101:3

**instance** 18:3 32:24 62:14 66:3 70:20 71:24 113:1 231:5,7 237:7

**instances** 71:14 74:1 78:22

**instructed** 223:17 253:21

**instructing** 30:4 88:20

**instruction** 245:4

**insured** 264:24

**intact** 202:20

**intended** 119:3

**intentionally** 209:14

**interaction** 99:13,18

**intercept** 167:8,12

**interchange** 49:14

**intercourse** 66:1

**interest** 41:24

**intern** 140:17

**interpretation** 165:16

**interrupt** 202:23

**intersection** 50:1 115:9 117:12 118:14 123:2,9 128:14 135:9 139:19 141:9 186:8 193:24

**interview** 12:18,21 13:21 15:1 55:24 86:24 263:1

**interviewed** 12:12 244:15

**interviews** 96:23,24

**intox** 62:15,16

**intoxicated** 60:20 61:1

**intoxication** 62:9 79:7

**introduce** 5:13

**intrusion** 214:24

**investigate** 34:1

**investigation** 7:20 13:3 15:1 16:6,21 17:10,11,24 18:2 20:3 22:22 35:21 224:6 237:11

**investigations** 48:6 238:18

**involved** 20:19 80:19 113:13 138:21,24 142:8,9,16 143:2 250:13 259:7,24 260:22 262:6 263:16

**involves** 254:24

**involving** 237:24 245:10

**ipad** 26:17 39:21,22

**ipads** 11:2

**iphone** 24:21 26:3,21 27:1

**issue** 7:21 12:11 44:1 65:13,15,16 227:23

**issued** 24:22 46:7 100:17

**issues** 65:7,8 79:3,5 244:3

**J**

**Jack** 70:4 82:15,24

**jacket** 198:12,13 199:15,16,17 228:16 229:12

**Jackson** 213:7

**Jaden** 241:23

**Jagermeister** 70:3

**jail** 212:15

**Jake** 80:15

**Jan-care** 213:6

**January** 37:12,13 96:21 97:10

**Jeep** 182:7,8,13,14, 18,21,24 183:6,22 184:8,14 193:16 249:14 277:5

**Jesse** 5:15

**jet** 107:5

**Jim** 70:5

**job** 54:5 63:16 75:11 155:9 156:21 242:15 243:21 244:5,18

**jobs** 243:6 263:8

**Joe's** 61:17,20

**joined** 83:1 136:9 244:11 249:2

**joining** 244:6

**joins** 51:2 136:15,18

**Jones** 68:8,18,20

**jump** 245:6

**jumped** 139:24 195:21

**jumping** 236:11

**jungle** 174:5

**jurisdiction** 261:6

**jury** 57:8 241:10

**justified** 114:5

**justifying** 247:10

**K**

**K-9** 168:1 169:7 176:19

**Kanawha** 240:10

**Kentucky** 76:13

**keys** 60:2

**kids** 174:4 241:15 242:8

**kids'** 248:6

**kind** 16:13 34:9 54:16 56:24 57:13,15 71:4 78:3 82:19 99:8 120:21 123:18 141:18 158:4 161:21 175:9 179:4 196:10 209:20 212:18 221:22 231:1

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: kitchen..make

238:21 239:18 242:13
260:17 264:14 273:3
275:17

**kitchen** 96:8

**knee** 42:10 222:13

**knees** 221:19

**knew** 21:7 37:22 38:1
60:14 69:7 113:9,17
151:16 169:10 239:18
249:22 251:23

**knowing** 126:2
238:13

**knowledge** 8:10 11:9
18:22 19:5 43:13
47:16 92:1 209:10
238:17 250:8 263:8,
15

**Kristen** 242:5

L

**label** 152:21 174:16

**lack** 34:8 66:7 68:21
75:5 138:4

**ladies** 182:15 183:9

**lady** 241:4

**laid** 141:10 201:12

**Lake** 76:13

**land** 191:15

**landed** 191:15

**lane** 106:6 110:20,21,
24 111:2 114:19,20
123:13,22 124:18,22
125:1,17 126:1,14,16,
23,24 127:1,2,11,24
128:16 129:3,9
146:21 174:18 186:18

**lanes** 145:22 146:3

**language** 209:20

**lapel** 81:14,15,19
83:22 84:24

**laptop** 40:10

**larger** 101:15

**lasted** 144:12

**late** 236:13

**latest** 99:21

**law** 8:10 29:8,24
36:23 47:21 48:8
63:1,5 82:22 167:12
213:2 223:22,24
230:17 235:21 243:1
269:7,17 270:1,10,12

**lawful** 256:19 257:19

**Lawn** 243:16

**lawsuit** 18:24 19:3
29:3 42:24 43:3,22
66:24

**lawsuit's** 28:22

**lawyer** 15:7,21 17:20,
21 18:1,15 20:14
32:14,16,18 33:9
34:23 35:3,17

**lawyers** 14:24

**lawyers'** 14:24

**laying** 202:8,9 203:22
204:1,2 207:20
232:12 273:15

**lead** 59:21 67:7
239:11 257:14

**leading** 77:18

**leads** 218:22

**learned** 23:20

**leave** 67:20 85:11
221:12 232:12 257:8

**leaving** 110:14

**lectures** 224:9

**left** 48:23 49:11,24
58:7 60:4,21 67:21
72:10 83:4 102:9
106:6 107:13,20
113:8,21 114:19
115:1,2 120:18 124:7
132:17 134:18 140:19
146:20,21 156:19
162:14 179:22 191:3
192:13 193:20
198:17,20 200:3
202:8,24 206:1,4
226:4 229:12 232:5,
14 237:9 248:24
251:13 271:5 273:3
275:24 276:4,12,13

**legal** 5:11 33:12 35:6,

7,13 144:4,7 257:23

**legs** 191:14 225:10
226:9,11,13,16,21
227:6,18,21 228:4
230:15 232:19

**Leigh** 5:10

**length** 193:4 233:18
276:3

**length/duration**
233:10

**lengths** 193:5,8,9,12,
13 276:19,22

**lengthy** 64:19 73:15

**letter** 239:20

**letting** 257:2

**level** 135:5 160:5

**license** 234:15,19,22

**licensing** 98:12

**lieutenant** 13:24
14:5,8,17 16:9 18:11,
23 20:2,7,15 23:9,14
89:3,6,8,20 94:11
150:5,11 154:15
219:19,22 220:2
229:19 253:22
259:15,17 260:6
266:13 267:8 272:1,4

**lieutenants** 89:9 92:5
93:5

**life** 83:10

**lifted** 216:3

**lifting** 222:21 224:16

**light** 105:7,8,13,21
106:2,5,14 107:12,15
108:3,4,5,11,13,15,20
109:10,12,13 110:14
112:12 155:10,18
185:20 186:13,14
189:13 263:21 265:12

**lights** 109:21 110:19
114:12 115:5 116:1
121:20 144:3 155:9,
18,19,20 156:3,9,10
157:19,20 186:7
278:14

**liking** 99:9

**limit** 50:17 118:3,6,9,

7,13 144:4,7 257:23

16 119:21 121:8
123:10 133:7 151:10
175:14

**limitations** 8:8

**limits** 151:7 165:9

**Lindsay** 241:24

**lines** 15:2 28:21 65:6
90:3 121:5 239:4

**lips** 228:10

**liquor** 70:4

**list** 244:15

**listed** 79:5

**listen** 52:14 115:18
117:1 118:7 121:4
161:10 170:24 171:2
219:24

**listened** 52:12,20,21,
22 135:19 172:9
185:19 186:12

**listening** 147:2 271:5

**litigation** 28:24
29:12,13

**live** 240:10,13 241:2,7

**lives** 241:4

**livestock** 152:23

**living** 69:2 71:1 72:20

**loaded** 62:8,10
229:21 270:8

**local** 64:1

**locate** 255:15

**located** 159:14
164:10

**location** 60:5 89:11
114:24 131:23 158:16
184:23 185:10 189:14
211:12 219:18

**long** 34:2 37:11 41:13
43:14 64:4 83:9,10
92:5 102:16 138:10
151:11 154:11 177:3
194:15 205:14,16,17,
18 208:21 213:9,10
224:6 235:5 236:8
242:18 243:2 271:12,
20

**longer** 24:23 62:11
64:14 70:3,4 82:18
128:16 165:14 270:16

**longest** 177:3

**looked** 20:18 52:8
53:15,16 55:1,4,5,6,8
57:13 81:22 86:24
94:14 95:12 98:22
106:24 109:17 174:9
179:24 181:13 192:4
197:2 201:1 218:3
276:20 277:3

**loose** 195:16

**lose** 74:7

**lot** 35:2 55:4 61:18
63:7 81:12 82:5
101:23,24 124:10
132:5 139:1 142:5
174:24 185:16 190:8
194:5 209:16 215:17
257:23

**loud** 155:13 156:4
159:5

**loudest** 158:21

**low** 60:11 123:15
125:12

**luck** 126:2 158:6

**Luckily** 125:5,7
252:12,14

**lunch** 72:1

M

**made** 42:1,16 66:5
89:4 95:5 121:3
147:7,8 202:15 211:8
238:20 254:13 271:7

**magistrate** 46:6,23

**maintenance** 104:15
263:3,5,13

**majority** 111:19
198:1

**make** 16:13 26:16
35:2 40:6 44:11 45:15
70:11 76:5 84:12 92:6
115:12,14 125:10
135:18,19 136:1
142:24 143:20 144:2
149:5 158:3 160:14

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: makes..month

161:3 190:15,17
196:13 211:1,2
212:13 214:19 215:3,
17 218:6 220:11
221:4 233:24 238:20,
22 239:4,19 242:14
248:15 255:7 257:5,7
261:19 264:15 272:14
277:24 278:1,7,11,16

**makes** 7:5 71:12
146:8

**making** 66:13 88:1
146:5 211:5 257:17
272:23

**male** 71:1 72:12 140:5

**male's** 8:23

**malfunctioned** 83:6

**malicious** 9:2 10:22
11:5,10 246:9

**man** 73:1 103:20
238:15

**managed** 243:11

**management** 64:24

**maneuver** 183:19
232:23

**manilla** 72:13 73:16

**manner** 48:12 112:5
207:20

**manual** 54:1,6,8,11
236:16,24

**manufacturer** 83:11

**March** 12:18,23 13:1,
11,12,14,15 14:9,14
16:8 19:9,11,15,16
22:5 27:14 30:16
32:13 33:18,22 37:15
38:5 53:4 94:24

**mark** 87:24 95:21
102:12 137:1,17
176:1 183:3 189:23
191:3 208:1 216:19
217:21 220:19 226:9
234:9 235:2 272:3
275:4,10

**marked** 44:15 45:22
95:24 96:10 115:20
124:21 126:17
193:21,22 208:15
216:23 234:16 235:9

268:21,24

**marker** 112:23
113:17,23 141:4
145:23,24

**market** 98:17

**markings** 183:3

**married** 59:12 65:9,
10,11 67:12 71:2,18
240:15,19,22 242:1

**material** 29:21

**matte** 257:24

**matter** 5:3 7:20 13:3
34:1 60:12

**mayor** 95:12 97:6,12
100:2

**mayor's** 100:5

**mcs** 270:22

**meaning** 18:8 93:8
150:22 274:17

**means** 5:3,16 20:22
26:7 37:22 42:2,8
43:8 47:19 48:15,23
49:12,16 50:10 92:20
104:8 105:5,6,7
106:13,15 107:10,14
113:3,12 116:3
141:18 143:14,15,16
146:19 152:13 167:8,
13 179:12 181:24
187:21 191:7 195:11
203:17,22 204:21
206:16 207:20
215:10,11,20 226:23
227:1,6,8,16 229:20
230:2 233:12,21
251:4,5,12 252:5,21
253:2,13 256:1,5,11,
19 258:8,9 270:4,7,15
274:19 276:1 277:11,
20,22 278:4,20

**Means's** 49:2 55:6
107:9 165:16 205:24
206:8 207:7,12,23
234:23 253:6 270:17

**measure** 133:13

**measurement**
133:14

**measurements**
268:9

**measures** 75:7
205:21

**mechanical** 121:8,23
151:2 153:24 165:9,
19

**media** 92:2

**medical** 212:23 269:2

**medically** 212:14

**medications** 7:9
270:20

**meet** 13:8,11 30:2
31:8 247:22

**meeting** 13:6 18:10
19:6,8,18 20:1 32:13
33:17,20 37:17 74:6
76:18

**meetings** 69:18
94:18 95:1

**member** 29:24 33:10
259:7

**members** 90:9
119:17 120:1

**membership** 33:14

**memo** 88:20 89:2
92:11 93:4,11

**mention** 242:24

**mentioned** 10:22
12:22 75:14 128:5
173:2,14 253:19

**mentions** 32:14
34:22 35:17 99:11

**merchandise** 11:2

**Mesaba** 243:12

**message** 24:1 28:3

**messaged** 14:23
16:2,5

**messager** 17:5

**messages** 24:11,12,
18 25:6,9 26:19 29:4
59:11,17 61:5

**messaging** 14:18
16:5 24:15 25:22

**Messer** 90:6

**Messer's** 57:16

**met** 31:24 76:12,23
140:17 237:12,13

**metal** 230:12

**method** 98:20

**Metro** 37:9 49:18,22
104:16 109:1,15
136:19,20 137:18,20
138:2,4,13,16,19
145:10 146:13 147:4,
6,10,17 148:6,18
149:14 150:1,18
153:20 154:5,20
161:12,18 162:8,20
163:3,8,13,15 164:2,
9,14,24 165:22 166:4,
11,15,17,24 167:3
169:18 170:5,10
171:5,11,16,19,24
172:3,6 173:7 185:20
186:11,12,14 189:15
212:4 219:17,23
271:6 275:15

**mic** 82:20

**microphone** 195:22
201:6

**middle** 22:17 27:15
30:17 66:4 159:16
242:4 271:3 275:12

**mile** 112:23 113:23
141:4 145:23,24
148:14

**miles** 117:11,12,14,
15 118:13,14,16
124:7 147:23 148:4
151:4,9,13,14,23
152:2 153:23 161:15
175:4 180:13 252:16

**Millennium** 243:19

**millisecond** 122:21

**mind** 141:19 255:9
257:10

**mine** 60:7 67:11
209:1 210:18 218:24
225:13,15,16 277:7

**minute** 49:9 59:21
68:3 105:9,24 108:7
109:13 115:19 117:2
123:8 139:16 151:8
168:23 169:9 189:22
198:2 200:16 202:24
219:14 272:3

**minutes** 48:20,24
49:2,3 50:3,5,6,7,12
51:3,4 52:5 68:3
102:9,15,16 108:19
113:24 114:21
115:11,15,24 119:22
120:6,7 122:20
124:15 127:6 128:22
131:15 136:13 138:10
139:8 144:13 145:12
147:12,19 148:10
149:16 150:21
154:22,24 155:3
158:13 164:21 166:6
167:2 169:23 170:19
171:2,22 172:10,17
174:2 175:23 177:9
179:1,21 184:22
185:5,6,7,8,11,14,15,
17,24 186:5 187:1,5,
17,19,21 188:9,24
189:4,7,13,18,23,24
239:24 253:2,4

**mirror** 86:1

**misdemeanor** 11:16

**misheard** 156:17

**misinterpreted**
115:16

**mistake** 89:22

**mistaken** 156:17

**misunderstood**
156:17

**misused** 90:24

**model** 98:22 99:5
143:20 248:15 257:5,
7 258:2 264:16
277:24

**models** 98:16

**Molly** 12:3

**moment** 154:14

**Monday** 27:17 47:9

**money** 9:15 87:17
88:3

**Monster** 84:17 85:1

**Monte** 249:16,18,23
250:1,10

**month** 89:16 141:11,
16 266:10,14,20
267:1

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: monthly..officers

**monthly** 92:8 266:9

**months** 9:14 12:6 16:24 44:3,6 75:23 76:8

**morning** 36:11,14 52:20,23 53:17,19 56:7 65:21 104:22 125:23 267:2,5

**mother's** 241:24

**mothers** 241:17,20

**motion** 18:6 42:10,11 200:16

**motioning** 135:1

**motor** 121:12,13 125:4 143:19 154:8 165:19

**motorcycle** 48:8,15 49:15 104:7 106:21, 23 107:10,16 108:1, 12 109:4 111:5,15 112:1 117:9 118:12 121:7,10,19,22,24 122:5,11 123:11 125:15,21 126:13 130:19,21,22 131:1, 10 132:22 134:14,16, 17 135:8 139:3,5,16 140:21,22 141:1,17 142:6,15,19 143:23 144:4 151:2,21 152:5 154:5,11,16 167:20 168:1,4,16 191:20,21, 23,24 192:18,20 212:17 217:14,15 221:20 222:3,7,9 254:16 255:23,24 256:1,6,7,9,11 257:14 262:4,13,17 264:15 277:20,24 278:1,7,11, 15,16,21

**motorcycle's** 123:17

**motorcycles** 122:8,9 139:1 142:11,13 143:3,19 154:10,13 256:1 257:23 258:4

**motorcyclist** 111:19 134:3 150:23

**motorcyclists** 111:19 122:8 151:22

**mount** 99:3,4

**Mountain** 132:2 134:21 135:9 149:9 157:16 183:21 184:7 248:19,20,21

**mounted** 160:16

**mouth** 106:11 108:23 228:21

**move** 8:5 145:7,8 201:9 204:4 216:11 219:3,6 220:13 221:6 230:2,24 232:22 242:10 269:21 270:5 273:16

**moved** 135:7 141:8 199:3 211:11,16 212:1,3 215:10 216:3 218:17 220:10 221:4 226:14,23 228:24 229:8 231:4 232:3,9, 11 247:24 270:16 271:16

**movement** 121:19,21

**movements** 125:11 270:17

**moving** 146:19 222:21 224:16

**Moyer** 8:23 10:12 11:8 12:3,4 57:3,5 71:7,24 72:1 76:4 77:15 81:9 82:8 84:5, 9,22 94:10 98:8 103:2,5,16 113:8 145:15 162:13 219:16 220:19 229:18 245:20 271:10,11,20 272:1,2

**muddy** 218:16

**mulchy** 264:11

**Mullens** 97:12,17

**multi** 69:1

**multiple** 130:20 215:5 257:5

**murder** 254:19 255:4

---

**N**

**name's** 77:2

**named** 10:2,3 18:23 19:2 63:10 76:7

**names** 240:21 241:19

**narcotics** 82:21 224:4,6

**narrate** 136:12

**narrating** 170:1 174:8,21 175:1

**narration** 114:22 136:13,14 184:24

**narrative** 53:9 153:10 208:9,10 209:7,11 261:9 269:4,6

**narrow** 268:5,10

**Naturally** 78:1

**nature** 65:24 251:8

**nausea** 270:23

**necessarily** 23:16 35:9 53:8 64:22 98:7 213:22

**neck** 214:4 223:2 227:24

**needed** 20:8 62:2 100:4 104:24 200:10 201:20

**negative** 97:21 122:10

**negotiating** 123:12, 23 124:19 125:15 126:13

**neighborhood** 55:21

**night** 47:10 60:21 61:10 66:4,14 145:1

**nights** 103:21

**Ninja** 258:2

**ninth** 242:18

**normal** 36:21

**Northwest** 243:13

**note** 30:7,9,11 66:20, 24 67:2

**noted** 30:5,14

**notes** 240:1

**notice** 5:23 180:17 230:5

**noticed** 109:19 128:3 155:6 174:24 175:1

277:20

**noticing** 45:7

**notification** 258:20 259:2,4,5,8,12 260:17,21 261:15

**notified** 23:9 38:20, 21 40:18 163:11 166:11,12,19 212:4 216:12 219:18 265:24

**notify** 49:10 148:21

**number** 5:4 26:23,24 27:3 45:1 72:18 95:21 97:13 98:16 101:21 156:11,12 157:10 177:5 179:2 180:21 219:1 225:18 234:10 247:19 250:12 261:19 262:10 271:7

**numbers** 60:7,8 180:19 188:12 225:17 226:2

---

**O**

**Oakhurst** 48:24 49:12

**oath** 46:14 56:2

**obey** 252:7

**object** 23:15 28:20,21 66:19 278:22

**objection** 29:20 30:5, 8,10,12,13 66:24 67:2 143:8,12 187:22

**objectionable** 30:4

**observant** 251:9

**observe** 228:8 250:15

**observed** 38:22 117:9 118:12 123:11 125:15 126:10,12 130:24 131:10 132:22 134:14,17 135:10 167:19 168:1,4,16

**obstructed** 214:5

**obtained** 233:12

**obvious** 51:22

**OC** 206:19 210:24

212:7,9,10 227:23

**occasions** 257:13

**occur** 78:14 191:6

**occurred** 20:5 169:1 227:5 267:5

**occurs** 114:14 230:23

**October** 59:8 92:9

**odd** 154:3,7 172:16 189:4

**Oddly** 124:16

**offender** 144:21

**offense** 61:13 145:2

**offer** 93:6 94:4

**offered** 244:17,20

**office** 16:20 22:15,16 28:8,11,12 29:6 30:22,23 38:17 39:5, 8,11,12,13,14,17 69:3 72:13,16 90:14,15 93:17 119:3

**officer** 5:18 8:17,18 13:2 18:22 29:23 30:24 36:23 45:24 54:3 56:21 57:16 59:11 60:24 61:2,8,9 62:20 73:22 74:19,20 79:6 80:12,20 88:2 90:7 92:15 96:17 100:20,22 101:11 110:9 136:21 138:24 139:7,15,20 140:7 141:2 144:10,13 151:11 203:10,17 205:8,21 206:11 210:1 212:20 218:23 232:14 235:12,21 238:24 240:10 255:1

**officer's** 59:10,20 247:21 257:10

**officers** 10:13,14,19 16:3 60:16 62:7 77:4 79:7,12,15 80:5,16 82:21 97:9,13 98:16, 22 99:4,5,10,11,17, 19,24 101:17,21 114:17 149:6 156:16 159:1 160:1 173:2 186:19 233:11,20 250:5 253:9 259:24

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: offices..phone's

**offices** 5:7

**official** 78:15

**Oil** 263:6

**older** 139:20 230:9 248:16

**oldest** 241:23

**omitted** 246:3,5

**omitting** 245:21

**oncoming** 123:14 127:4,5 184:1

**one's** 143:6 221:11

**online** 87:13

**open** 31:3 146:21 244:12

**opened** 72:14 131:24 273:20

**operate** 25:10,18 59:13 78:2 121:7 154:13 160:3

**operates** 48:11

**operating** 48:15 111:5

**operation** 110:22 122:8 130:21 253:7

**operator** 5:1,19 56:14,18 102:8 110:2,6 122:12 123:12 125:15 126:13 130:21 133:22 134:13,15 175:10 202:23 203:3, 7 240:3,7 268:13,17 279:4

**opinion** 42:9 140:18

**opposed** 42:8 188:18,19

**opposing** 129:11

**opposite** 97:16 123:13,22 124:18,22 125:1,8,16 126:1,14, 16 127:2,24 129:14 141:5 146:2 163:18 174:18 183:20 206:3

**order** 159:8 239:1

**original** 19:12

**originally** 23:20 277:1,3

**ourself** 212:11

**outcome** 78:8

**oversaw** 71:15

**oversee** 90:23

**owner** 255:16 256:9, 16

**owns** 72:23

**P**

**p.m.** 5:13 56:14,18 110:2,6 203:3,7 240:3,7 268:17 279:4

**pack** 130:14 140:2

**pages** 208:21 209:3 226:2

**paid** 9:15

**Paige** 240:24 242:5

**pain** 270:22

**paint** 143:19 153:13, 14 175:6 257:4,9 258:1,4 263:8

**painted** 107:1,6 143:17 254:17 257:6, 24 277:23

**painting** 107:5

**palpitate** 215:7

**pants** 140:7 197:22

**paperwork** 55:6 269:2

**paragraph** 99:19 117:9 167:18,22,23 233:5,24 258:7

**paralyzed** 277:11

**park** 68:8,18 174:2,3, 5,7 183:22 184:8 247:4 248:3,4,5 249:4,6 250:22

**park's** 174:10

**parked** 104:19 182:24 192:2 219:1 275:5

**Parker** 120:18,19

**Parkersburg** 224:12

**parking** 185:16

**Parkland** 68:6,14,24 69:5

**Parsons** 61:6,7,8,9

**part** 9:24 20:14 29:6 51:4 54:5 56:23 57:7 68:7 78:19 110:10 136:24 141:3 152:21 185:5,6,11,14 192:5 221:22 222:8 241:9 258:7,20,23 260:7,8 269:16

**parts** 45:10 131:1,3 132:16 137:9,13 165:12,13,14 188:2 208:8 239:18 256:2

**party** 67:10,13,15,20

**Paskal** 89:9 219:17, 19,22 229:19

**Paskel** 150:5,11 220:2 253:22 260:6 261:3 267:9 272:1,4

**pass** 125:3,8 170:13 171:8 172:21 179:24 183:17,19 264:10

**passed** 72:15 125:9 170:7,22 181:1 183:6, 10,12 184:1,12,16 238:14 248:20 249:1, 20 264:12

**passenger** 141:7,8

**passing** 28:7 174:2

**past** 177:1 247:12 248:18

**pat** 215:1

**path** 57:9 102:13,21 103:12 104:12 105:18 108:9 110:12 114:8 116:6 117:24 118:21 122:17 123:14 127:15 129:1,21 131:16 135:15 137:1,5,12 173:18 174:3 175:12, 17 176:22 177:12 178:6,16 179:2,3,19 182:5 184:19 185:8 187:13,15 188:3,22 251:16

**patient** 214:9,13 222:18,22 269:17,18, 19 270:11,20 271:23

**patients** 224:16

**patrol** 39:8,10,13,14 58:7,18,21 60:16 85:11,13,20 86:7,12, 14 266:3

**patrolman** 16:10 18:12 21:3 23:10 24:7 26:3,6 28:7,17 32:12 33:21 34:12 38:5 40:20 42:1 51:2 55:10,19 56:6 61:6,7 65:14 79:18 80:19 90:6 135:10,12,24 162:13 163:24 197:6, 15 206:17,21 207:1,6, 10,22 209:4 211:10, 19 219:8 226:18,21 227:5,16 229:20 231:10,13,23 245:18 261:8,10 270:7 271:14 276:15

**patrolman's** 245:15

**patrolmen** 60:24 79:17

**pause** 102:11 108:15 122:19 176:16,19

**paused** 150:20 164:21

**pavement** 121:1 123:16 154:4 165:14

**paving** 111:2

**pay** 33:11 63:24 64:7, 8 67:3 87:20 213:11 264:22,24

**PC** 39:4 40:1,9

**PCP** 64:1

**PD** 95:3,4 225:18

**pedestrian** 247:1,16, 17

**pedestrians** 152:23 250:12,15

**peers** 74:20

**pending** 7:14 9:20

**Pennsylvania** 68:17, 18,19

**Pens** 84:20

**people** 11:2 17:6,7 49:7,9,10 55:17 61:22

88:13 91:19 92:2 96:23 99:12,17 107:3 109:8 112:1 141:22, 23 142:1,3 143:18 154:12,13 191:1 212:17 232:3 241:13 249:11 250:9 257:4,8 258:1,3

**pepper** 195:14 196:4 197:16 202:11,14 203:17 204:15,17,24 205:6,14,22 206:7,14

**perception** 215:4

**perfectly** 257:23

**period** 64:19 81:14 213:1 243:12

**periods** 51:10,11

**person** 10:1,15 14:17 22:10,12 64:19 66:2,9 67:14 76:6 84:11 195:10 201:15 214:2, 9,13 254:11

**person's** 10:3 215:7 237:18

**personal** 42:9

**personnel** 75:8,13 220:12 221:5

**persons** 265:24

**perspective** 51:1

**Peterson** 5:2,4,18 6:5 8:16,17,18 13:2 18:22 44:13,16 95:22 96:1, 17 110:9 203:10 208:13,16 209:7 210:1 216:21,24 234:14,17 235:7,10, 12 240:10 268:19,22

**Peterson's** 208:11, 12

**phased** 85:23 86:2,4

**phone** 12:22 13:5 14:17 17:8,9 22:10 24:9,12,14,15,20,22 25:2,6,11,23 26:5,11, 17,18 27:5 39:21 40:3 59:16 60:2,17,18 72:18 84:12

**phone's** 26:8

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: photo..procedures

**photo** 217:1,10 229:3

**photograph** 229:23 234:15 271:17

**photographs** 216:22 230:1 239:13 271:18

**photos** 25:11,15 130:12 215:16 216:18,19 217:5 222:5 229:1

**physically** 93:16 121:11

**physician** 69:17

**pick** 60:5 80:6 150:9 151:18

**picked** 80:12

**pickup** 184:11

**picnic** 174:4 248:5

**picture** 153:11,14 175:6 218:8 221:20 222:3 228:16 229:15 234:19 261:19,23 262:1,2,17 268:1 272:12,15,23 274:1, 23

**pictures** 228:12,13 250:7 272:6,8 273:23

**piece** 100:1

**pieced** 106:24

**pills** 76:20 77:5,11,14, 15

**Pinkerton** 243:4,8

**pinned** 81:23

**pinpoint** 27:21

**pivotal** 113:18

**place** 22:13,15 38:15 42:14 62:10 93:13,15, 19 110:16 119:12 121:16,19,21 124:9 134:15 135:2 140:5 151:9 154:3

**places** 47:24 224:11, 14

**placing** 50:20 121:1

**plain** 10:19 58:20 64:13 70:21 77:3 79:12

**plaintiff** 5:3,22

**plan** 99:23

**plastic** 230:11

**plate** 107:23 108:21 234:16,19,22

**play** 40:13 57:8 122:21 148:1,2 170:18 248:6

**played** 102:21 103:12 104:12 105:18 108:9 110:12 114:8 116:6 117:24 118:21 122:17 127:15 129:1,21 135:15 137:5,20 138:2,13 145:10 146:13 147:4,10,17 148:6,18 149:14 150:1,18 153:20 154:20 161:12,18 162:8,20 163:8,13 164:2,14,24 165:22 166:4,15,24 169:18 170:5,10 171:5,16,24 172:6 173:18 175:12, 17 176:22 177:12 178:6,16 179:19 182:5 184:19 187:13 188:22 190:22 195:5 196:8,17 197:13 198:4,15 199:10,21 200:12 202:4

**playing** 114:10

**plea** 55:7

**pled** 11:7,16

**plenty** 146:6

**plug** 83:17 93:17

**plugged** 178:14

**pocket** 81:24

**Poe** 5:8 12:3

**point** 7:16 24:24 36:11 41:23 49:17,19, 21 56:2 59:23 62:6,22 68:1 69:19 73:13 75:9 77:5 85:13 87:1 95:9, 18 100:3,12 104:7 106:15 107:7,11,23 109:21 111:9,11 112:4,9,14,18 113:18, 24 114:5 116:11 119:23 120:23 123:21

124:14,17 126:3,5 127:17 128:21 129:16 133:22 136:17,20 138:17 140:20 146:8 147:6,7,20 151:17 152:5,17,24 153:24 159:2 164:16 168:6, 12 171:10 179:7,13 186:15,24 187:10 193:18 194:2 195:14 197:3,9,17 203:17 212:2 215:24 216:11 217:15 220:15 230:23 232:2,16,21 236:22 238:18 248:9 251:19, 24 252:19,23 271:8 275:16

**points** 72:1 243:6

**poison** 70:6

**poking** 221:22

**pole** 178:22

**police** 10:14 33:11 53:24 54:2,22 62:4,20 73:22 74:15 77:4 78:16 88:2 91:1 97:1, 9,20,23 99:21 100:22 101:21 160:1,24 173:2,4 212:20 223:11,23 224:16 225:2 235:16 238:23 250:9 260:9

**policies** 54:22 74:17 75:3 91:5 236:9 246:12 254:23

**policy** 53:12,14,23,24 54:19,21 74:9 75:3 79:2,4 88:20 89:2 91:2,3,7 235:4,9,17, 18,20,24 236:7,16,24

**pool** 221:12

**poor** 165:6

**populated** 247:15,17

**portion** 49:4 51:5,19 116:13,14 157:14 209:1,2 219:13 224:18 225:1 233:22 236:18 243:11,16

**portions** 50:13,14,15 51:15 54:11 236:15, 24 269:12

**position** 60:13 79:10 145:23 156:7,9,10 162:4 163:3,10,18 168:19 172:15 205:7 207:21 235:20 244:21

**positioned** 139:22 142:1,3 166:7 201:19 275:11

**positioning** 198:1

**positions** 58:16

**positive** 81:7 87:24 90:8 127:24 128:9 144:20 232:6 246:5 272:19 273:12

**possibility** 154:4 204:14

**possibly** 91:2 98:12 125:3 140:14 162:11 193:9,11 217:23 228:7 243:23 254:15, 18,21

**posted** 66:6,8 118:16 120:10 123:10 151:7

**postponed** 56:1

**potential** 66:23 214:9

**potentially** 8:13

**potholes** 112:1 130:21 182:2

**power** 238:23

**pre** 48:22

**preemptive** 49:5,6

**preferred** 134:12

**preliminary** 11:15

**premature** 153:7

**preparing** 51:22 53:18

**prescription** 77:15

**present** 18:10,15 28:15 29:24 30:1,18 41:3,16 80:3 182:15 207:3 259:23 271:4

**presentable** 196:14

**presume** 30:7 147:20

**pretty** 51:21 62:5 133:4 160:19 174:12 181:20 194:7 220:18

**229:11** 268:5,10 276:2

**preventing** 98:13 218:10

**previous** 78:24 111:18 112:24 113:19 154:12 246:22,23 247:8 254:17

**previously** 115:10 240:19

**primarily** 76:3,4 89:11 259:17

**primary** 69:16

**print** 87:4

**printed** 74:18 87:5

**prior** 8:19,21 12:23 13:6 20:18,20,22 36:17 43:3 55:2,3 56:8 59:18 62:19 75:22 76:8 107:1 113:11,13 119:2 131:22 134:10 146:4, 5 149:3 169:12,14 176:15 177:17 178:20 186:22 195:23 206:7, 14 213:1 217:14,15, 16 220:2 222:9 226:10,14 227:9 229:10 230:17 238:13 244:5 252:17 253:2,4 265:23

**prioritize** 24:17

**private** 39:11

**privileged** 18:20

**privy** 94:21

**pro** 78:3

**probable** 46:7

**problem** 62:5 93:10, 11 103:9 121:23 154:1

**problems** 71:13 98:15

**procedure** 53:13 54:1 93:24 236:16,24

**procedures** 53:14,23 54:22 74:17 91:7 222:20 230:4 236:9 254:23

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: process..recess

**process** 35:5 241:10

**produce** 266:16

**produced** 86:24 137:14 216:19 234:19 236:18

**product** 28:22 29:5, 10,13,14

**program** 213:16

**progress** 254:18

**prong** 79:21

**proof** 65:17,19 66:7

**proper** 143:13

**properly** 122:2,4

**prosecution** 9:2 10:22 11:5,10 234:21 246:9

**prosecutor** 93:20

**prosecutor's** 119:3

**protection** 10:13

**protections** 7:24 8:3

**protrusion** 214:24

**prove** 256:12

**provide** 77:19 238:7

**provided** 12:15 77:22 78:23 161:7 236:21

**providing** 197:7

**provisions** 74:16

**public** 8:12 60:20 61:1 62:9,15,16 79:6 84:23 233:12,20 253:11

**pull** 40:13 48:7 104:17 110:15 137:24 145:18 158:10 248:7,17 249:7 278:20

**pulled** 40:1 60:14 106:14 108:21 109:5 113:10 179:24 199:2 204:21 206:5 217:19 248:9 249:4 250:23

**Pullin** 5:7

**pulling** 107:12 180:6 195:17 198:7 199:16, 17

**pulls** 176:11

**pumps** 103:21

**punishment** 74:11

**purchase** 77:4 84:12 88:3

**purchased** 81:9 85:3 95:10,13 100:19 101:2,5

**purchases** 99:21

**purchasing** 76:20 84:6 94:15

**purpose** 33:20

**purposes** 44:15 96:1 178:20 208:15 216:23 234:17 235:10 268:21 272:22

**purse** 60:3,10,11

**pursuant** 5:22 113:11

**pursue** 128:13 251:4, 5

**pursued** 128:14,19 142:21 165:9 179:10

**pursuing** 49:3 233:11,20 253:9 258:15

**pursuit** 48:14,20 51:12 57:1,9 102:12, 21 103:12 104:12 105:18 108:9 110:12 112:24 113:6,13 114:8 116:6 117:24 118:21 120:2 122:17 123:22 124:14 127:15 129:1,21 130:4 131:16,18 135:15 136:18 137:1,5,12 139:7,8,16 140:24 141:16 144:11 152:17 172:10 173:18 174:3, 8,13 175:12,17 176:22 177:12 178:6, 16 179:1,3,7,12,19 182:5 183:23 184:19 185:8 187:13,15 188:1,3,22 233:10,18, 22 235:4,9,17 246:13, 14,24 247:5,10,11,14 248:10 249:2 250:13, 22 251:3,18,23 252:24 253:5,17,22,

23 254:7 256:18 257:19 258:6,16,20, 23 259:2,7,8,12,16 260:8,10,12,17,21,22 261:15 269:8,10

**pursuits** 52:1 142:6, 10,15,18,19 143:2,5 246:23 247:9 259:18 260:18

**put** 25:11,15,17 94:5 106:10 108:22 121:14 128:3 134:22,23 271:1

**putting** 20:9 97:13 123:15 211:17

**Q**

**quality** 81:11

**quarters** 212:14

**question** 6:16,20 7:14,15 17:22 23:16 43:7 52:4 76:15 77:10 106:16 120:11 121:6 125:18 143:9,13 168:15 187:23 194:22 197:18 213:18 214:11 252:23 256:10 262:9 263:2

**questioning** 12:12 37:21

**questions** 6:15 51:21 56:3 67:1,4 203:11 277:14,16 278:24

**quick** 56:11 136:24

**quid** 78:3

**quit** 153:9

**quo** 78:3

**quoted** 100:2,5

**quotes** 97:11

**R**

**Rabel** 132:2 134:19, 20,21 135:8 149:9 157:16 158:11 183:21 184:6,7 248:19,20,21

**radio** 49:17 52:9,10, 12 136:18,20 137:17,

19 138:1,12 141:22, 24 145:9 146:12 147:3,9,16 148:5,17 149:13,24 150:17 153:8,19 154:19 158:21,23 159:19,20, 21,23 160:23 161:11, 17 162:7,19 163:7,12 164:1,13,23 165:21 166:3,14,23 169:17 170:4,9 171:4,15,23 172:5 195:16 200:8,9 230:14

**radio's** 195:16

**radioed** 172:19,20

**radioing** 141:19

**rail** 219:17

**railroad** 169:13 172:3 177:2 180:18,19,21 181:1 183:10 188:12 191:9 192:13 193:21, 23 194:2,9,10,13 195:1 198:7 201:13 216:15,16 220:15 221:9 226:23 249:24 270:16 274:8,21 275:8 276:10,15,18 277:8

**Raleigh** 213:7

**ran** 112:11 128:6 129:12,15 156:3 185:6,14 186:4 200:8

**range** 22:7 119:5,9 175:4 242:8 245:4

**Ranger** 184:12 248:16 249:1

**ranging** 117:11 118:13

**rank** 89:19

**rape** 254:20

**rate** 87:20

**ravine** 139:18,24 199:17 202:18 203:20 215:10,16,18 216:10 217:13,17 231:20

**reached** 11:20 14:5

**reaction** 256:23

**read** 40:7 45:14,16,19 48:1,4 53:22 55:1,9,

12,15,16 56:7 109:9, 10,14 115:23 123:8 181:12 221:3 279:1,3, 6

**reader** 83:17 93:18

**reading** 128:5 163:21 168:14

**ready** 128:15 141:19 172:18 174:14 242:10

**real** 88:11 128:15 136:24 220:13

**realize** 151:14 181:4 194:1 230:16

**rear** 85:24 86:1 156:12 157:20 219:2

**reason** 59:1 112:10, 14,17 114:1 140:24 143:16,21,22 144:4,7, 23 156:4,18 256:19 257:19 277:19,21

**reasonable** 254:12 255:1

**reasons** 114:4 143:5 144:15 278:19

**recall** 16:10,22 17:4, 10,15 19:17 24:3 27:17 28:5 31:6,22 32:4,9,11 33:3 34:15, 18 37:6 38:18 39:3 41:4,12,17 43:1,2 55:5,7 63:15 64:5 75:16 77:23 78:8 79:11 81:6 82:16 83:8 127:11 130:11 139:6 140:12 141:2 143:6 144:15,17 152:11 160:21 174:20 181:14,16 211:5,6,14, 22 220:17 224:15 225:1,4,6 232:17 237:22 245:24 246:2, 9 266:22 273:22 276:20

**receive** 24:12 32:23 64:1

**received** 13:5,13 24:21 55:13,14 56:22 59:18 69:14 138:9

**recently** 139:1

**recess** 56:16 110:4

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: reckless..road

203:5 240:5 268:15

**reckless** 47:21,23
48:3,12,16 50:13
51:6,7,8 52:2 112:5
150:10 151:19,20,22
152:3,7,15,18 153:1,4
233:13 246:13,17,18,
19,24 247:20 251:23
252:24 253:5,7,17,22

**recognize** 45:15
102:23 208:17 235:12
262:1,2

**recollection** 9:10,11
40:24 124:1 169:4
178:18 183:11,12
184:10 203:16 274:15

**recommended**
74:22

**reconsideration**
246:16

**record** 5:12 6:3 8:13
47:12 56:15,19 60:15
84:3,13 110:1,3,7
115:14 203:4,8,10
240:4,8 267:19,20
268:14,18 272:23

**record's** 115:23

**recorded** 81:12 93:12

**recording** 60:17 79:8
84:3,8,10 236:6

**recordings** 93:14

**records** 75:10,12

**recreated** 185:16
186:5 189:24 190:9

**recreation** 104:3
188:4

**red** 105:7,8,12 106:5,
14 108:13 217:11
218:9 250:7,10

**redact** 45:3

**redid** 111:1 124:4
174:10 177:24

**redriven** 124:3

**reduction** 64:2

**reenactment** 155:22

**reevaluating** 152:20

**refer** 144:10

**reference** 226:3

**referring** 170:2 176:8

**refile** 245:16

**refiled** 11:8 245:17,19

**refiling** 245:21

**reflected** 75:8

**regard** 15:18

**registered** 112:20,21
140:22 255:16,17
256:9,16

**registration** 49:16
107:15,24 109:3,4,6,
7,14 114:2 141:1
143:7,10 144:5,9,12
234:22 256:20 257:8,
20 278:10

**registrations** 257:14

**regular** 85:11,12
230:12

**regulations** 258:6

**reholstered** 197:7

**reinstate** 218:18

**related** 64:22 79:22
113:7 226:19 241:11

**relations** 71:2

**relationship** 65:4
76:8 237:21 238:8,10,
14,16 239:1

**relay** 107:15 108:24
109:14 219:8 275:21

**relayed** 12:4,5
116:22,23 149:11
219:11 247:8 275:20

**relaying** 113:18
151:17

**released** 38:13

**relevance** 66:23

**relevant** 29:21 30:3

**relies** 247:8

**remained** 229:20
270:7

**remember** 8:23,24
10:3 34:4 42:20 43:21

50:18 51:13 52:10
53:2 55:5 75:17,24
76:19,22 79:4 89:7
91:4,22 98:2,6 119:6,
10,11,18 120:9 124:6
127:1,9 128:8,10,12
141:14 144:18,20
145:1 146:21 148:1
173:4 174:7,9 180:4
181:14 187:2 193:2
197:24 199:2 202:21,
22 203:12 204:17,18,
19,20 206:15 211:23
220:17 221:18
223:16,17,19 224:5,
17,18,20 231:24
239:16 242:21 243:18
246:3,7,10 248:14,15
250:3 264:18 269:23
270:6 271:17 272:7
273:21,22 276:20

**remembering** 32:6

**remove** 212:12
214:23 221:13
230:16,18

**removed** 64:10 211:8
216:6 227:22 228:3
229:1 270:15

**removing** 227:24
228:5

**rent** 107:4

**rented** 107:4

**repair** 129:5

**repairs** 263:9

**Repeat** 43:7 214:11

**repeatedly** 156:23

**repetitive** 6:10

**rephrase** 6:16,18
128:5

**replied** 263:3

**report** 44:7 53:8,10
121:2 123:5 128:3,6
151:15 153:15 208:4,
14,20 210:5,8,9
217:16 220:9,20
225:7 226:10 233:5,6
234:5 233:8 258:21
259:3,4,5,8,13
260:17,21,23 261:4,5,
6,11,15 264:20 265:3,

5,8,20 266:16 267:8,
10,15,20 268:20
269:4,5,20

**report's** 123:24

**reported** 266:5

**reporter** 5:11,19 7:5
234:12 261:20

**reporting** 194:20
209:24 258:20 260:7

**reports** 48:5 51:10
261:7 267:21

**reposition** 201:8,19

**repositioned** 199:19
201:20

**repository** 93:7

**represent** 5:14 29:9
262:16

**represented** 12:1,2

**representing** 8:9

**request** 134:10

**requested** 212:5
227:22

**requests** 21:2

**require** 98:18

**RESA** 213:15

**reset** 42:11

**residence** 239:9

**residential** 177:7

**resource** 30:24 31:2

**resources** 134:10

**respect** 237:19

**respond** 78:20

**responded** 80:16

**responder** 223:15

**response** 212:19
235:3,8,17 254:7

**responses** 20:10

**responsibility**
258:12

**responsible** 258:16

**rest** 36:7,8 47:4 56:1
236:21,23

**restaurant** 243:10,11

**restored** 127:22

**restroom** 56:11

**result** 9:12 11:11
63:20 77:22

**resulted** 255:2

**retained** 8:2 22:1
31:11 33:13 35:5,13,
19

**retake** 124:4

**retrieval** 90:22 91:16

**return** 64:20 83:13

**review** 45:9 53:14
217:6 246:16 258:24
260:8,9,11

**reviewed** 52:7 53:6

**reviewing** 12:17

**rewind** 180:2

**Rick** 104:14 143:21
257:11

**ridden** 154:11

**ride** 19:18 80:1,6
122:8 131:2 150:22
153:23 154:7,16
165:7

**rider** 122:5

**riders** 121:16,18

**Ridge** 49:14 50:1
107:15 108:16 112:12
185:23 186:13 264:8

**Ridges** 136:7,8

**riding** 154:10

**right-hand** 177:22
195:10

**Rinehart** 16:9 18:11,
14 19:2

**rink** 243:7,9

**ripped** 140:7

**Rise** 97:9

**risk** 48:8

**river** 252:19

**road** 50:1 51:5 58:12
64:16 113:14 116:15

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: roads..show

117:10 118:13 120:12
127:18 130:1,5,20
132:5,13 134:21
135:9,10 139:19
145:24 149:20 157:16
158:17 166:18,21
167:5,12 168:5,11,17
170:22 172:19,20
177:4 180:1 181:20,
23 184:7 185:22
186:7 193:20 233:10,
19 248:19,20 251:14,
17 252:1,17 274:3

**roads** 188:5,6,7,8

**roadside** 183:22
184:8

**roadway** 118:16
119:23 123:11,19
124:21,22 125:23
126:16 131:2 132:7,
17,18 135:11 145:21,
22 146:3,11 151:7
154:4 165:11 168:18
175:9 178:24 180:7
181:19 193:7,10
216:14 219:1 220:11
221:4 247:23,24
248:17

**roadways** 151:13

**robbery** 255:4

**Robinson** 8:22 10:21
11:8,16 245:7,9,13,14

**Rock** 76:13

**rode** 140:2

**roll** 231:13,15

**rolled** 231:6,24
269:19 270:11

**roller** 242:18,19
243:7,9

**rolling** 230:24 270:13

**room** 18:6 30:21

**rotated** 59:1

**rotation** 263:6

**rough** 127:18 130:22
131:2 181:16,19,20,
23

**roughage** 132:13

**rougher** 132:5,14

**roughly** 43:15 101:14
170:20 172:24 186:1
188:9 213:17 243:22

**round** 99:21

**rounded** 109:5

**rounding** 126:22
128:2

**route** 57:1 102:2
149:6,20 166:8
185:17 186:4 187:20,
23,24 188:1,3,4
189:1,21

**routine** 263:3,5,12

**row** 177:1

**Ruggier** 5:17 15:3,8,
17 16:1,10,18 17:14
18:21 23:15 28:20
29:11,18 30:5,7,11
44:19 45:6,10 66:19
95:15 96:5 102:19
143:8,12 187:22
190:15,19 201:4,6
208:6,10,12 210:13,
16,19,21 225:15
235:5 240:2 256:24
261:24 262:8 277:15,
18 279:3

**rules** 6:14

**run** 107:23 156:2
166:22 185:17 187:20
276:13

**running** 113:20
139:23 185:11 191:17
227:9 251:16

**runs** 38:20 252:19

**ruts** 127:18 130:5,20
132:17

**S**

**safe** 211:12

**safely** 216:11

**safety** 48:9,13

**saith** 279:8

**Sam's** 186:6

**sat** 18:6 80:5

**Saturday** 119:11,12,

19 178:1 267:6,7

**save** 25:14 93:18

**saved** 98:18

**scale** 139:24

**scene** 130:13 135:22
173:14 220:14 221:7
222:17 229:23 234:8
249:17 269:6 271:18,
23

**schedule** 27:19

**scheduled** 52:16

**school** 22:17 27:15
31:1 35:15 36:10,18,
24 58:21 213:12

**scratch** 263:22

**scratches** 263:9
265:11 266:4

**screaming** 196:13

**screeching** 192:22
275:13,23

**script** 77:16

**SD** 83:16 90:3 92:24

**search** 42:3

**searched** 201:15

**seat** 159:16

**seconds** 49:2,3 50:3,
6,8,12 52:6 105:9,24
108:7,20 109:13
113:24 114:22
115:11,15,24 119:23
120:6,8 122:20
124:15 127:6 128:23
131:15 145:12
147:12,19 148:10
149:16 150:21 162:6
164:22 166:6,10
167:2 169:23 170:20
171:2,22 172:10,17
173:12 174:2 175:23
177:9 179:1 183:4
184:22 185:6,11,15,
24 187:5,17 188:24
189:4,13,19,23 195:9,
20 196:5,11,19
200:16 205:20 272:4

**section** 48:10 69:2,3
74:18 117:17 118:9
123:19 131:21,22

132:1 145:21 146:22
156:24 157:3 236:3
258:12

**secured** 218:11
232:20 271:2

**security** 63:5,8,12
243:1,4 271:7

**sedan** 184:13 248:13
250:23

**seized** 71:6,7

**select** 95:2

**selection** 241:10

**send** 83:11 261:20

**senior** 69:2

**sense** 35:2 71:12
120:21 215:17 218:6

**sensitive** 204:24

**sensory** 215:3

**sentence** 221:2

**sentences** 226:6

**sentencing** 55:7

**separate** 10:9 29:7
30:23

**separated** 80:3

**separately** 19:19

**September** 38:14
43:18 89:1,24 90:12
92:9,19 94:3 223:20
245:5

**sequence** 206:15
221:2

**sergeant** 8:16 56:24
57:3,5 89:20 94:9,10,
11 103:2,5,16 162:13
163:22 210:7 219:15
229:18 245:20 259:18
261:8 266:13 271:10,
11,24 272:1

**series** 216:18,22
229:17

**service** 37:7 74:24
101:7 224:7

**session** 64:20

**set** 51:18 57:14 94:17
177:2 178:10 181:19

194:8,9,12

**settled** 9:13 11:14
12:5

**settlement** 9:15
11:20

**Seventeen** 102:16

**Seventh** 46:20

**sewed** 140:18

**sexual** 59:19 65:24
71:2 72:3 76:8 78:22
237:21 239:1,10

**shallower** 218:16
221:24

**shame** 100:2

**share** 39:16

**shared** 39:14 90:24
100:21

**sharp** 123:12 124:6
125:16 126:13

**sheet** 45:1

**sheriff** 173:3

**Sheriff's** 265:9

**shift** 38:16 39:15,16
47:6,8,10 60:7,8
89:10 90:6 92:11,12
104:24 180:16 259:19
260:2,3,5 266:14

**shifts** 64:6,8 74:4,7,
12

**shirt** 81:10,24 229:4

**shoes** 197:23

**shooting** 271:18
274:24

**shop** 263:13,18

**short** 205:19 243:16
269:17

**shot** 119:10

**shotgun** 156:19

**shoulder** 130:23

**shout** 14:2

**show** 24:2 37:2 57:9
97:14 102:13 104:19
115:2 116:13 118:10
135:12 136:23 146:6

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: showed..specifics

168:24 169:7,10
184:15 200:14 201:2
248:2 257:5 261:18

**showed** 43:2 60:16
92:12 173:13 276:7

**showing** 48:12

**shown** 195:20 202:1

**shows** 35:15 155:12
160:20 189:11,12
192:9

**shut** 31:3,4

**sic** 65:17

**side** 103:19 134:5,8
145:24 163:19 165:10
177:22 195:10,21,22
197:2 198:1 200:3
201:9,13,20 206:1,2,3
216:14,15 232:1,5
243:19 248:10 249:5

**sided** 34:9,10,13
35:16 36:6

**sides** 97:15

**sign** 36:18 128:2
129:11,15,18 186:9
228:11

**signal** 252:7

**signaling** 106:13

**signature** 46:3,4

**signed** 36:23 47:14,
15

**signs** 46:23 128:4,7
129:13 156:1 188:11
225:3

**silent** 275:18

**sill** 198:12

**Silverado** 105:2

**simply** 257:7

**single** 240:15

**sinuses** 96:4

**sir** 6:4,19 9:19 10:9
11:12,19 12:9,24 13:5
14:15,22 15:14,22,24
17:5,14,15 19:1,4,12,
20 22:6 23:12,24
24:5,10,17,23 25:4,9,
16 26:2,10,13,22

27:4,6,10,13,20 28:2,
16,19 30:19 31:2,14,1
20 32:17,19 33:7,10,
19 34:11 35:11 36:15,
20 37:4,10,16,24
38:3,7,9 39:18,22
41:20 42:22 43:12
44:5,9,22 45:1,18,20
46:2,5,9,12,15,18,21
47:4,18 48:22 50:14
51:24 52:13,23 54:4,
7,10,24 55:11 56:4,9
57:19,21,23 58:1,24
59:4 61:3,6,11,14
62:14,18,21,23 63:2,
19,22 65:1,10,15
66:18 68:12,24 69:6,
9,20,22 70:3,13
71:10,18 72:10,22
73:1 75:2,10,13 78:1,
13 79:15,20,24 80:7,
10,20,23 81:4 83:3,20
84:14 85:10,15,17
86:9,15,17 87:8,16,
19,23 88:16 90:18
92:4 95:8,10 96:22
97:3,5 98:2 100:9,11,
16,18 101:4,6,9,12,15
103:7 106:1,4,21,22
108:1 109:23 111:7,
10,16 112:11 113:4
114:3,6 116:24
117:22 118:24 120:3,
9 121:6 127:8 129:5,
14 130:3 131:4,6,13
133:1 135:6 136:21
137:22 138:18,21
139:4 142:13,19
143:4,16 147:22
148:9,12,22 149:2,8
150:7,13,16,21 152:4,
19 158:12 159:9,23
160:10 161:16
162:11,24 163:17,20
166:2,13 167:6,17,21,
24 168:3 170:17
171:14,20 175:22
178:4 179:11,14,16
181:8 182:9,11,20
183:11 185:9,13,18
186:3 187:9 191:2,5
194:3,21 195:2,15
196:20,24 197:11
198:7,9,12,19,23
199:2,12,18 200:5,17,
21,24 201:23 202:2,
19 203:15,24 205:16
206:15,23 207:2,9,14

208:17,18 209:5,9,12,
15,19,21,23 210:2,11
211:18,24 212:2,21
215:19 216:2,5,10
217:2,9,19 218:13
219:5,7 221:10,15,24
222:1,5,6,11,24
223:7,10,16 224:1,2,
11 225:4,6 227:12,13,
15 228:7,15,17,19,23
229:14 230:22
231:16,19 232:13
233:15 234:2,4,9,24
235:14 236:1,10,17
237:3 238:2,6,10
239:2,5,15 241:8
242:9 244:2,4 245:8,
11 247:13 248:8,11
249:8,13 250:11,15,
21,24 251:7,17,22
252:10 253:3,24
254:20 255:5,11,15
256:16 258:1,14,18
259:1,4,14 260:4,13
262:11,15,19,21,24
263:11,17,20 264:18
265:5,7,13 266:6,17
267:13 268:2,7
269:23 270:3,14,24
271:4,10,22 272:13
273:1,6,17 275:3,9

**siren** 110:19 154:23
155:4,5 156:9 157:11,
18,20,23 158:2,4,15
159:3 161:20,22

**sirens** 109:22 115:4
144:3 155:9 156:3
162:16

**sit** 45:14 100:7 186:19
255:10

**site** 63:11 184:21
189:9

**sitting** 43:21 146:2
154:14 160:6 222:7

**situation** 35:8 59:24
80:3 231:19

**situations** 52:1 78:14

**Sixty-seven** 87:10

**skim** 55:14

**skimmed** 56:7

**skin** 202:15 215:1

**skip** 107:20 173:20

**slam** 276:8,11

**slated** 101:19

**slide** 211:11

**sliding** 211:9

**slight** 123:12 125:16
126:14

**slip** 129:5 195:24

**slipped** 195:18,23

**slow** 50:19,20 51:12
117:3 120:24 180:4

**slowed** 50:18 120:23
121:13 124:7 127:3
128:20 130:16,21
194:8,11,12 252:20,
21,22

**slowing** 121:23
165:15,17 250:24

**small** 108:1 169:7
184:11

**smart** 17:8 25:2 59:16

**smashed** 212:14

**smell** 204:18

**smoother** 132:3

**Snap** 66:3,5

**Snapchat** 59:13,14,
18 61:4 65:20

**Snapchats** 59:11,12

**snapping** 154:5

**Snow** 224:7

**Social** 271:7

**socks** 197:23

**software** 73:8 94:19
98:11

**solely** 22:21

**solidified** 242:13

**somebody's** 39:5
118:5

**someone's** 199:23

**son** 241:23 242:4,5

**Sony** 81:13 82:7
83:18,20,21 84:24

**sooner** 13:17

**sort** 10:17 65:5 68:22
74:5 82:2 108:11
133:6 138:5,11
204:24 249:5

**sound** 153:23 158:1
271:13

**sounded** 271:6

**sounds** 27:24 77:1
121:2,17 128:6
155:11 220:4 239:17
240:2

**soures** 82:6

**south** 6:7 10:19 16:3,
4 22:17 30:17 49:13
50:1 53:24 54:2,21
58:4,12,16,23 62:24
63:21 67:15 68:7,8,22
69:13 70:15 71:9
72:23 74:14 75:8
77:3,17 78:11,16
85:20 88:1 91:5
96:23,24 97:4,11,24
100:13 101:7,13,17
107:13,15 108:16
112:12 161:6 185:22
186:13 225:18
235:16,21 238:18
240:13 244:6,11,13,
14,15,18,19,23
246:12 254:23 264:7
265:17 267:21

**Southern** 5:6 82:22

**space** 277:4

**speak** 14:6 21:23
23:1,8 80:2 91:21
230:2 249:14

**speaking** 11:22,23
31:7 60:19 80:1 98:7
150:4 181:6 239:20

**speaks** 261:4

**special** 222:20

**specialist** 5:11

**specific** 78:9 94:13
107:3 224:20

**specifically** 11:3
18:7 22:24 184:6
220:17 250:4 270:6

**specifics** 34:17

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: speculate..Sundays

**speculate** 255:21

**sped** 174:15

**speed** 50:17 117:11 118:3,6,9,14,16 119:21 120:11 123:10 125:12 127:3 134:6, 15 147:13 151:7,10 174:23,24 175:4,14 181:8 194:17,20 233:10,18 269:8,10

**speeding** 145:2 151:3,4

**speedometer** 153:7 181:9 194:21

**speeds** 117:10,18,20 118:13 120:21 121:21 123:15 150:9 151:18, 20,22 153:12 166:1 175:3 190:6

**spend** 88:3

**spent** 51:22

**spider** 271:2

**spin** 192:18

**spinal** 223:9 225:2,5 228:6 233:1

**spine** 228:1 230:19

**spins** 191:24 192:1

**spit** 228:20

**spitting** 215:12

**split** 63:9 137:8,13

**spoke** 12:1,3 14:3 15:18,24 17:14 21:20 28:13 35:13 36:9 37:20 43:17 73:13 82:7 104:24 119:17 120:1 238:11

**spoken** 15:20 21:15, 19 31:13

**Sports** 243:10

**spot** 46:6 77:7

**spotlight** 132:9,10

**spouse** 240:23

**spouses** 240:21

**spray** 107:1 143:17, 18 197:10 202:12 203:17 204:15,17

205:1,6,15,22 206:7, 14 210:24 212:7,12 257:4,6,24 258:1,4 277:23

**sprayed** 196:4 202:11,14 205:3,5,6, 15

**spraying** 195:14

**spread** 177:6,7

**spring** 223:19

**spun** 191:10

**Stabilization** 223:2

**stabilize** 204:12 227:24

**staff** 14:24

**standing** 60:13 69:8 205:7 218:23

**stands** 164:8

**Stanley** 104:16,18,19 105:6 106:12,13

**Stanley's** 106:7

**start** 7:2 16:15 20:2 24:19 49:17,21 55:22 130:1 131:1 172:11 189:8 244:23

**started** 6:8 11:23 58:10,11 64:16 70:21, 24 72:5 77:6 81:2 89:10 94:12,14 99:8 109:17 113:6,19 115:6 134:3 185:20 204:4 210:6,7 244:18, 19 245:2 271:17,18

**starting** 58:15 103:14 162:12 171:22 236:20

**starts** 50:8 116:10 137:2 150:3,9

**state** 6:3 144:18,19 148:21 171:12 173:3 223:11,23 224:16 225:2 234:21 267:11

**stated** 60:9 138:7 153:5 154:17 201:14, 21 215:13 225:9 226:8,13 227:20 231:24 269:7

**statement** 46:11,14

**states** 48:11 225:8 254:24 261:14

**stating** 47:15 259:21

**station** 14:19 22:14 39:6,7 42:14

**statute** 8:7

**stay** 68:10 188:16

**stayed** 60:13,21 143:16,22 220:15 249:15

**staying** 71:22

**stays** 158:22

**stealing** 11:3 256:5, 11

**step** 17:12 42:7,11

**stepped** 38:11 41:18 42:7 61:24 200:20 201:8,18

**stepping** 42:2,5 227:4

**steps** 276:2

**stick** 133:14

**sticker** 143:7,11 144:5 256:20

**sticks** 142:4,5

**stitches** 140:9

**stolen** 140:23 143:23 144:18,19,21 254:15, 16 255:10,14 256:8, 13,15 257:14 278:2,8, 12,17,21

**stomp** 42:1,8 200:20 207:6,23

**stomped** 38:6 207:12,16,19

**stomping** 206:21 227:4

**stop** 22:23 50:9 55:23 70:7,8 102:15 105:20 111:8 112:5,10,15,17 114:1,24 116:2,11,12 121:20 128:2,4,7,11, 17,18 129:11,12,15, 18 130:16 131:23 133:23 134:11 142:4, 5 144:4 149:4 152:2 155:18 157:21,24

158:16 172:13 173:23 179:7,12 180:4,17 186:8 187:10 188:11 219:19 220:6 239:23 250:22 253:23 256:19 257:20 264:8 278:15

**stopped** 12:10 105:8 108:4 119:17 120:4 129:6 130:16 133:21, 23 134:1,8 141:7,8 178:2 186:8 188:17 192:2 218:19 251:11

**stopping** 114:5 144:24 188:10,11

**stops** 99:12,17 144:16

**storage** 94:19 98:11, 17

**store** 93:8

**stored** 26:14 27:5 91:17 98:21

**storing** 91:16

**storm** 65:18

**story** 249:19

**straight** 51:13,14,19 153:6 168:17 169:16 174:14 175:22,24 176:2,3,5,8,10,14,15 177:3,4,16,22 181:5 194:5,10,24 244:24 248:24 252:3,18 253:6 269:14 274:6,7 276:16

**straightaways** 50:22

**straighter** 177:8

**strange** 246:20

**straps** 271:2

**stream** 205:14

**streamline** 236:12

**street** 58:19,22,23 64:10 68:8,20 71:9 76:13 81:8,10 83:1,5, 23,24 85:4,6,7,9,12 94:10 100:14 141:10 170:13 171:7 213:15 243:11,19 244:24 268:4,6

**streets** 68:21 69:1

174:23

**stretch** 102:6 109:20 113:2,7,14 124:22 129:17 146:1 168:17 175:22,24 176:6,8,10, 14 177:3,8,22 178:10 181:5 183:7 185:22 193:7,10 194:5,11,15 195:1 248:24 252:4, 18 265:16 269:14

**stretches** 51:14,19 153:6 169:16 174:15 176:2,4,15 177:4,16 253:6

**strike** 168:20 191:9, 22 277:10

**strikes** 191:23

**striking** 191:12,13 265:23

**strong** 204:21

**struck** 59:15 125:1 168:18 191:14,21,24 192:5,16,23 218:24 251:20 264:12,13 265:19

**stuck** 249:15

**studies** 94:15,19

**stuff** 55:4 93:1 100:14 103:9 108:17 130:5 138:20 174:5 177:5 204:21 231:1 245:4 263:9 271:8

**stuff's** 229:4

**subject** 7:20 13:3 247:6 269:8,9

**subscribe** 98:19

**substance** 18:14 20:6 37:21 78:19 228:11,22

**substances** 76:22 231:21

**success** 130:24

**suit** 7:21 113:19

**Sunday** 47:8 119:10, 14,18 178:1 266:13, 24 267:7,9

**Sundays** 89:16 266:21

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: superior..times

superior 92:14

supervisor 89:18,19 150:11 151:18 259:7 260:5 261:14 266:2

supervisors 91:13, 15,22 98:23 99:9 265:24

suppose 10:11 54:3, 6,23 55:22 140:15 222:21 235:22

supposed 10:23

surface 132:3

surveillance 68:23

suspect 84:23 211:7, 15 212:5,6 225:9 226:8 227:20 228:9 254:10,12

suspect's 211:1

suspects 212:11

suspended 63:24

suspension 64:3,4 67:3 72:12 74:12 237:1 238:13

suspicion 112:19

SUV 57:18 133:8 192:10,13 263:16

SUVS 133:6

Suzuki 258:2

swear 5:20

swearing 47:16

swerve 125:10 183:18 251:12

swerved 179:6,14 251:11

switch 156:7,15 159:13,14,19 160:9, 15,23 203:1

swore 126:8,10

sworn 5:23 46:10,14

symptoms 225:3

sync 189:18

system 36:24 58:21 98:18,19 100:21 255:20

**T**

tables 174:4 248:5

tackle 134:3,13

tact 203:13

tactful 67:5

tag 112:11,12,15 114:1 257:20

tags 108:1

takes 42:13 136:18 187:19 189:9

taking 11:2 60:1 159:7,21 164:16 230:1 271:18

talk 7:3 15:19 22:21 23:22 30:15 31:10 33:17 35:15 37:17 38:4,19 59:23 72:17 73:8 98:15 99:2,23 104:17 115:22 120:24 126:5 127:21 155:9 161:1 191:12 192:20 210:23 241:13 249:11 250:8,9 256:24 257:2 259:20

talked 17:24 18:1,2,5, 7 78:11 90:22 91:2 100:13 103:4 135:21 178:2 191:9 236:14 238:11 243:5 252:2,3

talking 26:18 37:15 40:2,7,9 51:1 53:23 73:13 76:6,24 84:11 98:2,6 99:13 103:24 115:19,21 121:12 123:17 126:18 132:11 136:14 138:6,7 143:14 149:17 153:12 155:22 158:8 165:8, 12,24 169:5 182:18 191:8 193:4 201:3 218:13,14 227:10 228:21 237:14 248:1 252:16 265:16 266:12 275:4

tape 154:24 202:24

tapes 110:1 203:2

taser 41:24

tax 87:10,14

tech 39:1

technical 103:9 137:23

Technology 82:16 83:1

tee 229:4

telemarketing 243:18

telephone 26:24

Teleservices 243:20

telling 18:13 26:13 43:5 79:22 80:1 92:15 113:2 114:15,17 138:16,19 145:13 147:6 163:15 164:4 166:17 177:23 196:13 201:18 219:19

tells 88:13 150:14

ten 59:21 77:1 102:8 234:12

Tennessee 224:14

term 34:9 232:10

Termination 258:6

terminology 73:20 246:20

terms 25:19 33:24 41:23 42:7 70:1 72:5 132:7,18 151:20 153:3 162:2,3 173:1 175:3 177:7 193:6 194:16 200:7 201:7 212:3 220:23 221:17 229:24 230:24 231:23 247:10 255:5 259:19, 21 266:1 276:19

Terrace 68:6,14,24 69:5

terrain 130:22

testified 5:24 15:20 238:3 245:7

testify 7:10 8:5 182:15 238:5

testifying 8:11

testimony 23:17,18 31:17 182:16

testing 99:6 244:12

text 14:23 16:2,5 17:2, 4 24:4,6,11,12,18 25:8,22

texted 16:21 27:7

texting 16:11,15 17:10

texts 26:6 29:16

theft 76:2

thicker 40:10

thing 32:7 45:15 73:12 84:22 97:21 100:18 107:5 122:2 137:9 153:8 156:22 160:19 176:18 188:15 190:9 214:19 218:2 226:3 239:19 254:15 259:14 276:7

things 7:6 20:9 30:3 44:8 45:13 61:18 78:2,19 84:16 94:20 131:19 141:19 152:20 153:17 158:20 212:18 215:5 230:11

thinking 17:3 63:3 145:19 146:4,6 158:4, 7 173:1 185:2 228:4 231:23 257:9

Thirteen 169:23

thirty 172:24 180:13

thirty-five 148:15 169:23 170:19

Thomas 80:4

thought 10:12,15,18 37:8 60:1 75:18 76:5 86:23 97:22 103:18 106:16 133:22 134:1 135:18 138:23 148:22 149:3,4,12,21 154:3 157:5,6,23 165:18,19 166:21 172:22 184:23 187:7 219:24 220:3 276:23 277:3 278:21

thoughts 23:1 35:4

threatened 255:1

throughs 37:1

throw 216:8

thrown 67:11

throws 140:1

thumb 25:14,15,20 81:21,23

Thursday 13:12 47:10

Tilt 178:13

time 5:12 7:12,19 8:1 10:3 13:20 19:5 28:1 31:8,17 36:16 37:15 39:17 41:1,6,11 42:20 43:4 48:14 49:1,2 50:4,5,11,24 51:1,22 52:6 53:2,17 55:16 56:5,14,18,22 58:1,3, 10,15 60:18 61:17,19, 20 62:2,4 64:18,20 65:11 66:15 68:6 71:7 72:19 76:19 78:2 81:14,22 82:11 83:23 85:5,7,9 86:8 87:3 89:9 94:24 96:13,24 97:12 98:8 101:10 102:18 107:2,4 109:20 110:2,6,24 119:15 124:17 125:23 126:21 127:1 130:6 131:16,18 135:24 140:16 144:3 145:1, 21 146:6,9 151:6,11 154:11,14,18 157:8 158:18 159:7,9,24 161:20 162:3 173:5, 13 178:20 182:22,23 183:2,24 186:9,13,18, 20,23 187:6,7,9 188:18 189:3,8,14,19 190:4 191:16,20 192:15,24 194:19 201:24 203:3,7 212:10 213:1 215:12, 19,20 219:13,16 220:19,23,24 221:1 226:15,20 227:5 228:2,10 232:1 233:17 234:5 237:1, 13 240:3,7 242:18 243:6,9,12 247:7 251:1 252:8 256:18 257:19 259:7 260:19 268:13,17 271:21,23 275:19 279:4

timed 48:22 49:1 52:5 187:4

times 31:23 32:1,3,7

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: tiny..vehicle

81:21 156:21 221:10 250:3 275:19

**tiny** 81:16

**tire** 221:21 263:6

**title** 61:7 224:19 238:24

**titled** 9:3

**today** 7:10 8:4,12 43:21 52:8 53:7 55:2 56:8 100:8 172:9 255:10 277:12

**toe** 214:6,7,21,22 215:2

**told** 13:23 14:5 21:19 23:14 25:2 31:8,11 32:23 38:11 94:2 99:11,17 131:23 171:11 187:7 200:19 207:1 226:20,22 227:6

**Tolley** 242:6

**top** 40:10,12 93:17,18 117:11 118:14 132:1 195:11 228:9 273:5

**total** 81:11 142:11 185:6,8,14 189:3 243:14

**touch** 163:2

**tour** 259:9

**Town** 63:9

**Trace** 116:16,17 117:10,14,16,20 118:3,12 119:24 120:13,20 123:19 141:6 147:13,20 148:13 158:17 172:13 183:24

**track** 188:12 191:13 195:1 219:4 221:9 226:24 232:7 242:24

**tracks** 177:2 183:10 188:12 191:10,12,14, 21,22,23 192:1,2,5, 13,16 193:1 194:9,10, 13 198:7 201:14 216:13,15,16 217:20 218:20 220:15 225:9 226:8,10,17 227:20 232:9,11 249:20,24

250:4 270:16 274:9, 21 275:8 276:10,15, 18 277:8

**tractor** 142:21

**traffic** 50:9,19 52:10, 11,12 99:12,17 111:3 114:18 116:2 124:23 125:1,8 127:2,4,5,24 129:6 141:22,24 142:5 149:3 156:14 211:13 216:12 218:19 219:18 220:11 221:5 247:2,3,6,16,17,18,20 249:13 252:6,7,9,10, 11

**trailer** 142:22

**train** 211:13 213:20 216:11 218:19,20 219:4

**Train's** 218:21

**trained** 212:16 224:15

**training** 212:19 213:13,14 222:16 223:11,15,23,24 224:17,19,20,22 225:1 230:17

**trains** 219:19 220:6

**transactions** 84:4

**transcribe** 155:15

**transcribing** 158:6

**transcript** 55:10 115:12 181:12,13

**transferred** 64:11

**transition** 42:3

**transmission** 159:5 180:16

**transmit** 158:18 159:3

**transmitting** 156:24 161:9 164:20

**transport** 223:4

**trash** 101:7

**travel** 117:10 118:12 123:13,14,23 124:18 125:17 126:1,14,16 127:11 133:7 134:17,

18 168:4,16 274:8,13, 17

**traveled** 145:20 274:4

**traveling** 49:12 133:9

**trial** 9:18 11:13 57:9 241:10

**trooper** 167:4 170:15 171:12 173:8 229:24 267:12

**trouble** 232:19

**truck** 104:20 105:2 184:11,12 217:11 218:9 250:7,10 275:12

**true** 47:16,17 101:10 209:11 220:22 223:5 253:15

**trust** 65:7

**truthfully** 7:10

**TSA** 62:22,24 63:16 243:14,15 244:7

**Tuesday** 13:10 47:9

**turn** 50:20 51:4 73:15 93:12 107:20 109:5, 12 114:12 120:12 124:6,20 126:15,19, 21,22 127:2,7,8,23 128:2 134:18 143:21 146:5,8,11 147:7,8 156:23 157:4 159:7 174:16 186:14 187:11 248:3,24 249:6 250:24 276:12,13 278:14

**turned** 49:12 50:5,8 93:21 106:20 107:18 120:14,16 123:9 130:19 141:4,5,7 147:13 149:21 155:20 156:15 157:4,7 158:17 183:13,24 184:3 187:6,9 189:19

**turning** 107:12,13 114:19,20 116:17 129:23 141:6 146:21 186:22 189:1 219:14 252:17

**turns** 52:6 108:11 115:3 118:15 123:12,

23 124:11,19 125:16 126:14,18,21 174:19

**TV** 155:12

**Twenty** 64:8

**Twenty-five** 118:4 148:15 175:15 180:13

**Twenty-sixth** 53:21

**type** 69:18 70:12 84:10 86:1 100:21 124:11 151:9 158:7 169:6 223:9 238:22

**types** 94:13 174:19

**U**

**uh-huh** 16:16 43:10 46:24 48:19 70:9 104:4 105:11 106:19 114:23 123:4 183:8 198:21 222:19 230:20 236:4 263:4

**ultimately** 233:21

**unable** 222:23 256:7, 8

**unbecoming** 60:23 74:19 79:6

**unbeknownst** 139:23

**underlined** 258:7

**underneath** 198:9 199:3 204:7

**understand** 6:10,15, 17 7:23 8:2,7,11 16:13 34:16 40:7 43:15 47:13 55:17 79:23 85:19 108:2 110:19 136:1 144:1 150:6 155:6 157:12 161:23 162:1 176:17 205:17 231:17 237:17 254:9 255:8,22 256:23 257:17 271:5 277:11

**understandable** 121:20

**understanding** 6:23 12:19 13:14 48:2 72:17 133:6 203:12 245:13 269:22

**understood** 6:21 19:13,24 34:21 43:23 75:3 79:4 228:8 260:16

**unfolded** 88:9

**uniform** 37:5 100:8 243:2

**uniformed** 37:6 79:15

**unit** 37:9 58:20,22,23 64:11 70:21,24 71:9 135:10 160:7 162:22 258:15

**units** 69:4 163:3,10, 16 166:7 220:10,14 221:3,7

**unmarked** 71:5,6

**unobstruct** 214:5

**unobstructed** 214:20 269:15

**unopened** 65:21

**unpaid** 74:3

**unplugging** 102:16

**unpredictable** 251:10

**unsure** 123:16

**upper** 264:11

**ups** 75:6,7 236:14,15 237:6 243:24

**user** 98:19

**V**

**valid** 77:16

**vantage** 126:3,5

**variance** 117:3

**variant** 125:12

**variations** 246:15

**varying** 117:14

**vegetation** 119:7

**vehicle** 48:12 57:4,20 59:24 60:1 67:23 68:16 71:3,4,5,6,8,11 78:20 99:21 106:8 109:7 112:10 113:21

WILLIAM ALLEN MEANS v.
E.M. PETERSON, et al.

ERIC PETERSON
05/04/2021 Index: vehicles..written

122:3 133:22 139:21
142:3 152:23 165:9
180:8 191:20 192:7,9
197:5 212:17 219:3,6
235:3,9,17 239:9
247:1,15,24 248:9,12,
15,17,18,21 249:4,6,
12 251:8,15 253:7
255:16 257:11 264:5,
7,10,14 265:21,23
266:4,6,10 267:9,14,
21 276:12,17 278:11

**vehicles** 58:5 85:8
88:21 93:6 94:3 95:11
99:20 111:23 123:14
125:4 143:19 183:20
184:2,10 188:11
195:19 218:24 226:24
247:19,23 254:17
257:4,6 266:16
275:18

**vehicular** 246:13
247:18 254:7 264:3

**Verizon** 244:9,10

**versa** 40:18 206:6

**version** 95:13

**versus** 8:22 39:11
230:6

**vice** 40:18 206:6

**victim** 45:1

**victims** 213:21,22

**video** 5:1,11,19
31:15,16,17 32:10,12
38:1,13,21,22,23,24
40:19,20 41:7,9,14
42:12,15,17 43:2,6,
15,20 44:4 52:24 53:3
56:14,18 57:1,2,3
65:23 66:12,13 82:3
88:11 89:5 93:21
102:1,8,14,17,21,23
103:2,6,12 104:12
105:18 108:9,20
110:2,6,10,12 112:10
113:22,24 114:8,10
115:12,13,19 116:6,
18 117:24 118:21,23
119:9,14 122:17
124:5,12 127:7,15
128:23 129:1,10,21,
24 131:17 135:15
136:13,24 137:5,7,10

151:8 153:14 155:19,
21,22 168:22,23
169:7,9 173:15 183:2,
6 185:1,5,9 187:16,20
188:3 189:11,12,22
190:12,14,18,22
191:1 192:9 193:17
194:4 195:3,5,10
196:8,17 197:9,13
198:4,15,20 199:6,10,
21 200:3,12 202:1,4,
7,23 203:3,7 206:20,
24 207:4 215:17
217:23 218:1,6 219:5,
6,7 227:3,9 234:7
236:6 240:3,7 248:4,7
252:2 263:1 268:13,
17 274:20 275:6
276:20 279:4

**videos** 89:5 91:16,20,
24 92:1 98:18,20,23
145:6 189:3,10

**view** 38:24 41:10
85:24 86:1 154:16
276:3

**viewed** 38:22 39:22,
23 40:8,16,19,20
41:1,8,9 43:20

**viewing** 32:12 40:23
53:3 91:18

**Vineyard** 89:8 219:16
220:19 229:18,19
270:6 271:14 272:2

**violated** 74:16 128:2
129:18 237:2

**violations** 74:9
236:15

**violent** 254:20

**Virginia** 5:6,8 8:8
48:6 97:10 151:12
157:11 173:3

**virus** 224:13

**visible** 89:12,23
204:8 211:2,3,5,8

**visor** 202:20,21,22
203:12,13 205:4

**visual** 156:8,11,12

**visualized** 201:24

**visually** 49:15

**voice** 135:17 162:10

---

**W**

**wagon** 62:10

**wait** 108:13 145:13,17
146:16,18 152:1
256:24

**waiting** 49:8 135:11
170:16 171:12

**waive** 279:2

**waived** 120:4

**walk** 37:1,2 52:6 58:9,
15 108:21 145:18
195:17 241:19
242:14,22

**walked** 60:4 68:20
80:4

**walking** 89:13 271:17

**wall** 66:6,8

**Walmart** 10:1,4,7,11,
18,19,23 11:3 108:17
109:13 110:15 185:21
186:14 189:13

**wanted** 14:6 68:1,10
76:5 95:12 144:21
161:3 231:9,12,18

**wanting** 15:1 33:24
59:23 142:24 163:23

**warrant** 46:7 233:12

**Washington** 243:19

**watch** 31:15 42:12
43:15 52:24 99:7
173:15 176:13 178:12
188:15 190:14 195:3
198:22 200:15 201:4,
6

**watched** 31:18,21,23
32:7,8 39:19 40:22
41:3,7,13 42:15
188:13 206:20,24
227:3 263:2

**watching** 49:8 124:5

**water** 96:3,6 127:19
131:11 132:23,24
133:5,7,18,23,24
134:4,17,22 191:18
196:20,21 197:8,20,

22,24 203:23 204:7
205:8,9 211:8,12
215:13,21 216:5,7
218:10 221:13,16,17,
21 270:16 276:5

**waterfall** 218:2

**weapons** 211:16
231:21 232:20

**wear** 81:10

**wearing** 37:5 130:9

**weaving** 247:2

**Webster's** 258:10

**Wednesday** 13:9,10
47:9

**week** 6:9 12:11,16
13:17,19 14:4,9,12
16:8 18:5 22:3,24
27:15,16 28:1,4,8,9,
12 30:16 32:13 33:18,
21 35:24 72:16 77:18
101:8 182:15 224:5

**weeks** 77:18 244:16

**weight** 42:3 201:9

**west** 5:6,8 8:8 48:6
97:9 144:18 151:12
157:11 173:3 243:19

**whatnot** 14:13 112:2
121:20 124:8 230:3
239:23 261:3

**wheel** 159:22 161:1

**whichever** 148:15

**white** 228:9,10,22

**wide** 180:1 268:4

**wife** 59:20 60:24 61:4
65:16 72:2

**Wild** 105:3

**William** 5:3 47:19
48:15 113:12

**Williams** 241:24

**window** 57:14

**windshield** 89:12

**Wings** 105:4

**winter** 223:19

**wise** 65:4

22,24 203:23 204:7
205:8,9 211:8,12
215:13,21 216:5,7
218:10 221:13,16,17,
21 270:16 276:5

**wondered** 104:21
169:10

**wondering** 85:21
103:17 173:6,9

**wooded** 157:15

**woods** 51:18 157:3,4
165:13

**woop** 158:1,9

**word** 33:23 34:13
54:12 64:10 65:2
68:22 75:5 138:5

**words** 31:6 34:4 40:6
106:10 108:22 114:24
118:11 126:6 207:5
236:18

**work** 19:21 28:22
29:5,9,13,14 36:9
67:12 78:1 81:12 82:5
94:10 139:14 213:5
237:7 243:17 262:22
263:14,16,19

**worked** 10:18 71:21
73:3 76:4 243:7

**working** 38:16 39:16
62:8 64:13,16 89:8
135:23 243:8 271:12

**works** 67:13 103:21
104:22

**world's** 122:11

**worn** 100:15

**worried** 33:1 91:19

**Wrangler** 182:13,14,
18,24 184:14

**wreck** 139:17

**wrecker** 181:2

**wrist** 198:8 199:1,7,
12

**write** 48:5 74:5 75:7
126:6 236:14,15
237:6 243:24 259:8
261:14,16 274:18

**writer** 54:18

**writes** 75:6

**written** 44:7 51:9,14
78:15 91:6 123:24
176:14 185:3 211:7,
10 220:8 260:17,21

266:16 267:20

**wrong** 33:9 66:2
100:6 126:23,24
127:11 200:19

**wrongful** 10:17

**wrote** 77:16 124:13
126:8 151:15 209:11
219:15 220:21,22
233:17 234:5 253:8,
15

**Y**

**y'all** 99:7

**ya** 12:7 22:19 45:2
52:4 70:7 117:5
149:23 230:10 244:10

**yards** 139:22 157:5

**year** 9:8 12:18 37:13
75:23 82:12 94:9,23
142:13,15,17 143:1
155:8 242:19 243:16
255:10,12

**yearly** 33:12 82:18
224:8

**years** 9:4,5,7,10
58:13 63:14 64:13
77:1 97:14,15 99:20
141:21,22 213:19
242:9,21 243:14

**yellow** 182:13,14,24
183:6 184:14 193:16
249:14

**yelp** 155:11

**yield** 180:8

**yielding** 188:11

**younger** 138:24

**youngest** 242:5,6

**Z**

**Zofran** 270:23

**zone** 148:14

**Zoom** 94:17 95:1