*WILLIAM ALLEN MEANS v.*

*E.M. PETERSON, et al.*

*MARY CHANDLER*

*04/26/2021*

Realtime
Reporters
"Because your time matters"

713 LeeStreet
Charleston, WV 25301

(304) 344-8463
schedulerealtime@gmail.com

Realtimereporters.net

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

* * * * * * * * * * * * * * * * * * * * * * * * *

WILLIAM ALLEN MEANS,
Plaintiff,

vs. CIVIL ACTION
NO. 2:20-cv-00561

E.M. PETERSON, D. HARVEY,
and THE CITY OF SOUTH
CHARLESTON,
Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * *

Deposition of Mary Chandler taken by the Plaintiff under the West Virginia Rules of Civil Procedure in the above-entitled action, pursuant to notice, before Angela L. Curtis, a Certified Court Reporter, at Pullin, Fowler, Flanagan, Brown & Poe, 901 Quarrier Street, Charleston, West Virginia, on the 26th day of April 2021.

REALTIME REPORTERS, LLC
ANGELA L. CURTIS, CCR
713 Lee Street
Charleston, WV 25301
(304) 344-8463
realtimereporters.net

APPEARANCES:

APPEARING FOR THE PLAINTIFF:

Dante diTrapano, Esquire
CALWELL LUCE DITRAPANO, PLLC
500 Randolph Street
Charleston, WV 25302

W. Jesse Forbes, Esquire
FORBES LAW OFFICES, PLLC
1118 Kanawha Boulevard, East
Charleston, WV 25301

APPEARING FOR THE DEFENDANTS:

Duane J. Ruggier, II, Esquire
PULLIN, FOWLER, FLANAGAN, BROWN & POE, PLLC
James Mark Building
901 Quarrier Street
Charleston, WV 25301

Also Appearing: Officer E.M. Peterson

EXAMINATION INDEX

BY MR. DITRAPANO . . . . . . . . . . . . . . 6
BY MR. RUGGIER . . . . . . . . . . . . . . .18
RE BY MR. DITRAPANO. . . . . . . . . . . . .30
RE BY MR. RUGGIER. . . . . . . . . . . . . .33
RE RE BY MR. DITRAPANO . . . . . . . . . . .33

EXHIBIT INDEX

Exhibit 1 Bystander Video
Exhibit 2 Hand Drawing

*Exhibits were marked in a previous deposition, thus are not reflected as marked in this transcript.

P R O C E E D I N G S

VIDEO OPERATOR: This is the videotaped deposition of Mary Chandler taken by the plaintiff in the matter of William Allen Means versus E.M. Peterson, et. al. being civil action number 2:20-cv-00561 in the US District Court for the Southern District of West Virginia at Charleston held at the offices of Pullin, Fowler, Flanagan, Brown and Poe in Charleston, West Virginia on this 26th day of April 2021.

My name is Chris Leigh and I'm the certified legal video specialist. The court reporter is Angie Curtis. We're now on the record. The time is approximately 4:01 p.m. Would counsel please introduce themselves and whom they represent?

MR. DITRAPAO: Yes. My name is Dante diTrapano and this is Jesse Forbes and we represent William Allen Means who I'll probably refer to as Billy during the course of the deposition.

MR. RUGGIER: Duane Ruggier representing Officers Peterson and Harvey.

VIDEO OPERATOR: Would the court reporter please swear in the witness?

M A R Y C H A N D L E R

was called as a witness by the Plaintiff, pursuant to notice, and having been first duly sworn, testified as follows:

EXAMINATION

BY MR. DITRAPANO:

**Q. Mary, I just introduced myself as Dante diTrapano and I represent, along with Jesse, Billy Means and I wanted to ask you some questions about that. Have you ever had your deposition taken before?**

A. No.

**Q. All right. There's just some very basic ground rules. The first one is that I'm going ask you a series of questions. You've sworn to tell the truth so help you God and so I'm going to assume that any question I ask you and that you answer that you're telling the truth, is that fair?**

A. Yes.

**Q. Okay. Also, I'm going to assume that if I ask you a question and you answer it that you understand precisely what I've asked and if you don't, just ask me to rephrase it or, you know, say it again or whatever you have to do to make sure that you have a clear understanding of what I'm asking you, is that okay?**

A. Yeah.

**Q. All right. The other thing is, and we're doing it very well right now, is let me finish my question, even if you anticipate where I'm kind of going with it, you want to jump in and answer, let me finish and then you think about what I've asked you and give an audible response so she can take it down in the book.**

A. Okay.

**Q. Good enough? We're not going to be here very long so if you do need a break, just say, you know, I need to run out and take a break, but I don't think that will be necessary today, okay?**

A. Okay.

**Q. Could you please state your full name for the record?**

A. Mary Elizabeth Chandler.

**Q. What is your home address, Mary?**

A. It's 2191 C&O Road, Nellis, West Virginia.

**Q. I know Nellis so that is Boone County and not Kanawha County; correct?**

A. Correct.

**Q. Are you -- are you presently employed?**

A. Yes.

**Q. Okay. Where do you work?**

A. Par Mar in Ashford.

**Q. Okay. What are you doing for Par Mar?**

A. Cashier.

**Q. How long have you been there?**

A. I just started Thursday.

**Q. Okay. Congratulations. I want to take you to the day of the accident which was May 2nd of 2020 and it was early in the morning and it's a Saturday, just for orientation, and ask you what you were doing that day.**

A. I was meeting with coworkers when we worked with Appalachian Botanical Company. We were meeting at the guard shack on Ashford Hill and Melissa and I were early and she was excited because she had bought or was buying a new home and she wanted to show me, we had time, so we drove down Emmons Road.

**Q. While driving down Emmons Road, did you have the occasion to encounter a motorcycle being followed by a couple of South Charleston Police Department cars?**

A. Yes.

**Q. And I'm going to use this, this Exhibit 2 to Melissa's, deposition and ask you --**

MR. DITRAPANO: Can you hear me if I

stand up there?
**Q. I'm going to ask you a couple of questions about that and I'll help orientate you to what's going on here. This is Melissa's artwork and this is the railroad crossing where the accident occurred and this is the railroad crossing where she says you guys pulled over and first encountered the bike and the two police officers. Does that look accurate to you?**
A. Yes.
**Q. Okay. I want to ask you a couple questions about -- I assume that the house that she wanted to look at was on up on the other side of that railroad crossing on the left because you were heading in -- you were heading in that direction?**
A. Yeah.
**Q. Okay and just tell us in your own words what's the first thing you saw when you got to that railroad crossing?**
A. We got right around the corner, because I'm pretty sure there were bushes right there, we heard sirens, but we couldn't figure out where they were coming from. So we slowed down and we seen a street bike and two police officers, two vehicles behind the street bike.

**Q. Okay. And did they come across the crossing there?**
A. The tracks, the railroad tracks?
**Q. Yeah. Yeah.**
A. Yes.
**Q. Okay. Did that startle you guys at all to see them come across there? If it --**
A. I wouldn't say startle. It was more of a shock because we don't see things like that in Boone County really.
**Q. Were you the front seat passenger of this vehicle that Melissa was driving?**
A. Yes.
**Q. Did you guys, at that point, make a decision to kind of see what was going on?**
A. Yes.
**Q. Now you just mentioned before that you heard -- you heard some sirens. How long before you saw the vehicles did you hear a siren?**
A. It was just a few seconds. It wasn't very long.
**Q. Do you recall whether or not you actually saw any police lights or not?**
A. I can't remember.

**Q. You remember hearing a siren, but you don't know whether or not you saw lights, is that fair?**
A. Yes.
**Q. Okay. What's the next thing that happened? Did you guys have to cross the railroad tracks to find a place to turn around or did you turn around right where you were?**
A. We went up a little ways to turn around.
**Q. Okay and then you went back in the same direction that the motorcycle and the police officers were headed; correct?**
A. Yes.
**Q. And what is the next thing that you saw that had to do with this bike and these officers?**
A. When we got back to the tracks, we couldn't cross the tracks to leave the area. We seen two officers, no bike, we didn't see the bike, but we seen two officers in the ditch line.
**Q. Okay. Why was it that you couldn't cross the tracks?**
A. An officer had his vehicle blocking the railroad tracks.
**Q. When you say blocking the railroad tracks, he was actually, he had his vehicle actually up on the railroad tracks where you couldn't get across the crossing?**

A. Yeah, we couldn't -- we couldn't get past him.
**Q. Okay. Did you then -- did you guys pull the vehicle over somewhere?**
A. No, we stayed behind. There was a white and black cruiser and we were behind that vehicle.
**Q. Okay. At some point did you decide that you were going to take a video with your cell phone of what was going on?**
A. Before we seen the incident I pulled my cell phone out because it's something that we don't see very often, but we didn't know what we were coming up on.
**Q. Okay and I want to thank you in advance for your service in taking a video of this because there were no dash cams and there were no body cams at all on this South Charleston Police Department vehicle or officers. Did you know that?**
A. No, I did not.
**Q. Okay. And further to that was at some point in time Officer Peterson, who was there, and also Officer Harvey had purchased their own go cams to put on their vehicles to film things like this, but they were told by their captain that they needed to take**

**them out of there so they were told to get rid of their cameras. Did you know that?**

A. No.

**Q. So at the time that you took this video, you have the only video footage of what went on with our client, Billy Means, and Officer Peterson and Officer Harvey. Did you know that?**

A. No, I did not.

**Q. Well, I just want to thank you in advance for filming this because it's the only way we would know what went on.**

MR. DITRAPANO: Can we play the video?

MR. FORBES: Make this Exhibit 1?

MR. RUGGIER: Let's make this an exhibit.

MR.FORBES: Why don't, just for purposes, we just run through the same exhibit numbers, Exhibit 1 be the video and Exhibit 2 be the map that she drew for both depositions.

MR. RUGGIER: That's fine.

MR. FORBES: Less confusing I think.

**Q. We're going to show you this video and ask you to watch it because we need to authenticate it, that this is what you actually took at the time, okay?**

(Whereupon the bystander video, Exhibit 1, was

played after which the deposition continued as follows:)

**Q. Mary, is that the video that you took on May the 2nd, 2020 at the scene of the incident?**

A. Yes, it is.

**Q. And did you take that video with your own cell phone?**

A. Yes.

**Q. And what we've just viewed today, is that an accurate depiction of what happened that day?**

A. Yes.

**Q. And that was a video that you took yourself on that day, May the 2nd, 2020?**

A. Yes.

**Q. When you took the video, did you have the video camera to a position where you could also see what was going on with your own two eyes?**

A. Yes.

**Q. There's some commentary in the very first part of it when you see the officers sort of on the other side of the tracks in the ditch where somebody says, you know, he tased him and then somebody says he maced him too. Were you the voice that says he tased him?**

A. Yes.

**Q. Okay. Now you don't know from that position where you were sitting whether or not he actually had a handgun or a taser, do you?**

A. No because I, from my understanding, they look similar, so I didn't know if it was for sure a taser or a gun.

**Q. All you knew is that one of the officers had something out and were pointing it in the ditch?**

A. Yes.

**Q. What else did you see that was going on over there with your own two eyes?**

A. I couldn't see the guy, Billy, is that his -- okay, I couldn't see him. I personally didn't see them hit him or anything on that side of the tracks, but then I seen them drag him across the tracks, which I thought myself was odd because if there's an accident I thought an EMT was suppose to come or anything like that.

**Q. Did you see them grab Billy Means by his wrists and drag him out of the ditch across the railroad tracks with your own two eyes?**

A. Yes.

**Q. Could you see, from where you were a passenger in the vehicle filming, better after they drug him**

**across the tracks than you could when they were on the other side of the tracks? Was it closer to you?**

**From where you're parked sitting in the vehicle, where the vehicle is parked, was it closer to you after they drug him across the tracks than it was when they were on the other side of the tracks?**

A. Yes.

**Q. Do you understand my question?**

A. Yes.

**Q. So in other words, from where they grabbed his wrists and drug him across the tracks and stopped, that was closer to your vision than where they were sitting all the way at the other part of the tracks when he was in the ditch?**

A. Yes.

**Q. Did you see with your own two eyes one of the officers take their foot and stomp Billy's head?**

A. Yes.

**Q. And you saw that absolutely with your own two eyes irrespective of what's on the video?**

A. Yes.

**Q. There's no question in your mind whatsoever that a foot of the officer came down with force and stomped Billy in the head?**

A. Yes.
**Q. No question whatsoever?**
A. No question.
**Q. And if Officer Harvey sat here today and said he simply was trying to step over top of his head and he did not stomp him, Officer Harvey is lying?**
A. Yes.
**Q. How did that make you feel to watch an officer of the law stomp an injured person in the head?**
A. It pissed me off to be honest.
**Q. Any other emotions that ran through your body?**
A. I'm a respectful person and I have respect for officers, but I'm trying to teach my kids that the police are somebody they can depend on and help and they're suppose to protect and serve. How am I suppose to do that when I just seen this happen and how am I suppose to explain that to them if they ever happen to see it?
**Q. Was -- based on your own two eyes and the video that you watched, was Billy means doing anything that would warrant being treated like that?**
A. No.
**Q. With your own two eyes on the video did it appear to you that Billy was totally limp being drug across the railroad tracks?**

A. Yes.
**Q. Do you think stomping him in the head was reasonable?**
A. No.
**Q. Do you think that stomping him in the head was excessive?**
A. That was more than excessive. It shouldn't have happened.
**Q. Did you give a copy of the video to the FBI?**
A. Yes.
**Q. Subject to whatever Mr. Ruggier might ask you, I'm finished with the questions. I really appreciate your time coming in here today.**
A. You're welcome.
MR. RUGGIER: I just have a couple questions for you.

EXAMINATION

BY MR. RUGGIER:
**Q. Let's see, getting back to -- getting back to the pursuit itself and when you passed the pursuit, we'll call it the pursuit. When you passed, I guess, Billy being followed by two motorcycles, did you pass them --**

MR. DITRAPANO: I think you misspoke, being followed by two motorcycles.
**Q. I'm sorry, not Billy being followed by two motorcycles, Billy being followed by two police cruisers. The area where you passed them, is that when you first passed it, going in the opposite direction of you, is that at the railroad tracks, not the tracks where the accident happened, but a railroad tracks?**
A. Yes. It's right on a curve.
**Q. Right on a curve?**
A. Yeah.
**Q. And it's right on a curve and was the motorcycle and the two police cruisers going over the railroad tracks?**
A. We had came -- we were coming up on the railroad tracks. We were in this little area right here --
**Q. Okay.**
A. -- right when the bike and the cruisers, so we hadn't passed the tracks yet. They had just passed them.
**Q. Okay, but you had seen them just as they had just gone over the tracks?**
A. Yes.

**Q. Your friend testified that they were going slow.**
A. Yeah. Yeah.
**Q. Could you estimate the speed?**
A. Oh, man. No, not really. It's -- if you don't know that road you're not going to go fast.
**Q. Won't go too fast on it?**
A. Not really.
**Q. When you passed them, when you passed the motorcycle and the cruisers, what was the distance, if you can estimate, between the motorcycle and the cruisers?**
A. I mean, they were real close. I don't even think they were five feet in between them.
**Q. Is it a fair characterization of your testimony that when you saw this pursuit, the pursuit was real close and the vehicles were going real slow?**
A. Yeah.
**Q. When you passed the pursuit, and you understand I'll call it, the group of these, the pursuit, you said that you -- could you hear sirens?**
A. Yeah, we heard sirens.
**Q. And you heard sirens before you actually even saw the pursuit?**

Page 21

A. Yes.
**Q. And how -- and I apologize if you were asked this already, but can you estimate in seconds how, you know, when you first heard the sirens to when you actually saw the pursuit?**
A. Probably about 5 to 10 seconds if that.
**Q. All right. So 5 to 10 seconds. You heard the sirens before you actually saw the pursuit?**
A. Yeah. Because I thought it was on the other side of the river.
**Q. Okay.**
A. That's usually where everything happens.
**Q. That's where all the bad stuff happens?**
A. Yeah.
**Q. And whenever you passed the pursuit, you can obviously hear the sirens still?**
A. Yeah.
**Q. Can you see any lights?**
A. I don't remember.
**Q. You don't remember, not sure?**
A. Uh-uh. That was a year ago.
**Q. Sure.**
A. A lot's happened.
**Q. I understand. After you passed the pursuit,**

Page 22

**at any point did you ever see -- was there -- did you see any vehicles that were in front of the motorcycle being pursued?**
A. No.
**Q. Because you're kind of going in the opposite direction so was there any vehicles that you saw that would have been, you know, along that straight stretch there or something, somebody that would have been in front of the motorcycle?**
A. No. We were the only ones on that road.
**Q. Okay. Didn't see any vehicle at all in front of the motorcycle?**
A. No.
**Q. Did you have any concerns that any vehicle in the pursuit was going to hit you?**
A. No, not hit us, but they were -- everybody was pretty close.
**Q. The road's not real --**
A. No, it's real narrow.
**Q. -- not real wide and did you have concerns that the motorcycle was going to hit you?**
A. No.
**Q. Did you have concerns that the police cruisers were going to hit you?**

Page 23

A. No. I mean, it's a tight squeeze, but.
**Q. Yeah. Can you estimate if you went -- you passed the pursuit, where did you go and turn around?**
A. We just pulled up by the tracks and --
**Q. By the tracks and turned right around?**
A. Yeah.
**Q. So you went over the tracks and then turned right around?**
A. I can't remember if we went over to the bus turn or if we turned right in front of the tracks.
**Q. Your friend testified it was the bus turn, but --**
A. I mean, I can't remember.
**Q. You turn around and can you estimate the amount of time from when you turn around and then you actually get over top of the railroad tracks, how long did that take, do you know?**
A. Over top of what?
**Q. Over top the railroad tracks to go in the opposite direction?**
A. On which side?
MR. DITRAPANO: I'm going to object to the form of the question because it's confusing.
A. Because I don't know if we for sure if -- I

Page 24

can't remember if we went over top of the tracks, so I don't feel comfortable answering that question.
**Q. Sure. You're not sure if you turned around before the tracks or after the tracks?**
A. There's two wide spots. I can't remember if we went across the tracks or in front of the tracks.
**Q. When you first turned around, were you able to see the pursuit after turning around?**
A. When we first turned around, no.
**Q. Okay.**
A. I was actually pulling up my phone.
**Q. Could you still hear the sirens?**
A. Yes.
**Q. You then drive towards where the pursuit just passed you; right?**
A. To the end?
**Q. Yeah. Drive to the end where it happens, where the incident happens, and you then decide you're going to video it and start to video; right?**
A. I decided right whenever we turned around.
**Q. When you turned around, we're talking about the -- we're talking about stomping on the head, talked about that, you videoed that. You agree with me that it wasn't -- even if there was an actual stomping, that**

Page 25

it was the plaintiff, Billy, was wearing a helmet?
MR. DITRAPANO: Object to the form. I don't understand your question, I mean.
Q. All right, so whenever Dante was questioning you and saying stomping on the head, would you agree with me that it's not actually stomping on Billy's head, it was actually stomping on the helmet?
A. He had a helmet on, but it's still --
MR. DITRAPANO: Let her finish her answer.
A. It's still his head.
Q. I understand, but he was wearing a helmet.
A. Yes.
Q. Was Billy, when he allegedly stomped on his helmet, was he -- was he face up or face down?
A. I don't remember.
Q. Not sure? Don't remember if you could see his face or not.
A. He had a helmet on.
Q. Would you agree with me that it is more difficult to step over top of a helmet than it is to step over top of somebody that is not wearing a helmet?
A. Nope.
Q. You think it's more difficult to step over

Page 26

somebody who is not wearing a helmet than it is to step over somebody who is wearing a helmet?
A. Isn't that the same question?
Q. Well, that's what I'm asking.
A. It's the same.
Q. Well, it's actually the opposite is what I was trying to say.
A. I mean, I don't -- I don't see it difficult at all really.
Q. I mean, I just represent the officer said I stepped over the head, stepped over the helmet because I didn't stomp on him.
A. That's not true.
Q. Did you see his foot make contact with the helmet?
A. Yes.
Q. Have you ever seen the video in slow motion?
A. No. I thought the video, I mean, I didn't know it was going to be on the internet.
Q. Yeah.
A. Well, until I got the phone call.
Q. Who called you?
A. Shawn -- what's her -- I can't remember her last name.

Page 27

Q. Shawn?
A. I can't remember her last name.
Q. Is she -- who was she with? Is she with plaintiff's counsel's firm?
A. Yeah.
Q. She was an investigator for them?
A. I guess. I don't know.
Q. And what did she tell you?
MR. DITRAPANO: I'm going to object. She didn't say she told her anything.
A. She didn't tell me anything.
MR. RUGGIER: She did say that she called her, so presumably they spoke.
MR. DITRAPANO: What did she ask her.
Q. What did she ask you or what did she tell you or what was the conversation between you and plaintiff's counsel's investigator?
A. If I was the one that recorded the original video.
Q. Okay. What else?
A. And that was it.
Q. Have you ever had any dealings with the South Charleston Police Department before?
A. No.

Page 28

Q. Any dealings with any other police departments before?
A. What do you mean?
Q. I don't know, have you ever been arrested, have you ever had something, some incident with police officers, anything like that?
A. 2011.
Q. What happened?
A. It wasn't in West Virginia.
Q. What happened?
A. My car was used in a theft and then I got charged with conspiracy.
Q. Charged with conspiracy to --
A. Commit larceny with intent to sell.
Q. What happened with that?
A. Probation.
Q. Did you plead guilty to it?
A. Yeah or I was looking at 40 years over nothing.
Q. Did that affect your view of police officers at all?
A. No, I actually have a best friend that's a police officer.
Q. Who?

A. Andrew White.
**Q. Who is he a police officer with?**
A. He's with Whitesville, but he works for the fire department in Charleston too.
**Q. Could you estimate how far away you were from the incident where these whatever stepped on the helmet?**
MR. DITRAPANO: I'm going to just object to the form of the question. You say stepped on the helmet. We've had --
MR. RUGGIER: What term would you like me to use? You want me to, you know --
MR. DITRAPANO: Her term is stomped, so --
MR. RUGGIER: What's that?
MR. DITRAPANO: Yeah, so --
**Q. Okay. Stomped on the helmet. Is that what you'd like me to say?**
A. That's what the video shows.
**Q. How far away were you from when you saw the officer allegedly stomp on the helmet?**
A. I don't, I mean, I don't know. I'm not good with math, honestly.
**Q. Sure. Do you have an estimate of how far away you were?**

A. No. Maybe 15 feet, 20 feet, something like that. I have no idea.
**Q. Can you see okay? Do you have any problem with your eyes?**
A. I mean, I do now.
**Q. What's that?**
A. I just -- at night I can't see when I drive, that's about it.
**Q. Can you see distance at all?**
A. Yeah.
**Q. Do you wear glasses or contacts, anything like that?**
A. No.
**Q. I don't have any more questions for you. Thanks.**

EXAMINATION

BY MR. DITRAPANO:

**Q. Mary, I just have a couple of follow up questions. I wasn't going to put you through, you know, verbalizing profanity on a court record, but since we're having some dispute as to what you actually saw, is there a portion on that video where there's a voice that says he step -- he stomped on his fucking head?**

A. Yeah.
**Q. Is that your voice?**
A. Yes.
**Q. So at the time that you viewed this with your own two eyes on May the 2nd, 2020, what you said was he stomped on his fucking head?**
A. Yes.
**Q. Didn't say he stepped over top of his head, did you?**
A. No.
**Q. You didn't say he stepped on his helmet, did you?**
A. Nope.
**Q. You said he stomped on his fucking head?**
A. Yes.
**Q. Now, there's been some discussion about the speeds and I understand that going across the railroad tracks down there that Billy Means and the police officers weren't going at a high rate of speed. That's the only part of the so-called pursuit that you actually saw, isn't it?**
A. Yes.
**Q. You don't know what may have happened, you know, 10 miles or 15 miles, you know, before?**

A. No.
**Q. You don't know how fast they might have been going?**
A. No.
**Q. And then you never saw how fast they may have been going after they encounter right there at the first set of tracks?**
A. No.
**Q. The next thing you saw was the police officer's vehicle parked blocking the railroad track?**
A. Yes.
**Q. And you were sort of captive because you couldn't get across that track, could you?**
A. No.
**Q. And your business that you needed to take care of would have been on the other side of the tracks; correct?**
A. Yes.
**Q. So you were there basically with a video camera where the only thing you could do is sit there and wait until something resolved with the officer's car and the track?**
A. Yes.

MR. DITRAPANO: That's all I have. Thank you.

MR. RUGGIER: One second.

EXAMINATION

BY MR. RUGGIER:

**Q. Did you ask for permission to cross the tracks?**

A. No because one officer did move a vehicle and I don't remember which one it was.

**Q. If it was Peterson, you don't know who it was?**

A. I don't know.

**Q. Have you watched -- so you've watched the video; right, that you took, obviously?**

A. Yeah.

**Q. When Billy is laying there, can you see his face at all?**

A. No.

**Q. You just see the helmet?**

A. Yes.

MR. RUGGIER: I don't have any further questions. Thanks.

EXAMINATION

BY MR. DITRAPANO:

**Q. Just have a couple. Sitting here today,**

**irrespective of any discussion about what your eyesight is like and irrespective of any discussion about some crime that you might have committed back in, you know, 2000, what, '11?**

A. Yeah.

**Q. Okay, there's no doubt in your mind as you sit here today that an officer of South Charleston Police Department there took his foot and stomped Billy Means in the head?**

A. Right.

**Q. There's no doubt in your mind today?**

A. No doubt.

**Q. Okay and if Officer Harvey sat here and said he didn't do it, you would call him a liar?**

A. Yes.

MR. DITRAPANO: That's all I have.

MR. FORBES: She's got the right to read or waive.

MR. DITRAPANO: Yeah, you have the right, you can trust that this fine lady here took everything down accurately and that this video is accurate and just waive the reading of this, which is what Melissa did, or you can have us send you a copy, go through it and make sure it's accurate. It's up to you.

THE DEPONENT: I'm good.

MR. DITRAPANO: You want to waive?

THE DEPONENT: Yeah.

MR. DITRAPANO: Okay.

MR. FORBES: Popular choice.

VIDEO OPERATOR: Time is 4:38 p.m. and this concludes the deposition.

(Having indicated she would like to waive reading and signing of her deposition, further this deponent saith not.)

--oOo--

STATE OF WEST VIRGINIA,
COUNTY OF KANAWHA, to wit;

I, Angela L. Curtis, a Notary Public within and for the County and State aforesaid, duly commissioned and qualified, do hereby certify that the foregoing deposition of Mary Chandler was duly taken by me and before me at the time and place and for the purpose specified in the caption hereof, the said witness having been by me first duly sworn.

I further certify that the attached deposition transcript of Mary Chandler meets the requirements set forth within article twenty-seven, chapter forty-seven of the West Virginia Code to the best of my ability.

I do further certify that the said deposition was correctly taken by me in shorthand notes, and that the same were accurately written out in full and reduced to typewriting and that the witness did not request to read her transcript.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties or financially interested in the action.

My commission expires August 23, 2022. Given under my hand this 3rd day of May 2021.

STATE OF WEST VIRGINIA
COUNTY OF KANAWHA, to wit:

I, Teresa Evans, owner of Realtime Reporters, LLC, do hereby certify that the attached deposition transcript of Mary Chandler meets the requirements set forth within article twenty-seven, chapter forty-seven of the West Virginia Code to the best of my ability.

Given under my hand this 3rd day of May 2021.

/s/ Teresa Evans

----------------------

Registered Professional
Reporter/Certified Realtime Reporter

**Exhibits**

**Exhibit 2** 4:3 8:22 13:17

**-**

**--ooo--** 35:12

**1**

**1** 13:13,16,24
**10** 21:6,7 32:1
**11** 34:4
**15** 30:2 32:1

**2**

**2** 8:22 13:17
**20** 30:2
**2000** 34:4
**2011** 28:7
**2020** 8:8 14:4,13 31:6
**2021** 5:9
**2191** 7:19
**2nd** 8:8 14:4,13 31:6

**4**

**40** 28:18
**4:01** 5:13
**4:38** 35:6

**5**

**5** 21:6,7

**A**

**absolutely** 16:19
**accident** 8:8 9:5 15:16 19:8
**accurate** 9:8 14:10 34:21,24
**accurately** 34:21
**action** 5:4
**actual** 24:24
**address** 7:18
**advance** 12:14 13:9
**affect** 28:20
**agree** 24:23 25:5,20
**allegedly** 25:14 29:21
**Allen** 5:3,18
**amount** 23:15
**Andrew** 29:1
**Angie** 5:12
**answering** 24:2
**anticipate** 7:4
**apologize** 21:2
**Appalachian** 8:13
**approximately** 5:13
**April** 5:9
**area** 11:16 19:5,16
**arrested** 28:4
**artwork** 9:4
**Ashford** 8:2,14
**assume** 6:15,19 9:11
**audible** 7:7
**authenticate** 13:22

**B**

**back** 11:9,15 18:20 34:3
**bad** 21:13
**based** 17:19
**basic** 6:12
**basically** 32:20
**bike** 9:7,23,24 11:14, 17 19:19
**Billy** 5:19 6:8 13:6 15:12,19 16:24 17:20, 24 18:23 19:3,4 25:1, 14 31:19 33:15 34:8
**Billy's** 16:17 25:6
**black** 12:7
**blocking** 11:21,23 32:11
**body** 12:16 17:11
**book** 7:8
**Boone** 7:20 10:9
**Botanical** 8:13
**bought** 8:15
**break** 7:11,12
**Brown** 5:8
**bus** 23:9,11
**bushes** 9:20
**business** 32:16
**buying** 8:16
**bystander** 13:24

**C**

**C&o** 7:19
**call** 18:22 20:20 26:21 34:14
**called** 6:2 26:22 27:12
**camera** 14:16 32:21
**cameras** 13:2
**cams** 12:16,22
**captain** 12:24
**captive** 32:13
**car** 28:11 32:23
**care** 32:16
**cars** 8:20
**Cashier** 8:4
**cell** 12:9,11 14:6
**certified** 5:11
**Chandler** 5:2 7:17
**characterization** 20:15
**charged** 28:12,13
**Charleston** 5:6,8 8:20 12:17 27:23 29:4 34:7
**choice** 35:5
**Chris** 5:10
**civil** 5:4
**clear** 6:23
**client** 13:6
**close** 20:13,17 22:17
**closer** 16:2,4,12
**comfortable** 24:2
**commentary** 14:19
**Commit** 28:14
**committed** 34:3
**Company** 8:13
**concerns** 22:14,20, 23
**concludes** 35:7
**confusing** 13:20 23:23
**Congratulations** 8:7
**conspiracy** 28:12,13
**contact** 26:14
**contacts** 30:12
**continued** 14:1
**conversation** 27:16
**copy** 18:10 34:23
**corner** 9:19
**correct** 7:21,22 11:11 32:18
**counsel** 5:14
**counsel's** 27:4,17
**County** 7:20,21 10:10
**couple** 8:20 9:2,10 18:16 30:19 33:24
**court** 5:5,11,23 30:21
**coworkers** 8:12
**crime** 34:3
**cross** 11:5,16,19 33:6
**crossing** 9:5,6,13,18 10:1 12:2
**cruiser** 12:7
**cruisers** 19:5,13,19 20:10,12 22:23
**Curtis** 5:12
**curve** 19:9,10,12

**D**

**Dante** 5:17 6:7 25:4
**dash** 12:16
**day** 5:9 8:8,11 14:10, 13
**dealings** 27:22 28:1
**decide** 12:8 24:18
**decided** 24:20
**decision** 10:14
**department** 8:20 12:17 27:23 29:4 34:8
**departments** 28:1
**depend** 17:14
**depiction** 14:10
**deponent** 35:1,3,10
**deposition** 5:2,20 6:10 8:23 14:1 35:7,9
**depositions** 13:18
**difficult** 25:21,24 26:8
**direction** 9:14 11:10 19:6 22:6 23:20
**discussion** 31:17 34:1,2
**dispute** 30:22
**distance** 20:10 30:10
**District** 5:5,6
**ditch** 11:18 14:21 15:8,20 16:14
**ditrapano** 5:17 6:6,8 8:24 13:12 19:1 23:22 25:2,9 27:9,14 29:8, 13,16 30:18 33:1,23 34:16,19 35:2,4
**DITRAPAO** 5:16
**doubt** 34:6,11,12

**drag** 15:15,20
**drew** 13:17
**drive** 24:14,17 30:8
**driving** 8:18 10:12
**drove** 8:17
**drug** 15:24 16:5,11 17:24
**Duane** 5:21
**duly** 6:3

E

**E.M.** 5:3
**early** 8:9,15
**Elizabeth** 7:17
**Emmons** 8:17,18
**emotions** 17:11
**employed** 7:23
**EMT** 15:17
**encounter** 8:19 32:7
**encountered** 9:7
**end** 24:16,17
**estimate** 20:4,11 21:3 23:2,14 29:5,24
**EXAMINATION** 6:5 18:18 30:17 33:4,22
**excessive** 18:7,8
**excited** 8:15
**exhibit** 8:22 13:13,14, 16,17,24
**explain** 17:17
**eyes** 14:17 15:11,21 16:16,20 17:19,23 30:5 31:6
**eyesight** 34:1

F

**face** 25:15,18 33:16
**fair** 6:17 11:2 20:15
**fast** 20:6,7 32:3,6
**FBI** 18:10
**feel** 17:8 24:2
**feet** 20:14 30:2
**figure** 9:21
**film** 12:23
**filming** 13:10 15:24
**find** 11:5
**fine** 13:19 34:20
**finish** 7:3,6 25:9
**finished** 18:13
**fire** 29:4
**firm** 27:4
**Flanagan** 5:7
**follow** 30:19
**foot** 16:17,23 26:14 34:8
**footage** 13:5
**Forbes** 5:17 13:13,20 34:17 35:5
**force** 16:23
**form** 23:23 25:2 29:9
**Fowler** 5:7
**friend** 20:1 23:11 28:22
**front** 10:11 22:2,9,11 23:10 24:6
**fucking** 30:24 31:7, 15
**full** 7:15

G

**give** 7:7 18:10
**glasses** 30:12
**God** 6:15
**good** 7:10 29:22 35:1
**grab** 15:19
**grabbed** 16:10
**ground** 6:13
**group** 20:20
**guard** 8:14
**guess** 18:22 27:7
**guilty** 28:17
**gun** 15:6
**guy** 15:12
**guys** 9:6 10:6,14 11:5 12:4

H

**handgun** 15:3
**happen** 17:16,17
**happened** 11:4 14:10 18:9 19:8 21:23 28:8, 10,15 31:24
**Harvey** 5:22 12:22 13:7 17:4,6 34:13
**head** 16:17,24 17:5,9 18:3,6 24:22 25:5,7, 11 26:11 31:1,7,9,15 34:9
**headed** 11:11
**heading** 9:13,14
**hear** 8:24 10:19 20:21 21:16 24:12
**heard** 9:20 10:18 20:22,23 21:4,7
**hearing** 11:1
**held** 5:7
**helmet** 25:1,7,8,12, 15,19,21,22 26:1,2, 11,15 29:7,10,17,21 31:12 33:18
**high** 31:20
**Hill** 8:14
**hit** 15:14 22:15,16,21, 24
**home** 7:18 8:16
**honest** 17:10
**honestly** 29:23
**house** 9:11

I

**idea** 30:3
**incident** 12:11 14:4 24:18 28:5 29:6
**injured** 17:9
**intent** 28:14
**internet** 26:19
**introduce** 5:14
**introduced** 6:7
**investigator** 27:6,17
**irrespective** 16:20 34:1,2

J

**Jesse** 5:17 6:8
**jump** 7:5

K

**Kanawha** 7:21
**kids** 17:13
**kind** 7:4 10:15 22:5
**knew** 15:7

L

**lady** 34:20
**larceny** 28:14
**law** 17:9
**laying** 33:15
**leave** 11:16
**left** 9:13
**legal** 5:11
**Leigh** 5:10
**liar** 34:14
**lights** 10:23 11:2 21:18
**limp** 17:24
**long** 7:11 8:5 10:18, 21 23:16
**lot's** 21:23
**lying** 17:6

M

**maced** 14:22
**make** 6:23 10:14 13:13,14 17:8 26:14 34:24
**man** 20:5
**map** 13:17
**Mar** 8:2,3
**Mary** 5:2 6:7 7:17,18 14:3 30:19
**math** 29:23
**matter** 5:3
**means** 5:3,18 6:9 13:6 15:19 17:20 31:19 34:8
**meeting** 8:12,13
**Melissa** 8:14 10:12 34:22
**Melissa's** 8:23 9:4
**mentioned** 10:17
**miles** 32:1
**mind** 16:22 34:6,11
**misspoke** 19:1
**morning** 8:9
**motion** 26:17
**motorcycle** 8:19 11:10 19:13 20:10,11 22:2,9,12,21
**motorcycles** 18:23 19:2,4
**move** 33:8
**MR.FORBES** 13:15

N

**narrow** 22:19
**needed** 12:24 32:16
**Nellis** 7:19,20

WILLIAM ALLEN MEANS v. E.M. PETERSON, et al.

MARY CHANDLER 04/26/2021 Index: night..stretch

**night** 30:8

**notice** 6:3

**number** 5:4

**numbers** 13:16

O

**object** 23:22 25:2 27:9 29:8

**occasion** 8:19

**occurred** 9:5

**odd** 15:16

**officer** 11:21 12:21, 22 13:6 16:23 17:4,6, 8 26:10 28:23 29:2,21 33:8 34:7,13

**officer's** 32:11,22

**officers** 5:22 9:8,23 11:10,14,17,18 12:18 14:20 15:7 16:17 17:13 28:6,20 31:20

**offices** 5:7

**OPERATOR** 5:1,23 35:6

**opposite** 19:6 22:5 23:20 26:6

**orientate** 9:3

**orientation** 8:10

**original** 27:18

P

**p.m.** 5:13 35:6

**Par** 8:2,3

**parked** 16:3,4 32:11

**part** 14:19 16:13 31:21

**pass** 18:23

**passed** 18:21,22 19:5,6,20 20:9,19 21:15,24 23:3 24:15

**passenger** 10:11 15:23

**past** 12:3

**permission** 33:6

**person** 17:9,12

**personally** 15:13

**Peterson** 5:4,22 12:21 13:6 33:10

**phone** 12:9,12 14:7 24:11 26:21

**pissed** 17:10

**place** 11:6

**plaintiff** 5:2 6:2 25:1

**plaintiff's** 27:4,17

**play** 13:12

**played** 14:1

**plead** 28:17

**Poe** 5:8

**point** 10:14 12:8,20 22:1

**pointing** 15:8

**police** 8:20 9:7,23 10:23 11:10 12:17 17:14 19:4,13 22:23 27:23 28:1,5,20,23 29:2 31:19 32:10 34:7

**Popular** 35:5

**portion** 30:23

**position** 14:16 15:1

**precisely** 6:21

**presently** 7:23

**pretty** 9:20 22:17

**Probation** 28:16

**problem** 30:4

**profanity** 30:21

**protect** 17:15

**pull** 12:4

**pulled** 9:6 12:11 23:4

**Pullin** 5:7

**pulling** 24:11

**purchased** 12:22

**purposes** 13:15

**pursuant** 6:2

**pursued** 22:3

**pursuit** 18:21,22 20:16,19,21,24 21:5, 8,15,24 22:15 23:3 24:8,14 31:21

**put** 12:22 30:20

Q

**question** 6:16,20 7:4 16:8,22 17:2,3 23:23 24:2 25:3 26:3 29:9

**questioning** 25:4

**questions** 6:9,14 9:2, 10 18:13,17 30:15,20 33:21

R

**railroad** 9:5,6,12,17 10:3 11:5,22,23 12:1 15:21 18:1 19:7,8,14, 16 23:16,19 31:18 32:11

**ran** 17:11

**rate** 31:20

**read** 34:17

**reading** 34:22 35:9

**real** 20:13,17 22:18, 19,20

**reasonable** 18:4

**recall** 10:22

**record** 5:13 7:16 30:21

**recorded** 27:18

**refer** 5:19

**remember** 10:24 11:1 21:19,20 23:9,13 24:1,5 25:16,17 26:23 27:2 33:9

**rephrase** 6:22

**reporter** 5:12,24

**represent** 5:15,18 6:8 26:10

**representing** 5:22

**resolved** 32:22

**respect** 17:12

**respectful** 17:12

**response** 7:7

**rid** 13:1

**river** 21:10

**road** 7:19 8:17,18 20:6 22:10

**road's** 22:18

**Ruggier** 5:21 13:14, 19 18:12,16,19 27:12 29:11,15 33:3,5,20

**rules** 6:13

**run** 7:12 13:16

S

**saith** 35:10

**sat** 17:4 34:13

**Saturday** 8:9

**scene** 14:4

**seat** 10:11

**seconds** 10:20 21:3, 6,7

**sell** 28:14

**send** 34:23

**series** 6:14

**serve** 17:15

**service** 12:15

**set** 32:8

**shack** 8:14

**Shawn** 26:23 27:1

**shock** 10:9

**show** 8:16 13:21

**shows** 29:19

**side** 9:12 14:21 15:14 16:2,6 21:10 23:21 32:17

**signing** 35:9

**similar** 15:5

**simply** 17:5

**siren** 10:19 11:1

**sirens** 9:21 10:18 20:21,22,23 21:4,8,16 24:12

**sit** 32:21 34:6

**sitting** 15:2 16:3,12 33:24

**slow** 20:2,17 26:17

**slowed** 9:22

**so-called** 31:21

**sort** 14:20 32:13

**South** 8:20 12:17 27:22 34:7

**Southern** 5:6

**specialist** 5:11

**speed** 20:4 31:20

**speeds** 31:18

**spoke** 27:13

**spots** 24:5

**squeeze** 23:1

**stand** 9:1

**start** 24:19

**started** 8:6

**startle** 10:6,8

**state** 7:15

**stayed** 12:6

**step** 17:5 25:21,22,24 26:1 30:24

**stepped** 26:11 29:6,9 31:9,12

**stomp** 16:17 17:6,9 26:12 29:21

**stomped** 16:24 25:14 29:13,17 30:24 31:7, 15 34:8

**stomping** 18:3,6 24:22,24 25:5,6,7

**stopped** 16:11

**straight** 22:7

**street** 9:22,24

**stretch** 22:7

Realtime Reporters, LLC
schedulerealtime@gmail.com 304-344-8463

**stuff** 21:13

**Subject** 18:12

**suppose** 15:17 17:15,17

**swear** 5:24

**sworn** 6:3,14

T

**taking** 12:15

**talked** 24:22

**talking** 24:21,22

**tased** 14:22,23

**taser** 15:3,5

**teach** 17:13

**telling** 6:17

**term** 29:11,13

**testified** 6:3 20:1 23:11

**testimony** 20:16

**theft** 28:11

**thing** 7:2 9:17 11:4,13 32:10,21

**things** 10:9 12:23

**thought** 15:16,17 21:9 26:18

**Thursday** 8:6

**tight** 23:1

**time** 5:13 8:17 12:21 13:4,23 18:14 23:15 31:5 35:6

**today** 7:13 14:9 17:4 18:14 33:24 34:7,11

**told** 12:24 13:1 27:10

**top** 17:5 23:16,18,19 24:1 25:21,22 31:9

**totally** 17:24

**track** 32:11,14,23

**tracks** 10:3 11:5,15, 16,20,22,23 12:1 14:21 15:14,15,21 16:1,2,5,6,11,13 18:1 19:7,8,14,16,20,23 23:4,5,7,10,16,19 24:1,4,6 31:19 32:8, 17 33:7

**treated** 17:21

**true** 26:13

**trust** 34:20

**truth** 6:14,17

**turn** 11:6,8 23:3,10, 11,14,15

**turned** 23:5,7,10 24:3,7,9,20,21

**turning** 24:8

U

**Uh-uh** 21:21

**understand** 6:20 16:8 20:20 21:24 25:3,12 31:18

**understanding** 6:24 15:4

V

**vehicle** 10:12 11:21, 24 12:5,7,17 15:24 16:3,4 22:11,14 32:11 33:8

**vehicles** 9:23 10:19 12:23 20:17 22:2,6

**verbalizing** 30:21

**versus** 5:3

**video** 5:1,11,23 12:9, 15 13:4,5,12,17,21,24 14:3,6,12,15,16 16:20 17:20,23 18:10 24:19 26:17,18 27:19 29:19 30:23 32:20 33:13 34:21 35:6

**videoed** 24:23

**view** 28:20

**viewed** 14:9 31:5

**Virginia** 5:6,8 7:19 28:9

**vision** 16:12

**voice** 14:23 30:24 31:3

W

**wait** 32:22

**waive** 34:18,22 35:2,8

**wanted** 6:9 8:16 9:11

**warrant** 17:21

**watch** 13:22 17:8

**watched** 17:20 33:12

**ways** 11:8

**wear** 30:12

**wearing** 25:1,12,22 26:1,2

**West** 5:6,8 7:19 28:9

**whatsoever** 16:22 17:2

**white** 12:6 29:1

**Whitesville** 29:3

**wide** 22:20 24:5

**William** 5:3,18

**words** 9:16 16:10

**work** 8:1

**worked** 8:12

**works** 29:3

**wrists** 15:20 16:11

Y

**year** 21:21

**years** 28:18