# CURRICULUM VITAE
### John H. Painter
### (Last Update – October 28, 2018)

| | |
|---|---|
| **CONSULTING SERVICES** | ***TARAS*, Inc.**<br>***T**raffic **A**ccident **R**econstruction, **A**nimation, and **S**imulation<br>1731 Bent Tree Court<br>Granbury, Texas, 76049<br>Telephone: (817) 573-0646<br>Fax: 817-573-0646<br>Incorporated September, 1995 |
| **PROFESSIONAL CERTIFICATION** | **The Accreditation Commission for Traffic Accident Reconstruction,** (ACTAR #564), January, 1994 |
| **PROFESSIONAL EXPERIENCE**<br><br>**Aug. 1992 -Sept 1995** | **National Transportation Safety Board**<br>**Highway Accident Investigator/Researcher**<br>Central Region, Highway Division<br>1200 Copeland Road, Suite 300<br>Arlington, Texas 76011 |

**The National Transportation Safety Board** is an independent government agency with oversight responsibility for both public and private entities having transportation safety responsibilities. Duties: Traffic safety research, the investigation and reconstruction of major highway accidents involving national issues of highway safety, such as: Any school bus accident resulting in death to a student passenger, any commercial bus accident resulting in death or injury to an occupant, heavy truck accidents resulting in two or more fatal injuries or involving issues of driver fatigue, railroad grade crossing accidents, or any accident involving five or more fatalities.

**Special Duties\Expertise:** Computer simulation and accident reconstruction. Technical advisor in Board's Child Occupant Restraint Study, 1994-95. Special investigations including fatal school bus accidents and railroad grade crossing investigations.

**Honors\Awards:** Outstanding Performance Award, 1994, & 1995; Superior Accomplishment Award, for bringing computerized TAR to the NTSB, September 1994; Certificate of Appreciation, NTSB Safety Study, Role of Fatigue in Commercial Vehicle Accidents, November 1995.

**(Professional Experience, continued)**

**Nov. 1990**
**-Aug. 1992**
**Division**

**Northwestern University Traffic Institute (now The Center for Public Safety) Senior Consultant and Lecturer, Accident Investigation**

405 Church Street, Evanston, Illinois

Served as a consultant and lecturer to law enforcement officials, engineers, attorneys and others in the area of traffic accident reconstruction and police vehicle operation. Responsible for developing and presenting instructional programs, particularly in the area of traffic accident investigation and reconstruction.

**May 1990**
**-Nov. 1990**

**Northwestern University Traffic Institute**
**Associate Director, Police Training Division**
405 Church Street, Evanston, Illinois

Responsibilities included: administering on-campus police training courses of limited duration (2 weeks or less); hiring and supervising instructors; determining the training and educational needs of students; planning, developing and scheduling a program to meet those needs; researching and developing courses of study; teaching; counseling students; evaluating and updating current courses.

**Sept. 1987**
**-May, 1990**

**Northwestern University, Traffic Institute**
**Associate Instructor, Field Services Division**
405 Church Street, Evanston, Illinois

Responsibilities included: teaching and administering off-campus police training courses of limited duration. Subject areas included: Traffic Accident Investigation, Driving Under the Influence of Alcohol and/or Drugs, Police Supervision.

**July 1979**
**-May 1990**

**Traffic Accident Reconstruction Consultant**
Boise, Idaho/Port Allegany, Pennsylvania
Providing consultation services to the legal profession.

**LAW**
**ENFORCEMENT**
**EXPERIENCE**

**Boise City Police Department**
7200 Barrister Drive
Boise, Idaho
Dec. 1976 - Oct. 1987

2

**(Law Enforcement Experience, continued)**

| | |
|---|---|
| **Aug. 1985<br>-Oct. 1987** | **Patrol Division, Supervisor of DUI Task Force of the Selective Traffic Enforcement Program.** Responsibilities included: Supervision of Accident Reconstruction Specialists, investigation of all nighttime serious injury and fatal traffic accidents, nighttime traffic and DUI enforcement efforts. Investigation of all accidents involving pursuits and police vehicles. Member of Chief's committee on departmental pursuit policy. |
| **Dec. 1984<br>-Aug. 1985** | **Administrative Support Division, Sergeant in Charge of Boise State University Law Enforcement Services.** Supervision duties included: Training and supervision of officer candidates, staffing and shift assignments, program design and evaluation. Field Training Supervisor. |
| **Dec. 1976<br>-Dec. 1984** | **Patrol Division,** General patrol duties to include criminal and traffic accident investigations, emergency and tactical response, field training officer and special assignments in DUI public information. |
| **EDUCATION** | **Masters in Public Administration,** Public Safety/CJ Emphasis<br>August 1991<br>Boise State University, Boise, Idaho<br><br>**Bachelor of Arts in Criminal Justice Administration**, Aug. 1976<br>Park College, Parkville, Missouri<br>Honors Graduate: Senior Scholarship Award |
| **TRAFFIC SAFETY/DUI ENFORCEMENT RELATED ACTIVITIES** | **Driving Under the Influence Instructor Training**<br>Northwestern University/National Highway Traffic Safety Administration<br>October, 1985<br><br>**Alcohol/Gaze Nystagmus Training**<br>Idaho State Police, October 1983<br><br>**Idaho Police Officer Standards and Training**<br>Certified Instructor: DUI, MOBAT, and Intoximeter |
| **MEMBERSHIPS** | Mensa<br>Texas Association of Accident Reconstruction Specialists (TAARS)<br>National Association of Professional Accident Reconstruction Specialists<br>Society of Automotive Engineers (SAE) |

**MEMBERSHIPS (continued)**

International Association of Chiefs of Police (IACP)
Association of Professional Law Enforcement Emergency Vehicle
 Response Trainers (ALERT)
SAE Accident Investigation and Reconstruction Practices Committee
 – Drag Sled Group, support personnel
Crash Safety Solutions I.DRR Users Group
 Inquiry into human conditions, capabilities, traits and behaviors
International Network of Collision Reconstructionists
Heavy Truck EDR Training Graduate Forum
CDR Tool Forum- Event Data Recorder for Collision Reconstruction
Commercial Motor Vehicle Testing Group
HVE for Collision Reconstruction Group

**OTHER ACTIVITIES IN TRAFFIC SAFETY**

**Originator and Co-Chairman, Remove Intoxicated Drivers (RID)** of Idaho. Feb. 1982 - April 1983. Conducted public seminars statewide.

**Successfully lobbied for new DUI laws** during the 1982 and 1983 legislative sessions, including testimony before the House and Senate Judiciary & Rules Committees.

**Guest panelist** on PBS TV program, "The Reporters" and on KIVI-TV, News Watch program-DWI "Deadliest Weapon in America". Nov. 1985.

**Crash Data Collection System Expert Panel,** Calspan, Inc., Buffalo, N.Y., 1996 through 1998. Development of computer based crash data collection system for police accident investigators.

**NUTI DUI/Negligent Homicide Conference** - Guest Speaker: July 1997, 1998, and 1999, Chicago, Topic: *Investigation of School Bus Accidents*.

**NUTI DUI/Negligent Homicide Conference** - Guest Speaker: September 1997, Binghamton, NY. Topic: *Investigation of School Bus Accidents/Computerized Accident Reconstruction.*

**National Association of Licensed Investigators** - Guest Speaker: Mid-Winter Conference, 1998, Arlington, Texas. Topic: *Issues in Police Pursuit Litigation*.

**National Association of State Directors of Pupil Transportation Services** - Guest Speaker, Annual Conference, October 1998, Austin, Texas. Topic: *Investigation of School Bus Accidents - Dangers of Lap Belts.*

4

**(Other Activities in Traffic Safety - continued)**

**National Safety Council - Instructor - Accident Investigation for Truck Fleet and Safety Managers**, Chicago Nat'l Safety Council Headquarters and Oil City, PA, Spring 90

**Materials Analysis, Inc. - Engineering Consulting Services**, 10338 Miller Road, Dallas, TX. Staff Accident Reconstructionist, Feb- May 1998

**Ford Motor Company - Dearborn, Michigan**. Instructor for Ford Motor Company Design Analysis Engineers, Traffic Accident Reconstruction, June 1992.

**Southeastern States Pupil Transportation 49th Annual Conference**, Guest Speaker, Huntsville, Alabama, *A Comparison of Risk of Occupant Injury in Large v. Small School Buses*, July 1999.

**Texas Association for Pupil Transportation** 27th Annual Conference, Guest Speaker, Fort Worth, Texas, *Understanding the Principles of Occupant Restraint and Injury in Large vs. Small School Buses*, July 2000

**Kentucky Association for Pupil Transportation, Inc., 10th Annual Spring Institute,** Bowling Green, Kentucky, *Understanding the Principles of Occupant Restraint and Injury in Large vs. Small School Buses*, April 17, 2001.

**United States Department of Transportation/Federal Highway Administration.** Expert consultant in development of *Expert Systems for Crash Data Collection* computer program, through CALSPAN.

**Federal Motor Carrier Safety Administration**. Expert consultant retained by subcontractor *Accident Research and Analysis* in design of agency Large Truck Crash Causation Study (LTCCS), 1999.

**Federal Motor Carrier Safety Administration**. Expert consultant retained by subcontractor *Accident Research and Analysis* in design of agency Commercial Bus Accident Investigation Program, 2002-2003.

## PUBLICATIONS:

*Pavement Friction Reduction Due to Fine-Grained Earth Contaminants*, George J. Hall, Hall Consulting, P.L.L.C.; John Painter, TARAS, Inc. Society of Automotive Engineers International -#2007-01-0736

During his tenure with the National Transportation Safety Board, Mr. Painter participated in several major investigations and published studies involving air-braked vehicles and human factors analysis. Those published investigations included the following:

> *Collision of a Small School Bus and Tractor-Semitrailer* near Snyder Oklahoma, November 10, 1993.

> *Multiple Vehicle Collision with Fire during Fog*, Menifee, AR, January 9, 1995-Special Investigation of Collision Warning Technology.

> *Factors that Affect Fatigue in Heavy Truck Accidents*, January 1995.

In March of 1994, Mr. Painter was selected to design and instruct a three-day training module for all National Transportation Safety Board investigators in support of NTSB safety study:

> #PB96-917005, *The Performance and Use of Child Restraint Systems, Seatbelts, and Airbags for Children in Passenger Vehicles.*

While on staff at the Northwestern University Traffic Institute he served as the Associate Director of Police Training, taught courses in Police Supervision, and authored:

> *An Administrator's Guide to Police Pursuit Policy.* (Available through the Northwestern University Transportation Library)

While on staff at the Northwestern University Traffic Institute, Mr. Painter served as a Senior Consultant and Lecturer, and designed and authored training programs and instructional materials in the area of Traffic Accident Investigation and Traffic Accident Reconstruction. These materials are marketed by the Traffic Institute, and used by training facilities nationwide.

## Magazine Articles:

*Evaluating the Safety of Lap Belts on Small School Buses*, School Bus Fleet Magazine, Bobit Publications, September 1999. Article describes Transport Canada school bus crash testing and military crash sled testing of live baboons, both indicating that lap belt restraints in frontal accidents increase the likelihood of severe injury or death.

***Instructional Experience/Traffic Accident Specific Courses:***

Mr. Painter has provided instruction to students from across the nation and many countries that come to the Traffic Institute for discipline specific training. The large number of classes and lectures he has given are too numerous to list, and include field courses in 25 states. However, Mr. Painter has taught all or portions of the following Traffic Institute instructional courses:

> ➤ Accident Reconstruction for Traffic Engineers (40 hours)
>
> ➤ Accident Investigation 1 - At-Scene Investigation (80 hours)
>
> ➤ Accident Investigation 2 - Delayed Data Collection (80 hours)
>
> ➤ Vehicle Dynamics (40 hours)
>
> ➤ Traffic Accident Reconstruction 1 (80 hours)
>
> ➤ Traffic Accident Reconstruction 2 (40 hours)
>
> ➤ Heavy Vehicle Crash Reconstruction (40 hours)
>
> ➤ Computerized Traffic Accident Reconstruction 1 - Introduction to EDCRASH (40 hours)
>
> ➤ Microcomputer-Assisted Traffic Accident Reconstruction - EDCRASH (40 hours)
>
> ➤ Computerized Traffic Accident Reconstruction 3 - Introduction to EDSMAC (24 hours)
>
> ➤ Northwestern University Traffic Institute Annual Vehicular Homicide/DWI Conference
>
> ➤ Police Supervision

Mr. Painter has also designed and taught his own 40 hour course of instruction to law enforcement officers in Texas entitled: *Introduction to Energy and Speed from Damage*, under contract with Texas A&M Engineering Extension (TEEX).

### *Summary of Professional Training*:

The following is a summary of Traffic Accident Reconstruction, Human Factors Analysis, and related training courses completed by Mr. Painter:  Certificates of Completion and/or Attendance may be provided upon request (approximately 1799 classroom hours).

**TAARS 3-Day Crash Data Retrieval Update Class**
Round Rock, Texas
October 24 – 26, 2018 (24 hours)
Instructor: Jon Northrup of Crash Data Specialists

**Video Examinations for the Police Investigator**
Accurate Interrogation of Digital Multi-media Evidence for the Investigator
Georgetown, Texas on April 9 and 10, 2018 (16 hours)
Instructor: Grant Fredericks – Forensic Video Solutions

**Event Data Recorder (EDR) Summit in Houston, Texas**
March 5 – 7, 2018 (20 hours)

**Crash Safety Solutions, IDRR User's Forum**
**Interactive Driver Response Research**
Austin, Texas on February 23-24, 2018 (16 hours)
Lead Instructor Jeffrey Muttart, Ph.D.

**Texas Association of Traffic Accident Reconstruction Specialists**
Evaluation and Analysis of Traffic Signal Timing, Measurement and Analysis of Crush Damage
Round Rock, Texas on December 07-09, 2015 (12 hours)
Lecturer Daniel Vomhoff III

**EDC Traffic Accident Simulations (HVE-EDSMAC, EDSVS, EDVTS)**
**Engineering Dynamics Corporation**
November 11-15, 2013, Coral Gables, Florida (35 hours)

**Advanced Crash Reconstruction Utilizing Human Factors Research**
Use of I.DRR Human Factors Software, Jeffrey Muttart, *Crash Safety Solutions*
Northwestern University Center for Public Safety
Evanston, Illinois, March 5-9, 2012 (40 hours)

**Engineering Dynamics Corporation 2010 HVE Forum**
Computer Simulation and Scientific Visualization
March 1 – 5, 2010, San Antonio, TX (35 hours)

8

## *Professional Training (continued)*

**How to Interpret Commercial Vehicle EDR's**
The University of Tulsa, Continuing Engineering and Science Education
February 22- 26, 2010 (32 hours)

**Crash Data Retrieval (CDR) User's Conference**
**Bosch Corporation** "Black Box" download technology-Chrysler and Ford PCM
January 26 -28, 2009, Houston, Texas (20 hours)

**EDC Traffic Accident Simulations (HVE-EDSMAC, EDSVS, EDVTS)**
**Engineering Dynamics Corporation**
January 5-9, 2009, California State University, Northridge (35 hours)

**EDC Traffic Accident Reconstruction (HVE-EDCRASH)**
**Engineering Dynamics Corporation**
November 10-14, 2008, Coral Gables, FL (35 hours)

**Crash Data Retrieval Analyst's Course**
**Bosch Corporation/Collision Safety Institute**
June 24-27, 2008, New Orleans, LA (32 hours)

**Crash Data Retrieval Technician's Course**
**Bosch Corporation/Collision Safety Institute**
April 18, 2008, Fort Worth, Texas (8 hours)

**Crash Data Retrieval (CDR) User's Conference**
**Bosch Corporation** "Black Box" download technology-Chrysler and Ford PCM
January 28 -30, 2008, Houston, Texas (20 hours)

**Factors, Formulae, Forensic Technology Training, and Combined Conference**
Sponsored by TAARS
Houston, Texas
September 18 – 21, 2006 (28 hours)

**Human Factors: Understanding Driver Response**
Instructor/Researcher: Jeffrey Muttart, UMASS
Also participated in Human Factors research – on-the-road study
Baltimore, Maryland
March 20 – 23, 2006 (28 hours)

**Crash Data Retrieval (CDR) User's Conference 2006**
Ford update
February 13 and 14, 2006 (14 hours), Irving, Texas

9

## *Professional Training (continued)*

**Crash Data Retrieval (CDR) System Operator**
**Vetronix Corporation** "Black Box" download technology
June 9 – 11, 2004, Houston, Texas (24 hours)

**Engineering Dynamics Corporation 2002 HVE Forum**
Computer Simulation and Scientific Visualization
May 13 – 17, 2002, New Orleans, Louisiana (35 hours)

**AutoCad – Computer Drafting**
Sept 23-27, 2002, Fort Worth Texas (20 hours)
And May 6 – 10, 2002, Fort Worth Texas (20 hours)

**Pursuit Seminar for Law Enforcement Driver Trainers**
NHTSA/ALERT International - Academic and field certification as EVOC Instructor
February 7 – 9, 2001, Dallas, Texas (24 hours)

**Crash Data Retrieval System for Airbag Sensing and Diagnostic Module**
Vetronix Corporation, General Motors Corporation
June 30, 2000, Santa Barbara, California (40 hours)

**Nikon Total Station Forensic Mapping: Theory and Operation**
Nikon Factory Training-Automated Investigation Measurement System
March 1, 2000, Arlington, Texas (8 hours)

**Human Factors in Automobile Accidents**
Lawyers and Judges Publishing Company
February 18 - 19, 2000, Las Vegas, Nevada (16 hours)

**VC2000 Vehicle Performance Computer Data Collection**
Vericom Corporation, Minnetonka, Minnesota
February 14 - 15, 2000, Plano, Texas (16 hours)

**Work Zone Traffic Control - Design and Operations**
Texas A&M University - Engineering Extension
August 10 -12, 1999 (24 hrs.)

**Air Brake System Training Seminar**
Allied Signal/Bendix Corporation
April 30, 1998 (24 hrs.)

10

## *Professional Training (continued)*

**Low Speed Collision Analysis**
Texas A&M University, Engineering Extension Service
April 24, 1998 (40 hrs.)

**Concept of Day/Night Visibility for Traffic Accident Investigators**
Northwestern University Traffic Institute - Dr. Bernard Abrams
December 18, 1996 (24 hrs.)

**National Safety Council Defensive Driving Course-Professional Truck Driving**
International Truck Driving School, Waxahachie, Texas
October 9, 1996 (8 hrs.)

**Applied Physics for Accident Reconstruction**
Texas A&M University, Engineering Extension Service
June 7, 1996 (40 hrs.)

**Advanced Interviewing Training Program -**
U.S. Department of the Treasury, Fed Law Enforcement Training Center
January 23, 1995 (40 hours)

**Tractor Trailer Low Speed Impact Testing, TAARS Seminar**
Texas A&M, College Station, TX, November, 1994 (8 hrs.)

**Traffic Accident Computer Animation**
Engineering Animation, Inc, Ames, Iowa, October 1994 (40 hrs.)

**Accident Investigation Techniques/Cause Analysis Training Seminar**
National Transportation Safety Board, July 1994 (24 hrs.)

**Engineering Dynamics Computer Simulations (EDSMAC, VTS, SVS)**
University of Miami, Coral Gables, Florida, May 1994 (40 hrs.)

**Child/Occupant Restraint Training**
National Transportation Safety Board, March 1994 (40 hrs.)

**Commercial Vehicle Accident Investigation**
Texas A&M University, August 1993 (40 hrs.)

**Eaton Truck Transmission and Axle Training**
Eaton Training Center, June 1993 (40 hrs.)

11

## *Professional Training (continued)*

**Pedestrian/Bicycle Accident Investigation**
Texas A&M University, May 1993 (40 hrs.)

**Federal Highway Administration, Roadside Design**
Austin, Texas, March 1993 (40 hrs.)

**Commercial Vehicle Brake System Training**
National Transportation Safety Board, October 1992 (24 hrs.)

**Commercial Vehicle Brake Inspection Training**
National Transportation Safety Board, May, September, and Oct. 1992
New Jersey, Pennsylvania, and Texas (48 hrs.)

**Introduction to Computer Assisted Drawing**
Northwestern University Traffic Institute, May 1992 (24 hrs.)

**Microcomputer Applications to Traffic Accident Reconstruction**
Northwestern University Traffic Institute, October 1990 (40 hrs.)

**Traffic Accident Reconstruction**
Northwestern University Traffic Institute, June 1988 (80 hrs.)

**Microcomputer Applications for Traffic Accident Reconstruction**
Northwestern University Traffic Institute, June 1987 (40 hrs.)

**DUI Vehicular Homicide Conference**
Idaho Prosecuting Attorneys Association, Jan. 1987 (16 hrs.)

**Management of a Selective Traffic Enforcement Program**
Institute of Police Technology and Management
University of North Florida, April, 1986 (40 hrs.)

**Investigation of Motorcycle Accidents**
Institute of Police Technology and Management
University of North Florida, April, 1986 (40 hrs.)

**Traffic Accident Reconstruction Seminar/Crash Testing**
International Association of Traffic Accident Investigators and Reconstructionists.
Boise, Idaho, April, 1982.  (24 hrs.)

12

## *Professional Training (continued)*

**Traffic Accident Reconstruction**
Institute of Police Traffic Management
University of N. Florida, April, 1982 (80 hrs.)

**Technical Motor Vehicle Traffic Accident Investigation**
Northwestern University Traffic Institute, June 1979 (120 hrs.)

**At-Scene Traffic Accident Investigation**
Northwestern University Traffic Institute, May 1978 (80 hrs.)

13

EXHIBIT

N



**TARAS, Inc.**

**Traffic
Accident
Reconstruction
Animation
Simulation**

*Traffic Safety Consulting*

1731 Bent Tree Court
Granbury, Texas 76049
Phone: (817) 573-0646
Fax: (817) 573-0648
E-mail: Jhpainter@aol.com
License # A-08332

June 30, 2021

Duane J. Ruggier II, Esq.
Pullin, Fowler, Flanagan, Brown & Poe, PLLC
901 Quarrier Street
James Mark Building
Charleston, WV 25301

RE:     Police Pursuit Followed by Fleeing Subject One Vehicle Crash
        William Allen Means vs. E.M. Peterson, D. Harvey, and the City of South Charleston
        Preliminary Report - TARAS Project 1321

Dear Mr. Ruggier:

The subject of this litigation is a one-vehicle motorcycle loss of control accident that occurred on
May 2, 2020, in rural Boone County, approximately 12 miles southeast of the City of South
Charleston, West Virginia.  The operator of the fleeing motorcycle, Mr. William Means, was the
only injured party. No third-party vehicles or pedestrians were involved.  You contacted me on
or about May 28, 2021 and asked me to examine the available evidence relating to the above
cause.

You asked me to (1) conduct an analysis of that evidence, in full compliance with procedures
and principles accepted within the discipline of traffic accident investigation and cause analysis,
(2) determine the factors and events ultimately resulting in the collision, (3) assess the conduct of
Officers Peterson and Harvey in initiating and continuing the pursuit, and (4) provide you with a
written report of my activities, observations, and opinions.

I have not been tasked with conducting a full reconstruction of the traffic accident from the
perspective of assessing the motion and loss of control of the motorcycle.  Nor have I been
tasked to assess the post collision actions of Officer Peterson or Officer Harvey.  You have
retained other experts to accomplish those tasks.

It is my intent to assess police conduct issues regarding the officer decision to pursue, and the
approximate 12 minute and 7 second duration of the pursuit that preceded the crash.

Preliminary Report-Means v. City of South Charleston

### *Expert Qualifications:*

2

I am currently a self-employed traffic safety consultant with 44 years of combined professional law enforcement, traffic accident reconstruction, and police emergency vehicle operation training and experience.  I have earned a Bachelor of Arts degree from Park University in Criminal Justice Administration, and a master's degree in Public Administration with a Criminal Justice Emphasis, from Boise State University.

I am a veteran of the United States Air Force, having served in the medical field (1972-1976).  My sworn police duties have included supervisor of police cadet training and supervisor of traffic accident reconstruction and traffic enforcement operations at the Boise Idaho Police Department (1976- 1987).

Subsequent thereto, and as a result of assisting Northwestern University Criminal Justice Researchers in a NHTSA sponsored DUI community outreach program, I was employed as a Consultant and Lecturer at Northwestern University Traffic Institute (now the Northwestern University Center for Public Safety) in Evanston, Illinois.  My duties there included lecturing in the disciplines of traffic accident investigation and reconstruction, DUI enforcement, and police supervision in part while serving as the *Associate Director of Police Training*.  My combined fulltime staff position and part time contractual position was for a period of ten years total.

While at Northwestern I authored a professional treatise entitled an *Administrator's Guide to Police Pursuit Policy* that can be obtained at the Northwestern University Transportation Library.  As a result of my research and writings, my duties at Northwestern included assisting local police agencies in the drafting of their pursuit policy guidelines.  I served as an advisory member of the National Highway Traffic Safety Administration committee studying the "Effects of Traffic Law Enforcement on Crime."

I left Northwestern to accept a position with the National Transportation Safety Board as a Highway Accident Investigator in 1992, assigned to the Arlington Texas office.  While there I received formal commendations for introducing the NTSB to computerized traffic accident reconstruction and simulation, and for my role in training other investigators in support of the child occupant safety study.  Part of my duties was to encourage the cooperation of local and state law enforcement agencies in identifying accident issues needing study, while assisting those officers in their criminal investigations of traffic related offenses.  In 1995 I established my own Texas based traffic safety consulting firm, while returning as a contract employee with Northwestern University Traffic Institute, thus remaining in public service as a private contractor.

As a traffic safety and police vehicle operations consultant, I have been retained to investigate and reconstruct traffic accidents in more than twenty-five states.  I have been court qualified as an expert in traffic accident reconstruction and/or police emergency vehicle operation and police pursuit in the courts of eleven states.  I have provided expert court room testimony on sixty-five (65) separate occasions.  I have also provided expert deposition testimony on one-hundred eleven (111) additional occasions.  My testimony is divided almost evenly between plaintiff and

defense.  I have provided court room and deposition testimony in police emergency vehicle operations on twenty-four separate occasions.

3

I am a member of ALERT International (the Association of Law Enforcement Response Trainers) and have been trained and certified as an emergency vehicle operations instructor.  I am a member of the International Association of Chiefs of Police (IACP) and the National Association of Chiefs of Police and maintain currency on relevant model policies and issues provided by both.

I do not claim expertise in all specialty areas of the law enforcement discipline, as do many police practices experts.  My professional expertise is focused upon areas in which I have received advanced education, training, experience and actual certification for these skills, training, and experience.  These areas include traffic accident investigation and reconstruction, emergency vehicle operation, Driving Under the Influence enforcement, and human factors issues as they relate to both authorized emergency vehicles and non-emergency vehicles and vehicle operators.

As a Boise Police Department sergeant supervising the accident reconstruction and DUI enforcement team, I implemented a community outreach program in educating the community about the DUI problem, encouraging citizen support of DUI enforcement activities, and strengthening DUI laws as a legislative liaison to the state legislature.  The Boise and Idaho community were energized to demand DUI reforms due to six child deaths in three separate DUI collisions within a 30-day period, one involving an attorney serving as an assistant to the Idaho Attorney General's office.  The parents of the six killed children were helpful in bringing the public's attention to this DUI issue.  Given the success of this outreach program, I was recognized by a community organization (RID) for "Outstanding achievement in pioneering lifesaving leadership in Idaho to Remove Intoxicated Drivers (RID) from the road."  RID was a forerunner to Mothers Against Drunk Drivers (MADD).  A more complete listing of my training, education and experience is contained in my Curriculum Vitae attached to this report.

I have received formal training in the reconstruction of motorcycle involved collisions and have been an avid motorcyclist since the age of eighteen, where I began riding motorcycles on the backroads of the Allegheny Mountains of northern Pennsylvania.  I have owned and operated eighteen motorcycles of varied types, and currently own and operate a sport touring motorcycle similar in design to that being operated by Mr. Means.  I log about 10,000 miles per year riding motorcycles.

### *Items Provided by counsel, Reviewed, and Found to be Potentially Relevant to the Scope of this Analysis:*

1. Plaintiff's Amended Complaint filed 11/24/20.
2. Report of Roy G. Taylor, Ph.D., named as Plaintiff's Police Operations Expert.
3. Plaintiff's Responses to Discovery.
4. Police Dispatch audio recording of radio communications beginning prior to the calling of a pursuit, through officer Peterson's extensive effort to gather information and pre-

empt the pursuit with additional manpower, and the motorcycle loss of control; through calling of the pursuit, suspect apprehension, summoning of medical personnel to the scene, and clearing of the scene by Officers Peterson and Harvey.

4

5. Original Chandler citizen video, 2 mins and 13 secs, thought to have begun taping 40 to 60 seconds after the crash.
6. Officer Peterson Go-Pro video of the pursuit route created on a Sunday morning in the days following the pursuit, intended to document the path of the motorcycle for purposes of possible criminal prosecution.
7. West Virginia State Police Report, 8 pages, containing no scale diagram of the accident area.  No state police photos were provided to me.  The crash was listed as occurring at 0821 hrs. on Saturday, 5/2/21.
8. SCPD Case Report Summary (13 pages) indicating that the pursuit began at 0801 hrs.
9. SCPD Arrest Information Sheet (2 pages).
10. SCPD Criminal History and III Request, 15 pages.
11. SCPD Call for Service Detail Report, 7 pages.
12. SCPD Field Case Report, 4 pages.
13. Metro 911 Vehicle registration and wants check, to include the following:  VIN check, NCIC license plate query, showing no report of stolen plate or stolen motorcycle.  Plate was last registered to a Yamaha XT250 enduro style motorcycle, not to Mr. Means. Registration expired in February 2020.  Mr. Means link to both the plate and the motorcycle have not been shown.
14. Photographs taken at the scene of the accident, apparently by Officer Peterson, documenting the condition of the motorcycle, the unregistered license plate, the VIN found along the base of the engine, and a backpack carried by Mr. Means containing a white powdery substance.  This was a backpack that Officer Peterson radioed that Mr. Means was attempting to remove during the pursuit, and to potentially discard along the pursuit route.
15. Photographs (23) of the motorcycle taken during a post-crash junk yard examination.
16. Additional Peterson photos illustrating the rest positions of the motorcycle and the rider, and the rider condition after the EMT's arrived, and black tire rub off on the railroad track showing at least one point along the travel path of the motorcycle.
17. During his deposition Mr. Peterson was asked to draw a line on one of the above photos illustrating his observation of the on-road to off-road transition of the path of the motorcycle.  The path terminated with the motorcycle striking a near rail well to the right of the actual railroad crossing platform, thus establishing that full control of the motorcycle was not lost until after it moved off the roadway.
18. Toxicology Report showing the presence of substances that could potentially affect Mr. Means judgement and vehicle control.
19. SCPD operations manual, section 23, **Emergency Response and Vehicular Pursuit**. Policy is undated.
20. Page 146 (only) of the SCPD operations manual, section 24 (partial) **In-Car video/audio Recording Policy**, indicating an effective date is yet to be established.
21. The deposition transcripts of Mr. William Means, Officer David Harvey, Ms. Melissa Nunley, Ms. Mary Chandler, and Officer Eric Peterson.
22. I have created summaries of the above depositions and have forwarded these summaries with this report.

## *Traffic Collision Analysis Flow Chart:*

5



**Exhibit 4.**

OPERATIONAL AND CONDITION FACTORS IN TRAFFIC-ACCIDENT CAUSES

52-8

The above exhibit is taken from Northwestern University Traffic Institute Publication Topic 852 and represents a typical chronologically based process by which to identify factors of relevance to determining the factors and events that ultimately resulted in a traffic collision.

6

A similar flow chart process was often used during my employment with the National Transportation Safety Board. The analytic flow of this chart is reasonably self-evident. I will be prepared to identify in more detail the factors and events of this event if called upon to do so. However, the human factors of trip preparation, driving strategy, and evasive tactics will be discussed in this report.

### *Summary of the Event/Factual Basis for Cause Analysis:*

In the discipline of Traffic Accident Investigation, Reconstruction and Cause Analysis, information may be divided between (1) *physical evidence*, subject to scientific evaluation pertaining to the laws of motion and vehicle dynamics, and (2) *testimonial evidence*, which is highly subject to interpretation and error. Physical evidence, when rigorously evaluated does not lie or mislead. Testimonial evidence, in contrast, may provide information that is highly unlikely, or otherwise physically impossible. A proper forensic analysis will first address the physical evidence, and then seek to "run the testimonial evidence through the physics model" as a means of establishing reliability of specific testimony.

The physical evidence in this investigation is provided primarily through the following sources:

- The police dispatch (Metro 911) audio tape of the radio traffic representing the observations and decision making of involved police personnel on a real time basis.
- Photographs of the accident scene, debris, Mr. Means, and the motorcycle immediately after the motorcycle loss of control.
- Photographs (23) photographs of the motorcycle taken during an apparent salvage or tow yard examination.
- Damage to the accident vehicle(s).
- Motorcycle debris and luggage and/or containers being carried on the motorcycle.
- The geometry of the area of the collision.
- The path and timing of the pursuit.
- The video created by Officer Peterson in the days after the event, documenting the path of the pursuit.
- The Chandler post-crash cell phone video and audio.

### *Physical Evidence Discussed:*

*Reconstruction Model:*

I have not been provided reports, scale diagrams, or other documents, created by police, Plaintiff or Defendant Accident Reconstruction Experts, claiming to have created a physics model of the motorcycle loss of control and crash. The Defendant expert accident reconstruction report is

pending release consistent with court deadlines, the same deadlines as the report I am writing.  I
have not conferred with Defendant's traffic accident reconstruction expert.  I look forward to
reviewing that report when it is made available.

7

Even though a full reconstruction of the collision is not currently available, I am able to reach
some preliminary conclusions based upon the physical evidence I have observed.  Should
conflicting or clarifying evidence be provided, I will reserve the right to modify my opinions
regarding a physics model of the motorcycle loss of control.

The only known mark along the path of the motorcycle is represented by apparent rub-off of tire
materials along what appears to be the near rail of the railroad tracks.  That rub-off establishes
that the motorcycle was likely in an upright orientation when it struck that rail, and the rail itself
is outboard (to the right of) of the flat platform provided for vehicular traffic to cross the tracks.

There are no tiremarks, scrapes, scratches, or other evidence of the motorcycle going down, or
braking in a manner to create a visible skidmark, anywhere along the motorcycle path, while on
the pavement or along the shoulder and railroad grade prior to impact with the near rail.

Furthermore, the motorcycle at rest is separated by a large distance, perhaps 30 feet or more,
from the rest position of the rider. Officer Peterson was the only direct witness of the motorcycle
leaving the roadway.  During his deposition he was asked to draw a line on a selected photo of
the railroad tracks.  The line so drawn established an approximate angle at which the motorcycle
left the roadway.  Officer Peterson describes the motion of the motorcycle being deflected by the
railroad track at which time the rider separated from the motorcycle.

The controlling principle to these vehicle dynamics is *Newton's First Law of Motion – an object
in motion will remain in motion and in a straight line unless acted upon by an unbalanced
external force.*  This foundational principle is often termed *the law of inertia*.

This physical evidence allows me to conclude that Officer Peterson's description of the event is
consistent with the physical evidence.  The motorcycle never reached the railroad track crossing
but was directed at an angle to the right onto the railroad grade prior to reaching the crossing
platform.  Furthermore, I am led to believe in part from reading Officer Peterson's testimony, in
which he was asked to identify the source of various blemishes or marks on the squad, that an
examination of the Peterson vehicle and the motorcycle has not revealed any evidence indicative
of contact between the two vehicles as alleged by Mr. Means.

*Motorcycle disguise and high-performance capabilities:*

My research into the configuration of this 1996 Honda CBR600 sport-oriented motorcycle
indicate that it was equipped with plastic body coverings and a plastic fairing.  The photos of the
motorcycle show none of this "Tupperware", as it is often termed, remaining on the motorcycle.
We see exposed frame and tank, and no fairing.  This altered condition created a circumstance
where the make and model of the motorcycle would be disguised in a manner that even an avid
motorcyclist would not be able to identify the motorcycle from even feet away.  Painting the gas

Preliminary Report-Means v. City of South Charleston

tank black would only further disguise the vehicle, implying that the vehicle may not have been missing Tupperware.

8

The rearview mirrors on this motorcycle were not attached to the handlebars; but were part of the missing plastic fairing. This would explain why Mr. Means was furtively, rapidly, and repeatedly turning his head to directly observe the Peterson patrol vehicle behind him in the minutes prior to the beginning of the pursuit.

This motorcycle when new weighed 454 pounds, developed 90.2 rear wheel horsepower, and could reach a top speed of 153 mph, a speed that would outrun many if not most city police vehicles on an open highway. However, the suspension of this motorcycle was not designed for rough and curvy road surfaces, a factor that would make eluding a police vehicle unlikely along the path of this pursuit.

This power and handling characteristic would be consistent with Officer Peterson's observation that the speed of the vehicle increased markedly along two straight stretches of roadway that preceded the loss of control and crash sequence. As previously noted, the license plate was not registered to the motorcycle nor to Mr. Means. How Mr. Means came into possession of that license plate has not been determined. Is there anyway to link the plate and the registration information directly to Mr. Means? Were they friends? Or did Mr. Means purposely seek out a license plate that could not be connected to him. These questions are unanswered.

This physical evidence of disguising the motorcycle would create a situation where Mr. Means could "ditch" the bike and successfully flee apprehension on foot, without the bike being traced back to him. I applaud Mr. Means for being so safety conscious by wearing a full-face helmet. However, Mr. Means was also very effectively disguised by this helmet. The helmet is another piece of equipment with origins unknown, per Mr. Means.

*Speed?*

Finally, the physical evidence indicates that the pursuit lasted 12 minutes and 7 seconds. My research using a computer mapping program suggests that the distance of the pursuit was about 11.57 miles. Therefore, the average speed of the pursuit is computed to be about 57 mph.

Officer Peterson's deposition testimony confirms my calculated pursuit time of 12 minutes and 7 seconds. However, I have no direct confirmation that I have calculated the exact pursuit path and distance correctly. Therefore, this calculation may be subject to revision.

**Pre-Pursuit Conditions:**

There was a great deal of visual interaction between Officer Peterson and Mr. Means in the minutes prior to the actual pursuit. Both individuals were operating at cognitive levels generally not experienced by the average motorist. Both were employing what might be termed street-smarts in evaluating the intended activities of the other.

What is *Street Smart*?  Some definitions limit the use of this term to individuals who have developed skills that aid them to survive, or even prosper, in a difficult environment, typically in urban neighborhoods.   However, the term may be extended to many different environments, and simplified to the following definition: "Street smart" *really* means understanding human nature in a rare but realistic way."  Much of this understanding is gained through observing actions and body language that may predict the actions of others.  Clearly, both Mr. Means and Officer Peterson have gained life experiences that would make them street smart.

Plaintiff's expert Roy G. Taylor, Ph.D. and I have been asked to shed light on what may be often characterized as the counterweight to "street smarts", that being "book smarts".  We are expected to be knowledgeable regarding the threshold at which a reasonable and prudent pursuing police officer will make certain decisions in an effort to balance risk tolerance with the duty to affect a criminal apprehension.  We are also expected to understand the current legal and social context in which the officer's decisions are made, and the information resources available at the state and local level.

It should be noted that there are no federal statutes or policy requirements that define what is required of police officers in pursuit of a motor vehicle.  It is my position that the best analysis of this event is to employ both "street smarts" and "book smarts".

### Mr. William Means:

Mr. Means, at the age of 32, is no longer a naïve teenager, making an impulsive decision to run from police to simply avoid a traffic ticket.  He has testified to a difficult life since ninth grade that would certainly result in a level of street smarts. His contact with the criminal justice system has been extensive.  He admits to being drug addicted, and his life being focused upon finding a means by which to finance and support his drug addictions.  He has stated that he was not narrowly defined in the drug world, as he would take any drug that he could obtain.  He was always looking for his next fix.

He has been arrested and charged for possession of a stolen vehicle and other drug and property crimes.  His explanation for fleeing police when found in possession of his neighbors stolen vehicle is highly creative, in my opinion.  His DUI history ultimately resulted in revocation of his driver's license many years ago, leading to his unwillingness or inability to fulfill requirements necessary to become a lawful motorist and renew his license.  He has claimed to have traveled and functioned in society by having others drive him about.  However, his counsel suggests that he was actively involved in restoring motorcycles, which would tend to indicate that he had regular access to a motor vehicle.  His own testimony indicates that he often rode with a plan in mind, trying not to attract the attention of law enforcement.

On the day of the pursuit, he had stayed the night at his employer's house, not at his own residence.  He worked part-time as a grave digger, working in an on-demand capacity.  He claims to having taken no drugs during the night and claims to have slept all night, waking near 8:00 am on a Saturday morning.  He acknowledges that the use of methamphetamine, or speed, results in extended periods of wakefulness and agitation.  He points out that had he been on meth, he would not have been able to sleep that night.  But he did sleep that night, which he

Preliminary Report-Means v. City of South Charleston

believes is proof that he was not on methamphetamine at the time of this event.  Mr. Means
believes that had he been on meth during the pursuit, the drug would not have hindered his
operation of the motorcycle.  In fact, he believes that meth can enhance driving skills.

10

Mr. Means has testified to being completely aware that he was operating an unregistered motor
vehicle and displaying a license plate last registered to another motorcycle.  His intent was
undeniably to deceive law enforcement officers into believing the motorcycle was something it
was not.  He admitted that he was always extremely careful not to draw the attention of police
officers while riding.  He was committed to not speeding, because he understood there would be
consequences for the violations he was committing, likely resulting in arrest.  Mr. Means
potential motivation for fleeing officers was clearly not limited to traffic citations, in that he was
carrying a black backpack that contained illicit substances.  To my knowledge, the source of
these drugs and items has not been determined.  However, Mr. Means was admittedly in route to
obtain a clutch cable for another motorcycle of his, a cable intended as either a gift or a barter
from a friend who worked at a motorcycle repair shop.  Mr. Means actually passed the friend's
home during the pursuit but chose not to stop.

It is clear from the testimony that Mr. Means had a general plan as to what he would do if
confronted by police.  The evidence would support the conclusion that the plan was to avoid
being identified, and to lead the police on a chase, perhaps with some specific ideas as to how to
elude officers.

***Officer Eric Peterson:***

Officer Peterson had his own professional training and experience that would clearly define
street-smarts.  He was not a rookie.  He began his career with SCPD in 2008 and transferred
from patrol to the ***street crimes unit*** in 2011, returning to patrol duties in 2018.  In 2020, he was
assigned to law enforcement duties with the South Charleston school system.  Although routine
patrol duties can afford a certain level of street smarts, no assignment in law enforcement can so
fully educate a police officer as does an undercover assignment.  And no assignment can be more
stressful and perhaps dangerous, dangerous to both mind and body.  Working undercover at
times requires the officer to live with the criminal element, inevitably training the officer how to
assume the persona of a criminal or risk serious repercussions – typically called a "blown cover."
Assuming a criminal persona means learning how to think like a criminal, and even how to read
body language and intent.

An assignment to street crimes investigations brings with it a clear understanding that there is a
web, or interconnectedness, between many types of criminal conduct.  Drug addictions create
desperate people, willing to commit property crimes to finance their addiction.  This generates a
criminal class who fence stolen property, and part-out or otherwise disguise that property to
avoid detection.  Drug dealers organize to control turf and create gangs, which in turn often
result in crimes against persons.  And if left unchecked the overall crime rate soars.

Virtually all serious crimes are facilitated to some degree with the use of a motor vehicle.  And it
is while operating a motor vehicle that these criminal activities may be at risk of detection by law
enforcement officials.  Discarding of items from a moving vehicle fleeing police is a clear sign

that the occupants are likely attempting to cover up a more serious crime than a simple traffic ticket.

11

For a period of time my duties as a Boise Police Department sergeant were to supervise a team of patrol officers responsible for accident investigation, reconstruction, and DUI enforcement. However, despite the emphasis on traffic, my team led the department in making arrests for more serious misdemeanor and felony crimes.  It became evident to more traditional ranking officers, as it was to those of us on patrol, that our team was effective in part because we were highly motivated, vigilant, and active, and we spread through high crime city streets during the late evening and early morning hours.  We did so searching for driving behaviors indicative of driving under the influence.  The bad guys also circulate during these hours.  When stops were made and drivers evaluated, links to other crimes and warrants for arrest were often discovered. Serious criminals often live lifestyles in which they are operating motor vehicles while DUI of alcohol or drugs.  The link is clear.

It is also clear from a review of the dispatch audio tape that Officer Peterson's attention had been drawn to the Means motorcycle at first in response to the unusual look of the vehicle, specifically what appeared to be a crude black spray painting of the gas tank.  Officer Peterson fell in behind the Means motorcycle and required a close distance to read the small motorcycle license plate. Means exhibited unusual body language, repeatedly turning his head near 180 degrees to view the presence of the following police vehicle, thus adding another street-smart indicator.  Then the dispatch registration check on the license plate came back expired and to another vehicle, though the plate had not been reported as stolen.

Officer Peterson's training, experience, knowledge, intelligence, and diligence to his duty of protecting the citizens of South Charleston convinced him that once he turned on his overhead lights, this face covered rider was going to run.  In contrast, the "book smart" definition of the totality of the circumstances then known to Officer Peterson is summarized by Plaintiff's counsel as being nothing more than an expired or unregistered license plate.

Officer Peterson took great pains to discourage Mr. Means from initiating this pursuit.  He requested assistance from other officers hoping to discourage flight by creating a manpower presence to discourage Mr. Means from running.  He asked to have county and state law enforcement alerted and mustered to key locations.  And in Officer Peterson's voice I heard not excitement, but calm, tempered with a deep breath at one point that told me what many law enforcement officers have experienced in similar situations.  "Here we go again.  Please don't do this, and don't make me do this.  I don't want to play your game.  Don't create circumstances where people are placed at risk, and don't threaten my life and potentially other citizens with your actions.  Just give it up."  Despite Officer Peterson's efforts to create an overwhelming presence to discourage or preempt this event, Mr. Means had a plan, and he put that plan in motion.

### *Conduct of the Pursuit:*

A properly conducted pursuit will typically reflect the following guidance:

1. An on-duty supervisor should be in place to monitor and advise officers involved, and to assist in delegating manpower and contacting other agencies.  The supervisor should also ensure that dispatch conducts a thorough search for vehicle and suspect wants, criminal records, registrations, licensing, and last known address of the suspect if known.
2. Officers are to report via radio transmission the location, direction, and speed of the pursuit on a regular basis.
3. Officers are required to advise of vehicle and driver description, and the reason for the pursuit.
4. Officers are to provide information regarding past and future potentially hazardous situations encountered, including traffic controls and other traffic or environmental conditions.

A review of the dispatch audio confirms that the above duties were accomplished in detail by the law enforcement team that came together to manage this event.  Officer Peterson's selective use of his siren accomplished the goal of clear and effective communications while lowering the temperature of the pursuit.  The very activation of a siren is known to raise heart rate even in trainees within the safety of a test track.  The liberal use of siren may also affect the performance of the suspect.

Officer Harvey performed properly in assuming a secondary position to Officer Peterson and assuming responsibility for "calling" the pursuit so that Officer Peterson could concentrate on the actions of the pursued.  Officer Harvey was effective in keeping other officers informed while balancing those needs with the goal of reducing non-essential radio traffic.

Seasoned officers involved in pursuits of motorcycles are generally aware that the suspect may have a plan regarding how to evade police.  The first attempt to escape could be a simple show of excessive speed, speeds that the officer chooses not to follow.  This strategy was clearly not going to be effective for Mr. Means, as the character of the narrow, curvy, and sometimes rough or gravel covered roadway placed his high-powered street bike at a disadvantage.

A second strategy may be to travel to a comfortable neighborhood that he knows well, establish some space in which he can drop the bike, and then elude police on foot as he seeks shelter in the residence of a friend, or perhaps in his own residence.  Clearly, Mr. Means had been headed to a meeting with a friend along this route, but he was only generally familiar with the area.  Due to the faux license plate displayed, officers would have no information from which to search for the vehicle owner and address, and then respond to the residence to make an apprehension.

A third plan might be to operate his narrow single-track vehicle along a narrow path that would not be accessible to police vehicles.  A made-to-order escape route might be a foot bridge over a stream or other difficult terrain.  Or a rider might believe that he could enter a railroad right of way, knowing that police cars could not follow, and then hope that he is able to ditch and run, or find a way out undetected once direct contact with police had been lost. Either of these would be best applied with local knowledge.

12

Mr. Means provided some indicator to Officer Peterson that he was looking for just that avenue of escape.  Mr. Means was described by Officer Peterson as traveling in the pursuit at slow speeds while looking around.  A street-smart officer would be prepared to transition from a vehicle chase to a foot chase when this happens.

13

In retrospect, it is likely that Mr. Means choice of roads, his lack of local knowledge, and the fact that he was riding a street bike and not an off-road machine, created circumstances that would not facilitate his escape through rough narrow terrain.

### *Termination of the Pursuit:*

Officer Peterson has testified that Mr. Means greatly increased the speed of the pursuit along two straight stretches of roadway just prior to the railroad track accident scene.  Witnesses in a yellow Jeep have confirmed that they stopped to allow the motorcycle and two police cars to pass at the beginning of one of those straight sections of roadway, and then turned around to follow the pursuit.  The two witnesses provide greatly contrasting testimony, but both confirm that Officer Peterson was not traveling within six inches of the rear of the motorcycle at that time.  One of those witnesses has no recollection of police lights or siren, while the other clearly remembers police lights but is uncertain about the use of the siren.  However, the audio on the witness video clearly detects a siren in use even as the vehicles are stopped.

Mr. Means claims not knowingly being involved in a pursuit, not trying to evade the police, not ever hearing a siren, or seeing lights.  His failure to stop was a fear that if he slowed down Officer Peterson's vehicle proximity to the rear of his motorcycle would result in his rear tire being struck.  And as the event played out, it was indeed his prediction that contact would be made that he alleges came true.  He states that he lost control only because he was rammed from behind.

There is nothing in Mr. Means testimony relating to the actual pursuit that can meet the reliability test of being run through the physical evidence-based model, as noted earlier in this report. There is no physical or circumstantial evidence of which I am aware that would support the ramming allegation.

Should reliable and convincing evidence of such contact between vehicles be produced, I would conclude that such contact was either evidence of simply driving too closely, failing to apply braking sufficiently to avoid collision as the motorcycle slowed, or an intentional contact intended to end the pursuit.  However, it would be unlikely that the physical evidence would establish which of the three circumstances resulted in contact between vehicles.

### <u>*Evolution of Police Pursuit Policy*</u>

Attached to this report is my treatise entitled "An Administrator's Guide to Police Pursuit Policy".  Therein, I discuss how in the 1980's attention was focused upon scientifically evaluating how the dangers of police pursuit may be lessened, while still accomplishing the

societal goals of reducing crime and traffic injury and death.  Several studies were initiated by law enforcement groups and studies for their assessment of the risks of pursuits, and the implications of policy development and associated training in the larger issues at hand.  I stand by all research and opinions offered in my Administrator's Guide and suggest that a full reading of that document will have clear application to the issues of this litigation.

14

There are three general descriptions that would come to be, summarizing the type of pursuit policy a department might develop.

1. The Officer Discretion, or traditional model.
2. The Restrictive Model.
3. The Prohibitive Model.

In recent years it has become apparent that state police agencies and rural sheriff's offices tend to favor the officer discretion model.  More heavily populated areas would be likely to adopt a restrictive model defining some police actions that might be discouraged.  A full prohibition of motor vehicle pursuits might be declared in densely populated major urban areas.  It is clear, that the danger of the pursuit is deemed most closely associated with the opportunity for conflict with third party vehicles.  The more densely populated the area, the greater the opportunity for injury to a third party, and the suspect, and the officer.

In the beginning, law enforcement officials had always used whatever conveyance was available to pursue and apprehend law violators to meet the expectations of the governed.  The pursuit of law breakers progressed from the age of horses to the age of automobiles, from country roads to city streets and interstate highways.  The traditional mantra of law enforcement is embodied in the "officer discretion" model.  The officer was limited only by the reasonableness of his own actions.  His duty required him to act, even at the risk of his own personal safety, even when in extreme cases gunfire was exchanged.  Within this light, pursuit training consisted largely of learning the control limits of the officer's own vehicle.

Training typically occurred on designated closed courses or parking lots, or roadways on fairgrounds or other areas that could be cordoned off for safety.  The goal was to be comfortable with driving a patrol vehicle as swiftly and efficiently as possible, using threshold braking, understanding lateral and longitudinal forces on tires, and thereby avoiding loss of control or collision, either in pursuit, or in response to a medical, fire, or other emergency.

Officers were made aware that were they to collide with an innocent third party then the officer was likely in trouble.  An assessment of the accident would be in part based upon the third party's ability to perceive the patrol vehicle lights and siren.  Training evolved to teach the officer the limits of siren effectiveness.  Officers were taught that fully 90% of driver perception is visual, therefore officers needed to visually "clear" intersections and other areas where sightlines were limited or otherwise complicated with heavy traffic.

Nowhere in this pursuit training was there any inference that the police officer somehow controlled the actions of the suspect fleeing police.  Nowhere was it claimed that it was the police who determined how fast the suspect vehicle traveled, and how the suspect steered the

vehicle and applied the brakes.  There was no plaintiff's attorney concept that the police were "pushing" the suspect to drive dangerously by his very presence, a concept offered in Mr. Mean's claim that he was afraid to slow down because the officer would run over him.

15

As the concern over pursuits heightened, the International Association of Chiefs of Police developed what could be termed a restrictive pursuit model policy.  Officers were provided guidance in managing a pursuit effectively, a process well demonstrated by Officer Peterson and others.  But more significantly, it was determined that police pursuits for traffic offenses only were to be discouraged, with an exception for DUI.  How is that rationale possible?

Citizens in the 1980's were literally MADD about the lack of DUI enforcement by police agencies and the courts.  It is not surprising that law enforcement was being asked to reform or conform to seemingly opposite ends of the enforcement spectrum.  They were being asked to let many violators flee without any attempt to apprehend, due to the dangers of police pursuit, while at the same time asked to increase efforts to apprehend and prosecute drunks behind the wheel.  Officers were given the seemingly impossible task of knowing whether the driving actions of a motorist was due to DUI or other considerations.  Is it possible that savvy practiced drunk drivers would come to understand that police would not always pursue unless they had hard evidence of intoxication, or a serious crime afoot?  The IACP wrote that efforts should be made to conceal the "no pursuit" restrictions from the general public, and those who would be inclined to flee were they to understand the policy.

Traditional police pursuit recognized that if a suspect were to refuse to stop in a reasonable time, that vehicles could be used to block the roadway to force the suspect to stop.  In the absence of a roadblock, contact between vehicles could also be used to initiate a loss of control.  However, court decisions brought both of these tools into question, resulting in what had been at one time wholesale banning of both tactics as an improper use of potentially deadly force.

Vehicle to vehicle contact to stop a pursued vehicle has in recent years been court approved via the PIT maneuver (Pursuit Intervention Technique), where the left or right front fender of the patrol vehicle is pressed against the appropriate rear fender of the pursued vehicle to induce loss of control.  Use of the technique is most often limited to speeds of less than 35 mph and should be implemented where the roadway environment is not hazardous to others.  This pursuit technique is not generally approved for motorcycles, as serious injury may occur.  If used, it must be with prior approval from a supervisor, and other officers.

In time, roadblocks have been softened into "vehicle intercepts" in many jurisdictions where a gathering of police vehicles stopped ahead is used to intimidate the suspect into just giving up.  To a determined suspect, intercepts are of little value as officers are required to leave an open space in the roadway for suspect to continue to drive away unimpeded, so that the dangers of the suspect not fully perceiving the danger of a full roadblock are avoided.  Intercepts have been used in part to deliver a new technology, the spike strips that penetrate tires and allow a controlled loss of air, thus causing the suspect to bring the vehicle to a stop.

Unfortunately, in our zeal to avoid injuring the suspect many law enforcement officers have been injured or killed while trying to deploy the spike strip equipment across the roadway in a timely

manner.  This has become an issue examined by members of the IACP, with papers published accordingly.

16

### *IACP Model Policy:*

Plaintiff's Expert has relied heavily upon language from the IACP model policy.

In December of 2015, the International Association of Chiefs of Police updated both their Model Policy - *Vehicular Pursuit* (4 pages) and the accompanying *Vehicular Pursuit – Concepts and Issues Paper* (9 pages).  Both publications have been forwarded with this report.

On page 1, item IV-2, the model policy reads:  *The decision to initiate a pursuit must be based on the pursuing officer's conclusion that the immediate danger to the officer and the public created by the pursuit is less than the immediate or potential danger to the public should the suspect remain at large.*

This statement or similar language have been a staple of IACP policy for many years.  Unfortunately, this statement lays a foundation for decision making that is impractical and unworkable in its application in the real world.

It is my opinion, that a literal interpretation of this statement would require (1) admitting that any pursuit caries with it a chance of death at the hands of the fleeing suspect, and (2) the only person subject to being pursued would therefore be a serial killer who if not captured will be free to kill again. This statement is not included in the SCPD pursuit policy.

*Discussion:*  From the moment an officer attempts to stop a suspect vehicle, and the driver refuses to yield and instead tries to elude that officer the immediate danger created by the fleeing suspect is that he will drive in a manner that could kill or maim.  In fact, pursuit studies have shown that the danger of a pursuit is greater at the beginning of the pursuit, and then lessens as the pursuit ages.

The implication of the above research data is that a suspect who manages his own vehicle with some degree of caution will maintain control and extend the pursuit.  It is the heavily intoxicated or otherwise unreasonable driver who will find a way to crash in a short distance.

It is important to understand that the danger of a pursuit is not measured or scaled, as we might consider the heat in a room rising in time, as the thermometer finally registers a tipping point where it just becomes too hot to handle.  The dangers in pursuits occur in spikes, typically at intersections or locations where driving skills are challenged, or other vehicles may be present. An officer pursuing a suspect does not carry a thermometer, nor any quantitative tool, from which to draw such a conclusion.  AS the pursuit progresses to less populated areas, the danger lessens.  If the pursuit is transitioning to more populated areas, then the continued driving strategy of the suspect may infer a greater danger.  Officer Peterson has described a recent pursuit that he chose to discontinue as it was entering heavier traffic.  This would appear to be an appropriate response.

Preliminary Report-Means v. City of South Charleston

This IACP guiding principle is often used to imply (1) that the officer has the ability to know 17
when and if the fleeing suspect is about to cause harm, and (2) that the officer so equipped and
skilled with the power of seeing the future, could therefore have protected the suspect from
himself, if only the officer had simply stopped the pursuit.

This is in part why we are engaged in this investigation. Plaintiff claims that his client was free
to flee because the IACP policy says that Mr. Means should never have been pursued to begin
with. And furthermore, Officer Peterson should have known, after observing Means operate his
motorcycle, that Mr. Means was going to injure himself.

### *IACP Concepts and Issues Paper:*

Should the Plaintiff infer that the IACP policy is a standard for police conduct, I would refer the
reader to page 3 of the accompanying IACP concepts and issues paper:

> *Thus, law enforcement officers and agencies are confronted with the dilemma of
> whether the public is best protected by engaging in high-speed pursuit or by taking
> some other form of action. There is no simple answer to this problem that can be
> applied in all circumstances. The department must balance the risks, take all of the
> factors into consideration, and reach a decision that is best suited to their jurisdiction.
> Banning or limiting pursuits by policy, or providing officers with full discretion in
> deciding these matters are all legally acceptable alternatives. Policy decisions of this
> type are limited less by law than by the professional judgement of the law enforcement
> executive and the judgement of officers in the field who must interpret and apply that
> policy.*

Portions of this paper discuss principles of Specific Deterrence and General Deterrence, often
discussed in relation to a closed system or an open system perspective. Principles applicable to
policy development involve "Broken Windows" theory, known well to students of criminal
justice science. I will be prepared to discuss these concepts when called upon.

### *SCPD Pursuit Policy*

It should be clear from the above IACP language that any criticism of the SCPD policy as being
inconsistent with the IACP model is contrary to the intent of the IACP publications. There are
no national models. Each jurisdiction is free to create their own policy. In my opinion, the
South Charleston Police Department has created a thorough, well-reasoned, and practical
document.

I conclude that Officers Peterson and Harvey acted reasonably at all times, were under
supervision by a senior officer, and were in compliance with the letter and spirit of the SCPD
policy. SCPD staff tasked with reviewing this pursuit have found the conduct of the pursuit in
compliance with their interpretation of the policy.

Preliminary Report-Means v. City of South Charleston

### *Summary of Opinions:*

18

1. Officer Peterson observed an unusual motorcycle that he concluded was suspiciously painted, consistent with his experience regarding disguising stolen vehicles.
2. Upon further inquiry, Officer Peterson determined that the identity of the vehicle and therefore the owner could not be determined, because the operator had disguised the vehicle with a license plate from another motorcycle.
3. Officer Peterson observed the body language of Mr. Means, repeatedly and nervously looking directly to the rear at the police vehicle.
4. Officer Peterson had reason to conclude that the vehicle was likely stolen, or otherwise disguised for purposes of criminal activity.
5. Officer Peterson was so convinced that the operator of this vehicle would attempt to evade contact, that he tried to muster manpower at critical locations to pre-empt or discourage the driver from initiating a pursuit. However, Mr. Means began to flee before assist officers could arrive.
6. During the pursuit Officer Peterson reported location and vehicle speeds as required by policy.
7. Officer Peterson's supervisor participated in managing the pursuit and was fully aware of the extenuating circumstances that raised the level of possible criminal activity well beyond a simple traffic violation.
8. Mr. Means actively attempted to discard his backpack during the pursuit, further indicating that he was likely in possession of property of drugs as evidence of criminal conduct.
9. Mr. Means clearly rode his motorcycle with a plan in mind. Should he be contacted by law enforcement, planned to elude officers. He was not fleeing a traffic citation. He was fleeing incarceration.
10. Mr. Means was in complete control of his motorcycle, claiming to be a skilled and experienced rider, until he approached an area where he failed to navigate a railroad crossing.
11. The pursued rider and police vehicles never overtook any vehicles traveling in the same direction, and therefore never presented a danger in passing any vehicles.
12. During the pursuit only three vehicles were passed moving in the opposite direction. None of those passes was described as being a near collision.
13. The environment in which this pursuit action took place, given the time of day and day of week, was low risk in comparison to more populated areas.
14. Officers were not only justified in attempting to stop and then pursuing Mr. Means. They were also fully justified in continuing the pursuit.
15. There is no physical evidence of which I am aware from which to conclude that there was contact between the police vehicle and the motorcycle.

**Closing:**

The conclusions and opinions listed above are based upon the materials and evidence I have reviewed, and upon my 44 years of education, training, and experience as a traffic accident

investigator, certified traffic accident reconstructionist, traffic safety consultant, and police vehicle operations expert.

19

Should additional information be made available, I would reserve the right to modify or supplement the opinions offered.

Respectfully submitted,

John H. Painter, MPA, ACTAR
Traffic Safety Consultant

A list of attachments will be compiled and listed separately.

**AN ADMINISTRATOR'S GUIDE TO POLICE PURSUIT POLICY**

by

JOHN H. PAINTER

May, 1991

© 1991

John H. Painter

ALL RIGHTS RESERVED

dedicated to.....

My wife Rosemarie

without whose loving support I would have

lacked the courage to break away.......

## ACKNOWLEDGEMENTS

"An Administrator's Guide to Police Pursuit Policy" has been a year in the making. Although several friends and colleagues have provided both support and assistance, I would like to thank two benevolent individuals who have gone well beyond the call of duty in clearing the way of seemingly insurmountable obstacles.

To Dr. Willard Overgaard, Professor of Public Law, Boise State University, without whose confidence, patience, and special consideration, my efforts at degree completion would have suffered an untimely death.

And to Mr. Paul Chylak, Deputy Director, Northwestern University Traffic Institute, whose high ethical standards and dedication toward growing even the greenest of his charges, have enabled me to take this first step toward loftier goals.

Thank you gentlemen.

**About the author......**

**JOHN H. PAINTER** is a Senior Consultant and Lecturer at The Traffic Institute of Northwestern University, Evanston, Illinois. Mr. Painter graduated with honors, earning a Bachelor of Arts in Criminal Justice Administration and a Masters in Public Affairs.

Mr. Painter served for eleven years with the Boise, Idaho Police Department; subsequently performing supervisory duties within the Selective Traffic Enforcement Program and the Boise State University Campus Law Enforcement Services.

Mr. Painter currently serves the Traffic Institute as a consultant to the legal profession in the areas of Traffic Accident Reconstruction and Police Pursuit Policy, and is an advisory member of the National Highway Traffic Safety Administration committee studying the "Effects of Traffic Law Enforcement on Crime".

v

**TABLE OF CONTENTS**

Page

DEDICATION PAGE......................................... iii

ACKNOWLEDGEMENTS....................................... iv

ABOUT THE AUTHOR....................................... v

INTRODUCTION........................................... 1

CONCEPTUAL FRAMEWORK................................... 7

    Statutory Authority and Traditional Philosophy..... 7
    Changing Standards................................. 10
    Pioneering Studies Regarding Pursuit Driving....... 13
    Comprehensive Pursuit Studies...................... 15
    Preceding Event.................................... 17
    DUI Discussed...................................... 18
    Rationale of Pursuit for Minor Traffic Violations.. 22
    Terminating Event.................................. 26
    Reluctance to Terminate............................ 27
    Policy Considerations for Termination.............. 30
    Damage, Injuries, and Death........................ 31
    Risk Factors Affecting Accident Rates.............. 33
    Factors Affecting Apprehension Rates............... 38
    Discussion and Conclusions Regarding Research Data. 39

FORMULATING THE PURSUIT POLICY......................... 44

    The Evolution of IACP Model Policies............... 46
    Current IACP Philosophy Discussed.................. 48
    The Process of Formulation......................... 52
    The Committee Process.............................. 57
    Common Policy Deficiencies......................... 60

POST PURSUIT ADMINISTRATIVE REVIEW..................... 71

    Fact Finding....................................... 71
    Reporting.......................................... 72

**TABLE OF CONTENTS (Con't)**

Page

**POST PURSUIT ADMINISTRATIVE REVIEW (Con't)**

    Analysis and Recommendations....................... 73
    Disposition........................................ 78

**OFFICER TRAINING....................................** 81

**SUMMARY.............................................** 88


**ENDNOTES............................................** 95

**SELECTED BIBLIOGRAPHY..............................** 98

**APPENDICES**

    A   IACP MODEL POLICIES

        IACP Model Policy, Vehicular Pursuit, Dec 1, 1989
        IACP Vehicular Pursuit, Concepts and Issues Paper,
            Aug 1, 1990
        IACP Model Policy, Hot Pursuit, May 1, 1987
        IACP Model Policy, Vehicular Pursuits by Police
            Officers, July 1973

    B   HIGH SPEED PURSUIT REPORT FORM

    C   EASTERN ILLINOIS UNIVERSITY POLICE ADVANCED DRIVING
        AND PURSUIT TECHNIQUES STUDENT MANUAL

**AN ADMINISTRATOR'S GUIDE TO POLICE PURSUIT POLICY:**
**Policy Formulation, Implementation, and Evaluation**

## INTRODUCTION

The conduct of police pursuits, and the departmental policies governing the conduct of police pursuits, have come under increasing scrutiny during the decade of the 1980's. Litigation in the civil courts has resulted in a myriad of decisions chastising police agencies for negligence resulting in death and injury, both to traffic law violators and innocent third parties, while engaged in the otherwise lawful conduct of police pursuits.

Large cash awards to those injured in police pursuits have threatened the solvency of many self-insured police departments, and have resulted in many smaller departments being refused insurance coverage unless a "no pursuit" policy is enacted.

Only very wide ranging estimates have been made as to the number of deaths and injuries resulting from police pursuits. Barker

> indicate(d) that pursuit driving situations may result in more deaths and injuries than any other law enforcement activity, including the use of firearms. [1]

Weisel suggested that over 300 people were killed in 1977 in an estimate 250,000 police pursuits.[2]

1

Beckman finds that the dangers of death and injury during the course of a pursuit are higher for the criminal and inno- cent third parties than for the police officers who are pur- suing.[3]  However, police pursuits do represent a substantial danger to police as well.

For instance, two of the 66 police officers who were feloniously killed in 1989 were intentionally run over by operators of motor vehicles during the course of a police pursuit.  Another seven officers were accidentally struck and killed by vehicles in roadblock or traffic stop situations, and an additional 48 officers lost their lives in auto and motorcycle accidents. Although the specific circumstances surrounding the accidental deaths reported above were not pro- vided, it is highly probable that a significant number were related to high speed pursuit.[4]

Department of Justice statistics contained in the "Law Enforcement Officers Killed and Assaulted" summary for the decade of the 1980's indicate that a total of 1514 officers were killed in the line of duty.  Eight hundred and one (801) were feloniously killed, 108 of which were reported killed in traffic pursuit or traffic stop situations. Another 713 offi- cers lost their lives accidentally, 361 of those in automobile or motorcycle accidents.   FBI statistics do not provide a breakdown as the percentage of the deaths occurring specifi- cally in pursuit related activities.[5]

Most police administrators have responded to the increased

3

awareness of the dangers of pursuit driving by establishing
written vehicular pursuit policies to govern the conduct of
their department personnel when attempting to apprehend law
violators who flee from the police in a motor vehicle.   The
International Association of Chiefs of Police has, as early as
1973, established model policy guidelines designed to govern
police pursuit.   The Commission on the Accreditation of Law
Enforcement Agencies has included, within it's manual of
standards, language requiring that law enforcement agencies
seeking accreditation have a written policy governing pursuit.

> The agency must balance the necessity of pursuit or
> apprehension against the probability and severity of
> damage or injury that may result. [6]

Yet little is available to assist the police administra-
tor in specifically addressing the process of formulating,
implementing, and evaluating a vehicular pursuit policy con-
sistent with the operational requirements and political reali-
ties of agency jurisdiction.

"An Administrators Guide to Police Pursuit Policy" has
been designed within a framework of practical application for
the police administrator.   In formulating and implementing a
department policy governing police pursuit that is fully con-
sistent with the standards of the law enforcement profession
and the changing expectations of the community to be policed,
the police administrator must perform several managerial func-
tions.    First he must examine the limited empirical data
available concerning the frequency and outcomes of pursuits.

4

A full appreciation of the risks and benefits associated with police pursuit will assist the administrator in assessing the risks he and his department are willing to accept in order to further agency goals and objectives.

Secondly, the administrator must turn his attention to the process by which a policy can be formulated. The administrator must ultimately choose between basic policy philosophies that may have the effect of encouraging, restricting, or discouraging pursuit altogether.

With a written policy in place, the administrator must now turn his attentions to training line and supervisory personnel in preparation for full implementation. General training guidelines must be established that fulfill the objectives of the policy.

Finally, the policy must be implemented and controls must be established to determine the extent of compliance by line personnel. This evaluation and control mechanism will serve a twofold purpose; to provide sanctions and guidance to those who fail to perform within policy guidelines, and to evaluate the effectiveness of the policy as currently written so that appropriate policy and training changes may be made.

This process of researching the issue, formulating and implementing the policy, and ultimately evaluating the real world outcomes of that policy is, no doubt, a familiar process to the police administrator. Yet few policy decisions made by police officials have the potential for negative outcomes as

5

deadly as those involved in the emergency operation of a po-
lice vehicle.  According to James Manak, Senior Legal Counsel
of the Northwestern University Traffic Institute,

> the vast majority of civil suits involving police
> agencies arise out of the emergency operation of a
> motor vehicle. [7]

Unlike many of their counterparts in private enterprise,
police managers are not strangers to making decisions that
will have immediate real world life or death consequences.  It
is a basic tenet of the job that police officers must at times
use firearms or other potentially deadly weapons to apprehend
and control criminals. This "good guy/bad guy" concept is
readily accepted both by police officers and by the community.
The police administrator understands, that in the vast
majority of police/criminal confrontations the lives at risk
are only those of the criminal and the officer.  Less
frequently is the life of an innocent third party endangered
by such police actions.

However, the emergency operation of a police vehicle,
while in the pursuit of a law violator, will all to often
involve the death or injury of an innocent third party who by
chance wanders into the path of the fleeing vehicle. Or often
the so called "criminal" being pursued is little more than a
teenager fleeing a traffic ticket, perhaps influenced by alco-
hol, who otherwise may not be capable of making a rational and
mature decision as to the seriousness of his offense, and the
potential outcomes of attempting to elude police.  Therefore,

the police officer's decision to pursue, and the guidelines under which the officer makes that decision, will have a substantial effect upon significant numbers of individuals who otherwise may have no association with the traditional criminal element.

Innocent lives lost or damaged under such circumstances will be highly valued by the community, resulting in the community ultimately holding the police agency to exacting standards of conduct. It is therefore incumbent upon the police administrator to approach the formulation, implementation and evaluation of his agency's pursuit policy from a perspective which considers not only standards as established by the law enforcement profession, but also in consideration of the standards established by the community, reflected both by court decisions and at times the will of elected officials.

### CONCEPTUAL FRAMEWORK

The International Association of Chiefs of Police defines "Hot Pursuit" as:

> an active attempt by an officer in an authorized emergency vehicle to apprehend fleeing suspects who are attempting to avoid apprehension through evasive tactics. [8]

### Statutory Authority and Traditional Philosophy

The authority under which police officers are empowered to pursue vehicles is historically contained within the state vehicle code of the given jurisdiction. Most state statutes are similar to those recommended within the text of the Uniform Vehicle Code as published by the National Committee on Uniform Traffic Laws and Ordinances, administered by the Northwestern University Traffic Institute.

The Uniform Vehicle Code (UVC) authorizes the operator of an emergency vehicle, "when in pursuit of an actual or suspected violator of the law", to disregard traffic control devices and to "exceed the maximum speed limits so long as he does not endanger life or property".[9] There exists no indication within these conditions, either written or implied, that the police officer must consider, nor is he responsible for, the danger presented by the vehicle being pursued. Therefore, the suggestion made by this type of standard

7

statute is that the police officer must be concerned with safe operation of his own vehicle, and should an accident occur between his vehicle and another, the officer will be judged on the basis of whether his own driving behavior could be interpreted as "endanger(ing) life or property."

Furthermore, the officer is provided additional assurance of his legal authority to pursue, and perhaps a false feeling of security in the operation of his vehicle, as a result of the statutory duty of other motorists to yield to the flashing lights and siren of an emergency vehicle.

In most states, there exists specific prohibitions against those who use a vehicle to flee from police.  The Uniform Vehicle Code recommends that such action be considered a misdemeanor, and punishable by not less than 30 days nor more than six months in jail, and/or by fine of not less than $100 nor more than $500.  From a policy development perspective it is important to note that the UVC recommends that "The officer giving such signal shall be in uniform, prominently displaying his badge of office, and his vehicle shall be appropriately marked showing it to be an official police vehicle."[10]

Police administrators should be thoroughly familiar with those versions of the above statutes within their own state and local vehicle codes.  Consideration should be given to what constitutes the police "uniform", "prominently display(ed)" badges, and appropriately marked "official police vehicle(s)."

Some consideration should also be given, within the deterrent model of criminal behavior, as to whether the potential sanctions available through current legislation prohibiting flight from the police, and those sanctions actually being imposed by local courts, are sufficient to justify a hard line policy against violators; or whether the imposition of small fines and other sanctions are a reflection of the value that the community attaches to such conduct.  We will discuss these issues further when we consider policy formulation criteria.

The enforcement philosophy dominant in the 1970's and before was therefore predicated on the statutory inference that the operator of the pursued vehicle, often called "the suspect" in police jargon, was by his very act of fleeing police committing a serious crime, and was logically responsible for any damage resulting from a collision with his vehicle and another.  The police officer was properly doing his duty in pursuing the law violator, and in fact was acting within the police tradition somewhat heroically at that, risking his own personal safety in order to protect the safe transit of law abiding motorists. The violator precipitated the pursuit situation, and therefore should be held totally accountable for his actions and the resulting damage and injury. This traditional enforcement philosophy, whether right or wrong, remains strong within the pursuit philosophy of many police organizations.

## Changing Standards

The reality that the community standards of conduct for
police pursuits have changed is often not fully addressed by
police administrators until such time that civil litigation is
initiated against the police agency. Judges and juries have
increasingly asked (1) whether the need for apprehension out-
weighed the risks presented by the pursuit, and (2) whether
the officer(s) involved in the pursuit should have anticipated
the outcome, given the totality of the circumstances.

With ever increasing frequency, civil courts have, on the
basis of the above criteria, found in favor of the plaintiff,
often making large awards to third parties injured in colli-
sions with the suspect vehicle.

This increase in litigation has been due in part to a
gradual erosion of the doctrines of sovereign and statutory
immunity, barriers that had prevented successful lawsuits in
the past.[11]

> At the federal level, section 1983 of the civil rights
> act of 1871 has become the predominant means of
> seeking redress for alleged police misconduct.[12]

Those pursuit situations in which a police agency is like-
ly to be named as a defendant in a civil action fall into
three broad categories:

1. An "innocent" third party plaintiff is involved in a
   collision with a police vehicle in pursuit:  The al-
   legation of negligence will likely be that the offi-
   cer in pursuit failed to exercise due regard for the

safety of other motorists. Specific negligent be-
haviors may include excessive speed, failing to slow
upon entering intersections, or depriving an other-
wise prudent and attentive driver of the opportunity
to yield to the emergency vehicle.

2. An "innocent" third party plaintiff is involved in a
collision with the suspect vehicle: In this type of
situation the plaintiff may allege that the officer
had ample warning that the suspect vehicle was not
fully under control, as a result of prior near acci-
dents, speeding through traffic control devices at
blind intersections, or a showing by the suspect of a
complete and wanton disregard for the safety of others
on the roadway. Had the officer discontinued the pur-
suit, it is reasoned that the suspect would have
accordingly changed his driving behavior, and no acci-
dent would have occurred.

3. The suspect becomes the plaintiff as a result of in-
juries sustained in a collision with a third party or
another police vehicle. A common term used by plain-
tiff's in projecting negligence from the pursued sus-
pect to the police is that of "pushing." The police
are, within this line of reasoning, at least partly at
fault for damages and injuries sustained, contending
that the close proximity of police vehicles to the
pursued presented a psychological barrier to any

12

consideration or desire that the suspect might have to discontinue the pursuit.  This concept of "pushing" is often used to justify the actions of impressionable juveniles, who in fleeing the authority figure of the police officer are allegedly concerned that surrender, once a pursuit is initiated, will result in physical abuse.  Unfortunately, the misdeeds of a minority of police officers, found guilty of excessive force associated with police pursuits, may serve to make this line of reasoning viable to many jurists and others in the community.

It is clear that the community standard has evolved considerably from the once traditional doctrine that police have the absolute duty to apprehend law violators, and that law violators are responsible for any damage resulting from their criminal acts. In our litigation driven society we commonly find that civil case law precedes the enactment of statutory or other internal controls in establishing new standards of conduct.  Often the ultimate question in civil litigation involving the conduct of police pursuits is:[13]

1.  Was the conduct of the police officer in keeping with acceptable standards of the Law Enforcement Profession?  The reasonableness of the officer's actions will be judged with consideration given to his training and experience.

2.  If not, was the agency negligent in providing proper

training and guidance, normally in the form of pol-
icy guidelines, in assisting the officer to perform
the given task in a manner consistent with the stan-
dards of the Law Enforcement Profession?

If the officer's conduct is judged to be within the stan-
dards for the profession, then the organizational framework
from which the officer acted will not be at issue.  In other
words, as long as the officers conduct was found to be rea-
sonable, then the presence of, or lack of, a comprehensive
written pursuit policy and appropriate training is not at
issue.[14]

However, if the officer is found to be negligent in con-
ducting the pursuit, then the reason for that poor performance
will be sought.  If it is found that the organization failed
to provide proper guidelines, training, or controls that are
comparable to the standards of the profession, the damages
awarded may reflect these aggravated circumstances.[15]  Reducing
this additional exposure to liability should be of practical
concern to the police administrator as he considers policy
formulation and implementation.

## Pioneering Studies Regarding Pursuit Driving

Although comparisons are often made between the importance
of policy development in the areas of high speed pursuit and
the use of deadly force by police officers, police administra-
tors have traditionally given firearms training and policy a
much higher priority within the organizational framework

Regular visits to the shooting range for firearms certification, at times supplemented by classroom instruction, is the norm for officers in most police agencies. Even the smallest agency may designate an officer or supervisor to function as firearms instructor and range master, to oversee the firearms certification process.  Officer's weapons are likely to be inspected on a regular basis.

If a weapon is discharged, accidentally or otherwise, a supervisory investigation is initiated and a "shooting board" may be convened to fully review the incident, and to make recommendations concerning discipline or policy and training improvements. Diligent efforts are made to document all firearms training and investigations concerning the discharge of a "deadly" weapon.  As a reflection of law enforcement's legitimate concerns over the use of deadly force, the circumstances and factors involved in the use of deadly force have been extensively researched on many private and governmental levels.

Unfortunately the same level of commitment to the equally deadly use of pursuit driving is seldom found in police agencies.  Pursuits may only be investigated or reported upon by a supervisor if they result in an accident.  A "pursuit board," comparable to the shooting board for firearms discharges, is seldom employed.  Classroom and practical road course training in pursuit driving may not exist outside of roll call or basic recruit school.  Likewise, this decreased

15

level of professional attention is also reflected in the lack
of comprehensive studies on the issue of pursuit driving.  Al-
though "deadly force has been well researched.... pursuits
have not been given equal attention".[16]

The first alarm concerning the dangers of police pursuits
was sounded in 1967 by a group calling itself Physicians for
Automotive Safety.   Members of the group collected data by
clipping newspaper accounts of police pursuits and sending
questionnaires to a sampling of local, state, and federal law
enforcement officials.   This unscientific methodology did not
keep the group from publishing claims that the 512 police pur-
suits studied resulted in 118 deaths and 509 injuries.[17]

A 1970 study conducted by the United States Department of
Transportation concluded, after studying only 46 pursuits in
a total of four agencies, that between 50,000 and 500,000 pur-
suits occur each year, resulting in as many as 8000 accidents,
400 deaths, and 5000 injuries.   DOT officials admitted that
their study was unscientific, and that the data obtained was
"unworkable".[18]

### Comprehensive Pursuit Studies

Not until 1982, with the release of a California Highway
Patrol study of 683 pursuits, and then again in 1984 with a
Michigan State University School of Criminal Justice study of
424 pursuits, were any scientifically constructed studies made
for purposes of identifying the factors involved in police
pursuits.  Both of these studies involved police agencies who

were predominantly functioning under an "officer discretion" type of pursuit policy, in which the officer was free to initiate a pursuit of any fleeing violator, and was required to discontinue the pursuit only when he deemed that the risks outweighed the need for apprehension.[19]

The California Highway Patrol study was conducted between April and September of 1982 and involved the CHP and 10 police and Sheriff's departments across the state of California. The Michigan State University study, conducted April 1 to September 30, 1984, involved a broader geographic area and a total of 75 agencies; consisting of local police departments and sheriffs departments in nine warm weather states, as well as Guam and the Virgin islands.

Also in 1984, the Dade Association of Chiefs of Police undertook a two part study that differed significantly from the CHP and MSU studies in that it had two distinct phases. First, a nationwide search was conducted for model pursuit policies, and a single policy was eventually developed and implemented in the Dade Metro area.  Secondly, a detailed empirical analysis was performed on data collected from 1323 pursuits occurring in the Metro-Dade area during the calendar year of 1987.[20] The Metro-Dade Police Department study may not be reflective of most police agencies across the country, due largely to the peculiar and volatile nature of the Miami community.  These issues will be further clarified as we discuss the results of the study.

17

Data gathering was accomplished in all three studies through the use of questionnaires which were to be completed by the agency at the conclusion of a pursuit. The MSU questionnaire was designed to be similar to that used in the earlier CHP study, specifically for the purpose of later comparing the findings of the two studies.

A tremendous amount of data was captured during the course of the three studies. Police Administrators may find useful information by examining each of the studies in whole. However, we will summarize herein only those areas felt to be of specific importance to the police administrator actively involved in the formulation of his agency's pursuit policy. In that the results of the studies were remarkably similar, for purposes of simplification we have where appropriate within this text used an estimated average figure for the results obtained by the studies.

### Precedin Event

This term is used to describe the suspect actions or attributes that caused the police officer to initiate a traffic stop on the pursued vehicle. In more than half of all pursuits (52% to 63%) the pursuit was initiated as a result of a vehicle code violation. An additional 10 percent to 16 percent of the MSU and CHP pursuits were prompted by an officer suspicion of DUI (driving under the influence of alcohol). Upon capture, the officer's suspicions of DUI were validated on the average of 89 percent of the time.

Approximately 7 percent of the CHP and MSU pursuits were
initiated upon the identification of a known felony suspect,
and 6 percent to 18 percent as a result of suspicion of crim-
inal activity. However, in the Metro Dade Police Department
study (MDPD) 44 percent of the pursuits were initiated as a
result of the suspicion of criminal activity, in an attempt to
capture a known felon, or as a result of a BOLO (be on the
lookout) broadcast of information.   The Metro-Dade area is
known to have unusually high incidence of crime, particularly
drug related.   The number of pursuits that involved known
criminals is not likely to translate well to other areas of
the country.

The police administrator should glean from this informa-
tion that as much as 70 to 80 percent of all pursuits are ini-
tiated as result of a traffic code violation, to include DUI

## DUI Discussed

Anecdotal evidence suggests that the use of alcohol by
suspects fleeing police may be much higher than reflected by
the DUI booking charges as captured by the CHP and MSU stud-
ies. Interviews with practicing police officers, particularly
those specially trained to recognize the symptomology of al-
cohol consumption, indicate that as many as 50 percent of all
suspects they have apprehended at the conclusion of a pursuit
have been drinking.   However, the MSU study indicates that
only 45 suspects of the more than 300 apprehended were admin-
istered blood alcohol tests, with the results known at the

time of questionnaire completion.  The report summary is un-
clear as to what percentage of those apprehended were booked
for DUI, but a range of 20 to 30 percent is suggested by the
data.

The likely reason that many "drinking" suspects are not
booked for DUI lies within the inability of the arresting of-
ficer to collect the evidence traditionally used to prosecute
DUI charges. It is proper police procedure, when taking a pur-
sued driver into custody, to anticipate that the driver may be
armed and dangerous.  The driver is normally brought under
control at gun point, consistent with felony stop procedures,
ordered or taken to the ground, and then handcuffed and
searched.  The opportunity does not present itself to request
that the driver perform standard roadside field sobriety
tests, such as walking a straight line or standing on one
foot.

Drivers so apprehended are generally not of a cooperative
nature.  Any request by the officer that the driver volunta-
rily submit to a breath or blood alcohol test later at the
station is not likely to be met with any degree of compliance.
Therefore, the arresting officer may be content to book the
suspect on another or more serious charge than DUI, that of
attempting to elude a police officer, resisting arrest, etc..
Only the most intoxicated of drivers, those exhibiting a
staggering gait or slurred speech, are likely to be charged
with DUI.

Another likely component in the under reporting of alcohol or DUI as a factor in police pursuits is illustrated by a Fort Lauderdale study dealing with general DUI arrests. Officers in the department who were reputed to be aggressive in making DUI arrests were accompanied by researchers possessing portable breath testing devices. Each time the officer made a traffic stop he would go on with business as usual and would make an assessment, based only upon his experience and his interview or tests of the drivers, whether or not the driver was in excess of the .10% blood alcohol limit as imposed by state law. After the officer had made his determination, the researcher was free to approach the driver, explain that scientific research was being conducted, and ask that the driver submit to a non-evidentiary breath test, using a portable breath testing instrument, to determine his true blood alcohol level. Driver compliance to this request was found to be very high.

The results of the study indicated that nearly 3 of every 4 drivers detained and evaluated by the Fort Lauderdale police officers, and who's blood alcohol content was determined to be between .10 percent and .20 percent, were not arrested and charged for DUI by the investigating officer. The officers had failed to properly classify 78 percent of drivers in the .10 to .20 percent BAC range. It should be noted that the police officers in this test group were reputed to be among the best DUI officers within the Fort Lauderdale Police

Department, but had not been provided training in any
scientifically validated field sobriety tests. Their decisions
were made upon common sense and experience only. Even though,
when compared to their peers, these officers were exception-
ally motivated toward apprehending DUI drivers, they were
often fooled into believing that the driver was not impaired.[21]

The apparent under reporting of alcohol involvement in po-
lice pursuits should be of serious concern to the police ad-
ministrator who is considering pursuit policy guidelines.  As
we will discuss later, model policy guidelines established by
the International Association of Chiefs of Police attach a
greater "need for apprehension", if reasonable grounds exist
to believe that the driver is DUI.

DUI is statutorily a more serious offense than perhaps
most other vehicle code violations.  To allow a DUI driver to
continue operating his vehicle upon the public highway, with-
out exhausting all reasonable means to bring him under con-
trol, amounts to allowing him to drive while committing a con-
tinuing crime. Unlike a specific minor vehicle code violation,
such as a stop sign or lane change infraction, whose danger
has passed with the moment, the DUI driver may continue to
drive dangerously for several minutes or even hours more.  A
police agency that fails to recognize that continuing danger,
and to take reasonable actions to bring the driver under con-
trol, may in fact be subject to sanctions for not pursuing.
An officer is generally perceived to be under a greater duty

to pursue a DUI driver than those drivers violating other traffic code provisions.

It is therefore important, in the successful implementation and possible defense of an agency's pursuit policy, that police administrators insure that all patrol officers are formally trained in recognizing DUI symptomology, in knowing how to properly collect and describe DUI evidence, and in identifying those driving behaviors common to individuals who drive while under the influence. A formal course of instruction, designed specifically to accomplish the above objectives, has been developed by the National Highway Traffic Safety Administration, and is being taught around the country by many state police training boards and educational institutions such as The Northwestern University Traffic Institute.

### Rationale of Pursuit for Minor Traffic Violations

Traditional post-incident arguments for having continued an otherwise dangerous pursuit, initiated only for relatively minor traffic code infractions, revolve around two basic lines of reasoning. Both rationales infer that the suspects decision to flee was itself the primary reason for continuing the chase.

1. The very act of fleeing from the police qualifies, under most department policies and state statutes as a serious traffic offense, thus justifying the grounds upon which the decision to pursue is made. Persons supporting this argument might conclude that any driver who wilfully and wantonly

drives in a reckless manner within the full view of police will most certainly continue to do so when out of the eyesight of such authority; and therefore may "present a clear and immediate threat to the safety of other motorists" as defined by the 1987 version of  the model policy of the International Association of Chiefs of Police.

Some have argued that this is a case of circular reasoning, and that if the stimulus of the police officer in pursuit is removed, the danger to the public presented by the driver who is being pursued is likewise removed.  Most certainly, this "chicken or the egg" rationale may be reduced to the question:   Is the motorist who flees pursuit inherently dangerous, or has he become dangerous only because he is being pursued?

Within the limited scope of the above question, few could argue successfully that within the short term the pursued driver is as dangerous when left alone as he is while being pursued.  High speed pursuit, under almost any circumstance, will create a greater likelihood of accident, death or injury than if the driver is left to himself.  However, the "chicken or the egg" debate bears firmly upon the deeper sociological issues of general deterrence regarding the long term effects upon traffic safety of allowing every traffic violator, with the courage to flee from police, to escape unimpeded by aggressive police action.

2.   The second common line of reasoning utilized to

justify the pursuit of a traffic violator involves the offi-
cer's perceptions that greater crimes must be afoot.   The
officer may have initiated the attempt to stop the violator
for a minor offense, however once the suspect began to flee it
is deemed reasonable for the officer to assume that the driver
was attempting to avoid capture for some more serious crimes,
or was perhaps in the process of transporting stolen property
or drugs. The justification for the traffic stop may have been
the minor traffic code violation, however the reason for the
pursuit was a "reasonable suspicion" of serious criminal con-
duct; this reasonable suspicion being based upon years of
police training and experience.

This argument for pursuing traffic violators would seem to
have some legal precedent in that it closely parallels the ar-
guments used in the Terry v. Ohio "Stop and Frisk" decision;
empowering police officers who have a reasonable and articu-
lable reason for suspecting that criminal conduct may be in
progress, based upon their training and experience, to detain,
interview, and perform a cursory search of the suspect for the
officers own protection.

The MDPD study seems to confirm the "reasonable suspicion"
theory that a large proportion of violators are in fact
fleeing as a result of fear of apprehension for more serious
crimes.

> While the majority of pursuits were initiated for
> relatively minor traffic infractions, many of those
> apprehended were charged with serious felony offenses
> unrelated to the pursuit (nearly 50%).  This indicates

that many offenders flee from the officer because of
concern over more than the traffic offense that ini-
tiated the pursuit.[22]

However, the findings of both the CHP and MSU studies fail
to support this reasonable suspicion theory.

These findings appear to indicate that when a suspect
flees from a traffic violation, there generally is no
evidence of a more serious crime at booking time. [23]

According to the CHP and MSU studies only 10 percent of
drivers pursued as a result of vehicle code violations or sus-
pected DUI were booked upon violent felony or property felony
charges.

Why the tremendous difference between the CHP/ MSU studies
and the MDPD study regarding this issue?   The urban, high
crime, nature of the patrol area contained in the MDPD study,
when compared to the more rural nature of the prior studies,
likely accounts for this disparity.  Police administrators may
well need to compare the character of their patrol environment
to those of the three studies in order to predict the validity
of the "reasonable suspicion" theory for police pursuits.

In defense of the reasonable suspicion theory, relative to
the low figures presented in the CHP and MSU studies, it
should be noted that later investigation into the suspect's
true identity and circumstances, occurring after booking and
completion of the study questionnaire, would likely increase
bookings for more serious crimes above the 10 percent level.
Experienced police officers are also aware that the pursuit
itself allows the suspect(s) time and opportunity to discard

26

into the darkness drugs, or other contraband or property, that might otherwise have resulted in arrest for more serious crimes.

It is however clear that, in a majority of the cases, traffic violator's flee police for reason's other than attempting to escape capture for more serious crimes. Again, poor judgement attributable largely to youth, and perhaps alcohol consumption, may be the primary motivator for violators to flee police.

On the positive side of the officer judgment equation, we do however find that

> when an officer perceives the preceding event to be criminal activity, including a felony, this belief is generally confirmed through booking charges.

Approximately 80 percent of drivers pursued as a result of being identified as felony suspects, or involved in other criminal activity, were so charged. Along the same lines, 62 percent of those pursued for suspected DUI were upon capture found to be under the influence and booked accordingly

### Terminatin gEvent

In the more than 1000 pursuits included within the MSU and CHP studies, fully 77 percent of all pursued drivers were apprehended. In approximately one third of the pursuits (28 to 36%) the suspect was ultimately convinced to simply pull over and give up. In another one third of the pursuits, the suspect is apprehended as a result of losing control of his vehicle, either by spinning out (8%), or by crashing (20%), or

the suspect or his vehicle are otherwise disabled and he surrenders (6%).  Suspects surrendering as a result of a forcible stop, ramming, or a roadblock constitutes the remainder of the successful apprehensions (9% to 13%).

The MDPD study also established a similar capture rate of 73 percent.  Only 8 percent of the pursuits were voluntarily terminated by the pursuing officer.

According to the MSU and CHP studies, when a suspect is ultimately successful at escaping he does so as a result of the police being involved in a collision, spinning out, or otherwise becoming disabled only 3 percent of the time (1% for each category).  He is successful in "outrunning" the police in approximately 13 percent of the pursuits.   The police choose to discontinue the pursuit in only about 5 percent of the cases.

### Reluctance to Terminate

Perhaps the most significant statistic to be gleaned from the above information is that once a pursuit has begun, police rarely discontinue the pursuit simply as a result of a value judgement that the risks involved are too great; this despite the fact that 70 percent to 80 percent of the chases involve only vehicle code violations.  Several factors may be involved in the apparent reluctance to "call it off."

Younger officers, inclined to work the high activity and high crime evening and late night hours either by choice or by lack of seniority, are over represented in pursuit statistics.

Their over representation is likely a result of both shift placement and youthful exuberance. Much has been written of the so-called "John Wayne" syndrome, often developed early in a police officer's career; and characterized in part by a feeling of invulnerability while behind the badge, and a clear cut perspective of the police mission being that of a struggle between right and wrong, good guy vs. bad guy. Once locked in a struggle of skills, wills and nerves, inherent to "hot pursuit", for some officers calling off the pursuit is synonymous with failure and defeat. Older officers, having seen the negative consequences of a pursuit gone bad, are not so controlled by their emotions, and may be more likely to avoid pursuits in general.

No doubt the "John Wayne syndrome" is to a degree at work within the conduct of some police pursuits. Plaintiff's attorneys will often portray the motivations of police officers as being purely "ego" oriented. Shuman parrots this opinion:

> That is, police administrators and officers alike agree that there is a great deal of "ego" involved in pursuits. All to often when an officer attempts to stop a violator, even for a minor traffic violation, and the violator attempts to flee, the chase is on. The "violation" becomes not the traffic offense but rather the fact that the officer's authority has been challenged. This is especially believed to be true among younger officers where it is important not to be "weak" or "afraid" to engage in high speed pursuits.[24]

Yet for us to assume that all decisions to pursue are made within this limited context does a disservice to the professionalism of the majority of police officers. Certainly other less value oriented factors are present in the reluctance of

29

police officers to discontinue the chase.

Physiologically, the very initiation of a pursuit, the flash of lights and scream of the siren, involves a tremendously heightened state of readiness resulting from our natural animal instincts toward "fight or flight".[25]   Specifically, the activation of a siren as the chase begins has been found to result in a surge of adrenalin and an increase in pulse and respiration rates, even under role play conditions commonly used in police driver training curriculums. Blood flow and oxygen is rushed to the major muscles in preparation for battle, and away from the brain and areas that effect perception and reasoning. Real time activities may be perceived as happening in slow motion, thus resulting in a distorted sense of speed and distance. Tunnel vision may develop. Such reactions are considered to be particularly heightened in the young or inexperienced officer.

The physical tasks involved in the chase require tremendous powers of concentration.  The lone officer must not only drive his vehicle in an attempt to maintain contact with the violator, he must also, with his "free" hand controlling the radio and the microphone, advise his dispatcher and other police units as to his ever changing location, speed and direction, as well as a description of and reason for pursuing the suspect vehicle. As speeds increase, the officer's peripheral vision is blurred by the landscape flying by, and he must focus even more intently upon the tail lights of the vehicle

he is pursuing, often becoming less aware of the nature of the roadway or the activities that are occurring out of the direct illumination of his headlights.

As the police officer is focused upon the demands of the task at hand, he is now expected to calmly stand back as a dispassionate observer and to consider the reasonableness of his actions, those of the driver of the pursued vehicle, the totality of the weather, traffic and road conditions; and then to weigh, within the limits of his experience and training, all of these factors in an attempt to deal with a most illusive question as to "whether the need for apprehension outweighs the risk of the pursuit." Under such circumstances, the physiological demands of the pursuit may often crowd out more philosophical considerations of relative risk.

### Policy Considerations for Termination

It is therefore imperative that the Police Administrator recognize the competing demands placed upon the reasoning process of the pursuing officer, and that other officers be empowered to make the decision to discontinue the pursuit. If the pursuing officer is assigned to a two-man vehicle, then the second officer riding with him should be formally given the duty to evaluate the totality of the situation and to recommend to the driver that the pursuit be discontinued; and to be free to do so without consideration of rank or seniority. The field supervisor, monitoring the pursuit by radio, should also be encouraged to exercise his authority to order the

chase discontinued, and should be specifically trained in making a rational accounting of all factors involved in the pursuit.

Additionally, policy makers need to consider establishing specific criteria, either in a policy or training format, that will define general situations in which discontinuance of the pursuit would be not only advisable, but imperative. We will later discuss certain "red flag" situations that should be easily recognizable as grounds upon which to discontinue the pursuit.

### Damage, Injuries and Deaths

The ultimate issue for the officer on the street, and consequently the policy maker, is "what are the chances that this pursuit will result in an accident, and more importantly what are the chances that someone will be injured or killed."

The pioneering study conducted by the CHP found that 29 percent of all pursuits involved collisions, 11 percent involved injury, and 1 percent resulted in death. Based upon this analysis, the California Highway Patrol concluded that pursuit is worth the risk:

> Attempted apprehension of motorists in violation of what appear to be minor traffic infractions is neces-sary for the preservation of order on the Highways of California. If approximately 700 people will attempt to flee from the officers in this six month study, knowing full well that the officers would give chase, one can imagine what would happen if the police suddenly banned pursuits. Undoubtedly innocent people may be injured or killed because an officer chooses to pursue a suspect, but this risk is necessary to avoid the even greater loss that would occur if law

enforcement agencies were not allowed to aggressively pursue violators.[26]

The findings of the CHP study, and the conclusions expressed above, have served as the flagship of conventional wisdom in authorizing the officer full discretion in the conduct of the pursuit. However, the Michigan State University Study found that the risk of death was significantly greater than established by the CHP report.

MSU concluded that although accidents occurred in only 20 percent, and injuries were inflicted in only 14 percent of the pursuits, deaths occurred in 2.8 percent of the pursuits, nearly three times the rate of the CHP study. The reason for the disparity in deaths between the two studies may be attributed to the character of the roads upon which the pursuits occurred. The CHP study involved a much larger proportion of interstate roadways than the MSU study, suggesting a greater degree of safety from pedestrian and vehicle cross traffic during the pursuit. Therefore, the police administrator may want to consider the nature of the roadways in his jurisdiction when deciding upon a policy that would either encourage or discourage pursuits.

Another reason for the disparity between the death rates of the two studies may lie in the decentralized control of the MSU study, involving some 75 agencies. Short or relatively uneventful pursuits may not have been reported as conscientiously in the MSU study as in the 11 agency CHP study, thus skewing the comparative death rate between the two.

The MDPD study for the calendar year 1987 however seemed to confirm the findings of the CHP study, more so than those from the MSU study.  Thirty four percent (34%) of the pursuits resulted in an accident, 15 percent included injuries attributable to the pursuit, of which only 7 percent were serious and 1.4 percent considered life threatening.  Deaths occurred in less than 1 percent of all pursuits.

### Risk Factors Affecting Accident Rates

Neither the MSU nor the CHP studies were successful in identifying controllable factors that could be used to predict the likelihood that a given set of circumstances would result in a traffic accident. "No pursuit speed, distance, or duration in time is particularly safe."  From the data collected it could be inferred that there is no such thing as conducting a "safe pursuit."  All pursuits, no matter what the time of day or the reason for the chase, carry with them a substantial risk.  Furthermore, officers who had received formal pursuit training were not any less likely to be involved in a pursuit with accidents than were officers who had received no pursuit training.  Whether or not an accident occurs may well depend upon a final factor of chance, particularly in those cases in which a third party wanders into the path of either vehicle.

Of particular significance in the findings of the MSU study is that extreme measures, such as ramming and roadblocks, often prohibited by many department policies, had the effect in the limited numbers reported of "increasing the

capture rate while (slightly) decreasing the injury rate."

Unfortunately legal precedent exists to effectively under-
mine a police agencies ability to employ ramming as an effec-
tive tactic at bringing the chase to an end. Ramming has been
deemed to be the use of deadly force upon the person of the
driver, even if the officer's intent is solely to disable the
vehicle. If the suspect or others are injured as a result of
a ramming tactic, legal precedent exists to find the police
agency negligent in the use of force.[27]

Many in law enforcement feel that prohibitions against
ramming are perhaps misguided. The ramming of a vehicle when
done in the proper environment, and at relatively slow speeds,
can be accomplished with some degree of safety and effective-
ness, as indicated by the MSU study. Police in urban areas,
having little opportunity to establish roadblocks, are partic-
ularly needful of some mechanism by which to bring the suspect
to a stop.

In cases of long pursuits around city streets during the
late night hours, ramming has been successfully implemented in
many departments, at times in deviation from formal policy.
Commonly the pursuing officer overtakes the pursued vehicle
from behind while the vehicle is slowing and turning sharply
at intersections. The pursued vehicle is struck by the police
vehicle in the side or rear quarter panel at a velocity not
significantly greater than the speed of the pursued vehicle,
and then pushed to the curb, perhaps into other parked cars or

roadside obstacles, generally at speeds of less than 25 mph. Despite legal precedent to the contrary, the MSU study findings may provide a legitimate basis upon which to consider ramming as a reasonably safe tool, when used under very controlled and definable situations.

In the area of risk factors, the MDPD study was somewhat more successful than prior studies in identifying variables which contributed significantly to the prediction of accidents. Even though the predictive strength of the factors is not great, resulting in the correct classification of 59 percent of the cases, officers and supervisors would be well advised to consider at least some of the following in deciding whether to order a pursuit discontinued:

1.  Officer's Age: Pursuits initiated by officers 40 years of age and over are least likely to end in accidents (23%). Pursuits initiated by officers in their 20's and 30's resulted in accidents 36 percent and 35 percent of the time, respectively.

2.  Reason for the Pursuit: There was a slightly greater likelihood of an accident if the pursuit was initiated for traffic reasons (36%) compared to pursuits initiated for other reasons (32%). No explanation for this difference is offered within the literature. Again, alcohol may be present in a larger number of pursuits initiated for traffic violations than for other criminal conduct.

3.   ~~Road Conditions:~~ Pursuits conducted on wet roadways
     had a greater probability of accidents (43%) than
     those conducted on dry roadways (33%). Of course, the
     questions of ice and snow on the road surface was not
     addressed by any of these three warm weather studies.

4.   ~~Officer Gender:~~ Female officers in a pursuit are less
     likely to get into an accident (28%) than male offi-
     cers (34%). This relationship is based upon only 25
     chases by females, out of the more than 1300 that were
     studied, and should be interpreted with caution. How-
     ever, other studies have indicated that female offi-
     cers are generally less aggressive and have greater
     safety concerns than their male counterparts.

5.   ~~Officer's Ethnicity:~~ There is a small difference be-
     tween the chances for accidents when anglo officers
     engage in pursuits (35%) compared to the pursuits of
     non-anglo officers (33%).

6.   ~~Time of Day:~~ Chases conducted in daylight hours, dur-
     ing times of somewhat higher traffic volumes, result
     in more accidents (38%) than chases occurring during
     hours of darkness (33%). It would appear that to
     whatever degree safety is compromised by darkness, the
     higher traffic volumes of daytime driving are a more
     serious concern.

7.   ~~Type of Road:~~ Chases on freeways are less likely than
     other pursuits to result in accidents (29% compared to

35%).  Although the speeds of pursuits on interstates are generally much higher than those on other roads, the lack of intersections and cross traffic appear to effectively counteract the greater dangers that higher speeds present.

The MDPD study also established that the risk of injury, not simply accident, was decreased when only one rather than multiple patrol cars were involved (20% v. 28%), when the patrol car was driven by a female (12% v. 24%), and when the chase took place in a rural area rather than an urban area (11% v. 24%).

One of the more surprising findings of the MDPD study was that there was no clear relationship between the time elapsed and the injury rate, confirming the prior findings of both the MSU and CHP studies.  Chases lasting less than 5 minutes had a 20 percent chance of injury, chases of 6 to 9 minutes in duration had a 37 percent chance of injury, while chases of 10 minutes or more had only an 11 percent chance of injury.  It is important to note that only 13 percent of all the injuries were serious or life threatening, and one third of all injuries occurred after the pursuit had ended, apparently while the driver was attempting to flee on foot, resisting arrest, or otherwise being taken into custody.

The police administrator will recognize that most of the risk factors identified in the MDPD study serve to confirm traditional theories of accident causation.  Accidents among

the general public tend to occur with greater frequency among younger males, on wet or slick roads, in highly populated areas and during times of heavy traffic volume on roadways having a large amount of cross traffic.  These factors will later be discussed as possible tools, to be used during the post-pursuit investigation, in assessing the relative risk of the pursuit.

### Factors Affecting Apprehension Rates

The MDPD study also isolated several factors that were predictive of the probability of apprehension.   Although chases employing more than one police vehicle have a significantly higher accident and injury rate, they also have fewer escapes than chases involving only one patrol vehicle (18% v. 31%).   Motorcycles are particularly illusive, escaping 44 percent of the time, while automobiles escape only 24 percent of the time.  Darkness does seem to aid the suspect's escape only slightly when compared to other times of the day (28% v. 24%).  And finally, chases conducted at speeds under 40 mph, likely to be in residential and business areas, result in escapes 33 percent of the time.

Experienced police officers are aware that suspects fleeing from police will generally employ one of two basic strategies:

1.   Attempt to outrun police vehicles by sheer nerve and speed, hoping that the police will quit, or

2.   Stay in, or return to , "familiar turf" with plans to

"ditch and run", hiding or abandoning the vehicle at an opportune moment and then escaping on foot to a personal residence or other safe haven.

The MDPD study would seem to confirm that the second strategy is generally more successful. Pursuing officers may find it helpful to anticipate the basic strategy being employed, and to advise assisting units of a pattern that might emerge during the pursuit that suggests that the suspect(s) are ready to "ditch and run". A circular pattern around a residential neighborhood is a good indicator.

## Discussion and Conclusions Regarding Research Data

The argument is often made by plaintiff's counsel, and thus presented to the judge and jury, that a pursuit conducted within reasonable standards of conduct, and utilizing good judgment on the part of the pursuing officers, will all but guarantee that no one will be injured or killed. Conversely, if an innocent third party suffers as a result of this police action, then the officer involved has made a mistake, either in his assessment of the competence of the driving behavior of the suspect, or in his failure to anticipate the presence of third parties in the area.   It is argued that the officer should have known that someone was going to be hurt.   And then, of course, in the final analysis the officer was wrong when he decided that the need for immediate apprehension outweighed the level of danger created by the hot pursuit.

Whenever an innocent person dies or is seriously injured

40

as a result of a police pursuit, all involved would agree that would we have it to do over again, knowing what we know now, the pursuit would not have been initiated.  However, the em-pirical data presented in the CHP, MSU, and MDPD studies agree that those factors that will ultimately determine whether the pursuit will result in an accident are largely a matter of chance.  Crashes of the suspect vehicle alone, and crashes be-tween the suspect vehicle and a third party, contain factors of driver attentiveness, skill and judgement that can not pos-sibly be fully assessed or controlled by the pursuing officer, his supervisor, or his department.

Therefore, the police administrator, and ultimately the city fathers or other elected officials, must accept the pre-mise that pursuits involve inherent risks that may be reduced but not eliminated; that in time innocent parties will be in-jured or killed, and that the injured party(s) or their loved ones will understandably seek redress in the courts claiming negligence on the part of the officer and his agency.  Payment to those injured as a result of a police pursuit is only just and fitting. Seldom does the pursued have appropriate insur-ance coverage, or any insurance coverage at all.  Therefore if justice is to be done, someone must pay and that someone will be government, as represented by the police agency and the officers who were attempting to bring the law breaker under control.

Juries are therefore predisposed to feel compassion for

the injured and to accept the "crystal ball" argument that the officer should have anticipated the outcome of his decision to pursue.  The news media will present a clear, vivid and bloody picture of the incident, unable or unwilling to discuss the long term effects that a "no-pursuit" policy may have upon traffic safety in their community.  Right or wrong, the police agency and those individuals who pay taxes to support that agency will stand the cost of the damages created by the pursued vehicle.

Were our representatives to enact legislation that would fund a "major catastrophe" insurance fund for situations of this type, perhaps the need to legally blame someone other than the suspect would be reduced or eliminated.   However, until such a governmental insurance policy is created, the police agency will be at an increased risk to pay any damages resulting from a police action in which a third party is accidentally injured or killed, regardless of the reasonableness of the police action.

In the short term interests of economy and political expediency, every police administrator must seriously consider and discuss with others of influence the wisdom of imposing a no-pursuit, or a pursuit discouraged, type of policy.  The financial, political, and social realities of his jurisdiction may demand drastic action that might not otherwise be considered in keeping with the long term goals of traffic law enforcement.

42

However, the police administrator may find support in the fact that of the three studies we have examined, none of the report authors have in any way suggested that the risks presented by police pursuit are unacceptable.  All have made a qualitative judgement that a no-pursuit policy would in the long term lead to extreme disorder on the highways, resulting in a far greater number of innocent dead and injured than those attributable to police actions.

A no-pursuit policy must also be considered as encouraging serious crimes by aiding the free transit of criminals, drugs, and stolen property upon our nations highways.   In it's Phase One report to the National Highway Traffic Safety Administration just released, the Committee for the Study of Traffic Law Enforcement on Crime found that no studies have been conducted to scientifically measure the impact of aggressive traffic law enforcement upon crime.  However, interviews with 13 senior administrators of major law enforcement agencies around the country found that:

> The participants in the interviews agreed unanimously that traffic enforcement can have an impact on criminal activity.  Most of them indicated a belief that the greatest effect was in making criminal arrests and in seizure of contraband rather than in the general deterrence of crime. While the participants did agree that most traffic enforcement can have an effect on criminal activity, most of them characterized their belief as a "gut feeling" or the result of long experience and observation.[28]

If police administrators all but unanimously agree that traffic law enforcement has an effect on crime, can we assume that a "no-pursuit" policy or an extremely restrictive policy

such as the current IACP model, if adopted nationally, would
(1) result in an increase in traffic offenses and traffic ac-
cidents, AND (2) would encourage criminals to use vehicles in
the commission of crimes or transport of contraband? Although
some large jurisdictions have all but eliminated pursuits
solely for traffic code violations, no studies have been pre-
sented that attempt to identify either the short or long term
effects of a no-pursuit policy. Such an empirical study would
be difficult if not impossible to construct. Any increase in
traffic accidents and crime solely as a result of a no-pursuit
policy would need to be measured over a period of years as a
new generation is socialized with the inherent understanding
that the police are largely without the tools to apprehend
traffic violators who flee. Such a social experiment would
need to be applied consistently over a large geographic area,
and would have the inevitable problem of accounting for a
multitude of other factors which can affect crime rates and
traffic accidents. Such social experimentation is highly
unlikely.

If an aggressive but controlled pursuit policy is to be
defended in court, or in the political and public forum, it
must be done merely on the basis of logic and reason. The
police administrator must be prepared to do so.

general public the fact that traffic violators will

not be pursued?  How long could the secret be kept?
Is it good public policy to act in a fashion so as not
to divulge such information?

2.  If the general public becomes aware that minor viola-
    tions will not be pursued, will general disorder in-
    crease?

3.  What is the political climate of my community.  Will
    elected officials support the new IACP policy, or are
    elected officials willing to risk the financial and
    political fallout from a pursuit of a mere traffic
    violator gone awry?

4.  Or would elected officials insist that aggressive tac-
    tics be employed, especially when an angry constituent
    complains that the police "refuse to take action"
    against speeders who flee?

5.  What policy would the community support?  The media
    support?

6.  Should such a policy change be brought to a public
    forum for debate?

7.  If the city council or another means were used to
    determine the "will of the people," would my depart-
    ment be in a more legally defensible position in a law
    suit resulting from the injury of an innocent third
    party?

It becomes the ultimate responsibility of the police

52

administrator to research and analyze the issues regarding po-
lice pursuits, and in consultation with others in the commun-
ity decide upon the basic model, either discretionary, re-
strictive, or prohibitive, around which to form a pursuit
policy appropriate for the agency.  This decision should not
be left strictly to a police agency committee process, and
certainly not to the sentiments of the rank and file.   The
issues are too complex, emotionally charged and potentially
devastating to be acted upon from the limited perspective only
of those actively involved in the law enforcement profession.

Advice and counsel should be sought from elected officials
and experienced experts in the field of police and traffic ac-
cident liability issues.  If possible, meetings should be held
involving key individuals in the community, where healthy de-
bate could be directed toward the issues.  However, that de-
bate should only take place after all involved have been edu-
cated as to the empirical data and traditional standards of
conduct which have heretofore been presented.  When the phi-
losophy issues have been addressed, and a decision has been
made as to the appropriate model to be used, then and only
then should the police administrator turn his attention to the
internal agency issues of formulating the nuts and bolts of
the pursuit policy.

### The Process of Formulation

Many police agencies have performed effectively in creat-
ing formal written policy where none had formerly existed.

53

Generally these policies have been written to govern many pro-
cedural and administrative activities of a police agency, and
are often created in their original form as a means of docu-
menting more informal or traditional methods that have been
used successfully in the past.  Policies so written tend to
confirm the organizational culture, rather than to look for
new and better ways of accomplishing the mission.  To approach
the process of formulating a pursuit policy in such a manner
would be a mistake.

The police administrator concerned with formulating an
effective and defensible pursuit policy must resist the organ-
izational inertia toward simply documenting the philosophy of
those in the organization as to how a pursuit should be con-
ducted. In order to avoid just that potentiality, it would be
advisable to examine a number of model policies, and to select
two or more as a point from which to begin discussion.  Selec-
tion of these model policies should be based both upon common
attributes that reflect the philosophy and demographics of the
community, and upon the defensibility of the policy in a court
room setting.

Using the IACP model policy, in whole or in part, offers
significant advantages in defending your agency's policy in
court.  If a national standard exists for pursuit policy, it
is embodied by the IACP guidelines. However, at this time, a
minority of agencies have policies as restrictive as the cur-
rent IACP model.  An effective legal argument could be made

that IACP policy does not establish the norm for the law en-
forcement profession nationally or locally.

Other possible sources of model policies, from which to
establish standards in your community, might be those policies
as established by other larger agencies in your state or re-
gion.  Regional and state agencies governing Police Standards
and Training may also have state approved model pursuit poli-
cies, or may otherwise provide resource material.  Of partic-
ular state or regional interest would be those operational
procedures which govern the conduct of interjurisdictional
pursuits, and the proper use of radio frequencies normally
used to coordinate operations between different police agen-
cies.  The standardization necessary to effectively deal with
radio and procedural aspects of interjurisdictional pursuits
must be established on a local or regional level, and cannot
be left to the general language of the IACP model policy.

Once appropriate models have been found and researched,
and the basic department philosophy concerning grounds for
initiation of the pursuit have been established, the proce-
dural aspects of the pursuit to be included within the
department policy should be addressed. A committee process is
generally most effective in dealing with procedural issues.

Committee selection should be based upon the participation
of all divisions which could possibly be impacted by a change
of policy, or the conduct of and aftermath of the pursuit.
Under such a definition, virtually every area of the agency

55

may be included.  Representatives from the following divisions should be considered:

Patrol

Obviously the pursuit function will impact patrol to a greater degree than any other area of the police department.    Multiple representatives from this area would be advisable, including management, supervision, and line personnel.  Specialists in accident investigation and reconstruction should be consulted when determining any special considerations regarding the investigation of accidents arising out of pursuits.

However, care should be taken in judging the weight of the accident reconstructionist's opinion concerning the accident. The individuals training and competence should be considered when determining his level of expertise.    In one department an officer was unjustly disciplined due to inaccurate testimony from a local department "expert." The expert testified that an examination of the patrol vehicle proved that the officer had exited a parking lot without activating his headlights, and had engaged in a pursuit for two blocks before being involved in a serious accident with another patrol vehicle.

Due to injuries sustained, the officers involved had only blurred recollections of the incident. Subsequent intervention by more skilled personnel unfortunately failed to rectify the incorrect decision made by the review board.

56

### Detectives

Plainclothes investigators may be needed to establish critical elements in the background of pursued suspects and in questioning witnesses to the pursuit.  Procedures that impact upon the ability of plainclothes personnel to initiate pursuits, and the potential use of unmarked vehicles in the pursuit, will also require the input of members of the detective bureau.

### Communications

The role of the dispatcher is often critical in the effective conduct of a pursuit.  Communications procedures must be clearly established within the proposed policy.  Many smaller agencies share dispatching resources with other agencies, and therefore may want to include representatives from those other agencies to insure that conflicts do not arise.

### Administration

Representatives of the department administration, to include the executive branch of the agency, must be present in order to oversee the general process, and to insure that the mandate and parameters established by the chief executive are effectively maintained.    Administration representatives must also insure that an effective post-pursuit review process is established, and that the guidelines established can be effectively implemented. Other administration concerns to be addressed are officer

57

training, records keeping procedures and officer discipli-
nary processes.

### Training

A representative of the department training section should
also be included as an administration representative.
Once the policy has been formulated, training requirements
and costs will need to be established.  The success or
failure of the new policy may depend largely upon the ef-
fectiveness of the training process, and the rounded know-
ledge of those providing the training.

### Legal

An experienced legal officer must be included within the
committee process.  Many procedural questions will need to
be addressed within a legal framework.  This legal repre-
sentative should also have been active in the precommittee
background data collection procedure, determining appli-
cable legal precedent, and providing input concerning the
general philosophy to be implemented within the agency.

## The Committee Process

A great deal has been written within the wealth of
management text books and publications concerning various
principles by which to conduct effective meetings.  It is not
within the scope of this presentation to explore the specifics
of the committee process.  However, some mention should be
made concerning some oversights and pitfalls commonly encoun-
tered in addressing the pursuit policy committee process.

58

Committee members must first be educated before they can function effectively.  Do not assume that an experienced police officer understands the dynamics of a police pursuit, or that all individuals within the department possess a common frame of reference.  The first meeting of the committee should be dedicated toward developing that common frame of reference.

A knowledgeable individual, or individuals, should be employed to present an effective program on pursuit issues.  All of those issues discussed within the Conceptual Framework portion of this "Administrator's Guide to Police Pursuit", should be addressed, to include research data, historical perspectives, and the evolution of IACP policy guidelines.

The committee presentation should also address issues concerning the local political and financial climate, case precedent, and opinions and positions as expressed by elected officials and others.  Finally, the committee mandate and guidelines as established by the Chief Executive should be presented, to include the specific policy language governing the grounds for initiation of a pursuit.  It should be clear to the committee members those areas of policy that have been already established by executive action, and those areas to which the committee should direct their attentions.

A second common inhibitor of effective committee process concerns the history of the department, and the inference that a change in policy is an indication that actions taken by specific individuals in the past was improper.

Anecdotal evidence offers a case in point. A committee process was being used to develop a new department policy regarding police pursuits, one aspect of which was the prohibition of using a firearm to attempt to disable the vehicle or the driver. A number of department pursuits over the last few years had involved just such a use of force. A common justification presented for this discharge of firearms held that an officer who had exited his vehicle, thinking the pursuit had terminated, was confronted by the pursued vehicle "attempting to run me over." Shots were fired in order to stop the vehicle. A critical examination of the circumstances would no doubt conclude that the path or speed of a vehicle shot at short range would not be significantly altered by impacting a bullet. And, if the driver were shot, he would not be able to steer the vehicle away from the officer, but instead the vehicle would continue straight ahead.

The best defense for the officer would be to run for cover, which was available nearby, out of the path of the approaching vehicle, not to shoot it. However, an internal investigation and shooting board inquiry had recently cleared the officer(s) of any wrong doing, holding that the suspect was attempting to use a deadly weapon to assault the officer, and the officer was therefore justified in "returning" fire. The committee debated the issue only briefly, and quickly chose to alter the model policy prohibitions against shooting at a moving vehicle. Although no official statement was made,

it was clear that to establish such a prohibition at this time would be to unofficially condemn the officers' actions, and perhaps to compromise any pending legal proceedings.

Although the above may be an aggravated case, committee members should be advised against maintaining old policy in order to avoid condemning past actions taken within more traditional department philosophies. The above anecdotal account should likewise not be condemned offhand, as the reality of political and financial conditions must be considered. Every attempt should be made, however, to avoid compromising the content of new policy in order to save face over past actions.

### Common Policy Deficiencies

Shuman and Kennedy contend, in their 1989 article entitled "Police Pursuit Policies: What is Missing" that their research indicated that almost all pursuit policies had four major deficiencies. "That is, they: (1) fail to embody the agency's mission statement as the guiding policy principle; (2) under utilize the supervisor; (3) do not contain guidelines on how to terminate a pursuit; and (4) do not provide for a mandatory administrative review of all pursuits."[35]

Some of the above named deficiencies have been rectified in the latest IACP model policy. However, the IACP policy in effect at the time of the Shuman article was largely deficient in the above four areas. It is likely that many policies currently in use by major police departments, and those presented as models by state agencies, are still deficient. Therefore,

61

a brief discussion of these four major deficiencies is in
order.

1.  Mission Statement

> "The mission statement sets forth the law
> enforcement agency's purpose for existence as
> a unit of government.  We believe a restate-
> ment of the agency's mission is necessary
> when a new and more restrictive pursuit pol-
> icy is implemented to remind officers that
> their primary objective is not to catch
> traffic violators.....but rather the pro-
> tection of life and property.  In the absence
> of such restatement, a more restrictive pol-
> icy on high speed pursuits is likely to gen-
> erate resentment by line officers."

The most recent IACP model policy approaches the concept
of a mission statement but falls somewhat short:

> "It is the policy of this department to pro-
> tect all person's lives to the extent possi-
> ble when enforcing the law."

A more comprehensive mission statement could be developed,
utilizing the IACP Concepts and Issues Paper background infor-
mation, by an adopting agency.

2.  Role of the Supervisor

> "Of the 36 pursuit policies reviewed, 10 made
> no mention of the role of the supervisor and
> 26 had only a limited role for the supervi-
> sor."

Shuman and Kennedy feel that the wisdom of age and expe-
rience, and the detached manner in which the supervisor can
monitor the pursuit via radio, makes him the logical choice
for having the responsibility to discontinue the pursuit.  The
latest IACP policy affords the supervisor that role, as well
as several other duties related to supporting the pursuit

62

effort.

However, Shuman and Kennedy suggest that the supervisor must specifically and formally authorize the continuance of the pursuit. "We recommend that no pursuit be continued without the approval of a supervisor." Although Shuman and Kennedy fail to address the practical implementation of such a policy, one could infer that within a specific time limit the supervisor must be on the air and advising officers by radio to continue, or the pursuit would be automatically terminated. Such a policy, requiring the supervisor to become actively involved rather than just monitoring the pursuit, would no doubt place a heavy psychological burden upon the supervisor, and would likely result in increased supervisory intervention toward ordering the pursuit to be terminated.

3. How to Terminate a Pursuit

Shuman and Kennedy indicated that although 30 of the 36 pursuit policies they reviewed made reference to the circumstances under which a pursuit should be terminated, none specifically indicated how the pursuit was to be terminated.

> Some policies specified that after a voluntary termination of the pursuit because of hazardous conditions the unit could drive in such a manner as to keep the violator in sight. This of course could lead to an officer turning off the overhead lights and siren thereby meeting the technical requirements of the pursuit but continuing to drive in excess of the speed limit.

The 1987 IACP model policy is guilty of the above. "The termination of a pursuit does not prohibit the following of a

63

vehicle at a safe speed..." The revised IACP policy released
in 1989 also fails to properly address how a pursuit is to be
terminated, stating only that "The pursuing officer shall
relay this information to communications personnel."

Shuman and Kennedy:

> We believe that every pursuit policy should
> clearly state that a pursuit is terminated
> when officers turn off their overhead lights
> and (they shall) stop or reduce their speed
> below the posted speed limit.

This author has been involved in a civil litigation in
which the officers have claimed to have discontinued formal
pursuit, but have continued to attempt to follow the suspect
vehicle, with lights and siren off, but at a rate of speed
significantly above the posted limit. A collision between the
patrol car and a third party resulted.

In a similar civil case, officers had wisely "broken off"
a pursuit with a stolen vehicle, driving recklessly through a
residential area, after observing the stolen vehicle nearly
strike a child on a tricycle. The police vehicle had slowed
and fallen back, but had continued to follow at a rate far
above the posted speed limit with lights and siren on.  The
suspect vehicle, still in sight of the police officers,
entered an intersection on a red light and struck another ve-
hicle, causing severe injuries to the occupants.  Third party
plaintiffs contended that had the officers fully discontinued
the pursuit, turning off lights and siren, the suspects would
not have violated the red light.

64

Both cases exposed the police agencies to unneeded civil liability largely as a result of deficient policies regarding pursuit termination.   There should be no question within the content of the departmental pursuit policy, that when a police vehicle is in pursuit, lights and siren shall be used.   When the pursuit has been discontinued, the police vehicle should return to the posted speed limits and discontinue lights and siren.

In a related issue, not addressed by Shuman and Kennedy, many officers may be using unsafe practices in attempting to overtake a speeding vehicle, without using lights or siren, prior to formally initiating a pursuit.   These unsafe practices are reflected in a long ago abandoned instruction contained within the 1973 IACP model pursuit policy which read:

> Officers intending to make a stop shall endeavor to be in close proximity to the violators vehicle before activating emergency equipment, thus eliminating the violator's temptation to attempt evasion.

This policy may be successful in raising the capture rate and overall effectiveness of patrol officers working interstate or low volume rural roadways, however substantial dangers may attach, particularly under more urban conditions. If the officer is at any time operating his vehicle at speeds in excess of the speed limit, failure to use lights and/or siren may expose his department to substantial liability.   If the suspect vehicle is too far away to overtake, or otherwise

is able to begin his flight with an overwhelming distance and speed advantage, then the attempt to overtake the violator should be discontinued. The only alternative may be to alert other units in the area to assist and intercept.

Along the same lines, language should be included within the agency pursuit policy that specifically addresses when "an attempt to overtake" a violator becomes a "full blown pursuit". This question is often at issue in civil litigation. An attempt to overtake a violator begins when the officer observes the violation, or other reason to more closely observe the suspect vehicle in anticipation of making a traffic stop, and drives in a manner necessary to close the distance between the suspect and the officer. If it is necessary to travel in excess of the speed limit in order to do so, then consistent with state code, the officer will use lights and/or siren while overtaking the suspect vehicle. The fact that lights and/or siren are used does not mean that a pursuit has begun. A pursuit has begun only when the driver of the sus- pect vehicle exhibits driving behaviors which could reasonably be interpreted to indicate that the suspect is actively attempting to elude police. An officer would be well advised to notify dispatch when, in the process of attempting to overtake a vehicle, the officer has reason to believe that the character and actions of the suspect vehicle present a strong likelihood of the situation developing into a pursuit.

66

Many pursuit polices are also deficient in specifically defining situations in which the pursuit should be discontinued. The 1989 IACP model policy provides general language defining three circumstances immediately requiring the termination of a pursuit:

- Weather or traffic conditions substantially increase the danger of pursuit beyond the worth of apprehending the suspect.
- The distance between the pursuit and fleeing vehicles becomes so great that further pursuit is futile
- The danger posed to the public, the officers, or the suspect is greater than the value of apprehending the suspect.

Unfortunately, the above language is of little practical value. All three situations require subjective evaluations, especially the third. Our empirical data has established unequivocally that the danger involved in every pursuit is ultimately a risk of death to the suspect, members of the public, or the officer, and in that order. Should chance determine that death is the result of the officer's attempt to apprehend the suspect, no matter how serious the crime, we must in retrospect find that "the danger posed...was greater than the value of apprehending the suspect."

Police administrators should consider including within their policy, or their training materials, language specifically listing those situations that may foretell of a

potential collision that would justify immediate discontin-
uance of the pursuit.  Some of those "red flag" situations
might be:

- The pursued driver violates traffic signals or stop
  signs at view obstructed intersections, without slowing
  reasonably to account for cross traffic.  Such actions
  are indicative that the suspect is driving totally with-
  out regard for the safety of others on the roadway.
- The pursued driver has a near miss with other occupied
  vehicles on the roadway.
- The pursued vehicle enters an area where children are
  likely to be in transit or at play, including a school
  zone during school hours; or a residential area during
  daylight hours when children are likely to be not at
  school and playing out of doors.
- The pursued driver is, as a result of the high speeds of
  the pursuit, repeatedly unable to maintain control of
  his vehicle.
- All reasonable attempts to stop the vehicle have been
  exhausted.  The suspect vehicle has passed the locations
  of other police vehicles at intercepts created to intim-
  idate the suspect into stopping by an overwhelming show
  of police presence.  It has therefore become obvious to
  the pursuing officers that the suspect will stop only
  when his vehicle breaks down or crashes.

Many successful civil suits filed alleging negligence on

the part of police agencies have one or more of the above cir-
cumstances upon which plaintiff's base their allegations that
the officer's should have known that a serious crash was immi-
nent.  Avoiding these situations when possible would serve to
significantly reduce the department's potential liabilities.

4.  Mandatory Administrative Review of All Pursuits

Shuman and Kennedy point out that most police agencies
require a thorough investigative review of all shootings, re-
gardless of outcome.  They suggest that all pursuits should be
dealt with in like manner, primarily to determine if the pur-
suit was carried out within the existing policy.  Other advan-
tages of this mandatory pursuit review are the opportunity to
review and revise policy, improve training, and to provide
data necessary to maintain a management information system for
pursuit driving.

Should pursuits, for what ever reason, come to the atten-
tion of members of the courts or the media, the existence of
an effective system of management and administrative review
will demonstrate to the public that the agency takes seriously
the potential for damage and injury existing in police pur-
suits, approaching the issue in a professional and competent
manner.

The 1987 IACP model pursuit policy made no mention of ad-
min istrative review, and the current policy released in 1989
addresses administrative review only briefly:

"The field supervisor shall prepare a comprehensive
analysis of the pursuit, and forward it to the chief

69

executive officer of the agency."

However the IACP concepts and issues paper accompanying the model policy is fairly comprehensive in detailing the items to be addressed in the supervisory investigation and analysis of the pursuit, including a finding on the part of the supervisor as to whether the pursuit was within policy guidelines.  This portion of the IACP concept paper could be incorporated into the agency pursuit policy.

IACP does not recommend that a "pursuit board" be convened, and therefore draws no parallels between standard operating procedures in most agencies requiring that a "shooting board" or other committee process in the case of the discharge of a firearm.  IACP simply states that the Chief Executive shall review the supervisory report of the pursuit and that he alone will make a determination as to whether the pursuit was conducted within policy guidelines, and consequently whether training or policy changes need to be considered.

In summary, the current IACP model policy addresses most major areas of concern to the police administrator in developing his own departmental pursuit policy. Some changes in policy philosophy may be called for, depending upon the needs and requirements of the jurisdiction.  Certainly, greater detail could be given to critical areas of the policy.  IACP recognizes that each department is unique, and that major modifications may be needed.

> This model policy is intended to serve as a guide for the police executive who is interested in forming a

70

written procedure for police pursuit.    The police
executive is advised to refer to all federal and
municipal  statutes,  ordinances,  regulations,  and
judicial and administrative decisions to insure that
the policy that he or she seeks to implement meets the
unique needs of the jurisdiction.

## POST PURSUIT ADMINISTRATIVE REVIEW

The necessity for a formal inquiry into the conduct of all pursuits was well presented by Shuman and Kennedy in their discussion of common pursuit policy deficiencies. However, Shuman and Kennedy did not expound upon the design that such an inquiry should take other than to suggest that pursuit policy should parallel department policy used to review firearms discharges.

The administrative review of pursuits could logically be divided into a chronological format involving fact finding, reporting, analysis, recommendations, and dispositions. A brief discussion of each stage of the process is presented as follows.

### Fact Finding

1. In those pursuits in which an accident has occurred, a thorough at-scene traffic accident investigation should be conducted by qualified specialists. It may be necessary to establish a call out procedure to insure that the investigation is attended to by fully trained personnel. Consideration should be given to establishing a policy and/or formal agreement with another jurisdiction, such as the State Police, that their personnel would conduct a concurrent or separate investigation into all traffic accidents, resulting in injury to the suspect or a third party, arising from the pursuit, not just those accidents involving police

71

72

vehicles.   In cases of serious injury or death, the
chief executive or his representative may also respond
to the scene in order to make an informal administra-
tive analysis.

2.  Supervisory personnel should be responsible for see-
ing that interviews and statements are taken from all
involved officers and witnesses, either personally or
through powers of delegation to other officers or in-
vestigators not involved in the pursuit.

3.  Supervisory personnel should be responsible for insur-
ing that a copy is made of all radio transmissions
regarding the pursuit.  If an accident has occurred,
a typewritten transcript of the tape recording should
be made.

### Reporting

The current IACP policy guidelines recommend that "the
field supervisor" prepare a comprehensive analysis of the
pursuit and forward it to the chief executive.  The content of
the pursuit analysis includes:

· Reason for the pursuit
· Conditions of the pursuit (traffic, weather, etc.)
· Any actions by officers which did not conform to depart-
  ment policy
· Any exceptions to policy, and the reasons for them
· Any actions taken against the suspect vehicle and the
  reasons for them

· An assessment of the role and number of personnel and
vehicles from other agencies

· Supervisory opinion as to whether the pursuit was han-
dled properly, or whether it should have been handled
differently, and how.

## Analysis and Recommendations

According to IACP recommendations the chief executive, on
the basis of the supervisory report, is then to assess whether
the pursuit was "necessary" and "within departmental policy,"
and whether there are policy changes or training needs to con-
sider.

Despite the economy and simplicity of the IACP administra-
tive review policy, police administrator's should seriously
consider Shuman and Kennedy's suggestion that pursuit policy
administrative reviews be made fully consistent with most
departmental policies regarding the discharge of firearms,
including a review board process.  Investing all power and
responsibility in only two people, the field supervisor and
the chief executive, may result in a less than thorough
investigation and negative feelings from the rank and file
being focused upon specific members of the management team.

Policy makers may consider limiting the job of the super-
visor to that of an investigator collecting facts, and re-
fraining from opinions.  The facts once collected could then
be acted upon by the Chief Executive or a "pursuit board."

A pursuit board could be an appropriate tool for in depth

interview of involved officers, analysis of the event, and the forwarding of a recommendation to the chief executive. The pursuit board would not have to be convened after every pursuit, but could consider all cases en masse on a monthly or quarterly basis, depending upon the needs of the agency. Administrative review by peers is also much preferable to concentrating all the power, and all the rank and file discontent resulting from new and more restrictive pursuit policies, upon one person. As in all potential disciplinary actions, the ultimate responsibility to either concur or disagree with the findings of the board is left to the Chief.

In many agencies, accident review boards are already in place to handle inquiries into accidents involving police vehicles. In lieu of establishing a separate bureaucracy to deal only with pursuits, the roll of the accident review board could be expanded to cover a review of all pursuits, not just the small percentage of pursuits which result in accidents with the police vehicle. This blending of functions would also eliminate any argument over departmental turf, duplication, and possible claims of double jeopardy.

Board Membership: It goes without saying that the members of the pursuit and/or accident review board should be carefully selected. Individuals with expertise in specific disciplines should be represented, and should be encouraged to assist the committee in the interpretation of both testimonial and physical evidence. Those disciplines of major importance

include that of traffic accident reconstruction, pursuit pol-
icy, and communications experts.

The traffic accident reconstructionist would be able to
interpret the physical evidence of a crash to determine rea-
sonable parameters for vehicles speeds, directions, and driver
perceptions and behaviors.  The traffic accident reconstruc-
tionist would also be able to provide an opinion concerning
the appropriate reaction times of drivers, and the other
options or evasive tactics that if employed might have avoided
the accident.

Other skills that the traffic accident reconstructionist
could bring to the committee table include (1) the ability to
critically analyze the testimony of witnesses and others, as
witnesses may testify to times, distances and speeds that are
physically impossible. (2) the ability to create scaled dia-
grams of the accident scene or the route of the pursuit so as
to aid the committee's understanding of the pursuit.  (3) the
ability to utilize the dispatch tape recording of the pursuit
in order to interpret the times and distances involved, and
then to compute the average speeds involved over given sec-
tions of roadway.

Consideration should also be given to appointing a commit-
tee member with expertise in pursuit policy. A representative
from the executive or administrative branch may be well suited
to assist the committee in interpretation of the pursuit pol-
icy, or perhaps an attorney from the legal department could be

76

made available for technical assistance only.

Radio communication is a critical element of any pursuit. Therefore, the communications/dispatch center should be represented or otherwise present to offer technical information about dispatch policy and procedures to the committee.  Most agency dispatch centers require, as well they should, that all radio communications relative to pursuits be tape recorded and preserved. A communications representative could be helpful in securing and interpreting this very important evidence. The policies or procedures utilized in handling pursuits and other emergency traffic may be critical to the analysis of the pursuit.  Allegations may also be made that dispatchers failed to handle the situation properly.  A communications expert should be represented on committee, or otherwise available to assist the committee in assessing communications problems as a factor in the pursuit.

Standardizing Review Procedures:  Our surveys have indicated that line officers are very concerned about fair treatment during the administrative review of critical incidents, including pursuit.  Dr. William Kroes indicates within the text of his book entitled, Society's Victim: The Police Officer that fear of  "Monday morning quarterbacking" is the single biggest stressor identified by law enforcement personnel.[36]  The line officer involved in the pursuit must make split second decisions that others will have days and weeks to evaluate.  Therefore, the police administrator should be very

concerned with developing clear standards of conduct and a review system capable of operating with consistency and fairness. Most police officers are content to operate within the rules, as long as they fully understand the reasoning behind the rule making, and find that the rules are applied consistently to the many varied scenarios and actors.

An effective means by which to encourage consistency in reporting and evaluation is the development of standard reporting forms. IACP policy states that "Development of standard reporting forms would facilitate these (supervisory) reports." Each department should seek to standardize the reporting forms as much as possible to insure that all elements of the pursuit are properly investigated and analyzed for each and every pursuit.

This author has developed a form to assist the immediate supervisor in assessing the strength of various risk factors as identified in the Miami Dade Police Department pursuit study released in 1987. The form does not purport to be statistically predictive of the chances that an accident may occur. As has been discussed previously, traffic accidents in pursuits are largely a matter of chance and the degree of skill possessed by the operator of the suspect vehicle; neither of which can be controlled by the pursuing officer.

However, a consistent interpretation of the identified risk factors, and the use of a standard description, will assist administrative personnel in making a qualitative

assessment of whether or not the pursuit should have been discontinued.  Furthermore, when sanctions are taken against an officer on the basis of the conduct of the pursuit, the specific reasons why this pursuit was not within policy, when compared to other past pursuits, will be more easily documented.

A copy of that form is included in Appendix B of this report.

## Disposition

Once the fact finding, reporting, analysis and recommendation stages of the post-pursuit administrative review have been accomplished, then the chief executive must consider the pursuit situation in terms of it's ultimate disposition:

1. Was the officer(s) in violation of policy.

2. If so, was the violation as a result of:

   a. Intentional officer misconduct

   b. Officer misjudgment

   c. Deficient skills as a result of inexperience

   d. Lack of an inherent ability to act under pressure, generally supported by a history of the officer's conduct in emergency situations.

   e. Deficiencies in training

   f. Unclear policy guidelines

   g. Other extenuating circumstances justifying the officer's actions as reasonable under the prevailing conditions.

3.  Should the officer(s) be referred to the standard disciplinary process?

The police administrator must also consider greater questions regarding the overall effect of the case disposition.

1.  What will be the reactions of the rank and file?
2.  To what degree can this case be used as a training aid?
3.  How, and to what degree, should this information be disseminated to the rank and file, and their supervisors?
4.  What are the media and community relations outcomes of the release of this information?
5.  Should the current policy be revised?
6.  To what degree should officials outside the agency be involved in, or advised of, the disposition decisions?

No doubt, the disposition of pursuit cases, as with any other internal investigation of police personnel, will be addressed within the greater considerations of the standard operating procedures of the agency and the political environment surrounding the issue.  However, some simple truths should be considered throughout this process:

· All rules and procedures must be consistently applied if the integrity of the process is to be maintained.  Proper records keeping will allow disposition decisions to be made with historical consistency and in consideration of similar violations occurring in the past.

80

- A full release of information regarding the incident is necessary if others within the department are to learn from the experience.

- Failure to make a full release of information may result in the informal communication processes spreading half truths throughout the agency, seriously affecting morale and officer productivity.

## OFFICER TRAINING

Our surveys of police students attending Traffic Institute courses suggest that training in the area of pursuit policy is in many agencies accomplished in an ineffective fashion. Often when new policies are released to the rank and file, supervisors are provided with the written directive and then are given the task to educate their troops solely within a role call environment. Given extreme time limitations available in the briefing room, the supervisor is generally able to provide only a cursory review of the policy. The new policy may simply be disseminated to the troops in a written form and then read aloud.

Actual "behind the wheel" practical emergency/pursuit driver training is rare outside of the formal police academy setting. Senior officers within an agency may have never had any practical training during their police careers. The reason often cited for this lack of "behind the wheel" training is that such training is very expensive and considered cost prohibitive by many agencies. One medium sized department intended to provide training to all 140 sworn personnel every other year, but upon conclusion of the first session costs for materials alone (tires, damaged cars, gasoline) were estimated to exceed $5000. The agency quickly abandoned the biannual training schedule, and no further practical driver training was provided.

Anecdotal evidence suggests that when an agency does

81

provide practical pursuit training, the emphasis presented in terms of time and effort weighs heavily toward teaching an officer how to drive as quickly as possible.  Race techniques of taking the proper line through corners, and threshold braking while slowing or entering corners, and acceleration upon exiting corners, are common and useful subject matter, but should be a scondary consideration to the practical and philosophical issues of the pursuit policy itself.

Training, or retraining, in policy areas as important as pursuit driving or deadly force should be accomplished in a fashion reflective of the potential seriousness of the subject matter.  Consideration should be given to the following chronology in developing a training program:

1.  Development of a classroom training curriculum specific to supervisors, and those administrative or support personnel who will have special tasks to perform as mandated by the new directive.

2.  Provide separate classroom training of the above personnel, with an emphasis toward dealing with philosophical and supervisory issues.

3.  Utilizing both external sources and the expertise of the above group, a training program should be developed for the rank and file, with specialists in certain disciplines being held responsible for developing and presenting information specific to areas within the pursuit policy.

4.  State and regional training standards should be

83

consulted in developing the training curriculum.  Other addi-
tional resources are available in the bibliography attached
hereto.   The National Highway Transportation Safety Adminis-
tration commissioned a study by the National Steering Commit-
tee on Basic Law Enforcement Precision Driving in April of
1987.   The committee mandate was

> "not intended to dictate absolute direction.  However,
> preliminary review shows law enforcement precision
> driving focuses on common denominators as presently
> taught across the Nation.   It is the committee's in-
> tent to define the focus by way of nationally accepted
> minimum guidelines."[37]

A copy of the committee report may be obtained through
NHTSA.

5.   All personnel should then be afforded training in a
formal classroom situation, not solely within the daily brief-
ing setting.

Emphasis should be placed upon training regarding the role
of the police department in traffic safety, the reasons for
initiating and terminating a pursuit, and the likelihood of
potential outcomes. To that end, the information presented
within the "Conceptual Framework" section of this document
should be incorporated into the lesson plan and discussed at
length.

In addition, the departmental processes used to arrive at
the new pursuit policy, and the factors and philosophy consid-
ered during the formulation stage, should be thoroughly re-
viewed within the classroom session.

6.   Practical "behind the wheel" pursuit driver training

has significant worth, especially to young inexperienced offi-
cers.   The greatest benefit to be derived from such training
may be in the area of psychological conditioning to lights and
siren, in attempting to control the "adrenalin high" that many
young officers will experience during their first few emergen-
cy runs.

However, administrators should not over estimate the value
of such training.   Many pursuit training programs have tradi-
tionally emphasized the practical aspect, rather than the
philosophical or policy aspects of the emergency driving
issue.   Instructors have themselves been trained more in how
to drive fast rather than in how to interpret those situations
in which pursuits should be discontinued, and thus pass that
emphasis on to their trainees.

A convincing argument may be made that traditional methods
of teaching pursuit driving are in fact not of significant
benefit.   The MSU study concluded that there was no apprecia-
ble difference in the number or seriousness of accidents in
pursuits involving trained vs. untrained officers.   If train-
ing has had no effect on pursuit outcomes, perhaps we should
question the value of standard training methods which tradi-
tionally spend few hours in the classroom and many hours on
the driving course.

> One commentator argues that because civil litigation
> against municipalities for high speed pursuit related
> injuries is usually based on negligence in training
> the officers involved, the establishment of a good
> training program would greatly reduce such causes of
> action.   However, another author argues that current

85

> state of the art training in pursuit driving offered
> by police academies is inadequate.  He states: "we can
> document no training activity that validly prepares
> officers for this particular task, viz., driving a
> police car at high speeds after another car, which in
> most cases, has committed a traffic offense, through
> populated areas, signalized intersections, and roads
> where the chances of running into other cars are
> extremely high."[38]

An examination of the 54 page document used in "Police

Advanced Driving and Pursuit Techniques Training" conducted by

Eastern Illinois University illustrates the above point.[39] No

where within the text is any information provided similar to

the research data and philosophy issues discussed in the con-

ceptual framework of this paper.  "The advanced driving maneu-

vers course is designed to teach emergency procedures and

evasive actions and to help students better understand their

capabilities and limitations as drivers, and the capabilities

and limitations of the vehicles they drive."   The handbook

continues "The .........program is designed to be a practical

experience with the bulk of the training behind the wheel of

the vehicle driving through various exercises.   A minimum

amount of time will be spent in the classroom discussing in-

formation pertinent to the program, such as curriculum devel-

opment, the how's and why's of each maneuver, range safety

rules, etc.".

Police administrators must recognize this practical versus

conceptual bias in the manner in which most pursuit driver

training programs are administered; and should strive to elim-

inate any suggestion within their own training program that

implies pursuit driving is primarily a test of skills, a con-
test between the officer and the suspect.  Officers must leave
the training session with a deep sense of commitment to driv-
ing as safely as possible, realizing that it may take more
courage to call off a pursuit than to continue one.

A final element of an effective pursuit training program,
as has been mentioned earlier, is in the area of making each
patrol officer effective in recognizing driving behaviors pre-
dictive of operators who are under the influence of alcohol or
drugs.  The National Highway Traffic Safety Administration has
researched and designed just such a program of instruction.
Officers taking this prescribed course of instruction will
learn that specific driving behaviors (e.g. making a wide turn
at an intersection, or failing to react promptly to signal
changes) are 40 to 80 percent predictive that the driver is
legally under the influence.   This knowledge, based upon
scientifically validated research and training, will enable an
officer to form an objective opinion regarding the likelihood
that the driver he is pursuing is driving under the influence.
Once the driver is apprehended, the officer will also be able
to administer certain standardized field sobriety tests, in-
cluding the much publicized "gaze nystagmus" eye examination,
in order to gain probable cause to arrest the suspect for
Driving Under the Influence.

The officer's ability to correctly assess the probability
of a driver being under the influence, and to charge that

87

driver accordingly, will have a substantial impact upon vali-
dating the officer's perception that the "need for apprehen-
sion" was worth the risk of the pursuit.

## SUMMARY

Quite often the circumstances surrounding pursuit driving
develop into tragedies that transcend the statistics of dead
and injured, and the personal losses of those involved.  On
two recent occasions high speed pursuits have culminated in
officers using excessive force in the capture of the suspect,
the repercussions of which have been felt throughout the law
enforcement profession.

On January 16, 1989, Officer William Lozano of the Miami
Florida Police Department pursued two black men on a high
powered motorcycle through the streets of the city.  Officer
Lozano ultimately brought the pursuit to a conclusion, shoot-
ing the driver and causing the passenger and motorcycle to
crash into a parked car. Both men were killed.  Subsequent
investigation showed the suspects to be in possession of
illegal drugs.  The Overton section of Miami was shortly
thereafter torn apart by riots and looting amid the shouts of
police brutality and racism.  Nearly a year later "people
danced and drivers honked their horns after a jury convicted
the officer on manslaughter charges."[40]

On March 3, 1990, four officers of the Los Angeles Police
Department were video taped by an amateur photographer using
their fists, feet, and nightsticks in severely beating black
motorist Rodney King, while several other officers looked on
and did nothing.  The officers' claimed that the suspect had
led them on a 100 mph chase through city streets, and then

88

resisted arrest prior to the beating. At this writing those
four officers have been indicted on criminal charges and the
investigation continues. The suspect was found to be under
the influence of drugs, as later proven by blood testing. The
black community of L.A., and many other individuals and organ-
izations, have demanded the resignation of Chief Daryl Gates.
Gates is accused of treating this situation with insensitiv-
ity, and of creating an organizational culture that encourages
both excessive force and racism.

Even though such incidents are the exception and not the
rule, all of law enforcement has been dealt a serious blow by
the actions of a few. Even though all of the suspects in this
case had extensive criminal histories, and were possessing or
under the influence of illicit drugs at the time of the inci-
dent, the community was properly outraged at the manner in
which the police reacted.

What motivates officers to take such extreme measures?
Are all such incidents racially motivated? Is physical abuse
at the conclusion of a high speed pursuit the norm? Why did
the results of the Miami Dade Police Department study indicate
that a third of all injuries sustained by suspects in pursuits
occurred after the pursuit had concluded?

The highly emotional nature of police pursuits is too
often ignored, and is instead given labels of pure racism and
police brutality. Yet in fully understanding the dynamics of
dangerous police encounters, it is sometimes useful to observe

90

the situation from the officer's perspective.

Many officer's feel that, in attempting to flee, the suspect is in effect threatening the life of the officer who is bound by duty to follow, to pursue. In order to make his escape, the suspect is by his actions attempting to cause the officer serious bodily harm by crashing his patrol vehicle. The suspect is in effect pointing a loaded gun at the officer. If we were to inquire of the wives and families of the officers each year killed in high speed pursuits, we would find that the result of such actions are essentially the same.

When the suspect surrenders or is otherwise overpowered, he decides that the game is over and calls time out. He and the public in general expect the officer to respect the truce the suspect seems ready to impose. Yet the officer whose life has been threatened may not yet be ready to stop. The "flight or fight" physical and mental reaction to the pursuit situation is not so easily turned off. The unpredictable and volatile nature of pursuits must be recognized by police administrators who are formulating policies based upon sound quantitative and qualitative considerations.

Apart from the highly publicized incidents described above, the empirical data presented herein is helpful to the administrator largely in predicting the likelihood of certain outcomes, and in assessing the probable risks and civil exposure of various types of pursuit policies.

In the final analysis we as police administrators are

creating public policy, not just department policy, when we
create the rules and regulations under which our officers will
use high speed pursuit as a tool by which to control criminal-
ity and modify human behavior.  The type of policy we mold
will ultimately be determined by philosophical rather than
utilitarian considerations.

As leaders within the community we must fulfill our re-
sponsibility to educate ourselves regarding the complex issues
of pursuit policy; and when necessary to speak out as our con-
science may dictate. Yet, our ultimate duty as police officers
is not to create public policy, but to reflect the standards
of conduct expected by the community.

We have addressed the question of "How do we determine
those community standards" only briefly.  We discussed in-
volving elected officials, assessing civil court decisions
both from within and outside our jurisdiction, and holding
public discussions concerning the costs and benefits of any
pursuit policy.  Yet one of the most important indicators of
the community standard regarding police pursuit is reflected
in the disposition of those cases involving suspects charged
with attempting to elude a police officer in a high speed
chase.

One goal of high speed pursuit is to successfully appre-
hend violators, and in so doing provide a general deterrent
effect that will discourage others from even considering such
a course of action. In order to deter any criminal behavior,

our system of justice must convince the potential criminal that there is an unacceptable risk of being apprehended, charged, prosecuted, convicted, and appropriately punished. If in fact the law enforcement community is successful in apprehending 3 of every 4 pursued suspects, then we must consider our responsibility as police professionals within the criminal deterrence model, that of taking the violator into custody, to be largely satisfied. However, if the courts of your jurisdiction do not effectively charge, convict, and punish the violator in a manner that will deter the violator and others from fleeing police, then the efforts of police personnel pursuing the suspects are being vainly applied.  A police administrator may, using sentencing as a sole criteria, choose to consider a more restrictive or even prohibitive pursuit policy.

Gary Vest addresses this issue in  an article entitled "Punishment is Too Light for Fleeing a Police Officer", published in Ohio Police Magazine:[41]

> It is difficult to understand how the State of Ohio will classify the theft of $300 as a felony; yet the same state has classified the wanton disregard for law and order by persons who would use a motor vehicle, recklessly endangering the community, for the purpose of evading prosecution, a misdemeanor offense.

Mr. Vest goes on to say that the goal of legislative prohibitions, and by inference the goal of police pursuit policy, should be:

> ...how do we stop the criminal act of fleeing and eluding?  Not how do we stop the police officer from pursuing the offender?

93

Although some would describe Mr. Vest's views as wholly traditional and overly simplistic, others might argue that at times we as criminal justice professionals lose perspective on some simple truths. We have in the past become innovative by showing compassion in sentencing armed robbers and rapists, and in building fewer jail cells. We have in the past abandoned traditional "truths" and chose to hold the environment largely responsible, and not the individual, for the crimes we commit. And only in recent years have we seen the consequences of that innovation, and a return toward traditional values of individual accountability.

If we accept the increasingly popular premise that pursuit is inherently too dangerous, are we not allowing the drunks, the reckless drivers, and perhaps the criminals among us to, in a sense, hold us all hostage? Are not those individuals who flee from police, doing so with the implied threat that if we as a society attempt to hold them responsible for their actions, they may in turn kill or injure innocent motorists.

With the introduction of the latest International Association of Chiefs of Police model pursuit policy, all but abandoning pursuit for any traffic violation or property crime, we have reached a cross roads that could have far reaching consequences upon our ability to police. A nationwide "no pursuit" policy may be in the not to distant future.

However, if the alternative to a "no-pursuit" policy is to continue to embrace more traditional values, it must be with

94

a renewed commitment from the community, the legislature, and the courts to hold those who flee from the police fully accountable, to make the punishment fit the crime, and to somehow establish a means by which innocent victims of those police actions can be duly compensated for their damages.

It is hoped that the information and processes outlined herein have assisted the law enforcement administrator in fulfilling his administrative duties toward developing an effective and legally defensible pursuit policy. Each agency and the community in which that agency functions have differing needs and standards. It should be apparent that no one pursuit policy is suited to all jurisdictions.

An effective policy must be founded to some degree upon a consideration of practical issues presented by immediate legal, financial and social pressures. However, law enforcement administrators, and the law enforcement profession as a whole, may be in danger of over reacting to those immediate concerns. If we are to avoid abandoning control of the roadways by totally discontinuing pursuits of any kind under any circumstances, we must do so by placing a greater degree of reliance upon sound reasoning and a genuine appreciation of both short and long term societal consequences. To that end we can best "protect and serve" ourselves, as well as our community.

## ENDNOTES

[1]Tom Barker, (1984) "Police Pursuit Driving: The Need for Policy." The Police Chief. 51(7).  Quoted by Shuman, I. Gayle and Kennedy, Thomas D. "Police Pursuit Policies: What is Missing?. American Journal of Police, Vol. 8, 1989, p. 21.

[2]J. Weisel, (1977) "Controversey Over High Speed Pursuits" Trooper. 2(7) 61-63.  Quoted by Shuman, I. Gayle and Kennedy, Thomas D. "Police Pursuit Policies: What is Missing?. American Journal of Police, Vol. 8, 1989, p. 21.

[3]Eric Beckman, "Identifying Issues in Police Pursuits: The First Research Findings".  The Police Chief, July 1987 57-63.

[4]U.S. Department of Justice, Federal Bureau of Investigation, Uniform Crime Reports:  Law Enforcement Officers Killed and Assaulted, 1989 (Washington, D.C., Federal Bureau of Investigation, 1990).

[5]Ibid.

[6]The Commission on the Accreditation of Law Enforcement Agencies, Inc.  Standards for Law Enforcement Agencies, September 1989, Sec. 41.2.8, pp. 41-5.

[7]Interview with James P. Manak, Senior Legal Counsel, the Northwestern University Traffic Institute, 405 Church Street, Evanston Illinois.  April 3, 1991.

[8]International Association of Chiefs of Police, Gaithersburg, Md., Models for Management: Emergency Vehicle Operation - Hot Pursuit, December 1, 1989  (This publication is included in the appendices of this report).

[9]National Committee on Uniform Traffic Laws and Ordinances, Northwestern University Traffic Institute, 405 Church Street, Evanston Il. Uniform Vehicle Code and Model Traffic Ordinance, 1987, Sec. 11-106, p. 54.

[10]Ibid., Sec. 11-908, p. 67.

[11]J. H. Koonz and P. M. Regan (1985) "Hot Pursuits: Proving Police Negligence" Trial. 21 (Dec):  63-66.

[12]Leonard Territo, 1982, "Citizen Safety:  Key Element in Police Pursuit Policy." Trial. 18(8) 1-34.

[13]Richard G. Zevitz, "Police Civil Liability and the Law of High Speed Pursuit" Marquette Law Review, Vol. 70:237, 1987 p. 237-284.

[14]Ibid.                                                                              96

[15]Ibid.

[16]Beckman, _Findings_.

[17]Ibid.

[18]Ibid.

[19]Ibid.

[20]G. P. Alpert and Roger G. Dunham, "Policing Hot Pursuits: The Discovery of Aleatory Elements". _The Journal of Criminal Law and Criminology_, 1989, Northwestern University School of Law, Vol. 80, No. 2, pp. 521-539.

[21]National Highway Traffic Safety Administration, _DWI Detection and Standardized Field Sobriety Testing Instructor Manual_, Northwestern University Traffic Institute, January 1989, p. II-8.

[22]Alpert and Dunham, _Elements_. (All data regarding the Miami Dade Police Department Study was gathered via the Alpert article).

[23]Beckman, _Findings_. (All data regarding the California Highway Patrol study and the Michigan State University Study were gathered via the Beckman article).

[24]I. G. Shuman and Thomas D. Kennedy, "Police Pursuit Policies: What is Missing?" _American Journal of Police_, Vol. 8 4.2, 1989.

[25]Bobby Westmoreland and Billy D. Haddock, "Code 3 Driving--Psychological and Physiological Stress Effects". _Law and Order_, Vol. 37, No. 11 (November 1989) p. 29-31.

[26]Alpert and Dunham, _Elements_, p. 526.

[27]George Aylesworth, "Police Pursuit Policies and Practices Need a Great Measure of Supervisory and Administrative Control", _The Florida Police Chief_, September 1989, p. 32.

[28]National Highway Traffic Safety Administration, U.S. Department of Transportation "_Effect of Traffic Law Enforcement on Crime, Phase 1 Final Report_," April 1991. Contract DTNH22-90-C-05103, submitted by Northwestern University Traffic Institute. p. 25.

[29]"Emergency Pursuit Driving", video tape presentation by The Traffic Institute, Northwestern University, Evanston, Illinois (1982) time 27 mins 31 seconds.  Directed by James Manak, Senior Legal Counsel.

[30]IACP, Pursuit.

[31]A survey was administered during January of 1991 to a random sampling of 17 police officers from various agencies attending Traffic Institute courses.  Classroom discussions were also conducted regarding department training and the incidence of drinking drivers involved in pursuits.  The results of the survey are not empirical evidence of general observations offered, but simply as anecdotal information. Additional studies of departmental administrative and training activities may be conducted at a later date.

[32]The IACP Concepts and Issues Paper is also contained in the Appendix A of this report.

[33]Ibid.

[34]Ibid.

[35]Shuman and Kennedy, Missing.

[36]William H. Kroes, M.D. Society's Victim-The Policeman, (Charles C. Thomas Publisher, Springfield, Illinois, 1976) p 15.

[37]National Highway Traffic Safety Administration, "Michigan Law Enforcement Training Counsel, National Steering Committee on Basic Law Enforcement Precision Driving" 1987-1988. Obtained from Committee papers on file at the Northwestern University Transportation Library, Evanston, Illinois.

[38]Zevitz, Pursuit, p. 243.

[39]Daniel J. Bolin, Police Advanced Driving and Pursuit Training Manual. Eastern Illinois University, Charleston, Illinois.  undated.  Copy of this publication is contained in the appendices to this report.

[40]"Miami Policeman Sentenced in Deaths that Led to Riots," Olean Times Herald, January 25, 1990, p. 8.

[41]Gary Vest, "Punishment is too Light for Fleeing a Police Officer" Ohio Police Magazine, Spring 1983, p. 35.

## BIBLIOGRAPHY

Alpert, Geoffrey P. and Dunham, Roger G.  Police Pursuit Driv-
    ing:   Controlling Responses to Emergency Situations.
    New York:  Greenwood Press.  1990:  "Policing Hot Pur-
    suits:   The Discovery of Aleatory Elements."   The
    Journal of Criminal Law & Criminology.  1989.  North-
    western University School of Law.  Vol. 80, No. 2:
    "Questioning Police Pursuits in Urban Areas."  Manage-
    ment and Organization.  Section III.

Auten, James H.  "Emergency and Pursuit Driving:  Police Con-
    siderations."   Illinois Police Association Official
    Journal,   Vol. 42.   April 1989:   "Law Enforcement
    Driving:  Part IV, Policy Development."  Law and Order.
    August 1985

Aylesworth, George.   "Police Pursuit Policies and Practices
    Need a Great Measure of Supervisory and Administrative
    Control."  The Florida Police Chief.  September 1989

Barker, Tom.  "Police Pursuit Driving:  The Need for Policy."
    The Police Chief.   1984

Beckman, Erik.   "Identifying Issues in Police Pursuits:  The
    First Research Findings."  The Police Chief.  July 1987:
    "A Report to Law Enforcement on Factors in Police Pur-
    suits."  East Lansing:  October 1985

Bolin, Daniel J.  Police Advanced Driving and Pursuit Training
    Manual.   Eastern Illinois University.   Charleston:
    Undated

Cole, Richard.  "Miami Police Sentenced in Deaths That Led to
    Riots."   Olean Times Herald.   Olean:  AP Wire Story
    January 25, 1990

Demarest, John B.  "Pursuit Policy:  Can An Agency be Without
    One?"   Journal of California Law Enforcement.   April
    1979

International Association of Chiefs of Police.   Models for
    Management:  Emergency Vehicle Operation - Hot Pursuit.
    Gaithersburg, Md.  December 1, 1989

Koonz, J. H. and Regan, P. M.  "Hot Pursuits:  Proving Police
    Negligence."  Trial.  December 1985

Kroes, William H., MD.  Society's Victim-The Policeman.  1976,
    Rev. 1986.  Springfield:  Charles C. Thomas Publisher

98

Misner, Gordon E. "High Speed Pursuit: Police Perspectives." CJA File. Vol. 2, No. 6. December/January 1990

Penrod, Michael S. "Legal Liability in High-Speed Pursuits." The Police Chief. September 1985

National Committee on Uniform Traffic Laws and Ordinances. Uniform Vehicle Code and Model Traffic Ordinance, 1987. Revised. Evanston: Northwestern University Traffic Institute

National Highway Traffic Safety Administration. U.S. Department of Transportation. "Effect of Traffic Enforcement on Crime, Phase I Final Report." Contract DTNH22-90-C-05103. Submitted by Northwestern University Traffic Institute. April 1991

National Highway Traffic Safety Administration. DWI Detection and Standardized Field Sobriety Testing Instructor Manual. Northwestern University Traffic Institute. January 1989

Pursuit in Traffic Law Enforcement. 3rd Ed. PN 553. The Traffic Institute, Northwestern University. 1981

Schofield, Daniel L., S.J.D. "Legal Issues in Pursuit Driving." Legal Digest. May 1988

Scotti, Anthony J. Police Driving Techniques. Englewood Cliffs: Prentice-Hall, Inc. 1988

Shuman, I. Gayle and Kennedy, Thomas D. "Police Pursuit Policies: What is Missing? American Journal of Police. Vol. 8. 1989. 21-30

Territo, Leonard. "Citizen Safety: Key Element in Police Pursuit Policy." Trial. 1982

The Commission on the Accreditation of Law Enforcement Agencies, Inc. Standards for Law Enforcement Agencies. September 1989

Turner, Richard H. Tactical Police Driving. United States: NAPD Publishing Company. 1982

U.S. Department of Justice. Federal Bureau of Investigation. Uniform Crime Reports: Law Enforcement Officers Killed and Assaulted. 1989

Vest, Gary. "Punishment is too Light for Fleeing a Police Officer." Ohio Police Magazine. Spring 1983

100

Weisel, J.  "Controversey Over High Speed Pursuits."  Trooper.
     1977

Westmoreland, Bobby and Haddock, Billy D.  "Code 3 Driving --
     Psychological and Physiological Stress Effects."  Law
     and Order.  Vol. 37, No. 11.  November 1989

Zevitz, Richard G.  "Police Civil Liability and the Law of
     High Speed Pursuit."  Marquette Law Review.  Vol.
     70:237, 1987

**APPENDIX A**

**IACP MODEL PURSUIT POLICIES**

*VEHICULAR
PURSUIT*

# Model Policy

| Effective Date<br>**December 1, 1989** | | Number | |
|---|---|---|---|
| Subject<br>**Vehicular Pursuit** | | | |
| Reference | | Special Instructions | |
| Distribution | Reevaluation Date<br>**November 30, 1990** | | No. Pages |

## I.  PURPOSE

The purpose of this policy is to state the guidelines to be followed during vehicular pursuit.

## II.  POLICY

Vehicular pursuit of fleeing suspects presents a danger to the lives of the public, officers and suspects involved in the pursuit. It is the policy of this department to protect all persons' lives to the extent possible when enforcing the law. In addition, it is the responsibility of the department to assist officers in the safe performance of their duties. To effect these obligations, it shall be the policy of the department to narrowly regulate the manner in which vehicular pursuit is undertaken and performed.

## III. DEFINITION

A. Vehicular Pursuit: An active attempt by an officer in an authorized emergency vehicle to apprehend fleeing suspects who are attempting to avoid apprehension through evasive tactics.

## IV. PROCEDURES

A. Initiation of Pursuit

1. The decision to initiate pursuit must be based on the pursuing officer's conclusion that the immediate danger to the public created by the pursuit is less than the immediate or potential danger to the public should the suspect remain at large.

2. Any law enforcement officer in an authorized emergency vehicle may initiate a vehicular pursuit when ALL of the following criteria are met:

   a. The suspect exhibits the intention to avoid arrest by using a vehicle to flee apprehension for an alleged felony or misdemeanor that would normally require a full custody arrest;

   b. The suspect operating the vehicle refuses to stop at the direction of the officer; and

   c. The suspect, if allowed to flee, would present a danger to human life or cause serious injury.

3. The pursuing officer shall consider the following factors in determining whether to initiate pursuit:

   a. The performance capabilities of the pursuit vehicle;

   b. The condition of the road surface upon which the pursuit is being conducted;

   c. The amount of vehicular and pedestrian

   d. Weather conditions.

B. Pursuit Officer Responsibilities

1. The pursuing officer shall immediately notify communications center personnel that a pursuit is underway. The officer shall provide communications personnel with the following information:

   a. Unit identification;

   b. Location, speed and direction of travel of the fleeing vehicle;

   c. Description and license plate number, if known, of the fleeing vehicle;

   d. Number of occupants in the fleeing vehicle, and descriptions, where possible; and

   e. Reasons supporting the decision to pursue.

2. Failure to provide this information to communications personnel may result in an immediate decision by a field supervisor assigned to monitor the pursuit to order its termination.

3. The primary pursuit unit shall reduce the level of pursuit to that of support or backup unit where:

   a. The fleeing vehicle comes under the surveillance of an air unit; or

   b. Another vehicle has been assigned primary pursuit responsibility.

4. Any primary or backup unit sustaining damage to, or failure of essential vehicular equipment during pursuit shall not be permitted to continue in the pursuit. The unit shall notify communications so that another unit may be assigned to the pursuit.

C. Communications Center Responsibilities

1. Upon notification that a pursuit is in progress, communications personnel shall immediately advise a field supervisor of essential information regarding the pursuit.

2. Communications personnel shall carry out the following activities and responsibilities during the pursuit:

   a. Receive and record all incoming information on the pursuit and the pursued vehicle;

   b. Control all radio communications and clear the radio channels of all nonemergency calls;

   c. Obtain criminal record and vehicle checks of the suspects;

   d. Coordinate and dispatch backup assistance and air support units under the direction of the field supervisor; and

   e. Notify neighboring jurisdictions, where practical, when pursuit may extend into their

D. Field Supervisor's Responsibilities During Vehicular Pursuit

1. Upon notification that a vehicular pursuit incident is in progress, the field supervisor shall assume responsibility for the monitoring and control of the pursuit as it progresses.
2. The field supervisor shall continuously review the incoming data to determine whether the pursuit should be continued or terminated.
3. In controlling the pursuit incident, the field supervisor shall be responsible for coordination of the pursuit as follows:
   a. Directing pursuit vehicles or air support units into or out of the pursuit;
   b. Redesignation of primary, support or other backup vehicle responsibilities;
   c. Approval or disapproval, and coordination of pursuit tactics; and
   d. Approval or disapproval to leave jurisdiction to continue pursuit.
4. The field supervisor may approve and assign additional backup vehicles or air support units to assist the primary and backup pursuit vehicles based on an analysis of:
   a. The nature of the offense for which pursuit was initiated;
   b. The number of suspects and any known propensity for violence;
   c. The number of officers in the pursuit vehicles;
   d. Any damage or injuries to the assigned primary and backup vehicle or officers;
   e. The number of officers necessary to make an arrest at the conclusion of the pursuit; and
   f. Any other clear and articulable facts that would warrant the increased hazards caused by numerous pursuit vehicles.

E. Traffic Regulations During Pursuit
1. Each unit authorized to engage in vehicular pursuit shall be required to activate headlights and all emergency vehicle equipment prior to beginning pursuit.
2. Officers engaged in pursuit shall at all times drive in a manner exercising reasonable care for the safety of themselves and all other persons and property within the pursuit area.
3. Officers are permitted to suspend conformance with normal traffic regulations during pursuit as long as reasonable care is used when driving in a manner not otherwise permitted, and the maneuver is reasonably necessary to gain control of the suspect.

F. Pursuit Tactics
1. Unless expressly authorized by a field supervisor, pursuit shall be limited to the assigned primary and backup vehicles. Officers are not otherwise permitted to join the pursuit team, or follow the pursuit on parallel streets.
2. Officers may not intentionally use their vehicle to bump or ram the suspect's vehicle in order to force the vehicle to a stop off the road or in a ditch.
3. Departmental policy pertaining to use of deadly force shall be adhered to during the pursuit.

G. Termination of Pursuit
1. A decision to terminate pursuit may be the most rational means of preserving the lives and property of both the public, and the officers and suspects engaged in pursuit. Pursuit may be terminated by the pursuing officer, the field supervisor or chief executive officer of the department.
2. Pursuit shall be immediately terminated in any of the following circumstances:
   a. Weather or traffic conditions substantially increase the danger of pursuit beyond the worth of apprehending the suspect;
   b. The distance between the pursuit and fleeing vehicles is so great that further pursuit is futile; or
   c. The danger posed by continued pursuit to the public, the officers or the suspect is greater than the value of apprehending the suspect(s).
3. The pursuing officer shall relay this information to communications personnel, along with any further information acquired which may assist in an arrest at a later date.

H. Interjurisdictional Pursuits
1. The pursuing officer shall notify communications when it is likely that a pursuit will continue into a neighboring jurisdiction, or across the state line.
2. Pursuit into a bordering state shall conform with the department's interjurisdictional pursuit agreement and state law.

I. The field supervisor shall prepare a comprehensive analysis of the pursuit, and forward it to the chief executive officer of the agency.

BY ORDER OF

---

CHIEF OF POLICE

This model vehicular pursuit policy was developed under the auspices of the Advisory Board to the IACP/BJA National Law Enforcement Policy Center.

---

This model policy is intended to serve as a guide for the police executive who is interested in formulating a written procedure to govern vehicular pursuit. The police executive is advised to refer to all federal, state and municipal statutes ordinances, regulations, and judicial and administrative decisions to ensure that the policy he or she seeks to implement meets the unique needs of the jurisdiction.



# IACP/BJA National
# Law Enforcement Policy Center



# Vehicular Pursuit

=== Concepts and Issues Paper ===

**August 1, 1990**

## I. INTRODUCTION

### A.  Purpose of Document

This paper is designed to accompany the Model Policy on Vehicular Pursuit established by the IACP/BJA National Law Enforcement Policy Center. This paper provides essential background material and supporting documentation to provide greater understanding of the developmental philosophy and implementation requirements for the model policy. This material will be of value to law enforcement executives in their efforts to tailor the model to the requirements and circumstances of their community and their law enforcement agency.

### B.  Background

Law enforcement pursuit policies are important for a number of reasons:
- To reduce injuries and deaths to an absolute minimum;
- To give officers a clear understanding of when and how to conduct pursuits;
- To maintain the basic law enforcement mission to enforce the laws and protect life and property; and
- To minimize municipal liability in those accidents that will still take place.

There can be little question that a law enforcement agency should have an explicit vehicular pursuit policy. The question is what kind of pursuit policy will best serve the agency's interests. The policy issue confronting law enforcement and municipal administrators is a familiar one of balancing conflicting interests: On one side there is the need to apprehend known offenders. On the other side, there is the safety of law enforcement officers, of fleeing drivers and their passengers, and of innocent bystanders.

Every law enforcement department is exposed to several kinds of loss from high speed chases. They always entail risk of loss of life, serious personal injury, and serious property damage. If the persons injured or killed are law enforcement officers themselves, the law enforcement department suffers direct loss. If the persons injured or killed are private citizens, the department or the government it serves may be liable in civil actions for damages. The same holds true for property damage. It is particularly difficult to escape liability when the injured parties are innocent by-standers.

On the other hand, if a law·enforcement agency is known not to engage in high-speed pursuits, then its credibility with both law-abiding citizens and law violators will suffer and effectiveness may be diminished. Public knowledge that a law enforcement department has a policy prohibiting pursuit may well encourage people to flee, decreasing the probability of apprehension.

The Model Vehicular Pursuit Policy recognizes these balancing problems in its policy statement and recommends a restrictive vehicular pursuit policy as the preferred means of meeting a law enforcement agency's obligations.

### C.  Types of Pursuit Policy

There are essentially three distinct models of vehicular pursuit policy:
- Judgmental or discretionary—allowing officers to make all major decisions relating to initiation, tactics, and termination.
- Restrictive—placing certain restrictions on officers' judgments and decisions.
- Discouraging—severely cautioning or discouraging any pursuit, except in the most extreme circumstances.[1]

The model policy is restrictive, placing officers under a series of carefully defined constraints and subjecting pursuits to close supervision and review. The rationale for this restrictive policy is outlined here.

### D.  Alternatives to Pursuit

There are two basic alternatives to pursuit: (1) no pursuit and (2) following at a safe speed. When a violator has too much lead time, pursuit should not be undertaken. When the violator's identity is known, and his behavior is not endangering others, high-speed pursuit is unnecessary because he can be apprehended at some other time.

Examples of situations in which following at a safe speed is preferable to a high-speed chase include when hostages are involved, when an occupant is already known to be the subject of an alarm, and when pursuit is in heavy traffic.

A publication of the IACP/BJA National Law Enforcement Policy Center
1110 North Glebe Road, Suite 200, Arlington, Virginia 22201

The development of this concept paper was supported under funding by the U.S. Department of Justice's Bureau of Justice Assistance under Grant No. 87-SN-CX-K077. The points of view or opinions stated in this document are the results of work performed by the International Association of Chiefs of Police and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Not initiating a pursuit or not continuing a pursuit does not mean giving up. It is possible that the pursuit will be reestablished by the pursuing officer or, through the use of the radio, by other law enforcement units. Also, the subject of a pursuit might be identified and subsequently apprehended from information obtained from a description of the pursued vehicle or from its license plate number. Discontinuing vehicular pursuit is not a reflection on an officer's courage or ability. In most cases, if an apprehension is not made quickly and at a reasonable speed, the most intelligent action for the officer is to discontinue the pursuit.

### E. Legal Considerations

The precise extent of a municipal government's liability for personal injuries or property damage caused by high-speed pursuits is in the first instance a matter of state law. To the extent a state has waived sovereign immunity for itself and its municipal governments, it may be liable for negligence. But there is also the potential for liability in the federal courts under 42 U.S.C. 1983 for deprivation of civil rights, for what are sometimes referred to as constitutional torts.

The civil rights protected by 42 U.S.C. 1983 include the right not to have life, liberty, or property taken without due process of law, which is secured by the Fourteenth Amendment to the Constitution of the United States, and the right of a person not to be unreasonably seized, which is guaranteed by the Fourth Amendment.

In federal civil rights cases to date, several principles have evolved. The Supreme Court will not use 42 U.S.C. 1983 for simple negligence cases.[2] Nor will it use it where there is adequate relief to injured parties under state law.[3] Municipalities can be found liable under 1983 only where the municipality itself causes the constitutional violation at issue.[4]

Three recent Supreme Court cases bear directly on the issues discussed in this paper. *Tennessee* v. *Garner*[5] held that the use of deadly force to apprehend an unarmed fleeing suspect is an unreasonable seizure under the Fourth Amendment. In *Garner*, a law enforcement officer had shot and killed a teenager suspected of burglary as he attempted to escape capture. The Supreme Court had little difficulty concluding that the application of deadly force is a Fourth Amendment seizure. But to determine whether it is an unreasonable seizure requires balancing this extreme form of seizure, indeed the ultimate form of seizure of a person, against the law enforcement interests being served.

The Court rejected the use of deadly force to prevent the escape of all felony suspects, regardless of the circumstances. "It is not better that all felony suspects die than that they escape."[6] The Court carefully analyzed the common-law rule which authorized the use of deadly force to apprehend a felon, and a Tennessee statute, which authorized the use "of all the necessary means to effect the arrest." The Memphis Police Department policy was slightly more restrictive, but still allowed the use of deadly force in cases of burglary.[7]

The Supreme Court also considered the deadly force rules followed by the states, finding that the common-law rule remains in force in fewer than half the states. The Court also examined policies adopted by law enforcement departments: "Overwhelmingly, these are more restrictive than the common-law rule."[8] Citing reports and studies by the IACP and the Commission on Accreditation for Law Enforcement Agencies, the Court found that only 7.5 percent of law enforcement departments permit use of deadly force against any felon, and that 86.8 percent explicitly do not.[9]

The Supreme Court concluded that deadly force may not be used unless it is necessary to prevent the escape and the officer has reason to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.[10] High-speed chases have frequently been analogized to the use of deadly force, and in *Brower* v. *County of Inyo*,[11] the Supreme Court considered a high-speed law enforcement pursuit culminating in the death of the fleeing driver. In *Brower*, officers chased the driver of a stolen car into a roadblock other officers of their department had established by parking a tractor trailer across a two-lane highway in the middle of the night. All members of the Court agreed that *Brower* had been "seized" within the meaning of the Fourth Amendment, but there was a five-four split on the issue of whether an element of governmental intent is required for violation of the Fourth Amendment. Distinguishing the case from an accidental or negligent seizure, such as would occur if the brake slipped on an unoccupied police car and it accidentally pinned a passerby against a wall, Justice Scalia, writing for the majority, said:

*It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only where there is a governmental termination of freedom of movement* through means **intentionally applied.**[12] *[Emphasis by Justice Scalia.]*

Justice Stevens, joined by Justices Brennan, Marshall, and Blackmun, concurred in the judgment that using the roadblock had constituted a Fourth Amendment seizure, but declined to join that part of the Court's opinion that seemed to "establish the proposition that '[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control.'"[13] Because the majority in *Brower* does look at the intention behind the particular tactic used, it is looking at policy questions, which are our primary concern in this paper.

*City of Canton* v. *Harris*[14] dealt with a question of liability for inadequate training. Combined with *Garner* and *Brower*, *Harris* has a direct bearing on the liability issues with which we are concerned here. Two passages bring the point home. Considering circumstances in which training might be found to be inadequate to protect constitutional rights, the Court said:

*But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the need.*[15]

A footnote to that passage reads as follows:

*For example, city policy makers know to a moral certainty that their law enforcement officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the*

*need to train officers in the constitutional limitations on the use of deadly force, see* Tennessee *v.* Garner, *471 U.S. 1 (1985), can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.*[16]

Deliberate indifference to constitutional rights may be a standard few plaintiffs will ever meet. Indeed, Justice O'Connor did not believe that Mrs. Harris, the plaintiff in *City of Canton*, could meet the deliberate indifference standard. But the risks inherent in high-speed pursuits are well known and cannot be taken lightly. As the facts of *Brower* v. *County of Inyo* make clear, high-speed pursuit can turn out to be the use of deadly force, as did the use of firearms in *Tennessee* v. *Garner*. Under *Garner*, there may be municipal liability for failure to have a policy limiting high-risk pursuits to circumstances justifying the risk. Under *City of Canton*, local governments may find themselves liable for failure to provide training clearly controlling this application of deadly force.

### F. Definition

The model policy uses the following definition of a vehicular pursuit: An active attempt by an officer in an authorized emergency vehicle to apprehend fleeing suspects who are attempting to avoid apprehension through evasive tactics.

There are four important points to be made about this definition:

- The law enforcement officer is in a patrol car and therefore presumably recognizable as a law enforcement officer.
- The driver is aware that the law enforcement officer is trying to stop him and resists the attempt.
- The definition itself is silent on why the law enforcement officer is trying to stop the driver. Thus, the definition includes both pursuit for traffic offenses, including speeding itself, and pursuit for felonies. However, the procedures prescribed in the model policy specify that the fleeing driver must be seeking to avoid apprehension for an alleged felony or misdemeanor that would normally require a full custody arrest.
- The definition is silent on vehicle speed. Because risk is ordinarily perceived as rising in direct proportion to speed, speed is a significant issue to be addressed within a pursuit policy. However, even low or moderate speeds in congested areas can create substantial risk.

## II. ELEMENTS OF THE POLICY

The Model Vehicular Pursuit Policy has nine major elements, beginning with the decision to initiate pursuit and concluding with analysis of the pursuit after its completion. Parts of the procedure focus on the individuals involved, like the pursuing officer and the supervisor, other parts on specific tactics and procedural constraints.

The model policy is relatively restrictive, particularly in prohibiting pursuit where the offense in question would not warrant an arrest. Most traffic violations therefore, would not meet these pursuit requirements. It is recognized that many law enforcement officers and administrators may find this prohibition difficult to accept and implement, particularly where a more

permissive pursuit policy has been traditionally accepted.

But in this critical area of pursuit driving, law enforcement administrators must be prepared to make difficult decisions based on the cost and benefits of these types of pursuit to the public they serve. As another national standard in this area states:

*The purpose of hot pursuit is the apprehension of a suspect who refuses to comply with the law requiring drivers to stop upon command. The primary goal of the department is the protection of life and property. To the extent that a hot pursuit exposes any officer, suspect, or member of the general public to an unnecessary risk of harm or injury then hot pursuit is inconsistent with that goal.*[17]

Before a law enforcement administrator adopts a pursuit policy he must examine his underlying beliefs about the value of such pursuits, weigh them in the light of available information, and strike a balance between what is an acceptable level of risk in his community. "Acceptable" risk is not an objective fact but a judgment based on factors such as community attitudes, the geography of the jurisdictions (eg. rural vs. urban), the departments history of accidents, injuries, and legal penalties in pursuits, and the volume and types of arrests resulting from such pursuits, to name a few.

From an overall perspective, based upon available research and the views of many law enforcement professionals, there is not sufficient justification to support the risks of vehicular pursuit in instances involving nonjailable offenses.

### A. Initiation of Pursuit

The decision to initiate pursuit requires a quick judgment by the pursuing officer, weighing the immediate danger to the public created by the pursuit itself against the immediate or potential danger to the public should the suspect remain at large. If that decision finds that the danger of allowing the suspect to escape outweighs the immediate risk to the public, the officer may begin pursuit.

The policy also specifies several criteria that must be met before initiation of the pursuit:

- Suspect exhibits intention to avoid arrest by using a vehicle to flee apprehension for an alleged felony or misdemeanor that would normally require a full custody arrest. This criterion removes ordinary traffic violations—requiring only citation and not arrest—from consideration.
- Suspect refuses to stop at the direction of the officer. Thus the fleeing driver must know that an officer is trying to stop him.
- Suspect would represent danger to human life or cause serious injury if allowed to flee. Thus the balancing test must lead to the conclusion that the risk of allowing the driver to flee is greater than the risk of the pursuit.

The officer deciding whether to initiate a pursuit should also consider four other factors, each of which bears not only on whether to begin the pursuit but upon the speeds at which pursuit may become too risky to continue:

- Performance capabilities of pursuit vehicle
- Condition of road surface
- Vehicular and pedestrian traffic in the area
- Weather conditions

3

## B. Pursuit Officer Responsibilities

The pursuing officer must immediately notify the communications center of the pursuit and of the following facts:

- Unit identification;
- Location, speed, and direction of travel of the fleeing vehicle;
- Description and license plate number, if known, of the fleeing vehicle;
- Number of occupants in the fleeing vehicle and descriptions, where possible; and
- Reasons supporting the decision to pursue.

This information is essential to a decision by the field supervisor assigned to monitor the pursuit on whether to allow the pursuit to continue. It is also essential to decisions about what other units to involve and what alternatives to use.

The model policy contemplates that just one unit will be the primary pursuit unit. The initiating unit begins as the primary pursuit unit but is to reduce the level of pursuit if the fleeing vehicle comes under surveillance by an air unit, if another unit is assigned primary responsibility, or if the officer's vehicle suffers damage or some essential equipment failure.

## C. Communications Center Responsibilities

Upon being notified that a pursuit has begun, the dispatcher or communications center has a number of responsibilities:



normal traffic regulations during pursuit as long as reasonable care is used when driving in a manner not otherwise permitted and the maneuver is necessary to gain control of the suspect.

The reasonable care standard is a tort standard of critical importance in limiting potential liability. There is an emergency exception to compliance with otherwise applicable legal requirements, but not even an emergency will excuse failure to exercise reasonable care under the circumstances.

## F. Pursuit Tactics

The model policy limits pursuit to assigned primary and backup vehicles unless others are specifically authorized to participate by the field supervisor. The policy also states that the departmental policy on deadly force is to be adhered to in all pursuits.

The model policy explicitly prohibits ramming a suspect's vehicle to force it off the road. While it does not address two other tactics—boxing-in and roadblocks—these tactics should be discouraged or prohibited.

## G. Termination of Pursuit

Pursuits may be terminated before apprehension of the suspect by the pursuing officer, by the field supervisor, or by the chief executive officer of the department. The model policy stresses the point that termination of a pursuit may be the most rational means of preserving life and property in appropriate circumstances.



## B. Pursuit Officer Responsibilities

The pursuing officer must immediately notify the communications center of the pursuit and of the following facts:

- Unit identification;
- Location, speed, and direction of travel of the fleeing vehicle;
- Description and license plate number, if known, of the fleeing vehicle;
- Number of occupants in the fleeing vehicle and descriptions, where possible; and
- Reasons supporting the decision to pursue.

This information is essential to a decision by the field supervisor assigned to monitor the pursuit on whether to allow the pursuit to continue. It is also essential to decisions about what other units to involve and what alternatives to use.

The model policy contemplates that just one unit will be the primary pursuit unit. The initiating unit begins as the primary pursuit unit but is to reduce the level of pursuit if the fleeing vehicle comes under surveillance by an air unit, if another unit is assigned primary responsibility, or if the officer's vehicle suffers damage or some essential equipment failure.

## C. Communications Center Responsibilities

Upon being notified that a pursuit has begun, the dispatcher or communications center has a number of responsibilities:

- Notify a field supervisor of essential information about the pursuit.
- Control all radio communications and clear radio channels of all nonemergency calls.
- Receive and record all incoming information on the pursuit and the pursued vehicle.
- Obtain criminal records and vehicle checks of the suspects.
- Coordinate and dispatch backup assistance and air support units, under the direction of the field supervisor.
- Notify neighboring jurisdictions, where practical, of a pursuit that may extend into their locality.

## D. Field Supervisor's Responsibilities

The model policy gives the field supervisor responsibility for monitoring and controlling the pursuit as it progresses, continuously reviewing incoming data to determine whether the pursuit should be continued or terminated. Coordination responsibilities include the following:

- Directing pursuit vehicles or air units in or out of the pursuit.
- Redesignating units as primary, backup, or support.
- Approving, disapproving, and coordinating tactics.
- Approving or disapproving leaving the jurisdiction to continue the pursuit.

## E. Traffic Regulations During Pursuit

The model policy stresses the standard of reasonable care in pursuits. Pursuing officers are to turn on their headlights and all emergency equipment at the beginning of the pursuit. They are to maintain reasonable care, for themselves and for all other persons and property, at all times during the pursuit. Pursuing officers are permitted to suspend conformance with normal traffic regulations during pursuit as long as reasonable care is used when driving in a manner not otherwise permitted and the maneuver is necessary to gain control of the suspect.

The reasonable care standard is a tort standard of critical importance in limiting potential liability. There is an emergency exception to compliance with otherwise applicable legal requirements, but not even an emergency will excuse failure to exercise reasonable care under the circumstances.

## F. Pursuit Tactics

The model policy limits pursuit to assigned primary and backup vehicles unless others are specifically authorized to participate by the field supervisor. The policy also states that the departmental policy on deadly force is to be adhered to in all pursuits.

The model policy explicitly prohibits ramming a suspect's vehicle to force it off the road. While it does not address two other tactics—boxing-in and roadblocks—these tactics should be discouraged or prohibited.

## G. Termination of Pursuit

Pursuits may be terminated before apprehension of the suspect by the pursuing officer, by the field supervisor, or by the chief executive officer of the department. The model policy stresses the point that termination of a pursuit may be the most rational means of preserving life and property. It specifies three circumstances calling for immediate termination of a pursuit:

- Weather or traffic conditions substantially increase the danger of pursuit beyond the worth of apprehending the suspect.
- The distance between the pursuit and fleeing vehicles becomes so great that further pursuit is futile.
- The danger posed to the public, the officers, or the suspect is greater than the value of apprehending the suspect(s).

The first and third of these criteria show that the balancing of values continues throughout the pursuit.

## H. Interjurisdictional Pursuits

Local and regional circumstances throughout the United States vary so greatly that it is difficult to write a general policy governing interjurisdictional relations. The model policy prescribes that a pursuing officer notify communications when it is likely that a pursuit will continue into a neighboring jurisdiction or across a state line. Any such pursuit must comply with the department's pursuit agreement and state law.

## I. Pursuit Analysis

The final step of the model policy's procedures is for the field supervisor to prepare a comprehensive analysis of the pursuit and forward it to the chief executive officer of the agency. Such a comprehensive review should address the following issues:

- What was the reason for the pursuit?
- What were the conditions of the pursuit (e.g., traffic condition(s), time of day, vehicle speed(s), number of officers involved, number of vehicles involved, etc.)?
- During the pursuit, did the actions of the involved officer(s) conform to established department policy?

- Were there any exceptions to the policy? If so, what were they and why did they occur?
- Was any action taken against the suspect vehicle? If so, what circumstances necessitated the use of this action?
- If personnel and/or vehicles from other agencies assisted in the pursuit, how many personnel and vehicles responded and what role(s) did the assisting agencies have in the pursuit?
- Based on the information compiled for this report, did the reporting supervisors find that the pursuit was handled properly or should it have been handled differently?

Development of standard reporting forms would facilitate these reports. When complete, the field supervisor report should be reviewed by the chief executive officer to determine whether:

- The pursuit was necessary and within departmental policy.
- There are training needs to be considered.
- Any policy changes need to be considered.

## Endnotes

[1]Geoffrey P. Alpert, "Questioning Police Pursuits in Urban Areas," *Journal of Police Science and Administration*, 15:298 (1987), p. 300.
[2]*Daniels* v. *Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).
[3]*Parratt* v. *Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).
[4]*Monell* v. *New York City Dept. of Social Services*, 436 U.S. 658, 694-695 (1978).
[5]471 U.S. 1 (1985).
[6]471 U.S. at 11.
[7]471 U.S. at 4-5.
[8]471 U.S. at 18.
[9]471 U.S. at 19.
[10]471 U.S. at 3.
[11]109 S.Ct. 1378 (1989).
[12]109 S.Ct. at 1381.
[13]109 S.Ct. at 1383.
[14]109 S.Ct. 1197 (1989).
[15]109 S.Ct. at 1205.
[16]109 S.Ct. at 1205, fn. 10.
[17]IACP, *A Manual of Model Police Traffic Services: Policies and Procedures* Arlington, VA. 1986.

**Acknowledgement**
This paper was prepared by Hugh Nugent of the Institute for Law and Justice, Alexandria, Virginia.

# Models for Management

| Effective Date | | Number |
|---|---|---|
| May 1, 1987 | | |

| Subject | | |
|---|---|---|
| EMERGENCY VEHICLE OPERATION—HOT PURSUIT | | |

| Reference | | Special Instructions |
|---|---|---|

| Distribution | Reevaluation Date | No. Pages |
|---|---|---|
| | April 30, 1988 | |

## I. PURPOSE
To establish guidelines for hot pursuit, requiring emergency operation of departmental vehicles.

## II. DEFINITIONS
The following definitions apply for the purpose expressed in this policy:
A. Hot Pursuit—an active attempt by one or more police officers to apprehend a suspect operating a motor vehicle, while the suspect is trying to avoid capture by using high speed driving or other evasive tactics such as driving off a highway, making sudden or unexpected movements, or maintaining legal speed but willfully failing to yield to the officer's signal to stop.
B. Serious Felony—a felony that involves an actual or threatened attack which the officer has reasonable cause to believe could result or has resulted in death or serious bodily injury (e.g., aggravated assault, armed robbery, murder).
C. Roadblock—any method, restriction, or obstruction utilized or intended for the purpose of preventing free passage of motor vehicles on a highway in order to effect the apprehension of an actual or suspected violator in a motor vehicle.
D. Primary Pursuing Unit—the police unit that initiates a pursuit or any unit that assumes control of the pursuit.

## III. POLICY
All emergency vehicle operations shall be conducted in strict accordance with existing statutes. Officers engaged in emergency vehicle operations shall utilize both audible (siren) and visual (emergency lights) emergency warning equipment when engaged in hot pursuit.

All personnel operating departmental vehicles shall exercise due regard for the safety of all persons. No assignment shall be of such importance, and no task shall be expedited with such emphasis, that the principles of safety become secondary. There are no tasks in the department of such importance that they justify the reckless disregard of the safety of innocent persons. Departmental personnel will be held strictly accountable for the consequences of their reckless disregard for the safety of others.

## IV. PROCEDURES
Hot pursuit is justified only when the officer knows or has reasonable grounds to believe the suspect presents a clear and immediate threat to the safety of other motorists; has committed or is attempting to commit a serious felony; or when the necessity of immediate apprehension outweighs the level of danger created by the hot pursuit, as in the case of a serious traffic violation such as DWI.
A. Initiating/Primary Unit Responsibilities
1. The responsibility for the decision to initiate hot pursuit rests with the individual officer. The officer initiating a pursuit shall, in all cases, notify the communications center as soon as reasonably possible that a pursuit is underway and provide the following information:
   a. Police unit identification
   b. Location, speed, and direction of travel
   c. Vehicle description, includ-

ing license number, if known

d. The specific reason for the pursuit, including known laws violated

e. Number of occupants

f. Traffic and weather conditions

2. Failure to provide the above information may be cause for the commanding officer/field supervisor to order termination of the pursuit.

3. The initiating or primary unit shall be in field command, and bears operational responsibility for the pursuit unless relieved by a supervisor.

4. The authority of the primary unit pertains to the immediate field operation and is, at all times, subordinate to the command of the field supervisor and commanding officer.

5. The primary unit may maintain pursuit as long as it is safe to do so, or until directed to terminate the pursuit by a supervisor, or the suspect is stopped.

6. The decision to abandon pursuit may be the most intelligent course of action. Officers must continually question whether the seriousness of the crime justifies continuing the pursuit. A hot pursuit shall be terminated under any of the following circumstances:

a. If, in the opinion of the pursuing officer, the commanding officer or the field supervisor, there is a clear and unreasonable danger to the officer and other users of the highway created by the pursuit that outweighs the necessity for immediate apprehension.

b. The suspect's identity has been established to the point that later apprehension can be accomplished, and there is no longer any need for immediate apprehension.

c. The prevailing traffic, roadway and environmental conditions indicate the futility of continued hot pursuit.

d. The pursued vehicle's location is no longer known.

e. The pursuing officer knows, or is reasonably certain, that the fleeing vehicle is operated by a juvenile and the offense constitutes a misdemeanor or a non-serious felony and the safety factors involved are ob-

viously greater than a juvenile can cope with.

7. The termination of a pursuit does not prohibit the following of a vehicle at a safe speed, or remaining in an area to reinitiate pursuit if the opportunity and conditions permit.

B. Assisting Unit Responsibility

1. Assistance will be coordinated by the communications center under the direction of the commanding officer or the field supervisor. The field supervisor and primary unit will be advised of the identity and location of backup units who can assist.

2. The active pursuit will *normally* involve not more than two units: the primary and one backup unit. If more assistance is specifically requested, the amount will be determined by:

a. Nature of the offense

b. Number of suspects

c. Whether the participating units have more than one officer

d. Other clear and articulated facts that would warrant the increased hazard.

3. Only the commanding officer or field supervisor may authorize more than two units to be in active pursuit. All other units will remain aware of the direction and progress of the pursuit but shall not actively participate, and shall not respond or parallel the pursuit on adjacent streets unless specifically authorized to do so.

4. The assisting unit, upon joining the pursuit, shall *immediately* notify the communications center of its identity. If the primary unit is a one-man unit, the assisting unit may assume radio communications responsibility, allowing the primary unit to devote full attention to driving.

5. The assisting unit will maintain a safe distance behind the primary unit, but be close enough to render backup assistance if and when required.

6. Assisting units shall, at all costs, avoid intersecting the path of an oncoming high-speed vehicle.

7. If the primary unit becomes disabled, the assisting unit will become the primary unit. The communications center will advise the field supervisor and other units that a new backup

unit is needed, and the next unit to join the pursuit will be designated the backup unit.

C. Communications Center Responsibilities

1. Receive and record all incoming information on the pursuit and the pursued vehicle.

2. Immediately notify the commanding officer and the field supervisor when a pursuit is initiated.

3. Clear radio channel of any unnecessary traffic and advise all other units that a pursuit is in progress, providing all relevant information.

4. Perform relevant record and motor vehicle checks.

5. Control all radio communications during the pursuit.

6. Coordinate assistance under the direction of the commanding officer or the field supervisor.

7. Continue to monitor the pursuit until it has been terminated.

D. Supervisory Responsibilities

1. Commanding Officer

a. The commanding officer initiating the pursuit shall assume overall command and exercise control through the field supervisor.

2. Field Supervisor

a. Upon being notified of the pursuit, the field supervisor shall verify the following:

1. No more than the required or necessary units are involved in the pursuit.

2. Aerial assistance, if available, has been requested.

3. Proper radio frequency is being utilized.

4. Affected allied agencies are being notified.

b. The field supervisor will continue to direct the pursuit, and approve or order alternative tactics, such as the use of a roadblock, and maintain control until the pursuit is terminated. In the absence of adequate information from the primary or backup unit, the field supervisor may order termination of the pursuit.

c. As with any tactical field problem, it is not necessary that the field supervisor be physically present in order to begin coordination and assert control of the pursuit.

d. The supervisor of the district

where the pursuit ends should proceed to the termination point to provide guidance and necessary supervision.

E. Emergency Vehicle Operation and Tactics

1. *Offensive Tactics*—In the course of pursuit, deliberate contact between vehicles or forcing the pursued vehicle into parked cars, ditches, or any other obstacle, boxing in, heading off, ramming, or driving alongside the pursued vehicle while it is in motion shall be prohibited, unless such actions are specifically authorized by the commanding officer or the field supervisor. Such actions may be approved only when the use of deadly force would be authorized.

   Reckless or hazardous driving maneuvers shall not be duplicated by any pursuing vehicle.

2. *Caravaning*—There shall be no caravaning by field units not directly involved in the immediate pursuit.

3. *Passing*—There shall be no attempt by officers to pass other field units involved in the pursuit unless the passing officer receives specific permission from the primary unit or the field supervisor.

4. *Spacing*—All units in pursuit, whether the vehicle in front of the unit is the suspect vehicle or another police vehicle, shall space themselves at a distance that will ensure proper braking and reaction time in the event the lead vehicle stops, slows, or turns.

5. *Number of Police Vehicles*—No more than two police vehicles will become actively involved in a pursuit, unless specifically directed otherwise by the commanding officer or field supervisor. Other officers should be alert to the pursuit progress and location.

6. *Unmarked Police Vehicles*—Officers operating unmarked vehicles (provided the vehicle is equipped with emergency lights and siren) may engage in *hot pursuit* only when the fleeing vehicle presents an immediate and direct threat to life or property. Whenever a marked vehicle becomes available to take over the pursuit, the unmarked vehicle will withdraw from active pursuit and serve in a support role.

7. *Police Motorcycles*—Officers operating police motorcycles may participate in a hot pursuit only until a marked patrol unit can assume pursuit.

8. *Controlled Access Highways*—Officers shall not pursue suspects the wrong way on interstate or other controlled access highways or divided roadways unless specifically authorized by the commanding officer or field supervisor.

9. *Roadblocks*—The use of a roadblock must be authorized by the commanding officer or the field supervisor. Generally, a roadblock will be employed only as a last resort. The use of a roadblock must be directly associated with the seriousness of the crime for which the suspect is wanted. The roadblock must be clearly visible and provide adequate warning to allow vehicles to come to a safe stop. The roadway shall not be completely blocked unless the use of deadly force would be authorized.

10. *Traffic Control Devices*—Extreme caution must be used whenever officers disregard traffic signs or signals, even though statutes specifically permit such conduct. Officers shall make use of all available warning devices to alert other motorists and pedestrians.

11. *Aerial Assistance*—Aerial assistance will be utilized if available. The air unit shall direct the movement of the primary unit and coordinate assistance of other ground units under the direction of the field supervisor.

F. Interjurisdictional Pursuits

1. The communications center, with the approval of the commanding officer or field supervisor, will notify outside agencies if this department is in pursuit in their jurisdiction. The informing person will specify that the call is either a request for assistance or merely a courtesy notification with no participation desired.

2. Officers shall not become involved in another agency's pursuit unless specifically authorized by the field supervisor, or unless it is clearly demonstrated

that a unit from an outside agency is unable to request assistance, or the emergency nature of the situation dictates the need for assistance. In these instances, all departmental pursuit policies are in effect.

G. Overtaking/Pursuit of Violators
The responsibility for the decision to overtake rests with the individual officer. In arriving at his decision he must carefully consider all factors involved, including the seriousness of the offense, the possible consequences and, most importantly, the safety of the general public. In order to diminish the likelihood of a pursuit, officers intending to stop a vehicle should, when practical, be within a close proximity to the vehicle prior to activating the emergency lights and siren.

During the course of enforcement activities, specific incidents may escalate from routine overtaking situations if the suspect attempts to evade apprehension. If this occurs, applicable hot pursuit policy and procedures apply.

By Order of:

_____

Chief of Police

The IACP model emergency vehicle operation policy is intended to serve as a guide for the police executive who is interested in formulating a written procedure to prevent and resolve potential pursuit problems. The police executive is advised to refer to all federal, state and municipal statutes, ordinances, regulations, and judicial and administrative decisions to ensure that the pursuit policy he or she seeks to implement meets the unique needs of the jurisdiction.

VEHICULAR PURSUITS BY POLICE OFFICERS
1973

WHEREAS, Persons  attempting to  evade arrest  are often the subject of high speed vehicle pursuits; and

WHEREAS, During the course of  these  pursuits  numerous  traffic  laws are violated; and

WHEREAS, Each pursuit results in a continuing condition of extreme hazard to persons involved in the pursuit and others; and

WHEREAS, The hazards increase immeasurably when  the speeds  of the involved vehicles increase and the duration of the pursuit lengthens; and

WHEREAS, One  of  the  most  difficult  problems  confronting  the pursuing officers is how to stop the fleeing suspects; and

WHEREAS, The hazards are,  in many  instances, amplified  by officers firing shots at the fleeing vehicles; now, therefore be it

RESOLVED, That  the International Association of Chiefs of Police, assembled at its 80th Annual Conference in San Antonio, Texas on  September 26,  1973 urges the adoption by law enforcement agencies of a written pursuit policy. *

*The attached Written Pursuit Policy was adopted by the International Association of Chiefs of Police Highway Safety Committee at  its Mid-Year  Meeting held in Gaithersburg, Maryland on July 9-12, 1973.

F-48

PURSUIT POLICY

I. <u>When to Initiate a Vehicular Pursuit</u>

Pursuits should  only be initiated when a law violator clearly exhibits the
intention of avoiding arrest.

Officers intending to make stops shall endeavor to be in close proximity  to
the violator's vehicle before activating emergency equipment thus eliminating
the violator's temptation to attempt evasion.

II. <u>Pursuit Procedures</u>

The emergency equipment (red lights and siren) must be activated not
only to warn the pursued but also to protect the officers and others.

A.    Number of Police Units Participating

Pursuit shall be limited to the initial unit and  a secondary unit.
All other units shall stay clear of the pursuit.

EXCEPTION: If  the  pursuit  is  initiated  by  a two wheel motorcycle
officer he shall abandon the pursuit when a  four wheel  unit joins the
pursuit. The  motor officer  shall proceed  to the termination point of
the pursuit if the suspect is apprehended.

The senior officer of  the  unit  initiating  the  pursuit  may request
additional units to join the pursuit if he deems it necessary.

B.    <u>Control of the Pursuit Unit Initiating the Pursuit</u>

The first responsibility of the unit initiating (primary unit) the
pursuit is  the  apprehension of the suspects without unnecessary danger
to themselves or other persons. Unless relieved  by a  supervisor, the
senior  officer  in  the  primary  unit  shall  be  responsible for the
broadcasting of the progress  of the  pursuit, controlling  the pursuit
tactics  and  deciding  if  the  pursuit  should  be abandoned.  If the
primary unit is unable to continue the pursuit the secondary unit shall
become the primary unit.

<u>Secondary Unit</u>

Officers in  the  secondary  unit shall make the necessary notifications
to assure that no additional units join the pursuit.

C.    <u>Pursuit Driving Tactics</u>

1.    There shall be no paralleling of the pursuit route, unless the
pursuit passes through a  unit's assigned  area.    The paralleling
unit shall  not be operated under emergency conditions (red lights
and siren).

G.  Termination of the Pursuit

Officers of the primary unit are responsible for the arrest of the suspect when the suspect voluntarily terminates the pursuit, or becomes involved in a traffic accident. The secondary unit shall be responsible for backing up the primary unit and making the necessary broadcast to terminate the vehicular pursuit. If the officers of the primary unit become involved in a foot pursuit the senior officer of the secondary unit or the responding supervisor shall be responsible for coordinating any further activity.

H.  Discontinuing the Pursuit

1.  Officers involved in a pursuit must continually question whether the seriousness of the violation reasonably warrants continuation of the pursuit.

2.  A pursuit shall be discontinued when there is a clear danger to the pursuing officers or the public.

Example: When the speeds dangerously exceed normal traffic flow or when pedestrians or vehicular traffic necessitates unsafe maneuvering of the vehicle.

The pursuing officers must consider present danger, seriousness of the crime, length of pursuit and the possibility of identifying the suspect at a later time when determining whether or not to continue the pursuit.

3.  When a helicopter is available and has visual contact with the pursued vehicle the primary unit should consider discontinuing emergency operation (red lights and siren) and allow the helicopter to continue surveillance of the suspect and assume the responsibility of directing the ground units so as to apprehend the suspect without the dangers involved in a pursuit.

4.  All officers involved in vehicular pursuits will be held accountable for the continuation of a pursuit when circumstances indicate the pursuit should be discontinued. Since the driver officer is primarily concerned with the safe operation of the police vehicle, the passenger officer is particularly responsible for advising the driver officer when he feels the pursuit is exceeding reasonable limits.

III. Supervisor's Responsibility

A field supervisor, if available, shall respond immediately to the termination point and assume responsibility for police action at the scene. The supervisor shall critique the concerned pursuit regarding adherence to policy.

**APPENDIX B**

**HIGH SPEED PURSUIT REPORTING FORM**

NORTHWESTERN UNIVERSITY TRAFFIC INSTITUTE

HIGH SPEED PURSUIT REPORTING FORM

IDENTIFYING DATA

DATE OF THIS REPORT: _____ VEHICLE PURSUIT/CASE NUMBER: _____

SUPERVISOR COMPLETING REPORT: _____ DATE OF PURSUIT _____

PRIMARY OFFICERS NAME: _____ BADGE # _____ VEHICLE # _____

SECONDARY OFFICERS NAME _____ BADGE # _____ VEHICLE # _____

SUBJECT NAME _____ RACE _____ SEX _____ DOB _____ CAPTURED:YES ___ NO ___

CHARGES _____

ACCIDENT INVOLVED: YES ___ NO ___: INVOLVING SUBJECT _____ 3RD PARTY _____ OFFICER (NAME) _____

ACCIDENT REPORT NUMBER _____ REPORT ATTACHED: YES ___ NO ___ INVESTIGATING OFFICER/AGENCY _____

SUBJECT INJURY INVOLVED: YES ___ NO ___: DURING ____ AFTER _____ PURSUIT? MINOR ___ SERIOUS ___ LIFE THREATENING ___

3RD PARTY INJURY INVOLVED: YES ___ NO ___: DURING ____ AFTER _____ PURSUIT? MINOR ___ SERIOUS ___ LIFE THREATENING ___

OFFICER INJURY INVOLVED: YES ___ NO ___: DURING ____ AFTER _____ PURSUIT? MINOR ___ SERIOUS ___ LIFE THREATENING ___

ASSESSMENT DATA

PURSUIT TIMES: BEGAN _____ ENDED _____ DURATION OF PURSUIT _____ SUSPECT VEHICLE _____

TERMINATING EVENT: LOST SUSPECT VEHICLE ___ LOST SUSPECT ON FOOT ___ OFFICER VOLUNTARILY TERMINATED _____

SUPERVISOR ORDERED TERMINATION ___ SUSPECT ACCIDENT ___ POLICE ACCIDENT ___ SUSPECT SURRENDER _____

ROADBLOCK ____ LEGAL INTERVENTION (RAMMING) ____ MECHANICAL BREAKDOWN: SUSPECT _____ OFFICER _____

CONTINUANCE OF PURSUIT AUTHORIZED BY SUPERVISOR: YES ___ NO ___ APPROVED BY _____ TIME _____

ROADBLOCK USED: YES ___ NO ___ APPROVED BY _____ TIME APPROVED _____

RAMMING USED: YES ___ NO ___ APPROVED BY _____ TIME APPROVED _____

LOCATION/JURISDICTION THAT PURSUIT BEGAN _____ AND ENDED _____

OTHER AGENCY INVOLVED YES ___ NO ___ OFFICERS KNOWN _____

DISPATCH TAPE RECORDING OF PURSUIT RADIO TRAFFIC REQUESTED YES ___ NO ___ PARTY CONTACTED _____

(PAGE 2, HIGH SPEED PURSUIT REPORTING FORM)

OFFICER/SUPERVISOR ASSESSMENT OF NEED FOR APPREHENSION:  SELECT LEVEL (LOW TO HIGH)  1  2  3  4  5

      1. MINOR TRAFFIC VIOLATION _____

      2. MISDEMEANOR/SERIOUS TRAFFIC VIOLATION (THEFT, RECKLESS DRIVING, RACING, POSSIBLE DUI)_____

      3. MAJOR PROPERTY FELONY/STOLEN VEHICLE ETC._____

      4. ARMED ROBBERY/AGG ASSAULT/CRIMES AGAINST PERSONS_____

      5. DANGEROUS/VIOLENT FELON/EXTREMELY INTOXICATED DRIVER_____

RISK FACTOR ASSESSMENT:

      DAYTIME PURSUIT _____      HEAVY TRAFFIC VOLUME _____      WET/SLIPPERY ROADWAY _____

      URBAN AREA _____      TRAFFIC VIOLATION ONLY _____

      MORE THAN ONE POLICE VEHICLE INVOLVED _____SPEED GREATER THAN 30 MPH IN EXCESS OF SPEED LIMIT_____

      JUVENILE SUSPECT DRIVER _____

"RED FLAG" SITUATIONS ENCOUNTERED DURING THE PURSUIT:

_____SUSPECT DISREGARDS STOP SIGNS OR TRAFFIC SIGNALS AT VIEW OBSTRUCTED INTERSECTIONS

_____SUSPECT OR OFFICER HAS A HIGH SPEED NEAR ACCIDENT WITH OCCUPIED VEHICLES

_____SUSPECT ENTERS AN AREA WITH HEAVY PEDESTRIAN TRAFFIC/CHILDREN PLAYING

_____ALL POLICE OPTIONS WHICH MIGHT CAUSE SUSPECT TO STOP HAVE BEEN EXHAUSTED

_____THE IDENTITY OF THE DRIVER IS KNOWN, AND MAY BE CAPTURED LATER WITHOUT FURTHER ENDANGERING THE PUBLIC.

_____VEHICLE AND OWNER HAVE BEEN IDENTIFIED, AND SUSPECT DRIVER DESCRIPTION IS SUFFICIENT TO ENABLE POLICE
          TO MAKE AN ARREST AT A LATER TIME.

THE SUPERVISOR IS TO COMPLETE A NARRATIVE REPORT OF THE PURSUIT, AVOIDING IF POSSIBLE FACTUAL INFORMATION
ALREADY EFFECTIVELY COMMUNICATED IN THE STANDARD FORM PORTION ON PAGE ONE AND TWO.  SPECIFIC AREAS TO BE COVERED
IN THE SUPERVISORY REPORT ARE:

      1. WHAT WAS THE SPECIFIC REASON FOR THE PURSUIT.
      2. WHAT WAS THE CHRONOLOGY AND PATH OF THE PURSUIT.
      3. WHAT OFFICERS AND AGENCIES WERE INVOLVED IN THE PURSUIT AND TO WHAT DEGREE.
      4. DESCRIBE AND EXPLAIN THE REASONING BEHIND ANY OFFICER ACTIONS WHICH WERE EXCEPTIONS TO POLICY .
      5. PROVIDE ANY ADDITIONAL INFORMATION CONCERNING INJURY AND DAMAGE DEEMED NECESSARY.
      6. PROVIDE AN OPINION AS TO WHETHER OFFICER ACTIONS WERE OR WERE NOT JUSTIFIED.

# Training Key #272

## Emergency Vehicle Operation: Fresh Pursuit

Responsibility for the decision to employ emergency vehicle operations in a "fresh pursuit" rests with each officer. In arriving at his decision, the officer must carefully consider all factors involved, including the seriousness of the offense and the possible consequences of his actions. Most importantly, the safety of citizens is the officer's paramount consideration.

The law permits officers who are engaged in "fresh pursuit" to exceed the speed limit and to disregard other specific traffic regulations as necessary to maintain fresh pursuit of a violator, but only:

- If emergency lights and siren are employed (designating an emergency vehicle) and
- If reasonable care is taken to ensure safety for himself and others.

Even though the officer is legally engaged in fresh pursuit, he is neither relieved of his duty to drive with "due regard" for the safety of all persons nor protected from the consequences of any reckless disregard for their safety. The officer must exercise that degree of care which a reasonably prudent person in the discharge of similar duties and under like circumstances would use. It is understood that the officer's ability to control other motorists is limited by the nature of existing circumstances, but it is his duty to avoid contributing unnecessarily to the danger already created by traffic violators.

When attempting to stop a violator who has not yet begun to flee, the pursuing officer should keep in mind personal safety and try everything within his authority to apprehend the subject without resorting to a high-speed chase. For example, he should utilize his public address systems, spotlights, or wait until the subject parks or stops at a traffic light. It should be remembered that some individuals enjoy being chased by the police solely for the excitement that the experience may yield.

## Pursuit Factors

The definition of high and moderate speeds depends on the vehicle in use, the skill of its driver, and the prevailing roadway conditions. Every patrol vehicle has a maximum speed at which it may be operated safely. Some of the limiting factors are:

- The type and condition of the tires and ambient temperature.
- The brakes related to the known characteristic of fading under severe use.
- The limit of the suspension system to support the vehicle at maximum side thrust.

Every driver has a limit to his ability to safely operate a high-speed vehicle on a given roadway. Some of the limiting factors include:

- Experience and training in high-speed operation.
- The degree of familiarity with the roadway being traveled.
- The degree of understanding of the handling characteristics of the vehicle being operated.
- The visibility and illumination available to the operator in the area being traveled.
- The obstacles, both present and potential, that must be avoided.

Every roadway has a maximum speed at which a particular vehicle may be operated safely. Some of the limiting factors include:

- Condition and type of road surface.
- The presence of rain, snow, ice, loose gravel, or other foreign substances on the road surface.
- The presence of intersections that could allow other vehicles to suddenly and unexpectedly obstruct the roadway.

When the speed of a patrol car nears 100 percent of the maximum of any one of the preceding limits or conditions, that speed is defined as high speed regardless of the actual indicated miles-per-hour. There is little or no margin for error

*Training Key*® published and copyrighted© 1978, by the International Association of Chiefs of Police, Inc., 515 N. Washington St., Alexandria, VA 22314-2357. All rights reserved. No part of this publication may be reproduced, stored in any system or transmitted in any form or by any means electrical, mechanical, photocopying, recording or other means without prior written permission of the International Association of Chiefs of Police, Inc.

when a driver approaches 100 percent of an absolute maximum. A driver's lack of knowledge and understanding of these maximums is of itself a limiting factor.

When an officer operates a patrol car at a speed between 1/2 and 3/4 of any one of the preceding maximums, that speed is defined as moderate speed.

## Fresh Pursuit Procedures

When engaged in "fresh pursuit," the pursuing officer should remember that the sooner the subject is stopped or apprehended the less the opportunity for an accident. Of the utmost importance, the officer should not endanger the public or himself as a result of his driving techniques. When the operator of a pursued vehicle increases his speed or drives in such a manner as to endanger the safety of others, the pursuing officer should immediately activate the siren and emergency light and continuously use both throughout the pursuit.

During pursuit, the officer must adjust his speed and position on the highway as he approaches other motorists until their reactions to his approach become clear. Drivers and pedestrians often respond in unexpected ways to the sudden appearance of an emergency vehicle. The officer must, therefore, be constantly prepared to maneuver appropriately to safely avoid other highway users.

In high-density traffic areas, drivers sometimes have difficulty in determining the direction from which the siren sound is coming. Some drivers, especially if car windows are closed or a radio is playing loudly, may not hear the siren at all. Even the reactions of motorists who do hear the siren cannot be taken for granted. A driver may completely stop in the middle of a traffic lane, blocking the police vehicle's forward progress. A motorist may even try to outrun the police vehicle to a turn off. Others may make no changes in speed or roadway position and continue their driving apparently unaware of the police unit's presence.

To gain the attention of confused drivers, the officer should vary siren pitch, tap the horn, or flash lights to try to establish eye contact. Once eye contact has been established, give hand signals indicating what action the motorist should take. By temporarily deactivating the siren, the confused motorist is given a chance to think and follow the officer's directions.

When initiating a pursuit, the officer must communicate with the dispatcher and other units, relaying information such as the identity and location of his unit, direction of travel, exact reason for pursuit, and other details which will enable other officers in the area, as well as the dispatcher, to assist. Throughout the pursuit the officer must, when safe to do so, maintain communication. While the pursuit officer is transmitting information to the dispatcher and other units, he must keep his voice as normal as possible and speak coherently. In the case of a two-man unit, the passenger should make the radio transmissions. Units that contain prisoners, witnesses, suspects, or complainants should not become engaged in pursuit situations.

Detailed descriptions of the pursued car including its license number and, if possible, occupants should be obtained and broadcast. Even a partial license number is a valuable aid in quick identification. In some cases, the license number could be obtained while following the motorist prior to directing him to stop. If at all possible, the officer should note the license number on his clipboard or notebook. These notes are valuable in the event the subject is able to avoid immediate arrest.

During pursuit, the officer should maintain that distance between the vehicles which enables him to duplicate any sudden turn and lessens the possibility of a collision in the event of a sudden stop. Deliberate contact with the violator's vehicle is not justifiable except when deadly force is permissible to effect an apprehension.

Because of the potential dangers involved, pursuing officers should not pull alongside a fleeing motorist to force the subject into a ditch, curb, parked car, or any other obstacle. It should be noted that if this occurred on a four-lane highway, the danger of sideswipe collision would be increased, and the opportunity for escape would become greater through quick application of the brakes and a sudden turn by the violator.

To avoid being arrested, many motorists will take imperiling chances. Regardless of the extenuating circumstances, the pursuing officer should not duplicate these hazards. In the apprehension of traffic offenders and other violators, an officer must be sensitive to the public's reaction. This means that in all cases, the officer must operate his vehicle in a manner that shows consideration for his own safety, the safety of the violator whom he seeks to apprehend, and, above all, the safety of others who may be using the roadway. Because of the many handicaps he encounters, the pursuit officer must recognize and accept the fact that he will not be able to successfully apprehend every motorist he decides to stop.

Units responding to assist should concentrate on covering the streets parallel to the one the pursuit is on, thus creating a "boxing in" effect to discourage the violator from continuing his flight. This technique is also advantageous when the violator is able to elude the immediate pursuit vehicle, or if the violator abandons his vehicle and flees on foot. If the violator should abandon his vehicle and flee on foot, the pursuit officer should, before giving foot pursuit, notify the dispatcher of his location, remove his ignition keys, and quickly check the violator's vehicle for other occupants within it.

**Use of Firearms.** Each officer should use only the minimum amount of force which is consistent with the accomplishment of his mission. He should exhaust every other reasonable means of apprehension or defense before resorting to the use of firearms.

An officer is justified in firing at or from a moving vehicle during fresh pursuit, only: (1) to defend himself or another from an attack which the officer has reasonable cause to believe could result in death or bodily injury, or (2) to effect the arrest or prevent escape of an extremely dangerous felon when every other means of effecting the arrest or preventing the escape has been exhausted, provided that lives of innocent persons are not endangered.

The safety of innocent bystanders should be the primary factor in an officer's determination to discharge a firearm at or from a moving vehicle. The following series of factors must be weighed first: ricochets, danger of a car out of control, and the safety of others.

In practical terms, firing a weapon at or from a moving vehicle is almost without exception a fruitless act. If the officer is driving while attempting to fire a weapon, control of his vehicle may be lost. In addition, the officer may find himself with an empty weapon when he suddenly needs it to defend his life.

When a suspect is fleeing from the scene of a crime in a moving vehicle, or the officer is himself in a moving vehicle,

2

it is best to attempt to apprehend the subject through the use of police communications media and cooperative police work rather than to shoot at the vehicle. Except in the most extreme cases, shots fired at or from a moving vehicle are to be avoided.

**Abandoning Pursuit.** The pursuing officer must at all times use his best judgment in evaluating and reevaluating the chase and make a continuous appraisal of it in deciding whether he should continue the pursuit. The element of personal challenge should never enter into the officer's decision. The decision to abandon pursuit is, under certain circumstances, the most proper course of action. Officers should discontinue any chase when:

- The hazards of exposing the officer and the public to unnecessary dangers are high.
- The environmental conditions indicate the futility of continued pursuit.
- The offense is a misdemeanor and the identity of the violator is known.

The pursuing officer knows, or has reason to believe, that (1) the fleeing vehicle is operated by a juvenile who has committed a misdemeanor or a non-violent felony, such as Unauthorized Use of a Vehicle, and (2) the safety factors involved are obviously greater than a juvenile can cope with.

It is difficult to describe exactly how a fleeing motorist can be apprehended, except that it must be done legally and safely. It is also difficult to list any particular traffic regulations that pursuing officers should not disregard. Nor can one set a safe, maximum pursuit speed or designate the limit of the number of police vehicles involved. Each individual chase is unique. The pursuing officer must rather quickly call upon his training and overall experience; bear in mind the policy, procedures, and guidelines of his agency; and apply them collectively to the existing circumstances. If the officer feels certain that his "fresh pursuit" is justified according to the established criteria and it can be performed with reasonable safety, he should continue with his attempt to apprehend the suspect. The officer must, however, exercise the maximum of caution for all concerned. Every endeavor should be made to handle pursuit with such care and finesse that it can be justified rationally as being helpful rather than hazardous to highway safety.

## Pursuit Tactics

Although most police cars are now purchased with a police package which includes a powerful engine and suspension components superior to those supplied with ordinary passenger cars, the officer's vehicle is not a racing car. Road and track racing permits drivers to traverse the same roadway time and time again until each competitor is thoroughly familiar with every section of the track and its individual characteristics. Racing cars can be made to "break traction" at will through adjustments. But no officer can become that knowledgeable of his beat or expect his police vehicle to perform like a racing car. Therefore, even though traffic conditions permit the ultimate in speed over a highway in a pursuit, the officer's objective should be to cover the ground as quickly as possible while retaining full control. If he is pursuing a fleeing driver, the officer need only keep up and wait until it is the pursued who miscalculates.

In pursuit driving, the officer should seldom drive so forcefully that he causes his vehicle to skid. If the officer's vehicle begins to skid, he is exceeding the limits of his vehicle or the roadway. In pursuit driving let the pursued make those mistakes skidding means loss of time and a spinout or running off the road will surely follow unless the driver slows.

Speeds must be reduced when the roadway surface coefficient of friction has been significantly reduced because of surface materials or extreme heat on blacktop roads. Any materials which impede contact between the road surface and the police vehicle's tires reduce the safe speed at which the roadway may be traveled. Water on the roadway can cause the police vehicle's tires to rise off the roadway at speeds as low as 35 miles per hour.[1] Blacktop roads become plastic during extremely hot weather and suffer significant declines in their coefficient of friction.

The quickest way around a corner or through a curve is to follow the most shallow arc possible, with the midpoint of the arc adjacent to the apex of the corner, or curve. The officer should use as much as possible of the roadway's width both before and after the curve - but only when that route is clearly visible from its beginning to the point at which the emergency vehicle has returned again to the right side of the roadway. It is sometimes possible to follow a nearly straight line through an "S" curve, but again the whole section of the roadway must be visible and free of obstructions. Necessary braking should be performed prior to entering the corner, and acceleration should be gradually increased through the curve to prevent spinout.

At times the officer finds it necessary to drive over sharp humps, such as railroad grade crossings, culverts, and even some cross streets. At high speeds, the vehicle bumper or frame may strike the pavement on the far side as the car comes down off the hump. It is possible to reduce these hard landings by jabbing the brakes hard for a split second when the front wheels are just cresting the hump. Under ordinary driving, application of the brakes causes the front of the car to dip. When cresting a hump the same forces are initiated, but the result is to reduce or dampen the upward motion of the car and provide a less severe and safer landing.

Certain factors that influence an offender to flee can actually be controlled. The offender may attempt to escape if the officer is a considerable distance behind or is not overtaking rapidly, the highway ahead of the violator is relatively clear of traffic, or there is an opportunity to take evasive action when out of the officer's sight. The officer should act to reduce or eliminate these circumstances. He should begin his pursuit as soon as possible and overtake as quickly as is safe, delay operating his emergency lights or siren until close to the offender if this action is safe, signal the violator to stop when his way is obstructed by other traffic, and try to keep the violator is sight at all times.

If the officer loses sight of the pursued vehicle, there are clues which the alert officer can use to determine the violator's travel direction. If there are other people in the vicinity, the officer would be advised to proceed in the direction they are looking. Some persons may assist the officer and point out the travel direction of the suspect. There may be a dust cloud that the pursued vehicle has left, or skid marks may be visible at corners, intersections, driveways, or curves. A very obvious cloud of dust may indicate that the violator has left the roadway, probably through loss of control. If the officer rounds a corner and the subject's car has disappeared, but probably could not have reached the next corner before the officer's ar-

tempting to escape on foot or awaiting the officer's departure. Other units may now be called to assist in a search of the immediate area.

## Legal Impact Upon Officers

Exceeding the limits of authority or acting contrary to laws, departmental procedures, or training can subject the officer to possible prosecution. Actions can be brought by local prosecutors, injured persons, or his own police agency through its disciplinary procedure for any wrong the officer commits during a pursuit. Also, federal prosecutors have been bringing charges against officers in federal courts for civil rights violations for causing death, injury, or property damage in pursuits wherein excessive force to effect an arrest was applied. If an officer does not follow state laws, departmental orders, and training guidelines, he can be charged administratively, in state courts, and in federal courts.

## The Obdurate Violator

An officer may occasionally find himself faced with the "obdurate violator." This is a person who, because of a quirk of personality or ignorance, believes that he has "committed no offense" and does not have to stop for the officer. Therefore, he continues on his way and refuses to stop, although his speed is normal and his driving is otherwise lawful. The situation is not dangerous, and the only reasonable choice for the officer is to remain behind while operating emergency lights and siren. The obdurate violator may become tired of the noise and stop. If he does not, the officer should continue to follow and radio for another unit. If the violator approaches other traffic which has stopped and all traffic lanes are occupied, the officer should wait for the offender to stop behind the other traffic and then alight from his vehicle. Two courses of action are open to the officer at this point. He may either direct that other drivers remain stopped to hold the violator temporarily or approach the violator on foot to begin the enforcement contact. Although the experience is frustrating, the obdurate violator as described above is not a reckless driver and, in most instances, not a threat to the safety of the officer.

## Escorts

Vehicle codes permit authorized emergency vehicles to operate emergency signaling devices and exercise privileges under the law, but there are no exemptions for other vehicles. Thus, escorting non-emergency vehicles through traffic is not recommended. If the emergency is critical, for example, a critically injured person must be transported to a medical facility without awaiting the arrival of an ambulance, then the officer should carry that person in his police car. In addition, the driver of the other vehicle should be firmly directed by the officer not to attempt to follow the police vehicle on its emergency run.

## Summary

Skilled driving of a vehicle in emergency circumstances is essential for the officer. The best emergency vehicle operator is the one who puts safety first; understands the laws of his jurisdiction's vehicle code as they apply to emergency vehicles; is aware of the degree of force which is permissible to effect arrest or prevent death or injury; thoroughly understands his department's vehicle emergency operations procedures; stud-

ies the highways and traffic conditions of his beat and adjacent areas so he can drive swiftly but safely; and whose attitude toward pursuits is such that he neither believes that they are for amusement nor feels that he must always succeed in apprehending the violator.

## Endnotes

[1] This is known as hydroplaning. At what point the tires can be completely on top of the layer of water and lose contact with the pavement depends on tread depth, tire pressure, smoothness of the roadway and depth of the water.



rival, then the offender has probably run to ground nearby. The officer should immediately stop and listen for the sound of the departing offender. If the suspect's vehicle cannot be heard, it is likely that he is not far away and parked, perhaps now atcan

# Discussion Guide

1. If the police vehicles wheels leave the roadway, the officer will have to perform an off-road recovery. This be dangerous unless performed properly.

A. No Obstacle
- hold the steering wheel firmly
- steering may be difficult if there is a significant difference between the level of the roadway and the shoulder; or if the composition of the roadway and the shoulder are significantly different the vehicle may pull to one side
- check traffic ahead and to the rear
- reduce speed by easing off the accelerator
- if brakes must be applied to reduce speed, brake very gradually
- if shoulder is gravel or muddy, skidding is a strong possibility
- center vehicle over road edge
- activate appropriate turn signal
- ease back on the roadway

B. Approaching Obstacle
- if the operator must avoid an obstacle, he should steer sharply toward the road
- turn steering wheel about 90 degrees while accelerating slightly
- the two main dangers are skidding and ending up in opposing traffic lanes

2. At the beginning of every shift, the officer should inspect his assigned patrol vehicle unless he is its only driver. If he is the sole driver, the officer's inspection need not be daily but at least often enough that all equipment subject to wear and breakdown can reasonably be assumed to be in good working order at the beginning of each day.
- tires should be inspected for wear and pressure
- the emergency signals, siren, and lights must be functioning in their approved condition
- all other lights, the steering and suspension systems, including shock absorbers, must be in good working order
- all items carried in the passenger compartment of the vehicle must be secured so that none will come loose during violent maneuvering
- the fuel and engine oil must be sufficient to last out the shift
- especially for operating during darkness, at dawn, or dusk, and when weather conditions will cause condensation inside and cause precipitation outside, all window glass should be scrupulously cleaned of dirt and film on both sides
- the officer's restraint system should be in good condition, and he should be secured by at least the lap belt at all times when the vehicle is in motion

3. The officer should complete a circuit of his beat as soon as possible after coming on duty, covering at least the major roads and as many of the minor highways or streets as possible, in order to become aware of every condition of traffic, roadway, and other environmental factors that could possibly affect his driving.
- drive through unfamiliar neighborhoods or areas in order to learn their characteristics
- know safety factors which are subject to change by time of day, day of week, period of the month, season of the year, and weather condition
- know where water may be running across the highway, where ice forms under certain weather conditions, and where gravel trucks drop parts of their loads.

4. While in pursuit of a violator, it is a natural tendency to concentrate on the violator's vehicle. The more serious the violation and the greater the speed of the chase, the greater is this fixation on one object. Of course, this can increase the danger to the police officer if his attention is dominated by sight of the violator's vehicle. The specific dangers are that:
- the officer may go into a corner too fast
- the officer may fail to notice other vehicles or pedestrians



# questions

The following questions are based on material in this *Training Key*®. Select the best answers.

1. An officer is operating his vehicle at maximum speed when:

   *(a) Traveling at speeds of more than 100 mph.*
   *(b) He has reached the maximum limit of his driving ability, the vehicle's performance, or the roadway conditions.*
   *(c) It is apparent that the violator cannot be caught.*
   *(d) He enters a section of roadway highly congested with traffic.*

2. The obdurate violator is best characterized as:

   *(a) Being a threat to the safety of the police officer.*
   *(b) A hazard to other highway users.*
   *(c) An eccentric personality.*
   *(d) A violator who has something to hide.*

3. In determining whether to fire at or from a moving vehicle, the police officer's primary consideration should be:

   *(a) The likelihood that the violator will otherwise escape.*
   *(b) The dangerousness of the fleeing violator.*
   *(c) The distance from the target.*
   *(d) The safety of innocent bystanders.*

# answers

1. (b) Whenever one of the conditions of driving has been pushed to the maximum safety limit, the officer should reduce the driving hazard.

2. (c) This type of driver is essentially harmless and should be considered as merely a traffic violator with an unusual personality.

3. (d) The safety of others is always the first consideration when deciding whether to use a weapon.

# have you read?

*A Manual of Police Traffic Services* Policies, Procedures and Rules, IACP, Gaithersburg, Maryland, 20760.

The IACP traffic manual, consisting of three volumes (one each on policies, procedures, and rules), was created to serve as a guide to police agencies in establishing traffic policy and procedures. The manual contains recommendations related to traffic law enforcement, accident investigation, control and direction of traffic,





**TARAS, Inc.**

**T**raffic
**A**ccident
**R**econstruction
**A**nimation
**S**imulation

*Traffic Safety Consulting*

1731 Bent Tree Court
Granbury, Texas 76049
Phone: (817) 573-0646
Fax:  (817) 573-0648
E-mail:  Jhpainter@aol.com
License # A-08332

## RECORD OF EXPERT TESTIMONY – SUMMARY
### (Last Update 6-1-21)

To Whom it May Concern:

Mr. Painter first testified as a court qualified traffic accident reconstruction expert in 1980.

Mr. Painter has testified as a court qualified traffic accident reconstruction, human factors, and police emergency vehicle operator as follows:

As an expert in trial proceedings 65 times:

- ➢ 29 times on behalf of Plaintiff
- ➢ 27 times on behalf of Defendant
- ➢ 3 times on behalf of Criminal Prosecution
- ➢ 6 times on behalf of Criminal Defense

As an expert in deposition proceedings 111 times:

- ➢ 57 times on behalf of Plaintiff
- ➢ 54 times on behalf of Defendant



## IACP LAW ENFORCEMENT POLICY CENTER

# Vehicular Pursuit

### Concepts and Issues Paper
### December 2015

## I. INTRODUCTION

### A. Purpose of the Document

This paper is designed to accompany the *Model Policy on Vehicular Pursuit* established by the IACP Law Enforcement Policy Center. This paper provides essential background material and supporting documentation to provide greater understanding of the developmental philosophy and implementation requirements for the model policy. This material will be of value to law enforcement executives in their efforts to tailor the model to the requirements and circumstances of their communities and their law enforcement agencies.

### B. Background

Currently, there are no comprehensive national statistics that provide data on all of the police pursuits in the United States. However, Login, Inc. has developed *Pursuits*, a database for collecting voluntary information regarding police pursuits. Based on the most recently published *Pursuits* data examining over 2,000 law enforcement pursuit incidents from 2011 to 2012,

> *[T]he majority of recorded pursuits were short in both duration and distance. More than two thirds of the recorded pursuits…started with an initial violation involving a traffic violation . The majority of pursuits recorded for 2011 and 2012 took place in urban or suburban settings on dry/ clear roads in light traffic. The highest percentage of pursuits took place at night between the hours of 10:00 p.m. and 3:00 a.m.*

> *Pursuits were most often terminated because the driver stopped his or her vehicle. When law enforcement intervention was used to terminate a pursuit, the preferred method was the use of a tire deflation device. More than 75% of recorded pursuit incidents in 2011 and 2012 involved male suspects. Most commonly, pursuit suspects were between the ages of 19 and 35…*

> *There were no injuries to law enforcement officers in 97% of recorded pursuits in 2011 and 99% of pursuits for 2012, and no law enforcement fatalities in the pursuits recorded for either year. Of the 11 fatalities reported in the two-year span, 7 were suspects or passengers in the fleeing vehicle, and 4 were uninvolved persons.*

> *Law enforcement agencies reported [property] damage in 7% of recorded pursuit incidents in 2011, and 6% in 2012. Suspects experienced [property] damage in 26% of recorded pursuits in 2011, and 30% of recorded pursuits in 2012. Uninvolved persons experienced property damage in 6% of reported pursuits in 2011, and 8% in 2012.[1]*

The purpose of this document is to assist law enforcement agencies in pursuit management by examining some of the most significant issues involved in vehicular pursuits and the law applicable to injuries resulting from vehicular pursuits.

---

[1]   Mead, Gerad. *Pursuits: Data that Drives Safety. An Examination of More than 2,000 Law Enforcement Pursuit Incidents from 2011 and 2012.* 2013 Edition. http://www.loginapursuits.net/2013%20Executive%20Summary.pdf

A publication of the IACP Law Enforcement Policy Center
44 Canal Center Plaza, Suite 200, Alexandria, VA 22314

This document is the result of work performed by the IACP Law Enforcement Policy Center. The views and opinions expressed in this document are sanctioned by the center's advisory board and do not necessarily represent the official position or policies of the International Association of Chiefs of Police.

## II. THE LAW

Every officer must be aware of the law regarding pursuit of a fleeing vehicle, and every agency must ensure that its policies and procedures are consistent with the law.

Today, most lawsuits instituted against law enforcement agencies are brought under the federal Civil Rights Act,[2] including vehicle pursuit cases. In the past, the federal courts applying federal constitutional law often analyzed pursuit injuries or deaths in terms of the application of deadly force.[3] However, the 1998 Supreme Court decision in *County of Sacramento* v. *Lewis* announced a new standard of liability for civil rights cases involving vehicular pursuits by police.[4] These standards are based upon a theory of deprivation of due process.

In *Lewis*, Sacramento County (California) deputies were pursuing a motorcycle upon which the deceased, Lewis, was riding as a passenger. The operator of the motorcycle, which was traveling at high speed, was attempting to elude the deputies when the motorcycle overturned. One of the patrol cars skidded into Lewis as he lay on the road, killing him. The lawsuit was brought under §1983 of the Civil Rights Act, alleging, among other things, deprivation of Lewis's Fourteenth Amendment due process right to life. The lower court held in favor of the defendant county and deputy, but the Ninth Circuit reversed that decision, holding that the test for due process liability in police pursuits should be deliberate indifference to, or reckless disregard of, a person's right to life.[5]

Upon appeal to the Supreme Court, the Court acknowledged that deliberate indifference is the standard by which many civil rights claims are judged. For example, deliberate indifference to the medical needs of detainees. However, the Court said different constitutional rights have different burdens of proof for liability, and that where the claim is based upon a Fourteenth Amendment substantive due process violation, liability will be found only where the action of the deliberate indifference is so egregious that it "shocks the conscience."[6]

This case was interpreted by many in law enforcement as blanket approval for all police pursuits. However, while the decision is certainly favorable to law enforcement in one sense, it must not be misunderstood. In particular, it must not be thought to be a license to engage in high-speed pursuits without thought of the consequences. Note the following aspects of the case:

1. The deceased was a fleeing suspect, not an inno-cent motorist or pedestrian. The Supreme Court did not indicate whether the *Lewis* rationale would be applicable to plaintiffs of the latter types.
2. The death occurred as a direct result of the loss of control of the fleeing subject's vehicle. Even though the deceased was a passenger, rather than the operator of the motorcycle, this factor may be significant.
3. The decision was based upon one narrow ground, that is, Fourteenth Amendment substantive due process. The Court said that under such claims, the test is whether or not the official conduct "shocks the conscience." It does not affect liability in other types of actions, even other civil rights actions. If a suit is brought upon other grounds, such as a "seizure" involving unlawful use of deadly force, other standards may apply.
4. What "shocks the conscience" depends upon the facts of the individual case.
5. State court tort actions are not subject to the "shocks the conscience" standard, or even to the "deliberate indifference" standard.
6. The Court in *Lewis* did not approve the conduct of the deputies; indeed, the opinion criticizes their conduct. The Court merely says that the plaintiff did not meet the required burden of proof. The fact that a plaintiff does not meet a required burden of proof does not preclude a department from bring-ing disciplinary action against an officer or finding him or her liable on another count or another type of action where the burden of proof is less.

Where a pursuit has resulted in injury or death, it is entirely possible for a plaintiff to bring the action as a common-law personal injury action or statutory wrongful death action in a state court under state law. In such actions, the plaintiff may need to prove only that the police were negligent in conducting the pursuit in a manner that resulted in injury.[7]

A 2007 Supreme Court decision added additional legal insight and interpretation of the law regarding police pursuits. In *Scott* v. *Harris*, the Court weighed the reasonableness of Deputy Scott's decision to terminate a

---

[2]   See 42 U.S.C. § 1983.

[3]   The issue in these cases has often been whether the pursuit con-stitutes a "seizure" under the Fourth Amendment and whether the "seizure" involves the unlawful application of deadly force. See, e.g., *Brower* v. *County of Inyo*, 109 S. Ct. 1378 (1989). As to the rules generally applicable to the use of deadly force by police to stop fleeing suspects, see *Tennessee* v. *Garner*, 471 U.S. (1985) and the cases based upon that decision.

[4]   *Sacramento* v. *Lewis*, 523 U.S. 833 (1998).

[5]   The "deliberate indifference" standard has been applied in a number of civil rights suits against police. See, e.g., *City of Canton* v. *Harris*, 109 S. Ct. 1197 (1989).

[6]   *Rochin* v. *California*, 342 U.S. 165, at 172 (1952).

[7]   In a number of states, simple negligence is not enough to render the police liable; gross negligence or some higher degree of fault must be shown. However, most state laws permit recovery upon a showing of fault much less than that required in a federal civil rights action.

2

high-speed pursuit by bumping the suspect's motor vehicle from behind, causing it to crash and rendering Harris a quadriplegic.[8] The justices viewed the in-car camera video of the pursuit, which clearly refuted the plaintiff's contention that he was not driving in a reckless manner. On the contrary, the video showed the plaintiff racing down two lane roads at night at speeds that were "shockingly fast," swerving around more than a dozen other vehicles, crossing the double yellow line, and forcing cars in both directions of travel to the shoulder of the road in order to avoid being hit. The plaintiff ran multiple red lights and traveled for a considerable time in the left-hand turn only lane.

The Court found that the deputy's actions were reasonable under the Fourth Amendment when considering not only the number of innocent individuals involved but also the culpability of the plaintiff who intentionally placed himself and others in danger. Weighing the lesser probability of killing or injuring numerous persons against a greater probability of injuring or killing one person, the Court found the deputy's actions to be reasonable. The Court also rejected the plaintiff's notion that terminating the pursuit would have better served the interests of the public. The court rejected this argument in saying: "Every fleeing motorist would know that escape is within his grasp, if only he accelerates to 90 miles per hour, crosses the double-yellow line a few times, and runs a few red lights."[9]

## III.  THE PURSUIT DECISION

The primary mission and sworn duty of every law enforcement agency and officer is to protect and to serve the public. Therefore, one of the first issues to be examined is whether law enforcement pursuits further that end.

It is a statistical reality that law enforcement pursuits can, and frequently do, place the public in danger. Over the years, thousands of innocent people have been injured or killed when struck by a fleeing suspect's vehicle or by one or more of the law enforcement vehicles engaged in the pursuit. In addition, many law enforcement officers are injured or killed in such collisions. Aside from the human tragedy involved for the families and friends of all concerned, these losses heavily affect law enforcement agencies. Aside from the immense emotional impact, loss of an officer's availability, training of new officers, and replacement of damaged or destroyed equipment can be a significant strain on an agency's budget.

Finally, fleeing suspects often suffer injury or death in pursuits. There is a tendency when considering this risk to downplay it on the grounds that the fleeing suspects have "brought it on themselves" by initiating the pursuit. But this view fails to consider that (a) drivers often flee from law enforcement merely out of panic; (b) in a statistical majority of pursuit cases, the person being pursued initially committed a simple traffic violation;[10] and (c) the fleeing vehicle may contain passengers who have committed no offense at all, including children.

There are two arguments that are generally set forth in favor of pursuits. First is the argument that it is necessary to pursue suspects because if it becomes generally known that an agency will not pursue, or that it has severe limitations on pursuit, this will encourage lawbreakers to flee whenever they are approached by law enforcement. Proponents of pursuit argue that such a position would severely limit law enforcement. As noted, the U.S. Supreme Court in *Scott* v. *Harris* recognized this concern.

The second argument is that many traffic stops that first appear routine can and do result in the discovery and arrest of a person who has outstanding charges and/or is a violent and dangerous offender. Many officers can point to specific examples of situations in which this has taken place. While on a statistical basis these situations constitute a minority of all traffic stops, this reality cannot be denied.

Thus, law enforcement officers and agencies are confronted with the dilemma of whether the public is best protected by engaging in a high-speed pursuit or by taking some other form of action. There is no simple answer to this problem that can be applied in all circumstances. Departments must balance the risks, take all of the factors into consideration, and reach a decision that is best suited to their jurisdiction. Banning or limiting pursuits by policy, or providing officers with full discretion in deciding these matters are all legally acceptable alternatives. Policy decisions of this type are limited less by the law than by the professional judgment of the law enforcement executive and the judgment of officers in the field who must interpret and apply that policy.

## IV.  ELEMENTS OF THE PURSUIT DECISION

There are several factors that should be considered in making the pursuit decision. The following does not represent an exhaustive list, but provides examples of some of the more important factors to be considered.

---

[8]   *Scott* v. *Harris*, 550 U.S. 372 (2007).

[9]   *Harris*, 550 U.S. ___, opinion by Justice Scalia. For a more extensive discussion of state and federal court rulings see: 2007 (2) *AELE Mo. L. J.* 101, Civil Liability Law Section - February 2007; 2007 (6) *AELE Mo. L. J.* 101 Civil Liability Law Section - June, 2007

[10]   Mead, Gerad.  *Pursuits: Data that Drives Safety. An Examination of More than 2,000 Law Enforcement Pursuit Incidents from 2011 and 2012.*

## A. Offenses Justifying Pursuit

The first decision that must be made is to identify those offenses that are sufficiently significant to justify a pursuit. As noted earlier, most of the injuries and deaths arising out of pursuits occur in cases in which the initial offense was nothing more than a minor traffic violation. The table below provides information obtained from the *Pursuits* database that supports that assertion.[11]

In its simplest form, the question is this: How serious does an offense have to be to justify engaging in vehicular pursuits that contain inherent risk? As the table below reflects, in the responding agencies, well over 50 percent of pursuits were initiated in response to a traffic violation. Whether this constitutes sufficient grounds to initiate a pursuit depends on the discretion afforded by agency policy and a variety of factors that should be taken into consideration when deciding whether or not to pursue.

An agency may choose to adopt a policy that permits high-speed pursuit only when the fleeing driver is known or reasonably suspected of committing a dangerous felony; or the agency may establish a more liberal, less restrictive policy that leaves this decision up to the individual officer. Thus, an agency may choose to set flexible limits as to the degree and nature of the offense that justifies initiation of a pursuit, allowing the ultimate decision to depend upon other circumstances.

## B. Alternatives to Pursuit

Whether an offense or suspected offense justifies a pursuit depends in part on the type of pursuit to be employed. Today, with modern equipment and training

[11]   Dr. Cynthia Lum and Mr. George Fachner, *IACP Police Pursuit Database: Police Pursuits in an Age of Innovation and Reform*, IACP, Alexandria, VA, September 2008. This document contains a wealth of information on police vehicular pursuits compiled from an analysis of 7,737 pursuit records entered into the IACP database from police departments between February 2001 and May 2007 when the data was downloaded for analysis.   http://www.theiacp.org/Portals/0/pdfs/Publications/Police%20Pursuit.pdf

most agencies are in a position to choose between several alternative courses. A variety of tactics are often available that do not involve the risk of the classic high-speed pursuit. The traditional high-speed pursuit may be necessary in some instances; however, it should be employed only when other alternatives are not available or until such time as the lower-risk techniques can be employed. These alternative tactics may include the following:

- *Air Assets.* The availability of air assets such as helicopters may make it possible to keep the suspect in view without the necessity of a high-speed surface pursuit.

- *Additional Surface Assets.* The pursuit situation may also be affected by the number and type of surface assets available to assist the primary unit. For example, a jurisdiction that has only one patrol vehicle available has fewer options than a jurisdiction that can call in additional patrol cars to assist in the apprehension.

- *Roadblocks.* Traditionally, the roadblock has been employed in conjunction with the high-speed pursuit. This creates a danger that the suspect will crash into the roadblock causing injuries or death. Many lawsuits against law enforcement agencies have been generated in precisely this way.[12] But with proper training, preparation and proper configuration, a roadblock can be effectively employed in some situations.

- *Ramming.* Some pursuits have been concluded by using a law enforcement vehicle to ram the fleeing vehicle. However, the probability of death or injury to the suspect or the officer is high, and damage to the patrol car is virtually inevitable. Ramming is a

[12]   See, e.g., *Brower v. County of Inyo*, 109 S. Ct. 1378 (1989) (wrongful death action where officers pursued the deceased suspect at high speed until the suspect crashed into a roadblock formed by pulling a tractor-trailer across a two-lane highway at night).

| Table: Reason Given for Why a Pursuit was Initiated (2008-2015)* | | |
|---|---|---|
| | N (pursuits) | % pursuits |
| Traffic violation | 4,587 | 57.4% |
| Driver believed to be intoxicated (DWI) | 1,001 | 12.5% |
| Violent felony | 628 | 7.9% |
| Vehicle was believed to be stolen | 578 | 7.2% |
| Non-violent felony | 387 | 4.8% |
| Other misdemeanors | 565 | 7.1% |
| Assisting other departments | 252 | 3.2% |
| **Total** | **7,998** | **100%** |

* Data from the *Pursuits* database, January 1, 2008 – May 5, 2015

4

highly dangerous action that is not recommended and indeed should be restricted to only the most dire situations where failure to take such action could reasonably be expected to result in death or serious injury, such as previously discussed in the case *Scott* v. *Harris*. An alternative to ramming is the "Pursuit Immobilization Technique" (PIT Maneuver) which is a physical vehicle contact maneuver designed to terminate a pursuit at lower speeds with limited risk of injury to the officer or those being pursued. The PIT maneuver may be undertaken only by trained law enforcement personnel.

- *Spike Strips & Other Devices.* Spike strips specially designed to bring a fleeing vehicle to a gradual stop by slowly deflating the tires are available to most law enforcement agencies. The use of slow tire-deflation devices is intended as an alternative to more dangerous techniques such as roadblocks, ramming, or use of the PIT maneuver. Other vehicle-stopping devices are also currently available or under development. When they become available to an agency, they offer additional alternatives to the more dangerous techniques.

- *Identification of the Driver or Suspect.* If the identity of the fleeing suspect is known or can be obtained it may not be necessary to pursue at all. For example, where the officers recognize the individual through personal knowledge or information received, or where the license number of the vehicle can be obtained, pursuit may not be vital, since there is a reasonable expectation that the suspect may be apprehended at a later time.

# V. INITIATION OF A PURSUIT

## A. The Balancing Test

The model policy takes the position that an officer may pursue if the following conditions are met:

1. The suspect, if allowed to flee, would present a danger to human life or cause serious injury.
2. The immediate danger to the officer and the public created by the pursuit is less than the immediate or potential danger to the public should the suspect remain at large.

The policy discourages pursuits that are the result of minor traffic violations. However, it does not prohibit such pursuits if the officer reasonably believes that, based on his or her training, experience, and the objective factors at the time, the offending motorist should be stopped. In addition, in general, if the subject can be identified and apprehended at a later time, a pursuit should not be

undertaken.

This is not always an easy decision to make or one that can easily be articulated in agency policy. But it allows officers a reasonable amount of discretion while discouraging pursuits based on violations that do not, on their face, pose a significant risk to the community. These decisions must be made objectively and rationally, and officers must be made aware that injuries and property damage resulting from unwarranted pursuits may result in disciplinary action and civil liability. While a law enforcement officer may have an instinctive desire to pursue a suspected perpetrator, the dangers involved in pursuit make it absolutely necessary that this instinct be subordinated to rational evaluation of risks versus potential advantages.

## B. Factors to Be Considered in the Pursuit Decision

In making the pursuit decision, the officer must take into consideration a number of factors. These include but are not limited to the following:

- *The seriousness of the offense.* As noted earlier, many high-speed pursuits arise over a minor traffic infraction. To risk injury or death to the officer or to the public over such a minimal infraction violates the risk-versus-benefit balancing test described earlier. There will of course be instances in which the officer reasonably suspects that more than a minor traffic violation may be involved and a pursuit may be justified.

- *Known information on the suspect.* As previously mentioned, if the identity of the suspect is known and it is reasonable to believe that he or she can be apprehended without harm to the officer or the public, a pursuit should be avoided. However, if the suspect is known to be a violent offender, a pursuit may be justified.

- *Road configuration, population density, and existence of vehicular and pedestrian traffic.* A pursuit that would be proper on a sparsely traveled interstate highway might be inexcusably reckless in a heavily populated urban area with many pedestrians, in a school zone, or residential community.

- *Lighting, visibility, weather and other environmental factors.* This includes the nature and condition of the road(s) upon which the pursuit will be conducted and the weather conditions at the time.

- *The relative performance capabilities of the pursuit vehicle(s).* Pursuit in a vehicle that lacks the performance to overtake or maintain contact with the target vehicle will necessarily result in excessive risk taking by the pursuing officer, a total failure of the pursuit, or both. Whenever possible,

only pursuit-rated vehicles should be utilized, as they are equipped to handle the vigorous demands of a pursuit.

- *The performance capabilities of the vehicle being pursued.* For instance, pursuits should not be continued when the suspect is riding a motorcycle, as the performance capability of the motorcycle exceed those of the pursuing law enforcement vehicle.
- *Officer training and experience.* Only officers who have received training should participate in a pursuit.
- *The presence of other persons in the police vehicle.* In some instances, persons other than police officers may be present in the police vehicle. These may include arrestees, witnesses to an earlier incident, non-police officials of the jurisdiction, observers of various kinds, or others. It is improper to risk the lives of such persons in a vehicular pursuit. Under exigent circumstances it may be possible to release such individuals in a safe location prior to initiating the pursuit.
- *The presence of other persons in the pursued vehicle.* The same can be said of the presence of persons in addition to the driver in the suspect vehicle, particularly children. The presence of other persons who are not considered suspects of a crime in the suspect vehicle should normally lessen the justification for initiation or continuation of a high-speed pursuit, all other factors being held constant.
- *Other factors.* Some other factors that might be taken into consideration include the availability of additional equipment, the speed and evasive tactics employed by the suspect, and any other condition or situation that would create an unreasonable risk.

## VI. PURSUIT PROCEDURES

### A. Pursuit Operations

The following are some issues and factors that officers should take into consideration prior to and during pursuit operations.

*Communication.* Good communication is essential in a vehicular pursuit. The officer initiating the pursuit should notify communications of the initial reason for the attempted stop; any information concerning the use of firearms, threat of force, or other unusual hazard; the location, direction, and speed of the pursuit; a description of the pursued vehicle and license number, if available; and the number, identity, and description of any known occupants. Communications should be updated on the progress of the pursuit and other pertinent information as it comes available, such as weather conditions and

the presence of other traffic. Communications personnel should notify an available supervisor of the pursuit, clear the channel of non-emergency traffic, relay necessary information to other officers and, where appropriate, other jurisdictions. When available, the secondary unit involved in the pursuit should assume communication responsibilities.

*Emergency Equipment.* At the initiation of the pursuit, the officer operating the pursuing vehicle shall activate the emergency lights; sirens; and, where available, cameras. This equipment should remain activated for the duration of the pursuit.

Vehicle manufacturers have designed vehicles for use during high-speed police pursuits. These vehicles, referred to as pursuit-rated, have increased horsepower, braking, and handling capabilities, as well as specialized tires and suspension systems, among other specifications, that provide an added level of safety to officers during pursuits. Whenever possible, pursuit-rated vehicles should be used during vehicular pursuits.

*Other Considerations.* Police pursuits almost inevitably require that the participating law enforcement vehicles operate beyond the scope of normal traffic laws. Most states exempt "emergency vehicles" (as equipped in accordance with state law) from traffic regulations under specified conditions. Officers may operate the pursuing vehicle in a manner that exceeds normal traffic regulations to the extent they are authorized to do so by state law, departmental policy, and circumstances that are present during the pursuit. This is usually, in effect, an exemption from criminal liability only. Even when in pursuit, officers in most states are still subject to some degree of civil liability if they operate their emergency vehicles inappropriately. With this in mind, the model policy states that no pursuit shall be conducted in a direction against the lawful flow of traffic on a one-way street or lane of a divided highway.

Whenever possible, and unless circumstance dictate otherwise, a pursuit should consist of no more than two vehicles: the primary and secondary units. All other personnel should stay clear of the pursuit unless instructed otherwise by a supervisor. While officers should monitor the progress of the pursuit, caravanning and trailing, to include paralleling, intercepting, and tracking, are prohibited.

### B. Supervisory Involvement

The designated supervisor should be advised immediately by communications of any pursuit. This supervisor should monitor, coordinate, and direct pursuit operations, and should have full authority to terminate the pursuit if circumstances warrant. It is essential that officers in pursuit provide the foregoing information to

6

communications and the appropriate supervisor so that he or she can make reasonable and responsible decisions. In particular, the supervisor is responsible for coordinating and directing activities as needed to ensure that proper procedures are used. This includes ensuring that no more than the necessary number of units are involved; aircraft has been requested, when available and appropriate; the appropriate radio channel is being utilized; and surrounding jurisdictions have been notified.

In particular, barring exigent circumstances, officers should convey their intention or desire to undertake intervention tactics such as ramming or the use of the PIT maneuver to slow and stop the pursued vehicle. Supervisory approval must be provided for the use of such tactics and officers performing these maneuvers must be trained in their use.

Pursuing officers may request the formation of roadblocks or the use of spike strips as deemed necessary and provide information on the best juncture for their placement, but supervisors should be responsible for authorizing their use. The supervisor should also monitor the pursuing unit's compliance with departmental policy, driving tactics, and speed; should determine whether the use of additional pursuit vehicles are warranted; and should make decisions concerning interjurisdictional pursuits and the use of additional resources such as air support.

Once the pursuit has ended, the supervisor should respond to the termination point as soon as possible. The presence of a supervisor may aid in ensuring that officers do not act rashly due to their increased adrenaline. The supervisor can also aid in the proper documentation of the scene. In addition, the supervisor may choose to request that the pursuing officer record the mileage on the pursuit vehicle at the time of termination. This ensures that the officer did not continue the pursuit even after he or she claimed to have stopped.

### C.  Pursuit Tactics

While each pursuit situation may be different and require different tactics and resources, some general principles can be cited for safe pursuit. For example, wherever feasible, marked patrol vehicles should conduct the pursuit. If a pursuit is initiated by an unmarked unit, a marked unit should take over the primary position as soon as possible. In addition, all officers involved in a pursuit must wear a seat belt.

Motorcycles should not be used for pursuit except in exigent circumstances and when weather and related conditions allow. They should disengage when marked patrol units become available. Non-involved officers should not normally follow a pursuit on parallel streets unless authorization is granted by a supervisor.

All intervention tactics short of deadly force, such as spike strips, low speed channeling, and the PIT maneuver should be used whenever possible to do so safely. Only officers who have received appropriate training should use these tactics and only with prior approval from the appropriate supervisor. The decision to use intervention tactics should be made following careful consideration of all the facts known to the officer and only when conditions permit. Consistent with this agency's policy on use of force, officers shall employ only the force option that reasonably appears necessary to confront the situation.[13] Intervention tactics should be used only when the following two conditions are met:

1.  The officer has reason to believe the continued movement of the pursued vehicle would place others in imminent danger of serious physical injury or death, and
2.  The apparent risk of harm to other persons than those in the pursued vehicle is so great as to outweigh the apparent risk of harm involved in using the intervention tactics.

Once the pursued vehicle is stopped, officers shall follow law and agency policy regarding taking the suspect into custody, using only the amount of force reasonably necessary to affect an arrest. Officers should also be aware of the volatile nature of these situations and employ the appropriate officer safety tactics.

### D.  Use of Firearms

Discharging firearms at moving vehicles is prohibited by many agency policies. Other agencies discourage such practices by prohibiting them if they present an unreasonable risk to others. The IACP *Model Policy on Use of Force* states that "Firearms shall not be discharged at a moving vehicle unless a person in the vehicle is immediately threatening the officer or another person with deadly force by means other than the vehicle." Instead of discharging a firearm, it is strongly suggested that an officer instead move out of the path of the oncoming vehicle. Discharging a firearm from a moving vehicle is prohibited in all situations.

### E.  Termination of the Pursuit

Perhaps the most difficult thing for an officer in pursuit to do is to break off the pursuit once it has begun. Almost every officer who has engaged in a high-speed pursuit has experienced "pursuit fixation," that is, the dogged determination to continue the pursuit even though the circumstances would indicate to any reasonable person that the pursuit should be abandoned. To guard against this very dangerous phenomenon, every officer engaged in a pursuit,

---

[13]   See the IACP *Model Policy on Use of Force.*

in conjunction with the appropriate supervisor, should continually evaluate the changing circumstances of the pursuit. They should end the pursuit if it appears that the risks associated with continuing the pursuit have altered to the point that the risk outweighs the potential benefit of continuing. The primary unit or the supervisor may order the termination of the pursuit at any time. In addition, a pursuit should be terminated if the suspect's identity has been determined and immediate apprehension is not necessary to protect the public or officers or if the pursued vehicle's location is no longer definitively known.

As previously stated, supervisory personnel shall respond to the location where a vehicle has been stopped following a pursuit.

### F. Interjurisdictional Pursuits

Pursuing officers must notify communications when it appears that a pursuit will continue into another jurisdiction and communications should immediately notify the neighboring jurisdiction.

When the pursuit extends into another jurisdiction, the responsible supervisor, or the primary unit if the supervisor is not available, shall determine if the other jurisdiction should be asked to assume the pursuit. This decision should be based on several factors to include the distance between the pursuing and pursued vehicles; the speed involved, the pursuing officer's familiarity with the area; and the willingness and capability of the other jurisdiction to assume control of the pursuit. Also, in some remote locations, communications abilities may be limited. If the decision is made that the neighboring jurisdiction should take control of the pursuit, the request shall be clearly relayed to that agency. Clear confirmation of acceptance of control of the pursuit should be obtained.

In all situations, pursuits that travel into a neighboring jurisdiction must conform with the laws of both jurisdictions and any applicable interjurisdictional agreements. However, the action of the involved officers shall be governed by the policy of the officers' own agency. Once control of the pursuit has been assumed by the neighboring jurisdiction, officers of the initiating agency must cease emergency driving and proceed to the termination point.

### G. Pursuits from Other Jurisdictions

As discussed above, in some situations a pursuit may travel from one jurisdiction to another. An agency should participate in a neighboring jurisdiction's pursuit only if requested to do so. Notification of the pursuit by a neighboring jurisdiction should not be construed as a request to participate in the pursuit. When such notification is received, the communications center should clarify that this information is provided as a courtesy only and not as request for participation.

In cases where assistance is requested from a neighboring jurisdiction, the responsible supervisor shall consider available resources and determine the degree of the agency's involvement. When the pursuit is assumed by the agency and where appropriate, the supervisor shall cancel units from the other agency.

### H. Post-Pursuit Procedures

Whenever an officer engages in a pursuit, a report of that pursuit should be filed in accordance with agency policy. The designated supervisor should examine this report and review it with the officer involved. Any pursuit that results in a fatality, personal injury, or serious property damage shall be investigated by personnel who were not directly involved in the pursuit.

In addition, a designated agency supervisor should at least annually analyze all pursuit reports and review videos of vehicular pursuits to evaluate the agency's pursuit operations and to identify any modifications that need to be made to the agency's pursuit policy, training, equipment, philosophical approach, and interjurisdictional issues. This review should occur even if a pursuit did not occur during the designated time period.

### I. Training

The key to abiding by accepted pursuit policy and honing driving skills is training. This means training of all agency personnel who may be engaged in a vehicular pursuit and training of all supervisors and communications personnel who may be called upon to perform their functions in relation to such pursuits.

This should consist of initial training prior to exposure of personnel to pursuit situations and updated training at regular intervals. The periodic updated training should cover any interim changes in agency policy affecting pursuits and the use of any new equipment that has been added to the agency's inventory.

### Acknowledgment

This document was developed by the IACP Law Enforcement Policy Center in cooperation with the IACP Highway Safety Committee.

Every effort has been made by the IACP Law Enforcement Policy Center staff and advisory board to ensure that this document incorporates the most current information and contemporary professional judgment on this issue. However, law enforcement administrators should be cautioned that no "model" policy can meet all the needs of any given law enforcement agency. Each law enforcement agency operates in a unique environment of federal court rulings, state laws, local ordinances, regulations, judicial and administrative decisions and collective bargaining agreements that must be considered. In addition, the formulation of specific agency policies must take into account local political and community perspectives and customs, prerogatives and demands; often divergent law enforcement strategies and philosophies; and the impact of varied agency resource capabilities among other factors. This document is not intended to be a national standard.

IACP Law Enforcement Policy Center Staff: Philip Lynn, Manager; Sara Dziejma, Project Manager; and Vincent Talucci, Executive Director, International Association of Chiefs of Police.

© Copyright 2015. International Association of Chiefs of Police, Alexandria, Virginia U.S.A. All rights reserved under both international and Pan-American copyright conventions. No reproduction of any part of this material may be made without prior written consent of the copyright holder.



Documents provided by Attorney Ruggier on thumb drive (requiring access code), mailed 5/28/21, received via UPS on 6/1/21 at 3:43 PM. Review begins on 6/3/21. Dispatch audio forwarded via e-mail on 6/3/21.



# *VEHICULAR PURSUIT*

# Model Policy

| Effective Date | Number |
|---|---|
| December 2015 | |

| Subject | |
|---|---|
| Vehicular Pursuit | |

| Reference | Special Instructions |
|---|---|

| Distribution | Reevaluation Date | No. Pages |
|---|---|---|
| | | 4 |

## I. PURPOSE

The purpose of this policy is to establish guidelines for the initiation and continuation of vehicular pursuits.

## II. POLICY

Vehicular pursuit of fleeing suspects can present a danger to the lives of the public, officers, and suspects involved in the pursuit. Tactics used to stop a fleeing vehicle may be considered a use of force.  It is the policy of this law enforcement agency to regulate the manner in which vehicular pursuits are undertaken and performed.

## III. DEFINITIONS

*Vehicular Pursuit:* A deliberate attempt by an officer in an authorized emergency vehicle to apprehend a fleeing suspect who is actively attempting to elude apprehension.

*Authorized Emergency Vehicle:* A vehicle of this agency equipped with operable emergency equipment as designated by state law.

*Pursuit-Rated Vehicle:*  An authorized emergency vehicle that is specially designed and equipped for use during high-speed pursuits.

*Primary Unit:* The police unit immediately following the suspect vehicle at a reasonable distance and that assumes primary control of the pursuit.

*Secondary Unit:* Any police unit that becomes involved as a backup to the primary unit and follows the primary unit at a safe distance.

*Trail or Trailing:* The unauthorized following of a pursuit at any distance, to include paralleling, intercepting, or tracking.

*Caravanning:* Direct participation in, or following of, a pursuit by emergency vehicles other than the primary and authorized secondary units.

*Terminate:* To abandon or abort the pursuit.

*Termination Point:* The location where the pursuit comes to a conclusion.

## IV. PROCEDURES

A.  Initiation of Pursuit

1. Pursuit is authorized only if the officer has a reasonable belief that the suspect, if allowed to flee, would present a danger to human life or cause serious injury.  In general, pursuits for minor violations are discouraged.

2. The decision to initiate a pursuit must be based on the pursuing officer's conclusion that the immediate danger to the officer and the public created by the pursuit is less than the immediate or potential danger to the public should the suspect remain at large.

3. Unless a greater hazard would result, a pursuit should not be undertaken if the subject(s) can be identified with enough certainty that they can be apprehended at a later time.

4. In deciding whether to initiate or continue a pursuit, the officer shall take the following into consideration:

   a.  The seriousness of the offense

   b.  Known information on the suspect

   c.  Road configuration (e.g. interstate, divided highway, work zone)

   d.  Physical location and population density (e.g. residential area, school zone, business district)

   e.  Existence of vehicular and pedestrian traffic

   f.  Lighting and visibility

g. Weather and environmental conditions
h. The relative performance capabilities of the pursuit vehicle and the vehicle being pursued
i. Officer training and experience
j. Available equipment
k. Speed and evasive tactics employed by the suspect
l. The presence of other persons in the police and suspect vehicle
m. Any other condition or situation that would create an unreasonable risk

5. A pursuit should not be initiated or engaged in while providing transportation for any person, other than law enforcement officers.

B. Pursuit Operations
1. All emergency vehicle operations shall be conducted following jurisdictional laws and related regulations.
2. Upon undertaking a pursuit, the pursuing vehicle shall activate emergency lights, sirens, and cameras, and they shall remain activated for the duration of the pursuit.
3. Upon undertaking a pursuit, the officer shall notify communications of the
   a. initial purpose of the stop;
   b. any information concerning the use of firearms, threat of force, or other unusual hazard;
   c. location, direction and speed of the pursuit;
   d. description of the pursued vehicle, including license plate number, if known; and
   e. number, identity, and description of any known occupants.
4. The officer shall continuously update communications on the pursuit conditions, location, weather conditions, and presence of other traffic.
5. Communications personnel shall notify an available supervisor of the pursuit, clear the radio channel of non-emergency traffic, and relay necessary information to other officers and jurisdictions.
6. When available, the secondary unit shall immediately notify communications that they are joining the pursuit and should assume responsibility for relaying information to communications.
7. No pursuit shall be conducted in a direction against the lawful flow of traffic on a one-way street or lane of a divided highway.
8. Unless circumstances dictate otherwise, a pursuit shall consist of no more than two police

vehicles: a primary and a secondary unit.
   a. All other personnel shall stay clear of the pursuit unless instructed to participate by a supervisor.
   b. Caravanning and trailing is prohibited. However, officers should monitor the progress of the pursuit and be prepared to assist if directed by a supervisor.
   c. The number of vehicles engaged in a pursuit may be adjusted to fit the situation with supervisory approval.
   d. A supervisor who has joined in the pursuit and supervises the units shall be considered an additional unit.
   e. The supervisor shall consider units from other jurisdictions in determining the number of vehicles participating.
9. Whenever possible, pursuit-rated vehicles should be utilized.
10. The primary unit shall become secondary when the fleeing vehicle comes under air surveillance or when another unit has been assigned as the primary unit.

C. Supervisory Responsibilities
1. Supervisors are responsible for managing all vehicular pursuits to include determining whether the pursuit should continue or be terminated.
2. When made aware of a vehicular pursuit, the appropriate supervisor shall notify communications that he or she is monitoring the pursuit and accepting supervisory responsibility.
3. The supervisor is responsible for
   a. monitoring incoming information;
   b. coordinating and directing activities as needed to ensure that proper procedures are used, to include ensuring that
      (1) no more than the necessary number of units are involved,
      (2) where available, aircraft has been requested,
      (3) the appropriate radio channel is being utilized, and
      (4) surrounding jurisdictions have been notified; and
   c. discontinuing the pursuit when necessary.
4. A supervisor shall respond to the termination point following a pursuit.

D. Pursuit Tactics
1. All officers involved in a vehicular pursuit shall wear a seat belt.
2. Non-involved officers shall not follow the pursuit on parallel streets unless authorized by a supervisor or when it is possible to conduct

such an operation without unreasonable hazard to other vehicular or pedestrian traffic.

3. Available patrol units having the most prominent markings and emergency lights shall be used to pursue, particularly as the primary unit. When a pursuit is initiated by other than a marked patrol unit, such unit shall disengage when a marked unit becomes available.

4. Motorcycles should not be used for pursuits except in extremely exigent circumstances and when weather and related conditions allow. Motorcycle units shall disengage when support from marked patrol units becomes available.

5. All intervention tactics short of deadly force such as spike strips, low speed tactical intervention techniques, PIT maneuver, and low speed channeling (with appropriate advance warning) should be used when it is possible to do so safely and when the officer utilizing such tactics has received appropriate training.

   a. Officers shall employ only the force option that reasonably appears necessary to control the situation.

   b. The decision to use intervention tactics shall be based on careful consideration of all facts known to the officer and should be initiated when conditions permit.

   c. A supervisor's permission should be obtained prior to the use of intervention tactics.

6. Intervention tactics should be used only when

   a. the officer has reason to believe the continued movement of the pursued vehicle would place others in imminent danger of serious physical injury or death; and

   b. the apparent risk of harm, to other than the occupant of the pursued vehicle, is so great as to outweigh the apparent risk of harm involved in making the forcible stop.

7. Firearms shall not be discharged from a moving vehicle.

8. Once the pursued vehicle is stopped, officers shall utilize appropriate officer safety tactics. The suspect(s) shall be taken into custody in accordance with law and agency policy, using only the amount of force reasonably necessary to affect an arrest.

E. Termination of the Pursuit

1. The primary unit and supervisor shall continually reevaluate and assess the pursuit situation including all of the initiating factors and terminate the pursuit whenever it is reasonable to believe the risks associated with continued pursuit are greater than the public safety bene-

fit of making an immediate apprehension.

2. The pursuit may be terminated by the primary unit at any time.

3. A supervisor may order the termination of a pursuit at any time.

4. A pursuit should be terminated if the suspect's identity has been determined, immediate apprehension is not necessary to protect the public or officers, and apprehension at a later time is feasible.

5. The pursuit should be terminated if the pursued vehicle's location is no longer definitively known.

F. Interjurisdictional Pursuits

1. The pursuing officer shall notify a supervisor and communications when it is likely that a pursuit will continue into a neighboring jurisdiction or across the county or state line. Communications shall immediately notify law enforcement in the jurisdiction being entered by the pursuit.

2. When a pursuit extends into another jurisdiction, the responsible supervisor, or the primary unit if a supervisor is not available, shall determine if the other jurisdiction should be asked to assume the pursuit. The following should be considered:

   a. The distance between the pursuing and pursued vehicles and the speed involved

   b. The pursuing officer's level of familiarity with the area

   c. The willingness and capability of the other jurisdiction to assume control of the pursuit

   d. Communication limitations at longer distances

3. If it is determined that the control of the pursuit should be relinquished to another jurisdiction, the request shall be clearly relayed to that agency. Confirmation of their acceptance of control of the pursuit should be obtained.

4. Pursuit into a bordering jurisdiction shall conform to the laws of both jurisdictions and any applicable interjurisdictional agreements. The action of officers shall be governed by the policy of the officers' own agency.

5. Once a pursuit has been taken over by the law enforcement agency of another jurisdiction, the initial pursuing officers shall cease emergency driving and proceed to the termination point.

G. Pursuits from Other Jurisdictions

1. Participation in a neighboring jurisdiction's pursuit is appropriate only in response to a specific request for participation. Mere notifi-

cation of the existence of a pursuit shall not be construed as a request for participation. Upon such notification, the communications center shall clarify whether this agency is being requested to assist in the pursuit.

2. Prior to acceptance of a pursuit from another agency, the responsible supervisor shall determine the degree of this agency's involvement, if any, and provide the appropriate direction.

3. When the pursuit is assumed by this agency and where appropriate, the supervisor shall attempt to cancel units from the other agency.

H. Post-Pursuit Procedures

1. Whenever an officer engages in a pursuit, he or she shall file a written report on the appropriate form detailing the circumstances.  This report shall be reviewed by the appropriate supervisor(s) to determine compliance with policy.

2. Any pursuit that results in a fatality, personal injury, or serious property damage shall be investigated by personnel who were not directly involved in the pursuit.

3. All videos of vehicular pursuits shall be reviewed following the incident.

4. The department shall analyze police pursuit activity at least annually and identify any additions, deletions, or modifications warranted in departmental pursuit procedures. This analysis shall

   a. consider the following implications on the organization:
      (1) Policy
      (2) Equipment
      (3) Training
      (4) Philosophical approach
      (5) Interjurisdictional issues; and
   b. occur even if a pursuit did not occur during the designated time period.

5. Any vehicle involved in a pursuit should be inspected before returning to service.

I. Training

Officers who drive police vehicles shall be given initial and periodic updated training in the agency's pursuit policy and in safe driving tactics.

**Acknowledgment**

This document was developed by the IACP Law Enforcement Policy Center in cooperation with the IACP Highway Safety Committee.

Every effort has been made by the IACP Law Enforcement Policy Center staff and advisory board to ensure that this document incorporates the most current information and contemporary professional judgment on this issue. However, law enforcement administrators should be cautioned that no "model" policy can meet all the needs of any given law enforcement agency. Each law enforcement agency operates in a unique environment of federal court rulings, state laws, local ordinances, regulations, judicial and administrative decisions and collective bargaining agreements that must be considered. In addition, the formulation of specific agency policies must take into account local political and community perspectives and customs, prerogatives and demands; often divergent law enforcement strategies and philosophies; and the impact of varied agency resource capabilities among other factors.  This document is not intended to be a national standard.

IACP Law Enforcement Policy Center Staff: Philip Lynn, Manager; Sara Dziejma, Project Manager; and Vincent Talucci, Executive Director, International Association of Chiefs of Police.

© Copyright 2015. Departments are encouraged to use this policy to establish one customized to their agency and jurisdiction. However, copyright is held by the International Association of Chiefs of Police, Alexandria, Virginia U.S.A. All rights reserved under both international and Pan-American copyright conventions. Further dissemination of this material is prohibited without prior written consent of the copyright holder.

**Summary of Deposition of Officer David Harvey**
**Taken April 26, 2021**
**TARAS Project 1321**
**Means v. City of South Charleston**
**Attorney Duane Ruggier**


**Secondary:** Officer Harvey was the secondary officer involved in the pursuit. Page 4 exhibit index and there are 15 exhibits attached to include the pursuit policy, several photographs, crash report from West Virginia State Police, Bystander video, Use of Force Report, Two videos of pursuit route. Exhibit 3 is Case Report. Exhibit 2 are articles from the Charleston Gazette in 2015, which discussed the potential use of dash cams in the police vehicles.

**FBI:** Page 6, discussion regarding the FBI being called in to review this situation and this officer was cleared. He was at one point asked to provide an interview to the FBI and he told them he would have to clear that with authorities, which would be potentially his own attorney that he retained once he was a subject of the investigation, He ultimately was given permission to go ahead and by that time the FBI had cleared him. Plaintiff's attorney makes this look as though he is dodging making a statement under 5th amendment rules. Yet here we are with a 172-page deposition.

**Degrees:** This officer has two technical college degrees, both in criminal justice administration. He has never been deposed before. He has retained counsel through the Fraternal Order of Police Legal Defense Fund.

**Employment:** Page 22, he says during his employment with South Charleston Police where he is still employed, he has never been suspended as a result of this or anything else. His first police job began in December 2013 in Dunbar. When asked why he became a police officer his answer is "just to help people out. The job is always different. There is always new stuff going on." Dunbar sent him to the state police academy which was four months long. He graduated in August of 2014.

**Pepper:** Page 26, some discussion under the conditions that pepper spray can be administered specific to this process. Under conditions when individuals who are under arrest are being arrested and are noncompliant with orders and putting their hands in waistbands and pockets and so on where they could be accessing a weapon. Dunbar did have dash cams in some of their vehicles. If he were to activate his lights and siren they would automatically engage. You do not have to activate your siren, just the lights for the dash cam to come on. He was at Dunbar for 3 ½ years and went to South Charleston Police Department as it was a larger department with better pay. He came on in 2017 and currently his rank remains the same although he has gone up certain automatic steps regarding pay raises. He is married with one child who is almost 2 years old. His wife does not work. Dunbar had 9 or 10 officer and South Charleston has around 50. He is currently reporting to Captain Rader as he is a member of the Metro Drug Unit and has been for a few months now. He works in a unit that coordinates with DEA.

**Training:** Page 40, bottom, he discusses being trained in vehicular pursuit at the State Police Academy in which the emphasis is given to vehicle control when driving. There was a classroom section. He does not recall specifically being given classroom instruction from the state police as to the conditions under which you engage in pursuit or the conduct through a pursuit. *(That is typically left to classroom with the agency in which they have their own pursuit policy to define those things. He does not say that but that would be typical.)* He defines well from a memory standpoint the conditions under which a pursuit is initiated and the conditions for discontinuing a pursuit and those conditions and situations change as time goes on. During a pursuit there is never a constant condition. *(This would be my comparison of a thermometer and a spike.)*

**Metro:** He used the term metro for the Metropolitan Dispatch Center. He makes the point on page 43 that supervisors will basically monitor the pursuit and will interact in the pursuit only sparingly as they do not wish to tie up airways for the actual conduct of the pursuit.

**Number:** Page 44, he has been involved with perhaps 20 or 30 pursuits, 10 or 15 of those in South Charleston. Page 44, he has been involved in what he calls a handful of pursuits with Corporal Peterson. Perhaps, 5 to 10. He describes on page 49, using a taser in a pursuit but it was ineffective. (He was not asked whether the subject was under the influence.) Page 50, he was tased during training for use of the taser.

**Cruisers:** Page 54, every person on the police department has a take home cruiser. None have dash cams.

**Dash Cams:** Page 55, discussion begins that he recalls there was talk at the community level about whether to put dash cams in South Charleston Police vehicles. Bottom of page 56, he describes how he and a couple other officers purchased their own videos and mounted them in their own cars and did so because they wanted to protect themselves from allegations of misconduct. They all bought the same camera, and they have an SD card which can simply be removed whenever there was something that needed to be preserved. There was an email that went department wide from the chief of police who said without the proper administrative foundations for handling this information that officers were prohibited from having videos in their car.

**Why:** Page 60, When asked, "why did you guys put cameras in your cars?" He answered, "just the same reason you'd have them in general, just so you can document what's going on or whatever.*" (Somewhere in here Officer Harvey and Corporal Peterson, the primary officer on this were those who had purchased their own cameras.)* Page 64 begins with an article from a local newspaper during 2015 where various people are quoted regarding the worth of video cameras with support from the mayor. They talk about having complaints that if they would have had a camera, they could have investigated more effectively. It was during that discussion when officers went out and got their own cameras. Page 65, the attorney asks an invalid question and says, "There is not two sides to a video, are their?" Page 66, there was a plan to buy 40 cameras for each one of the officers. There is nothing in this narrative that talks about who made decisions not to purchase the cameras and why.

**Route:** Page 67, exhibit #3, Case Report, dated May 2nd. Page 12 and 13 is his narrative. His report indicates that Peterson initiated the pursuit on Highway 119 at Trace Fork. He intercepted the pursuit on Rabel Mountain at Split Rail Drive. Bottom of page 68, they use the term, "marked out" as being determined no longer available for calls because you are tied up on something. When this pursuit or pre-pursuit began, he was at the Jefferson Road City Garage. He decides going on Brounland Road and then Emmons Drive, which turned into Dartmouth Ashford Road. During which the motorcyclist continued to look back at them during the chase. The first general description of the motorcyclist going at a high rate of speed around blind curves or at times he would go left of center. It seems to be the Plaintiff's major factor that he once considered as being too dangerous for the pursuit to continue. This was on a weekend morning at 8 AM.

**Left:** Quoted as saying that the motorcycle went over the railroad tracks and did not make the left turn. He seems to be describing the left turn that preceded the railroad tracks in which the motorcyclist must not have placed the proper lean angle to get around that curve. It was during the straight stretch prior to that accident area that the motorcyclists speed maxed out at 60 miles per hour. During most of the other areas the call was that he was at least at one point in the 47 mile per hour category.

**Control:** He did not see the alleged loss of control as it occurred in front of the Peterson vehicle. Given the speeds they were traveling and the conditions he would speculate that it was a loss of control due to speed related issues. The speedometer read 55 to 60 keeping up with the pursuit at that point.

**Strike:** Page 73, he did not witness Corporal Peterson strike the motorcycle with his vehicle and said it would have been impossible from the spacing that he saw in front of him. Now when the motorcycle lost control, he was 15 to 20 yards behind Peterson, earlier on the straight stretch he was probably 30 to 35 yards behind Peterson. Throughout the deposition, plaintiff's counsel attempts to describe the situation as nothing more than a failure to register license plates to the pursued vehicle as being the crime for which Mr. Means is being pursued. This officer makes it obvious that the furtive movements and the totality of the circumstances would lead a reasonable officer to believe that there is a high probability that this motorcycle was stolen.

**Mirrors:** Page 77, What goes unsaid is that the suspect vehicle must not have had mirrors attached or the suspect would not have been turning his head back to see where the police vehicles are. The fact that he could not see where the police vehicles are and had to turn his head around would be impede his ability to operate the vehicle. And Corporal Peterson's choice not to us a siren but only lights on under the conditions then present may have had some application given the need to slow this individual down.

**Reckless:** Page 79, Lieutenant Paskal, at about 4:40 on the audio tape they are reviewing makes a general statement about telling Peterson, "If he goes reckless, just let him go." Although there are no quotations in the text of this deposition.

Page 3

**Speeds:** Page 80, they are on the audio tape at 4 minutes 40 seconds, Page 81, they talk about reporting that the speed is 47 miles per hour. 5 minutes 47 seconds, he is asked if he has heard any sirens on the recording and the officer says no. This officer's call numbers on the tape would be 45.

Page 83, He confirms that there is no channel switching going on for car to car. Everything that is going on is on the primary channel.

**Falling:** Page 84, he did not see anything falling off the motorcycle. At 11 minutes 30 seconds, Peterson is asking dispatch to have an intercept ahead. Apparently, they are talking about the Boone County Sheriff's office and the State Patrol in that area. He confirms they would have a better knowledge of local roads, had the pursuit gone that far. 13 minutes 34 seconds he is describing crossing railroad tracks on Emmons. 14 minutes and 12 seconds, dispatch advises that they are starting to lose radio contact with someone, but he said it was not him. 14 minutes and 50 seconds is when the crash occurs according to the attorney.

**Residential:** Page 90 and through out the video of the pursuit route made by Corporal Peterson days after the collision. The attorney attempts to identify where there are houses that are situated along the roadway and represent this very rural road as a residential area.

**Two:** Page 92, there is a conclusion that there are two people in the Peterson vehicle, one in the passenger seat but this officer says it is not him. He does not know who is in the passenger seat.

**School:** Page 96, there is a discussion of this Saturday morning pursuit about a school zone sign they passed at 8 AM and they see a school. There is no mention that there is any activity around the school at all. The officer says that because of the pandemic at that time there was nothing going on at the school.

**Second:** They began the second pursuit path video. There are two railroad crossings that the police vehicle stops and then proceeds across the railroad tracks. These are crossings as I recall from viewing it where the vehicle is driving parallel to the railroad track and then does an S cross over. 9 minutes and 23 seconds there is a park with a basketball court and picnic tables.

Page 103, plaintiff's attorney is concerned that at 9:45 there is a cemetery off to the left. 13:22 into the second video, arrival at the accident scene. He points out that there is no water in the ditch.

**Exit:** Page 108, shifting from the videos to other items. Witness confirms that he exited his vehicle about the same time that Peterson did or maybe slightly after. The water is 3 feet deep and he uses the phrase that Mr. Means had, "kicked dirt up." Making the water completely murky so they could not see anything. Plaintiff's attorney was attempting to interpret that as being the fact that Mr. Means was kicking his feet or legs. The witness points out that "kicked up dirt" is an expression. Bottom of page 110, he describes what would have occurred not on video over the railroad tracks with Means in the water and being noncompliant. Peterson had to get down in the water and grabbed Means' left hand, which he was trying to pull away and he refused to show him his right hand, at which time Officer Harvey initiated a "quick spirt" or

short burst, defined as under one second of pepper spray into the opening on the helmet. Confirming that the motorcycle helmet did not have a visor.

**Helmet:** Page 113, he did not ever remove the helmet and does not recall Peterson removing the helmet. He is led to believe that it would likely have been EMT personnel. They discuss the fact that Peterson initially handcuffed Means behind his back, which would be appropriate. The Means was complaining of being very cold and his coat he was wearing was saturated so they uncuffed him to remove his coat, after EMTs arrived. Then cuffed him again with his hand in front of him. *(It would have been apparent at that point that the suspect was an escape risk.)*

**Injuries:** He is asked if he knows anything about spinal cord injuries and he referred to his lifeguard training about backboards and C collars. He said they had no indication that there was a spinal injury at the time this individual was resisting and noncompliant. He goes on to say that they never found any kind of weapon on Mr. Means, and they did not search in the mud in the bottom of the ditch for any objects that might have been discarded by Mr. Means with his hands underneath the water. They did not look in that area for a gun or other weapon. In the video, he was the officer who was being accused of stomping on the helmet. He said he did not stomp on the helmet. At 7 seconds, he said it could be him who we see falling in the video. He thinks he was trying to pull Means out of the water and he does not know if that where he would have administered pepper spray or not. It was Officer Peterson who went back to the cruiser, and it was him on the far right where he had his firearm drawn and he believes that was the point where Means was refusing to be compliant and bring his right hand up out of the water.

**Ladies:** Page 122, there was language between the two ladies that are in the automobile behind the cruiser filming the interaction who say they were afraid of being hit. Perhaps in the straight stretch that the motorcyclist and the two police cars may have gone around this ladies' car. *(There is no further definition of this.)* The witness thinks they initially lifted him by his arms and maybe by the back of the jacket. Then later he says it looks as though they each have ahold of a wrist. Page 123, these ladies say that he stomped on his head, and they also say that they tased him but neither officer had a taser.  Plaintiff's attorney attempts to revisit this FBI investigation making it sound like the officer had refused to cooperate with the FBI when all he had done was to seek counsel regarding their requests and then ultimately was approved to give an account which we are deep into here.

**Threat:** Page 124, the plaintiff's attorney attempts to infer that every police officer threatens a suspect by saying who has invoked their right to get a lawyer saying that guilty people get lawyers. He says he has never told anyone that and respects when someone asks for a lawyer. He follows the rules.

**Step:** Page 126, the officer maintains that when he stepped over the helmet, it was simply that, he did not stomp on the helmet. Page 127, he of course did not have these ladies' video at the time he did his reports to review the exact chronology of events.

**Cuffing:** Page 128, while they were still in the area of the water, he grabbed the right wrist of Mr. Means and told him to roll over on his stomach so that he could be cuffed behind his back, and he refused to do so. Means instead, "attempted to grab my right wrist with his left hand."

Page 120, the initial cuffing occurred after they got him across the railroad tracks. His coat was removed, and he was recuffed with his hand in front of him. *(A confusing timeline painted here by the questions.)*

**Train:** Page 129, he indicates the attorney's question is that "at the point you rolled him over, there was no danger of a train, correct?" *(So that would mean it was after they brought him across the railroad tracks. The attorney never investigates the circumstance under which they were in a dangerous or precarious position in the water hole adjacent to the tracks.)*

**Weapon:** Page 130, they describe they never found a weapon.

**Location:** Page 131, they are reviewing the West Virginia State Police Crash Report in which there is an indication that the vehicle came to rest 60 feet to the south beside of the railroad tracks. He agrees that does not describe where the body came to rest.

**Coat:** Page 135, he describes dragging Means by his wrists. Page 138, he describes taking the coat off and rehandcuffing in the front. There is one photo with his hands behind his back and he is propped up and another one which his hands over his head.

**Vehicles:** Page 144, he says they did not see any other vehicles out and about. Page 145, The inference is the people waiting at the end of the road had the ability to capture Mr. Means, but the plaintiff's attorney does not explain how. The witness says typically they will stay off the road ya know and wait for us to come past them.

**Definition:** Page 148, a discussion of what constitutes a serious criminal. Page 150, they are going through the pursuit policy. Page 154, the pursuit policy addresses accruing the apprehension of law violators. Page 157, he states part of the description in the policies says, "if in the opinion of".

**Dog:** Page 161: Plaintiff's attorney brings up, "what if he had hit a dog or nearly hit a dog would you discontinue the pursuit?"

**PIT:** Page 165, ramming is discussed and there appears to be no PIT maneuver. Part of the policy reads, "is there a greater probability of a collision than there is of a successful apprehension" question to which there is no answer.

**Choice:** Page 171, he is again asked why he became a police officer, and he says, "to help people, like I said before you know, it is something always different every day, every day is different."

*(Recorded June 7, 2021)*

**Summary of Deposition of Mary Chandler**
**Taken April 26, 2021**
**TARAS Project 1321**
**Means v. City of South Charleston**
**Attorney Duane Ruggier**

**Passenger:** The witness was a passenger in the right front seat of a Jeep that turned to follow the slow speed pursuit and who as soon as the pursuit went by, she had identified the fact that there was a siren or sirens involved and she was taking out her cell phone because they wanted to follow it and video whatever might occur.

**Background:** She lives at 2191 C&O Road, Nelis, West Virginia which is in Boone County a county neighboring Kanawha County where this occurred. She had just started a new job as a cashier at the time she was meeting coworkers when she and Melissa were employed with Abolition Botanical Company, they were coworkers at a guard shack on Ashford Hill. "And Melissa and I were early, and she was excited because she had bought or was buying a new home and she wanted to show me, we had time, so we drove down Emmons Road."

**Diagram:** This witness is then given the diagram drawn by Melissa from which she certifies that it is correct. *(Clear violation of investigative process.)* Then the attorney goes about explaining everything on the diagram that Melissa drew in a prior deposition. She is asked to use her own words to describe they saw when they approached the railroad crossing. She says, "we got right around the corner, because I'm pretty sure there were bushes right there. We heard sirens, but we couldn't figure out where they were coming from. So, we slowed down, and we see a street bike and two police officers, two vehicles behind the street bike."

**Startle:** Page 10, the attorney suggests by asking the question, "Did that startle you?" to which she said "no", it was more like a shock of actually seeing such things happening in this county." *(Clearly, she was cognizant of the fact that there was a siren in the area.)* She heard the vehicle for "just a few seconds" before they saw the vehicles. She remains consistent through the deposition that although she heard sirens, she can not remember whether the lights were on either of the police vehicles. *(As is SOP, typically the lights are engaged if the siren is on but not the other way around.)*

Page 11, she says she went up a little way to turn around, but she does not have a direct recollection about whether they turned around on the opposite side of the tracks or on the near side of the tracks as there is a turnaround place in either position. *(This is not fully consistent with Melissa's testimony who indicated they were about to enter the railroad tracks when the vehicles appeared from the other side. Melissa says they went over the railroad tracks and made a u-turn and came back over the railroad tracks to follow the pursuit.)*

**First:** She confirms that her first sight of the actual accident scene was with the two police vehicles at a stop and the two officers already having exited their vehicles. They were in the "ditch line".

**Block:** Page 11, The attorney asked the questions leading as though they were unable to cross the railroad tracks because the police had blocked the roadway and therefore, they were compelled to stay in that location and shoot this video.

**Decide:** Page 12, that philosophy seems to be undermined. Attorney asked, "at some point did you decide that you were going to take a video with your cell phone of what was going on?" Answer, "before we seen the incident, I pulled my cell phone out because it is something that we don't see very often. But we didn't know what we were coming up on." Attorney thanks them for performing this public service because there were no other videos being run or available in the police vehicles.

**Video:** Page 14, She confirms that she had the video camera in the position that allowed her to see what was going on with their own eyes. She was the voice on the video that said that the officer had tased the subject and apparently it was Melissa's voice therefore that said they had maced him too. She confirms that she saw something in a hand of an officer pointed at the subject that she does not at this time know whether it was a real gun or a taser gun. She did not see any kind of electrodes being shot from the end of the officer's gun. She has never seen a slow-motion representation of this video; however, her opinion is that the officer stomped on the helmeted head of Mr. Means. She could not see Billy's face *(Nobody asked whether they could see his body behind the silver control box.)*

**FBI:** She confirms she gave a copy of her video to the FBI. The railroad tracks where they passed the pursuit is right on or adjacent to a sharp curve limiting sightline. She believes that the distance between the front of the cruiser and the back of the motorcycle was 5 feet. She agrees with the statement, "The pursuit was really close, and the vehicles were going really slow."

**Sirens:** Page 21, she thought the sirens that she heard prior to seeing the pursuit were on the other side, "I thought it was on the other side of the river." *(She is referring to a larger highway that would have been in the vicinity.)*

**Pursuit:** She confirms that after the pursuit passed, she could continue to hear the sirens, but she does not remember whether there were lights on the police cars. As far as she knows, she was the only vehicle then on the roadway during this process. *(It would be of interest to check the video to see if there are any vehicles stopped at the railroad crossing going in the opposite direction during the duration of the video.)*

**Hit:** Bottom of page 22, she said she did not have any concerns that either the motorcycle or the police cars were going to hit her. *(It was however a tight squeeze.)* Top of page 23, she is uncertain whether she turned and made a U-turn on the near side or the far side of the railroad tracks. Confirming that she was not driving, she was in the process of grabbing her cellphone and getting it ready to video during the turnaround process.

**Slow-motion:** Bottom of page 26, she has never seen the video in slow motion Someone had uploaded the video to u-tube, she was not aware of that and was contacted by Sean, a person in the plaintiff's attorney officer to confirm that she took the video.

**Record:** Page 28, when asked if she had ever been arrested, she indicated that she pled guilty to committing larceny with intent to sell and it was her car that was used in a theft, and she therefore was charged with conspiracy. (The question is never asked nor answered as to whether she was present in the car during the larceny or not) She states that she has no animosity toward police and has a good friend who is employed with Whitesville who a police officer was.

**Vision:** Page 30, she confirms that she has problems with night blindness or seeing at night. She does not wear glasses or contacts and has no problems with distance vision. It is confirmed that her exact exclamation was, "he stomped on his fucking head."

**Trapped:** Page 32, the plaintiff's lawyer again attempts to make the event sound as though they were trapped because the police officers parked on the railroad tracks and therefor, they had nothing more to do than to pull out the cell phone and video it.

**Moved:** Page 33, she confirms that shortly thereafter an officer moved his vehicle, and they were able to pass. She states that she could only see the helmet being worn by Billy and not his face.

*(Recorded June 13, 2021)*

**Summary of Deposition of Melissa Nunley**
**Taken April 26, 2021**
**TARAS Project 1321**
**Means v. City of South Charleston**
**Attorney Duane Ruggier**

**Drawing:** This was taken the same day and immediately after the deposition of Officer David Harvey, the secondary unit. I have sent an email to Mr. Ruggier asking for the hand drawing of both Ms. Nunley and her friend Mary Chandler. They drew a diagram for the point at which the vehicle was going in the opposite direction as the pursuit to show the approximate location of vehicles. She is a native of this area, she left and came back recently and lives at 75 Chessy, Alum Creek, West Virginia in Kanawha County. She works for a temporary service and is currently doing billing work at the Lincoln Public Service District.

**Temp:** At the time she and Mary were doing temporary work at the Ravencrest Mine. This was a Saturday morning, May 2, 2020. She and her coworker were early to arrive at a meeting spot and so in discussions with her friend Mary, they decided to take a drive down to Emmons to see a home she was interested in purchasing. While enroute to that home, location unspecified, they passed what she described as "a motorbike and two police cars and at that point we decided to turn around and follow them."

**Turn:** Page 9, she is asked if they decided to turn around. "And see what was going on." She said "Yes". They went over a railroad crossing and found and a bus stop, turned around at that bus stop and decided to head back and follow the motorbike and the police officers. She was driving a Jeep Wrangler, year unspecified. Then as they overtook the police vehicles as they had come to a stop in the area of the tracks and that was the first that she could see. Then as they got closer, she said, "we saw two police officers on the opposite side of the tracks, but down into a ditch, that's all we could see, and they are moving their arms about quickly".

**Partially:** She described pulling partially off the pavement into a wide spot short of the tracks and she describes their perspective as being obscured to where they could only see the top halves of the police officer's bodies. Asked, "if it looked like they were moving their arms quickly?" and she said, "Yes" Asked to describe that motion. "They were moving their arms up and down. *(There was no follow-up on that. Did they have a closed fist, did it appear they were literally throwing punches? Moving the body in a manner that would be consistent with that? Which arms were they moving? None of that was asked in follow up.)*

**Pointing:** She confirmed they saw a police officer pointing either a gun or some object into the ditch and she said, "yes". *(Obviously, she did not have the ability to see the officer's attempts to restrain the individuals' arms and the fact that he was secreting one or more arms underneath the water.)* When asked what they were holding in their hands, she said, "I saw mace I definitely saw mace. Because I saw a stream." "I don't know if I saw a taser gun or a regular gun like a Glock gun. I do not know the difference. Like I've never seen a taser in real life, so I don't know." (Page 11) When asked about the application of mace and the duration of that, she said

Page 1

"seconds". *(Then there was absolutely no follow up on that that means, two seconds, 10 seconds.)*

**Video:** Bottom of page 12, the video was taken by her friend in the passenger seat, Mary Rich who is a former Mary Chandler. Page 13, it is indicated that the voice we hear on the video was Mary's that said that the officer tazered the suspect. *(We know now that they never had a taser gun.)* This witness says it could have been a taser or a handgun she is not sure which.

**Dragged:** The point is made that once Mr. Means is dragged across the railroad tracks then they had a better view. *(Their view was largely blocked by the silver control box.)* Page 15, she answers "yes" to the question, "did you witness one of the officers take his foot and stomp Billy Means in the head?" *(Clearly that is a misstatement. If there was any contact made, it would have been with the helmet and that is yet to be determined by slow motion analysis of the video.)* Then the attorney states he didn't try to step over top of him, did he? Answer, "No"

**Helmet:** The questioner keeps talking about being stomped in the head and clearly any contact that was made to a helmet. Completely misleading testimony. The attorney says, "Do you remember after Mr. Means was stomped in the head by the police officer, this police officer then turning him over on his stomach and handcuffing him behind his back?" The answer is "yes" she says handcuffing or zip tie or something. *(The video does not show the handcuffing because it is hidden behind the silver box from my recall.)*

Page 17, *(the question whether Mr. Means posed a threat to these officers at the time that he was handcuffed and supposedly stomped on the head is based upon a video where all that could be seen was the upper body of the police officers and then after that most of the actual body of Mr. Means is obscured behind the silver control box.)*

**Arms:** There has been no indication that the moving arms had anything to do with punching or someway hitting Mr. Means, However, the leading question is asked that in the absence of being able to see anything and offering that testimony, she is asked whether they could have been doing those things. The witness states, "could have been."

**Crossing:** Top of page 19, questions from Mr. Ruggier. The general testimony is that the police officers and the motorcycle were crossing over a railroad crossing prior to the one where the accident occurred and the description of the relationship between this passenger vehicle and the party of three is as follows. Question, "Do you call it Emmons Road, is it a straight stretch when you passed them, is it a curvy part, is it a mountainous area?" Answer, "The part where I passed them is a straight stretch but right where I passed them when we were turning up to get onto the railroad tracks and they were turning down off of the railroad tracks." So, the inference is that the right of way at the railroad tracks had been gained by the party of three. They were already on the tracks and leaving them when this vehicle approached and limited whatever access there would have been to the railroad tracks under the conditions. The inference is that they came to a stop on this roadway in order to allow the three vehicles to pass.

**Lights:** Page 21, Some confusing testimony, the question is, did the police cruisers have on their lights? And the answer is, "I can't recall." Question, "Their flashing lights?" and the answer is "yeah". Question, "Did they have on their sirens?" answer, "I really don't remember."

**Interested:** Page 22, she says, "I'm interested because you don't see this happening in my neighborhood." The question followed, "Well, but how do you know it's a police pursuit?" Answer, "I don't know it's a police pursuit, I didn't say that." *(The witness is adopting a position that she did not actually recognize this as a police pursuit. She simply turned to follow three vehicles that, going very slowly, did not demonstrate anything other than they were driving down the road. So, my question would be, why would somebody simply turn around and follow vehicles that do not seem to be behaving in any kind of an odd manner?)* The question is, "You recognized that this was some kind of a police involved incident because somebody had on lights and sirens?" Answer, "I am interested because police don't come to my neighborhood, and I wanted to know what was happening." Question, "Is it your testimony that they did not have on their lights and siren?" Answer, "I don't recall about the lights and sirens." Question, "I understand your answer to be essentially I'm not sure if they had on their lights and sirens, I don't know?" answer, "right, I don't know." Question, "So, you're not sure if they did, not sure if they didn't and that goes for both their lights and you know what I mean about the flashing lights, right? Answer, "yeah". Question, "And also their siren, which you know what that is obviously, right?" Answer, "yes" Question, "How close was the motorcycle to the police cruiser?" Answer, "I felt like it was pretty close. Like they had all just crossed over the tracks. I am waiting to cross the tracks and they had all just crossed over the tracks, so you know I don't know like a car length, car length between them." Question, "a car length apart between the police cruiser and the motorcycle the first motorcycle (police car)?" answer, "yes."

**Diagram:** Top of page 25, she is asked to draw a diagram showing the relationship between the vehicles at the passing point. I have asked for that diagram to be sent to me.

Page 28, she says, "they drug him over there he didn't move or anything and they stomped on his head over there." Asked how far away she was from the officer who she alleges stomped on his head, she says, "about 20 feet."

**Stepped:** Page 29, she is advised that the officer says that he had stepped over the rider's head. She is asked whether she viewed the incident in slow motion and she said she has not. She admits that a helmet takes up more space than an unhelmeted head.

**FBI:** Page 31, she spoke to the FBI in August or July and does not know who she spoke to. She and Mary no longer work together but they are still friends. She was not wearing glasses at the time, and she does not need to wear them unless she is reading. *(I do not believe I have seen a record of the age of this subject.)*

**Wrists:** Page 34, she believes the officers dragged Mr. Means by his wrists.

**Speed:** Page 35, she is asked to estimate the speed of the three vehicles as they passed her. She declines to estimate the speed other than to say they were going quite slow. *(All of which supports the officer's testimony relative to those types of issues.)* She is asked whether 10 miles per hour or 20 miles per hour would be correct and she says she cannot estimate that. Page 37, talking about the motorcyclist, "I can't estimate his speed, but it wasn't fast." The police cruisers were driving at the same speed. *(One would assume that the speed limit if in fact there is nothing about the operation of any of these three vehicles that suggests anything suspicious.)*

**Sitting:** Bottom of page 38, it is confirmed that she was sitting at the railroad crossing as the three vehicles passed her. Page 39, the question about some comment in the video about he almost hit you, she indicates that it is given the motorcyclist's narrow body, that it would not have been the motorcyclist that almost hit her, it would have been one of the police officers. It is Mary's voice that says that so we will find out in the next deposition.

**Present:** Page 40, it is confirmed that Officer Peterson is in the room during the deposition. Officer Harvey was the individual that was at least standing near the helmeted Mr. Means who is being accused of stomping and Mr. Ruggier indicates that this officer said he was stepping over top of Mr. Means and she disagrees with that.

**Pass:** Page 41, she did not pass any cars on the roadway prior to passing Mr. Means and the two police officers. *(However, there are no questions asked about how far she had traveled from her meeting place toward Emmons.)*

**One:** Page 42 she talks about the roadway being basically a one lane road. She has never seen any other police pursuits on that road, and she says, "never saw anything."

**Track:** Page 43, the plaintiff's attorney asks questions and confirms what we can see in the video as one of the police officers' vehicles was stopped on the train track and the point is made as to how inappropriate it would be to choose a parking position for a police vehicle that would have been on the train track. *(Which reminds me of a story about a rider in my vehicle making similar statements.)*

**Summary of Deposition of Officer Eric Peterson**
**Taken May 4, 2021**
**TARAS Project 1321**
**Means v. City of South Charleston**
**Attorney Duane Ruggier**

**Long:** The deposition is nearly 8 hours in length covering 279 pages in which plaintiff's counsel spent a great amount of time before actually getting to the pursuit itself on approximately page 101. Then most of the testimony is going through the pursuit 1 and 2 videotapes made by the officer and his sergeant, describing each location by a time element. Intertwining into that the true time element that would be reflected in the dispatch tape.

**Concise:** I will attempt to simply put time stamped information down here and what page it is in which the discussion occurs relative to a specific portion of the pursuit. Exhibit 9 contains a photograph that on page 216 the officer is asked to draw on that photograph the direction that the motorcycle took as it left the paved roadway and got to the railroad track area.

**Reconstruction:** This is to some degree an issue of accident reconstruction, but it is of some interest as it was in the last two or three minutes that the motorcyclist began to attempt to create space by going at high speeds, 55 to 60 miles per hour, according to Peterson's testimony. It is the witness' testimony that there was a total of 4 railroad crossings. The accident happened on the fourth one and that was the only one that did not have an advanced warning sign that there was a crossing ahead.

**Crossing:** If the video proves that out, then this is a situation where the officer admitted to being somewhat surprised by the presence of the railroad crossing and if he was surprised then it would also follow that Mr. Means may have failed to anticipate the railroad grade crossing and that was part in parcel to his loss of control of his motorcycle.

**FBI:** Going to the deposition transcript, prior to this deposition they met and began a deposition that was called off in anticipation of getting a copy of a statement made by the witness to FBI investigators. However, I do not recall that FBI statement was ever entered as any kind of an exhibit.

**Right:** Page 7, they go through the fact that he has a 5th amendment right not to testify. He is waving that 5th amendment. He understands there is no statute of limitations for felonies in West Virginia. *(From the prior deposition of the secondary officer, David Harvey, the FBI found no grounds upon which to intervene.)* Page 8, he is currently rank of corporal. The FBI interview occurred on March 11, 2021, which would have been less than 3 months prior to this deposition.

**Lawyer:** Page 15, the witness has not retained a criminal attorney. Page 31, he states he may have seen the witness cell phone footage 3 times prior to watching it with agents from the FBI. Officer Harvey was not with him on any of those three occasions that he recalls. *(I have gleaned from some of the information that this video ended up on YouTube prior to it being identified as evidentiary in this case.)*

**Warrant:** Page 47, Mr. Means was issued a warrant for fleeing law enforcement with reckless indifference. Page 49, he confirms that the actual pursuit, the point at which he turned on his overheads and did a quick blast on his siren.  This act was a total of 12 minutes and 7 seconds to the location of the crash.

**Length:** Top of page 49 and again on page 50, he confirms that the pursuit from the turn off 119 to the crash site is between 12 minutes 7 seconds and 12 minutes 9 seconds. *(That would have been taken from the audio tape of the dispatch.)*

**Speeds:** Page 51 and 52, he says throughout the deposition, the motorcycle did not accelerate to what he would consider to be an excessive or reckless speed until the last 2 or 3 minutes on straight stretches prior to the accident site.

**Straightaways:** Bottom of page 50, he says, then in the end there are three different straightaways and out of the two he accelerated on the last two.

**Manual:** Page 54, he confirms that he is familiar with the policy and procedure manual and that manual is designed to provide guidance, in which time the attorney returns that a directive isn't it? And the officer says, "I believe you would have to ask the writer of that policy."

**Segments:** Top of page 57, when he ran the two segments of the pursuit driving path, he was driving the vehicle and Sergeant Moyer took the video. He says he believes he did that for purposes of showing to the grand jury and if there was a trial. They initiated the pursuit route video on their own using Officer Messer's GoPro.

**Rank:** Page 58, he confirms he has been with South Charleston PD since 2008, which would be 13 years. From 2008 through 2011 he was with the patrol division. From 2011 to 2018 he was part of a street crimes unit, plain clothes. From 2018 to 2020 he was on patrol and then in 2021 he says he has been with the school system. *(That would seem to be a juvenile officer or a school resource officer position, but the plaintiff's attorney does not want to discuss that.)* Page 64, after describing things that occurred largely while he was in plain clothes, he indicated it was time for him to get out of that work. "It was better that I went back to the road and started working on myself."

**Drugs:** Page 76, he and at that time "Detective" Moyer primarily worked drug cases. Page 82, they both went back to patrol, and both bought cameras on their own to put in their own vehicle. Page 81, they are discussing the street crimes unit, they also had body cams that they purchased.

**Dash Cams:** Page 85, he is asked about South Charleston at one time having dash cams and then not having them at this time. He says all he knows is in 2011 when he went to the street crimes unit, they had dash cams and in 2018 when he came back on patrol they did not. May of 2018, he bought his own dash cam for his patrol unit. Bottom of page 88, he discusses the fact that the administration wrote a memo advising those who had bought dash cams for their own vehicles to remove them as there had been no systemized process by which to save and distribute videos as each officer is responsible for keeping his own. *(This sounds a lot like the pocket tape recorder issues that we had at BPD.)*

**Articles:** A lot of newspaper articles have been gathered at the point in time where there were discussions about whether to have dash cams in vehicles and so on, all of which is not directly applicable to the analysis of this accident.

**Path:** Page 101, they begin discussing the pursuit. There were about 50 police officers in South Charleston currently. There is a pursuit path one video that lasts about 17 minutes. It takes them approximately halfway through the pursuit incident.

**Chick-Fil-A:** Page 103, he discusses the video beginning at Chick-Fil-A and what he was doing there and where he was when he first had a visual on this motorcycle and then thought it to be suspicious and began following it. The rider kept looking back at the police officer. *(There are no mirrors mounted on this motorcycle, but that question has not been broached in any of these depositions.)*

**Paint:** The motorcycle had been spray painted black which he finds to be a common process in the criminal world to disguise freshly stolen vehicles.  And then as he ran, the license plate that was on the motorcycle. He found that it was not registered to this vehicle.

**Attention:** Page 106, the witness discusses why the motorcycle caught his attention. He makes the point to the plaintiff's attorney that the motorcycle plate is small and until you get directly behind them perhaps at a stop sign, they are not real easy to read. Page 110, he makes the point that the video has been run when the road had been opened up to two lanes and said at the time of the pursuit it was only one lane bordered by traffic cones through the construction area so the motorcycle did not have an easy escape route because he had vehicles in front of him and he realized that one motorcycle turned left on 119, that it was likely it was going to be a runner.

**Tag:** Page 112, he ran the tag at the Southridge traffic signal. The tag came back as expired and registered to another vehicle. Page 115, at 3 minutes and 34 seconds he initiated an attempt to stop the suspect as he turned left off 119. They do not identify specifically the road that they turned onto from 119. But they turned onto a second road called Trace Fork at 4 minutes 9 seconds.

**Speed:** Page 117, his report indicates that the motorcycle speed varied from 15 to 53 miles per hour.

**Season:** Page 118, he does not know specifically when they shot this video, but it was at a point in time when the vegetation was still green, so he assumes it was before the fall and it was shot on a Sunday and not on a Saturday. The pursuit happened on a Saturday morning around 8 AM.

**Locations:** The next road they went on was Heavenly Drive. There is a 35 mile per hour sign that starts at 7 minutes 16 seconds, and they are still on Trace Fork. 07:38, there is 25 mile per hour sign, and they are still on Trace Fork.

**Corners:** Bottom of page 120, he discusses the motorcyclist slowing way down to go around some corners and putting his foot down on the pavement as he goes around the corner, which he thought was the sign of an unskilled motorcyclist. When he discusses the motorcycle possibly failing, he thought there would be some sort of a motor problem and although he is not a skilled

motorcyclist, he says that it is not normal to see motorcyclists putting their foot down on pavement as there is a potential of control issues and damaging ankles.

09:20, they reach Heavenly drive.

12:07, he goes left of center, page 125, he says they did pass some traffic going in the opposite direction, but they never passed any vehicles gong in the same direction.

09:22, He recalls an S turn with him going left of center. Page 128, he confirms that the motorcyclist ran all the stop signs and seems to indicate that he slowed down to check traffic and was not completely throwing caution to the wind.

10:55, page 129, he identifies an area that he believes is an area where the roadway was repaired as though the embankment had slipped. It is in this area where the first stop sign was violated.

11:55, where the gravel road started. There are ruts in the gravel, and this was the point where the motorcyclist was trying to take off the backpack. It is about in this area where he believes he observed things falling off the motorcycle. He never went back and looked for them.

13:31, They came to a stop or near stop where there was water flowing across a creek in the roadway. The motorcyclist went through. It was simply an estimate of 4 feet deep, no indication as to whether that could be wave action that is at 4 feet or what the actual standing or moving water issue. He stopped his vehicle before going through the water after watching the motorcyclist go through. The motorcyclist lifted his knees up about handlebar height as he went through the water. (There may be some relevance to the height of the air intake on both vehicles relative to this issue.)

14:53, Page 136, he says, "we're near "The ridges". (Possibly a housing area.)

15:00, He says Officer Harvey fell in as secondary officer. There is no discussion about what position Officer Harvey had, whether it was a position to try to encourage the motorcyclist to stop, etc.,

**Second:** Page 137, they move to the second pursuit path video. At that point, they decide not to do the second video and they go to the dispatch audio tape. Page 138, at 1:51, into the tape he is telling dispatch he may decide to flee.

**Previous:** Page 139, they discuss a motorcycle pursuit in April of 2021 that lasted about 2 minutes. The motorcycle went down, and suspect fled on foot. The witness was injured being cut by some bottles going down in a ravine, but the suspect was taken into custody. That motorcycle was improperly registered, but he does not believe it was stollen. Page 141, The April motorcycle pursuit was prior to the pursuit in question here, which occurred on May 2, 2020.

**Tenure:** Page 142, During his thirteen years on the PD, he believes he has been in over 50 pursuits as either a primary, second or third car. There were at lest five last year alone. (An example of knowing the criminal mind and being able to find vehicles that those folks may be operating.) Page 143, he is asked about those last five pursuits.

02:28, on the audio he is telling Officers Harvey and Moyer that if they are in the area, he will wait for them to get to his location before he attempts to pull the subject over. He is thinking that the subject does not have anywhere to go because lanes are restricted.

02:38, he tells them to disregard because it looks like he is about to run. He was moving over on the left side and cannot recall if there was a left turn lane there but ultimately it looked as though he was going to turn off 119, cross the opposite lanes and take off.

03:28, the subject turns off that road and gets on Trace Fork doing 47 miles per hour.

03:54, he asks dispatch to notify the county and state. Page 149, he kept asking for assistance on Rabel Mountain because he thought that was where the suspect was going to come out.

04:40, Lieutenant Pascal is heard, and he said, "if speeds pick up or he starts to get reckless, let him go."

04:56, He acknowledges Lieutenant's instructions and says that the motorcyclist does not seem to know what he is doing. It is either his poor abilities or motorcycle mechanical capabilities. He gives a speed 47 miles per hour and he is unaware of what the speed limit is on the roadway but didn't feel that they were speeding. He did not realize it was 25 or 30 miles per hour through out until they wrote the report.

**Communications:** Page 153, he advises that when Officer Harvey took over as second in the pursuit. He ceased all radio communication. He talks about his procedure which should be standard procedure where he tries to paint a picture of what is going on, because the vehicle is not equipped with dash cam. *(That is also needed so that supervisors can analyze the pursuit as well.)* Page 154, he talks about how it is odd for the motorcyclist to put his foot down on pavement risking snapping his ankle and crashing the motorcycle.

**Lights:** Page 155, they discuss lights and siren, and he says initially when he turned his overhead lights on to make the initial stop, he hit the horn sounds and then the yelp as a brief notification that he has lights on and wanted to pull over.

**Switch:** Page 156, he describes the three-position switch for his lights and siren. The third switch is both audio and visual and the second switch is the front and rear visual and number one is rear only lights. So, he turns the switch back to position 2 when he transmits so that he can be sure that other officers and dispatch can understand what he is saying. He talks also about the fact that he has difficulty understanding what they are saying because he has impairment from a shotgun blast in his left ear. His front and rear lights were always on. The siren was only on when he was not communicating. Page 158, he has his radio volume up to 31, which is the loudest it can possibly go.

Page 159*, (he does not say specifically whether the siren is mounted in the overhead lights or in the grill.)* He confirms on page 160, that they do not have audio where you can keep both hands on the wheel. No handsfree transmitting.

**AVL:** Page 163, he notes how he has an AVL on his car. *(Which I presume may stand for Automated Vehicle Locator.)* that tells dispatch his location but perhaps only as a result of radio transmissions.

**Transmission:** Officer Harvey asked him in advance whether he wanted him to take over transmission responsibilities and he was told to do so.

13:10, he is advised that there is a Boone County deputy on the Boone County line on Emmons Road. *(However, they never made it that far.)*

**Dachshund:** Page 168 begins a line of questioning about the fact that at some point in this pursuit, there was what he believed to be dachshund dog in the roadway and the motorcycle almost struck the dog.

13:50, they passed Holstein Drive.

14:35, he is advised by dispatch just pas the last street before going into Boone County and there is a trooper and a deputy waiting at the Boone County line.

14:46, Officer Harvey is advising dispatch that the motorcyclist crashed, and it appears that Peterson transmits, "Metro he crashed into the railroad."

**Mileage:** Page 172, he confirms that the pursuit was 12 minutes and 07 seconds long however, nowhere in the deposition has anyone asked what the mileage was.

**Dog:** Page 173, he is asked again where the dog location was. Pursuit video number two at 09:36 and he is asked to find out where that dog was. Page 176, the dog is at the end of a straight stretch that occurs about 10 minutes and 13 seconds into the video. So, after some debate, approximately 10 minutes and 43 seconds is where the dog was. Page 179, it appears that at 11:37 they have pinned down the location where the dog crossed. This line of questioning occurs, "okay, and that is where you saw the dog kind of cross and the way you described it, he nearly hits the dog?" Answer, "he swerved to miss the dog". Question, "You all didn't stop the pursuit at that point, did you?" Answer, "Of the dog?" Question, "You never pursued the dog, did you?" Answer, "no sir", Question, "You didn't stop the pursuit of Mr. Means at that point, did you?" Answer, "when he swerved around the dog sir?" Question, "correct". Answer, "ah, no sir". Question. "Okay."

11:50, he passes a large Ford Expedition and apparently pulls to the right and stops to yield to that vehicle.

Bottom of page 180, he is asked why he stops at the railroad crossings, and he says in order to identify the crossing numbers that might be visible.

Page 181, he says they shot this video by following the wrecker driver out. *(That seems to imply that he through the wrecker driver had a better idea of the roadways.)*

**Jeep:** 12:55, they are in a rough area of roadway and then at 12:59, page 183, they pass the yellow Jeep, and he has testified that the crash occurred at about 40 to 60 seconds prior to the Jeep witness video starting.

**Vehicles:** Page 183, *(There is a disagreement between where the ladies think they passed them at the railroad tracks or whether it was near or far side, and the record does not define where they are referring to on the video.)* They begin talking about three vehicles that they passed during the entire pursuit, one on Rabel Mountain, one near the roadside park and the third the Jeep. Rabel Mountain was a Ford Ranger pickup. The second one was a dark colored Ford sedan then a yellow Jeep Wrangler.

13:12 into the second pursuit, the path of video, they are at the crash site. Then there are several minutes consumed with discussion about the time element without talking about the mileage.

Bottom of page 190 begins the bystander video. He describes the motorcyclist and motorcycle striking the tracks and then spinning. When the motorcycle spun, the motorcyclist was ejected.

**Car Lengths:** Page 193, he says he was likely 3 to 4 car lengths behind the motorcycle however, nobody defines what a car length is.

Page 193, An important acknowledgement is that the railroad crossing was not marked. He had never driven this roadway before, "I wasn't aware these railroad crossings were here until we came to this intersection."

**Slowing:** Page 194, in the area where they passed the yellow Jeep, he describes the motorcyclist and the police car as slowing greatly to come over the third set of railroad tracks and that is where he began real acceleration to elude. He does not know specifically how fast he was going; the officer was not looking at his speedometer.

**Camera:** Page 195, he describes getting out of his vehicle about the time that Harvey came screeching to a stop. He then goes on to describe the actions that occurred after the pursuit, all of which are not specifically within my report area. Much of what occurred afterward is out of camera angle and below the tracks at first and then behind a silver switch box. However, a major allegation is that Harvey stomped on the helmeted head of the subject, and I find that very unconvincing in looking at the video given the posture of Mr. Harvey.

End of Summary

*(Recorded ,June 16, 2021)*

**Summary of Deposition of William Means**
**Taken March 29, 2021**
**TARAS Project 1321**
**Means v. City of South Charleston**
**Attorney Duane Ruggier**

**Statistics:** Deposition began at 10:11 AM.  Mr. Ruggier begins questioning and is the only attorney to be asking questions during this deposition. The motorcyclist is currently 32 years old, born August 25, 1989. At the time of the accident, he would have been 5 feet 11 inches and 180 pounds. He believes he is about 165 pounds now. His address is 2615 6th Avenue and now lives with his dad and has been for less than a month. He has had problems with his dad through the years. Page 7, his dad owns a contracting company, Absolute Contracting. He had worked for his father for a period but not for several years.

**License:** Page 8, he says he last had a drivers license in 2009 or 2010, that would have been at about the age of 21 or 22. The deposition goes into what appears to be starting in 9th grade by being expelled from school for smoking weed. He never finished his high school degree and but admits to being a drug addict, a thief and habitual DUI driver. He denies having taken any kind of drugs within proximity to the accident. *(I would assume that the medical people will be able to speak to the blood tests and what they mean.)* His drug of choice at that time was not IV drugs but he was smoking both Methamphetamine and Heroin. (In a backpack that he was trying to get ride during the pursuit, was found either methamphetamine or components to make methamphetamine.)

**Job:** Page 11, he talks about working with a man who was the owner of Brown's Grave Digging services prior to the accident. Prior to that he was homeless for a large period.

**Father:** Page 18, he is asked why he and his dad had a falling out and his answer is, "He's an asshole." The answer why he is an asshole is, "because he's a dad." He has never been married and has no children. He has no relationship with his mother.

**Criminal:** Page 24, he begins a description of being expelled from high school in 9th grade. Page 26, there are several pages of going through criminal history. February 25, 2019, he was charged with running from the police.

**Abandoned:** Page 27, he talks about finding a vehicle that had been abandoned that just happened to belong to his neighbor with the keys in it and was taking it back to his neighbor when he was arrested by the police for possession of a stolen vehicle.

**History:** January 22, 2020, suspended, revoked and secondary arson. August 5, 2019, driving on suspended license. February 26, 2019, fleeing with reckless indifference in a stolen vehicle. February 19, 2018, driving on a revoked license and driving revoked for DUI. August 26th driving on a suspended, revoked license and transferring stolen property. April 5, 2016, marijuana possession, March 29, 2016, driving while revoked for DUI. January 31, 2016, DUI, October 13, 2015, DUI, October 22, 2011, DUI, January 23, 2011, for receiving and transferring

stollen vehicle. October 14, 2010, for possession of marijuana. October 11, 2010, for concealed weapon without a license which he claims was tossed out of court because the weapon was in a lock box. April 8, 2009, charged with embezzlement connected with him stealing cigarettes from his employer at GoMart. He said they could not prove that he stole money, but they could prove that he stole cigarettes. Bottom of page 33, he says he has never been in treatment for drug addiction. In short, he says he is not a drug addict now because he has no means by which to get drugs because he is paraplegic. He is however on several prescription drugs.

**Addiction:** Bottom of page 37, he said he had been sober for a good while before the wreck. Page 38, he had just been smoking meth and smoking heroin, no IV drugs. He says on the day of the accident, there should not have been any drugs in his system.

**Motorcycle:** Page 42 begins on the day of the accident. He has never been licensed at any time as a motorcycle operator. He never had any training on motorcycles other than he grew up on dirt bikes and he has always ridden motorcycles since he was a kid. He was 5 or 6 when he began riding motorcycles. He considers himself to be an experienced motorcycle rider. He would ride a street bike daily. In 2005 he would have gotten his first street bike which would be a 500 Ninja. The motorcycle he was riding on the day of the accident was from the boyfriend of his mother's sister. It was gifted to him, and the boyfriend got it as a barter in part for a car. He said his girlfriend called the police on him to have them check the VIN on the motorcycle while it sat in his driveway, and they could not find any record of it being stolen. He claimed he was going to take the motor off this and put it on a go-cart because he could not register the bike. He rode it to the Gravedigger Boss's house the day before, spent the night at the boss' house. The boss does not do drugs. When he woke up at 8:30 the next morning he planned to pick up some equipment for a Honda Shadow that he was trying to fix up and a clutch cable for this bike. He had in fact painted the gas tank black since he got it. So, Officer Peterson's observations are verified. He claims he would only ride this in a parking lot doing wheelies from time to time. If he dropped it, the black rhino bedliner that he had used on the vehicle resisted damage. It originally had a purple gas tank. The license plate that was on the bike was on the bike when he got it and as it turns out it is registered to a Yamaha XT250. He had not done anything but paint it and then put another set of used tires on it. Page 53, the brakes and steering were operating properly the day of the accident. It had no seat on it when he got it, but he was able to find another seat that fit it exactly that came off in the wreck. (I could see in photographs that there was a seat floating in the water.)

Page 55, they talk about safely crossing railroad tracks on a motorcycle.

Page 57, obviously, the motorcycle was not insured.

**Observations:** Page 59, they start with a series of questions about the reasonableness of the officer's observations and of their actions. After several "yeses" he gives a "no" that it was not reasonable for the officers to initiate a pursuit. The answer is that they never engaged him in a real pursuit during this entire 14-minute, 12-mile process. Peterson was using a police car to bully him. He does not remember hearing any sirens or seeing any lights throughout the process where he was simply afraid to slow down and stop because the police car was operating within 6 to 8 inches of the rear of his motorcycle. If he slowed down, he would be struck.

**Cables:** He had gotten up that morning at his boss's house about 8:30 and got on his motorcycle and was enroute to the residence of Ronny Blizzard at some location on Trace Fork. Ronny Blizzard works at a motorcycle dealership and was going to give him some cables to fit his motorcycle clutch. He was going to put those cables on a Honda Shadow because the clutch cables on the bike he was riding were operating properly. The bike he was riding was a Honda CBR 650. (My research indicates the VIN is to a 1996 CBR600.)

**Route:** Page 74, he left Don Brown's house (his boss) and went to Davis Creek and Corridor G, 119, so perhaps Corridor G and 119 are one in the same. He was on 119 heading south out of town, when he passed the Walmart. He leaves 119 at what he says is the second exit past Walmart, but he does not know the name of the road. Page 76, Ronny works at Blizzard's Custom Cycles. When he turned off 119, he noticed then that there was a police officer behind him. *(In fact, the police officer says the pursuit began at the point where the motorcyclist turned left off 119.)* He said neither the officer's lights nor his siren was on at any point. So, he just keeps driving. He says he is not concerned about being stopped and driving without a registration or a driver's license.

**Concern:** What he was concerned about was that he had a feeling that this police car and the police officer in this police car wanted to run over him. Then he provides conflicting testimony on page 78, "I didn't think he was going to pull me over or I didn't think he was going to try. They usually leave you alone." "Meaning as if I would have hit my brakes, he would have rammed me." He says he is not aware that there is any attempt to stop him even after he went by a second police officer who he could tell fell in behind the first police officer and then the two cars were behind him. He never heard a siren nor saw lights at any point in time during this entire process. *(This contact with the second officer is about halfway or more through the pursuit and would be seven minutes of driving.)* He is asked repeatedly why he did not just slow down gradually in order to avoid being bumped in the rear when coming to a stop. His answer is (Top of page 82) "He would be so close literally so close to my back tire that he could have taken me out at any point in time you know what I mean?" He estimates the distance of 6 to 8 inches of following distance. *(This is of course an impossibility. I would assume that the front of the police vehicle may have push bars on it as well. You cannot maintain that kind of distance between vehicles for any period.)* Page 84, he says, "Like literally he attempted to wreck me I mean a couple times before any of this happened. I mean it's like you be on a motorcycle and have somebody 6 inches away from your back tire you're not going to want to stop for anything."

Top of page 86, he again uses the term, "I mean he was bullying me." Top of page 88, he says that since he does not have a driver's license, he does not like to bring attention to himself, so he never goes over the speed limit. He says he never reached the speed of over 50 miles an hour during the whole pursuit. *(That is disproved by the distance of the pursuit divided by the number of minutes it took to travel that distance.)*

**Speeds:** Bottom of page 88, questions about the seconds immediately preceding the wreck of his motorcycle. He says that he is traveling at 15 to 20 miles per hour coming onto the railroad crossing. *(I would interpret that as meaning that he was on the near edge of the flat area that is the crossing.)* He acknowledges that is an "S" turn area going over the top of the railroad track.

He says as he is going over the railroad tracks there was a car in front of him, so he was not going fast, maybe 25 to 30 miles an hour.

**Awareness:** Page 90, he confirms again that at no point prior to his accident did he ever see any lights or hear any police sirens. Page 91, he was aware of the police officers behind him, but he did not think they were trying to pull him over because he had blue tooth headphones on.

Page 93, he is asked what was in his backpack and the first thing he names is a set of brazing torches and his birth certificate. He was carrying the brazing torches because he was going to do some work for his grandpa and the backpack was his bookbag. He denies that there was any kind of crystal meth or components for crystal meth in that bookbag.

Page 95, he and a friend named Dante went back out to the scene at some point afterward and found pieces of his brazing torches. Describing the moment of contact between the rear tire and the front of the police cruiser that he assumes was striking, although he could not see it. He says it felt like his tire was being pushed to the side. After that he says, "I slide on the tracks and that's all I remember until I woke up." It is pointed out in his medical records where he says that he never lost consciousness. The video from the ladies at the railroad crossing would not indicate that there was any lengthy loss of consciousness.

**Ditch:** Page 98, he describes being knocked out and waking up in the ditch. He was on his stomach and went to roll over on his back and stand up and got kicked back over on his back laying in the mud. *(The context of this is uncertain as to what he is describing.)* He says, "I said I was laying on my back went to roll over to stand up and got kicked back onto my back." He repeats that description of being kicked back onto his back in the water and that was when they started using mace on him and telling him "They should have killed me." "They grabbed me by the arms jerked me across the tracks and I could feel my leg. I could not feel my legs after that." (He goes on to say that he could feel his legs and thought he was standing up and knew he was kicking in the 3 feet of water and then he lost feeling in his legs after they dragged him across the tracks.) he was asked about his claim that he was drowning in 3 feet of water. (Especially when he had not suffered any disability he believes at that time.) He repeats that he felt he was drowning in the water because he thought it was deep. He was being told not to move apparently was not compliant, he implies here, and they drew guns on him.

Page 104, he says he knew he could move because, "I was watching my legs kicking the water."

Page 105, he repeats that the last thing he remembers was being dragged across the railroad tracks.

Page 106, he does not know the officers. He was wearing his helmet when he says he was being maced, but the helmet had no visor.

Deposition ends somewhat prematurely as the witness was in pain and needed to be relieved. There is discussion about having a follow up deposition.

*(Recorded June 4, 2021)*

**Summary of Second Deposition of William Means**
**Taken April 20, 2021**
**TARAS Project 1321**
**Means v. City of South Charleston**
**Attorney Duane Ruggier**

**Second:** The prior deposition was taken on March 29, 2021, and this is a continuation. Exhibits to this deposition are photocopies of color photographs in which the contents of a black bag and other items are discussed. This is a standard deposition and not a Zoom format.

**Connection:** Page 4, reentry into the thread from the last deposition going back to what occurred at the scene. He is asked if it was correct that he was driving his motorcycle and being pursued by police officers and he answers "basically." *(He claims however that he was simply being bullied by police officers because he never heard lights or sirens so therefore it was not a pursuit and he never exceeded 50 miles per hour was his claim in the prior deposition.)*

**Pursued:** Page 5, he says he did not realize he was being pursued but, "I realized they were behind me, yeah." He did not know they were trying to arrest him or pull him over. He says no lights and no sirens. He had ear buds in and was listening to music through his cell phone. He was wearing a helmet that was given to him, a full-face helmet DOT approved and black in color. He removed the visor because it was too badly scratched. He does not remember which one of his friends gave him this helmet. He had a prior motorcycle wreck on the street near his home where he slid in some gravel. He was not under the influence he says but he had bald tires.

**Speed:** Page 13, back to the scene of the accident. He simply said he was driving below the speed limit as he was crossing the tracks and says, "Below the speed limit. I was crossing the railroad tracks." Question, "Crossing the railroad tracks?" answer, "And I was struck." He does not know what speed he was going. He was slowing down and that resulted in the police officer contacting his rear tire.

No Google Earth photographs were used during this deposition testimony to attempt to place where various things happened. However, he has a basic scenario indicating that when he went back to view the scene, he was specific about riding his motorcycle upright down the railroad tracks and having his motorcycle get caught by about the fifth railroad tie, which was higher than the other railroad ties.

**Struck:** Page 16, he was seated at the time that he police vehicle struck his rear tire. He describes looking on Google Maps and you can see the railroad tracks and says, "the bike slid on the tracks." Then he talks about the railroad ties. He is not sure what to call them. Bottom of page 16, he says, "The fifth one down sticks up like an inch and a half or two inches than the rest." He describes his motorcycle as being laid on its side and him attempting to mount the top of the motorcycle as it is sliding on the tracks. He says, "the bike laid on its side and I was going to get on the bike, on top of it, ride it out and jump off of it." Page17, "If the bike is laying… it's sliding on its side, you … my instinct is to jump on top and make sure that I am sitting on top of

the bike so I can actually jump off the bike instead of flopping and flipping with the bike instinctively."

**Tire:** Question, "So when the cruiser hit your back tire where does it send your bike?" Answer, "lying flat on the tracks." "Sliding, yeah, I was, I mean, in the middle of explaining." He then continues, "and then my rear pegs, they stick out like this (demonstrating). I mean for the rear foot pegs; they stick out at an angle well I guess you would say the left side of the rear peg caught on that. It was like the 5th railroad timber, and it catapulted me it slammed it, it stopped the bike and made it flip over and that is when I flipped and landed on the tracks. Well, I bounced off the tracks and into the puddle of mucky water whatever it is. (He does not specify that this is a left side foot peg or that the vehicle was sliding on its left or right side.)

**Submerged:** Page 18 and throughout the deposition he never once indicates that his head was submerged under water, that he breathed in any water, just that he was in this dirty greasy water and wanted to get out of it. He gives multiple descriptions of everything going white for a period and then when he regained his senses, he was laying on his back in this puddle of greasy water. He then determined that he needed to get out of the water and was rolling over, got face down but on his hands and knees and at that point he was being told not to move and at that point the police officer kicked him back over on his back. He does not make any indication that he is on his back and submerged under the water.

**First:** Top of page 19, he confirms that what they called the first kick, pushing him back over on his back, was not on the video. He contends that he was mobile, able to move his legs, able to roll over and get up on all fours, and it was the point at which the officers chose to remove him from the position he was in which appears to be near the edge of the water with his head above the water that at the point they began dragging him up the hill to get him across the railroad tracks and out of harms way that he lost feeling in his legs. So, according to him it did not occur during the accident, did not occur in him being returned to his back by what he describes as a kick. It occurred as they both grabbed him underneath his armpits and dragged him up the hill and over the railroad tracks. He then, from the video, perceives that the police officer placed his knee on the rider's back and held him in that position. He does not have any perception of any kind of a kick to the helmeted head.

**Grab:** Page 21, the two officers removed him from the water by grabbing him under his arms. *(It goes unsaid that if his head was above the water toward the side of the stagnant water at the tracks, the photographs show perhaps less than a foot between the end of the railroad tie. In that position, his head may have even high enough to have been contacted by some component of a train passing by.)*

Page 22, Even despite his attorney's objections to the question, he reinforced it saying that he knows that he could get up beforehand, immediately after the accident.

**Legs:** Page 23, he confirms it was after the kick to turn him back over on his back that he could still feel his legs and therefore we are left to presume that damage was done as he was dragged up over the railroad tracks.

Page 24, *(It should be noted that at times the term, "Pick you up" is used relative to the moving of his body across the railroad tracks when in fact his upper torso was picked up, but his lower torso and legs would have been dragging across the railroad tracks. (It should be obvious that any motion of this subject getting up when he really was not drowning, that he was rolling over in order to attempt to raise up on both legs. He was wearing a black full-face helmet that would not allow him to be identified, driving a motorcycle that was not registered by VIN, was not registered by plate number and that if he were to escape on foot, then he would have been able to likely avoid any arrest or prosecution. It also becomes obvious later in this deposition that he is carrying equipment that he calls used for metal working for brazing metal, a type of welding causing metals to blend under some circumstances. He is asked if these tools are not also used in the production of methamphetamine. He says he does not know about that. But he was at that point in time wearing a black backpack, which he identifies, and then the contents are shown as obviously things that could be described as white powders. He denies that the interior of the bag was his because he knows he had a different arrangement of pockets on the interior)*

**Prevent:** Page 26, it is pointed out that his prior testimony was that he was drowning in the water, and he corrects that by saying "trying to prevent from drowning." He confirms, page 26, that he had asked the officers to help him get out of the water. *(So, therefore they in complying with his requests, it is at that point that he determines that his back injury occurred.)* He is asked twice by the officers by the officers to take off his helmet or whether he asked the officers to take off the helmet. He says he did not although he complained because of the helmet the mace that had been sprayed remained in the helmet and continued to be a problem. Therefore, there was cause to attempt to take his helmet off once he was under control.

**Stomping:** Page 32, he contends that at the time of the alleged head stomping that he was already passed out and has no recollection of it. He was asked, "Didn't you tell me that you said your name and social security number or something like that?" answer, "that was when I was laying in the puddle of water." His claim was that when he was in the puddle of water, he told them his name and his date of birth, not his social security number.

**Respect:** Bottom of page 32, He has an entire paragraph where he talks about how he respects police officers and that he knows they are just doing their job. Page 33, the last thing he remembers is opening his eyes and seeing the ambulance pull up and then he woke up in the hospital 14 to 16 days later.

**Drugs:** Page 35, we go through an entire list of drugs, and he denies having taken the night before the pursuit. He said specifically that if he had taken methamphetamine, he never would have slept, he would not have been getting up at 8:30. The fact that he claims to have slept that night is a defense for him saying he never took methamphetamine.

**Destination:** Page 37, he sort of describes where he was going. He was going to the house of a friend named Ronny Blizzard Jr. He was about 40 and died within the last two days from some

sort of cancer where he had a large tumor at his belly button. Ronny Blizzard worked at a motorcycle shop owned by his father, Ronny Sr. and he was going to give the suspect a clutch cable, which he described last time as not for this bike but for a Honda Shadow. (So, we are not to believe that all the things that are in his backpack had anything to do with any kind of drug exchange or cooking.) He says there is one person that could confirm that he was going to get a clutch cable from Ronny Blizzard and that would be Chelsea Pickens, because she lived with Ronny or was at least dating Ronny. Page 40, he had been to Blizzard's house once or twice before. Top of page 41, he is asked, all this time that this non pursuit was going on, is only intent was to go to Ronny Blizzard's house? And he said, "yeah, until I got on Trace Fork, I actually passed Ronny's because like I said I was it was intimidating he didn't have his lights on at the time there was no…" his own attorney interrupts. So, his own attorney attempts to correct his client's testimony and it is uncertain where this is going but he was not going to Ronny Blizzard's house.

**Flee:** Page 41, he says, "I wasn't actually attempting to flee, I was intimidated like he was following a very close distance I didn't want to be wrecked but yes, I did pass Ronny Blizzard's house at the time or during."

Page 42, he does not know his address, it is not that which is listed in local listings as Blizzard's Custom Cycles. He knows only that it is on Trace Fork, and we did not get better description of that location.

**Running:** He admits running from the police once before and that was when he found his neighbors vehicle that had been stolen and just left in the neighborhood with doors unlocked and the key in the ignition and he decided to get in it and drive it home and give it to her and at that point in time police saw him and he fled from them because they did not realize that he was actually taking it home to give it to the rightful owner. His reason for fleeing was that he did not have a driver's license.

**Bumped:** Page 44, he is asked when he first sought an attorney and when it was that he claimed to anyone that his vehicle had been bumped by a police car and he said he does not remember.

**Overdose:** He indicates that about one month prior to this deposition he overdosed on what he thought was oxycontin, but it was fentanyl and the reason he was taking fentanyl was because somebody stole his prescription bottle from his dresser at home and he does not know who and the doctors refused to refill his oxycontin and so therefore he went to the street and bought some oxycontin from somebody who did not need all of their oxycontin. As it turned out it was fentanyl. So, he has been on a website called "drugs inc". "I've seen on drugs inc they are making pills out of fentanyl to look like actual pills. I had no clue." At that point, the largest parts of this second testimony are concluded.

Page 57, he said his father did not really have any problem with his drug abuse.

**Photographs:** Page 86, they begin discussing photographs found at the accident scene which he either confirms or denies belong to him. He confirmed that he was carrying a black backpack that one photograph was of the backpack he was carrying but the insides of the black backpack

Page4

were not his backpack. He is asked if he was physically trying to throw his backpack off while he was involved in the pursuit and he says, "No"

**Tattoos:** He has a tattoo on his right arm that says, "veritas" and "aequitas" which he says mean truth and justice. He also has a number on one of his tattoos, "304" which turned out to be his area code.

*(Recorded June 5, 2021)*