## EXHIBIT II – CURRICULUM VITAE

# STEVEN D. ASHLEY

15 Custer Court
Monroe, Michigan 48161

Voice: 517.548.2275            Cell: 248.467.1541            Facsimile: 734.749.1321
E-Mail: Steve@PoliceRisk.com            Web Site: www.PoliceRisk.com

NOTE: IN THE PDF VERSION, CLICK TO INDEX IN THE FOOTER OF EACH PAGE TO RETURN TO THIS INDEX.
CLICK TOC TO RETURN TO THE MAIN TABLE OF CONTENTS.

**Last Reviewed/Updated June 30, 2021**

## CV INDEX

Special Qualifications................................................................................**64**
Formal Education......................................................................................**66**
Current Employment................................................................................**66**
Employment History.................................................................................**67**
Expert Case Consultation.........................................................................**69**
Membership Associations & Volunteer Activities ....................................**69**
Instructor / Armorer Certifications Completed/Earned...........................**71**
Certificate Instructor Program Completed/Earned.................................**73**
Career Certifications Completed/Earned..................................................**73**
Awards and Recognition...........................................................................**74**
Publications..............................................................................................**74**
Guest Lecturer..........................................................................................**79**
Training Videos & Multimedia Productions.............................................**84**
Book Chapter............................................................................................**84**

## SPECIAL QUALIFICATIONS

- 15 Years as a full-time, sworn, law enforcement officer and manager.[266]

- 12 Years as a full-time risk management professional, specializing in law enforcement, criminal justice, security, and corrections risk management.

- Over 45 years as a criminal justice trainer in the areas of high-risk activity, police driving, use of force, training, and training management.

- Completed over 6,000 hours of law enforcement, emergency management, risk management, and public safety related training.

- Personally delivered over 150,000 man hours of training to over 16,500 law enforcement and corrections officers and managers, more than 30,000 man-hours of which was instructor- or Master-level training.

- Earned and received certification as a Master Use of Force Instructor, Advanced Force Science Specialist, Master Force and Control Instructor, Certified Force

---

[266] Many of the following time frames overlap in various ways.

Science Analyst, Master Excited Delirium/Agitated Chaotic Event Instructor, and TASER Senior Master Instructor.

- Instructor Graduate of the *Law of Self Defense Instructor Program*, Law of Self Defense Institute.

- 10 years as Police Academy Use of Force/Driver Training Coordinator.

- Earned and received state approval as lead police academy Firearms Instructor.

- Earned and received state approval as lead police academy Driving Instructor.

- Designed and developed many training programs, presentations, and curricula.

- 15 years management experience spanning both the public and private sectors.

- Personally conducted on-site risk management reviews of more than 400 law enforcement agencies and jails in more than seven states, examining all aspects of law enforcement and corrections management, practices, and operations.

- Personal critical reviews of more than 500 law enforcement and corrections Policy and Procedure Manuals, from agencies across the United States.

- Advisory Board Member (§ 1701), curriculum developer, and quality assurance specialist, for the OSS Academy, a Texas state-licensed education provider, approved by the Texas Commission on Law Enforcement[267] to provide required in-service training as well as other courses.

- Subject Matter Expert for the Michigan Law Enforcement Officers Training Council,[268] in the development of the *Michigan Emergency Vehicle Operations Instructor Manual*.

- Subject Matter Expert and Content Review Specialist for the Michigan Law Enforcement Officers Training Council, in the development of the *Michigan Law Enforcement Driver Training Reference Guide*.

- Subject Matter Expert for the Mississippi Department of Public Safety, Standards and Training Division, in the development of the *Mississippi Detention Officer Course*.

- Subject Matter Expert for the Mississippi Department of Public Safety, Public Safety Planning Division, in the development of the *Mississippi Model Law Enforcement Policies & Procedures* program.

- Subject Matter Expert for the Mississippi Department of Public Safety, Public Safety Planning Division, in the development of the *Mississippi Model Jail Policies & Procedures* program.

- Subject Matter Expert for the Michigan Law Enforcement Officers Training Council, in the development of the *Michigan Law Enforcement Officer-Subject Control Continuum*.

---

[267] TCOLE, *i.e.*, the Texas Commission on Law Enforcement, was formerly known by the acronym TCLEOSE, *i.e.*, the Texas Commission on Law Enforcement Officer Standards and Education.

[268] Originally known by the initialism MLEOTC; MLEOTC was rebranded as the Michigan Commission on Law Enforcement Standards (MCOLES) in 1996.

- Subject Matter Expert for the Illuminating Engineering Society of North America, *Security Lighting Committee* and *Security Lighting Committee on Lighting and Crime*.

- Published author and frequent guest lecturer on the subjects of management of high-risk police and corrections activity, including, *inter alia*, use of force and deadly force, pursuit driving and vehicle operations, law enforcement and corrections procedures and practices, training, training management, risk management, and other public safety related topics.

- Author, columnist, and contributor, to criminal justice publications, including, *inter alia*, Law Officer, PoliceMag.com, Law and Order, Police and Security News, The ASLET Trainer, Law Enforcement Technology, Police Magazine, Answering the Call, The ILEETA Review, The ILEETA Chronicle, and Officer.com.

## FORMAL EDUCATION

| | |
|---|---|
| Associate in Risk Management / Public Entities, Insurance Institute of America | 2000 |
| Master of Liberal Studies in Technology [CJ], Eastern Michigan University | 2000 |
| Associate in Risk Management, Insurance Institute of America | 1991 |
| Master of Science in Criminal Justice [Management], Michigan State University | 1988 |
| School of Police Staff and Command, Northwestern University | 1987 |
| Bachelor of Arts in Communications, Michigan State University | 1982 |
| Police Officer Certification, Southeast Regional Criminal Justice Training Center | 1976 |

## CURRENT EMPLOYMENT

### 1993 to Present – CIRMAT, Inc., Monroe, Michigan

*Owner*. Specializing in law enforcement and corrections risk management and consulting services, and training of criminal justice operators, trainers, and managers. Case consultation services specializing in police and corrections high-risk activity, with primary emphasis in management of force/control, motor vehicle operations, and arrest procedures.

### 2005 to Present – OSS - Law Enforcement Advisors®, Spring, Texas

*Law Enforcement Advisor*®. Contracted law enforcement advisor and risk manager, providing services, assessments, and consultation, to other law enforcement and corrections professionals, adjusters, and legal professionals.

*OSS Academy*® *- TCOLE Advisory Board Member* of the *OSS Academy*, which is a Texas state-licensed education provider. In addition to serving on the Board, I am an instructor, curriculum developer, and Quality Assurance Specialist. Curriculum includes both instructor-led training and E-learning for law enforcement, corrections, security, telecommunications, and public-sector risk managers.

## EMPLOYMENT HISTORY

**2013 to 2021 – Concordia University, Ann Arbor, Michigan**

_Adjunct Professor_. Justice & Public Policy, Haab School of Business. Teach various law enforcement, corrections, juvenile justice, criminal justice, risk management, and public policy subjects to undergraduate and graduate students at a traditional, brick-and-mortar university. Actively assist with program and curriculum development. Courses taught included, _inter alia_, Administration of Justice, Corrections Theory and Practice, Ethics in Criminal Justice, Foundations of Justice, Juvenile Justice Theory, Law Enforcement Policy and Practices, Management of Law Enforcement Agencies, Public Safety Risk Management, and Report Writing & Documentation.

**2004 to 2008 – Northrop-Grumman Corporation, Galloway, New Jersey**

_Instructional Technologist_. Deliver training on security procedures to transportation security personnel at airports across the United States. Train and certify Screeners in the use of equipment and techniques for screening checked baggage. Certified to train on equipment currently in use by Transportation Security Administration Baggage Screeners.

**2001 to 2009 – Police Policy Studies Council, Spofford, New Hampshire**

_Staff member and Researcher/Trainer_. Served as a police use of force, motor vehicle operations, and arrest techniques, trainer and consultant. Developed and delivered training programs to police, corrections, and other municipal executives and trainers. Consulted in police use of force cases, police driving, arrest tactics, and general law enforcement procedures.

**1986 to 2008 – Washtenaw Community College, Ann Arbor, Michigan**

_Force management, firearms, use-of-force, and police driving instructor_. Appointed as Police Academy Use of Force/Driver Training Coordinator from 1996 to 2005. Chief Firearms Instructor and Chief Driving Instructor. Responsible for conceptualizing, planning, developing, and delivering, many training programs at the academy, in-service, and advanced in-service levels, for police, corrections, security, and Natural Resources officers, including instructor training and certification in various use of force disciplines, as well as police driving.

**2002 to 2003 – AIS, Inc., Renton, Washington**

_Master Instructor_. Last assignment was as a subcontractor with Boeing Corporation, conducting baggage screener training throughout the United States. One of only 35 (out of 1,600) training staff that were transitioned to Boeing from AIS, for the purpose of fulfilling the federal "bridge" contract for baggage screener training.

Initially employed under a U.S. Government contract for the Transportation Security Administration. Certified as one of only 30 BST Master Instructors, with responsibility for training and supervising baggage screeners and baggage screener trainers throughout the United States. Certified to train on screening machines in use by federal transportation security baggage screeners.

**2000 to 2003 – Legal Defense Manual, East Lansing, Michigan**

*Co-Owner* and *Executive Editor*. Responsible for writing articles, as well as editing and publishing a periodical that focused on legal and managerial issues in law enforcement and corrections.

**1999 to 2001 – American Risk Pooling Consultants, Inc., Southfield, Michigan**

*Manager of Loss Control Development* and *Director of Law Enforcement Risk Control*. Direct responsibility for management of two company subsidiaries located in Iowa and Ohio, providing direction and supervision to loss control employees. Conducted specialized field loss control assessments of law enforcement agencies, jails, and other municipal practices and facilities. Created, developed, and coordinated, a law enforcement advisory committee of criminal justice executives, attorneys, trainers, and risk management specialists, for the purpose of developing recommended procedural guidelines – *i.e.*, policies – for law enforcement and corrections entities associated with municipal insurance pools and programs.

**1992 to 2002 – Smith & Wesson Academy, Springfield, Massachusetts**

*Adjunct Faculty*. Develop and present training programs geared toward use of force management skills. Develop curricula and present training in advanced use of force and firearms skills for police, security, and corrections trainers, as well as training managers.

**1991 to 1998 – Meadowbrook Insurance Group, Southfield, Michigan**

*Public Entity Loss Control Manager*. Direct management responsibility for loss control staff members, and coordination of Public Entity oriented loss control programs for insurance coverage pools and individual public entity and private clients in six states. Planned and structured delivery of services to approximately 50 client corporations, developed and assisted with the presentation of new marketing approaches, assured coordinated communications between internal company units, and with external customers and fellow contractors. Conducted specialized field loss control assessments of municipalities, law enforcement agencies, and jails. Other responsibilities included development of service plans and budgeting for multiple programs, coordination of personnel and resources to fulfill diverse client needs, and allocation/utilization of resources.

Formerly, *Director of Law Enforcement Risk Control*. Created a law enforcement/corrections risk control program from scratch. Responsibilities included day-to-day, hands-on management, development of service plans, coordination, budget management, and frequent interaction with both internal company units and clients. Primary responsibility for the design and implementation of a risk control program for approximately 900 law enforcement and corrections agencies in five states. Conducted many on-site risk assessments of police and public safety agencies, jails, and other municipal facilities and practices. Created, developed and coordinated law enforcement advisory committees of criminal justice executives, attorneys, trainers, and risk management specialists, for the purpose of developing recommended procedural guidelines – *i.e.*, policies – for law enforcement and corrections entities associated with municipal insurance pools and programs.

**1989 to 1991 – Governmental Risk Managers, Inc., Plymouth, Michigan**

_Risk Control Manager_. Direct responsibility for planning, implementation, and delivery, of risk control services to two public entity insurance pools that collectively represented approximately 1,200 governmental jurisdictions. Responsibilities included day-to-day hands-on management, development of service plans, budgeting, coordination of service delivery, marketing assistance, assessment of results, and resource allocation. Conducted specialized field loss control assessments of municipalities, police and public safety agencies, and jails.

Previously served as a _Risk Control Consultant_, specializing in law enforcement and corrections risk management, general liability, administration, personnel practices, training, and program development. Conducted many specialized field loss control assessments of municipalities, police and public safety agencies, and jails. Assumed responsibility for coordination and on-going development of two law enforcement advisory committees of criminal justice executives, attorneys, trainers, and risk management specialists, for the purpose of continuing development of recommended procedural guidelines – _i.e._, policies – for law enforcement and corrections entities associated with municipal insurance pools and programs.

**1978 to 1989 – Livingston County Sheriff Department, Howell, Michigan**

Served as a road patrol deputy sheriff on all three shifts, and as afternoon shift commander. Final five-year assignment was as _Staff Services Administrator_, with department-wide responsibility for training all law enforcement, corrections, and civilian, staff; community service/crime prevention programs for Michigan's fastest growing county; training, liaison, and oversight, of the Sheriff's volunteer/reserve Mounted Patrol Division; departmental policy research, development, and implementation; and departmental county-wide emergency management.

**1974 to 1978 – Various police employment as a Patrol Officer and Sergeant,**

at smaller departments, including Fowlerville, Pinckney, Webberville, and Perry, Michigan. My duties included patrol, investigations, training, and supervision of other officers and volunteer/reserve officers.

## EXPERT CASE CONSULTATION

I have provided expert consultation and review in more than 170 cases since 1994, approximately 75% of which have been defense cases. During the same years, I have testified as an expert – at deposition, hearing, or trial – 50 times in 43 cases, approximately 65% of which have been defense cases.

## MEMBERSHIP ASSOCIATIONS & VOLUNTEER ACTIVITIES

- Alpha Phi Sigma, National Criminal Justice Honor Society
- American Civil Liberties Union – Former Member
- American Jail Association – Professional Member
- American MENSA

- American Red Cross – Livingston County Chapter, Board of Directors – Former Member
- American Society of Law Enforcement Trainers (ASLET) – Charter Member (former Region 5 Director; formerly Michigan State Director)
- American Society of Safety Engineers[269] – Former Professional Member
- American Society for Testing and Materials, International (ASTM) – Voting Member
- Association of Force Investigators – Founding Member
- Concerns of Police Survivors (COPS) – Family/Survivor Member
- Illuminating Engineering Society of North America – Professional Member
- International Association of Chiefs of Police (IACP) – Academic Member
- International Association of Correctional Training Personnel (IACTP) – Professional Member
- International Association of Directors of Law Enforcement Standards and Training (IADLEST)
- International Association of Law Enforcement Emergency Vehicle Response Trainers (ALERT)
- International Association of Law Enforcement Firearms Instructors (IALEFI)
- International Foundation for Protection Officers – Professional Member
- International Law Enforcement Educators and Trainers Association (ILEETA) – Advisory Board, Managing Editor Emeritus, and Founding Member
- Lakewood Research Training Group – Former Member
- Law Enforcement & Emergency Services Video Association International (LEVA)
- Michigan Academy of Science, Arts & Letters (MASAL) – Affiliate Member
- Michigan Association of Chiefs of Police (MACP) – Active Member
- Michigan Commission on Law Enforcement Standards – Former Member, Training Advisory Committee (Ad-Hoc)
- Michigan News Broadcasters Association – Former Member
- Michigan Sheriffs' Association – Professional Member
- Mississippi Department of Public Safety, Public Safety Planning Division – Subject Matter Expert
- Mississippi Department of Public Safety, Standards & Training Division – Subject Matter Expert
- MSU Alumni Association – Life Member
- National Law Enforcement Academy Resource Network (NLEARN) – Member
- National Rifle Association (NRA) – Benefactor (Life) Member
- National Sheriffs' Association (NSA) – Active Member

---

[269] The American Society of Safety Engineers (ASSE) was rebranded as the American Society of Safety Professionals (ASSP) in 2018.

- Northwestern University Traffic Institute Alumni Association
- OSS Academy – TCOLE Advisory Board Member (§ 1701)
- Phi Kappa Phi Academic Honor Society
- Police Marksman Association – Life Member
- Society for Police and Criminal Psychology – Professional Member
- Volunteer Law Enforcement Officer Alliance (VLEOA) – Active Member

## INSTRUCTOR / ARMORER CERTIFICATIONS COMPLETED/EARNED

- Advanced Driving Techniques Instructor, General Motors Corporation
- Advanced Firearms Instructor, Washtenaw Community College
- Advanced Officer Survival Instructor, Washtenaw Community College
- Aerosol Chemical Munitions Instructor, AERKO International
- Aerosol Chemical Weapon Instructor-Trainer, AERKO International
- AXON/Evidence.com Instructor, TASER International[270]
- Baggage Screener Training Master Instructor, Advanced Interactive Systems
- Below 100 Officer Safety Instructor, Law Officer Initiative
- Certified Baggage Screener Trainer, Transportation Security Administration
- Certified Field Training Officer, MLEOTC
- Chemical Agents Decontamination Instructor, National Association of Tactical / Medical Response
- Chemical Munitions Instructor, Smith and Wesson Academy
- Civilian Safety Awareness Program Instructor, SABRE
- Defensive Driving Instructor, National Safety Council
- Defensive Tactics Instructor, PPCT Management Systems
- Driving Instructor, Federal Law Enforcement Training Center
- Emergency Vehicle Operations Instructor – EVO (MLEOTC), Lead Academy Instructor Certified
- Excited Delirium/Agitated Chaotic Event Master Instructor, Institute for the Prevention of In-Custody Deaths
- FATS Instructor Trainer, FATS, Inc.
- Firearms Instructor, Federal Law Enforcement Training Center
- Firearms Instructor, National Rifle Association
- Firearms Instructor / Range Officer, Lansing Community College
- Firearms Instructor (MLEOTC), Academy Instructor Certified
- Firearms Instructor (MLEOTC), Lead Academy Instructor Certified
- Firearms Program Management, Smith and Wesson Academy
- Firearms Retention/Disarming Techniques Instructor, Defensive Tactics Institute

---

[270] TASER International, Inc., was rebranded as AXON Enterprise, Inc., in 2017.

- First Aid Instructor, American Red Cross
- Flashlight Defensive Tactics Instructor, Defensive Tactics Institute
- Glock Armorer, Glock, Inc., Macomb Community College
- Handcuffing & Restraint Techniques Instructor, Defensive Tactics Institute
- Identification, Prevention, Management and Investigation of Sudden and In Custody Death Instructor [3 awards], Institute for the Prevention of In Custody Deaths
- Impact Weapons Instructor, PPCT Management Systems
- Interactive Training Instructor, Smith & Wesson Academy
- International Certified Instructor – Charter Member (IICI), International Association of Directors of Law Enforcement Standards and Training
- Kubotan Techniques Instructor, Defensive Tactics Institute
- Law Enforcement Rifle Instructor, Smith & Wesson Academy
- Management of Aggressive Behavior (MOAB) for Public Safety Instructor, PPCI, Inc.
- Metal-Tec 1400 Instructor, Metal-Tec, Inc.
- Michigan Traffic Radar Instructor, Michigan State University
- Mossberg Field Armorer, O.F. Mossberg & Sons, Inc.
- Nationally Certified Instructor – Charter Member (INCI), International Association of Directors of Law Enforcement Standards and Training
- OCAT Aerosol Weapon Instructor-Trainer, National Criminal Justice Training Council
- Officer Survival Instructor, PPCT Management Systems
- Oleoresin Capsicum Law Enforcement and Corrections Instructor, MSI-Mace, Inc.
- Police Narcan Instructor, Gendarme Consulting Group
- Police Drivers' Training Instructor, Saint Publications
- Police Precision Driving Instructor, Macomb Community College
- Police Precision Driving Instructor (MLEOTC), Academy Certified
- Police Pursuit Driving Policy Instructor, National Highway Traffic Safety Administration
- Radiological Monitoring Instructor, Federal Emergency Management Agency
- Re-Creating Stress Instructor, Mission Critical Concepts, LLC
- Refuse to be a Victim® Instructor, National Rifle Association
- Remington Armorer, Remington Arms Co.
- Remington Shotgun Maintenance Armorer, Remington Arms Co. / Washtenaw Community College
- Revolver Armorer, Smith and Wesson Academy
- Sabre OC Aerosol Projector Instructor, Security Equipment Corporation
- Safariland Use of Force Instructor, Safariland Training Group
- Semi-Automatic Pistol Instructor, Smith and Wesson Academy

- Service Animal Instructor, Institute for the Prevention of In-Custody Deaths
- Sexual Harassment, Assault, Rape Prevention (SHARP) Instructor, PPCT Management Systems
- Shotgun Instructor, Smith and Wesson Academy
- Sig-Sauer Armorer, SigArms, Inc.
- SkidCar™ System Instructor, SkidCar, Incorporated
- Springfield Armory XD Armorer, Team One Network / Northeast Wisconsin Technical College
- Stinger Instructor, Stinger Systems
- Stinger S-200 Intermediate Instructor, Stinger Systems
- Stop Stick Controlled Tire Deflation Device Instructor, StopTech, Ltd.
- Stop Stick Controlled Tire Deflation Device Instructor [Trainer], StopTech, Ltd.
- Tactical OC Instructor, Defensive Tactics Institute
- TASER Armorer, TASER International
- TASER Electronic Control Device Instructor, TASER International
- TASER Master Instructor, TASER International
- TASER Senior Master Instructor, TASER International
- TASER Technician, TASER International
- Use of Force By-the-Numbers® Instructor, Institute for the Prevention of In-Custody Deaths
- Use of Force Instructor, Michigan Municipal Risk Management Authority
- Use of Force Instructor, National Criminal Justice Training Council
- Wrap Restraint System Instructor, Safe Restraints, Inc.

## CERTIFICATE INSTRUCTOR PROGRAM COMPLETED/EARNED

- Law of Self Defense Instructor Program, Law of Self Defense Institute

## CAREER CERTIFICATIONS COMPLETED/EARNED

- Advanced Force Science Specialist, Force Science Institute
- Advanced Internal Affairs Investigator, Daigle Law Group
- Advanced Police Officer Training Certification [(4 awards)], Michigan Law Enforcement Officers Training Council
- Associate in Risk Management, Insurance Institute of America[271]
- Associate in Risk Management for Public Entities, Insurance Institute of America
- Certified Breathalyzer Operator, Michigan State Police
- Certified Force Science Analyst, Force Science Institute
- Certified Internal Affairs Investigator, Daigle Law Group

---

[271] The Insurance Institute of America (IIA) is now rebranded as *The Institutes*.

- Certified Law Enforcement Instructor, Arkansas Commission on Law Enforcement Standards and Training
- Certified Litigation Specialist [2 awards], Americans for Effective Law Enforcement (AELE)
- Certified TASER Technician/Armorer, TASER International
- Emergency Medical Technician, State of Michigan
- Evidence Collection and Analysis, AXON Enterprise
- Excited Delirium/Agitated Chaotic Event Master Instructor, Institute for the Prevention of In-Custody Deaths
- IADLEST International Certified Instructor – Charter Member (IICI), International Association of Directors of Law Enforcement Standards and Training
- IADLEST Nationally Certified Instructor – Charter Member (INCI), International Association of Directors of Law Enforcement Standards and Training
- Master Force & Control Instructor, Smith & Wesson Academy
- Master Use of Force Instructor, Police Policy Studies Council
- OSHA Compliance Assurance Certification
- Police Management Development Certification [3 awards], Michigan Law Enforcement Officers Training Council (now MCOLES)
- Police Officer Certification, Michigan Law Enforcement Officers Training Council (now MCOLES)
- Police Supervisor Development Certification, Michigan Law Enforcement Officers Training Council (now MCOLES)
- Qualified Accident & Illness Prevention Service Provider, Commonwealth of Pennsylvania, Bureau of Worker's Compensation
- TASER Senior Master Instructor, TASER International (now AXON)
- Texas Loss Control Representative, Texas Department of Insurance

## AWARDS AND RECOGNITION

- Citation for Bravery, Pinckney Police Department
- Life Saving Citation, Livingston County Sheriff Department
- Outstanding Academic Achievement – 1998, Eastern Michigan University
- Outstanding Academic Achievement – 1999, Eastern Michigan University
- Most Competent Instructor – Corrections Officers Academy, Washtenaw Community College

## PUBLICATIONS

Risk Management for Trainers: A Continuing Series on Applied Risk Reduction, The ILEETA Chronicle, Volume 4, Number 1, December, 2009

No Money is No Excuse: Cutting Training Budgets Due to Lack of Funding is No Excuse, Officer.com Online Magazine, February, 2009

Weapons, Weapons Everywhere: The World is Full of Weapons, So Choose Wisely, Officer.com Online Magazine, February, 2009

Watch Your Mouth! Someone Might Make You Eat Your Words, Officer.com Online Magazine, January, 2009

Your Pen is Trying to Kill You, Officer.com Online Magazine, January, 2009

Avoid PowerPointlessness: From Preparation through Delivery, The ILEETA Chronicle, Volume 3, Number 1, December, 2008

Officer Down! Thankfully We're Hearing that Less, Officer.com Online Magazine, December, 2008

Risk Management for Trainers: A Continuing Series on Applied Risk Reduction, The ILEETA Chronicle, Volume 3, Number 1, December, 2008

Resistance is Futile, Officer.com Online Magazine, December, 2008

Training: How Much is Enough? Officer.com Online Magazine, November, 2008

Write Your Report! Officer.com Online Magazine, November, 2008

Explain it to me Like I'm a Six-Year Old, Officer.com Online Magazine, October, 2008

Stay Alert for Falsehoods: A Little Knowledge is a Dangerous Thing, Officer.com Online Magazine, September, 2008

TASER C2 – Go Prepared in Style, New American Truth, September, 2008

We've Got a Real Problem in Police Work, Officer.com Online Magazine, August, 2008

Duty Gear is Good – Except When It's Not, Officer.com Online Magazine, August, 2008

When Bad Things Happen to Good Agencies: Risk Management = More than Just Training and Policies, Officer.com Online Magazine, July, 2008

Not Training is Dumb: You Have to Train, or You're Gonna' get Hurt! Officer.com Online Magazine, June, 2008

The Customers are Always Right, Even When They're Wrong, PoliceMag.com Training Channel, June, 2008

Technology is a Double-Edged Sword, Officer.com Online Magazine, June, 2008

Familiarity Breeds Complacency, Officer.com Online Magazine, May, 2008

The Technology Crutch, Officer.com Online Magazine, May, 2008

The Meaning of Training Certification, PoliceMag.com Training Channel, April, 2008

Don't Stick Your Head in the Sand: It's Called Risk Management for a Reason, Officer.com Online Magazine, April, 2008

Teach with Less Talk, More Action, PoliceMag.com Training Channel, April, 2008

Combined Skills Training, PoliceMag.com Training Channel, April, 2008

What a Great Idea! Officer.com Online Magazine, April, 2008

Work Safer, Get Sued Less! PoliceMag.com Training Channel, March, 2008

Get Off the Couch – Join ILEETA! Officer.com Online Magazine, March, 2008

Where Trainers Go to be Trained, PoliceMag.com Training Channel, March, 2008

Training Videos are Great – When They Work, Officer.com Online Magazine, March, 2008

What is a Trainer? PoliceMag.com Training Channel, February, 2008

<u>Train More? Train Less?</u> Officer.com Online Magazine, February, 2008

<u>Danny, We Hardly Knew Ye</u>, The ILEETA Review, February, 2008

<u>Solving Problems with PowerPoint and Video</u>, PoliceMag.com Training Channel, February, 2008

<u>What's Wrong with Using Electronic Control Devices</u>? Officer.com Online Magazine, February, 2008

<u>Projector Blues</u>, PoliceMag.com Training Channel, February, 2008

<u>Policies are NOT Rules</u>, Officer.com Online Magazine, January, 2008

<u>Why We Don't Need Firearms Instructors</u>, PoliceMag.com Training Channel, January, 2008

<u>Aerosol Spray Weapon Refresher</u>, Officer.com Online Magazine, January, 2008

<u>SWAT & EOD Tactical Vehicle</u>, Tactical Weapons, January, 2008

<u>Choose Wisely</u>, Officer.com Online Magazine, December, 2007

<u>Online Education CAN be a Good Thing, If You do it Right</u>, The ILEETA Chronicle, Volume 2, Number 1, December, 2007

<u>Michigan State Showdown</u>, POLICE Magazine, December, 2007

<u>Risk Management for Trainers: A Series on Applied Risk Reduction</u>, The ILEETA Chronicle, Volume 2, Number 1, December, 2007

<u>Justice for Daniel Faulkner: Danny, We Hardly Knew Ye</u>, PoliceMag.com Training Channel, December, 2007

<u>Working with Problem Shooters</u>, PoliceMag.com Training Channel, November, 2007

<u>Train in the Rain</u>, PoliceMag.com Training Channel, November, 2007

<u>21 Ways to Stretch Your Training Dollars</u>, POLICE Magazine, November, 2007

<u>Be a Smart Learner</u>, PoliceMag.com Training Channel, November, 2007

<u>Why TASERs Don't Work</u>, Officer.com Online Magazine, October, 2007

<u>Can We Talk? Interoperability</u>, POLICE Magazine, October, 2007

<u>Slip and Slide No More</u>, Officer.com Online Magazine, October, 2007

<u>Unintended Consequences</u>, PoliceMag.com Training Channel, October, 2007

<u>Retention Holster Showdown</u>, POLICE Magazine, September, 2007

<u>The Best Defense is a Good Defense</u>, Officer.com Online Magazine, September, 2007

<u>Put It In Writing</u>, PoliceMag.com Training Channel, September, 2007

<u>Body Armor Fiber and Fabric</u>, Officer.com Online Magazine, September, 2007

<u>Training with TASERs</u>, Law Officer, Volume 3, Number 8, August, 2007

<u>Tips for Trainers: Class Preparation</u>, PoliceMag.com Training Channel, August, 2007

<u>The ABCs of Precision Driving: Practicing the Basics Can Keep You Safer</u>, Officer.com Online Magazine, July, 2007

<u>Classroom Management</u>, PoliceMag.com Training Channel, July, 2007

<u>Bat Belt Overload: Gearing Up Can Weigh You Down</u>, Officer.com Online Magazine, July, 2007

<u>Conducting Safe, Effective TASER Training</u>, PoliceMag.com Training Channel, July, 2007

Pursuit Policy Pitfalls, Officer.com Online Magazine, June, 2007

Safe Training in a Troubled World, PoliceMag.com Training Channel, June, 2007

Excessive Use of Force – The Evil Flashlight, Officer.com Online Magazine, June, 2007

Watch Your Words, PoliceMag.com Training Channel, June, 2007

Keep Your Officers' Firearms Scores, PoliceMag.com Online Magazine, May, 2007

Traffic Hazards: Situational Awareness, In and Out of the Car, Officer.com Online Magazine, May, 2007

Things Break, Weapons Fail, Stay Safe! Officer.com Online Magazine, May, 2007

2007 Model Year Police Vehicle Testing, POLICE Magazine, May, 2007

Driving Skills are Perishable Skills, Officer.com Online Magazine, April, 2007

Pursuits are Dangerous…So What? Officer.com Online Magazine, March, 2007

Verbal Survival: Terminology Traps, Officer.com Online Magazine, March, 2007

Managing and Using Critical Information in the Law Enforcement Environment, Answering the Call, Volume 1, Issue 1, March, 2007

Stay Cool in the Heat of the Chase, Officer.com Online Magazine, February, 2007

What Gets You Sued, Gets You Hurt, Law Officer, Volume 3, Number 2, February, 2007

Sacred Cows Will Get You Hurt, Officer.com Online Magazine, February, 2007

Managing a Pursuit and Surviving the Aftermath, Officer.com Online Magazine, January, 2007

Pick Your Ride: Vehicle Testing, Law Enforcement Technology, Volume 34, Number 1, January, 2007

You Can't Always Get What You Want, Officer.com Online Magazine, January, 2007

Your Most Deadly Weapon: Your Vehicle, Officer.com Online Magazine, December, 2006

Technology is Your Friend, Officer.com Online Magazine, December, 2006

Websites by Design: Every Trainer Needs a Website, The ILEETA Chronicle, Volume 1, Number 1, December, 2006

A Real Life Saver: Proper Use is the Key, Officer.com Online Magazine, November, 2006

Which Vehicles are Fastest? Officer.com Online Magazine, November, 2006

On-Line Education: The Good, the Bad, and the Pointless, Law Officer, Volume 2, Number 8, October, 2006

Sound Tactics = Safe Outcomes: Safe Pursuit 101, Officer.com Online Magazine, October, 2006

Safe Driver Training: Keeping it Between the Cones, Officer.com Online Magazine, September, 2006

E-Mail 101: Avoiding SPAM, Officer.com Online Magazine, September, 2006

Admissibility of Digital Images, Officer.com Online Magazine, August, 2006

EVO Training: Critical to Officer Safety, Officer.com Online Magazine, August, 2006

Procurement: Resource Acquisition, Law Officer, Volume 2, Number 5, July, 2006

Power Management: Use It or Lose It, Officer.com Online Magazine, July, 2006

Keep Pursuits in Context, Officer.com Online Magazine, July, 2006

Simulator Shoot-Out, Law and Order Magazine, Volume 54, Number 6, June, 2006

The Truth About TASERS: Don't Believe Everything You Read, Officer.com Online
        Magazine, June, 2006

Simulation Training Options: Live Fire or Lasers? Officer.com Online Magazine,
        May, 2006

A New Computer System: Spending Your Tax Refund, Officer.com Online Magazine,
        April, 2006

Firearms Simulator Shoot-Out, Tactical Response Magazine, Volume 4, Number 8,
        March/April, 2006

Reducing Pursuit Liability, The Law Enforcement Trainer, Volume 21, Number 1,
        January, 2006

Digital Patrol, Part Two: Admissibility of Digital Evidence, Law Officer, Volume 2,
        Number 1, January/February, 2006

When the Vehicle Becomes a Lethal Weapon, The Law Enforcement Trainer,
        Volume 20, Number 3, July/August/September, 2005

Digital Patrol, Part One: Digital Cameras for Law Enforcement, Law Officer, Volume 1,
        Number 2, September/October, 2005

Vehicular Assault: Fight or Flight? Police and Security News, Volume 21, Number 5,
        September/October, 2005

The Effect of Police Officer Confidence on Officer Injuries and Excessive Force
        Complaints, Legal Defense Manual, Volume 2002, Number 4, December, 2002

Managing Police Pursuit Driving Practices, Police and Security News, Volume 18,
        Number 4, September, 2002

Law Enforcement Jurisdictional Issues, Legal Defense Manual, Volume 2002, Number 2,
        June, 2002

Changing Aerosol Weapon and Use of Force Practices, Police and Security News,
        Volume 18, Number 3, May/June, 2002

On Computers: It's Not Really Magic, Police and Security News, (1996 thru 2006)
        Bi-monthly column on computers and their application to government service.

Automating Your Agency: Make It Easy on Yourself, Police and Security News,
        Volume 17, Number 5, September/October, 2001

Risk Management Fundamentals, Legal Defense Manual, Volume 2001, Number 1,
        March, 2001

Searching the Internet, Tow Times, Volume 15, Number 12, July, 1998

Finally…Use of Force Guidelines We Can All Train To, MML Law Enforcement Risk
        Control News, Volume 4, Number 2, June 1998

Computers: Learn from My Experience, Tow Times, Volume 15, Number 11, June, 1998

Motor Vehicle Pursuit: Managing Your Department's Risk, MML Law Enforcement
        Risk Control News, Volume 3, Number 4, December, 1997

Issues with Aerosols, MML Law Enforcement Risk Control News, Volume 1, Number 3,
        September, 1995

Crossing the Border, Public Risk Magazine; Volume 10, Number 5; May/June, 1996

Managing Aerosol Issues, Law & Order Magazine, Volume 44, Number 3, March, 1996

Managing the Use of Force: The Key to Risk Reduction, Redman Report, June, 1995

Police Pursuit Risks: Setting the Standard, Public Risk Magazine; Volume 9, Number 3; March, 1995

Pursuit Management: Implementing a Control Continuum, Law and Order Magazine; Volume 42, Number 12; December, 1994

Real Management of the Use of Force, Smith and Wesson Academy Training News; Issue Number 23; April, 1993

## GUEST LECTURER

*After Using Force, Now What? Surviving the Onslaught*, International Law Enforcement Educators and Trainers Association (ILEETA), March, 2019

*Protecting the Protectors Instructor Course*, International Law Enforcement Educators and Trainers Association (ILEETA), March, 2018

*Protecting the Protectors: The Role of the Trainer*, International Law Enforcement Educators and Trainers Association (ILEETA), March, 2017

*Survive & Succeed: Saving Your Officers and Your Department*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2015

*Stay Safe: It's Time to Sweat the Small Stuff*, International Law Enforcement Educators and Trainers Association (ILEETA), March, 2014

*Post-Traumatic Stress Disorder in Criminal Justice*, CMI 2013 Client Education Day, November, 2013

*Protect Your People: Because Nobody Else Will*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2013

*TASERs and the Law*, National Rifle Association – Michigan Consumer Weekend, February, 2013

*Keep Your People Safe: On the Street, In the Jail, and In Court*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2012

*Managing the Risks of Interjurisdictional Police Pursuits*, Richmond Regional Multijurisdictional Pursuit Project, Policy Training Symposium, September, 2011

*Using Force: Words and Plans and Goals, Oh My!* The 2011 Use of Force Summit, The Performance Institute, July, 2011

*Force Continuums, Training Priorities, and Smart Use of Force*, The 2011 Use of Force Summit, The Performance Institute, July, 2011

*TASER, TASER, TASER!* The 2011 Use of Force Summit, The Performance Institute, July, 2011

*Avoiding and Managing Arrest-Related Deaths*, The 2011 Use of Force Summit, The Performance Institute, July, 2011

*TASER Download & Data Collection Practices*, 2011 TASER Master Instructor School, TASER International, June, 2011

*Police Use of Force: TASERs and Other Options*, Bancorp South Municipal Insurance Risk Control Program, Gulfport, Mississippi, May, 2011

*Smart Use of Force: In the Jail and On the Street*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2011

*Defining Use of Force for Law Enforcement Professionals*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, June, 2010

*Current Shifts in the use of Use of Force Continuums*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, June, 2010

*Arrest-Related Death and the Use of Force*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, June, 2010

*Considerations for TASERs and Other Non-Lethal Devices*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, June, 2010

*Addressing Allegations of Police Misconduct*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, June, 2010

*Smart Use of Force*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2010

*Defining Use of Force for Law Enforcement Professionals*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, January, 2010

*The Ramifications of In-Custody Death After the Use of Force*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, January, 2010

*The Great Debate: TASERs and Other Non-Lethal Devices – Are They Helping or Hurting?* The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, January, 2010

*Examining the Current Usage of, and Shifts in, the Use of Force Model*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, January, 2010

*Evidence.com, AXON, and TASER Download & Data Collection Practices*, 2009 TASER Master Instructor School, TASER International, July, 2009

*Live Long and Prosper: The Trainer as Risk Manager*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2009

*Liability in the Use of Force*, The 2008 National Summit on Use of Force in Law Enforcement, The Performance Institute, August, 2008

*TASER's and Other "Less Lethal" Options*, The 2008 National Summit on Use of Force in Law Enforcement, The Performance Institute, August, 2008

*Defining Use of Force*, The 2008 National Summit on Use of Force in Law Enforcement, The Performance Institute, August, 2008

*TASER Download & Data Collection Practices*, 2008 TASER Master Instructor School, TASER International, June, 2008

*Work Safer – Get Sued Less: Managing High Risk Activity*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2008

*Managing the Risks of Non-Deadly Force*, Detroit Police Department, Command & Legal Lecture Series, City of Detroit Law Department, March, 2008

*Assessing and Managing the Risk of Less Lethal Options*, The 2007 National Summit on Use of Force in Law Enforcement, The Performance Institute, November, 2007

*TASER Usage – Risks & Rewards*, The 2007 National Summit on Use of Force in Law Enforcement, The Performance Institute, November, 2007

*Defining Force for Ourselves*, The 2007 National Summit on Use of Force in Law Enforcement, The Performance Institute, November, 2007

*Work Safer – Get Sued Less!* 2007 Michigan NAFTO Conference, National Association of Field Training Officers, October, 2007

*Risk Management: Avoiding "Self-Inflicted Wounds"*, 2007 TASER International Conference, TASER International, July, 2007

*PowerPoint for the Law Enforcement Trainer*, 2007 TASER Master Instructor School, TASER International, July, 2007

*TASER Usage – Risks & Rewards*, The 2007 National Summit on Use of Force in Law Enforcement, The Performance Institute, May, 2007

*Defining Force for Ourselves*, The 2007 National Summit on Use of Force in Law Enforcement, The Performance Institute, May, 2007

*Enhancing Safety & Reducing Liability: The Trainer is the Key*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2007

*Motor Vehicle Pursuits: High Risk Issues for Trainers*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2006

*Enhancing Safety & Reducing Liability: The Role of the Trainer*, American Society of Law Enforcement Trainers, 19th Annual International Training Conference, January, 2006

*How to Set Up Your Own Website*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2005

*Get on the Web!! Set Up Your Own Trainer's Website*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2004

*Managing Police Pursuit Risk*, Richmond Regional Multijurisdictional Pursuit Project, Training Symposium, December, 2003

*Managing the Risks of Pursuit: Reducing Liability and the Potential for Officer Injuries*, Association of Professional Law Enforcement Emergency Vehicle Response Trainers (ALERT, International), Annual Training Conference, September, 2003

*Dealing with High Risk Activity: Keeping Officers Safer While Reducing Liability*, National Criminal Justice Training Council Annual Conference, April, 2003

*Risk Management and Civil Liability*, Kellogg Community College, October, 2002

*Protecting Officers in High Risk Situations: Enhancing Safety and Reducing Liability*, Wyoming Chiefs and Sheriffs Association, April, 2001

*Protecting Officers in High Risk Situations: The Role of the Trainer in Enhancing Safety and Reducing Liability*, American Society of Law Enforcement Trainers, 14th Annual International Training Conference, January, 2001

*Managing High Risk Emergency Services Activity,* Iowa League of Cities/ICAP, Annual Training Conference, June, 2000

*Managing High Risk Law Enforcement Activity: Use of Force, Pursuit, and Officer Safety*, American Society of Law Enforcement Trainers, 13th Annual International Training Conference, January, 2000

*Managing the Risks of Volunteers,* Public Risk Management Association (PRIMA), Annual Training Conference, June, 1999

*Force & Control: Risk Management Issues for Instructors*, American Society of Law Enforcement Trainers, 12th Annual International Training Conference, January, 1999

*Civil Liability for Emergency Telecommunicators*, Association of Public Safety Communication Officers - Michigan Chapter, Fall Training Conference, September, 1998

*Supplemental Police Manpower: Necessary Evil or True Benefit?* Public Risk Management Association (PRIMA), Annual Training Conference, June, 1998

*Law Enforcement Training: A Systematic Approach*, Public Risk Management Association (PRIMA), Annual Training Conference, June, 1998

*Managing Risk in the Municipal Arena*, 1998 Michigan Municipal Clerks Institute, East Lansing, Michigan, April, 1998

*Getting a Grip: The Management of High Risk Police Activities*, Michigan Association of Chiefs of Police, Winter Training Conference, February, 1998

*Managing Force: Enhancing Safety & Reducing Risk*, American Society of Law Enforcement Trainers, 11th Annual International Training Conference, January, 1998

*Law Enforcement Use of Force in the 21st Century*, Illinois Risk Management Association, November, 1997

*Use of Force: Managing Risk & Safety*, PPCT Management Systems International Training Conference, August, 1997

*Use of Force Management: Special Issues for Managers*, Oklahoma Department of Corrections, July, 1997

*Control Challenges in the School Environment*, Central Michigan University, Law Enforcement & School Liaison Program Institute, June, 1997

*Managing High Risk Law Enforcement Activity*, Michigan Association of Chiefs of Police, Summer Training Conference, June, 1997

*Law Enforcement Post Incident Damage Control*, Public Risk Management Association (PRIMA), Annual Training Conference, May, 1997

*Pursuit Management: Implementing a Control Continuum*, American Society of Law Enforcement Trainers, 10th Annual International Training Conference, January, 1997

*Instructor Challenges in Use of Force Management*, American Society of Law Enforcement Trainers, 10th Annual International Training Conference, January, 1997

*The Risks of Crossing the Border: Managing Interjurisdictional Exposures*, Public Risk Management Association (PRIMA), Annual Training Conference, June, 1996

*Aerosol Weapons: Reducing Your Risks*, Michigan Association of Chiefs of Police, Mid-Winter Training Conference, February, 1996

*Pursuit Management: Implementing a Control Continuum*, American Society of Law Enforcement Trainers, 9th Annual International Training Conference, January, 1996

*Critical Incident Policy Management*, Minnesota Sheriff's Association Training Conference, December, 1995

*Use of Force Management for Supervisors*, Upper Peninsula Law Enforcement Development Center, November, 1995

*Vehicle Operations Management*, International Association of Chiefs of Police Training Conference, October, 1995

*Total Control Management*, PPCT Management Systems International Training Conference, August, 1995

*Police Administration and Risk Control*, Ohio Municipal League Joint Self Insurance Pool, Annual Training Conference, June, 1995

*Effective Risk Manager/Law Enforcement Executive Relationships*, Public Risk Management Association (PRIMA), Annual Training Conference, June, 1995

*Pursuit Management: Implementing a Control Continuum*, Michigan Association of Chiefs of Police, Mid-Winter Training Conference, February, 1995

*Managing the Use of Force*, American Society of Law Enforcement Trainers, 8th Annual International Training Conference, January, 1995

*Fundamentals of Risk Management*, Wyoming Chiefs and Sheriffs Annual Conference, Wyoming Law Enforcement Academy, April, 1994

*Implementing Defensible Control Continuums*, Law Enforcement Officers Regional Training Consortium, Flint, Michigan, March, 1994

*Deadly Force: The Importance of Management*, Northern Michigan Law Enforcement Training Consortium, March, 1994

*Interjurisdictional Liability*, Michigan Association of Chiefs of Police, Mid-Winter Training Conference, February, 1994

*Risk Control: Managing the Use of Force*, American Society of Law Enforcement Trainers, 7th Annual International Training Conference, January, 1994

*Managing Force in a Correctional Setting*, Minnesota Counties Insurance Trust, November, 1993

*Cross-Jurisdictional Liability Issues*, Northern Michigan Association of Chiefs of Police, Annual Meeting, October, 1993

*Managing the Use of Force*, PPCT Management Systems International Training Conference, August, 1993

*Managing Effective Police Training: Doing More with What You Have*, Law Enforcement Officers Regional Training Consortium, May, 1993

*Managing Effective Police Training*, Michigan Association of Chiefs of Police, Mid-Winter Training Conference, February, 1993

*Contemporary Use of Force Issues*, Michigan Association of Chiefs of Police, Mid-Winter Training Conference, February, 1992

*Reducing Motor Vehicle Related Losses*, Michigan Association of Chiefs of Police, Mid-Winter Training Conference, February, 1991

## TRAINING VIDEOS & MULTIMEDIA PRODUCTIONS

*Police Pursuit Driving*, 30-minute video. Performance Dimensions, Inc., Twin Lakes, Wisconsin, 1998.

*Precision Driving Decision System*, 3-part training video. Governmental Risk Managers, 1991.

## BOOK CHAPTER

*Plan to Train or Plan to Fail,* W.I.N. 2: Insights into Training and Leading Warriors, Edited by Brian R. Willis, Warrior Spirit Books, Calgary, Alberta CA, 2009.

| June 30, 2021 | |
|---|---|
| DATE | STEVEN D. ASHLEY, MSc, MLS, ARM/P, ARSS, INCI, IICI |
| | MONROE, MICHIGAN |

# EXHIBIT III – PRIOR TESTIMONY

**Last Reviewed/Updated June 30, 2021**

## LAW ENFORCEMENT & CRIMINAL COURTS

During 15 years of active-duty law enforcement service, I offered testimony, depositions, and affidavits, in State District Courts, State Circuit Courts, State Probate and Juvenile Courts, and various other Hearings and Tribunals, in cases too numerous to list.

## EXPERT COURT TESTIMONY (WITHIN THE PAST FOUR YEARS)

While I have provided expert consultation and review in more than 170 cases, I have testified and/or been deposed 50 times in 43 cases since 1994. The following are cases in which I have testified at deposition, hearing, or trial, in the past four years.

2020 – Anthony Zerwas and City of Wyoming, Minnesota. Veteran's Preference Discharge Grievance. BMS Case Number 20VP1419. I testified as an expert witness on behalf of terminated Officer Anthony Zerwas. This was a police excessive use of force case.

2019 – D'Marco Craft and Michaele Jackson, Plaintiffs, v. Richard Billingslea, Hakeem J. Patterson, Yossif Mana, Antoine Hill, Glenn Bines, David Mays, II, Naim Brown, Michael Bailey, Randall Craig, Bryan Moore, and the City of Detroit, a political subdivision of the State of Michigan, Defendants. United States District Court for the Eastern District of Michigan, Southern Division. Case Number 2:17-cv-12752-MKM. I was deposed as an expert witness on behalf of Defendant Richard Billingslea. This was a police excessive use of force/false arrest case.

2019 – Kelvion Walker, Plaintiff, v. Amy Wilburn, Defendant. United States District Court for the Northern District of Texas, Dallas Division. Civil Action Number 3:13-cv-04896-D. I was deposed and later testified at trial as an expert witness on behalf of the Defendant. This was a police shooting/excessive use of force case.

2019 – Cassandra Luster, individually, and A/N/F of _____ a minor child, Damon Luster, Desmond Luster, Jr.; Beverly Diana Luster, individually, and as Administrator of the Estate of Desmond Luster, Sr., Plaintiffs, v. The City of Dallas, et al., Defendants. United States District Court for the Northern District of Texas, Dallas Division. Civil Action Number 3:16-cv-00396-B. I was deposed and later testified at trial as an expert witness on behalf of the Defendants. This was a police excessive use of force/deadly force case.

2018 – Syndel Kabchef, Plaintiff, v. Pickens County Sheriff Donnie Craig, Individually and in his capacity as Sheriff of Pickens County and Deputy Sheriff Rick Hales, individually and in his official capacity as a Pickens County Deputy Sheriff, Defendants, Quik Trip Corporation, Defendant by Counterclaim. Superior Court of Pickens County, State of Georgia. Civil Action File Number 2017 SUCV 76. I was deposed as an expert witness on behalf of the Defendant Quik Trip

Corporation and the Plaintiff, Syndel Kabchef. This was a police emergency vehicle operations/collision case.

2018 – Christopher Cantu, as the Administrator of the Estate of Robert Earl Lawrence, Plaintiff, v. City of Dothan, Alabama, Greg Benton, Chris Summerlin, and Adrianne Woodruff, Defendants. United States District Court for the Middle District of Alabama, Southern Division. Case Number 1:16-cv-01003-MHT. I was deposed as an expert witness on behalf of the Defendants. This was a police excessive use of force/deadly force case.

2017 – Collette L. Flanagan, individually, and on behalf of the Estate of Clinton Allen, Deceased; and Ronderaline S. Allen, individually, Plaintiffs, v. The City of Dallas, Texas; and Clark Staller, Defendants. United States District Court for the Northern District of Texas, Dallas Division. Case Number 3:13-cv-04231-M. I was deposed and later testified at trial as an expert witness on behalf of the defense. This was a police excessive use of force/deadly force case.

2017 – A.M., A Minor, by his parents and natural guardians, Audley Muschette and Judith Muschette, Plaintiff, v. American School for the Deaf, Town of West Hartford, Paul W. Gionfriddo in his individual and official capacities, Chris Hammond in his individual and official capacities, Elwin Espinoza in his individual and official capacities, Defendants. United States District Court for the District of Connecticut. Case Number 3:13-cv-01337-WWE. I was deposed as an expert witness on behalf of the Plaintiff. This was a police excessive use of force/police practices case.

2016 – Lameco M. Williams, Plaintiff, v. City of Birmingham, a Municipal Corporation; Nathan Elmore, an individual; Jeffrey Sanders, an individual; Ashley Knighten, an individual; Jacob McDonald, an individual; Lane Harper, an individual; Arthur Wilder, an individual; Christopher Hayes, an individual; Curtis Mitchell, an individual; Cedric Stevens, an individual; A.C. Roper, an individual, Defendants. United States District Court for the Northern District of Alabama, Southern Division. Case Number 2:15-cv-00949-AKK. I was deposed as an expert witness on behalf of the defendants. This was a police excessive use of force case.

June 30, 2021
DATE

STEVEN D. ASHLEY, MSc, MLS, ARM/P, AFSS, INC CICI
MONROE, MICHIGAN

# EXHIBIT IV – FEE SCHEDULE

Last Reviewed/Updated June 30, 2021

## ALL AMOUNTS ARE IN ADDITION TO EXPENSES

| | |
|---|---|
| Initial Telephone Consultation | No Charge |
| Advance Retainer (Non-Refundable, Billed Against on Hourly Basis) | Waived/Billed |
| Review of Records and Analysis | $150/hour |
| Preparation of Report, Including Research | $150/hour |
| Meetings with Counsel, Site Visits, etc. | $150/hour |
| Deposition (minimum of 6 hours per day) | $200/hour |
| Trial or Hearing (minimum of 6 hours per day) | $200/hour |
| Travel Time, Portal to Portal (maximum of 12 hours per day) | $75/hour |
| Expedite Fee (requested with 7 to 14-day notice) | $500.00 |
| Expedite Fee (requested with less than 7 days' notice) | $1,000.00 |
| Cancellation of Deposition/Hearing/Trial – 7 days or less notice | $1,500.00 |
| Cancellation of Deposition/Hearing/Trial – 8 to 14-day notice | $1,000.00 |
| Cancellation of Deposition/Hearing/Trial – more than 14 days' notice | No Charge |

**PLEASE NOTE:**

Should you engage my services, I will provide services to you as an independent professional. Payment to me for the services I provide is not dependent upon my findings, or upon the outcome of any legal action, mediation, or arbitration; or the amount or terms of any settlement of the underlying legal cause, nor upon any arrangement or other agreement between plaintiff and/or defense counsel and any other person or party.

You may not identify me as either a testifying or non-testifying expert until such time as any engagement fee has been paid or specific arrangements have been made and agreed to – in writing – by me.

All amounts (including any retainer) are in addition to expenses, which include those items that are customary, including – but not limited to – business class airfare, hotel, rental vehicle (full-size), meals, parking fees, and mileage (at the current IRS rate).

Should you engage my services, my relationship is with you. You are responsible for all payments as outlined in this Fee Schedule, regardless of any arrangement you may have with any party or parties you represent, including deposition fees originating from opposing counsel. If engaged, I will issue bills on a monthly basis, or whatever other interval I deem appropriate. Bills are due on receipt, and shall be considered delinquent if unpaid more than thirty (30) days after their date of issuance. Interest shall accrue to any delinquent balance at the maximum rate permitted by law, not to exceed 1.5 per cent per month.

June 30, 2021
DATE

STEVEN D. ASHLEY, MSc, MLS, ARM/P, AFSS, INCI, IICI
MONROE, MICHIGAN



WILLIAM ALLEN MEANS,

PLAINTIFF,

V.

E. M. PETERSON,
AND D. HARVEY,

DEFENDANTS.

IN THE
UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CIVIL ACTION NUMBER:  2:20-CV-00561

RULE 26(a) REPORT OF STEVEN D. ASHLEY

JUNE 30, 2021

# TABLE OF CONTENTS

NOTE: IN THE ELECTRONIC VERSION, CLICK TOC IN THE FOOTER OF EACH PAGE TO LINK BACK TO THIS TABLE OF CONTENTS
PRESSING ALT + LEFT ARROW RETURNS TO THE TABLE OF CONTENTS PAGE YOU LINKED FROM
PRESSING YOUR "HOME" KEY WILL RETURN YOU TO THE COVER PAGE

*Provisos*..................................................................................................................................... *v*

1. **Declaration of Steven D. Ashley**........................................................................................ 1

2. **Introductory Statements**.................................................................................................... 2

   *Report Intent* ........................................................................................................................ *2*
   *Not Legal Advice or the Practice of Law* ............................................................................. *2*
   *Report Focus*........................................................................................................................ *2*
   *Case Specific Limitation*...................................................................................................... *2*
   *Expert Capacity*.................................................................................................................... *2*
   *Right to Amend*..................................................................................................................... *2*
   *Further Development* ........................................................................................................... *2*
   *Specific References*............................................................................................................... *2*
   *Newly Identified Issues*......................................................................................................... *2*
   *Degree of Certainty*.............................................................................................................. *2*
   *Discussions and Explanations of Underlying Issues*............................................................ *2*
   *Credibility Determinations*.................................................................................................. *2*

3. **Executive Summary.**........................................................................................................... 3

   Incident Synopsis ................................................................................................................. 3
   Opinions in Brief................................................................................................................... 4

4. **Expert Qualifications.**........................................................................................................ 5

   Introduction to Qualifications. ............................................................................................ 5
   Credentials in Brief. ............................................................................................................. 5
   *Formal Education.* ................................................................................................................ *5*
   *Training Completed and Certifications Earned.* .................................................................. *6*
   *Memberships.* ....................................................................................................................... *7*
   *Training Delivered.* .............................................................................................................. *8*
   During my active-duty law enforcement career at Livingston County........................ 8
   During my 22 years of police academy service ........................................................... 8
   University Professorship .............................................................................................. 8
   *Risk Management.* ................................................................................................................. *9*
   *Authorship.*........................................................................................................................... *9*
   *Currently.* ............................................................................................................................. *9*
   In maintenance and furtherance of my professional skills and knowledge .................10
   Expert Case Consultation Objectivity ................................................................................10

5. **Analysis Protocol.**.............................................................................................................10

   Terminology..........................................................................................................................10
   Truth, Veracity, and Bias ....................................................................................................10
   Methodology.........................................................................................................................11
   *General Methodology.*..........................................................................................................*11*
   *Specific Methodology.* ..........................................................................................................*12*
   Nature and Status of Opinions ............................................................................................12

6. **Scope of This Report.**........................................................................................................12

   Claims Asserted ...................................................................................................................12
   Focus of Review ...................................................................................................................13

7.   **Background.** ...................................................................................................................**13**

8.   **Facts or Data Considered.** ..........................................................................................**13**

   Event Venue, Location, Time Frame, Weather, and Lighting ...............................13
      Venue ...........................................................................................................13
      Location .......................................................................................................14
      Time ..............................................................................................................15
      Weather ........................................................................................................15
      Lighting ........................................................................................................16
   Centrally Involved Individuals...............................................................................16
      *Other Individual Witnesses to the Incident.* ..............................................*17*
   General Summary of Incident ..................................................................................17
      *Narrative Report of Corporal Eric Peterson*...............................................*17*
      *Narrative Report of Patrolman David Harvey* .............................................*22*
      *Officer Harvey's Use of Force report* ...........................................................*23*
      *Bystander Video Recording.* ..........................................................................*23*
         Points noted in Ms. Chandler's video:...............................................23
      *William Means' Toxicology Report.* ..............................................................*25*

9.   **Information Focus.** ......................................................................................................**25**

      *Body Alarm Stress* .........................................................................................*27*

10.  **Human Factors Research.** .........................................................................................**27**

   Action vs. Reaction .................................................................................................27
   Speed of a Subject ...................................................................................................29
      *While seated* ..................................................................................................*29*
      *While prone* ...................................................................................................*29*
      *In the instant case.* .......................................................................................*30*

11.  **Cognition and Performance During Stressful Events.** .........................................**30**

   The Effect of Tense, Uncertain, and Rapidly Evolving Events ..............................30
      *Time distortion* ..............................................................................................*30*
      *In the instant case.* ........................................................................................*31*
   A Note on Variations in Officer Statements Regarding Events. ..............................31
   Situational Awareness and Perceptual Narrowing ..................................................32
      *In the instant case.* ........................................................................................*33*

12.  **Risk Management in Law Enforcement Force and Control.** ................................**34**

   Managing Force and/or Control Options .................................................................34
      *In the instant case.* ........................................................................................*35*
   Managing Risk Through Likely Outcomes .............................................................35
      *Perception of threat* .......................................................................................*35*
      *In the instant case.* ........................................................................................*36*

13.  **Use of Force and Control – General Considerations.** ...........................................**36**

   Perspective of a Reasonable Officer on the Scene. .................................................36
      *The Rashomon Effect.* .....................................................................................*36*
      *In the instant case.* ........................................................................................*37*

14.  **Analysis.** .......................................................................................................................**37**

   Analysis Context ......................................................................................................37
   Use of Force by Officers – Generally ......................................................................38
   Use of Force Under *Graham v. Connor* ..................................................................38

Identifying Use of Force .................................................................................................39
   *Actual uses of force* ....................................................................................................*39*
Application of the *Graham* Factors to Peterson and Harvey's Use of Force ..................39
      Discussion ................................................................................................................41
Consideration of Time and the Selection of Options ......................................................41
   *Time often equals safety* ..............................................................................................*41*
   *In the instant case.* .......................................................................................................*42*
      William Means quickly escalated the level of resistance in the encounter....................42
The Importance of Perspective.......................................................................................42
   *In the instant case.* .......................................................................................................*43*
The Necessity for or Reasonableness of Force and Control............................................43
   *In the instant case.* .......................................................................................................*44*
Alleged/disputed uses of force.......................................................................................44
   *The patrol vehicle striking Means' rear tire* ...............................................................*44*
   *Both officers engaged in improperly dragging or pulling Means from the water*...........*45*
   *Officer Harvey "stomped" on Means' helmet while searching him* ...............................*45*
   *The alleged kicking* .....................................................................................................*46*

**15.    Generally Recognized Preferred Practices. ........................................................47**

   The Difference Between Rules and Procedures ..............................................................47
      *Internal Department Rules and Procedures are Not Laws* ............................................*47*
      *Maintenance of the Rule – Procedure Differentiation* ..................................................*48*
   Use of Sample or Model Documents ..............................................................................48
      *The Origin of Sample and Model Policies* ....................................................................*48*
      *The Nature, Applicability, and Scope of Sample and Model Policies* ............................*48*
   International Association of Chiefs of Police (IACP).......................................................49
      *In the instant case.* .......................................................................................................*49*

**16.    Departmental Procedural Guidelines.................................................................50**

   Operational Procedural Guidelines – Generally.............................................................50
   South Charleston Police Use of Force and Control Procedural Guidelines .....................50
   Application of Procedural Guidelines in a Real-World Context.......................................51
      *In the instant case.* .......................................................................................................*51*

**17.    Law Enforcement Training of Officers Peterson and Harvey. .........................51**

   Police Academy Training................................................................................................51
      *Corporal Peterson's Academy Training* .......................................................................*51*
      *Patrolman Harvey's Academy Training.* ......................................................................*51*
   Use of Force Training Rubrics and Memory....................................................................51
   Applicability of Training to this Incident.........................................................................52
      *In the instant case.* .......................................................................................................*52*
      *Discussion.* ..................................................................................................................*52*

**18.    Conclusion. ..........................................................................................................52**

**19.    Opinions. ..............................................................................................................53**

**20.    Compensation for Study and Testimony............................................................54**

   Compensation for Study, Analysis, Testimony, and Travel.............................................54
   Compensation as of this Writing.....................................................................................54

**21.    Exhibits. ...............................................................................................................54**

**Exhibit I – Document List .........................................................................................55**

   Documents .....................................................................................................................55

References..................................................................................................61
Table of Cases.........................................................................................63

**Exhibit II – Curriculum Vitae.........................................................................64**

Special Qualifications ...............................................................................64
Formal Education.....................................................................................66
Current Employment................................................................................66
Employment History.................................................................................67
Expert Case Consultation..........................................................................69
Membership Associations & Volunteer Activities...........................................69
Instructor / Armorer Certifications Completed/Earned....................................71
Certificate Instructor Program Completed/Earned.........................................73
Career Certifications Completed/Earned .....................................................73
Awards and Recognition............................................................................74
Publications.............................................................................................74
Guest Lecturer........................................................................................79
Training Videos & Multimedia Productions...................................................84
Book Chapter..........................................................................................84

**Exhibit III – Prior Testimony..........................................................................85**

Law Enforcement & Criminal Courts...........................................................85
Expert Court Testimony (within the past four years).......................................85

**Exhibit IV – Fee Schedule..............................................................................87**

*Provisos*

Bracketed Comments: Unless otherwise noted, comments and information appearing in brackets – particularly in conjunction with quoted text passages – have been inserted by the author of this report, to assist the reader, or to aid in clarity or brevity.

Case Training Specificity: I note that, while officers are trained in the concepts and constructs discussed in this report, as they have evolved from various Court rulings, many may not be trained as to the specifics or captions of individual cases.

Contemporaneous Context: Unless otherwise noted, identifying a reference in this report in the present context, *i.e.*, is, is not meant to imply that the same reference was not identified in a past context, *i.e.*, was, contemporaneous to the events being discussed.

Format Simplification: In the interest of clarity, this report will forego standard APA formatting for in-text case citations, and will instead utilize footnotes.

Gender Specificity: Unless referring – in context – to a specific individual, the use of masculine or feminine pronouns, *i.e.*, he, she, her, his, etc., in this document is not intended to be gender specific.

Misuse of TASER Trademark Terminology: The term TASER® is a registered trademark of TASER International, Inc. Consistent with the manufacturer's training, the term *TASER* is an acronym for *Thomas A. Swift's Electric Rifle*, and – as such – is properly written in all capital letters, without periods. The company has trained and cautioned instructors and others since at least 2007 to avoid misuse of the trademark or terminology. This is especially true of the use of modified terms such as "tase", "tasing", and "tased". When and/or if these terms appear in quoted text, they will be marked thus [sic].

References to the Record: Unless otherwise specified, references to "the record" cited herein refer to the documents of record provided to me during the course of my review and analysis.

Time Convention: Various case-related documents in the record may utilize standard time nomenclature, while others may utilize military time nomenclature. For example, 10:30:45 pm – or 10:30 pm and 45 seconds – converted to military time is equivalent to 22:30:45 hours. Similarly, some military times in the record may be expressed in a slightly revised format (but with no difference in meaning), *e.g.*, 2230:45. Additionally, tenths or hundredths of a second will be expressed in decimal, *e.g.*, 22:30:45.01.

Timing Calculations: Calculations of timing are based on any running on-screen display (OSD) clocks. Absent running OSD clocks, timing calculations are drawn from on-screen clocks incorporated into playback software, and are approximated to one second, to $\frac{1}{10}$ of a second, or to $\frac{1}{100}$ of a second, accordingly.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

| | | |
|---|---|---|
| WILLIAM ALLEN MEANS | \| | |
| Plaintiff, | \| | |
| | \| | |
| v. | \| | Civil Action No. 2:20-cv-00561 |
| | \| | |
| E. M. PETERSON, | \| | |
| and D. HARVEY, | \| | |
| | \| | |
| Defendants. | \| | |

## RULE 26(a) REPORT OF STEVEN D. ASHLEY

### SUBMITTED: JUNE 30, 2021

1. **DECLARATION OF STEVEN D. ASHLEY.**

   I, Steven D. Ashley, being of legal age and under penalty of perjury, state as follows:

   1. I am a competent adult and have personal knowledge of the following facts, or believe them to be true based on information and belief. Facts about which I do not have personal knowledge are of the type reasonably relied upon by experts in this field and have probative value to me in rendering my opinions.

   2. Attached hereto is a true and accurate copy of my expert report in this matter.

   3. This report summarizes my analyses and findings and includes a statement of my opinions and the basis and reasons for them. The report also includes facts or data considered by me in forming my opinions and sets out my qualifications (including my curriculum vitae).

   4. My opinions are expressed to a reasonable, or higher, degree of professional certainty.

   5. I affirm under penalty of perjury that the foregoing statements are true and correct.

| | |
|---|---|
| June 30, 2021 | *Steven D. Ashley* |
| DATE | STEVEN D. ASHLEY, MSC, MLS, ARM/P, AFSS, NNCI, IICI |
| | MONROE, MICHIGAN |

2. **INTRODUCTORY STATEMENTS.**

The following introductory statements apply to this entire report, including any attached exhibits, which are to be incorporated as integral parts thereof. Some of these introductory statements may be reiterated in the body of this report.

*Report Intent*. Nothing in this report intends to, or should be understood as an attempt to, usurp or subvert the function of the Court, or to intrude upon or inappropriately influence the role of the Jury or other trier of fact.

*Not Legal Advice or the Practice of Law*. The expert services rendered in this case and this document are not legal advice, and are not to be construed, in any way, as legal advice, or as the practice of law.

*Report Focus*. This report is focused solely on the incident captioned and related concerns and/or issues.

*Case Specific Limitation*. Any actions, statements, writings, this report, information, any testimony, etc., are specifically limited to this case.

*Expert Capacity*. This report and any subsequent reports, testimony, opinions, etc., are within my capacity as an independent criminal justice and governmental risk management expert.

*Right to Amend*. The opinions in this report are living opinions. That is, should additional discovery material be received, and/or additional research be completed, and then reviewed, these opinions may be altered and/or reinforced depending upon what information is obtained, reviewed, considered, and/or studied.

*Further Development*. The opinions expressed in this report are not necessarily final in nature. Rather, they are listed to comply with current report requests. Each opinion may be further developed through research, investigation, during deposition, and/or trial testimony.

*Specific References*. Some of the opinions in this report may list or cite specific references to some of the documents or research reviewed and/or considered. These listings and citations are not intended to be exhaustive or exclusive. I specifically reserve the right to supplement the support for each of the opinions in this report.

*Newly Identified Issues*. If new issues are opined, identified, and/or developed subsequent to submission of this report, I reserve the right to supplement this report.

*Degree of Certainty*. All opinions stated in this report are in direct regard to the case captioned, and the underlying incident or events leading to this case, and are expressed to a reasonable, or higher, degree of professional certainty.

*Discussions and Explanations of Underlying Issues*. Any discussion or explanation of underlying issues is intended to assist the reader with understanding some of the concepts that inform my opinions in this matter.

*Credibility Determinations*. It is not my intent to make any credibility determinations in developing or expressing my opinions in this case.[1]

---

[1] I understand that credibility determinations are solely and exclusively within the province of the trier of fact, as instructed by the Judge.

3. **EXECUTIVE SUMMARY.**

My name is Steven D. Ashley. I was contacted by defense counsel on or about May 28, 2021, and ultimately engaged on June 4, 2021,[2] in the above captioned matter – for the purpose of providing review, analysis, and opinions – regarding allegations made against certain officers of the South Charleston, West Virginia, Police Department, and the City of South Charleston.[3]

Incident Synopsis.[4] During the morning hours of Saturday, May 2, 2020,[5] an officer[6] of the South Charleston Police Department observed a motorcycle that appeared to be improperly registered. He further noted that the motorcycle's paint job and the behavior of the rider caused him to believe the vehicle may be stolen. After following the motorcycle a short distance, the officer initiated a traffic stop. When the motorcyclist[7] failed to stop, the officer began a pursuit. After some time, another officer[8] joined the pursuit as a back-up unit.[9]

The two officers continued the pursuit until the motorcyclist lost control of his machine at a railroad crossing.[10] Upon striking the tracks, the motorcyclist was thrown from the cycle, and landed in standing water in a drainage ditch on the far side of the tracks. The motorcycle came to rest in the water some distance past where the rider fell.

Officers approached the rider, and tried to gain control of his hands, which the rider kept putting out of sight below the water. When officers tried to grasp the rider's hands, he pulled away and resisted. Ultimately, one officer (Harvey) sprayed the rider with pepper spray with reportedly no effect. After further struggle, officers were eventually able to control the rider's hands.

The rider told them he felt like he was drowning, and asked the officers to get him out of the water. Both officers took hold of the rider's arms and clothing, and pulled him from the water. Because of the terrain, the officers pulled the rider across the railroad tracks, and away from the tracks. One officer (Peterson) returned to the patrol vehicles momentarily and called for EMS. The other officer (Harvey) searched and rolled the rider over in order to handcuff him behind his back. During this process, Harvey is accused of "stomping" on the rider's helmet; Harvey maintains that he did not do so, but stepped over the rider while searching him. There is a cell phone video

---

[2] I was engaged by Mr. Duane J. Ruggier, II (WVSB #7787), of the firm Pullin, Fowler, Flanagan, Brown & Poe, PLLC.

[3] Complaint, Civil Action Number 2:20-cv-00561, Document 1, PageID #: 1-9, date filed 08/25/2020.

[4] This is intended to be a very brief synopsis of general events, as reported by officers and upon information and belief. A more detailed version of events that reportedly occurred or are claimed to have occurred will be addressed later in this report.

[5] TimeandDate.com Monthly Calendar for May, 2020, accessed by Steve Ashley during 06/2021.

[6] Corporal Eric Peterson.

[7] The plaintiff, William Allen Means.

[8] Patrolman David Harvey.

[9] Harvey joined the pursuit after approximately 5 1/4 miles.

[10] Later, Means alleged that Peterson's patrol vehicle struck his rear tire, causing him to lose control.

of the latter part of the arrest, shot by two passers-by.[11] The video shows, *inter alia*, Harvey's movement, which plaintiffs characterize as showing the "stomping."

When Peterson returned from the vehicles, the rider told him that he could not feel his legs, and asked for his helmet to be removed. Peterson told him they would leave it on because removing it might injure him further.

Ultimately, other officers and EMS arrived at the scene. The incident crash was reported by a West Virginia State Trooper. In checking the rider's backpack at the scene, officers located what they believed to be methamphetamine, which was logged into evidence. The motorcycle was towed.

The rider (Means) was transported to hospital for treatment. He survived his injuries, but is reportedly paralyzed from the waist down.

Opinions in Brief. For the reasons set forth in this report, and to a reasonable – or higher – degree of professional certainty, I hold the following opinions.[12]

1.   It is my opinion that the use of force in self-defense was a logical and appropriate response by Officers Peterson and Harvey to the perceived potential threat posed by William Means.

2.   It is my opinion that, under similar *tense, uncertain, and rapidly evolving circumstances*, other officers would believe it appropriate to act as Peterson and Harvey did.

3.   It is my opinion that the actions of Officers Peterson and Harvey were consistent with recommended preferred and trained practices that I am familiar with, through my education, research, training, and experience, and that are in wide use in the law enforcement community.

4.   It is my opinion that the South Charleston Police use of force and vehicle pursuit procedural guidelines are consistent with recommended preferred procedural guidelines that I am familiar with, through my education, research, training, and experience, and that are in wide use in the law enforcement community.

    4.1.   It is my opinion that, within the context of the circumstances in which they found themselves, the South Charleston officers' actions were consistent with typical law enforcement procedural guidelines that are commonly presented to officers through various modes of training.

    4.2.   It is my opinion that, within the context of the circumstances in which they found themselves, the South Charleston officers' actions were consistent with their departmental use of force and vehicle pursuit procedural guidelines.

A reiterated statement of these opinions is set forth later in this report.[13]

---

[11] Hereafter referred to as the *bystander video*.

[12] I hold any statements of opinion made here, or elsewhere in the body of this report, to a reasonable – or higher – degree of professional certainty, based upon my skill and/or knowledge, as gained through my education, experience, and/or training.

[13] Other statements of opinion may be incorporated into the body of this report.

4. **EXPERT QUALIFICATIONS.**[14]

Introduction to Qualifications.  This report is provided based upon my personal and professional skill, knowledge, experience, education, and/or training, in and of the law enforcement, corrections, security, criminal justice, governmental service, and risk management fields, gained over the past 46 years and more.

I am a retired law enforcement officer, formerly employed as a full-time, sworn police officer, deputy sheriff, and law enforcement supervisor, trainer, and manager. As such, I have supervised and instructed law enforcement, security, and corrections officers – as well as supervisors, managers, and executives – in the performance of their duties, to include, *inter alia*, arrest, restraints, use of force and deadly force, conducted energy weapons, motor vehicle operations, corrections operations, policy development, and the training, supervision, and management of other criminal justice and municipal professionals, and trainers. I have instructed other governmental and NGO[15] executives, supervisors, employees, and other personnel, on many of the same topics.[16]

Credentials in Brief.  More specifically, I served for 15 years as a professional, credentialed – sworn and fully empowered – law enforcement officer, trainer, and manager, with approximately one-half of that time as a supervisor, field supervisor, and manager. In addition to my certification as a Michigan police officer, I earned four Advanced Police Officer Training certificates, three Police Management Development certificates, and one Police Supervisor Development certificate, from the Michigan Law Enforcement Officers Training Council.[17]

Subsequently, I served for 12 years as a full-time, credentialed, governmental risk manager. In that capacity, I counseled municipalities, municipal insurance pools, and other government and non-government entities – throughout the United States – on managing the risks of employee injuries and litigation, particularly as regards law enforcement and jail training, operations, and management.

*Formal Education.*  I earned and was awarded a Bachelor of Arts Degree in Communication Arts, and a Master of Science Degree in Criminal Justice, from Michigan State University. Additionally, I earned and was awarded a Master of Liberal Studies Degree in Interdisciplinary Technology – with criminal justice focus – from Eastern Michigan University, graduating with a perfect academic record. I am a graduate of the Northwestern University School of Police Staff and Command, again with a perfect academic record. I completed and earned professional designations as an Associate in Risk Management, and as an Associate in Risk Management for Public Entities, from the Insurance Institute of America.[18] I

---

[14] My detailed Curriculum Vitae is attached to, and incorporated into, this report as Exhibit II.

[15] NGO is an initialism for Non-Governmental Organization. In this context, examples include municipal insurance carriers and non-profit municipal insurance pools.

[16] Including graduate and undergraduate university students, and police academy recruits.

[17] MLEOTC, now formally renamed MCOLES (Michigan Commission on Law Enforcement Standards), is the state-mandated law enforcement certifying entity in Michigan.

[18] The Insurance Institute of America (IIA) was rebranded as *The Institutes* in 2009. The Institutes is the insurance industry's primary credentialing organization.

successfully completed police academy training and earned certification as a Michigan police officer.

*Training Completed and Certifications Earned.* I have attended and successfully completed – largely at my own expense – more than 6,000 hours of law enforcement, corrections, criminal justice, and public entity, operational and risk management related training. Much of my training has been – and is – of an advanced nature, and includes more than 70 law enforcement instructor, instructor-trainer, and Master instructor-trainer[19] certification courses. These advanced- and instructor-level courses include, *inter alia*, firearms, defensive tactics, officer safety and survival, aerosol weapons, impact weapons, handcuffing, weapon retention and disarming techniques, internal affairs investigations, conducted energy weapons,[20] use of force, use of deadly force, police driving, pursuit driving, emergency vehicle operations, and policy development.[21]

I have been trained and certified as a TASER Senior Master Instructor,[22] by TASER International,[23] and hold a Master Use of Force Instructor™ certification from the Police Policy Studies Council®, as well as a Master Force and Control Instructor™ certification from the Smith & Wesson Academy®.[24] I am an IADLEST® Nationally Certified Instructor (INCI)™, certified as a Charter INCI Member, and an IADLEST International Certified Instructor (IICI)™, certified as a Charter IICI Member, by the International Association of Directors of Law Enforcement Standards and Training.[25]

I am a Certified Force Science Analyst™ and an Advanced Force Science Specialist™, trained by and at the Force Science Institute®, and am an Instructor Graduate of the Law of Self Defense™ Instructor Program, presented by the Law of

---

[19] Instructor-trainer courses are often referred to as *train-the-trainer* courses; Master Instructor-Trainers typically train other instructor-trainers.

[20] Conducted energy weapons are sometimes referred to as electronic control devices, conducted electronic devices, conducted electrical weapons, and other similar naming conventions. In some cases, the brand-name *TASER* is inappropriately applied as a generic reference. Generally – and in the context of this report – all of these terms have the same, or a similar, meaning.

[21] In addition to the aforementioned, I have successfully completed numerous armorer and technician courses, regarding various handgun, long gun, and non-lethal weapon systems, including TASER branded devices and various aerosol and chemical munitions.

[22] As such, I have trained hundreds of TASER Instructors, and hundreds of TASER Master Instructors (instructor-trainers), as well as TASER end-users. Notably, as a senior member of the TASER instructional cadre, I trained TASER Master Instructors on downloads and the interpretation of same, at Master Instructor Schools presented by the manufacturer of TASER branded devices, TASER International, Inc. Additionally, as part of the TASER, International, Quality Assurance Program, I was chosen to provide quality assurance oversight and review of TASER Master Instructors, as they presented instructor courses, at numerous locations across the United States.

[23] TASER, International, Inc., has been rebranded AXON Enterprise, Inc.

[24] This credential is sometimes referred to as a Master Use of Force Instructor certification.

[25] I am also an IADLEST member. From the IADLEST.org website, *"IADLEST is an association of standards and training managers and leaders. Its primary focus is criminal justice standards and training. To the extent that the focus and the values promoted thereby can be furthered and shared, all training professionals are welcome as members. The mission of IADLEST is to research, develop, and share information, ideas and innovations which assist states in establishing effective and defensible standards for employment and training of law enforcement officers, and, in those states where dual responsibility exists, correctional personnel."* Accessed and retrieved by Steve Ashley on 28 May 2018.

Self Defense Institute®. I earned and received an Excited Delirium/Agitated Chaotic Events™ Master Instructor certification, from the Institute for the Prevention of In-Custody Deaths. I successfully completed and received credentials from both the Federal Driving Instructor Training Program and the Federal Firearms Instructor Training Program, conducted by and at the Federal Law Enforcement Training Center.

*Memberships*.  In order to remain professionally current, I maintain active and professional memberships in numerous associations and organizations. My memberships include, *inter alia*,

- Alpha Phi Sigma, National Criminal Justice Honor Society
- American Jail Association – Professional Member
- American Society for Testing and Materials, Intl (ASTM) – Voting Member
- Association of Force Investigators
- Concerns of Police Survivors (COPS) – Family/Survivor Member
- Illuminating Engineering Society of North America – Professional Member
- International Association of Chiefs of Police (IACP) – Academic Member
- International Association of Correctional Training Personnel (IACTP) – Professional Member
- International Association of Directors of Law Enforcement Standards and Training (IADLEST)
- International Association of Law Enforcement Emergency Vehicle Response Trainers (ALERT)
- International Association of Law Enforcement Firearms Instructors (IALEFI)
- International Foundation for Protection Officers – Professional Member
- International Law Enforcement Educators and Trainers Association (ILEETA) – Advisory Board, Managing Editor Emeritus, and Founding Charter Member
- Law Enforcement & Emergency Services Video Association, International (LEVA)
- Michigan Academy of Science, Arts & Letters (MASAL)
- Michigan Association of Chiefs of Police (MACP) – Active Member
- Michigan Sheriffs' Association – Professional Member
- Michigan State University (MSU) Alumni Association – Life Member
- National Law Enforcement Academy Resource Network (NLEARN) – Member
- National Rifle Association (NRA) – Benefactor (Life) Member
- National Sheriffs' Association (NSA) – Active Member
- Northwestern University Traffic Institute Alumni Association

- OSS Academy – TCOLE Advisory Board Member (§ 1701)
- Phi Kappa Phi Academic Honor Society
- Police Marksman Association – Life Member
- Society for Police and Criminal Psychology – Active Member
- Volunteer Law Enforcement Officer Alliance (VLEOA) – Active Member

*Training Delivered.* I have taught law enforcement, corrections, security, and criminal justice, courses at colleges, universities, civic organizations, and law enforcement agencies, throughout the United States. I have been an invited presenter on a broad range of law enforcement, security, corrections, and risk management topics, at numerous state, regional, national, and international conferences. Among the many topics I have taught – and upon which I have presented – are law enforcement and jail operations, policies and procedures, civil rights, arrest tactics, officer safety, use of force and deadly force, use of force management, management of volunteer officers, training management, law enforcement driving, conducted energy weapons, law enforcement liability, and jail liability.[26]

*During my active-duty law enforcement career at Livingston County*, I was responsible for planning, developing, and delivering, a department-wide, in-service training program, which included development and implementation of an agency-wide field training and evaluation program,[27] as well as a department-wide police precision driver training program. This effort included conducting a full training needs analysis of the department, including jail and detective operations. The department-wide training program included a far reaching effort for driver training, firearms training and qualification, defensive tactics and non-lethal force, and numerous other subjects. I provided training for, as well as liaison to and oversight of, the Sheriff's volunteer/reserve Mounted Patrol Division. I both trained and mentored department training staff, as well as personally delivered much of the training described, *supra*, to department personnel. Additionally, I developed and delivered various community based training programs – such as crime prevention and child/personal safety courses – to citizen groups and fraternal organizations.

*During my 22 years of police academy service*, I was the Use of Force Coordinator, Chief Firearms - Use of Force Instructor, and Chief Driving Instructor, for a college-based police academy. As such – along with teaching firearms, use of force, non-lethal weapons, and both recruit and in-service driving – my primary tasks included program and curriculum development and oversight, as well as the training and certification of use of force, firearms, and police driving instructors.

Since 1976, I have personally delivered over 150,000 man-hours of training to more than 16,500 officers, trainers, supervisors, and managers.

*University Professorship.* I have had the honor of serving as an Adjunct Professor of Justice and Public Policy, at Concordia University in Ann Arbor, Michigan. As such,

---

[26] Training related to legal issues and constructs is presented from an informed lay-person's perspective.

[27] Field Training and Evaluation Programs are often colloquially referred to as FTO programs in the law enforcement community. FTOs, or Field Training Officers, train newly hired police recruits after they graduate from the police academy.

I taught traditional undergraduate and graduate students in various courses, including, *inter alia*, Administration of Justice, Corrections Theory and Practice, Ethics in Criminal Justice, Foundations of Justice, Juvenile Justice Theory, Law Enforcement Policy and Practices, Management of Law Enforcement Agencies, and Public Safety Risk Management.

*Risk Management.*  As a credentialed risk manager, I have personally conducted more than 400 detailed – on-site – risk management reviews of law enforcement agencies and detention facilities, and have completed in-depth critical reviews of more than 500 law enforcement policy and procedure manuals[28] from law enforcement agencies and jails located across the United States. These risk management and manual reviews routinely and frequently result in documented recommendations for improvement. In many cases, compliance with my recommendations has been mandated by municipalities' insurance carriers.

I have served on – as well as conceived, formulated, mentored, and managed – subject matter expert (SME) panels. The objective of said SME panels was the development of sample policies and recommended procedural guidelines for critical law enforcement, security, and corrections, management and operations.[29]

*Authorship.*  In my over 46 years as a criminal justice professional and trainer, I have authored and published more than 120 articles on various law enforcement, security, and criminal justice topics, in numerous publications. In my writing, my primary focus has been on use of force, police vehicle operations, and other critical aspects of law enforcement and corrections operations, as well as the training and supervision of criminal justice professionals. Additionally, I have – at the request of both authors and publishers – edited, fact-checked, and content reviewed, criminal justice and risk management-oriented manuscripts, books, periodicals, and publications, authored by other criminal justice professionals. For several years, I was honored to serve as the volunteer Managing Editor for the various publications of the 4,000 member International Law Enforcement Educators and Trainers Association.

*Currently.*  I am an independent criminal justice advisor, risk manager, and trainer. As such, I conduct risk assessments of law enforcement and jail operations – as well as policy reviews – for agencies throughout the United States. I am frequently consulted for risk management advice by criminal justice leaders, trainers, and municipal officials. Additionally, I present staff and management training for peace officers and corrections personnel, as well as public sector managers, trainers, and government officials.

---

[28] Operating manuals for criminal justice agencies are identified in many different ways: common naming conventions include, *inter alia*, policies, procedures, policies and procedures, rules and regulations, general orders, operating guidelines, standard operating procedures, and directives. Colloquially, these documents are often referred to as *policies*. Within the context of this report – and unless specified differently – all these terms are defined as having generally the same meaning. In some contexts, rules and regulations are considered to be more oriented toward mandated workplace rules, while policies and procedures are intended more as procedural guidelines.

[29] Examples are the Law Enforcement Committee of the Michigan Municipal Risk Management Authority (MMRMA), the Law Enforcement Action Forum (LEAF committee) of the Michigan Municipal Liability and Property Pool (a division of the Michigan Municipal League), and the law enforcement advisory committee of the Iowa Communities Assurance Plan (ICAP).

*In maintenance and furtherance of my professional skills and knowledge*, I attend training programs and conferences on an on-going basis, and I continue my membership and active involvement in numerous professional organizations, as outlined, *supra*. I maintain a professional library of over 6,000 books and research publications, and continue receipt and review of numerous professional journals, periodicals, and other publications.

<u>Expert Case Consultation Objectivity</u>.  I have been privileged to provide expert consultation and review in more than 170 cases since 1994, approximately 75% of which have been defense cases. During the same years, I have had the honor of testifying as an expert – at deposition, hearing, or trial – 50 times in 43 cases, approximately 65% of which have been defense cases.[30]

5. **ANALYSIS PROTOCOL.**

In preparation of my review and development of associated opinions in this matter, I have conducted an analysis of much of the documentation and data currently available, and analysis continues.[31] These documents and other materials are of the type typically relied upon by consultants and experts when conducting analyses of law enforcement, corrections, security, and criminal justice issues. The documents received, researched, and reviewed, thus far have – upon information and belief – provided me with enough relevant data to develop my opinions to a reasonable – or higher – degree of professional certainty.

In addition to my evaluation of documents and other materials, I rely upon my skill and/or knowledge – as gained through my many years of experience, education, and/or training – in the law enforcement, security, corrections, and risk management fields; consultation with peers, review of professional literature, and independent research; as well as my understanding of the instant case.

<u>Terminology</u>.  Any opinions I proffer or statements that I make in this report that relate to legal terminology, standards, best practices, preferred practices, case law, or similar constructs, are drawn from my training and/or experience as a criminal justice practitioner, manager, educator, and trainer, as well as my experience and/or training as a researcher, governmental risk manager, and advisor.

I explicitly note that use of specific legal terminology in this report is not intended to usurp or subvert the function of the Court, or to intrude upon or inappropriately influence the role of the Jury or other trier of fact.[32]

<u>Truth, Veracity, and Bias</u>.  The following analysis is not intended to presume that any one version of the claims made in this case is more truthful than any other. Information drawn from various documents and other sources may be reported and

---

[30] A listing of cases in which I have testified as an expert at deposition, hearing, or trial, in the past four years, is attached to, and incorporated into, this report as <u>Exhibit III</u>.

[31] A listing of documents and data received, reviewed, or considered – thus far – is attached to, and incorporated into, this report as <u>Exhibit I</u>.

[32] Like many other criminal justice managers, trainers, and instructors, I use such terms in training that I present to police and corrections personnel, because they are commonly understood by criminal justice practitioners, and are typically used in daily operations by law enforcement and corrections professionals.

contrasted for the purpose of relating events as they were perceived by those involved.[33,34]

Methodology.  I understand that a non-scientific expert must be qualified to offer expert testimony by *"knowledge, skill, experience, training, or education"*.[35] Similarly, I understand that the role of the expert is to provide *"specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue"*[36]; and that said expert's contribution must be *"not only relevant, but reliable."*[37]

In this report I have provided both general and specific information that demonstrates and illustrates my qualifications to provide expert opinions and testimony in this case.

*General Methodology*.  The methodology I used in this case is the same that I have utilized for many years, and that has been peer-reviewed – at my request – by numerous other experts.

Dependent upon the specific nature of each case, my methodology framework generally incorporates the following:[38]

- Orientation to case issues and elements;

- Review of provided case documents and materials;

- Development of a timeline, as well as a geographical and climatological context for the incident;

- Review of case related documents available on PACER and/or other on-line resources;

- Literature review regarding issues indicated in the instant case;

- General context consideration, regarding the backdrop of current and historical practices in relevant fields;

- Comparative analysis of case-related issues against the backdrop of current practices;

- Research and review of other relevant resource materials;

- Analysis of case information against a backdrop of my skills, knowledge, experience, education, and/or training;

---

[33] Where practical I rely upon undisputed facts, and attempt to indicate those that are disputed when appropriate. Where facts and evidence appear to directly contradict statements and assertions of any party to this action, I attempt to point out the contradictions, and place them into context.

[34] Any apparent assumption of truth or implied assignment of veracity by me is undertaken solely for the purpose of analysis and the rendering of opinion, and is not intended to usurp the role of the Jury or other trier of fact.

[35] Fed. R. Evid. 702.

[36] *Kumho Tire Co., LTD., et al., v. Carmichael, et al.*, 526 U.S. 137, 147 (1999), citing Fed. R. Evid. 702.

[37] *Kumho Tire Co., LTD., et al.,* 526 U.S., at 147, citing *Daubert, et al., v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), at 589.

[38] While these elements are typically part of my methodology, not every element listed here is necessary – or will be undertaken – in every case. In some cases, additional elements may be undertaken.

- Formulation of opinions.

*Specific Methodology*.  In the instant case, in connection with the methodology outlined, *supra*, I:

- Began by not assigning specific credibility to any witness;

- Reviewed sufficient data that would enable me to reach conclusions and, ultimately, opinions to a reasonable degree of professional certainty;

- Developed a set of relevant and material facts only after a review of all materials provided and researched;

- Assumed the aforementioned facts to be true solely for the purpose of analysis;

- Conducted analysis of the aforementioned facts utilizing my skill and knowledge, as gained through my education, experience, and/or training;

- Developed opinions that I believe are reliable to a reasonable degree of professional certainty.

This methodology has been accepted by presiding Judges in previous cases wherein I have had the privilege of testifying at trial. My methodology is consistent with that utilized by other competent experts in the field of criminal justice when conducting analyses of criminal justice practices.

Nature and Status of Opinions.  Within the scope of the information thus far received, and unless otherwise indicated, each of my opinions is held to a reasonable – or higher – degree of professional certainty, whether stated in the body of this report, or in the opinions section.[39]

6. **SCOPE OF THIS REPORT**.[40]

I was engaged by defense counsel,[41,42] and was asked to review and opine regarding the reported actions of South Charleston Police Officers, concerning the events that gave rise to this action, as well as ancillary issues.[43]

Claims Asserted. It is my understanding that the following claims are or were initially asserted in this case.[44]

---

[39] Some of the opinions that I have expressed in this report may contain references to some of the case specific documents or other resources reviewed or considered. Such references are not intended to be exhaustive or exclusive, and I specifically reserve the right to supplement the support for each of the opinions in this report.

[40] In this report, I state my opinions based upon my understanding of the incident and circumstances in question. That understanding is drawn from the documents and other information that is available to me as of this writing. Other documents and materials may yet be discovered, disclosed, or provided. As my review and consideration of documents continues, further discovery occurs, and/or other information becomes available, I reserve the right to modify, revise, extend, and/or affirm my opinions.

[41] Duane J. Ruggier, II (WVSB #7787), of the firm Pullin, Fowler, Flanagan, Brown & Poe, PLLC.

[42] I was first contacted on or about May 28, 2021. I was formally engaged shortly thereafter, on or about June 4, 2021.

[43] Complaint, Civil Action Number 2:20-cv-00561, Document 1, PageID #: 1-9, date filed 08/25/2020.

[44] Complaint, Civil Action Number 2:20-cv-00561, Document 1, PageID #: 1-9, date filed 08/25/2020.

- *"Count I – Negligence, Gross Negligence, and Reckless Disregard in [¶] the Operation of a Motor Vehicle as to Defendants Peterson and [¶] City of South Charleston"*[45]

- *"Count II – Excessive Force in Violation of the Laws and [¶] Constitutions of West Virginia and the United States"*[46]

- *"Count III – Section 1983 Claim Against [¶] the City of South Charleston"*[47]

- *"Count IV – Claim for Injunctive and Declaratory Relief"*[48]

My understanding is that several of the claims, *supra*, have been dismissed,[49] including Counts III and IV, and some portions of Count I.

<u>Focus of Review</u>. My specific imprimatur in this case was to review the actions of South Charleston Police Officers E. M. Peterson and D. Harvey, regarding their actions during officers' encounter with William Means, and to consider ancillary issues.

## 7.  BACKGROUND.

This action arises out of allegations concerning an incident that occurred on Saturday,[50] May 2, 2020, involving Officers of the South Charleston, West Virginia, Police Department.[51]

## 8.  FACTS OR DATA CONSIDERED.

The following reflects my understanding of the events and circumstances that are alleged to have occurred during the incident that gave rise to the instant case. It is drawn from the information currently available to me and is included here upon information and belief. It is not intended to be an exhaustive or exclusive recitation of events or circumstances.

<u>Event Venue, Location, Time Frame, Weather, and Lighting</u>. The events giving rise to the instant case occurred along public roadways located in and around the City of South Charleston, and in portions of Kanawha and Boone counties, West Virginia. The events occurred during the morning hours of Saturday, May 2, 2020.[52]

*Venue*. On the day of the vehicle pursuit that culminated in the traffic crash and incident that gave rise to the instant case, the roadways involved began in South

---

[45] Complaint, Civil Action Number 2:20-cv-00561, Document 1, PageID #: 1-9, date filed 08/25/2020, ¶¶ 21 – 27.

[46] Complaint, Civil Action Number 2:20-cv-00561, Document 1, PageID #: 1-9, date filed 08/25/2020, ¶¶ 28 – 34.

[47] Complaint, Civil Action Number 2:20-cv-00561, Document 1, PageID #: 1-9, date filed 08/25/2020, ¶¶ 35 – 38.

[48] Complaint, Civil Action Number 2:20-cv-00561, Document 1, PageID #: 1-9, date filed 08/25/2020, ¶¶ 39 – 41.

[49] Memorandum Opinion and Order, Civil Action Number 2:20-cv-00561, Document 16, date filed 11/13/2020.

[50] TimeandDate.com Monthly Calendar for May, 2020, accessed by Steve Ashley during 06/2021.

[51] Complaint, Civil Action Number 2:20-cv-00561, Document 1, PageID #: 1-9, date filed 08/25/2020.

[52] Complaint, Civil Action Number 2:20-cv-00561, Document 1, PageID #: 1-9, date filed 08/25/2020.

Charleston's commercial corridor, and continued into western Kanawha County and northern Boone County. The roadways wound through some rural residential areas, and other more sparsely populated venues. A significant portion of the route traversed wooded, hilly, winding areas, with roadways that sometimes narrowed.[53],[54] The route traveled during the pursuit (as reflected in the reenactment videos) covered approximately 13.85 miles.[55]

*Location.* As seen in overhead satellite views and Google Street Views,[56] as well as in scene photographs and the reenactment video, the location of the motorcycle crash that ended the pursuit occurred at a railroad grade crossing (identified as the *"Dartmont-Ashford"* crossing by Officer Peterson) along Emmons Road, adjacent to the Big Coal Subdivision rail line.[57],[58]

As one approaches the area of the crash, Emmons Road is a nominal two way, unlined, blacktop road. There are no lane markings. The surface is rough and patched in some areas, and appears to be less than two car widths wide. Trees and undergrowth line each side of the roadway. There are no curbs or sidewalks, as the area is rural.

Emmons Road parallels railroad tracks (along the north side of the tracks) for some distance, and as one nears the area of the crash, Emmons Road curves and crosses the tracks, and begins paralleling the tracks on the south side. Approximately 3/10 of a mile past this first crossing, Emmons Road curves and re-crosses the tracks, to begin paralleling along the north side again. The motorcycle crash occurred at or near this second crossing.

Between the two grade crossings, the geographic elevation context is initially gently rolling, giving way to a relatively flat, straight stretch as one approaches the left curve and rise at the second grade crossing crash scene. The vegetation opens up to the south side of the roadway – forming a clearer vision, turn-around area – just prior to this curve to the left. The elevation at the actual grade crossing is approximately 640 feet above sea level.[59],[60]

The railroad crossing is marked with the usual crossbuck crossing signs and flashing red warning lights. There are no barricades. There is a metal equipment junction box located to the right of the crossing point, on the south side of the tracks. The rail bed is graveled and sloped on both sides of the tracks. There is a deep ditch running along

---

[53] Video file labeled *GOPR0963 Pursuit Route Part 1.mp4* [length 00:17:35, frame rate 29.97 fps], undated.

[54] Video file labeled *GP010963 Pursuit Route Part 2.mp4* [length 00:14:59, frame rate 29.97 fps], undated.

[55] Various Google Maps and Satellite view captures, accessed by Steve Ashley during 06/2021.

[56] Various Google Maps and Satellite view captures, accessed by Steve Ashley during 06/2021.

[57] Elevation for 38.201667, -81.725346, https://www.freemaptools.com/elevation-finder.htm. Accessed by Steve Ashley during 06/2021.

[58] Peterson also identified the railroad crossing as number 226159.

[59] Elevation for 38.201667, -81.725346, https://www.freemaptools.com/elevation-finder.htm. Accessed by Steve Ashley during 06/2021.

[60] I note that Corporal [Trooper] Robinson's Crash Report cites slightly different GPS coordinates [i.e., 38.20139, -81.72472], which map south of the actual roadway, and indicate an elevation of approximately 630 feet.

the north side of the rail bed; this ditch contained water on the day of the incident.[61] The north side of the ditch appears steep and brush covered, as the continuation of Emmons Road on the north side of the track appears somewhat elevated.[62]

*Time.*[63] This was a daytime incident, occurring during morning hours. The various reports list the time occurred as *"08:01,"*[64,65] The CFS[66] Report of radio transmissions shows both *Call Created* and *Incident Created* times of 8:01:57 am for incident number 2020-00005682.[67,68] Corporal [Trooper] Robinson's Crash Data report lists the time for the crash as 0821; while the dispatch CFS log lists the first crash entry at 8:19:56 am.[69]

*Weather.*[70] Assuming, *arguendo*, that the recorded crash times are correct at approximately 8:20 am, then during the approximate time of the incident,[71] the weather was *"Partly Cloudy,"*[72] with an approximate temperature of 43°, and humidity at 97%.[73] The dewpoint was 42°.[74] The winds were calm.[75]

There had been no rain for at least 18 hours prior to this incident, following an

---

[61] The exact depth of the water is in dispute; Peterson reported that the water was *"up to my knees"* (Peterson Narrative, p. 8), while Harvey reported that it was *"approximately three foot [sic] deep"* (Harvey Narrative, p. 12). Trooper Robinson testified that the water depth was *"at least a couple feet. Maybe a little more"* (Robinson dep., p. 33.

[62] Video file labeled *GP010963 Pursuit Route Part 2.mp4* [length 00:14:59, frame rate 29.97 fps], undated.

[63] I do not know that these times are synchronized with system time at the dispatch center, or in any other manner.

[64] South Charleston Police Department, Case Number 2020-00005682, Case Report Summary, dated 05/02/2020.

[65] 08:01, or 0801 hrs is equivalent to 8:01 am.

[66] CFS is an initialism for *Calls for Service.*

[67] [Dispatch] Call for Service Detail Report-CFS 65, dated 05/02/2020, p. 4.

[68] These are the actual times entered on the Event Log. Other information appears to be timed as manually entered.

[69] [Dispatch] Call for Service Detail Report-CFS 65, dated 05/02/2020, p. 3.

[70] Historical weather readings utilized in this report originate from Yeager Airport Weather Station at Yeager Airport, which is located approximately 8.6 miles east/northeast of the pursuit route starting point at Ruth Road, and 13.75 miles northeast of the crash scene on Emmons Road. (As the crow flies).

[71] The actual weather data were recorded hourly at 7:54 am. "Weather History for Yeager Airport Weather Station KCRW." Weather Underground, 2 May 2020, https://www.wunderground.com/history/daily/KCRW/date/2020-5-2. Accessed and retrieved by Steve Ashley during 06/2021.

[72] "Weather History for Yeager Airport Weather Station KCRW." Weather Underground, 2 May 2020, https://www.wunderground.com/history/daily/KCRW/date/2020-5-2. Accessed and retrieved by Steve Ashley during 06/2021.

[73] "Weather History for Yeager Airport Weather Station KCRW." Weather Underground, 2 May 2020, https://www.wunderground.com/history/daily/KCRW/date/2020-5-2. Accessed and retrieved by Steve Ashley during 06/2021.

[74] "Weather History for Yeager Airport Weather Station KCRW." Weather Underground, 2 May 2020, https://www.wunderground.com/history/daily/KCRW/date/2020-5-2. Accessed and retrieved by Steve Ashley during 06/2021.

[75] "Weather History for Yeager Airport Weather Station KCRW." Weather Underground, 2 May 2020, https://www.wunderground.com/history/daily/KCRW/date/2020-5-2. Accessed and retrieved by Steve Ashley during 06/2021.

---

extended period of light rain during most of the prior 24 hours.[76,77,78] There was well documented water in the drainage ditch. The road surface appears dry in the bystander video.

*Lighting*. This was an outdoor, daytime incident. Civil twilight was clocked to end at 5:59 am, and sunrise was at 6:28 am.[79] Solar noon was at 1:23 pm.[80]

A review of the bystander video recorded toward the end of the incident indicates that the general area was well-lit, while a portion of the area was shaded by trees.[81]

Centrally Involved Individuals. Various law enforcement officers and individuals are mentioned in the documentation of this case. This report primarily focuses on the following:[82]

- *William Allen Means, Plaintiff*.[83] William "Billy" Means (Mr. Means, Billy, Means) was the motorcycle rider that reportedly fled from police following an attempted traffic stop. Mr. Means was ultimately involved in a single-vehicle motorcycle crash which culminated in his being arrested by two officers.

- *Eric Peterson, a named Defendant*.[84] At the time of this incident, Eric Peterson (Corporal Peterson, Officer Peterson, Peterson) was engaged as a fully empowered police officer, employed by the South Charleston Police Department.[85] On May 2, 2020, Corporal Peterson was on duty and was the driver of police department unit SC126.[86] Following an attempted traffic stop, Peterson pursued William Means' motorcycle, ultimately arresting Means after Means crashed.

- *David Harvey, a named Defendant*.[87] At the time of this incident, David Harvey (Patrolman Harvey, Officer Harvey, Harvey) was engaged as a fully

---

[76] "Weather History for Yeager Airport Weather Station KCRW." Weather Underground, 2 May 2020, https://www.wunderground.com/history/daily/KCRW/date/2020-5-2. Accessed and retrieved by Steve Ashley during 06/2021.

[77] "Weather History for Yeager Airport Weather Station KCRW." Weather Underground, 1 May 2020, https://www.wunderground.com/history/daily/KCRW/date/2020-5-1. Accessed and retrieved by Steve Ashley during 06/2021.

[78] "Weather History for Yeager Airport Weather Station KCRW." Weather Underground, 30 April 2020, https://www.wunderground.com/history/daily/KCRW/date/2020-4-30. Accessed and retrieved by Steve Ashley during 06/2021.

[79] "Sunrise and sunset times in Charleston WV for May 2020". https://www.timeanddate.com/sun/usa/charleston-wv?month=5&year=2020. Accessed and retrieved by Steve Ashley during 06/2021.

[80] "Sunrise and sunset times in Charleston WV for May 2020". https://www.timeanddate.com/sun/usa/charleston-wv?month=5&year=2020. Accessed and retrieved by Steve Ashley during 06/2021.

[81] Video File labeled *2020-05682 video provided by Peterson (Youtube Video).mp4* [length 00:02:14], undated].

[82] This proviso is made for the sake of brevity and is not intended to imply that any individual associated with the instant case is less credible, or that their information is less relevant or material. Any other – more tangentially – involved individuals may be listed elsewhere in this report.

[83] Complaint, Civil Action Number 2:20-cv-00561, Document 1, PageID #: 1-9, date filed 08/25/2020.

[84] Complaint, Civil Action Number 2:20-cv-00561, Document 1, PageID #: 1-9, date filed 08/25/2020.

[85] Complaint, Civil Action Number 2:20-cv-00561, Document 1, PageID #: 1-9, date filed 08/25/2020.

[86] [Dispatch] Call for Service Detail Report-CFS 65, dated 05/02/2020, p. 7.

[87] Complaint, Civil Action Number 2:20-cv-00561, Document 1, PageID #: 1-9, date filed 08/25/2020.

empowered police officer, employed by the South Charleston Police Department.[88] On May 2, 2020, Patrolman Harvey was on duty and was the driver of police department unit SC145.[89] Harvey backed up Peterson during the motorcycle pursuit, ultimately arresting Means after Means crashed.

- *Melissa Nunley, a non-party witness.*[90] At the time of this incident, Melissa Nunley (Ms. Nunley) was a civilian by passer. On May 2, 2020, Ms. Nunley was driving on Emmons Road, accompanied by a friend, Ms. Chandler.[91] As they drove, they met the on-coming motorcycle pursuit, and turned around to follow it. Ms. Nunley stopped at the scene of the motorcycle crash, and Ms. Chandler recorded a portion of the ensuing events on her cell phone.[92] Ms. Nunley did not witness the crash or its immediate aftermath.[93]

- *Mary Chandler, a non-party witness.*[94] At the time of this incident, Mary Chandler (Ms. Chandler) was a civilian by passer. On May 2, 2020, Ms. Chandler was a passenger in the vehicle driven by her friend, Ms. Nunley.[95] As they drove on Emmons Road, they met the on-coming motorcycle pursuit, and turned around to follow it. As Ms. Nunley stopped at the scene of the motorcycle crash, Ms. Chandler recorded a portion of the ensuing events on her cell phone.[96] Ms. Chandler did not witness the crash or its immediate aftermath.[97]

<u>*Other Individual Witnesses to the Incident*</u>.  There are no reported witnesses to the pursuit, crash, or immediate aftermath, other than Officers Peterson and Harvey.

<u>General Summary of Incident</u>. The general incident description that follows is reproduced from the narrative reports of Officers Eric Peterson and David Harvey,[98],[99] as their reported perceptions and impressions were those that informed their actions during the incident.[100] While they are generally consistent, there are some minor variations, so both are reproduced here.

<u>*Narrative Report of Corporal Eric Peterson*</u>.

> *"On 02 May 2020 I observed a black motorcycle bearing WV registration G92897 traveling southbound on US 119 at the*

---

[88] Complaint, Civil Action Number 2:20-cv-00561, Document 1, PageID #: 1-9, date filed 08/25/2020.

[89] [Dispatch] Call for Service Detail Report-CFS 65, dated 05/02/2020, p. 7.

[90] Deposition transcript of Melissa Nunley, dated 04/26/2021.

[91] Deposition transcript of Melissa Nunley, dated 04/26/2021.

[92] Deposition transcript of Melissa Nunley, dated 04/26/2021.

[93] Deposition transcript of Melissa Nunley, dated 04/26/2021, p. 10.

[94] Deposition transcript of Mary Chandler, dated 04/26/2021.

[95] Deposition transcript of Mary Chandler, dated 04/26/2021.

[96] Deposition transcript of Mary Chandler, dated 04/26/2021.

[97] Deposition transcript of Mary Chandler, dated 04/26/2021, p. 11.

[98] South Charleston Police Department, Case Number 2020-00005682, Field Case Report Narrative by Corporal Peterson, dated 05/02/2020.

[99] South Charleston Police Department, Case Number 2020-00005682, Field Case Suppliment [sic] Narrative by Officer Harvey, dated 05/02/2020.

[100] Beyond bracketed insertions, I have endeavored to quote the text verbatim.

*intersection with Southridge Blvd, South Charleston, Kanawha County, WV. I relayed the registration to Metro Communications and they relayed back that the registration was for a 2009 Yamaha XT250 and that it was expired. The registration had an orange expiration sticker on it displaying expired July of 06 or 08. The motorcycle registration was improperly displayed and the motorcycle was spray painted in black primer paint which is common on motorcycles that have been stolen or their identity altered. I relayed this information to other units and requested they start towards my position for assistance with conducting a traffic stop of the motorcycle.*

*"I observed the motorcycle operator look over his shoulder multiple times while at the red light checking my position. Unit I09 and 145 had started my direction as the motorcycle and I continued on southbound on US 119 passing mile marker 74.0. I informed other units that the operator of the motorcycle was a white male, wearing black pants over blue jeans, a brown Carhartt jacket, black helmet, black and white tennis shoes and was wearing a back pack [sic]. I observed the motorcycle operator traveling the posted speed limit and again looking back over his shoulder to check my position. I informed other units that I would wait for them to move to catch up to our position to initiate the stop as the operator was giving indicators he may attempt to flee the initial stop.*

*"I observed the motorcycle approach the 73.6 mile marker and move to the left lane of travel indicating he may turn off of US 119 and onto Ruth Rd. I asked other units their position and they informed me they were passing Green Rd. I then decided to initiate the traffic stop as the motorcycle was turning left off of US 119 onto Ruth Rd. The area adjacent to the turn provided safe, ample room for the traffic stop. I turned on my emergency lights and loud audible siren providing clear visual and audible sound for the operator to stop the vehicle. The operator looked over his shoulder again and instead of stopping the vehicle began to speed up fleeing from this officer. I observed the motorcycle continue on Ruth Rd to the intersection with Trace Fork Rd where the motorcycle turned and traveled onto Trace Fork Rd.*

*"I observed the motorcycle continue to travel on Trace Fork Rd with speeds ranging from 15 mph to a top speed of 53 mph to the intersection with Heavenly Dr where it turned onto Heavenly Dr. The posted speed limit for this roadway is 25mph [sic]. I observed the motorcycle operator while negotiating sharp and slight turns cross into the opposite lane of travel (which did not travel into the path of any oncoming vehicles) at high and low speeds also putting his foot down on the pavement seeming to indicate he was unsure of his or the motorcycle's abilities. The motorcycle continued on Heavenly Dr passing Elwood Dr where it did not stop at all for a stop sign. The motorcycle then turned down off of Heavenly Dr onto a dirt/gravel access road with multiple ruts and potholes. The motorcycle operator*

slowed operation of the motorcycle due to the rough terrain and continued to look over his shoulder as he appeared to try and take off the backpack without success. I observed some parts of the motorcycle start to fall from the frame and hit the roadway due to the rough ride. I observed the motorcycle approaching a creek bed with four foot [sic] of water flowing in it. I stopped my vehicle at this point as I thought the operator may stop and not try and cross the water. I observed the motorcycle speed up and the operator place his feet up in the air in alignment with the handlebars of the motorcycle and travel through the water. I observed the motorcycle then travel up a hillside and turn left onto Rabel Mountain Rd. I moved through the creek and continued to follow the motorcycle on Rabel Mountain Rd. As we approached the intersection with Brounland Rd I observed Unit 145 Ptlm D Harvey off to the right of the roadway waiting to assist. We passed Harvey's position and Harvey traveled behind my position at some distance and took over radio communication for the pursuit. I observed the motorcycle fail to come to a complete stop as it turned left from Rabel Mountain Rd onto Brounland Rd.

"The motorcycle continued on Brounland Rd and just past the Sand Plant road [sic] intersection and [sic] approached a section of roadway that was blocked down to one lane due to a road/slip repair. The motorcycle failed to stop to alternate with oncoming traffic (which at the time there was not any) and proceeded directly through the coned/signed off area into the opposite direction of traffic. The motorcycle continued to travel on Brounland Rd to the intersection with Emmons Rd where it turned right off of Brounland Rd onto Emmons Rd.

"The motorcycle, Harvey and I continued out Emmons Rd crossing over two sets of railroad tracks winding out a stretch of roadway that was un level [sic] with multiple pot holes [sic] and after two miles we entered into Boone County, WV where we were advised a WVSP Trooper and Boone County Sheriff Deputy were in the area to assist. I observed the motorcycle continue to travel on Emmons Rd on a straight stretch where he accelerated, almost struck a Dachshund k-9 [sic] in the roadway and gained distance between his position and my cruiser. The motorcycle as [sic] rounding a slightly, [sic] elevated left hand corner failed to make the turn, traveled up onto the Dartmont-Ashford railroad crossing and struck the rail road [sic] tracks. The motorcycle spun as it struck the tracks ejecting the motorcycle operator off of the seat onto the railroad tracks and into a creek/ditch line, full of water left of the railroad tracks. The motorcycle continued on and came to rest in the same ditch of water ten to twelve feet away from the operator. I immediately exited my cruiser and approached the suspect as he was lying on his back in the water spitting water out of his mouth. I observed the male alert and oriented and at no time did I observe him lose consciousness. Harvey exited his cruiser and accompanied me. Harvey provided cover as I entered the water and

*the suspect informed me that he thought he was drowning. I informed the suspect to make his hands visible as they were under the water at this time. The suspect failed to comply and make his hands visible. I attempted to gain control of his hands and got his left had [sic] without being able to see through the muddy water. Harvey assisted and was trying to get a hold [sic] of his right hand. I slipped backwards in the water at this point and lost grip. I still could not see the suspect's hands and I did not know what the suspect was doing with his hands as he was reaching towards his waistband and his hands were back under the water. Harvey deployed his OC spray [[101]] and sent a burst of OC spray into the suspects [sic] face as he failed to make his hands visible. The suspect stated again he thought he was drowning in the water that was up to my knees and filling up with leaking gasoline from the motorcycle. The suspect made his hands visible and was removed from the water by Harvey and I sliding up under his armpits, and moving him on his back to a safe location out of the water and away from the possible train traffic as they had not been yet [sic] notified at this point of our position. The suspect was placed into handcuffs once he was moved, detained and cleared of weapons. I immediately notified Metro of the suspect being detained and requested fire and EMS assistance for the assessment of the suspect and deacon [sic] for the OC spray. Once across the tracks the suspect stated he could not feel his legs and still felt as if he was drowning and requested his helmet be removed. I informed him that the OC probably was adding to his issue and that we were not removing his helmet as it can help stabilize his neck/spine and he had a clear airway as he was talking and breathing. I did observed [sic] the suspect to have white foam around his lips at this time (a possible sign of substance abuse). I did not observe any damage to his helmet other then [sic] scratches. Lt B Paschall, Sgt E Moyer and Cpl R Vinyard arrived at this time to assist. Paschall alerted Metro to ask CSX to delay rail traffic at our location and they were notified. Once the other units arrived Harvey and I moved our cruisers out of the roadway to make way for traffic and other emergency personnel. Means once cleared of weapons and other officers arrived on-scene was un-handcuffed for medical treatment. I requested a wrecker for the motorcycle. Boone County Sheriff Deputy Mullins and WVSP Trooper Robinson arrived to assist. Robinson stated he would complete a crash report for the incident. I photographed the scene from my cruiser looking on and back from the scene to my cruiser.*

*"Moyer identified the male as William Allen Means (suspect) WV OLN F482879. Metro Communications stated that Means [sic] license status was revoked for an active DUI. Means was unable to provide registration or insurance for the motorcycle. While speaking with*

---

[101] OC is an initialism for oleoresin capsicum, the active ingredient in OC spray, colloquially referred to as *pepper spray.*

*Means Moyer informed him that he should have just yielded officers [sic] and stopped at the initial stop location and Means stated to Moyer " I know I'm a dumb ass I should have just pulled over". [sic] Boone County EMS unit #40 (Lt Perdue and EMT Brown) arrived on-scene to assess Means. When EMS personnel asked if Means had used any drugs Means stated he was a heroin user and that he believed there maybe [sic] some heroin in his pockets as he used frequently. Means [sic] multiple pockets were searched and no other substances were located. Means was assessed and loaded onto the EMS stretcher by medics for transport. Means was informed I would be obtaining warrants for his arrest.*

*"I removed Means [sic] backpack from the water and cleared it for weapons. While clearing the backpack I located a small plastic wrap of a hard crystal like [sic] substance, methamphetamine (a schedule II controlled substance) inside a small black Nintendo case. I seized and secured the substance for evidence. The backpack contained miscellaneous tools, tubing, two small propane canisters, gloves and two small lights. Paschall packed Means's [sic] items back into his backpack and put it in the ambulance for transport. Once initial care was provided for Means Boone County EMS transported him from the scene to Charleston Area Medical Center's General division for treatment followed by Paschall. Once EMS arrived at the hospital safely Paschall cleared the scene.*

*"Mountain Auto arrived for recovery of the motorcycle. The motorcycle was pulled from the creek/ditch line and brought to the road above. Officers were initially not able to find a vehicle identification number on the vehicle because of the recent spray painting. Vinyard used a metal object and rubbed the paint from the fork of the bike to display the VIN number. The number is as follows: JH2PC2532TM5500454. The VIN was relayed back to Metro Communications and they were unable to find any information in the WV DMV database. They were able to find a response in a different search engine using VIN Assist. The VIN Assist response states the VIN belongs to a 1996 Honda CBR 600SE with no registration or owner information provided. Mountain Auto secured and towed the vehicle from the scene.*

*"Once Means was transported and the motorcycle was removed all officers cleared the scene.*

*"Once back at the station I reviewed Means [sic] criminal background and learned Means had a DUI conviction effective 06/17/2016 for a 10 year duration.*

*"A copy of Means [sic] criminal complaint drafted [sic], criminal background, photographs taken at the scene and Robinson's crash report is [sic] attached to this report.*

"Based on the combination of speed, length/duration of pursuit and road conditions which created a hazard for the pursuing officers, the public, and Means, I obtained a warrant for Means for fleeing with reckless indifference on 07 May 2020. I will also be requesting a subpoena for Means [sic] medical records in relation to this incident to investigate if he was under the influence of any substance or alcohol while in operation of the motorcycle on this date.

"Evidence seized and secured.

"1.   .52 grams white crystal like [sic] substance (suspect back pack [sic] in Nintendo case) – EMP

"Nothing further at this time."[102]

_Narrative Report of Patrolman David Harvey._

"On 5/2/20 Cpl. Peterson initiated a pursuit on 119 at Trace Fork. The pursuit went for a few minutes and I waited for it to pass me on Rabel Mountain at Split Rail Drive. After they passed me I backed up Corporal Peterson in the pursuit and was the second car and called the radio traffic. We went left on Brounland Road and then ultimately on Emmonds [sic] Drive which turned into Dartmoth-Ashford [sic] Road. The entire duration of the pursuit the driver continued to look back at us and see if we were still chasing him. He was also going at a high rate of speed around blind curves. Whenever he would make these blind turns he would cross into the opposite lane of traffic. If there were any vehicles on the other side of the turn he would have struck them.

"On Dartmoth-Ashford [sic] Road (County Highway 10) right passed [sic] the Kanawha/Boone County line near Gripple Lane the driver of the motorcycle went over the railroad tracks and didn't make the left turn. He wrecked and went into standing water to the left side of the tracks. I didn't see the actual crash but saw water splash. I got out of my cruiser at the same time as Cpl. Peterson. We began to approach and drew our service weapon [sic] giving commands for him to show us his hands. I saw the male later identified as William Means lying on his back in water. The water was approximately 3 foot [sic] deep. Where he had kicked dirt up you couldn't see under the water at all. Mr. Means initially complied and put his hand [sic] up in the air as ordered. Whenever we got closer to him he immediately put both hands under the water where we couldn't see. Peterson had to get in the water with him and grabbed his left hand. He still refused to show us his other hand and was pulling away. I administered a short burst of OC spray to Mr. Means to get him to comply. This had no affect [sic] on him and he still started to reach with his right hand toward his pocket and or waist band. While this was happening he was in the

---

[102] South Charleston Police Department, Case Number 2020-00005682, Field Case Report Narrative by Corporal Peterson, dated 05/02/2020.

*water and saying he was drowning. I then was able to find his hand under the water and grab it. He started to try to pull away and try [sic] to maneuver his hand to grab my wrist. I was able to re-grip his wrist to stop him. We were eventually able to pull him out of the water. We had to pull him across the track to the other side due to the water on that side and couldn't leave him on the tracks in fear of trains [sic].*

*"As soon as we got him safely out of harm's way Peterson had to run back to his cruiser to move his car from the tracks. I grabbed Mr. Mean's [sic] right wrist and told him to roll over. He refused and attempted to grab my right wrist with his left hand. I was able to move my hand to stop him and then I rolled him over and secure [sic] him in cuffs. Officers were not able to see what was under the water that he was trying to get or conceal. Mr. Means had previous firearm offenses.*

*"Whenever the medics asked him if he had any injuries he didn't reply. They asked what hospital he wanted to go to and he said "I don't know jail". He then stated to them that he "should've pulled over and is a dumbass"."*[103]

*Officer Harvey's Use of Force report*.  The narrative portion of Officer Harvey's Use of Force form is consistent with his narrative report, and so is not reproduced here.[104]

*Bystander Video Recording*.  I have received a bystander video recording that was recorded by Ms. Chandler.[105] Ms. Chandler apparently recorded her video with her cell phone as she and Ms. Nunley drove to a stop near the crash scene. The video is short (approximately two minutes and fourteen seconds long), and begins with a still frame of Ms. Chandler's phone screen, then continues as they drive to a stop.[106]

The video file name identifies it as a YouTube video that was *"provided by Peterson."* I have no information as to how or when the video was uploaded to YouTube, or any other information regarding the video's provenance. Ms. Chandler testified that she gave a copy of the video to the FBI.[107] She testified that she *"didn't know it was going to be on the internet."*[108]

*Points noted in Ms. Chandler's video:*

- Ms. Nunley stops her vehicle at approximately 5 seconds in.[109]

---

[103] South Charleston Police Department, Case Number 2020-00005682, Field Case Suppliment [sic] Narrative by Officer Harvey, dated 05/02/2020.

[104] South Charleston Police Department, Use of Force Report by Officer Harvey, Incident Number 2020-5682, dated 05/02/2020.

[105] Video File labeled *2020-05682 video provided by Peterson (Youtube Video).mp4* [length 00:02:14], undated.

[106] I note that, when the video begins, Ms. Chandler's phone screen shows a time of 8:41 [about 1.1 seconds in]. Other times in the record indicate that the crash occurred at approximately 8:20 am, some 21 minutes earlier.

[107] Deposition transcript of Mary Chandler, dated 04/26/2021, p. 18.

[108] Deposition transcript of Mary Chandler, dated 04/26/2021, p. 26.

[109] Software utilized for video and audio review was *Media Player Classic Home Cinema* 64-bit, Version 1.9.10 (29a1254b5). Build date 02/25/2021.

- Her vehicle appears to be at least one or two car lengths behind Officer Harvey's 2015 Dodge Charger police vehicle, and is offset to the right. The officers' upper bodies can be seen over the tracks; they are in the ditch on the north side.

- At the 6 second mark, Ms. Chandler zooms her camera lens, shortening and enlarging the view.

- At the 12 second mark, she pans the camera to the left, showing that their vehicle is still well back from Harvey's unit; they have not physically moved forward.

- The officers have moved slightly higher on the north side of the tracks; more of their bodies can be seen.

- At the 49 second mark, Ms. Nunley's vehicle appears to edge forward a couple of feet. They are still to the rear of Harvey's vehicle.

- The front of Harvey's vehicle is south of the railroad crossbuck pole, which is located several feet from the tracks.

- At the 1 minute, 22 second mark, the officers have moved Means over to the south side of the tracks, and Ms. Chandler pans her camera to her right (her lens is still zoomed). The vehicle does not appear to move forward. Means and the officers are partially obscured by a large equipment junction box.

- At the 1 minute, 59 second mark, Ms. Chandler pans her camera to her left, showing that Ms. Nunley's vehicle is still well behind Harvey's patrol unit, and that they have not moved forward.

- Distances. The crossbuck pole is several feet from the tracks; Harvey's vehicle is south of the pole; Harvey's Charger is 16 1/2 feet long;[110] the Nunley vehicle is at least a car length behind Harvey's unit; Ms. Chandler is inside Ms. Nunley's Jeep, seated several feet from the front of her vehicle. Conservatively, Ms. Chandler's camera location is at least 45 - 50 feet from the south edge of the railroad tracks, viewing directly to the front of the Jeep.[111,112] The view across the tracks to where the officers are struggling with Means in the water would add another 10 to 15 feet.[113] Angling the view to the right, past the large junction box increases the distance from Ms. Chandler's seating position to where Means was handcuffed even farther.

---

[110] 2015 Dodge Charger Pursuit Specifications, undated. Accessed and retrieved by Steve Ashley during 06/2021.

[111] In the interest of brevity, not every event on the video is listed here.

[112] These times reflect the on-screen software display clock, starting with 00:00:00 at the beginning of the video. These times are not synchronized with dispatch clocks or times reflected on any other documentation.

[113] United States standard railroad gauge (defined as the distance *between* the rails) is 4 feet, 8 1/2 inches.

*William Means' Toxicology Report*. A hospital lab toxicology analysis (unconfirmed screening) of his urine reported that William Means was positive for various substances, including amphetamine, opiates, THC, and ecstasy.[114]

9. **INFORMATION FOCUS.**

Beyond the points discussed, *supra*, I draw the reader's attention to the following items, in order to specifically focus on or to underscore individual points that inform my opinions.

- When Corporal Peterson determined to stop William Means, it was due to three things; that the motorcycle was painted flat black, that the license plate was registered to a different motorcycle, and that Means kept looking back at Peterson's patrol unit. Means was exhibiting behavior that police officers recognize as targeting glances. These three elements combined to create suspicion in Peterson's mind that the motorcycle may be stolen.

- Peterson announced over the radio the possibility that the motorcycle may be stolen, and did so before the pursuit started.

- Once Means fled the attempted traffic stop, Peterson's belief that the vehicle may be stolen was strengthened.

- Peterson believed that, because it was early on a Saturday morning, there was likely to be little traffic encountered along the route of the pursuit.

- Peterson testified that he used his emergency lights, that they were always on.[115] He testified that he turned his siren off when transmitting on the radio, and turned it back on in the interim.

- Peterson testified – and Mr. Taylor agreed – that Means would pull ahead on straightaways, as the power to weight ratio was in the motorcycle's favor.

- There was a straightaway for some distance prior to the left curve and railroad crossing where Means lost control and crashed.

- Both Peterson and Harvey testified that Means pulled away on that last straightaway, and was well ahead when he crashed. Peterson reiterated that point during his FBI interview.[116]

- Once Means had crashed and was in the drainage ditch, he asked the officers to get him out of the water, although he first reportedly resisted their efforts to do so.

- Officer Harvey delivered a short burst of OC spray to Means' face, in order to get him to comply with commands. Harvey testified that it had no effect.

---

[114] CAMC General Hospital, Toxicology Report for William Means, dated 05/02/2020.

[115] Deposition transcript of Eric Peterson, dated 05/04/2021, p. 157.

[116] Video file [FBI interview of Corporal Peterson] labeled *ACC Export - 2021-03-11 09.37.49 AM.ave* (with player software) [length approximately 00:23:00], dated 03/11/2021.

- There are no notations on the ambulance run sheet regarding the OC spray, something for which the medics would have provided first-aid relief if asked by their patient.

- The scene photos of Means' face do not show the telltale signs of OC spray to any degree. While it's possible that some OC spray reached his face through the visor opening of his helmet, there is no indication in the photos that it was a significant amount.

- Means did not demonstrate a typical reaction to being sprayed. Harvey either missed Means face with most of his spray, or the burst (stream) he delivered was very short.

- Once they gained control of Means' hands, the officers moved him out of the water, and over the tracks to a better location. In doing so, they appeared to pull him by his arms and clothing, as they testified. The difficulty in moving Means was exacerbated by the fact that his clothing was wet, making him more difficult to grasp, and adding to his overall weight. Plaintiff characterizes this act as dragging, in a pejorative sense. However, the issue is in dispute, as the bystander video – even in its enhanced version – is unclear. Most of the movement is obscured by the large junction box that is between the tracks and the camera.

- At the time they moved Means, the officers did not know whether he was injured or not, as he had not told them he was, and he had been moving to stand up when they first arrived. He then physically resisted them for a time before acquiescing to the movement that he had asked for.

- While there is always some other way to have done things, in the context in which they were operating, the officers' actions were not illogical in dealing with the exigent circumstances as they did.

  - They had just pursued Means on what they believed was a stolen motorcycle;

  - Means fled for an extended period of time, over a significant distance;

  - When they approached him in the ditch, he was reportedly in the process of physically standing up;

  - After he crashed, he resisted their attempts to control him;

  - He was apparently not affected by the OC spray, which is a pain-compliance option;[117]

---

[117] OC spray, or oleoresin capsicum, is an inflammatory agent. It is used as a defense spray, and is most effective when sprayed directly into the center of a subject's face (as officers are taught). For OC to be effective, it generally must get into a subject's eyes and respiratory system. When it does, it inflames the mucus membranes, causing the eyes to involuntarily close (opening them after exposure is painful), and the respiratory system to discharge copious amounts of mucus, effecting the subject's ability to talk, and causing him to cough. The skin is usually inflamed and flushed. Affected areas of the skin often assume an orangish tint, as the OC spray is tinted pale orange in color, due to the orange color of the OC itself. Exposure to OC spray is quite painful, although usually most of the discomfort subsides within

- He had still not been fully searched or handcuffed;

- He had not told them he was injured.

- The resistance exhibited by William Means constituted *Active Resistance* thus, the force and control used to counteract Means' resistance was initially empty-hand techniques, followed by *minimal deployment of a low level, intermediate weapon (the OC spray).*

- The first indication the officers had that Means was actually injured was after he had been moved, turned over and handcuffed. He then told Peterson that he could not feel his legs. From that point forward, officers did not move him, and even refused to remove his helmet, as they felt it would help to stabilize his neck.

*Body Alarm Stress*. Under the elevated stress – body alarm response – of such an encounter, it would be expected that Peterson and Harvey would not have a clear memory of what exactly happened in those few seconds, in the immediate aftermath of the incident. This common phenomenon is discussed at greater length, *infra*. Surprisingly, their reports indicate an unusually clear recitation of the event.

## 10. HUMAN FACTORS RESEARCH.

Officers are typically trained in various aspects of human performance and human factors research. Additionally, knowledge of many of the same factors and how they manifest in the real world is gained and reinforced through officers' on-going training and experience.[118] This can be especially true if the officer also has a background in martial arts, or is a military veteran.

Action vs. Reaction.  Police officers are trained that action beats reaction.[119,120] By way of illustration, time and movement action/reaction research conducted through and by the Force Science Institute[121] has shown that even an average, untrained, individual can draw and fire a concealed handgun from his or her waistband in less than $^{23}/_{100}$ of a second, with some untrained individuals able to do so in $^{9}/_{100}$ of a

---

30-45 minutes, and even more quickly if the excess spray is removed from the face by flushing with cool water.

[118] This discussion of underlying issues will assist the reader in understanding some of these human factors/performance concepts. They are also a reflection of my applicable skills and/or knowledge, as gained through my experience, education, and/or training.

[119] Joyner, C. (2011). *Advanced Concepts in Defensive Tactics: A Survival Guide for Law Enforcement.* Boca Raton FL: CRC Press. 66-67.

[120] This axiom is not unique to law enforcement; the same is true of any series of events wherein each reaction is dependent upon what happens first.

[121] Originally located at Minnesota State University-Mankato; The Force Science Institute training center is now headquartered in Des Plaines, Illinois.

second.[122,123] Other research shows that even novice shooters can fire at least three rounds in 1.5 seconds.[124]

In counterpoint, similar research shows that – under laboratory conditions – an average police officer, with his gun out and pointed at an identified target, with the officer's finger on the trigger, and being psychologically set, is able to react to a stimulus and pull the trigger of a handgun in between ¼ and ⅓ of a second.[125,126,127]

However, police trainers – and others in the human performance field – have long understood[128] that, in the field, officers' reaction times to all sorts of stimuli will be slowed by distractions in the environment, and the frequent need to multitask. Of course, before an officer can begin to react to a stimulus, he must first perceive the stimulus and the need to react. This can lead to longer reaction times, depending on how quickly the officer perceives that need. This illustrates the very nature of the axiom *action beats reaction*.

Reaction times are also often affected by the need to choose from among several available tactics, weapon options, or courses of action. This phenomenon is recognized by police trainers[129] as a manifestation of a rubric known as *Hick's Law*,[130] which states that, as one's options or choices (stimuli) increase, the time required to choose from among those options or stimuli increases proportionally with the number of stimuli.[131,132] This can also apply to the need to focus attention on more than one subject, or the distracting behavior of one or more individuals.

So, in short, a seemingly unarmed or non-threatening suspect can produce and use a concealed firearm or other weapon – on themselves, the officer, or others – before an officer (who already has his gun out and pointed at the suspect, with his finger on the

---

[122] Lewinski, B. (2000, November/December). Why is the Suspect Shot in the Back? *The Police Marksman, 27*(6). 20-28.

[123] Lewinski, W. J., & Dysterheft, J., Bushey, J., & Dicks, N. (2015). Ambushes Leading Cause of Officer Fatalities – When Every Second Counts: Analysis of Officer Movement from Trained Ready Tactical Positions. *Law Enforcement Executive Forum. 15*(1). 1-15.

[124] Lewinski, W. J., & Redmann, C. (2009). New Developments in Understanding the Behavioral Science Factors in the "Stop Shooting" Response. *Law Enforcement Executive Forum. 9*(4). 35-54.

[125] Force Science Research Center, Force Science Institute, Des Plaines, Illinois.

[126] Lewinski, B. (2000, November/December). Why is the Suspect Shot in the Back? *The Police Marksman, 27*(6). 20-28.

[127] Lewinski, W. J., & Dysterheft, J., Bushey, J., & Dicks, N. (2015). Ambushes Leading Cause of Officer Fatalities – When Every Second Counts: Analysis of Officer Movement from Trained Ready Tactical Positions. *Law Enforcement Executive Forum. 15*(1). 1-15.

[128] Remsberg, C., Adams, R. J., & McTernan, T. M. (1980). *Street Survival: Tactics for Armed Encounters*. Evanston IL: Calibre Press. 126.

[129] Siddle, B. K. (2004). *PPCT Defensive Tactics Instructor Manual – United States edition*. Belleville IL: PPCT Management Systems. 1-9.

[130] Sometimes referred to as the *Hick-Hyman Law*, after British and American psychologists William Edmund Hick and Ray Hyman.

[131] Jennett, S. (Ed.). (2008). *Churchill Livingstone's Dictionary of Sport and Exercise Science and Medicine*. New York: Elsevier Limited.

[132] VandenBos, G. (Ed.). (2015). *APA Dictionary of Psychology* (2nd ed.). Washington DC: American Psychological Association, 493-4.

---

trigger) can react to the threat and/or fire at the suspect. The lagged response is exacerbated when the officer is exposed to distracting stimuli.

<u>Speed of a Subject</u>.  Officers are trained to always be concerned about the movement of a subject, especially when they have not checked them for weapons, such as when an individual is also moving into an area that has also not been checked beforehand or when an unsearched, unknown subject is moving away, or is grasping at their clothing. Subjects can acquire and employ weapons very quickly in some scenarios, often before an officer realizes what is happening.

Contextually, additional human factors research has shown that an individual can point a handgun at an officer, and then turn away so quickly that, by the time the officer perceives the dangerous move and reacts by pulling the trigger of his own handgun, the individual will have completely turned away and presented his back to the officer. The average time for such an individual pointing a handgun at an officer, to then turn away to a squared back posture is $^{14}/_{100}$ of a second, with some individuals completing the maneuver in even less time.[133,134] This sometimes results in an officer firing in defense of his own life, and the suspect sustaining gunshot wounds to his side or back, or in other suspect wound patterns that might seem inappropriate.

<u>*While seated*</u>.  This general concept holds true even when the individual is seated, as if in a vehicle. Research with a seated subject, with a handgun in his right hand, and the weapon held down to the subject's right, as if it were concealed alongside or below the subject's right thigh, indicates that the subject can bring the weapon up and discharge a round through the driver's window in approximately $^{25}/_{100}$ of a second (on average). The fastest time recorded by several research subjects in the same study was $^{15}/_{100}$ of a second. This is almost twice as fast as the average officer can pull the trigger of his own weapon, even set with his finger on the trigger and ready to fire.[135,136]

<u>*While prone*</u>. Other research reports that prone subjects – with their hands hidden beneath their body[137] – can produce and fire a weapon from under their body in between ⅓ and ½ of a second.[138] Still other research illustrates that a typical

---

[133] Lewinski, B. (2000, November/December). Why is the Suspect Shot in the Back? *The Police Marksman, 27*(6). 20-28.

[134] Lewinski, W. J., & Dysterheft, J., Bushey, J., & Dicks, N. (2015). Ambushes Leading Cause of Officer Fatalities – When Every Second Counts: Analysis of Officer Movement from Trained Ready Tactical Positions. *Law Enforcement Executive Forum. 15*(1). 1-15.

[135] Lewinski, B. (2000, November/December). Why is the Suspect Shot in the Back? *The Police Marksman, 27*(6). 20-28.

[136] Lewinski, W. J., & Dysterheft, J., Bushey, J., & Dicks, N. (2015). Ambushes Leading Cause of Officer Fatalities – When Every Second Counts: Analysis of Officer Movement from Trained Ready Tactical Positions. *Law Enforcement Executive Forum. 15*(1). 1-15.

[137] This posture of a prone subject secreting their hands beneath their body is colloquially known in the law enforcement community as *turtling*.

[138] Lewinski, W. J., Seefeldt, D., Redman, C., Gonin, M., Sargent, S., Dysterheft, J., & Thiem, P. (2016). The Speed of a Prone Subject. *Law Enforcement Executive Forum. 16*(1). 70-83.

individual in their early 20s can run 15 feet, and slash or stab an officer with a blade instrument in approximately 1 second.[139,140,141]

*In the instant case*.  The officers did not know if Means was armed. When ordered to show his hands, instead of complying, Means reportedly moved his hands out of sight under the muddy water. When officers tried to control his hands, Means moved and pulled them away, twisting, and attempting to grasp the officers' wrists. The situation was thus dangerous for the officers, as they had no idea whether Means was armed (Means had attempted to shed his backpack while fleeing), or why he continued to resist their attempts to control his hands.

## 11. COGNITION AND PERFORMANCE DURING STRESSFUL EVENTS.

Because of the tense, uncertain, and rapidly evolving, nature of the incident during the morning of May 2, 2020, an additional discussion of underlying issues is in order.[142]

The Effect of Tense, Uncertain, and Rapidly Evolving Events.  While the phrase *"tense, uncertain, and rapidly evolving"*[143] is most often considered when discussing the justification for an officer's use of force, these same three dimensions are factors that impact the perception of officers and other individuals under stress, *e.g.*, while being attacked, while waiting for the arrival of an ambulance or other emergency vehicle, or while watching or participating in an altercation, a foot chase, or other high stress event.

*Time distortion*.  Officers are trained that the more tense a situation is perceived to be; the greater the uncertainty of events or outcomes; and the more rapidly a situation seems to be unfolding – implying an increasing lack of control, or safety – the more an individual's perception and memory of time and events can be distorted.

Different stimuli and shifting situational factors impact how particular events are perceived. Despite their training, it is not uncommon for officers to experience many of the same effects as victims, witnesses, and other parties, in believing that events take much longer to occur than they actually do, or that they occur more quickly.[144] In some cases, events seem to telescope in officers' minds, causing them to not enumerate some details of a stressful encounter when reporting or memorializing an

---

[139] Lewinski, W. J., & Dysterheft, J., Bushey, J., & Dicks, N. (2015). Ambushes Leading Cause of Officer Fatalities – When Every Second Counts: Analysis of Officer Movement from Trained Ready Tactical Positions. *Law Enforcement Executive Forum. 15*(1). 1-15.

[140] Lewinski, W. J., Dysterheft, J. L., Seefeldt, D. A., & Pettitt, R. W. (2013). The influence of officer positioning on movement during a threatening traffic stop scenario. *Law Enforcement Executive Forum, 13*(1), 98-109.

[141] Lewinski, W. J., Hudson, B, & Dysterheft, J. L. (2014). Police officer reaction time to start and stop shooting: The influence of decision-making and pattern recognition. *Law Enforcement Executive Forum, 14*(2), 1-16.

[142] This discussion of underlying issues is intended to assist the reader with understanding some of the concepts that inform my opinions in this matter. They are a reflection of my applicable skills and/or knowledge, as gained through my experience, education, and/or training.

[143] *Graham v. Connor*, 490 U.S. 386, 396-7 (1989).

[144] *Psychological time*, VandenBos, G. (Ed.). (2015). *APA Dictionary of Psychology* (2nd ed.). Washington DC: American Psychological Association, 859.

incident, while in other cases, things seem to slow down; perceived as if they were occurring in slow motion.

This effect has long been well known among police trainers, as well as other emergency service professionals. It is often referred to as time distortion, or tachy-psyche effect.[145],[146],[147] Trainers and researchers recognize it as a normal, human reaction to stress, and a form of body alarm response, or alarm reaction.[148] Body alarm response is often colloquially referred to as fight-flight-freeze, or the fight-or-flight survival response.[149] The effect is so common that most people have experienced it at one time or another.

These time distortion effects are often seen when witnesses under- or overestimate how long an incident lasted, how long it took for an EMS vehicle to reach an injured party, or how long it took a particular individual to cover a certain distance or perform a certain task, even when documented evidence to the contrary illustrates the correct distances or time frames.[150]

*In the instant case.* Because the events surrounding the encounter at the railroad crossing happened so quickly, failure of some of the participants or observers to recognize and report some details, or to report them out of order, are likely indicators of tachypsychia.

A Note on Variations in Officer Statements Regarding Events.  Law enforcement trainers, supervisors and managers are trained, and know, that there are sometimes variations in the accounts of different officers, regarding the specific events in a given situation. This variation does not necessarily imply discrepancy or subterfuge; criminal justice trainers and managers have long understood that some variation is to be expected. Of note, this phenomenon is also typically present in witness accounts, for many of the same reasons.

Without anticipating specific or possible variations here, several general statements are relevant:

- It is common for reports and recitations of details to become more fully developed during successive telling. This is often due to the nature of the

---

[145] Tachy-psyche effect, sometimes referred to as *tachypsychia,* is a neurological condition wherein a person's sense of time is distorted. Police trainers and other emergency services personnel know it as one of the most common effects of high-stress encounters and events.

[146] Nugent, Pam M.S. "Tachypsychia". *PsychologyDictionary.org.* April 13, 2013, https://psychologydictionary.org/tachypsychia/. Accessed by Steve Ashley on May 28, 2018.

[147] VandenBos, G. (Ed.). (2015). *APA Dictionary of Psychology* (2nd ed.). Washington DC: American Psychological Association, 1063.

[148] As defined by *The American Heritage Medical Dictionary,* 2nd ed. (2007). *"The initial stage in the body's response to stressful stimuli, characterized by adaptive physiological changes, such as increased hormonal activity and increased heart rate."*

[149] Other common manifestations of body alarm response are well known to law enforcement trainers and officers, and can include tunnel vision, auditory exclusion, loss of fine motor skills, and inaccurate memory of details.

[150] *Time sense*, VandenBos, G. (Ed.). (2015). *APA Dictionary of Psychology* (2nd ed.). Washington DC: American Psychological Association, 1090.

> questioning, and the time, energy, and motivation available to the reporting or
> testifying person.

- This phenomenon often results in details being stated out of order, or skipped altogether, until the questioner or the individual themselves discover the problem, and correct it.

- Accounts of the same event can be framed differently – sometimes even accounts by the same individual – based on the purpose of the report, statement, interview, or testimony. Internal Affairs detectives are often seeking different information than criminal investigators; probation officers are seeking different information for a pre-sentence report than a plaintiff's attorney taking a deposition. Depending on the nature and purpose of the accounting, different details are often pursued for different purposes. Comparing such statements can lead to an impression that they are different for some nefarious, conspiratorial reason.

In the final analysis, all accounts of any given occurrence derive from individuals that see events from different, unique perspectives,[151] or whose perspective shifts over time. Despite their training, police officers are people, too. Variances in the details of a stressful event, are not only likely, they are expected.

<u>Situational Awareness and Perceptual Narrowing</u>.  Body alarm response can affect an officer's – or anyone's – situational awareness.[152] Situational awareness is a term police and military trainers use to describe a personal safety trait, wherein individuals attempt to maintain awareness of all that is occurring around them, regardless of where their focus is.[153]

In the law enforcement profession, officers are trained that, while perfect situational awareness is something to strive for, it is not really attainable, especially under high levels of stress. It is more often the case that an officer's attention – or that of another person – will be narrowed, to a greater or lesser degree, on the focus of his or her attention, based upon the individual's perception of need or danger. This is commonly referred to in law enforcement as perceptual narrowing.[154]

Hence, an officer moving toward – or a citizen running away from – an emergency situation will sometimes pass other individuals without fully seeing them or even being aware of their existence.[155] The officer or other individual may develop tunnel vision on a specific item or threat – such as a weapon in the hand of an adversary – to

---

[151] *Byther ex rel. Byther v. City of Mobile*, 398 F. Supp. 2d 1222, 1237 (S.D. Ala. 2005).

[152] Situational awareness has long been recognized in the military, medical, research, and law enforcement fields. It is one of the cornerstones of risk management.

[153] See, generally, Felter, B.A. (1988). *Police Defensive Handgun Use and Encounter Tactics*. New Jersey: Prentice-Hall.

[154] Artwohl, A. (2002, October). Perceptual and Memory Distortion During Officer-Involved Shootings. *FBI Law Enforcement Bulletin, 71*(10), 18-24.

[155] For a true-life, law enforcement example of this, see Chabris, C., & Simons, D. (2010). *the invisible gorilla: And Other Ways Our Intuitions Deceive Us*. New York: Crown.

the exclusion of things occurring in his peripheral vision.[156] In effect, the individual becomes hyper-aware of whatever is the focus of his attention.

It is also common for individuals caught up in extremely stressful occurrences to experience another type of perceptual narrowing, an effect known as auditory exclusion.[157] When perceptual narrowing occurs, it's not uncommon for persons standing quite close to extremely loud sounds to be totally unaware of them, because they are so focused on the object of their concern, or on a particular goal, such as escape. This frequently manifests as the failure to hear yelling or screaming; or even normal conversation, when one is focused intently on another stimulus (most parents of teenagers have probably experienced this effect). Police officers often experience such auditory exclusion at the end of a traffic pursuit, during a shooting or other use of force, or when struggling with an arrestee, wherein they find themselves confronting a dangerous individual, or while they are standing close to vehicle sirens that are still blaring.[158]

Witnesses and suspects experience these effects as well. Officers know that it is common that witnesses to stressful events will often report very minute details about one specific aspect of a scene, a vehicle, or a weapon. Yet, those same witnesses will often be unable to relate or even recall even the most obvious elements of the same scene. They become so tunneled in on a very narrow focus, fixated on details (such as operating their cell phone video camera), that macro or even micro elements of the same scene or event go completely unnoticed by them.

Different people see the same scene from their own, unique, filtered, perspective.

Conversely, other witnesses or officers may remember events differently, or may not remember some details of the event at all. Memory is fragile, and in some cases, subsequent telling of events can be influenced by other factors – legitimately or otherwise – causing the teller, or witness, to leave out details they have decided they didn't really see. In other cases, witnesses may add details that they become convinced actually occurred, due to some unrecognized outside influence. These effects are often heightened when the initial event was extreme or traumatic. Investigators and trainers recognize that, when such memory events occur, they do not necessarily represent some nefarious or ill-intentioned purpose; the witness often legitimately believes in what they are saying.

One example of this is well known to law enforcement professionals; frightened[159] or startled people often make mistakes in eyewitness identifications.

_In the instant case_. Following the short, intense, encounter in the drainage ditch, Officers Peterson and Harvey reported basic information regarding the encounter. Later, during their deposition testimony, they were each clearer in the details they reported, particularly Corporal Peterson.

---

[156] Klinger, D. (2004). _Into the Kill Zone: A Cop's Eye View of Deadly Force_. San Francisco: Josey-Bass.

[157] Auditory exclusion is sometimes referred to in the literature as _tunnel hearing_.

[158] Ross, D. L., & Siddle, B. K. (2003). An Analysis of the Effects of Survival Stress in Police Use-of-Force Encounters. _Law Enforcement Executive Forum, 3_(2).

[159] Wise, J. (2009). _Extreme Fear: The Science of Your Mind in Danger_. New York: Palgrave.

## 12. <u>RISK MANAGEMENT IN LAW ENFORCEMENT FORCE AND CONTROL.</u>

Risk management can be defined as the weighing of alternatives based upon an informed assessment of an acceptable balance of risk versus reward. When viewed from that perspective, all of criminal justice is engaged in daily risk management. However, there is arguably no part of law enforcement that is more sensitive to an acceptable balance of risk versus reward, than the use of force and control by police officers.

<u>Managing Force and/or Control Options</u>. Typically, once a police officer recognizes the need to take enforcement action or gain control of a situation, he – given time to do so – weighs the various alternatives available to him, and decides upon a course of action that is multi-dimensional in nature. However, one aspect of this decision-making process is particularly sensitive to a desirable outcome; the officer's selection of a force or control tool, technique, weapon, procedure, or methodology.

Ideally, the alternative selected should be effective in the short-term and generally safe to use (preferably for all concerned). It should also be acceptable to those that will evaluate the outcome of the officer's actions.

Many force or control alternatives that appear safest to use are the least effective in the short-term, and many of the alternatives that are the most effective in the short-term are the least acceptable to those who would pass judgment on the outcome. Many of the options that an officer has for the use of control or force may appear – at least outwardly – to be inhumane and excessive, although research has shown that they may, in fact, be among the safer alternatives in terms of the potential for long lasting or significant injury to the subject of the force or control, as well as to third parties and officers.[160,161,162]

This real-life risk management dilemma can be summed up succinctly, as *"the use of force [and control] is never pretty."*[163] Today, members of the public are exposed to police use of force and control as they have never been before. Officers must still make their risk management decision, however, as they undertake to use force and control in assisting a victim, managing a situation, pursuing a suspect, making an arrest, or protecting themselves and others.

When officers decide to use force or control, based on what they know and perceive at that moment, they are making a risk management decision.[164] They are balancing their perceived need for the application of force or control against their perceived negative outcome of not using that force or control. Frequently the decision is of

---

[160] Ho, J. D., Dawes, D. M., Lundin, E. J., & Miner, J. R. (2009). 127: Comparison of Acidosis Markers Associated with Law Enforcement Applications of Force. *Annals of Emergency Medicine, 54*(3), S40.

[161] Lundin, E. J., Dawes, D. M., Ho, J. D., Ryan, F.J., & Miner, J. R. (2009). 315: Catecholamines in Simulated Arrest Scenarios. *Annals of Emergency Medicine, 54*(3), S98-S99.

[162] Ho, J., Dawes, D., Nelson, R., Lundin, E., Ryan, F., Overton, K., Zeiders, A., & Miner, J. (2010). Acidosis and Catecholamine Evaluation Following Simulated Law Enforcement ''Use of Force'' Encounters. *Academic Emergency Medicine, 17*(7):E60-E68.

[163] Joyner, C. (2011). *Advanced Concepts in Defensive Tactics: A Survival Guide for Law Enforcement*. Boca Raton FL: CRC Press. 9.

[164] See, generally. Head, G. L. (1987). *Essentials of the Risk Management Process, Vol. 1 & 2*. Malvern PA: Insurance Institute.

lesser significance, with a fairly mild likely outcome. At other times, the decision the officer makes can – quite literally – result in life or death. Often, the life or death dependent upon the decision of the officer is his own, or that of the person he is trying to assist or control.

*In the instant case.* Unfortunately, sometimes the risk management decision is made for – instead of by – officers. Events are compressed into a shorter period, resulting in less decision-making time. In this case, the events in the drainage ditch were compressed into a short time span. Still, due to the nature of Means' resistance, officers had little choice but to act. When it became clear to Peterson and Harvey that they were unable to control Means' hands, and that they had no idea if he was armed, Means essentially made the risk management decision for the officers – there was little time for methodical decision making.

Managing Risk Through Likely Outcomes. Another key element in an officer's decision-making process regarding escalation and de-escalation of force and control is his knowledge of the likely outcome of his actions. Officers are trained to base their decisions on what they understand the likely outcome to be, not whatever could possibly happen. In a world where circumstances can combine in unexpected and unpredictable ways, yielding an infinite number of possible results, it is impossible for officers to base their decisions on the avoidance of any possibility of a negative, unanticipated outcome.[165] This is particularly true when time is very short.

Instead, officers learn, from both their formal training and their experiences as officers, what the likely results of a particular action are. They are trained to then base their decisions on those likely outcomes.

*Perception of threat.* Many of the same concerns attach to an officer's perception of the threat posed by the actions of other individuals. Officers are aware of the likelihood of injury posed by a subject's perceived weapons and actions, but they are also mindful of the dearth of information they typically possess regarding a particular subject's capabilities, purpose, and intent, as well as the unpredictability of a mentally detached or substance-influenced subject. For that reason, when considering an unknown subject's risk factors, officers find themselves shifting their likelihood analysis further toward possible outcomes.

This understanding of likely outcomes facilitates law enforcement risk management in its purest form. It allows officers to make reasonable decisions regarding how to respond to perceived resistance by a suspect, while also reducing the potential for injury to themselves, the suspect, and others. They are trained that, in their wisdom, the courts do not expect them to be perfect, only to be reasonable in their decision-making.[166,167] As the Ninth Circuit said in *Brooks v. City of Seattle*, *"Officers are not required to use the least intrusive means available; they simply must act within the range of reasonable conduct."*[168] To hold officers to any other

---

[165] This reflects another central tenet of risk management: *One cannot manage away all risk.*

[166] *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990).

[167] *Dickerson v. McClellan*, 101 F3d 1151, 1160 (6 Cir. 1996).

[168] *Brooks v. City of Seattle*, 509 F.3d 1018, 1025 (9 Cir. 2010).

standard would be to prevent them from ever taking action in the face of resistance or the need to control someone in order to help them. [169]

*In the instant case*. In this case, officers did not know if Means was armed and had no information about him, other than their knowledge that he had fled on a motorcycle. When they encountered Means in the water, he refused to yield control of his hands, and Harvey saw him reaching toward his waist area. That threat cue caused both officers to react based on their training.

Unfortunately, when Means failed to comply with commands to show his hands, Officers Peterson and Harvey were forced to take action to control him. When they were initially unsuccessful due to his *active resistance*, Harvey quickly escalated to use of OC, while both he and Peterson continued to grapple beneath the water for control. They were then, eventually, able to control Means' hands.[170,171,172]

This use of force and control by Officers Peterson and Harvey was consistent with typical law enforcement training.

13. <u>USE OF FORCE AND CONTROL – GENERAL CONSIDERATIONS</u>.

<u>Perspective of a Reasonable Officer on the Scene</u>. Officers are trained that in determining whether or not a particular use of force or control was appropriate, and consistent with what other officers are likely to do under similar circumstances, one must view the event from the perspective of *"a reasonable officer on the scene."*[173] As the Eleventh Circuit said in 2009, *"Perspective also is crucial to the analysis: '[t]he only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded.'"*[174]

*The Rashomon Effect*. In order to reach a satisfactory outcome to an encounter, officers bring their training, experience, skill sets, and education, with them as they begin an interaction with other individuals. When that interaction morphs into a situation wherein force or control may be necessary, an officer bases his decision-making on what he brought to the event, along with whatever information and sensory input he can absorb from his unique perspective in the moment.

Each officer's – and indeed each person's – perspective is different, and is constantly evolving as an event unfolds. Another person or another officer – even one located just a few feet (or even inches) away – is likely to see the event differently, based not only on their physical relationship to the event, but also on their own unique set of

---

[169] I note that, while officers are trained in these concepts and constructs as they have evolved from various Court rulings, many may not be trained as to the specifics of individual cases.

[170] *Active resistance* is generally defined as any action by a subject that attempts to prevent an officer from gaining control of the subject. Examples are pushing/pulling away, blocking, etc.

[171] I note that some systems of police training substitute the term *Defensive Resistance* for the term *Active Resistance*. This is done with no change in the actual definition.

[172] The aforementioned terms for *perceived levels of resistance* and *levels of control* are ubiquitous; many agencies and police training systems use these or very similar terms in their training and directives/procedural guidelines.

[173] *Graham*, 396.

[174] *Jean-Baptiste v. Gutierrez*, 627 F.3d 816 (11 Cir. 2010), citing *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11 Cir. 2009).

filters;[175] education, experience, training, or emotional attachment. This tendency to perceive events differently due to a difference in perspective is known as the Rashomon Effect, or the Rashomon Principle.[176,177,178]

If asked for a value judgment, individuals are likely to have very different assessments of the need or justification for certain actions, based on their own unique perspective. However – particularly in use of force situations – officers are trained that an officer's actions *"must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."*[179,180]

Officers are trained and understand that *"[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."*[181]

Often the facts of a particular encounter give rise to some debate regarding whether an officer's use of force and control in a specific situation met the criteria suggested by his or her department's particular procedural guideline. In such cases, officers are trained that, in fact, since at least 1979, the courts have taken the position that *"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application."*[182,183]

*In the instant case.* Whether an officer made correct or appropriate decisions during an encounter is often debated *ad nauseam*, after the fact, and with the luxury of time, by individuals who did not see rapidly evolving events through the eyes – and from the perspective – of that officer. However, in the instant case, Officers Peterson and Harvey had to react to what they knew to be a resistant, unknown, flight-prone individual, who had already fled in a vehicle for an extended period of time, and whose armed/unarmed status they did not know.

## 14. <u>ANALYSIS</u>.

<u>Analysis Context</u>. The following analyses of officer actions in the incident described, *supra*, are undertaken through application of commonly understood training and procedural criteria as they are presented and utilized throughout the law enforcement

---

[175] Green, M., et al. (2008). *Forensic Vision with Application to Highway Safety (3rd ed.)*. Tucson: Lawyers & Judges Publishing.

[176] Heider, K. G. (1988). The Rashomon Effect: When Ethnographers Disagree. *American Anthropologist, New Series, 90*(1), 73-81.

[177] This is also referred to as the *Kurosawa Effect*, after the 1950 movie, *Rashomon*, by Akira Kurosawa.

[178] Klinger, D. (2004). *Into the Kill Zone: A Cop's Eye View of Deadly Force*. San Francisco: Josey-Bass, p. 13.

[179] *Graham*, 396.

[180] Even a video camera will not capture things from an officer's perspective, and with the perceptual context the officer has in the moment. The camera may capture some – or arguably, even most – of the *what* that is in front of the lens. However, the camera cannot really capture the *why* that controls the officer's perception of the need to take a certain course of action; in this case, deciding on a particular level of force, or selection of a particular implement or technique for effecting control of the situation. Such problems particularly manifest in digital video recordings.

[181] *Long v. Slaton*, 508 F.3d 576, 581 (11 Cir. 2007).

[182] *Graham*, 396, citing *Bell v. Wolfish*, 441 U.S., 559.

[183] *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

community. Utilization of specific terminology – including any legal terminology – is intended to clarify the relationship between this analysis and a broader criminal justice training, policy, and procedural context.[184,185] In effect, this analysis is cast as a contextual application of typical law enforcement training.

<u>Use of Force by Officers – Generally</u>. Officers are trained that if, when acting in their governmental capacity, they intentionally terminate someone's freedom of movement, they are presumed to have effected a seizure.[186] They are trained that their use of force during a stop or an arrest is also a seizure,[187] and is therefore evaluated from the perspective of the Fourth Amendment[188] to the United States Constitution.[189] Officers are also trained that the United States Supreme Court outlined a constitutional construct for reviewing government use of force, in the 1989 case, *Graham v. Connor*.[190]

<u>Use of Force Under *Graham v. Connor*</u>. Law enforcement officers are trained that whether or not a particular use of force application was objectively reasonable[191] under the Fourth Amendment *"requires careful attention to the facts and circumstances of each particular case, including"*:[192,193]

- *"whether the suspect poses an immediate threat to the safety of the officers or others"*;

- *"whether he is actively resisting arrest or attempting to evade arrest by flight"*;

- *"the severity of the crime at issue"*.[194]

---

[184] As stated, *supra*, use of such terminology is not intended to subvert or usurp the function of the Court, or to inappropriately influence the role of the jury or other trier of fact.

[185] Any discussion of case law reflects what I, as well as many – perhaps most – other law enforcement use of force trainers, have been researching, analyzing, and teaching, for many years. As is common practice throughout the law enforcement community, when this material is taught to officers, it is framed from an informed lay-person's perspective, with the goal of having officers understand the practical application of the criteria that courts will generally hold them to, based on existing case law. This methodology is widely utilized in the law enforcement training community, and is geared to inculcate in officers a deeper appreciation and understanding of the rationale applied when use of force and/or control incidents are reviewed for justification.

[186] *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989).

[187] *Tennessee v. Garner,* 471 U.S. 1 (1985).

[188] U.S. Const. amend. IV.

[189] *Graham,* 388.

[190] *Graham v. Connor*, 490 U.S. 386 (1989).

[191] See generally, *Graham v. Connor*, 490 U.S. 386 (1989).

[192] *Graham*, 396.

[193] Officers are trained that, while the *Graham* Court did not specify a particular hierarchy of importance for these factors, the Ninth Circuit – and other courts – have; perhaps most notably in the case *Chew v. Gates*, 27 F.3d 1432 (9 Cir. 1994), cert. denied, (U.S. Feb. 21,1995)(No. 94-980). This ordering of factors is commonly taught and emphasized in law enforcement use of force training, as well as in procedural guidelines. Thus, these factors are listed here in the order of importance seemingly considered by *Graham's* progeny.

[194] *Graham*, 396.

Officers are trained that in applying these criteria, the U. S. Supreme Court reiterated its earlier statement in *Bell v. Wolfish*,[195] that the *"test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.*"[196] Officers are also trained that, *"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"*[197] and is properly analyzed in light of the *"totality of the circumstances"* [198] facing the officer. Officers are further trained that, when reviewing the above (and other) factors, courts will consider the degree to which a given situation is "*tense, uncertain, and rapidly evolving*"[199] when assessing the reasonableness of a particular use of force.

Identifying Use of Force. As the Court said in *Graham*, *"With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment."*[200] [Internal citation omitted.]

I note that, among the allegations put forth in this case, there are several that are in significant dispute. Those will be addressed later in this report. Initially, this report will address the following actual uses of force.

*Actual uses of force*.  There are arguably four separate and distinct uses of force that occurred in the course of William Means' arrest: Grappling for control of his hands, the application of OC spray,[201] positioning him for handcuffing (by rolling him over), and the actual handcuffing.

In effect, these four are really parts of two transactions: grappling and the use of OC spray in order to control Means, and positioning then handcuffing him in order to secure him in a controlled fashion.

Application of the *Graham* Factors to Peterson and Harvey's Use of Force. [202] With respect to the individual *Graham* factors, and without reiterating all of the incident information discussed, *supra*:

- *Immediacy of the threat*.  The immediate threat posed by William Means was not insignificant. He had fled for a distance on a possibly stolen motorcycle. When officers approached him after he crashed, he would not comply with their commands to make his hands visible. When confronted by officers in the drainage ditch, rather than comply with commands to expose his hands, Means moved them below the muddy water, and resisted their attempts to control his hands. Based upon their training and experience, Peterson and

---

[195] *Bell v. Wolfish*, 441 U.S. 520 (1979).

[196] *Graham*, 396, citing *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

[197] *Graham*, 396.

[198] *Graham*, 396, citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985).

[199] *Graham*, 396-7.

[200] *Graham*, 396-7, (quoting *Johnson v. Glick*, 481 F. 2d 1028, 1033 (2 Cir. 1973).

[201] The OC spray used by Harvey in this incident was a Fox Labs International, Inc., *5 point 3 Defense Spray*, stream unit.

[202] This analysis of *Graham* as it relates to Peterson's and Harvey's use of force and control, is undertaken from the perspective of how officers are trained, and the practical application of that training.

Harvey believed the situation to be dangerous and the threat that he may be armed immediate.

And – as stated by the Fifth Circuit in *Rockwell* – "… *neither the Supreme Court nor this Court has ever held that **all** of the Graham factors must be present for an officer's actions to be reasonable; indeed, in the typical case, it is sufficient that the officer reasonably believed that the suspect posed a threat to the safety of the officer or others.*"[203] [emphasis in original]

- *Actively resisting arrest*. William Means actively resisted arrest by first fleeing when police tried to stop him, then resisting with active resistance when officers moved to control him in the drainage ditch.

- *Attempting to evade arrest by flight*.  William Means fled for a lengthy period, over a significant distance. When they approached him in the ditch – and he resisted – officers did not know if he was going to continue his attempts to flee.

- *Severity of the crime at issue*. Plaintiff has chosen to cast this event in the context of a mere license plate violation, which – if that were the sole precipitating transaction – would indeed be a low severity offense. However, that is not the case.

  While the registration violation was one factor that initially drew Corporal Peterson's attention, the appearance of the motorcycle and the behavior of the rider created a context for Peterson's suspicion that the motorcycle was stolen. His suspicion is evident from the beginning, as he stated as much during his initial radio transmissions. When Peterson initiated the traffic stop, Means opted to escalate the encounter to a more severe offense by fleeing, and ultimately continued to escalate by resisting arrest following the crash.

- *Tense, uncertain and rapidly evolving*. Finally, regarding the officers' interaction with William Means, the situation was tense, uncertain, and rapidly evolving. Consider that:

  - *The situation was tense*, in that, as the incident began, officers were faced with a fleeing individual who they believed may be on a stolen motorcycle, and who fled for an extended period of time.

  - *The situation was uncertain*, in that officers did not know why Means was fleeing. They did not know if he was armed. They did know that Means was an unknown quantity, and was therefore unpredictable.

  - *The situation was rapidly evolving*, in that, once the incident began, it unfolded quickly: One moment, Corporal Peterson was preparing to investigate a possible stolen motorcycle and its rider; the next, Peterson – and ultimately Harvey – was engaged in a lengthy pursuit of a fleeing motorcyclist. When challenged by police, Means failed to comply with commands, and continued to both conceal his hands under the water and to grapple with the officers to keep them from gaining control of his

---

[203] *Rockwell v. Brown*, 664 F.3d 985, 992 (5 Cir. 2011).

hands, thereby escalating his physical resistance, culminating in what ultimately led to both officers reacting according to their training.

*Discussion.* Because the culminating use of force happened so quickly, there was little time for Peterson and Harvey to continue grappling with Means, or to continue issuing the commands they already had. Officer Harvey reported that his burst of OC spray seemed to have no effect on Means.[204] The combination of Means physically resisting, while at the same time, asking to be removed from the water, likely added to the confusion of the moment. When Harvey saw that the OC spray had no effect, he would know that such an occurrence was common when dealing with persons that do not react to pain compliance implements, such as OC spray. That is a threat cue for officers, often leading to an escalation on the part of suspects. For the officers to slow their actions in order to continue issuing commands in the hope that Means would comply, and not escalate, "*could readily cause such a warning to be [their] last.*"[205]

Consideration of Time and the Selection of Options. Although officers may sometimes have various courses of action open to them, and multiple use of force or control options for dealing with an individual, they often do not have time to study a situation in order to make a carefully reasoned, fully informed decision regarding which option to choose.

Officers may approach a given situation with limited information, or without adequate time to analyze circumstances in detail. In those cases, officers often need to *"make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving."*[206] In such a moment, officers will choose force or control options based on their perception of need or danger, and predicated on their assessment of the likely outcome of the option's use. This decision is sometimes complicated by the relative ineffectiveness – or even the inadvisability – of different options, given the circumstances facing the officer.[207,208,209] This is especially true when an officer is exposed, with no viable cover.

*Time often equals safety.* Perhaps the most critical dimension that affects an officer's choice of force or control option is that of time. Officers are trained that time often equals safety, and that – generally speaking – one of the clearest manifestations of time-as-safety is that of distance. Principally, this is reflected in officers'

---

[204] Deposition transcript of David Harvey, dated 04/26/2021, p. 113.

[205] *Carr v. Tatangelo*, 338 F.3d 1259 n.19 (quoting *McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4 Cir. 1994).

[206] See generally, *Graham v. Connor*, 490 U.S. 386, 397 (1989).

[207] Many force and control options fail under differing conditions. Even TASER electrical weapons – one of the most effective, non-lethal options officers have – do not work to control resistive behavior every time they are deployed. Some studies have indicated that their effectiveness rate can be as low as 50-60 percent, given circumstances at the time of their deployment.

[208] Mesloh, C., Wolf, R., Henych, M., & Thompson, F. (2008). Less Lethal Weapons for Law Enforcement: A Performance-Based Analysis. *Law Enforcement Executive Forum. 8*(1).

[209] OC spray is considered a pain compliance tool; in order for OC to be effective, the targeted person must be susceptible to pain. When they are not, it's not uncommon for OC spray to be ineffective. This is especially true when a subject is impervious to pain; often the case when a subject is under the influence of a substance, or is extremely highly motivated or under high levels of stress.

understanding that, the closer you are to an adversary, the less time you will have to react to a sudden attack. This concept is referred to as *reactionary gap*.[210]

Officers are trained to create distance, if time and the environment allows. When they cannot do so, officers are acculturated to be hyper-sensitive to threat cues presented by the individual, or by the environment, including the urgency of any expeditious resolution. Additionally, when they cannot create distance, officers are actually trained to close the distance quickly, to – in effect – shorten their adversaries' reaction time. Plainly stated; if an officer can't move back safely, they are trained to move in quickly. This maneuver is referred to as *penetrating the gap*.[211] In a situation where they can do neither, officers are trained to react as quickly as possible in an attempt to gain an advantage during a dangerous situation.

*In the instant case.* As the incident in the drainage ditch unfolded, officers verbally challenged Means, ordering him to raise his hands. However, once he did so and then put them back under the water, they quickly saw that he was not going to continue to comply. In order to get him out of the water, they would have to move in close to him, without cover. If Means was armed, they would be exposed. Their option at that point would be to move even closer and physically take control, which they ultimately did.

*William Means quickly escalated the level of resistance in the encounter*. When Means failed to comply with orders to keep his hands in view, and instead moved them back under water, the encounter rapidly evolved to a more significant altercation than would otherwise have occurred.

The Importance of Perspective. When officers are engaged in a physical control situation, it is they who are in the best position to assess the level of resistance or difficulty they are encountering. An individual reviewing an officer's actions after the fact and conducting a detailed analysis, is sometimes tempted to apply his own filters, reasoning, criticisms, and conclusions – *ipse dixit* – to the actions of that officer. It is easy to fall into this hindsight trap, yet the courts have steadfastly cautioned against it.[212]

The twin luxuries of time and hindsight may make such an analysis seem logical and appropriate. However, officers are usually closest to the action – often in direct, physical, contact with the subject – and their perspective is likely to be different than that of a dispassionate reviewer or even a close-by observer.

When engaged in a physical control situation, officers combine what knowledge they already have (or know that they don't have), with the information and feedback gained in the midst of the moment.[213] In fact, they view events through the prism of context. Context is key, particularly as it relates to vision. Vision is highly context

---

[210] Reactionary gap has been defined as a range of distances, based upon the context of the encounter. Distances of 6 – 8 feet are frequently cited as the minimum acceptable for safety; although, depending on the weapon or tactics chosen by an adversary, ranges of 21 feet and beyond are not uncommon.

[211] Siddle, B. K. (2005). *PPCT Defensive Tactics Student Manual – Michigan edition*. Belleville IL: PPCT Management Systems.

[212] *Penley v. Eslinger*, 605 F.3d 843 (11 Cir. 2010).

[213] Artwohl, A., & Christensen, L. W. (1997). *Deadly Force Encounters: What Cops Need to Know to Mentally and Physically Prepare for and Survive a Gunfight*. Boulder CO: Paladin Press.

dependent.[214] Someone else may see part or all – relatively speaking – of a series of events, but because their context is different, their perspective will often yield a different evaluation of the circumstances and outcome.

When an officer views a sequence of events through his highly personalized prism of context, the result is each officer's unique perspective regarding the totality of the circumstances they are dealing with.

In the aftermath of an incident, it is common for a subject or witness to allege that officers were not threatened, that there was no intent to harm officers, that the witness saw no aggressive behavior on the part of an individual, or that officers' actions were unnecessary. However, the intent of a subject is not something an arresting, controlling, or pursuing officer can know. Officers base their responses to perceived resistance on the behavior of subjects, and what that behavior conveys as a subject's likely intent, as officers perceive it in the moment. Officers learn through both training and experience to react to pattern-recognition of threat or movement cues, as they manifest in an individual's observed behavior.[215] Those cues provide the basis for an officer's perception of resistance or lack of control, and thus, danger.[216]

This can be especially true when the perspective of the observer is at a distance, in either time or space, removed from the practical ramifications of the incident.

*In the instant case*. In this case, only William Means and the officers were in the ditch. Officers did not know if Means was armed but they knew that he had fled, and was now resisting. Peterson and Harvey filtered – perhaps even subconsciously, due to the short time available – Means' perceived actions and threat cues through their training and experience. As Means escalated to active resistance, both Peterson and Harvey reacted based upon their perceptions, in what they knew to be a potentially dangerous situation.

The Necessity for or Reasonableness of Force and Control. Officers are trained that they need not use the least amount of force necessary,[217,218] a quantity they can never effectively measure before the fact. Officers are trained that they are, as the 11th Circuit said in 2009, *"entitled to continue [his] use of force until a suspect thought to be armed is 'fully secured.'"*[219]

In fact, officers are trained that they *"...are not required to use the least intrusive degree of force possible. Rather [...] the inquiry is whether the force that was used to effect a particular seizure was reasonable, viewing the facts **from the perspective of a***

---

[214] Green, M., et al. (2008). *Forensic Vision with Application to Highway Safety (3rd ed.)*. Tucson: Lawyers & Judges Publishing.

[215] (2011). *Stress and Decision Making*. Federal Law Enforcement Training Center.

[216] The Fifth Circuit stated in *Harris v. Serpas*, 745 F.3d 767, 773 (5 Cir. 2014) citing *Rockwell*, 664 F.3d at 991, *"The relevant law, however, does not require the court to determine whether an officer was in actual, imminent danger of serious injury, but rather, whether "the officer reasonably believe[d] that the suspect pose[d] a threat of serious harm to the officer or to others.""*

[217] As eloquently stated by Judge Tallman in his dissent, *Bryan v. MacPherson*, 630 F.3d 805, 818 (9 Cir. 2010).

[218] *Forrester v. City of San Diego*, 25 F.3d 804 (9 Cir. 1994).

[219] *Jean-Baptiste*, 821, citing *Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11 Cir. 2009).

*reasonable officer on the scene.*"[220] [emphasis added] And, they are trained that their use of force must be objectively reasonable under the totality of circumstances they encounter in a given situation.

*In the instant case.* Unfortunately, William Means' escalating resistance led to Peterson and Harvey using more force than would otherwise have been required, had Means simply raised his hands as directed and not resisted; and the entire, unfortunate affair could have been avoided, had Means simply pulled over when signaled to do so by Peterson – a point that was underscored by plaintiff's putative expert, Mr. Taylor, during his deposition.[221]

Still, the degree of escalating risk posed by William Means' initial flight, his continued flight and ultimate crash, his resistance while in the ditch, the officers' lack of knowledge regarding the person they were dealing with, and their lack of knowledge whether Means was armed, all clearly combined to present Corporal Peterson and Officer Harvey with a *totality of the circumstances* worthy of consideration.

Alleged/disputed uses of force. There are three additional, disputed, allegations of use of force: that Corporal Peterson's patrol vehicle struck Means' rear tire – presumably intentionally – causing Means to lose control, that both officers engaged in improperly "dragging" or pulling Means from the water, and that Officer Harvey *"stomped"* on Means' helmet while searching him. There is one other issue, that an officer kicked Means, however, I note that the issue was not raised in the Complaint,[222] so I will address it separately, *infra*.

*The patrol vehicle striking Means' rear tire.* This issue is in dispute. However, I note the following:

- Peterson denies that it happened. He testified that he was probably three to four car lengths away when Means struck the tracks.[223] He reaffirmed his statement to investigators during his FBI interview, stating that he was some distance back when Means hit the tracks.[224]

- Harvey testified that it wasn't possible, because Peterson's vehicle was back, closer to Harvey's vehicle, and Means' vehicle was farther ahead.[225]

- Neither of the two bystander witnesses reported seeing it happen; they were not at the scene until well after the crash.

- There is no physical evidence in the record provided to me.

- Only William Means claims that it occurred.

---

[220] *Forrester v. City of San Diego,* 25 F.3d 804, 808 (9 Cir. 1994).

[221] Deposition transcript of plaintiff's putative expert, Roy Taylor [rough draft utilized, due to exigency], dated 06/23/2021, pp. 75, 77, 83, 88, 90, 94, 95, 98.

[222] Complaint, Civil Action Number 2:20-cv-00561, Document 1, PageID #: 1-9, date filed 08/25/2020.

[223] Deposition transcript of Eric Peterson, dated 05/04/2021, p. 193.

[224] Video file [FBI interview of Corporal Peterson] labeled *ACC Export - 2021-03-11 09.37.49 AM.ave* (with player software) [length approximately 00:23:00], dated 03/11/2021.

[225] Deposition transcript of David Harvey, dated 04/26/2021, pp. 73-74.

- Means himself testified that he didn't see it happen,[226] but that he felt the bump.[227]

- Assuming, *arguendo*, that it did actually happen; if it was unintentional it would not meet the definition of a seizure, and thus would not be a use of force. It would not have been a *"Governmental termination of freedom of movement, through means **intentionally** applied."*[228] *[emphasis added]*

*Both officers engaged in improperly dragging or pulling Means from the water*. This issue is in dispute. However, I note the following:

- Means asked the officers to move him out of the water, and they did so.

- Moving Means was not a termination of his freedom of movement; moving him was at his request, in order to get him out of the water. It was, in effect a shallow-water rescue.

- Means was moved to the south, over the tracks, because the terrain was steep and brush covered to the north of his position.

- When asked if moving Means was a use of force, Plaintiff's putative expert, Roy Taylor, testified that, *"**It wasn't intended to be a use of force**. It was just an inappropriate way to do it. And the manner in which they did was inappropriate."*[229] [emphasis added]

- Regardless of how Means was moved, the act of moving him was not a use of force. Moving him, at his request, for non-seizure purposes, was not a *"Governmental termination of freedom of movement, through means **intentionally** applied."*[230] *[emphasis added]*

*Officer Harvey "stomped" on Means' helmet while searching him*. The allegation that Officer Harvey "stomped" on William Means' helmet apparently springs from the bystander video recorded by Mary Chandler. Regarding this issue, I note the following:

- While recording, Mary Chandler spontaneously stated that the officer had *"stomped"* on Means' head.[231] She later testified that that was what she saw.[232]

- Melissa Nunley testified that she saw the alleged stomping also.[233] I note that she was in the driver's seat of the vehicle, to the left of Ms. Chandler, and at a different angle.

---

[226] Deposition transcript of William Means, dated 03/29/2021, p. 96.

[227] Deposition transcript of William Means, dated 03/29/2021, p. 95.

[228] *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989).

[229] Deposition transcript of plaintiff's putative expert, Roy Taylor [rough draft utilized, due to exigency], dated 06/23/2021, p. 146.

[230] *Brower*, 597.

[231] Video File labeled *2020-05682 video provided by Peterson (Youtube Video).mp4* [length 00:02:14], undated.

[232] Deposition transcript of Mary Chandler, dated 04/26/2021.

[233] Deposition transcript of Melissa Nunley, dated 04/26/2021.

- There is no mention of the alleged stomping, or of any resultant injury complaint, noted in the EMS report.[234]

- Means testified that he was unconscious, and does not remember his helmet being "stomped".[235]

- Mary Chandler estimated that she was 15-20 feet away from where the alleged "stomping" occurred, while recording, after first saying she had no idea how far away she was.[236]

- Melissa Nunley estimated that she was 20 feet away from where the alleged "stomping" occurred, after first saying she had no idea how far away she was.[237]

- As discussed, *supra*, review of Ms. Chandler's video indicates that both women were significantly farther away than their estimated 20 feet. A map review indicates they could have been as far away as 80 to 100 feet.[238]

- The video shows that Ms. Chandler is recording the video through Ms. Nunley's windshield.[239]

- The video shows that – shortly arriving at the scene – Ms. Chandler zoomed her camera lens, which shortened the apparent distance that she was physically from the arrest.[240]

*The alleged kicking*. Means testified that when he was attempting to stand up while in the water, an officer kicked him back over onto his back.[241] I note that, while there is no claim associated with "kicking" in the Complaint, the plaintiff apparently first raised the issue during his deposition. Regarding this issue, I note the following:

- Means testified that he didn't actually see anyone do it, but that he *"felt it."*[242]

- Assuming, *arguendo*, that the kicking actually occurred, because he did not see which officer allegedly kicked him, Means cannot attribute the act to either individual.

- I also note that Means testified that the officers *tased* [sic] him.[243]

---

[234] Ambulance Report [Boone County Ambulance Authority, Patient Care Record of William Means, incident number 200502-1008-BCAA, dated 05/02/2020.

[235] Deposition continuation transcript (volume II) of William Means, dated 04/20/2021, p. 32.

[236] Deposition transcript of Mary Chandler, dated 04/26/2021, pp. 29-30.

[237] Deposition transcript of Melissa Nunley, dated 04/26/2021, p. 28.

[238] See page 24 in this report for a discussion of the probable distance between Ms. Nunley's vehicle and the railroad tracks.

[239] Video File labeled *2020-05682 video provided by Peterson (Youtube Video).mp4* [length 00:02:14], undated.

[240] Video File labeled *2020-05682 video provided by Peterson (Youtube Video).mp4* [length 00:02:14], undated.

[241] Deposition transcript of William Means, dated 03/29/2021, p. 98.

[242] Deposition transcript of William Means, dated 03/29/2021, pp. 99-100.

[243] Deposition transcript of William Means, dated 03/29/2021, pp. 100, 104.

- Harvey did not have a TASER during the incident.[244]

- Harvey testified that *"we didn't have tasers."* [sic][245]

- During his FBI interview, Peterson reiterated that they did not have TASERs.[246]

- Plaintiff's putative expert, Roy Taylor, testified that the kicking was – in his opinion – the first use of *"excessive force"* during the incident.[247]

- There is no mention of the alleged kicking, or of any resultant injury complaint, noted in the EMS report.[248]

- Beyond Means' deposition statement, there is no indication that the kicking occurred in the record provided to me.

### 15. GENERALLY RECOGNIZED PREFERRED PRACTICES.

The Difference Between Rules and Procedures.  Law enforcement agencies typically have sets of written guidelines; as discussed, *infra*, these documents take many forms. However, these types of documents typically fall within two broad categories of guidance; the first is a set of workplace rules that set forth requirements for conduct. Examples are regulations about grooming, timeliness, management of documents, and workplace propriety.

The second broad category for these documents is that of procedural guidelines. Usually, these documents state routine methodologies for handling typical situations that arise in the day-to-day operations of the agency. Such documents establish general expectations regarding the handling of different types of calls, the methods used for collecting and preserving evidence, and other suggested courses of action.

The primary difference between these two types of documents is that one is a set of specific expectations that officers are expected to follow except in extraordinary circumstances. The other is a set of suggested protocols outlining general expectations to be followed unless officers encounter situations that require a different approach. In other words, rules are to be followed, while procedures are suggested – sometimes strenuously suggested – courses of action. It's possible to step outside procedural guidelines – with practical, articulable, reasons. Such guidelines are not inviolate.

*Internal Department Rules and Procedures are Not Laws*.  In either case, officers are trained that documents such as these are internal documents; they are not laws. In fact, in many cases, such documents set a higher bar than do legal requirements such as statutes, case law, and the Constitution. Generally, these guidelines should be at

---

[244] Deposition transcript of David Harvey, dated 04/26/2021, p. 121.

[245] Deposition transcript of David Harvey, dated 04/26/2021, p. 123.

[246] Video file [FBI interview of Corporal Peterson] labeled *ACC Export - 2021-03-11 09.37.49 AM.av*e (with player software) [length approximately 00:23:00], dated 03/11/2021.

[247] Deposition transcript of plaintiff's putative expert, Roy Taylor [rough draft utilized, due to exigency], dated 06/23/2021, p. 130.

[248] Ambulance Report [Boone County Ambulance Authority, Patient Care Record of William Means, incident number 200502-1008-BCAA, dated 05/02/2020.

least as restrictive as the law requires. However, many jurisdictions adopt stricter – sometimes far stricter – guidelines.

For that reason, officers are trained that courts have frequently held that a violation of a department procedural document – in and of itself – does not constitute a violation of the law, or of a person's constitutional rights.[249] Officers are trained that that is a different analysis, to a different standard.

*Maintenance of the Rule – Procedure Differentiation*. In my years of developing and reviewing many such documents for departments across the country, the differentiation between workplace rules and recommended (and even preferred) procedural guidelines has been one of the greatest challenges. The tendency in many departments is to stiffen procedural guidelines, enforcing them as if they were rules, even, sometimes, internally charging officers with "violation" of recommended procedural guidelines. This tendency manifests in many different ways, but frequently – in my experience – eventually leads to difficulty in utilizing guidelines for safe, effective, efficient, operations. Still, once such differentiation is firmly in place, agencies usually experience many positive outcomes.

Use of Sample or Model Documents.  There are no required criteria in the development of these management documents, save those requirements put in place by statutes or the courts. So, in order to assure that their documents comply with generally accepted and recognized preferred practices (which typically include meeting any required legal standards), agencies often rely upon sample guidelines published by outside entities. These sample guidelines serve as a starting point for document development.

*The Origin of Sample and Model Policies*.  There are volumes of model policies, sample directives, and recommended guidelines, promulgated by many different entities across the country. These generic guidelines are provided in order to assist police chiefs and sheriffs in devising, developing, and maintaining, up-to-date operating procedures for their respective agencies. Some of these guidelines are provided by legal advisors, insurance carriers, or risk management groups, while others emanate from associations and other non-governmental organizations. Some sets of guidelines are developed and sold by private companies.[250]

*The Nature, Applicability, and Scope of Sample and Model Policies*.  While many elements of such documents are similar, all of these guidelines are voluntary in nature, as there is no mandated set of protocols – what some might think of as *standards* – that all law enforcement agencies must adopt. They are also generic in content, as most are developed so as to be applicable to many different agencies, often in different states. For that reason, many are – by their very nature – limited in scope and applicability.[251]

---

[249] *Wren v. United States*, 517 U.S. 806, 815 (1996).

[250] One such company that develops policy sets for different states and individual departments is Operational Support Services (OSS) Law Enforcement Advisors, of Spring, Texas. Another is Lexipol, Inc., of Irvine, California.

[251] For example, from the July 2020, *National Consensus Policy on Use of Force* "*This National Consensus Policy on Use of Force is a collaborative effort among 11 of the most significant law enforcement*

While it's not uncommon for practitioners to consider – and often to refer to – these documents as *standards*, that is not the case. Indeed, it's common for promulgating organizations to specifically caution that no model policy or procedural guideline can meet all the needs of any given law enforcement agency, and that their documents do not constitute, and are *"not intended to be a national standard."*[252]

One entity that is often cited as a prolific purveyor of these generic guidelines is the International Association of Chiefs of Police (IACP). The IACP is a private, non-profit (501c3) entity.

International Association of Chiefs of Police (IACP).  The IACP is a membership organization that, among other activities, promulgates model policies, training keys,[253] and position papers. These address a wide range of law enforcement issues, with the goal of assisting their police executive members in developing guidelines for law enforcement operations.

The model policies and recommended guidelines published by the IACP are generic and advisory only, and their adoption is voluntary in nature. The position papers and training keys provide more detailed discussion of many aspects of each issue, but are also advisory in nature.

When put to use during practical procedure development, these sample policy documents and other tools provide a basic framework; in no way could they be considered as meeting the definition of a standard, *i.e.*, *"A type, model, or combination of elements accepted as correct or perfect."*[254]

*In the instant case*. Plaintiff has chosen to reference the IACP model policy on Vehicular Pursuit,[255] but has not chosen to reference – or apparently to review, as it is

---

*leadership and labor organizations in the United States [...]. The policy reflects the best thinking of all consensus organizations and* **is solely intended to serve as a template for law enforcement agencies to compare and enhance their existing policies**." [emphasis added]

[252] An example (one of many) of such a cautionary approach is that taken by the International Association of Chiefs of Police (IACP), in their publication of model or sample policies. From the December 2015, iteration of the IACP model policy on *Vehicular Pursuit*: *"Every effort has been made by the IACP Law Enforcement Policy Center staff and advisory board to ensure that this model policy incorporates the most current information and contemporary professional judgment on this issue. However, law enforcement administrators should be cautioned that no "model" policy can meet all the needs of any given law enforcement agency. Each law enforcement agency operates in a unique environment of federal court rulings, state laws, local ordinances, regulations, judicial and administrative decisions and collective bargaining agreements that must be considered.  In addition, the formulation of specific agency policies must take into account local political and community perspectives and customs, prerogatives and demands; often divergent law enforcement strategies and philosophies; and the impact of varied agency resource capabilities among other factors.* **This document is not intended to be a national standard.**" [emphasis added]

[253] IACP Training Keys are resource documents, similar in nature to "white papers" or position papers.

[254] *Black's Law Dictionary* 1404, 6th ed. 1990.

[255] Model Policy – *Vehicular Pursuit*. International Association of Chiefs of Police (IACP). December 2015.

not listed in his report – the IACP-provided consensus policy on Use of Force.[256,257] I have referenced both here.

The South Charleston Police Department's written directives for the use of force and vehicle pursuit are generally consistent with relevant IACP model policies, but are much more developed and well-rounded. As such, the South Charleston directives address issues that the IACP model policies do not. Accordingly, even when the South Charleston directives speak to the same issues, they generally do so in greater detail, with more practical direction and guidance. Such an approach is consistent with many guidelines that are in wide-spread use in departments today.

Some aspects of this more in-depth approach effectively put greater restrictions on South Charleston's management of field operations than the IACP model policies call for as recognized preferred practices, while other aspects provide similar guidance, yet allow for the flexibility of practical decision making, under circumstances that are tense, uncertain, and rapidly evolving.

16. **Departmental Procedural Guidelines.**

Operational Procedural Guidelines – Generally. Law enforcement agencies develop various directives and procedures in order to provide guidance for officers. Few of these guidelines take the form of hard-and-fast rules, due to the very nature of the work that officers do. Because most law enforcement officers work in the field, they are often away from the hands-on control of what most people would think of as a direct supervisor.

Additionally, the many different people officers interact with – and the situations they find themselves in daily – frequently present problems calling for unique and creative solutions. For that reason, aside from typical workplace regulations, most law enforcement documents and constructs of this type are implemented as guidelines or preferred practices, to allow for the flexibility and discretion that are usually required when officers are addressing the human condition in the real world.

Because of the nature of use of force and control, procedural guidelines addressing such issues are typically relatively firm in setting forth a framework within which officers can conduct their operational activities, while – at the same time – allowing for the aforementioned flexibility and discretion that officers need.

South Charleston Police directives on the use of force and control are consistent with this construct.

South Charleston Police Use of Force and Control Procedural Guidelines. No published guideline or procedure can be perfect. However, as written, South Charleston's directives provide practical guidelines for officers to use when making decisions in the field, regarding the use of force and control.[258]

---

[256] The IACP no longer publishes a separate model policy on Use of Force, choosing instead to distribute (and participate in) the *National Consensus Policy on Use of Force*.

[257] *National Consensus Policy on Use of Force*. As provided by the International Association of Chiefs of Police (IACP). July 2020.

[258] SCPD Policy & Procedures [Manual] 2014, § 22.0, *Use of Force*.

The South Charleston Police documents and directives illustrate measures that have been put into place by South Charleston – and by extension, the police department, as an agency or department of the city – in order to prevent and address issues arising from allegations of improper conduct by police officers regarding the use of force. Having reviewed, formulated, and recommended, hundreds of similar documents, it is my professional opinion that – while the format and terminology of these documents may vary from those utilized in different agencies and jurisdictions – issues are addressed in a manner similar to methods used in other municipalities, and are framed in a manner that is consistent with generally recognized preferred practices.

Application of Procedural Guidelines in a Real-World Context. Procedural guidelines only provide a framework from which officers can approach the tactical, real-world, challenges of force and control or other operational activities. As with all procedural documents of this type, the application of such guidance is contingent upon the totality of circumstances that officers perceive, as they deal with individuals on a day-to-day basis. To adapt and paraphrase a construct familiar to most officers in another context, the question of whether a written guideline can be applied exactly to a given field situation *is not capable of precise definition or mechanical application.*

In a broader sense, the South Charleston Police Department has promulgated directives and procedural guidelines for the purpose of directing employees in their day-to-day law enforcement activities, including the use of force and control as well as vehicle pursuits. These written directives compare well to many actual, in use, policy documents with which I am familiar, as well as various model, sample, and best practices, policies and guidelines that are utilized within the law enforcement field.

*In the instant case.* Within the context of the circumstances in which they found themselves, Corporal Peterson's and Officer Harvey's actions during the incident in question were consistent with the South Charleston Police use of force procedural guidelines.

## 17. LAW ENFORCEMENT TRAINING OF OFFICERS PETERSON AND HARVEY.

Police Academy Training. Based upon their separate, individual, testimony during deposition, both Corporal Peterson and Patrolman Harvey attended and completed academy training to become police officers.

*Corporal Peterson's Academy Training* was at the State Police Academy, from September through December of 2008.[259]

*Patrolman Harvey's Academy Training.* Harvey graduated from the State Police Academy, in August of 2014.[260]

Use of Force Training Rubrics and Memory.  Law enforcement officers are entrusted with the power to deny someone their freedom in order to enforce laws, preserve the peace, and to make the world safer for everyone. Use of this power frequently entails stopping someone from doing what they are doing, or from doing what they want to do, and that sometimes meets with resistance. Law enforcement officers are provided

---

[259] Deposition transcript of Eric Peterson, dated 05/04/2021, p. 223.
[260] Deposition transcript of David Harvey, dated 04/26/2021, p. 25.

with various tools – both tangible and intangible – to use in overcoming that resistance. The use of those tools to overcome resistance – in other words, to change behavior, at least in the short term – is what officers refer to as use of force.

An officer's decision regarding the level of force to be used is often impacted – as it was in the instant case – by the amount of time available for making the decision. When there is very little time in which to make a conscious decision, officers rely on their training and experience to guide their reaction to resistance or to a perceived threat, whether that be to themselves or to someone else. In effect, officers utilize their training as a mechanism for pre-thinking and pre-planning for various scenarios. In this way, officers can shorten the time required for decision making. When the product of an officer's training is filtered through his or her experiences, the officer is left with a programmed defense mechanism which allows for a much quicker – though still controlled – response to the perception of threatening behavior on the part of someone the officer interacts with.

Officers and trainers know, understand, and respect, this concept of training and conditioning,[261] especially as it impacts the safety of the public and officers, as well as suspects.

<u>Applicability of Training to this Incident</u>.  Perhaps one of the best measures of the quality and quantity of training is the degree to which that training is applied in the field, during situations that allow for little reaction time, and when officers must rely on their training to shorten their reaction time to a perceived threat.

*In the instant case*. In this incident, officers' reactions to William Means' actions were based on information they had at the moment that force and control were used, as well as their training and experience. Peterson and Harvey were each the *"officer on the scene,"*[262] applying what they had learned and been trained to do.

This is especially true because they were caught in the open, without cover, dealing with an unknown – possibly armed and non-compliant – suspect, encountering a situation that forced them to make *split-second judgments under circumstances that were tense, uncertain, and rapidly evolving*.

*Discussion*. My review of the record I have received leads me to conclude that the actions reportedly taken by Officers Peterson and Harvey do not suggest a lack of proper use of force training. Through their completion of state police academy training, Peterson and Harvey met or exceeded recommended use of force preferred practices that I am familiar with, through my education, research, training, and experience, and that are in wide use in the law enforcement community.

18. <span style="font-variant:small-caps">Conclusion</span>.

This event happened quickly after the motorcycle crash; the encounter in the waterlogged ditch (at least that portion that is seen on the bystander video – Corporal Peterson testified that there was some activity in the ditch before the video starts) occurred in slightly more than a minute, while the actual handcuffing and searching

---

[261] This conditioning is colloquially known in the law enforcement community as *programmed memory*, or *programmed muscle memory*.

[262] *Graham*, 396.

of Means occurred in approximately 45 seconds.[263] As is typical of these sorts of events, much happened in a short time.

Ultimately, when William Means failed to comply, and resisted their attempts at control, Peterson and Harvey determined that their best option was to continue to grapple for Means' hands below the waterline, and to deliver a short burst of OC spray to assist in their efforts. At some point – as Peterson continued to grapple with Means – Harvey delivered a short burst of OC spray. Although Harvey characterized the spray as ineffective, control of Means' hands was eventually achieved, he was removed from the water, and subsequently handcuffed.

19. <u>OPINIONS.</u>

Based on the items outlined above, as well as my general understanding of the case, I hold the following opinions, each to a reasonable – or higher – degree of professional certainty. These opinions are the result of my case review and research, and are the product of my skill and knowledge, as gained through my years of experience, education, and/or training.

My specific imprimatur in this case was to review the actions of South Charleston Police Officers E. M. Peterson and D. Harvey, regarding their actions during officers' encounter with William Means, and to consider ancillary issues.

These opinions are a reiteration of those presented earlier in the Executive Summary of this report; and they are in addition to any statements of opinion I may have expressed in the body of this report, *supra.*

1.   It is my opinion that <u>the use of force in self-defense was a logical and appropriate response by Officers Peterson and Harvey to the perceived potential threat</u> posed by William Means.

2.   It is my opinion that, under similar *tense, uncertain, and rapidly evolving circumstances*, <u>other officers would believe it appropriate to act as Peterson and Harvey did</u>.

3.   It is my opinion that <u>the actions of Officers Peterson and Harvey were consistent with recommended preferred and trained practices</u> that I am familiar with, through my education, research, training, and experience, and that are in wide use in the law enforcement community.

4.   It is my opinion that the <u>South Charleston Police use of force and vehicle pursuit procedural guidelines are consistent with recommended preferred procedural guidelines</u> that I am familiar with, through my education, research, training, and experience, and that are in wide use in the law enforcement community.

   4.1.   It is my opinion that, within the context of the circumstances in which they found themselves, <u>the South Charleston officers' actions were consistent with typical law enforcement procedural guidelines</u> that are commonly presented to officers through various modes of training.

---

[263] Video File labeled *2020-05682 video provided by Peterson (Youtube Video).mp*4 [length 00:02:14], undated.

4.2.    It is my opinion that, within the context of the circumstances in which they found themselves, <u>the South Charleston officers' actions were consistent with their departmental use of force and vehicle pursuit procedural guidelines</u>.

## 20. COMPENSATION FOR STUDY AND TESTIMONY.

<u>Compensation for Study, Analysis, Testimony, and Travel</u>. In addition to reasonable and customary reimbursement for expenses, I am compensated at a rate of $150.00 per hour for study, review, research, analysis, and report preparation. I am compensated at a rate of $200.00 per hour for testimony. My rate of compensation for travel is $75.00 per hour.[264]

As is my usual practice, my fees are not dependent upon my findings, or on the outcome of any legal action, mediation, arbitration, or the amount or terms of any settlement of any underlying cause, nor upon any arrangement between defense or plaintiff's counsel and any other person or party.

<u>Compensation as of this Writing</u>. As of this writing, I have not received any compensation for my services in this matter.

## 21. EXHIBITS.

The following exhibits are attached, and are to be considered part of this report.[265]

- <u>Exhibit I</u> is a list of documents and materials that I have reviewed or considered during the completion of this report.

- <u>Exhibit II</u> is my Curriculum Vitae, which includes a list of publications that I have authored or coauthored in the last ten years.

- <u>Exhibit III</u> is a listing of cases in which I have testified as an expert at deposition, hearing, or trial, in the last four years.

- <u>Exhibit IV</u> is my complete Fee Schedule.

June 30, 2021
_____
DATE

_____
STEVEN D. ASHLEY, MSC, MLS, ARM/P, AFSB, CFCI, IICI
MONROE, MICHIGAN

---

[264] My detailed Fee Schedule is attached to, and is incorporated into, this report as <u>Exhibit IV</u>.

[265] In the electronic version of this report, each exhibit can be accessed directly by clicking on the underlined exhibit number.

## EXHIBIT I – DOCUMENT LIST

**Last Reviewed/Updated June 30, 2021**

The following items were considered, reviewed, recalled, or referenced, by me during my analysis of this case and the development of this report. Some were provided by counsel, while others are the product of my research and/or consideration.

### DOCUMENTS

1.  Complaint, Civil Action Number 2:20-cv-00561, Document 1, PageID #: 1-9, date filed 08/25/2020.

2.  South Charleston Police Department, Case Number 2020-00005682, Case Report Summary, dated 05/02/2020, with attachments:

    2.1.   South Charleston Police Department, Case Number 2020-00005682, Field Case Report by Corporal Peterson, dated 05/02/2020.

    2.2.   South Charleston Police Department, Case Number 2020-00005682, Field Case Report Narrative by Corporal Peterson, dated 05/02/2020.

    2.3.   South Charleston Police Department, Case Number 2020-00005682, Field Case Suppliment [sic] Report by Officer Harvey, dated 05/02/2020.

    2.4.   South Charleston Police Department, Case Number 2020-00005682, Field Case Suppliment [sic] Narrative by Officer Harvey, dated 05/02/2020.

    2.5.   State of West Virginia Uniform Traffic Crash Report, Crash Data, Record Number WVSP20-1506, dated 05/02/2020.

3.  18 color photographs, undated.

4.  CAMC General Hospital, Toxicology Report for William Means, dated 05/02/2020.

5.  South Charleston Police Department, Use of Force Report by Officer Harvey, Incident Number 2020-5682, dated 05/02/2020.

6.  South Charleston Police Department, Case File, date stamped RECEIVED OCT 26 2020.

    6.1.   South Charleston Police Department, Case Number 2020-00005682, Field Case Report by Corporal Peterson, dated 05/02/2020.

    6.2.   South Charleston Police Department, Case Number 2020-00005682, Field Case Report Narrative by Corporal Peterson, dated 05/02/2020.

    6.3.   South Charleston Police Department, Case Number 2020-00005682, Field Case Suppliment [sic] Report by Officer Harvey, dated 05/02/2020.

    6.4.   South Charleston Police Department, Case Number 2020-00005682, Field Case Suppliment [sic] Narrative by Officer Harvey, dated 05/02/2020.

    6.5.   South Charleston Police Department, Case Number 2020-00005682, Arrest Information Sheet by Lieutenant Gordon/Narrative typed by Detective Keeney, dated 08/27/2020.

6.6.     State of West Virginia Uniform Traffic Crash Report, Crash Data, Record Number WVSP20-1506, dated 05/02/2020.

6.7.     Monochrome photocopy of West Virginia license plate, plate number G92897.

6.8.     [Dispatch] Call for Service Detail Report-CFS 65, dated 05/02/2020.

6.9.     South Charleston Police Department, Case Number 2019-00002933, Field Case Report Narrative by Corporal Parsons, dated 02/25/2019.

6.10.    NLET computer record, dated 05/02/2020.

6.11.    Driving Record and Criminal History of William Means, various dates.

6.12.    Monochrome photocopy screen shot of a media post, dated May 18 (no year).

6.13.    18 color photocopies, undated.

6.14.    Letter from Morgan Switzer, Assistant Prosecutor, to Attorney Forbes, dated 10/15/2020.

7.   Video and audio files:

7.1.     Video File labeled *2020-05682 video provided by Peterson (Youtube Video).mp4* [length 00:02:14], undated.

7.2.     Audio file labeled *20200502 - Pursuit - Trace Fork Rd. & Ruth Rd, Davis Creek - CFS 65 - SCPD Radio Traffic.wav* [length 00:31:15], dated 05/02/2020.

7.3.     Video file labeled *GOPR0963 Pursuit Route Part 1.mp4* [length 00:17:35, frame rate 29.97 fps], undated.

7.4.     Video file labeled *GP010963 Pursuit Route Part 2.mp4* [length 00:14:59, frame rate 29.97 fps], undated.

7.5.     Enhanced video file labeled *received_490391439074810 Enhanced Segment 1.mp4* [length 00:00:24, frame rate 30.000 FPS], encoded 05/15/2021.

7.6.     Enhanced video file labeled *received_490391439074810 Enhanced Segment 2.mp4* [length 00:00:16, frame rate 30.000 FPS], encoded 05/15/2021.

7.7.     Video file [FBI interview of Corporal Peterson] labeled *ACC Export - 2021-03-11 09.37.49 AM.ave* (with player software) [length approximately 00:23:00], dated 03/11/2021.

8.   South Charleston Police Department Policy & Procedures [Manual] 2014, specifically sections:

8.1.     SCPD Policy & Procedures [Manual] 2014, § 1.0, *Introduction & Purpose*, p. 3.

8.2.     SCPD Policy & Procedures [Manual] 2014, § 22.0, *Use of Force*, pp. 139-143.

8.3.     SCPD Policy & Procedures [Manual] 2014, § 23.0, *Emergency Response & Vehicular Pursuit*, pp. 144-148.

9.   Fox Labs International, Inc., *Five point Three Defense Spray* product information.

10.   Deposition transcript of David Harvey, dated 04/26/2021, with attached exhibits:

    10.1.   Exhibit 1, Defendants' Emergency Motion for Protective Order and/or Stay, Document 43, date filed 03-29-2021.

    10.2.   Exhibit 2, 2015 Charleston Gazette article [*Body cameras for police officers on rise in W.Va.*, 01/22/2015].

    10.3.   Exhibit 3, South Charleston Police Department, Case Number 2020-00005682, Case Report, dated 05/02/2020.

    10.4.   Exhibit 4, Audio file labeled *20200502 - Pursuit - Trace Fork Rd. & Ruth Rd, Davis Creek - CFS 65 - SCPD Radio Traffic.wav* [length 00:31:15], dated 05/02/2020.

    10.5.   Exhibit 5, Video file labeled *GOPR0963 Pursuit Route Part 1.mp4* [length 00:17:35, frame rate 29.97 fps], undated.

    10.6.   Exhibit 6, Video file labeled *GP010963 Pursuit Route Part 2.mp4* [length 00:14:59, frame rate 29.97 fps], undated.

    10.7.   Exhibit 7, South Charleston Police Department, Use of Force Report by Officer Harvey, Incident Number 2020-5682, dated 05/02/2020.

    10.8.   Exhibit 8, Bystander Video [Video File labeled *2020-05682 video provided by Peterson (Youtube Video).mp4* [length 00:02:14], undated].

    10.9.   Exhibit 9, State of West Virginia Uniform Traffic Crash Report, Crash Data, Record Number WVSP20-1506, dated 05/02/2020.

    10.10.   Exhibit 10, Photograph [South Charleston Police Department, Case File, date stamped RECEIVED OCT 26 2020, p. 78].

    10.11.   Exhibit 11, Photograph [South Charleston Police Department, Case File, date stamped RECEIVED OCT 26 2020, p. 79].

    10.12.   Exhibit 12, Photograph [South Charleston Police Department, Case File, date stamped RECEIVED OCT 26 2020, p. 64].

    10.13.   Exhibit 13, Photograph [South Charleston Police Department, Case File, date stamped RECEIVED OCT 26 2020, p. 66].

    10.14.   Exhibit 14, Photograph [South Charleston Police Department, Case File, date stamped RECEIVED OCT 26 2020, p. 67].

    10.15.   Exhibit 15, *Emergency Response & Vehicular Pursuit Policy*, § 23.0, undated.

11.   Deposition transcript of Eric Peterson, dated 05/04/2021, with attached exhibits:

    11.1.   Exhibit 1, Defendants' Emergency Motion for Protective Order and/or Stay, Document 43, date filed 03-29-2021.

    11.2.   Exhibit 2, Criminal Complaint, Magistrate Court of Kanawha County, case number 20-M20F-00628, dated 05/07/2020.

11.3.   Exhibit 3, Charleston Gazette article [*Body cameras for police officers on rise in W.Va.*, 01/22/2015].

11.4.   Exhibit 4, Video file labeled *GOPR0963 Pursuit Route Part 1.mp4* [length 00:17:35, frame rate 29.97 fps], undated.

11.5.   Exhibit 5, Video file labeled *GP010963 Pursuit Route Part 2.mp4* [length 00:14:59, frame rate 29.97 fps], undated.

11.6.   Exhibit 6, Audio file labeled *20200502 - Pursuit - Trace Fork Rd. & Ruth Rd, Davis Creek - CFS 65 - SCPD Radio Traffic.wav* [length 00:31:15], dated 05/02/2020.

11.7.   Exhibit 7, Bystander Video [Video File labeled *2020-05682 video provided by Peterson (Youtube Video).mp4* [length 00:02:14], undated].

11.8.   Exhibit 8, South Charleston Police Department, Case Number 2020-00005682, Case Report, dated 05/02/2020.

11.9.   Exhibit 9, [19] color photocopies of photographs [South Charleston Police Department, Case File, date stamped RECEIVED OCT 26 2020, pp. 62-79 (different order), with one duplicate, enlarged, photo].

11.10.  Exhibit 10, Monochrome photocopy of license plate photograph [South Charleston Police Department, Case File, date stamped RECEIVED OCT 26 2020, p. 26].

11.11.  Exhibit 11, *Emergency Response and Vehicular Pursuit Policy*, § 23.0, undated.

11.12.  Exhibit 12, Electronic picture [color photo of parked motorcycle, undated].

11.13.  Exhibit 13, Ambulance Report [Boone County Ambulance Authority, Patient Care Record of William Means, incident number 200502-1008-BCAA, dated 05/02/2020].

12.  Deposition transcript of Mary Chandler, dated 04/26/2021, with attached exhibits:

12.1.   Exhibit 1, Bystander video [Video File labeled *2020-05682 video provided by Peterson (Youtube Video).mp4* [length 00:02:14], undated].

12.2.   Exhibit 2, Hand drawing [hand-drawn diagram, dated 04/26/2021].

13.  Deposition transcript of Melissa Nunley, dated 04/26/2021, with attached exhibits:

13.1.   Exhibit 1, Bystander video [Video File labeled *2020-05682 video provided by Peterson (Youtube Video).mp4* [length 00:02:14], undated].

13.2.   Exhibit 2, Hand drawing [hand-drawn diagram, dated 04/26/2021].

14.  Deposition transcript of William Means, dated 03/29/2021.

15.  Deposition continuation transcript (volume II) of William Means, dated 04/20/2021, with attached exhibits:

15.1.   Exhibit 1, photocopied color photograph [South Charleston Police Department, Case File, date stamped RECEIVED OCT 26 2020, enlarged from p. 73].

15.2.   Exhibit 2, photocopied color photograph [South Charleston Police Department, Case File, date stamped RECEIVED OCT 26 2020, enlarged from p. 72].

16.   Deposition transcript of Sergeant [Trooper] J. W. Robinson, dated 06/03/2021, with attached exhibits:

16.1.   Exhibit 1, State of West Virginia Uniform Traffic Crash Report, Crash Data, Record Number WVSP20-1506, labeled Exhibit 1, dated 05/02/2020.

16.2.   Exhibit 2, placeholder for Thumb Drive [drive not provided], labeled Exhibit 2, dated 06/03/2021.

16.3.   Exhibit 3, color photocopy of color photograph of railroad rail, showing apparent damage, undated.

16.4.   Exhibit 4, color photocopy of color photograph of railroad ties and rail, showing apparent damage, undated.

17.   2015 Dodge Charger Pursuit Specifications, undated. Accessed and retrieved by Steve Ashley during 06/2021.

18.   Charleston Police Department, Case Number 21031105, Overdose Report of William Means, dated 03/11/2021.

19.   Proffered Report of plaintiff's putative expert, Roy G. Taylor, dated 05/13/2021, with appendices:

19.1.   Curriculum Vitae [believed to be Appendix A], undated.

19.2.   Litigation Experience, Appendix B, undated.

19.3.   Materials Reviewed, Appendix C, undated.

19.4.   Facts Assumed to be True/Disputed Facts, Appendix D, undated.

20.   Deposition transcript of plaintiff's putative expert, Roy Taylor [rough draft utilized, due to exigency], dated 06/23/2021.

21.   Venue, Location, Time Frame, Weather, Geography, and Lighting.

21.1.   Various Google Maps and Satellite view captures, accessed by Steve Ashley during 06/2021.

21.2.   TimeandDate.com Monthly Calendar for May 2, 2020, accessed by Steve Ashley during 06/2021.

21.3.   "Weather History for Yeager Airport Weather Station KCRW." Weather Underground, 2 May 2020, https://www.wunderground.com/history/daily/KCRW/date/2020-5-2. Accessed and retrieved by Steve Ashley during 06/2021.

21.4.   "Weather History for Yeager Airport Weather Station KCRW." Weather Underground, 1 May 2020, https://www.wunderground.com/history/daily/KCRW/date/2020-5-1. Accessed and retrieved by Steve Ashley during 06/2021.

21.5.   "Weather History for Yeager Airport Weather Station KCRW." Weather Underground, 30 April 2020, https://www.wunderground.com/history/daily/KCRW/date/2020-4-30. Accessed and retrieved by Steve Ashley during 06/2021.

21.6.   "Weather History for Yeager Airport Weather Station KCRW." Weather Underground, 29 April 2020, https://www.wunderground.com/history/daily/KCRW/date/2020-4-29. Accessed and retrieved by Steve Ashley during 06/2021.

21.7.   Elevation for 38.201667, -81.725346, https://www.freemaptools.com/elevation-finder.htm. Accessed by Steve Ashley during 06/2021.

21.8.   "Sunrise and sunset times in Charleston WV for May 2020". https://www.timeanddate.com/sun/usa/charleston-wv?month=5&year=2020. Accessed and retrieved by Steve Ashley during 06/2021.

21.9.   "Moon Phases for 2020," https://www.timeanddate.com/moon/phases/usa/charleston-wv?year=2020, Accessed and retrieved by Steve Ashley during 06/2021.

21.10.  "Moonrise/Moonset for Charleston West Virginia, for 2020," https://www.timeanddate.com/moon/usa/charleston-wv?month=5&year=2020. Accessed and retrieved by Steve Ashley during 06/2021.

22.  West Virginia Statutes.

22.1.   WV Code § 17A-9-3 Improper use of evidence of registration.

22.2.   WV Code § 17B-4-3 Driving while license suspended/revoked.

22.3.   WV Code § 17D-2A-3 Insurance – No Insurance for Vehicle.

22.4.   WV Code § 60A-4-401(c) (Narcotic) Possess controlled substance unless from valid prescription.

22.5.   WV Code § 61-5-17(e) Flee (attempt) from officer.

22.6.   WV Code § 17C-2-5 Authorized Emergency Vehicle.

23.  Additional court documents:

23.1.   Memorandum Opinion and Order, Civil Action Number 2:20-cv-00561, Document 16, date filed 11/13/2020.

## REFERENCES

Artwohl, A. (2002, October). Perceptual and Memory Distortion During Officer-Involved Shootings. *FBI Law Enforcement Bulletin, 71(10)*:18-24.

Artwohl, A., & Christensen, L. W. (1997). *Deadly Force Encounters: What Cops Need to Know to Mentally and Physically Prepare for and Survive a Gunfight*. Boulder CO: Paladin Press.

*Black's Law Dictionary, 6th ed*. 1990.

Chabris, C., & Simons, D. (2010). *the invisible gorilla: And Other Ways Our Intuitions Deceive Us*. New York: Crown.

Fed. R. Evid. 702.

Felter, B. A. (1988). *Police Defensive Handgun Use and Encounter Tactics*. New Jersey: Prentice-Hall.

Green, M., et al. (2008). *Forensic Vision with Application to Highway Safety (3rd ed.)*. Tucson: Lawyers & Judges Publishing.

Head, G. L. (1987). *Essentials of the Risk Management Process, Vol. 1 & 2*. Malvern PA: Insurance Institute.

Heider, K. G. (1988). The Rashomon Effect: When Ethnographers Disagree. *American Anthropologist, New Series, 90(1)*:73-81.

Ho, J. D., Dawes, D. M., Lundin, E. J., & Miner, J. R. (2009). 127: Comparison of Acidosis Markers Associated with Law Enforcement Applications of Force. *Annals of Emergency Medicine, 54(3)*:S40.

Ho, J., Dawes, D., Nelson, R., Lundin, E., Ryan, F., Overton, K., Zeiders, A., & Miner, J. (2010). Acidosis and Catecholamine Evaluation Following Simulated Law Enforcement ''Use of Force'' Encounters. *Academic Emergency Medicine, 17(7)*:E60-E68.

Jennett, S. (Ed.). (2008). *Churchill Livingstone's Dictionary of Sport and Exercise Science and Medicine*. New York: Elsevier Limited.

Joyner, C. (2011). *Advanced Concepts in Defensive Tactics: A Survival Guide for Law Enforcement*. Boca Raton FL: CRC Press.

Klinger, D. (2004). *Into the Kill Zone: A Cop's Eye View of Deadly Force*. San Francisco: Josey-Bass.

Lewinski, B. (2000, November/December). Why is the Suspect Shot in the Back? The *Police Marksman, 27(6)*:20-8.

Lewinski, W. J., Hudson, B., & Dysterheft, J. L. (2014). Police officer reaction time to start and stop shooting: The influence of decision-making and pattern recognition. *Law Enforcement Executive Forum, 14(2)*:1-16.

Lewinski, W. J., & Dysterheft, J., Bushey, J., & Dicks, N. (2015). Ambushes Leading Cause of Officer Fatalities – When Every Second Counts: Analysis of Officer Movement from Trained Ready Tactical Positions. *Law Enforcement Executive Forum. 15(1)*:1-15.

Lewinski, W. J., Dysterheft, J. L., Seefeldt, D. A., & Pettitt, R. W. (2013). The influence of officer positioning on movement during a threatening traffic stop scenario. *Law Enforcement Executive Forum, 13(1)*:98-109.

Lewinski, W. J., & Redmann, C. (2009). New Developments in Understanding the Behavioral Science Factors in the "Stop Shooting" Response. *Law Enforcement Executive Forum. 9(4)*:35-54.

Lewinski, W. J., Seefeldt, D., Redman, C., Gonin, M., Sargent, S., Dysterheft, J., & Thiem, P. (2016). The Speed of a Prone Subject. *Law Enforcement Executive Forum. 16(1)*:70-83.

Lundin, E. J., Dawes, D. M., Ho, J. D., Ryan, F.J., & Miner, J. R. (2009). 315: Catecholamines in Simulated Arrest Scenarios. *Annals of Emergency Medicine, 54(3)*:S98-S99.

Mesloh, C., Wolf, R., Henych, M., & Thompson, F. (2008). Less Lethal Weapons for Law Enforcement: A Performance-Based Analysis. *Law Enforcement Executive Forum. 8(1)*:133-149.

Model Policy – *Vehicular Pursuit*. International Association of Chiefs of Police (IACP). December 2015.

*National Consensus Policy on Use of Force*. As provided by the International Association of Chiefs of Police (IACP). July 2020.

National Weather Service. Definitions of Twilight. https://www.weather.gov/fsd/twilight. Accessed by Steve Ashley during 04/2020.

Nugent, Pam M.S. "Tachypsychia". PsychologyDictionary.org. April 13, 2013, https://psychologydictionary.org/tachypsychia/. Accessed by Steve Ashley on May 28, 2018.

Remsberg, C., Adams, R. J., & McTernan, T. M. (1980). *Street Survival: Tactics for Armed Encounters*. Evanston IL: Calibre Press.

Ross, D. L., & Siddle, B. K. (2003). An Analysis of the Effects of Survival Stress in Police Use-of-Force Encounters. *Law Enforcement Executive Forum, 3(2)*:9-26.

Siddle, B. K. (2005). *PPCT Defensive Tactics Student Manual – Michigan edition*. Belleville IL: PPCT Management Systems.

Siddle, B. K. (2004). *PPCT Defensive Tactics Instructor Manual – United States edition*. Belleville IL: PPCT Management Systems.

Spitz, S. (Ed.). (2007). *American Heritage Medical Dictionary (2nd ed.)*. Boston: Houghton Mifflin Company.

(2011). *Stress and Decision Making*. Federal Law Enforcement Training Center.

U.S. Const. amend. IV.

VandenBos, G. (Ed.). (2015). *APA Dictionary of Psychology (2nd ed.)*. Washington DC: American Psychological Association.

Wise, J. (2009). *Extreme Fear: The Science of Your Mind in Danger*. New York: Palgrave.

## TABLE OF CASES

*Bell v. Wolfish*, 441 U.S. 520 (1979).

*Brooks v. City of Seattle*, 599 F.3d 1018 (9 Cir. 2010).

*Brower v. County of Inyo*, 489 U.S. 593, 597 (1989).

*Bryan v. MacPherson*, 630 F.3d 805 (9 Cir. 2010).

*Byther ex rel. Byther v. City of Mobile*, 398 F. Supp. 2d 1222, 1237 (S.D. Ala. 2005).

*Carr v. Tatangelo*, 338 F.3d 1259 (11 Cir. 2003).

*Chew v. Gates*, 27 F.3d 1432 (9 Cir. 1994), cert. denied, (U.S. Feb. 21,1995)
(No. 94-980).

*Crenshaw v. Lister*, 556 F.3d 1283 (11 Cir. 2009).

*Daubert, et al., v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

*Dickerson v. McClellan*, 101 F3d 1151, 1160 (6 Cir. 1996).

*Forrester v. City of San Diego*, 25 F.3d 804 (9 Cir. 1994).

*Garczynski v. Bradshaw*, 573 F.3d. 1158 (11 Cir. 2009).

*Graham v. Connor*, 490 U.S. 386 (1989).

*Harris v. Serpas*, 745 F.3d 767, 773 (5 Cir. 2014).

*Illinois v. Rodriguez*, 497 U.S. 177 (1990).

*Jean-Baptiste v. Gutierrez*, 627 F.3d 816 (11 Cir. 2010).

*Johnson v. Glick*, 481 F. 2d 1028 (2 Cir. 1973).

*Kumho Tire Co., LTD., et al., v. Carmichael, et al.*, 526 U.S. 137 (1999).

*Long v. Slaton*, 508 F.3d 576, 581 (11 Cir. 2007).

*McLenagan v. Karnes*, 27 F.3d 1002 (4 Cir. 1994).

*Penley v. Eslinger*, 605 F.3d 843 (11 Cir. 2010).

*Rockwell v. Brown*, 664 F.3d 985 (5 Cir. 2011).

*Scott v. Harris*, 550 U.S. 372 (2007).

*Tennessee v. Garner*, 471 U.S. 1 (1985).

*Whren v. United States*, 517 U.S. 806, 815 (1996).

## EXHIBIT II – CURRICULUM VITAE

# STEVEN D. ASHLEY

15 Custer Court
Monroe, Michigan 48161

Voice: 517.548.2275          Cell: 248.467.1541          Facsimile: 734.749.1321
E-Mail: Steve@PoliceRisk.com          Web Site: www.PoliceRisk.com

NOTE: IN THE PDF VERSION, CLICK TO INDEX IN THE FOOTER OF EACH PAGE TO RETURN TO THIS INDEX.
CLICK TOC TO RETURN TO THE MAIN TABLE OF CONTENTS.

**Last Reviewed/Updated June 30, 2021**

## CV INDEX

Special Qualifications ........................................................................................ **64**
Formal Education ............................................................................................... **66**
Current Employment .......................................................................................... **66**
Employment History ........................................................................................... **67**
Expert Case Consultation ................................................................................... **69**
Membership Associations & Volunteer Activities ............................................. **69**
Instructor / Armorer Certifications Completed/Earned ...................................... **71**
Certificate Instructor Program Completed/Earned ............................................. **73**
Career Certifications Completed/Earned ............................................................. **73**
Awards and Recognition ..................................................................................... **74**
Publications ......................................................................................................... **74**
Guest Lecturer .................................................................................................... **79**
Training Videos & Multimedia Productions ....................................................... **84**
Book Chapter ...................................................................................................... **84**

## SPECIAL QUALIFICATIONS

- 15 Years as a full-time, sworn, law enforcement officer and manager.[266]

- 12 Years as a full-time risk management professional, specializing in law enforcement, criminal justice, security, and corrections risk management.

- Over 45 years as a criminal justice trainer in the areas of high-risk activity, police driving, use of force, training, and training management.

- Completed over 6,000 hours of law enforcement, emergency management, risk management, and public safety related training.

- Personally delivered over 150,000 man hours of training to over 16,500 law enforcement and corrections officers and managers, more than 30,000 man-hours of which was instructor- or Master-level training.

- Earned and received certification as a Master Use of Force Instructor, Advanced Force Science Specialist, Master Force and Control Instructor, Certified Force

---

[266] Many of the following time frames overlap in various ways.

Science Analyst, Master Excited Delirium/Agitated Chaotic Event Instructor, and TASER Senior Master Instructor.

- Instructor Graduate of the *Law of Self Defense Instructor Program*, Law of Self Defense Institute.

- 10 years as Police Academy Use of Force/Driver Training Coordinator.

- Earned and received state approval as lead police academy Firearms Instructor.

- Earned and received state approval as lead police academy Driving Instructor.

- Designed and developed many training programs, presentations, and curricula.

- 15 years management experience spanning both the public and private sectors.

- Personally conducted on-site risk management reviews of more than 400 law enforcement agencies and jails in more than seven states, examining all aspects of law enforcement and corrections management, practices, and operations.

- Personal critical reviews of more than 500 law enforcement and corrections Policy and Procedure Manuals, from agencies across the United States.

- Advisory Board Member (§ 1701), curriculum developer, and quality assurance specialist, for the OSS Academy, a Texas state-licensed education provider, approved by the Texas Commission on Law Enforcement[267] to provide required in-service training as well as other courses.

- Subject Matter Expert for the Michigan Law Enforcement Officers Training Council,[268] in the development of the *Michigan Emergency Vehicle Operations Instructor Manual*.

- Subject Matter Expert and Content Review Specialist for the Michigan Law Enforcement Officers Training Council, in the development of the *Michigan Law Enforcement Driver Training Reference Guide*.

- Subject Matter Expert for the Mississippi Department of Public Safety, Standards and Training Division, in the development of the *Mississippi Detention Officer Course*.

- Subject Matter Expert for the Mississippi Department of Public Safety, Public Safety Planning Division, in the development of the *Mississippi Model Law Enforcement Policies & Procedures* program.

- Subject Matter Expert for the Mississippi Department of Public Safety, Public Safety Planning Division, in the development of the *Mississippi Model Jail Policies & Procedures* program.

- Subject Matter Expert for the Michigan Law Enforcement Officers Training Council, in the development of the *Michigan Law Enforcement Officer-Subject Control Continuum*.

---

[267] TCOLE, *i.e.*, the Texas Commission on Law Enforcement, was formerly known by the acronym TCLEOSE, *i.e.*, the Texas Commission on Law Enforcement Officer Standards and Education.

[268] Originally known by the initialism MLEOTC; MLEOTC was rebranded as the Michigan Commission on Law Enforcement Standards (MCOLES) in 1996.

- Subject Matter Expert for the Illuminating Engineering Society of North America, *Security Lighting Committee* and *Security Lighting Committee on Lighting and Crime*.

- Published author and frequent guest lecturer on the subjects of management of high-risk police and corrections activity, including, *inter alia*, use of force and deadly force, pursuit driving and vehicle operations, law enforcement and corrections procedures and practices, training, training management, risk management, and other public safety related topics.

- Author, columnist, and contributor, to criminal justice publications, including, *inter alia*, Law Officer, PoliceMag.com, Law and Order, Police and Security News, The ASLET Trainer, Law Enforcement Technology, Police Magazine, Answering the Call, The ILEETA Review, The ILEETA Chronicle, and Officer.com.

## FORMAL EDUCATION

| | |
|---|---|
| Associate in Risk Management / Public Entities, Insurance Institute of America | 2000 |
| Master of Liberal Studies in Technology [CJ], Eastern Michigan University | 2000 |
| Associate in Risk Management, Insurance Institute of America | 1991 |
| Master of Science in Criminal Justice [Management], Michigan State University | 1988 |
| School of Police Staff and Command, Northwestern University | 1987 |
| Bachelor of Arts in Communications, Michigan State University | 1982 |
| Police Officer Certification, Southeast Regional Criminal Justice Training Center | 1976 |

## CURRENT EMPLOYMENT

**1993 to Present – CIRMAT, Inc., Monroe, Michigan**

*Owner*. Specializing in law enforcement and corrections risk management and consulting services, and training of criminal justice operators, trainers, and managers. Case consultation services specializing in police and corrections high-risk activity, with primary emphasis in management of force/control, motor vehicle operations, and arrest procedures.

**2005 to Present – OSS - Law Enforcement Advisors®, Spring, Texas**

*Law Enforcement Advisor*®. Contracted law enforcement advisor and risk manager, providing services, assessments, and consultation, to other law enforcement and corrections professionals, adjusters, and legal professionals.

*OSS Academy*® *- TCOLE Advisory Board Member* of the *OSS Academy*, which is a Texas state-licensed education provider. In addition to serving on the Board, I am an instructor, curriculum developer, and Quality Assurance Specialist. Curriculum includes both instructor-led training and E-learning for law enforcement, corrections, security, telecommunications, and public-sector risk managers.

## EMPLOYMENT HISTORY

**2013 to 2021 – Concordia University, Ann Arbor, Michigan**

*Adjunct Professor*. Justice & Public Policy, Haab School of Business. Teach various law enforcement, corrections, juvenile justice, criminal justice, risk management, and public policy subjects to undergraduate and graduate students at a traditional, brick-and-mortar university. Actively assist with program and curriculum development. Courses taught included, *inter alia*, Administration of Justice, Corrections Theory and Practice, Ethics in Criminal Justice, Foundations of Justice, Juvenile Justice Theory, Law Enforcement Policy and Practices, Management of Law Enforcement Agencies, Public Safety Risk Management, and Report Writing & Documentation.

**2004 to 2008 – Northrop-Grumman Corporation, Galloway, New Jersey**

*Instructional Technologist*. Deliver training on security procedures to transportation security personnel at airports across the United States. Train and certify Screeners in the use of equipment and techniques for screening checked baggage. Certified to train on equipment currently in use by Transportation Security Administration Baggage Screeners.

**2001 to 2009 – Police Policy Studies Council, Spofford, New Hampshire**

*Staff member and Researcher/Trainer*. Served as a police use of force, motor vehicle operations, and arrest techniques, trainer and consultant. Developed and delivered training programs to police, corrections, and other municipal executives and trainers. Consulted in police use of force cases, police driving, arrest tactics, and general law enforcement procedures.

**1986 to 2008 – Washtenaw Community College, Ann Arbor, Michigan**

*Force management, firearms, use-of-force, and police driving instructor*. Appointed as Police Academy Use of Force/Driver Training Coordinator from 1996 to 2005. Chief Firearms Instructor and Chief Driving Instructor. Responsible for conceptualizing, planning, developing, and delivering, many training programs at the academy, in-service, and advanced in-service levels, for police, corrections, security, and Natural Resources officers, including instructor training and certification in various use of force disciplines, as well as police driving.

**2002 to 2003 – AIS, Inc., Renton, Washington**

*Master Instructor*. Last assignment was as a subcontractor with Boeing Corporation, conducting baggage screener training throughout the United States. One of only 35 (out of 1,600) training staff that were transitioned to Boeing from AIS, for the purpose of fulfilling the federal "bridge" contract for baggage screener training.

Initially employed under a U.S. Government contract for the Transportation Security Administration. Certified as one of only 30 BST Master Instructors, with responsibility for training and supervising baggage screeners and baggage screener trainers throughout the United States. Certified to train on screening machines in use by federal transportation security baggage screeners.

**2000 to 2003 – Legal Defense Manual, East Lansing, Michigan**

<u>*Co-Owner* and *Executive Editor*</u>. Responsible for writing articles, as well as editing and publishing a periodical that focused on legal and managerial issues in law enforcement and corrections.

**1999 to 2001 – American Risk Pooling Consultants, Inc., Southfield, Michigan**

<u>*Manager of Loss Control Development*</u> and <u>*Director of Law Enforcement Risk Control*</u>. Direct responsibility for management of two company subsidiaries located in Iowa and Ohio, providing direction and supervision to loss control employees. Conducted specialized field loss control assessments of law enforcement agencies, jails, and other municipal practices and facilities. Created, developed, and coordinated, a law enforcement advisory committee of criminal justice executives, attorneys, trainers, and risk management specialists, for the purpose of developing recommended procedural guidelines – *i.e.*, policies – for law enforcement and corrections entities associated with municipal insurance pools and programs.

**1992 to 2002 – Smith & Wesson Academy, Springfield, Massachusetts**

<u>*Adjunct Faculty*</u>. Develop and present training programs geared toward use of force management skills. Develop curricula and present training in advanced use of force and firearms skills for police, security, and corrections trainers, as well as training managers.

**1991 to 1998 – Meadowbrook Insurance Group, Southfield, Michigan**

<u>*Public Entity Loss Control Manager*</u>. Direct management responsibility for loss control staff members, and coordination of Public Entity oriented loss control programs for insurance coverage pools and individual public entity and private clients in six states. Planned and structured delivery of services to approximately 50 client corporations, developed and assisted with the presentation of new marketing approaches, assured coordinated communications between internal company units, and with external customers and fellow contractors. Conducted specialized field loss control assessments of municipalities, law enforcement agencies, and jails. Other responsibilities included development of service plans and budgeting for multiple programs, coordination of personnel and resources to fulfill diverse client needs, and allocation/utilization of resources.

Formerly, <u>*Director of Law Enforcement Risk Control*</u>. Created a law enforcement/corrections risk control program from scratch. Responsibilities included day-to-day, hands-on management, development of service plans, coordination, budget management, and frequent interaction with both internal company units and clients. Primary responsibility for the design and implementation of a risk control program for approximately 900 law enforcement and corrections agencies in five states. Conducted many on-site risk assessments of police and public safety agencies, jails, and other municipal facilities and practices. Created, developed and coordinated law enforcement advisory committees of criminal justice executives, attorneys, trainers, and risk management specialists, for the purpose of developing recommended procedural guidelines – *i.e.*, policies – for law enforcement and corrections entities associated with municipal insurance pools and programs.

**1989 to 1991 – Governmental Risk Managers, Inc., Plymouth, Michigan**

*Risk Control Manager*. Direct responsibility for planning, implementation, and delivery, of risk control services to two public entity insurance pools that collectively represented approximately 1,200 governmental jurisdictions. Responsibilities included day-to-day hands-on management, development of service plans, budgeting, coordination of service delivery, marketing assistance, assessment of results, and resource allocation. Conducted specialized field loss control assessments of municipalities, police and public safety agencies, and jails.

Previously served as a *Risk Control Consultant*, specializing in law enforcement and corrections risk management, general liability, administration, personnel practices, training, and program development. Conducted many specialized field loss control assessments of municipalities, police and public safety agencies, and jails. Assumed responsibility for coordination and on-going development of two law enforcement advisory committees of criminal justice executives, attorneys, trainers, and risk management specialists, for the purpose of continuing development of recommended procedural guidelines – *i.e.*, policies – for law enforcement and corrections entities associated with municipal insurance pools and programs.

**1978 to 1989 – Livingston County Sheriff Department, Howell, Michigan**

Served as a road patrol deputy sheriff on all three shifts, and as afternoon shift commander. Final five-year assignment was as *Staff Services Administrator*, with department-wide responsibility for training all law enforcement, corrections, and civilian, staff; community service/crime prevention programs for Michigan's fastest growing county; training, liaison, and oversight, of the Sheriff's volunteer/reserve Mounted Patrol Division; departmental policy research, development, and implementation; and departmental county-wide emergency management.

**1974 to 1978 – Various police employment as a Patrol Officer and Sergeant,**

at smaller departments, including Fowlerville, Pinckney, Webberville, and Perry, Michigan. My duties included patrol, investigations, training, and supervision of other officers and volunteer/reserve officers.

## EXPERT CASE CONSULTATION

I have provided expert consultation and review in more than 170 cases since 1994, approximately 75% of which have been defense cases. During the same years, I have testified as an expert – at deposition, hearing, or trial – 50 times in 43 cases, approximately 65% of which have been defense cases.

## MEMBERSHIP ASSOCIATIONS & VOLUNTEER ACTIVITIES

- Alpha Phi Sigma, National Criminal Justice Honor Society
- American Civil Liberties Union – Former Member
- American Jail Association – Professional Member
- American MENSA

- American Red Cross – Livingston County Chapter, Board of Directors – Former Member
- American Society of Law Enforcement Trainers (ASLET) – Charter Member (former Region 5 Director; formerly Michigan State Director)
- American Society of Safety Engineers[269] – Former Professional Member
- American Society for Testing and Materials, International (ASTM) – Voting Member
- Association of Force Investigators – Founding Member
- Concerns of Police Survivors (COPS) – Family/Survivor Member
- Illuminating Engineering Society of North America – Professional Member
- International Association of Chiefs of Police (IACP) – Academic Member
- International Association of Correctional Training Personnel (IACTP) – Professional Member
- International Association of Directors of Law Enforcement Standards and Training (IADLEST)
- International Association of Law Enforcement Emergency Vehicle Response Trainers (ALERT)
- International Association of Law Enforcement Firearms Instructors (IALEFI)
- International Foundation for Protection Officers – Professional Member
- International Law Enforcement Educators and Trainers Association (ILEETA) – Advisory Board, Managing Editor Emeritus, and Founding Member
- Lakewood Research Training Group – Former Member
- Law Enforcement & Emergency Services Video Association International (LEVA)
- Michigan Academy of Science, Arts & Letters (MASAL) – Affiliate Member
- Michigan Association of Chiefs of Police (MACP) – Active Member
- Michigan Commission on Law Enforcement Standards – Former Member, Training Advisory Committee (Ad-Hoc)
- Michigan News Broadcasters Association – Former Member
- Michigan Sheriffs' Association – Professional Member
- Mississippi Department of Public Safety, Public Safety Planning Division – Subject Matter Expert
- Mississippi Department of Public Safety, Standards & Training Division – Subject Matter Expert
- MSU Alumni Association – Life Member
- National Law Enforcement Academy Resource Network (NLEARN) – Member
- National Rifle Association (NRA) – Benefactor (Life) Member
- National Sheriffs' Association (NSA) – Active Member

---

[269] The American Society of Safety Engineers (ASSE) was rebranded as the American Society of Safety Professionals (ASSP) in 2018.

- Northwestern University Traffic Institute Alumni Association
- OSS Academy – TCOLE Advisory Board Member (§ 1701)
- Phi Kappa Phi Academic Honor Society
- Police Marksman Association – Life Member
- Society for Police and Criminal Psychology – Professional Member
- Volunteer Law Enforcement Officer Alliance (VLEOA) – Active Member

## INSTRUCTOR / ARMORER CERTIFICATIONS COMPLETED/EARNED

- Advanced Driving Techniques Instructor, General Motors Corporation
- Advanced Firearms Instructor, Washtenaw Community College
- Advanced Officer Survival Instructor, Washtenaw Community College
- Aerosol Chemical Munitions Instructor, AERKO International
- Aerosol Chemical Weapon Instructor-Trainer, AERKO International
- AXON/Evidence.com Instructor, TASER International[270]
- Baggage Screener Training Master Instructor, Advanced Interactive Systems
- Below 100 Officer Safety Instructor, Law Officer Initiative
- Certified Baggage Screener Trainer, Transportation Security Administration
- Certified Field Training Officer, MLEOTC
- Chemical Agents Decontamination Instructor, National Association of Tactical / Medical Response
- Chemical Munitions Instructor, Smith and Wesson Academy
- Civilian Safety Awareness Program Instructor, SABRE
- Defensive Driving Instructor, National Safety Council
- Defensive Tactics Instructor, PPCT Management Systems
- Driving Instructor, Federal Law Enforcement Training Center
- Emergency Vehicle Operations Instructor – EVO (MLEOTC), Lead Academy Instructor Certified
- Excited Delirium/Agitated Chaotic Event Master Instructor, Institute for the Prevention of In-Custody Deaths
- FATS Instructor Trainer, FATS, Inc.
- Firearms Instructor, Federal Law Enforcement Training Center
- Firearms Instructor, National Rifle Association
- Firearms Instructor / Range Officer, Lansing Community College
- Firearms Instructor (MLEOTC), Academy Instructor Certified
- Firearms Instructor (MLEOTC), Lead Academy Instructor Certified
- Firearms Program Management, Smith and Wesson Academy
- Firearms Retention/Disarming Techniques Instructor, Defensive Tactics Institute

[270] TASER International, Inc., was rebranded as AXON Enterprise, Inc., in 2017.

- First Aid Instructor, American Red Cross
- Flashlight Defensive Tactics Instructor, Defensive Tactics Institute
- Glock Armorer, Glock, Inc., Macomb Community College
- Handcuffing & Restraint Techniques Instructor, Defensive Tactics Institute
- Identification, Prevention, Management and Investigation of Sudden and In Custody Death Instructor [3 awards], Institute for the Prevention of In Custody Deaths
- Impact Weapons Instructor, PPCT Management Systems
- Interactive Training Instructor, Smith & Wesson Academy
- International Certified Instructor – Charter Member (IICI), International Association of Directors of Law Enforcement Standards and Training
- Kubotan Techniques Instructor, Defensive Tactics Institute
- Law Enforcement Rifle Instructor, Smith & Wesson Academy
- Management of Aggressive Behavior (MOAB) for Public Safety Instructor, PPCI, Inc.
- Metal-Tec 1400 Instructor, Metal-Tec, Inc.
- Michigan Traffic Radar Instructor, Michigan State University
- Mossberg Field Armorer, O.F. Mossberg & Sons, Inc.
- Nationally Certified Instructor – Charter Member (INCI), International Association of Directors of Law Enforcement Standards and Training
- OCAT Aerosol Weapon Instructor-Trainer, National Criminal Justice Training Council
- Officer Survival Instructor, PPCT Management Systems
- Oleoresin Capsicum Law Enforcement and Corrections Instructor, MSI-Mace, Inc.
- Police Narcan Instructor, Gendarme Consulting Group
- Police Drivers' Training Instructor, Saint Publications
- Police Precision Driving Instructor, Macomb Community College
- Police Precision Driving Instructor (MLEOTC), Academy Certified
- Police Pursuit Driving Policy Instructor, National Highway Traffic Safety Administration
- Radiological Monitoring Instructor, Federal Emergency Management Agency
- Re-Creating Stress Instructor, Mission Critical Concepts, LLC
- Refuse to be a Victim® Instructor, National Rifle Association
- Remington Armorer, Remington Arms Co.
- Remington Shotgun Maintenance Armorer, Remington Arms Co. / Washtenaw Community College
- Revolver Armorer, Smith and Wesson Academy
- Sabre OC Aerosol Projector Instructor, Security Equipment Corporation
- Safariland Use of Force Instructor, Safariland Training Group
- Semi-Automatic Pistol Instructor, Smith and Wesson Academy

- Service Animal Instructor, Institute for the Prevention of In-Custody Deaths
- Sexual Harassment, Assault, Rape Prevention (SHARP) Instructor, PPCT Management Systems
- Shotgun Instructor, Smith and Wesson Academy
- Sig-Sauer Armorer, SigArms, Inc.
- SkidCar™ System Instructor, SkidCar, Incorporated
- Springfield Armory XD Armorer, Team One Network / Northeast Wisconsin Technical College
- Stinger Instructor, Stinger Systems
- Stinger S-200 Intermediate Instructor, Stinger Systems
- Stop Stick Controlled Tire Deflation Device Instructor, StopTech, Ltd.
- Stop Stick Controlled Tire Deflation Device Instructor [Trainer], StopTech, Ltd.
- Tactical OC Instructor, Defensive Tactics Institute
- TASER Armorer, TASER International
- TASER Electronic Control Device Instructor, TASER International
- TASER Master Instructor, TASER International
- TASER Senior Master Instructor, TASER International
- TASER Technician, TASER International
- Use of Force By-the-Numbers® Instructor, Institute for the Prevention of In-Custody Deaths
- Use of Force Instructor, Michigan Municipal Risk Management Authority
- Use of Force Instructor, National Criminal Justice Training Council
- Wrap Restraint System Instructor, Safe Restraints, Inc.

### CERTIFICATE INSTRUCTOR PROGRAM COMPLETED/EARNED

- Law of Self Defense Instructor Program, Law of Self Defense Institute

### CAREER CERTIFICATIONS COMPLETED/EARNED

- Advanced Force Science Specialist, Force Science Institute
- Advanced Internal Affairs Investigator, Daigle Law Group
- Advanced Police Officer Training Certification [4 awards], Michigan Law Enforcement Officers Training Council
- Associate in Risk Management, Insurance Institute of America[271]
- Associate in Risk Management for Public Entities, Insurance Institute of America
- Certified Breathalyzer Operator, Michigan State Police
- Certified Force Science Analyst, Force Science Institute
- Certified Internal Affairs Investigator, Daigle Law Group

---

[271] The Insurance Institute of America (IIA) is now rebranded as *The Institutes*.

- Certified Law Enforcement Instructor, Arkansas Commission on Law Enforcement Standards and Training
- Certified Litigation Specialist [2 awards], Americans for Effective Law Enforcement (AELE)
- Certified TASER Technician/Armorer, TASER International
- Emergency Medical Technician, State of Michigan
- Evidence Collection and Analysis, AXON Enterprise
- Excited Delirium/Agitated Chaotic Event Master Instructor, Institute for the Prevention of In-Custody Deaths
- IADLEST International Certified Instructor – Charter Member (IICI), International Association of Directors of Law Enforcement Standards and Training
- IADLEST Nationally Certified Instructor – Charter Member (INCI), International Association of Directors of Law Enforcement Standards and Training
- Master Force & Control Instructor, Smith & Wesson Academy
- Master Use of Force Instructor, Police Policy Studies Council
- OSHA Compliance Assurance Certification
- Police Management Development Certification [3 awards], Michigan Law Enforcement Officers Training Council (now MCOLES)
- Police Officer Certification, Michigan Law Enforcement Officers Training Council (now MCOLES)
- Police Supervisor Development Certification, Michigan Law Enforcement Officers Training Council (now MCOLES)
- Qualified Accident & Illness Prevention Service Provider, Commonwealth of Pennsylvania, Bureau of Worker's Compensation
- TASER Senior Master Instructor, TASER International (now AXON)
- Texas Loss Control Representative, Texas Department of Insurance

## AWARDS AND RECOGNITION

- Citation for Bravery, Pinckney Police Department
- Life Saving Citation, Livingston County Sheriff Department
- Outstanding Academic Achievement – 1998, Eastern Michigan University
- Outstanding Academic Achievement – 1999, Eastern Michigan University
- Most Competent Instructor – Corrections Officers Academy, Washtenaw Community College

## PUBLICATIONS

Risk Management for Trainers: A Continuing Series on Applied Risk Reduction, The ILEETA Chronicle, Volume 4, Number 1, December, 2009

No Money is No Excuse: Cutting Training Budgets Due to Lack of Funding is No Excuse, Officer.com Online Magazine, February, 2009

Weapons, Weapons Everywhere: The World is Full of Weapons, So Choose Wisely, Officer.com Online Magazine, February, 2009

Watch Your Mouth! Someone Might Make You Eat Your Words, Officer.com Online Magazine, January, 2009

Your Pen is Trying to Kill You, Officer.com Online Magazine, January, 2009

Avoid PowerPointlessness: From Preparation through Delivery, The ILEETA Chronicle, Volume 3, Number 1, December, 2008

Officer Down! Thankfully We're Hearing that Less, Officer.com Online Magazine, December, 2008

Risk Management for Trainers: A Continuing Series on Applied Risk Reduction, The ILEETA Chronicle, Volume 3, Number 1, December, 2008

Resistance is Futile, Officer.com Online Magazine, December, 2008

Training: How Much is Enough? Officer.com Online Magazine, November, 2008

Write Your Report! Officer.com Online Magazine, November, 2008

Explain it to me Like I'm a Six-Year Old, Officer.com Online Magazine, October, 2008

Stay Alert for Falsehoods: A Little Knowledge is a Dangerous Thing, Officer.com Online Magazine, September, 2008

TASER C2 – Go Prepared in Style, New American Truth, September, 2008

We've Got a Real Problem in Police Work, Officer.com Online Magazine, August, 2008

Duty Gear is Good – Except When It's Not, Officer.com Online Magazine, August, 2008

When Bad Things Happen to Good Agencies: Risk Management = More than Just Training and Policies, Officer.com Online Magazine, July, 2008

Not Training is Dumb: You Have to Train, or You're Gonna' get Hurt! Officer.com Online Magazine, June, 2008

The Customers are Always Right, Even When They're Wrong, PoliceMag.com Training Channel, June, 2008

Technology is a Double-Edged Sword, Officer.com Online Magazine, June, 2008

Familiarity Breeds Complacency, Officer.com Online Magazine, May, 2008

The Technology Crutch, Officer.com Online Magazine, May, 2008

The Meaning of Training Certification, PoliceMag.com Training Channel, April, 2008

Don't Stick Your Head in the Sand: It's Called Risk Management for a Reason, Officer.com Online Magazine, April, 2008

Teach with Less Talk, More Action, PoliceMag.com Training Channel, April, 2008

Combined Skills Training, PoliceMag.com Training Channel, April, 2008

What a Great Idea! Officer.com Online Magazine, April, 2008

Work Safer, Get Sued Less! PoliceMag.com Training Channel, March, 2008

Get Off the Couch – Join ILEETA! Officer.com Online Magazine, March, 2008

Where Trainers Go to be Trained, PoliceMag.com Training Channel, March, 2008

Training Videos are Great – When They Work, Officer.com Online Magazine, March, 2008

What is a Trainer? PoliceMag.com Training Channel, February, 2008

Train More? Train Less? Officer.com Online Magazine, February, 2008

Danny, We Hardly Knew Ye, The ILEETA Review, February, 2008

Solving Problems with PowerPoint and Video, PoliceMag.com Training Channel, February, 2008

What's Wrong with Using Electronic Control Devices? Officer.com Online Magazine, February, 2008

Projector Blues, PoliceMag.com Training Channel, February, 2008

Policies are NOT Rules, Officer.com Online Magazine, January, 2008

Why We Don't Need Firearms Instructors, PoliceMag.com Training Channel, January, 2008

Aerosol Spray Weapon Refresher, Officer.com Online Magazine, January, 2008

SWAT & EOD Tactical Vehicle, Tactical Weapons, January, 2008

Choose Wisely, Officer.com Online Magazine, December, 2007

Online Education CAN be a Good Thing, If You do it Right, The ILEETA Chronicle, Volume 2, Number 1, December, 2007

Michigan State Showdown, POLICE Magazine, December, 2007

Risk Management for Trainers: A Series on Applied Risk Reduction, The ILEETA Chronicle, Volume 2, Number 1, December, 2007

Justice for Daniel Faulkner: Danny, We Hardly Knew Ye, PoliceMag.com Training Channel, December, 2007

Working with Problem Shooters, PoliceMag.com Training Channel, November, 2007

Train in the Rain, PoliceMag.com Training Channel, November, 2007

21 Ways to Stretch Your Training Dollars, POLICE Magazine, November, 2007

Be a Smart Learner, PoliceMag.com Training Channel, November, 2007

Why TASERs Don't Work, Officer.com Online Magazine, October, 2007

Can We Talk? Interoperability, POLICE Magazine, October, 2007

Slip and Slide No More, Officer.com Online Magazine, October, 2007

Unintended Consequences, PoliceMag.com Training Channel, October, 2007

Retention Holster Showdown, POLICE Magazine, September, 2007

The Best Defense is a Good Defense, Officer.com Online Magazine, September, 2007

Put It In Writing, PoliceMag.com Training Channel, September, 2007

Body Armor Fiber and Fabric, Officer.com Online Magazine, September, 2007

Training with TASERs, Law Officer, Volume 3, Number 8, August, 2007

Tips for Trainers: Class Preparation, PoliceMag.com Training Channel, August, 2007

The ABCs of Precision Driving: Practicing the Basics Can Keep You Safer, Officer.com Online Magazine, July, 2007

Classroom Management, PoliceMag.com Training Channel, July, 2007

Bat Belt Overload: Gearing Up Can Weigh You Down, Officer.com Online Magazine, July, 2007

Conducting Safe, Effective TASER Training, PoliceMag.com Training Channel, July, 2007

Pursuit Policy Pitfalls, Officer.com Online Magazine, June, 2007

Safe Training in a Troubled World, PoliceMag.com Training Channel, June, 2007

Excessive Use of Force – The Evil Flashlight, Officer.com Online Magazine, June, 2007

Watch Your Words, PoliceMag.com Training Channel, June, 2007

Keep Your Officers' Firearms Scores, PoliceMag.com Online Magazine, May, 2007

Traffic Hazards: Situational Awareness, In and Out of the Car, Officer.com Online
        Magazine, May, 2007

Things Break, Weapons Fail, Stay Safe! Officer.com Online Magazine, May, 2007

2007 Model Year Police Vehicle Testing, POLICE Magazine, May, 2007

Driving Skills are Perishable Skills, Officer.com Online Magazine, April, 2007

Pursuits are Dangerous…So What? Officer.com Online Magazine, March, 2007

Verbal Survival: Terminology Traps, Officer.com Online Magazine, March, 2007

Managing and Using Critical Information in the Law Enforcement Environment,
        Answering the Call, Volume 1, Issue 1, March, 2007

Stay Cool in the Heat of the Chase, Officer.com Online Magazine, February, 2007

What Gets You Sued, Gets You Hurt, Law Officer, Volume 3, Number 2, February, 2007

Sacred Cows Will Get You Hurt, Officer.com Online Magazine, February, 2007

Managing a Pursuit and Surviving the Aftermath, Officer.com Online Magazine,
        January, 2007

Pick Your Ride: Vehicle Testing, Law Enforcement Technology, Volume 34, Number 1,
        January, 2007

You Can't Always Get What You Want, Officer.com Online Magazine, January, 2007

Your Most Deadly Weapon: Your Vehicle, Officer.com Online Magazine,
        December, 2006

Technology is Your Friend, Officer.com Online Magazine, December, 2006

Websites by Design: Every Trainer Needs a Website, The ILEETA Chronicle, Volume 1,
        Number 1, December, 2006

A Real Life Saver: Proper Use is the Key, Officer.com Online Magazine,
        November, 2006

Which Vehicles are Fastest? Officer.com Online Magazine, November, 2006

On-Line Education: The Good, the Bad, and the Pointless, Law Officer, Volume 2,
        Number 8, October, 2006

Sound Tactics = Safe Outcomes: Safe Pursuit 101, Officer.com Online Magazine,
        October, 2006

Safe Driver Training: Keeping it Between the Cones, Officer.com Online Magazine,
        September, 2006

E-Mail 101: Avoiding SPAM, Officer.com Online Magazine, September, 2006

Admissibility of Digital Images, Officer.com Online Magazine, August, 2006

EVO Training: Critical to Officer Safety, Officer.com Online Magazine, August, 2006

Procurement: Resource Acquisition, Law Officer, Volume 2, Number 5, July, 2006

Power Management: Use It or Lose It, Officer.com Online Magazine, July, 2006

<u>Keep Pursuits in Context</u>, Officer.com Online Magazine, July, 2006

<u>Simulator Shoot-Out</u>, Law and Order Magazine, Volume 54, Number 6, June, 2006

<u>The Truth About TASERS: Don't Believe Everything You Read</u>, Officer.com Online Magazine, June, 2006

<u>Simulation Training Options: Live Fire or Lasers</u>? Officer.com Online Magazine, May, 2006

<u>A New Computer System: Spending Your Tax Refund</u>, Officer.com Online Magazine, April, 2006

<u>Firearms Simulator Shoot-Out</u>, Tactical Response Magazine, Volume 4, Number 8, March/April, 2006

<u>Reducing Pursuit Liability</u>, The Law Enforcement Trainer, Volume 21, Number 1, January, 2006

<u>Digital Patrol, Part Two: Admissibility of Digital Evidence</u>, Law Officer, Volume 2, Number 1, January/February, 2006

<u>When the Vehicle Becomes a Lethal Weapon</u>, The Law Enforcement Trainer, Volume 20, Number 3, July/August/September, 2005

<u>Digital Patrol, Part One: Digital Cameras for Law Enforcement</u>, Law Officer, Volume 1, Number 2, September/October, 2005

<u>Vehicular Assault: Fight or Flight</u>? Police and Security News, Volume 21, Number 5, September/October, 2005

<u>The Effect of Police Officer Confidence on Officer Injuries and Excessive Force Complaints</u>, Legal Defense Manual, Volume 2002, Number 4, December, 2002

<u>Managing Police Pursuit Driving Practices</u>, Police and Security News, Volume 18, Number 4, September, 2002

<u>Law Enforcement Jurisdictional Issues</u>, Legal Defense Manual, Volume 2002, Number 2, June, 2002

<u>Changing Aerosol Weapon and Use of Force Practices</u>, Police and Security News, Volume 18, Number 3, May/June, 2002

<u>On Computers: It's Not Really Magic</u>, Police and Security News, (1996 thru 2006) Bi-monthly column on computers and their application to government service.

<u>Automating Your Agency: Make It Easy on Yourself</u>, Police and Security News, Volume 17, Number 5, September/October, 2001

<u>Risk Management Fundamentals</u>, Legal Defense Manual, Volume 2001, Number 1, March, 2001

<u>Searching the Internet</u>, Tow Times, Volume 15, Number 12, July, 1998

<u>Finally…Use of Force Guidelines We Can All Train To</u>, MML Law Enforcement Risk Control News, Volume 4, Number 2, June 1998

<u>Computers: Learn from My Experience</u>, Tow Times, Volume 15, Number 11, June, 1998

<u>Motor Vehicle Pursuit: Managing Your Department's Risk</u>, MML Law Enforcement Risk Control News, Volume 3, Number 4, December, 1997

<u>Issues with Aerosols</u>, MML Law Enforcement Risk Control News, Volume 1, Number 3, September, 1995

<u>Crossing the Border</u>, Public Risk Magazine; Volume 10, Number 5; May/June, 1996

Managing Aerosol Issues, Law & Order Magazine, Volume 44, Number 3, March, 1996

Managing the Use of Force: The Key to Risk Reduction, Redman Report, June, 1995

Police Pursuit Risks: Setting the Standard, Public Risk Magazine; Volume 9, Number 3; March, 1995

Pursuit Management: Implementing a Control Continuum, Law and Order Magazine; Volume 42, Number 12; December, 1994

Real Management of the Use of Force, Smith and Wesson Academy Training News; Issue Number 23; April, 1993

## GUEST LECTURER

*After Using Force, Now What? Surviving the Onslaught*, International Law Enforcement Educators and Trainers Association (ILEETA), March, 2019

*Protecting the Protectors Instructor Course*, International Law Enforcement Educators and Trainers Association (ILEETA), March, 2018

*Protecting the Protectors: The Role of the Trainer*, International Law Enforcement Educators and Trainers Association (ILEETA), March, 2017

*Survive & Succeed: Saving Your Officers and Your Department*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2015

*Stay Safe: It's Time to Sweat the Small Stuff*, International Law Enforcement Educators and Trainers Association (ILEETA), March, 2014

*Post-Traumatic Stress Disorder in Criminal Justice*, CMI 2013 Client Education Day, November, 2013

*Protect Your People: Because Nobody Else Will*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2013

*TASERs and the Law*, National Rifle Association – Michigan Consumer Weekend, February, 2013

*Keep Your People Safe: On the Street, In the Jail, and In Court*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2012

*Managing the Risks of Interjurisdictional Police Pursuits*, Richmond Regional Multijurisdictional Pursuit Project, Policy Training Symposium, September, 2011

*Using Force: Words and Plans and Goals, Oh My!* The 2011 Use of Force Summit, The Performance Institute, July, 2011

*Force Continuums, Training Priorities, and Smart Use of Force*, The 2011 Use of Force Summit, The Performance Institute, July, 2011

*TASER, TASER, TASER!* The 2011 Use of Force Summit, The Performance Institute, July, 2011

*Avoiding and Managing Arrest-Related Deaths*, The 2011 Use of Force Summit, The Performance Institute, July, 2011

*TASER Download & Data Collection Practices*, 2011 TASER Master Instructor School, TASER International, June, 2011

*Police Use of Force: TASERs and Other Options*, Bancorp South Municipal Insurance Risk Control Program, Gulfport, Mississippi, May, 2011

*Smart Use of Force: In the Jail and On the Street*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2011

*Defining Use of Force for Law Enforcement Professionals*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, June, 2010

*Current Shifts in the use of Use of Force Continuums*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, June, 2010

*Arrest-Related Death and the Use of Force*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, June, 2010

*Considerations for TASERs and Other Non-Lethal Devices*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, June, 2010

*Addressing Allegations of Police Misconduct*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, June, 2010

*Smart Use of Force*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2010

*Defining Use of Force for Law Enforcement Professionals*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, January, 2010

*The Ramifications of In-Custody Death After the Use of Force*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, January, 2010

*The Great Debate: TASERs and Other Non-Lethal Devices – Are They Helping or Hurting?* The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, January, 2010

*Examining the Current Usage of, and Shifts in, the Use of Force Model*, The 2010 Conference on The Use of Force in Law Enforcement, The Performance Institute, January, 2010

*Evidence.com, AXON, and TASER Download & Data Collection Practices*, 2009 TASER Master Instructor School, TASER International, July, 2009

*Live Long and Prosper: The Trainer as Risk Manager*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2009

*Liability in the Use of Force*, The 2008 National Summit on Use of Force in Law Enforcement, The Performance Institute, August, 2008

*TASER's and Other "Less Lethal" Options*, The 2008 National Summit on Use of Force in Law Enforcement, The Performance Institute, August, 2008

*Defining Use of Force*, The 2008 National Summit on Use of Force in Law Enforcement, The Performance Institute, August, 2008

*TASER Download & Data Collection Practices*, 2008 TASER Master Instructor School, TASER International, June, 2008

*Work Safer – Get Sued Less: Managing High Risk Activity*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2008

*Managing the Risks of Non-Deadly Force*, Detroit Police Department, Command & Legal Lecture Series, City of Detroit Law Department, March, 2008

*Assessing and Managing the Risk of Less Lethal Options*, The 2007 National Summit on Use of Force in Law Enforcement, The Performance Institute, November, 2007

*TASER Usage – Risks & Rewards*, The 2007 National Summit on Use of Force in Law Enforcement, The Performance Institute, November, 2007

*Defining Force for Ourselves*, The 2007 National Summit on Use of Force in Law Enforcement, The Performance Institute, November, 2007

*Work Safer – Get Sued Less!* 2007 Michigan NAFTO Conference, National Association of Field Training Officers, October, 2007

*Risk Management: Avoiding "Self-Inflicted Wounds"*, 2007 TASER International Conference, TASER International, July, 2007

*PowerPoint for the Law Enforcement Trainer*, 2007 TASER Master Instructor School, TASER International, July, 2007

*TASER Usage – Risks & Rewards*, The 2007 National Summit on Use of Force in Law Enforcement, The Performance Institute, May, 2007

*Defining Force for Ourselves*, The 2007 National Summit on Use of Force in Law Enforcement, The Performance Institute, May, 2007

*Enhancing Safety & Reducing Liability: The Trainer is the Key*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2007

*Motor Vehicle Pursuits: High Risk Issues for Trainers*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2006

*Enhancing Safety & Reducing Liability: The Role of the Trainer*, American Society of Law Enforcement Trainers, 19th Annual International Training Conference, January, 2006

*How to Set Up Your Own Website*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2005

*Get on the Web!! Set Up Your Own Trainer's Website*, International Law Enforcement Educators and Trainers Association (ILEETA), April, 2004

*Managing Police Pursuit Risk*, Richmond Regional Multijurisdictional Pursuit Project, Training Symposium, December, 2003

*Managing the Risks of Pursuit: Reducing Liability and the Potential for Officer Injuries*, Association of Professional Law Enforcement Emergency Vehicle Response Trainers (ALERT, International), Annual Training Conference, September, 2003

*Dealing with High Risk Activity: Keeping Officers Safer While Reducing Liability*, National Criminal Justice Training Council Annual Conference, April, 2003

*Risk Management and Civil Liability*, Kellogg Community College, October, 2002

*Protecting Officers in High Risk Situations: Enhancing Safety and Reducing Liability*, Wyoming Chiefs and Sheriffs Association, April, 2001

*Protecting Officers in High Risk Situations: The Role of the Trainer in Enhancing Safety and Reducing Liability*, American Society of Law Enforcement Trainers, 14th Annual International Training Conference, January, 2001

*Managing High Risk Emergency Services Activity*, Iowa League of Cities/ICAP, Annual Training Conference, June, 2000

*Managing High Risk Law Enforcement Activity: Use of Force, Pursuit, and Officer Safety*, American Society of Law Enforcement Trainers, 13th Annual International Training Conference, January, 2000

*Managing the Risks of Volunteers,* Public Risk Management Association (PRIMA), Annual Training Conference, June, 1999

*Force & Control: Risk Management Issues for Instructors,* American Society of Law Enforcement Trainers, 12th Annual International Training Conference, January, 1999

*Civil Liability for Emergency Telecommunicators,* Association of Public Safety Communication Officers - Michigan Chapter, Fall Training Conference, September, 1998

*Supplemental Police Manpower: Necessary Evil or True Benefit?* Public Risk Management Association (PRIMA), Annual Training Conference, June, 1998

*Law Enforcement Training: A Systematic Approach,* Public Risk Management Association (PRIMA), Annual Training Conference, June, 1998

*Managing Risk in the Municipal Arena,* 1998 Michigan Municipal Clerks Institute, East Lansing, Michigan, April, 1998

*Getting a Grip: The Management of High Risk Police Activities,* Michigan Association of Chiefs of Police, Winter Training Conference, February, 1998

*Managing Force: Enhancing Safety & Reducing Risk,* American Society of Law Enforcement Trainers, 11th Annual International Training Conference, January, 1998

*Law Enforcement Use of Force in the 21st Century,* Illinois Risk Management Association, November, 1997

*Use of Force: Managing Risk & Safety,* PPCT Management Systems International Training Conference, August, 1997

*Use of Force Management: Special Issues for Managers,* Oklahoma Department of Corrections, July, 1997

*Control Challenges in the School Environment,* Central Michigan University, Law Enforcement & School Liaison Program Institute, June, 1997

*Managing High Risk Law Enforcement Activity,* Michigan Association of Chiefs of Police, Summer Training Conference, June, 1997

*Law Enforcement Post Incident Damage Control,* Public Risk Management Association (PRIMA), Annual Training Conference, May, 1997

*Pursuit Management: Implementing a Control Continuum,* American Society of Law Enforcement Trainers, 10th Annual International Training Conference, January, 1997

*Instructor Challenges in Use of Force Management,* American Society of Law Enforcement Trainers, 10th Annual International Training Conference, January, 1997

*The Risks of Crossing the Border: Managing Interjurisdictional Exposures,* Public Risk Management Association (PRIMA), Annual Training Conference, June, 1996

*Aerosol Weapons: Reducing Your Risks,* Michigan Association of Chiefs of Police, Mid-Winter Training Conference, February, 1996

*Pursuit Management: Implementing a Control Continuum,* American Society of Law Enforcement Trainers, 9th Annual International Training Conference, January, 1996

*Critical Incident Policy Management*, Minnesota Sheriff's Association Training
Conference, December, 1995

*Use of Force Management for Supervisors*, Upper Peninsula Law Enforcement
Development Center, November, 1995

*Vehicle Operations Management*, International Association of Chiefs of Police Training
Conference, October, 1995

*Total Control Management*, PPCT Management Systems International Training
Conference, August, 1995

*Police Administration and Risk Control*, Ohio Municipal League Joint Self Insurance
Pool, Annual Training Conference, June, 1995

*Effective Risk Manager/Law Enforcement Executive Relationships*, Public Risk
Management Association (PRIMA), Annual Training Conference, June, 1995

*Pursuit Management: Implementing a Control Continuum*, Michigan Association of
Chiefs of Police, Mid-Winter Training Conference, February, 1995

*Managing the Use of Force*, American Society of Law Enforcement Trainers, 8th Annual
International Training Conference, January, 1995

*Fundamentals of Risk Management*, Wyoming Chiefs and Sheriffs Annual Conference,
Wyoming Law Enforcement Academy, April, 1994

*Implementing Defensible Control Continuums*, Law Enforcement Officers Regional
Training Consortium, Flint, Michigan, March, 1994

*Deadly Force: The Importance of Management*, Northern Michigan Law Enforcement
Training Consortium, March, 1994

*Interjurisdictional Liability*, Michigan Association of Chiefs of Police, Mid-Winter
Training Conference, February, 1994

*Risk Control: Managing the Use of Force*, American Society of Law Enforcement
Trainers, 7th Annual International Training Conference, January, 1994

*Managing Force in a Correctional Setting*, Minnesota Counties Insurance Trust,
November, 1993

*Cross-Jurisdictional Liability Issues*, Northern Michigan Association of Chiefs of Police,
Annual Meeting, October, 1993

*Managing the Use of Force*, PPCT Management Systems International Training
Conference, August, 1993

*Managing Effective Police Training: Doing More with What You Have*, Law
Enforcement Officers Regional Training Consortium, May, 1993

*Managing Effective Police Training*, Michigan Association of Chiefs of Police,
Mid-Winter Training Conference, February, 1993

*Contemporary Use of Force Issues*, Michigan Association of Chiefs of Police,
Mid-Winter Training Conference, February, 1992

*Reducing Motor Vehicle Related Losses*, Michigan Association of Chiefs of Police,
Mid-Winter Training Conference, February, 1991

## TRAINING VIDEOS & MULTIMEDIA PRODUCTIONS

*Police Pursuit Driving*, 30-minute video. Performance Dimensions, Inc.,
     Twin Lakes, Wisconsin, 1998.

*Precision Driving Decision System*, 3-part training video. Governmental
     Risk Managers, 1991.

## BOOK CHAPTER

*Plan to Train or Plan to Fail,* W.I.N. 2: Insights into Training and Leading Warriors,
     Edited by Brian R. Willis, Warrior Spirit Books, Calgary, Alberta CA, 2009.


June 30, 2021
_____
DATE

STEVEN D. ASHLEY, MSc, MLS, ARM/P, AFSS, INCI, IICI
MONROE, MICHIGAN

# EXHIBIT III – PRIOR TESTIMONY

**Last Reviewed/Updated June 30, 2021**

## LAW ENFORCEMENT & CRIMINAL COURTS

During 15 years of active-duty law enforcement service, I offered testimony, depositions, and affidavits, in State District Courts, State Circuit Courts, State Probate and Juvenile Courts, and various other Hearings and Tribunals, in cases too numerous to list.

## EXPERT COURT TESTIMONY (WITHIN THE PAST FOUR YEARS)

While I have provided expert consultation and review in more than 170 cases, I have testified and/or been deposed 50 times in 43 cases since 1994. The following are cases in which I have testified at deposition, hearing, or trial, in the past four years.

2020 – Anthony Zerwas and City of Wyoming, Minnesota. Veteran's Preference Discharge Grievance. BMS Case Number 20VP1419. I testified as an expert witness on behalf of terminated Officer Anthony Zerwas. This was a police excessive use of force case.

2019 – D'Marco Craft and Michaele Jackson, Plaintiffs, v. Richard Billingslea, Hakeem J. Patterson, Yossif Mana, Antoine Hill, Glenn Bines, David Mays, II, Naim Brown, Michael Bailey, Randall Craig, Bryan Moore, and the City of Detroit, a political subdivision of the State of Michigan, Defendants. United States District Court for the Eastern District of Michigan, Southern Division. Case Number 2:17-cv-12752-MKM. I was deposed as an expert witness on behalf of Defendant Richard Billingslea. This was a police excessive use of force/false arrest case.

2019 – Kelvion Walker, Plaintiff, v. Amy Wilburn, Defendant. United States District Court for the Northern District of Texas, Dallas Division. Civil Action Number 3:13-cv-04896-D. I was deposed and later testified at trial as an expert witness on behalf of the Defendant. This was a police shooting/excessive use of force case.

2019 – Cassandra Luster, individually, and A/N/F of _____ a minor child, Damon Luster, Desmond Luster, Jr.; Beverly Diana Luster, individually, and as Administrator of the Estate of Desmond Luster, Sr., Plaintiffs, v. The City of Dallas, et al., Defendants. United States District Court for the Northern District of Texas, Dallas Division. Civil Action Number 3:16-cv-00396-B. I was deposed and later testified at trial as an expert witness on behalf of the Defendants. This was a police excessive use of force/deadly force case.

2018 – Syndel Kabchef, Plaintiff, v. Pickens County Sheriff Donnie Craig, Individually and in his capacity as Sheriff of Pickens County and Deputy Sheriff Rick Hales, individually and in his official capacity as a Pickens County Deputy Sheriff, Defendants, Quik Trip Corporation, Defendant by Counterclaim. Superior Court of Pickens County, State of Georgia. Civil Action File Number 2017 SUCV 76. I was deposed as an expert witness on behalf of the Defendant Quik Trip

Corporation and the Plaintiff, Syndel Kabchef. This was a police emergency vehicle operations/collision case.

2018 – Christopher Cantu, as the Administrator of the Estate of Robert Earl Lawrence, Plaintiff, v. City of Dothan, Alabama, Greg Benton, Chris Summerlin, and Adrianne Woodruff, Defendants. United States District Court for the Middle District of Alabama, Southern Division. Case Number 1:16-cv-01003-MHT. I was deposed as an expert witness on behalf of the Defendants. This was a police excessive use of force/deadly force case.

2017 – Collette L. Flanagan, individually, and on behalf of the Estate of Clinton Allen, Deceased; and Ronderaline S. Allen, individually, Plaintiffs, v. The City of Dallas, Texas; and Clark Staller, Defendants. United States District Court for the Northern District of Texas, Dallas Division. Case Number 3:13-cv-04231-M. I was deposed and later testified at trial as an expert witness on behalf of the defense. This was a police excessive use of force/deadly force case.

2017 – A.M., A Minor, by his parents and natural guardians, Audley Muschette and Judith Muschette, Plaintiff, v. American School for the Deaf, Town of West Hartford, Paul W. Gionfriddo in his individual and official capacities, Chris Hammond in his individual and official capacities, Elwin Espinoza in his individual and official capacities, Defendants. United States District Court for the District of Connecticut. Case Number 3:13-cv-01337-WWE. I was deposed as an expert witness on behalf of the Plaintiff. This was a police excessive use of force/police practices case.

2016 – Lameco M. Williams, Plaintiff, v. City of Birmingham, a Municipal Corporation; Nathan Elmore, an individual; Jeffrey Sanders, an individual; Ashley Knighten, an individual; Jacob McDonald, an individual; Lane Harper, an individual; Arthur Wilder, an individual; Christopher Hayes, an individual; Curtis Mitchell, an individual; Cedric Stevens, an individual; A.C. Roper, an individual, Defendants. United States District Court for the Northern District of Alabama, Southern Division. Case Number 2:15-cv-00949-AKK. I was deposed as an expert witness on behalf of the defendants. This was a police excessive use of force case.

_____
June 30, 2021
DATE

_____
STEVEN D. ASHLEY, MSc, MLS, ARM/P, AFSS, INC, RCI
MONROE, MICHIGAN

## EXHIBIT IV – FEE SCHEDULE

**Last Reviewed/Updated June 30, 2021**

### ALL AMOUNTS ARE IN ADDITION TO EXPENSES

| | |
|---|---|
| Initial Telephone Consultation | No Charge |
| Advance Retainer (Non-Refundable, Billed Against on Hourly Basis) | Waived/Billed |
| Review of Records and Analysis | $150/hour |
| Preparation of Report, Including Research | $150/hour |
| Meetings with Counsel, Site Visits, etc. | $150/hour |
| Deposition (minimum of 6 hours per day) | $200/hour |
| Trial or Hearing (minimum of 6 hours per day) | $200/hour |
| Travel Time, Portal to Portal (maximum of 12 hours per day) | $75/hour |
| Expedite Fee (requested with 7 to 14-day notice) | $500.00 |
| Expedite Fee (requested with less than 7 days' notice) | $1,000.00 |
| Cancellation of Deposition/Hearing/Trial – 7 days or less notice | $1,500.00 |
| Cancellation of Deposition/Hearing/Trial – 8 to 14-day notice | $1,000.00 |
| Cancellation of Deposition/Hearing/Trial – more than 14 days' notice | No Charge |

**PLEASE NOTE:**

Should you engage my services, I will provide services to you as an independent professional. Payment to me for the services I provide is not dependent upon my findings, or upon the outcome of any legal action, mediation, or arbitration; or the amount or terms of any settlement of the underlying legal cause, nor upon any arrangement or other agreement between plaintiff and/or defense counsel and any other person or party.

You may not identify me as either a testifying or non-testifying expert until such time as any engagement fee has been paid or specific arrangements have been made and agreed to – in writing – by me.

All amounts (including any retainer) are in addition to expenses, which include those items that are customary, including – but not limited to – business class airfare, hotel, rental vehicle (full-size), meals, parking fees, and mileage (at the current IRS rate).

Should you engage my services, my relationship is with you. You are responsible for all payments as outlined in this Fee Schedule, regardless of any arrangement you may have with any party or parties you represent, including deposition fees originating from opposing counsel. If engaged, I will issue bills on a monthly basis, or whatever other interval I deem appropriate. Bills are due on receipt, and shall be considered delinquent if unpaid more than thirty (30) days after their date of issuance. Interest shall accrue to any delinquent balance at the maximum rate permitted by law, not to exceed 1.5 per cent per month.

| June 30, 2021 | _Steven D. Ashley_ |
|---|---|
| DATE | STEVEN D. ASHLEY, MSC, MLS, ARM/P, CFSS, INCI, IICI |
| | MONROE, MICHIGAN |