**In the Matter of:**

WILLIAM ALLEN MEANS

vs

PETERSON, HARVEY and THE CITY OF SOUTH CHARLESTON

ROY TAYLOR, PH.D., ROUGH DRAFT

*June 23, 2021*



5010 Dempsey Drive
Cross Lanes WV 25313
304-415-1122

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


WILLIAM ALLEN MEANS,

            Plaintiff,


  -vs-      Civil Action No. 2:20-561


E.M. PETERSON, D. HARVEY, and
THE CITY OF SOUTH CHARLESTON,

           Defendants.


DEPOSITION OF ROY G. TAYLOR, PH.D.
(BY VIDEO CONFERENCE)
_____

    The deposition of Roy G. Taylor, Ph.D.,
was taken on June 23, 2021, at 10:00 a.m.,
at 219 Baker Drive, Winfield, West Virginia.
_____




ELITE COURT REPORTING, LLC
5010 Dempsey Drive
Cross Lanes, West Virginia  25313
(304) 415-1122


Tara Arthur, CCR

Page 2

```
 1               A P P E A R A N C E S

 2   L. Dante di Trapano
     Attorney at Law
 3   Calwell Luce diTrapano, PLLC
     500 Randolph Street
 4   Charleston, West Virginia  25302
     (By video conference)
 5
     W. Jesse Forbes
 6   Attorney at Law
     Forbes Law Firm, PLLC
 7   1118 Kanawha Boulevard, East
     Charleston, West Virginia  25301
 8   (By video conference)

 9   Duane J. Ruggier, II
     Attorney at Law
10   Pullin Fowler Flanagan Brown & Poe
     901 Quarrier Street
11   Charleston, West Virginia  25301
     (By video conference)

12

13

14

15

16

17

18

19

20

21

22

23

24
```





Page 3

1                    I N D E X

2          WITNESS

3               Roy G. Taylor, Ph.D.

4          EXAMINATION

5               by Mr. Ruggier          Page 04
                by Mr. di Trapano       Page 158
6               by Mr. Ruggier          Page 159

7          EXHIBITS

8               None

9

10

11

12

13

14

15

16

17

18     Reporter's Certificate:        Page 162
       Errata Sheet/Signature Page:    Enclosed
19

20

21

22

23

24

Elite Court Reporting, LLC
ROY TAYLOR, PH.D., ROUGH DRAFT, 06/23/2021

Page 4

1                    ROY G. TAYLOR, PH.D.,

2     called as a witness, first being duly sworn

3     by the Court Reporter/Notary Public,

4     testified as follows, to wit:

5                    EXAMINATION

6     BY MR. RUGGIER:

7           Q.  Mr. Taylor, as I said, I represent

8     Officers Peterson and Harvey in the lawsuit

9     filed by Mr. Means.  I presume that your

10    deposition has been taken before?

11          A.  I have.  But what was your name?  I

12    couldn't understand you.  It is still kind

13    of tinny sounding.

14                MR. RUGGIER:  Hold on a second.

15    Let me get my legal assistant in here.

16                (Pause in proceedings.)

17    BY MR. RUGGIER:

18          Q.  So can you state your full name for

19    the record?

20          A.  (No response.)

21          Q.  Did you hear that, Roy?

22          A.  No.  Can you put a headset on?

23          Q.  Well, I am not sure if I have one.

24    That was the problem.

Page 5

```
1          A.  Maybe just you can call me on my

2    cell phone and I can put the audio over

3    that.

4          Q.  Sure.  Okay.  Give me your cell

5    phone number.

6          A.  919-697-1995.

7              (A discussion was held off the

8    record.)

9    BY MR. RUGGIER:

10         Q.  Roy, can you state your full name

11   for the record?

12         A.  Dr. Roy G. Taylor.

13         Q.  All right.  And, Roy, what is your

14   professional address?

15         A.  9650 Strickland, S-t-r-i-c-k-

16   l-a-n-d, Road, Raleigh, North Carolina,

17   27615.

18         Q.  And what is your -- well, I don't

19   guess I need your phone number.  Let's see.

20   Roy, what is your -- can you tell me your

21   educational background?

22         A.  I have got a Ph.D. in criminal

23   justice from Walden University.  I have a

24   master's degree in criminal justice from
```

Page 6

```
1    Walden's University.  I have a master's

2    degree from East Carolina University and a

3    bachelor's degree from Mount Olive

4    University in North Carolina.  And an

5    associate's degree from Bladen Community

6    College in North Carolina.

7         Q.  Let's see.  Is Walden University,

8    is that an online university?

9         A.  Primarily.  There was four

10   residencies that were required.  But the

11   majority of the course work is handled by

12   distant learning.

13        Q.  Okay.  And did you do your -- did

14   you do a dissertation?

15        A.  I did.  On crisis intervention team

16   training.

17        Q.  Okay.  And when did you graduate

18   from there?

19        A.  November of 2020.

20        Q.  Any other education?

21        A.  Not formal education.  I have over

22   5,000 hours of police training.

23        Q.  Okay.  Take me through your --

24   let's see.  What year did you graduate --
```

Page 7

```
 1    when did you get your bachelor's degree from

 2    my Mount Olive?

 3         A.  1997.

 4         Q.  All right.  And when did you get

 5    your master's degree from East Carolina?

 6         A.  2003.

 7         Q.  And when did you get your master's

 8    degree from Walden?

 9         A.  February of 2020.

10         Q.  You got a master's degree in

11    February of 2020.  And you got a Ph.D. --

12    let's see.  You got a master's degree from

13    Walden in February of 2020.  When did you

14    get your Ph.D. from Walden?

15         A.  November of 2020.

16         Q.  Okay.  And I presume you went to

17    high school?

18         A.  I did.

19         Q.  Where did you go and when did you

20    graduate?

21         A.  Marion L. Steele High School in

22    Amherst, Ohio.  And I graduated in 1980.

23         Q.  1980?

24         A.  Yes, sir.
```

Page 8

1          Q.  Okay.  So after high school, what

2    did you do?

3          A.  I actually graduated -- I actually

4    met all the requirements for graduation in

5    1979.  And I entered the Air Force.  And I

6    was in the Air Force from '79 to '82 as a

7    law enforcement military working dog

8    specialist.

9          Q.  And how were you discharged from

10   the Air Force?

11         A.  Honorable.

12         Q.  And what did you do after that?

13         A.  I returned home to Ohio and

14   obtained three separate police department

15   part-time positions.

16         Q.  In 1982?

17         A.  Correct.

18         Q.  Where were you working?

19         A.  First was Twinsburg Township,

20   T-w-i-n-s-b-u-r-g, Township in Ohio.

21         Q.  Okay.

22         A.  And then Plymouth, Ohio.  And them

23   Olmsted, O-l-m-s-t-e-d, Township in Ohio.

24         Q.  Okay.  And those are all three

Page 9

```
 1   part-time positions?

 2        A.  Yes.  The economy was really bad

 3   and the departments weren't hiring any

 4   full-time officers.  They were just putting

 5   on part-time officers and working you

 6   32 hours a week.

 7        Q.  Sure, I understand.

 8            And then after that, what did you

 9   do?

10        A.  I was hired by the Sandusky Fire

11   Department in 1984 as a firefighter EMT.  I

12   did that full-time and retained my police

13   job as well.  And continued to apply for a

14   full-time police officer position.

15        Q.  All right.  So in '84, you were

16   with Sandusky.  Did you retain any of your

17   other jobs also?

18        A.  Yes, sir.

19        Q.  And so what do you do next?

20        A.  1986, I was hired by the Cary,

21   C-a-r-y, North Carolina Police Department as

22   a full-time police officer.

23        Q.  Okay.  And what did you -- how long

24   were you there?
```

1        A.  Four years.  I was hired by the

2   Wake, W-a-k-e, Sheriff's Office with a K-9

3   handler and worked a lot with the drug task

4   force.  And the sheriff offered me a full-

5   time job for me and my dog.

6        Q.  Have you attended any kind of

7   police officer training?  I know you said

8   you did many years.  But at this point in

9   1986, had you gone to any state police

10  officer's academy?

11        A.  In 1979, I completed the Air Force

12  Law Enforcement Academy.  In 1983, I

13  completed the Ohio Peace Officer Training

14  Council's Police Academy.  And in 1986, I

15  completed the North Carolina Criminal

16  Justice Training and Standards Basic Law

17  Enforcement Training.

18        Q.  Okay.  And then -- so in 1990, you

19  were at the Wake -- what's that, Wake County

20  Sheriff's Department?

21        A.  Yes, sir.

22        Q.  And how long were you there?

23        A.  Four years.

24        Q.  So what do you do next?

Page 11

```
 1          A.  Chief of police for Bladenboro,

 2   North Carolina.

 3          Q.  Spell Bladenboro.

 4          A.  B-l-a-d-e-n-b-o-r-o.

 5          Q.  Okay.  And then what do you do

 6   next?

 7          A.  Chief of police for Norwood,

 8   N-o-r-w-o-o-d, North Carolina Police

 9   Department.

10          Q.  When did you start that position?

11          A.  I believe that was 1996 or '97.  I

12   don't have that.

13          Q.  Did you leave the Bladenboro -- did

14   you -- just approximately, did you leave the

15   Bladenboro Department to become chief of

16   Norwood?

17          A.  I did.

18          Q.  All right.  And next -- the next

19   time -- the next position?

20          A.  I left Norwood and went to Liberty,

21   North Carolina as the police chief.

22          Q.  Okay.  And how long were you chief

23   there?

24          A.  I only stayed there about three
```

Page 12

```
 1    months.  I found it to be very tumultuous

 2    politically.

 3         Q.  What year would that have been?

 4         A.  I believe it was 1998.

 5         Q.  1998, okay.  Let's see.

 6             When you were with the Wake County

 7    Sheriff's Department, you were a deputy?

 8         A.  Yes, sir.

 9         Q.  How high did you rise in rank?

10         A.  I remained a road patrol deputy,

11    K-9 handler my entire time there.

12         Q.  Okay.  And then when you were chief

13    of Bladenboro, how big of a city is -- how

14    big was your -- let's see.  Let's go with,

15    how big was your department?

16         A.  It was five full-time officers.

17         Q.  Including yourself?

18         A.  Yes, sir.

19         Q.  Would you agree that's a pretty

20    small police department?

21         A.  Yes, sir.  But the average size

22    police department in the United States is

23    ten officers.

24         Q.  Okay.  And then when you were chief
```

Page 13

```
 1    of Norwood, how many police officers were

 2    within your department?

 3         A.  I believe it was nine full-time,

 4    and then we had several part-time and

 5    reserve officers.

 6         Q.  Okay.  Would you agree that's also

 7    a pretty small police department?

 8         A.  It is.

 9         Q.  Okay.  And then when you were chief

10    at Liberty, how many people -- how many

11    officers were in your department?

12         A.  That was 13 officers and several

13    part-time and reserve officers as well.

14         Q.  Okay.  Would you agree that's also

15    a pretty small police department?

16         A.  That's the average size in the

17    United States.

18         Q.  Okay.  So after Liberty, what did

19    you do?

20         A.  Governors Highway Safety Program

21    hired me to be the manager of external

22    affairs to manage all of the law enforcement

23    programs across the state.

24         Q.  Okay.  And when did you start that
```

Page 14

```
 1   position?
 2        A.  I believe it was end of '98 or '99.
 3        Q.  And how long were you in that
 4   position?
 5        A.  For about one year.  I was hired to
 6   be the police chief of the state psychiatric
 7   hospital.
 8        Q.  And when did you start with the
 9   state psychiatric hospital?
10        A.  I believe it was November of '99.
11        Q.  Let's see.  The Governor Highway
12   Safety Program, that was in North Carolina?
13        A.  Yes, sir.
14        Q.  And the hospital that you were
15   chief of police over was what?  The North
16   Carolina State Psychiatric Hospital?
17        A.  Name was Dorothea Dix Psychiatric
18   Hospital.
19        Q.  What?
20        A.  Dorothea Dix, Dix.  Dorothea Dix
21   was famous for her work in psychiatric
22   healthcare and was a nurse in the civil war.
23        Q.  Okay.  And so after that in '99 --
24   when you were over the state psychiatric
```

Page 15

```
 1    hospital, how many officers were in your

 2    department?

 3          A.   Five police officers.

 4          Q.   Okay.  Wonder why it requires that

 5    many police officers?

 6          A.   Say again.

 7          Q.   How come it required that many

 8    police officers?

 9          A.   24 hours, 7 days a week coverage.

10    So you had one officer per shift.  And then

11    the chief to manage it and fill in if

12    necessary.

13          Q.   Always got to have somebody there?

14          A.   Yes.

15          Q.   I got you.

16               All right.  So after that in 1999,

17    what did you do?

18          A.   Well, I was hired to be the East

19    U.S. Emergency Manager for Nortel Networks.

20    So I had from New York to Florida to the

21    Mississippi River.  I think I had 13

22    different complexes that I was responsible

23    for the security, safety, hazardous

24    materials, emergency medical care of all of
```

Page 16

```
 1   the people on those facilities.

 2        Q.  When did that start?

 3        A.  I believe it was February of 2000.

 4        Q.  Okay.  And how long did that last?

 5        A.  Sometime late 2005.

 6        Q.  Okay.  Was this your first foray we

 7   will call it into the private security

 8   world?

 9        A.  Yes.  It was more emergency

10   management than security.  We had a contract

11   security company that I managed that had a

12   contract with us to provide entry control

13   and that type of thing.

14        Q.  Right.  And so after that, what did

15   you do?

16        A.  There was a lot of things that went

17   on.  There was a lot of things that were

18   going on simultaneously.  I joined the

19   National Guard, North Carolina.  Went

20   through officer candidate school.  I became

21   commissioned as a second lieutenant.  I had

22   to go through officer basic course which is

23   a full-time course.

24        Q.  All right.
```

Page 17

```
 1         A.  And then in 2002, I started Capitol
 2   Special Police how to provide law
 3   enforcement services throughout the state of
 4   North Carolina.  I did that in conjunction
 5   with working full-time at Nortel.
 6         Q.  What is it called, Capitol Special
 7   Police?
 8         A.  Yes, sir.  It is C-a-p-i-t-o-l
 9   Special Police.
10         Q.  All right.  And that started in
11   2002?
12         A.  Correct.
13         Q.  And that is still an ongoing
14   concern?
15         A.  It is.
16         Q.  And that is a private -- that's a
17   private company that you own?
18         A.  I don't own it.  I sold it in I
19   think 2017.  But I'm still the manager of
20   it.  I take care of all operations.
21         Q.  How much did you sell it for?
22         A.  I think it was like 2.8 million.
23         Q.  Excellent.
24             And so were you the sole owner?
```

Page 18

1          A.  When I sold it, yes.

2      Q.  All right.  I got you.

3          All right.  So you are still doing

4  -- you still are with Capitol Special Police

5  and you are, what, managing it, you say?

6          A.  Correct.  I am the chief of police.

7  So I'm sworn in through the Attorney

8  General's Office as a police chief.

9          Q.  But that is -- you are chief of

10  police of a private company, right?

11          A.  Right.  Actually two.  Blue Ridge

12  Public Safety is another private company.

13  It is on the western side of the state.

14          Q.  All right.  Blue Ridge Public

15  Safety.  And when did you start -- did you

16  start that, or are you in that?  Or is that

17  your company or what?

18          A.  I bought it in 2014.  It has been

19  in existence about 53 years now.

20          Q.  Okay.  So you've been there since

21  2014?

22          A.  Correct.

23          Q.  And what is your job at Blue Ridge

24  Public Safety?

```
                                              Page 19
 1        A.  Chief of police.
 2        Q.  All right.  That's also a private
 3   company?
 4        A.  Correct.
 5        Q.  How much did you buy it for?
 6        A.  I want to say it was like 1.2
 7   million.
 8        Q.  Do you have any employees?
 9        A.  I have 109 employees altogether.
10        Q.  Under Blue Ridge?
11        A.  Under Capitol and Blue Ridge
12   combined.
13        Q.  Okay.  But you are not the owner of
14   Capitol anymore, right?
15        A.  Yeah.  And I sold Blue Ridge as
16   well.
17        Q.  Oh, you sold Blue Ridge.  Okay.
18            So when did you sell Blue Ridge?
19        A.  It was a package deal.  I sold
20   three security companies and two police
21   departments.
22        Q.  Okay.  So what were the three
23   security companies that you sold?
24        A.  Signal 88 Security of Charlotte.
```

Page 20

```
 1    Capitol Special Police -- well, Capitol

 2    Special Patrol is our security branch.  And

 3    Sapphire Valley Public Safety.  Those are

 4    the three security companies.

 5         Q.  And you sold all three of those

 6    when?

 7         A.  In 2017, along with Blue Ridge

 8    Public Safety and Capitol Special Police.

 9    So I sold five companies altogether.

10         Q.  Okay.  And is that the one that you

11    sold -- you sold all five for 2.8 million,

12    is that the deal?

13         A.  Yes, sir.

14         Q.  All right.  So are you in any

15    private law enforcement company now?

16         A.  I am the chief of police of both of

17    those agencies.  You have to be a sworn law

18    enforcement officer in order to be a chief

19    of police in North Carolina.

20         Q.  Right.  You are chief of police of

21    Blue Ridge Public Safety and Capitol Special

22    Police?

23         A.  Correct.

24         Q.  And those are both -- those are
```

Page 21

```
 1   both private companies?

 2        A.  Correct.

 3        Q.  And you have 109 employees under

 4   you?

 5        A.  Correct.

 6        Q.  What does Blue Ridge Public Safety

 7   do?

 8        A.  We have a contract with 40 property

 9   owner associations which encompasses the

10   majority of the southern portion of Jackson

11   County, North Carolina.  And then we provide

12   all law enforcement services for those

13   communities.

14        Q.  Okay.  You provide all law

15   enforcement for the communities?

16        A.  Yes.

17        Q.  For how many communities?

18        A.  Forty.

19        Q.  So in North Carolina, they -- are

20   these cities that they hire?

21        A.  They are private communities.

22        Q.  Private communities?

23        A.  It's operating in an unincorporated

24   area of Jackson County.  There is no
```

Page 22

```
 1   corporations in that area.  No incorporated

 2   cities.

 3        Q.  There is no -- so there is no

 4   actual -- there is no incorporated cities in

 5   Jackson, North Carolina?

 6        A.  In the southern part of Jackson

 7   County, North Carolina.

 8        Q.  Okay.  How come?

 9        A.  I don't know.  It is just the way

10   it is.

11        Q.  Okay.  We don't have anything like

12   that in West Virginia.  That's what I am

13   asking about.  I don't know much about it.

14        A.  Yeah.  North Carolina general

15   statute 74E as in Edward is the about the

16   company police program which was started in

17   1871.  So that's how long special police has

18   been in existence to handle situations like

19   this.  Think about after the civil war,

20   North Carolina would have been a lot of

21   cotton mill towns.  There wouldn't have been

22   any real law enforcement.  So the law was

23   passed to allow companies to have their own

24   police departments or a company to be in the
```

Page 23

```
 1   business to provide law enforcement

 2   services.

 3        Q.  Okay.  All right.  And so that's

 4   what you are involved in now is Capitol

 5   Special Police, Blue Ridge Public Safety and

 6   I presume serving as an expert witness?

 7        A.  Right.  And I am still a colonel in

 8   the Army Reserve as military police corps.

 9        Q.  Okay.  Anything else?

10        A.  I am the Use-of-Force Director for

11   Compliant Technologies, which is a company

12   that makes conducted energy weapons.

13        Q.  Okay.  So that's also a private

14   company, you said?

15        A.  Yes.

16        Q.  Are you employed in any public

17   capacity whatsoever?

18        A.  As a colonel in the United States

19   Army.

20        Q.  As a lieutenant colonel in the

21   United States Army --

22        A.  Correct.

23        Q.  -- or as a colonel?

24        A.  Huh?  Could you --
```

Page 24

1          Q.  What is your public capacity that

2     you are employed in?

3          A.  Lieutenant Colonel of the United

4     States Army Reserve.  I'm the emergency

5     preparedness liaison officer for the State

6     of North Carolina.  And so I work with the

7     governor and the emergency operations center

8     so if they need additional resources, they

9     would come to me to look at using active

10    duty military to resolve whatever issues

11    they are having.

12         Q.  And so you are in the -- so you are

13    in the U.S. Army Reserve.  Does that mean

14    you get called out periodically?

15         A.  I just came off of 109 active duty

16    for the COVID vaccination mission.

17         Q.  Okay.  When was the last time that

18    you performed any street level police work?

19         A.  I do occasionally in both Capitol

20    Special Police and Blue Ridge Public Safety.

21    I back up officers if they are having a

22    call, if we are short-handed and have

23    multiple calls at the same time, I will go

24    out and answer those calls.

Page 25

```
 1         Q.   Okay.  When is the last time that
 2    you actually arrested somebody?
 3         A.   Eight to 10 years ago.  It has been
 4    a while.  Again, as chief of police, I don't
 5    have to, you know, go out on the street and
 6    have usually -- if I was involved in a call
 7    even today, I would, you know, turn it over
 8    to one of the on-duty officers to do the
 9    physical arrest.
10         Q.   Where were you when you last
11    arrested somebody do you think?
12         A.   The last one that I recall was at a
13    shopping center in Raleigh, North Carolina.
14         Q.   With what department?
15         A.   Capitol Special Police.
16         Q.   Okay.  And do you have the -- I
17    guess you have the ability to do that as a
18    member of the Capitol Special Police -- or
19    as chief of Capitol Special Police?
20         A.   Yes, sir.  As I said, I am sworn in
21    by the attorney general and have full
22    subject matter law enforcement authority and
23    the police were contracted.  The only
24    difference between us and a municipal agency
```

Page 26

1    is that we don't have receive tax dollars as

2    our primary source of income.

3          Q.  Okay.  And when is the last time

4    you were involved in a police pursuit?

5          A.  I was actually in that same

6    situation where I arrested a guy.  He was

7    wanted for driving while impaired, and he

8    fled.  We chased him for about a mile before

9    he pulled over.

10         Q.  You chased him in a vehicle?

11         A.  Yes.

12         Q.  What kind of vehicle was he in?

13         A.  I don't recall.  It was a passenger

14   car.

15         Q.  Okay.  When was the last time you

16   were involved in a pursuit of a motorcycle?

17         A.  The last one that I remember was a

18   -- when I was a Wake County Deputy Sheriff.

19   But we didn't pursue motorcycles very long

20   because the power/weight ratio, they are

21   much faster than a patrol car.  And usually

22   end up with disastrous results such as, you

23   know, the Means case we are discussing

24   today.  So our policy was not to pursue them

Page 27

```
 1    very long.  If they weren't going to yield

 2    the right-of-way, it was just too dangerous

 3    to continue.

 4         Q.  So it would have been how many

 5    years ago that you were last involved in a

 6    pursuit of a motorcycle if you were last

 7    involved -- in a pursuit of a motorcycle

 8    when you were with the Wake County -- when

 9    you were a Wake County deputy?

10         A.  Correct.  It would have been

11    between 1990 and 1994.

12         Q.  So that would be, what,

13    approximately maybe 43 years ago, 40 years

14    ago, something like that?

15         A.  I will let you do the math.  That

16    wouldn't be 40.  It would probably be more

17    like 30 something.  But I would have to get

18    the calculator out.

19         Q.  Well, I know.  It was 1980.  And it

20    is not 2021.  My math says it would be

21    41 years.  Correct me if I am wrong.

22              MR. FORBES:  I thought he said

23    1990.

24         A.  1994.
```

Page 28

```
 1          Q.  1990 to 1994.  So maybe 30 years.

 2    I don't want to put words in your mouth.

 3          A.  Twenty-seven years.

 4          Q.  Twenty-seven years.

 5          A.  But again, that just leads to, you

 6    know, the use of good judgment and not

 7    continuing to do it.  Because if I see that

 8    they are not going to yield once the lights

 9    and siren come on, I am not going to

10    continue to pursue it.  It is just too

11    dangerous.

12          Q.  Yeah.

13              Have you ever -- have you published

14    any articles?

15          A.  I have.

16          Q.  What articles have you published?

17          A.  They are listed on my CV.  But

18    Ethically Correct I believe was the title of

19    one.  There was another one about ethics.

20    And then one about shooting people was

21    Action Meets Reaction or Does It?  I was

22    co-author of that.  And then my

23    dissertation --

24          Q.  That was your dissertation, right?
```

Elite Court Reporting, LLC
ROY TAYLOR, PH.D., ROUGH DRAFT, 06/23/2021

Page 29

```
 1          A.  No.  My dissertation was Crisis

 2   Intervention Training Full Implementation.

 3          Q.  Okay.  Do you have any other

 4   articles that you've published?

 5          A.  No.  Just those four.

 6          Q.  Okay.

 7          A.  I have got some life papers out,

 8   you know, that I have done on police reform

 9   and body worn cameras, homelessness.  But

10   those are just life papers I have written on

11   my website.

12          Q.  Okay.  Have you ever -- I saw that

13   you've taught a lot of classes.  Have you

14   ever taught a police pursuit class?

15          A.  No.  In North Carolina, driving

16   instructor is a specialty.  So you have to

17   go through a separate instructor course in

18   order to teach that.  And I have never gone

19   through that training.

20          Q.  Okay.  What does that mean?  What

21   do you mean in North Carolina?  What is the

22   special course that needs to be taken to

23   teach a -- I guess, what, an invasive

24   driving course?
```

Page 30

1          A.   It is a vehicle operations course.

2     But in North Carolina, in order to teach

3     certain specialties -- like I am a firearms

4     instructor.  You cannot teach firearms

5     unless you are a certified firearms

6     instructor.

7               You also -- I was a certified first

8     responder instructor where I taught the

9     medical portion of the basic law enforcement

10    training.  I was a hazardous material

11    instructor and taught about hazardous

12    materials and explosive devices.  I was a

13    physical fitness instructor.  So I taught

14    the physical fitness portions of BLET, Basic

15    Law Enforcement Training.

16               So North Carolina has certain

17    topics that you have to have additional

18    training in order to instruct on.  And

19    driving is one of those.  And I have never

20    attended that training.

21          Q.   And I apologize, but can you say

22    the name of the training again?

23          A.   That I have completed?

24          Q.   No.  The name of the training that

Page 31

1    is required to teach a police pursuit

2    training.

3          A.  Follander Vehicle Operations.

4          Q.  Yeah.  Do you know the name of the

5    course?

6          A.  That is the name of the course.  We

7    call it drivers instructor.  But it would be

8    the course of vehicle -- emergency vehicle

9    operations.

10         Q.  Okay.  And you've never taken that

11   course?

12         A.  No.  I never taught that course.

13   But I have taken the course.  And I have

14   taken speciality courses.  But I am not an

15   instructor.  If that's what you asked.

16         Q.  Yeah.  I apologize.

17              So you have taken the vehicle

18   operations course in North Carolina?

19         A.  Right.  It is a required portion of

20   basic law enforcement training.  And I've

21   also been through the Pursuit and Precision

22   Driving Course taught by the North Carolina

23   Highway Patrol.

24         Q.  Okay.  You just have never taught

Page 32

```
 1    those courses?

 2         A.   Correct.

 3         Q.   Do you consider yourself an expert

 4    in police pursuits?

 5         A.   I do.

 6         Q.   Okay.  And do you consider yourself

 7    an expert in police pursuits because you

 8    have taken those classes and you served as a

 9    police officer for a while?

10         A.   I have been in law enforcement for

11    over 40 years.  I have been a police chief

12    for 26.  And during that time, I have, you

13    know, formulated policies and procedures to

14    regulate the use of pursuits in my agencies,

15    both federal, state, local and private, as

16    well as the military.  I have also, you

17    know, had to supervise officers and

18    discontinue pursuits as I felt the situation

19    was requiring.  I have also read, you know,

20    many articles on it.  I stay up-to-date on,

21    you know, case law that involves vehicle

22    pursuits.  So yes, through education,

23    training and past skills or past experience,

24    I would be an expert.
```

Page 33

1          Q.   How many police pursuits have you

2     been involved in over the course of your

3     career?  Guesstimate?

4          A.   Between 15 and 20 over 40 years.

5          Q.   And of that 15 to 20 pursuits, how

6     many pursuits were of a motorcycle?

7          A.   Only two that I recall.  And I had

8     terminated both of those myself.

9          Q.   Do you agree with me that a

10    motorcycle pursuit is different than

11    pursuing a vehicle?

12         A.   It is.  It is more dangerous to the

13    person on the motorcycle.

14         Q.   Would you agree with me that

15    although it is more dangerous to the person

16    on the motorcycle, it would be less

17    dangerous to the public at large because the

18    motorcycle is smaller and lighter than a

19    vehicle?

20         A.   No.  I don't think that's a good

21    characterization.  You are walking along the

22    highway, the motorcycle hits and kills you,

23    I don't think it matters whether it was a

24    two-ton truck or a motorcycle.  If you are

Page 34

1   dead, you are dead.  And, you know, doing so

2   is just reckless.

3          Q.  Do you agree with me that a pursuit

4   of a motorcycle is less dangerous to the

5   public at large for any reason?

6          A.  No, I don't.  It is just as

7   dangerous as any size vehicle.

8          Q.  Okay.  And why is that?

9          A.  Because the chances for somebody to

10  be seriously injured or killed is just as

11  great.  And a motorcycle has a, like I said,

12  quicker or power to weight ratio.  So they

13  are able to accelerate a lot quicker than a

14  motor vehicle is.  And that would make it

15  even more responsible to chase them because

16  a police officer isn't going to be able to

17  maintain constant contact with the vehicle.

18  So they are going to lose sight of them more

19  quickly.

20          And again, at first even though

21  they are lighter and faster, that doesn't

22  mean that their ability to decelerate and

23  break is any quicker.  It still could take

24  the same distance or close to the same

Page 35

```
 1    distance that an automobile would take.  So
 2    if they become, you know, upon traffic or
 3    pedestrians in a crosswalk, they are still
 4    going to have to be able to slow down enough
 5    to avoid colliding with them.
 6          Q.  Do you think that pursuing a
 7    motorcycle is more dangerous than pursuing a
 8    vehicle?
 9          A.  Yes.
10          Q.  And how come?
11          A.  Because the risk of injury or death
12    to the rider of the motorcycle is greater
13    than a passenger car because the passenger
14    car, especially today's more modern vehicles
15    have occupants restraint devices and
16    airbags.  So if they do collide with
17    something, the likelihood of injury is less
18    than somebody colliding with something on a
19    motorcycle like we have in the Means case
20    where now we are dealing with somebody that
21    is a paraplegic because they were ejected
22    from a motorcycle and placed in a ditch.
23          Q.  Do you agree with me that a
24    motorcycle is generally smaller than a car?
```

Page 36

```
 1        A.  Yes.

 2        Q.  When were you first retained to

 3   this matter?

 4        A.  Almost exactly a year ago.  It was

 5   in June of 2020.

 6        Q.  And who retained you?

 7        A.  Let me look and see.  The letter

 8   was just signed by a legal assistant, Katie

 9   Tranthum.  I am not sure which one of the

10   Calwell Luce di Trapano attorneys I spoke

11   with first.

12        Q.  Sure.

13             And what is your hourly rate?

14        A.  $250.  But I charge a flat fee for

15   these type of cases of $5,000.  So that way

16   I don't have to worry about, you know, the

17   clients not sending me everything.  So I can

18   review it.  You know, sometimes attorneys

19   are worried about the costs.  But I've found

20   that a flat rate works better.

21        Q.  Okay.  A flat one-time rate of

22   $5,000, does that encompass everything up to

23   trial -- or including trial?

24        A.  The $5,000 is the, you know,
```

Page 37

1    report, reviewing all of the discovery.  The

2    deposition is a $1500 additional cost if we

3    are doing it like we are today where I don't

4    have to travel.  And then trial would be

5    another $2500 plus expenses for travel

6    costs.

7          Q.  Okay.  And how much have you been

8    paid in this case to date?

9          A.  The $5,000 retainer and the $1500

10   deposition fee.

11         Q.  Did we pay the $1500?

12         A.  I received a check the other day --

13   I believe it was from their company.  So I

14   don't know.  And I think it was for this

15   case.  I have got a couple other cases I

16   have had in the past.  But I received it

17   last week.  So I am assuming it was for this

18   case.

19         Q.  Okay.  How many times have you been

20   retained by that law firm --

21             MR. DI TRAPANO:  I suppose --

22   Duane, I mean, you are going to pay the

23   1500, right?  I don't think that was for

24   this case.

Page 38

```
 1                    THE WITNESS:  Okay.  Maybe not.
 2    I will have to look.  I just saw it was from
 3    your firm.
 4                    MR. DI TRAPANO:  I am not going
 5    pay for your deposition.
 6                    MR. RUGGIER:  Well, I appreciate
 7    the offer.  I appreciate that, Dante.
 8         Q.  So how many times have you been
 9    retained by the plaintiff's law firm?
10         A.  One other case that I recall.
11         Q.  Okay.  What case is that?
12         A.  It was a young lady named Taylor
13    that was shot by the police.  I don't recall
14    the caption offhand.
15         Q.  Do you know -- you don't remember
16    -- you don't know where she was shot or what
17    -- where or what the case style was?
18         A.  I mean, I can look real quick if
19    you would like.  Hold on.
20                    MR. FORBES:  I am just going to
21    interject too that there is a case that I
22    took over that Henry Wood had retained Mr.
23    Taylor in.  I didn't retain him, but I am
24    now counsel in that case that is pending in
```

```
 1   front of Judge Johnstone.

 2               MR. RUGGIER:  What's that case?

 3               MR. FORBES:  It is the estate --

 4   it is Cleo Murdoch versus Kanawha County

 5   Sheriff.

 6               MR. RUGGIER:  Okay.

 7               MR. DI TRAPANO:  And, Duane,

 8   just in full disclosure, he was retained by

 9   David Simms in a case in Parkersburg that

10   David got me involved in.  And the case is

11   styled I think Dent versus The City of

12   Parkersburg.  And it is a -- I think it is a

13   chase case with a paraplegic.

14         Is that right, Roy?

15               THE WITNESS:  Yes.  What was the

16   name of the -- I'm sorry.  What was Taylor's

17   last name?  Or first name?

18               MR. FORBES:  Quinn.

19               MR. DI TRAPANO:  Taylor Quinn,

20   Q-u-i-n-n.

21               THE WITNESS:  Like my last name

22   is Taylor.  So I was thinking I had to

23   recall that it was hers.

24               MR. FORBES:  And just to be
```

Page 40

```
 1    clear.  Duane, even though Wood had retained
 2    him in that Murdoch case, we intend to keep
 3    him retained through the trial.  I just want
 4    to make it clear that no one else had
 5    retained him.  But I am now handling that
 6    case.  And he is the expert, gave a
 7    deposition in it.
 8              MR. RUGGIER:  Sounds good.
 9              THE WITNESS:  Yeah.  It was
10    Taylor Quinn versus the West Virginia State
11    Police, was the case that I was referring
12    to.
13         Q.  My law firm has never retained you,
14    right?  Pullin Fowler Flanagan Brown & Poe?
15         A.  That doesn't sound familiar, no,
16    sir.  But you are welcome to.  I appreciate
17    all of the business.
18         Q.  I got you.
19              Let's see.  Do you work for a TV
20    station now?
21         A.  I don't work for them.  But they
22    call me as a consultant as an expert on
23    police cases.
24         Q.  Do they pay you when they do that?
```

Page 41

1          A.  No.  They just call to get my

2    opinion on things.

3          Q.  Okay.  What percentage of your

4    income is for expert witness work?

5          A.  About 60 percent.

6          Q.  Okay.  And what was your -- how

7    much did you make in 2020 doing expert

8    witness work?

9          A.  In 2020, it was almost 200,000.

10         Q.  Okay.  Do you know what you made in

11   2019?

12         A.  Around 150,000.

13         Q.  Okay.  Was 2020 your best year as

14   far as --

15         A.  Every year it gets better.  Every

16   year it increases.  So I am looking for

17   another great year in 2021.

18         Q.  I got you.

19              Are you looking to make -- have you

20   made more than -- are you on track to make

21   more than 200,000?

22         A.  Yes.

23         Q.  Okay.  What do you think you are

24   going to make this year?

Page 42

1           A.  I hope I hit 300,000.  That's my

2      goal.

3           Q.  Okay.  What percentage do you do of

4      plaintiff as compared to defendant?

5           A.  60 percent plaintiff, 40 percent

6      defendant.  I try to be as close to 50/50.

7      But again, I can't control who retains me.

8           Q.  Have you ever -- have you ever been

9      retained as a -- to provide an opinion for a

10     defendant in the State of West Virginia?

11          A.  Not that I recall.

12          Q.  Have you ever been admitted as an

13     expert in the State of West Virginia?

14          A.  I don't believe that I have been

15     called to testify on any cases in West

16     Virginia yet.

17          Q.  Are the only times you have been

18     retained in West Virginia those four times

19     that we talked about earlier by plaintiff's

20     law firm?

21          A.  I would have to go back through my

22     trial history to look.  But I have had quite

23     a few cases.  I would say probably eight to

24     ten cases in West Virginia.

Page 43

1        Q.  Okay.  Over the years you have been

2   retained as an expert witness, eight to ten

3   times in West Virginia?

4        A.  Correct.

5        Q.  Do you know what law firm?  I

6   understand that three or four times have

7   been with Calwell firm and others.  But do

8   you know any of the other law firms that

9   have retained you?

10       A.  Not offhand, no, sir.

11       Q.  Okay.  Are you associated with any

12  expert group?

13       A.  TASA group, T-A-S-A, out of

14  Pennsylvania.  They send business my way.

15  Then SEAK, S-E-A-K, they have, you know,

16  again clients that retain me.  And there is

17  Experts by Expert.  I have had -- you know,

18  these are all places that, you know, have

19  different experts and find business for

20  their --

21       Q.  For this case, were you retained

22  out of TASA?

23       A.  I don't believe so.  I believe it

24  was just through my past performance with

Page 44

```
 1    their group.

 2            Q.  With who -- oh, with Calwell?

 3            A.  Yes.

 4            Q.  Calwell Law Firm.

 5                And you work with Dante, is that --

 6    in a lot of cases?

 7            A.  He is one of -- he is one of the

 8    attorneys.  But I've worked with several

 9    others.  Mr. Simms as well.

10            Q.  Okay.  All right.  Let's see.  So

11    switching gears a little bit.  Just some

12    general questions about law enforcement.

13    What is your opinion of the broken window

14    theory of policing?

15            A.  I love it.  I use it all of the

16    time in my community policing programs.

17            Q.  How so?

18            A.  Teach people that if they, you

19    know, keep up with a property -- you know,

20    we work with a lot of landlords and, you

21    know, property owner groups to make sure

22    that their property is maintained so that if

23    the grass is cut and everything is kept

24    orderly, the likelihood of people to litter
```

Page 45

```
 1    and cause other disruption is less likely.

 2    It is shown psychologically.  So we try to

 3    encourage them to keep everything up to code

 4    based on the city ordinances or county

 5    ordinances.

 6              But anytime that it appears things

 7    are taken care of orderly, there is less

 8    likely for disorderly or criminal conduct to

 9    occur.  So we make sure all of the lights

10    are working and junk cars are towed off,

11    that there is no, you know, cars left on the

12    street or people with washing machines in

13    their front yard.  All of those type of

14    things help.  But it's all part of community

15    engagement.

16         Q.  What is your understanding of the

17    broken window theory of policing?

18         A.  That's what I just was talking

19    about.  If the areas appear to be cared for,

20    the likelihood of disruption and further,

21    you know, even minor criminal activity is

22    less likely.

23         Q.  Would that be kind of your

24    definition of it?
```

Page 46

1        A.   Yeah.   Off the top of my head,

2   after having not read it for several years.

3   But I have used it.   I have won national and

4   state awards in community policing.   So

5   community policing is my philosophy of law

6   enforcement.

7        Q.   Okay.   Is that the normal

8   definition of community policing?

9        A.   Well, community policing is, you

10  know, a program that engages in a community

11  to be a partner with law enforcement to

12  report crimes and to tear down barriers

13  between law enforcement and the community.

14  Again, to gain their trust and their

15  cooperation and the administration of

16  justice.

17       Q.   Okay.   What is meant by the idea of

18  a closed system versus an open system?

19       A.   I don't know.   I am not sure

20  exactly what you are talking about.   I mean,

21  in my master's degree with safety, we have,

22  you know, open and closed systems as well

23  for safety programs.   So I think that's kind

24  of an obscure question if you can define it

Page 47

1    a little bit.

2         Q.  Yeah.  Sure.

3             So as far as maybe a closed system

4    of justice as opposed to an open system, is

5    there an open system of policing versus a

6    closed system of policing?

7         A.  Not even heard that terminology.

8         Q.  Okay.  What is your definition of a

9    specific deterrent as opposed to a general

10   deterrent?

11        A.  Specific deterrents would be based

12   on statistical analysis of criminal activity

13   and directing police resources to target

14   that specific issue to remediate it.

15        Q.  Okay.  Let's see.  Can you define

16   what is meant by the term nanny state?

17        A.  My definition of nanny state would

18   be someone that has overregulation and

19   governance over the population.

20        Q.  Does that have anything to do with

21   police work?

22        A.  It possibly could if they had a

23   community that had low crime and they

24   focused on traffic enforcement because there

Elite Court Reporting, LLC
ROY TAYLOR, PH.D., ROUGH DRAFT, 06/23/2021

Page 48

```
 1    was nothing else to do, that could be a

 2    nanny state when they are overregulating,

 3    you know, traffic enforcement instead of --

 4    the real reason for it is to reduce injuries

 5    and deaths on the highways.  But I have

 6    seen, you know, agencies that use it for

 7    monetary gain.  And, you know, that's not

 8    what the purpose of law enforcement is.

 9         Q.  How do you use it for monetary

10    gain?

11         A.  Because portions of the fines for

12    the traffic violations go into the

13    department's budget.

14         Q.  So they are encouraged to write up

15    more fines so that the department has more

16    money, is that what you are saying?

17         A.  Correct.  If you remember the Brown

18    case from St. Louis, that the police chief

19    and the mayor have both been caught in

20    conversations talking about adding officers

21    to increase the town's budget.  And, you

22    know, that's what they, you know, allege was

23    the reason that they were stopping, you

24    know, Mr. Brown that led to his death.
```

Page 49

```
 1          Q.  Writing too many tickets so that
 2   there is more money in the city's coffers?
 3          A.  Correct.
 4          Q.  Okay.  Have you ever presented a
 5   seminar to West Virginia officers?
 6          A.  No.
 7          Q.  Have you ever taught a class to
 8   West Virginia officers?
 9          A.  No.  There may have been somebody
10   from West Virginia at a national conference.
11   But not specifically.
12          Q.  Okay.  Have you ever attended a
13   class or seminar in West Virginia?
14          A.  No.  I had a wife that lived in
15   Beckley and used to visit.  But that's about
16   as close to West Virginia as I came, was
17   coming to visit family.
18          Q.  I got you.  Well, Beckley is in
19   West Virginia, so ...  We are talking about
20   Beckley, West Virginia, right?
21          A.  What about it?
22          Q.  You are talking about Beckley, West
23   Virginia?
24          A.  Right.  She actually lived in Oak
```

Page 50

```
 1    Hill was where their family was.  But it is
 2    close to Beckley.
 3           Q.  Okay.  Yeah.
 4                Have you driven the pursuit route
 5    in this case?
 6           A.  No, sir.  I have watched the video
 7    that was produced by the defendants.
 8           Q.  All right.  Have you viewed the
 9    railroad crossing where the accident
10    happened?
11           A.  I have photographs and the video.
12           Q.  Have you ever been out to the
13    accident scene?
14           A.  No, sir.
15           Q.  Have you viewed the railroad
16    crossing where this happened in person?
17           A.  No, sir.
18           Q.  Have you viewed the ditch where the
19    plaintiff landed in this case?
20           A.  Only the photographs and
21    videotape.
22           Q.  All right.  You have never seen it
23    in person?
24           A.  No, sir.
```

Page 51

1          Q.  Have you ever had a motorcycle

2    license?

3          A.  I do.  Still have one.

4          Q.  Do you drive motorcycles?

5          A.  I sold my Harley a couple of years

6    ago.  I wasn't able to have the time to ride

7    it as much as I wanted to.

8          Q.  I got you.

9               How long did you drive motorcycles?

10         A.  Since I was 18 years old.  So

11   41 years.

12         Q.  And did you ever drive a motorcycle

13   across railroad tracks?

14         A.  Many times.

15         Q.  And I presume you have watched the

16   video taken by the two girls after the

17   accident scene?

18         A.  Yes, sir.  Yes, sir, I did.

19         Q.  All right.  Did you take into

20   account any witness's credibility when

21   forming your opinions in this case?

22         A.  No, sir.  I look at everybody as

23   telling the truth.  And if there is a

24   disputed fact, I would list it separately.

Page 52

```
 1   But it is not up to me to determine

 2   truthfulness.

 3        Q.  Okay.  Did you take into account

 4   Plaintiff's criminal history in forming your

 5   opinion?

 6        A.  No.

 7        Q.  Did you take into account that the

 8   plaintiff did not have a motorcycle license

 9   on forming your opinion?

10        A.  No.  I am looking at police

11   procedure and the violation of that, not the

12   -- not Plaintiff's actions.

13        Q.  Did you take into account that the

14   plaintiff did not have insurance when

15   forming your opinions?

16        A.  No.

17        Q.  Did you take into account that

18   plaintiff had ecstasy in his system when

19   forming your opinion?

20        A.  No.

21        Q.  Did you take into account that

22   Plaintiff had amphetamines in his system

23   when forming your opinion?

24        A.  No.
```

Page 53

1         Q.  Did you take into account that

2    Plaintiff had THC in his system when forming

3    your opinion?

4         A.  No.

5         Q.  Did you take into account that

6    Plaintiff had benzodiazepines in his system

7    when forming your opinion?

8         A.  No.

9         Q.  Did you take into account that

10   Plaintiff is an admitted drug addict when

11   forming your opinion?

12        A.  No.

13        Q.  Did you take into account that

14   Plaintiff overdosed on March 11, 2021, when

15   forming your opinion?

16        A.  No.

17        Q.  How does a -- as a police officer,

18   have you dealt with people on meth?

19        A.  I have.

20        Q.  On amphetamines?

21        A.  I have.

22        Q.  What's that?

23        A.  Yes.

24        Q.  How does that affect them?

Page 54

1       A.  Become agitated and hyperactive.

2       Q.  Overly agitated?

3       A.  I'm sorry, what?

4       Q.  Like overly agitated or easily

5  agitated?

6       A.  Yes.  And I have also seen them

7  have hallucinations as well.

8       Q.  Yeah.

9           Plaintiff testified that he was

10  probably a better motorcycle driver on

11  methamphetamines.  Would you agree with that

12  statement?

13      A.  No.

14      Q.  Let's see.  Do you agree that

15  Plaintiff was attempting to flea from the

16  police in this case?

17      A.  Yes.

18      Q.  In assessing this pursuit, did you

19  take into account that it was on an early

20  Saturday morning?

21      A.  I did.

22      Q.  Did you take into account that

23  there is less traffic on early Saturday as

24  opposed to other days when forming your

Page 55

1    opinion?

2         A.  I would disagree with that.  But I

3    am not specifically familiar with that area

4    other than there were homes, churches,

5    schools and playgrounds along the route.

6    And on a Saturday morning, they would very

7    well likely be occupied.  People do a lot of

8    errands on Saturday mornings.  So I would

9    say that the likelihood of more traffic on a

10   Saturday morning than on, you know, Saturday

11   night and early morning hours.

12          So again, this was a time where the

13   officers going twice the speed limit should

14   have been cognizant of the possibility of a

15   pedestrian or across traffic.  And with the

16   corporal failing to use his siren

17   continuously, he also endangered the public

18   by not giving them adequate warning that

19   somebody twice the speed limit is coming.

20        Q.  So is it your belief that there is

21   more traffic on Saturday morning than at

22   other times normally?

23        A.  It is possible, yes, sir.  It has

24   to be taken into consideration.

Page 56

1      Q.  It is possible?

2      A.  Right.

3      Q.  So do you disagree with the

4  statement there is less traffic on early

5  Saturday morning at 8:00 a.m. than at other

6  times?

7      A.  The other times may have more

8  traffic than Saturday morning.  But there

9  certainly is likely to be traffic on a

10  Saturday morning.  And you can't disregard

11  that.

12      Q.  Do you agree with me that it is a

13  low traffic time on Saturday mornings at

14  8:00 a.m. generally speaking?

15      A.  No.

16      Q.  Okay.  Do you think that it is a

17  heavy traffic time on Saturday mornings at

18  8:00 a.m.?

19      A.  I don't believe it would be as

20  heavy as it would be if it is a week day and

21  more people would be going to work.  But

22  again, Saturday morning traffic, there's

23  still a considerable amount of traffic.

24      Q.  Uh-huh.  Did you take into account

1    that the pursuit was mostly on back roads?

2         A.  I did.  I took into account.  It

3    was a 19-mile pursuit which was ridiculous

4    and that it was exceeding speed limits and

5    causing danger to other motorists and

6    pedestrians while along the roadway as well

7    as to the officers and to the plaintiff.

8         Q.  How long was it the pursuit?

9         A.  It was over 14 minutes.

10        Q.  Over 14 minutes.  And how many

11   miles?

12        A.  Nineteen.

13        Q.  Do you agree with me that it was

14   not Officer Peterson's fault that the

15   plaintiff painted his gas tank black?

16        A.  Yeah.  Correct.  I mean, I don't

17   see that that's illegal.  He could have

18   painted it pink.  It doesn't matter.

19        Q.  Do you agree that it is not

20   Peterson's fault that the plaintiff's

21   motorcycle did not match the license plate?

22        A.  It is not his fault.  But when he

23   first took notice of it and decided that he

24   saw a motorcycle painted black sitting at an

Page 58

```
 1    intersection, he couldn't read the license

 2    plate.  He would have no idea that it was

 3    even expired.  So he started pursuing

 4    somebody because they chose to paint their

 5    motorcycle black.

 6            And when you are looking at a low

 7    income economically depressed area like this

 8    area, this gentleman not having a lot of

 9    money, you know, they piece together and do

10    the best they can to have something nice.

11    So I don't see that that's an indication of

12    any criminal intent or a reason that a

13    police officer should start following

14    somebody.

15        Q.  Do you disagree with the statement

16    that a motorcycle being painted black on his

17    gas tank might indicate that the motorcycle

18    was stolen?

19        A.  No.

20        Q.  Do you agree with me that it is

21    common for stolen motorcycles to have their

22    gas tank painted black?

23        A.  Do I disagree, is that what you

24    said?
```

Page 59

1      Q.  I think I said do you agree.  Do

2  you agree that it is common that a stolen

3  motorcycle would have a gas tank painted

4  black?

5      A.  I don't agree with that, no.  There

6  is no evidence to show that that's a common

7  trait.  I have not seen any statistical

8  studies in 40 years that say that's a common

9  trait of a motorcycle that has been stolen.

10  And to this date, no piece of that

11  motorcycle has ever been found to be stolen.

12      Q.  Do you think it was reasonable for

13  Officer Peterson to believe that the

14  motorcycle may have been stolen because the

15  gas tank was painted black?

16      A.  No.

17      Q.  Do you think it was reasonable for

18  Officer Peterson to believe that the

19  motorcycle might have been stolen if the gas

20  tank was painted black and the license did

21  not match the motorcycle?

22      A.  It is a potential.  It is possible.

23  But it is also what it turned out to be.  It

24  was a registration violation.  And that was

Page 60

1    the only crime that was committed.

2          Q.   So you agree with me that it was

3    possible.  And if you agree that it was

4    possible, do you think that it was

5    reasonable for Officer Peterson to have

6    reasonable suspicion that the motorcycle was

7    stolen?

8          A.   No.  All he knew and all they could

9    prove was that the registration was expired

10   and -- you know, again, I am not familiar

11   enough with every model of Yamaha and Honda

12   to know the difference between what I recall

13   -- I think it was like a YT250 and Honda

14   CVR.  So, again, unless you are a motorcycle

15   enthusiast and know the different models and

16   makes with a tape painted black, probably no

17   logos, how would he know that it is not the

18   motorcycle that it was registered to.  I

19   have not seen any testimony that he is

20   familiar with different makes and models of

21   motorcycles and the specific models of each

22   one of those brands.

23         Q.   So if Officer Peterson was told by

24   dispatch that the motorcycle registration

```
1    did not match the license plate, would it be

2    reasonable for him to have reasonable

3    suspicion that the motorcycle was stolen?

4         A.  Well, your question was convoluted.

5    The license and the registration are the

6    same thing.  So I don't think -- I know what

7    you mean.  You mean that the make -- the

8    motorcycle came back different than the

9    registration, is that what you meant?

10        Q.  Yeah.  Yeah.  That's a better way

11   of putting it.

12        A.  Well, again, there is no testimony

13   that he knew the difference between Yamaha

14   and Honda.  All he knows is that the license

15   plate came back on a motorcycle, that it was

16   expired.

17        Q.  Do you think he did know the

18   difference --

19        A.  He has not testified that he knew

20   the difference.

21            Say again.

22        Q.  If he did know the difference,

23   would you then agree that it was reasonable

24   for him to have reasonable suspicion that
```

Page 62

1    the bike may have been stolen?

2         A.  No.  All he knows is there is a

3    registration violation which, you know, was

4    a very common occurrence.  And people trade

5    motorcycles fairly regularly.  Again, not

6    having a right registration on a vehicle

7    does not necessarily dictate that it is a

8    stolen vehicle.  And in North Carolina, you

9    have 30 days to change tags on a vehicle and

10   notify DMV.  So he doesn't have any way to

11   know that this motorcycle wasn't

12   legitimately purchased within 30 days and

13   that he put an expired tag from another

14   motorcycle on it.  That's the only thing he

15   knows is that this is an expired motorcycle

16   registration plate.

17        Q.  Right.  But does it give him the

18   right as a police officer to follow that

19   motorcycle and to see what happens?

20        A.  He has a right to stop it for a

21   registration violation which would give him

22   the opportunity to do a closer inspection

23   and run a VIN number and ask questions about

24   when did you purchase this motorcycle, where

Page 63

1    did you get it from, you know.  But again,

2    the only thing that he can do is stop him

3    for a registration violation.  And when the

4    vehicle didn't stop and engage in a pursuit,

5    again, based on policy and national police

6    practices, again, for such a minor

7    violation, it is not worth the risk of

8    injury to the public or to the operator of

9    the motorcycle or the law enforcement

10   officers to continue in a reckless manner

11   which he did.

12        Q.  Would you agree with me that if he

13   had a reasonable suspicion that the

14   motorcycle was stolen, that he could then

15   engage in a -- he could then engage in

16   following the motorcycle?

17        A.  Following, but not pursuing.

18        Q.  If he had a reasonable suspicion

19   that the motorcycle was stolen, could he

20   pull over that motorcycle?

21        A.  No.  He doesn't have probable cause

22   for that.  The only thing he was able to

23   stop that motorcycle for was a registration

24   violation.  That's it.

Page 64

1          Q.  Well, if there is a registration

2     violation, would you agree -- do you agree

3     there was a registration violation?

4          A.  I do.

5          Q.  If there is a registration

6     violation, then he can pull that motorcycle

7     over, correct?

8          A.  Yes.

9          Q.  And if there is a -- if that

10    officer -- I'm sorry.  If that motorcycle

11    refuses to be pulled over, can he then

12    engage in a pursuit?

13         A.  He can.  But again, it has to be

14    reasonable.  And when it becomes too

15    dangerous to continue, he needs to use good

16    judgment and discontinue.  Or his

17    supervisor, the lieutenant, should have

18    stepped in once this pursuit continued for

19    ten minutes.  I mean, in that four minutes

20    the supervisor told him to discontinue if it

21    became reckless or the speeds got too high,

22    and they failed to do that.  And they

23    testified -- both officers testified that

24    the pursuit did get dangerous and was a

Page 65

```
 1   hazard to others.  And that was one of the
 2   criminal charges that they took out against
 3   him.  So they were in defiance of their
 4   policy, and they were in defiance of a
 5   direct order of a supervisor.
 6        Q.  If there was a registration
 7   violation and if the officer had a
 8   reasonable belief that the motorcycle was
 9   stolen, do you agree that he can engage in a
10   pursuit of that motorcycle if the motorcycle
11   refuses to pull over?
12        A.  Correct.  I mean, I have said
13   previous testimony was he has the lawful
14   authority to do so.  But again, he also has
15   an obligation to follow policy and direct
16   orders to disengage if it appears it is too
17   dangerous.  Again, the reason for the
18   pursuit has to be outweighed by the danger
19   to society.  And in this case, it wasn't.
20   And now we have somebody that is a
21   paraplegic because these officers acted
22   outside of the scope of a reasonable officer
23   and a wreck with serious bodily injury
24   resulted.  And it should have never happened
```

Page 66

1    because, again, this all rolled back to a

2    registration violation.

3         Q.  Do you believe that it is the fault

4    of Officer Peterson that the plaintiff

5    refused to be pulled over?

6         A.   It was a decision of the plaintiff

7    not to yield the right of way to an

8    emergency vehicle.  But again, it was

9    Corporal Peterson and Officer Harvey's

10   decisions -- conscious decisions to continue

11   a pursuit that was endangering themselves

12   and the public and the plaintiff.  That was

13   their decision.  If they would have turned

14   off their lights and the siren that was used

15   intermittently and fallen back, turned

16   around, then there is less likelihood that

17   the plaintiff would be in a wheelchair

18   today.

19        Q.  Let's see.  Do you agree that it is

20   not Officer Peterson's fault that the

21   plaintiff did not have a license?

22        A.  No.

23        Q.  Do you agree that it is not Officer

24   Peterson's fault that the plaintiff had

Elite Court Reporting, LLC
ROY TAYLOR, PH.D., ROUGH DRAFT, 06/23/2021

Page 67

```
 1    ecstasy in his system?

 2         A.  No.

 3         Q.  Do you agree that it is not Officer

 4    Peterson's fault that the plaintiff had

 5    methamphetamines in his system?

 6         A.  No.

 7         Q.  All right.  Let's see.  Let's see.

 8    Going through a little bit on your report.

 9    The plaintiff under your facts which are

10    assumed to be true of your report, you can

11    pull that up if you would like or look at

12    it.  Appendix D.

13         A.  Right.  Let me pull it up real

14    quick.  I just printed out the report.  I

15    didn't do the appendix.  Let me just pull it

16    up real quick.

17         Q.  Take your time.  No problem.

18         A.  Okay, sir.  Go ahead.

19         Q.  Let's see.  You accepted as true

20    that the plaintiff was on his way back to

21    visit a friend to give him a clutch cable?

22         A.  That's what he testified to or

23    based statement of, yes, sir.

24         Q.  You don't know -- do you know which
```

Page 68

1   friend?

2          A.  I don't recall offhand, no, sir.

3          Q.  Do you know where that friend

4   lived?

5          A.  I don't recall.  I believe he, you

6   know, made mention of it.  But again, I

7   didn't need to go into that level of detail.

8   I was just giving a reason he was out on the

9   road that morning.

10          Q.  Do you know the route to that

11   friend's house?

12          A.  No, I don't.

13          Q.  Do you contend that the plaintiff

14   was driving to his friend's house the

15   entirety of the pursuit?

16          A.  No.

17          Q.  At what point do you assert that

18   the plaintiff was no longer trying to break

19   his friend's clutch cables?

20          A.  Again, I don't know of the route to

21   the friend's house.  So I don't know if he

22   made that first left turnoff of 119, if that

23   was to go to his friend's or if he was

24   trying to see if the police were going to

Page 69

```
 1    follow him.  I don't know what was in his
 2    mind.
 3           Q.  Okay.  Do you know why the
 4    plaintiff did not drive -- just drive to his
 5    friend's house?
 6           A.  No.  I don't know.
 7           Q.  Okay.  As a police officer, is it
 8    your testimony that it would not raise your
 9    suspicion that the gas tank was painted over
10    black?
11           A.  No.  That is not an uncommon
12    occurrence.
13           Q.  In your history as a police
14    officer, if someone drove by you and their
15    motorcycle had been painted black -- I'm
16    sorry -- their gas tank had been painted
17    black, that would not indicate to you at all
18    that that motorcycle might be stolen?
19           A.  No.  I mean, I would go out on the
20    road today and find all different colors of,
21    you know, can spray paint jobs.  And that's
22    not indicative of a stolen motorcycle, just
23    somebody that can't afford a custom paint
24    job.
```

1        Q.  Or is it somebody that is trying to

2    cover up the motorcycle?

3        A.  Again, that's all, you know,

4    circumspection.

5        Q.  Let's see.  Do you agree that

6    Officer Peterson was an experienced officer?

7        A.  I do.

8        Q.  Do you agree that Officer Peterson

9    was an experienced officer in police

10    pursuits?

11        A.  No.  There is no evidence that he

12    has received any training outside of the

13    basic academy.  So he would be trained to a

14    very minimal level.

15        Q.  Does the fact that Officer Peterson

16    had just picked up Chic-Fil-A for himself

17    and a garage employee indicate anything to

18    you?

19        A.  That he decided he was going to try

20    to stop the motorcycle to see if it was

21    stolen or not because he again noticed it

22    because of the paint job and decided to pull

23    it over.  And he was able to do that because

24    the vehicle had an expired registration

Page 71

```
 1   plate.
 2        Q.  Do you agree that it was reasonable
 3   for Officer Peterson to think that the bike
 4   may have been stolen because the bike did
 5   not match the license plate?
 6        A.  It would be another factor that
 7   could be used in weighing that decision.
 8        Q.  Okay.  How should Officer Peterson
 9   have interpreted the plaintiff looking over
10   his shoulder multiple times as Officer
11   Peterson got in behind him?
12        A.  The plaintiff testified that, you
13   know, the lights weren't on.  There was no
14   siren.  So I think he was just checking to
15   see if the officer turned on his lights
16   because he felt that it was unusual that the
17   officer was following him so closely and for
18   such a long period of time.  So, you know, I
19   don't know if the motorcycle had mirrors on
20   it.  But, you know, having driven different
21   brands of motorcycles, sometimes the mirrors
22   are not very stable and they are difficult
23   to see anything.  So looking over your
24   shoulder to see if the police have activated
```

Page 72

```
 1    their lights, I think is a prudent motorist

 2    looking to make sure that if the police do

 3    activate their lights that he would, you

 4    know, respond immediately.

 5         Q.  So is it your testimony that the

 6    plaintiff was being prudent by constantly

 7    looking over his shoulder when Officer

 8    Peterson was behind him?

 9         A.  Yes.  We don't know -- again,

10    that's their characterization.  So how many

11    times that is, how frequent it is, how

12    flagrant it is, you know, again, we just --

13    it is left up to our imagination based on

14    what they wrote.

15         Q.  Do you agree that continually

16    looking over the shoulder would be

17    suspicious behavior to a police officer --

18    the plaintiff continually looking over his

19    shoulder would be suspicious behavior to a

20    police officer?

21         A.  It could be.  But again, there is

22    also reasonable explanations that he wanted

23    to make sure -- to see what the police

24    officer is doing.
```

Page 73

1          Q.   Okay.

2          A.   It is not illegal activity.

3          Q.   When you were a police officer,

4     would that indicate some type of potential

5     suspicious behavior if that individual kept

6     looking over his shoulder when they were

7     driving a motorcycle?

8          A.   It is possible.  It could be a

9     warning sign.

10          Q.   Do you agree that it was proper for

11     Officer Peterson to initiate a stop of the

12     plaintiff's motorcycle?

13          A.   It was for a registration

14     violation.

15          Q.   And instead of stopping, the

16     plaintiff sped up and tried to get away from

17     the officer, right?

18          A.   Yes.

19          Q.   And you agree that it was

20     reasonable for Officer Peterson to believe

21     that the plaintiff was trying to flea him at

22     that point?

23          A.   Yes.

24          Q.   And do you agree that the plaintiff

Page 74

```
 1    was committing a crime when he initially

 2    tried to flea the officer?

 3         A.  It's a motor vehicle violation of

 4    failure to stop for an emergency vehicle.

 5         Q.  Is that a crime?

 6         A.  Either an infraction or a

 7    misdemeanor, yes.

 8         Q.  So the answer is yes, it is a

 9    crime, correct?

10         A.  Again, I am not familiar with West

11    Virginia statutes.  It could be an

12    infraction or misdemeanor.  Most of the time

13    an infraction is considered a crime.

14         Q.  I am going to ask you some

15    questions about the police route.  Are you

16    familiar with the police route -- I'm sorry

17    -- the police pursuit route?

18         A.  The route?

19         Q.  Yeah.

20         A.  Only with what was in the report

21    and the audio -- or the videotape that they

22    produced later.

23         Q.  Okay.  Let's see.  Do you agree

24    that the plaintiff could have stopped his
```

Page 75

1    motorcycle and pulled over when he turned

2    off of Route 19 onto Ruth Road?

3         A.  Yes.

4         Q.  Do you agree that Plaintiff should

5    have stopped his bike and pulled over when

6    he turned off of Route 119 onto Ruth Road?

7         A.  As long as the officer was

8    signalling to do so, yes.

9         Q.  Do you agree that Plaintiff

10   probably would not have ended up paralyzed

11   had he simply pulled over when he turned off

12   of Route 119 onto Ruth Road?

13              MR. DI TRAPANO:  I'm going to

14   object.

15        A.  That's the first turn.  Well, it's

16   119 on to Southridge Boulevard is where they

17   caught up.  And then --

18        Q.  Yeah.  I think he turned off

19   onto --

20        A.  Onto Ruth Road, yes.  Yeah.  If it

21   was safe to do so.  But again, you know, a

22   disputed fact is that the plaintiff said

23   that he never saw the lights or heard the

24   siren until much later in a pursuit.  So,

Page 76

```
1    again, I qualify that answer with if the

2    officer was displaying his emergency lights

3    and audible warning signal by siren.

4         Q.  Do you agree that it was reasonable

5    for Officer Peterson to think that Plaintiff

6    was committing a crime when Plaintiff was

7    refusing to stop?

8         A.  Yes.

9         Q.  Do you believe that when Plaintiff

10   was turning off of Route 119 to Ruth Road,

11   he was going to a friend's house?

12        A.  Again, I don't know where his

13   friend lives.  I have never mapped it out.

14   I don't know that he gave us a specific

15   address.

16        Q.  Do you agree that Plaintiff could

17   have stopped his bike or his motorcycle and

18   pulled over when Officer Peterson turned on

19   his lights and sirens?

20        A.  What was the beginning of that?

21   I'm sorry.  I missed it.

22        Q.  Do you agree that plaintiff could

23   have -- or do you agree that Plaintiff

24   should have stopped his motorcycle and
```

Page 77

```
 1    pulled over when Officer Peterson turned on

 2    his lights and siren?

 3         A.  Yes.

 4         Q.  Do you know how long the plaintiff

 5    was on Ruth Road?

 6         A.  Once he entered Ruth Road, he went

 7    to the intersection of Trace Fork Road where

 8    he turned onto Trace Fork Road.  But I don't

 9    know the distance from 119 to that road.  So

10    whatever that distance is.

11         Q.  All right.  Do you agree that the

12    plaintiff could have stopped his motorcycle

13    and pulled over when he was on Ruth Road?

14         A.  I would assume so, yes.

15         Q.  Do you agree that Plaintiff

16    probably would not have ended up paralyzed

17    had he simply pulled over and stopped his

18    motorcycle when he was on Ruth Road?

19         A.  Yes.

20         Q.  Do you agree that it was reasonable

21    for Officer Peterson to think that Plaintiff

22    was committing a crime when Plaintiff was

23    refusing to stop his motorcycle on Ruth

24    Road?
```

Page 78

```
1          A.  The crime he was committing was

2    registration violation and failure to yield

3    to lights and siren.  So that would be the

4    only crimes.  Again, minor misdemeanors.

5          Q.  What, fleeing a police officer is a

6    minor misdemeanor?

7          A.  Again, different states have

8    different laws.  So, again, it depends on --

9          Q.  Do you know what (inaudible) --

10         A.  Not off the top of my head, no.

11   But it would have been failure to stop.  In

12   North Carolina, if we have a speed to

13   allude, that turns into a felony.  But then

14   we also have failure to stop for blue light

15   and siren, which is a misdemeanor.  So,

16   again, based on speed and duration and

17   recklessness, there may be a different

18   statute or felony to different statute for

19   misdemeanor.  So at that point I am not sure

20   which violation he may have been committing.

21   But either way, I know there is a felony for

22   alluding the police in West Virginia.  I

23   just don't know what all of the requirements

24   or the elements of that crime are.
```

Page 79

```
 1        Q.  Do you know what -- you don't know

 2   whether it is a felony to attempt to evade

 3   the police in West Virginia?

 4        A.  No.  I'm sorry.  You will have to

 5   repeat that.

 6        Q.  Do you know if it's a felony to

 7   attempt to evade the police in West

 8   Virginia?

 9        A.  Yes.  At some point it is, yes.

10   But again, that's committed, you know,

11   during the pursuit.  It is not the reason

12   for the pursuit.  And that's not a good

13   reason to justify a pursuit's continuance.

14   If that's the only felony that exists, if it

15   is not a armed robber or a rapist or a

16   murder, then, you know, a continued vehicle

17   pursuit endangering people is again not

18   warranted because it doesn't overcome that

19   fact that it is more dangerous to commit the

20   pursuit than it is for the crime that has

21   been committed.  So by them chasing him,

22   that's what continues to a felony.

23        Q.  Are you asserting that it is

24   Officer Peterson's fault that the plaintiff
```

Page 80

1    was committing a felony?

2         A.  Not his fault that that's the

3    choice he made.  But by continuing the

4    pursuit, he continued the felony and

5    continued the dangerousness to everyone

6    involved and the motor in public and

7    pedestrians and dogs walking along the side

8    of the road.

9         Q.  Do you agree with me that the

10   continuing of the pursuit was the fault of

11   the plaintiff and not Officer Peterson?

12        A.  No.  It is the plaintiff that made

13   that decision.  But with the continuous

14   police pursuit is what caused it to

15   continue.  If the police would have

16   terminated the pursuit, as would be per

17   their regulation and national standards,

18   then the plaintiff most likely would not

19   have wrecked.

20        Q.  So is it your testimony that the

21   fault of the police pursuit is the actions

22   of the police officers?

23        A.  Yes.  That's why it is common

24   practice in the United States and according

Page 81

```
 1    to their policy, again, if the dangerousness
 2    of the pursuit outweighs the type of crime
 3    and that person remaining at large in the
 4    community, it has to be terminated.  And
 5    that's the problem that we face here.  And
 6    that's why this action has been brought
 7    because the police should have terminated
 8    this within the first few miles.  Once they
 9    realized that he was not going to yield the
10    right-of-way, that the dangerousness to the
11    community and to themselves and to the
12    plaintiff outweighed them overtaking and
13    catching him.  So it is their fault.
14              That's why these regulations are
15    put into place.  That's why they are
16    supposed to obey the regulations and the
17    direction of their supervisor.  And they did
18    not heed either of those.  So it puts the
19    ball back in their court for fault.
20              MR. DI TRAPANO:  Hey, Duane, I
21    am going to object to the use of the felony
22    terminology.  I mean, there was never a
23    conviction on that.  He was charged, but the
24    charge was dismissed.  So, you know, any
```

Page 82

```
 1    reference to that -- I was going to let you

 2    go through your questions and answers.  But

 3    I object to using it as a felony.

 4                    MR. RUGGIER:  Fair enough.

 5         Q.  So the pursuit went from Ruth Road

 6    onto Trace Fork Road.  Are you aware of

 7    that?

 8         A.  Yeah.  Paragraph 10 of my report,

 9    that's what it says.

10         Q.  Do you agree that the plaintiff

11    could have stopped his motorcycle and pulled

12    over when he turned onto Trace Fork Road?

13         A.  He could have, yes.

14         Q.  Do you agree that the plaintiff

15    could have stopped his motorcycle and pulled

16    over when the pursuit was going as slow as

17    15 miles an hour?

18         A.  Right.  Or as fast as 53 miles an

19    hour in a 25-mile-an-hour zone.

20         Q.  Do you agree that Plaintiff should

21    have stopped his motorcycle and pulled over

22    when he was on Trace Fork Road?

23         A.  Yes.

24         Q.  Do you agree that Plaintiff
```

Page 83

1    probably would not have ended up paralyzed

2    had he simply pulled his motorcycle over and

3    stopped his motorcycle when he was on Trace

4    Fork Road?

5         A.  Yes.

6         Q.  Do you agree that it was reasonable

7    for Officer Peterson to believe that the

8    plaintiff was committing a crime when he was

9    refusing to stop on Trace Fork Road?

10        A.  Yes.  And he should have also

11   acknowledged this Lieutenant Paske1's

12   command to let it go if the speeds or

13   recklessness continues.  And he failed to do

14   that.  And that was on most likely Trace

15   Fork Road.  It was at that same period of

16   time, four minutes into the pursuit.

17        Q.  Do you have a specific time when

18   you believed that this pursuit should have

19   been terminated?

20        A.  Yes.

21        Q.  When?

22        A.  It should have been terminated

23   shortly after the lieutenant told him to

24   because he was going 53 miles an hour in a

Page 84

```
 1    25-mile-an-hour speed zone.  So that's twice
 2    the speed limit.  And the lieutenant ordered
 3    him if the speeds get excessive, well,
 4    that's excessive.
 5               As a police expert of 40 years and
 6    chief of police, if a commanding officer
 7    gives you that direction, then you need to
 8    heed it and you need to discontinue the
 9    pursuit.  And they failed to do that.  And
10    they failed to keep the lieutenant
11    adequately informed of speeds and locations
12    where he could have stepped in and
13    terminated them.  And I feel like the
14    lieutenant should have terminated it once it
15    continued just a few more minutes to allow a
16    pursuit to go on 14 minutes is ludicrous.
17         Q.  So just so I am clear.  You believe
18    that the pursuit should have been terminated
19    at the point when the plaintiff was driving
20    53 miles an hour in the -- in a 25-mile-an-
21    hour zone, is that what you are saying?
22         A.  One of the factors was excessive
23    speed.  And yes, once they reached twice the
24    legal speed limit, that should have been
```

Page 85

```
 1    notice to them that this is too reckless and
 2    we need to discontinue it.  And especially
 3    when you got Corporal Peterson saying he
 4    wasn't running his siren because he couldn't
 5    hear and he wanted to make sure people could
 6    hear him on the radio.  So, again, he is not
 7    giving audible warning to people who may be
 8    pulling out of their driveway and that this
 9    high speed chase is coming by.
10            You know, who is going to expect a
11    vehicle to be traveling twice the speed
12    limit down their treat?  Nobody.  And the
13    police have an obligation by using this
14    audible device to warn them that, hey,
15    something is happened.  Maybe I need to get
16    out of the road or pull over.  But they
17    failed to do that.
18        Q.  Is it your belief that Officer
19    Peterson was not using his audible signal
20    the entirety of the pursuit?
21        A.  He testified to that fact.
22        Q.  It is your understanding that
23    Officer Peterson testified that he was not
24    using his audible signal the entirety of the
```

Page 86

1   pursuit?

2          A.  He did.  He had it on at the end.

3   But at like 14 minutes, you hear the siren

4   in the background.  But in his deposition,

5   he testified that he was not using the siren

6   the entire time because he wanted to make

7   sure his radio transmissions were clear and

8   that he had hearing loss from a shotgun

9   blast some years before.  So that hurt his

10  ears or for whatever reason he decided not

11  to use it which typically is a violation of

12  state law.  Anytime you are engaged in

13  emergency response, you have your audible

14  and visual signals activated the entire

15  time.

16         Q.  Would your opinion in this case

17  change if Officer Peterson had used his

18  audible signal during the pursuit?

19         A.  No.  Because of the duration and

20  the dangerousness of the pursuit.  But I am

21  just saying that he made it even more

22  dangerous by failing to use his audible

23  warning device continuously.

24         Q.  Do you agree that when Plaintiff

Page 87

1    was on Trace Fork Road, that he was not

2    going to a friend's house?

3         A.  Again, I don't know where his

4    friend lived, but -- I don't know where the

5    route would have deviated.

6         Q.  Do you know how long Plaintiff was

7    on Trace Fork Road?

8         A.  Went from Trace Fork Road to

9    Heavenly Drive.  But I don't know what the

10   distance is.  But that's where he turned on

11   to Heavenly Drive, which is another

12   25-mile-an-hour speed zone.  And that's

13   where he crossed over to the opposite lane

14   of travel at both high and low speeds and

15   putting his foot down on the ground.  He was

16   making a turn.  And that's after he was told

17   to discontinue the pursuit by the lieutenant

18   if it got dangerous or reckless or his speed

19   picked up.

20        Q.  Do you agree that Plaintiff was

21   committing a crime when he was trying to

22   flee the police officers on Heavenly Drive?

23        A.  Yes.  He had motor --

24        Q.  Do you know how long -- do you know

Page 88

1    how long Plaintiff was on Heavenly Drive?

2         A.  He turned onto a dirt and gravel

3    access road with multiple ruts.  But I don't

4    know the distance.  It didn't say.

5         Q.  Okay.  Do you agree that Plaintiff

6    could have stopped his motorcycle and pulled

7    over when he was on Heavenly Drive?

8         A.  Yes.

9         Q.  Do you agree that Plaintiff

10   probably would not have ended up paralyzed

11   had he simply stopped his motorcycle and

12   pulled over when he was on Heavenly Drive?

13        A.  Yes.

14        Q.  Do you agree that it was reasonable

15   for Officer Peterson to think that Plaintiff

16   was committing a crime when he was -- when

17   Plaintiff was refusing to stop on Heavenly

18   Drive?

19        A.  Yes.

20        Q.  Let's see.  You don't really know

21   where he was going when he was on Heavenly

22   Drive, right?

23        A.  No.  Only that he turned onto a

24   dirt gravel access road that I guess didn't

Page 89

1    have a name.

2         Q.  Yeah.  It doesn't really seem like

3    -- do you agree that he probably at this

4    point was not attempting to go to his

5    friend's house or go to a friend's house?

6         A.  Again, I don't know where he lives.

7    And this is a road.  It is a pot holey road.

8    But just like Corporal Peterson failed to

9    obey his supervisor and department policy.

10        Q.  Do you agree that Plaintiff could

11   have stopped his motorcycle and pulled over

12   on Heavenly Drive?

13        A.  Yes.

14        Q.  Do you agree -- or do you agree

15   that Plaintiff should have stopped his

16   motorcycle and pulled over when he was on

17   Heavenly Drive?

18        A.  Yes.

19        Q.  Are you aware that this pursuit

20   went through a creek bed?

21        A.  Yes.

22        Q.  And do you agree that the plaintiff

23   could have stopped his motorcycle and I

24   guess pulled over when he was in the creek

Page 90

```
 1   bed?
 2        A.  I probably would have done that
 3   before or after because there was water
 4   flowing.  But yes, he could have.
 5        Q.  Do you agree that Plaintiff would
 6   not have ended up paralyzed had he simply
 7   stopped his motorcycle when he was in the
 8   creek bed?
 9        A.  Yes.
10        Q.  And you agree that it was
11   reasonable for Officer Peterson to think
12   that Plaintiff was committing a crime when
13   he was -- when Plaintiff was refusing to
14   stop in the creek bed?
15        A.  Yes.
16        Q.  Are you aware of the Plaintiff
17   testimony that the reason he could not stop
18   his motorcycle was because Officer Peterson
19   was following too closely?
20        A.  Yes.
21        Q.  Does that sound to you like a false
22   statement if this pursuit went over the
23   course of 19 miles?
24        A.  No.
```

1          Q.  Why not?  Do you believe that the

2     motorcycle was so close to the Peterson's

3     SUV over the course of 19 miles that the

4     plaintiff on the motorcycle was unable to

5     stop?

6          A.  That was his testimony, that he was

7     afraid that the SUV would strike him if he

8     did stop.  And again, as an expert, I am not

9     allowed to assign credibility to either

10    party.  So -- but just like at the end of

11    this pursuit, the plaintiff claims that

12    Corporal Peterson struck his motorcycle.

13    And that's what caused the crash.  You know,

14    and then Corporal Peterson says that he was

15    about one car length behind the motorcycle

16    when it crashed.  So again, that's a

17    disputed fact.

18          You know, I am not saying the

19    plaintiff is telling the truth.  I am not

20    saying that the defendant is telling the

21    truth.  I am only offering what information

22    that I was providing and provided.

23          So it is not unreasonable.  I have

24    seen police officers act in a reckless

Page 92

1   manner in the past where they would be right

2   on somebody's bumper or somebody's rear

3   tire.  I remember a police crash in Rapid

4   City, South Dakota where they actually did

5   make contact with a motorcycle's back wheel,

6   that the guy robbed a bank and they were in

7   a pursuit and they, you know, touched the

8   back wheel with a bumper of the car and it

9   caused the motorcycle to wreck and killed

10  the driver of the motorcycle.  So it is not

11  unlikely that police officers do these

12  things.

13       Q.  So it is your testimony that it is

14  reasonable to believe that over the course

15  of 19 miles of this pursuit that Officer

16  Peterson was so close to the plaintiff's

17  motorcycle that he was unable to stop?

18       A.  Not at all locations.  There were

19  times where he was able to pull ahead

20  because, again, the weight to horsepower

21  ratio.  But again, majority of the time,

22  according to the plaintiff, he was afraid of

23  the close proximity of Corporal Peterson

24  that it would wreck him.

Page 93

1        Q.  Right.

2             So you agree with me that there are

3   places that the plaintiff could have stopped

4   his motorcycle and pulled over without being

5   struck from behind by Peterson's SUV?

6        A.  It is a disputed fact.  Because we

7   don't know how far away he got.  All we can

8   say is that Corporal Peterson reported that

9   in a certain straightaway that he was able

10  to get some distance.  But again, I don't

11  have that corroboration from the plaintiff.

12  So again, it is just a fact that I report as

13  parts of the information that I was given.

14       Q.  Let's see.  The pursuit goes on to

15  Rabel Road.  Do you know how long the

16  plaintiff was driving on Rabel Road?

17       A.  It said that motorcycle continued

18  up a hillside and then turned left onto

19  Rabel Road.  And continued to follow

20  motorcycle on Road road till he got to the

21  intersection of Roland Road -- or Brounland

22  Road, B-R-O-U-N-L-A-N-D Road.  And that's

23  where Patrolman Harvey was waiting.

24       Q.  Do you agree that the plaintiff

Page 94

```
 1    could have stopped his bike and pulled over

 2    when he was on Rabel Road?

 3         A.  I would believe so, yes.

 4         Q.  Do you agree that Plaintiff

 5    probably would not have ended up paralyzed

 6    had he simply stopped his bike and pulled

 7    over when he was on Rabel Road?

 8         A.  Yes.

 9         Q.  Do you agree that it was reasonable

10    for Officer Peterson to think that the

11    plaintiff was committing a crime when

12    Plaintiff was refusing to stop his

13    motorcycle on Rabel Road?

14         A.  Yes.  I also believe that Corporal

15    Peterson should have stopped the pursuit

16    prior to that point.

17         Q.  Do you agree that when Plaintiff

18    was on Rabel Road, he was not going to his

19    friend's house?

20         A.  No.  Again, I don't know where his

21    friend lived.

22         Q.  Do you agree that when Plaintiff

23    was in the creek bed, he probably wasn't

24    going to his friend's house?
```

Page 95

1          A.  No.  Again, it could be a shortcut.

2    I don't know.  I mean, I don't know what his

3    intents were.

4          Q.  Let's see.  Do you agree that

5    Plaintiff should have stopped his bike and

6    pulled over when he was on Rabel Road?

7          A.  Yes.

8          Q.  All right.  The pursuit then went

9    on to Brounland Road.  Do you agree that

10   Plaintiff could have stopped his motorcycle

11   and pulled over when he was on Brounland

12   Road?

13         A.  Yes.

14         Q.  Do you agree that Plaintiff

15   probably would not have ended up paralyzed

16   had he simply stopped his bike and pulled

17   over when he was on Brounland Road?

18         A.  Yes.

19         Q.  Do you agree that it was reasonable

20   for Officer Peterson to think that Plaintiff

21   was committing a crime when Plaintiff was

22   refusing to stop on Brounland Road?

23         A.  Yes.

24         Q.  Pursuit goes on to Emmons Road.  Do

Page 96

```
 1    you agree that Plaintiff could have stopped

 2    his bike -- his motorcycle and pulled over

 3    when he was on Emmons Road?

 4         A.  We didn't talk about the going in

 5    front of the sand plant where they had to

 6    drive on a narrow down one-lane road and

 7    motorcycle failed to stop at the alternating

 8    signal for oncoming traffic.  And then it

 9    continued down Brounland Road to Emmons

10    Road, E-M-M-O-N-S.  And it turned off of the

11    road onto Emmons Road.  But yeah, I guess

12    he, you know, could have pulled over at any

13    one of those parts other than the one-lane

14    road.

15         Q.  Yeah.  I mean, would you agree that

16    there are numerous places where he could

17    have pulled over and stopped his motorcycle

18    along this pursuit route?

19         A.  I would think that would be

20    reasonable, yes.

21         Q.  Do you agree that the police

22    pursuit was driving slowly as it passed the

23    two women who later on filmed the arrest

24    scene?
```

Page 97

```
 1          A.  No one gave me any characterization

 2    of the speeds at that point.  So I don't

 3    know.  At one point that's I think where the

 4    officers had testified and told the state

 5    trooper that they were going over 60 miles

 6    an hour.

 7          Q.  Have you read the testimony of -

 8    let's see - Nunley or Chandler, the two

 9    women?

10          A.  Yes.

11          Q.  And I believe that one of them

12    testified that the pursuit was going slowly

13    as it passed them?

14          A.  I don't recall that.  But again --

15          Q.  You don't recollect?

16          A.  I don't recall it.

17                MR. DI TRAPANO:  Object.  That's

18    a mischaracterization of the testimony.  It

19    depends on where they passed them.  You

20    know, if you are talking about going up the

21    railroad tracks, that was the testimony.

22                But anyway, that's my objection to

23    the form.

24                Go ahead.
```

Page 98

```
 1          A.  My characterization or my statement
 2     would be that, you know, speed slowly, fast
 3     was all relevant to people's experience and
 4     driving abilities.  So I don't know -- maybe
 5     50 miles an hour.  25 would seem slow when
 6     they went by.  50 maybe.  You know, there is
 7     just a number of factors.  I don't know.  I
 8     don't know what their experience is in
 9     driving and how they would characterize
10     that.
11          Q.  I think they characterized it as
12     slowly.
13          A.  But again, I don't know what their
14     opinion about fast and slow is.  It is all
15     subjective.  Each person is going to be a
16     little different.
17          Q.  I got you.  I understand.
18          So do you agree that Plaintiff
19     would not have ended up paralyzed had he
20     simply stopped his motorcycle and pulled
21     over when he was on Emmons Road?
22          A.  Yes.
23          Q.  And do you agree it was reasonable
24     for Officer Peterson to think that Plaintiff
```

Page 99

```
 1   was still committing a crime when he was
 2   refusing to stop on Emmons Road?
 3        A.  Yes.
 4        Q.  And do you agree that Plaintiff was
 5   not going to a friend's house when he was on
 6   Emmons Road?
 7        A.  Again, I don't know.  I can't
 8   answer that question.
 9        Q.  Do you agree that Plaintiff should
10   have stopped his motorcycle and pulled over
11   when he was on Emmons Road?
12        A.  Yes.
13        Q.  Do you have any evidence that the
14   plaintiff would have slowed down and not
15   wrecked had this pursuit been terminated?
16        A.  There is no evidence other than
17   just the fact that that's why these policies
18   are put into place to discontinue pursuits
19   because of the likelihood of them continuing
20   in a reckless speed and rate is less if they
21   are no longer being pursued.  Once they see
22   that the law enforcement officers have
23   discontinued the pursuit, then the
24   likelihood is they are going to slow down
```

Page 100

1   and drive safely and continue their escape.

2   But if they see the police officers are

3   continuously behind them, pursuing, they are

4   going to continue their fleeing until they

5   get away or decide to give up.

6        Q.  Do you have any evidence to support

7   that?

8        A.  No.  Only that that's the purpose

9   of the policy being in place.  Discontinue

10  pursuits once it becomes too dangerous,

11  weighing the fact of what the reason of the

12  pursuit is for against society, that that's

13  why we discontinue because common sense and

14  normal human interaction would be that they

15  are going to reduce speed and drive in a

16  normal manner once the police give up the

17  pursuit.

18        Q.  Well, do you agree with me that

19  once the police officer gives up the

20  pursuit, that the individual is still going

21  to flea the pursuit most likely for a period

22  of time?

23        A.  I don't know.  I mean, that's why

24  we train them, once you discontinue the suit

Page 101

1  -- pursuit, to turn off your lights and

2  siren and make a U-turn and go the opposite

3  way so that you are no longer behind the

4  vehicle.  And that's to enable them to see

5  obviously that you are no longer pursuing

6  them and that the likelihood is they are

7  going to reduce speed and drive in a more

8  safe manner.

9       Q.  But what do you base that on?

10 Just common sense?

11      A.  No.  That's the purpose these

12 policies were crafted.  I have read a number

13 of white papers over the years, and I

14 understand the rational behind discontinuing

15 pursuits.

16      Q.  Well, do you agree with me that

17 that individual is still going to continue

18 to flea for a period of time after the

19 pursuit is discontinued?

20      A.  There is no evidence to support

21 that.

22      Q.  So you think that -- is it your

23 testimony that the individual being pursued

24 is most likely to immediately stop when the

Page 102

1    pursuit ends?

2        A.  Nothing said about stopping.  But

3    they are going to reduce speed and drive in

4    a more safe manner.

5        Q.  Well, do you have any -- do you

6    have any evidence or information in regard

7    to the time period between when a pursuit is

8    stopped and when the individual being

9    pursued stops fleeing?

10       A.  No.  I have never found any studies

11   that quantify that.

12       Q.  Okay.  Then if there is not any

13   studies on it, how do you know when the

14   individual being pursued is going to stop?

15       A.  Again, it is just the premise of

16   the policy is to enable the person to know

17   that they are not being pursued anymore by

18   law enforcement, and that would cause them

19   to drive in a more sane manner.  And then if

20   they continue on and crash, then again the

21   police department is already -- or the law

22   enforcement agency is already

23   discontinued -- obviously discontinued.

24       Q.  Well, you keep referring to the

Page 103

```
 1   policy.  And I am not talking about the

 2   police policy, I am talking about what's in

 3   the mind of the individual being pursued and

 4   how far that individual is going to continue

 5   on once the policy -- I'm sorry -- once the

 6   pursuit is ceased?

 7        A.  It is going to differ with every

 8   single person.

 9        Q.  Okay.  And is it fair to say then

10   you don't necessarily know how long the

11   individual is going to continue to flee once

12   the police pursuit is stopped?

13        A.  Correct.  We don't have any way to

14   determine that.  But again, human nature and

15   the likelihood is that once they realize

16   they are no longer being pursued, that they

17   will slow down and drive in a more sane

18   manner or safer manner.  But at least the

19   police department is not continuously

20   pursuing them, causing them to either crash

21   as they did in this instance or get away or

22   finally decide for themselves that it is not

23   worth the pursuit and they pull over.  So I

24   mean there is those three options.  And in
```

Page 104

1    this situation, they pursued them until he

2    crashed and seriously injured himself.

3         Q.   Is it a fair characterization of

4    your testimony that you don't know how long

5    the plaintiff would have continued to flee

6    if the police officer stopped their pursuit?

7         A.   Correct.

8         Q.   Do you have any -- we've kind of

9    talked about this.  Do you have any

10   knowledge as to where Means was going, the

11   plaintiff was going, or intending to go?

12        A.   Only what he initially said, that

13   that was where his trip was going that day

14   was to his friend's house to pick up a

15   clutch cable.

16        Q.   Right.  But, I mean, when he is on

17   Emmons Road, he is not going to his friend's

18   house, right?

19        A.   Again, I don't know.

20        Q.   Getting to the accident scene and

21   the tracks.  Do you have any idea where

22   Means was intending on going on the tracks?

23   Was he going to attempt to flee the officers

24   by going down the side of the tracks, or was

1    he going to continue to go through the --

2    through the crossing there and continue on

3    up the hill a little bit?  Or do you know?

4         A.  I don't know.  But based on reading

5    the plaintiff's statements and reading the

6    defendants' statements, my opinion is that

7    he was continuing down the road and was not

8    going to go off road, that the officer said

9    that he, you know, going into that turn just

10   miscalculated and struck the railroad track

11   instead of staying on the paved portion of

12   the road.  And then you have Mr. Means that

13   said that when he was on the railroad track,

14   the police officer struck him with a

15   vehicle.  So either of those could have

16   caused the crash.  But I didn't see anything

17   that led me to believe that he was

18   attempting to leave the paved portion of the

19   roadway and drive along the railroad track.

20             MR. DI TRAPANO:  Duane, it is

21   almost 12:00.  We have been going for two

22   hours.  You know, when you get to the next

23   sort of topic or subject matter, maybe we

24   could take a short break if that's okay.

```
 1                    MR. RUGGIER:  If you guys want
 2    to take a break, we can take a break right
 3    now if you want.  I mean, I am not going to
 4    go -- I mean, I would think I am not going
 5    to have -- probably go less than an hour.
 6    But why don't we take a break, and we will
 7    reconvene her in just a little while.
 8                    MR. DI TRAPANO:  Why don't we
 9    take a break and come back in like ten
10    minutes, and then you said you've got maybe
11    about another hour left?
12                    MR. RUGGIER:  Yeah.  If that.  I
13    don't even think I got that.  So we can --
14    let's reconvene in 15 minutes because I am a
15    little bit slower than most people.
16                    (Break in proceedings.)
17    BY MR. RUGGIER:
18         Q.  Roy, since you agree that there are
19    numerous places along the route that -- I'm
20    sorry.  We can start over again.
21         A.  That's okay.
22         Q.  Can you hear me?
23         A.  Yes, sir.
24         Q.  Okay.  Roy, since you agree that
```

```
 1    there are numerous places along the route of

 2    the police pursuit that the plaintiff should

 3    have and could have pulled over, do you also

 4    agree with me that the plaintiff bears some

 5    -- at least some responsibility for this

 6    police pursuit?

 7              MR. DI TRAPANO:  I'm going to

 8    object to the form of the question as it's

 9    asked and answered.  He can't give a

10    responsibility in this case.

11         Q.  But you can answer.

12         A.  Yes.  He could have pulled over a

13    number of places and should have obeyed the

14    law and pulled over when an emergency

15    vehicle approached him.  And just like the

16    officer should have obeyed their department

17    policy and orders of their supervisor to

18    discontinue, they had many opportunities to

19    do that.  And they failed to do so.

20         Q.  So it is your opinion that both the

21    police officer and the plaintiff bears some

22    responsibility for this occurrence?

23              MR. FORBES:  Objection.

24         A.  Yes.
```

1          Q.   Do you agree with Trooper Robinson

2     of the West Virginia State Police that the

3     cause of this accident was the plaintiff

4     hitting the tracks?

5               MR. DI TRAPANO:  Object to the

6     form.

7          A.   No.  Because the trooper never

8     interviewed Mr. Means.  He only interviewed

9     the two officers.  So he did not have a full

10    accounting of what happened, and he didn't

11    conduct any tests or other examination.  He

12    simply went off of the statements he

13    obtained from the two officers who were

14    involved.

15         Q.   What do you believe was the cause

16    of Mr. Means' accident?

17         A.   Corporal Peterson striking the

18    vehicle with his patrol car.

19         Q.   And what do you base that on?

20         A.   Mr. Means' statement and the fact

21    that Mr. Means had crossed over at least one

22    other set of railroad tracks that were

23    similar in nature.  And he was able to go

24    across those successfully.  So why would

Page 109

1    this set be any different?

2         Q.  Do you agree with me that it is

3    possible that because this is a different

4    set of railroad tracks, that it might have

5    been a different set of railroad tracks?

6         A.  Obviously, it was a different set.

7    But it was -- put in with the Department of

8    Transportation's approval.  So they should

9    have been similar in nature.

10        Q.  Have you looked at any of the

11   photos of the railroad tracks?

12        A.  I have.

13        Q.  Do any of the photos -- I am

14   talking about the railroad tracks where the

15   -- where the arrest occurred or the accident

16   happened, whatever you want to say.

17            Do the railroad -- is there any

18   indication to you that there were any marks

19   on those railroad tracks which might

20   indicate that a motorcycle had struck them?

21        A.  There were some marks.  But whether

22   or not it was caused by Mr. Means'

23   motorcycle, I can't determine.

24        Q.  Have you spoken to anybody in

Page 110

1    regard to the cause of the accident at the

2    railroad tracks?

3         A.  No.  I relied on all of the

4    information that was provided to me by the

5    plaintiff's attorneys.

6         Q.  And what information was all of

7    that?  Is that what is in your -- in your

8    opinion, what you gave me here?

9         A.  It is Appendix C -- yes, Appendix C

10   to the report has all of the material that I

11   relied upon to make my opinion.

12        Q.  Okay.  Let's see.  I presume you

13   have -- like I said before, you looked at

14   the video of this -- I guess the accident

15   aftermath?

16        A.  Yes, sir.

17        Q.  Does that video show you anything

18   of in interest to the case?

19        A.  Yes.  It shows an excessive use of

20   force and improper moving of somebody that

21   may have cervical spinal injuries.

22        Q.  Okay.  So is that all?

23        A.  That's quite a bit.

24        Q.  Yeah.  But is that all?

1      A.  Yes.

2      Q.  Okay.  That video shows you that

3  Harvey has his lights on, correct, and his

4  siren on?

5      A.  I'm sorry?  I couldn't understand

6  what you said.

7      Q.  That video would you agree shows

8  that -- or demonstrates that Officer Harvey

9  had his lights and siren on?

10     A.  No.

11     Q.  How come?

12     A.  I never heard the siren -- I never

13  heard the siren on the video.

14     Q.  Do you not hear any siren on the

15  video at all?

16     A.  No.  I don't recall any.  Well,

17  there was -- I think it was Patrolman

18  Harvey's vehicle -- now that I think about

19  it, yeah, there was a siren that -- that was

20  one of the things that Corporal Peterson

21  did, was go back and turn the siren off of

22  Corporal -- or Patrolman Harvey's vehicle.

23     Q.  Did you see any lights on Officer

24  Harvey's vehicle?

1      A.  I don't recall.

2      Q.  Emergency lights operating on

3 Harvey's vehicle?

4      A.  Right.  I don't recall seeing it.

5      Q.  Did you see any emergency lights

6 operating on Officer Peterson's vehicle?

7      A.  I don't recall that, no, sir.

8      Q.  Do you have an issue with Officer

9 Peterson -- you believe that -- do you have

10 an issue with Officer -- well, never mind.

11 I guess I am going to change that.  We will

12 scratch that.

13         It is your understanding that the

14 plaintiff was attempting to remove his

15 backpack when he was driving along the

16 pursuit?

17      A.  That's one of the allegations that

18 Corporal Peterson stated.

19      Q.  Right.  And you accepted that

20 statement as true?

21      A.  I accept all statements as true.  I

22 do not determine the truthfulness or

23 untruthfulness.  I simply report the facts

24 as I am presented with them.  Given a

Page 113

1    separate set of facts, my opinions may be

2    different.

3         Q.  In your experience as a police

4    officer, are drugs often carried in

5    backpacks by individuals?

6              MR. DI TRAPANO:  I'm just going

7    to object to the form.  That's crazy.  But

8    it is a form objection.

9         A.  I have seen them more often carried

10   in other manners than in backpacks.  But I

11   have encountered drugs being carried in

12   backpacks.  But not as frequently as I have

13   in people's pants pockets or underwear or

14   socks.  I have seen them in more places than

15   a backpack and more frequently than in a

16   backpack.

17        Q.  But you agree it is common for

18   people to carry -- or individuals to carry

19   drugs in backpacks?

20        A.  It has occurred.  I don't --

21   wouldn't say that it is common.  But it has

22   occurred.

23        Q.  Did you review the materials that

24   the plaintiff had in his backpack?

Page 114

```
 1        A.  I did.

 2        Q.  And did you see the canisters which

 3   were in the backpack?

 4        A.  I'm not exactly sure what you are

 5   talking about.  But it has been a while

 6   since I reviewed the photographs.

 7        Q.  When you reviewed the information

 8   -- or when you reviewed the things that the

 9   plaintiff had in his backpack, did any of

10   those things suggest to you that they were

11   the things in his backpack were the

12   precursors to making methamphetamines?

13        A.  No, it did not.

14        Q.  So it is your understanding that

15   Officer Peterson struck the back tire of the

16   plaintiff's motorcycle?

17        A.  Yes, sir.  That's what the

18   plaintiff stated.

19        Q.  Is that what you base your opinion

20   on?

21        A.  Yes.  By undisputed facts.

22   Actually, I believe that the opinion as the

23   version of the police officers -- let me

24   review it real quick.
```

Elite Court Reporting, LLC
ROY TAYLOR, PH.D., ROUGH DRAFT, 06/23/2021

Page 115

1                Actually, in paragraph 25, taking

2    Corporal Peterson's statement that the

3    motorcycle struck the railroad tracks.  The

4    motorcycle spun as it hits the tracks,

5    ejecting motorcycles off the seat onto the

6    railroad tracks and into a ditch full of

7    water.  And the motorcycle came to rest in

8    the same ditch approximately 10 to 12 feet

9    away from the driver.  So in disputed facts

10   I believe is where I have the statement from

11   Mr. Means.

12        Q.  Do you agree with me then that the

13   -- it is not disputed that Officer Peterson

14   never came in contact with the plaintiff's

15   motorcycle?

16            MR. FORBES:  Objection to the

17   form.

18        A.  It is disputed.

19        Q.  It is disputed?

20        A.  Yes.

21        Q.  And so what fact did you base your

22   opinion on?  You based your opinion on the

23   statement of Peterson that there was no

24   contact, or you based your opinion on the

1    statement of Means that there was contact?

2         A.  Again, it is a disputed fact.  So I

3    can't determine -- that's up to the court to

4    decide which is true.  But given the fact

5    that the officers denied using excessive

6    force when it is plainly caught on video,

7    then their honesty has to be impugned.

8         Q.  So you are impugning the honesty of

9    the officers but not the plaintiff in this

10   case?

11        A.  No.  I am not doing that to either.

12   But I mean you asked what my personal

13   opinion is.  If you are caught in one lie,

14   then your honesty is subjected to everything

15   that you said.  It can be impugned.  So

16   again, my report says that the officer said

17   he hit the tracks and lost control, but it

18   also says in disputed facts in Appendix D

19   that Mr. Means said the officer struck his

20   vehicle.  And that would be up to the court

21   to decide which is true.

22        Q.  So you agree with me that if you

23   are caught in one lie, then all of your

24   testimony has to be questionable?

Page 117

1      A.   Yes.

2           Q.   And you do not question the

3    testimony of the plaintiff?

4           A.   I haven't found any disputed facts

5    with his version of the account other than

6    the striking of the vehicle.  So again,

7    that's where it diverges.  Again, nobody,

8    you know, questioned him about, you know,

9    possessing drugs or anything else.  I mean,

10   those are things that were found.  But

11   again, this is a police procedure case where

12   the police have used excessive force, and

13   that's what we are in court about.  We are

14   not here about him not having a driver's

15   license or insurance and driving with a

16   registration plate that is expired or not

17   assigned to that vehicle.  Again, we are

18   talking about the police and their, you

19   know, potential violation of his civil

20   rights by using excessive force.

21          Q.   Well, that might be what you want

22   to focus on, I would agree with that.  But I

23   would agree that -- but I contend that the

24   case is a lot about a whole lot more than

Page 118

1   that.

2          A.  Well, the criminal case has been

3   dismissed.  So now we are in a civil case.

4          Q.  That's exactly right.  And that's

5   what I believe the case is about, is a lot

6   more than just a police procedure case.

7          A.  Okay.  Well, that's my only focus.

8   That's what I was brought to be as the

9   expert on those matters.

10         Q.  I understand.

11             MR. DI TRAPANO:  Are you

12  testifying, Duane, about the case?

13             MR. RUGGIER:  Generally

14  speaking, yes.  I got a lot more too.

15         Q.  All right.  Let's see.  Roy, do you

16  have any problem with Peterson stopping his

17  SUV on the railroad tracks?

18         A.  I think it was poor judgment.  He

19  should have gone ahead and pulled all of the

20  way across.  Again he, you know, came to an

21  abrupt stop.  He almost caused Patrolman

22  Harvey to run into the back of him according

23  to their testimony.  So obviously they are

24  not maintaining an assured clear distance.

Page 119

```
 1   But if I stop my vehicle on the railroad
 2   tracks, I would go ahead and pull past the
 3   railroad tracks so that I don't endanger an
 4   oncoming train.  Because he didn't have time
 5   at that point to notify the railroad that
 6   the tracks may be blocked.
 7            So, again, a prudent officer would
 8   have moved his vehicle off of the tracks
 9   before exiting them.
10        Q.  Did Officer Peterson have room to
11   drive through and stop across the tracks?
12        A.  Yes.
13        Q.  Okay.  Do you have a problem with
14   the officers approaching the plaintiff with
15   their pistols drawn after the accident?
16        A.  No.
17        Q.  When Officer -- let's see.  When
18   the plaintiff has his hands in the water and
19   then brings them out and then puts his hands
20   back -- hands back under the water, would
21   that concern you as a police officer?
22        A.  No.  Because again, common sense
23   dictates.  I mean, the police officer is
24   saying this is knee high water, which I
```

Page 120

1  don't believe is correct because we can see

2  the motorcycle laying in the ditch and parts

3  of the, you know, left-hand portion of the

4  motorcycle is visible from the water.  So it

5  is probably maybe calf deep but not quite

6  knee deep.  But I believe that what Mr.

7  Means was doing was simply trying to keep

8  his head out of water.  And he complied with

9  the orders.  He showed his hands.  And then

10  in order to maintain his balance and keep

11  his head out of water, he put his hands back

12  down under the water.

13          So if he was actually trying to

14  draw a weapon or do anything nefarious,

15  other upper movement of his arms and his

16  body would have been prevalent.  And then

17  that would have been of concern.  But in

18  this situation, the way they described it

19  his hands were simply under the water.  And

20  my summation would be that he was simply

21  trying to maintain his balance to keep his

22  head out of the water.  And he had even

23  asked them to help get him out of the water

24  because he felt like he was drowning.  And

Page 121

1    he even said he was fluttering his feet and

2    trying to maintain, you know, his airway

3    which is perfectly reasonable.  Because

4    nobody wants to drown.

5         Q.  Okay.  Was it reasonable in your

6    opinion for Officer Harvey and Officer

7    Peterson to be concerned that the plaintiff

8    was reaching for a weapon when he was

9    reaching under the water?

10        A.  Yes.

11        Q.  Is the plaintiff resisting arrest

12   when he puts his hands under the water?

13        A.  No.

14        Q.  Would you agree that the plaintiff

15   is resisting arrest when he is not letting

16   the officers grab a hold of his hands when

17   he is under the water?

18        A.  Again, that's only their

19   characterization of it.  He didn't offer any

20   resistance that I can tell.  He never

21   uttered any threats.  He never, you know,

22   tried to flee.  He was simply trying to keep

23   his airway out of the water.

24        Q.  Do you agree with me that the

Page 122

1   plaintiff would be resisting arrest if he

2   was putting his hands under the water and

3   refusing to allow the police officers to

4   grab his hands?

5        A.  There is no evidence to support

6   that, so no.  And the fact is that at no

7   point --

8        Q.  Wait.  Did you read the testimony

9   of the officers?

10       A.  I am telling you what my opinion

11  is.  And my opinion is that he wasn't

12  resisting arrest.  And that I don't recall

13  any testimony that he had been based under

14  arrest.  Is there any testimony?  I never

15  saw where they said we were informing him he

16  was under arrest.

17       Q.  There is testimony that --

18            MR. DI TRAPANO:  Asked and

19  answered.

20            (Inaudible.)

21       A.  That doesn't mean he is under

22  arrest.  They never uttered the words "you

23  are under arrest."

24       Q.  But they are clearly attempting to

Page 123

1    arrest him?

2         A.  No.  There is nothing clear about

3    it.  Just because you grab a hold of

4    somebody doesn't mean they are under arrest.

5         Q.  Is it your opinion that over the

6    course of this entire 19-mile pursuit and

7    then the officers attempt to grab onto the

8    plaintiff's hands after the accident that

9    the police officers are not attempting to

10   arrest the plaintiff?

11        A.  May be their intent, but they

12   didn't tell him he was under arrest either.

13        Q.  Did they have to yell it out before

14   they attempted to arrest him?

15        A.  It is always advisable to say, sir,

16   you are under arrest and then try to take

17   physical custody of him.

18        Q.  Do you recall -- do you think it

19   would be reasonable for the officer to

20   presume that the plaintiff would know that

21   he was attempting to be arrested after a

22   19-mile pursuit and an attempt to grab onto

23   his wrist after he wrecks?

24        A.  What's the problem with telling the

Page 124

1  person that he is under arrest?  Then there

2  is no doubt about it.  That is what a

3  prudent law enforcement officer does is

4  inform the person they are under arrest and

5  why they are being arrested.  So, sir, you

6  are under arrest for fleeing a police

7  officer.  You are under arrest for -- and

8  that's the only thing they could have

9  arrested him for because they wouldn't be

10  able to arrest him for a registration

11  violation.

12      Q.  Do you have a problem with the

13  officers using OC spray to gain control of

14  the plaintiff?

15      A.  Yes.  I think it was excessive

16  especially in this situation.

17      Q.  Why was it excessive?

18      A.  Because, again, he is simply trying

19  to maintain his airway to keep his head out

20  of the water.  And any reasonable person

21  should have been able to determine that.

22  And to pepper spray him -- because it really

23  isn't Mace, they really had pepper spray,

24  but they are calling it Mace.  But pepper

Page 125

```
 1    spray, you know, should only be used when

 2    somebody is actively resisting arrest.  At

 3    the very least -- or I should say at the

 4    very most, this would be a passive

 5    resistance and that the use of pepper spray

 6    at that point was excessive, particularly

 7    with somebody that had just been involved in

 8    a motor vehicle crash and is in water.

 9         Q.  Do you consider the plaintiff

10    refusing to pull over when the officers are

11    engaging in the pursuit an example of

12    resisting arrest?

13         A.  It is a motor vehicle violation of

14    failing to stop or blue lights and siren

15    which can be elevated obviously to a felony.

16         Q.  That wasn't my question.  My

17    question though was, do you consider the

18    plaintiff refusing to pull over and

19    attempting to evade the police as an attempt

20    to resist arrest?

21         A.  Again, so criminal violation.  But,

22    I mean, how does he know they are going to

23    arrest him?

24         Q.  Because they've got their lights
```

Page 126

1    and siren on and they are attempting to pull

2    him over and he is fleeing and attempting to

3    evade the police officer.

4              MR. DI TRAPANO:  Object to the

5    form.  There is no evidence that they had

6    their lights and sirens on at any particular

7    time.

8         A.  Again, you know, does a person know

9    he is going to be arrested because they have

10   blue lights and siren on.  They don't really

11   know that.  He is again violating the law.

12   But whether or not he is arrested or not and

13   resisting arrest, they wouldn't know that.

14        Q.  When a person -- does the person

15   know that the officers are attempting to

16   arrest him when he is attempted to be pulled

17   over and the officers have on their lights

18   and sirens?

19        A.  No.  He only knows that they are

20   signalling him to stop.  He doesn't know

21   what their intent is.  He doesn't know if he

22   is going to be arrested.  What if you are

23   talking your wife to the hospital because

24   she is in labor and you don't stop?  Do you

Page 127

1    know that the police are going to arrest you

2    when you get to the hospital?

3         Q.  Do you think that --

4         A.  You know that they are wanting you

5    to stop, but you decide for whatever reason

6    not to stop.  He may ultimately be arrested

7    or he may be given a citation or he may be

8    given a warning.  You don't know what is

9    going to be the outcome of the traffic stop.

10        Q.  Do you think that the plaintiff was

11   attempting to take his wife to the hospital

12   during this pursuit?

13        A.  Well, he didn't have anybody else

14   on the motorcycle.  So that would be out of

15   the question.

16        Q.  Do you agree that it is a

17   potentially dangerous situation if the

18   officer -- it's a dangerous situation for

19   the officer if the officer is unable to see

20   the plaintiff's hands and they are in the

21   water in this situation?

22        A.  It can be.  But again, there is two

23   officers.  One should have less lethal

24   force.  One could have lethal force.  And

Page 128

```
 1   they need to move around behind the person
 2   and give them commands.  But again, I think
 3   by witnessing the subject's upper body
 4   movement would give you more indication of
 5   what was going on.  And again, my
 6   interpretation of the facts as they have
 7   been relayed is that he was simply trying to
 8   balance himself to remain out of the water
 9   so he could breathe.  And he was asking the
10   officers to help him get out of the water.
11   At no point did he utter any threats or any
12   aggressive nature to cause him to have an
13   unreasonable fear.
14        Q.  Do you agree that the plaintiff was
15   asking the officers to remove him from the
16   water?
17        A.  Correct.
18        Q.  And do you agree that the officers
19   need to remove the plaintiff from the water
20   if he is drowning?
21        A.  If he was drowning.  But before
22   that, what he is asking, they, as he
23   described it, field goal kicked him back
24   into the water as he was trying to get out
```

Page 129

```
1    of the water.  So again, that's an example
2    of an excessive force, that he is trying to
3    get out to save himself.  But he was worried
4    about drowning.  And an officer kicks him
5    and knocks him back into the water.
6              And again, we are dealing with
7    somebody that had just been ejected from a
8    motorcycle and lands in a ditch.  The
9    possibility of cervical spinal injury is
10   very much realistic because you are wearing
11   a motorcycle helmet which makes your
12   25-pound head even more heavy and less
13   likely that your muscles in your neck are
14   going to be able to control it.
15             I mean, just with unrestrained,
16   unhelmeted motorcycle people, that's what
17   they die of is injuries to their head and
18   their cervical spine because they are not
19   able to -- the muscles in the neck are not
20   strong enough to keep your head off of the
21   pavement.  And when you have a helmet on,
22   that's just adding that much more weight.
23             So to a reasonable police officer
24   who has had first responder training as all
```

Elite Court Reporting, LLC
ROY TAYLOR, PH.D., ROUGH DRAFT, 06/23/2021

1    officers do, the prevalence of cervical

2    spinal injury should be evident.

3         Q.  Would a reasonable police officer

4    think that the plaintiff was potentially

5    dangerous after in this case the plaintiff

6    attempted to evade the police over the

7    course of 19 miles?

8         A.  And it is always a possibility.  I

9    mean, officer survival should be prevalent.

10   But again, the use of excessive force is not

11   tolerable.

12        Q.  And are you saying the first act of

13   excessive force was the kick?

14        A.  I believe so.  Then the pepper

15   spray.  And then dragging him out by his

16   arms across the tracks and, you know, when

17   the -- I am sure you will get to it.  So I

18   won't get ahead of myself.

19        Q.  You agree that the plaintiff had to

20   be removed from the water?

21        A.  At some point.

22        Q.  And then when the plaintiff is

23   carried across the tracks, is that what you

24   have a problem with?

Page 131

```
 1              MR. DI TRAPANO:  Object to the

 2   form.  There is no evidence anywhere that he

 3   was carried across the tracks.

 4        A.  My observation of the videotape is

 5   that he was drug across the tracks by his

 6   wrists and by clothing.  He was not properly

 7   moved as the officers were trained do so in

 8   their first responder training.  And as

 9   particularly with Corporal Peterson being a

10   former emergency medical technician and

11   working for an ambulance, his knowledge of

12   immobilization was much more than Patrolman

13   Harvey who had been trained as a lifeguard

14   about immobilization of possible spinal

15   injuries.  In addition to the 40-hour

16   training they should have had at the West

17   Virginia State Police Academy.

18        Q.  We have all seen the video numerous

19   times.  Describe to me what was improper

20   about what the officers did when they

21   carried the plaintiff across the railroad

22   tracks?

23              MR. DI TRAPANO:  Object to the

24   form of the question because it
```

Page 132

1   mischaracterizes what the video shows.

2   Nobody was carrying him across the railroad

3   tracks.

4        A.   They drug him across the tracks in

5   my opinion.  And what they should have done,

6   because he was in a supine position, they

7   should have left him in the supine position.

8   One of the officers should have put both

9   hands underneath his armpits, cradling his

10  head with his helmet in it across his

11  forearms and then moved him length-wise

12  according to which way his spine was --

13  attitude was to keep his neck and spine in

14  line and then moved him up out of that body

15  of water.  And it looks like it would have

16  been just as reasonable and probably more

17  prevalent to move him to the left out of the

18  water instead of bringing him over to the

19  tracks.  That was their decision to move him

20  over the tracks.  They could have moved the

21  other direction, and it would have been just

22  as good and it would have been less rough

23  terrain for them to move him across.  But

24  one officer should have supported his neck

Page 133

1  and head, and the other officer, you know,

2  could have picked him up by the waist or

3  picked him up by the legs and helped moved

4  him -- again, keeping his body in line with

5  his spine, neck and spine.  And that's how

6  officers are trained.

7       Q.  You don't believe that the officers

8  had to take him across the tracks, you

9  believe they could have taken him in the

10  other direction?

11       A.  Absolutely.

12       Q.  And I know you just talked about

13  this.  Bear with me.  I am not an expert in

14  carrying folks.  How do you think that the

15  plaintiff should have been handled in this

16  situation?  In other words, can you explain

17  to me again how he should have been I guess

18  carried across the tracks?

19       A.  Well, moved out of water where he

20  didn't feel like he was going to drown.  He

21  doesn't have to go across the tracks or any

22  further than to move him far enough to get

23  him out of the water where he doesn't think

24  he is going to drown.  And that should have

Page 134

1    been it.  Whether it was six inches or two

2    feet.  But to drag him all of the way across

3    the tracks was irresponsible.  Knowing that

4    the likelihood of cervical spinal injury was

5    prevalent, they should have again, you know,

6    cradled his head and neck under one

7    officer's arms, moving him with basically

8    what's called a fireman's drag, is what the

9    proper term is, and then moved him along the

10   long axis of his body out of that area so

11   that he no longer felt like he was in danger

12   of drowning.  And then left him there for

13   EMS to come with a backboard and cervical

14   spinal column and properly immobilize him.

15   So there was no necessity to move him as far

16   as they did.

17       Q.  Do you believe there was any

18   necessity to move him as far as he did

19   because of the proximity of the railroad

20   tracks?

21       A.  Correct.  He could have gone the

22   other way, and it would have been shorter if

23   they would have moved -- I will say to the

24   left if the railroad tracks are to the

Page 135

```
 1    right, they could have moved him a couple of

 2    feet to the left, got out of the water and

 3    not had to cross the railroad tracks.  But

 4    they've had to move him twice as far because

 5    now they have got to worry about their

 6    proximity to the railroad tracks and the

 7    possibility of a train coming.  So it would

 8    have been more prudent to move him to the

 9    left side than cross over the tracks to the

10    right.

11              Q.  Have you seen photos of where he

12    was located by the tracks?

13              A.  Yes.

14              Q.  Have you seen the hillside which is

15    right beside him on the tracks?

16              A.  Yes.

17              Q.  I guess -- are you saying that they

18    should have -- you can't really take him up

19    a hillside then is what I am saying.  I am

20    not quite understanding what you want them

21    to do if you don't -- can't take him across

22    the tracks and there is a hillside right

23    there, I don't -- explain to me again what

24    you would like them to do, what they should
```

Page 136

```
 1    have done, you believe they should have

 2    done?

 3          A.  Well, they should not have drug him

 4    the way they did.  That's the first thing.

 5    They improperly moved him.

 6          Q.  Right.

 7          A.  They should have used the proper

 8    techniques as they were taught to do in the

 9    police academy.  And as Officer Peterson had

10    been trained to do in his emergency medical

11    technician training and that as Officer

12    Harvey had been trained in his lifeguard

13    training, they should have moved him

14    according to those procedures and only moved

15    him enough so that he was no longer in

16    danger of the water or the railroad tracks.

17    And that could have been -- they could have

18    moved him back up onto the surface of the

19    roadway.  They could have blocked the road

20    with their vehicles, left him on the asphalt

21    of the road.  That was closer.  But again,

22    you know, drag him across the rough terrain

23    and across the railroad tracks, that was

24    inappropriate.
```

Page 137

```
 1          Q.  Do you agree that putting him on
 2    the roadway would have been dangerous?
 3          A.  I'm sorry.  Say again.
 4          Q.  Would you agree that putting him on
 5    the roadway would be dangerous?
 6          A.  No.  They would be able to block it
 7    with their vehicles.
 8          Q.  What information or evidence do you
 9    believe that there is that the officers knew
10    when they were carrying the plaintiff across
11    the railroad tracks that the plaintiff was
12    paralyzed or that this was dangerous?
13                MR. DI TRAPANO:  And I want to
14    continue to object to the form of the
15    question when you mischaracterize the
16    testimony or the reality of the fact that he
17    was carried across the railroad tracks
18    because he was never carried across the
19    tracks.  He was drug across the tracks by
20    the wrists.
21                But you can answer the question.
22                You can keep characterizing it like
23    that.  I am not going to object again.  But
24    I want a continued objection to, you know,
```

Page 138

1    the way that you are narrating what

2    happened.

3              MR. RUGGIER:  I will be glad to

4    repeat you a continuing objection to it.

5         A.  Can you repeat your question,

6    please.

7         Q.  I'm not sure I can.  Maybe the

8    court reporter can.  That might be better.

9              (The preceding question was read

10   back by the court reporter.)

11        A.  At that point, they wouldn't have

12   known he was paralyzed, but they would have

13   known that it was an improper movement

14   through the training they received both in

15   the police academy, through the emergency

16   medical technician course and through the

17   lifeguard training they both received.

18   Because knowing that somebody has been

19   ejected from a motorcycle, traveled several

20   feet off the roadway, impacted, you know,

21   the ground and in water environment, they

22   should have known that the likelihood of

23   cervical spinal injury just like with any

24   motorcycle crash, officers are taught that

Page 139

1    the likelihood of cervical spinal injury is

2    there and they should not move the vehicle

3    -- the victims unless it was absolutely

4    necessary for the preservation of life.

5    Otherwise, they need to be immobilized as

6    they are found.

7         Q.  Do you agree with me that at the

8    time the plaintiffs were carrying the -- I'm

9    sorry.  Scratch that.

10            Let's see.  So your issue is how

11   they carried the plaintiff across the

12   railroad tracks?

13        A.  How they drug him -- yeah.  I have

14   a problem with how they drug him across the

15   railroad tracks.  That's the first problem.

16   But we will get to the other problems as we

17   move along.

18        Q.  I hope so.

19            Do you agree with me that the

20   police officers would not have known that

21   the plaintiff was paralyzed at the time when

22   they carried him across the tracks?

23        A.  My belief is he was not paralyzed

24   until after Patrolman Harvey stomped him on

Page 140

```
 1   the head and rolled him over onto his

 2   stomach and handcuffed him while Corporal

 3   Peterson was away calling for EMS.  At that

 4   point is when Mr. Means told Corporal

 5   Peterson when he returned that he could no

 6   longer feel his legs.

 7           But before that, he felt like he

 8   could stand up and didn't have any issues

 9   with his lower extremities.  But then after

10   Harvey stomped him on the head, rolled him

11   over, handcuffed him, again, in

12   contradiction to the training that they

13   received about potential cervical spinal

14   injuries and motor vehicle crashes that he

15   conducted this.  And at that point, he

16   notified Corporal Peterson that he could no

17   longer feel his legs.  So it is that point

18   again based on testimony that I believe that

19   the immobilization or the paralysis

20   occurred.  But again, you know, that's up to

21   the doctors and people -- but as a police

22   procedure expert in knowing that they are

23   not supposed to move injured people that

24   way, that is a likely cause.
```

Page 141

1      Q.  What is your understanding of the

2  cause of the paralysis?

3      A.  I believe that his spinal cord was

4  injured during the crash and that it was

5  exacerbated by the -- Officer Harvey turning

6  him over to handcuff him.  So he moved him

7  from a supine position to a prone position.

8  He didn't place his hands behind his back.

9  And all that time, that is going to cause

10  his head to move back and forth and twist.

11  And I believe that's what exacerbated the

12  spinal cord injury.

13      Q.  Was the -- what was the specific

14  act of the police officers that is your

15  understanding that caused the plaintiff to

16  be paralyzed?

17      A.  Like I said, two potentials would

18  be one stomping on his head which would be

19  excessive force and unreasonable.  And then

20  turning him over from a supine position to a

21  prone position to facilitate handcuffing him

22  behind his back.  Again, that would have

23  caused unnecessary movement of the cervical

24  spine.

Page 142

1           Q.  And we both agree that you don't

2     have any real medical background to

3     determine what --

4           A.  I have 30 years as an emergency

5     medical technician and over 15 years as an

6     instructor.  But of course without having

7     the advantage of medical equipment, I

8     wouldn't be able to tell.  But again, you're

9     asking my opinion about what was the

10    mechanism of injury.  And I have given you

11    that opinion.  That a motor vehicle crash is

12    well documented to cause cervical spinal

13    injuries.  And that a motorcycle crash

14    involving the ejection of a driver and

15    landing in a ditch, then being drug across

16    railroad tracks, stomped on the head and

17    flipped over would all be things that would

18    exacerbate the mechanism of injury.

19          Q.  And to be clear, it is your

20    understanding that there was two acts which

21    may have caused paralysis, and that would be

22    flipping him over and stomping on the

23    helmet?

24          A.  And I would say -- I wouldn't

Page 143

```
 1   negate the fact of being drug across the

 2   railroad tracks inappropriately.  We moved

 3   in that manner.  It could have also caused

 4   injury.  But Mr. Means stated he did not

 5   feel that he had lost the use of his legs

 6   until after Patrolman Harvey had stomped on

 7   his head and flipped him over and handcuffed

 8   him.  And at that point, he notified

 9   Corporal Patterson when he returned that he

10   couldn't feel his legs anymore.  So those

11   were the two incidents that occurred just

12   prior to that.

13              MR. DI TRAPANO:  Did you say

14   that was Peterson's testimony?  I got lost

15   for a second.

16              MR. RUGGIER:  I don't know.

17      Q.  Have you spoken to any medical

18   doctors who told you what the cause of the

19   paralysis was in this case?

20      A.  No.  No.  I have not talked to

21   anybody.

22      Q.  And do you agree with me that the

23   first time any officer heard that the

24   plaintiff could not feel his legs was when
```

ion 89-18   Filed 07/08/21   Page 145 of 192 PageID #: 1481

Page 144

1   the plaintiff told Officer Peterson after he

2   was handcuffed that he could not feel his

3   legs?

4           A.  That's my recollection, yes.

5           Q.  Okay.  Is there a standard by which

6   officers are supposed to pick up individuals

7   after they are arrested if they are on the

8   ground?

9           A.  It is all going to be

10  circumstantial.  In this situation, based on

11  the mechanism of injury, the potential for

12  injury, yes, they are taught not to move

13  them the way they did.

14          Q.  Well, but if they don't know that

15  he is paralyzed or hurt, why are the

16  officers supposed to treat him like he is

17  paralyzed or hurt?

18          A.  Because they are aware of the

19  mechanism of injury.  They saw him wreck his

20  motorcycle and fall into a ditch.  And

21  again, in the 40-hour first responder

22  training, all of the officers -- and this

23  training is required by Department of

24  Transportation for any state that gets

Page 145

```
 1    federal funds.  Though it is part of their
 2    mandated curriculum in the training academy.
 3    And to assume that anybody that has been in
 4    a motor vehicle crash is going to suffer
 5    from cervical spinal injuries because they
 6    are not able to control their head.  And
 7    especially if there is any visible injury.
 8            But in this case, he is wearing a
 9    helmet.  There is no visible head injuries.
10    But the likelihood of him suffering those
11    type of injuries is prevalent.  And those
12    officers and any reasonable officer would
13    know not to move him in a manner they did.
14        Q.  Do you agree though that he had to
15    be moved?  You just disagree with how he was
16    moved?
17        A.  I think he should have been moved
18    out of the water.  But where he was moved
19    to, how he was moved were both
20    inappropriate.  There is nothing that would
21    have stopped them from simply basically
22    putting him in the fireman drag position and
23    leaving him in the water until EMS comes.
24    They could have stood there in the water
```

Page 146

1  supporting his head and neck so he didn't

2  feel like he was going to drawn.  And that

3  would have probably been the safest thing to

4  do.

5       Q.  Do you agree with me that moving

6  the plaintiff after the accident was not the

7  use of force?

8       A.  It wasn't intended to be a use of

9  force.  It was just an inappropriate way to

10  do it.  And the manner in which they did was

11  inappropriate.

12      Q.  The stomp on the helmet is pretty

13  clearly excessive force if that's what

14  occurred, do you agree?

15      A.  I do.

16      Q.  And if he did not stomp on the

17  helmet, then it is not an excessive use of

18  force, do you agree?

19      A.  If it didn't occur.  But there is

20  video that has been enhanced and is very

21  prevalent that it was occurring without

22  justification of any sort.

23      Q.  Do you disagree with Officer

24  Harvey's testimony in regard to what he said

Page 147

1    actually occurred when he attempted to step

2    over top of the plaintiff's helmet?

3         A.  Again, that will be up to the jury

4    and the judge to determine if he is telling

5    the truth or not.  But again, they are going

6    to watch the video and make up their own

7    mind.

8         Q.  When you watched that video, do you

9    believe that you see Officer Harvey step or

10   stomp onto the helmet of the plaintiff?

11        A.  My opinion is from based on both

12   the raw video and the enhanced video is that

13   it was an intentional use of force by

14   stomping on the head, which there is no

15   justification.  No officer is ever taught to

16   stomp on anybody's head for any reason.  So

17   there is just no plausible excuse for doing

18   so.

19        Q.  Have you spoken to any of

20   plaintiff's other experts in regard to --

21   any of the other plaintiff's experts at all

22   actually?

23        A.  No.

24        Q.  When you viewed that video, how

Page 148

```
1    close do you believe that Nunley and

2    Chandler are?  That's the name of the two

3    girls in the car.

4         A.  Twenty-five to 30 feet.

5         Q.  Okay.  Do you agree with me that

6    you can't really see where Officer Harvey's

7    foot lands when he attempts to step over top

8    of the plaintiff's helmet?

9              MR. DI TRAPANO:  Object to the

10   form.

11        A.  I could see that the head moves

12   when he stomps on it.  So you cannot exactly

13   see where his foot contacted his head.  But

14   you can tell by his body movement and

15   Harvey's actions that he stomped on his

16   head.

17        Q.  Do you agree with me that the

18   plaintiff was wearing a helmet?

19        A.  I agree.

20        Q.  And do you agree with me that it

21   would be inaccurate to say that Officer

22   Harvey stomped on the plaintiff's head

23   because in fact the plaintiff was wearing a

24   helmet?
```

Page 149

1          A.  I'm sorry.

2                    MR. DI TRAPANO:  I'm going to

3     object to the form because that's a

4     distinction without a difference.

5              But you can answer the question.

6          A.  Can you rephrase that?

7          Q.  Maybe the court reporter can repeat

8     the question.

9                    (The preceding question was read

10    back by the court reporter.)

11         A.  So you are asking he stomped him on

12    the head but he was wearing a helmet, is

13    that what you are getting at?

14         Q.  Yeah.  I am saying, is it your

15    testimony that the stomp on the head is

16    false and inaccurate because he was wearing

17    a helmet?

18         A.  No.  His head was in the helmet and

19    that it was excessive force.  And if I was

20    the chief of police, he would have been

21    terminated that day.  When that video was

22    brought to my attention, he would have been

23    terminated and possibly criminally charged.

24         Q.  Do you agree with me that Officer

Page 150

```
 1    Harvey's foot -- even if what occurred as
 2    you stated it occurred, that Officer
 3    Harvey's foot never actually came into
 4    contact with the plaintiff's head?
 5              MR. DI TRAPANO:  Object to the
 6    form.
 7         A.  It came into contact with -- it
 8    came in contact with the helmet that he was
 9    wearing on his head.  So it would have still
10    transferred energy into his head.  It still
11    would have done damage to his neck and
12    spine.  And it was unreasonable and
13    excessive and criminal in nature.
14         Q.  Fair enough.
15              And you are aware that Officer
16    Harvey was never prosecuted for this?
17         A.  No.  But hopefully the U.S.
18    attorney will take a re-look at it.
19         Q.  Are you aware that they looked at
20    it once and decided not to prosecute?
21         A.  They decided not to property.  But
22    that doesn't mean it didn't exist.
23         Q.  It doesn't mean it doesn't exist?
24         A.  And the videotape wasn't in place
```

Page 151

1    at that point.  Or the enhanced video and

2    some more testimony.  So there is actually

3    more evidence today to re-look at it.

4          Q.  Yeah.  It would seemingly indicate

5    though that the fact that they didn't

6    prosecute -- because this would be a

7    prosecutable offense if Officer Harvey

8    actually stomped on the plaintiff's head --

9          A.  I agree.

10          Q.  -- I would agree with that.

11          A.  Yeah.

12          Q.  And we have talked about the

13    alleged stomp on the head or on the helmet a

14    lot in this case, but I would ask you, did

15    you look and see where Officer Harvey --

16    where were Officer Harvey's hands at the

17    time of the alleged stomp?

18          A.  I don't recall.

19          Q.  Do you remember that he was

20    actually handcuffing the plaintiff, so he

21    was kind of bent over the plaintiff?  Does

22    that make any sense to you?

23          A.  No.  My recollection was he did the

24    head stomp, and then he moved into a

1   handcuffing position.

2         Q.  Do you recall that Officer Harvey

3   was actually leaned over the plaintiff when

4   the alleged stomp occurred?

5         A.  No.  That's not my recollection.

6         Q.  Would you agree with me that if you

7   are going to stomp on someone's helmet who

8   is laying there, the best position to do so

9   would not be bent over reaching for their

10  handcuffs on their -- I guess their back,

11  lower back?

12        A.  Well, any reason to do it or doing

13  so would be inappropriate.  So it doesn't

14  matter what attitude is.  I mean, I am sure

15  there would be he could have jumped up and

16  down and done a better job.  But instead, he

17  stomped on his head.

18        Q.  Do you agree with me that a normal

19  way to stomp on somebody's head would be to

20  stand up and do it?

21        A.  Again, everybody has got different

22  tactics and their point of balance is

23  different.  So the fact is he did it, and it

24  was inappropriate.

1        Q.  Well, you are stating that as a

2    fact, but that's actually a disputed fact.

3        A.  Right.  I have got a video that --

4    you know, again, it could be disputed.  But

5    we will let the jury decide.

6        Q.  Yeah.  Do you agree with me that

7    Officer Harvey disputes that?

8        A.  I'm sorry.  What?

9        Q.  Do you agree with me that Officer

10   -- that Officer Harvey disputes it?

11       A.  Yes.

12       Q.  Okay.  Have you ever been sued?

13       A.  I have been named in a suit as a

14   law enforcement officer, yes.

15       Q.  How often?  How many times?

16       A.  Twice.

17       Q.  And when?

18       A.  One was as a Wake County Deputy

19   Sheriff probably 1993.  And then one was as

20   the chief of police for Bladenboro Police

21   Department.  You know, just named in the

22   action.

23            But the first action in 1993 was

24   dismissed.  I filed a counterclaim of

Page 154

1    assault.  And plaintiffs dismissed.  And

2    then in the case in Bladenboro, I was found

3    not to have -- that I committed -- that I

4    had adequate policies and supervision in

5    place, and I was actually dismissed from the

6    lawsuit.

7           Q.  Case number one, was there a

8    settlement of any kind?

9           A.  No.  None.

10          Q.  Case number -- were you voluntarily

11   dismissed by the plaintiff, is that what you

12   were found?

13          A.  For number one or two?

14          Q.  One.

15          A.  Number one, they dismissed their

16   case.  When I counter-sued them for

17   assault, they dismissed the case and I

18   dismissed my action.

19          Q.  What was the name of the plaintiff?

20          A.  Honestly, I don't remember.  It has

21   been 20 years ago.

22          Q.  Case number two, what was the final

23   -- what was the result of that case?

24          A.  I was removed from the lawsuit.

Page 155

1    And the town ended up paying a settlement of

2    $80,000.

3          Q.   Okay.  So you were dismissed from

4    the suit, but the city or town paid 80,000

5    bucks?

6          A.   Yes.

7          Q.   What was -- do you remember the

8    name of the case?

9          A.   No, sir.

10         Q.   What was the allegation against

11   you?

12         A.   That I failed to properly supervise

13   and manage the officers.

14         Q.   And what was the allegation against

15   the officers?

16         A.   Excessive use of force.

17         Q.   Okay.  What were the names of the

18   officers?

19         A.   I believe it was Officer Beret

20   (phonetic) was a full-time officer.  And I

21   don't remember the reserve officer's name.

22   He was an American-Indian.  I don't

23   remember.  He had a very common American-

24   Indian name, but I don't recall it off the

1   top of my head.

2          Q.  And this was at -- I'm sorry.  This

3   was at the Wake County Sheriff's Department?

4          A.  No.  That was Bladenboro Police

5   Department in Bladenboro -- in Bladen, North

6   Carolina.

7          Q.  Were you chief of police?

8          A.  Yes.

9          Q.  Okay.  Let's see.  How did you

10  prepare for this deposition?

11         A.  I reviewed, y report.

12         Q.  Anything else?

13         A.  I spoke with Plaintiff's counsel

14  before the deposition began this morning.

15         Q.  Okay.  And which lawyer?

16         A.  I believe both.

17         Q.  Okay.  And what did they tell you?

18         A.  Just a little bit about you and how

19  your questioning had been.  So what to

20  anticipate.

21         Q.  Well, I definitely don't want to

22  know what they said about me.

23         A.  It was very complimentary.

24         Q.  Excellent.

Page 157

 1              Did they provide you with any

 2    information or anything of that like nature?

 3         A.   No.   They were going to send me a

 4    deposition from the highway patrolman.  But

 5    I didn't receive it by the time we started.

 6    It was something I hadn't been previously

 7    provided with.

 8              MR. RUGGIER:  All right.  Bear

 9    with me.  I don't think I have any further

10    questions.

11              THE WITNESS:  How did you want

12    to handle payment for the deposition?

13              MR. RUGGIER:  I don't know.

14    Let's see if they have any other questions.

15    Do you guys have any questions, Dante?

16              MR. DI TRAPANO:  I just want to

17    ask you a couple of questions, Mr. Taylor.

18    And I will arrange with Duane's office to

19    make sure that you get paid.  Other than the

20    nice things that I said about him and his

21    approach to depositions, I also would say

22    that he pays to the witnesses.  So, you

23    know, you don't have anything to worry

24    about.

Page 158

1                    THE WITNESS:  I am sure I don't.

2                    MR. RUGGIER:  We will pay it.

3                    EXAMINATION

4    BY MR. DI TRAPANO:

5         Q.  The only questions that I have --

6    the first question is, you have given a lot

7    of opinions here today and gave a lot of

8    opinions in your report.  And I just wanted

9    to get on the record that all of those

10   opinions were to a reasonable degree of

11   probability within your profession; is that

12   correct?

13        A.  Yes, sir, they are.  Based on my

14   training, experience and education.

15        Q.  Okay.  And then the other question

16   that I had was that it is important for

17   police officers to tell the truth at all

18   times; isn't that correct?

19        A.  Yes, sir.  It is imperative for our

20   justice system to work properly.

21        Q.  And it is even -- there is even a

22   heightened, you know, importance of that

23   when somebody is sworn under oath in a

24   deposition; isn't that correct?

Elite Court Reporting, LLC
ROY TAYLOR, PH.D., ROUGH DRAFT, 06/23/2021

Page 159

1          A.   Absolutely.

2          Q.   Okay.  And then if somebody was

3   actually sworn in at a federal trial sitting

4   before a federal judge and they have sworn

5   to tell the truth, it would be important for

6   that officer to tell the truth so help him

7   God, wouldn't that be true?

8          A.   Absolutely.  For every witness.

9          Q.   And if they didn't tell the truth,

10  that would be perjury, wouldn't it?

11         A.   Yes, sir, it would.

12         Q.   And if an officer committed perjury

13  in the face of overwhelming video evidence

14  and eyewitness testimony, that would be a

15  crime that would potentially be prosecuted,

16  correct?

17         A.   In my opinion, yes, sir.

18              MR. DI TRAPANO:  Those are all

19  of the questions that I have is.

20              THE WITNESS:  Thank you, sir.

21              MR. RUGGIER:  I just have a

22  couple more.

23                   RE-EXAMINATION

24  BY MR. RUGGIER:

1        Q.  It is very important for the

2    plaintiff who is suing the police officers

3    to tell the truth and testify truthfully; do

4    you agree with that?

5        A.  Absolutely.

6        Q.  And do you agree that it is very

7    important for the plaintiff to tell the

8    truth because if the plaintiff is not

9    telling the truth, they are committing

10   perjury?

11       A.  Yes, sir.

12       Q.  And you would agree with me that

13   perjury is a crime and to perjure yourself

14   in front of a federal court in an attempt to

15   get money is a criminal act that is

16   extremely offensive and prosecutable?

17       A.  In my opinion, yes, sir.

18            MR. RUGGIER:  I don't have any

19   further questions.

20            THE WITNESS:  Thank you, sir.

21            MR. DI TRAPANO:  He will -- do

22   you want to read the deposition and --

23            THE WITNESS:  I will waive and

24   sign -- or waive signature.

Page 161

```
 1                 MR. RUGGIER:  So as far as

 2   getting you paid, we owe you $1500 for the

 3   deposition; is that clear?

 4                 THE WITNESS:  Yes, sir.

 5                 MR. RUGGIER:  Can you send me

 6   your -- can you e-mail me your -- through

 7   Dante or however you want to do it, but

 8   e-mail us your -- we will need whatever it

 9   is -- you know, who we make the check out to

10   and your -- usually we need your --

11                 THE WITNESS:  W-9.

12                 MR. RUGGIER:  -- yeah, W-9.

13                 THE WITNESS:  Yes, sir.  I will

14   be glad to -- I will forward it to the

15   plaintiff's attorneys, and they can move it

16   over to you if that's fine.

17                 MR. RUGGIER:  Sounds good.  That

18   will work.  Thank you, sir.

19                 THE WITNESS:  Yes, sir.  Nice

20   meeting you all.

21                 (Deposition concluded at 1:15

22   p.m.)

23                 * * * * * * * *

24
```

Page 162

**CERTIFICATE**

1

2

3        I, Tara Arthur, Certified Stenotype

4   Reporter and Notary Public, do hereby

5   certify that the foregoing deposition of the

6   above-named witness, was duly taken by me in

7   machine shorthand, and that the same were

8   accurately written out in full and reduced

9   to computer transcription.

10        I further certify that I am neither

11   attorney or counsel for, nor related to or

12   employed by any of the parties to the action

13   in which this deposition is taken; and

14   furthermore, that I am not a relative or

15   employee of any attorney or counsel employed

16   by the parties hereto or financially

17   interested in the action.

18        My commission expires April 16, 2022.

19

20   _____

21   Tara Arthur
     Certified Court Reporter/Notary Public

22

23

24

1

## $

**$1500** 37:2,9, 11 161:2

**$250** 36:14

**$2500** 37:5

**$5,000** 36:15, 22,24 37:9

**$80,000** 155:2

## 1

**1.2** 19:6

**10** 25:3 82:8 115:8

**109** 19:9 21:3 24:15

**11** 53:14

**119** 68:22 75:6,12,16 76:10 77:9

**12** 115:8

**12:00** 105:21

**13** 13:12 15:21

**14** 57:9,10 84:16 86:3

**15** 33:4,5 82:17 106:14 142:5

**150,000** 41:12

**1500** 37:23

**18** 51:10

**1871** 22:17

**19** 75:2 90:23 91:3 92:15 130:7

**19-mile** 57:3 123:6,22

**1979** 8:5 10:11

**1980** 7:22,23 27:19

**1982** 8:16

**1983** 10:12

**1984** 9:11

**1986** 9:20 10:9,14

**1990** 10:18 27:11,23 28:1

**1993** 153:19, 23

**1994** 27:11,24 28:1

**1996** 11:11

**1997** 7:3

**1998** 12:4,5

**1999** 15:16

**1:15** 161:21

## 2

**2.8** 17:22 20:11

**20** 33:4,5 154:21

**200,000** 41:9, 21

**2000** 16:3

**2002** 17:1,11

**2003** 7:6

**2005** 16:5

**2014** 18:18,21

**2017** 17:19 20:7

**2019** 41:11

**2020** 6:19 7:9, 11,13,15 36:5 41:7,9,13

**2021** 27:20 41:17 53:14

**24** 15:9

**25** 98:5 115:1

**25-mile-an-** 84:20

**25-mile-an-hour** 82:19 84:1 87:12

**25-pound** 129:12

**26** 32:12

**27615** 5:17

## 3

**30** 27:17 28:1 62:9,12 142:4 148:4

**300,000** 42:1

**32** 9:6

## 4

**40** 21:8 27:13, 16 32:11 33:4 42:5 59:8 84:5

**40-hour** 131:15 144:21

**41** 27:21 51:11

**43** 27:13

## 5

**5,000** 6:22

**50** 98:5,6

**50/50** 42:6

**53** 18:19 82:18 83:24 84:20

## 6

**60** 41:5 42:5 97:5

## 7

**7** 15:9

**74E** 22:15

**79** 8:6

## 8

**80,000** 155:4

## 82

**82** 8:6

**84** 9:15

**88** 19:24

**8:00** 56:5,14, 18

## 9

**919-697-1995** 5:6

**9650** 5:15

**97** 11:11

**98** 14:2

**99** 14:2,10,23

## A

**a.m.** 56:5,14, 18

**abilities** 98:4

**ability** 25:17 34:22

**abrupt** 118:21

**absolutely** 133:11 139:3 159:1,8 160:5

**academy** 10:10,12,14 70:13 131:17 136:9 138:15 145:2

**accelerate** 34:13

**accept** 112:21

**accepted** 67:19 112:19

**access** 88:3, 24

**accident** 50:9,13 51:17 104:20 108:3, 16 109:15 110:1,14 119:15 123:8 146:6

**account** 51:20 52:3,7, 13,17,21 53:1,5,9,13 54:19,22 56:24 57:2 117:5

**accounting** 108:10

**acknowledged** 83:11

**act** 91:24 130:12 141:14 160:15

**acted** 65:21

**action** 28:21 81:6 153:22, 23 154:18

**actions** 52:12 80:21 148:15

**activate** 72:3

**activated** 71:24 86:14

**active** 24:9, 15

**actively** 125:2

**activity** 45:21 47:12 73:2

**acts** 142:20

**actual** 22:4

**addict** 53:10

**adding** 48:20 129:22

**addition** 131:15

**additional** 24:8 30:17 37:2

**address** 5:14 76:15

**adequate** 55:18 154:4

**adequately** 84:11

**administration** 46:15

**admitted** 42:12 53:10

**advantage** 142:7

**advisable** 123:15

**affairs** 13:22

**affect** 53:24

**afford** 69:23

**afraid** 91:7 92:22

**aftermath** 110:15

**agencies** 20:17 32:14 48:6

**agency** 25:24 102:22

**aggressive** 128:12

**agitated** 54:1, 2,4,5

**agree** 12:19 13:6,14 33:9, 14 34:3 35:23 54:11,14 56:12 57:13, 19 58:20 59:1,2,5 60:2, 3 61:23 63:12 64:2 65:9 66:19,23 67:3 70:5,8 71:2 72:15 73:10, 19,24 74:23 75:4,9 76:4, 16,22,23 77:11,15,20 80:9 82:10, 14,20,24 83:6 86:24 87:20 88:5,9,14 89:3,10,14,22 90:5,10 93:2, 24 94:4,9,17, 22 95:4,9,14, 19 96:1,15,21 98:18,23 99:4,9 100:18 101:16 106:18,24 107:4 108:1 109:2 111:7 113:17

115:12 116:22 117:22,23 121:14,24 127:16 128:14,18 130:19 137:1, 4 139:7,19 142:1 143:22 145:14 146:5, 14,18 148:5, 17,19,20 149:24 151:9, 10 152:6,18 153:6,9 160:4,6,12

**ahead** 67:18 92:19 97:24 118:19 119:2 130:18

**Air** 8:5,6,10 10:11

**airbags** 35:16

**airway** 121:2, 23 124:19

**allegation** 155:10,14

**allegations** 112:17

**allege** 48:22

**alleged** 151:13,17 152:4

**allowed** 91:9

**allude** 78:13

**alluding** 78:22

**alternating** 96:7

**altogether** 19:9 20:9

**ambulance** 131:11

**American-** 155:23

**American-indian** 155:22

**Amherst** 7:22

**amount** 56:23

**amphetamines** 52:22 53:20

**analysis** 47:12

**answers** 82:2

**anticipate** 156:20

**anybody's** 147:16

**anymore** 19:14 102:17 143:10

**anytime** 45:6 86:12

**apologize** 30:21 31:16

**appears** 45:6 65:16

**appendix** 67:12,15 110:9 116:18

**apply** 9:13

**approach**

157:21

**approached** 107:15

**approaching** 119:14

**approval** 109:8

**approximatel y** 11:14 27:13 115:8

**area** 21:24 22:1 55:3 58:7,8 134:10

**areas** 45:19

**armed** 79:15

**armpits** 132:9

**arms** 120:15 130:16 134:7

**Army** 23:8, 19,21 24:4,13

**arrange** 157:18

**arrest** 25:9 96:23 109:15 121:11,15 122:1,12,14, 16,22,23 123:1,4,10, 12,14,16 124:1,4,6,7, 10 125:2,12, 20,23 126:13, 16 127:1

**arrested** 25:2,11 26:6 123:21 124:5, 9 126:9,12,22

**127:6 144:7**

**articles** 28:14,16 29:4 32:20

**asphalt** 136:20

**assault** 154:1,17

**assert** 68:17

**asserting** 79:23

**assessing** 54:18

**assign** 91:9

**assigned** 117:17

**assistant** 4:15 36:8

**associate's** 6:5

**associations** 21:9

**assume** 77:14 145:3

**assumed** 67:10

**assuming** 37:17

**assured** 118:24

**attempt** 79:2, 7 104:23 123:7,22 125:19 160:14

**attempted** 123:14 126:16 130:6 147:1

**attempting** 54:15 89:4 105:18 112:14 122:24 123:9, 21 125:19 126:1,2,15 127:11

**attempts** 148:7

**attended** 10:6 30:20 49:12

**attention** 149:22

**attitude** 132:13 152:14

**attorney** 18:7 25:21 150:18

**attorneys** 36:10,18 44:8 110:5 161:15

**audible** 76:3 85:7,14,19,24 86:13,18,22

**audio** 5:2 74:21

**authority** 25:22 65:14

**automobile** 35:1

**average** 12:21 13:16

**avoid** 35:5

**awards** 46:4

**aware** 82:6 89:19 90:16 144:18 150:15,19

**axis** 134:10

**B**

**B-L-A-D-E-N-B-O-R-O** 11:4

**B-R-O-U-N-L-A-N-D** 93:22

**bachelor's** 6:3 7:1

**back** 24:21 42:21 57:1 61:8,15 66:1, 15 67:20 81:19 92:5,8 106:9 111:21 114:15 118:22 119:20 120:11 128:23 129:5 136:18 138:10 141:8, 10,22 149:10 152:10,11

**backboard** 134:13

**background** 5:21 86:4 142:2

**backpack** 112:15 113:15,16,24

114:3,9,11

**backpacks** 113:5,10,12, 19

**bad** 9:2

**balance** 120:10,21 128:8 152:22

**ball** 81:19

**bank** 92:6

**barriers** 46:12

**base** 101:9 108:19 114:19 115:21

**based** 45:4 47:11 63:5 67:23 72:13 78:16 105:4 115:22,24 122:13 140:18 144:10 147:11 158:13

**basic** 10:16 16:22 30:9,14 31:20 70:13

**basically** 134:7 145:21

**Bear** 133:13 157:8

**bears** 107:4, 21

**Beckley** 49:15,18,20,

22 50:2

**bed** 89:20 90:1,8,14 94:23

**began** 156:14

**beginning** 76:20

**behavior** 72:17,19 73:5

**belief** 55:20 65:8 85:18 139:23

**believed** 83:18

**bent** 151:21 152:9

**benzodiazepines** 53:6

**Beret** 155:19

**big** 12:13,14, 15

**bike** 62:1 71:3,4 75:5 76:17 94:1,6 95:5,16 96:2

**bit** 44:11 47:1 67:8 105:3 106:15 110:23 156:18

**black** 57:15, 24 58:5,16,22 59:4,15,20 60:16 69:10, 15,17

**Bladen** 6:5 156:5

**Bladenboro** 11:1,3,13,15 12:13 153:20 154:2 156:4,5

**blast** 86:9

**BLET** 30:14

**block** 137:6

**blocked** 119:6 136:19

**blue** 18:11, 14,23 19:10, 11,15,17,18 20:7,21 21:6 23:5 24:20 78:14 125:14 126:10

**bodily** 65:23

**body** 29:9 120:16 128:3 132:14 133:4 134:10 148:14

**bought** 18:18

**Boulevard** 75:16

**branch** 20:2

**brands** 60:22 71:21

**break** 34:23 68:18 105:24 106:2,6,9,16

**breathe** 128:9

**bringing** 132:18

**brings** 119:19

**broken** 44:13

45:17

**brought** 81:6 118:8 149:22

**Brounland** 93:21 95:9, 11,17,22 96:9

**Brown** 40:14 48:17,24

**bucks** 155:5

**budget** 48:13, 21

**bumper** 92:2, 8

**business** 23:1 40:17 43:14,19

**buy** 19:5

**C**

**C-A-P-I-T-O-L** 17:8

**C-A-R-Y** 9:21

**cable** 67:21 104:15

**cables** 68:19

**calculator** 27:18

**calf** 120:5

**call** 5:1 16:7 24:22 25:6 31:7 40:22 41:1

**called** 4:2 17:6 24:14 42:15 134:8

**calling** 124:24 140:3

**calls** 24:23,24

**Calwell** 36:10 43:7 44:2,4

**cameras** 29:9

**candidate** 16:20

**canisters** 114:2

**capacity** 23:17 24:1

**Capitol** 17:1, 6 18:4 19:11, 14 20:1,8,21 23:4 24:19 25:15,18,19

**caption** 38:14

**car** 26:14,21 35:13,14,24 91:15 92:8 108:18 148:3

**care** 15:24 17:20 45:7

**cared** 45:19

**career** 33:3

**Carolina** 5:16 6:2,4,6 7:5 9:21 10:15 11:2,8,21 14:12,16 16:19 17:4 20:19 21:11, 19 22:5,7,14, 20 24:6 25:13 29:15,21 30:2,16

31:18,22 62:8 78:12 156:6

**carried** 113:4, 9,11 130:23 131:3,21 133:18 137:17,18 139:11,22

**carry** 113:18

**carrying** 132:2 133:14 137:10 139:8

**cars** 45:10,11

**Cary** 9:20

**case** 26:23 32:21 35:19 37:8,15,18,24 38:10,11,17, 21,24 39:2,9, 10,13 40:2,6, 11 43:21 48:18 50:5,19 51:21 54:16 65:19 86:16 107:10 110:18 116:10 117:11,24 118:2,3,5,6, 12 130:5 143:19 145:8 151:14 154:2, 7,10,16,17, 22,23 155:8

**cases** 36:15 37:15 40:23 42:15,23,24 44:6

**catching**

5

81:13

**caught** 48:19 75:17 116:6, 13,23

**caused** 80:14 91:13 92:9 105:16 109:22 118:21 141:15,23 142:21 143:3

**causing** 57:5 103:20

**ceased** 103:6

**cell** 5:2,4

**center** 24:7 25:13

**certified** 30:5, 7

**cervical** 110:21 129:9, 18 130:1 134:4,13 138:23 139:1 140:13 141:23 142:12 145:5

**chances** 34:9

**Chandler** 97:8 148:2

**change** 62:9 86:17 112:11

**characterizati on** 33:21 72:10 97:1 98:1 104:3 121:19

**characterize** 98:9

**characterized** 98:11

**characterizin g** 137:22

**charge** 36:14 81:24

**charged** 81:23 149:23

**charges** 65:2

**Charlotte** 19:24

**chase** 34:15 39:13 85:9

**chased** 26:8, 10

**chasing** 79:21

**check** 37:12 161:9

**checking** 71:14

**Chic-fil-a** 70:16

**chief** 11:1,7, 15,21,22 12:12,24 13:9 14:6,15 15:11 18:6,8,9 19:1 20:16,18,20 25:4,19 32:11 48:18 84:6 149:20 153:20 156:7

**choice** 80:3

**chose** 58:4

**churches** 55:4

**circumspecti on** 70:4

**circumstantia l** 144:10

**citation** 127:7

**cities** 21:20 22:2,4

**city** 12:13 39:11 45:4 92:4 155:4

**city's** 49:2

**civil** 14:22 22:19 117:19 118:3

**claims** 91:11

**class** 29:14 49:7,13

**classes** 29:13 32:8

**clear** 40:1,4 84:17 86:7 118:24 123:2 142:19 161:3

**Cleo** 39:4

**clients** 36:17 43:16

**close** 34:24 42:6 49:16 50:2 91:2 92:16,23 148:1

**closed** 46:18, 22 47:3,6

**closely** 71:17 90:19

**closer** 62:22 136:21

**clothing** 131:6

**clutch** 67:21 68:19 104:15

**co-author** 28:22

**code** 45:3

**coffers** 49:2

**cognizant** 55:14

**College** 6:6

**collide** 35:16

**colliding** 35:5,18

**colonel** 23:7, 18,20,23 24:3

**colors** 69:20

**column** 134:14

**combined** 19:12

**command** 83:12

**commanding** 84:6

**commands** 128:2

**commissione d** 16:21

**commit** 79:19

**committed** 60:1 79:10,21 154:3 159:12

**committing** 74:1 76:6 77:22 78:1,20 80:1 83:8 87:21 88:16 90:12 94:11 95:21 99:1 160:9

**common** 58:21 59:2,6, 8 62:4 80:23 100:13 101:10 113:17,21 119:22 155:23

**communities** 21:13,15,17, 21,22

**community** 6:5 44:16 45:14 46:4,5, 8,9,10,13 47:23 81:4,11

**companies** 19:20,23 20:4,9 21:1 22:23

**company** 16:11 17:17 18:10,12,17 19:3 20:15 22:16,24 23:11,14 37:13

**compared** 42:4

6

completed
10:11,13,15
30:23

complexes
15:22

Compliant
23:11

complied
120:8

complimentar
y 156:23

concern
17:14 119:21
120:17

concerned
121:7

concluded
161:21

conduct 45:8
108:11

conducted
23:12 140:15

conference
49:10

conjunction
17:4

conscious
66:10

considerable
56:23

consideration
55:24

considered
74:13

constant
34:17

constantly
72:6

consultant
40:22

contact 34:17
92:5 115:14,
24 116:1
150:4,7,8

contacted
148:13

contend
68:13 117:23

continually
72:15,18

continuance
79:13

continue 27:3
28:10 63:10
64:15 66:10
80:15 100:1,4
101:17
102:20 103:4,
11 105:1,2
137:14

continued
9:13 64:18
79:16 80:4,5
84:15 93:17,
19 96:9 104:5
137:24

continues
79:22 83:13

continuing
28:7 80:3,10
99:19 105:7
138:4

continuous
80:13

continuously
55:17 86:23
100:3 103:19

contract
16:10,12 21:8

contracted
25:23

contradiction
140:12

control 16:12
42:7 116:17
124:13
129:14 145:6

conversation
s 48:20

conviction
81:23

convoluted
61:4

cooperation
46:15

cord 141:3,12

corporal
55:16 66:9
85:3 89:8
91:12,14
92:23 93:8
94:14 108:17
111:20,22
112:18 115:2
131:9 140:2,
4,16 143:9

corporations
22:1

corps 23:8

correct 8:17
17:12 18:6,22

19:4 20:23
21:2,5 23:22
27:10,21
28:18 32:2
43:4 48:17
49:3 57:16
64:7 65:12
74:9 103:13
104:7 111:3
120:1 128:17
134:21
158:12,18,24
159:16

corroboration
93:11

cost 37:2

costs 36:19
37:6

cotton 22:21

Council's
10:14

counsel
38:24 156:13

counter-sued
154:16

counterclaim
153:24

county 10:19
12:6 21:11,24
22:7 26:18
27:8,9 39:4
45:4 153:18
156:3

couple 37:15
51:5 135:1
157:17
159:22

courses

31:14 32:1

court 4:3
81:19 116:3,
20 117:13
138:8,10
149:7,10
160:14

cover 70:2

coverage
15:9

COVID 24:16

cradled 134:6

cradling
132:9

crafted
101:12

crash 91:13
92:3 102:20
103:20
105:16 125:8
138:24 141:4
142:11,13
145:4

crashed
91:16 104:2

crashes
140:14

crazy 113:7

credibility
51:20 91:9

creek 89:20,
24 90:8,14
94:23

crime 47:23
60:1 74:1,5,9,
13 76:6 77:22
78:1,24 79:20

81:2 83:8 87:21 88:16 90:12 94:11 95:21 99:1 159:15 160:13

**crimes** 46:12 78:4

**criminal** 5:22, 24 10:15 45:8,21 47:12 52:4 58:12 65:2 118:2 125:21 150:13 160:15

**criminally** 149:23

**crisis** 6:15 29:1

**cross** 135:3,9

**crossed** 87:13 108:21

**crossing** 50:9,16 105:2

**crosswalk** 35:3

**curriculum** 145:2

**custody** 123:17

**custom** 69:23

**cut** 44:23

**CV** 28:17

**CVR** 60:14

**D**

**Dakota** 92:4

**damage** 150:11

**danger** 57:5 65:18 134:11 136:16

**dangerous** 27:2 28:11 33:12,15,17 34:4,7 35:7 64:15,24 65:17 79:19 86:22 87:18 100:10 127:17,18 130:5 137:2, 5,12

**dangerousne ss** 80:5 81:1, 10 86:20

**Dante** 38:7 44:5 157:15 161:7

**date** 37:8 59:10

**David** 39:9,10

**day** 37:12 56:20 104:13 149:21

**days** 15:9 54:24 62:9,12

**dead** 34:1

**deal** 19:19 20:12

**dealing** 35:20 129:6

**dealt** 53:18

**death** 35:11 48:24

**deaths** 48:5

**decelerate** 34:22

**decide** 100:5 103:22 116:4, 21 127:5 153:5

**decided** 57:23 70:19, 22 86:10 150:20,21

**decision** 66:6,13 71:7 80:13 132:19

**decisions** 66:10

**deep** 120:5,6

**defendant** 42:4,6,10 91:20

**defendants** 50:7

**defendants'** 105:6

**defiance** 65:3,4

**define** 46:24 47:15

**definition** 45:24 46:8 47:8,17

**degree** 5:24 6:2,3,5 7:1,5, 8,10,12 46:21 158:10

**demonstrates** 111:8

**denied** 116:5

**Dent** 39:11

**department** 8:14 9:11,21 10:20 11:9,15 12:7,15,20,22 13:2,7,11,15 15:2 25:14 48:15 89:9 102:21 103:19 107:16 109:7 144:23 153:21 156:3, 5

**department's** 48:13

**departments** 9:3 19:21 22:24

**depends** 78:8 97:19

**deposition** 4:10 37:2,10 38:5 40:7 86:4 156:10, 14 157:4,12 158:24 160:22 161:3, 21

**depositions** 157:21

**depressed** 58:7

**deputy** 12:7, 10 26:18 27:9 153:18

**Describe** 131:19

**detail** 68:7

**determine** 52:1 103:14 109:23 112:22 116:3 124:21 142:3 147:4

**deterrent** 47:9,10

**deterrents** 47:11

**deviated** 87:5

**device** 85:14 86:23

**devices** 30:12 35:15

**di** 36:10 37:21 38:4 39:7,19 75:13 81:20 97:17 105:20 106:8 107:7 108:5 113:6 118:11 122:18 126:4 131:1,23 137:13 143:13 148:9 149:2 150:5 157:16 158:4 159:18 160:21

dictate 62:7

dictates 119:23

die 129:17

differ 103:7

difference 25:24 60:12 61:13,18,20, 22 149:4

difficult 71:22

direct 65:5,15

directing 47:13

direction 81:17 84:7 132:21 133:10

Director 23:10

dirt 88:2,24

disagree 55:2 56:3 58:15,23 145:15 146:23

disastrous 26:22

discharged 8:9

disclosure 39:8

discontinue 32:18 64:16, 20 84:8 85:2 87:17 99:18 100:9,13,24 107:18

discontinued 99:23 101:19 102:23

discontinuing 101:14

discovery 37:1

discussing 26:23

discussion 5:7

disengage 65:16

dismissed 81:24 118:3 153:24 154:1, 5,11,15,17,18 155:3

disorderly 45:8

dispatch 60:24

displaying 76:2

disputed 51:24 75:22 91:17 93:6 115:9,13,18, 19 116:2,18 117:4 153:2,4

disputes 153:7,10

disregard 56:10

disruption 45:1,20

dissertation 6:14 28:23,24 29:1

distance 34:24 35:1 77:9,10 87:10 88:4 93:10 118:24

distant 6:12

distinction 149:4

ditch 35:22 50:18 115:6,8 120:2 129:8 142:15 144:20

diverges 117:7

Dix 14:17,20

DMV 62:10

doctors 140:21 143:18

documented 142:12

dog 8:7 10:5

dogs 80:7

dollars 26:1

Dorothea 14:17,20

doubt 124:2

drag 134:2,8 136:22 145:22

dragging 130:15

draw 120:14

drawn 119:15 146:2

drive 51:4,9, 12 69:4 87:9, 11,22 88:1,7, 12,18,22 89:12,17 96:6 100:1,15 101:7 102:3, 19 103:17 105:19 119:11

driven 50:4 71:20

driver 54:10 92:10 115:9 142:14

driver's 117:14

drivers 31:7

driveway 85:8

driving 26:7 29:15,24 30:19 31:22 68:14 73:7 84:19 93:16 96:22 98:4,9 112:15 117:15

drove 69:14

drown 121:4 133:20,24

drowning 120:24 128:20,21 129:4 134:12

drug 10:3 53:10 131:5 132:4 136:3 137:19 139:13,14 142:15 143:1

drugs 113:4, 11,19 117:9

Duane 37:22 39:7 40:1 81:20 105:20 118:12

Duane's 157:18

duly 4:2

duration 78:16 86:19

duty 24:10,15

### E

E-M-M-O-N-S 96:10

e-mail 161:6, 8

earlier 42:19

early 54:19, 23 55:11 56:4

ears 86:10

easily 54:4

East 6:2 7:5 15:18

economically 58:7

economy 9:2

ecstasy

9

52:18 67:1

**education**
6:20,21 32:22
158:14

**educational**
5:21

**Edward** 22:15

**ejected** 35:21
129:7 138:19

**ejecting**
115:5

**ejection**
142:14

**elements**
78:24

**elevated**
125:15

**emergency**
15:19,24 16:9
24:4,7 31:8
66:8 74:4
76:2 86:13
107:14 112:2,
5 131:10
136:10
138:15 142:4

**Emmons**
95:24 96:3,9,
11 98:21
99:2,6,11
104:17

**employed**
23:16 24:2

**employee**
70:17

**employees**
19:8,9 21:3

**EMS** 134:13
140:3 145:23

**EMT** 9:11

**enable** 101:4
102:16

**encompass**
36:22

**encompasses**
21:9

**encountered**
113:11

**encourage**
45:3

**encouraged**
48:14

**end** 14:2
26:22 86:2
91:10

**endanger**
119:3

**endangered**
55:17

**endangering**
66:11 79:17

**ended** 75:10
77:16 83:1
88:10 90:6
94:5 95:15
98:19 155:1

**ends** 102:1

**energy** 23:12
150:10

**enforcement**
8:7 10:12,17
13:22 17:3
20:15,18

21:12,15
22:22 23:1
25:22 30:9,15
31:20 32:10
44:12 46:6,
11,13 47:24
48:3,8 63:9
99:22 102:18,
22 124:3
153:14

**engage** 63:4,
15 64:12 65:9

**engaged**
86:12

**engagement**
45:15

**engages**
46:10

**engaging**
125:11

**enhanced**
146:20
147:12 151:1

**entered** 8:5
77:6

**enthusiast**
60:15

**entire** 12:11
86:6,14 123:6

**entirety** 68:15
85:20,24

**entry** 16:12

**environment**
138:21

**equipment**
142:7

**errands** 55:8

**escape** 100:1

**estate** 39:3

**Ethically**
28:18

**ethics** 28:19

**evade** 79:2,7
125:19 126:3
130:6

**evidence**
59:6 70:11
99:13,16
100:6 101:20
102:6 122:5
126:5 131:2
137:8 151:3
159:13

**evident** 130:2

**exacerbate**
142:18

**exacerbated**
141:5,11

**examination**
4:5 108:11
158:3

**exceeding**
57:4

**Excellent**
17:23 156:24

**excessive**
84:3,4,22
110:19 116:5
117:12,20
124:15,17
125:6 129:2
130:10,13
141:19

146:13,17
149:19
150:13
155:16

**excuse**
147:17

**exist** 150:22,
23

**existence**
18:19 22:18

**exists** 79:14

**exiting** 119:9

**expect** 85:10

**expenses**
37:5

**experience**
32:23 98:3,8
113:3 158:14

**experienced**
70:6,9

**expert** 23:6
32:3,7,24
40:6,22 41:4,
7 42:13 43:2,
12,17 84:5
91:8 118:9
133:13
140:22

**experts**
43:17,19
147:20,21

**expired** 58:3
60:9 61:16
62:13,15
70:24 117:16

**explain**
133:16

135:23

**explanations**
72:22

**explosive**
30:12

**external**
13:21

**extremely**
160:16

**extremities**
140:9

**eyewitness**
159:14

**F**

**face** 81:5
159:13

**facilitate**
141:21

**facilities** 16:1

**fact** 51:24
70:15 75:22
79:19 85:21
91:17 93:6,12
99:17 100:11
108:20
115:21 116:2,
4 122:6
137:16 143:1
148:23 151:5
152:23 153:2

**factor** 71:6

**factors** 84:22
98:7

**facts** 67:9
112:23 113:1

114:21 115:9
116:18 117:4
128:6

**failed** 64:22
83:13 84:9,10
85:17 89:8
96:7 107:19
155:12

**failing** 55:16
86:22 125:14

**failure** 74:4
78:2,11,14

**fair** 82:4
103:9 104:3
150:14

**fairly** 62:5

**fall** 144:20

**fallen** 66:15

**false** 90:21
149:16

**familiar** 40:15
55:3 60:10,20
74:10,16

**family** 49:17
50:1

**famous** 14:21

**fast** 82:18
98:2,14

**faster** 26:21
34:21

**fault** 57:14,
20,22 66:3,
20,24 67:4
79:24 80:2,
10,21 81:13,
19

**fear** 128:13

**February** 7:9,
11,13 16:3

**federal** 32:15
145:1 159:3,4
160:14

**fee** 36:14
37:10

**feel** 84:13
133:20 140:6,
17 143:5,10,
24 144:2
146:2

**feet** 115:8
121:1 134:2
135:2 138:20
148:4

**felony** 78:13,
18,21 79:2,6,
14,22 80:1,4
81:21 82:3
125:15

**felt** 32:18
71:16 120:24
134:11 140:7

**field** 128:23

**filed** 4:9
153:24

**fill** 15:11

**filmed** 96:23

**final** 154:22

**finally** 103:22

**find** 43:19
69:20

**fine** 161:16

**fines** 48:11,

15

**Fire** 9:10

**firearms**
30:3,4,5

**firefighter**
9:11

**fireman**
145:22

**fireman's**
134:8

**firm** 37:20
38:3,9 40:13
42:20 43:5,7
44:4

**firms** 43:8

**fitness** 30:13,
14

**flagrant**
72:12

**Flanagan**
40:14

**flat** 36:14,20,
21

**flea** 54:15
73:21 74:2
100:21
101:18

**fled** 26:8

**flee** 87:22
103:11 104:5,
23 121:22

**fleeing** 78:5
100:4 102:9
124:6 126:2

**flipped**
142:17 143:7

**flipping**
142:22

**Florida** 15:20

**flowing** 90:4

**fluttering**
121:1

**focus** 117:22
118:7

**focused**
47:24

**folks** 133:14

**Follander**
31:3

**follow** 62:18
65:15 69:1
93:19

**foot** 87:15
148:7,13
150:1,3

**foray** 16:6

**FORBES**
27:22 38:20
39:3,18,24
107:23
115:16

**force** 8:5,6,10
10:4,11
110:20 116:6
117:12,20
127:24 129:2
130:10,13
141:19 146:7,
9,13,18
147:13
149:19
155:16

**forearms**

132:11

**Fork** 77:7,8
82:6,12,22
83:4,9,15
87:1,7,8

**form** 97:23
107:8 108:6
113:7,8
115:17 126:5
131:2,24
137:14
148:10 149:3
150:6

**formal** 6:21

**forming**
51:21 52:4,9,
15,19,23
53:2,7,11,15
54:24

**formulated**
32:13

**Forty** 21:18

**forward**
161:14

**found** 12:1
36:19 59:11
102:10 117:4,
10 139:6
154:2,12

**Fowler** 40:14

**frequent**
72:11

**frequently**
113:12,15

**friend** 67:21
68:1,3 76:13
87:4 94:21

**friend's**
68:11,14,19,
21,23 69:5
76:11 87:2
89:5 94:19,24
99:5 104:14,
17

**front** 39:1
45:13 96:5
160:14

**full** 4:18 5:10
25:21 29:2
39:8 108:9
115:6

**full-** 10:4

**full-time** 9:4,
12,14,22
12:16 13:3
16:23 17:5
155:20

**funds** 145:1

---

**G**

**gain** 46:14
48:7,10
124:13

**garage** 70:17

**gas** 57:15
58:17,22
59:3,15,19
69:9,16

**gave** 40:6
76:14 97:1
110:8 158:7

**gears** 44:11

**general** 22:14
25:21 44:12

47:9

**General's**
18:8

**generally**
35:24 56:14
118:13

**gentleman**
58:8

**girls** 51:16
148:3

**give** 5:4
62:17,21
67:21 100:5,
16 107:9
128:2,4

**giving** 55:18
68:8 85:7

**glad** 138:3
161:14

**goal** 42:2
128:23

**God** 159:7

**good** 28:6
33:20 40:8
64:15 79:12
132:22
161:17

**governance**
47:19

**governor**
14:11 24:7

**Governors**
13:20

**grab** 121:16
122:4 123:3,
7,22

**graduate**
6:17,24 7:20

**graduated**
7:22 8:3

**graduation**
8:4

**grass** 44:23

**gravel** 88:2,
24

**great** 34:11
41:17

**greater** 35:12

**ground** 87:15
138:21 144:8

**group** 43:12,
13 44:1

**groups** 44:21

**Guard** 16:19

**guess** 5:19
25:17 29:23
88:24 89:24
96:11 110:14
112:11
133:17
135:17
152:10

**Guesstimate**
33:3

**guy** 26:6 92:6

**guys** 106:1
157:15

---

**H**

**hallucination
s** 54:7

**handcuff**
141:6

**handcuffed**
140:2,11
143:7 144:2

**handcuffing**
141:21
151:20 152:1

**handcuffs**
152:10

**handle** 22:18
157:12

**handled** 6:11
133:15

**handler** 10:3
12:11

**handling** 40:5

**hands**
119:18,19,20
120:9,11,19
121:12,16
122:2,4 123:8
127:20 132:9
141:8 151:16

**happened**
50:10,16
65:24 85:15
108:10
109:16 138:2

**Harley** 51:5

**Harvey** 4:8
93:23 111:3,8
118:22 121:6
131:13
136:12
139:24
140:10 141:5
143:6 147:9

148:22
150:16 151:7,
15 152:2
153:7,10

**Harvey's** 66:9
111:18,22,24
112:3 146:24
148:6,15
150:1,3
151:16

**hazard** 65:1

**hazardous**
15:23 30:10,
11

**head** 46:1
78:10 120:8,
11,22 124:19
129:12,17,20
132:10 133:1
134:6 140:1,
10 141:10,18
142:16 143:7
145:6,9 146:1
147:14,16
148:11,13,16,
22 149:12,15,
18 150:4,9,10
151:8,13,24
152:17,19
156:1

**headset** 4:22

**healthcare**
14:22

**hear** 4:21
85:5,6 86:3
106:22
111:14

**heard** 47:7
75:23 111:12,

13 143:23

**hearing** 86:8

**Heavenly**
87:9,11,22
88:1,7,12,17,
21 89:12,17

**heavy** 56:17,
20 129:12

**heed** 81:18
84:8

**heightened**
158:22

**held** 5:7

**helmet**
129:11,21
132:10
142:23 145:9
146:12,17
147:2,10
148:8,18,24
149:12,17,18
150:8 151:13
152:7

**helped** 133:3

**Henry** 38:22

**hey** 81:20
85:14

**high** 7:17,21
8:1 12:9
64:21 85:9
87:14 119:24

**highway**
13:20 14:11
31:23 33:22
157:4

**highways**
48:5

**hill** 50:1
105:3

**hillside** 93:18
135:14,19,22

**hire** 21:20

**hired** 9:10,20
10:1 13:21
14:5 15:18

**hiring** 9:3

**history** 42:22
52:4 69:13

**hit** 42:1
116:17

**hits** 33:22
115:4

**hitting** 108:4

**hold** 4:14
38:19 121:16
123:3

**holey** 89:7

**home** 8:13

**homelessness** 29:9

**homes** 55:4

**Honda** 60:11,
13 61:14

**Honestly**
154:20

**honesty**
116:7,8,14

**Honorable**
8:11

**hope** 42:1
139:18

**horsepower**
92:20

**hospital** 14:7,
9,14,16,18
15:1 126:23
127:2,11

**hour** 82:17,19
83:24 84:20,
21 97:6 98:5
106:5,11

**hourly** 36:13

**hours** 6:22
9:6 15:9
55:11 105:22

**house** 68:11,
14,21 69:5
76:11 87:2
89:5 94:19,24
99:5 104:14,
18

**human**
100:14
103:14

**hurt** 86:9
144:15,17

**hyperactive**
54:1

---

**I**

**idea** 46:17
58:2 104:21

**illegal** 57:17
73:2

**imagination**
72:13

**immediately**
72:4 101:24

**immobilization** 131:12,14
140:19

**immobilize**
134:14

**immobilized**
139:5

**impacted**
138:20

**impaired** 26:7

**imperative**
158:19

**Implementation** 29:2

**importance**
158:22

**important**
158:16 159:5
160:1,7

**improper**
110:20
131:19
138:13

**improperly**
136:5

**impugned**
116:7,15

**impugning**
116:8

**inaccurate**
148:21
149:16

**inappropriate**
136:24
145:20 146:9,
11 152:13,24

13

inappropriately 143:2

inaudible 78:9 122:20

inches 134:1

incidents 143:11

including 12:17 36:23

income 26:2 41:4 58:7

incorporated 22:1,4

increase 48:21

increases 41:16

Indian 155:24

indication 58:11 109:18 128:4

indicative 69:22

individual 73:5 100:20 101:17,23 102:8,14 103:3,4,11

individuals 113:5,18 144:6

inform 124:4

information 91:21 93:13 102:6 110:4,6 114:7 137:8

157:2

informed 84:11

informing 122:15

infraction 74:6,12,13

initially 74:1 104:12

initiate 73:11

injured 34:10 104:2 140:23 141:4

injuries 48:4 110:21 129:17 131:15 140:14 142:13 145:5, 9,11

injury 35:11, 17 63:8 65:23 129:9 130:2 134:4 138:23 139:1 141:12 142:10,18 143:4 144:11, 12,19 145:7

inspection 62:22

instance 103:21

instruct 30:18

instructor 29:16,17 30:4,6,8,11, 13 31:7,15

142:6

insurance 52:14 117:15

intend 40:2

intended 146:8

intending 104:11,22

intent 58:12 123:11 126:21

intentional 147:13

intents 95:3

interaction 100:14

interest 110:18

interject 38:21

intermittently 66:15

interpretation 128:6

interpreted 71:9

intersection 58:1 77:7 93:21

intervention 6:15 29:2

interviewed 108:8

invasive 29:23

involved 23:4 25:6 26:4,16 27:5,7 33:2 39:10 80:6 108:14 125:7

involves 32:21

involving 142:14

irresponsible 134:3

issue 47:14 112:8,10 139:10

issues 24:10 140:8

**J**

Jackson 21:10,24 22:5,6

job 9:13 10:5 18:23 69:24 70:22 152:16

jobs 9:17 69:21

Johnstone 39:1

joined 16:18

judge 39:1 147:4 159:4

judgment 28:6 64:16 118:18

jumped 152:15

June 36:5

junk 45:10

jury 147:3 153:5

justice 5:23, 24 10:16 46:16 47:4 158:20

justification 146:22 147:15

justify 79:13

**K**

K-9 10:2 12:11

Kanawha 39:4

Katie 36:8

keeping 133:4

kick 130:13

kicked 128:23

kicks 129:4

killed 34:10 92:9

kills 33:22

kind 4:12 10:6 26:12 45:23 46:23 104:8 151:21 154:8

knee 119:24 120:6

knew 60:8
61:13,19
137:9

knocks 129:5

knowing
134:3 138:18
140:22

knowledge
104:10
131:11

**L**

l-a-n-d 5:16

labor 126:24

lady 38:12

landed 50:19

landing
142:15

landlords
44:20

lands 129:8
148:7

lane 87:13

large 33:17
34:5 81:3

late 16:5

law 8:7 10:12,
16 13:22 17:2,
20:15,17
21:12,14
22:22 23:1
25:22 30:9,15
31:20 32:10,
21 37:20 38:9
40:13 42:20
43:5,8 44:4,

12 46:5,11,13
48:8 63:9
86:12 99:22
102:18,21
107:14 124:3
126:11
153:14

lawful 65:13

laws 78:8

lawsuit 4:8
154:6,24

lawyer
156:15

laying 120:2
152:8

leads 28:5

leaned 152:3

learning 6:12

leave 11:13,
14 105:18

leaving
145:23

led 48:24
105:17

left 11:20
45:11 68:22
72:13 93:18
106:11 132:7,
17 134:12,24
135:2,9
136:20

left-hand
120:3

legal 4:15
36:8 84:24

legitimately

62:12

legs 133:3
140:6,17
143:5,10,24
144:3

length 91:15

length-wise
132:11

lethal 127:23,
24

letter 36:7

letting 121:15

level 24:18
68:7 70:14

liaison 24:5

Liberty 11:20
13:10,18

license 51:2
52:8 57:21
58:1 59:20
61:1,5,14
66:21 71:5
117:15

lie 116:13,23

lieutenant
16:21 23:20
24:3 64:17
83:11,23
84:2,10,14
87:17

life 29:7,10
139:4

lifeguard
131:13
136:12
138:17

light 78:14

lighter 33:18
34:21

lights 28:8
45:9 66:14
71:13,15
72:1,3 75:23
76:2,19 77:2
78:3 101:1
111:3,9,23
112:2,5
125:14,24
126:6,10,17

likelihood
35:17 44:24
45:20 55:9
66:16 99:19,
24 101:6
103:15 134:4
138:22 139:1
145:10

limit 55:13,19
84:2,24 85:12

limits 57:4

list 51:24

listed 28:17

litter 44:24

lived 49:14,
24 68:4 87:4
94:21

lives 76:13
89:6

local 32:15

located
135:12

locations
84:11 92:18

logos 60:17

long 9:23
10:22 11:22
14:3 16:4
22:17 26:19
27:1 51:9
57:8 71:18
75:7 77:4
87:6,24 88:1
93:15 103:10
104:4 134:10

longer 68:18
99:21 101:3,5
103:16
134:11
136:15 140:6,
17

looked
109:10
110:13
150:19

lose 34:18

loss 86:8

lost 116:17
143:5,14

lot 10:3
16:16,17
22:20 29:13
34:13 44:6,20
55:7 58:8
117:24 118:5,
14 151:14
158:6,7

Louis 48:18

love 44:15

low 47:23
56:13 58:6
87:14

15

lower 140:9
152:11

Luce 36:10

ludicrous
84:16

___

M

Mace 124:23,
24

machines
45:12

made 41:10,
20 68:6,22
80:3,12 86:21

maintain
34:17 120:10,
21 121:2
124:19

maintained
44:22

maintaining
118:24

majority 6:11
21:10 92:21

make 34:14
40:4 41:7,19,
20,24 44:21
45:9 61:7
72:2,23 85:5
86:6 92:5
101:2 110:11
147:6 151:22
157:19 161:9

makes 23:12
60:16,20
129:11

making 87:16
114:12

manage
13:22 15:11
155:13

managed
16:11

management
16:10

manager
13:21 15:19
17:19

managing
18:5

mandated
145:2

manner 63:10
92:1 100:16
101:8 102:4,
19 103:18
143:3 145:13
146:10

manners
113:10

mapped
76:13

March 53:14

Marion 7:21

marks
109:18,21

master's 5:24
6:1,7:5,7,10,
12 46:21

match 57:21
59:21 61:1
71:5

material
30:10 110:10

materials
15:24 30:12
113:23

math 27:15,
20

matter 25:22
36:3 57:18
105:23
152:14

matters 33:23
118:9

mayor 48:19

Means 4:9
26:23 35:19
104:10,22
105:12 108:8,
21 115:11
116:1,19
120:7 140:4
143:4

Means'
108:16,20
109:22

meant 46:17
47:16 61:9

mechanism
142:10,18
144:11,19

medical
15:24 30:9
131:10
136:10
138:16 142:2,
5,7 143:17

meeting
161:20

Meets 28:21

member
25:18

mention 68:6

met all 8:4

meth 53:18

methampheta
mines 54:11
67:5 114:12

mile 26:8

miles 57:11
81:8 82:17,18
83:24 84:20
90:23 91:3
92:15 97:5
98:5 130:7

military 8:7
23:8 24:10
32:16

mill 22:21

million 17:22
19:7 20:11

mind 69:2
103:3 112:10
147:7

minimal
70:14

minor 45:21
63:6 78:4,6

minutes 57:9,
10 64:19
83:16 84:15,
16 86:3
106:10,14

mirrors
71:19,21

miscalculated
105:10

mischaracteri
zation 97:18

mischaracteri
ze 137:15

mischaracteri
zes 132:1

misdemeanor
74:7,12 78:6,
15,19

misdemeanor
s 78:4

missed 76:21

mission
24:16

Mississippi
15:21

model 60:11

models
60:15,20,21

modern
35:14

monetary
48:7,9

money 48:16
49:2 58:9
160:15

months 12:1

morning
54:20 55:6,
10,11,21
56:5,8,10,22
68:9 156:14

mornings
55:8 56:13,17

**motor** 34:14 74:3 80:6 87:23 125:8, 13 140:14 142:11 145:4

**motorcycle** 26:16 27:6,7 33:6,10,13, 16,18,22,24 34:4,11 35:7, 12,19,22,24 51:1,12 52:8 54:10 57:21, 24 58:5,16,17 59:3,9,11,14, 19,21 60:6, 14,18,24 61:3,8,15 62:11,14,15, 19,24 63:9, 14,16,19,20, 23 64:6,10 65:8,10 69:15,18,22 70:2,20 71:19 73:7,12 75:1 76:17,24 77:12,18,23 82:11,15,21 83:2,3 88:6, 11 89:11,16, 23 90:7,18 91:2,4,12,15 92:9,10,17 93:4,17,20 94:13 95:10 96:2,7,17 98:20 99:10 109:20,23 114:16 115:3, 4,7,15 120:2, 4 127:14

129:8,11,16 138:19,24 142:13 144:20

**motorcycle's** 92:5

**motorcycles** 26:19 51:4,9 58:21 60:21 62:5 71:21 115:5

**motorist** 72:1

**motorists** 57:5

**Mount** 6:3 7:2

**mouth** 28:2

**move** 128:1 132:17,19,23 133:22 134:15,18 135:4,8 139:2,17 140:23 141:10 144:12 145:13 161:15

**moved** 119:8 131:7 132:11, 14,20 133:3, 19 134:9,23 135:1 136:5, 13,14,18 141:6 143:2 145:15,16,17, 18,19 151:24

**movement** 120:15 128:4 138:13

141:23 148:14

**moves** 148:11

**moving** 110:20 134:7 146:5

**multiple** 24:23 71:10 88:3

**municipal** 25:24

**murder** 79:16

**Murdoch** 39:4 40:2

**muscles** 129:13,19

**N**

**N-O-R-W-O-O-D** 11:8

**named** 38:12 153:13,21

**names** 155:17

**nanny** 47:16, 17 48:2

**narrating** 138:1

**narrow** 96:6

**national** 16:19 46:3 49:10 63:5 80:17

**nature** 103:14

108:23 109:9 128:12 150:13 157:2

**necessarily** 62:7 103:10

**necessity** 134:15,18

**neck** 129:13, 19 132:13,24 133:5 134:6 146:1 150:11

**nefarious** 120:14

**negate** 143:1

**Networks** 15:19

**nice** 58:10 157:20 161:19

**night** 55:11

**Nineteen** 57:12

**normal** 46:7 100:14,16 152:18

**Nortel** 15:19 17:5

**North** 5:16 6:4,6 9:21 10:15 11:2,8, 21 14:12,15 16:19 17:4 20:19 21:11, 19 22:5,7,14, 20 24:6 25:13 29:15,21 30:2,16 31:18,22 62:8

78:12 156:5

**Norwood** 11:7,16,20 13:1

**notice** 57:23 85:1

**noticed** 70:21

**notified** 140:16 143:8

**notify** 62:10 119:5

**November** 6:19 7:15 14:10

**number** 5:5, 19 62:23 98:7 101:12 107:13 154:7, 10,13,15,22

**numerous** 96:16 106:19 107:1 131:18

**Nunley** 97:8 148:1

**nurse** 14:22

**O**

**O-L-M-S-T-E-D** 8:23

**Oak** 49:24

**oath** 158:23

**obey** 81:16 89:9

**obeyed** 107:13,16

**object** 75:14 81:21 82:3 97:17 107:8 108:5 113:7 126:4 131:1, 23 137:14,23 148:9 149:3 150:5

**objection** 97:22 107:23 113:8 115:16 137:24 138:4

**obligation** 65:15 85:13

**obscure** 46:24

**observation** 131:4

**obtained** 8:14 108:13

**OC** 124:13

**occasionally** 24:19

**occupants** 35:15

**occupied** 55:7

**occur** 45:9 146:19

**occurred** 109:15 113:20,22 140:20 143:11 146:14 147:1 150:1,2 152:4

**occurrence** 62:4 69:12

107:22

**occurring** 146:21

**offense** 151:7

**offensive** 160:16

**offer** 38:7 121:19

**offered** 10:4

**offering** 91:21

**offhand** 38:14 43:10 68:2

**office** 10:2 18:8 157:18

**officer** 9:14, 22 10:7,13 15:10 16:20, 22 20:18 24:5 32:9 34:16 53:17 57:14 58:13 59:13, 18 60:5,23 62:18 64:10 65:7,22 66:4, 9,20,23 67:3 69:7,14 70:6, 8,9,15 71:3,8, 10,15,17 72:7,17,20,24 73:3,11,17,20 74:2 75:7 76:2,5,18 77:1,21 78:5 79:24 80:11 83:7 84:6 85:18,23 86:17 88:15

90:11,18 92:15 94:10 95:20 98:24 100:19 104:6 105:8,14 107:16,21 111:8,23 112:6,8,10 113:4 114:15 115:13 116:16,19 119:7,10,17, 21,23 121:6 123:19 124:3, 7 126:3 127:18,19 129:4,23 130:3,9 132:24 133:1 136:9,11 141:5 143:23 144:1 145:12 146:23 147:9, 15 148:6,21 149:24 150:2, 15 151:7,15, 16 152:2 153:7,9,10,14 155:19,20 159:6,12

**officer's** 10:10 134:7 155:21

**officers** 4:8 9:4,5 12:16, 23 13:1,5,11, 12,13 15:1,3, 5,8 24:21 25:8 32:17 48:20 49:5,8 55:13 57:7 63:10 64:23

65:21 80:22 87:22 91:24 92:11 97:4 99:22 100:2 104:23 108:9, 13 114:23 116:5,9 119:14 121:16 122:3, 9 123:7,9 124:13 125:10 126:15,17 127:23 128:10,15,18 130:1 131:7, 20 132:8 133:6,7 137:9 138:24 139:20 141:14 144:6, 16,22 145:12 155:13,15,18 158:17 160:2

**Ohio** 7:22 8:13,20,22,23 10:13

**Olive** 6:3 7:2

**Olmsted** 8:23

**on-duty** 25:8

**oncoming** 96:8 119:4

**one-lane** 96:6,13

**one-time** 36:21

**ongoing** 17:13

**online** 6:8

**open** 46:18, 22 47:4,5

**operating** 21:23 112:2,6

**operations** 17:20 24:7 30:1 31:3,9, 18

**operator** 63:8

**opinion** 41:2 42:9 44:13 52:5,9,19,23 53:3,7,11,15 55:1 86:16 98:14 105:6 107:20 110:8, 11 114:19,22 115:22,24 116:13 121:6 122:10,11 123:5 132:5 142:9,11 147:11 159:17 160:17

**opinions** 51:21 52:15 113:1 158:7, 8,10

**opportunities** 107:18

**opportunity** 62:22

**opposed** 47:4,9 54:24

**opposite** 87:13 101:2

**options**
  103:24

**order** 20:18
  29:18 30:2,18
  65:5 120:10

**ordered** 84:2

**orderly** 44:24
  45:7

**orders** 65:16
  107:17 120:9

**ordinances**
  45:4,5

**outcome**
  127:9

**outweighed**
  65:18 81:12

**outweighs**
  81:2

**overcome**
  79:18

**overdosed**
  53:14

**overly** 54:2,4

**overregulatin
g** 48:2

**overregulatio
n** 47:18

**overtaking**
  81:12

**overwhelmin
g** 159:13

**owe** 161:2

**owner** 17:24
  19:13 21:9
  44:21

---
**P**
---

**p.m.** 161:22

**package**
  19:19

**paid** 37:8
  155:4 157:19
  161:2

**paint** 58:4
  69:21,23
  70:22

**painted**
  57:15,18,24
  58:16,22
  59:3,15,20
  60:16 69:9,
  15,16

**pants** 113:13

**papers** 29:7,
  10 101:13

**paragraph**
  82:8 115:1

**paralysis**
  140:19 141:2
  142:21
  143:19

**paralyzed**
  75:10 77:16
  83:1 88:10
  90:6 94:5
  95:15 98:19
  137:12
  138:12
  139:21,23
  141:16
  144:15,17

**paraplegic**
  35:21 39:13

65:21

**Parkersburg**
  39:9,12

**part** 22:6
  45:14 145:1

**part-time**
  8:15 9:1,5
  13:4,13

**partner** 46:11

**parts** 93:13
  96:13 120:2

**party** 91:10

**Paskel's**
  83:11

**passed** 22:23
  96:22 97:13,
  19

**passenger**
  26:13 35:13

**passive**
  125:4

**past** 32:23
  37:16 43:24
  92:1 119:2

**patrol** 12:10
  20:2 26:21
  31:23 108:18

**patrolman**
  93:23 111:17,
  22 118:21
  131:12
  139:24 143:6
  157:4

**Patterson**
  143:9

**pause** 4:16

**paved**
  105:11,18

**pavement**
  129:21

**pay** 37:11,22
  38:5 40:24
  158:2

**paying** 155:1

**payment**
  157:12

**pays** 157:22

**Peace** 10:13

**pedestrian**
  55:15

**pedestrians**
  35:3 57:6
  80:7

**pending**
  38:24

**Pennsylvania**
  43:14

**people** 13:10
  16:1 28:20
  44:18,24
  45:12 53:18
  55:7 56:21
  62:4 79:17
  85:5,7 106:15
  113:18
  129:16
  140:21,23

**people's** 98:3
  113:13

**pepper**
  124:22,23,24
  125:5 130:14

**percent** 41:5
  42:5

**percentage**
  41:3 42:3

**perfectly**
  121:3

**performance**
  43:24

**performed**
  24:18

**period** 71:18
  83:15 100:21
  101:18 102:7

**periodically**
  24:14

**perjure**
  160:13

**perjury**
  159:10,12
  160:10,13

**person** 33:13,
  15 50:16,23
  81:3 98:15
  102:16 103:8
  124:1,4,20
  126:8,14
  128:1

**personal**
  116:12

**Peterson** 4:8
  59:13,18
  60:5,23 66:4,
  9 70:6,8,15
  71:3,8,11
  72:8 73:11,20
  76:5,18 77:1,
  21 80:11 83:7
  85:3,19,23

86:17 88:15
89:8 90:11,18
91:12,14
92:16,23 93:8
94:10,15
95:20 98:24
108:17
111:20 112:9,
18 114:15
115:13,23
118:16
119:10 121:7
131:9 136:9
140:3,5,16
144:1

**Peterson's**
57:14,20
66:20,24 67:4
79:24 91:2
93:5 112:6
115:2 143:14

**Ph.d.** 4:1 5:22
7:11,14

**philosophy**
46:5

**phone** 5:2,5,
19

**phonetic**
155:20

**photographs**
50:11,20
114:6

**photos**
109:11,13
135:11

**physical** 25:9
30:13,14
123:17

**pick** 104:14
144:6

**picked** 70:16
87:19 133:2,3

**piece** 58:9
59:10

**pink** 57:18

**pistols**
119:15

**place** 81:15
99:18 100:9
141:8 150:24
154:5

**places** 43:18
93:3 96:16
106:19 107:1,
13 113:14

**plainly** 116:6

**plaintiff** 42:4,
5 50:19 52:8,
14,18,22
53:2,6,10,14
54:9,15 57:7,
15 66:4,6,12,
17,21,24
67:4,9,20
68:13,18 69:4
71:9,12 72:6,
18 73:16,21,
24 74:24
75:4,9,22
76:5,6,9,16,
22,23 77:4,
12,15,21,22
79:24 80:11,
12,18 81:12
82:10,14,20,
24 83:8 84:19
86:24 87:6,20

88:1,5,9,15,
17 89:10,15,
22 90:5,12,
13,16 91:4,
11,19 92:22
93:3,11,16,24
94:4,11,12,
17,22 95:5,
10,14,20,21
96:1 98:18,24
99:4,9,14
104:5,11
107:2,4,21
108:3 112:14
113:24 114:9,
18 116:9
117:3 119:14,
18 121:7,11,
14 122:1
123:10,20
124:14 125:9,
18 127:10
128:14,19
130:4,5,19,22
131:21
133:15
137:10,11
139:11,21
141:15
143:24 144:1
146:6 147:10
148:18,23
151:20,21
152:3 154:11,
19 160:2,7,8

**plaintiff's**
38:9 42:19
52:4,12 57:20
73:12 92:16
105:5 110:5
114:16
115:14 123:8

127:20 147:2,
20,21 148:8,
22 150:4
151:8 156:13
161:15

**plaintiffs**
139:8 154:1

**plant** 96:5

**plate** 57:21
58:2 61:1,15
62:16 71:1,5
117:16

**plausible**
147:17

**playgrounds**
55:5

**Plymouth**
8:22

**pockets**
113:13

**Poe** 40:14

**point** 10:8
68:17 73:22
78:19 79:9
84:19 89:4
94:16 97:2,3
119:5 122:7
125:6 128:11
130:21
138:11 140:4,
15,17 143:8
151:1 152:22

**police** 6:22
8:14 9:12,14,
21,22 10:7,9,
14 11:1,7,8,
21 12:20,22
13:1,7,15

14:6,15 15:3,
5,8 17:2,7,9
18:4,6,8,10
19:1,20 20:1,
8,16,19,20,22
22:16,17,24
23:5,8 24:18,
20 25:4,15,
18,19,23 26:4
29:8,14 31:1
32:4,7,9,11
33:1 34:16
38:13 40:11,
23 47:13,21
48:18 52:10
53:17 54:16
58:13 62:18
63:5 68:24
69:7,13 70:9
71:24 72:2,
17,20,23 73:3
74:15,16,17
78:5,22 79:3,
7 80:14,15,
21,22 81:7
84:5,6 85:13
87:22 91:24
92:3,11 96:21
100:2,16,19
102:21 103:2,
12,19 104:6
105:14 107:2,
6,21 108:2
113:3 114:23
117:11,12,18
118:6 119:21,
23 122:3
123:9 124:6
125:19 126:3
127:1 129:23
130:3,6
131:17 136:9
138:15

139:20
140:21
141:14
149:20
153:20 156:4,
7 158:17
160:2

**policies**
32:13 99:17
101:12 154:4

**policing**
44:14,16
45:17 46:4,5,
8,9 47:5,6

**policy** 26:24
63:5 65:4,15
81:1 89:9
100:9 102:16
103:1,2,5
107:17

**politically**
12:2

**poor** 118:18

**population**
47:19

**portion** 21:10
30:9 31:19
105:11,18
120:3

**portions**
30:14 48:11

**position** 9:14
11:10,19
14:1,4 132:6,
7 141:7,20,21
145:22 152:1,
8

**positions**

8:15 9:1

**possessing**
117:9

**possibility**
55:14 129:9
130:8 135:7

**possibly**
47:22 149:23

**pot** 89:7

**potential**
59:22 73:4
117:19
140:13
144:11

**potentially**
127:17 130:4
159:15

**potentials**
141:17

**power** 34:12

**power/weight**
26:20

**practice**
80:24

**practices**
63:6

**preceding**
138:9 149:9

**Precision**
31:21

**precursors**
114:12

**premise**
102:15

**prepare**
156:10

**preparedness**
24:5

**presented**
49:4 112:24

**preservation**
139:4

**presume** 4:9
7:16 23:6
51:15 110:12
123:20

**pretty** 12:19
13:7,15
146:12

**prevalence**
130:1

**prevalent**
120:16 130:9
132:17 134:5
145:11
146:21

**previous**
65:13

**previously**
157:6

**Primarily** 6:9

**primary** 26:2

**printed** 67:14

**prior** 94:16
143:12

**private** 16:7
17:16,17
18:10,12 19:2
20:15 21:1,
21,22 23:13
32:15

**probability**
158:11

**probable**
63:21

**problem** 4:24
67:17 81:5
118:16
119:13
123:24
124:12
130:24
139:14,15

**problems**
139:16

**procedure**
52:11 117:11
118:6 140:22

**procedures**
32:13 136:14

**proceedings**
4:16 106:16

**produced**
50:7 74:22

**profession**
158:11

**professional**
5:14

**program**
13:20 14:12
22:16 46:10

**programs**
13:23 44:16
46:23

**prone** 141:7,
21

**proper** 73:10
134:9 136:7

**properly**
131:6 134:14

155:12
158:20

**property** 21:8
44:19,21,22
150:21

**prosecutable**
151:7 160:16

**prosecute**
150:20 151:6

**prosecuted**
150:16
159:15

**prove** 60:9

**provide** 16:12
17:2 21:11,14
23:1 42:9
157:1

**provided**
91:22 110:4
157:7

**providing**
91:22

**proximity**
92:23 134:19
135:6

**prudent** 72:1,
6 119:7 124:3
135:8

**psychiatric**
14:6,9,16,17,
21,24

**psychologically** 45:2

**public** 4:3
18:12,14,24
20:3,8,21
21:6 23:5,16

24:1,20 33:17
34:5 55:17
63:8 66:12
80:6

**published**
28:13,16 29:4

**pull** 63:20
64:6 65:11
67:11,13,15
70:22 85:16
92:19 103:23
119:2 125:10,
18 126:1

**pulled** 26:9
64:11 66:5
75:1,5,11
76:18 77:1,
13,17 82:11,
15,21 83:2
88:6,12
89:11,16,24
93:4 94:1,6
95:6,11,16
96:2,12,17
98:20 99:10
107:3,12,14
118:19
126:16

**Pullin** 40:14

**pulling** 85:8

**purchase**
62:24

**purchased**
62:12

**purpose** 48:8
100:8 101:11

**pursue** 26:19,
24 28:10

**pursued**
99:21 101:23
102:9,14,17
103:3,16
104:1

**pursuing**
33:11 35:6,7
58:3 63:17
100:3 101:5
103:20

**pursuit** 26:4,
16 27:6,7
29:14 31:1,21
33:10 34:3
50:4 54:18
57:1,3,8 63:4
64:12,18,24
65:10,18
66:11 68:15
74:17 75:24
79:11,12,17,
20 80:4,10,
14,16,21 81:2
82:5,16
83:16,18
84:9,16,18
85:20 86:1,
18,20 87:17
89:19 90:22
91:11 92:7,15
93:14 94:15
95:8,24
96:18,22
97:12 99:15,
23 100:12,17,
20,21 101:1,
19 102:1,7
103:6,12,23
104:6 107:2,6
112:16 123:6,
22 125:11
127:12

**pursuit's**
79:13

**pursuits**
32:4,7,14,18,
22 33:1,5,6
70:10 99:18
100:10
101:15

**put** 4:22 5:2
28:2 62:13
81:15 99:18
109:7 120:11
132:8

**puts** 81:18
119:19
121:12

**putting** 9:4
61:11 87:15
122:2 137:1,4
145:22

**Q**

**Q-U-I-N-N**
39:20

**qualify** 76:1

**quantify**
102:11

**question**
46:24 61:4
99:8 107:8
117:2 125:16,
17 127:15
131:24
137:15,21
138:5,9
149:5,8,9
158:6,15

**questionable**
116:24

**questioned**
117:8

**questioning**
156:19

**questions**
44:12 62:23
74:15 82:2
157:10,14,15,
17 158:5
159:19
160:19

**quick** 38:18
67:14,16
114:24

**quicker**
34:12,13,23

**quickly** 34:19

**Quinn** 39:18,
19 40:10

**R**

**Rabel** 93:15,
16,19 94:2,7,
13,18 95:6

**radio** 85:6
86:7

**railroad** 50:9,
15 51:13
97:21 105:10,
13,19 108:22
109:4,5,11,
14,17,19
110:2 115:3,6
118:17 119:1,
3,5 131:21
132:2 134:19,

24 135:3,6
136:16,23
137:11,17
139:12,15
142:16 143:2

**raise** 69:8

**Raleigh** 5:16
25:13

**rank** 12:9

**Rapid** 92:3

**rapist** 79:15

**rate** 36:13,20,
21 99:20

**ratio** 26:20
34:12 92:21

**rational**
101:14

**raw** 147:12

**RE-
EXAMINATIO
N** 159:23

**re-look**
150:18 151:3

**reached**
84:23

**reaching**
121:8,9 152:9

**Reaction**
28:21

**read** 32:19
46:2 58:1
97:7 101:12
122:8 138:9
149:9 160:22

**reading**
105:4,5

**real** 22:22
38:18 48:4
67:13,16
114:24 142:2

**realistic**
129:10

**reality** 137:16

**realize**
103:15

**realized** 81:9

**rear** 92:2

**reason** 34:5
48:4,23 58:12
65:17 68:8
79:11,13
86:10 90:17
100:11 127:5
147:16
152:12

**reasonable**
59:12,17
60:5,6 61:2,
23,24 63:13,
18 64:14
65:8,22 71:2
72:22 73:20
76:4 77:20
83:6 88:14
90:11 92:14
94:9 95:19
96:20 98:23
121:3,5
123:19
124:20
129:23 130:3
132:16
145:12
158:10

**recall** 25:12

26:13 33:7
38:10,13
39:23 42:11
60:12 68:2,5
97:14,16
111:16 112:1,
4,7 122:12
123:18
151:18 152:2
155:24

**receive** 26:1
157:5

**received**
37:12,16
70:12 138:14,
17 140:13

**reckless** 34:2
63:10 64:21
85:1 87:18
91:24 99:20

**recklessness**
78:17 83:13

**recollect**
97:15

**recollection**
144:4 151:23
152:5

**reconvene**
106:7,14

**record** 4:19
5:8,11 158:9

**reduce** 48:4
100:15 101:7
102:3

**reference**
82:1

**referring**
40:11 102:24

**reform** 29:8

**refused** 66:5

**refuses** 64:11
65:11

**refusing** 76:7
77:23 83:9
88:17 90:13
94:12 95:22
99:2 122:3
125:10,18

**regard** 102:6
110:1 146:24
147:20

**registered**
60:18

**registration**
59:24 60:9,24
61:5,9 62:3,6,
16,21 63:3,23
64:1,3,5 65:6
66:2 70:24
73:13 78:2
117:16
124:10

**regularly**
62:5

**regulate**
32:14

**regulation**
80:17

**regulations**
81:14,16

**relayed** 128:7

**relevant** 98:3

**relied** 110:3,
11

**remain** 128:8

**remained**
12:10

**remaining**
81:3

**remediate**
47:14

**remember**
26:17 38:15
48:17 92:3
151:19
154:20 155:7,
21,23

**remove**
112:14
128:15,19

**removed**
130:20
154:24

**repeat** 79:5
138:4,5 149:7

**rephrase**
149:6

**report** 37:1
46:12 67:8,
10,14 74:20
82:8 93:12
110:10
112:23
116:16
156:11 158:8

**reported** 93:8

**reporter**
138:8,10
149:7,10

**Reporter/
notary** 4:3

**represent** 4:7

**required** 6:10
15:7 31:1,19
144:23

**requirements**
8:4 78:23

**requires** 15:4

**requiring**
32:19

**reserve** 13:5,
13 23:8 24:4,
13 155:21

**residencies**
6:10

**resist** 125:20

**resistance**
121:20 125:5

**resisting**
121:11,15
122:1,12
125:2,12
126:13

**resolve** 24:10

**resources**
24:8 47:13

**respond** 72:4

**responder**
30:8 129:24
131:8 144:21

**response**
4:20 86:13

**responsibility**
107:5,10,22

**responsible**
15:22 34:15

23

rest 115:7

restraint 35:15

result 154:23

resulted 65:24

results 26:22

retain 9:16 38:23 43:16

retained 9:12 36:2,6 37:20 38:9,22 39:8 40:1,3,5,13 42:9,18 43:2, 9,21

retainer 37:9

retains 42:7

returned 8:13 140:5 143:9

review 36:18 113:23 114:24

reviewed 114:6,7,8 156:11

reviewing 37:1

ride 51:6

rider 35:12

Ridge 18:11, 14,23 19:10, 11,15,17,18 20:7,21 21:6 23:5 24:20

ridiculous 57:3

right-of-way 27:2 81:10

rights 117:20

rise 12:9

risk 35:11 63:7

River 15:21

road 5:16 12:10 68:9 69:20 75:2,6, 12,20 76:10 77:5,6,7,8,9, 13,18,24 80:8 82:5,6,12,22 83:4,9,15 85:16 87:1,7, 8 88:3,24 89:7 93:15, 16,19,20,21, 22 94:2,7,13, 18 95:6,9,12, 17,22,24 96:3,6,9,10, 11,14 98:21 99:2,6,11 104:17 105:7, 8,12 136:19, 21

roads 57:1

roadway 57:6 105:19 136:19 137:2, 5 138:20

robbed 92:6

robber 79:15

Robinson 108:1

Roland 93:21

rolled 66:1 140:1,10

room 119:10

rough 132:22 136:22

route 50:4 55:5 68:10,20 74:15,16,17, 18 75:2,6,12 76:10 87:5 96:18 106:19 107:1

Roy 4:1,21 5:10,12,13,20 39:14 106:18, 24 118:15

RUGGIER 4:6,14,17 5:9 38:6 39:2,6 40:8 82:4 106:1,12,17 118:13 138:3 143:16 157:8, 13 158:2 159:21,24 160:18 161:1, 5,12,17

run 62:23 118:22

running 85:4

Ruth 75:2,6, 12,20 76:10 77:5,6,13,18, 23 82:5

ruts 88:3

—————————

S

S-E-A-K 43:15

S-T-R-I-C-K- 5:15

safe 75:21 101:8 102:4

safely 100:1

safer 103:18

safest 146:3

safety 13:20 14:12 15:23 18:12,15,24 20:3,8,21 21:6 23:5 24:20 46:21, 23

sand 96:5

Sandusky 9:10,16

sane 102:19 103:17

Sapphire 20:3

Saturday 54:20,23 55:6,8,10,21 56:5,8,10,13, 17,22

save 129:3

scene 50:13 51:17 96:24 104:20

school 7:17, 21 8:1 16:20

schools 55:5

scope 65:22

scratch 112:12 139:9

SEAK 43:15

seat 115:5

security 15:23 16:7, 10,11 19:20, 23,24 20:2,4

seemingly 151:4

sell 17:21 19:18

seminar 49:5, 13

send 43:14 157:3 161:5

sending 36:17

sense 100:13 101:10 119:22 151:22

separate 8:14 29:17 113:1

separately 51:24

served 32:8

services 17:3 21:12 23:2

serving 23:6

set 108:22 109:1,4,5,6 113:1

**settlement**
154:8 155:1

**sheriff** 10:4
26:18 39:5
153:19

**Sheriff's**
10:2,20 12:7
156:3

**shift** 15:10

**shooting**
28:20

**shopping**
25:13

**short** 105:24

**short-handed**
24:22

**shortcut** 95:1

**shorter**
134:22

**shortly** 83:23

**shot** 38:13,16

**shotgun** 86:8

**shoulder**
71:10,24
72:7,16,19
73:6

**show** 59:6
110:17

**showed**
120:9

**shown** 45:2

**shows**
110:19 111:2,
7 132:1

**side** 18:13

**sight** 34:18

**sign** 73:9
160:24

**signal** 19:24
76:3 85:19,24
86:18 96:8

**signalling**
75:8 126:20

**signals** 86:14

**signature**
160:24

**signed** 36:8

**similar**
108:23 109:9

**Simms** 39:9
44:9

**simply** 75:11
77:17 83:2
88:11 90:6
94:6 95:16
98:20 108:12
112:23 120:7,
19,20 121:22
124:18 128:7
145:21

**simultaneous
ly** 16:18

**single** 103:8

**sir** 7:24 9:18
10:21 12:8,
18,21 14:13
17:8 20:13
25:20 40:16
43:10 50:6,
14,17,24

80:7 104:24
135:9

51:18,22
55:23 67:18,
23 68:2
106:23
110:16 112:7
114:17
123:15 124:5
155:9 158:13,
19 159:11,17,
20 160:11,17,
20 161:4,13,
18,19

**siren** 28:9
55:16 66:14
71:14 75:24
76:3 77:2
78:3,15 85:4
86:3,5 101:2
111:4,9,12,
13,14,19,21
125:14 126:1,
10

**sirens** 76:19
126:6,18

**sitting** 57:24
159:3

**situation** 26:6
32:18 104:1
120:18
124:16
127:17,18,21
133:16
144:10

**situations**
22:18

**size** 12:21
13:16 34:7

**skills** 32:23

**slow** 35:4

82:16 98:5,14
99:24 103:17

**slowed** 99:14

**slower**
106:15

**slowly** 96:22
97:12 98:2,12

**small** 12:20
13:7,15

**smaller** 33:18
35:24

**society** 65:19
100:12

**socks** 113:14

**sold** 17:18
18:1 19:15,
17,19,23
20:5,9,11
51:5

**sole** 17:24

**somebody's**
92:2 152:19

**someone's**
152:7

**sort** 105:23
146:22

**sound** 40:15
90:21

**sounding**
4:13

**Sounds** 40:8
161:17

**source** 26:2

**South** 92:4

**southern**

21:10 22:6

**Southridge**
75:16

**speaking**
56:14 118:14

**special** 17:2,
6,9 18:4 20:1,
2,8,21 22:17
23:5 24:20
25:15,18,19
29:22

**specialist** 8:8

**speciality**
31:14

**specialties**
30:3

**specialty**
29:16

**specific** 47:9,
11,14 60:21
76:14 83:17
141:13

**specifically**
49:11 55:3

**sped** 73:16

**speed** 55:13,
19 57:4
78:12,16
84:1,2,23,24
85:9,11
87:12,18 98:2
99:20 100:15
101:7 102:3

**speeds** 64:21
83:12 84:3,11
87:14 97:2

**Spell** 11:3

**spinal** 110:21
129:9 130:2
131:14 134:4,
14 138:23
139:1 140:13
141:3,12
142:12 145:5

**spine** 129:18
132:12,13
133:5 141:24
150:12

**spoke** 36:10
156:13

**spoken**
109:24
143:17
147:19

**spray** 69:21
124:13,22,23
125:1,5
130:15

**spun** 115:4

**St** 48:18

**stable** 71:22

**stand** 140:8
152:20

**standard**
144:5

**standards**
10:16 80:17

**start** 11:10
13:24 14:8
16:2 18:15,16
58:13 106:20

**started** 17:1,
10 22:16 58:3
157:5

**state** 4:18
5:10 10:9
13:23 14:6,9,
16,24 17:3
18:13 24:5
32:15 40:10
42:10,13 46:4
47:16,17 48:2
86:12 97:4
108:2 131:17
144:24

**stated** 112:18
114:18 143:4
150:2

**statement**
54:12 56:4
58:15 67:23
90:22 98:1
108:20
112:20 115:2,
10,23 116:1

**statements**
105:5,6
108:12
112:21

**states** 12:22
13:17 23:18,
21 24:4 78:7
80:24

**stating** 153:1

**station** 40:20

**statistical**
47:12 59:7

**statute** 22:15
78:18

**statutes**
74:11

**stay** 32:20

**stayed** 11:24

**staying**
105:11

**Steele** 7:21

**step** 147:1,9
148:7

**stepped**
64:18 84:12

**stolen** 58:18,
21 59:2,9,11,
14,19 60:7
61:3 62:1,8
63:14,19 65:9
69:18,22
70:21 71:4

**stomach**
140:2

**stomp**
146:12,16
147:10,16
149:15
151:13,17,24
152:4,7,19

**stomped**
139:24
140:10
142:16 143:6
148:15,22
149:11 151:8
152:17

**stomping**
141:18
142:22
147:14

**stomps**
148:12

**stood** 145:24

**stop** 62:20
63:2,4,23
70:20 73:11
74:4 76:7
77:23 78:11,
14 83:9 88:17
90:14,17
91:5,8 92:17
94:12 95:22
96:7 99:2
101:24
102:14
118:21 119:1,
11 125:14
126:20,24
127:5,6,9

**stopped**
74:24 75:5
76:17,24
77:12,17
82:11,15,21
83:3 88:6,11
89:11,15,23
90:7 93:3
94:1,6,15
95:5,10,16
96:1,17 98:20
99:10 102:8
103:12 104:6
145:21

**stopping**
48:23 73:15
102:2 118:16

**stops** 102:9

**straightaway**
93:9

**street** 24:18
25:5 45:12

**Strickland**
5:15

**strike** 91:7

**striking**
108:17 117:6

**strong**
129:20

**struck** 91:12
93:5 105:10,
14 109:20
114:15 115:3
116:19

**studies** 59:8
102:10,13

**style** 38:17

**styled** 39:11

**subject** 25:22
105:23

**subject's**
128:3

**subjected**
116:14

**subjective**
98:15

**successfully**
108:24

**sued** 153:12

**suffer** 145:4

**suffering**
145:10

**suggest**
114:10

**suing** 160:2

**suit** 100:24
153:13 155:4

**summation**
120:20

**supervise**
32:17 155:12

**supervision**
154:4

**supervisor**
64:17,20 65:5
81:17 89:9
107:17

**supine** 132:6,
7 141:7,20

**support**
100:6 101:20
122:5

**supported**
132:24

**supporting**
146:1

**suppose**
37:21

**supposed**
81:16 140:23
144:6,16

**surface**
136:18

**survival**
130:9

**suspicion**
60:6 61:3,24
63:13,18 69:9

**suspicious**
72:17,19 73:5

**SUV** 91:3,7
93:5 118:17

**switching**
44:11

**sworn** 4:2

18:7 20:17
25:20 158:23
159:3,4

**system** 46:18
47:3,4,5,6
52:18,22
53:2,6 67:1,5
158:20

**systems**
46:22

**T**

**T-A-S-A**
43:13

**T-W-I-N-S-B-
U-R-G** 8:20

**tactics**
152:22

**tag** 62:13

**tags** 62:9

**taking** 115:1

**talk** 96:4

**talked** 42:19
104:9 133:12
143:20
151:12

**talking** 45:18
46:20 48:20
49:19,22
97:20 103:1,2
109:14 114:5
117:18
126:23

**tank** 57:15
58:17,22
59:3,15,20
69:9,16

**tape** 60:16

**target** 47:13

**TASA** 43:13,
22

**task** 10:3

**taught** 29:13,
14 30:8,11,13
31:12,22,24
49:7 136:8
138:24
144:12
147:15

**tax** 26:1

**Taylor** 4:1,7
5:12 38:12,23
39:19,22
40:10 157:17

**Taylor's**
39:16

**teach** 29:18,
23 30:2,4
31:1 44:18

**team** 6:15

**tear** 46:12

**technician**
131:10
136:11
138:16 142:5

**techniques**
136:8

**Technologies**
23:11

**telling** 51:23
91:19,20
122:10
123:24 147:4
160:9

**ten** 12:23
42:24 43:2
64:19 106:9

**term** 47:16
134:9

**terminated**
33:8 80:16
81:4,7 83:19,
22 84:13,14,
18 99:15
149:21,23

**terminology**
47:7 81:22

**terrain**
132:23
136:22

**testified** 4:4
54:9 61:19
64:23 67:22
71:12 85:21,
23 86:5 97:4,
12

**testify** 42:15
160:3

**testifying**
118:12

**testimony**
60:19 61:12
65:13 69:8
72:5 80:20
90:17 91:6
92:13 97:7,
18,21 101:23
104:4 116:24
117:3 118:23
122:8,13,14,
17 137:16
140:18
143:14

146:24
149:15 151:2
159:14

**tests** 108:11

**THC** 53:2

**theory** 44:14
45:17

**thing** 16:13
61:6 62:14
63:2,22 124:8
136:4 146:3

**things** 16:16,
17 41:2 45:6,
14 92:12
111:20 114:8,
10,11 117:10
142:17
157:20

**thinking**
39:22

**thought**
27:22

**threats**
121:21
128:11

**tickets** 49:1

**till** 93:20

**time** 10:5
11:19 12:11
24:17,23 25:1
26:3,15 32:12
44:16 51:6
55:12 56:13,
17 67:17
71:18 74:12
83:16,17
86:6,15 92:21
100:22

101:18 102:7 119:4 126:7 139:8,21 141:9 143:23 151:17 157:5

**times** 37:19 38:8 42:17,18 43:3,6 51:14 55:22 56:6,7 71:10 72:11 92:19 131:19 153:15 158:18

**tinny** 4:13

**tire** 92:3 114:15

**title** 28:18

**today** 25:7 26:24 37:3 66:18 69:20 151:3 158:7

**today's** 35:14

**told** 60:23 64:20 83:23 87:16 97:4 140:4 143:18 144:1

**tolerable** 130:11

**top** 46:1 78:10 147:2 148:7 156:1

**topic** 105:23

**topics** 30:17

**touched** 92:7

**towed** 45:10

**town** 155:1,4

**town's** 48:21

**towns** 22:21

**Township** 8:19,20,23

**Trace** 77:7,8 82:6,12,22 83:3,9,14 87:1,7,8

**track** 41:20 105:10,13,19

**tracks** 51:13 97:21 104:21, 22,24 108:4, 22 109:4,5, 11,14,19 110:2 115:3, 4,6 116:17 118:17 119:2, 3,6,8,11 130:16,23 131:3,5,22 132:3,4,19,20 133:8,18,21 134:3,20,24 135:3,6,9,12, 15,22 136:16, 23 137:11,17, 19 139:12,15, 22 142:16 143:2

**trade** 62:4

**traffic** 35:2 47:24 48:3,12 54:23 55:9, 15,21 56:4,8, 9,13,17,22,23 96:8 127:9

**train** 100:24 119:4 135:7

**trained** 70:13 131:7,13 133:6 136:10, 12

**training** 6:16, 22 10:7,13, 16,17 29:2,19 30:10,15,18, 20,22,24 31:2,20 32:23 70:12 129:24 131:8,16 136:11,13 138:14,17 140:12 144:22,23 145:2 158:14

**trait** 59:7,9

**transferred** 150:10

**transmissions** 86:7

**Transportation** 144:24

**Transportation's** 109:8

**Tranthum** 36:9

**Trapano** 36:10 37:21 38:4 39:7,19 75:13 81:20 97:17 105:20 106:8 107:7 108:5 113:6 118:11 122:18 126:4

131:1,23 137:13 143:13 148:9 149:2 150:5 157:16 158:4 159:18 160:21

**travel** 37:4,5 87:14

**traveled** 138:19

**traveling** 85:11

**treat** 85:12 144:16

**trial** 36:23 37:4 40:3 42:22 159:3

**trip** 104:13

**trooper** 97:5 108:1,7

**truck** 33:24

**true** 67:10,19 112:20,21 116:4,21 159:7

**trust** 46:14

**truth** 51:23 91:19,21 147:5 158:17 159:5,6,9 160:3,8,9

**truthfully** 160:3

**truthfulness** 52:2 112:22

**tumultuous** 12:1

**turn** 25:7 75:15 87:16 101:1 105:9 111:21

**turned** 59:23 66:13,15 71:15 75:1,6, 11,18 76:18 77:1,8 82:12 87:10 88:2,23 93:18 96:10

**turning** 76:10 141:5,20

**turnoff** 68:22

**turns** 78:13

**TV** 40:19

**Twenty-five** 148:4

**Twenty-seven** 28:3,4

**Twinsburg** 8:19

**twist** 141:10

**two-ton** 33:24

**type** 16:13 36:15 45:13 73:4 81:2 145:11

**typically** 86:11

---

**U**

**U-TURN** 101:2

**U.S.** 15:19
24:13 150:17

**Uh-huh** 56:24

**ultimately**
127:6

**unable** 91:4
92:17 127:19

**uncommon**
69:11

**underneath**
132:9

**understand**
4:12 9:7 43:6
98:17 101:14
111:5 118:10

**understandin**
g 45:16 85:22
112:13
114:14
135:20 141:1,
15 142:20

**underwear**
113:13

**undisputed**
114:21

**unhelmeted**
129:16

**unincorporat**
ed 21:23

**United** 12:22
13:17 23:18,
21 24:3 80:24

**university**
5:23 6:1,2,4,
7,8

**unnecessary**
141:23

**unreasonable**
91:23 128:13
141:19
150:12

**unrestrained**
129:15

**untruthfulnes**
s 112:23

**unusual**
71:16

**up-to-date**
32:20

**upper** 120:15
128:3

**Use-of-force**
23:10

**utter** 128:11

**uttered**
121:21
122:22

**V**

**vaccination**
24:16

**Valley** 20:3

**vehicle**
26:10,12 30:1
31:3,8,17
32:21 33:11,
19 34:7,14,17
35:8 62:6,8,9
63:4 66:8
70:24 74:3,4
79:16 85:11
101:4 105:15
107:15
108:18

111:18,22,24
112:3,6
116:20 117:6,
17 119:1,8
125:8,13
139:2 140:14
142:11 145:4

**vehicles**
35:14 136:20
137:7

**version**
114:23 117:5

**versus** 39:4,
11 40:10
46:18 47:5

**victims** 139:3

**video** 50:6,11
51:16 110:14,
17 111:2,7,
13,15 116:6
131:18 132:1
146:20 147:6,
8,12,24
149:21 151:1
153:3 159:13

**videotape**
50:21 74:21
131:4 150:24

**viewed** 50:8,
15,18 147:24

**VIN** 62:23

**violating**
126:11

**violation**
52:11 59:24
62:3,21 63:3,
7,24 64:2,3,6
65:7 66:2

73:14 74:3
78:2,20 86:11
117:19
124:11
125:13,21

**violations**
48:12

**Virginia**
22:12 40:10
42:10,13,16,
18,24 43:3
49:5,8,10,13,
16,19,20,23
74:11 78:22
79:3,8 108:2
131:17

**visible** 120:4
145:7,9

**visit** 49:15,17
67:21

**visual** 86:14

**voluntarily**
154:10

**W**

**W-9** 161:11,
12

**W-A-K-E** 10:2

**waist** 133:2

**Wait** 122:8

**waiting** 93:23

**waive** 160:23,
24

**Wake** 10:2,19
12:6 26:18
27:8,9 153:18

156:3

**Walden** 5:23
6:7 7:8,13,14

**Walden's** 6:1

**walking**
33:21 80:7

**wanted** 26:7
51:7 72:22
85:5 86:6
158:8

**wanting**
127:4

**war** 14:22
22:19

**warn** 85:14

**warning**
55:18 73:9
76:3 85:7
86:23 127:8

**warranted**
79:18

**washing**
45:12

**watch** 147:6

**watched** 50:6
51:15 147:8

**water** 90:3
115:7 119:18,
20,24 120:4,
8,11,12,19,
22,23 121:9,
12,17,23
122:2 124:20
125:8 127:21
128:8,10,16,
19,24 129:1,5
130:20



132:15,18
133:19,23
135:2 136:16
138:21
145:18,23,24

**weapon**
120:14 121:8

**weapons**
23:12

**wearing**
129:10 145:8
148:18,23
149:12,16
150:9

**website**
29:11

**week** 9:6 15:9
37:17 56:20

**weighing**
71:7 100:11

**weight** 34:12
92:20 129:22

**West** 22:12
40:10 42:10,
13,15,18,24
43:3 49:5,8,
10,13,16,19,
20,22 74:10
78:22 79:3,7
108:2 131:16

**western**
18:13

**whatsoever**
23:17

**wheel** 92:5,8

**wheelchair**
66:17

**white** 101:13

**wife** 49:14
126:23
127:11

**window**
44:13 45:17

**wit** 4:4

**witness's**
51:20

**witnesses**
157:22

**witnessing**
128:3

**women** 96:23
97:9

**won** 46:3

**Wood** 38:22
40:1

**words** 28:2
122:22
133:16

**work** 6:11
14:21 24:6,18
40:19,21
41:4,8 44:5,
20 47:21
56:21 158:20
161:18

**worked** 10:3
44:8

**working** 8:7,
18 9:5 17:5
45:10 131:11

**works** 36:20

**world** 16:8

**worn** 29:9

**worried** 36:19
129:3

**worry** 36:16
135:5 157:23

**worth** 63:7
103:23

**wreck** 65:23
92:9,24
144:19

**wrecked**
80:19 99:15

**wrecks**
123:23

**wrist** 123:23

**wrists** 131:6
137:20

**write** 48:14

**Writing** 49:1

**written** 29:10

**wrong** 27:21

**wrote** 72:14

---

**Y**

---

**Yamaha**
60:11 61:13

**yard** 45:13

**year** 6:24
12:3 14:5
36:4 41:13,
15,16,17,24

**years** 10:1,8,
23 18:19 25:3
27:5,13,21
28:1,3,4
32:11 33:4

43:1 46:2
51:5,10,11
59:8 84:5
86:9 101:13
142:4,5
154:21

**yell** 123:13

**yield** 27:1
28:8 66:7
78:2 81:9

**York** 15:20

**young** 38:12

**YT250** 60:13

---

**Z**

---

**zone** 82:19
84:1,21 87:12