IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


WILLIAM ALLEN MEANS,

    Plaintiff,

v.          Civil Action No. 2:20-cv-00561

E.M. PETERSON, D. HARVEY, and
THE CITY OF SOUTH CHARLESTON,

    Defendants.


VIDEO DEPOSITION OF SERGEANT J. W. ROBINSON


THURSDAY, JUNE 3, 2021
1:24 P.M. - 2:27 P.M.


 CALWELL LUCE diTRAPANO, PLLC
500 RANDOLPH STREET
CHARLESTON, WEST VIRGINIA




Wendy M. Thomas
Certified Court Reporter

399 Blue Lick Road
Winfield, WV 25213
304-541-0636
wvnoah@yahoo.com

Video Depo: Sergeant J. W. Robinson
Civil Action No. 2:20-cv-00561
Thursday, June 3, 2021

---

**Sheet 2 Page 2**

A P P E A R A N C E S

On Behalf of the Plaintiff:

L. Dante DiTrapano, Esquire
Calwell, Luce, DiTrapano, PLLC
500 Randolph Street
Charleston, West Virginia 25302
dcarriger@cldlaw.com
crussell@cldlaw.com
jharwell@cldlaw.com


On Behalf of the Defendants:

Duane J. Ruggier, II, Esquire
Pullin, Fowler, Flanagan, Brown & Poe, PLLC
James Mark Building
901 Quarrier Street
Charleston, West Virginia 25301
druggier@pffwv.com
lburke@pffwv.com


Also Present:

Jim Damron, Legal Video Specialist

---

**Page 3**

T A B L E  O F  C O N T E N T S

WITNESS                    EXAMINATION

Sergeant J. W. Robinson      Mr. DiTrapano   Pg 4, 50

                             Mr. Ruggier     Pg 31, 52


EXHIBITS MARKED FOR IDENTIFICATION

EXHIBIT                              MARKED

No. 1 - Accident Report              Pg 14

No. 2 - Thumb Drive                  Pg 26

No. 3 - Photograph                   Pg 54

No. 4 - Photograph                   Pg 54


READ & SIGN SHEET / ERRATA SHEET     W A I V E D

REPORTER'S CERTIFICATE               Pg 55, 56

---

**Page 4**

1  P R O C E E D I N G S
2       VIDEOGRAPHER: This is the video deposition of
3  Sergeant J. W. Robinson being taken by the Plaintiff, Civil
4  Action 2:20-cv-00561, caption, Means v. Peterson, Harvey, and
5  City of South Charleston, US District Court for the Southern
6  District of West Virginia at Charleston.
7       We're beginning at 1324 on Thursday, the third day
8  of June 2020 at the law firm of Calwell, Luce, diTrapano in
9  Charleston, West Virginia. The court reporter is Wendy
10 Thomas. I am the videographer, Jim Damron. Will counsel
11 please state their appearances then our court reporter will
12 please swear in the witness.
13      Mr. DiTRAPANO: My name is Dante DiTrapano, and I
14 represent William Means.
15      MR. RUGGIER: Duane Ruggier on behalf of Peterson
16 and Harvey.
17 (WITNESS SWORN.)
18      (WHEREUPON,
19 SERGEANT J. W. ROBINSON
20      WAS CALLED AS A WITNESS, DULY SWORN, AND
21      TESTIFIED AS FOLLOWS:)
22 EXAMINATION
23      BY MR. DITRAPANO:
24      Q.   So I just learned that it is Sergeant Robinson now.

---

**Page 5**

1       A.   Yes, sir.
2       Q.   Okay. Congratulations for the -- the promotion
3  and --
4       A.   Thank you.
5       Q.   I just wanted to ask you a few questions today as
6  it relates to a call that you made -- that you came upon some
7  time back in May of 2020. And I wanted to ask you, have you
8  ever had your deposition taken before?
9       A.   Yes, sir, I have.
10      Q.   All right. So I'm not going to go through a bunch
11 of the typical instructions because you understand that one
12 of the most -- one of the things is, is that, you know,
13 you've been sworn in, so you're -- you're bound to tell the
14 truth; is that correct?
15      A.   Yes, sir, it is.
16      Q.   Is it also correct that it's very important for a
17 police officer in this job to tell the truth --
18      A.   Yes, sir.
19      Q.   -- in -- in all circumstances?
20      A.   I believe so, sir, yes, sir.
21      Q.   Whether in a deposition or in a report or -- or,
22 you know, to the supervisors or whatever the situation is.
23 And one of the things that comes along with the trust that we
24 give police officers is that we can trust that they're

---

Video Depo: Sergeant J. W. Robinson
Civil Action No. 2:20-cv-00561
Thursday, June 3, 2021

Sheet 3   Page 6

1  telling the truth. Do you agree with that?
2      A.    I agree.
3      Q.    I want to get into a little bit about -- of your
4  background. When did you go to the police academy?
5      A.    January of 2003.
6      Q.    All right. And was that at the academy in Dunbar,
7  West Virginia?
8      A.    Yeah, at Institute. Yes, sir.
9      Q.    Yeah. How old were you when you went into the
10 academy?
11     A.    Twenty-six I think, sir.
12     Q.    Twenty-six. Did you go to high school around here?
13     A.    I went to Man High School.
14     Q.    Okay. Down in Logan?
15     A.    Logan County, yes, sir.
16     Q.    Yeah. Are you born and raised in Logan?
17     A.    Yes, sir.
18     Q.    The Buffalo Creek area?
19     A.    Yes, sir.
20     Q.    So you're a Man Hillbilly?
21     A.    I am a Man Hillbilly --
22     Q.    Yeah.
23     A.    -- through and through.
24     Q.    Yeah. Good -- great people down there. After high

Page 7

1  school what's the first thing that you did?
2      A.    I worked -- worked for the sheriff's department
3  there in Logan.
4      Q.    So you were a member of the Logan County Sheriff's
5  Department?
6      A.    Yeah, as a -- as a process server.
7      Q.    All right. How long did you work for them?
8      A.    Six years.
9      Q.    Was that prior to you going to the police academy?
10     A.    Yes, it was. I started in 1996.
11     Q.    So what kind of training did you have to have to --
12 what kind of training do you have to have to be a sheriff's
13 deputy in Logan County?
14     A.    Well, I wasn't actually a deputy. I was a process
15 server, but no training, really.
16     Q.    Okay. So -- so you worked for the Logan County
17 Sheriff's Department as a process server, not as a police
18 officer?
19     A.    That is correct.
20     Q.    All right. And then at some point you decided that
21 you wanted to do something different than serve papers for
22 the Sheriff's Department so you did what?
23     A.    In 2003 I joined the State Police -- West Virginia
24 State Police.

Page 8

1      Q.    And how do you do that? How does one become a West
2  Virginia State Police Officer?
3      A.    Well, it's about a six-month process. It starts
4  out with an application and physical test, a knowledge test,
5  a general knowledge test, background investigation, a couple
6  different interviews and if you pass through the background
7  -- or through the process, they -- they let you in.
8      Q.    So there's actually an application process,
9  correct?
10     A.    Yes.
11     Q.    And then once you get in, then they send you to the
12 academy?
13     A.    That is correct.
14     Q.    All right. Did -- when you were at the academy,
15 did you have a -- a course that dealt with pursuit of
16 vehicles?
17     A.    Yeah, basically.
18     Q.    All right.
19     A.    It probably didn't just -- they probably just
20 didn't teach about pursuits, but it was -- it was taught,
21 yes.
22     Q.    What do you remember from -- from your experience
23 there? And this isn't a test. I just want to know if you
24 recall what -- what they taught you about pursuing, you know,

Page 9

1  motorcycles, cars, whatever it may be.
2      A.    I really don't remember exactly what they -- what
3  they taught us.
4      Q.    Do you remember that, perhaps, maybe there's some
5  balancing test that -- that -- that you have to take into
6  consideration the necessity of apprehension versus the risk
7  to the public?
8      A.    Absolutely.
9      Q.    Does that sound like that's something that they
10 would have taught you?
11     A.    Yes.
12     Q.    Is that something that's in this -- the policies
13 now as a -- the West Virginia State Police policies?
14     A.    Yes, it is.
15     Q.    So -- so you -- when you decide whether to take on
16 to pursue somebody, there's a test that you balance whether
17 or not it's -- it's so important to apprehend this particular
18 suspect and what the risk is to the general public?
19     A.    That's correct.
20     Q.    Okay. And if the risk to the general public
21 outweighs the need to apprehend, then you are supposed to
22 pull back from the pursuit?
23     A.    Yes, sir.
24     Q.    All right. Now, on this particular day -- and I

Video Depo: Sergeant J. W. Robinson
Civil Action No. 2:20-cv-00561
Thursday, June 3, 2021

Sheet 4   Page 10

1  believe it was May the 2nd.
2       MR. DITRAPANO: Is that right, Duane?
3       MR. RUGGIER: I believe that's correct.
4       BY Mr. DITRAPANO:
5       Q.  May the 2nd 2020, what -- what were your -- what
6  was your shift that day and what was your area that you were
7  working?
8       A.  I can't really remember the shift. I'm thinking it
9  was a day shift, but I was actually in the Madison area of --
10 of Boone County.
11      Q.  All right. Were you -- as part of your territory,
12 I guess, does it -- are you working in Boone County now?
13      A.  No, I'm working in South Charleston now in Kanawha
14 County.
15      Q.  Okay.
16      A.  May the 2nd of 2020, yes, I was in Boone County.
17      Q.  All right.
18      A.  We cover the entire county.
19      Q.  Is there a detachment in Boone County?
20      A.  Yes. It is in Danville.
21      Q.  Okay. So -- so you were working out of the
22 Danville detachment on May the 2nd of 2020 and you got some
23 kind of an alert that there -- that there may be a pursuit in
24 -- going on, correct?

Page 11

1       A.  Yeah, from -- from Boone County 911. They
2  dispatched it as a -- as a pursuit coming from Kanawha County
3  into Boone County.
4       Q.  Okay. Do you know --
5       A.  Possibly -- possibly coming into Boone County.
6       Q.  Okay. Do you know approximately where -- where you
7  were and what time it was when you received that notice?
8       A.  Not exactly, but I -- like I said, I was in -- in
9  the Madison area because it took quite a bit of time to get
10 to where -- to the scene.
11      Q.  All right. What did -- what did you do in response
12 to the 911 operator telling you that there was a possible
13 pursuit heading into Boone County?
14      A.  I -- I -- I responded to that location.
15      Q.  Okay. Did -- do you know -- you're in Madison, so
16 you're on the other side of Corridor G, I guess. Did you --
17 did you get out on, I guess they call it 119? Is that --
18      A.  Yeah. I got out on 119, made a right-hand turn on
19 Route 3 for several miles, then made a left-hand turn on
20 Riverview Road.
21      Q.  Okay.
22      A.  I got to Ashford and turned left on Inlands
23 (phonetic) Road.
24      Q.  Okay. And so you -- when you came into where the

Page 12

1  -- the wreck had occurred, you were coming down on the other
2  side of the tracks?
3       A.  Yeah. I was coming the opposite direction of the
4  pursuit, yes.
5       Q.  Okay. When you -- when you arrived at the scene,
6  had -- had there already been a -- an accident?
7       A.  Yes.
8       Q.  Okay. So -- so you were not a witness to anything
9  that happened at the -- in terms of whether Billy Means hit
10 the railroad track and wrecked or whether Peterson hit his
11 back tire and caused the accident? You -- you're not a
12 witness to either of those things?
13      A.  I'm not a witness to either of those, no.
14      Q.  Okay. What -- what did you see when you first
15 arrived at the scene?
16      A.  As I was coming down the hill to the scene I seen a
17 couple of the South Charleston Police Department, a couple of
18 their guys. As I got down and parked my car and I got out, I
19 could see a motorcycle laying over to the left of the track
20 in a waterhole, a drain. It was not completely submerged,
21 but most of the back was underwater. And I saw a gentleman
22 laying on the other side of the track on his back.
23      Q.  Okay. So -- so by the time you arrived, Billy
24 Means had already been taken across the railroad tracks to

Page 13

1  the other side?
2       A.  That is correct.
3       Q.  And were both the officers in the vicinity of Billy
4  Means at the time that you pulled your cruiser up?
5       A.  I -- I can't remember exactly what location they
6  were at, but they were in the -- in the general area, yes.
7       Q.  All right. Do you recall when you pulled up if one
8  of the South Charleston Police Department vehicles was
9  actually parked on top of the railroad tracks? The crossing?
10      A.  I don't think it was, sir.
11      Q.  What did you do when you arrived at the scene?
12      A.  I talked to the officers that was there. Like I --
13 like I was telling him earlier, I don't know either of --
14 either the Peterson or Harvey. I don't personally know them,
15 so I don't know who I was speaking with. And basically asked
16 them, you know, what happened. And they told me they
17 attempted to stop the motorcycle around Southridge, pursued
18 him here, and he didn't make the turn and -- and -- and he --
19 and he crashed and he went into the -- the drain and was face
20 down in the water, so they had to remove him from the water
21 and across the track so he didn't drown at that time.
22      Q.  Okay. So -- so they told you that he was face down
23 in the water?
24      A.  Best of my knowledge, yes, sir.

Video Depo: Sergeant J. W. Robinson
Civil Action No. 2:20-cv-00561
Thursday, June 3, 2021

### Sheet 5 Page 14

1  Q. And they told you that they needed to get him out
2  of the water because they feared he might drown?
3  A. Yes.
4  Q. Did they show you where in the ditch line that he
5  actually was?
6  A. No, sir. Just -- I mean I could see the motorcycle
7  where it was at. They just said he was right next to it, so,
8  I mean, I assumed he was laying in the water right beside of
9  it.
10  Q. I noticed that -- that you -- you actually did a --
11  an accident report; is that true?
12  A. Yes, sir.
13  Q. All right. And I don't want to ask you questions
14  without you having a chance to look at it, so I want -- I
15  want to mark this as Plaintiff's Exhibit 1.
16      (WHEREPON, Exhibit No. 1 was marked for
17       identification, and is attached hereto.)
18  MR. DITRAPANO: And I want you to give that to the
19  witness. Do you have a copy, Duane?
20  MR. RUGGIER: I think I do.
21  MR. DITRAPANO: All right.
22  BY MR. DITRAPANO:
23  Q. And I want to ask you some questions about this --
24  this accident report. Is it -- would it be just your normal

### Page 15

1  protocol because you responded to a -- an accident scene that
2  -- that you would fill out this report or were you asked by
3  the South Charleston Police to fill out this report?
4  A. Shoot. I don't remember if they asked or not, but
5  it is -- it's pretty normal that we work an accident, do the
6  accident report for that.
7  Q. Okay. And -- and you never spoke directly to Billy
8  Means when you filled out this accident report; is that
9  correct?
10  A. I did not. When I -- I think I was just a couple
11  minutes quicker than the EMS getting on scene.
12  Q. Yeah.
13  A. And they were tending to him and I just never got
14  an opportunity to get to speak with him.
15  Q. Okay. So you -- everything that's in this report
16  is based on information that you learned from Peterson and
17  Harvey, who are the two South Charleston Police Department --
18  A. Yes, sir.
19  Q. So what -- what they told you is -- is the -- is
20  the source of any information that's in this report?
21  A. Yes.
22  Q. Okay. So in the narrative it says -- this is on
23  page 2. It says vehicle 1 was traveling south on West
24  Virginia Route 3 at approximately 60 miles per hour while

### Page 16

1  being pursued by South Charleston Police Department. That
2  information would have come directly from one of the police
3  officers, correct?
4  A. Yes.
5  Q. Okay. Because -- because you didn't see him
6  driving 60 miles an hour; did you?
7  A. I did not, no.
8  Q. And Billy Means didn't tell you he was driving 60
9  miles per hour; did he?
10  A. He did not.
11  Q. Okay. So -- so 60 miles per hour had to come from
12  Peterson or Harvey; would you agree with that?
13  A. Yes.
14  Q. And then it says he refused to stop and, while
15  fleeing, lost control while crossing the railroad tracks and
16  crashed into an embankment. Now, that had to come from
17  Peterson or Harvey, right?
18  A. Yeah, but, I mean, it was pretty obviously he --
19  pretty obvious that he did crash down the railroad track.
20  Q. But -- but you don't know whether he crashed or
21  whether Peterson hit his back tire; do you?
22  A. I don't know that, no, sir.
23  Q. Okay. So -- so, again, what you put in this report
24  is based only on what you learned from Peterson and Harvey?

### Page 17

1  A. Correct.
2  Q. All right. And then it says vehicle 1 came to rest
3  approximately 60 feet to the south from where Route 1 beside
4  the railroad tracks and the creek. So you could learn that
5  on your own. Did you measure that 60 feet or just eyeball
6  it?
7  A. Just approximate.
8  Q. Okay. And -- and you just assumed that Billy was
9  close to the motorcycle, correct?
10  A. Yes. I never seen him. He was already across the
11  railroad tracks when -- when I got there, so.
12  Q. Okay. And that -- and that brings me to a --
13  another question I should have asked you when we were talking
14  about your training at the state police academy. Did you
15  have a -- a -- a course or a section in training about how to
16  deal with people who have been in an automobile or motorcycle
17  accident in terms of -- of, you know, making sure that they
18  are medically stable?
19  A. Other than the first aid, CPR, no, sir.
20  Q. Okay. So you -- so you wouldn't -- you wouldn't
21  have had any kind of training about not moving somebody who
22  could have had a neck or back injury?
23  A. Well, I mean that's common sense.
24  Q. Okay.

Wendy M. Thomas
Certified Court Reporter
304-541-0636

Video Depo:  Sergeant J. W. Robinson
Civil Action No.  2:20-cv-00561
Thursday, June 3, 2021

Sheet 6   Page 18

1   A.   So, yeah.
2   Q.   So -- so common sense would tell you that if
3   somebody had been in a high-speed chase on a motorcycle and
4   they wrecked, whether it was caused by the South Charleston
5   Police officer hitting the back tire or he just wrecked at
6   those speeds and thrown over a railroad track and -- and laid
7   beside the track, common sense would tell you that you don't
8   drag that person to the other side of the track by their
9   wrists.  Would you agree with that?
10  A.   Well, not really.  I mean if -- if this guy is
11  going to drown if I leave him here, I'm going -- I'm going to
12  remove him from the water to keep him from drowning.
13  Q.   Okay.
14  A.   I mean I'd rather have a broke arm than drown.  You
15  see what I'm saying?  So --
16  Q.   Okay.  But --
17  A.   But I understand what you're saying, but if -- if
18  -- if I left -- if you leave this guy alone, he's laying
19  there on the railroad track and a train -- and a train is
20  coming and I don't remove him, he's going to get run over by
21  the train and he's going to die.  Well, he's got a chance to
22  live if we move him off the track.
23  Q.   Was he ever on the railroad track?  Do you know if
24  -- did anybody tell you that he was on --

Page 19

1   A.   I think --
2   Q.   -- the railroad track?
3   A.   No, they never said he was on the railroad track.
4   That was just an -- an example, but the drug him across the
5   track.
6   Q.   Right.  But I mean is there no other way that they
7   could have -- and this is all sort of hypothetical because
8   you weren't there, but they -- they could have dealt with --
9   with making sure that they didn't disrupt his spinal cord and
10  his neck by, you know, treating him more gently than dragging
11  him by his wrists across the railroad tracks.
12       MR. RUGGIER:  Object to the form of the question.
13  You can answer.
14       THE WITNESS:  Say that again.
15       MR. RUGGIER:  You can -- I objected to the
16  question.
17       THE WITNESS:  Okay.
18       MR. RUGGIER:  But you still have to answer.
19       THE WITNESS:  I mean I wasn't there for that part
20  of the pursuit, so, I mean, I -- I don't know.  I don't know
21  what they could have done different.
22       BY MR. DITRAPANO:
23  Q.   Okay.  The pursuit was over with and he -- and he
24  -- he wrecked and he's laying, you know, in a ditch on the

Page 20

1   other side of the railroad tracks.  And there's a video of --
2   of the -- of the police officers grabbing him by his wrists
3   and dragging him across the railroad track.  And I'm just
4   asking you if -- if you believe that that was -- is the best
5   way that they could have handled somebody who was in a high-
6   speed crash like that.
7        MR. RUGGIER:  Same objection.  You can answer.
8        THE WITNESS:  I don't -- probably not, but, like I
9   said, I was not there.  I don't know.  I mean I have no idea.
10       BY MR. DITRAPANO:
11  Q.   Okay.  Okay.  You have in -- you have on page 6 of
12  the report that the vehicle was operating in a -- operating
13  vehicle in an erratic, reckless, or careless manner.  Now,
14  that's information that you learned from either Peterson or
15  Harvey, correct?
16  A.   Yes.
17  Q.   And then the charge of failure to maintain control
18  of the vehicle was also something you learned from them
19  because you don't know whether he was hit by one of the South
20  Charleston Police officers or wrecked on his own, right?
21  A.   That's correct.
22  Q.   Did you -- did you have any opportunity to speak
23  with the emergency medical folks when you arrived or when
24  they --

Page 21

1   A.   No.
2   Q.   -- they arrived?  They arrived after you, correct?
3   A.   Yeah, they -- they did arrive after I did, but no.
4   No, sir.  I didn't speak with them because they were working
5   with -- with the victim and got him loaded up and got him to
6   the hospital.
7   Q.   Do you remember when you arrived at the scene
8   whether or not Billy Means was on his back or face down to
9   the ground?
10  A.   He was on his back.
11  Q.   Okay.  Was he handcuffed?
12  A.   Yes, sir, I think he was.
13  Q.   Did you see the officers handcuff him?
14  A.   I did not.
15  Q.   So -- so when you -- when you arrived, what -- were
16  he -- was he cuffed in front of him?
17  A.   To the best of my knowledge, yes, sir, he was.
18  Q.   Okay.  So -- so he was -- he was facing up, so he
19  would be looking at the sky and his hands would have been,
20  you know, cuffed in front of him, correct?
21  A.   Yes, sir.
22  Q.   Was he conscious or unconscious?
23  A.   He was conscious because he was talking.
24  Q.   Okay.  Did -- what did he say?

Sheet 7 Page 22

1  A.  Well, when I say talking, he was screaming in pain.
2  Q.  Okay.  He was -- he was hurting; wasn't he?
3  A.  Yes.
4  Q.  Do you know that he's paralyzed?
5  A.  I had no idea, sir.
6  Q.  Okay.  He -- he -- he had a -- he suffered a spinal
7  cord injury and he's going to spend the rest of his life in a
8  wheelchair.
9  A.  I didn't know that.
10  Q.  You did not know that?
11  A.  I did not know that.
12  Q.  Okay.  And that -- thus, I was asking you the
13  questions about, you know, when somebody is in an accident
14  like that, grabbing him by his wrists and dragging him across
15  the railroad tracks might not be the best thing to do; would
16  you agree with that?
17      MR. RUGGIER:  Objection to the form of the
18  question.  He's not an expert in this area.
19      MR. DITRAPANO:  I'm not -- I'm just asking him.  He
20  -- he has training as a police officer, so I'm asking him a
21  question about if somebody is in a -- in an accident, which
22  we've got in the accident report that he was going 60 miles
23  an hour.  Got that from the South Charleston Police.  And he
24  was in an accident and -- and he -- and he wrecked and now

Page 23

1  they -- they drug him across the railroad tracks.  I was just
2  asking him, you know, did he think there was a better way to
3  handle it.  Maybe he's already answered it, but --
4      MR. RUGGIER:  Same -- I still object saying he's
5  not an expert and he wasn't at the scene, so he doesn't know
6  -- he doesn't know what happened, but you can ask him.
7      BY MR. DITRAPANO:
8  Q.  Do you think they could have treated a person in
9  that situation -- I'm talking about the two officers before
10  the emergency medical folks got there.  Do you think they
11  could have treated him in a way that was -- that -- that was
12  less likely to cause additional injuries?
13      MR. RUGGIER:  Objection.  Calls for a hypothetical.
14  He just wasn't there.
15      BY MR. DITRAPANO:
16  Q.  He's going to keep objecting to that.  You can just
17  answer the question, you know.
18  A.  I wasn't there and I don't know exactly how they
19  drug him, but, I mean, I'm sure, as a police officer, we can
20  always do something different after we sit back and look at
21  it, but at the time in the heat of the moment, I mean I -- I
22  don't know.  I can't really answer that.
23  Q.  Okay.  I'm getting ready to show you a video of
24  that so you -- you'll -- you'll see and then maybe you can

Page 24

1  give me a better answer than that.  And I -- and I'll ask
2  you, also, a question before we show the video.  I want you
3  to define for me what excessive force is.
4  A.  What excessive force is?  More force -- use more
5  force necessary than what it would take to -- to, I guess,
6  subdue the subject.
7  Q.  Okay.  There's a -- there's a thing in the -- in
8  the --- in the law that -- that we all had in -- in law
9  school that dealt with a supreme court case like back in
10  1964.  And it was -- it was -- it had to do with obscene
11  material, you know.  You can't really describe obscene
12  material, but you know it when you see it, right?
13  A.  Right.
14  Q.  And I've had people, you know, in your line of work
15  say that, you know, it's really hard to define excessive
16  force, but you know it when you see it.  Would you agree with
17  that?
18  A.  That's true, yes.
19  Q.  Okay.  Well, I'm going to show you a video.
20      MR. DITRAPANO:  Jasmine, I want you to play the
21  video.
22      BY MR. DITRAPANO:
23  Q.  I'm going to show it about three times before I ask
24  you any questions.  I want you to watch -- watch the video.

Page 25

1      MR. DITRAPANO:  I want you to show the -- the
2  stomping video.
3      MS. HARWELL:  We may need a brief break to get Josh
4  up here.
5      MR. DITRAPANO:  Okay.  Can -- can we take a -- a --
6  a couple of minutes?
7      VIDEOGRAPHER:  Going off the record at 1347.
8      (Brief recess.)
9      VIDEOGRAPHER:  Back on the record at 1352.
10      MR. DITRAPANO:  Okay.  Don't play it yet, Jasmine.
11      BY MR. DITRAPANO:
12  Q.  I want to -- I want to tell you that the South
13  Charleston Police officers do not have any body cams and they
14  do not have any dash cams, but there was a couple of
15  bystanders who pulled over in the car and they took a video
16  of this on -- on their iPhone.
17  A.  Okay.
18  Q.  And -- and -- and we've had it enhanced to -- you
19  know, so you can see it clearer.  And so I wanted to ask you
20  whether or not you would -- I'm going to have you watch it
21  three times and then I'm going to ask you some questions.
22  A.  Okay.
23  Q.  Okay.
24      MR. DITRAPANO:  Go ahead and play it.

Video Depo: Sergeant J. W. Robinson
Civil Action No. 2:20-cv-00561
Thursday, June 3, 2021

Sheet 8  Page 26

1      MR. RUGGIER:  Is this Exhibit 2?
2      MR. DITRAPANO:  This will be Exhibit 2 to the
3  deposition.
4           (WHEREPON, Exhibit No. 2 was marked for
5            identification, and is attached hereto.)
6           (WHEREUPON, Exhibit No. 2 was played into
7            the video record.)
8      MR. DITRAPANO:  Okay.  Play it again.
9           (WHEREUPON, Exhibit No. 2 was played into
10           the video record.)
11     MR. DITRAPANO:  Okay.  One more time.
12          (WHEREUPON, Exhibit No. 2 was played into
13           the video record.)
14     BY MR. DITRAPANO:
15     Q.    Okay.  Sergeant Robinson, you -- you just watched a
16  video, I had you watch three times of -- of one of the South
17  Charleston Police officers, and I'm going to represent to you
18  that's it's Harvey handling Mr. Means.  I want to ask you if
19  you would agree with me that that was excessive force.
20     A.    What was -- what was he trying to do in the video?
21  Just handcuff him?  Is that what he was doing?  I couldn't
22  really tell.
23     Q.    Do you want to watch it again?
24     A.    Yeah.

Page 27

1      Q.    Let's watch it again.
2      MR. DIRAPANO:  Go ahead and play it again.
3           (WHEREPON, Exhibit No. 2 was played into
4            the video record.)
5      BY MR. DITRAPANO:
6      Q.    Okay.  Would you agree with me that -- that -- that
7  Mr. Means was not in a position where he was any threat to
8  the officer?
9      A.    I wouldn't think so, no, sir.
10     Q.    Okay.  So -- so would you agree with me that
11  stomping on his head was excessive force?
12     A.    I probably would --
13     MR. RUGGIER:  Objection to the form of the
14  question.
15     THE WITNESS:  I'm not 100 percent sure by that
16  video if he -- that was the helmet he stomped on or head or
17  whatever or kicked out of the way, but, yeah, I probably
18  would have handled it a little different.
19     BY MR. DITRAPANO:
20     Q.    Okay.  What -- all right.  Would -- would you agree
21  with me that if -- if he, in fact, stomped on his head, which
22  is what the video shows, that that would be excessive force?
23     MR. RUGGIER:  Object to the form of the question.
24  The video doesn't show that.  But go ahead and answer.

Page 28

1      THE WITNESS:  Yes.
2      BY MR. DITRAPANO:
3      Q.    Okay.  So -- so you would agree that stomping on
4  the head of -- of -- of a -- of a defenseless person is
5  excessive force?
6      A.    Yeah.  I mean if that's actually what happened
7  there.  If that was his head that he stomped on, yes, I would
8  say that's excessive force.
9      Q.    Okay.  Do you want to watch it again?  Is there --
10  is there --
11     A.    Well, at the end of it, I couldn't tell whether --
12  to me, it looks like his helmet came off and that's what was
13  kicked or whatever happened there.
14     Q.    Okay.
15     A.    I -- I -- just by the way the helmet moved, the
16  white helmet moved, I don't think his head was in it.  I
17  think it was just the helmet.
18     Q.    Okay.  If I told you --
19     A.    But that's me, personally, looking at it, so --
20     Q.    Right.  If I told you that the helmet never left
21  his head, would you agree that that -- that he was stomping
22  on the helmet?
23     A.    Something happened, yes, sir.
24     Q.    Okay.  And you -- and -- and if he was stomping on

Page 29

1  the helmet of a defenseless person in this video, Billy
2  Means, you would agree that that's excessive force?
3      A.    Yes, sir.
4      Q.    Okay.  I want to show you another part of the
5  video.  This happens, actually, before the stomping on the
6  head.  And this is -- this is when he's on the other side of
7  the tracks after being -- after wrecking going 60 miles an
8  hour according to the officers.
9           (WHEREUPON, Exhibit No. 2 was played into
10           the video record.)
11     MR. DITRAPANO:  Okay.  One more time when they drag
12  him.
13          (WHEREPON, Exhibit No. 2 was played into
14           the video record.)
15     BY MR. DITRAPANO:
16     Q.    Would you agree with me that they're dragging him
17  across the railroad tracks?
18     A.    Would I agree with you?  Yes, they are.
19     Q.    Okay.  So you can see that pretty clear on the
20  video?
21     A.    Oh, yes, sir.
22     Q.    Okay.  Do you think in the video that -- in the
23  video that -- that -- knowing that he was in a wreck on a
24  motorcycle and, according to them, going 60 miles per hour

Video Depo: Sergeant J. W. Robinson
Civil Action No. 2:20-cv-00561
Thursday, June 3, 2021

### Sheet 9   Page 30

that that was an appropriate way to handle somebody in that kind of a wreck?

    MR. RUGGIER: Objection to the form of the question. You can answer.

    THE WITNESS: Like I said, I wasn't there to see that, so, I mean, I -- I can't answer that.

BY MR. DITRAPANO:

    Q. Okay. But you -- you know -- you know from your own training as a police officer and I know you're not an expert in this case, but you're a state police officer. From your own training, when somebody is involved in a high-speed collision, whether it was caused by Peterson or he wrecked on his own, there's a -- there's a risk of some kind of spinal cord injury; isn't there?

    A. Yeah. Yes, there is.

    Q. Okay. So -- so wouldn't the officer, if the EMTs aren't there, be the -- be the first responder?

    A. Yes.

    Q. Okay. And in that regard, wouldn't it be up to the officer, who is the first responder, to try to take as much care as possible to make sure that they don't exacerbate the injury?

    A. Yes, sir.

    Q. Okay. Did that look like, to you, dragging them

### Page 31

across the -- dragging Billy Means across the railroad tracks that they were being -- they were being cautious about not exacerbating any injury?

    A. No, sir.

    Q. Okay. And besides the -- what we've talked about here today, and I really appreciate you taking the time to, you know, come in and -- and give your testimony, there's nothing else that you know or have learned about this case that you think is important?

    A. No, sir.

    Q. Okay. Those are all the questions that I have.

EXAMINATION

BY MR. RUGGIER:

    Q. Let's see. So I'm going to have several questions for you, Officer. I'm going to bounce around a little bit. Would you agree with me that it would be common sense to pull an individual out of water after a motorcycle accident if that individual is drowning?

    A. Absolutely.

    Q. Would it be common sense to pull that individual out of the water if that individual asked to be pulled out of the water because they were drowning?

    A. Yes.

    Q. Would it be common sense or reasonable for a police

### Page 32

officer to move an individual if the -- if the police officers believe that the individual is drowning in water and beside the railroad tracks, you know, they could be struck by a train?

    A. Yes, sir. I would move him.

    MR. DITRAPANO: Did you say on the railroad tracks?

    MR. RUGGIER: I said beside. Beside the --

    MR. DITRAPANO: How are you going to get struck by a train beside the railroad tracks?

    MR. RUGGIER: You'll get your chance to ask questions later.

BY MR. RUGGIER:

    Q. Do you recall when you were there you come up on the scene and Mr. Means is already laying on the opposite side of the tracks, right?

    A. Yes. He was on the opposite side of the railroad track from his motorcycle --

    Q. All right.

    A. -- on his back.

    Q. Where the motorcycle was located, though, was -- was on the other side of the tracks, right?

    A. That's correct.

    Q. And it was in water?

    A. That is correct.

### Page 33

    Q. And that waster was how deep?

    A. I would say at least a couple feet. Maybe a little more. You could see in some of the pictures that the -- the motorcycle was submerged --

    Q. Motorcycle was --

    A. -- most of the way.

    Q. -- submerged and somebody -- an individual, if they were laying in that water and would not lift up their head, would be potentially drowning?

    A. Absolutely.

    Q. Now, you don't have any idea, do you, as to when Mr. Means actually became paralyzed?

    A. I do not.

    Q. And you don't -- when you arrived on the scene, was Mr. Means moving at all?

    A. Not that I can remember.

    Q. Have you ever dealt with anybody -- any situation where someone has become paralyzed?

    A. Not that I recall.

    Q. As a police officer?

    A. No, sir, not that I recall.

    Q. Have you ever heard of individuals who had phantom movement? In other words, they feel like they're moving, but they're not?

Video Depo:  Sergeant J. W. Robinson
Civil Action No.  2:20-cv-00561
Thursday, June 3, 2021

Sheet 10   Page 34

1   A.   No, sir.
2   Q.   You prepared the accident report?
3   A.   That is correct.
4   Q.   You got a copy of it, Exhibit 1.
5   A.   Yes.
6   Q.   And we'll go through the accident report a little
7   bit.  You prepared the -- the accident report of, I guess,
8   the state police, right?
9   A.   That's correct.
10  Q.   All right.  And in the accident report on page 1
11  you remark that the vehicle was operated -- Mr. Means
12  operated his vehicle in an erratic, reckless, or careless
13  manner.  Do you see that?
14  A.   On page 1?
15  Q.   Yeah.  The -- you got the right one?  Down on the
16  right-hand side there, halfway down through the page.  You
17  got the wrong report.  I'm looking at the South Charleston
18  Police --
19  A.   It's on page 4 I think.  Three or four.  No, six.
20  Q.   Let's see here.  Actually, I have the South
21  Charleston report.
22  MR. DITRAPANO:  You -- you want a copy of the state
23  police report?
24  MR. RUGGIER:  I've actually got it here.  I was

Page 35

1   just looking at the wrong one.
2   BY MR. RUGGIER:
3   Q.   Sorry.  Let's go back to -- let's go back to the
4   report that you prepared, which is Exhibit 1, correct?
5   A.   Okay.
6   Q.   Go to page 2, the narrative.  It says vehicle
7   number 1 was traveling south on West Virginia Route 3 at
8   approximately 60 miles per hour.  You got that from Officer
9   Peterson or Officer Harvey or do you know?
10  A.   One of the officers.  I'm not sure which one it
11  was.
12  Q.   Do you have any reason to doubt that?
13  A.   I do not.
14  Q.   Is it your understanding that this was a police
15  pursuit?
16  A.   Yes, it was.
17  Q.   And that Mr. Means was attempting to flee from the
18  police?
19  A.   Yes, sir.
20  Q.   Were you aware of anything about Mr. Means at that
21  time?
22  A.   I had never -- I didn't know him, no.
23  Q.   Okay.  Were you -- did you ever become aware of why
24  he was -- why he was fleeing from the police?

Page 36

1   A.   I think one of them mentioned it was traffic --
2   traffic violation.
3   Q.   Well, were you aware that he was in -- that he was
4   in position -- possession of some crystal meth?
5   MR. DITRAPANO:  I'm just going to object to the
6   form of the question.  That's not why he was being pursued,
7   Duane.
8   BY MR. RUGGIER:
9   Q.   Were you aware that he was in possession of some
10  crystal meth?
11  A.   No, sir.
12  Q.   Did you see any crystal meth at the scene?
13  A.   I did not.
14  Q.   Did you take any photographs of any crystal meth at
15  the scene?
16  A.   I did not.
17  Q.   Any -- any substances of any kind at the scene?
18  A.   I did not, no.
19  Q.   Did you -- do you remember seeing a backpack that
20  he had on?
21  A.   I did see a backpack, yes, sir.
22  Q.   Did you inspect the backpack or look in the
23  backpack?
24  A.   I did not.

Page 37

1   Q.   Okay.  Were you aware that Mr. Means did not have a
2   driver's license?
3   A.   Not at that time, no, sir.
4   Q.   Are you aware that he was driving on a revoked
5   driver's license?
6   A.   I -- I found that out later, yes, sir.
7   Q.   Were you aware that Mr. Means had previously
8   attempted to flee from the South Charleston Police officers
9   on another occasion a year or two ago?
10  A.   No.  I had no idea.
11  Q.   Were you aware that Mr. Means was driving on a
12  revoked license?
13  MR. DITRAPANO:  Asked and answered.
14  THE WITNESS:  No, I -- I wasn't aware at the time
15  of the crash, no.
16  BY MR. RUGGIER:
17  Q.   Were you aware that Mr. Means was driving without
18  insurance?
19  A.   Afterwards, yes, sir.
20  Q.   Were you aware that Mr. Means was driving with a
21  registration which didn't seem to match the bike?
22  A.   Yes, sir.
23  Q.   Do you have any reason to doubt that Mr. Means was
24  fleeing Officer Peterson?

Video Depo: Sergeant J. W. Robinson
Civil Action No. 2:20-cv-00561
Thursday, June 3, 2021

### Sheet 11  Page 38

1  A. I do not.
2  Q. Do you have any reason to doubt that Mr. Means, as
3 stated in the report, refused to stop and, while fleeing,
4 lost control while crossing a railroad tracks and crashed
5 into an embankment?
6  A. I do not.
7  Q. It states there that vehicle number 1 came to rest
8 approximately 60 feet to the south from West Virginia Route 1
9 besides the railroad tracks and the creek.
10  A. Yeah. That's where it came to rest at.
11  Q. Did you see that?
12  A. Approximately. I did see that.
13  Q. Did you see that with your eyes?
14  A. Yes.
15  Q. Do you have any understanding as to why the bike
16 ended up down there? In other words, further down the tracks
17 or do you have any idea?
18  A. Well, I mean, just by looking at the -- the scene
19 and seeing the couple gouge marks on the track that the bike
20 left the roadway and traveled down the railroad track.
21  Q. Okay. Is it your understanding that Mr. Means
22 struck something -- the gouge marks on the tracks, what did
23 they show?
24  A. Just that the vehicle had -- had hit the track.

### Page 39

1  Q. It hit the track?
2  A. Yeah.
3  Q. Hit the tracks at a high rate of speed?
4  A. I -- I would assume, yes.
5  Q. Presumably. Moving on to page 6. In you notes I
6 see on the far right that he was driving on a revoked license
7 under status.
8  A. Yes.
9  Q. And is that illegal?
10  A. Is that what, sir?
11  Q. Illegal?
12  A. Yes, it is illegal.
13  Q. And you note that he was under the influence of
14 medication/alcohol/drugs? On the left-hand side there.
15  A. Oh. Yeah. Yes, sir.
16  Q. And how do you -- where did you get that
17 information?
18  A. I don't remember, sir. I think it was one of the
19 officers that had mentioned that.
20  Q. Did Mr. Means tell you anything?
21  MR. DITRAPANO: Object to the form. And he -- he
22 said Mr. Means never talked to him.
23  THE WITNESS: No.
24  BY MR. RUGGIER:

### Page 40

1  Q. Did Mr. Means, by the way he looked, did it
2 indicate to you that he was on some type of medication or
3 drugs or something along those lines?
4  A. I mean I couldn't tell by just looking at him.
5  Q. Are you aware that Mr. Means is an admitted drug
6 addict?
7  MR. DITRAPANO: Object to the form.
8  THE WITNESS: Like I said, sir, I didn't know Mr.
9 Means prior to that day, so I -- I -- I couldn't answer that.
10  BY MR. RUGGIER:
11  Q. Were you aware that Mr. Means testified that he's
12 -- he's an admitted drug addict?
13  A. I'm not aware of that, no.
14  MR. DITRAPANO: Object to the form.
15  BY MR. RUGGIER:
16  Q. I know that you say alcohol use was not suspected
17 on the left-hand side there of your report.
18  A. Alcohol use was not suspected.
19  Q. Yes.
20  A. Yeah. Let me just -- let me find it again.
21  Q. It's on page 6.
22  A. Yes.
23  Q. But you do say that drug use was suspected?
24  A. Yes.

### Page 41

1  Q. And where do you get that from?
2  MR. DITRAPANO: Object to the form. He just said
3 the officers told him that, Duane. And you asked the same
4 question twice in -- within the last 30 seconds. He said the
5 officers told him that.
6  BY MR. RUGGIER:
7  Q. Were do you get that from? Where do you get that
8 information from?
9  A. From the officers.
10  Q. Did you have anything yourself that showed you or
11 demonstrated to you that drug use was suspected, because this
12 is your report, right?
13  A. Right. Yeah. No, sir, I didn't. Just going on
14 what the officers told me, but I wasn't able to do any kind
15 of field sobriety or anything on Mr. Means.
16  Q. So why did you -- why did you mark that drug use
17 was suspected?
18  A. I was just going on what the -- what the officers
19 had told me.
20  Q. Did they tell you why they suspected drug use?
21  A. Not that I recall, sir. I can't remember.
22  Q. Then on page 7 you marked that it was a failure to
23 maintain control of the vehicle.
24  A. Uh-huh.

Sheet 12   Page 42

1  Q. Did you base that on what the officer's told you?
2  **A. Well, no, that was pretty obvious. He lost control**
3  **and he crashed.**
4  Q. Lost control? You based that on looking at the
5  scene?
6  **A. Yes.**
7  Q. Okay. Have you seen any photos of the gouge marks?
8  **A. Yes.**
9  Q. How about you -- you show me if -- tell me if those
10 -- that -- the photo of those gouge marks are in this group
11 of photographs here. You can -- if you can find that photo,
12 we can make that photo an exhibit.
13 **A. Okay.**
14 Q. Here it is.
15 MR. DITRAPANO: What are you handing the witness?
16 I'd like to see it.
17 MR. RUGGIER: Those are some photographs, which
18 were attached to the report.
19 MR. DITRAPANO: Attached to the state police
20 report?
21 MR. RUGGIER: I think that they're attached -- they
22 may be attached to the South Charleston Police officer's
23 report. Those are the ones that have been floating around.
24 MR. DITRAPANO: Are you making the whole thing an

Page 43

1  exhibit or --
2  MR. RUGGIER: I'm not sure yet. I want to see what
3  he finds out.
4  THE WITNESS: These two picture here appear to be
5  the -- the gouge, the scrape marks.
6  BY MR. RUGGIER:
7  Q. All right. Let me -- can you hold them up so we
8  can see? Could you show me where the gouge mark is?
9  **A. Looks like it appears to be right in this area**
10 **right here.**
11 Q. Okay. Were the -- that is -- is that -- that's the
12 metal portion of the track?
13 **A. Yes.**
14 Q. Okay. And that -- is that on the area of the track
15 where -- is it the crossing part of the track?
16 **A. No. That is in between where the motorcycle came**
17 **to rest and the -- the crossing.**
18 Q. Okay. And do you have any idea why or how the
19 motorcycle got there?
20 **A. I guess when he -- the way the road was designed,**
21 **it -- when he went to cross the railroad track, lost control,**
22 **and instead of making the turn on the road way, he went**
23 **straight down the railroad track.**
24 Q. Okay. Is that what the scene looked like to you,

Page 44

1  not just based on what the officers told you?
2  **A. Yes, sir.**
3  Q. Okay. And -- and explain to me, then, just how --
4  how -- so he's -- he's on the straight away to your
5  understanding, right?
6  **A. Uh-huh.**
7  Q. Right? And he then has to kind of veer up left.
8  **A. Yeah, he has -- the road -- it's a straight away,**
9  **then it makes a -- kind of a sharp left-hand turn across the**
10 **track.**
11 Q. Okay.
12 **A. And then another right-hand turn.**
13 Q. Right.
14 **A. So when he was coming down the straight stretch, he**
15 **couldn't make the turn.**
16 Q. Yeah.
17 **A. So he went straight down the track.**
18 Q. Okay. And that's what the evidence seems to
19 suggest?
20 **A. Yes.**
21 Q. And that's not based on just what the officers told
22 you happened?
23 MR. DITRAPANO: I'm just going to object to the
24 form.

Page 45

1  THE WITNESS: No, sir.
2  BY MR. RUGGIER:
3  Q. Okay. So would you agree with me that the evidence
4  suggests that Mr. Means simply lost control of his bike --
5  MR. DITRAPANO: Object to the form.
6  BY MR. RUGGIER:
7  Q. -- as to why he had wrecked?
8  **A. Yes, he did lose control of his vehicle.**
9  Q. Yeah.
10 **A. Or of the motorcycle.**
11 Q. What's that? Yeah, the motorcycle.
12 **A. Uh-huh.**
13 Q. And that is suggested to you by the gouge marks,
14 the location of the motorcycle, and the -- I guess maybe the
15 location of Mr. Means?
16 MR. DITRAPANO: Object to the form.
17 THE WITNESS: Well, like I said, Mr. Means was
18 across the railroad track, but his motorcycle -- compared to
19 the location of his motorcycle and the gouge mark that was on
20 the track and the debris that was in between the track and
21 the motorcycle indicated that was the path of the -- of the
22 motorcycle.
23 BY MR. RUGGIER:
24 Q. Does -- does that -- does that view -- is that

Sheet 13   Page 46

comport with what Officer Peterson told you happened?
   A.   Yes.
   Q.   And does that view -- does the evidence comport with what Officer Harvey told you had happened?
   A.   Yes.
   Q.   Did you speak to the EMTs after the incident -- after the accident?
   A.   I did not, no.
   Q.   And I -- do you recall exactly who all you spoke with?
   A.   Just the officers that was on the scene. That included Deputy Mullins from -- from the Boone County Sheriff's Department.
   Q.   Okay. Anybody else?
   A.   Not that I recall, sir. Well, the wrecker driver when he showed up, but that's it.
   Q.   Okay. When you were on scene -- when you arrived on scene, you beat the EMTs there, correct?
   A.   By a couple minutes, yes.
   Q.   A couple minutes. And Mr. Means was laying on the -- laying on the -- on the ground?
   A.   That is correct.
   Q.   And he was handcuffed at that point?
   A.   Yes.

Page 47

   Q.   Was he -- did you tell me he was laying face up or face down?
   A.   He was laying face up looking -- looking at the sky.
   Q.   Okay. And then the EMTs came and they -- what -- put him in the -- in the ambulance?
   A.   They worked with him a couple minutes while he was laying there and then, yes, they put him in the ambulance.
   Q.   Okay. Did they -- did they mobilize him before putting him in the ambulance?
   A.   I -- I don't know. I couldn't answer that.
   Q.   You don't know? Do you know -- did they put anything on his head that you remember?
   A.   I -- to be honest, I don't remember.
   Q.   Did they put him in the ambulance on a stretcher?
   A.   I can't remember.
   Q.   You just don't know?
   A.   No.
   Q.   I got you. So you've been a police officer for a long time.
   A.   Well, in between 18, 19 years.
   Q.   Does it seem reasonable to you that Mr. Means said or testified that, during the pursuit, the reason he could not stop his motorcycle was because the police cruiser behind

Page 48

him was too close, so he was unable to stop because he felt that the cruiser would hit him?
   MR. DITRAPANO:   Object to the form. What's that have to do with it?
   THE WITNESS:   I mean I don't know why he couldn't stop.
   BY MR. RUGGIER:
   Q.   Doesn't sound reasonable; does it?
   A.   It does not.
   Q.   Now, are you aware that in the -- that -- that Officer Harvey said I never stomped -- I never stomped on the helmet of the Plaintiff?
   A.   Am I aware of that?
   Q.   Yeah.
   A.   No.
   Q.   Are you aware that Officer Harvey said what I did was I tried to step over top of his helmet and, because the helmet is bigger than his head, I had to step over top, which put me in a vulnerable position, so I put my foot down quickly on the ground?
   MR. DITRAPANO:   Object to the form. That's nothing -- he didn't say anything like that.
   THE WITNESS:   I mean that's the first time I've heard of the video, the first time I've seen the video --

Page 49

   BY MR. RUGGIER:
   Q.   Sure.
   A.   -- or of any -- anything like that going on, so, I mean, I wasn't aware of any of that.
   Q.   Okay. Are you familiar with stolen bicycles [sic] are often painted over? Is that something --
   MR. DITRAPANO:   Object to the form.
   BY MR. RUGGIER:
   Q.   -- that you're aware of? Is that true?
   A.   Sometimes they are, yes, sir.
   Q.   Maybe the gas tank will be painted over?
   A.   I've seen that before, yes.
   Q.   When you arrived on the scene, do you recall if any of the police officer's lights were on?
   A.   Yeah, I think the lights maybe -- maybe some sirens, but I'm pretty sure there was lights on.
   Q.   Do -- when you arrived on the scene do you recall if any sirens were on?
   A.   I think so, yes.
   Q.   So more likely than not, lights and sirens were on?
   A.   Yeah, lights and sirens because -- because I remember once we got there -- once I got there, you could hear the sirens and then, once they got everything situated, they went and turned them off -- turned the sirens off.

Video Depo:  Sergeant J. W. Robinson
Civil Action No.  2:20-cv-00561
Thursday, June 3, 2021

Sheet 14   Page 50

1  Q.  Did you see any --
2  A.  Because it was loud.
3  Q.  I'm sorry.
4  A.  It -- because it was loud.  I mean you just
5  couldn't --
6  Q.  Did you see any evidence at the scene that Officer
7  Peterson's vehicle struck the Plaintiff's motorcycle?
8  A.  I did not.
9  Q.  Do you have any reason to doubt that Officer
10 Peterson was lawfully attempting to pull over Mr. Means
11 during the pursuit?
12      MR. DITRAPANO:  Object to the form.
13      THE WITNESS:  I do not.
14      BY MR. RUGGIER:
15 Q.  Were you aware that Mr. Means, since this incident,
16 has overdosed on drugs?
17      MR. DITRAPANO:  Object to the form.
18      THE WITNESS:  I'm not aware.
19      MR. RUGGIER:  I don't have any further questions.
20      MR. DITRAPANO:  I have just a couple follow-ups.
21 RE-EXAMINATION
22      BY MR. DITRAPANO:
23 Q.  Now, Duane was asking you some questions about how
24 the accident occurred.  I mean you didn't do an accident

Page 51

1  reconstruction; did you?
2  A.  We did not.
3  Q.  Okay.  So you -- you were relying on what Officer
4  Peterson and Officer Harvey told you about the incident;
5  isn't that right?
6  A.  Correct.
7  Q.  Okay.  And -- and, you know, your conclusion that
8  -- that there was a -- a -- a wreck that happened that did
9  not involve Officer Peterson hitting the back tire was based
10 upon what Officer Peterson told you?
11 A.  Yes.
12 Q.  So -- so if -- if Billy Means said that Officer
13 Peterson hit his back tire and caused the accident, you don't
14 have any way to dispute that other than what Officer Peterson
15 told you?
16 A.  Well, I mean, there -- there was no evidence that
17 indicated that.  There was no damage.  Well, obviously, the
18 motorcycle was very damaged.  We don't know how that got
19 there.
20 Q.  All right.  Did you inspect -- did you inspect
21 Officer Peterson's vehicle?
22 A.  No, sir.
23 Q.  Okay.  So you don't know whether Officer Peterson
24 hit him or not; do you?

Page 52

1  A.  Right.
2  Q.  Okay.  And you're going off what they told you?
3  A.  Yes.
4  Q.  All right.  And -- and you testified under oath
5  here at this deposition that -- that, to you, it looked like
6  Officer Harvey had kicked the helmet of Billy Means; isn't
7  that right?
8  A.  Yes, that's what I said.
9  Q.  Okay.  And -- and if I'm telling you that the
10 helmet was on his head, then he kicked his helmet while it
11 was on his head, correct?
12 A.  Yes.
13 Q.  He didn't step over top of him; did he?
14      MR. RUGGIER:  Object to the form of the question.
15 That's false.
16      THE WITNESS:  I -- I don't -- I don't know exactly
17 what happened, but it looks like he kicked the helmet is what
18 it looked like.
19      MR. DITRAPANO:  Okay.  I don't have any further
20 questions.
21 RE-EXAMINATION
22      BY MR. RUGGIER:
23 Q.  The only thing you heard Mr. Means do was -- was
24 scream out in pain.  You didn't hear him say anything to you

Page 53

1  at all?
2  A.  Not that --
3  Q.  You didn't hear him --
4  A.  Not that I recall.
5  Q.  You didn't hear him say any words that you recall?
6  A.  No, not that I recall.
7  Q.  Was he talking or was he just screaming in pain or
8  do you remember?
9  A.  Well, when the EMS was there, I -- I wasn't close
10 to him, but I assume he was talking to them.
11 Q.  Okay.  Did you see him speaking with people?
12 A.  No.
13 Q.  Did he -- was he alert or was he passed out or was
14 he -- do you remember?
15 A.  I'm pretty sure he was alert.
16 Q.  Okay.  And why do you say that?
17 A.  Because he was screaming.
18 Q.  Okay.  I don't think I have any other questions.
19      MR. DITRAPANO:  You have the right to read the
20 deposition and make sure that this young lady took down
21 everything accurately, but it's videoed, so, you know, you
22 can waive it and you don't have to fool with it anymore.
23 Would you want to --
24      THE WITNESS:  I don't -- I'm good.

### Sheet 15   Page 54

```
1        MR. DITRAPANO:  Okay.
2        VIDEOGRAPHER:  Going off the record at 1427.
3            (WHEREUPON, two photographs were marked as
4             Exhibits No. 3 and 4, and are attached
5             hereto.)
6  (Video Deposition Concluded.)
```

### Page 56

counsel, or financially interested in the action, or interested, directly or indirectly, in the matter in controversy.

    I certify that the attached transcript meets the requirements set forth within article twenty-seven, chapter forty-seven of the West Virginia Code.

    Given under my hand this 18th day of June, 2021.

    My commission expires March 15, 2025.

_____
Wendy M. Thomas
Certified Court Reporter
and Notary Public

### Page 55

REPORTER'S CERTIFICATE
STATE OF WEST VIRGINIA,
COUNTY OF KANAWHA, to-wit:

    I, Wendy M. Thomas, Notary Public within and for the State of West Virginia, duly commissioned and qualified, do hereby certify that the foregoing videotaped deposition of SERGEANT J. W. ROBINSON was duly taken by and before me, under the West Virginia Rules of Civil Procedure, at the time and place and for the purpose specified in the caption thereof; the said witness having been duly sworn by me to testify the whole truth and nothing but the truth concerning the matter in controversy.

    I do certify that the said videotaped deposition was correctly taken by me by means of the Stenomask; that the same was transcribed by me or under my direct supervision, and that the said transcript is a true record of the testimony given by said witness.

    I further certify that I am not connected by blood or marriage with any of the parties to this action, am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or