IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

**WILLIAM ALLEN MEANS,**
      **Plaintiff,**

**v.**                                    **Civil Action No.: 2:20-561**

**E.M. PETERSON and D. HARVEY,**
      **Defendants.**

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Defendants, by counsel, and state as follows for their *Memorandum.*

## BACKGROUND

1.  On May 2, 2020, Plaintiff William Means was driving a motorcycle, without proper registration, insurance, or a license,[1] southbound on US 119 at the intersection of Southridge Boulevard, in South Charleston, West Virginia. Plaintiff was driving under the influence of several narcotics, including amphetamines, opiates, THC, and ecstacy.[2]

2.  Officer Peterson was on duty and noted that the motorcycle was spray painted black and its registration was improperly displayed, did not match the motorcycle, and expired. Peterson knew by experience that stolen motorcycles are often spray painted.[3] Peterson called for assistance, announced on the radio that the motorcycle may be stolen, and noticed Plaintiff look over his shoulder at him multiple times while at the red light before suddenly changing lanes and turning

---

[1] Pl's Test., Dep. Tr. 42:5–10, March 29, 2021, attached hereto as Ex. 1; Case Report at 1, attached hereto as Ex. 2.
[2] Toxicology Report, attached hereto as Ex. 3. Plaintiff continues to use drugs. *See* Medical Records, attached hereto as Ex. 4. Since the filing of this lawsuit, Plaintiff has non-fatally overdosed on drugs.
[3] Peterson Test., Dep. Tr. 106–107. 143, 257. 277–278, attached hereto as Ex. 5.

toward Trace Fork Road.[4]   These facts, Peterson's experience, as well Plaintiff's flight once Peterson attempted to stop him, indicated to Officer Peterson the bike may be stolen.[5]

3.   Officer Peterson realized he would not have time to await back up as Plaintiff darted to the left to exit Route 119, so he engaged his lights and sirens, hitting two horn sounds and a yelp to signal Plaintiff to pull over.[6] Plaintiff fled. Officer Peterson kept his lights on the entire duration of the pursuit.[7] Plaintiff does not recall whether Officer Peterson had engaged his lights. When Peterson spoke on the radio, he'd turn his sirens off to be heard, but would turn them back on when not using the radio.[8] Officer Peterson also selectively used his sirens to avoid noise pollution in the event he had to exit his car and use his handheld radio.[9] Although Plaintiff contends that he heard no sirens for the duration of the pursuit, it is indisputable that sirens can first be heard at the 6:24 point of the recording and other times.[10] A bystander, Mary Chandler, recalls hearing sirens as Plaintiff fled.[11] Plaintiff states he did not hear any sirens, but was wearing Bluetooth headphones while driving.[12] Notably, Plaintiff is no stranger to police pursuits as Plaintiff had fled police a year before in February 2019 and has been convicted of the felony of fleeing with reckless indifference.[13] Accordingly, Plaintiff has no corroborating evidence that Officer Peterson failed to

---

[4] Case Report at 1, attached hereto as Ex. 2; Radio Recording at 0:13, attached hereto as Ex. 6.
[5] Peterson Test., Dep. Tr. at 143:16–24; 111:18–22; 112:9–13; 116:8–14, attached hereto as Ex. 5.
[6] *Id.* at 146:18–23.
[7] *Id.* at 157.
[8] *Id.*
[9] *Id.* at 157:7–13.
[10] Radio Recording at 6:24, attached hereto as Ex. 6.; *see also id.* at 11:06, 12:02.
[11] Chandler Test., Dep Tr. 9, 11, 20–21, attached hereto as Ex. 7.
[12] Pl's Test., Dep. Tr. 90–91, March 29, 2021, attached hereto as Ex. 1.
[13] Indictment, attached hereto as Ex. 8; Dec. 8, 2020, letter from Kanawha County Office of the Prosecuting Attorney, attached hereto as Ex.9; Plea and Conviction Order, attached hereto as Ex. 10; Order Accepting Pleas of Guilty, attached hereto as Ex.11.

engage his lights and sirens, the positive evidence shows otherwise, and it is thus beyond genuine dispute that Officer Peterson had his lights and siren engaged during the pursuit.

4.   During the pursuit, Plaintiff accelerated and exceeded the speed limit through the straight stretches of the pursuit and slowed down around curves.[14] The pursuit lasted approximately 12 minutes and 7 seconds over 11.57 miles.[15] Plaintiff's average speed was thus approximately 57 miles per hour in a 25 mile-per-hour zone.[16] Plaintiff ran three stop signs, tried to slow down by putting his feet on the road, swerved to miss a dog, negotiated sharp and slight turns crossing into the opposite lane of travel, and ultimately lost control of the motorcycle.[17]

5.   When Plaintiff turned from Heavenly Drive onto a gravel access road containing ruts, Plaintiff attempted to discard his backpack. Plaintiff slowed down due to the terrain and continued looking over his shoulder at Officer Peterson.[18] Parts of Plaintiffs' motorcycle started to fall off its frame.

6.   The pursuit came upon a creek bed with approximately 4 feet of water. Officer Peterson stopped because he thought Plaintiff would stop before the water, but Plaintiff put his feet up in line with the handlebars and drove through the creek.[19] Plaintiff ended up on the other side of the creek coming up onto Emmons Road where the pursuit continued.

7.   Once the pursuit reached Emmons Road, the officers were advised that a Boone County deputy and a West Virginia state trooper were positioned at the Kanawha/Boone County Border

---

[14] Peterson Test, Dep. Tr. 50:11–23, attached hereto as Ex. 5.
[15] *See* Radio Recording, attached hereto as Ex. 6.
[16] Report of John Painter at 8, attached hereto as Ex. 12.  Defendants disclosed their experts, including Mr. Painter as their accident reconstruction expert, on July 1, 2021.
[17] Peterson Test., Dep Tr. 126, 128, 168–169, attached hereto as Ex. 5; Case Report, attached hereto as Ex. 2.
[18] Peterson Test., Dep Tr. 130:17–24, attached hereto as Ex. 5
[19] *Id.* at 134:14–19.

3

and would intercept Plaintiff if the pursuit continued.[20] Near the end of the pursuit, it is undisputed that Plaintiff was driving recklessly.[21]

8.   Before Plaintiff could be intercepted, Plaintiff wrecked the motorcycle on railroad tracks. In his deposition, Officer Peterson drew the path of Plaintiff's bike before the crash; Plaintiff drove off the road before striking the railroad tracks.[22]

9.   When Plaintiff's bike reached the railroad tracks, the tracks spun the bike and ejected Plaintiff through the air. Plaintiff's body then came down, struck the tracks, and went into the ditch area where Officer Peterson lost sight of him.[23]

10. Officer Peterson was 3 to 4 car lengths behind Plaintiff when the motorcycle struck the tracks.[24] Officer Harvey did not witness the cause of the crash but verifies that Officer Peterson was closer to Officer Harvey, who was trailing the pursuit, than he was to Plaintiff.[25]

11. When the Officers reached Plaintiff, he was screaming, and they instructed him to show his hands.[26] With Officer Harvey providing cover, Officer Peterson holstered his gun and went into the water. As the Officers got closer, Plaintiff would not show his hands or let the officers gain control of his hands, but instead put his hands under the water toward his waistband. Officer Peterson got into the water and grabbed Plaintiff's left hand but Plaintiff continued to refuse to show his other hand and was pulling away.[27] At this point, Officer Harvey used a short burst of

---

[20] *Id.* at 173:7–14.
[21] *See id.* at 50.
[22] *Id.* at 274; *id.* at Ex. 9 attached thereto.
[23] *Id.* at 191:6–11.
[24] *Id.* at 193:1–14
[25] Harvey Test, Dep. Tr. 73–74, attached hereto as Ex.13.
[26] *Id.* at 108–110.
[27] *Id.*

OC spray. The OC spray had no effect on Plaintiff, and Plaintiff did not seek any medical attention for the same as evidenced by ambulance records.[28]

12. Officer Peterson testified that they did not have time to assess Plaintiff's injuries or move him to a shallow part of the water because Plaintiff told them he was drowning.[29] The water in the ditch was apparently surprisingly deep as can be seen in the photograph. Moreover, the ditch can be seen to be directly beside the tracks. In the water, Plaintiff asked the Defendant Officers to help him out of the water because he felt he was going to drown.[30] Given his statement that he was drowning and the possibility of a train arriving, the Officers removed Plaintiff from the water.[31]

13. Officers Peterson and Harvey lifted Plaintiff under each arm and carried him out of the water, up the incline of the railroad tracks, across the railroad tracks, and back down the decline on the other side of the railroad tracks, with difficulty the entire time. At the time of the incident, Plaintiff was 5'10" tall and weighed 177 lbs.[32] He was also wearing clothes and a motorcycle jacket that were soaking wet from the water, as well as a motorcycle helmet.

14. As Officer Peterson went to check on the cruiser, Officer Harvey grabbed Plaintiff's right wrist and ordered him to roll over. Plaintiff did not comply and attempted to grab Harvey's right wrist with his left hand. Officer Harvey moved his hand to stop Plaintiff, rolled him over, and cuffed him behind his back. He did not cuff Plaintiff in the front or through a belt loop because there was still a possibility Plaintiff could reach a weapon.[33]

---

[28] Ambulance record, attached hereto as Ex. 14.
[29] Peterson May 2, 2020, Photograph, attached hereto as Ex. 22.
[30] Pl's Test., Dep. Tr. 105, March 29, 2021, attached hereto as Ex. 1; Peterson Test., Dep. Tr. 215, attached hereto as Ex. 5.
[31] Peterson Test., Dep. Tr. 196–197, attached hereto as Ex. 5.
[32] Pl's CAMC General Hospital May 2, 2020 Admission Record, attached hereto as Exhibit 23.
[33] Harvey Test., Dep. Tr. 128, attached hereto as Ex. 13.

15. Only after the Officers moved Plaintiff out of the water per Plaintiff's request and brought him up the slope and across the tracks did Plaintiff tell the Officers that he could not feel his legs.[34]

16. Officer Peterson observed white stuff around Plaintiff's mouth, indicating to him that Plaintiff was on some type of drug.[35] After the accident, police found 0.52 grams of methamphetamine in a small black Nintendo case.[36] The pack also contained miscellaneous tools, tubing, two small propane canisters, gloves, and two small lights.[37]

17. Two bystanders, Mary Chandler and Melissa Nunley, recorded a cell phone video of Officer Peterson and Officer Harvey apprehending Plaintiff.[38] The bystanders shot the video 55 to 65 feet from the scene.[39] The bystanders comment in the video that one of the officers use a taser on Plaintiff and stomp on his helmeted head. However, Plaintiff has never claimed to be tased and Officer Harvey has clarified that neither he nor Officer Peterson were carrying tasers.[40] Plaintiff has failed corroborate that he was stomped on, as explained *infra*.

18. As a result of this incident, Plaintiff was charged and indicted with two felonies: fleeing with reckless indifference and fleeing under the influence.[41]

19. As a result of the accident, Plaintiff suffered injuries and is now a paraplegic. As Plaintiff's disclosed, proposed law enforcement expert Roy Taylor has testified, Plaintiff could have avoided his injuries if he had simply pulled over.[42]

---

[34] Pl's Test., Dep Tr. 23, April 20, 2021, attached hereto as Ex. 15; Peterson's Test., Dep. Tr. 225, attached hereto as Ex.5; Case Report at 8, attached hereto as Ex. 2.
[35] Peterson Test., Dep. Tr. 228:8–14, attached hereto as Ex. 5.
[36] Case Report at 9, attached hereto as Ex. 2.
[37] *Id.*
[38] *See* Video, attached hereto as Ex. 16.
[39] Report of Steven D. Ashley at 24, attached hereto as Ex. 17. Mr. Ashley is Defendant's law enforcement use of force expert disclosed on July 1, 2021.
[40] *See* Doc 1; Harvey Test., Dep. Tr. 82:4–10, attached hereto as Ex. 13
[41] *See* Exs. 8–11 attached hereto.
[42] Taylor Test., Dep. Tr. (draft due to exigency) 75, 77, 83, 88, 90, 94, 95, 98, attached hereto as Ex. 18.

20. The Court issued its *Memorandum Opinion and Order* on November 13, 2020, leaving only excessive force claims against Defendants Officer Peterson and Officer Harvey and gross negligence and reckless claims against Officer Peterson.

## STANDARD OF REVIEW

21. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[43] Where no genuine issues of material fact exist and further inquiry regarding the facts is not necessary in order to decide that the movant is entitled to judgment as a matter of law, summary judgment is appropriate.[44] The moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact.[45] "[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial."[46] This obligation is particularly strong when the non-moving party bears the burden of proof.[47] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff."[48] In considering a motion for summary judgment, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party.[49]

## LEGAL ARGUMENT

---

[43] Fed. R. Civ. P. 56(a).
[44] *Pachaly v. City of Lynchburg*, 897 F.2d 723, 725 (4th Cir. 1990); *De Leon v. St. Joseph Hosp., Inc.*, 871 F.2d 1229, 1233 (4th Cir. 1989).
[45] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[46] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (internal citations and quotations omitted).
[47] *Celotex Cor*p., 477 U.S. at 323.
[48] *Anderson*, 477 U.S. at 252.
[49] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

22. At the motion to dismiss stage, the Court explained in its *Order* that Plaintiff's allegations, if true, would support his claims of excessive force and gross negligence. However, Plaintiff has failed to support his allegations with anything other than his own self-serving testimony and allegations blatantly contradicted by video evidence. As such, summary judgment is warranted.

## I. EXCESSIVE FORCE

23. Plaintiff alleges the following instances of excessive force in his *Complaint* that Plaintiff alleges violated the West Virginia and the United States Constitutions by using excessive force: (1) Officer Peterson struck Plaintiff's motorcycle tire, causing Plaintiff to crash; (2) Officer Harvey used OCR spray; and (3) Officer Harvey stomped on Plaintiff's head.[50]

24. Plaintiff previously attempted to amend his *Complaint* and add, *inter alia*, an allegation that the Officers improperly drug him out of the water;[51] however, the Court denied Plaintiff's *Motion*.[52] Since the filing of his *Complaint*, Plaintiff also alleged, for the first time in his depositions, that he was kicked by one of the officers. Plaintiff has never sought leave of Court to amend his *Complaint* to add this allegation, and the deadline for amending his *Complaint* has long passed.[53] Accordingly, Plaintiff's allegations that he was kicked and improperly drug out of the water are not before the Court, and summary dismissal of the same is appropriate.

25. Defendants adopts by reference the first two paragraphs of page 11 of the Court's *Memorandum Opinion and Order* outlining the legal standard for excessive force claims.[54]

### A. OFFICER PETERSON DID NOT STRIKE PLAINTIFF'S MOTORCYCLE, AND PLAINTIFF CAN IDENTIFY NO CORROBORATING EVIDENCE TO THE CONTRARY

---

[50] Doc. 1 at Count II.
[51] Doc. 20.
[52] Doc. 22.
[53] *See* Doc. 34.
[54] Doc 16 at 11.

8

26. Plaintiff testified that he did not see Officer's vehicle make contact, but only felt a bump.[55] "Mere speculation, however, cannot create a genuine factual dispute, nor can the building of one inference upon another."[56] "[M]erely a self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment."[57] Plaintiff cannot sustain his claim on speculation and self-serving testimony and allegations.

27. In any event, Plaintiff has produced no evidence that Officer Peterson's vehicle made any contact with the motorcycle, and the positive evidence shows otherwise.[58] Sergeant J.W. Robinson with the West Virginia State Police investigated the scene of the crash shortly after it occurred. Sergeant Robinson testified that there was no evidence or damage indicating Officer Peterson made contact with Plaintiff's motorcycle.[59] Not only has Plaintiff failed to produce evidence of any contact, but also Plaintiff can produce no evidence that any contact was intentional. "[A] Fourth Amendment seizure [occurs] . . . when there is a governmental termination of freedom of movement through means *intentionally* applied."[60]

28. Plaintiff cannot show that Officer Peterson made any contact with the motorcycle, and even if he could, no evidence of intentional contact exists in the record. Defendant Peterson is entitled to summary judgment on Plaintiff's excessive force claim based on said alleged contact.

**B. OFFICER HARVEY'S USE OF OC SPRAY WAS OBJECTIVELY REASONABLE AND JUSTIFIED UNDER THE CIRCUMSTANCES**

---

[55] Pl's Test., Dep Tr. 95, 96, March 29, 2021, attached hereto as Ex.1.
[56] *DAG Petroleum Suppliers, L.L.C. v. BP P.L.C.*, 268 F. App'x 236, 242 (4th Cir. 2008) (citations and internal quotations omitted); *see Dash v. Mayweather*, 731 F.3d 303, 324 (4th Cir. 2013).
[57] *Williams v. Giant Food, Inc*., 370 F.3d 423, 433 (4th Cir. 2004) (citing *National Enters., Inc. v. Barnes*, 201 F.3d 331, 335 (4th Cir. 2000); *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996)).
[58] *See* ¶ 10 *supra*.
[59] Sgt. J.W. Robinson Test., Dep Tr. 51, June 3, 2021, attached hereto as Ex. 24.
[60] *Scott v. Harris*, 550 U.S. 372, 381, 127 S. Ct. 1769, 1776 (2007) (quoting *Brower v. County of Inyo*, 489 U.S. 593, 596-597, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989)).

29. As noted by this Court, reasonable use of force turns on "the information possessed by the officer at the moment that force is employed."[61] Courts must look to the totality of the circumstances surrounding a given claim and consider the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[62] The "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation."[63] Yet this analysis necessarily "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade by flight."[64]

30. The evidence beyond reasonable dispute shows that Plaintiff evaded the Officers by flight, resisted arrest, and failed to comply with the Officers' commands.[65] As discussed, the evidence shows that the Officers were reacting to a resistant, unknown, flight-prone individual who had already fled in a vehicle for an extended period of time, and whose armed/unarmed status they did not know. At the time, due to his improper registration, the Officers could not even ascertain his identity, which naturally raises a multitude of concerns, such as whether he has a criminal record, what that criminal record entails, whether any warrants exist for his arrest, and whether he may likewise be armed. The Officers did not know why he was fleeing or why he going to such great

---

[61] 637 F.3d 503, 507–08 (4th Cir. 2011).
[62] *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989).
[63] *Id*. at 396–397.
[64] *Id.*
[65] *See* ¶¶ 2–7, 11, 14, *supra*.

10

lengths (fleeing for a long distance and traversing a creek by raising his feet to the handlebars' height) to flee. Officer Harvey testified, "we don't know what he could have been reaching for under the water because he was reaching toward his waist band and pockets."[66] He testified that weapons are commonly concealed or hidden in waistbands or pockets.[67] For all Officer Harvey knew, any additional warning before using the short burst of spray "could readily cause such a warning to be his last."[68] Further, Officer Harvey did not know whether he would flee again. Therefore, Officer Harvey used a burst of OC spray to gain compliance with lawful commands. The spray appeared to have little effect on Plaintiff, and ambulance records do not indicate that he sought any treatment for the spray.

31. Considering that Plaintiff had fled police for an extended amount of time over a significant distance, that Plaintiff kept looking over his shoulder, that the motorcycle appeared to be stolen, that Plaintiff tried to discard a backpack, that Plaintiff plunged his hands under the muddy water toward his waistband, and that Plaintiff continued to resist Officer Peterson's attempt to secure his hands, Officer Harvey acted objectively reasonably by using a burst of OC spray.[69]

### C.  OFFICER HARVEY DID NOT STOMP ON PLAINTIFF'S HEAD

32. Defendants' forensic video expert has slowed down the video and zoomed in to see whether Officer Harvey stomped on Plaintiff's helmeted head.[70] The slowed-down, zoomed-in video

---

[66] Harvey Test., Dep. Tr. 130, attached hereto as Ex. 13.
[67] *Id.* at 27.
[68] *See McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994).
[69] *See* Case Report at 8, attached hereto as Ex. 2; Peterson Test., Dep. Tr. 204–205, attached hereto as Ex. 5.
[70] The Court can consider expert testimony at summary judgment phase without ruling on admissibility of the same. *See Statoil USA Onshore Props. v. Pine Res., LLC*, No. 2:14-cv-021169, 2017 U.S. Dist. LEXIS 92786, at *5 n.2 (S.D. W. Va. June 16, 2017) (considering expert opinions at the summary judgment phase without addressing admissibility under the Federal Rules of Evidence). Videos prepared by David Notowitz, Defendant's audio/video expert disclosed on July 1, 2021, and attached hereto as Ex. 19; *see* CV of David Notowitz, forensic audio, video, and digital evidence expert, attached hereto as Ex. 20.

blatantly contradicts Plaintiff's claim that Officer Harvey stomped on his head. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."[71]

33. Officer Harvey did not stomp on Plaintiff's head, which is corroborated by Officer Harvey's testimony that he denies stomping on Plaintiff's head and that he merely stepped over him, as well as Plaintiff's testimony, in which Plaintiff states he does not remember being stomped on.[72] Moreover, Defendant's biomechanical expert, Timothy Joganich, M.S., C.H.F.P., has analyzed the video and concluded that Officer Harvey did not stomp on Plaintiff's head.[73] The video unequivocally shows that Officer Harvey bent over and stepped over Plaintiff's helmeted head without making contact.[74] As the video demonstrates and consistent with biomechanics and kinematics, Officer Harvey's movements are consistent with him stepping over Plaintiff, not stomping on his head.[75]

34. As verified by Officer Harvey's testimony and Defendants' biomechanical and video experts, Plaintiff has produced no evidence outside his own uncorroborated testimony that he was kicked or stomped on. The video blatantly contradicts Plaintiff's claim.[76] Accordingly, the Officers are entitled to summary judgment on Plaintiff's excessive force claim based on the alleged stomp.

---

[71] *See Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686, (2007); *Hupp v. Cook*, 931 F.3d 307, 315 n.3 (4th Cir. 2019); *Brown v. Santiago*, No. 2:19-cv-00571, 2021 U.S. Dist. LEXIS 41800, at *12-13 (S.D. W. Va. Mar. 5, 2021).
[72] Pl's Test., Dep. Tr. 32, March 29, 2021, attached hereto as Ex. 1; Harvey Test., Dep. Tr. 119, 123, 126, attached hereto as Ex. 13
[73] *See* Report of Timothy Joganich, MS, CHFP, attached hereto as Ex. 21.
[74] *Id.* at 7.
[75] *Id.* at 8.
[76] In *Scott v. Harris*, 550 U.S. 372 (2007), the United States Supreme Court reprimanded a Court of Appeals for finding a question of fact in the plaintiff's version of events and failing to instead rely on a video that captured the subject police chase. *Id.* at 378, 380–381 (The videotape quite clearly contradicts the version of the story told by

### D. OFFICERS HARVEY AND PETERSON PROPERLY REMOVED PLAINTIFF FROM THE WATER AND CARRIED HIM TO SAFETY

35. In addition to the reasons discussed above,[77] Plaintiff's allegation that he was improperly moved out of the water, or "dragged across the railroad tracks," fails for lack of legal and evidentiary support. Both Officers testified that they moved Plaintiff out of the water to flat land free from danger of the train tracks or any traffic. The video of the incident shows no "dragging across the railroad tracks." It is undisputed that Plaintiff asked the Officers to remove him from the water for his fear of drowning.[78] Plaintiff's putative expert, Roy Taylor, testified that moving him from the water "wasn't intended to be a use of force."[79] Again, Plaintiff's excessive force must depend on a termination of freedom of movement through a means *intentionally* applied.[80] Here, the video does not show any improper moving of Plaintiff; Plaintiff asked to be moved from the water; and Plaintiff's own putative expert agrees that no force was intentionally applied here. Therefore, the Officers are entitled to summary judgment on Plaintiff's excessive force claim that he was improperly moved.

### E. OFFICERS HARVEY AND PETERSON DID NOT KICK PLAINTIFF

36. In addition to the reasons discussed above,[81] Plaintiff's claim that he was kicked fails for lack of legal and evidentiary support. As noted, Plaintiff can produce nothing but his own self-serving testimony to show that he was kicked. The video does not show a kicking; the EMS report

---

respondent and adopted by the Court of Appeals. . . . The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.").

[77] *See* ¶ 24 *supra*.

[78] Pl's Test., Dep. Tr. 105, March 29, 2021, attached hereto as Ex. 1; Peterson Test., Dep. Tr. 215, attached hereto as Ex. 5.

[79] Taylor Test., Dept. Tr. 146, attached hereto as Ex. 18.

[80] *Scott v. Harris*, 550 U.S. 372, 381, 127 S. Ct. 1769, 1776 (2007) (quoting *Brower v. County of Inyo*, 489 U.S. 593, 596-597, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989)).

[81] *See* ¶ 24 *supra*.

mentions no injury from kicking; no medical record mentions any kicking. Plaintiff cannot identify

who kicked him because he saw no one kick him. Speculation and self-serving, uncorroborated

testimony do not defeat summary judgment. The Officers are thus entitled to summary judgment

on Plaintiff's excessive force claim based on the alleged kick.

## II.   QUALIFIED IMMUNITY

37. Defendants adopt by reference the qualified immunity standard iterated on pages 10 and

12 of the Court's *Memorandum Opinion and Order*.[82] As qualified immunity is "an immunity from

suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted

to go to trial."[83]

38. The United States Supreme Court has explained that, even if an officer uses excessive

force, he may still be entitled to qualified immunity if the officer mistakes what force is lawfully

allowed under the circumstances.[84] Thus, as distinguished by the United States Supreme Court,

even if a court determines that an officer used un-permitted, excessive force, that officer is entitled

to a qualified immunity defense so long as "the law did not put the officer on notice that his conduct

would be clearly unlawful."[85]

### A.   THE ALLEGED PIT MANEUVER VIOLATED NO CLEARLY ESTABLISHED LAW UNDER THE CIRCUMSTANCES

39. As discussed, Plaintiff has failed to prove that Peterson's vehicle made any contact with

the motorcycle. Assuming *arguendo* that there was contact, Plaintiff cannot show that it was

intentional as any excessive force claim requires. Assuming *arguendo* that there was intentional

---

[82] Doc. 16 at 10, 12; *see* Fed R. Civ. P. 10(c).
[83] *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis removed).
[84] *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019).
[85] *See Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

contact, Officer Peterson's actions violated no clearly established law and were carried out in accordance with *Scott v. Harris*.

40. Under *Scott*, "[a] police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death."[86] The Supreme Court clarified: "We are loath to lay down a rule requiring the police to allow fleeing suspects to get away whenever they drive so recklessly that they put other people's lives in danger."[87]

41. The Fourth Circuit has applied *Scott* to a case involving pursuit of a motorcycle. In *Abney v. Cole*, the Fourth Circuit reversed a district court's denial of summary judgment, finding that an officer was justified in ramming the motorcycle as the motorcycle posed a danger to the public by fleeing police. The Court explained:

> This case is similar to *Scott*. Indeed, plaintiff's opening brief stated as much: "The *Harris* case is very similar to this matter." In both cases, a motorist refused to stop for police after committing a routine traffic violation; the police pursued the motorist; the motorist employed various tactics to escape capture thereby endangering other motorists and bystanders; a law enforcement officer terminated the chase; and the motorist was injured. The fact that, unlike Scott, Abney did not accelerate to 85 miles-per-hour is not dispositive; indeed, the narrow, winding, two-lane roads in this case all but prohibited such speeds. The fact that Abney was driving during the day and Harris "in the dead of the night," *Scott*, 127 S. Ct. at 1775, means only that Abney had the opportunity to scare more motorists to death. Similarly, the fact that Abney was driving a motorcycle, rather than a car, does not require a different result since the probability that a motorist will be harmed by a Precision Intervention Technique is high in either circumstance. See *Scott*, 127 S. Ct. at 1778 (holding that although Deputy Scott clearly "posed a high likelihood of serious injury or death to [Harris]" that risk was justified by the possibility that innocent bystanders or motorists might be killed). In accordance with *Scott v. Harris*, 127

---

[86] *Scott v. Harris*, 550 U.S. 372, 374, 127 S. Ct. 1769, 1772 (2007); *Abney v. Coe*, 493 F.3d 412, 417 (4th Cir. 2007).
[87] *Scott*, 550 U.S. at 385–386.

S. Ct. 1769, 167 L. Ed. 2d 686 (2007), we hold that Deputy Coe's "attempt to terminate a dangerous . . . car chase that threaten[ed] the lives of innocent bystanders d[id] not violate the Fourth Amendment, even [though] it place[d] the fleeing motorist at risk of serious injury or death." [88]

42. In the case *sub judice*, it is beyond genuine dispute that the pursuit lasted approximately 12 minutes over approximately 12 miles at an average speed of 57 miles per hour in a 25 mile-per-hour zone. Plaintiff crossed onto the left side of the road in blind curves endangering any oncoming traffic, ran stop signs, swerved to miss a dog, was losing parts from his motorcycle, tried to take off his backpack while driving, drove part of the pursuit with his feet as high as the handlebars, and drove around corners with his foot on the ground. The Case Report plainly states that, "[i]f there were any vehicles on the other side of the turn, he would have struck them."[89] Plaintiff posed a danger to the public. As such, the alleged PIT maneuver, if used by Peterson, was proper under *Scott* and *Abney*. Officer Peterson is therefore entitled to qualified immunity.

## B. OFFICER HARVEY'S USE OF OC SPRAY COMPLIED WITH THE LAW

43. As this Court noted in its *Order*, if Plaintiff was incapacitated and motionless when Officer Harvey used pepper spray, such use of force may be deemed excessive under *Brockington*. However, as discussed, Plaintiff was not motionless, but was actively resisting and even reaching for his waistband. Officer Harvey acted objectively reasonable under the circumstances, especially considering the use of harsher force has been found justified in similar scenarios, such as where police shot a man who lowered his hands and reached toward his back pocket but only to turn off

---

[88] *Abney v. Coe*, 493 F.3d 412, 417–18 (4th Cir. 2007).
[89] Case Report at 12, attached hereto as Ex. 2; Harvey Test., Dep. Tr. 70, 81, 104, 158, attached hereto as Ex. 13.

a Walkman radio.[90] Defendant Harvey is entitled to qualified immunity for any claim based on his use of OC (pepper) spray.

### C.  THE ALLEGED STOMP VIOLATED NO CLEARLY ESTABLISHED LAW

44. Assuming *arguendo* that Officer Harvey's foot made any contact with Plaintiff's helmet, there is a dearth of evidence that Harvey used any force. In other words, even assuming contact, there was no "stomp." Plaintiff testified he remembers the incident but does not remember being stomped on. Defendants' biomechanical expert, Mr. Joganich, has opined that "Officer Harvey's bent over posture throughout the video . . . would not have allowed him to stomp on Mr. Means' head in a forceful manner."[91] Plaintiff's allegation and evidence is blatantly contradicted. It is axiomatic that, without a showing of force, Plaintiff cannot sustain his excessive force claim based on the unsupported stomping allegation. Officer Harvey is therefore entitled to qualified immunity.

### D.  CARRYING PLAINTIFF OUT OF THE WATER RESULTED IN NO DEPRIVATION OF CONSTITUTIONAL RIGHTS AND VIOLATED NO CLEARLY ESTABLISHED LAW

45. As discussed, Plaintiff does not dispute that he requested to be moved out of the water for fear of drowning. As such, Defendant Officers did not terminate his freedom as their actions were requested by Plaintiff. Further, as discussed, Plaintiff's putative expert, Mr. Taylor, agrees that the Officers' movement of Plaintiff from the water was not an intentional use of force. Officer Harvey had no reason to believe he had a spinal cord injury at this time,[92] and Plaintiff had not yet told the Officers he could not feel his legs. As such, the Officers' actions did not deprive Plaintiff of a constitutional right and could not have violated any clearly established law as their actions do not amount to excessive force as a matter of law. The Officers are entitled to qualified immunity.

---

[90] *Anderson v. Russell*, 247 F.3d 125, 127 (4th Cir. 2001).
[91] Report of Timothy Joganich at 7, attached hereto as Ex. 21.
[92] Harvey Test., 128–129, attached hereto as Ex. 13.

17

### E. THE ALLEGED KICK DID NOT VIOLATE ANY CLEARLY ESTABLISHED LAW

46. As discussed, Plaintiff has not substantiated his claim that he was kicked with any evidence in the record. Even if he could corroborate this allegation, Plaintiff has not identified which officer kicked him and did not see anyone kick him.[93] Plaintiff cannot support his claim with speculation. Nonetheless, the evidence shows that Plaintiff was actively resisting Officer Peterson in the water as discussed and even when Officer Harvey was trying to cuff him.[94] The Officers had no reason to believe he had a spinal cord injury at the time.[95] Accordingly, Plaintiff cannot establish that the alleged kick violated a clearly established law. Officer Harvey and Officer Peterson are entitled to qualified immunity.

### III. OFFICER PETERSON'S ACTIONS WERE NEITHER GROSSLY NEGLIGENT NOR RECKLESS

47. Under the pertinent portion of the Tort Claims Act, Officer Peterson is immune from liability unless his acts were with malicious purpose, in bad faith, or in a wanton or reckless manner.[96] Plaintiff alleges a state gross negligence and recklessness claim against Officer Peterson in Count I.[97]

48. Under West Virginia law, "gross negligence" is synonymous with "reckless disregard."[98] Reckless is defined as:

> that the actor has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to the consequences, amounting almost

---

[93] Pl's Test., 99–100, March 29, 2021, attached hereto as Ex.1.
[94] Harvey Test., 128, attached hereto as Ex.13.
[95] *Id.* at 128–129, attached hereto as Ex. 13.
[96] W. Va. Code § 29-12A-5(b).
[97] Doc. 1.
[98] *Peak v. Ratliff*, 185 W. Va. 548, 552 n.4, 408 S.E.2d 300, 304 (1991); *Sergent v. City of Charleston*, 209 W. Va. 437, 443 n.15, 549 S.E.2d 311, 317 (2001).

to willingness that they shall follow; and it has been said that this is indispensable.[99]

49. What's left of Plaintiff's Count I fails as a matter of law because, as discussed, Plaintiff lacks evidence for these allegations, the positive evidence disproves these allegations, and assuming these allegations could be proven, Officer Peterson's conduct is privileged[100] and authorized under *Scott v. Harris* and *Abney v. Coe*.

50. Addressing Plaintiff's allegations in Count I, Plaintiff has offered no corroborating evidence that Peterson was following too close and made contact with his motorcycle.[101] Plaintiff has offered no evidence whatsoever that any contact was intentional. Plaintiff testified that he does not recall whether Officer Peterson had turned on his lights. Officer Peterson testified and wrote in the Case Report that he did turn on his lights; as such, Officer Peterson was authorized under W. Va. Code § 17C-2-5(b) to exceed the speed limit (as Plaintiff was) and ignore traffic signs (as Plaintiff did) in his attempt to stop Plaintiff.  Officer Peterson is entitled to summary judgment on Count I.

## IV. UNDER W. VA. CODE § 55-7-13d, PLAINTIFF CANNOT RECOVER DAMAGES BECAUSE HE WAS INJURED DURING THE COMMISSION OF AND AS PROXIMATE RESULT OF FELONIES

51. Under W. Va. § 55-7-13d(c)–(d), Plaintiff cannot recover if his damages arise from his felonious conduct.[102] The parties have conducted extensive discovery, and it is now beyond genuine dispute that Plaintiff's commission of felonies—fleeing with reckless indifference and under the influence—caused his injury. For the May 2, 2020, incident, Plaintiff has been indicted

---

[99] *Holsten v. Massey*, 200 W. Va. 775, 788, 490 S.E.2d 864, 877 (1997).
[100] *See Hutchinson v. W. Va. State Police*, 731 F. Supp. 2d 521, 547 (S.D. W. Va. 2010).
[101] *See* ¶ 10 *supra*.
[102] W. Va. Code § 55-7-13d.

and charged felonies of fleeing with reckless indifference under W. Va. Code § 61-5-17(f) and fleeing while driving under the influence under W. Va. Code § 61-5-17(j).[103] Plaintiff thus cannot recover under state law.

### V.    PUNITIVE DAMAGES

52. Because Plaintiff can show no excessive force, recklessness, or gross negligence, Plaintiff's punitive damages claim fails.[104] Further, Plaintiff has established no intentional, and therefore no malicious, conduct on part of Defendants to warrant any punitive damages. Plaintiff is not entitled to punitive damages under West Virginia or federal law.[105]

### CONCLUSION

53. Defendant Officers are entitled to qualified immunity, statutory immunity, and summary judgment on the entirety of Plaintiff's remaining claims. Defendant Officers move the Court to grant the *Motion for Summary Judgment* and dismiss Plaintiff's claims with prejudice.

**E.M. PETERSON and
D. HARVEY,
By Counsel,**

*/s/ Duane J. Ruggier II*
**DUANE J. RUGGIER II (WVSB #7787)
EVAN S. OLDS (WVSB #12311)**

**PULLIN, FOWLER, FLANAGAN,
BROWN & POE, PLLC**
901 Quarrier Street
Charleston, West Virginia 25301
304-344-0100

---

[103] *See* Exs. 8–11 attached hereto.

[104] *Barnette v. Equifax, Inc*., No. 2:18-cv-01348, 2019 U.S. Dist. LEXIS 229480, at *20 (S.D. W. Va. Dec. 12, 2019) ("West Virginia does not recognize a standalone claim for punitive damages. The right to recover punitive damages in any case is not the cause of action itself, but a mere incident thereto. Thus, a plaintiff must have sustained an injury and be awarded compensatory damages therefor before he/she may receive an award of punitive damages.") (citing *Cruse v. Frabrizio*, 2014 U.S. Dist. LEXIS 90997, 2014 WL 3045412, at *13 (S.D. W. Va. July 2, 2014)).

[105] W. Va. Code § 29-12A-7(a) *Helmbright v. Davis*, Civil Action No. 5:04CV69, 2006 U.S. Dist. LEXIS 100481, at *20 (N.D.W. Va. Jan. 20, 2006) ("Punitive damages cannot be awarded against municipalities or official capacity defendants.").

**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**

**WILLIAM ALLEN MEANS,**

       **Plaintiff,**

**v.**                                 **Civil Action No.: 2:20-561**

**E.M. PETERSON, D. HARVEY, and
THE CITY OF SOUTH CHARLESTON,**

       **Defendants.**

## CERTIFICATE OF SERVICE

The undersigned, counsel of record for Defendants, do hereby certify on this 12th day of July, 2021, that a true copy of the foregoing "***Defendant's Memorandum of Law in Support of its Motion for Summary Judgment***" was filed with the Clerk via the court's CM-ECF Filing System which will provide electronic notification to the following counsel of record:

L. Dante' diTrapano, Esq.
Alex McClaughlin, Esq.
Benjamin D. Adams, Esq.
Calwell Luce diTrapano PLLC
500 Randolph Street
Charleston, West Virginia 25302
*Counsel for Plaintiff*

W. Jesse Forbes, Esq.
Forbes Law Firm, PLLC
1118 Kanawha Boulevard, East
Charleston, West Virginia 25301
*Co-Counsel for Plaintiff*

*/s/Duane J. Ruggier II*
**DUANE J. RUGGIER II (WVSB #7787)
EVAN S. OLDS (WVSB #12311)**

**PULLIN, FOWLER, FLANAGAN,**
**BROWN & POE, PLLC**
901 Quarrier Street
Charleston, West Virginia 25301